## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ATS TREE SERVICES, LLC, <br><br> Plaintiff, <br><br> v. <br><br> FEDERAL TRADE COMMISSION; LINA M. KHAN, in her official capacity as Chair of the Federal Trade Commission; and REBECCA KELLY SLAUGHTER, ALVARO BEDOYA; ANDREW N. FERGUSON, and MELISSA HOLYOAK, in their official capacities as Commissioners of the FTC, <br><br> Defendants. | **No.** 2:24-cv-1743 |

### COMPLAINT

1.      Created in 1914 as an adjudicative agency, the Federal Trade Commission ("FTC") was established to prevent the use of unfair methods of competition and unfair or deceptive trade practices. When it was founded, the FTC lacked the power to issue legislative rules—rules that regulate the conduct of individuals and companies and have the force of law. Instead, the FTC adjudicated on a case-by-case basis through a hearing whether a competition method or business practice was unfair. It was not until 1975 that Congress empowered the FTC to issue legislative rules, and then only with respect to unfair or deceptive acts or practices. Congress has never authorized the FTC to issue legislative rules concerning purported unfair methods of competition.

2.      Nevertheless, by a 3-2 vote on April 23, 2024, the FTC cast off its statutory and constitutional restraints and unilaterally declared non-compete agreements nationally to be unfair and therefore banned.

3.      Although Congress has declined to outlaw non-compete agreements, the FTC now asserts a roving power to prohibit by legislative rule any business arrangement that any three Commissioners deem "unfair," even where such arrangements are legal under state law.

4.      Non-compete agreements are a common feature of employment relationships that allow employers to provide valuable training to employees or provide them with access to proprietary information while minimizing the risk that employees will leave their jobs and use their new skills and newly acquired information to benefit a competitor.

5.      Non-compete agreements are legal and regulated in 46 states, and Pennsylvania, where Plaintiff ATS Tree Services, LLC ("ATS") does business, is one such state.

6.      ATS uses reasonable non-compete agreements to ensure that it can provide its employees with necessary and valuable specialized training while minimizing the risk that employees will leave and immediately use that specialized training and ATS's confidential information to benefit a competitor.

7.      ATS's non-compete agreements benefit both ATS and its employees: The employees receive invaluable training that will last them a lifetime, and ATS is able to hire individuals who are committed to learning the skills necessary to become effective and experienced tree care specialists without fear that those specialized skills will be immediately transferred to a competitor.

8.      The FTC's non-compete agreement ban is unlawful, senseless, and itself unfair. It treats employees as though they are not competent to understand their own interests and powerless to control their own destinies. It treats employers as behaving coercively and exploitatively, rather than negotiating with their employees in good faith. It usurps the authority of states to establish their own laws concerning contracts. And it ignores that only Congress can make the law under

our constitutional system. As a result, it will harm both small businesses who need skilled workers and workers who need skill development.

9.     The FTC's ban on non-compete agreements must be set aside as unconstitutional and contrary to law to avoid the significant harm it will impose on ATS and other small businesses.

## PARTIES

10.     Plaintiff ATS Tree Services, LLC, is a tree service company that resides in Perkasie, Pennsylvania. ATS uses non-compete agreements with its employees.

11.     Defendant Federal Trade Commission is an agency of the United States headquartered in Washington, D.C.

12.     Defendant Lina M. Khan is Chair of the Federal Trade Commission and is being sued in her official capacity.

13.     Defendant Rebecca Kelly Slaughter is a Commissioner of the Federal Trade Commission and is being sued in her official capacity.

14.     Defendant Alvaro Bedoya is a Commissioner of the Federal Trade Commission and is being sued in his official capacity.

15.     Defendant Andrew N. Ferguson is a Commissioner of the Federal Trade Commission and is being sued in his official capacity.

16.     Defendant Melissa Holyoak is a Commissioner of the Federal Trade Commission and is being sued in her official capacity.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper under 28 U.S.C. § 1331 because this action arises under the Administrative Procedure Act. 5 U.S.C. § 701, *et seq*., and the Constitution of the United States.

18.     Plaintiff's claims for declaratory and injunctive relief are authorized by the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201–02), the Administrative Procedure Act (5 U.S.C.

§§ 705, 706(2)), Federal Rules of Civil Procedure 57 and 65, and by the legal and equitable powers of this Court.

19.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(e) because ATS resides in Perkasie, Pennsylvania, which is within this judicial district, and defendants include a United States agency and officers sued in their official capacities.

**BACKGROUND**

**A.  Federal Trade Commission Act**

20.     The Federal Trade Commission Act declares all "[u]nfair methods of competition" and "unfair or deceptive acts or practices in or affecting commerce" to be "unlawful." 15 U.S.C. § 45(a)(1).

21.     The FTC can enforce this command through individual adjudications, which is the FTC's exclusive mechanism to prevent unfair methods of competition. 15 U.S.C. § 45(b).

22.     The FTC is also authorized to "make rules and regulations for the purpose of carrying out" these adjudications. 15 U.S.C. § 46(g).

23.     To initiate an adjudication, the FTC serves a complaint on a person or entity it believes to be engaging in an unfair method of competition or an unfair or deceptive act or practice. 15 U.S.C. § 45(b).

24.     A hearing is then held by the FTC on the allegations in the complaint and, if the respondent is found to have violated section 45(a), the FTC issues a cease and desist order. *Id.*

25.     The respondent can seek review of a cease-and-desist order in a U.S. court of appeals where the "method of competition or act or practice" was used or where the respondent "resides or carries on business." 15 U.S.C. § 45(c).

26.     Violations of cease-and-desist orders can incur fines that—if regarding unfair methods of competition—can be recovered through a civil action brought by the Attorney General of the United States. 15 U.S.C. § 45(l).

27.     When the FTC was established in 1914, it was understood to function as an adjudicative body that did not possess the authority to make substantive rules.

28.     The Supreme Court affirmed that understanding in 1935 when it distinguished between the National Industrial Recovery Act's delegation of rulemaking authority regarding fair competition and the FTC's more limited adjudication authority in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532–33 (1935).

29.     Congress considered granting the FTC substantive rulemaking authority when the FTC was created in 1914 but rejected that proposal.

30.     In 1975, Congress authorized the FTC to make legislative rules for regulating "unfair or deceptive acts or practices" in the Magnuson-Moss Warranty—Federal Trade Commission Improvements Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975).

31.     The FTC's new legislative rulemaking authority did not include unfair methods of competition. 15 U.S.C. § 57a.

32.     Despite possessing no legislative rulemaking authority from Congress for unfair methods of competition, the FTC issued a rule banning non-compete agreements nationally as purported unfair methods of competition.

### B.  Non-Compete Agreements

33.     A non-compete agreement is a contract—frequently between an employer and an employee or another type of worker—that restricts the ability of the signee to work for a competitor if the signee ceases working for the employer or to operate a competing business if the signee is selling his business.

34.     Non-compete agreements are widely used in the United States with an estimated "one in five American workers—or approximately 30 million workers—[] bound by a non-compete clause." 88 Fed. Reg. 3482, 3485 (Jan. 19, 2023) (the "Proposed Rule").

35.     Reasonable non-compete agreements in certain forms have been permissible in English common law since the early 1700s and that approach carried over into American common law. *See, e.g.*, *Mitchel v. Reynolds*, 24 Eng. Rep. 347 (1711) (QB) (non-compete agreement between lessor of a bakery and the lessee); *Pierce v. Fuller*, 8 Mass. 223 (1811).

36.     Currently, non-compete agreements are permissible and subject to statutory or common law regulation in 46 states; only California, Minnesota, North Dakota, and Oklahoma have effectively outlawed the use of non-compete agreements.

37.     Non-compete agreements are generally used to protect certain business interests, including trade secrets, training, clients, or customer goodwill, the value of which could be undermined or eliminated if the employee or other worker left and took that information or experience immediately to a direct competitor.

38.     Alternatives to non-compete agreements such as non-disclosure agreements protecting confidential information or non-solicitation agreements protecting client relationships are of more limited utility because the employee can go immediately to a direct competitor with all the critical information, training, or relationships, and they are difficult to enforce should litigation become necessary.

39.     The restrictions in non-compete agreements often only apply for a reasonable period of time and within a limited geographic area.

40.     What is "reasonable" has long been governed by state common law.

41.     For example, in Pennsylvania, non-compete agreements are enforceable where "supported by adequate consideration," "reasonably limited in duration and geographic extent," and "designed to protect the legitimate interests of the employer." *Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*, 665 Pa. 496, 519–20 (2021).

42.     Moreover, lawmakers in various states have enacted statutory restrictions on the use of non-compete agreements.

43.     For example, Texas requires that non-compete agreements "contain[] limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee," and the legislature imposed additional requirements where licensed Texas physicians are involved. Tex. Bus. & Com. Code § 15.50(a) and (b).

44.     Non-compete agreements can be particularly valuable to small businesses, who could easily have their employees or other workers taken by larger or more established competitors, and with them the small business's proprietary information and investments in those employees.

**C.  Initial Proposal to Ban Non-Compete Agreements**

45.     On January 19, 2023, the FTC published a proposed rule banning non-compete agreements nationally. 88 Fed. Reg. 3482.

46.     In support of the Proposed Rule, the FTC made a preliminary determination that non-compete agreements are unfair methods of competition based on the following findings:

  a.  "[N]on-compete clauses are restrictive conduct that negatively affects competitive conditions;"

  b.  "[N]on-compete clauses are exploitative and coercive at the time of contracting" "[f]or workers who are not senior executives;"

    c.   [N]on-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer" "[f]or workers who are not senior executives;" and

    d.   Non-compete clauses have "demonstrable effects on competition in both labor markets and markets for products and services." 88 Fed. Reg at 3500, 3504.

47.    But the FTC's preliminary finding that all non-compete agreements are unfair methods of competition is belied by certain facts cited by the FTC in the Proposed Rule.

48.    Courts have generally found non-compete agreements do not violate federal antitrust laws.

49.    The FTC identified only 17 cases in which non-compete agreements were challenged as violations of section 1 of the Sherman Act—which makes "contract[s] ... in restraint of trade" illegal, 15 U.S.C. § 1—"or an analogous provision in a state antitrust statute," and 15 of those 17 challenges failed, 88 Fed. Reg. at 3496.

50.    In the Proposed Rule, the FTC only references three enforcement actions it brought against the use of non-compete agreements, despite its view that all non-compete agreements are unfair and unlawful. 88 Fed. Reg. at 3498. And only one more consent decree regarding non-compete agreements has been agreed to since the Proposed Rule was published. *See* FTC, *In the Matter of Anchor Glass Container Corp. et al.*, FTC File No. 2210182 Analysis of Agreement Containing Consent Order to Aid Public Comment (Mar. 15, 2023).

51.    The FTC references only four merger review settlements that included provisions restricting the use of non-compete agreements. *Id.* at 3498–99.

52.    Finally, according to studies cited by the FTC, non-compete agreements have been demonstrated to have a positive impact on employee training and investment. *Id.* at 3493.

**D.  Final Rule Banning Non-Compete Agreements**

53.     The FTC voted to issue the final rule banning non-compete agreements on April 23, 2024. Fed. Trade Comm'n, *Non-Compete Clause Rule*, RIN3084-AB74 (Apr. 23, 2024) (the "Final Rule") *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/noncompete-rule.pdf.

54.     The same day, the FTC posted the text of the Final Rule on its website. *Id.*

55.     The FTC claims authority to promulgate the Final Rule under 15 U.S.C. §§ 45 and 46(g). *Id.* at 561.

56.     The FTC "f[ound] that non-competes with all workers are an unfair method of competition." *Id.* at 104.

57.     The Final Rule declares it to be an unlawful unfair method of competition to "enter into or attempt to enter into," "enforce or attempt to enforce," or "represent that [a] worker is subject to" a non-compete agreement. *Id.* at 564.

58.     It applies to any "worker," a term the FTC broadly defines as any "natural person," "whether paid or unpaid" who is an "employee, independent contractor, extern, intern, volunteer, apprentice, or a sole proprietor who provides a service," but excludes franchisees. *Id.* at 563–64.

59.     A non-compete agreement is defined as any "term or condition of employment" that "prohibits a worker from, penalizes a worker for, or functions to prevent a worker from" taking a new job or operating a business after the conclusion of the worker's current employment. *Id.* at 562.

60.     The Final Rule makes an exception for the continued enforcement of existing non-compete agreements with senior executives. *Id.* at 564.

61.     The Final Rule also exempts non-compete agreements that are part of the bona fide sale of a business entity, an "ownership interest in a business entity" or "all or substantially all of a business entity's operating assets." *Id.* at 567.

62.     Additionally, the Final Rule requires that employers give notice by the Final Rule's effective date that they will no longer enforce any existing non-compete agreement against a worker who is not a senior executive and provides model language for that notice. *Id.* at 564–67.

63.     The Final Rule "supersedes" state statutory and common law that permits the use of non-compete agreements in circumstances covered by the Final Rule. *Id.* at 567.

64.     The Final Rule will go into effect 120 days after its publication in the Federal Register. *Id.* at 568.

**E.  Injury to ATS Tree Services, LLC**

65.     ATS is a professional tree service company that serves residential, commercial, industrial, and municipal clients in Bucks County, Pennsylvania.

66.     ATS grew out of a sole proprietorship founded by Adam Servin in 2014.

67.     Mr. Servin operated and grew his sole proprietorship and then ATS while also working a full-time job as a mechanical technician.

68.     ATS provides a variety of tree care services, including tree trimming and removal, tree preservation, emergency responses to storm damage, and the preparation of tree management plans.

69.     The tree care ATS is engaged in requires specialized skills that are developed through extensive training and internal and third-party certifications to ensure that the trees are properly cared for and that limbs or entire trees can be safely removed without unnecessary risk to ATS's crew or other people and property in the area.

70.     ATS is known in its community for its tree care expertise, and it is regularly called upon by other tree care companies to assist with technically difficult tree removals.

71.     ATS currently employs 12 people, including skilled tree climbers.

72.     ATS also employs an estimator, who maintains extensive proprietary knowledge of ATS's pricing structure, clients, and overall business strategy.

73.     ATS's estimator also interacts directly with many of ATS's clients and can develop a relationship with those clients that is an important component of customer goodwill towards ATS.

74.     ATS hires full-time employees—not independent contractors—to whom it provides a good wage and benefits.

75.     ATS's employees receive significant specialized training to ensure they have the skills to operate at ATS's high level of technical expertise and in accordance with the ATS-specific methods and processes ATS has developed over its 10 years in operation to offer customers quality tree care service at a competitive price.

76.     ATS provides its employees the opportunity to apprentice for five different roles within the company, including arborist, bucket operator, and tree climber.

77.     Each apprenticeship includes specialized training at ATS's expense to help the employee develop the skills necessary for the role and any methods unique to ATS for fulfilling that role.

78.     For example, tree climbing is a technical skill that requires the climber to use ropes and specialized devices to climb a tree and then use technical rigging to lower limbs that are trimmed from the tree.

79.     ATS invests great attention and thousands of dollars in specialized climber training, including individual technical climbing gear and on-the-job climbing training with ATS's certified climbers, so that those interested employees can be certified as a master climber.

80.     ATS also considers all the employees it hires to be potential crew leaders—the highest rank in the company among its skilled employees—and works to develop each employee to attain that position.

81.     As part of ATS's overall training program, ATS pays for its employees' arborist certification, specialized equipment, and commercial driver's license.

82.     These are benefits that ATS employees can carry with them throughout their career.

83.     ATS considers its employees a part of the ATS family and is committed to helping them reach their full potential through its specialized training and other investments.

84.     Each employee is also trusted with proprietary information about ATS's business operations and clients.

85.     Because of the significant personal investment ATS makes in its employees and the proprietary business information it shares with them, ATS requires its employees to sign a reasonable non-compete agreement.

86.     In general, the agreement requires employees not to engage in the same type of work they performed at ATS at a competitor tree care service provider within the geographic area in which the employee worked while at ATS for one year after leaving ATS.

87.     ATS considers this mutual commitment between ATS and its employees— manifested in the non-compete agreement and ATS's specialized training and investment in its employees—to be a critical component of its internal operations and overall success in the tree-care industry and a benefit to both ATS and its employees.

88.     ATS would continue to use non-compete agreements with each new employee that it hires but for the Final Rule.

89.     After the FTC published its proposed rule, David Servin—ATS's chief financial officer, minority owner, and father of Adam Servin—submitted a comment opposing the FTC's proposed ban on non-compete agreements and explaining the negative impact the rule would have on ATS and the tree-care industry generally.

90.     Under the Final Rule, ATS cannot enforce its existing non-compete agreements with its current and former employees who have left within a year of the effective date and will not be able to use non-compete agreements with its employees going forward.

91.     The inability of ATS to enforce its non-compete agreements will irreparably harm ATS because ATS will lose a significant benefit of its agreed employment arrangement with its employees—the restriction on their ability to immediately leave for a direct competitor with ATS's specialized training and investment, as well as confidential information ATS has provided to them.

92.     ATS's competitors will be able to hire away ATS's employees and obtain the benefit of ATS's training and professional development investments immediately without having to make that investment themselves.

93.     Because of ATS's positive reputation in the local tree service industry, ATS's employees will be in high demand by its competitors.

94.     ATS's competitors will also be able to access ATS's proprietary business information by hiring away ATS's employees.

95.     These harms cannot be compensated monetarily.

96.     Without non-compete agreements, ATS will be restricted in its ability to provide the same level of training of and investment in its employees because there is no guarantee that the benefit ATS expected to receive back from its employees as a result of the specialized training and investment ATS provided will not be immediately transferred to a direct competitor.

97.     It is not reasonable or feasible financially for ATS to provide training in various tree-care skills, finance certifications and licenses, and otherwise invest in the professional development of its employees to the degree that ATS currently does if that investment will be immediately available to its competitors.

98.     Instead, ATS, like other tree companies, will be incentivized to hire away from its competitors the most skilled and experienced tree climbers that fit ATS's needs and do not require additional specialized training and investments.

99.     The infeasibility of continuing with ATS's current employee training and investment model will also harm the company's operational model and culture of mutual commitment between employer and employee that ATS is proud to have built and that it believes is a critical component of its success in the tree care industry.

100.    ATS seeks both a preliminary and permanent injunction of the Final Rule in order to avoid these harms.

## COUNT I: The FTC Does Not Have Statutory Authority to Promulgate Substantive Rules to Prevent Purported Unfair Methods of Competition

### (5 U.S.C. § 706(2))

101.    Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

102.    The Administrative Procedure Act directs a court to "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional ... power," or "in excess of statutory ... authority, or limitations." 5 U.S.C. § 706(2)(A), (B), (C).

103.    The FTC does not possess any statutory authority to promulgate substantive rules for "[u]nfair methods of competition."

104.    The FTC may only enforce the prohibition on the use of unfair methods of competition through cease-and-desist orders issued after individualized adjudications. 15 U.S.C. § 45(b).

105.    The FTC's power "to make rules and regulations for the purpose of carrying out" the business of the FTC, 15 U.S.C. § 46(g), does not authorize the promulgation of substantive rules regarding unfair methods of competition, but is limited to promulgating procedural rules.

106.    In 1975, Congress gave the FTC substantive rulemaking authority for "unfair or deceptive acts or practices"—but *not* "unfair methods of competition." This confirms the FTC's lack of substantive rulemaking authority for unfair methods of competition. 15 U.S.C. § 57a.

107.    The Final Rule is a substantive legislative rule that the FTC represents is directed at unfair methods of competition.

108.    The FTC only relies on 15 U.S.C §§ 45 and 46(g) as its statutory authority for the Final Rule. Final Rule, at 561.

109.    The Final Rule exceeds the FTC's statutory authority and is therefore invalid.

**COUNT II: The FTC's Ban on All Non-Compete Agreements Exceeds FTC's Statutory Authority to Prevent Methods of Competition That Are "Unfair."**

**(5 U.S.C. § 706(2))**

110.    Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

111.    The Administrative Procedure Act directs a court to "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional ... power," or "in excess of statutory ... authority, or limitations." 5 U.S.C. § 706(2)(A), (B), (C).

112.    The FTC Act only declares methods of competition that are "[u]nfair" to be "unlawful." 15 U.S.C. § 45(a)(1).

113.    The Final Rule exceeds the FTC's authorization to enjoin only methods of competition that are "unfair" by banning non-compete agreements nationally.

114.    Currently, 46 states permit and regulate the use of non-compete agreements.

115.    To declare all non-compete agreements to be "unfair" is an unlawfully capacious interpretation of the word in light of the existing state regulation of non-compete agreements and the justifications FTC provides in the Final Rule.

116.    The regulation of non-compete agreements is also a traditional area of state regulation.

117.    The displacement of this traditional area of state regulation requires clear authorization by Congress and that is lacking from the FTC's authority to police unfair methods of competition on a case-by-case basis. *See Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991).

118.    The FTC does not possess clear statutory authorization to displace state regulation of non-compete agreements, a traditional area of state regulation.

119.    Non-compete agreements are also an issue of "economic and political significance."

120.    One in five Americans are bound by non-compete agreements. Final Rule, at 14.

121.    Non-compete agreements are also the subject of proposed legislation in Congress and in many states.

122.    Regulation of an issue of "economic and political significance" such as non-compete agreements requires clear authorization from Congress. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).

123.   The regulation of non-compete agreements by the FTC—an agency traditionally responsible for regulating competition between businesses for the protection of consumers—goes beyond its traditional regulatory sphere.

124.   If Congress were to authorize the regulation of non-compete agreements—an employment relationship—the Department of Labor would be the natural agency to wield that rulemaking power.

125.   This "'discover[y] in a long-extant statute [of] an unheralded power'" of the FTC to regulate employment relationships "representing a 'transformative expansion in [its] regulatory authority'" also requires a clear authorization from Congress. *West Virginia*, 597 U.S. at 724.

126.   The FTC does not possess clear statutory authorization to ban such an economically and politically significant employment arrangement or to otherwise regulate employment relationships, which fall outside the FTC's traditional regulatory sphere.

127.   Interpreting the FTC Act to permit the FTC to ban non-compete agreements nationally also raises, at a minimum, a serious question of whether Congress has unconstitutionally delegated its legislative authority to the FTC, and the FTC Act should be interpreted to avoid that serious constitutional question. *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 174 (2001).

**COUNT III: Rendering Existing Non-Compete Agreements for Non-Senior Executives Unenforceable Is Arbitrary and Capricious**

**(5 U.S.C. § 706(2))**

128.   Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

129.    The Administrative Procedure Act directs the court to "hold unlawful" and "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

130.    The Final Rule requires that anyone who has entered into a non-compete agreement with a worker to give notice to the worker by the effective date of the Final Rule that the non-compete agreement is not enforceable and will not be enforced. Final Rule, at 564–65.

131.    The Final Rule upsets the prior contractual expectations of anyone who entered into non-compete agreements with employees or other workers with the understanding that the employers' training, investment, trade secrets, and other proprietary information would be protected from competitors through such agreements.

132.    Here, the Final Rule upsets the prior contractual expectations of ATS and its employees by permitting those employees to immediately leave ATS for a direct competitor with all the specialized training, investment, and confidential information ATS has provided to those employees with the expectation that such benefits would not immediately be transferred to a direct competitor—a secondary retroactive effect of the Final Rule.

133.    Because of this secondary retroactive effect, the rendering of existing non-compete agreements unenforceable for non-senior executives must be "reasonable" "both in substance and in being made retroactive." *U.S. AirWaves, Inc. v. F.C.C.*, 232 F.3d 227, 233 (D.C. Cir. 2000).

134.    A secondary retroactive effect that is unreasonable is arbitrary and capricious and must be set aside. *See id.*

135.    The FTC's consideration of the secondary retroactive effects of the Final Rule on the prior expectations of parties to existing non-compete agreements was insufficient for the FTC to have reasonably considered the secondary retroactive effects of the Final Rule.

136.    The FTC asserts that the general prospective benefits that will purportedly be generated by the Final Rule justify the costs without adequately examining the cost of lost prior expectations.

137.    The Final Rule does not address the cost of eliminating the prior expectations of parties to non-compete agreements in its costs and benefits summary. Final Rule, at 451–55.

138.    When the Final Rule addressed comments on secondary retroactive effects it simply declared that the purported "significant benefits" from the Final Rule "justify any burdens of applying the final rule to the future enforcement of pre-existing agreements" without substantively addressing those burdens in the context of secondary retroactivity. *Id.* at 346.

139.    Additionally, to the extent that the Final Rule does engage with the loss of prior contract expectations, the analysis itself is unreasonable.

140.    For example, the FTC's proposed solutions to lost reliance on a non-compete agreement for training and investments—fixed-term employment contracts and hiring skilled workers from competitors—are prospective proposals that do not address the harm from the lost contract expectations from a preexisting non-compete agreement. *Id.* at 214–15.

141.    Additionally, when addressing commenters from small businesses asserting that non-compete agreements were important to protecting the extensive training of their workers, the FTC declared that it "is focused on the aggregate effects of non-competes on competitive conditions." Final Rule, at 528, 531.

142.    Because the FTC failed to sufficiently consider the lost prior expectations of employers and workers who are parties to non-compete agreements—and to the extent it did, its analysis was unreasonable—the ban on enforcement of existing non-compete agreements for non-senior executives is unreasonable, arbitrary and capricious, and therefore invalid.

**COUNT IV: The FTC Act Unconstitutionally Delegates Legislative Power to the FTC**

**(U.S. Const. art. 1, § 1; 5 U.S.C. § 706(2)(B))**

143.    Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs, as if fully set forth herein.

144.    The Administrative Procedure Act directs the court to "hold unlawful" and "set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

145.    Article 1, section 1 of the U.S. Constitution "vest[s]" "[a]ll legislative Powers" "in a Congress of the United States." U.S. Const. art. 1, § 1.

146.    Congress cannot delegate its legislative power to the executive branch, including the FTC. *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 472 (2001).

147.    To fulfil its constitutional obligation to legislate, Congress must—at a minimum—provide executive agencies with "an intelligible principle" to which the agency must conform. *Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

148.    The agency must be left only to "fill up the details" on subjects of "less interest." *Wayman v. Southard*, 23 U.S. 1, 43 (1825).

149.    The FTC Act's only substantive statutory guidance on which the FTC relied to promulgate the Final Rule is to declare "[u]nfair methods of competition" to be "unlawful." 15 U.S.C. § 45(a)(1).

150.    The FTC Act provides no definition of "[u]nfair methods of competition," leaving that to be worked out through the FTC's case-by-case adjudications. *Schechter Poultry*, 295 U.S. at 532–33.

151.    In 1935, the Supreme Court struck down the National Industrial Recovery Act, which granted the President general authority to develop rules of "fair competition," as an

unconstitutional delegation of legislative power. *Schechter Poultry*, 295 U.S. at 531 (quoting National Industrial Recovery Act, Pub. L. No. 73-67, 48 Stat. 195 (1933)).

152.    In *Schechter Poultry*, the Supreme Court distinguished the FTC's authority to prevent "'unfair methods of competition'" on the basis that the FTC could only proceed through individual adjudications and "determine[]" what was unfair "in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest." *Id.* at 532–33.

153.    The FTC Act does not provide a sufficiently intelligible principle by which the FTC can substantively regulate methods of competition, including non-compete agreements.

154.    The FTC Act's prohibition on "[u]nfair methods of competition," 15 U.S.C. § 45(a)(1), unconstitutionally delegates legislative power to the FTC and is therefore invalid.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff requests that this Court provide the following relief:

i.    The issuance of a preliminary injunction prohibiting Defendants from enforcing the Final Rule pursuant to 5 U.S.C. § 705, 28 U.S.C. §§ 2201–02, and Federal Rule of Civil Procedure 65.

ii.    A declaratory judgment and permanent injunction, pursuant to 5 U.S.C. § 706(2) and 28 U.S.C. §§ 2201–02, holding unlawful and setting aside the Final Rule.

iii.    An award of attorneys' fees and costs to Plaintiff, pursuant to 28 U.S.C. § 2412, or any other applicable authority.

iv.    Any other relief as the Court deems just, equitable, and proper.

DATED: April 25, 2024.

Respectfully submitted,

s/ *Sean Radomski*
SEAN RADOMSKI
Pennsylvania Bar No. 319732
JOSHUA M. ROBBINS*
Virginia Bar No. 91020
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd.
Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
SRadomski@pacificlegal.org
JRobbins@pacificlegal.org

LUKE WAKE*
California Bar. No. 264647
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, California
Telephone: (916) 419-7111
LWake@pacificlegal.org

*Attorneys for Plaintiff*

*\*Pro Hac Vice applications*
*forthcoming*