## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ATS TREE SERVICES, LLC,<br><br>    Plaintiff,<br><br> v.<br><br>FEDERAL TRADE COMMISSION; LINA M. KHAN, in her official capacity as Chair of the Federal Trade Commission; and REBECCA KELLY SLAUGHTER, ALVARO BEDOYA, ANDREW N. FERGUSON, and MELISSA HOLYOAK, in their official capacities as Commissioners of the FTC,<br><br>    Defendants. | Case No. 2:24-cv-01743-KBH |

## BRIEF IN SUPPORT OF MOTION TO STAY EFFECTIVE DATE
## AND FOR PRELIMINARY INJUNCTION

On April 23, 2024, the Federal Trade Commission ("FTC") took an unprecedented step in its 110-year history and issued a rule banning non-compete agreements, an employment practice that is otherwise regulated and legal in 46 states. Congress created the FTC to prevent "[u]nfair methods of competition" by enabling the FTC to pursue individualized adjudications. But, with a 3–2 vote, the FTC has decided to unilaterally extend its statutory authority. The FTC now arrogates Congress' power to make law because it has finalized a rule that ignores express limitations on its authority. It now claims power to write its own law disrupting the employment relationships of one in five American workers. Irrespective of its goals, the FTC must operate exclusively within the authority granted to it by Congress.

Plaintiff ATS Tree Services, LLC ("ATS"), is a small tree care business that uses non-compete agreements as a key component of its operational model to specially train and invest in the professional development of its employees. The FTC's unlawful and unconstitutional ban on

1

non-compete agreements significantly disrupts this model, making ATS's extensive training and investment infeasible, and harming both ATS and its employees. ATS requests that the Court stay the effective date of the FTC's non-compete agreement ban pursuant to 5 U.S.C. § 705 and preliminarily enjoin its enforcement while ATS's claims are litigated. ATS also requests oral argument on its motion.

ATS satisfies all four factors necessary to obtain a stay and a preliminary injunction. ATS is likely to succeed on the merits of its claims that the FTC does not have the statutory or constitutional authority to ban non-compete agreements.[1] The FTC claims the authority to make substantive rules for unfair methods of competition based on statutes that only empower it to conduct adjudications and to make procedural rules for the same. And even if the FTC had such substantive rulemaking authority, its vague statutory mandate to prevent "[u]nfair methods of competition" cannot be construed as authority to issue per se bans on commonplace business practices. Nor is this oblique language a "clear statement" from Congress that the FTC is permitted to entirely displace an area of traditional state regulation and outlaw an employment practice of economic and political significance. Moreover, a prohibition on "[u]nfair methods of competition" provides no intelligible principle by which the FTC can promulgate substantive regulations and is, therefore, an unconstitutional delegation of legislative power by Congress.

ATS will be irreparably harmed unless the FTC's ban on noncompete agreements is stayed or preliminarily enjoined. Non-compete agreements make it feasible for ATS to make significant investments in the professional development of its employees. But the ban eliminates the benefit ATS receives from that agreement and allows its employees to leave immediately and transfer to

---

[1] ATS moves for a stay and preliminary injunction on three of the four claims in its complaint, Counts I, II, and IV. Compl. ¶¶ 101–27, 143–54. ATS maintains it is also likely to succeed on the merits of its claim in Count III.

a direct competitor the benefits of ATS's training and investment. This makes ATS's current model unworkable, and both ATS and its employees worse off. As a result of the ban, ATS now must restructure its employment agreements and operational model and incur other nonrecoverable compliance costs over the next four months before the ban goes into effect.

The equities and the public interest also favor ATS because it is never in the public interest for the government to act unlawfully. Additionally, a short delay in the rule's implementation causes no harm to the government, which has waited, according to its own view, since the FTC was established in 1914 to regulate non-compete agreements.

Through its ban on non-compete agreements, the FTC has exceeded its statutory authority, abrogated the laws of 46 states, reached far outside its remit as an antitrust legislator and called into question the FTC's constitutionality. And this ban is generating immediate and irreparable harm for ATS. To avoid that irreparable harm, the effective date of the rule should be stayed, and the FTC enjoined from enforcing it to maintain the status quo while ATS's claims are litigated.

## BACKGROUND

### I.  The FTC's Non-Compete Agreement Ban

On April 23, 2024, the FTC issued a final rule banning non-compete agreements by a 3-2 vote. Press Release, Fed. Trade Comm'n, FTC Announces Rule Banning Noncompetes (Apr. 23, 2024), https://tinyurl.com/4u26b6se. It was published in the Federal Register on May 7, 2024. Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) (the "Final Rule"). Non-compete agreements are a common feature of employment arrangements in which an employee or other worker agrees, if they leave their position, not to work for a direct competitor. Non-compete agreements are generally limited in time and geographical scope. Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 626 (1960). The agreements help employers protect proprietary information, client relationships, and training and investment in employees. *Id.*

at 626–27; *see also* 88 Fed. Reg. 3482, 3493 (Jan. 19, 2023) (Notice of proposed rulemaking). They also help the employee by incentivizing employers to invest in the training and professional development of their employees, as the FTC acknowledges. *See* 88 Fed. Reg. at 3493. Non-compete agreements can be particularly valuable to small businesses, like ATS, who could easily have their employees or other workers taken by larger or more established competitors. *See* Compl. ¶¶ 91–94; Declaration of D. Servin ¶ 25.

Non-compete agreements have been in use for centuries—they were permissible in English common law since the early 1700s and that approach carried over into American common law. *See, e.g.*, *Mitchel v. Reynolds*, 24 Eng. Rep. 347 (1711) (QB) (non-compete agreement between lessor of a bakery and the lessee); *Pierce v. Fuller*, 8 Mass. 223 (1811). Approximately one in five American workers are currently in a non-compete agreement. 88 Fed. Reg. at 3485. And they are legal and regulated in 46 states. Only California, North Dakota, Oklahoma, and Minnesota have banned them—and only then with legislation expressly addressing noncompete policy. *See* Beck Reed Riden LLP, *Employee Noncompetes: A State-by-State Survey* (Feb. 19, 2024), https://tinyurl.com/2tnx2yz3.

The Final Rule makes it unlawful to enter into, enforce, or "represent that [a] worker is subject to" a non-compete agreement with any "worker." 89 Fed. Reg. at 38,502–03. Non-compete agreements are defined broadly to include any "term or condition of employment" that "prohibits a worker from, penalizes a worker for, or functions to prevent a worker from" taking a new job or operating a business after the conclusion of the worker's current employment. *Id.* at 38,502. Exempt from the rule are non-compete agreements between franchisors and franchisees, those associated with the sale of a business, and the enforcement of existing non-compete agreements with "senior executives." *Id.* at 38,502–04. Employers must give notice by the effective date to

any non-senior executive workers covered by non-compete agreements that the employer will no longer enforce the agreement. *Id.* at 38,503–04. The Final Rule will become effective on September 4, 2024. *Id.* at 38,505.

## II.    The Structure of FTC's Authority

The FTC asserts the authority to promulgate the Final Rule under sections 45 and 46(g) of the Federal Trade Commission Act ("FTC Act"). 88 Fed. Reg. at 38,502. The FTC Act declares that "[u]nfair methods of competition" and "unfair or deceptive acts or practices in or affecting commerce" are "unlawful." 15 U.S.C. § 45(a)(1). The statute "empowered" the FTC to "prevent" such conduct through individualized adjudications. *Id.* § 45(a)(2) and (b). Upon identifying potential unlawful conduct, the FTC can issue a complaint and initiate a hearing. *Id.* § 45(b). If the FTC finds that unlawful conduct occurred, it issues a cease-and-desist order. *Id.* The recipient of the order can seek review in a U.S. court of appeals. *Id.* § 45(c). Violations of a final order from the commission incur a civil penalty for each violation that "may be recovered in a civil action brought by the Attorney General." *Id.* § 45(l). The statute does not define "[u]nfair methods of competition." *See* 15 U.S.C. § 44. Instead, it leaves that up to the individualized adjudications. *See id.* § 45. The FTC also possesses statutory authority to create procedural rules for its adjudications, investigations, and other authorized functions. 15 U.S.C. § 46(g).

The FTC was initially understood to have authority to enforce the FTC Act exclusively through adjudications. *See, e.g.*, *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 533 (1935). From the FTC's creation in 1914 until 1962, it did not engage in any substantive rulemaking. Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 551–52 (2002). Moreover, in the 1940s and 1950s, Congress affirmatively granted the FTC *piecemeal* substantive rulemaking authority over

relatively minor issues such as product labeling. Thomas W. Merrill, *Antitrust Rulemaking: The FTC's Delegation Deficit*, 75 Admin. L. Rev. 277, 301 (2023).

In 1962, the FTC began inching into the realm of substantive rulemaking without any further authorization from Congress through the adoption of Trade Regulation Rules ("TRR") that imposed "trivial" requirements such as the labeling of sleeping bag sizes. Merrill & Watts, *supra* at 552 & n.443. In 1964, when the FTC attempted a substantive rulemaking for cigarette labeling, it was overruled by Congress. Merrill, *supra* at 302. The FTC retreated to more trivial TRRs for several years until it advanced yet again and issued a substantive rule requiring octane ratings to be posted on gasoline pumps. Merrill & Watts, *supra* at 554–55; 36 Fed. Reg. 23,871, 23,871 (Dec. 16, 1971). The octane-rating rule was challenged in court and the D.C. Circuit held—contrary to decades of common understanding and practice—that the FTC had substantive rulemaking authority through Sections 45 and 46(g) to make rules that could be enforced through FTC adjudications. *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 678 (D.C. Cir. 1973).

While *National Petroleum Refiners* was being litigated, Congress was considering whether to grant the FTC substantive rulemaking authority. Merrill & Watts, *supra* at 555. In 1975, just a year and half after the D.C. Circuit issued its opinion, Congress explicitly granted the FTC substantive rulemaking authority for "unfair or deceptive acts or practices," but *not* for unfair methods of competition. 15 U.S.C. § 57a. Congress made Section 57a the exclusive means by which rules for "unfair or deceptive acts or practices" are made. *Id.* § 57a(2). Congress also declared that this new, exclusive rulemaking authority "shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition." *Id.* Congress has never granted the FTC substantive rulemaking authority for unfair methods of competition. *See* Merrill, *supra* at 315.

### III.     The Non-Compete Agreement Ban Irreparably Harms ATS

ATS is a professional tree service business in Perkasie, PA. Servin Decl. ¶ 4. ATS provides a variety of tree care services, including tree trimming and removal, tree preservation, emergency responses to storm damage, and the preparation of tree management plans. *Id.* ¶ 5. The tree care ATS engages in requires specialized skills that are developed in ATS's employees through extensive training and internal and third-party certifications to ensure that the trees are properly cared for and that limbs or entire trees can be safely removed without unnecessary risk to ATS's crew or other people and property. *Id.* ¶ 6. ATS is known in its community for its tree care expertise, and is regularly called upon by other tree care companies to assist with technically difficult tree removals. *Id.* ¶ 7.

ATS employs around a dozen people, including skilled tree climbers and an estimator, to whom ATS is committed to help reach their full professional potential. *Id.* ¶¶ 8–9, 19. ATS's employees receive significant specialized training to ensure they have the skills to operate at ATS's high level of technical expertise and in accordance with ATS-specific methods and processes. *Id.* ¶ 11. ATS's employee training includes the opportunity to apprentice for five different roles or certifications. *Id.* ¶ 12. Each apprenticeship includes specialized training and the acquisition of any necessary internal or third-party certifications—such as an arborist certification or commercial driver's license—at ATS's expense. *Id.* ¶¶ 13, 17. For example, ATS trains employees to become an experienced tree climber, which includes on-the-job climbing training in the use of the specialized climbing devices and technical rigging for lowering tree limbs. *Id.* ¶¶ 14–15. As part of the climbing training, ATS spends thousands of dollars to provide individual technical climbing gear and further sacrifices productivity to ensure that the apprenticing employee develops the necessary skills. *Id.* ¶ 15. Additionally, ATS considers all the employees it hires for tree care work

to be potential crew leaders—the highest rank in the company among its skilled employees. *Id.* ¶ 16.

Each ATS employee is also trusted with proprietary information about ATS's business. *Id.* ¶ 18. In particular, ATS's estimator maintains extensive proprietary knowledge of ATS's pricing structure, clients, and overall business strategy and also personally develops goodwill with ATS's clients. *Id.* ¶¶ 9–10.

Because of the significant personal investment ATS makes in its employees and the proprietary business information it shares with them, ATS requires its employees to sign a reasonable non-compete agreement. *Id.* ¶ 20. In general, the agreement requires, or would only be enforced to require, ATS employees not to engage in the same type of work they performed at ATS at a competitor tree care service provider within the geographic area in which the employee worked while at ATS for one year after leaving ATS. *Id.* ¶ 21. ATS considers the non-compete agreement and ATS's specialized training and investment in its employees to be a manifestation of a mutual commitment between ATS and its employees. *Id.* ¶ 22. It is a critical component of ATS's internal operations and overall success in the tree care industry and a benefit to both ATS and its employees. *Id.*

The Final Rule will prohibit ATS from enforcing its non-compete agreements and using non-compete agreements with any new employees it hires. *Id.* ¶ 23. Without the ability to enforce its non-compete agreements, ATS faces the risk that its employees will leave and transfer the benefit of ATS's training and investment, as well as ATS's confidential information, immediately to a direct competitor. *Id.* ¶ 24. Going forward under the Final Rule, it will not be feasible for ATS to provide the same level of training and investment if that investment can be lost at any time to a direct competitor. *Id.* ¶ 26. The infeasibility of continuing with ATS's current employee training

and investment approach will also harm the company's operational model and culture of mutual commitment that ATS believes is a critical component of its success. *Id.* ¶ 27. With the Final Rule becoming effective on September 4, 2024, 89 Fed. Reg. at 38,505, ATS must start taking steps to change its business operations and comply with the Final Rule's notice requirement, Servin Decl. ¶ 28. A stay of the Final Rule's effective date and a preliminary injunction is necessary to protect ATS from suffering these irreparable harms while the legality of the Final Rule is litigated.

## LEGAL STANDARD

"To get a preliminary injunction, [ATS] must satisfy four factors: (1) [it] will likely succeed on the merits, (2) [it] will likely suffer irreparable injury without an injunction, (3) the balance of equities favors [it], and (4) an injunction serves the public interest." *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023). "Because the government is the opposing party, the latter two factors merge." *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The first two factors are the "'most critical.'" *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Demonstrating a likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not." *Id.* Any irreparable injury must be "more likely than not." *Id.* These same factors apply to whether the effective date of the Final Rule should be stayed pursuant to 5 U.S.C. § 705. *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021).

## ARGUMENT

**I.    ATS Is Likely To Succeed on the Merits of Its Claims**

### A.  The FTC Does Not Have the Power To Make Substantive Rules for Unfair Methods of Competition

Sections 45 and 46 of the FTC Act—on which the FTC relies for authority to promulgate the Rule—do not permit substantive rulemaking for "[u]nfair methods of competition." *See* 15 U.S.C. §§ 45 and 46(g); 88 Fed. Reg. at 38,502. The FTC was created to address antitrust issues

through adjudications, *see Schechter Poultry*, 295 U.S. at 532–34, and was given the authority to create procedural rules for those adjudications, 15 U.S.C. § 46(g). It was later granted substantive rulemaking and enforcement authority for the *other* category of conduct it may regulate. 15 U.S.C. §§ 45(m), 57a(a). Accordingly, the most "symmetrical and coherent" interpretation of the FTC's authority that allows its components to "fit" together in a "harmonious whole" is that it does *not* have substantive rulemaking authority for unfair methods of competition. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citations omitted).

### 1.  The Text of the FTC Act Does Not Authorize Substantive Rulemaking for Unfair Methods of Competition

The FTC Act only allows the FTC to prevent "[u]nfair methods of competition" through adjudications. 15 U.S.C. § 45. Section 45 declares "[u]nfair methods of competition" to be "unlawful." *Id.* § 45(a)(1). The statutory text is explicit that to address a possible unfair method of competition "[the FTC] *shall* issue and serve ... a complaint stating its charges" and "a notice of a hearing." *Id.* § 45(b) (emphasis added). Any cease-and-desist order resulting from the hearing is directed *solely* to the persons or entities that were the recipients of the complaint. *Id.* Nothing in Section 45 authorizes the FTC to use substantive rulemakings to prevent "[u]nfair methods of competition." *Id.* § 45. Given this glaring omission in the statutory text, Congress cannot be understood to have also granted substantive rulemaking authority to the FTC on unfair methods of competition. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468, 471 (2001) (no statutory authority for EPA to consider costs of air quality standards when not included in statute).

In fact, the FTC does not even have authority to enforce its cease-and-desist orders regarding unfair methods of competition. *Id.* § 45(l). Such orders can only be enforced—and any civil penalty imposed—through a civil suit brought by the Attorney General in an Article III court. *Id.* The lack of FTC's own enforcement authority for unfair methods of competition orders is

consistent with and further indicative of its lack of substantive rulemaking authority for unfair methods of competition. *See Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 311 (1953) (rulemaking authority substantive because it included enforcement authority). Moreover, Congress affirmatively gave the FTC authority to enforce its own orders and rules regarding unfair or deceptive acts or practices. 15 U.S.C. § 45(m).

Section 46(g)'s authorization "to make rules and regulations for the purpose of carrying out the provisions of this subchapter," only grants the FTC rulemaking authority to make procedural rules, *not* substantive rules for unfair methods of competition. *See* 15 U.S.C. § 46(g). Section 46(g) is part of a statutory section that authorizes various procedural mechanisms through which the FTC can carry out its duties, including authority to initiate investigations, to require covered persons and entities to make reports to the FTC, and to enter into international cooperation agreements for the exchange of information. *Id.* § 46. The rulemaking authority itself is in the second half of a sentence that also authorizes the FTC to "classify corporations" "[f]rom time to time." *Id.* § 46(g). The authority to classify is of a completely different nature than substantive rulemaking on the scale the FTC is attempting here. Moreover, there is no mechanism in the statute by which the FTC can enforce the rules it makes through Section 46(g). *See id.* § 45(l) (authorizing enforcement of "an order" through a civil action by the Attorney General). The lack of enforcement authority is a significant indicator section 46(g) does not include the power to promulgate substantive rules. *See Am. Trucking Ass'ns*, 344 U.S. at 311.[2]

Congress's grant, in 1975, of substantive rulemaking authority for "unfair or deceptive acts or practices" confirms that section 46(g) does not provide substantive rulemaking authority for

---

[2] The major questions doctrine also requires that section 46(g) not be interpreted to allow substantive rulemaking when considered in conjunction with the significance of the Final Rule. *See infra* Part I.B.3.

unfair methods of competition. *See* Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975). As part of its acts or practices rulemaking authority, the FTC must follow specific procedural requirements—including holding an "informal hearing" with interested parties. 15 U.S.C. § 57a(b), (c). This specific grant of substantive rulemaking authority stands in sharp contrast to section 46(g)'s oblique rulemaking authorization. 15 U.S.C. § 46(g). Congress also enacted a judicial review scheme for section 57a providing for petitions of review to U.S. courts of appeals, something that does not exist for rules promulgated under section 46(g). 15 U.S.C. § 57a(e); *id.* § 45(c) (persons or entities "may obtain a review of [a cease-and-desist] *order*" (emphasis added)). Moreover, section 46(g) was enacted when the FTC was a purely adjudicative agency. *See Schechter Poultry*, 295 U.S. at 532–34. If the FTC already had broad substantive rulemaking authority through section 46(g), Congress would not have bothered to grant such authority again in 1975. It is even less likely that Congress enacted this additional rulemaking authority simply to impose additional rulemaking procedures for unfair or deceptive acts or practices while leaving the purported authority for competition rulemaking through section 46(g) unfettered.

### 2. The Supreme Court Recognized the FTC Does Not Have Legislative Rulemaking Authority for Unfair Methods of Competition

For the first roughly half century of the FTC's existence, neither Congress, the U.S. Supreme Court, nor the FTC itself understood the FTC to have substantive rulemaking authority. *See* Merrill and Watts, *supra* at 549–52; *Schechter Poultry*, 295 U.S. at 533. From 1914 until 1962, the FTC did not engage in legislative rulemaking. *Id.* at 549–52. But during this same period, Congress authorized the FTC to make legislative rules on specific issues, an unnecessary step if the FTC already possessed that authority. Merrill, *supra* at 301.

Notably, in 1935, the Supreme Court characterized the FTC as an adjudicative body in its seminal non-delegation case, *Schechter Poultry*, 295 U.S. at 532–33. In *Schecter Poultry*, the Court held that the National Industrial Recovery Act's ("NIRA") authorization for the President to adopt codes of "fair competition" was an unconstitutional delegation of legislative authority. *Id.* at 531, 541–42. The Court distinguished the FTC from the NIRA because the phrase "unfair methods of competition" was "left to judicial determination [by the FTC] as controversies arise," *not* rulemaking. *Id.* at 532–34. So, not only did the Court characterize the FTC as exercising exclusively adjudicative authority, this characterization was also a key component of the Court's holding. *Id.* Similarly, the Third Circuit described the FTC as "originally" "an investigatory body which would judge and note violations." *N.J. Wood Finishing Co. v. Minn. Min. & Mfg. Co.*, 332 F.2d 346, 355 (3d Cir. 1964), *aff'd*, 381 U.S. 311 (1965)

### 3. *National Petroleum Refiners* Was Wrongly Decided

The Final Rule relies heavily on the D.C. Circuit's decision in *National Petroleum Refiners*, 482 F.2d 672, to support its substantive rulemaking authority, but that decision has seen little purchase. 89 Fed. Reg. at 38,350–51.[3] *National Petroleum Refiners* decided that the FTC had the authority to promulgate substantive rules pursuant to Section 46(g). 482 F.2d at 678. But *National Petroleum Refiners* is not the law in the Third Circuit, has never been addressed by the Supreme Court, and should not be followed by this Court because it is demonstrably wrong.

*National Petroleum Refiners* decided to "liberally [] construe" section 46(g)'s rulemaking authorization. 482 F.2d at 678. The D.C. Circuit reasoned that because "the broad, undisputed policies which clearly motivated the framers of the" FTC Act "would [] be furthered" through

---

[3] The Seventh Circuit accepted the reasoning of *National Petroleum Refiners* and that is the only other case the Final Rule cites. *United States v. JS & A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983); 89 Fed. Reg. at 38,350–51.

substantive rulemaking authority, section 46(g) should be interpreted to grant such authority. *Id.* at 686. This purpose-driven analysis ignores that "[a]dministrative agencies are creatures of statute" that "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022). Further, *National Petroleum Refiners* rests its holding on the *absence* of "limiting language [in section 45(b)] suggesting that adjudication alone is the only proper means of elaborating the statutory standard." 482 F.2d at 675. But section 45(b) affirmatively requires the FTC to proceed through a complaint and a hearing to prevent unfair methods of competition 15 U.S.C. § 45(b). Given this requirement, Section 45's silence as to substantive rulemakings cannot be the basis for such authority, particularly after Congress granted it solely for "unfair or deceptive acts or practices." *See Whitman*, 531 U.S. at 468, 471.

    *National Petroleum Refiners* also generally misapplied the main cases on which it relied; they did not generally address whether rulemaking authority was substantive or procedural. 482 F.2d at 678–81*; see also* Merrill and Watts, *supra* at 556. *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 215–220 (1943), and *Am. Trucking Ass'ns*, 344 U.S. at 309–12, addressed the scope and specificity of rulemaking authority as to certain activities.[4] *United States v. Storer Broad. Co.*, 351 U.S. 192, 203 (1956), and *Fed. Power Comm'n v. Texaco, Inc.*, 377 U.S. 33, 39–42 (1964), addressed whether agencies could promulgate substantive rules that would serve as a threshold for whether non-compliant regulated entities received a hearing. And *Mourning v. Fam. Publications Serv., Inc.*, 411 U.S. 356, 371–73 (1973), addressed whether or to what extent a grant of rulemaking

---

[4] In *Am. Trucking Ass'ns*, it was argued that one of the two grants of rulemaking authority at issue "merely concerns agency procedures." 344 U.S. at 311. But the Court rejected this argument because the statute contained a "distinct reference in the section to enforcement." *Id.*; Motor Carrier Act, Pub. L. No. 74-255, § 204(d), 49 Stat. 543, 547 (1935) (permitting agency to order compliance after notice and hearing with "any provision of this part, or with any requirement established pursuant there to"). There is no such enforcement authority for unfair method of competition rules the FTC promulgates pursuant to section 46(g).

authority was limited by other statutory provisions. None of these cases engaged with whether the rulemaking authority at issue was substantive or procedural in a manner that supported the conclusion in *National Petroleum Refiners*. But that is the threshold question here.

### B. The FTC Act Does Not Authorize the FTC To Ban All Non-Compete Agreements as Unfair Methods of Competition

Even if the FTC Act were construed as delegating substantive rulemaking authority for the Commission to define "unfair methods of competition," the Final Rule is unlawful because the FTC cannot impose a sweeping rule that deems freely negotiated and reasonably tailored noncompete agreements per se "unfair." As Pennsylvania courts have long recognized, noncompete agreements are fair—and therefore enforceable—so long as "reasonably limited in duration and geographic" scope. *See Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 917 (Pa. 2002). And both the federalism canon and the major questions doctrine presume that Congress will speak clearly if it wishes to authorize regulation to override state law on such a significant matter.

#### 1. Reasonable Non-Compete Agreements Are Fair

The FTC cannot proclaim *all* noncompete agreements to be "unfair." The Commission's authority to prohibit "unfair methods of competition" does not operate as a "bar [on] any business practice found to have an adverse effect on competition." *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136 (2d Cir. 1984). Such a test would unlawfully "permit arbitrary or undue government interference with the reasonable freedom of action." *Id*. at 137. But adopting an arbitrary ban on an entire business practice is precisely what the FTC has done in the Final Rule.

The Final Rule reflects the implementation of the FTC's capacious 2022 policy statement on unfair methods of competition. Federal Trade Commission, Commission File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (2022) ("2022 FTC Policy Statement"). According to the FTC,

competition is unfair when it "goes beyond competition on the merits," including when it is "restrictive or exclusionary" and "tends to negatively affect competitive conditions." *Id.* at 9. In reliance on the 2022 FTC Policy Statement, the Final Rule found non-compete agreements to be *per se* "unfair" because the FTC determined that they are "restrictive," "exclusionary," "exploitative," and "coercive conduct" "that tend[] to negatively affect competitive conditions in labor" and "product and service markets." 89 Fed. Reg. at 38,372.

This is effectively "[a] test based solely upon restraint of competition" and as such "is so vague as to permit arbitrary or undue government interference with the reasonable freedom of action that has marked our country's competitive system." *E.I. du Pont de Nemours*, 729 F.2d at 137. To prevent this "abuse of power," courts must adopt "appropriate standards" for unfairness. *Id.* And here where the FTC "seeks to break new ground by enjoining otherwise legitimate practices," the Court must closely "scrutin[ize]" the FTC's decision. *Id.*

In the Third Circuit, "covenants not to compete should be examined under the rule of reason" when reviewed under federal antitrust statutes. *Eichorn v. AT & T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001), as amended (June 12, 2001). The rule of reason requires an individualized review of the "totality of the circumstances surrounding an alleged anti-competitive activity, *including facts peculiar to the relevant business*." *Id.* at 144–45 (emphasis added). Even though the FTC Act applies beyond the federal antitrust statutes to "incipient" antitrust violations, some weighing analysis like the rule of reason must be employed to determine the fairness of non-compete agreements in particular circumstances. *See E.I. du Pont de Nemours & Co.*, 729 F.2d at 136–37, 140; *Luria Bros. & Co. v. FTC*, 389 F.2d 847, 860 (3d Cir. 1968) (using "cases decided under [Sherman] Act for guidance"). This is the sort of analysis that many states have effectively implemented in adopting reasonable limitations on non-compete agreements. For example, in

Pennsylvania, non-compete agreements must be "'supported by adequate consideration,'" "'reasonably limited in duration and geographic extent,'" and "'designed to protect legitimate interests of the employer.'" *Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*, 249 A.3d 918, 932 (Pa. 2021). A rule of reason style analysis is also consistent with the exclusively adjudicative authority the FTC has over unfair methods of competition. *See supra* Part I.A. This approach ensures that the FTC does not arbitrarily "interfere[] with the reasonable freedom of action." *E.I. du Pont de Nemours*, 729 F.2d at 137.

Additionally, the permissibility and regulation of non-compete agreements in 46 states is itself evidence that non-compete agreements cannot be classified as categorically "unfair." The FTC asserts the authority to preempt state law and effectively claims that state determinations of fairness are irrelevant. *See* 89 Fed. Reg. at 38,504–05. But centuries of state-level development of reasonable parameters for non-compete agreements should not be so easily swept away. Moreover, because the FTC does not have substantive rulemaking authority for "unfair methods of competition," Congress cannot have categorically preempted all non-compete agreements. *See Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 989–90 (D.C. Cir. 1985). Even where the FTC does have substantive rulemaking—for "unfair or deceptive acts or practices"—it was not intended to "occupy the field" such that all state laws are preempted. *Id.* at 990. So, the FTC cannot override *all* the fairness determinations of state legislatures and judges at will.

### 2. The Final Rule Displaces a Traditional Area of State Regulation Without Clear Authorization from Congress

The FTC Act also does not contain a clear statement that the FTC is empowered to ban an employment term that is traditionally regulated by state law. *See Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991). Non-compete agreements fall squarely within the traditional field of state regulation. The Final Rule displaces the statutory and common law of 46 states that currently

permit reasonable non-compete agreements. 89 Fed. Reg. at 38,465. State common law has long distinguished between appropriate and unduly restrictive non-compete agreements in the United States. *E.g., Pierce v. Fuller*, 8 Mass. 223 (1811). But nothing in the FTC Act speaks to whether Congress intended to authorize the wholesale preemption of state laws governing non-compete agreements. *Cf. Parker v. Brown*, 317 U.S. 341, 351–52 (1943) (rejecting a contention that federal antitrust law should be construed as preempting anti-competitive state laws).

Congress is presumed not to "alter" state law unless Congress does so in "unmistakably clear" terms. *Gregory*, 501 U.S. at 460–61 (quotation marks omitted). Congress must use "exceedingly clear language ...  to significantly alter the balance between federal and state power." *See U.S. Forest Service v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621–22 (2020); *see also Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001). The FTC Act's declaration of "unfair methods of competition" as "unlawful" and establishment of an adjudicative process to prevent them does not provide the requisite clear statement that would permit the FTC to eliminate the laws of 46 states. *See Gregory*, 501 U.S. at 470.

### 3. The Final Rule Bans an Employment Practice of Economic and Political Significance Without Clear Authorization from Congress

Banning non-compete agreements nationally is also "[a] decision of such magnitude and consequence" that the FTC requires a "clear delegation" of authority from Congress. *West Virginia v. EPA*, 597 U.S. 697, 735 (2022). The Final Rule changes the employment relationships of "one in five American workers" and is expected by the FTC to have hundreds of billions of dollars in financial consequences for employers and workers. 89 Fed. Reg. at 38,343, 38,470–71. But there is no "clear delegation" of authority by Congress to the FTC to promulgate such a consequential rule. *See West Virginia*, 597 U.S. at 735.

The Final Rule is of similar "'economic and political significance'" to recent applications of the major questions doctrine. *Id.* at 721. *West Virginia* applied the major questions doctrine to an EPA plan to shift power generation away from fossil fuels that "would [have] entail[ed] billions of dollars in compliance costs," "require[d] the retirement of dozens of coal-fired power plants, and eliminate[d] tens of thousands of jobs." *Id.* at 714. *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023), applied the major questions doctrine to a plan "to release 43 million borrowers from their obligations to repay $430 billion in student loans." And the doctrine was similarly applied to a federal eviction moratorium estimated to have an "economic impact" of approximately $50 billion. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021). Here, the FTC estimates the Final Rule affects approximately 30 million people. 89 Fed. Reg. at 38,343. Its cost-benefit analysis anticipates a $400–488 billion effect on earnings, a shift of tens-of-billions of dollars in "investment in human capital," and billions of dollars of pricing changes. *Id.* at 38,470–71. This "exercise [of] control over 'a significant portion of the American economy'" is sufficient to trigger application of the major questions doctrine. *Nebraska*, 143 S. Ct. at 2372.

The Final Rule also unilaterally ends "'earnest and profound debate' across the country" about the scope and necessity of non-compete agreements making section 45's "oblique" delegation of authority "all the more suspect." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006). For example, lawmakers in Pennsylvania are considering legislation that would prohibit noncompete agreements in the medical field. Sarah Boden, *A bill in the Pa. legislature could end non-compete agreements for most doctors*, 90.5 WESA (Apr. 26, 2024), https://tinyurl.com/bdfrpedx. And legislation is pending in Congress to restrict the use of non-compete agreements with low wage workers, Freedom to Compete Act of 2023, S. 379, 118th Cong. (2023), and to largely ban them, Workforce Mobility Act of 2023, S. 220, 118th Cong. (2023). Congress could not have intended

to allow the FTC to ban an employment term subject to such serious political debate in as "cryptic a fashion" as the FTC Act. *Brown & Williamson*, 529 U.S. at 160.

Beyond its economic and political impact, the Final Rule represents a "'transformative expansion'" of the FTC's "'regulatory authority'" based on "'a long-extant statute'" enacted in 1914. *West Virginia*, 597 U.S. at 724. Such a claim of authority should be treated with "skepticism." *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). The FTC points to a brief period of unauthorized competition rulemakings from the 1960s and 70s as evidence the Final Rule is part of the FTC's normal business. 89 Fed. Reg. at 38,349–50. But these rulemakings were generally about advertising and labeling, *id.*, something which today is covered by unfair or deceptive acts or practices rulemakings, *see* Merrill, *supra* at 305; 15 U.S.C. § 45(n) (requiring FTC to find unfair or deceptive acts or practices "cause[] or [are] likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves"). And they cover mundane topics like misrepresentations of sleeping bag and tablecloth sizes or extension ladder lengths. 89 Fed. Reg. at 38,349–50. It is further notable that the FTC does not identify other competition rulemakings after 1978, creating a nearly five-decade gap since the FTC has implemented such a rulemaking. *Id.* at 38,349–51. That lengthy silence speaks volumes.

Additionally, employment relationships are not the traditional regulatory sphere of the FTC, an antitrust agency. *See E.I. du Pont de Nemours & Co*, 729 F.2d at 136. If Congress were to entrust any agency with non-compete regulation, the Department of *Labor* would be the most logical choice. This also militates in favor of applying the major questions doctrine because "[t]here is little reason to think Congress assigned" decisions about the validity of employment contracts to the FTC. *West Virginia*, 597 U.S. at 729.

### 4.   Interpreting the FTC Act Not To Authorize the Final Rule Avoids a Serious Constitutional Question

The FTC Act also should not be interpreted to "'raise [a] serious constitutional problem'" regarding the delegation of legislative authority to the FTC. *Solid Waste Agency*, 531 U.S. at 173. The FTC's open-ended view of its authority under section 45 to ban non-compete agreements nationally provides the FTC with no intelligible principle by which to make rules *See infra* Part I.C. Because of this "serious [constitutional] doubt," an interpretation of the FTC Act that does not extend to include the Final Rule should be adopted. *Crowell v. Benson*, 285 U.S. 22, 62 (1932).

### C.   The FTC Act Unconstitutionally Delegates Legislative Power to the FTC

If the Court holds that Congress empowered the FTC with the ability to make substantive rules and delegated to it the ability to ban non-competes, section 45 unconstitutionally delegates legislative power to the FTC. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States ...." U.S. Const. art. I, § 1. As a result of this vesting clause, Congress may not "delegate ... powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42 (1825). Administrative agencies may only "fill up the details" on "subjects" "of less interest." *Id.* at 20. To avoid an unconstitutional delegation, Congress must provide executive branch agencies with an "'intelligible principle'" by which to regulate. *Whitman*, 531 U.S. at 472.

The Supreme Court has already decided that a delegation of rulemaking authority over economic competition with fairness as the only standard is an unconstitutional delegation of legislative power. *Schechter Poultry*, 295 U.S. at 530, 541–42. In *Schechter Poultry*, defendants were criminally charged with violating the Live Poultry Code, promulgated under section 3 of NIRA, which "authorize[d] the President to approve 'codes of fair competition.'" 295 U.S. at 508, 521-22. "[F]air competition" was undefined in the NIRA, which was otherwise devoid of any

meaningful standard or limitation on the President's authority. *Id.* at 531, 541. *Schechter Poultry* took a similarly dim view of the phrase "unfair methods of competition" in the FTC Act, explaining "that it does not admit of precise definition." *Id.* at 532. But critically, the Court found that the term would *not* be defined through substantive rulemaking as in the NIRA, but "determined in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest*." Id*. at 533. This finding was key to the Court's rejection of the NIRA as a non-delegation violation. *See id.* at 533–34.

Here, the Final Rule erases the FTC's distinctive role as an adjudicative body by creating the FTC's own code of fair competition in the labor market, and claiming the authority to do the same for any other purported unfair method of competition. In fact, this very scenario was contemplated in *Schecter Poultry* because the NIRA provided that violations of the codes of fair competition "[were] to be deemed 'an unfair method of competition' within the meaning of the [FTC] Act." *Id.* at 534. So, the Final Rule functions in a nearly identical way as the unconstitutional fair competition codes in *Schecter Poultry*.

Even on its own, the phrase "unfair methods of competition" fails to establish an "'intelligible principle.'" *Whitman*, 531 U.S. at 472. Congress is expected to "provide substantial guidance" on regulations like the Final Rule "that affect the entire national economy." *Id.* at 475. Here, "unfair" is not enough. *See Schecter Poultry*, 295 U.S. at 532–33. Its insufficiency is evident from the FTC's own policy statement on the phrase, which sweeps in any conduct that is "restrictive or exclusionary" and "tend[s] to negatively affect competitive conditions." 2022 FTC Policy Statement at 9; 89 Fed. Reg. at 38,358, 38,374–75. Such vague language is effectively the FTC's blank check to itself to regulate any conduct of which it disapproves. Its standardless nature is underscored by comparing it to the guidance Congress provided regarding unfair or deceptive

acts or practices: The FTC can act only when "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C § 45(n).

## II.   ATS Is Irreparably Harmed By the Final Rule

ATS is irreparably harmed in two significant ways: (1) it must undertake nonrecoverable efforts to comply with the Final Rule and conform its business to an environment with no non-compete agreements now, and (2) it will lose the contractual benefits from its existing non-compete agreements once the Final Rule goes into effect. First, ATS must incur "the nonrecoverable costs of complying with a putatively invalid regulation" and must do so before the Final Rule goes into effect. *Rest. Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (citation omitted). The Final Rule requires ATS to give notice by its effective date that ATS will no longer enforce its existing non-compete agreements. 89 Fed. Reg. at 38,503–04. The FTC recognizes in the Final Rule that employers, including ATS, will incur costs to comply with the notice requirement. *Id.* at 38,483–84; Servin Decl. ¶ 28. Moreover, ATS will have to undertake efforts to review its employment agreements, structure, and training practices and make modifications to its business to account for the inability to prevent its employees from immediately leaving for a direct competitor. Servin Decl. ¶ 28; *see also* 89 Fed. Reg. at 38,481–83. For example, ATS will be forced to change its operational model and reduce the training that it provides its workers because of the infeasibility of providing such a benefit that could be immediately available to any of its competitors. Servin Decl. ¶¶ 26–28. And, "[t]he loss of an employee and the associated costs ... are nonrecoverable costs" for ATS, the risk of which significantly increases as a result of the Final Rule. *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022); Servin Decl. ¶ 25. Indeed, that is the point of the Final Rule. *See* 89 Fed. Reg. at 38,380 ("[A] key component of a competitive labor market is voluntary labor mobility."). These compliance costs are not recoverable by ATS, and

constitute an irreparable injury. *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016); *see also* 5 U.S.C. § 702 (allowing only relief "other than money damages").

Second, if this case continues beyond the effective date of the Final Rule, ATS will be further irreparably injured through a "depriv[ation of] its contractual rights," in particular losing a "meaningful benefit [it] negotiated for" in its employment agreements. *SEIU Health Care Mich. v. Snyder*, 875 F. Supp. 2d 710, 725 (E.D. Mich. 2012). The Court has already recognized that the loss of an employee subject to a non-compete agreement to a direct competitor constitutes irreparable injury. *Syzygy Integration LLC v. Harris*, 616 F. Supp. 3d 439, 450 (E.D. Pa. 2022). So, to eliminate the contractual term that prevents that from happening in the first place is, itself, an irreparable injury as well. *See id.*

### III.    A Preliminary Injunction Is in the Public Interest

The final two factors—balance of the equities and the public interest—merge when the government is the opposing party. *See Nken*, 556 U.S. at 435. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors*, 594 U.S. at 766. And here, any harm to the government from a several month delay in the implementation of the Final Rule will be minimal given that the FTC was willing to take over a year to finalize its proposed rule after waiting since 1914 to propose such a ban. *See* 89 Fed. Reg. at 38,342. Moreover, "if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury," as is the case here, "it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)

## IV.    Bond Is Not Necessary

A bond is not necessary in this case to issue a preliminary injunction because an injunction is in the public interest and there is no harm to Defendants. *See supra* Part III. The Third Circuit recognizes an exception to the bond requirement in Federal Rule of Civil Procedure 65(c) in cases "to enforce important federal rights or public interests." *Temple Univ. v. White*, 941 F.2d 201, 220 (3d Cir. 1991) (quotation marks omitted). Here, ATS seeks to vindicate its statutory right under the Administrative Procedure Act not to be subjected to unlawful regulations, 5 U.S.C. § 702, and the structural constitutional principal of non-delegation, which also protects individuals and businesses, *see Stern v. Marshall*, 564 U.S. 462, 483 (2011). There is no harm to Defendants because they have no interest in enforcing an unlawful regulation and a stay and preliminary injunction will only delay their implementation of the Final Rule while this case is decided. *See League of Women Voters*, 838 F.3d at 12; *supra* Part III. Under these circumstances, the Court may waive Rule 65(c)'s bond requirement. *See Gilliam v. USDA*, 486 F. Supp. 3d 856, 882 (E.D. Pa. 2020) (excusing bond where no "true harm" alleged from injunction compelling USDA to comply with provision of SNAP); *Marshall v. Amuso*, 571 F. Supp. 3d 412, 430 (E.D. Pa. 2021) (no bond for preliminary injunction of school board policies restricting speech).

## CONCLUSION

For the foregoing reasons, ATS respectfully requests that this Court stay the effective date of the Final Rule and enter a preliminary injunction pending a ruling on the merits.

DATED: May 14, 2024.

Respectfully submitted,

s/ *Sean Radomski*

SEAN RADOMSKI
Pennsylvania Bar No. 319732
JOSHUA M. ROBBINS*
Virginia Bar No. 91020
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd.
Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
SRadomski@pacificlegal.org
JRobbins@pacificlegal.org

LUKE WAKE*
California Bar No. 264647
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, California
Telephone: (916) 419-7111
LWake@pacificlegal.org

*Attorneys for Plaintiff*

*\*admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2024, I electronically filed the foregoing with the Clerk of the United States District Court for the Eastern District of Pennsylvania using the CM/ECF system, which sent notifications of such filing to all registered CM/ECF users. I also certify that courtesy copies of foregoing will be served via certified mail to the following:

Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Melissa Holyoak
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

Alvaro Bedoya
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

Rebecca Kelly Slaughter
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

Lina M. Khan
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

Andrew N Ferguson
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

Jacqueline C. Romero
U.S. Attorney Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

DATED: May 14, 2024.

/s/ *Sean Radomski*
SEAN RADOMSKI