**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ATS TREE SERVICES, LLC,<br><br>       Plaintiff,<br><br>v.<br><br>FEDERAL TRADE COMMISSION; LINA M. KHAN, in her official capacity as Chair of the Federal Trade Commission; and REBECCA KELLY SLAUGHTER, ALVARO BEDOYA, ANDREW N. FERGUSON, and MELISSA HOLYOAK, in their official capacities as Commissioners of the FTC,<br><br>       Defendants. | Case No.: 2:24-cv-1743-KBH |

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO STAY EFFECTIVE DATE AND FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.     THE FEDERAL TRADE COMMISSION ACT ...................................... 3

    A.    The Commission's Directive to Prevent Unfair Methods of Competition ............ 3

    B.    The Commission's Section 5 Adjudicatory Authority ........................... 4

    C.    The Commission's Section 6 Rulemaking Authority ............................ 5

II.    THE NON-COMPETES RULEMAKING ............................................... 8

    A.    The Proposed Rule ............................................................................ 8

    B.    The Commission's Findings and Public Comments .............................. 9

    C.    The Final Rule ................................................................................ 11

PROCEDURAL HISTORY ............................................................................... 11

LEGAL STANDARD ....................................................................................... 12

ARGUMENT .................................................................................................... 12

I.     ATS IS UNLIKELY TO PREVAIL ON THE MERITS. ........................ 12

    A.    The Commission Has Statutory Authority to Promulgate the Final Rule ............ 13

        1.    Ordinary tools of statutory interpretation make clear that Congress conferred legislative rulemaking authority on the Commission in Section 6 ............ 14

        2.    This case does not implicate the major questions doctrine ...................... 20

    B.    The Commission Properly Designated All Non-Competes As "Unfair Methods of Competition." .................................................... 23

    C.    Congress Lawfully Delegated Authority to the Commission. .............. 27

II.    ATS FAILS TO DEMONSTRATE IRREPARABLE HARM. ................. 29

III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DISFAVOR A PRELIMINARY INJUNCTION. ................................. 33

IV.  ANY RELIEF SHOULD BE TAILORED. ............................................ 34

CONCLUSION ................................................................................................. 35

## TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*A.L.A. Schechter Poultry Corp. v. U.S.*,
  295 U.S. 495 (1935)........................................................................................ 19, 28, 29

*A.O. Smith Corp. v. FTC*,
  530 F.2d 515 (3d Cir. 1976) ................................................................................. 31

*Altana Pharma AG v. Teva Pharms. USA, Inc.*,
  532 F. Supp. 2d 666 (D.N.J. 2007) ...................................................................... 32

*Am. Beverage Corp. v. Diageo N. Am., Inc.*,
  936 F. Supp. 2d 555 (W.D. Pa. 2013).................................................................. 30

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*,
  669 F.3d 359 (3d Cir. 2012)................................................................................. 29

*Am. Fin. Servs. Ass'n v. FTC*,
  767 F.2d 957 (D.C. Cir. 1985) ............................................................................ 26

*Am. Hosp. Ass'n v. Harris*,
  625 F.2d 1328 (7th Cir. 1980) ............................................................................ 31

*Am. Power & Light Co. v. Sec. & Exch. Comm'n*,
  329 U.S. 90 (1946)............................................................................................... 28

*Am. Trucking Ass'n v. U.S.*,
  344 U.S. 298 (1953)............................................................................................. 19

*Badii v. Rick's Cabaret Int'l, Inc.*,
  2014 WL 550593 (N.D. Tex. Feb. 11, 2014)...................................................... 31

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
  2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017)................................................... 30

*Biden v. Missouri*,
  595 U.S. 87 (2022)............................................................................................... 22

*Bristol Meyers Co.*,
  102 F.T.C. 21 (1983).................................................................................. 4, 26, 30

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)............................................................................................. 35

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
  68 F.3d 828 (3d Cir. 1995).................................................................................. 31

ii

*Carr v. City of Florence*,
   729 F. Supp. 783 (N.D. Ala. 1990) ................................................................. 31

*CFTC v. Schor*,
   478 U.S. 833 (1986) ....................................................................................... 15

*Cmty. Oncology All. v. Becerra*,
   2023 WL 9692027 (D.D.C. Dec. 21, 2023) ..................................................... 30

*Corley v. U.S.*,
   556 U.S. 303 (2009) ....................................................................................... 17

*Dennis v. Dowdle*,
   937 F.2d 612 (9th Cir. 1991) .......................................................................... 31

*NFIB v. DOL*,
   595 U.S. 109 (2022) ....................................................................................... 21

*Duncan v. Walker*,
   533 U.S. 167 (2001) ....................................................................................... 14

*Eichorn v. AT&T Corp.*,
   248 F.3d 131 (3d Cir. 2001) ........................................................................... 24

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ....................................................................................... 21

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
   320 U.S. 591 (1944) ....................................................................................... 28

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) ........................................................................... 31

*FTC v. Brown Shoe Co.*,
   384 U.S. 316 (1966) ............................................................................. 3, 27, 28

*FTC v. Cement Inst.*,
   333 U.S. 683 (1948) ................................................................................... 3, 24

*FTC v. Motion Picture Advert. Serv. Co.*,
   344 U.S. 392 (1953) ..................................................................... 3, 23, 24, 28

*FTC v. R.F. Keppel & Bro.*,
   291 U.S. 304 (1934) ................................................................................... 3, 23

*FTC v. Raladam Co.*,
   283 U.S. 643 (1931) ................................................................................. 27, 28

*FTC v. Texaco, Inc.,*
   393 U.S. 223 (1968) ........................................................................ 23, 24, 27, 28

*G.L. v. Ligonier Valley Sch. Dist. Auth.,*
   802 F.3d 601 (3d Cir. 2015)............................................................................. 16

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) .................................................................................... 35

*Gonzales v. Oregon,*
   546 U.S. 243 (2006)........................................................................................ 21

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991)........................................................................................ 26

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC,*
   774 F.3d 192 (3d Cir. 2014)............................................................................ 12

*Gundy v. U.S.,*
   588 U.S. 128 (2019)........................................................................................ 27

*Labrador v. Poe,*
   144 S. Ct. 921 (2024)...................................................................................... 35

*Louisiana v. Biden,*
   575 F. Supp. 3d 680 (W.D. La. 2021)........................................................ 32, 33

*Mallet & Co. v. Lacayo,*
   16 F.4th 364 (3d. Cir. 2021) .......................................................................... 12

*Marupov v. Mayorkas,*
   2021 WL 4477221 (E.D. Pa. Sept. 30, 2021) ................................................ 33

*Maryland v. King,*
   567 U.S. 1301 (2012)...................................................................................... 34

*Mistretta v. U.S.,*
   488 U.S. 361 (1989)........................................................................................ 27

*N.Y. Cent. Secs. Corp. v. U.S.,*
   287 U.S. 12 (1932).......................................................................................... 28

*Nat'l Broad. Co. v. U.S.,*
   319 U.S. 190 (1943)........................................................................................ 28

*Nat'l Petroleum Refiners, Ass'n v. FTC,*
   482 F.2d 672 (D.C. Cir. 1973) .............................................................. 6, 15, 20

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*,
  416 U.S. 267 (1974)................................................................................................ 13

*Parker v. Brown*,
  317 U.S. 341 (1943)................................................................................................ 26

*Peerless Prods., Inc. v. FTC*,
  284 F.2d 825 (7th Cir. 1960) ................................................................................. 25

*Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*,
  249 A.3d 918 (Pa. 2021) ........................................................................................ 24

*Pont de Nemours & Co. v. FTC*,
  729 F.2d 128 (2d Cir. 1984)............................................................................... 4, 25

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
  415 U.S. 1 (1974).................................................................................................... 31

*Rowland v. Bissell Homecare, Inc.*,
  73 F.4th 177 (3d Cir. 2023) ................................................................................... 17

*Sears, Roebuck & Co. v. FTC*,
  258 F. 307 (7th Cir. 1919) ..................................................................................... 27

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947)................................................................................................ 13

*Second Amend. Found., Inc. v. ATF*,
  -- F. Supp. 3d---, 2023 WL 7490149 (N.D. Tex. Nov. 13, 2023)............................ 30

*Spiegel, Inc. v. FTC*,
  540 F.2d 287 (7th Cir. 1976) ................................................................................. 25

*Synthes, Inc. v. Gregoris*,
  228 F. Supp. 3d 421 (E.D. Pa. 2017) .................................................................... 12

*Syzygy Integration LLC V. Harri*s,
  616 F. Supp. 3d 439 (E.D. Pa. 2022) .................................................................... 33

*FTC v. Texaco, Inc.*,
  393 U.S. 223 (1968) .............................................................................. 23, 24, 27, 28

*U.S. v. Am. Tobacco Co.*,
  221 U.S. 106 (1911).................................................................................................. 8

*U.S. v. Cooper*,
  750 F.3d 263 (3d Cir. 2014)................................................................................... 28

*U.S. v. JS&A Grp., Inc.*,
   716 F.2d 451 (7th Cir. 1983) ................................................................. 6, 20

*U.S. v. Kalb*,
   891 F.3d 455 (3d Cir. 2018)..................................................................... 15

*United Refining Co. v. EPA*,
   64 F.4th 448 (3d Cir. 2023) .................................................................... 21

*U.S. v. Morton Salt Co.*,
   338 U.S. 632 (1950)........................................................................... 16, 18

*U.S. v. Restland Funeral Home, Inc.*,
   51 F.3d 56 (5th Cir. 1995) ...................................................................... 19

*West Virginia v. EPA*,
   597 U.S. 697 (2022)........................................................... 14, 20, 21, 23

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)............................................................... 27, 28, 29

*Winter v. NRDC*,
   555 U.S. 7 (2008)........................................................... 31, 32, 33, 34

*Yakus v. U.S.*,
   321 U.S. 414 (1944)................................................................................ 28

*Ysleta Del Sur Pueblo v. Texas*,
   596 U.S. 685 (2022)................................................................................ 17

**Federal Statutes**

5 U.S.C. § 705 ............................................................................................ 35

15 U.S.C. § 45 ................................................................................... *passim*

15 U.S.C. § 46 ................................................................................... *passim*

15 U.S.C. § 53(b) ......................................................................................... 5

15 U.S.C. § 56(a) ....................................................................................... 19

15 U.S.C. § 57a ............................................................................. 7, 15, 17

15 U.S.C. § 57b-3 ......................................................................... 7, 16, 22

15 U.S.C. § 1333 .......................................................................................... 5

15 U.S.C. §§ 41-58 ........................................................................................................ 3

Federal Trade Commission Act of 1914,
    Pub. L. No. 63-203, 38 Stat. 717 (codified as amended at 15 U.S.C. §§ 41-58) ...................... 3

Cigarette Labeling and Advertising Act of 1965,
    Pub. L. No. 89-92, 79 Stat. 282 (codified as amended at 15 U.S.C. § 1333) ........................... 5

Magnuson-Moss Warranty-Federal Trade Commission Improvement Act,
    Pub. L. No. 93-637, 88 Stat. 2183 (Jan. 4, 1975) ....................................................... 6

Federal Trade Commission Improvements Act of 1980,
    Pub. L. No. 96-252, 94 Stat. 374 (May 28, 1980) ...................................................... 7

**State Statutes**

N.Y. Gen. Bus. Law §§ 340 *et seq* ................................................................................ 26

73 Pa. Cons. Stat. § 201-2 ............................................................................................. 26

73 Pa. Cons. Stat. § 201-3 ............................................................................................. 26

**Regulations**

16 C.F.R. pt. 3 ................................................................................................................ 4

16 C.F.R. § 910.2 ..................................................................................................... 30, 35

16 C.F.R. § 910.5 ........................................................................................................... 35

Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health
    Hazards of Smoking, 29 Fed. Reg. 8,324 (July 2, 1964) ................................................. 5

Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps,
    36 Fed. Reg. 23,871 (Dec. 16, 1971),
        repealed by 43 Fed. Reg. 43,022 (Sept. 22, 1978) .................................................... 5

Non-Compete Clause Rule,
    88 Fed. Reg. 3,482 (Jan. 19, 2023) ......................................................................... 9

Non-Compete Clause Rule,
    89 Fed. Reg. 38,342 (May 7, 2024) ..................................................................... 1, 11

**Other Authorities**

120 Cong. Rec. 39,579 (1974) ................................................................................ 7

*In re POM Wonderful LLC*, No. 9344, Final Order (FTC Jan. 10, 2013) ..................................... 4

Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of
  the Federal Trade Commission Act, Comm'n File No. P221202 (Nov. 10, 2022),
  https://perma.cc/2G3F-2UW9 .............................................................................. 4

Harlan M. Blake, *Employee Agreements Not to Compete*,
  73 Harv. L. Rev. 625 (1960) .............................................................................. 8

S. Conf. Rep. 93-1408 (1974) ................................................................................ 6

# INTRODUCTION

Non-compete clauses ("non-competes") restrict competition in labor, product, and service markets by preventing workers from taking new jobs or starting new businesses. Because they undermine competition, non-competes have been scrutinized by courts for hundreds of years and are prohibited or restricted to some degree in all States. Yet, despite this patchwork of existing oversight, non-competes continue to impair competition, suppressing wages, entrepreneurship, and economic liberty.

Congress charged the Federal Trade Commission ("the Commission") through the Federal Trade Commission Act ("the Act" or "FTC Act") with preventing unfair methods of competition in or affecting commerce. Recognizing the need to address harms caused by non-competes, the Commission conducted an extensive inquiry into the issue spanning two presidential administrations, including a robust review of the literature, the Commission's own empirical analysis, and collection of input from market participants.

The Commission received overwhelming evidence from the public about the detrimental effects of non-competes. The Commission heard from doctors about rural healthcare shortages caused by non-competes, from aspiring innovators blocked from bringing to market a better product at a better price, from scientists for whom non-competes had impeded collaboration and delayed discovery of breakthrough cancer treatments, and from businesses prevented from expanding because dominant corporations had locked up key talent. The Commission's expert analysis of the record culminated in the promulgation of a rule declaring most existing non-competes unenforceable, subject to an exception for certain senior executives, and banning the future use of most non-competes. Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) ("Rule" or "Final Rule"). The Rule is expected to generate a 2.7% increase in new businesses each

1

year, raise wages, lower health care costs, and boost innovation.

Plaintiff ATS Tree Services, LLC ("ATS"), a tree servicing company that requires its employees to sign non-competes, challenges the Commission's effort to promote fair competition, seeking a stay of the Rule's effective date and a preliminary injunction preventing the Rule's enforcement. But ATS has not satisfied the demanding standard to justify extraordinary, emergency relief.

ATS is unlikely to succeed on the merits of its claims. ATS has not meaningfully contested that the use of non-competes is an unfair method of competition or that the Commission has authority to regulate non-competes through adjudication. Rather, ATS's argument centers on whether the Commission can prohibit the use of non-competes through rulemaking. But Congress authorized the Commission in clear language to prevent unfair methods of competition through both adjudication and rulemaking, and the Commission's choice of rulemaking to address the anti-competitive effects of non-competes is both logical and unremarkable. The major questions doctrine is also not implicated here, as the Rule falls squarely within the Commission's expertise and delegated authority. ATS has not offered a persuasive reason that the Commission cannot regulate "unfair methods of competition" generally and instead must apply a specific Sherman Act framework on a case-by-case basis, particularly given that Congress designed the FTC Act to bolster and complement—rather than duplicate—the Sherman Act. The FTC Act also provides an intelligible principle by which the Rule can be measured. Furthermore, and independently of ATS's likelihood of success on the merits, the balance of equities tips decidedly in favor of the Commission, which has projected sizeable benefits from the Rule in the form of increased new business formation, innovation, and higher wages, as well as lower prices.

For these reasons, and those explained herein, ATS's motion should be denied.

## BACKGROUND

### I.     THE FEDERAL TRADE COMMISSION ACT

Congress established the Commission in 1914 as a bipartisan expert agency. Federal Trade Commission Act of 1914, Pub. L. No. 63-203, 38 Stat. 717, codified as amended at 15 U.S.C. §§ 41-58. The Commission has two core mandates, set forth in Section 5 of the Act, which is codified at 15 U.S.C. § 45. First, Congress "empowered and directed [the Commission] to prevent … unfair methods of competition in or affecting commerce." *Id.* § 45(a)(2). Second, Congress empowered and directed the Commission to prevent "unfair or deceptive acts or practices [("UDAPs")] in or affecting commerce." *Id.*

### A.     The Commission's Directive to Prevent Unfair Methods of Competition

Section 5's directive to prevent "unfair methods of competition" confers on the Commission "broad powers to declare trade practices unfair." *FTC v. Brown Shoe Co.*, 384 U.S. 316, 320-21 (1966). The phrase that Congress intentionally chose—"unfair methods of competition"—was then new in the law. The initial proposal used the phrase "unfair competition," which had a recognized common law definition. *FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 310-11 (1934). But Congress found that phrase "too narrow," and substituted for it the "broader and more flexible phrase 'unfair *methods of* competition.'" *Id.* at 311-12 (emphasis added). The Supreme Court has recognized that "unfair methods of competition" encompasses conduct beyond that which violates the Sherman or Clayton Acts, and that the FTC Act "supplement[s] and bolster[s]" those statutes rather than merely duplicating them. *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394-95 (1953); *see FTC v. Cement Inst.*, 333 U.S. 683, 694 (1948) ("[T]here are many unfair methods of competition that do not … [violate the] Sherman Act.").

To fall within Section 5's ambit, conduct must first be a "method of competition" "as opposed to merely a condition of the marketplace, … such as high concentration or barriers to

entry." Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act at 8, Comm'n File No. P221202 (Nov. 10, 2022), https://perma.cc/2G3F-2UW9 ("Section 5 Policy Statement") (synthesizing caselaw); *see E.I. du Pont de Nemours & Co. v. FTC ("Ethyl")*, 729 F.2d 128, 139 (2d Cir. 1984). The conduct must also be "unfair," meaning it "goes beyond competition on the merits." Section 5 Policy Statement at 8-9. As articulated in caselaw and the Act's legislative history, whether competition goes beyond the merits requires "two key criteria": (1) the conduct is "coercive, exploitative, collusive, abusive, deceptive, predatory" or  "otherwise restrictive or exclusionary;" and (2) the conduct "tend[s] to negatively affect competitive conditions," *e.g.*, by tending to "foreclose or impair the opportunities of market participants" or "reduce competition between rivals." Section 5 Policy Statement at 9 & nn. 51, 52; *see also* 89 Fed. Reg. at 38,358-59 (explaining this framework). This "second prong … does not turn on whether the conduct directly caused actual harm in the specific instance at issue," and may be satisfied when conduct tends to harm competitive conditions "in the aggregate along with the conduct of others engaging in the same or similar conduct." 89 Fed. Reg. at 38,358.

### B.    The Commission's Section 5 Adjudicatory Authority

The Commission carries out its mandates—preventing unfair methods of competition and UDAPs—through various mechanisms, including adjudication and rulemaking. Pursuant to Section 5 of the Act, enforcement actions subject to adjudication before the Commission are governed by formal procedures and subject to judicial review. 15 U.S.C. § 45(b), (c); 16 C.F.R. pt. 3. These adjudications are precedential and apply to future Commission action.[1] The

---

[1] For example, the Commission announced its "competent and reliable scientific evidence" standard in an adjudication decades ago, *Bristol Meyers Co.*, 102 F.T.C. 21, 312, 315 (1983), and has regularly invoked that standard since, *e.g.*, *In re POM Wonderful LLC*, No. 9344, Final Order (FTC Jan. 10, 2013).

Commission may also seek injunctive relief in district court to halt activity that is unlawful under the Act. 15 U.S.C. § 53(b).

When a cease-and-desist order becomes final under Section 5(g), 15 U.S.C. § 45(g), the Commission may seek civil penalties for violations of the order, as well as injunctive relief, in court under Section 5(*l*). *Id.* § 45(*l*); *id.* § 56(a). Separately, if anyone, including a non-party, violates a UDAP rule or order with "actual knowledge," they may also be subject to civil penalties under Section 5(m). *Id.* § 45(m).

### C.     The Commission's Section 6 Rulemaking Authority

Section 6 of the Act, codified at 15 U.S.C. § 46, contains "additional powers" of the Commission, including significant investigative authority and rulemaking authority pertaining to any provision of the Act. *Id.* Section 6(g) empowers the Commission "to make rules and regulations for the purpose of carrying out the provisions of this Act." 38 Stat. at 722; *see also* 15 U.S.C. § 46(g). It also provides the Commission authority to "classify corporations." *Id.*

Before statutory amendments that created separate procedural requirements for UDAP rulemakings, *see infra*, the Commission used its Section 6(g) authority to promulgate twenty-six rules combatting various violations of Section 5, including both unfair methods of competition and UDAPs. *See* 89 Fed. Reg. at 38,349-50. For example, the Commission's "Octane Rule" declared it to be both an unfair method of competition and a UDAP to fail to disclose the minimum octane number on gasoline pumps. Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 Fed. Reg. 23,871 (Dec. 16, 1971), *repealed by* 43 Fed. Reg. 43,022 (Sept. 22, 1978).

Some rules attracted Congressional attention and were displaced by legislation. *See, e.g.*, Cigarette Labeling and Advertising Act of 1965, Pub. L. No. 89-92 (1965), 79 Stat. 282, codified as amended at 15 U.S.C. § 1333 (displacing Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324 (July 2, 1964)). Yet

Congress took no action to limit the scope of the Commission's rulemaking authority with respect to unfair methods of competition. The Commission's rulemakings also withstood judicial challenges to the Commission's statutory authority to promulgate such rules. The D.C. Circuit held that the Commission "is authorized to promulgate rules defining the meaning of the statutory standards of the illegality that the Commission is empowered to prevent," including unfair methods of competition. *Nat'l Petroleum Refiners, Ass'n v. FTC*, 482 F.2d 672, 698 (D.C. Cir. 1973) ("*National Petroleum*"). The Seventh Circuit later agreed and "incorporate[d] by reference that case's lengthy discussion of the Commission's rulemaking authority under section 6(g)." *U.S. v. JS&A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983).

After the D.C. Circuit upheld the Commission's rulemaking authority with respect to both UDAPs and unfair methods of competition in *National Petroleum*, Congress amended the FTC Act to add additional procedural requirements for UDAP rulemakings while explicitly declining to disturb the Commission's authority to issue rules regarding unfair methods of competition. *See* Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (Jan. 4, 1975) ("1975 Amendments"). The House initially proposed to prohibit the Commission from "prescribing rules with respect to unfair competitive practices." S. Conf. Rep. 93-1408 § 202 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7755, 7762. But the Senate rejected the House's proposal, and the Conference report adopting the final text of the 1975 Amendments made clear that "[t]he conference substitute does not affect any authority of the FTC under existing law to prescribe rules with respect to unfair methods of competition ...." *Id.*

Debate immediately before the Senate vote on the conference report further demonstrated Congress's awareness of the holding in *National Petroleum*, with a statement quoting from the decision and noting that, because the 1975 Amendments concerned consumer protection

provisions, the new procedural requirements "are limited to unfair or deceptive acts or practices rules." 120 Cong. Rec. 39,579, 40,713 (1974) (statement of Sen. Hart). Debate also made clear that the amendments "are not intended to affect the Commission's authority to prescribe and enforce rules respecting unfair methods of competition" and the Commission may continue to do so "in accordance with the informal rulemaking procedures of [the Administrative Procedure Act ("APA")]." *Id.*

The 1975 Amendments, which became Section 18 of the Act, codified at 15 U.S.C. § 57a, created special procedures for Rules defining UDAPs while explicitly preserving the Commission's Section 6(g) authority to promulgate rules for unfair methods of competition. Section 18(a)(2) provides:

> "The Commission shall have no authority under [the Act], other than its authority under this section, to prescribe any rule with respect to [UDAPs].... *The preceding sentence shall not affect any authority of the Commission to prescribe rules ... with respect to unfair methods of competition....*"

15 U.S.C. § 57a(a)(2) (emphasis added). Congress also amended Section 6(g) to reference Section 18, stating that the Commission may issue rules and regulations "except as provided in [Section 18(a)(2)]." *Id.* § 46(g).

In the Federal Trade Commission Improvements Act of 1980 ("1980 Amendments"), Congress again amended the Act. Pub. L. No. 96-252, 94 Stat. 374. These amendments, codified at 15 U.S.C. § 57b-3, created additional procedural steps for the Commission's rulemakings. Confirming that both Section 6(g) and Section 18(a) provide substantive rulemaking authority, Congress defined "rule" by reference to those sections and exempted from the new procedural requirements "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice." 15 U.S.C. § 57b-3(a)(1). Congress also demonstrated its awareness of the scope of rules promulgated

under Sections 6(g) and 18(a) by recognizing that amendments to those rules could have "an annual effect on the national economy of [$100 million] or more," "cause a substantial change in the cost or price of goods or services which are used extensively," or "have a significant impact upon [regulated] persons and … consumers." *Id.* § 57b-3(a)(1)(A)-(C).

## II.    THE NON-COMPETES RULEMAKING

### A.    The Proposed Rule

Non-competes undermine economic liberty, preventing individuals from moving freely to switch jobs or start their own businesses. For centuries, courts have scrutinized non-competes, recognizing their anticompetitive nature and pernicious effects. *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 636 (1960) (in *Dyer's Case*, the Court of Common Pleas in 1414 declared it "illegal at common law" to condition a promise on an agreement "not [to] practice his trade for a period of six months in the plaintiff's town"); *Mitchel v. Reynolds*, 1 P. Wms. 181, 190 (Q.B. 1711) (enforcing a non-compete but recognizing that non-competes may threaten "the loss of [the worker's] livelihood, and the subsistence of his family"). Non-competes are also subject to the Sherman Act. *See U.S. v. Am. Tobacco Co.*, 221 U.S. 106, 181-83 (1911). All States restrict non-competes to some degree, and four States have banned them.

In recent decades, a robust empirical literature studying non-competes has developed. Changes in state law have provided natural experiments enabling economists to isolate and quantify the harms caused by (not just correlated with) non-competes. 89 Fed. Reg. at 38,382-84. It has simultaneously become clear that non-competes are widespread, proliferating far beyond the boardroom to middle- and low-wage workers. *Id.* at 38,346 (over half of workers covered by non-competes are hourly workers). Employers continue to use non-competes even in States where they are unlawful. *Id.* at 38,429. And employers and workers face a confusing patchwork of non-compete policies, exacerbated by the rise in interstate remote work. *Id.* at 38,465.

Beginning in 2018, the Commission studied the extent of non-competes and their effects through public hearings and workshops, invitations for public comment, and a review of academic studies. *See* 89 Fed. Reg. at 38,343-44. In 2021, the Commission initiated several investigations into the use of non-competes, which resulted in consent decrees settling charges that those agreements were unfair methods of competition under Section 5 and requiring firms to eliminate non-competes for thousands of workers. *Id.* at 38,344. In 2023, the Commission proposed a rule that would require employers to rescind all existing non-competes and prohibit employers from entering into new ones. Non-Compete Clause Rule, 88 Fed. Reg. 3,482 (Jan. 19, 2023).

B.    **The Commission's Findings and Public Comments**

Before adopting the Final Rule, the Commission conducted an exhaustive survey and analysis of the economic literature regarding non-competes and considered the public comments that were filed in response. In its expert judgment, the Commission found that all non-competes: (1) are a method of competition as opposed to a condition of the marketplace, 89 Fed. Reg. at 38,374; (2) are facially unfair because they are restrictive and exclusionary, *id.*; and (3) tend to negatively affect competition in labor, product, and service markets, *id.* at 38,379-402, 38,406-11. The Commission also found that non-competes with non-senior executives are exploitative and coercive because they are often imposed unilaterally. *Id.* at 38,374-79. However, the same is not true for senior executives, who often have an opportunity to bargain for, and receive compensation for, non-competes. *Id.* at 38,405-06.

For labor markets, the evidence showed that non-competes tend to reduce competition by inhibiting efficient matching between workers and employers. *Id.* at 38,379. That is, non-competes reduce labor mobility by limiting the movement of workers between firms. *Id.* at 38,380-81. This in turn suppresses wages, even for workers *not* subject to non-competes. *Id.* at 38,382-84. For

product and service markets, the weight of the empirical evidence showed that non-competes inhibit new business formation by preventing workers from leaving their jobs to start firms, and by preventing existing businesses from hiring talented workers. *Id.* at 38,388-91. And for similar reasons, non-competes inhibit innovation. *Id.* at 38,394-95. The Commission also found that "the principal harms from non-competes arise from their tendency to negatively affect competitive conditions in the aggregate." *Id.* at 38,463. Thus, rulemaking (as opposed to case-by-case adjudication) is particularly appropriate here because, by preventing efficient matching between workers and employers, non-competes can have negative externalities that are difficult to capture in an adjudication. *Id.* at 38,463-64.

The overwhelming public support for the proposed rule reinforced these empirical findings. *See id.* at 38,344 (over 25,000 of the 26,000 comments received supported the proposed rule). Thousands of workers explained how restrictive non-competes prevent them from taking a better job or starting a competing business, which in turn keeps their wages low, subjects them to poor working conditions, and reduces the quality and increases the prices of goods or services their employers offer. *Id.* at 38,340-46; *contra* ATS Mot. 8 (mistakenly describing non-competes as a "benefit to both ATS and its employees"). Numerous small businesses and small business associations also supported the Rule. 89 Fed. Reg. at 38,491-92.

The Commission also exhaustively studied employers' purported justifications for non-competes. *Id.* at 38,422. Those justifications include claims that non-competes incentivize businesses "to make productive investments … in worker human capital (worker training), client and customer attraction and retention" or to "create[e] or shar[e] trade secrets or other confidential information with workers." *Id.* After reviewing relevant studies on the issue, however, the Commission concluded that "there are alternatives [to non-competes] that burden competition to

a lesser degree" without "suppressing competition" that the Rule leaves undisturbed, such as trade secret law, appropriately tailored non-disclosure agreements, fixed duration employment agreements, and competing on the merits. *Id.* at 38,422, 38,424-26. The Commission also concluded that, in any event, "the asserted benefits from the claimed business justifications from non-competes do not justify the considerable harm from non-competes." *Id.* at 38,422.

In short, the Commission concluded that prohibiting the use of non-competes would result in sizable benefits for the American economy due to the resulting increase in competition, dynamism, and wages. The Commission estimated that prohibiting non-competes would increase new business formation by 2.7% annually and spur innovation, leading to over 100,000 new patents over ten years. 89 Fed. Reg. at 38,433, 38,470. Worker earnings would increase by $400 to $488 billion over ten years, *id.*, and consumer prices would fall, *id.* at 38,478.

## C.     The Final Rule

For those reasons, the Commission adopted the Final Rule, which provides that it is an unfair method of competition under Section 5 for employers to enter into non-competes after the Rule's effective date, September 4, 2024. 89 Fed. Reg. at 38,342. The Rule also prohibits employers from enforcing existing non-competes and requires employers to provide notices that those clauses are unenforceable, except with respect to senior executives. *Id.* Existing non-competes with senior executives—which the Rule defines as any worker who makes above $151,164 annually and is in a policy-making position—may remain in effect. *Id.*; *id.* at 38,414.

## PROCEDURAL HISTORY

ATS filed suit on April 25, 2024, challenging the Rule on several constitutional and statutory bases under the APA. Compl. ¶¶ 101-54, ECF No. 1. On May 14, 2024, ATS moved for a stay of the Rule's effective date and preliminary injunction preventing enforcement of the Rule. Mot. for Stay of Effective Date & Prelim. Inj., ECF No. 10. Although ATS raised four independent

claims in its Complaint, its preliminary injunction motion is limited to Counts I, II, and IV. *See* Br. in Supp. of Mot. to Stay Effective Date & for Prelim. Inj. 2 n.1, ECF No. 11 ("ATS Mot.").

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014).[2] "Awarding preliminary relief, therefore, is only appropriate upon a clear showing that the plaintiff is entitled to such relief." *Id.* A plaintiff seeking a preliminary injunction must establish: (1) "that he is likely to succeed on the merits;" (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "that the balance of equities tips in his favor;" and (4) "that an injunction is in the public interest." *Id.*

The plaintiff must meet the first two "threshold factors"—likelihood of success on the merits and irreparable harm—before the court reaches the last two factors—balance of the equities and public interest. *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d. Cir. 2021). If the first two factors are met, the court then must determine "in its sound discretion, whether the balance of all four factors warrants granting preliminary relief." *Id.* The moving party bears a "heavy burden" to prove each element. *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 428-29 (E.D. Pa. 2017).

## ARGUMENT

## I.   ATS IS UNLIKELY TO PREVAIL ON THE MERITS.

The Commission properly determined that non-competes as a class are "unfair methods of competition" because they "tend to negatively affect competitive conditions in labor markets" as well as in "markets for products and services." 89 Fed. Reg. at 38,379. The Commission found that non-competes prevent efficient matching between employees and employers, reduce wages,

---

[2] Unless otherwise indicated, internal quotations and citations are omitted throughout.

inhibit new business formation and innovation, and ultimately may result in higher prices and lower quality products for consumers. *See id.* at 38,379-402. The Commission also concluded that non-competes with workers other than senior executives "are exploitative and coercive" because employers often impose them unilaterally "without meaningful negotiation or compensation" and because they "trap workers in worse jobs" and "force workers to bear significant harms and costs." *Id.* at 38,375-79.

ATS does not meaningfully challenge the Commission's ability to regulate non-competes or its conclusion that they are an "unfair method of competition." Rather, ATS primarily contends that the Commission cannot regulate non-competes through its rulemaking authority in Section 6. But the text and legislative history clearly demonstrate that Congress conferred rulemaking authority on the Commission. Because agencies empowered with both rulemaking and adjudicative authority have discretion to choose between the two, the Commission lawfully exercised its rulemaking authority to regulate non-competes. *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974); *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947).

For similar reasons, ATS's claim that the Commission improperly designated all non-competes as an unfair method of competition fails. ATS's nondelegation challenge falls short as well because the FTC Act's prohibition on "unfair methods of competition" establishes an intelligible principle, particularly in light of ample precedent applying this standard.

### A.    The Commission Has Statutory Authority to Promulgate the Final Rule.

The FTC Act declares unlawful "unfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a)(1). Congress "empowered and directed" the Commission to prevent the use of unfair methods of competition through both adjudication, *id.* § 45(b), and rulemaking, *id.* § 46(g). Notwithstanding Congress's clear grant of regulatory authority, ATS seeks to impose an artificial

and atextual limit on that authority, cabining it to "procedural" or "investigative" rules. *See* ATS Mot. 11. The statutory text contains no such limit. ATS's reading of Section 6 is further contrary to an interpretation of the statute explicitly ratified by Congress and would render other provisions superfluous.

ATS also invokes the major questions doctrine, but this is not an "extraordinary" case meriting a different approach to interpreting the words chosen by Congress. *Cf. West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Unfair methods of competition are at the core of the Commission's expertise, and ATS does not dispute that the Commission has the authority to address the lawfulness of non-competes through adjudication, including by the creation of rules through adjudication. ATS cites no authority for its position that it is an impermissible major-questions delegation to issue rules through notice and comment rulemaking when the agency could undoubtedly regulate the same area through adjudication and enforcement actions.

1.  **Ordinary tools of statutory interpretation make clear that Congress conferred legislative rulemaking authority on the Commission in Section 6.**

The statutory text and legislative history make clear that Congress conferred on the Commission the authority to promulgate legislative rules prohibiting unfair methods of competition. Analysis "begin[s], as always, with the language of the statute." *Duncan v. Walker*, 533 U.S. 167, 172 (2001). Section 6(g) states: "The Commission shall also have power ... to make rules and regulations for the purpose of carrying out the provisions of this Act." 38 Stat. at 722; *see also* 15 U.S.C. § 46(g) (substituting "subchapter" for "Act"). That provision thus permits the Commission to promulgate all "rules and regulations"—without any textual limitation—to implement Section 5(a)'s prohibition on unfair methods of competition. The Rule plainly falls within that ambit because it prohibits the use of non-competes as unfair methods of competition. And the Commission's power to prohibit practices in furtherance of Section 5(a) is further

confirmed by the Act's directive to the Commission to "prevent" entities subject to its jurisdiction "from using unfair methods of competition," *id.* § 45(a)(2). That directive inherently contemplates that the Commission will use forward-looking rulemaking—rather than only backward-focused adjudications—to "prevent" unfair methods of competition. *Contra* ATS Mot. 10 (arguing that nothing in Section 5 "authorizes" the Commission to use substantive rulemakings to "prevent" unfair methods of competition).

Confirming that Section 6(g) confers legislative rulemaking authority, including the authority to define unfair methods of competition, Congress ratified this interpretation in the 1975 Amendments. *See CFTC v. Schor*, 478 U.S. 833, 846 (1986) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress."). Congress enacted the 1975 Amendments against the backdrop of the then-recent decision in *National Petroleum*, which held that Section 6(g) empowers the Commission to issue rules defining unfair methods of competition.[3] 482 F.2d 672. Congress rejected a proposal to limit the Commission's rulemaking authority for unfair methods of competition, adopting instead statutory text explicitly preserving that authority consistent with the holding of *National Petroleum*. *See supra*, Background Part I.C; *see also* 15 U.S.C. § 57a(a)(2) (limits on the Commission's UDAP rulemaking authority "shall not affect any authority of the Commission to prescribe rules ... with respect to unfair methods of competition"); *U.S. v. Kalb*, 891 F.3d 455, 463 (3d Cir. 2018) (applying ratification canon to statutory text left intact after

---

[3] ATS argues that *National Petroleum* was wrongly decided. ATS Mot. 13-15. But the "correctness" of that decision is irrelevant to the key point here: The holding of that case provided the basis for the congressional ratification confirming that Section 6(g) extends to rules related to unfair methods of competition.

judicial interpretations of that text). ATS fails to explain why Congress would expressly preserve the Commission's unfair method of competition rulemaking authority if, as they claim, Congress never granted such authority. *Cf.* ATS Mot. 11-12.[4]

Congress revisited the Commission's rulemaking authority again in the 1980 Amendments, but left unchanged Section 6(g), as well as the language in Section 18 preserving the Commission's authority to regulate unfair methods of competition, further ratifying the Commission's authority. *See G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 619 (3d Cir. 2015) (Against "the backdrop" of judicial interpretations, "it bears particular significance that Congress reenact[s]" statutory text without change.). The 1980 Amendments added procedural requirements for all Commission rulemakings, not just UDAP rulemakings, defining "rule" as one promulgated under Section 6 or 18 of the Act. 15 U.S.C. § 57b-3(a)(1). While these amendments specifically included Section 6 rules, they specifically excluded non-legislative rules, which makes sense only if Congress understood rules issued under Section 6 to include legislative rules even after the 1975 Amendments removing UDAP rulemaking authority from Section 6. Accordingly, the 1980 Amendments demonstrate Congress's understanding that Section 6 provides the Commission with authority to promulgate legislative rules regarding unfair methods of competition. The 1980 Amendments also recognized that amendments to Commission rules could have "annual effect[s] on the national economy of $100,000,000 or more," suggesting that Congress contemplated legislative rules under Section 6 regarding unfair methods of competition might have a substantial economic impact. *Id.* § 57b-3(a)(1)(A).

---

[4] ATS makes much of the fact that the FTC did not promulgate legislative rules until 1962. ATS Mot. 5, 12. But agency powers, if granted, "are not lost by being allowed to lie dormant." *U.S. v. Morton Salt Co.*, 338 U.S. 632, 647-51 (1950).

ATS's reading of the statute is also "at odds with one of the most basic interpretive canons," because it would render language in Section 6(g) and 18(a)(2) "inoperative or superfluous." *Corley v. U.S.*, 556 U.S. 303, 314 (2009). Section 6(g) empowers the Commission to make rules "for the purpose of carrying out" the Act "*except* as provided in section [18(a)(2)]," which circumscribes the Commission's rulemaking authority specifically with respect to UDAPs. 15 U.S.C. § 46(g). This statutory carve-out for rules promulgated under Section 18(a)(2) would have no independent significance if Section 6(g) did not allow the Commission to make legislative rules before the 1975 Amendments. *See Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 182 (3d Cir. 2023) (reading statute to avoid superfluity and to "give full effect" to both provisions of the statute at issue). The explicit reservation of rulemaking authority for unfair methods of competition in Section 18(a)(2) would similarly be superfluous if the Commission did not already possess that authority. ATS's reading of Section 6(g) impermissibly asks the Court not to "give effect" to that reservation. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 699 (2022).

ATS's view of these same amendments is incompatible with the text of the statute and the unambiguous legislative history. ATS characterizes the 1975 Amendments as *granting* rulemaking authority for UDAPs, but this authority already existed under Section 6(g) and, indeed, the Commission had exercised it for the several preceding decades by promulgating over two dozen legislative rules. *See supra*, Background Part I.C. Rather, the 1975 amendments *narrowed* the Commission's pre-existing authority to issue rules regarding UDAPs by permitting only rules that "define with specificity" such acts and requiring the Commission to satisfy certain procedural requirements beyond those required by the APA. 15 U.S.C. § 57a(a)(1)(B); *see also id.* § 57a(a)(2); *id.* § 57a(b). It is thus no surprise that the 1975 Amendments did not "grant" the Commission rulemaking authority for unfair methods of competition; Congress previously granted the

17

Commission that authority in Section 6(g) and ratified the Commission's use of that authority to promulgate legislative rules regarding unfair methods of competition in the 1975 Amendments. *Contra* ATS Mot. 11-12. And while ATS contends it is not "likely" that Congress intended there to be different procedural tracks for UDAP and unfair method of competition rulemakings, *id.* at 12, legislative history reveals that was exactly Congress's intent. *See* 120 Cong. Rec. at 40,713 (in Senate debate before vote on 1975 Amendments, discussing "dual approach" to Commission rulemaking and how that "dual approach" would allow Congress to compare rules for unfair methods of competition issued under Section 6(g) with UDAP rules issued under Section 18). In short, the history of amendments to the FTC Act confirms what the plain text and structure of the statute already make clear: Section 6(g) authorizes the Commission to enforce the prohibition against "unfair methods of competition" through promulgating rules.

ATS's remaining arguments are unpersuasive. ATS gives the text of Section 6(g) short shrift, arguing that the location of Section 6(g) in the Act controls its interpretation. ATS Mot. 11. But there is nothing remarkable about the location of the Commission's substantive rulemaking authority. Section 6 is titled "additional powers," suggesting that Congress conferred these powers *in addition to* the Commission's adjudicatory authority. Indeed, courts have recognized the importance and breadth of other powers conferred by Section 6. *See, e.g.*, *Morton Salt Co.*, 338 U.S. at 642-43 (describing the Commission's "power of inquisition" as analogous to that of a grand jury and confirming the Commission's broad authority to "take steps to inform itself as to whether there is a probable violation of the law").

ATS also incorrectly claims that the Commission has no authority to enforce cease-and-desist orders regarding unfair methods of competition. ATS Mot. 10-11. After a cease-and-desist order becomes final, the Commission may seek, in federal court, civil penalties for violations of

the order as well as injunctive relief—including a permanent injunction enjoining conduct in violation of that order.[5] *See* 15 U.S.C. § 45(*l*); § 56(a). Thus, the Commission may enforce its cease-and-desist orders. That the Act contains a separate provision regarding civil penalties for other misconduct—*knowing* violations of UDAP rules and UDAP orders (including by non-parties to the Commission proceeding), *see id.* § 45(m), is irrelevant to whether and how the Commission's orders regarding unfair methods of competition are enforceable. In any event, ATS incorrectly reads *American Trucking Ass'n v. U.S.*, 344 U.S. 298 (1953), to stand for the proposition that all substantive grants of rulemaking authority must include particular enforcement provisions. *See* ATS Mot. 11. That case did not suggest that a specific reference to enforcement was required in order to grant legislative rulemaking authority but merely noted that a reference to enforcement made it more likely that a rulemaking provision was not administrative. *Am. Trucking Ass'n*, 344 U.S. 298.

Finally, ATS's repeated assertion that the Supreme Court's decision in *A.L.A. Schechter Poultry Corp. v. U.S.*, 295 U.S. 495 (1935), recognized the Commission as a "purely adjudicative agency" misunderstands that decision. *See* ATS Mot. 12; *id.* at 9-10. The Court there discussed the creation of the Commission, including its function as a "quasi judicial body," in comparison to the lack of any agency or "administrative procedure" created for implementation of the National Industrial Recovery Act, which left implementation solely to the President. *Schechter*, 295 U.S. at 533-34. The Court did not discuss the tools the Commission may use to exercise its mandate under

---

[5] Section 5(*l*) civil penalty suits can be brought by the Attorney General or by the Commission according to the terms of the Act. *See* 15 U.S.C. § 56(a); *see, e.g.*, *U.S. v. Restland Funeral Home, Inc.*, 51 F.3d 56, 57-59 (5th Cir. 1995) (holding that the Commission and Attorney General have "*concurrent* authority" to bring Section 5(*l*) civil penalty suits after the Act's notice period lapses). ATS's contention that only the Attorney General can bring such suits, ATS Mot. 10, is thus incorrect.

Section 5 to prevent unfair methods of competition, which include case-by-case adjudications as well as rulemaking. Indeed, the only courts to squarely address the question held that Section 6 authorizes the Commission to promulgate rules regulating unfair methods of competition. *See Nat'l Petroleum*, 482 F.2d 672; *JS&A Grp.*, 716 F.2d at 454.

### 2.   This case does not implicate the major questions doctrine.

ATS also invokes the major questions doctrine. ATS Mot. 18-20. But that doctrine is reserved only for "extraordinary" cases, "in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721. Congress "directed" the Commission to "prevent" the use of "unfair methods of competition." 15 U.S.C. § 45(a)(2). In the more than 100 years since, the Commission has done just that, both by adjudication and rulemaking. *See supra*, Background Part I.C. Finding that the use of non-competes is an unfair method of competition thus goes to the heart of the Commission's mandate under the Act and is not a "transformative expansion [of its] regulatory authority." *West Virginia*, 597 U.S. at 724.

ATS does not contest that the Commission could bring a Section 5 enforcement action—or, indeed, enforcement actions against every user of non-competes subject to the Commission's jurisdiction—charging that the use of non-competes is an unfair method of competition. It defies logic to argue that an agency unquestionably has the authority to carry out its express statutory mandate using its express authority to bring enforcement actions and adjudicate but not through its equally express authority to issue rules and regulations. Courts have applied the major questions doctrine when an agency steps outside of its area of expertise to regulate an issue beyond its core mandate, not when an agency chooses one method of regulation over another. *See, e.g.*, *West*

*Virginia*, 597 U.S. at 729 (characterizing agency as making "a different type of policy judgment" based on "expertise … *not* traditionally needed in [the agency's] regulatory development"); *NFIB v. DOL*, 595 U.S. 109, 117-18 (2022) (applying major questions doctrine to rule setting "public health measures" that were "outside of OSHA's sphere of expertise" rather than "workplace safety standards"). Congress directed the Commission to "prevent" unfair methods of competition, and in Section 5 and Section 6 of the original authorizing statute, Congress expressly granted the Commission discretion in deciding whether to carry out this mandate by way of adjudication, rulemaking, or both. *See United Refining Co. v. EPA*, 64 F.4th 448, 459 (3d Cir. 2023). And in the more than hundred years since the Act became law, through many amendments, Congress has never seen fit to revisit these core powers.

ATS errs by attaching significance to state and congressional debate regarding non-competes. *See* ATS Mot. 19-20. Congress explicitly directed the Commission to prevent unfair methods of competition. And the States' differing approaches to regulation of non-competes have enabled the Commission to identify how non-competes undermine fair competition. There is likely always preexisting debate on practices the Commission determines are unlawful under Section 5, but that is no reason to question the Commission's authority to act within its expertise. This case is therefore readily distinguishable from *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006), and *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000), where the court questioned "oblique" and "cryptic" grants of rulemaking authority, respectively.

The Commission's historical use of Section 6(g) to promulgate substantive rules further distinguishes it from major questions cases. In *West Virginia*, the seminal major questions doctrine case, the Court recounted the EPA's one prior rule under the relevant section, noting that "the legality of that choice was controversial at the time and was never addressed by a court." 597 U.S.

at 725. Contrary to that case, where the challenged rule had "no precedent" because it operated differently from the sole prior rule, the Commission's Rule is consistent with its historical use of Section 6(g), including for rules defining certain unfair methods of competition. And, further distinguishing the Rule from the one at issue in *West Virginia*, the only courts to have reviewed the Commission's rulemaking authority have upheld it. *See supra*, Background Part I.C.

ATS additionally argues that the major questions doctrine applies simply because of the Rule's economic scope. ATS Mot. 18-19. But there is no basis for this Court to invalidate an express grant of statutory authority on the grounds that it permits the Commission to take actions that have significant economic effect. *Cf. Biden v. Missouri*, 595 U.S. 87, 95 (2022) (not applying major questions doctrine despite agency action "go[ing] further than what the Secretary has done in the past"). Congress explicitly and deliberately created the Commission to prevent unfair methods of competition "in or affecting commerce." 15 U.S.C. § 45(a)(2). The Commission is authorized and designed to take actions affecting commerce throughout the national economy with significant economic effect. *See, e.g., id.* § 57b-3(a)(1)(A) (defining "rule" with reference to amendments that could have an "annual effect on the national economy of $100,000,000 or more"). ATS does not (and cannot) reasonably dispute that the Commission could carry out its statutory mandate to prevent unfair methods of competition by bringing multiple enforcement actions against companies that use non-competes as an unfair method of competition over time—which would likewise have significant economic effects. Given that, there is no basis for ATS's argument that there is a "major questions" problem with the Commission exercising its express rulemaking authority to carry out the same statutory mandate.

In any event, the Commission has "clear Congressional authorization" to issue rules relating to the Act, including unfair methods of competition, for all the reasons explained *supra*,

Argument II.A.1. *See West Virginia*, 597 U.S. at 724.

**B.**     **The Commission Properly Designated All Non-Competes As "Unfair Methods of Competition."**

Seemingly acknowledging that the Commission has the ability to regulate some non-competes, ATS next contends that the Commission improperly designated all non-competes as unfair methods of competition. ATS Mot. 15-21. ATS primarily challenges the Rule's application of the 2022 Section 5 Policy Statement in designating non-competes as "unfair methods of competition." The Policy Statement relies on decades of Supreme Court caselaw as well as the text, structure, and legislative history of Section 5 to conclude that "unfair conduct" is conduct that "goes beyond competition on the merits." Section 5 Policy Statement at 8. As explained above, conduct that goes beyond competition on the merits encompasses two "key criteria": (1) the conduct is "coercive, exploitative, collusive, abusive, deceptive, predatory" or similarly unfair; and (2) the conduct "tend[s] to negatively affect competitive conditions," for example by tending to "foreclose or impair the opportunities of market participants" or "reduce competition between rivals." Section 5 Policy Statement at 9 (collecting cases); *see also* 89 Fed. Reg. at 38,358-59 (explaining this framework). As the Policy Statement explains, these criteria are grounded in established law and Supreme Court precedent. Section 5 Policy Statement at 9 nn. 51, 52, 55-58. Further, it is well-established that courts should defer to the Commission as to what constitutes an unfair method of competition under Section 5. "The precise impact of a particular practice on the trade is for the Commission, not the courts, to determine," *Motion Picture Advert. Serv. Co.*, 344 U.S. at 396, and accordingly, "determinations of the Commission, an expert body charged with the practical application of the statute, are entitled to great weight." *Texaco*, 393 U.S. at 226; *see also R.F. Keppel & Bro.*, 291 U.S. at 314.

ATS contends that the Commission should have instead adopted the "rule of reason," but that is a specific doctrinal framework that applies to some claims under the Sherman Act and does not apply here. The FTC Act was specifically enacted to supplement the Sherman Act and the rule of reason, as Congress used distinct terminology to provide a separate framework for assessing illegality. *See, e.g.*, S. Rep. No. 1326, 62d Cong., 3d Sess., at xiv (1913) (explaining that the rule of reason had made it "impossible to predict" whether courts would condemn many "practices that seriously interfere with competition, and are plainly opposed to the public welfare," and thus called for legislation "establishing a commission for the better administration of the law and to aid in its enforcement"). Indeed, the Supreme Court has repeatedly affirmed that Section 5 reaches conduct that would not itself violate the Sherman Act, which ATS does not appear to dispute. *Motion Picture Advert. Serv. Co.*, 344 U.S. at 394-95.

Moreover, contrary to ATS's claim that the Commission needs to demonstrate actual anticompetitive harm to establish a Section 5 violation, "unfair methods of competition" includes "incipien[t] acts" and conduct with a "dangerous tendency … to hinder competition," *FTC v. Cement Inst.*, 333 U.S. 683, 690 (1948); *see also Texaco, Inc.*, 393 U.S. at 224; 89 Fed. Reg. at 38,358 (conduct that tends to negatively affect competition "in the aggregate" violates Section 5). That some Pennsylvania courts have applied the rule of reason to evaluate the validity of individual non-competes on a case-by-case basis—under laws other than the FTC Act—does not make this test any more relevant to the Commission's exercise of rulemaking authority here. ATS's citations to cases applying the rule of reason under either the Sherman Act or Pennsylvania law are thus inapposite. *See Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001), *as amended* (June 12, 2001) (Sherman Act claims); *Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*, 249 A.3d 918, 932 (Pa. 2021) (Pennsylvania law claims).

ATS heavily relies on *Ethyl*, 729 F.2d 128, but that case did not apply the rule of reason—rather, *Ethyl* affirmed the Commission's "broad" power to "declare trade practices unfair." *Id*. at 136; *see id*. at 136-37 (describing the contours of the Commission's authority under Section 5). *Ethyl* involved an oligopoly in which three companies "independently and unilaterally adopted at different times" certain pricing practices. *Id.* at 130. The case did not involve non-competes and does not speak to the widespread use of non-competes, which, according to the Commission's findings, tend to harm competition and are not justified by legitimate business purposes. *See* 89 Fed. Reg. at 38,379-402.[6] And unlike in *Ethyl*, in which the Court characterized the alleged conduct as "non-collusive, non-predatory and independent conduct of a non-artificial nature," 729 F.2d at 137, the Commission found that non-competes involving workers other than senior executives "are exploitative and coercive" because employers often impose them unilaterally "without meaningful negotiation or compensation" and because they "trap workers in worse jobs" and "force workers to bear significant harms and costs." Fed. Reg*.* at 38,375-79.

ATS's argument that the federal government is precluded from regulating non-competes under the Act simply because state law may also address non-competes is unavailing. *See* ATS Mot. 17-18. In the context of the Commission's authority to regulate unfair and deceptive practices under Section 5, courts have upheld the federal government's ability to regulate conduct also governed by the states. *See Peerless Prods., Inc. v. FTC*, 284 F.2d 825, 827 (7th Cir. 1960); *Spiegel, Inc. v. FTC*, 540 F.2d 287, 292-93 (7th Cir. 1976). As described, *supra* Background II.A, courts have scrutinized non-competes for centuries, and non-competes have also long been subject to federal antitrust laws. Indeed, it is commonplace for antitrust law to involve overlapping

---

[6] ATS also ignores that the Commission found that the "claimed benefits do not justify the harms from non-competes." 89 Fed. Reg. at 38,422.

jurisdiction between states and the federal government. For example, many states have their own antitrust laws regulating conduct similar to federal antitrust laws. *See, e.g.*, 73 Pa. Cons. Stat. §§ 201-2(4), 201-3(a); N.Y. Gen. Bus. Law §§ 340 *et seq*. Moreover, as noted, ATS does not appear to contest that the Commission could regulate *some* non-competes—it takes issue only with the Commission's ability to regulate "all" non-competes through rulemaking, ATS Mot. 15, undermining its claim that non-competes fall within the exclusive province of the states. Accordingly, the Rule does not "alter the usual constitutional balance between the States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), and the clear statement principles ATS invokes are misplaced.

Further, the Rule expressly states that State laws that restrict non-competes and do not conflict with the Rule are not preempted. 89 Fed. Reg. at 38,505. The Rule "reflects the Commission's intent that States may continue to enforce in parallel laws that restrict non-competes and do not conflict with the final rule, even if the scope of the State restrictions is narrower than that of the final rule." *Id*. at 38,454. This "makes explicit" that the Rule is not intended to "occupy the field or to preempt state law in the absence of requirements that are inconsistent with the rule." *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 990 (D.C. Cir. 1985) (upholding FTC UDAP rule that preempted conflicting state laws).[7] And because Section 6(g) authorizes the Commission to promulgate rules regarding "unfair methods of competition," the Court should reject ATS's argument that the Rule cannot preempt state law because the Commission lacks rulemaking authority, *see* ATS Mot. 17.

---

[7] ATS relies on *Parker v. Brown*, 317 U.S. 341, 351-52 (1943), but that case did not address any preemption issues. In *Parker*, the Court rejected a claim by a raisin producer that a state program regulating the marketing of raisins violated the Sherman Act. *Id*. at 350. The Court explained that the Sherman Act "must be taken to be a prohibition of individual and not state action." *Id*. at 352. That holding does not imply that federal antitrust laws cannot have preemptive effect.

Finally, because the Commission has clear rulemaking authority, *see supra* Argument I.A, and because there is a clearly-defined intelligible principle, *see infra* Argument I.C., the Court need not apply any constitutional avoidance principles here.

### C.    Congress Lawfully Delegated Authority to the Commission.

ATS's nondelegation challenge lacks merit. The nondelegation doctrine requires that Congress articulate "an intelligible principle" to guide the agency. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). That standard is "not demanding." *Gundy v. U.S.*, 588 U.S. 128, 146 (2019) (plurality op.). It stems from the "practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. U.S.*, 488 U.S. 361, 372 (1989). The Supreme Court has only twice found a congressional delegation of power unconstitutional, and only because "Congress had failed to articulate any policy or standard" to confine the agency's discretion. *Gundy*, 588 U.S. at 130 (plurality op.).

Section 5's directive that the FTC prevent "unfair methods of competition in or affecting commerce," 15 U.S.C. § 45(a), easily meets the intelligible-principle test. For decades, the Supreme Court has approved of Congress's delegation of authority to the Commission to regulate "unfair methods of competition." *See, e.g.*, *Texaco,* 393 U.S. at 225; *Brown Shoe,* 384 U.S. at 320. The Court has described the meaning of the phrase "unfair methods of competition" as "obvious": "[T]he word 'competition' imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors." *FTC v. Raladam Co.*, 283 U.S. 643, 649 (1931); *accord Sears, Roebuck & Co. v. FTC*, 258 F. 307, 311 (7th Cir. 1919) (rejecting nondelegation challenge to the Act). Particularly given this backdrop, the "unfair method of competition" standard is not nearly as sweeping as other, more generalized delegations previously upheld by the Supreme Court, such as the authority to set "fair

27

and equitable" prices, *Yakus v. U.S.*, 321 U.S. 414, 427 (1944); to determine "just and reasonable" rates, *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944); to regulate broadcast licensing as "public interest, convenience, or necessity" require, *Nat'l Broad. Co. v. U.S.*, 319 U.S. 190, 225-26 (1943); to allow railroad acquisitions in the "public interest," *N.Y. Cent. Secs. Corp. v. U.S.*, 287 U.S. 12, 24 (1932); and to issue any air quality standards "requisite to protect the public health[,]" *Whitman*, 531 U.S. at 472.

Further, in analyzing a nondelegation claim, courts may consider the "purpose" of the statute, its "factual background," and the "statutory context." *U.S. v. Cooper*, 750 F.3d 263, 270 (3d Cir. 2014) (quoting *Am. Power & Light Co. v. Sec. & Exch. Comm'n*, 329 U.S. 90, 104 (1946)). Congress initially enacted the FTC Act "to supplement and bolster" the Sherman and Clayton Acts. *Motion Picture Advert. Serv. Co.*, 344 U.S. at 394-95. Specifically, the FTC Act was intended "to stop in their incipiency those methods of competition which fall within the meaning of the word 'unfair.'" *Raladam Co.*, 283 U.S. at 647; *Texaco, Inc.*, 393 U.S. at 225. The Supreme Court has also understood the phrase "unfair methods of competition" to include trade practices that "conflict with basic policies of the Sherman and Clayton Acts even though such practices may not actually violate these laws." *Brown Shoe Co.*, 384 U.S. at 321. *A.L.A. Schechter Poultry Corp. v. U.S.* further underscores the validity of the Act's delegation. 295 U.S. 495 (1935). The Court there contrasted the National Industrial Recovery Act's impermissible delegation to regulate "fair competition" with the permissible delegation in the Act to regulate "unfair methods of competition." *Id*. at 531-36. Even though the latter was also "an expression new in the law" without "precise definition," the Commission could determine what constituted "unfair methods of competition" "in the light of particular competitive conditions and of what is found to be a specific and substantial public interest." *Id*. at 532-33. The Rule does just that.

Contrary to ATS's claims, ATS Mot. 22, the *Schechter* Court disclaimed reliance on the Commission's function as an adjudicatory body, stating that "the difference between the code plan of the Recovery Act and the scheme of the [FTC] Act lies not only in procedure but in subject matter." *Schechter*, 295 U.S. at 533-34. The Court understood the phrase "fair competition" as having "a much broader range and a new significance" than "unfair methods of competition." *Id*. at 534. ATS identifies no support for its novel theory that a statutory phrase can constitute a lawful delegation in the context of adjudication but an unlawful delegation with respect to rulemaking.

ATS also contends that the Commission's identification of specific criteria it will consider when determining whether a method of competition is unfair in the Section 5 Policy Statement shows Section 5 lacks an intelligible principle. *See* ATS Mot. 22-23. But agencies frequently elaborate on statutory standards without raising nondelegation issues, and the Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474-75. And ATS's reference to the statutory provision governing rulemakings for UDAPs in 15 U.S.C. § 45(n) has nothing to do with the Commission's ability to regulate unfair methods of competition, which draws from an entirely separate source of authority.

## II.   ATS FAILS TO DEMONSTRATE IRREPARABLE HARM.

ATS's failure to establish a likelihood of success on the merits is a sufficient basis to deny its motion. *See, e.g.*, *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 374 (3d Cir. 2012) (declining to address the remaining preliminary injunction factors where the plaintiff had not established a likelihood of success on the merits). In any event, ATS also fails to establish that a preliminary injunction is necessary to prevent imminent, irreparable harm.

First, ATS contends that it "will incur costs to comply with the [Rule's] notice requirement." ATS Mot. 23. The Rule requires employers to notify current and former employees

who are subject to existing non-competes that their non-competes cannot and will not be enforced. 89 Fed. Reg. at 38,503 (codified at 16 C.F.R. § 910.2(b)(1)). Notice may be provided by email, text message, mail, or hand-delivery; an exception applies where the employer has no record of an email address, mobile telephone number, or street address for the employee; and the Rule includes model language that satisfies the notice requirement. *Id.* at 38,503-04 (codified at 16 C.F.R. § 910.2(b)(2)-(4)).

ATS fails to establish that the costs of providing such notice are sufficient to warrant the extraordinary remedy of a preliminary injunction. ATS does not attempt to quantify the associated costs it anticipates; instead, it invokes the Commission's analysis in the Rule. ATS Mot. 23 (citing 89 Fed. Reg. at 38,483-84). The Commission projected that the average affected firm will incur costs of $27.78 to comply with the one-time notice requirement. *See* 89 Fed. Reg. at 38,483-84 (estimating a cost of $21.23 per firm to compose and send digital notice, based on twenty minutes of a human resource specialist's time at an average rate of $63.70 per hour, in addition to $1.81 per printed notice to employees for whom the firm lacks digital contact information—including staff time, mailing supplies, and postage—estimated to include up to 12.3 million workers, divided by 3.4 million affected firms, for a total of $6.55 per firm). Such *de minimis* costs do not satisfy ATS's burden to demonstrate irreparable harm.[8]

---

[8] *See, e.g.*, *Cmty. Oncology All. v. Becerra*, 2023 WL 9692027, at *5 (D.D.C. Dec. 21, 2023) ("[A] movant's failure to 'demonstrate anything more than *de minimis* economic harm, is fatal to [its] motion for the extraordinary relief of a preliminary injunction.'" (citation omitted)); *Second Amend. Found., Inc. v. ATF*, -- F. Supp. 3d---, 2023 WL 7490149, at *14 (N.D. Tex. Nov. 13, 2023) (for a preliminary injunction, "[a] party must show that its non-speculative compliance costs are more than *de minimis*"), *appeal filed*, No. 23-11157 (5th Cir. Nov. 14, 2023); *Bernardino v. Barnes & Noble Booksellers, Inc.*, 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017), *report and recommendation adopted*, 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017) (same); *Am. Beverage Corp. v. Diageo N. Am., Inc.*, 936 F. Supp. 2d 555, 615 (W.D. Pa. 2013) (same). In other contexts, courts have recognized that dollar amounts greater than the costs at issue here were *de*

Even if plaintiffs could demonstrate some compliance costs that were more than *de minimis*, such ordinary expenses cannot justify preliminary injunctive relief. As the Supreme Court has made clear, such relief is "an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Consistent with that admonition, the Third Circuit has held that ordinary and insubstantial costs of operating a business in compliance with government regulation cannot constitute irreparable harm. *See A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976) ("Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that … such an injury, alone, would satisfy the requisite for a preliminary injunction."). "Rather, … the threatened injury must be, in some way, peculiar." *Id.*; *accord Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("ordinary compliance costs are typically insufficient to constitute irreparable harm"); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury … from attempted compliance with government regulation ordinarily is not irreparable harm."). Similarly, the Supreme Court has held that ordinary "litigation expense," even if "unrecoupable," "does not constitute irreparable injury" for purposes of a preliminary injunction. *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974).

Next, ATS asserts that, as a result of the Rule, ATS will need to "make modifications to its business to account for the inability to prevent its employees from immediately leaving for a direct competitor," such as by "reduc[ing] the training that it provides its workers." ATS Mot. 23. But nothing in the Rule requires ATS to reduce its training, and to the extent that ATS chooses to do so, that decision constitutes "self-inflicted" harm that "does not qualify as irreparable." *Caplan v.*

---

*minimis. E.g., Dennis v. Dowdle*, 937 F.2d 612 (9th Cir. 1991) ($30); *Badii v. Rick's Cabaret Int'l, Inc.*, 2014 WL 550593, at *8 (N.D. Tex. Feb. 11, 2014) ($80 to $90); *Carr v. City of Florence*, 729 F. Supp. 783, 791 (N.D. Ala. 1990) ($100), *aff'd mem.*, 934 F.2d 1264 (11th Cir. 1991).

*Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995). Moreover, as the Commission addressed in the preamble to the Rule, "the provision of training can itself be a competitive differentiator for an employer" in a more competitive labor market where non-competes do not restrict labor mobility. 89 Fed. Reg. at 38,431.

ATS's cursory reference to the "risk" of losing employees to competitors after the Rule takes effect also fails to satisfy its burden with respect to irreparable harm. ATS Mot. 23. ATS has proffered no evidence that any of its twelve employees would leave the company but for his or her non-compete. *See* Compl. ¶ 71 (alleging that "ATS currently employs 12 people"). It is well established that the mere "possibility of irreparable harm" is not an adequate basis for a preliminary injunction. *Winter v. NRDC*, 555 U.S. 7, 22 (2008). In particular, a court in this Circuit has held that a potential "reduction in workforce" was "speculative and thus, not cognizable harm[]" for purposes of a preliminary injunction. *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 532 F. Supp. 2d 666, 682 (D.N.J. 2007), *aff'd*, 566 F.3d 999 (Fed. Cir. 2009).

*Louisiana v. Biden*, on which ATS relies, is readily distinguishable in this respect. That case addressed a COVID-19 vaccination requirement applicable to federal contractors' employees. 55 F.4th 1017, 1019 (5th Cir. 2022). The plaintiffs proffered testimony from an employee who was denied a religious exemption from the vaccination and thus faced termination. *Louisiana v. Biden*, 575 F. Supp. 3d 680, 687 (W.D. La. 2021), *aff'd*, 55 F.4th 1017 (5th Cir. 2022). By contrast, and as noted, ATS has proffered no evidence that any of its employees would leave the company but for his or her non-compete—much less that any already has done so.

Moreover, ATS errs in framing "the increased labor mobility afforded by the final rule as a one-way street." 89 Fed. Red. at 38,430. That is, even in the speculative event that any of ATS's employees were to leave the company after the Rule takes effect, ATS will "benefit from access

to a wider pool of labor," because its competitors' employees will no longer be bound by non-competes. *Id.*; *see also id.* at 38,379 (explaining that "non-competes tend to negatively affect competitive conditions in labor markets by inhibiting efficient matching between workers and employees"). Thus, firms in the aggregate will benefit, and individual employers also will benefit to the extent that they are "ab[le] to compete for workers on the merits to attract and retain talent," *id.* at 38,430—such as by offering the specialized training and apprenticeship opportunities that ATS provides its employees, *see* Decl. of David Servin ¶¶ 11-17, ECF No. 11-1.

Finally, ATS incorrectly suggests that invalidating a contractual term, alone, itself constitutes irreparable harm. ATS Mot. 24. For purposes of a preliminary injunction, "the injury alleged must be 'both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief.'" *Marupov v. Mayorkas*, 2021 WL 4477221, at \*7 (E.D. Pa. Sept. 30, 2021). ATS has not shown that the invalidation of a contractual term—without more, such as action taken in reliance on such invalidation, which, as noted, ATS has not established is likely to occur here—is incapable of remediation through subsequent reinstatement of that term. ATS attempts to rely on *Syzygy Integration LLC v. Harris*, but in that case, the court granted a preliminary injunction where a former employee already was employed by a competitor, in alleged violation of his non-compete. 616 F. Supp. 3d 439, 443 (E.D. Pa. 2022), *appeal dismissed*, 2022 WL 18587916 (3d Cir. Dec. 7, 2022). *Syzygy* thus underscores ATS's failure to establish anything more than the speculative possibility of harm when the Rule takes effect and ATS's employees are no longer bound by non-competes.

## III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DISFAVOR A PRELIMINARY INJUNCTION.

Finally, the balance of equities and public interest weigh markedly in the Commission's favor. Initially, ATS mistakenly conflates its merits arguments with the distinct requirement to

demonstrate that the balance of equities and public interest tip in its favor. It characterizes the Rule as "unlawful agency action" and then argues that there is no public interest in its enforcement. ATS Mot. 24. Conversely, whenever the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). ATS's framing would collapse the merits prong of the preliminary injunction standard with the equities and public interest factors. But the Supreme Court has made clear that a likelihood of success on the merits, standing alone, is not a sufficient basis for that extraordinary remedy. *See, e.g.*, *Winter*, 555 U.S. at 26 (reversing entry of a preliminary injunction on the ground "that the balance of equities and consideration of the overall public interest" weighed in favor of the government, despite accepting the lower courts' conclusion that the agency action in question was likely unlawful). Thus, even if ATS had established a likelihood of success on the merits (it has not), the Court still should deny its preliminary injunction motion on the distinct ground that it has failed to meaningfully address the remaining requirements, much less establish that they weigh in ATS's favor.

Indeed, ATS makes no effort to establish that any costs it may incur outweigh the Rule's expected benefits. Those benefits include increasing new business formation by 2.7%; spurring innovation, including by leading to over 100,000 new patents over the next decade and by increasing patent value; increasing wages by $524 annually for the average worker; decreasing healthcare spending by between $74 billion and $194 billion over the next decade; and protecting the fundamental freedom of workers to pursue employment. 89 Fed. Reg. at 38,433, 38,476-77, 38,506. And ATS wholly ignores the comment record, which is replete with stories from workers across the country experiencing the harms from non-competes, underscoring the strong public interest in the Rule taking effect as scheduled.

## IV.    ANY RELIEF SHOULD BE TAILORED.

If the Court determines that emergency relief is warranted, any injunction or stay of the Rule's effective date should be limited to the extent necessary to redress ATS's injuries. ATS does not argue otherwise. *See generally* ATS Mot. Under Article III's case-or-controversy requirement, a court may grant relief only insofar as it remedies "the inadequacy that produced [a plaintiff's] injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018). Reinforcing that constitutional limitation is the traditional equitable principle that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Labrador v. Poe,* 144 S. Ct. 921, 923, 925-28 (2024) (Gorsuch, J., concurring) (documenting the significant legal and practical problems with nonparty relief generally and universal injunctions specifically).

These constitutional and equitable principles are reinforced by the APA's text, which limits relief in the form of a stay of a rule's effective date "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. And the legislative history of that provision makes clear that Congress intended § 705 relief to be "equitable" and to be used only "to prevent irreparable injury." H.R. Rep. No. 79-1980, at 43 (1946). Thus, consistent with equitable principles, Congress understood that "[s]uch relief would normally, if not always, be limited to the parties complainant." *Id.* The APA thus requires this court to decline to enter nationwide relief, however styled, where a more limited remedy would fully address ATS's purported injury. Finally, narrow tailoring is especially important here because the Rule's severability provisions make clear that the Commission intended the Rule to remain in effect to the maximum extent possible if any portion is held "invalid or unenforceable" or is "stayed." 89 Fed. Reg. at 38,505 (codified at 16 C.F.R. § 910.5).

## CONCLUSION

ATS's motion for a stay of effective date and preliminary injunction should be denied.

Dated: June 4, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY R. FARBY
Assistant Branch Director

*/s/ Arjun Mody*
RACHAEL L. WESTMORELAND
TAISA M. GOODNATURE
ARJUN MODY (DC #90013383)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 451-7723
E-mail: arjun.a.mody@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed electronically and is available for viewing and downloading from the ECF system.

/s/ Arjun Mody
ARJUN MODY

37