UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

ATS TREE SERVICES, LLC,

        Plaintiff,

      v.

FEDERAL TRADE COMMISSION, et al.,

        Defendants.

No. 2:24-cv-01743-KBH

**BRIEF OF AMICI CURIAE PUBLIC CITIZEN AND
NATIONAL EMPLOYMENT LAW PROJECT
IN OPPOSITION TO PLAINTIFF'S MOTION TO STAY EFFECTIVE DATE
AND FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................ii

INTEREST OF AMICI CURIAE .................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

ARGUMENT ..................................................................................................................... 2

I.      The Rule significantly benefits workers, including low-wage workers. ............................2

      A.  Noncompete provisions are prevalent in employment contracts,
            including for low-wage workers. ....................................................................2

      B.  Noncompetes are often imposed without meaningful consent. ................................... 4

      C.  Noncompetes harm workers. ........................................................................ 6

          1.  Noncompetes reduce wages and job mobility for all workers. .............................. 6

          2.  Noncompetes impose significant harms on low-wage workers............................ 8

II.     The Rule is within the FTC's statutory authority................................................ 12

CONCLUSION................................................................................................................ 14

CERTIFICATE OF SERVICE ....................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**                                                                     **Pages**

*Mourning v. Family Publications Service, Inc.*,
    411 U.S. 356 (1973) ................................................................................ 14

*National Petroleum Refiners Ass'n v. FTC*,
    482 F.2d 672 (D.C. Cir. 1973) .......................................................... 13, 14

*Superior Oil Co. v. FERC*,
    563 F.2d 191 (5th Cir. 1977) ................................................................ 14

*United States v. JS & A Group., Inc.*,
    716 F.2d 451 (7th Cir. 1983) ................................................................ 13

**Statutes**

15 U.S.C. § 45(a)(1) .................................................................................. 12

15 U.S.C. § 45(a)(2) .................................................................................. 12

15 U.S.C. § 46(g) ................................................................................ 12, 13

15 U.S.C. § 57a(a)(2) ........................................................................... 12, 13

**Regulatory Materials**

Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) ......................................... *passim*

Comments on Non-Compete Clause Rule, Notice of Proposed Rulemaking,
    https://www.regulations.gov/docket/FTC-2023-0007/comments ..................................... 3

    American Federation of Labor and Congress of Industrial Organizations (AFL-CIO),
    Comment Letter, FTC-2023-0007-21103 (Apr. 19, 2023) ................................................. 3

    Center for Law and Social Policy,
    Comment Letter, FTC-2023-0007-20946 (Apr. 18, 2023) ........................................... 10, 11

Justice at Work Pennsylvania,
Comment Letter, FTC-2023-0007-19417 (Apr. 17, 2023) ................................................. 5

The Leadership Conference on Civil and Human Rights,
Comment Letter, FTC-2023-0007-21100 (Apr. 19, 2023) ........................................... 5, 11

The Legal Aid Society,
Comment Letter, FTC-2023-0007-20967 (Apr. 17, 2023) ...................................... 3, 5, 10

Mobilization for Justice,
Comment Letter, FTC-2023-0007-19361 (Apr. 17, 2023) ................................................. 5

National Employment Law Project,
Comment Letter, FTC-2023-0007-20862 (Apr. 19, 2023) ............................. 5, 7, 8, 9, 10

Public Justice Center,
Comment Letter, FTC-2023-0007-20893 (Apr. 3, 2023) ........................................... 5, 11

Public Rights Project,
Comment Letter, FTC-2023-0007-20926 (Apr. 14, 2023), ............................................. 11

18 State Attorneys General,
Comment Letter, FTC-2023-0007-21043 (Apr. 19, 2023) .......................... 3, 4, 6, 8, 9, 10

Texas RioGrande Legal Aid,
Comment Letter, FTC-2023-0007-21014 (Apr. 19, 2023) ......................................... 9, 10

## Articles

Natarajan Balasubramanian et al., *Employment Restrictions on Resource Transferability and Value Appropriation from Employees* (2024),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403 .................................... 3

Natarajan Balasubramanian et al., *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*,
57 J. Hum. Res. S349 (Apr. 2022),
https://jhr.uwpress.org/content/wpjhr/57/S/S349.full.pdf.................................................. 7

Tyler Boesch et al., Federal Reserve Bank of Minneapolis,
*Non-compete contracts sideline low-wage workers* (Oct. 15, 2021),
https://www.minneapolisfed.org/article/2021/non-compete-contracts-sideline-low-wage-workers................................................................................................................ 3, 4, 8, 9

Alexander Colvin & Heidi Shierholz, Econ. Policy Inst.,
*Noncompete agreements* (2019), https://www.epi.org/publication/noncompete-agreements ..................................................................................................................... 3

iii

Jane Flanagan, *No Exit: Understanding Employee Non-Competes and Identifying Best Practices to Limit Their Overuse*, Am. Const. Soc'y (Nov. 2019), https://www.acslaw.org/wp-content/uploads/2019/11/Understanding-Employee-Non-Competes-and-Identifying-Best-Practices-to-Limit-Their-Overuse.pdf ............................................................................... 4

Matthew S. Johnson et al., *The Labor Market Effects of Legal Restrictions on Worker Mobility* (Nat'l Bureau of Econ. Research, Working Paper No. 31929, 2023) .......... 6, 7, 8

Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143 (2022) ............................................................................... 7

Matt Marx & Ryan Nunn, *The Chilling Effect of Non-compete Agreements*, The Hamilton Project (May 20, 2018), https://www.hamiltonproject.org/publication/post/the-chilling-effect-of-non-compete-agreements ........................................................................................................... 10

Evan Starr, *Consider This: Training, Wages and the Enforceability of Covenants Not to Compete*, 72 Indus. & Labor Rel. Rev. 783 (2019) ............................... 6

Evan Starr et al., *Noncompete Agreements in the US Labor Force*, 64 J.L. & Econ. 53 (2021) ............................................................................................ 2, 4, 5

## INTEREST OF AMICI CURIAE

Amicus curiae Public Citizen is a nonprofit consumer advocacy organization with members in all 50 states. Among other things, Public Citizen works for enactment and enforcement of laws to protect workers, consumers, and the public, including federal agency efforts to administer and enforce worker protections. Public Citizen frequently appears as amicus curiae to address issues of statutory interpretation and administrative law. In response to the notice of proposed rulemaking and request for comment from the Federal Trade Commission (FTC) on the proposed rule on noncompete clauses, Public Citizen submitted a comment in support of the proposed rule.

Amicus curiae National Employment Law Project (NELP) is a nonprofit organization with over 50 years of experience advocating for the employment and labor rights of low-wage and unemployed workers. In collaboration with community partners, including grassroots groups, national organizations, worker centers and unions, and local, state, and federal agencies, NELP seeks to ensure that all employees—especially the most vulnerable—can take advantage of the basic workplace protections guaranteed in our nation's labor and employment laws. In response to the FTC's notice of proposed rulemaking and request for comment, NELP submitted a comment in support of the proposed rule.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Noncompete clauses in employment contracts are prevalent throughout the United States, including in employment contracts for low-wage workers. In promulgating its Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024), the FTC determined that approximately one in five workers in the United States is subject to a noncompete. For workers earning $20 per hour or less, approximately 12 percent are subject to a noncompete restriction.

The Rule's prohibition of noncompete clauses will significantly benefit workers. Noncompete provisions lower wages and reduce workers' job mobility, as numerous economic

studies demonstrate. According to one study in the rulemaking record, rendering noncompete provisions unenforceable nationwide would increase wages by up to 14 percent for all workers. In addition, as the record shows, these provisions are often imposed by employers on workers without meaningful consent. For low-wage workers, who often lack bargaining power and access to legal resources, the consequences of a noncompete provision can impose particular hardship, making it difficult to leave underpaid and even harmful work environments.

The motion for plaintiff ATS Tree Service (ATS) to stay the Rule's effective date and for preliminary injunction should be denied because its challenges to the Rule are not likely to succeed. The Rule has a strong basis in the record and falls within the FTC's statutory authority.

## ARGUMENT

I.   **The Rule significantly benefits workers, including low-wage workers.**

A.   **Noncompete provisions are prevalent in employment contracts, including for low-wage workers.**

Noncompete provisions are used widely throughout the United States. The FTC "estimates that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete." 89 Fed. Reg. at 38,343. According to a leading study analyzing nationally representative survey data for 11,505 workers, "38.1 percent of [United States] labor force participants have agreed to a noncompete at some point in their lives and … 18.1 percent, or roughly 28 million individuals, currently work under one." Evan Starr et al., *Noncompete Agreements in the US Labor Force*, 64 J.L. & Econ. 53, 60 (2021) (footnote omitted), *cited in* 89 Fed. Reg. at 38,346 n.68.

Low-wage workers are subject to noncompete provisions on a widespread basis. 89 Fed. Reg. at 38,343. For example, an analysis of 2017–2018 survey data from the Bureau of Labor Statistics found that "[a]mong low- and moderate-income workers, more than one in ten reported

having a non-compete contract." Tyler Boesch et al., Fed. Reserve Bank of Minneapolis, *Non-compete contracts sideline low-wage workers* (Oct. 15, 2021), https://www.minneapolisfed.org/article/2021/non-compete-contracts-sideline-low-wage-workers, *cited in* 18 State Attorneys General (State AGs), Comment Letter, FTC-2023-0007-21043, at 4 n.17 (Apr. 19, 2023). In addition, the analysis found that "[o]f workers earning $20 per hour or less, 12 percent reported having a noncompete contract in their current or most recent job." *Id.*[1]

According to another study in the rulemaking record, approximately 30 percent of businesses have subjected all their workers making $17 per hour or less to noncompete provisions. Alexander Colvin & Heidi Shierholz, Econ. Policy Inst., *Noncompete agreements* (2019), https://www.epi.org/publication/noncompete-agreements (analyzing 2017 data from a national survey), *cited in* 89 Fed. Reg. at 38,346 n.65. And a study surveying nearly 70,000 workers found that approximately 17 percent of food preparation and service workers, approximately 19 percent of building and grounds cleaning and maintenance workers, and approximately 20 percent of transportation and materials-moving workers have signed noncompetes. *See* Natarajan Balasubramanian et al., *Employment Restrictions on Resource Transferability and Value Appropriation from Employees* 47 (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403, *cited in* 89 Fed. Reg. at 38,345 n.74. Noncompete agreements are also imposed on "home health aides, dance instructors, and nail salon workers," The Legal Aid Society, Comment Letter, FTC-2023-0007-20967, at 5 (Apr. 17, 2023), as well as "camp counselors, unpaid interns, and doggy daycare workers," American Federation of Labor and Congress of Industrial Organizations (AFL-CIO), Comment Letter, FTC-2023-0007-21103, at 10 (Apr. 19, 2023).

---

[1] The comments received by the FTC in response to its Notice of Proposed Rulemaking are available at https://www.regulations.gov/docket/FTC-2023-0007/comments.

Moreover, "employers frequently impose non-competes even when they are unenforceable under State law." 89 Fed. Reg. at 38,377. Indeed, "employers use noncompetes virtually as often in states where such restrictions are clearly unenforceable." Starr et al., *Noncompete Agreements in the US Labor Force*, *supra* p. 2, at 81. This evidence suggests that "employers may be seeking to take advantage of workers' lack of knowledge of their legal rights; or that workers are unable to enforce their rights through case-by-case litigation." 89 Fed. Reg. at 38,343.

**B.  Noncompetes are often imposed without meaningful consent.**

The suggestion that noncompetes are bargained agreements "is largely legal fiction." Jane Flanagan, *No Exit: Understanding Employee Non-Competes and Identifying Best Practices to Limit Their Overuse*, Am. Const. Soc'y (Nov. 2019), https://www.acslaw.org/wp-content/uploads/2019/11/Understanding-Employee-Non-Competes-and-Identifying-Best-Practices-to-Limit-Their-Overuse.pdf, *cited in* State AGs, Comment Letter, FTC-2023-0007-21043, at 7 n.42. Evidence in the record shows that for workers who are not senior executives, noncompetes are often "unilaterally imposed" by the employer, "without meaningful negotiation or compensation." 89 Fed. Reg. at 38,375; *see also* Boesch et al., *supra* p. 3 (finding that workers "rarely negotiate over non-competes and frequently misunderstand whether and to what extent their non-competes are enforceable").

A leading 2021 study shows that "employers present (or employees receive) non-compete proposals as take-it-or-leave-it propositions," where workers must either sign the noncompete or reject the job. Starr et al., *Noncompete Agreements in the US Labor Force*, *supra* p. 2, at 72. Indeed, "only 10 percent of employees report attempting to negotiate over the terms of their noncompete or asking for additional compensation or benefits in exchange for agreeing to such an employment condition." *Id*. at 71. Rather, "[w]hen presented with a noncompete, most respondents report just reading and signing it, with a nontrivial fraction not even reading it." *Id.* at 71–72. Numerous

comments from workers and worker advocacy groups confirm these findings, "attest[ing] [that] non-competes are often included in standard-form contracts and offered on a take-it-or-leave-it basis." 89 Fed. Reg. at 38,460; *see* National Employment Law Project (NELP), Comment Letter, FTC-2023-0007-20862, at 2 (Apr. 19, 2023) ("Far from an agreement negotiated at arm's length, [noncompetes] have become a routine condition of employment for many."); *see also* The Legal Aid Society, Comment Letter, FTC-2023-0007-20967, at 2; Mobilization for Justice, Comment Letter, FTC-2023-0007-19361, at 1 (Apr. 17, 2023); Justice at Work Pennsylvania, Comment Letter, FTC-2023-0007-19417, at 3 (Apr. 17, 2023); The Leadership Conference on Civil and Human Rights, Comment Letter, FTC-2023-0007-21100, at 1 (Apr. 19, 2023).

In addition, many workers are presented with a noncompete only *after* they have accepted the job offer. According to one study, "approximately 30 percent [of workers] first learn they will be asked to agree only after they have already accepted their offers." Starr et al., *Noncompete Agreements in the US Labor Force*, *supra* p. 2, at 69. Of those who learned about the noncompete after accepting their job offer, "26 percent report that if they had known about their employer's noncompete plans earlier, they would have reconsidered accepting the offer." *Id.* Comments from workers confirmed that "they did not receive notice that they would be required to sign a non-compete until after accepting a job offer." 89 Fed. Reg. at 38,377. Further, "[m]any workers … stated that non-competes are often hidden or obscured," for example, by being "buried in other paperwork or confusingly worded or vague." *Id.* Commenters also described noncompetes that were written in English but imposed on workers with limited English proficiency, without any accompanying translation; the workers thus did not "fully understand[] the implications" of the noncompetes. Justice at Work Pennsylvania, Comment Letter, FTC-2023-0007-19417, at 3; *see* Public Justice Center, Comment Letter, FTC-2023-0007-20893, at 2 (Apr. 3, 2023).

### C.  Noncompete provisions harm workers.

#### 1.  Noncompetes reduce wages and job mobility for all workers.

Noncompete provisions suppress wages and reduce job mobility for all workers. As a comment submitted on behalf of 18 state attorneys general stated, "[r]esearchers have found that where states have passed … laws [banning noncompetes], workers across all income strata experience gains in wages and job mobility." State AGs, Comment Letter, FTC-2023-0007-21043, at 3. By contrast, "in states where non-competes are more enforceable, all workers, including those who have not signed non-competes, experience relatively reduced job mobility and lower wages compared to states where non-competes are less enforceable." *Id.*

For example, a 2019 study cited by the FTC found that wages were four percent higher in states that do not enforce noncompetes as compared to states with average levels of enforceability. *See* Evan Starr, *Consider This: Training, Wages and the Enforceability of Covenants Not to Compete*, 72 Indus. & Labor Rel. Rev. 783, 785 (2019), *cited in* 89 Fed. Reg. at 38,381 n.445. Another study cited by the FTC similarly found, based on data from all 50 states and the District of Columbia from 1991 and 2014, that "[m]oving from the 25th to the 75th percentile in enforceability is associated with an approximately 2% decrease in the average worker's earnings." Matthew S. Johnson et al., *The Labor Market Effects of Legal Restrictions on Worker Mobility* 3 (Nat'l Bureau of Econ. Research, Working Paper No. 31929, 2023), *cited in* 89 Fed. Reg. at 38,373 n.388. According to that study, extrapolating its results suggests that "rendering [noncompetes] unenforceable nationwide would increase average earnings among *all* workers by 3.2% to 14.2%." *Id.*

Case studies of state laws banning noncompetes for certain workers are illustrative. A study analyzing an Oregon law banning noncompetes for hourly and low-wage workers found that the ban "increased hourly wages by 2.2%–3.1% on average, with effects as great as 6% over a seven-

year period." Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 144 (2022), *cited in* 89 Fed. Reg. at 38,346 n.72. Similarly, a study examining Hawaii's law banning noncompetes for technology workers found that the law increased monthly earnings by 4.2 percent for those workers. *See* Natarajan Balasubramanian et al., *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349, S351 (Apr. 2022), *cited in* 89 Fed. Reg. at 38,381 n.452.

Noncompetes also reduce worker mobility, thereby "damaging … the overall job market." NELP, Comment Letter, FTC-2023-0007-20862, at 3. More specifically, noncompetes "often prevent workers from taking jobs in their field of expertise[,] … forc[ing] many workers to remain in a job in which they are less productive and end up being paid less than what workers could obtain in the broader job market." *Id.* (footnote omitted). Thus, the record shows that "across the board, studies of non-competes and labor mobility find decreased rates of mobility, measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within-industry and between-industry mobility." 89 Fed. Reg. at 38,380.

For example, the study of data from 1991 to 2014 found that "moving from the 25th to the 75th percentile of [noncompete] enforceability" decreases within-industry job mobility by nearly 6 percent in industries that use noncompetes at a high rate. Johnson et al., *supra* p. 6, at 20. Case studies of specific states show even greater increases in job mobility: After Oregon banned noncompetes for hourly workers, "mobility increased by 17.3%." 89 Fed. Reg. at 38,381 (citing Lipsitz & Starr, *supra* p. 7). Hawaii's ban on noncompetes for high-tech workers "increased mobility by 12.5%." *Id.* (citing Balasubramanian et al., *Locked In?*, *supra* p. 7).

Women and people of color are disproportionately harmed by noncompetes. For example, as amicus NELP explained in its comment to the FTC, a 2020 study found that "the earnings of women and workers of color are reduced by twice as much as white, male workers when there is stricter noncompete enforcement." NELP, Comment Letter, FTC-2023-0007-20862, at 6 (citing Johnson et al., *supra* p. 6). The study concluded that "banning noncompetes would close the earnings gap between white men and Black women by 4.6 percent; 5.6 percent for white women; 8.7 percent for Black men; and 9.1 percent for non-Black, non-white women." *Id.* (same).

## 2. Noncompetes impose significant harms on low-wage workers.

For low-wage workers, the imposition of noncompetes is "especially concerning." Boesch et al., *supra* p. 3. To begin with, the justification that noncompetes protect companies' trade secrets and "proprietary information," ATS Br. 3, "often does not withstand scrutiny when applied to low- and middle-wage workers," State AGs, FTC-2023-0007-21043, Comment Letter 4. "[M]any workers—especially low-wage workers—do not possess important trade secrets, and even for those who do, the protections provided by trade-secrets law can be sufficient (and better targeted) to address this specific concern." Boesch et al., *supra* p. 3.

Moreover, as the FTC found and numerous commenters explained, "non-competes are exploitative and coercive" for "workers other than senior executives," including low-wage workers. 89 Fed. Reg. at 38,375. State attorneys general from across the country stated that they "have seen firsthand how non-competes and restrictive employment arrangements can substantially harm low- and middle-wage workers." State AGs, Comment Letter, FTC-2023-0007-21043, at 3. The imposition of noncompetes on low- and middle-wage workers "is particularly troubling because such workers often lack bargaining power to negotiate the terms of their employment." *Id.* at 4. Moreover, because "low-wage workers have less access to legal advice than

other workers have, … it [is] more difficult for them to enter a fair, well-informed negotiation with employers over their non-compete contracts." Boesch et al., *supra* p. 3.

Further, the record shows that even if the noncompete is likely unenforceable, low-wage workers "generally may not be willing to file lawsuits against deep-pocketed employers to challenge their non-competes." 89 Fed. Reg. at 38,486. Low-wage workers often lack "access to legal resources to challenge the non-compete." State AGs, Comment Letter, FTC-2023-0007-21043, at 4; *see* 89 Fed. Reg. at 38,486 (stating that "for relatively low-paid workers, … access to legal services may be prohibitively expensive"). As a legal aid organization explained, "[l]itigation of non-compete provisions, even in cases against low-wage workers where the employer is unlikely to be successful, can be costly and lengthy endeavors." Texas RioGrande Legal Aid (TRLA), Comment Letter, FTC-2023-0007-21014, at 5 (Apr. 19, 2023) (explaining that the question of enforceability under state law "is an intensely fact-specific inquiry" that "turns on whether the non-compete is reasonable"); *see* State AGs, Comment Letter, FTC-2023-0007-21043, at 7. Accordingly, low-wage workers may be "discouraged by litigation costs even if they have cases where they are likely to prevail—and indeed, low-income workers are likely to have meritorious cases under common law reasonableness tests." *Id*. at 7.

In addition, low-wage workers may be more vulnerable to "coercive methods" utilized by employers seeking to enforce noncompetes. NELP, Comment Letter, FTC-2023-0007-20862, at 2. For example:

> Employers send threatening cease-and-desist letters to former employees "reminding them" of their signed agreement. If an initial letter does not result in the response they want, some employers then take it a step further and call the new employer to threaten litigation.

*Id*. at 2–3. Even if the noncompete is likely unenforceable, "few employees are aware of this, and unscrupulous employers exploit their lack of knowledge … by filing lawsuits that they know they

would not win if the workers were able to secure legal representation." The Legal Aid Society, Comment Letter, FTC-2023-0007-20967, at 5. For example, The Legal Aid Society noted a case in which an employer "promptly agreed to dismiss the action" after the organization appeared on behalf of the worker, but that "for a worker without a lawyer, such a case can cause considerable distress and expense, even if the case has no merit, not to mention the waste of judicial resources." *Id.*

The result is that "many workers simply comply with the agreements rather than risk a lawsuit, even where the agreement would not be legally enforceable." NELP, Comment Letter, FTC-2023-0007-20862, at 3 (citing Matt Marx & Ryan Nunn, *The Chilling Effect of Non-compete Agreements*, The Hamilton Project (May 20, 2018), https://www.hamiltonproject.org/ publication/post/the-chilling-effect-of-non-compete-agreements). Thus, as the FTC found and commenters described, "non-competes exert a powerful in terrorem effect: they trap workers in jobs and force them to bear these harms and costs even where workers believe the non-competes are overbroad and unenforceable." 89 Fed. Reg. at 38,378; *see, e.g.*, TRLA, Comment Letter, FTC-2023-0007-21014, at 5–6 (discussing the "in terrorem effects" of noncompetes); State AGs, Comment Letter, FTC-2023-0007-21043, at 8 (same).

Those harms and costs can be devastating. "Most workers … depend on income from their jobs to get by—to pay their rent or mortgage, pay their bills, and put food on the table." 89 Fed. Reg. at 38,375. Noncompetes, however, can "forc[e] workers to either stay in jobs where they are underpaid and undervalued, to change industries, … or to travel great distances to make ends meet." Center for Law and Social Policy, Comment Letter, FTC-2023-0007-20946, at 4 (Apr. 18, 2023). In particular, as 11 local governments, agencies, and elected officials from across the country explained, low-wage workers "lack the savings necessary to relocate, change their line of

work, or survive periods of unemployment," as they would need to do if they wanted to switch jobs but were subject to a noncompete. Public Rights Project, Comment Letter, FTC-2023-0007-20926, at 4 (Apr. 14, 2023); *see* The Leadership Conference on Civil and Human Rights, Comment Letter, FTC-2023-0007-21100, at 4 (Apr. 19, 2023) ("In order to increase wages, people … would need to change industries or move to a new area, something that many cannot afford to do.").

Noncompetes also "make it difficult to address workplace violations, which are often disproportionately higher in industries paying low wages." Center for Law and Social Policy, Comment Letter, FTC-2023-0007-20946, at 3. For example, commenters described noncompetes that "trap[ped] some workers in jobs where their employer commits wage and hour violations, such as wage theft." 89 Fed. Reg. at 38,388; *see* Public Justice Center, Comment Letter, FTC-2023-0007-20893, at 3 (describing its representation of "a group of home care workers [subject to a noncompete] whose employer … failed to pay them their earned wages, including overtime and travel-time wages, as required by federal and state law").

In addition, as the FTC found, "by diminishing workers' competitive alternatives, non-competes keep workers trapped in jobs where they experience dangerous, abusive, or toxic conditions; discrimination; sexual harassment; and other forms of harassment." 89 Fed. Reg. at 38,388; *see id.* at 38,378 (providing examples). For example, "[s]everal comments said they were unable to receive benefits because a non-compete rendered them unable to switch to a job with better benefits or rendered them unable to leave their job when their employer took their benefits away." *Id.* at 38,388. Another commenter stated that "[d]ue to stricter non-compete enforcement and the fear of violating these agreements, many workers who have been or continue to be victims of sexual harassment are afraid to report it or to leave their job." The Leadership Conference on Civil and Human Rights, Comment Letter, FTC-2023-0007-21100, at 4.

* * *

For all these reasons, the FTC had strong factual support for its determination that noncompete provisions are unfair methods of competition that harm workers by reducing wages and impeding the ability to change jobs.

## II.       The FTC Act provides authority for the FTC to issue the Rule.

The Federal Trade Commission Act declares unlawful two types of activities: unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. § 45(a)(1). And the Act "empower[s] and direct[s]" the FTC "to prevent" those unlawful activities. *Id*. § 45(a)(2). To enable the FTC to fulfill this function, the Act authorizes it "to make rules and regulations for the purpose of carrying out the provisions of this subchapter." *Id*. § 46(g). Here, because the rulemaking record establishes that noncompete clauses are unfair methods of competition, issuance of the Non-Compete Clause Rule fits comfortably within the FTC's authority.

ATS's assertion that the FTC's rulemaking authority for unfair methods of competition is limited to "procedural rules, not substantive rules," ATS Br. 11 (emphasis removed), finds no support in the Act. The text of section 46 does not limit the FTC's authority to issue rules concerning unfair methods of competition. Importantly, that section does carve out rules addressing unfair or deceptive acts or practices by incorporating section 57a(a)(2). *See* 15 U.S.C. § 46(g) (stating "except as provided in section 57a(a)(2)"). The first sentence of section 57a(a)(2), in turn, reiterates that the rulemaking authority of section 46 does not apply to "any rule with respect to unfair or deceptive acts or practices in or affecting commerce." Section 57a(a)(2) goes on to state that it "shall not affect any authority of the [FTC] to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce." Sections 46(g) and 57a(a)(2) thus show both that Congress knew how

to limit the FTC's rulemaking authority and that it chose not to do so "with respect to unfair methods of competition in or affecting commerce." Moreover, the text of section 57a(a)(2), which refers to the FTC's authority "to prescribe rules (including interpretive rules), and general statements of policy," belies ATS's assertion that the statute limits the FTC's rulemaking authority to procedural rules.

In light of the statutory language, it is not surprising that courts have held that the FTC Act authorizes the FTC to promulgate substantive rules. In *National Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973), the D.C. Circuit rejected an argument that the FTC's rulemaking authority did not encompass substantive rules "for the simple reason that Section 6(g) [15 U.S.C. § 46(g)] clearly states that the [FTC] 'may' make rules and regulations for the purpose of carrying out the provisions of Section 5 and it has been so applied." *Id.* at 677. After construing "the words of the statute creating the Commission and delineating its powers," the court held "that under the terms of its governing statute and under Section 6(g), 15 U.S.C. § 46(g), the Federal Trade Commission is authorized to promulgate rules defining the meaning of the statutory standards of the illegality the Commission is empowered to prevent." *Id.* at 674, 698 (citation omitted) (upholding an FTC rule requiring the disclosure of octane numbers on gasoline pumps). Likewise, in *United States v. JS & A Group., Inc.*, 716 F.2d 451 (7th Cir. 1983), the Seventh Circuit upheld the FTC's authority to promulgate a substantive rule about mail-order merchandise. Agreeing with *National Petroleum*, the court rejected the contention that the Act authorized rulemaking only "related to procedures and enforcement" but did not encompass substantive rulemaking. *Id.* at 454.

Further, in analyzing language similar to section 46(g) in other federal statutes, the Supreme Court and courts of appeals have repeatedly upheld agency authority to promulgate substantive rules with the force law. *See, e.g.*, *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356,

369 (1973) (upholding the Federal Reserve Board's rulemaking authority and stating that "[w]here the empowering provision of a statute states simply that the agency may 'make . . . such rules and regulations as may be necessary to carry out the provisions of this Act,' we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" (footnote omitted)); *Superior Oil Co. v. FERC*, 563 F.2d 191, 196 (5th Cir. 1977) (citing analogous language in the Natural Gas Act, 15 U.S.C. § 717o, and stating that "the rules which [the Federal Power Commission] issues are legislative in nature"); *see also Nat'l Petroleum*, 482 F.2d at 678–82 (citing cases where courts construed "similar provisions [to 15 U.S.C. § 46(g)] in the authorizing statutes of other administrative agencies" and found that the agency had authority "to promulgate binding substantive rules as well as rules of procedure"). ATS attempts to distinguish cases cited in *National Petroleum* as particular "to certain activities" or other circumstances, *see* ATS Br. 14, but, as the D.C. Circuit explained, those cases upheld substantive rules based on language in the agencies' authorizing statutes similar to the language in the FTC Act. *See Nat'l Petroleum*, 482 F.2d at 678.

## CONCLUSION

For the foregoing reasons and those set forth by the FTC, the Court should deny plaintiff ATS's motion to stay effective date and for preliminary injunction.

June 5, 2024

Respectfully submitted,

/s/ *Michael D. Donovan*
Michael D. Donovan
Donovan Litigation Group, LLC
1885 Swedesford Road
Malvern, PA 19355
(610) 647-6067

Wendy Liu (*pro hac vice* motion pending)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Amici Curiae Public Citizen
and National Employment Law Project*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2024, I electronically filed this document using the ECF System, which will send notification to the ECF counsel of record.

/s/ *Michael D. Donovan*
Michael D. Donovan