IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ATS TREE SERVICES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL TRADE COMMISSION; LINA M. KHAN, in her official capacity as Chair of the Federal Trade Commission; and REBECCA KELLY SLAUGHTER, ALVARO BEDOYA, ANDREW N. FERGUSON, and MELISSA HOLYOAK, in their official capacities as Commissioners of the FTC,<br><br>Defendants. | Case No. 2:24-cv-01743-KBH |

**BRIEF OF *AMICUS CURIAE* COMMUNITY LEGAL SERVICES, INC., IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Edward Diver
PA ID No. 85011
Mary Catherine Roper
PA ID No. 71107
David Nagdeman
PA ID No. 327652
LANGER, GROGAN & DIVER P.C.
1717 Arch St., Ste 4020
Philadelphia, PA 19103
(215) 320-5660
ndiver@langergrogan.com
mroper@langergrogan.com
dnagdeman@langergrogan.com

Brendan Lynch
PA ID No. 82675
COMMUNITY LEGAL SERVICES INC.
1424 Chestnut St.
Philadelphia, PA 19102
(215) 981-3700
blynch@clsphila.org

June 7, 2024

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF AMICUS CURIAE .................................................................................... 1

INTRODUCTION ............................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.   Legal Standards ........................................................................................................... 3

II.  ATS Tree Services Has Not Established that Its Legally Protectable Interests Will Suffer If the FTC Rule Goes into Effect. ............................................................. 3

III. The Injunction ATS Seeks Would Cause Enormous Harm to Low-Wage Workers in Pennsylvania and Beyond. ........................................................................................ 6

  A. CLS's experience directly supports the FTC's argument that non-compete clauses are exploitative and coercive at the time of contracting. ............................ 6

  B. CLS's experience directly supports the FTC's argument that non-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer. ................................................................................... 8

  C. In CLS's experience non-compete clauses are frequently imposed and used as the basis to limit workers' economic opportunities and employers' freedom to hire, even when the clauses are legally unjustified. ................................................. 11

IV. The Balance of Equities and the Public Interest Weigh Against Issuance of the Injunction ATS Tree Services Seeks. ....................................................................... 13

CONCLUSION .................................................................................................................. 14

i

**TABLE OF AUTHORITIES**

**Cases**

*Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*,
  39 F.4th 95 (3d Cir. 2022) .............................................................................................. 3

*Arthur Murray Dance Studios of Cleveland v. Witter*,
  105 N.E.2d 685 (Ohio Ct. Com. Pl. 1952) ..................................................................... 8

*B.H. v. Easton Area Sch. Dist.*,
  725 F.3d 293 (3d Cir. 2013) ........................................................................................... 3

*Hess v. Gebhard & Co. Inc.*,
  808 A.2d 912 (Pa. 2002) ............................................................................................ 4, 5

*Jacobson & Co. v. Int'l Env't Corp.*,
  235 A.2d 612 (Pa. 1967) ................................................................................................ 4

*Morgan's Home Equip. Corp. v. Martucci*,
  136 A.2d 838 (Pa. 1957) ................................................................................................ 5

*Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*,
  249 A.3d 918 (Pa. 2021) ................................................................................................ 5

*Sidco Paper Co. v. Aaron*,
  351 A.2d 250 (Pa. 1976) ................................................................................................ 5

*SkyHawke Technologies LLC v. Unemployment Compensation Bd. of Review*,
  2011 WL 3839763, 27 A.3d 1050 (Pa. Cmwlth. Ct. 2011) ......................................... 13

**Regulations**

Final Non-Compete Clause Rule, 89 Fed. Reg. 38342 (May 7, 2024) .................................. *passim*

Proposed Non-Compete Clause Rule, 88 Fed. Reg. 3482 (Jan. 18, 2023) ..................................... 8

**Other Authorities**

*Restraints on Workers' Wages and Mobility: No-Poach Agreements and the Antitrust Laws*,
  59 Santa Clara L. Rev. 579 ............................................................................................ 4

## INTEREST OF *AMICUS CURIAE*[1]

Community Legal Services, Inc., ("CLS") is the largest provider of free civil legal services in Philadelphia, representing over 11,000 low-income individuals every year. CLS's Employment Unit works to remove barriers to employment for CLS's clients, who are almost exclusively Philadelphians living in poverty. Through this work, CLS has discovered that low-wage workers are forced to sign non-compete clauses in order to obtain work in a wide variety of fields, from ambulance drivers and home health care aides, to part- time custodians and hairdressers, truck drivers making food deliveries, personal assistants, staffing agency callers, and many others.

As explained below, CLS's experience with non-compete clauses provides substantial evidence that, particularly with respect to low-wage workers, the growing trend of non-compete clauses for these workers restricts competition, limits choices for consumers, and damages low-wage workers' ability to earn a living. CLS supports the FTC Rule banning non-compete clauses for most workers and submitted a comment to the FTC when the Rule was proposed, setting forth CLS's experience and position. *See* Exhibit A, CLS Comment to FTC Non-Compete Clause Rulemaking (Apr. 19, 2023) ("CLS Comment"). Any delay in the implementation of the FTC's Rule would impede CLS's ability to assist its clients and harm thousands of low-wage workers in Pennsylvania and millions nationwide.

---

[1] *Amicus* certifies that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than *Amicus*, and its counsel contributed money intended to fund this brief.

1

## INTRODUCTION

Plaintiff ATS Tree Services wishes to continue using non-compete clauses to deter its twelve employees from leaving to work for competitors. On that basis, ATS asks this Court to deny the protections of the Federal Trade Commission's recently announced FTC Non-Compete Clause Rule, 89 Fed. Reg. 38342 (May 7, 2024) (to be codified at 16 C.F.R. pt. 910 and 912) (the "Final Rule"),, to one-fifth of the nation's workers—approximately 30 million individuals—by enjoining the effective date of the Rule nationwide. The balance of equities and the public interest cannot support the requested injunction.

Plaintiff ATS is a tree service company that serves residential, commercial, industrial, and municipal clients in Bucks County, Pennsylvania. Compl. ¶ 65. ATS employs "around a dozen people," including "skilled tree climbers" and an "estimator." Declaration of David Servin ¶¶ 8-9, ECF 11-1 ("Servin Decl."). The Federal Trade Commission estimates that approximately one in five American workers—or approximately 30 million workers—are subject to a non-compete clause that restricts their ability to obtain employment in their field from another employer. Final Rule, 89 Fed. Reg. at 38343. In May 2024, the FTC issued a rule banning new non-compete agreements for most employees and banning the enforcement of most existing non-compete agreements. The Final Rule will become effective on September 4, 2024.

Suing on its own behalf only, ATS asks this Court to issue an injunction to halt the FTC's rule not only as to ATS, but throughout the United States. ATS claims that the harm it faces from implementation of the FTC rule outweighs any harm that would result from such an injunction. CLS submits this brief *amicus curiae* to dispute ATS's claim to protectable legal interests in using concededly overbroad noncompete agreements with its tree technicians and to document the harm that the requested injunction would cause to low-wage workers in Pennsylvania and beyond. CLS contends that ATS cannot establish that it will likely suffer irreparable injury

2

without an injunction; that the balance of equities favors the issuance of a nationwide injunction; or that such an injunction serves the public interest.

## ARGUMENT

**I.      Legal Standards**

Four factors determine whether a temporary restraining order or preliminary injunction is appropriate:

> (1) whether the movant has a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denying the injunction; (3) whether there will be greater harm to the nonmoving party if the injunction is granted; and (4) whether granting the injunction is in the public interest.

*B.H. v. Easton Area Sch. Dist.*, 725 F.3d 293, 302 (3d Cir. 2013) (en banc). The movant ordinarily must establish the first two factors, after which "the court then determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*, 39 F.4th 95, 103 (3d Cir. 2022).

**II.     ATS Tree Services Has Not Established that Its Legally Protectable Interests Will Suffer If the FTC Rule Goes into Effect.**

ATS avers that it requires all of its employees to sign non-compete agreements in order to deter those employees from seeking employment with ATS's competitors. What ATS has not made any effort to establish is that those non-compete agreements are enforceable under Pennsylvania law. In fact, ATS essentially concedes that its non-compete clauses are overbroad as written. Although ATS does not disclose the specifics of those clauses, what it avers is that "the non-compete agreement requires—**or would only be enforced to require**—employees not to engage in the same type of work they performed at ATS at a competitor tree care service

3

provider within the geographic area in which the employee worked while at ATS for one year after leaving ATS." Servin Decl. ¶ 21, ECF 11-1 (emphasis added).

Whether and to what extent the ATS non-compete agreement is legally enforceable cannot be assumed. Both in the experience of CLS and as documented by the FTC in adopting the Final Rule, employers of low-wage workers routinely rely upon overly broad and facially unenforceable non-compete clauses—and do so successfully, because whether and to what extent a non-compete agreement is enforceable in Pennsylvania as in other states cannot be determined without litigation. CLS Comment at 3; Final Rule, 89 Fed. Reg. at 38378-79. For the vast majority of low-wage workers and the companies that might wish to employ them in the face of a former employer's assertion of a non-compete clause, the cost and risk of such litigation overshadows the benefit of the potential employment. CLS Comment at 3-4. As a result, non-competes operate merely by the threat of enforcement. CLS Comment at 4.

Restrictive covenants are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living. *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 917 (Pa. 2002) (citing *Jacobson & Co. v. Int'l Env't Corp.,* 235 A.2d 612 (Pa. 1967)). The Pennsylvania Supreme Court has acknowledged the economic harm caused by non-compete clauses and other restrictions on employment:

> Moreover, the no-hire provision undermines free competition in the labor market in the shipping and logistics industry, which creates a likelihood of harm to the general public. *See, e.g.*, Donald J. Polden, *Restraints on Workers' Wages and Mobility: No-Poach Agreements and the Antitrust Laws*, 59 SANTA CLARA L. REV. 579, 610 ("[T]he high percentage of U.S. workers who are subject to agreements and covenants restricting their employment opportunities are contributing to slow wage growth and rising inequality. For example, recent studies have demonstrated that worker wages are 4%-5% higher in states that do not recognize or enforce worker non-compete restraints.").

4

*Pittsburgh Logistics Sys., Inc. v. Beemac Trucking, LLC*, 249 A.3d 918, 936 (Pa. 2021) (invalidating agreement not to hire competitors' employees that was paired with non-compete clauses for the employees).

Nonetheless, non-compete clauses have been enforceable under Pennsylvania law if they are (1) incident to an employment relationship between the parties; (2) the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and (3) the restrictions imposed are reasonably limited in duration and geographic extent. *Hess*, 808 A.2d at 917; *Sidco Paper Co. v. Aaron,* 351 A.2d 250 (Pa. 1976); *Morgan's Home Equip. Corp. v. Martucci,* 136 A.2d 838 (Pa. 1957). There must be a close fit between the restrictions imposed and the protectable interests of the employer. *Hess*, 808 A.2d at 917 ("Our law permits equitable enforcement of employee covenants not to compete only so far as reasonably necessary for the protection of the employer.") (quoting *Sidco Paper,* 351 A.2d at 254.). When a non-compete agreement exceeds this scope, a court may partially enforce the agreement to the extent necessary for the protection of the employer's legitimate interests. But before enforcing the agreement to any degree, the court must balance "the employer's protectible business interests against the interest of the employee in earning a living in his or her chosen profession, trade or occupation, and then balance the result against the interest of the public. *Hess*, 808 A.2d at 920.

ATS has not disclosed the actual content of the non-compete clauses it requires its employee to sign, but it has acknowledged that they would not be enforced as written. ATS avers that the clauses would be enforced to prevent its workers from doing "the same type of work they performed at ATS at a competitor tree care service provider within the geographic area in which the employee worked while at ATS for one year after leaving ATS." Servin Decl. at ¶ 21. But ATS does not aver that its clauses have been judged enforceable by a court and, since ATS

does not disclose the actual terms of its non-competes, the Court has no way to evaluate the enforceability of those clauses and the weight of the interests that ATS asserts here such that ATS is not able to establish irreparable injury should the Final Rule go into effect.

### III. The Injunction ATS Seeks Would Cause Enormous Harm to Low-Wage Workers in Pennsylvania and Beyond.

#### A. CLS's experience directly supports the FTC's argument that non-compete clauses are exploitative and coercive at the time of contracting.

Non-compete clauses are imposed on low-wage workers as a standard practice by companies with bargaining power without the opportunity for negotiation. As CLS explained in its comment to the FTC:

> We have never seen a case in which a low-wage worker was party to a non-compete agreement that was negotiated between the parties. Legitimate restrictive clauses ought to be negotiated between two parties of relatively equal bargaining power, both of whom recognize the subject of the agreement and can make a bargain that protects their mutual interests. In the case of low-wage workers, however, these clauses are invariably just included as boilerplate language in contracts that are presented as a take it or leave it option, with no negotiation at all.

CLS Comment at 2.

Low-wage workers are not the same as a savvy professional who, perhaps with legal advice, might agree to a restrictive covenant in exchange for compensation that would safeguard their financial standing in the event that they needed or wanted to leave the company. Unfortunately, the workers with sufficient bargaining power to negotiate the terms of—and compensation for—a non-compete appear to be a fairly small proportion of the workers who are subject to non-compete clauses. Low-wage workers do not receive any additional compensation for signing a contract that restricts their future employment options. Pennsylvania does not require employers to provide any additional compensation in order for a non-compete to be binding. Notably, the low-wage worker who signs one of these agreements does not even get

6

job security, as the employment for which they trade their future work options is almost always an at-will position from which they can be fired without cause at any time.

Not only are these clauses a bad deal for low-wage workers, these workers are often unaware that their employment agreement contains a non-compete clause until an employer uses it to prevent a worker from getting a new job. In CLS's experience, the most common time that low-wage workers learn they are subject to a non-compete is when, at the very end of the job, or after they have already separated from employment, they receive a threat that the non-compete will be enforced against them. CLS Comment at 4. And if the worker does know that they have signed an agreement that includes a non-compete clause, they often do not understand its implications. As one example, CLS has assisted people who provided home care to their own parent or other close relative through a home health care agency, and who have tried to switch to a different agency that will be a better fit for them and their family, only to be sued in court by their former agency, which is seeking to enforce a non-compete by having the court order that they cannot provide care for their own relative. It is absurd to think that these workers willingly agreed that they would stop being the primary caregiver for their own family if they wanted to work through a different agency. CLS Comment at 4. In one CLS case, the client's former home health care provider asked a court for an injunction preventing the client from providing home health care services *for her own mother* when the worker sought to move to a different home health care agency. CLS Comment at 4.

Moreover, the non-compete clauses that CLS's clients are required to sign are commonly buried in the middle of a multi-page contract dealing with a variety of items. These contracts are often so generic that they include sections about subjects such as intellectual property rights, which obviously have no relation at all to the work duties of an entry-level

7

home health aide or administrative staffer who is being made to sign it.  Partly as a result of the length and complexity of these agreements, workers do not actually read or understand them before signing them.  CLS Comment at 2-3.

The FTC cites evidence that only a small fraction of workers actually bargains over their non-compete clauses. Final Rule, 89 Fed. Reg. at 38375. It remains true today that:

> "The average, individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses. His individual bargaining power is seldom equal to that of his employer." *Arthur Murray Dance Studios of Cleveland v. Witter*, 105 N.E.2d 685, 703–04 (Ohio Ct. Com. Pl. 1952).

Proposed FTC Non-Compete Clause Rule, 88 Fed. Reg. 3482, at 3502 (Jan. 18, 2023). That language very well describes the clients CLS has represented who have signed agreements containing non-competes.

### B. CLS's experience directly supports the FTC's argument that non-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer.

CLS has observed that workers are hurt by the mere existence of clauses that clearly go beyond the bounds of enforceable restrictive covenants under controlling state law, as appears to be the case with ATS's non-compete clauses.  The mere inclusion of these clauses and threats to enforce them hurts workers and damages competition.

Under Pennsylvania law, the question of whether or not a non-compete clause is legally valid and enforceable depends upon a variety of factors, which the courts can weigh in a balancing test.  That test will only be applied, however, if the matter is taken to court and both sides make an argument on the merits of the case before a judge. While there are often compelling legal arguments that could be made against the enforceability of these clauses against low-wage workers, as a matter of economic reality, there is usually no one who is

8

positioned to make those arguments. Thus, even clearly unlawful clauses are typically effective at restricting the worker's opportunities.

As CLS explained to the FTC in its comment:

> Most low-wage workers (and, in the home health care context, disabled Medicaid recipients who wish to have their home health aide remain as their caregiver) simply do not have the resources to fight lawsuits that seek to enforce non-compete clauses. Meanwhile, potential future employers and consumers lack incentives to fight these clauses—defending a lawsuit costs time and money, and low-wage workers can usually be replaced easily enough that it is not worth the effort to go to court in order to ensure the right to keep them.

CLS Comment at 3. As a result, non-compete clauses restrict low-wage workers' opportunities merely by the threat of enforcement—or, in some cases, by just the act of an employer filing suit and requesting a temporary restraining order.  In one CLS case, a building maintenance contractor threatened to enforce a non-compete clause against Pamela Reed, a janitor who they had paid $10.00/hour for part-time work, and who had just been hired by a school where the company had previously held a cleaning contract. CLS argued to the new employer that the non-compete clause was unenforceable. The school's principal agreed but told CLS that they could not afford the risk that the contractor might file a suit, and consequently they terminated the worker. CLS Comment at 4. As that case demonstrates, the threatened use of a non-compete agreement, even an invalid or overbroad one, will usually be enough to prevent the worker from getting a new job.  Ms. Reed's case was the unusual situation in which a low-wage worker had *pro bono* counsel before they lost a job—but she lost her job anyway, due to the new employer's reluctance to fight the case in court.

CLS has seen, over and over, clients only learning they were subject to a non-compete clause after they left their job when, attempting to find new employment, their former employer invokes it against them. Sometimes the old employer sends a threatening letter to the worker or

9

a prospective new employer, or the former employer files a lawsuit in state court, seeking to enforce the clause and force the worker to pay heavy, unaffordable damages. The new employer may be threatened with a claim for "interference with contractual relations." The result of these threats, for nearly all of CLS's clients who have faced such threats, is that the new employer has terminated the relationship to avoid any legal risk or expenses. CLS Comment at 4-5.

This hurts prospective employers, who are precluded from hiring their preferred applicants. It also hurts consumers—especially in fields such as home health care, where many disabled patients would prefer to maintain a relationship with the same worker whom they have come to know and trust as someone performing intimate personal services in their homes. CLS Comment at 4.

Of course, the people hurt most of all are low-wage workers. The U.S. Treasury Office of Economic Policy reported in 2016 that approximately 15% of workers without a college degree, and 14% of workers earning less than $40,000/year, are subject to non-compete clauses. As noted above, CLS has seen non-compete clauses included in the contracts required of low-wage workers from ambulance drivers to home health care aides, part-time custodians and hairdressers, truck drivers making food deliveries, personal assistants, staffing agency callers, and many others. CLS Comment at 4.

Low-wage workers are less likely to have the flexibility of seeking a different type of employment than the type they have been doing, to find work outside the geographic scope of a non-compete clause, or to wait out the effective reach of the clause. Low-wage workers are especially likely to need a new job promptly in order to meet their living expenses. And if the worker has willingly left their old job for what they believed would be a better opportunity, they

10

likely will not qualify for unemployment compensation if the new job is then withdrawn. CLS Comment at 4-5. As CLS notes in its comment: "For low-wage workers, who have limited job qualifications and professional networks, losing a job opportunity in this fashion does not simply mean a period of modest financial hardship, or of accepting a job below their skill level—sometimes, it is a matter of scrambling to avoid homelessness." CLS Comment at 5.

    **C.**    **In CLS's experience non-compete clauses are frequently imposed and used as the basis to limit workers' economic opportunities and employers' freedom to hire, even when the clauses are legally unjustified.**

For many low-wage workers subject to non-compete agreements, the employer has no legitimate interests to be protected by the agreement. Low-wage workers are typically easily replaced and have no specialized knowledge or training that they could use in some unfair way in a new job; the workers' low value to the company is manifest in the poverty-level wages they are paid. CLS Comment at 5. To the extent that these workers have any valuable knowledge about the employer's business processes or clients, those interests could easily be protected by trade secret protection clauses which do not prevent workers from taking new jobs. Nonetheless, it appears that many employers follow a blanket policy of requiring all employees to sign boilerplate non-competes, with no regard to whether a particular worker's job duties or informational access might give rise to a genuine need for a restrictive covenant. CLS Comment at 5.

Once the agreement is signed, however, it does not actually matter whether the employer has protectable interests, or whether the new employment falls within the scope of the "agreement" or whether the agreement is overbroad. Employers can use the threat of litigation costs and possible damage awards to get the worker to comply, even where the clause would not be enforced by a court if it were litigated all the way through a civil action to a verdict. In the case of CLS's client Ms. Reed, the part-time custodian who was forced out of a

subsequent job at a school by the threat of enforcement of a non-compete, the clause she signed said that she could not go to work for a competitor of the cleaning contractor company. The job she took was as an in-house custodian for a high school—and high schools are not in economic competition with cleaning contractors.  So, ultimately, it is highly likely that any court would have refused to enforce the terms of the clause. But the threat of possible litigation by the contractor was enough, by itself, to cause the school to terminate her employment. CLS Comment at 5.

This is not unusual. In nearly every case in which a client has sought CLS's help in dealing with a non-compete clause, often because they have already been threatened by their former employer, the legal enforceability of the clause is highly dubious, at best. CLS Comment at 5-6.  In most cases, there is no legitimate business interest at stake which outweighs the harm to the worker. CLS Comment at 6. Nevertheless, the mere existence of the clauses succeeds in making CLS's clients fearful, and in raising risks for potential new employers, and – when the former employer actually files a lawsuit to enforce the clause—in forcing CLS's clients to deal with the time, energy, risks, and expense that comes with litigation. This is a risk that even higher-paid workers will face, since the clauses will often provide that the worker will have to reimburse the employer for any legal expenses incurred in enforcing the clause.  Such a punitive terms make any decision to go to court a risky one for the worker – there is always some chance that they will lose a court battle over the enforceability of a non-compete, and will then be out of a job while also being on the hook for thousands of dollars in legal fees to their former employer (and possibly to their own attorney as well). CLS Comment at 6.

Gig workers—a growing segment of the workforce—fall into these traps, as well. Many of CLS's clients find work as drivers for ride-sharing companies or for package delivery

12

services, which can involve driving into neighboring states—especially New Jersey, which is just across the Delaware River from Philadelphia. Even these workers, who lack other employment protections because they are employed as independent contractors, can be required to sign a non-compete agreement and have it enforced against them. *See SkyHawke Technologies LLC v. Unemployment Compensation Bd. of Review*, 2011 WL 3839763, 27 A.3d 1050, 1056 (Pa. Cmwlth. Ct. 2011) (holding that worker could be required to sign an agreement which included an enforceable non-compete clause, and yet could also be classified as an independent contractor and, therefore, could be denied unemployment benefits when the job ended).

### IV. The Balance of Equities and the Public Interest Weigh Against Issuance of the Injunction ATS Tree Services Seeks.

Whatever legally protectable interest ATS has in the non-competes it has required its twelve employees to sign, its interest in enforcing those agreements to whatever extent a court would find them enforceable cannot compare to the hardship that non-compete clauses inflict on CLS's clients and the much larger universe of low-wage workers across Pennsylvania and the nation. As CLS's experience demonstrates, non-compete clauses are widely imposed on low-wage workers who have no power to avoid them, often have no idea they have signed them, and have little to no ability to fight them. The result is that low-wage workers lose the ability to seek better paying employment and can be locked out of the very industries where they have built experience and skills and left with very few options. The impacts on these workers are devastating. Thousands of low-wage workers in Pennsylvania and millions nationwide need the FTC's Final Rule to go into effect—the sooner the better.

## CONCLUSION

For these reasons and those stated in Respondents' brief, CLS respectfully urges the Court to deny Plaintiff's Motion for a preliminary injunction to halt the effective date of the Final Rule.

Dated: June 7, 2024                                        Respectfully submitted,

/s/ David Nagdeman
David Nagdeman
PA ID No. 327652
Edward Diver
PA ID No. 85011
Mary Catherine Roper
PA ID No. 71107
LANGER, GROGAN & DIVER P.C.
1717 Arch St., Ste 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
ndiver@langergrogan.com
mroper@langergrogan.com
dnagdeman@langergrogan.com

/s/ Brendan Lynch
Brendan Lynch
PA ID No. 82675
COMMUNITY LEGAL SERVICES, INC.
1424 Chestnut St.
Philadelphia, PA 19102
Tel: (215) 981-3700
Fax: (215) 981-0434
blynch@clsphila.org

Counsel for *Amicus Curiae* Community Legal Services, Inc.

14