## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ATS TREE SERVICES, LLC,

      *Plaintiff,*

    v.

FEDERAL TRADE COMMISSION;
LINA M. KHAN, in her official capacity
as Chair of the Federal Trade
Commission; and REBECCA KELLY
SLAUGHTER, ALVARO BEDOYA,
ANDREW N. FERGUSON, and
MELISSA HOLYOAK, in their official
capacities as Commissioners of the FTC,

      *Defendants*

Case No.: 2:24-cv-1743-KBH

**PROPOSED BRIEF OF *AMICI CURIAE* 35 LAW, BUSINESS, AND ECONOMICS PROFESSORS AND SCHOLARS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO STAY EFFECTIVE DATE AND FOR PRELIMINARY INJUNCTION**

Alia Al-Khatib
PA Bar No. 325456
Civil Practice Clinic
University of Pennsylvania Carey Law School
3501 Sansom Street
Philadelphia, PA 19104
Tel: 215-898-8427
Email: aliaalkh@law.upenn.edu

Phillip R. Malone (*pro hac vice pending*)
Juelsgaard Intellectual Property &
  Innovation Clinic
Mills Legal Clinic, Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Tel: 650-725-6369
Email: pmalone@law.stanford.edu

TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

ARGUMENT ............................................................................................ 3

I.   The Commission's Adoption of the Rule is Well-Supported
     by Substantial Evidence ........................................................... 3

II.  The Rule Will Significantly Increase Entrepreneurship,
     Competition, Innovation, Wages, and Equality ............................ 3

     A.   Expanded Entrepreneurship .............................................. 3

     B.   Greater Competition between Firms ................................... 4

     C.   Increased Innovation ....................................................... 5

     D.   Market-Based Wages. ...................................................... 6

     E.   Greater Worker Equality .................................................. 8

     F.   Comparing the Experience of California to Massachusetts Shows
          the Benefits of the Ban .................................................... 9

III. A Nationwide Ban Is Essential to Achieve These Benefits ................ 11

IV.  The Rule Properly Bans "Functional" Noncompetes ...................... 12

V.   The Rule Properly Rejected Ineffective Alternative                      16

VI.  The Rule Does Not Prevent Employers from Effectively
     Protecting Confidential Information .......................................... 18

CONCLUSION ....................................................................................... 19

APPENDIX — LIST OF *AMICI*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Bionics Corp. v. Medtronic, Inc.*,
    59 P.3d 231 (Cal. 2002) ........................................................................1

*Brown v. TGS Management Co.*,
    57 Cal. App. 5th 303 (2021) ...............................................................15

*Nken v. Holder*,
    556 U.S. 418 (2009)..............................................................................3

*TLS Mgmt. & Mktg. Servs. v. Rodriguez-Toledo*,
    966 F.3d 46 (1st Cir. 2020).....................................................................4

**Statutes**

Defend Trade Secrets Act, 18 U.S.C. § 1836 (2016)....................................18

Mass. Gen. Laws Ann. ch. 149, § 24L(c) (2018)........................................9

**Other Authorities**

AnnaLee Saxenian, *Regional Advantage: Culture and Competition in Silicon
    Valley and Route 128* (Harv. Univ. Press 2006) .....................................10

Camilla Hrdy & Christopher Seaman, *Beyond Trade Secrecy: Confidentiality
    Agreements That Act Like Noncompetes*, 133 Yale L. J. 669 (2024) ......................4

Carmen Nobel, *Non-competes Push Talent Away*, Harv. Bus. Sch. Working
    Knowledge (July 11, 2011), https://perma.cc/V2VV-J3F8 ....................................10

Evan Starr, *Noncompete Clauses: A Policymaker's Guide through the Key
    Questions and Evidence* (Econ. Innovation Grp., 2023) ...........................2

Evan Starr, *The Use, Abuse, and Enforceability of Non-Compete and No-Poach
    Agreements* (Econ. Innovation Grp., 2019) ............................................2

Federal Rule of Appellate Procedure 29(a)(4)(E)........................................1

Hyo Kang & Lee Fleming, *Non-competes, Business Dynamism, and
    Concentration: Evidence from a Florida Case Study*, 29 J. Econ. & Mgmt.
    Strategy 663 (2020)..............................................................................4, 5

J.J. Prescott, Stewart Schwab, & Evan Starr, *First Evidence on the Use of Training Repayment Agreements in the US Labor Force*, ProMarket (Mar. 27, 2024), https://perma.cc/U2H2-E6B6 ...........................................................................2

James E. Rauch, *Dynastic Entrepreneurship, Entry, and Non-Compete Enforcement*, 86 European Econ. Rev. 188 (2016) ..................................................6

Jonathan F. Harris, *Consumer Law as Work Law*, 112 Calif. L. Rev. 1 (2024) ..........................12

Jonathan Harris, Dalié Jiménez, and Jonathan Glater, Comment Letter on Proposed Non-Compete Clause Rule (Apr. 19, 2023) .....................................12, 15

Jonathan F. Harris, *Unconscionability in Contracting for Worker Training*, 72 Ala. L. Rev. 723 (2021) .........................................................................................13

Liyan Shi, *Optimal Regulation of Noncompete Contracts* (Working Paper, 2022), https://perma.cc/6799-A3WE ..........................................................................18

Mark J. Germaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J. Econ. & Org. 376 (2011) .....................................2

Mark Lemley & Orly Lobel, *Banning Noncompetes is Good for Innovation*, Harv. Bus. Rev. (Feb. 6, 2023), https://perma.cc/93FH-6ABJ ...........................................9

Mark Lemley & Orly Lobel, *Supporting Talent Mobility and Enhancing Human Capital: Banning Noncompete Agreements to Create Competitive Job Markets,* Day One Projects (Jan. 2021) ...................................................................19

Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (Dec. 2023) (Nat'l Bureau of Econ. Rsch., Working Paper No. 31929), https://perma.cc/6EMU-3JSB...........................8

Mitchell Hoffman & Stephen V. Burks, *Training Contracts, Employee Turnover, and the Returns from Firm-Sponsored General Training* (Nat'l Bureau of Econ. Rsch., Working Paper No. 23247, 2017).......................................................13

Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Bundling Postemployment Restrictive Covenants: When, Why, and How it Matters* (Working Paper, 2021).............................................................................................14

Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Employment Restrictions on Resource Transferability and Value Appropriation from Employees* (May 16, 2024), https://perma.cc/XL3U-UDQ3 ..................................14

Non-Compete Clause Rule, 89 Fed. Reg. 38342 (May 7, 2024)............................................ *passim*

On Amir & Orly Lobel, *Driving Performance: A Growth Theory of Noncompete Law*, 16 Stan. Tech. L. Rev. 833 (2013) ...............................................................6

On Amir & Orly Lobel, *How Noncompetes Stifle Performance,* Harv. Bus. Rev.
(Jan.-Feb. 2014), https://perma.cc/3R84-K9HX..................................................................6

Orly Lobel, *Knowledge Pays: Reversing Information Flows & the Future of Pay
Equity*, 120 Colum. L. Rev. 547 (2020)...........................................................................8

Orly Lobel, *Non-Competes, Human Capital Policy & Regional Competition*, 45 J.
Corp. L. 931 (2020) ....................................................................................4, 7, 8. 15

Orly Lobel, *Talent Wants to be Free: Why We Should Learn to Love Leaks, Raids,
and Free Riding* (Yale Univ. Press 2013)...............................................................10, 16

Orly Lobel, *The Spinoff Advantage: Human Capital Law and Entrepreneurship,
in* the Cambridge Handbook of L. and Entrepreneurship in the United States
(D. Gordon Smith et. al. eds., 2022) ...............................................................................5

Orly Lobel, *Why California Is Such a Talent Magnet*, Harv. Bus. Rev. (Jan. 19,
2016), https://perma.cc/U89T-2P78..............................................................................10

Philip J. Siegel, *Protect Your Investment*, Professional Roofing (Nov. 2019),
https://perma.cc/NA32-WGZY....................................................................................13

Rachel Arnow-Richman, *Bargaining for Loyalty in the Information Age: A
Reconsideration of the Role of Substantive Fairness in Enforcing Employee
Noncompetes,* 4 Or. L. Rev. 1163 (2001) ...................................................................16

Rachel Arnow-Richman et al., *Supporting Market Accountability, Workplace
Equity, and Fair Competition by Reining in Non-Disclosure Agreements,*
Fed'n of Am. Scientists: Day One Project (Jan. 31, 2022)  ..........................................14

Rachel Arnow-Richman, Jonathan F. Harris, & Orly Lobel, Comment Letter on
Proposed Non-Compete Clause Rule (Apr. 18, 2023) ...................................... *passim*

Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial
Districts: Silicon Valley, Route 128, and Covenants Not to Compete*, 74
N.Y.U. L. Rev. 575 (1999) ..................................................................................10, 11

Sampsa Samila & Olav Sorenson, *Non-compete Covenants: Incentives to
Innovate or Impediments to Growth*, 57 Mgmt. Sci. 425 (2011)...................................6

Sharon Belenzon & Mark Schankerman, *Spreading the Word: Geography, Policy,
and Knowledge Spillovers*, 95 Rev. Econ. & Stat. 884 (2013)...................................6

*Startups by Amazon Alumni*, Tracxn (Jan. 11, 2023), https://perma.cc/7C9H-2JY5......................4

*Startups by Google Alumni*, Tracxn (Jan. 11, 2023), https://perma.cc/M5K7-
ZB3C..........................................................................................................................4

*Startups by Microsoft Alumni*, Tracxn (Jan. 11, 2023), https://perma.cc/KP4A-ZPFR ................................................................................................................4

Student Borrower Prot. Ctr., *Trapped at Work: How Big Business Uses Student Debt to Restrict Worker Mobility* (July 2022), https://perma.cc/2A2T-8PG6.......................13

Toby Stuart & Olav Sorenson, *Liquidity Events and the Geographic Distribution of Entrepreneurial Activity*, 48 Admin. Sci. Q. 175 (2003)........................................6

U.S. Dep't of the Treasury, *Non-Compete Contracts: Economic Effects and Policy Implications* (2016).....................................................................................2, 5

Viva Moffat, *Making Non-Competes Unenforceable*, 50 Ariz. L. Rev. 939 (2012) ...................16

Zhaozhao He, Motivating Inventors: Non-competes, Innovation Value, and Efficiency (2021), https://perma.cc/MM2J-QVTH .................................................6

## INTEREST OF AMICI CURIAE

*Amici* are 35 law, business, and economics professors and scholars who teach and write about economics, intellectual property, antitrust, consumer, employment, and labor law, among other subjects.[1] They have studied and written extensively about noncompete agreements and their harmful effects on innovation, entrepreneurship, competition, and employee mobility and wages, and several of them submitted comments to the Federal Trade Commission ("the Commission") in support of the Rule during the rulemaking process.

*Amici* have no personal interest in this case. *Amici*'s sole interest is in ensuring the law supports policies that maximize labor mobility, competition, and innovation and ensure fair and equal terms of employment for all workers. Noncompete agreements ("noncompetes") have long undermined these policy goals.

A full list of *amici* can be found in the Appendix.[2]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Our national economy depends on an increasingly national labor force. While worker mobility has always been important, today more and more workers are employed by companies with a national presence. In a world of increasing opportunities, employees—and the economy—need the assurance of guaranteed labor mobility.

---

[1] *Amici* make the following disclosure similar to the one required for appellate *amicus* briefs by Federal Rule of Appellate Procedure 29(a)(4)(E): No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund its preparation or submission. No person other than the *amici* or their counsel made a monetary contribution to the preparation or submission of this brief.

[2] *Amici* thank Juelsgaard Intellectual Property and Innovation Clinic Certified Law Students Ruihan (Ray) Guo, Neel Guha, and Ashton Woods for their substantial contributions to the Motion for Leave and this *amici* brief.

Despite the importance of employee mobility, the use of noncompetes is pervasive in the United States. The U.S. Treasury Department has estimated that 30 million American workers are subject to a noncompete, U.S. Dep't of the Treasury, *Non-Compete Contracts: Economic Effects and Policy Implications* 3 (2016) ("*Non-Compete Contracts*"), targeting everyone from volunteers, Evan Starr, *The Use, Abuse, and Enforceability of Non-Compete and No-Poach Agreements* 2 (Econ. Innovation Grp., 2019); Evan Starr, *Noncompete Clauses: A Policymaker's Guide through the Key Questions and Evidence* 3 (Econ. Innovation Grp., 2023), to executives, Mark J. Germaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J. L. Econ. & Org. 376, 396 (2011). These direct restraints on mobility are bad not only for workers, but also for our economy and society as a whole. The economy performs better when workers can easily move between jobs. Increased mobility makes it easier for employees to find employers that most value their skills, and for employers to find employees who are a good fit in talent, skill, and experience. Noncompetes restrain mobility, stifling entrepreneurship, competition, and innovation. They also artificially depress wages and perpetuate unequal access to employment opportunity.

The ban on noncompetes imposed by the Commission's Non-Compete Clause Rule, 89 Fed. Reg. 38342 (May 7, 2024), ("the Rule") will increase entrepreneurship, competition, and, ultimately, innovation by increasing workforce mobility and promoting efficiency in the marketplace. It will increase employee wages to market-based levels and lead to greater equality in employment. The Rule and its powerful benefits are the product of a painstakingly thorough and comprehensive process of investigation, research, and rulemaking by the Commission. The data, evidence, and reasoning supporting the Rule are substantial and fully justify its enactment and the ban. Because of the important benefits created by the ban, the Rule is squarely in the public

interest and that preliminary injunction factor tips strongly in the Commission's favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (finding balance-of-equities and public interest factors "merge when the Government is the opposing party").

## ARGUMENT

### I.      THE COMMISSION'S ADOPTION OF THE RULE IS WELL-SUPPORTED BY SUBSTANTIAL EVIDENCE.

After conducting an exhaustive rulemaking process and carefully reviewing 26,000 public comments, the Commission has adopted the Rule, which provides that entering into noncompetes with workers is an unfair method of competition that violates section 5 of the Federal Trade Commission Act. Non-Compete Clause Rule, 89 Fed. Reg. at 38342.

The Rule is well supported. The Commission's comprehensive review of empirical literature, the full comment record, and its expertise in identifying harmful practices, *see id.* at 38345-46, provides substantial evidence of the unfairness and anti-competitive nature of noncompetes. *Amici*'s extensive research and expertise involving noncompetes strongly supports these conclusions.

### II.     THE RULE WILL SIGNIFICANTLY INCREASE ENTREPRENEURSHIP, COMPETITION, INNOVATION, WAGES, AND EQUALITY.

The Rule's ban on noncompetes will produce social and economic benefits for employees, employers, and the public at large. Specifically, the Rule will enhance entrepreneurship, competition, innovation, fair wages, and worker equality.

#### A.      Expanded Entrepreneurship.

Robust entrepreneurship incentives and opportunities require that workers with new ideas be willing and able to leave their current employers to launch new businesses or join emerging

ones. Because noncompetes stop employees from leaving, they prevent the creation of new businesses. Even when workers do challenge noncompete agreements, they are more likely to join other large incumbent firms, which can help them litigate the terms of their agreements, rather than new startups. *See* Orly Lobel, *Non-Competes, Human Capital Policy & Regional Competition*, 45 J. Corp. L. 931, 938 (2020); *see also* Hyo Kang & Lee Fleming, *Non-competes, Business Dynamism, and Concentration: Evidence from a Florida Case Study*, 29 J. Econ. & Mgmt. Strategy 663 (2020).

The connection between noncompetes and entrepreneurship is illustrated by comparing California and Washington. Noncompetes are enforceable in Washington, and unenforceable in California; these variations in state noncompete law have likely contributed to the fact that alumni of Google (based in noncompete-banning California) have been far more prolific than alumni of Microsoft and Amazon (based in noncompete-enforcing Washington) in starting their own companies and raising capital.[3]

### B.   Greater Competition between Firms.

The Rule's ban on noncompetes will enhance competition. Noncompetes favor large incumbent firms with the resources to enforce agreements. By forcing employees to sign noncompetes, an incumbent can prevent rival startups from hiring employees. Moreover, by

---

[3] Over twenty-four years of incorporation, Google alumni have founded 2,801 startups (114 per year) raising over $108.09 billion in capital ($4.41 billion per year), *Startups by Google Alumni*, Tracxn (Jan. 11, 2023), https://perma.cc/M5K7-ZB3C. Over forty-eight years of incorporation, Microsoft alumni have founded 3,579 startups (75 per year) raising over $67.66 billion in capital ($1.41 billion per year), *Startups by Microsoft Alumni*, Tracxn (Jan. 11, 2023), https://perma.cc/KP4A-ZPFR. Over twenty-nine years of incorporation, Amazon alumni have founded 1,405 startups (49 per year) raising over $24.23 billion in capital ($0.85 billion per year), *Startups by Amazon Alumni*, Tracxn (Jan. 11, 2023), https://perma.cc/7C9H-2JY5.

stifling entrepreneurship and new business formation, noncompetes can prevent competitors from ever forming in the first place.

Limiting noncompetes will give companies greater ability to hire experienced talent by freeing some workers who would otherwise have been blocked by a noncompete. This freedom will especially benefit smaller and emerging companies that require new talent but that lack the resources to defend against a noncompete lawsuit brought by a large, more established rival. Rachel Arnow-Richman, Jonathan F. Harris, & Orly Lobel, Comment Letter on Proposed Non-Compete Clause Rule at 9 (Apr. 18, 2023) ("Arnow-Richman Comment").

The Rule is especially important for competition because research shows that alumni of incumbent firms are best positioned to start innovative competitors that disrupt stale industries, make technological progress, and ultimately benefit consumers. Orly Lobel, *The Spinoff Advantage: Human Capital Law and Entrepreneurship*, *in* the Cambridge Handbook of L. and Entrepreneurship in the United States 257-67 (D. Gordon Smith et al. eds., 2022) ("*The Spinoff Advantage*"). Other research demonstrates that markets become more concentrated when noncompetes are adopted and enforced. Kang & Fleming, *supra*, at 2.

### C. Increased Innovation.

The Rule's ban on noncompetes will significantly enhance innovation. Noncompetes lower job mobility, which diminishes the rates of knowledge flow. *The Spinoff Advantage*, *supra*, at 262. The U.S. Treasury Department's 2016 report on noncompetes found that increased mobility "raise[s] labor productivity by achieving a better matching of workers and firms, and may facilitate the development of industrial clusters like Silicon Valley." *Non-Compete Contracts*, *supra*, at 4.

A wealth of empirical, experimental, and theoretical research enforces this view. Studies find that increased noncompete enforceability decreases drivers of innovation, like employee

motivation, new business formation, and knowledge sharing. On Amir & Orly Lobel, *Driving Performance: A Growth Theory of Noncompete Law*, 16 Stan. Tech. L. Rev. 833 (2013); Toby Stuart & Olav Sorenson, *Liquidity Events and the Geographic Distribution of Entrepreneurial Activity*, 48 Admin. Sci. Q. 175, 193 (2003); Sharon Belenzon & Mark Schankerman, *Spreading the Word: Geography, Policy, and Knowledge Spillovers*, 95 Rev. Econ. & Stat. 884, 886 (2013). Noncompetes also decrease the products of innovation, like patenting activity and patent value. Sampsa Samila & Olav Sorenson, *Non-compete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt. Sci. 425, 432 (2011); Zhaozhao He, *Motivating Inventors: Non-competes, Innovation Value, and Efficiency* at 21 (2021), https://perma.cc/MM2J-QVTH.

The Rule's ban on noncompetes thus enhances innovation by increasing the productivity of employees within their own firms. Noncompetes prevent employees from taking ownership of their own labor and skills, reducing employee incentives to invest in professional self-development. On Amir & Orly Lobel, *How Noncompetes Stifle Performance*, Harv. Bus. Rev. (Jan.-Feb. 2014), https://perma.cc/3R84-K9HX. Preventing unhappy and unproductive employees from leaving to pursue other opportunities keeps those employees within firms, where their discontent hurts firm performance. James E. Rauch, *Dynastic Entrepreneurship, Entry, and Non-Compete Enforcement*, 86 European Econ. Rev. 188 (2016).

### D. Market-Based Wages.

The Rule's ban on noncompetes will benefit employees by increasing wages consistent with the market. Noncompetes prevent employees from relying on competing offers from other firms as leverage in pay negotiations—employers know workers cannot accept a competing offer without either breaching the noncompete and taking on substantial legal and economic risks or moving to a different region altogether. Banning noncompetes increases bargaining power by

removing these risks, increasing the ability of employees to receive and consider accepting competing offers, thus incentivizing both their current and prospective employers to offer higher pay to retain them. Their improved bargaining position helps employees negotiate more-competitive, higher pay.

The Rule's ban on noncompetes will also encourage employers to adopt positive incentive structures that reward employees for staying. For instance, employers in California place greater reliance on positive retention mechanisms like performance-based pay, bonuses, and stock options compared to employers in states that enforce noncompetes. *Non-Competes, Human Capital Policy & Regional Competition*, *supra*, at 938. In states without noncompetes, the proliferation of these mechanisms has helped improve employee wages. Accordingly, a widespread shift to these sort of positive incentive structures that will result from the Rule's ban on noncompetes will likely result in market-based higher wages for employees.

Finally, employee mobility improves worker knowledge and will lead to more talented employees because of knowledge spillovers and denser collaboration networks. Employees will be free to move between employers in the same field, continually crossing paths with new people and new ideas. And by engaging with others more frequently, employees are exposed to richer knowledge, increasing their own knowledge base and skills. As employees get more skilled and demonstrate greater productivity, competitive wages will naturally rise to reflect their increasing human capital and value-add. And even where an employee's skillset remains constant, the Rule's noncompete ban will lead to more productive use of those skills by increasing employee motivation, retention and improvement of skills, and the quality of the match between the employee and their employer.

### E.      Greater Worker Equality.

The Rule will enhance worker equality. Studies have shown that noncompetes affect women more potently and more frequently than men. Noncompetes often force an employee to choose between staying with their current employer, leaving the workforce until the noncompete expires, or, in some cases, moving and working for a competitor in a different regional area. Studies show, however, that women are more likely than men to have geographic constraints based on their family and spousal obligations, which means many women are left with a difficult choice: either stay (unhappily) with the current employer or leave the workforce for a period of time. *See Non-Competes, Human Capital Policy, & Regional Competition*, *supra*, at 941; Orly Lobel, *Knowledge Pays: Reversing Information Flows & the Future of Pay Equity*, 120 Colum. L. Rev. 547, 557, 587 (2020). Staying can lead to lower motivation and productivity, whereas leaving can lead to lost skills and make it harder to rejoin the workforce. Both unfairly decrease future career prospects.

The Rule's ban on noncompetes will help to reduce current wage gaps. Data show that limiting the enforceability of noncompetes "would not only likely raise earnings on average, but also help close racial and gender wage gaps." Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 41 (Dec. 2023) (Nat'l Bureau of Econ. Rsch., Working Paper No. 31929), https://perma.cc/6EMU-3JSB. Employees are not able to discover their true value without external offers. Women and people of color will be able to rely on competing offers to bolster their own wages, leading to a more accurate reflection of their true value-add. The upward pressure of a single non-discriminatory competing offer—an offer that can only be realistically entertained absent noncompetes—is a powerful mechanism to help erode persistent wage gaps.

Noncompetes also disproportionately affect women's opportunities, in part because studies show that women are more likely than men to abide by and less likely to challenge noncompetes, even when they have legitimate legal grounds to do so. This particularly undermines female entrepreneurship, preventing women from founding new companies. As a result, the enforcement of noncompetes contributes to the substantial gaps between women and men both in wages and rates of entrepreneurship. By banning noncompetes, the Rule will both encourage the formation of more female-founded businesses and enable women to use competing job offers to negotiate wages reflecting their true value.

Beyond wage gaps, noncompetes insidiously trap women and people of color in work environments where they may be subject to harmful forms of discrimination. By preventing employees from seeking competing employment, noncompetes force employees to endure discriminatory treatment and diminish employer incentives for undertaking reforms of discriminatory workplace culture.

F.  **Comparing the Experience of California to Massachusetts Shows the Benefits of the Ban.**

States are policy laboratories. In addition to the differences between entrepreneurship in California and Washington described above, the different treatment of noncompetes in California and Massachusetts provides a multi-decade natural experiment on the effect of noncompetes on entrepreneurship, competition, and innovation that demonstrates the broad value of banning noncompetes. Mark Lemley & Orly Lobel, *Banning Noncompetes Is Good for Innovation*, Harv. Bus. Rev. (Feb. 6, 2023), https://perma.cc/93FH-6ABJ.

Massachusetts has long enforced noncompetes; only in 2018, in the face of mounting economic research about their harms, did it limit their use. Mass. Gen. Laws Ann. ch. 149, § 24L(c)

(2018) (making noncompete clauses unenforceable against nonexempt workers). California, on the other hand, has always deemed noncompetes void.

Both states were well positioned in the early 1970s to become the global center of high-tech innovation. But the use of noncompetes by high tech companies in Massachusetts made it harder for talented employees to start their own ventures. In contrast, the computer industry exploded in California, with inventor networks in the Bay Area in particular becoming denser, and entrepreneurship and innovation flourished. Meanwhile, the industry stagnated in Massachusetts around an older generation of companies. *See* Orly Lobel, *Why California Is Such a Talent Magnet*, Harv. Bus. Rev. (Jan. 19, 2016), https://perma.cc/U89T-2P78; AnnaLee Saxenian, *Regional Advantage: Culture and Competition in Silicon Valley and Route 128* (Harv. Univ. Press 2006); Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete*, 74 N.Y.U. L. Rev. 575, 592 (1999) ("Route 128 gave rise to traditionally vertically integrated companies; in this locality, knowledge transfer took place within, rather than across firms.").

Thriving entrepreneurship resulted in vigorous competition and the best talent worldwide was drawn by the freedom California offered. Carmen Nobel, *Non-competes Push Talent Away*, Harv. Bus. Sch. Working Knowledge (July 11, 2011), https://perma.cc/V2VV-J3F8. Companies were forced to compete for talent, because a free labor market enabled the best talent to match with the best employers. Massachusetts computer firms largely withered in a culture of secrecy and protectionism made possible by noncompetes, while California firms thrived in a culture of mobility, openness, and knowledge sharing. Orly Lobel, *Talent Wants to be Free: Why We Should Learn to Love Leaks, Raids, and Free Riding* 64-70 (Yale Univ. Press 2013) ("*Talent Wants to be Free*").

Although many factors contributed to the rise of Silicon Valley, "[i]n the end, the difference in their treatments of post-employment covenants not to compete remains the most likely difference in the legal infrastructures of Silicon Valley and Route 128 that led the two districts down their ultimately quite different paths." Gilson, *supra*, at 613. This long natural experiment between states clearly demonstrates the powerful benefits of noncompetes and the significant harms of restricting employee mobility. The results provide strong support for the broad and prompt end to noncompetes that the Rule provides.

## III.     A NATIONWIDE BAN IS ESSENTIAL TO ACHIEVE THESE BENEFITS.

The Rule will provide much-needed uniformity through its nationwide treatment of noncompetes. The current legal regime is a patchwork that incentivizes strategic behavior by employers in drafting noncompetes. It is common for employers to designate the law of a noncompete-friendly jurisdiction, regardless of where the employee actually lives or works. This creates a high risk of litigation and, in some cases, a race to the courthouse and even a race between different courts in different states. *See Advanced Bionics Corp. v. Medtronic, Inc.*, 59 P.3d 231 (Cal. 2002). Indeed, the inconsistent legal rules mean that, in the rare case where an employee does seek legal counsel, the best advice often is for them to immediately file suit to challenge their noncompetes in a favorable jurisdiction, because they know companies are likely to file a competing suit in a different jurisdiction.

The patchwork harms our national labor force and economy, decreasing entrepreneurship, concentrating markets, stifling innovation, suppressing wages, and exacerbating inequality. A uniform ban is needed to address these national harms. The Rule's ban on noncompetes will do just that; it will encourage economic growth, increase company formation and market entry, and promote increased innovation, among other economic benefits.

**IV.     THE RULE PROPERLY BANS "FUNCTIONAL" NONCOMPETES.**

The Rule properly recognizes that various contractual terms other than direct noncompete requirements can act as "functional" noncompetes where they have the effect of prohibiting, penalizing, or functioning to prevent employees from seeking or accepting future employment. Non-Compete Clause Rule, 89 Fed. Reg. at 38363-64. The Commission properly recognizes that in operating to restrict employee mobility, these clauses engender the same harms as traditional non-compete provisions. Experience has shown that employers switch to functionally equivalent restraints when specific restrictions on labor mobility are banned. Jonathan Harris, Dalié Jiménez, and Jonathan Glater, Comment Letter on Proposed Non-Compete Clause Rule at 4-5, 8 (Apr. 19, 2023) ("Harris Comment").

TRAPs. For example, the Rule properly characterizes certain types of Training-Repayment Agreement Provisions ("TRAPs") as functional noncompetes when they "function to prevent a worker from seeking or accepting other work or starting a business after the employment associated with the TRAP," Non-Compete Clause Rule, 89 Fed. Reg. at 38366, such as when they burden employees with "significant out-of-pocket costs" for leaving their jobs and effectively prevent them from switching jobs. *Id.* at 38365.

In fact, the use of TRAPs has spread dramatically in recent years, with around one in twelve workers bound by the contract provisions. J.J. Prescott, Stewart Schwab, & Evan Starr, *First Evidence on the Use of Training Repayment Agreements in the US Labor Force*, ProMarket (Mar. 27, 2024), https://perma.cc/U2H2-E6B6. Employers have most recently expanded TRAPs among entry-level workers, including those in the transportation, cosmetology, health care, retail, technology, and finance sectors. Jonathan F. Harris, *Consumer Law as Work Law*, 112 Calif. L.

Rev. 1, 12 (2024); Student Borrower Prot. Ctr., *Trapped at Work: How Big Business Uses Student Debt to Restrict Worker Mobility* 14 (July 2022), https://perma.cc/2A2T-8PG6.

Many employers do not hide the fact that they use TRAPs primarily to keep workers from leaving their jobs rather than to recover costs for providing useful general skills training to workers. *See* Mitchell Hoffman & Stephen V. Burks, *Training Contracts, Employee Turnover, and the Returns from Firm-Sponsored General Training* 19-20 (Nat'l Bureau of Econ. Rsch., Working Paper No. 23247, 2017)*.* In fact, some employers and trade groups have openly recommended TRAPs as workarounds to traditional non-competes to accomplish the same goal of forced employee retention, but through a mechanism that will face less scrutiny than a traditional non-compete. *See, e.g.*, Philip J. Siegel, *Protect Your Investment*, Professional Roofing (Nov. 2019), https://perma.cc/NA32-WGZY. In some cases, TRAPs can be worse for workers than traditional noncompetes because "preventing workers from working for a competitor may be less onerous to workers than requiring them to pay the employer a substantial sum to quit." Jonathan F. Harris, *Unconscionability in Contracting for Worker Training*, 72 Ala. L. Rev. 723, 726 (2021).

NDAs. Similarly, the Rule properly treats nondisclosure agreements ("NDAs") between employers and employees as functional noncompetes if they "are so broadly written" and "span such a large scope of information" that they effectively "function to prevent workers from seeking or accepting other work or starting a business after they leave their job." Non-Compete Clause Rule, 89 Fed. Reg. at 38365.[4] Examples in the Rule of overbroad NDAs are those that prohibit the employee from "disclosing, in a future job, any information that is 'usable in' or 'relates to' the

---

[4] The Rule distinguishes and excludes "appropriately tailored" NDAs that do not have the same "functional effect" as noncompetes. Non-Compete Clause Rule, 89 Fed. Reg. at 38366.

industry in which they work," or from "disclosing any information or knowledge the worker may obtain during their employment whatsoever, including publicly available information." *Id.*

Treating overbroad NDAs as functional noncompetes is essential. Such NDAs are already a significant backdoor for unfair competition. *See generally* Camilla A. Hrdy & Christopher B. Seaman, *Beyond Trade Secrecy: Confidentiality Agreements That Act Like Noncompetes*, 133 Yale L. J. 669 (2024); Rachel Arnow-Richman et al., *Supporting Market Accountability, Workplace Equity, and Fair Competition by Reining in Non-Disclosure Agreements*, Fed'n of Am. Scientists: Day One Project (Jan. 31, 2022). Research estimates that approximately 57% of U.S. workers are subject to an NDA, Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Employment Restrictions on Resource Transferability and Value Appropriation from Employees* 11 (May 16, 2024), https://perma.cc/XL3U-UDQ3, and the prevalence is even higher in innovation-leading professions: 73% of workers in "computer or mathematical jobs" report having an NDA with their employer. Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Bundling Postemployment Restrictive Covenants: When, Why, and How it Matters* (Working Paper, 2021).

Overbroad NDAs that effectively prohibit departing workers from joining competitors can restrain competition. They can limit workers' ability to share and apply knowledge gained through on-the-job experience and impede worker mobility, economic growth, and new firm entry. This in turn diminishes workers' human capital and makes them less competitive in the labor market. *See TLS Mgmt. & Mktg. Servs v. Rodriguez-Toledo*, 966 F.3d 46 (1st Cir. 2020) ("overly broad nondisclosure agreements, while not specifically prohibiting an employee from entering into competition with the former employer, raise the same policy concerns about restraining competition as noncompete clauses where . . . they have the effect of preventing the defendant from competing with the plaintiff.").

Employers in states that ban noncompetes have illegally attempted to use overbroad NDAs as an alternative mechanism to impede employee mobility. *See, e.g.*, *Brown v. TGS Mgmt, Co.,* 57 Cal. App. 5th 303 (2021). California courts have recognized that "overly restrictive [confidentiality] provisions operate as a de facto noncompete provision." *Id*. at 319.

<u>Non-solicitation, no-hire, no-business, and other agreements</u>. The Rule similarly treats other types of restrictive employment agreements as noncompetes not only if they "expressly prohibit" an employee from or penalize the employee for "seeking or accepting other work or starting a business," but also if the noncompete is not express but is nevertheless "so broad or onerous in scope that it functionally has the same effect of preventing a worker from doing the same." Non-Compete Clause Rule, 89 Fed. Reg. at 38366. This functional approach that focuses on the nature and effect of the restrictive agreement rather than its title or form is critical to prevent employers from evading the ban on noncompetes and perpetuating the harm they cause. *See generally*, Harris Comment, *supra*, at 2.

For example, nonsolicitation clauses (NSCs), which forbid soliciting customers of a former employer, might as well be noncompetes for client-facing positions like sales. Broad NSCs can also make it impossible to start new companies "because a business without clients is like a pool without water." *Non-Competes, Human Capital Policy & Regional Competition*, *supra*, at 943.

Employee nonsolicitation agreements, which prevent the recruitment of former co-workers, can strip workers of their professional networks, particularly when they are interpreted as prohibiting the hiring of any former coworkers that approach after seeing a former employee advertise generally. Because it is impossible to start a business without staff, employee non-solicitation clauses can operate as functional noncompetes for any employee who wants to start their own business.

15

Non-dealing clauses, which forbid working with a former employer's customers at all, even if the customer seeks out the former employee on their own accord, can make it almost impossible for an employee to move to or start a competing business. This is particularly true today when more and more workers are employed by companies with a national presence and are engaged in more business sectors. In many cases such clauses can become functional noncompetes. To avoid these harms, California has restricted such ancillary agreements.

## V.    THE RULE PROPERLY REJECTED INEFFECTIVE ALTERNATIVES.

In adopting the Rule, the Commission properly considered and rejected various alternative restrictions that would have failed to provide the same benefits as a categorical ban on noncompetes. Non-Compete Clause Rule, 89 Fed. Reg. at 38457. First, the Commission correctly rejected proposals to make the enforceability of noncompete provisions dependent on the reasonableness of the provision or the balance of employer and employee interests. In doing so, the Commission recognized that a categorical ban offers clarity, which prevents the chilling effect and burden on employees that result from the ambiguity of a reasonableness standard. *Id.* at 38458.

In fact, a reasonableness standard would simply replicate the current law in most states, which is easily and regularly abused by employers to prevent employees from leaving. Applying a reasonableness standard requires identifying what constitutes a proprietary employer interest and what alternatives exist, and ultimately depends on the discretion of the individual judge. Arnow-Richman Comment, *supra*, at 4. This creates substantial uncertainty about whether an agreement is enforceable and the lawfulness of individual uses, and encourages employers to overreach in writing and enforcing noncompetes. *See* Viva Moffat, *Making Non-Competes Unenforceable*, 50 Ariz. L. Rev. 939 (2012); s*ee also Talent Wants to be Free*, *supra*, at 53-57; Rachel Arnow-Richman, *Bargaining for Loyalty in the Information Age: A Reconsideration of the Role of*

*Substantive Fairness in Enforcing Employee Noncompetes,* 4 Or. L. Rev. 1163*,* 1242-43 (2001) (describing noncompetes as mere "placeholders . . . for a judicially crafted remedy").

This fact-specific process can lead to expensive, time-consuming, and burdensome litigation where the costs and risks burden employees asymmetrically. Non-Compete Clause Rule, 89 Fed. Reg. at 38463*; see also* Arnow-Richman Comment, *supra*, at 4. Employees often lack the time and money to file claims invalidating agreements or defend against employers claiming unlawful breach. Non-Compete Clause Rule, 89 Fed. Reg. at 38463; *see also id*. at 4. And often, while paying for litigation, employees are likely deprived of their source of regular income. *See id*. at 5.

As a result, in states that allow noncompetes, many workers never challenge even unreasonable noncompetes, chilling mobility even beyond what any given state's law contemplates. *Id*. at 6. Applying a reasonableness standard would allow fact-specific inquiries to have the *in terrorem* effect desired by employers. Most employees would be likely to think the noncompetes are enforceable and thus feel forced to stay in their jobs. *See id*. at 5.

Second, the Rule properly rejected alternatives proposing exemptions for different categories of employees, allowing only existing agreements for high-level employees or those making a minimum salary. *See* Non-Compete Clause Rule, 89 Fed. Reg. at 38459. While these exemptions were offered as a way to protect proprietary employer information, they mistakenly conflate criteria like pay and title with access to proprietary information. *See* Arnow-Richman Comment, *supra*, at 6.

Labor mobility is at least as critical for skilled as for unskilled workers. Studies have shown that highly skilled and experienced employees are essential to driving innovation and spurring economic development, as they are the most likely to start new disruptive businesses or add value

to existing employers. *See id.* at 6; *see also* Liyan Shi, *Optimal Regulation of Noncompete Contracts* 3 (Working Paper, 2022), https://perma.cc/6799-A3WE. The mobility of highly skilled and experienced employees is important to the policy goal of facilitating economic dynamism through enhanced competition. *See* Arnow-Richman Comment, *supra*, at 6. Exempting them would diminish the beneficial impact of the comprehensive noncompete ban.

The Commission was correct to reject future exemptions based on imperfect proxies such as wage level and job title that would be difficult to enforce and raise serious administrative challenges that would perpetuate the problems of the current system. *Id.* Salary levels are largely dependent on industry, geographic location, and the employees' skillset and experience level, so nationwide salary threshold by the FTC would be arbitrary and would also have to be adjusted frequently for inflation.

## VI.   THE RULE DOES NOT PREVENT EMPLOYERS FROM EFFECTIVELY PROTECTING CONFIDENTIAL INFORMATION.

The Rule only affects noncompetes and their functional equivalents. It does not prevent employers from using other legal restrictions on misappropriation of confidential information, provided those requirements do not bar employees from pursuing work elsewhere. Thus, under the Rule companies have a panoply of options available for protecting sensitive trade information, even as employees may depart to work for competitors.

Specifically, trade secrecy law has been and will continue to be an effective tool for preventing the disclosure of sensitive employer information. Under the Defend Trade Secrets Act (DTSA), employers may bring civil claims against former employees for trade-secret misappropriation. Defend Trade Secrets Act, 18 U.S.C. § 1836. The DTSA complements existing state trade secrecy laws, which balance employers' right to protect proprietary information with

the public interest in the flow of non-proprietary information. Thus, employers are provided adequate remedies for violations without preventing employees from pursuing competitive work in their fields. Non-Compete Clause Rule, 89 Fed. Reg. at 38424; *see* Arnow-Richman Comment, *supra*, at 9.

Under the Rule, employers will also remain free to use "appropriately tailored" NDAs that do not "function to prevent a worker from seeking or accepting other work or starting a business." Non-Compete Clause Rule, 89 Fed. Reg. at 38366. And returning to real-world examples, under California's longstanding ban on noncompetes, companies have remained able to fully protect confidential information and business secrets and competition and innovation have flourished. *See generally*, Mark Lemley & Orly Lobel, *Supporting Talent Mobility and Enhancing Human Capital: Banning Noncompete Agreements to Create Competitive Job Markets,* Day One Project (Jan. 2021).

## CONCLUSION

For the above reasons, *amici* urge the Court to deny the pending motions to delay the effective date of the Rule and for a preliminary injunction.

Dated: June 7, 2024

Respectfully submitted,

By: /s/ Phillip R. Malone

Phillip R. Malone (*pro hac vice pending*)
Juelsgaard Intellectual Property &
  Innovation Clinic
Mills Legal Clinic, Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Tel: 650-725-6369
Fax: 650-723-4426
Email: pmalone@law.stanford.edu

Alia Al-Khatib
PA Bar No. 325456
Civil Practice Clinic
University of Pennsylvania Carey Law School
3501 Sansom Street
Philadelphia, PA 19104
Tel: 215-898-8427
Email: aliaalkh@law.upenn.edu

## APPENDIX — LIST OF AMICI

*Amici curiae* are the 35 professors and scholars listed below. Affiliation is provided for identification purposes only; all signatories are participating in their individual capacity and not on behalf of their institutions.

**Professor Richard Alderman**
University of Houston Law Center

**Professor Rachel Arnow-Richman**
University of Florida Levin College of Law

**Professor Jonathan Askin**
Brooklyn Law School

**Professor Gilat Juli Bachar**
Temple University Beasley School of Law

**Professor Susan Block-Lieb**
Fordham School of Law

**Professor Andrew Chin**
University of North Carolina School of Law

**Professor Christine Desan**
Harvard Law School

**Professor Rochelle Dreyfuss**
New York University School of Law

**Professor Kathleen C. Engel**
Suffolk University Law School

**Professor Keith Marzilli Ericson**
Boston University Questrom School of Business

**Professor Eric M. Fink**
Elon University School of Law

**Professor Pamela Foohey**
University of Georgia College of Law

**Professor Brian L. Frye**
University of Kentucky College of Law

**Professor Farshad Ghodoosi**
Nazarian College of Business and Economics, California State University, Northridge

**Professor Jonathan D. Glater**
UC Berkeley School of Law

**Professor Nikolas Guggenberger**
University of Houston Law Center

**Professor Jonathan F. Harris**
LMU Loyola Law School Los Angeles

**Professor Peter Henderson**
Princeton University

**Professor Robert A. Heverly**
Albany Law School

**Professor Dalié Jiménez**
University of California, Irvine School of Law

**Professor Amy Landers**
Drexel University, Thomas R. Kline School of Law

**Professor Mark A. Lemley**
Stanford Law School

**Professor Yvette Joy Liebesman**
Saint Louis University School of Law

**Professor Orly Lobel**
University of San Diego School of Law

**Professor Michael J. Madison**
University of Pittsburgh School of Law

**Seth E. Mermin**
UC Berkeley School of Law

**Professor Viva Moffat**
University of Denver College of Law

**Professor John M. Newman**
University of Miami School of Law

**Professor Vijay Raghavan**
Brooklyn Law School

**Professor Christopher B. Seaman**
Washington and Lee University School of Law

**Professor Michael S. Sinha**
Saint Louis University School of Law

**Professor Olav Sorenson**
UCLA Anderson

**Professor Marshall Steinbaum**
University of Utah

**Professor David C. Vladeck**
Georgetown University Law Center

**Professor Eric Wright**
Santa Clara University School of Law

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Brief of *Amici Curiae* 35 Law, Business, and Economics Professors and Scholars in Support of the Defendants' Opposition to Plaintiff's Motion to Stay Effective Date and Preliminary Injunction:

1.    Contains 5268 words, including footnotes but excluding the case caption, the table of contents, the table of authorities, the signature block, and the certificates, as determined by the word count feature of Microsoft Word, and

2.    It has been prepared in a proportionally spaced typeface using Microsoft Office Word with text in 12-point Times New Roman font.

DATED: June 7, 2024

By: /s/ Phillip R. Malone

Phillip R. Malone (*pro hac vice pending*)
Juelsgaard Intellectual Property &
    Innovation Clinic
Mills Legal Clinic, Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
Tel: 650-725-6369
Fax: 650-723-4426
Email: pmalone@law.stanford.edu