## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

ATS TREE SERVICES, LLC

        Plaintiff,

    v.

FEDERAL TRADE COMMISSION;
LINA M. KHAN, in her official
capacity as Chair of the Federal Trade
Commission; and REBECCA KELLY
SLAUGHTER, ALVARO BEDOYA,
ANDREW N. FERGUSON, and
MELISSA HOLYOAK, in their
official capacities as Commissioners of the
FTC,

        Defendants.

Case No. 2:24-cv-01743-KBH

### BRIEF OF *AMICI CURIAE* PROFESSORS WILLLIAM ARAIZA, JEFFREY LUBBERS, AND PETER M. SHANE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO STAY EFFECTIVE DATE AND FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

INTEREST OF *AMICI CURIAE* ...................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 1

ARGUMENT ...................................................................................................................... 2

   I.    The Rule is an ordinary exercise of the Commission's well-established statutory
authority, and thus, does not pose a major question ................................................. 2

        a.    The major questions doctrine applies only to extraordinary cases of agencies making
novel claims to authority well beyond their contemplated substantive scope ....................... 3

        b.    The Rule is consistent with the Commission's long history of addressing non-compete
agreements as unfair anti-competitive practices and fits easily within its expertise ............. 5

        c.    Plaintiff's arguments to the contrary misapprehend the major questions doctrine and
are meritless ................................................................................................ 7

   II.    The FTC Act provides an intelligible principle for the Commission's exercise of its
authority ................................................................................................................ 11

CONCLUSION ................................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)...........................................6

*Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) .................................................................. 2, 4

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946) ................................................................11, 12

*Biden v. Missouri*, 595 U.S. 87 (2022)...................................................................................... 5, 7

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023).....................................................................................3

*FTC v. Motion Picture Advert. Serv., Co.*, 344 U.S. 392 (1953)......................................................6

*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972) ................................................................ 14

*Gonzalez v. Oregon*, 546 U.S. 243 (2006) ....................................................................................4

*Gundy v. United States*, 588 U.S. 128 (2019) .............................................................................. 14

*In re Tyco Int'l Ltd.*, 2000 WL 1779005 (F.T.C. Dec. 1, 2000) ................................................. 6, 8

*J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928)................................................. 14

*Kim v. Hanlon*, 99 F.4th 140 (3d Cir. 2024).....................................................................................2

*Kisor v. Wilkie*, 588 U.S. 558 (2019) ...........................................................................................7

*MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218 (1994).........................4

*Mistretta v. United States*, 488 U.S. 361 (1989) ..........................................................................11

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109 (2022)................................................4

*Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672 (D.C. Cir. 1973)...................................... 10

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) .................................................................................9

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ........................................................... 2, 3, 4, 8

*Wayman v. Southard*, 23 U.S. 1 (1825) ...................................................................................... 14

*West Virginia v. EPA*, 597 U.S. 697 (2022) ........................................................................... passim

*Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.*, 80 F.4th 536 (5th Cir. 2023) ............. 2

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) .................................................................2

*Yakus v. United States*, 321 U.S. 414 (1944)..........................................................................11, 13

**Statutes**

15 U.S.C. § 45(a)(1)................................................................................................................ 5, 14

15 U.S.C. § 46(g) .......................................................................................................................9

15 U.S.C. § 57a ........................................................................................................................ 10

15 U.S.C. § 57a(2) ................................................................................................................... 10

5 U.S.C. § 553(e) ......................................................................................................................11

**Other Authorities**

Compl., *Pennsylvania v. EQT Corp.*, No. 23-cv-01483 (W.D. Pa. Aug. 16, 2023)........................ 8

Dep't of Just., Press Release, *Sports Equipment Sales Professional Pleads Guilty to Long-
    Running Bid Rigging Schemes and Conspiracy to Defraud Public Schools* (May 13, 2024),
    https://tinyurl.com/39my3258........................................................................................... 9

Donald L. R. Goodson, *Judge Kacsmaryk Shuts Down Frivolous Use of the Major Questions Doctrine* (Oct. 10, 2023), https://tinyurl.com/53chcz5s ............................................................ 3

FTC, Comm'n File No. P221202, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022), https://tinyurl.com/4ydzbeuc ........................................................................................ 12

FTC, Press Release*, FTC Approves Final Order Requiring Anchor Glass Container Corp. to Drop Noncompete Restrictions That It Imposed on Workers* (June 2, 2023), https://tinyurl.com/349mv65t ...................................................................................... 6

FTC, Press Release, *FTC Approves Final Order Requiring Michigan-Based Security Companies to Drop Noncompete Restrictions That They Imposed on Workers* (Mar. 8, 2023), https://tinyurl.com/2k3w4xd2 .................................................................................... 6

FTC, Press Release, *FTC Approves Final Orders Requiring Two Glass Container Manufacturers to Drop Noncompete Restrictions That They Imposed on Workers* (Feb. 23, 2023), https://tinyurl.com/2vveuzb7 ...................................................................................... 6

Isaac Kirschner, *The New Antitrust Rules: The FTC's § 5 Rulemaking Authority*, 78 N.Y.U. Ann. Surv. Am. L. 359 (2022) ................................................................................................ 12

Norman D. Bishara & Evan Starr, *The Incomplete Noncompete Picture*, 20 Lewis & Clark L. Rev. 497 (2016) ............................................................................................................... 5

Robert L. Glicksman & David L. Markell, *Unraveling the Administrative State: Mechanism Choice, Key Actors, and Regulatory Tools*, 36 Va. Env't L. J. 318 (2018) ................................ 9

S. Rep. No. 597 (1914) ...................................................................................................... 14

**Regulations**

Non-Compete Clause Rule, 89 Fed. Reg. 38342 (May 7, 2024) (to be codified at 16 C.F.R. pts. 910, 912) ..................................................................................................................... 1, 6

## INTEREST OF *AMICI CURIAE*

*Amici* are law professors who teach and write in the fields of administrative law and statutory interpretation. *Amicus* William Araiza is the Stanley A. August Professor of Law at Brooklyn Law School. *Amicus* Jeffrey Lubbers is Professor of Practice in Administrative Law at American University, Washington College of Law. *Amicus* Peter M. Shane is the Jacob E. Davis and Jacob E. Davis II Chair in Law Emeritus at Ohio State University, Moritz College of Law.

*Amici* have a strong interest in the sound development of administrative law in the federal courts, and are submitting this brief because of the importance of the administrative law and statutory interpretation issues implicated by the plaintiff's positions. As leading administrative law scholars, *amici* are well-positioned to provide insights that may assist the Court in evaluating Plaintiff's arguments concerning both the recently announced major questions doctrine and the nondelegation doctrine.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Federal Trade Commission ("Commission") has taken an important step in favor of competition. By largely eliminating worker non-compete clauses, the Non-Compete Clause Rule, 89 Fed. Reg. 38342 (May 7, 2024) (to be codified at 16 C.F.R. pts. 910, 912) ("the Rule") will greatly aid the mobility of the American labor force and incentivize employers to offer competitive compensation. While the Rule and its impacts will be life-changing for individual workers, it is decidedly not a transformative or unheralded exercise of the Commission's authority. To the contrary, the Rule is of a piece with long-established Commission authorities; accordingly, it does not implicate the major questions doctrine. Nor does the nondelegation doctrine pose any bar to the Rule; the Commission is clearly guided by an intelligible principle in exercising its authority to regulate unfair methods of competition.

## ARGUMENT

Plaintiff has not shown that it has "a substantial likelihood of success on the merits,"[1] as it must to obtain a preliminary injunction.  Its claims to the contrary rest on fundamental misunderstandings and misapplications of both the major questions doctrine and the nondelegation doctrine.  Neither doctrine poses any bar to the Rule.

## I.    The Rule is an ordinary exercise of the Commission's well-established statutory authority, and thus, does not pose a major question.

The major questions doctrine, first articulated by the Supreme Court of the United States in *West Virginia v. EPA*, 597 U.S. 697 (2022), generally stands for the proposition that Congress does not delegate extraordinary powers to agencies without speaking clearly.[2]  The doctrine applies only to an "unprecedented"[3] exercise of authority involving an action of "vast economic and political significance,"[4] where "an agency [] make[s] a 'radical or fundamental change' to a statutory scheme"[5] after claiming "to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority . . . in the vague language of an ancillary provision . . . [that] allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."[6]  This is no such case.

---

[1] *Kim v. Hanlon*, 99 F.4th 140, 155 (3d Cir. 2024) (quoting *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020).

[2] *W. Virginia*, 597 U.S. at 723 ("Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'") (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

[3] *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021).

[4] *W. Virginia*, 597 U.S. at 721 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

[5] *Id*. at 723 (internal citation omitted).

[6] *Id.* at 724 (quoting *Util. Air*, 573 U.S. at 324 (2014); *Whitman*, 531 U.S. at 468 (citing cases)) (internal quotation marks omitted).

### a. The major questions doctrine applies only to extraordinary cases of agencies making novel claims to authority well beyond their contemplated substantive scope.

Despite the wide-ranging invocation of the major questions doctrine by litigants since 2022,[7] the doctrine applies only in "extraordinary cases."[8]  A review of the cases in which the Supreme Court expressly applied the major questions doctrine as well as those discussed as "extraordinary" in *West Virginia* itself reveals that to trigger the major questions doctrine, an agency's claim of authority must be novel and transformative indeed.  As the Court has made clear, the doctrine applies only in instances where the agency purports to regulate, for the first time, a subject beyond what Congress has laid out as the agency's substantive scope of authority.[9]

The doctrine applies only in a narrow set of circumstances where an agency has attempted a novel regulatory action that would transformatively expand its statutory authorities.  In *West Virginia* itself, the Court applied the major questions doctrine to an effort to shift energy production from dirtier sources to cleaner sources under statutory authority to limit emissions levels.[10]  And in *Biden v. Nebraska*, the Court determined that the Department of Education implicated the doctrine when it offered unprecedented cancellations of student debt under statutory authority to waive or modify provisions concerning federal student loans in connection with a national emergency.[11]

---

[7] *See* Donald L. R. Goodson, *Judge Kacsmaryk Shuts Down Frivolous Use of the Major Questions Doctrine* (Oct. 10, 2023), https://tinyurl.com/53chcz5s ("[M]any challengers view the major questions doctrine as akin to an incantation—something that if uttered enough times will ensure a favorable ruling").

[8] *W. Virginia*, 597 U.S. at 723 (quoting *Brown & Williamson*, 529 U.S. at 159-160).

[9] Even in such cases, the major questions doctrine poses no bar to agency action if the agency can "point to 'clear congressional authorization' for the power it claims."  *W. Virginia*, 597 U.S. at 723 (quoting *Util. Air*, 573 U.S. at 324).

[10] *W. Virginia*, 597 U.S. at 725.

[11] *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

This limited application of the doctrine is consistent with the relevant precedent.  In *West Virginia*, the Court recognized as prior major questions: [12] the FDA's effort to regulate tobacco for the first time;[13] a first-ever national eviction moratorium under a statutory provision concerning public health measures to target communicable diseases;[14] the EPA's self-described "unprecedented"[15] effort to newly subject tens of thousands of facilities to emissions and licensing standards;[16] a first-of-its-kind interpretive rule prohibiting use of controlled substances for a specific purpose despite express state law authorization of that purpose;[17] and an unprecedented economy-wide vaccine mandate issued under authority to ensure workplace safety.[18]  In reviewing each of these administrative actions, the Supreme Court determined that an agency had attempted to break entirely new ground in its substantive authority, pursuing a "radical or fundamental change" to the underlying statutory scheme.[19]

---

[12] *W. Virginia*, 597 U.S. at 721-23. The prior cases discussed in *West Virginia* did not use the term "major questions doctrine," but the *West Virginia* Court cited them as earlier instances of the not-yet-named doctrine's application.  *Id*. at 724 ("As for the major questions doctrine 'label[],' it took hold because it refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted.").

[13] *Brown & Williamson*, 529 U.S. at 126.  The Court also considered both the FDA's "long-held position that it lacks jurisdiction under the FDCA to regulate tobacco products" and that Congress had "effectively ratified" that view.  *Id*. at 144.

[14] *Ala. Ass'n of Realtors*, 594 U.S. at 761.

[15] *Util. Air*, 573 U.S. at 310.

[16] *Id.*  Those standards had previously only been applied to several hundred large industrial plants and similar sources of pollution, whereas the proposed change, the "single largest expansion in the scope of the [Clean Air Act] in its history," *id*., would have covered tens of thousands of "smaller industrial sources, large office and residential buildings, hotels, large retail establishments, and similar facilities.  *Id*. (internal citations omitted).

[17] *Gonzalez v. Oregon*, 546 U.S. 243 (2006).

[18] *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109 (2022).

[19] *W. Virginia*, 597 U.S. at 723 (quoting *MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co*., 512 U.S. 218, 229 (1994)).

**b. The Rule is consistent with the Commission's long history of addressing non-compete agreements as unfair anti-competitive practices and fits easily within its expertise.**

On the other hand, on the same day that the Court, invoking the major questions doctrine, invalidated the vaccine mandate enacted under workplace safety authority, it upheld such a mandate for staff of healthcare facilities that participate in Medicare or Medicaid.[20]  Holding that the mandate was within the statutory authority of the Secretary of Health and Human Services, the Court noted that "the Secretary routinely imposes conditions of participation that relate to the qualifications and duties of healthcare workers. . . [and] has always justified these sorts of requirements by citing"[21] the same statutory authority invoked to issue the mandate.  In stark contrast to those agency actions invalidated in the Supreme Court's major questions cases and the "extraordinary" cases discussed in *West* Virginia, the Medicare/Medicaid facilities mandate was simply another exercise of an agency's long-standing, plainly established, and often-exercised authority—as is the Rule at issue here.  Neither unheralded, nor unprecedented, nor transformative, nor extraordinary, this lacks the indicia that signify a major question.

Non-compete agreements fall squarely within the Commission's statutory authority over "unfair methods of competition."[22]  Non-compete clauses and their historical antecedents had long been considered anticompetitive under the common law: "Restrictive covenants, including employee covenants not to compete, have a long history in the common law with the first known agreements of this kind dating back to the 1400s in England.  From that time on, they have been recognized as anticompetitive by design[.]"[23]  And the Commission's "unfair methods of

---

[20] *Biden v. Missouri*, 595 U.S. 87 (2022).
[21] *Id*. at 94.
[22] 15 U.S.C. § 45(a)(1).
[23] Norman D. Bishara & Evan Starr, *The Incomplete Noncompete Picture*, 20 Lewis & Clark L. Rev. 497, 504 (2016).

competition" authority is even broader than the common law understanding of "unfair competition,"[24] reinforcing the Commission's authority over non-compete agreements.

The Commission has taken numerous enforcement actions[25] concerning non-compete agreements,[26] and the Rule merely applies the standard developed through these individual enforcement actions broadly, putting regulated entities on notice and providing greater clarity for compliance.  The Commission further recognized that "existing case-by-case and State-by-State approaches to non-competes have proven insufficient to address the tendency of non-competes to harm competitive conditions in labor, product, and service markets."[27]  On the basis of its "experience and expertise,"[28] including the expertise specifically acquired through enforcement actions,[29] the Commission analyzed the impacts of the Rule, concluding that it would improve earnings or earnings growth,[30] innovation,[31] and consumer prices.[32]

---

[24] *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532 (1935) ("Debate apparently convinced the sponsors of the [FTC Act] that the words 'unfair competition,' in the light of their meaning at common law, were too narrow.  We have said that the substituted phrase [unfair methods of competition] has a broader meaning.").

[25] FTC, Press Release, *FTC Approves Final Orders Requiring Two Glass Container Manufacturers to Drop Noncompete Restrictions That They Imposed on Workers* (Feb. 23, 2023), https://tinyurl.com/2vveuzb7; FTC, Press Release*, FTC Approves Final Order Requiring Anchor Glass Container Corp. to Drop Noncompete Restrictions That It Imposed on Workers* (June 2, 2023), https://tinyurl.com/349mv65t; FTC, Press Release, *FTC Approves Final Order Requiring Michigan-Based Security Companies to Drop Noncompete Restrictions That They Imposed on Workers* (Mar. 8, 2023), https://tinyurl.com/2k3w4xd2.

[26] Additionally, the Commission has exercised authority over exclusivity contracts as unfair methods of competition for seven decades.  *See, e.g., FTC v. Motion Picture Advert. Serv., Co.*, 344 U.S. 392, 395 (1953) (upholding Commission order limiting exclusive contracts for advertisements in movie theaters to one year because such contracts are "an unfair method of competition within the meaning of [§] 5(a)") (internal quotation marks omitted).  And since at least 2000, the Commission has exercised authority to partially prohibit employers from enforcing non-compete agreements in the context of mergers.  *See In re Tyco Int'l Ltd.*, 2000 WL 1779005 (F.T.C. Dec. 1, 2000).

[27] 89 Fed. Reg. at 38343.

[28] *Id.* at 38346.

[29] *Id.* at 38354.

[30] *Id.* at 38474.

[31] *Id.* at 38476.

[32] *Id.* at 38478.

Courts are most likely to invoke the major questions doctrine where the agency "'has no comparative expertise' in making certain policy judgments," suggesting that "'Congress presumably would not' task it with doing so."[33]  In other words, the major questions doctrine is more likely to apply where "there is a mismatch between an agency's challenged action and its congressionally assigned mission and expertise."[34]  No such mismatch plausibly exists here: Congress has vested the Commission with broad powers over unfair methods of competition, and no government agency could reasonably be expected to have greater expertise than the Commission concerning non-compete agreements or unfair methods of competition generally. Invalidating non-compete agreements has been an ordinary Commission activity for over twenty years.  And where an agency is engaged in its ordinary business, even if its regulatory action "goes further than what the [agency] has done in the past to" conduct that business, "there can be no doubt that [the action] is what [the agency] does."[35]  Such agency actions—like the Rule— cannot be said to be a novel or transformative claim of authority.

### c.  Plaintiff's arguments to the contrary misapprehend the major questions doctrine and are meritless.

In support of its position that the Rule implicates a major question, Plaintiff relies principally on characterizations of its economic and political significance.[36]  In contrast, the Supreme Court's various formulations of the doctrine make clear that, while economic and political significance are *necessary* conditions for agency action to implicate the major questions doctrine, they are not, by themselves, sufficient.  In articulating the doctrine in *West Virginia*, the Court

---

[33] *W. Virginia*, 597 U.S. at 729 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019)).
[34] *Id.* at 748 (Gorsuch, J., concurring).
[35] *Missouri*, 595 U.S. at 87, 95 ("[A]ddressing infection problems in Medicare and Medicaid facilities is what [the agency] does.").
[36] Pl.'s Br. Supp. Mot. Prelim. Inj. 18-20 (primarily discussing economic impact and political significance in arguing that Rule implicates a major question).

explained that the relevant precedents involve situations where *both* "the 'history and the breadth of the authority that [the agency] has asserted,' *and* the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."[37]  The Court could not be more clear: to implicate the major questions doctrine, an agency must claim expansive authority *and* the economic and political consequences of that claim must be significant.  The latter, standing alone, cannot create a major question.[38]  Because the authority exercised by the Commission does not trigger the major questions doctrine, any political and economic significance of the Rule, standing alone, could not do so.

Plaintiff further suggests, without explanation, that the Department of Labor would be the appropriate government agency to regulate non-compete agreements.[39]  This suggestion is mistaken.  Restricting such agreements protects and fosters competition, a core Commission function—that it *also* protects workers does not change that fact.  Plaintiff's lens ignores the Commission's long-standing history of actions concerning non-compete agreements[40] and would, followed to its logical conclusion, assign authority of virtually all actions against anti-competitive practices to government agencies with no expertise in the area.  Following Plaintiff's thinking, the Pennsylvania Attorney General's action against an anti-competitive acquisition between competing natural gas companies[41] should have been handled by the Pennsylvania Department of Environmental Protection, and a football helmet company employee's recent

---

[37] *W. Virginia*, 597 U.S. at 721 (quoting *Brown & Williamson*, 529 U.S. at 159-60) (emphasis added).
[38] Similarly, as the Supreme Court explained in one of the "extraordinary" predecessors to its announcement of the doctrine, "[w]e expect Congress to speak clearly *if it wishes to assign to any agency* decisions of vast 'economic and political significance.'" *Util. Air*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 159) (emphasis added).  This explanation plainly contemplates that Congress may *choose* to assign such decisions to agencies.  It requires only that Congress speak clearly to do so, as it has done here.
[39] Pl.'s Br. Supp. Mot. Prelim. Inj. 20.
[40] *See e.g. Tyco*, *supra* n. 26.
[41] Compl., *Pennsylvania v. EQT Corp.*, No. 23-cv-01483 (W.D. Pa. Aug. 16, 2023).

guilty plea for rigging bids to secure procurements for school sports equipment[42] should have been handled by the United States Department of Education.

Plaintiff also seems to imply that the Commission's choice of mechanism to address non-compete agreements—rulemaking, as opposed to enforcement—somehow implicates the major questions doctrine.[43]   This notion flatly misunderstands the operation of the doctrine, which is concerned with the substance of agency action, not its form.   Nor does Plaintiff offer any authority for its contention.   The argument runs headlong into the longstanding principle of administrative law that agencies typically may choose "between proceeding by general rule or by individual, ad hoc litigation[.]"[44]   It is common and appropriate for agencies to choose rulemaking, as developing rules through individual actions "may blind an agency to broader policy implications,"[45] though individual actions may be more appropriate in some instances such as addressing isolated misconduct.   Whether the Commission can exercise its indisputable authority over non-compete agreements through rulemaking is a simple statutory interpretation question, not a major question—if the statute authorizes it, it is within the agency's discretion to pick its process.

To this end, it is difficult to imagine a clearer statement of the Commission's authority to issue substantive rules concerning unfair methods of competition than Section 6(g) of the FTC Act, which provides, in relevant part, that the Commission has the power to "make rules and regulations for the purpose of carrying out the provisions of this subchapter."[46]   This plain meaning was confirmed by the D.C. Circuit's decision in *National Petroleum Refiners Association v. FTC*, which

---

[42] Dep't of Just., Press Release, *Sports Equipment Sales Professional Pleads Guilty to Long-Running Bid Rigging Schemes and Conspiracy to Defraud Public Schools* (May 13, 2024), https://tinyurl.com/39my3258.

[43] Pl.'s Br. Supp. Mot. Prelim. Inj. 11, n. 2; *id*. at 20.

[44] *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947).

[45] Robert L. Glicksman & David L. Markell, *Unraveling the Administrative State: Mechanism Choice, Key Actors, and Regulatory Tools*, 36 Va. Env't L. J. 318 (2018).

[46] 15 U.S.C. § 46(g).

held that the "Commission is authorized to promulgate rules defining the meaning of the statutory standards of the illegality the Commission is empowered to prevent."[47]  That is precisely what the Commission has done here.  And contrary to what some critics suggest, the subsequent limitation on the FTC's authority to make rules concerning "unfair and deceptive trade practices" imposed by the Magnuson-Moss Act changed nothing about the FTC's authority to make rules concerning unfair methods of competition.[48]

Finally, Plaintiff contends that, because the Commission has not exercised its unfair methods of competition rulemaking authority frequently or recently, the Commission's exercise of that authority is inherently transformative, triggering the major questions doctrine.[49]  But the Commission has not transformed anything.  Far from it: the authority is obvious on the face of the text and even the most cursory consideration of Congressional action.  The major questions doctrine cannot apply on that basis; subjecting any idle statutory authority, no matter how obvious, to the doctrine would force agencies into a meaningless formality of exercising all of their authorities solely for the purpose of preserving them.  It would also render superfluous the Administrative Procedure Act provision allowing for petitions for rulemaking which seek the

---

[47] *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 698 (D.C. Cir. 1973) (regarding *both* unfair and deceptive acts and practices authority and unfair methods of competition authority).

[48] The Magnuson-Moss Act, enacted in response to *National Petroleum*, in fact *demonstrates* Congress' intent that the Commission be empowered to enact substantive rules concerning unfair methods of competition; it does not, as Plaintiff contends, indicate Congressional intent to remove such authority. The Magnuson-Moss Act added significant limitations and added requirements to Commission rulemakings concerning unfair and deceptive acts or practices, 15 U.S.C. § 57a, and expressly exempted rulemakings concerning unfair methods of competition from those same limitations and requirements.  15 U.S.C. § 57a(2).  Prior to the Magnuson-Moss Act, there was no distinction between the Commission's rulemaking authority pertaining to unfair or deceptive acts or practices and its rulemaking authority pertaining to unfair methods of competition.  *National Petroleum* subsequently confirmed the Commission's authority to make rules concerning both, and Congress responded by restricting that authority with regard to unfair and deceptive acts and practices and explicitly declining to restrict the authority with regard to unfair methods of competition.  The only way to reconcile this sequence of events is to conclude that Congress intended to allow the Commission to retain full authority to issue rules for the purpose of preventing unfair methods of competition.

[49] Pl.'s Br. Supp. Mot. Prelim. Inj. 20.

"issuance" of a rule;[50] if any unused authority becomes unavailable to an agency under the major questions doctrine, any petition for issuance of a rule not yet in existence would necessarily rely on unavailable authority.

## II.   The FTC Act provides an intelligible principle for the Commission's exercise of its authority.

Plaintiff separately contends that the FTC Act violates the nondelegation doctrine because Congress failed to provide the Commission with an intelligible principle to guide its discretion in rulemaking.[51]  Not so.  "Congress simply cannot do its job absent an ability to delegate power under broad general directives,"[52] so while a statute must provide an intelligible guiding principle, it need not prescribe every detail of an agency's action.  Under that standard, there is no question that Congress has provided "an intelligible principle to which the [Commission] is directed to conform[.]"[53]

Most fundamentally, the statutory text provides an adequate principle.  The Supreme Court has repeatedly held that statutory delegations of authority to determine whether given practices are "unfair," such as the one at issue here, do not pose a nondelegation concern.  In upholding the SEC's authority to modify corporate structures to ensure that they do not "unfairly or inequitably distribute voting power among security holders,"[54] the Supreme Court rejected the notion that

---

[50] 5 U.S.C. § 553(e).
[51] Pl.'s Br. Supp. Mot. Prelim. Inj. 21-23.
[52] *Mistretta v. United States*, 488 U.S. 361, 372 (1989).
[53] *Id.* at 371-72.
[54] *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946).  *See also Yakus v. United States*, 321 U.S. 414, 420-21 (1944) (upholding authority to set "generally fair and equitable" commodity prices).

that phrase did not provide an "ascertainable standard[] for guidance in carrying out"[55] the SEC's

functions.[56]

Additionally, Section 5's use of the phrase "unfair methods of competition," particularly

taken in the context of Congress' choice not to simply use the common law language "unfair

competition," provides an intelligible principle to guide the FTC's authority.  The Supreme Court

has repeatedly confirmed that the specific language of the FTC Act authorizes the Commission to

take action against anti-competitive practices beyond the scope of the Clayton and Sherman

Acts.[57]

And as the Commission itself has noted, the FTC Act's legislative history contains extensive

guidance the Commission can use to analyze the practices it investigates, further delineating the

boundaries of its authority.[58]  The Commission may therefore rely on the text and legislative

---

[55] *Am. Power & Light Co.*, 329 U.S. at 104.

[56] The Court further noted that the term derives additional meaning from the purposes of the statute in which it appears, *id*.  The Commission can similarly avail itself of the purposes of the FTC Act in interpreting Section 5.

[57] *See* FTC, Comm'n File No. P221202, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act*, at 1 n.3 (Nov. 10, 2022), https://tinyurl.com/4ydzbeuc (discussing twelve Supreme Court cases); Isaac Kirschner, *The New Antitrust Rules: The FTC's § 5 Rulemaking Authority*, 78 N.Y.U. Ann. Surv. Am. L. 359, 364–65 (2022) ("[T]he Supreme Court has come to recognize § 5's broad scope and grant of discretion to the FTC.  In early cases, the Court constrained the FTC's authority to determine whether conduct was an 'unfair method of competition' and stipulated that this power was limited to conduct already found to be anticompetitive.  The Court has since confirmed that § 5 covers conduct within the Sherman and Clayton Acts.  In *Federal Trade Commission v. R.F. Keppel & Brother, Inc.*, the Court adopted an expanded scope, however, finding that § 5 was not limited to "fixed and unyielding categories" or conduct forbidden at common law or by the Sherman Act.  In *Federal Trade Commission v. Sperry & Hutchinson Co.*, the Court . . . concluded that the FTC 'does not arrogate excessive power to itself if . . . [it] considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws.' Additional cases confirm the FTC's discretion to bring 'unfair methods of competition' cases over conduct outside of the existing antitrust laws").

[58] FTC, Comm'n File No. P221202, at 4 n.16 ("For instance, a Senate report referenced practices 'such as local price cutting, interlocking directorates, and holding companies intended to restrain substantial competition.' S. REP. NO. 63-597, at 13. In considering what conduct should be prohibited, the House distinguished between 'artificial bases' of monopolistic power and 'natural bases.' *See* H.R. REP. NO. 63-533, at 23–25. The House viewed artificial bases of monopolistic power to include, for instance, the acceptance of rates or terms of service from common carriers not granted to other shippers; price discrimination not justified by differences in cost or distribution; procuring the secrets of competitors by

history of the FTC Act; the statutory prohibitions, structure, and history of the Sherman and Clayton Acts; and common law principles of competition to inform and guide its understanding of the statutory meaning of "unfair methods of competition." Under these authorities, the Commission is bound by a simple intelligible principle: it can take action against acts or practices that it concludes are unfair and likely to cause injury to competition similar to the harms caused by violations of the antitrust statutes.

While this principle leaves some discretion to the Commission, the Supreme Court has made clear that an intelligible principle need not specifically direct the exact outcome of agency action. "It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework."[59]

Under the nondelegation doctrine, as currently applied, that ends the inquiry. Plaintiff attempts, however, to impose an additional requirement to satisfy the nondelegation doctrine, casually presenting a stray remark from a 199-year-old decision as an alternate formulation of the doctrine.[60] Despite this attempted sleight of hand, the "intelligible principle" standard is the

---

bribery or any illegal means; procuring conduct on the part of employees of competitors inconsistent with their duties to their employers; making oppressive exclusive contracts; the maintenance of secret subsidiaries or secretly controlled agencies held out as independent; the destruction or material lessening of competition through the use of interlocking directorates; and the charging of exorbitant prices where the seller has a substantial monopoly. *Id.* Natural bases included control of natural resources, transportation facilities, financial resources, or any other economic condition inherent in the character of the industry, such as patent rights. *Id. See also* 51 CONG. REC. 11084–86 (1914) (statement of Sen. Newlands) (discussing jurisprudence on unfair competition); *id.* at 14928-14931 (statement of Rep. Covington) (discussing jurisprudence on unfair competition); *id.* at 11108 (statement of Sen. Newlands) (providing specific examples of unfair competition, such as local price cutting and organizing 'bogus independent concerns . . . for the purpose of entering the field of the adversary and cutting prices with a view to his destruction[,]' among other things); *id.* at 11230 (statement of Sen. Robinson) (providing examples of unfair competition)."); *see also id.* at 3 n.15.

[59] *Yakus*, 321 U.S. at 425.

[60] Pl.'s Br. Supp. Mot. Prelim. Inj. 21.

sole inquiry this Court need undertake,[61] and the FTC Act clearly satisfies it.  The "fill up the details"[62] standard endorsed by plaintiff has no binding precedential effect on this or any other court, and to the extent it ever did, it has been superseded by the "intelligible principle" standard which has been consistently applied since 1928.[63]

In any event, *amici* note that the FTC Act would meet even this more stringent standard. The "fill up the details" language comes from *dicta* in an 1825 decision, noting the difference between those "important subjects, which must be entirely regulated by the legislature itself," and "those of less interest, in which a general provision may be made, and power given to those who are to act . . . to fill up the details."[64]  In writing the FTC Act, Congress clearly recognized that unfairness was among the latter category: the drafting committee "gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce and forbid their continuance or whether it would, by a general declaration condemning unfair practices, leave it to the commission to determine what practices were unfair."[65]  The drafters settled on leaving it to the Commission, recognizing "that there were too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent others."[66]  This is an archetypal example of setting a "general provision" and leaving the Commission the power "to fill up the details" by defining "[u]nfair methods of competition."[67]

---

[61] *See Gundy v. United States*, 588 U.S. 128, 157 (2019) (Gorsuch, J., dissenting) (discussing "fill up the details" as alternative test if Supreme Court were to revisit existing nondelegation doctrine jurisprudence).
[62] *Wayman v. Southard*, 23 U.S. 1, 43 (1825).
[63] *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).
[64] *Wayman*, 23 U.S. at 43.
[65] *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240 (1972) (quoting S. Rep. No. 597, at 13 (1914)).
[66] *Id.*
[67] 15 U.S.C. § 45(a)(1).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for stay of effective date and for a preliminary injunction.

Dated: June 10, 2024

Respectfully submitted,

By: */s/ David S. Cohen*
David S. Cohen
3320 Market Street
Philadelphia, PA 19104
(215) 571-4714
dsc39@drexel.edu

Mark B. Samburg*
Robin F. Thurston*
Democracy Forward Foundation
PO Box 34553
Washington, DC 20043
202-448-9090
msamburg@democracyfoward.org
*pro hac vice *application*
  *forthcoming*

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing via the ECF system on June 10, 2024.

<u>/s/ David S. Cohen</u>
David S. Cohen