**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ATS TREE SERVICES, LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>FEDERAL TRADE COMMISSION, et al.,<br><br>　　　　Defendants. | No. 2:24-cv-01743-KBH |

**[PROPOSED] BRIEF OF AMICUS CURIAE AMERICAN ACADEMY OF EMERGENCY MEDICINE IN OPPOSITION TO PLAINTIFF'S MOTION FOR STAY OF EFFECTIVE DATE AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... 3

INTRODUCTION AND SUMMARY OF ARGUMENT .................................................... 5

LEGAL STANDARD ............................................................................................................ 6

ARGUMENT .......................................................................................................................... 7

    I.    AAEM Supports the Final Rule Becoming Effective Immediately Without Delay ............. 7

    A.    Patient Access to Care ................................................................................................ 7

    B.    Patient Quality-of-Care ............................................................................................... 9

    C.    Overall Innovation in the Healthcare Sector ............................................................. 11

    D.    Our Membership ........................................................................................................ 12

    II.    The Final Rule Serves the General Public Interest and Is Well-Supported by the Evidentiary Record ................................................................................................... 13

    III.    Staying the Effective Date of the Final Rule is Not in the Public Interest ......................... 14

CONCLUSION ..................................................................................................................... 15

CERTIFICATE OF SERVICE .............................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Duneland Emergency Physicians' Med. Grp. v. Brunk*,
    723 N.E.2d 963 (Ind. Ct. App. 2000) ................................................................................. 13

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
    774 F.3d 192 (3d Cir. 2014). ............................................................................................... 6

*Iredell Digestive Disease Clinic v. Petrozza*,
    373 S.E.2d 449 (N.C. Ct. App. 1988) ................................................................................ 13

*Mohanty v. St. John Heart Clinic*,
    No. 101251, 866 N.E. 2d 85 (Ill. 2006) ............................................................................. 13

*Murfreesboro Med. Clinic, P.A. v. Udom*,
    166 S.W.3d 674 (Tenn. 2005) ............................................................................................ 13

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) ................................................................................................ 7

*Statesville Med. Grp. v. Dickey*,
    418 S.E.2d 256 (N.C. Ct. App. 1992) ................................................................................ 13

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................................ 7

**Other Authorities**

Am. Acad. of Emergency Med.,
    Comment on Proposed Non-Compete Clause Rule (Apr. 13, 2023), https://perma.cc/272V-DLR8 ........................................................................................................................ 7, 11, 12

Am. Acad. of Emergency Med.,
    Comment Re: Dep't of Just., Dep't of Health and Hum. Serv., and the Fed. Trade Comm'n's Request for Information on Consolidation in Healthcare Markets: Docket No. ATR 102 (May 2, 2024), https://perma.cc/6PBJ-U3L6 ....................................................... 11

Am. Coll. of Emergency Physicians,
    Comment on Proposed Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (Mar. 7, 2023), https://perma.cc/2GAH-KUFV ............................................................................. 8, 9, 10, 11

Brandon Elledge,
    *Don't Fret (Yet): Trade Secrets, NDAs and Non-Solicits After the FTC Non-Compete Rule*, Holland & Knight, https://perma.cc/K7T4-U82Q ............................................................... 14

Brett Kelman and Blake Farmer,
    *Doctors Are Disappearing From Emergency Rooms as Hospitals Look to Cut Costs*, KFF HEALTH NEWS (Feb. 13, 2023), https://perma.cc/7NKL-87RX ............................................ 7

Dr. David Farcy,
    *Letter Re: Fed Trade Comm'n: Non-Competes in The Workplace: Examining Antitrust and Consumer Protection Issues* (Mar. 2, 2020), https://perma.cc/5D6Q-L52L ........................ 12

Dr. Jane M. Zhu, Hayden Rooke-Ley, Erin Fuse Brown,
 *A Doctrine in Name Only – Strengthening Prohibitions against the Corporate Practice of Medicine*, 398 New Eng. J. Med. 11 ................................................................................. 10

Dr. Jennifer Gholson,
 *Hearing on The Collapse of Private Practice: Examining the Challenges Facing Indep. Med. Before the Subcomm. on Health of the House Ways & Means Comm.*, 118th Cong. (May 23, 2024) ............................................................................................................. 8

Fred Schulte,
 *Sick Profit: Investigating Private Equity's Stealthy Takeover of Health Care Across Cities and Specialties*, KFF Health News (Nov. 14, 2022), https://perma.cc/H9GM-C6ZN ......... 10

Katie Arcieri,
 *UFC Fighters Ask Court to Approve $335 Million Cash Settlement*, Bloomberg Law, May 2024, https://perma.cc/2ZJE-G8LJ ................................................................................ 13

PA. COAL. OF NURSE PRAC.,
 PENNSYLVANIA FAMILIES INCREASINGLY DEPEND ON NURSE PRACTITIONERS FOR PRIMARY CARE (Aug. 2020) https://perma.cc/JUL8-7ZZ9 ................................................................. 8

Sandeep Vaheesan and Matthew Buck,
 *Non-Competes and Other Contracts of Dispossession*, Mich. St. L. Rev. 113 (2022) ........ 13

Testimony of Dr. Jonathan Jones, Fed. Trade Comm'n,
 Transcript of "Private Capital, Public Impact: An FTC Workshop on Private Equity in Health Care" (Mar. 5, 2024), https://perma.cc/GQS7-4GNE............................................... 10

Testimony of Erin Fuse Brown, Fed. Trade Comm'n,
 Transcript of "Private Capital, Public Impact: An FTC Workshop on Private Equity in Health Care" (Mar. 5, 2024), https://perma.cc/45PN-45V3 ................................................ 11

Xiaoming Zhang, et al.,
 *Physician workforce in the United States of America: forecasting nationwide shortages*, 18 HUM. RES. FOR HEALTH, 8 (Feb. 2020) https://perma.cc/XWC9-RR3F ............................... 8

**Regulations**

Federal Trade Commission's final Non-Compete Clause Rule,
 89 Fed. Reg. 38,342 (F) ....................................................................................... 5, 9, 10, 14

## INTEREST OF AMICUS CURIAE

The American Academy of Emergency Medicine (AAEM) is a three decade-old organization representing more than 8,000 board-certified emergency physicians across the country. In Pennsylvania, we have 640 members. Our organization is interested in this topic and the outcome of this litigation because many of our members are bound by non-compete agreements. These agreements negatively impact our physician members and their patients. Ensuring that the Federal Trade Commission's final Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) (the "Rule" or "Final Rule") becomes effective immediately, without delay, will significantly benefit patient access to care, patient quality-of-care, overall innovation in the healthcare sector, our membership, and the public interest. Conversely, any delay in the effective date would be harmful on all of these measures.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Court should deny Plaintiff's motion for a stay of effective date and preliminary injunction of the Final Rule. Plaintiff fails to meet the high standard necessary to justify such extraordinary emergency relief of a stay of effective date and preliminary injunction. Plaintiff fails in part because implementation of the Rule is in the public interest and delaying implementation of the Rule would be contrary to the public interest. In addition, if the Court were to delay the effective date for the Rule, doing so would cause harm to our members.

AAEM supports the Final Rule and views it as beneficial for patient access to care, patient quality-of-care, overall innovation in the healthcare sector, and our membership. Consistent with this, implementation of the Rule without delay is in the public interest. We hold this position primarily because our experience teaches us that physician labor mobility results in significant benefits, whereas restrictions on labor mobility result in significant harm.

The harms that flow from emergency physicians being bound by non-compete agreements primarily fall into the following categories: physician shortages, reduced quality-of-care, and chilled innovation in the healthcare sector. Non-competes prevent physicians from practicing in under-served areas. They can trap our members in jobs that may force them to compromise on patient safety and prevent our members from speaking out about patient safety issues. Non-compete agreements can also keep innovative, high-quality and high-value physician groups from competing for and winning bids for contracts.

Furthermore, arguments used to try and justify non-compete agreements are not present for our members for two main reasons. First, emergency physicians, like many workers nationwide, have no clients or private patient lists. Second, hospitals or contract groups employing our members provide no specialized training or proprietary information to emergency physicians.

The Final Rule, as written and issued by the FTC, serves the public interest and our members. As for our members, a stay of the Rule would be harmful. Purported justifications for non-compete clauses are not present for our profession and forcing our members to challenge unreasonable non-compete agreements through litigation, on a case-by-case basis, would be unduly time-consuming and expensive. This is true even for the relatively high-paid emergency room physicians we represent.

**LEGAL STANDARD**

A preliminary injunction is an extraordinary remedy. *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014). An award of preliminary relief, therefore, "is only appropriate upon a clear showing that the plaintiff is entitled to such relief." *Id.* In order to obtain a preliminary injunction, Plaintiff must demonstrate: (1) "that he is likely to succeed on the merits;" (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "that the balance of equities tips in his favor;" and (4) "that an injunction is in the public interest."

*Id.* Although the first two of these "gateway" factors are the "most critical," *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), if a movant fails to meet the balance of equities and overall public interest requirement, the request for preliminary injunctive relief must be denied. *See, e.g.*, *Winter v. Nat Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (Supreme Court overturning a preliminary injunction against the government because "the balance of equities and consideration of the overall public interest" weighed in the government's favor).

## ARGUMENT

**I.     AAEM Supports the Final Rule Becoming Effective Immediately Without Delay**

Ensuring that the Final Rule becomes effective immediately, without delay, will significantly benefit patient access to care, patient quality-of-care, overall innovation in the healthcare sector, and our membership.

**A.     Patient Access to Care**

Non-compete clauses hinder access to care and endanger patients. Many U.S. hospitals, particularly critical access hospitals, are not staffed by board-certified emergency medicine specialists and instead rely on non-specialist physicians or other healthcare practitioners. *See, e.g.*, Am. Acad. of Emergency Med., Comment on Proposed Non-Compete Clause Rule (Apr. 13, 2023), https://perma.cc/272V-DLR8; *see also* Brett Kelman and Blake Farmer, *Doctors Are Disappearing From Emergency Rooms as Hospitals Look to Cut Costs*, KFF HEALTH NEWS (Feb. 13, 2023), https://perma.cc/7NKL-87RX. The free flow of labor, unimpeded by non-compete clauses, would help remedy this situation. The elimination of non-compete agreements necessarily increases the available pool of board-certified emergency medicine specialists, thereby (i) increasing access to specialty care for more Americans, and (ii) helping to mitigate physician shortages in underserved communities.

In underserved and rural areas, non-compete agreements with geographic restrictions prevent physicians who change employers from continuing to serve patients in those areas, despite the patient population's dire need. *See, e.g.*, Am. Coll. of Emergency Physicians, Comment on Proposed Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (Mar. 7, 2023), https://perma.cc/2GAH-KUFV ("In rural [A]merica where doctor shortages are a daily event [non-competes] further restrict[] supply if a doctor must relocate outside region."). At a time when there is a shortage of physicians nationwide and in Pennsylvania, non-competes exacerbate this problem by preventing doctors currently practicing in or near underserved areas from continuing to do so for a different employer. *See* Xiaoming Zhang, et al., *Physician workforce in the United States of America: forecasting nationwide shortages*, 18 HUM. RES. FOR HEALTH, 8 (Feb. 2020), https://perma.cc/XWC9-RR3F; PA. COAL. OF NURSE PRAC., PENNSYLVANIA FAMILIES INCREASINGLY DEPEND ON NURSE PRACTITIONERS FOR PRIMARY CARE (Aug. 2020), https://perma.cc/JUL8-7ZZ9 ("In 2015, the Joint State Government Commission issued a serious warning. It called for an additional 1,039 primary care physicians (PCPs) by 2030 – an 11% increase – just to maintain the status quo in primary health care access. Unfortunately despite the warning, the downward trend continued in subsequent years. . . . Thirty-seven of Pennsylvania's 67 counties saw their primary care physician workforce shrink, including 20 counties with a significant decrease.").

Physicians with geographically restrictive non-compete clauses may have to move more than 30 miles if they are terminated or change jobs. *See, e.g.*, Testimony of Dr. Jennifer Gholson, *Hearing on The Collapse of Private Practice: Examining the Challenges Facing Indep. Med. Before the Subcomm. on Health of the House Ways & Means Comm.*, 118th Cong. (May 23, 2024) ("For instance, when I was considering selling my practice, I considered going to work for the hospital, but I would have been under a non-compete. Due to the expanse of where they had practices and outlying hospitals, if I were to break that non-compete, I think I would be 80 miles

8

away from where I live, and I would have had to uproot my family."); *see also* Am. Coll. of Emergency Physicians, Comment on Proposed Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (Mar. 7, 2023), https://perma.cc/2GAH-KUFV ("As a Physician, I had a non compete [sic] clause in my contract that extended two counties wide (100 square miles). . . . [W]hen I would not sign a contract amendment regarding pay that was very unfavorable and nebulous I was called in and summarily dismissed 'no cause.' Because of that I had to work out of state and my patients were instantly without a physician. The community did not have enough physicians to be able to care for the patients who now had no medical provider. . . ."); Non-Compete Clause Rule, 89 Fed. Reg. 38,342 at 38,395, citing Individual commenter, FTC–2023–0007–3885, https://perma.cc/F2MH-DTS9 (". . . Often a physician would take a job, and if it did not work out, the restrictions were so severe, that they would need to move to a new geographic location in order to be employed."). In addition to negatively affecting patients' access to care, a recent survey of emergency room physicians about non-compete agreements reveals that physician non-competes can also upend the lives of physicians' spouses and school-aged children. *See, e.g.,* Am. Coll. of Emergency Physicians, Comment on Proposed Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (Mar. 7, 2023), https://perma.cc/2GAH-KUFV ("I recently moved away from my hometown and my wives [sic] family due to noncompete clause. This was a very trying time for my family and my children. I had to tear them away from their school, friends, and sports. After the move my children experienced bullying at school, lack of sports options and one child developed severe anxiety requiring treatment. I then lost significant income and equity selling my house and moving back to my original location but had to accept a less desirable job due to noncompete clauses.").

### B.   Patient Quality-of-Care

Non-compete agreements hold emergency physicians captive in jobs where they may have to compromise on patient safety, against their professional judgment and norms. Some AAEM

members employed by private equity (PE)-controlled staffing groups and hospitals have had this experience as non-competes are commonly employed by PE firms, which increasingly control hospitals and physician groups. *See, e.g.*, Dr. Jane M. Zhu, Hayden Rooke-Ley, Erin Fuse Brown, *A Doctrine in Name Only – Strengthening Prohibitions against the Corporate Practice of Medicine*, 398 New Eng. J. Med. 11 at 967; Fred Schulte, *Sick Profit: Investigating Private Equity's Stealthy Takeover of Health Care Across Cities and Specialties*, KFF Health News (Nov. 14, 2022), https://perma.cc/H9GM-C6ZN.

Our members have reported significant issues with the PE staffing model, including being required to treat a higher number of patients than is safe, breaks from ordinary safety protocols, and a lack of hospital beds. *See, e.g.*, Testimony of Dr. Jonathan Jones, Fed. Trade Comm'n, Transcript of "Private Capital, Public Impact: An FTC Workshop on Private Equity in Health Care" (Mar. 5, 2024), https://perma.cc/GQS7-4GNE ("I've worked at multiple hospitals and under multiple employment models, and I can definitely say that working under a private equity backed managed group has been the worst experience of my professional life. More importantly, it's also been the worst possible experience for my patients."). But if our members want to leave these PE-backed groups out of concern for patient safety, they risk upending their family lives due to geographically restrictive non-competes. *See, e.g.*, Am. Coll. of Emergency Physicians, Comment on Proposed Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (Mar. 7, 2023), https://perma.cc/2GAH-KUFV. Additionally, the state licensure, credentialing and insurance requirements of our profession make relocating to a new state all the more difficult for our members, and for physicians in general. Non-Compete Clause Rule, 89 Fed. Reg. 38,342 at 38,379. These non-compete agreements restrict doctors from working at another, non-private equity-run emergency department that would allow them to honor their Hippocratic Oath. Am. Acad. of Emergency Med., Comment Re: Dep't of Just., Dep't of Health and Hum. Serv., and the Fed. Trade Comm'n's Request for Information on

Consolidation in Healthcare Markets: Docket No. ATR 102 (May 2, 2024), https://perma.cc/6PBJ-U3L6. Non-competes, therefore, effectively prevent our members from speaking out about patient safety issues. Am. Acad. of Emergency Med., Comment on Proposed Non-Compete Clause Rule (Apr. 13, 2023), https://perma.cc/9RT9-8ZRD.

As Professor Erin Fuse Brown explained at a recent FTC workshop, non-competes can be used to prevent physicians and clinical staff from leaving if they have concerns about how their practice groups operate or the quality of patient care. Professor Fuse Brown testified that management services organizations use agreements with hospitals and doctors to exert "control over hiring, firing, scheduling, contracting, billing, coding, all of which can threaten professional autonomy, cause burnout and moral injury while using non-competes and gag clauses to prevent physicians and clinical staff from leaving or speaking out if they have concerns about these practices or about the quality of patient care." Testimony of Erin Fuse Brown, Fed. Trade Comm'n, Transcript of "Private Capital, Public Impact: An FTC Workshop on Private Equity in Health Care" (Mar. 5, 2024), https://perma.cc/45PN-45V3.

Non-compete clauses intimidate the emergency physician into unquestioning servitude to business interests. Given physicians' ethical obligation to patients, many continue to speak out for patient safety; however, knowing that they can be forced to relocate their family to another city or state undoubtedly has a chilling effect on physician advocacy for their patients, their communities, and themselves. *See, e.g.*, Am. Coll. of Emergency Physicians, Comment on Proposed Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (Mar. 7, 2023), https://perma.cc/2GAH-KUFV.

C.     **Overall Innovation in the Healthcare Sector**

Quality patient care and safety is enhanced when hospitals and physician groups have to compete for contracts. Am. Acad. of Emergency Med., Comment on Proposed Non-Compete Clause Rule (Apr. 13, 2023), https://perma.cc/9RT9-8ZRD. But competition among these entities

to provide the highest-quality and highest-value care to patients seeking emergency care is stifled when non-compete clauses held by one group or hospital bar a better or more innovative group from vying for the contract. *Id*. Non-compete clauses allow inferior groups to continue providing substandard working conditions, staffing levels, and patient safety measures as the clauses eliminate or severely restrict competition for the physicians who provide the actual patient care. *Id*.

### D.     Our Membership

Purported justifications for non-compete clauses are not present in the emergency medicine context. In addition, forcing our members to challenge unreasonable non-compete agreements on a case-by-case basis, through litigation, would be unduly time-consuming and expensive. This is true even for AAEM's relatively high-paid emergency room physician membership.

Arguments used to try and justify non-compete agreements are not present for our members for two primary reasons. First, emergency physicians, like many workers nationwide, do not have clients or private patient lists. Am. Acad. of Emergency Med., Comment on Proposed Non-Compete Clause Rule (Apr. 13, 2023), https://perma.cc/9RT9-8ZRD. We proudly treat every patient presenting to the emergency department regardless of the patient's status within the healthcare system. *Id.* Second, the hospital or contract group provides no specialized training or proprietary information to emergency physicians. *See* Dr. David Farcy, *Letter Re: Fed Trade Comm'n: Non-Competes in The Workplace: Examining Antitrust and Consumer Protection Issues* (Mar. 2, 2020), https://perma.cc/5D6Q-L52L. Emergency physicians do possess highly specialized information and skills; however, this specialized knowledge is obtained through rigorous study and training in medical school and emergency medicine residency programs, both of which are often paid for or subsidized by federal or state government. Am. Acad. of Emergency Med., Comment on Proposed Non-Compete Clause Rule (Apr. 13, 2023), https://perma.cc/9RT9-8ZRD.

If the Final Rule is stayed, our members and the public would be harmed because a case-by-

case approach to determining the validity of non-competes necessitates engaging in costly litigation that also takes up time, which our members could instead spend on providing emergency care to patients. For example, nearly a decade ago, a class of Ultimate Fighting Championship (UFC) fighters sued their employer alleging they had been bound by an overly restrictive noncompete agreement. Katie Arcieri, *UFC Fighters Ask Court to Approve $335 Million Cash Settlement*, Bloomberg Law, May 2024, https://perma.cc/2ZJE-G8LJ. That litigation only concluded this year, after many expensive hours of attorney and expert witness work. *Id.*

Similarly, it is not uncommon for physicians to have to spend multiple years litigating their noncompete agreements. *See, e.g.*, *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674 (Tenn. 2005); *Statesville Med. Grp. v. Dickey*, 418 S.E.2d 256 (N.C. Ct. App. 1992); *Iredell Digestive Disease Clinic v. Petrozza*, 373 S.E.2d 449 (N.C. Ct. App. 1988); *Duneland Emergency Physicians' Med. Grp. v. Brunk*, 723 N.E.2d 963 (Ind. Ct. App. 2000); *Mohanty v. St. John Heart Clinic*, No. 101251, 866 N.E. 2d 85 (Ill. 2006) (Physicians litigating their non-compete agreements under prevailing state law standards, which necessitated appeals and years of costly litigation).

The difficulty of litigating a noncompete under the prevailing standard in many states, especially for workers who cannot afford to retain sophisticated legal counsel and economic experts, gives employers a de facto right to impose these agreements as they see fit. Sandeep Vaheesan and Matthew Buck, *Non-Competes and Other Contracts of Dispossession*, Mich. St. L. Rev. 113 (2022).

## II. The Final Rule Serves the General Public Interest and Is Well-Supported by the Evidentiary Record

Our membership's experience makes clear that non-compete agreements are not appropriate, even for high-skill, high-wage workers like the physicians we represent. Competition benefits the public, and contractual terms that hinder competition harm the public. All workers should have the freedom to seek and hold employment across the United States, undeterred by non-

13

compete clauses. We enthusiastically agree with the FTC that the freedom to change jobs is core to economic liberty and that non-compete clauses hamper innovation. The Final Rule will significantly enhance job mobility, foster greater job flexibility, help address labor shortages, and create new opportunities within the healthcare industry. Additionally, to the extent purported justifications may be credited, other means are available to achieve the purported goals served by non-compete agreements, such as non-disclosure agreements and trade secrets law. *See, e.g.,* Brandon Elledge, *Don't Fret (Yet): Trade Secrets, NDAs and Non-Solicits After the FTC Non-Compete Rule*, Holland & Knight, https://perma.cc/K7T4-U82Q ("Simply put, in addition to trade secret statutory relief, NDAs and Non-Solicitation agreements are alive and well under the new FTC rule, even if the rule ultimately takes effect in its current form, provided they don't functionally operate as a non-compete to sideline a worker from taking another job.").

The experience of our members closely aligns with the robust evidentiary record relied upon by the FTC in enacting its Final Rule, including strong empirical evidence and tens of thousands of public comments. Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024). We agree with the Commission that "non-competes are restrictive and exclusionary conduct that tends to negatively affect competitive conditions in labor markets and markets for products and services . . . . [and that] non-competes are exploitative and coercive." *Id.* In line with the FTC's evidentiary record and our membership's experience, the costs associated with staying the rule and forcing our members to engage in case-by-case adjudication—among other harms explained above—weigh strongly in favor of implementing the FTC's rule-based approach without delay.

### III.     Staying the Effective Date of the Final Rule is Not in the Public Interest

As explained above, non-competes are against the public interest. The harms of allowing non-competes are significant without any cognizable benefits. To the extent claimed benefits of non-competes are credited, there are alternative tools employers can use to achieve those claimed

14

goals that present a lower risk of harm to the public.

## CONCLUSION

Every patient should have the right to the best emergency care provided by the best emergency physician. AAEM believes that non-compete clauses in emergency physician contracts hinder this right, violate the intrinsic ethical values of emergency physicians, and damage the integrity of the physician-patient relationship. Because the balance of equities and public interest weigh strongly in Defendants' favor and Plaintiff has not carried its burden to demonstrate otherwise, the motion for a stay of effective date and preliminary injunction should be denied.

DATED: June 18, 2024						Respectfully submitted,

/s/ *Robert S. Kitchenoff*
Robert S. Kitchenoff
WEINSTEIN KITCHENOFF & ASHER, LLC
24 W. Lancaster Avenue, Suite 201
Ardmore, PA 19003
(215) 545-7200
kitchenoff@wka-law.com

Amanda G. Lewis (*pro hac vice* pending)
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
(202) 789-3960
alewis@cuneolaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2024, I electronically filed this document using the ECF System, which will send notification to the ECF counsel of record.

/s/ *Robert S. Kitchenoff*
Robert S. Kitchenoff
WEINSTEIN KITCHENOFF & ASHER, LLC
24 W. Lancaster Avenue, Suite 201
Ardmore, PA 19003
(215) 545-7200
kitchenoff@wka-law.com

Amanda G. Lewis (*pro hac vice* pending)
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue NW, Suite 200
Washington, DC 20016
(202) 789-3960
alewis@cuneolaw.com