IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ATS TREE SERVICES, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>FEDERAL TRADE COMMISSION,<br>*et al.*,<br><br>    Defendants. | Case No. 2:24-cv-01743-KBH |

**BRIEF OF PENNSYLVANIA STATE AND LOCAL ELECTED OFFICIALS AS
*AMICI CURIAE* IN OPPOSITION TO THE PENDING MOTION TO STAY
EFFECTIVE DATE AND FOR PRELIMINARY INJUNCTION**

## STATEMENT OF INTEREST OF AMICI
## AND SUMMARY OF ARGUMENT

*Amici Curiae* are state and local elected officials from Western Pennsylvania who seek to promote a commonwealth with a vibrant economy in which every resident thrives.[1] *Amici* see the essential role that small businesses play to stitch together the fabric of our communities. Many of these small businesses join with larger counterparts to fuel our commonwealth's economic growth through innovation across sectors. Beyond these high-level economic measures, *Amici* assist their constituents with the constant challenge of obtaining quality health care at a reasonable cost. And they see the families in each community that stretch each paycheck to make basic needs.

*Amici* and their colleagues throughout the Commonwealth have made efforts to promote the growth of innovation and small business, support workers, and increase access to health care in our various jurisdictions. In 2023, Harrisburg City Council reinvested in its Community Connection Hub to increase workforce development and create job opportunities.[2] With its PGH Lab, the City of Pittsburgh partners with startups to test new products that could benefit city operations.[3] Across the Commonwealth, community leaders fight for broadly shared digital equity.[4] In 2023, Philadelphia city leaders announced two new city health centers to open in Northeast Philadelphia, an area of the city considered a health care desert for affordable primary

---

[1] A complete list of *amici* is attached as an Appendix.
[2] Matthew Maisel, *Mayor Williams and Harrisburg City Council approve more than $31 million in American Rescue Plan funding to benefit residents*, City of Harrisburg (Jul. 12, 2023), https://perma.cc/TG9V-EX9L.
[3] *FAQs*, PGH Lab, https://perma.cc/3QYL-GPYB.
[4] *See, e.g., Pittsburgh Digital Equity Coalition,* City of Pittsburgh, https://perma.cc/WL7N-CW2U.

1

care.[5] Additionally, Philadelphia allocated thirteen local health organizations grants between $14,000 and $250,000 to advance health equity.[6]

*Amici*'s efforts to provide for the economic and social needs of Pennsylvanians reaffirms their support of the Federal Trade Commission (FTC) in promulgating its Noncompete Clause Rule (the "Rule"). It is no wonder that the Pennsylvania Attorney General directly offered her support of the FTC's Rule, recognizing the harmful effects of non-competes.[7] As the FTC's extensive analysis of quantitative and qualitative data reveals, noncompete agreements undermine each of these building blocks for a strong Commonwealth: small-business creation, innovation, health care quality and affordability, and strong household wages. They do so despite less socially harmful means of protecting employers' legitimate interests, such as nondisclosure agreements (NDAs) and trade-secret protections. Accordingly, the FTC's decision to adopt its rule was far from arbitrary or capricious—rather, it was a sensible response to a widespread practice.

Apart from the general soundness of the Rule, a delay would be particularly harmful for Pennsylvanians who are currently subject to unenforceable noncompetes, as well as their communities. Although these agreements would not stand up in a court of law, they nonetheless restrict many workers in Pennsylvania and elsewhere. An immediate, bright-line rule is necessary to prevent these continued harms.

---

[5] Nicole Leonard, *A new health center in Frankford aims to alleviate a 'primary care desert,'* WHYY PBS (May 15, 2023), https://perma.cc/LB3D-H6T8.

[6] Fallon Roth, *13 local orgs are getting $250k to advance health equity, thanks to the Philadelphia City Fund,* Billy Penn at WHYY (July 26, 2023), https://perma.cc/A6TL-KZS4.

[7] Press Release, Pennsylvania Attorney General, "AG Henry Offers Support of New Rule That Would Prevent Companies From Demanding Non-Compete Agreements With Employees," Apr. 20, 2023, https://perma.cc/YE6U-Z8NY.

# ARGUMENT

**I.     The FTC Appropriately Considered the Costs And Benefits of the Rule.**

The FTC considered a wide range of potential effects of the rule—positive and negative—before adopting the final rule. Ultimately, this detailed analysis of the Rule correctly recognized that substantial benefits will accrue to markets and communities and that negative effects on employers can be minimized. Thus, contrary to Intervenors' insistence that the FTC's analysis failed to justify the Rule or to properly conduct cost benefit analysis [ECF 47 at 31-36] the Rule is well suited to provide ample benefits with limited (and avoidable) legitimate costs. This is only one reason the agency is likely to succeed on the merits, and no stay or preliminary injunction should issue.

   **A.     The FTC properly found that noncompete agreements harm communities in several ways.**

The FTC's analysis comports with a wide range of evidence that shows the multiple harms of noncompetes, not just to the workers subject to the agreements but to communities more broadly. Here in Pennsylvania, non-competes are pervasive, with 42% of businesses using these provisions.[8] By limiting the free movement of labor, noncompete agreements impede small-business formation and innovation, undermine patient care, and restrict wages. These benefits amply justify the Rule.

      *1.     Noncompetes limit the creation of small businesses.*

Noncompetes prevent new small businesses both directly and indirectly. Most obviously, workers subject to a noncompete cannot open a small business in competition with their prior

---

[8] Alexander Colvin & Heidi Shierholz, *Noncompete agreements*, Economic Policy Institute (Dec. 10, 2019), https://perma.cc/4GBT-PA9V.

3

employer. In one survey, forty-six percent of current small-business owners reported that they had been previously prevented from opening a business because of a noncompete.[9] This survey accords with several additional studies cited by the agency, as well as numerous individual commenters who described the ways that noncompetes undermined their efforts at entrepreneurship.[10] Two studies considered by the agency found a decline in new firm entry when noncompetes become enforceable.[11] In addition, a study considered by the agency found that decreases in enforceability of noncompetes in Utah and Massachusetts increased entrepreneurship among low-wage workers.[12]

Beyond the explicit prohibition on opening a competitor, noncompetes further undermine small businesses by restricting their ability to hire skilled workers within an industry. One study considered by the agency found that workers subject to a noncompete are 35% less likely to take a job with a competitor.[13] This leaves new businesses starved for talent or subject to extortionary "buyout fees."[14] It is no wonder that more than a third of surveyed small-business owners reported that a noncompete agreement prevented them from hiring a desired employee.[15]

### 2. *Noncompetes limit innovation.*

Noncompetes also slow innovation. In part, this results from the negative effects of small-business formation described above. In states that prohibit noncompetes, higher levels of startup

---

[9] *See* Noncompete Clause Rule, 89 Fed. Reg. 38,342, 38,491 (May 7, 2024).
[10] 89 Fed. Reg. at 38,391–92.
[11] 89 Fed. Reg. at 38, 389 (citing Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*, 37 Rev. Fin. Stud. 1 (2024); Matt Marx, *Employee Non-Compete Agreements, Gender, and Entrepreneurship*, 33 Org. Sci. 1756 (2022)).
[12] 89 Fed. Reg. at 38,389 (citing Ege Can & Frank M. Fossen, *The Enforceability of Non-Compete Agreements and Different Types of Entrepreneurship: Evidence From Utah and Massachusetts*, 11 J. of Entrepreneurship and Pub. Pol. 223 (2022)).
[13] 89 Fed. Reg. at 38,408.
[14] 89 Fed. Reg. at 38,408.
[15] Comment of Small Business Majority, https://perma.cc/PA49-AM5R.

activity have both generated new ideas and forced larger corporations to improve their own products and services.[16] One study found that "breakthrough" innovations are less likely as noncompetes become more enforceable. This innovation effect shows at the Patent Office: as noncompetes become less enforceable, inventors file more patents.[17] In addition, a study considered by the FTC found that greater noncompete enforceability inhibits entry of spinouts founded by former employees which tend to innovate more and are relatively higher quality than other new firms.[18] Contrary to one *amicus*'s suggestion [ECF 53 at 11] there is no inconsistency between this innovation effect and the continued availability of NDAs for *company-specific* information; innovation thrives amid the "spread and recombination of novel ideas," when workers can engage in new combinations.[19]

These effects are particularly strong in Pennsylvania's leading industries, such as software technology, healthcare and biotech, and manufacturing. Our information technology sector generates over $57 billion in GDP.[20] Pennsylvania is one of nation's leaders in public research and development funding, which goes on to generate economic returns across the economy.[21] Scholars have credited the lack of non-compete clause enforceability in California for the growth of Silicon Valley.[22] Likewise, the energy industry has flourished in North Dakota and Oklahoma, not only

---

[16] 89 Fed. Reg. at 38,390 (discussing Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt. Sci. 425, 436 (2011)).
[17] 89 Fed. Reg. at 38,394 (discussing Matthew S. Johnson, et al., *Innovation and the Enforceability of Non-Compete Agreements*, Nat'l. Bur. Of Econ. Rsch. (2023) at 36).
[18] 89 Fed. Reg. at 38,390 (citing Salomé Baslandze, *Entrepreneurship Through Employee Mobility, Innovation, and Growth* (Fed. Res. Bank of Atlanta Working Paper No. 2022-10, 2022), https://perma.cc/MAF4-NW5J).
[19] 89 Fed. Reg. at 38,472.
[20] Bridge for Innovation, *Technology's Impact in Pennsylvania* (2022), https://perma.cc/4GYR-RQFN.
[21] *Id*.
[22] 89 Fed. Reg. at 38,424 (considering Fallick, et al., 88 Rev. Econ. & Statistics at 472-81).

because of their resource endowments but also because their courts do not strongly enforce noncompetes.[23] This growth could similarly benefit Pennsylvania's booming natural gas industry.[24]

### 3. *Noncompetes interfere with patient care.*

The use of noncompete agreements in the health care sector can have dire consequences, as patients are not mere consumers. Noncompetes decrease patients' access to the physicians of their choice, increase healthcare shortages, and negatively affect the quality of health care.[25] Additionally, a study found that the increased enforceability of noncompetes increases consumer prices for healthcare.[26] The American Medical Association has long recognized that "covenants not-to-compete restrict competition, can disrupt continuity of care, and may limit access to care," and recently adopted a policy banning noncompetes for many doctors.[27]

For these reasons, *amicus* Rep. Dan Frankel advanced legislation to restrict such noncompetes.[28] This legislation, which would render nearly all doctors' noncompetes unenforceable, passed the Pennsylvania House with broad, bipartisan support from three-fourths of the representatives. A noncompete can have stark effects on underserved medical communities, imposing longer wait times and reduced access to care. But the harms extend beyond physicians. The agency received comments from other medical providers, such as nurse practitioners,

---

[23] 89 Fed. Reg. at 38,425.
[24] Pennsylvania Department of Community and Economic Development, *Powering our Homes, Businesses- and Economy*, https://perma.cc/S8EX-TBC7.
[25] 89 Fed. Reg. at 38,399.
[26] 89 Fed. Reg. at 38,433 (citing Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 Am Econ. J. Applied Econ. 278 (2021)).
[27] 89 Fed. Reg. at 38,401 (citing the AMA Code of Medical Ethics Opinion 11.2.3.1)
[28] H.B. 1633, 2023-24 Reg. Sess. (Pa. 2024) (PN 2959).

physician assistants, and others who provide essential care—and often form close relationships—to patients.[29]

Based on prior research on noncompete agreements as applied to physicians, the agency estimates that the rule will save $74–194 billion over ten years.[30] This sophisticated estimate accounts for the existing variation on noncompete enforceability across states and is reflective of the careful approach that the agency took to estimating the effects of the Rule.

### 4. *Noncompetes restrict wages.*

Alongside the effects on small businesses, innovation, and healthcare, noncompete agreements often affect our communities most deeply through their effects on workers' paychecks. The agency estimated that the Rule will boost wages by $400–488 billion over ten years.[31] When the people we represent take home less money each week, they also have less money to spend to support our local economies.

In part, these wage boosts result from the increased productivity of workers (including executives) being able to move to employers to which they are better suited. Noncompete agreements interfere with this "matching" process, potentially benefiting one firm but constraining overall economic activity.[32] Thus, these wage boosts are more than a mere monetary transfer from employers to workers.

The Rule will particularly contribute to wage gains for low-wage workers, which have particularly positive effects for our communities. Nationally, over 53% of all workers who are

---

[29] *See, e.g.,* 89 Fed. Reg. at 38,384, 38,387. A recent independent review of comments to the rule reviewed dozens of comments by various health care providers. Eushrah Hossain, Valencia Scott, & Josh Rosenthal, *Unconventional Tools for States and Cities to Build Worker Power*, 57 UC Davis L. Rev. __ (forthcoming, 2024), https://perma.cc/UGK3-ZTK5.
[30] 89 Fed. Reg. at 38,478.
[31] 89 Fed. Reg. at 38,470.
[32] 89 Fed. Reg. at 38,408.

subjected to noncompetes are hourly workers who are less able to negotiate new contracts, higher pay, and better working conditions.[33] When these workers receive pay increases, they require less support from the public fisc,[34] and the funds are likely to be spent in the local economy to meet those workers' basic needs.[35]

### B. The FTC properly recognized that employers can protect their investments without noncompetes.

The FTC carefully examined the other ways that employers can address legitimate concerns through alternative means like non-disclosure agreements ("NDAs") and protection for trade secrets.[36] Trade secrets receive extensive protection under both Pennsylvania and federal law, each of which allow a prior employer to enjoin a worker to prevent future misappropriation of a trade secret.[37] The federal Defend Trade Secrets Act even authorizes a court to issue civil *ex parte* orders for the "seizure of property necessary to prevent the propagation or dissemination of the trade secret."[38] Nondisclosure agreements can likewise provide for specific-performance relief and compensation where there is a risk that valuable non-public information would be shared.

While Plaintiff-Intervenors raise hazy concerns that the rule would interfere with these protections [ECF 47 at 35] the Rule itself makes clear that legitimate NDAs remain available.[39] While the Rule prohibits any agreement (however characterized) that "functions to prevent a

---

[33] 89 Fed. Reg. at 38,463 (citing Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements*, 68 Mgmt. Sci. 143, 162 (2021)).
[34] Ken Jacobs, et al., U.C. Berkeley Labor Center, *The High Public Cost of Low Wages* (Apr. 2015) https://perma.cc/PY62-5XZB.
[35] Jonathan Fisher, et al., Fed. Res. Bank of Boston, *Estimating the Marginal Propensity to Consume Using the Distributions of Income, Consumption, and Wealth* (Fed. Res. Bank of Boston Research Dept. Working Paper No. 19-4, 2019), https://perma.cc/FD88-LAYP.
[36] 89 Fed. Reg. at 38,424–26 (describing these alternative means).
[37] 18 U.S.C. § 1836(b)(3)(A); 12 Pa. Cons. Stat. § 5302
[38] 18 U.S.C. § 1836(b)(2).
[39] 89 Fed. Reg. at 38,365.

worker from" starting another business or working for another employer,[40] the agency has made clear this does not prohibit "appropriately tailored NDAs: . . . [A]n NDA would not be a non-compete under § 910.1 where the NDA's prohibitions on disclosure do not apply to information that (1) arises from the worker's general training, knowledge, skill or experience, gained on the job or otherwise; or (2) is readily ascertainable to other employers or the general public."[41] This leaves ample protection for employers' specific and confidential information.

Nor is there merit to Plaintiff-Intervenors' complaints about the agency's analysis of litigation costs to enforce NDAs and trade secrets. [ECF 47 at 35]. The agency carefully examined the likely effects on litigation and identified two likely effects: first, the Rule would shift the burden of litigation from individual workers, who now must bear substantial cost and risk to challenge a potentially invalid noncompete, to employers, who may need to pursue litigation to enforce an NDA or protect a trade secret.[42] Second, there may be less litigation overall because the Rule establishes a bright-line, unlike the laws currently governing noncompetes in Pennsylvania and many other states.[43] Ultimately, while the agency did not aspire to attach a falsely certain numerical value, it determined the net "magnitude of any change would be sufficiently small as to be immaterial."[44] "[T]he law does not require agencies to measure the immeasurable. [FTC]'s discussion of unquantifiable benefits fulfills its statutory obligation to consider and evaluate potential costs and benefits."[45]

---

[40] 89 Fed. Reg. at 38,502 (to be codified at 16 C.F.R. § 910.1).
[41] 89 Fed. Reg. at 38,365.
[42] 89 Fed. Reg. at 38,484, 38,494.
[43] 89 Fed. Reg. at 38,484; *see, e.g.,* Rullex Co., LLC v. Tel-Stream, Inc., 659 Pa. 446, 624-25 (Pa. 2020) (establishing fact-specific limitations on noncompetes).
[44] 89 Fed. Reg. at 38,484.
[45] *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 379 (D.C. Cir. 2013).

In sum, the FTC identified the legitimate interests that noncompetes served and examined how these alternative mechanisms serve to protect them. Examining the potential consequences on this greater reliance on NDAs, trade-secret protections, and other methods, the agency found that the substantial benefits—to innovation, small-business creation, health care, wages, and other areas not discussed in this brief—outweigh the costs. There is no reason to doubt or disturb this finding.

## II. Delaying The Effective Date of the FTC Rule Would Harm Our Communities.

The clarity the FTC's action provides makes the urgency of the Rule even more clear. Currently, many workers in Pennsylvania and elsewhere are presented with noncompetes of dubious validity. For example, even though Pennsylvania (like many other states) allows for enforcement only of "reasonable" and proportional noncompetes,[46] "employers frequently use non-competes even when they are unenforceable under State law."[47] Many workers nonetheless operate under the assumption that a noncompete agreement is unenforceable, either because they are unaware of their legal protections or because they lack the means to litigate the issue.[48]

The delay sought by Plaintiff will stall the creation of small businesses, block innovation, undermine health care, and depress wages—not only due to employers' lawful noncompetes but also pursuant to contracts with no legal basis.

## **CONCLUSION**

For the reasons described above, *Amici* State and Local Officials respectfully respect that the Court deny Plaintiff's motion for a stay and preliminary injunction.

---

[46] *Hess v. Gebhard & Co. Inc.*, 570 Pa. 148, 157 (2002) ("In Pennsylvania, restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent.")
[47] 89 Fed. Reg. at 38,377.
[48] 89 Fed. Reg. at 38,381.

Respectfully submitted,

/s/ Jim Davy
Jim Davy (PA ID No. 321631)
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
 (215) 792-3579
jimdavy@allriselaw.org

Joshua A. Rosenthal*
Eushrah Hossain*
**PUBLIC RIGHTS PROJECT**
490 43rd Street, Unit #115
Oakland, CA 94609
Tel. (510) 738-6788
josh@publicrightsrproject.org
eushrah@publicrightsproject.org

**Pro hac vice* application forthcoming.

## **APPENDIX—List of Amici**

Rep. Dan Frankel
*Chair, Pennsylvania House Health Committee*
*23rd Legislative District*

Erika Strassburger
*Pittsburgh City Council*

Rock Copeland
*Erie County Council*

## CERTIFICATE OF SERVICE

I certify that on June 14, 2024, I electronically filed this document using the ECF System, which will send notification to the ECF counsel of record.

/s/ Jim Davy

Jim Davy