**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ATS TREE SERVICES, LLC,<br><br>            Plaintiff,<br><br>    v.<br><br>FEDERAL TRADE COMMISSION; LINA M. KHAN, in her official capacity as Chair of the Federal Trade Commission; and REBECCA KELLY SLAUGHTER, ALVARO BEDOYA, ANDREW N. FERGUSON, and MELISSA HOLYOAK, in their official capacities as Commissioners of the FTC,<br><br>            Defendants. | Case No. 2:24-cv-01743-KBH |

**REPLY IN SUPPORT OF MOTION TO STAY EFFECTIVE DATE
AND FOR PRELIMINARY INJUNCTION**

The FTC's rule banning nearly all non-compete agreements nationally, 89 Fed. Reg. 38,342 (May 7, 2024) (the "Final Rule"), is an extraordinary assertion of authority by an administrative agency to reshape tens of millions of employment relationships and to force significant changes to businesses. This agency that was created to operate like a court has attempted to transform itself into a five-person legislature. But Congress never granted the FTC such sweeping authority. ATS Tree Services, LLC ("ATS") is a successful Pennsylvania tree care company that will suffer significant and irreparable harm if the Final Rule goes into effect.

ATS has built its success and reputation on a robust training program to develop its employees into highly skilled tree care professionals—skills they can take with them to other jobs. In return for this significant investment, ATS requires its employees not to engage in the same type of work for a direct competitor who operates nearby for one year after leaving ATS. Without its

non-compete agreements, ATS's training program becomes infeasible, and their absence would harm both ATS and its employees.

The question before the Court is not the policy justifications for the Final Rule, but whether FTC has the authority to promulgate it. For this reason, ATS seeks a preliminary injunction to temporarily maintain the status quo while this question is litigated. A short delay of the effective date of the Final Rule to avoid irreparably harming ATS is a reasonable request in the face of the FTC's dramatic assertions of authority in the Final Rule.

## ARGUMENT

### I.   ATS Is Likely to Succeed on the Merits of Its Claims

#### A.   The FTC Does Not Have the Power to Make Substantive Rules for Unfair Methods of Competition

Congress has never granted the FTC substantive rulemaking authority for unfair methods of competition ("UMC"). Brief ISO Mot. Stay Eff. Date & Prelim. Inj. ("Br."), Doc. 11, 9–15.

##### 1.   A Complete Analysis of the Statutory Text Demonstrates that the FTC Act Does Not Authorize Substantive Competition Rulemaking

Section 46(g)'s authorization to make "rules and regulations" does not include substantive rulemaking when read as part of the overall statutory scheme. Br. 10–15. "'Statutory construction must begin with the language employed by Congress.'" *Gross v. FBL Fin. Servs.*, *Inc.*, 557 U.S. 167, 175 (2009). And it is a "'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Accordingly, section 46(g) is limited by section 45's authorization for the FTC to proceed against UMCs *exclusively* through case-by-case adjudications. 15 U.S.C. § 45(b). In this context, section 46(g)'s rulemaking authority does not include substantive rules. *See Brown & Williamson*, 529 U.S. at 133.

The FTC's mandate to "prevent" UMCs in section 45 does not "contemplate[] that the Commission will use forward-looking rulemaking." Defs.' Br. in Opp. ("Opp."), Doc. 22, 15. Again, context is crucial. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014). Among the definitions of "prevent" is "[t]o stop or intercept the approach, access, or performance of a thing." *Prevent*, Black's Law Dictionary (4th ed. 1968). The FTC's adjudications—which are the exclusive method of prevention authorized in section 45—do just that for UMCs. 15 U.S.C. § 45(b). The only remedy in an adjudication is a cease-and-desist order, which is necessarily prospective. *Id.* These orders stop, or "prevent," a UMC from continuing. *Id.* § 45(a)(2).[1]

### 2. Congress Did Not Ratify or Acquiesce to Substantive Competition Rulemaking Authority

The 1975 Magnuson-Moss Warranty–Federal Trade Commission Improvements Act (the "1975 Amendments"), granted the FTC substantive rulemaking authority for the first time exclusively for unfair or deceptive acts or practices ("UDAP"). Br. 11–12. This addition did *not* ratify the FTC's or D.C. Circuit's contemporaneous interpretations of section 46(g) as authorizing substantive rulemaking authority. *See Jama v. ICE*, 543 U.S. 335, 349 (2005); Opp. 15. Congressional ratification of a judicial interpretation can only be assumed when Congress "simply reenact[s]" a statute "without change" and the "judicial consensus" about its meaning was "so broad and unquestioned that [the court] must presume Congress knew of and endorsed it." *Jama*, 543 U.S. at 349. Similarly, "great weight" may be given to a "longstanding" administrative interpretation where the statute was "re-enacted ... without pertinent change." *N.L.R.B. v. Bell*

---

[1] ATS acknowledges that the FTC currently has authority to bring civil actions to enforce its orders. 15 U.S.C. § 56(a); Opp. 18–19 & n.5. But originally, FTC's orders were not even final without being converted into a court order. Federal Trade Commission Act, ch. 311, § 5, 38 Stat. 717, 720 (1914); Thomas W. Merrill, *Antitrust Rulemaking: The FTC's Delegation Deficit*, 75 Admin. L. Rev. 277, 297 (2023). This lack of *any* enforcement authority at the time section 46(g) was enacted, 38 Stat. at 722, is further evidence section 46(g) did not authorize substantive rulemaking. *See Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 311 (1953).

*Aerospace Co. Div. of Textron*, 416 U.S. 267, 274–75 (1974).[2] Congressional ratification is irrelevant here because Congress directly addressed the FTC's rulemaking authority in 1975. *See* Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub. L. No. 93-637, § 202, 88 Stat. 2183, 2193–98 (1975). It did not simply reenact section 46(g) and thereby acquiesce to *National Petroleum Refiners Association v. FTC*, 482 F.2d 672 (D.C. Cir. 1973). *See* 88 Stat. at 2193–98. Congress dramatically changed the statute by adding an entirely new section authorizing substantive rulemaking for UDAPs with specific rulemaking procedures. *Id.* And Congress amended section 46(g) to account for this. *Id.* at 2198. The FTC's Third Circuit cases are not to the contrary because in both there was no change to the relevant statutory provision related to the substance of the interpretive question. *United States v. Kalb*, 891 F.3d 455, 463 (3d Cir. 2018); *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 619 (3d Cir. 2015). There is no congressional ratification under these circumstances. *See Jama*, 543 U.S. at 349–51.

### 3. The Text of the 1975 Amendments Does Not Demonstrate the FTC Already Had Substantive Rulemaking Authority

Neither the savings clause in the 1975 Amendments nor the exception added to section 46(g) provide a textual basis for the preexistence of substantive rulemaking authority. Opp. 17–18. Congress stated that the 1975 Amendments "shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce." 15 U.S.C. § 57a(a)(2). Congress

---

[2] To the extent Defendants are relying on their prior administrative interpretation for their ratification argument, they fail because their interpretation of section 46(g) was not "longstanding" in 1975. *Bell Aerospace*, 416 U.S. at 274–75. The earliest substantive rule the FTC identifies in the Final Rule came in 1963, 89 Fed. Reg. at 38,349, and was preceded by nearly a half-century of no substantive rulemaking at all, Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 552 (2002). Moreover, these rules generally regarded advertising and labeling (i.e. "represent[ing] used lubricating oil as new") and did not address non-compete agreements. 89 Fed. Reg. at 38,349–50.

mirrored that requirement in section 46(g) by adding an explicit exception from its rulemaking authority for anything covered by the 1975 Amendments. 15 U.S.C. § 46(g) ("except as provided in section 57a(a)(2) of this title"). The savings clause explicitly contemplates "interpretive rules" and "general statements of policy," *not* substantive rules. 15 U.S.C. § 57a(a)(2). Prior to the 1975 Amendments, the FTC issued nonbinding and interpretive rules, Merrill & Watts, *supra* at 551–52, including widely relied-upon merger guidelines, Merrill, *supra* at 288–89; 307–08. Congress, logically, would want to make clear such important competition-based guidelines could still be developed through section 46(g).[3] The savings clause and exception added to section 46(g) are not superfluous if section 46(g) does not authorize substantive rulemaking.

Congress also explicitly preserved the "validity of any rule which was promulgated under section 6(g)" prior to the enactment of the 1975 Amendments. 88 Stat. at 2198. This would have been unnecessary if the 1975 Amendments merely added procedural restrictions for UDAP rulemaking. But if, as is the case, Congress granted new substantive rulemaking authority, it would be necessary to preserve existing substantive rules Congress did not want to implicitly abrogate.

It is implausible that the 1975 Amendments "*narrowed*" the FTC's rulemaking authority. Opp. 17–18. First, section 57a is drafted as an entirely new rulemaking authorization. 15 U.S.C. § 57a(a). If Congress were merely adding a procedural requirement for certain section 46(g) rules, it could simply have referenced the supposed preexisting rulemaking authority. It did not. Second, the 1975 Amendments *expanded* the FTC's jurisdiction by replacing the phrase "in commerce" in section 45 with the broader "in or affecting commerce." 88 Stat. at 2193; S. Conf. Rep. 93-1408

---

[3] Interpretive rules and general statements of policy are, along with procedural rules, excluded from the requirements of notice and comment rulemaking. 5 U.S.C. § 553(b)(A). As such, these categories of rules are all distinct from substantive rules that "have the 'force and effect of law.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

§ 201 (1974). In this context, the better reading of the 1975 Amendments is a grant of new substantive rulemaking authority. *See Brown & Williamson*, 529 U.S. at 133.

The legislative history of the 1975 amendments—while not necessary to consult because "[t]he text is clear," *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017)—also supports interpreting the 1975 Amendments as a *new* grant of substantive rulemaking authority. The conference report explained that the bill "would *codify* the Commission's authority to make substantive rules for [UDAPs]." S. Conf. Rep. 93-1408 § 202 (1974) (emphasis added). Codifying this authority would be unnecessary if it already existed in section 46(g). Defendants make much of the fact that the House's language that "prohibited [the FTC] from prescribing rules with respect to unfair competitive practices" was removed. *Id.*; Opp. 6. But it was replaced with ambivalent language referring to "any authority" the FTC already had for rulemaking. 15 U.S.C. § 57a(a)(2). The FTC also relies on the statement of a single senator, Opp. 6–7, which "rank[s] among the least illuminating forms of legislative history." *SW Gen.*, 580 U.S. at 307. The senator was also directly contradicted by a Representative and conference committee member who "d[id] not believe that the FTC ha[d]" competition rulemaking authority. 120 Cong. Rec. 41,407 (1974) (statement of Rep. Broyhill); Merrill, *supra* at 312–14. Finally, *National Petroleum* was not discussed in the conference report. S. Conf. Rep. 93-1408

### 4. The Text of the 1980 Amendments to the FTC Act Do Not Demonstrate that Section 46(g) Grants Substantive Rulemaking Authority.

The Federal Trade Commission Improvements Act of 1980 (the "1980 Amendments") does not reflect Congress's understanding that section 46(g) granted substantive rulemaking authority. Pub. L. No. 96–252, 94 Stat. 374, 388–90 (1980); Opp. 7–8, 16. The 1980 Amendments added an exclusively procedural requirement for substantive rules and amendments that have a "significant impact." 15 U.S.C. § 57b-3(a) and (b). Congress's definition of the term "rule" here to include

6

section 46(g) rules and exclude non-substantive rules cannot create substantive rulemaking authority where none already existed. *Cf. ICC v. Cincinnati, N. O. & T. P. Ry. Co.*, 167 U.S. 479, 505 (1897). Additionally, Congress preserved the validity of substantive rules promulgated under section 46(g) prior to the 1975 Amendments. 88 Stat. at 2198; 89 Fed. Reg. at 38,349–50. Congress would understandably want its new procedural requirements to apply to amendments to the preserved rules that meet the statutory requirements. Finally, the 1980 amendments cannot "further ratify[]" *National Petroleum*, Opp. 16, because Congress already addressed the FTC's rulemaking authority in the 1975 Amendments, *see supra* Part I.A.2.

### B. The FTC Act Does Not Authorize the FTC to Ban All Non-Compete Agreements as Unfair Methods of Competition

#### 1. The FTC Does Not Have Unbounded Authority to Declare What Is an Unfair Method of Competition.

The FTC appears to accept no limitation on its ability to declare a business practice a UMC.[4] Opp. at 23. It largely relies on its own 2022 policy statement to define "unfair methods of competition." *Id.* But the policy statement offers little meaningful guidance. Federal Trade Commission, Commission File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (2022) https://tinyurl.com/yc8z9hnh. And the FTC's reliance on its own fact finding regarding non-compete agreements is unhelpful to understanding the objective meaning of the phrase. Opp. 25 & n.6. The FTC is not permitted to arbitrarily decide what is a UMC. *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 138 (2d Cir. 1984).

---

[4] The FTC treats ATS's focus on the Final Rule rather than on individual adjudications as a concession of the FTC's authority here. Opp. 23, 26. It is not. The FTC's sweeping Final Rule raises unique separation of powers issues that are not necessarily raised by one-off cease-and-desist orders. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532–34 (1935); *Cincinnati*, 167 U.S. at 501, 505–06.

The FTC overstates ATS's position as requiring the application of the rule of reason, Opp. 24, rather than applying "*some* weighing analysis *like* the rule of reason" with respect to "particular circumstances." Br. 16 (emphasis added). The FTC Act is meant "to stop in their incipiency acts and practices which, when full blown, would violate" the Sherman and Clayton Acts. *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394–95 (1953). As such, the Third Circuit "look[s] to cases decided under [the Sherman] Act for guidance," *Luria Bros. & Co. v. FTC*, 389 F.2d 847, 860 (3d Cir. 1968), which apply the rule of reason to covenants not to compete. *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001), as amended (June 12, 2001). In fact, the FTC's 2015 enforcement principles called for evaluating methods of competition "under a framework similar to the rule of reason." Federal Trade Commission, Statement of Enforcement Principles Regarding "Unfair Methods of Competition" (2015) https://tinyurl.com/3d7un9f7. *E.I. du Pont de Nemours*, 729 F.2d at 138–139 & n.10, similarly applied a modified antitrust standard to prevent the FTC's "arbitrary or capricious administration of § 5."

The latitude the FTC claims to define UMCs is based upon its function as an adjudicator, *not* a rule-maker. Opp. 23–25. The cases on which the FTC relies involved adjudications of specific methods of competition employed by specific businesses in specific industries. *Id.* Indeed, the "point where a method of competition becomes 'unfair' ... will often turn on the exigencies of a particular situation, trade practices, or the practical requirements of the business in question." *Motion Picture Advert.*, 344 U.S. at 396; *see also FTC v. Texaco, Inc.*, 393 U.S. 223, 225–26 (1968); *FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 314 (1934). Any deference to FTC's view of UMCs should not be extended to FTC's novel expansion of its authority to legislate UMCs rather than execute section 45 by applying the UMC standard to specific facts. *See Cincinnati*, 167 U.S.

at 501, 505–06; *supra* Part I.A; *see also Texaco*, 393 U.S. at 226 ("[U]ltimate responsibility for the construction of this statute rests with the courts.").

### 2. Non-Compete Agreements Are a Traditional Area of State Law that Require a Clear Congressional Statement to Displace

The phrase "unfair methods of competition" is insufficiently clear to authorize the FTC to abrogate traditional state regulations of non-compete agreements. *See U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621–22 (2020). Defendants incorrectly reduce ATS's argument to the claim that FTC cannot regulate non-compete agreements "because state law may also address non-competes." Opp. 25. They also point to occasions on which the FTC or federal courts regulated concurrently with the states, relying on cases that address only individual adjudications. *Id.* 25–26. The relevant question is not whether non-compete agreements can be subject to federal regulation, but whether the Final Rule "upset[s] the usual constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Congress must have used "exceedingly clear language" to alter this balance. *Cowpasture River*, 590 U.S. at 621–22.

The traditional regulatory role of the states includes exercises of the police power for which the states are afforded "'great latitude.'" *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006). The police power includes employment regulations. *Bedoya v. Am. Eagle Express Inc.*, 914 F.3d 812, 818 (3d Cir. 2019). Here, four states have banned non-compete agreements and "[t]he majority of the remaining 46 states have statutory provisions or case law that" regulate non-compete agreements. 89 Fed. Reg. at 38,465; Opp. 8. This traditional area of state regulation is almost entirely eliminated by the Final Rule, 89 Fed. Reg. at 38,502–05, disrupting the constitutional balance.

The FTC Act is not "exceedingly clear" that the FTC may effectively eliminate an entire field of state regulation. *Cowpasture River*, 590 U.S. at 621–22. The statute merely declares "unfair methods of competition" to be unlawful, 15 U.S.C. § 45(a)(1), a phrase that "does not admit of

9

precise definition," *Schechter Poultry*, 295 U.S. at 532. While the Final Rule preserves states' ability to enforce consistent prohibitions on non-compete agreements, permitting states to enforce non-compete rules mandated by the FTC hardly preserves the constitutional balance between the states and federal government. 89 Fed. Reg. at 38,454, 38,502–05.

### 3. The Final Rule Addresses a Major Question Without Clear Congressional Authorization

Defendants answer the wrong question by repeatedly asserting that the major questions doctrine ("MQD") is inapplicable because "Congress explicitly directed the Commission to prevent unfair methods of competition." Opp. 21, *see id.* 20, 22. The MQD does not ask whether Congress has entrusted an agency with power generally. Instead, it asks whether there is "'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation omitted). This requirement is triggered by "the 'history and the breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion." *Id.* at 721 (citation omitted). Defendants misapply these factors. *See* Opp. at 20.

First, although Defendants do not contest the Final Rule's economic significance, they contend "there is no basis for this Court to invalidate an express grant of statutory authority on the grounds that it permits the Commission to take actions that have significant economic effect." *Id.* at 22. But the term "unfair methods of competition" is not an express grant of authority to ban non-compete agreements nationwide. *See Schechter Poultry*, 295 U.S. at 532. It is precisely the type of "vague statutory grant" and "oblique ... language" that cannot satisfy the MQD. *West Virginia*, 597 U.S. at 723, 732. Moreover, the FTC's assertion that it could generate the same economic impact through adjudications is not credible when it identifies only four enforcement actions it has taken since 2021 (or ever) addressing non-compete agreements. 89 Fed. Reg. at 38,344.

Second, Defendants are wrong that the existence of "state and congressional debate regarding non-competes" means the political significance factor weighs in their favor. *See* Opp. 21. Precedent says just the opposite, as an attempt to end "an 'earnest and profound debate' across the country" through an "oblique form of the claimed delegation" favors application of the MQD. *Gonzales*, 546 U.S. at 267 (citation omitted). The introduction of and failure to enact competing bills, *see* Br. 19, "help[s] resolve the antecedent question whether the agency's challenged action implicates a major question." *West Virginia*, 597 U.S. at 743 n.4 (Gorsuch, J., concurring); *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023); *West Virginia*, 597 U.S. at 731–32. Defendants' admission that "[c]hanges in state law have provided natural experiments," Opp. 8, also favors MQD application. *West Virginia*, 597 U.S. at 739 (Gorsuch, J., concurring); *see also NFIB v. Dep't of Labor*, 595 U.S. 109, 121 (2022) (Gorsuch, J., concurring).

Third, the history of state-based non-compete regulation and absence of FTC rulemaking, as well as the Final Rule's breadth, favor ATS. Non-compete regulation has historically been through state law, which favors applying the MQD. *See surpa* Part I.B.2; *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021). Defendants claim the "Commission's historical use of Section 6(g) to promulgate substantive rules further distinguishes it from major questions cases." Opp. 21. But the FTC's prior rules "have been extremely modest and narrow in scope" and were almost entirely *not* about competition issues (i.e. requirements for clothing labels with "care and maintenance instructions").[5] *Nebraska*, 143 S. Ct. at 2372, 89 Fed. Reg. at 38,349–50; Br. 20. No one would confuse targeted advertising and labeling rules for a major question.

---

[5] The one exception established a presumption that certain advertising and promotional practices of sellers of men's and boy's clothing violated the Clayton Act; it did not explicitly define an unfair method of competition. 89 Fed. Reg. at 38,349; 32 Fed. Reg. 15,584 (Oct. 18, 1967).

Defendants attempt to salvage the unprecedented scope of the Final Rule by citing *Biden v. Missouri*, 595 U.S. 87, 95 (2022) for the proposition that the MQD does not apply when an agency merely "goes further than what [it] has done in the past." *See* Opp. 22. But they omit the next sentence, which clarifies that the Center for Medicare and Medicaid Studies was allowed to "go further" with a vaccine mandate for healthcare workers because it had "never had to address an infection problem [like Covid-19] of this scale and scope before." *Missouri*, 595 U.S. at 95. Here, Defendants concede non-competes have been in use for "centuries." Opp. 8. Because the FTC claims to have had the authority to ban non-compete agreements since 1914, this "'want of assertion of power by those who presumably would be alert to exercise it'" favors applying the MQD. *West Virginia*, 597 U.S. at 725 (citation omitted).

The FTC's ability to initiate case-by-case adjudications does not defeat ATS's argument. *See* Opp. 20. It further highlights the applicability of the MQD. Rulemakings implicate legislative power, the authorization of which requires more scrutiny than the "partly judicial, partly executive and administrative" power exercised in adjudications. *Cincinnati*, 167 U.S. at 501, 505–06; *see also infra* Section I.C. Likely for this reason, the Supreme Court has also consistently looked askance at broad readings of statutes to authorize substantive rulemaking when the text contemplates narrow and particularized determinations. In *Gonzales*, 546 U.S. at 250–51, 262, the Court rejected the Attorney General's attempt to "claim[] extraordinary authority" to, by rule, "declare an entire class of activity outside the course of professional practice," even though he only had the authority to make case-by-case determinations regarding the scheduling of drugs and registration of physicians. In *Utility Air*, 573 U.S. at 321–24, the Court invalidated EPA's attempt "to require permits for ... millions, of small sources nationwide" when the statutory permitting scheme was designed for "a relative handful of large sources." Indeed, the FTC's own broad

assertions of authority over UMCs have rested on its operation "like a court of equity." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).

As enough "'indicators from ... previous major question cases are present'" *Nebraska*, 143 S. Ct. at 2374 (citation omitted),[6] "precedent counsels skepticism" toward the Final Rule. *West Virginia*, 597 U.S. at 732. "To overcome that skepticism, [FTC] must—under the major questions doctrine—point to 'clear congressional authorization.'" *Id.* (citation omitted). "All [FTC] can offer, however, is" the type of "vague statutory grant [that] is not close to the sort of clear authorization required." *Id.*

### C.   The FTC Act Unconstitutionally Delegates Legislative Power to the FTC

As with their major questions doctrine argument, Defendants misapply the nondelegation doctrine. Defendants cite four cases for the proposition that "[f]or decades, the Supreme Court has approved of Congress's delegation of authority to the Commission to regulate 'unfair methods of competition.'" Opp. 27. But none of these cases concerned nondelegation challenges to substantive FTC rules. It is unremarkable that these cases approved FTC's ability to conduct adjudications because agencies have "conduct[ed] adjudications ... since the beginning of the Republic." *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). What Defendants ignore is that although agency adjudications may take "'judicial forms,'" "'they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the executive Power.'" *United States v. Arthrex*, 594 U.S. 1, 17 (2021) (citation omitted). Section 45 permits the FTC to function like an anti-trust prosecutor, bringing complaints and making fact-specific determinations. 15 U.S.C. § 45(b). The

---

[6] The absence of some MQD factors does not prevent the doctrine's application. *Nebraska*, 143 S. Ct. at 2384 (Barrett, J., concurring). *Gonzales*, 546 U.S. at 249, did not involve economic significance. Neither *Nebraska*, 143 S. Ct. at 483, nor *King v. Burwell*, 576 U.S. 473, 485–86 (2015), involved "a long-extant statute." Neither *Nebraska*, 143 S. Ct. at 483, nor *Utility Air*, 574 U.S. at 307, involved "mismatch" between a rule and agency's area of expertise.

FTC's ability to exercise prosecutor-like power in adjudications raises different and less serious non-delegation concerns than legislative rulemaking. *Cf. Cincinnati*, 167 U.S. at 501, 505–06.

Defendants' other cases, Opp. 27–28, underscore the capaciousness of section 45(a)(1)'s delegation. In *Yakus v. United States*, 321 U.S. 414, 420–23 (1944), the authority to fix "fair and equitable" prices was cabined by the requirement that the Administrator find facts and "give due consideration" to "enumerated distributing factors affecting prices." Similarly, *Mistretta v. United States*, 488 U.S. 361, 374–79 (1989), rejected a nondelegation challenge to the Sentencing Guidelines because the statute restricted the Commission "to consider[ation of] seven factors." The FCC's broader discretion to regulate for the "public interest, convenience, or necessity," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943), must be understood in that delegation's limited application to radio facilities, whereas less discretion is allowed for delegations "that affect the entire national economy," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001).[7]

The Supreme Court already found that fairness as a standard for industry-wide regulations that could be enforced through the FTC was an unconstitutional delegation of legislative power. *Schechter Poultry*, 295 U.S. at 533–34, 541–42. And the FTC cannot rely on its own policy statements to fill out that standard. *See Whitman*, 531 U.S. at 472; Opp. 29. Nothing in *Schechter Poultry* indicates the Court would have upheld a nondelegation challenge to substantive rulemaking for "unfair methods of competition" just because "fair competition" had "'a much broader range.'" Opp. at 29 (quoting *Schechter Poultry*, 295 U.S. at 534). *Schechter Poultry*

---

[7] *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944), did not involve a nondelegation challenge. *New York Central Securities Corp. v. United States*, 287 U.S. 12, 19–21, 24-25 (1932), and *American Power & Light Co. v. SEC*, 329 U.S. 90, 96, 104–06 (1946), rejected nondelegation challenges to agency adjudications, making them inapposite. Additionally, the *Gundy* plurality upheld the Sex Offender Registration and Notification Act ("SORNA") delegation as "a stopgap, and nothing more." *Gundy v. United States*, 588 U.S. 128, 139 (2019).

invalidated the codes of fair competition delegation because "[i]t supplie[d] no standards," gave the President "virtually unfettered" discretion, and involved no "administrative procedure[s]." *Schechter Poultry*, 295 U.S. at 541–42. The same is true for "unfair methods of competition" if the "judicial determination[s]" used to apply it are cast aside in favor of the "legislative undertaking" of rulemaking. *Id.* at 532, 541.

## II.   ATS Is Irreparably Harmed by the Final Rule

ATS is irreparably harmed by the Final Rule through the compliance costs it must incur, the changes to its business it must undertake, and the loss of its contractual agreements with its employees. Br. 23–24. Courts regularly find irreparable harm in challenges to new rules that impose significant legal changes with far-reaching effects on regulated parties. *Rest. L. Ctr. v. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023); *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022); *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016); *Tennessee v. Dep't of Educ.*, --- F.4th ----, 2024 WL 2984295, at \*25 (6th Cir. June 14, 2024); *Tennessee v. Cardona*, --- F.Supp.3d ----, 2024 WL 3019146, at \*38–39 (E.D. Ky. June 17, 2024). Indeed, the Third Circuit has already acknowledged that something *less* than "significant changes in company operations" can still satisfy the irreparable harm requirement. *A. O. Smith Corp. v. FTC*, 530 F.2d 515, 527 n.9a (3d Cir. 1976). Here, ATS has put forward an uncontested declaration that the inability to use non-compete agreements will require it to fundamentally change its operational strategy and to incur unrecoverable compliance costs in the process, Doc. 11-1 ¶¶ 24–28, which are anticipated in the Final Rule, 89 Fed. Reg. at 38,470, 38,479–84. That is sufficient.

The FTC attempts to obscure this irreparable harm by deconstructing ATS's imminent injuries. Opp. 29–33. With respect to compliance costs, the FTC's opposition focuses exclusively on the costs ATS will incur from the Final Rule's notice requirement, Opp. 29–30, ignoring the additional compliance costs ATS will incur reviewing and modifying its business practices,

Doc. 11-1 ¶¶ 24–28. The FTC recognized such costs in the Final Rule, and, assuming without accepting the FTC's calculation, just updating standard contract language and "revis[ing ] contractual practices" will cost up to $1,211,58.[8] 89 Fed. Reg. at 38,482. This does not include the time and expense required to more broadly review and modify ATS's business strategy, which will be infeasible under the Final Rule. *See* Doc. 11-1 ¶¶ 24–28. Moreover, the compliance costs must be considered in the context of ATS as a small business. *See id.* ¶ 8. Defendants cannot claim that ATS's compliance costs are *de minimis* based on only a portion of those costs when just a single additional cost *identified by the FTC* exceeds the *de minimis* amounts Defendants identify. *See* Opp. 30–31 n.8.

Additionally, the cases on which Defendants rely for the proposition that compliance costs cannot be an irreparable injury are all readily distinguishable. *A. O. Smith Corp.*, 530 F.2d at 518–19, 527, and *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114–15 (2d Cir. 2005), involved reporting and payment requirements that did not require substantive operational changes. Moreover, *A. O. Smith Corp.*, 530 F.2d at 527 n.9a, disclaimed that it was establishing a "general rule—applicable to other factual situations." *American Hospital Association v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980), involved compliance costs that "should already have been incurred" or "could be remedied," and the court held that the movant was unlikely to succeed on the merits.

ATS's other irreparable injuries are neither speculative nor self-inflicted. A self-inflicted injury occurs when the movant "act[s] to permit the outcome [it] find[s] unacceptable." *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995). ATS cannot be said to have permitted the Final Rule to come about. Additionally, the entire purpose of the Final Rule is

---

[8] The FTC estimated that one hour of attorney time costs $134.62 and that one hour would be necessary to update standard contract language and four to eight hours would be needed to revise contractual practices. 89 Fed. Reg. at 38,482.

to increase the risk that ATS will lose its current employees. *See* 89 Fed. Reg. at 38,380. This situation is in sharp contrast to the patent infringement case on which FTC relies. Opp. 32.

To the extent there is aggregate benefit to ATS from labor mobility, Opp. 32–33, it does not change the loss of the "'efficiency, institutional memory, and operational know-how'" that accompanies the departure of current employees. *Louisiana*, 55 F.4th at 1033. Nor does making a sufficient showing depend on evidence that a specific employee would leave absent a non-compete agreement given that *Louisiana* relied on the government's representations that some employees were likely to leave their jobs. *Id.* at 1034–35. Here, the FTC is similarly anticipating significant turnover given the scale of the economic benefits the FTC claims will result from the Final Rule. *See* 89 Fed. Reg. at 38,470–71.

Finally, FTC does not provide any basis for its argument that invalidation of a contractual term is not an irreparable harm. Opp. 33. Again, the Final Rule itself establishes that there is inherent value in these contractual terms. And the elimination of contractual terms has been recognized as an irreparable injury. *SEIU Health Care Mich. v. Snyder*, 875 F.Supp.2d 710, 725 (E.D. Mich. 2012) ("Plaintiff will be irreparably harmed by being deprived its contractual rights."). Moreover, ATS has established reliance *on* its non-compete agreements because it is with these agreements that ATS is able to provide extensive training to its employees. Doc 11-1 ¶¶ 20, 24, 26.[9] The Final Rule eliminates the benefit of the agreements, and ATS could no longer enter into the same agreements on the same terms with its already trained employees.

---

[9] The enforceability of the scope of ATS's non-compete agreements is not a factor in the irreparable harm analysis because Pennsylvania courts may limit enforcement of non-compete agreements to restrictions that are "reasonably necessary for the protection of the employer." *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 920 (Pa. 2002).

**III.     A Preliminary Injunction Is in the Public Interest**

A movant's likelihood of success on the merits is a critical factor in evaluating the merged equities and public interest factors of a facial challenge to a regulation. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Indeed, where a movant is likely to succeed on a statutory challenge to a regulation, it is not the Court's "role to weigh [] tradeoffs" of the policy implications. *NFIB*, 595 U.S. at 120. So, ATS has certainly not "failed to meaningfully address the remaining" factors. Opp. 34. *Winter v. NRDC*, 555 U.S. 7, 23–24 (2008), is not to the contrary because the Court "d[id] not address" the merits factor. Instead, *Winter* held that the necessity of sonar training to counter the threat of enemy submarines "plainly outweighs" the movant's "ability to study and observe" "marine mammals." *Id.* at 24–26. This prioritization of national security bears no resemblance to the economic interests involved in the Final Rule.

Additionally, what is at stake in this motion is not the permanent end of the purported policy benefits the FTC claims the Final Rule will bring about. Opp. 34. A preliminary injunction will "merely [] preserve the relative positions of the parties" while ATS's claims are litigated. *Starbucks Corp. v. McKinney*, --- S. Ct. ----, 2024 WL 2964141, at *4 (June 13, 2024). Given the irreparable harm that will be done to ATS's business, *see supra* Part II, such a short delay is more than reasonable after the FTC waited 110 years to promulgate the Final Rule. Because ATS is likely to succeed on the merits of its claim that the Final Rule exceeds the FTC's authority, "[t]he equities do not justify withholding interim relief." *NFIB*, 595 U.S. at 120.

## CONCLUSION

For the foregoing reasons, ATS respectfully requests that this Court stay the effective date of the Final Rule and enter a preliminary injunction pending a ruling on the merits.

DATED: June 25, 2024.

Respectfully submitted,

s/ *Sean Radomski*
SEAN RADOMSKI
Pennsylvania Bar No. 319732
JOSHUA M. ROBBINS*
Virginia Bar No. 91020
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
SRadomski@pacificlegal.org
JRobbins@pacificlegal.org

LUKE WAKE*
California Bar No. 264647
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
LWake@pacificlegal.org

*Attorneys for Plaintiff*

*admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2024, I electronically filed the foregoing with the Clerk of the United States District Court for the Eastern District of Pennsylvania using the CM/ECF system, which sent notifications of such filing to all registered CM/ECF users.

DATED: June 25, 2024.

*/s/ Sean Radomski*
SEAN RADOMSKI