**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ATS TREE SERVICES, LLC, | Civil Action |
|         Plaintiff, | No. 24-1743 |
| v. | |
| FEDERAL TRADE COMMISSION, LINA M. KHAN, in her official capacity as Chair of the Federal Trade Commission, REBECCA KELLY SLAUGHTER, ALVARO BEDOYA, ANDREW N. FERGUSON and MELISSA HOLYOAK, in their official capacities as Commissioners of the FTC, | |
|         Defendants. | |

**PROPOSED BRIEF OF THE SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, THE FUTURES INDUSTRY ASSOCIATION, THE MANAGED FUNDS ASSOCIATION, AND THE AMERICAN INVESTMENT COUNCIL AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR STAY OF EFFECTIVE DATE AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICI CURIAE* ........................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

ARGUMENT ................................................................................................................... 3

I.    The Rule Would Hurt Competition And Employees In The
Financial-Services Industry ..................................................................................... 3

    A.    The Rule Would Eviscerate The Significant Competitive
Benefits Of Noncompete Agreements ........................................................... 3

        1.    Noncompete Agreements Incentivize Employee Training ............................ 3

        2.    Noncompete Agreements Protect Companies'
Confidential Information ........................................................................ 5

    B.    The Rule Would Harm Employees ................................................................. 7

        1.    The Rule Would Deprive Employees Of The Benefits Of Noncompete
Agreements ............................................................................................. 8

        2.    Substitutes For Noncompete Agreements Generally Are Worse For
Employees .............................................................................................. 10

II.    The Rule Exceeds The FTC's Statutory Authority ............................................. 10

    A.    Section 6(g) Does Not Authorize The FTC To Make
Substantive Competition Rules ................................................................... 11

    B.    Section 5 Does Not Authorize The FTC To Declare That A Practice Harms
Competition In The Aggregate ................................................................... 13

    C.    Any Doubts About The FTC's Power To Promulgate The
Rule Should Be Resolved Against The FTC ................................................ 14

    D.    The FTC Lacks Authority To Enact Retroactive Rules ............................... 15

III.    The Rule Does Not Contain An Adequate Cost-Benefit Analysis
And Otherwise Is Not Supported By The Record ............................................... 17

    A.    The FTC Underestimates The Rule's Costs ................................................. 17

    B.    The FTC Fails To Establish The Rule's Benefits ........................................ 18

CONCLUSION ............................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    594 U.S. 758 (2021)................................................................................................15

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023)..........................................................................................14

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)..............................................................................................16

*Bus. Roundtable v. SEC*,
    647 F.3d 1144 (D.C. Cir. 2011)............................................................................17

*Cantor Fitzgerald, L.P. v. Ainslie*,
    312 A.3d 674 (Del. 2024)........................................................................................9

*Chevron U.S.A. Inc. v. Echazabal*,
    536 U.S. 73 (2002)................................................................................................12

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)..............................................................................................11

*Cortez-Amador v. Att'y Gen.*,
    66 F.4th 429 (3d Cir. 2023) ..................................................................................12

*First Tower Loan, LLC v. Broussard*,
    No. 15-cv-385, 2015 WL 13942412 (S.D. Miss. July 7, 2015)................................4

*FTC v. Wyndham Worldwide Corp.*,
    799 F.3d 236 (3d Cir. 2015)..................................................................................13

*INS v. St. Cyr*,
    533 U.S. 289 (2001)..............................................................................................16

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)..............................................................................................16

*Lindh v. Murphy*,
    521 U.S. 320 (1997)..............................................................................................16

*Morris v. Schroder Cap. Mgmt. Int'l*,
    859 N.E. 2d 503 (N.Y. 2006)..................................................................................9

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012).............................................................................17

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                                                                            **Page(s)**

*Nat'l Petrol. Refiners Ass'n v. FTC*,
    482 F.2d 672 (D.C. Cir. 1973) ........................................................................12, 13

*Pierce v. Fuller*,
    8 Mass. 223 (1811) ........................................................................................15

*Snap-On Tools Corp. v. FTC*,
    321 F.2d 825 (7th Cir. 1963) ........................................................................14

*United States v. Addyston Pipe & Steel Co.*,
    85 F. 271 (6th Cir. 1898) ..............................................................................6

*West Virginia v. EPA*,
    597 U.S. 697 (2022).......................................................................................15

*Whitman v. Am. Trucking Assocs.*,
    531 U.S. 457 (2001)................................................................................12, 13

**Statutes and Regulation**

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*: ..............................................2

    5 U.S.C. § 706...........................................................................................17

    5 U.S.C. § 706(2)(C)...................................................................................11

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*: .........................................

    15 U.S.C. § 45.................................................................................2, 11, 16

    15 U.S.C. § 45(a)(2).....................................................................................13

    15 U.S.C. § 45(b)........................................................................................13

    15 U.S.C. § 46............................................................................................11

    15 U.S.C. § 46(a)........................................................................................11

    15 U.S.C. § 46(b)........................................................................................11

    15 U.S.C. § 46(c)........................................................................................11

    15 U.S.C. § 46(d)........................................................................................11

    15 U.S.C. § 46(e)........................................................................................11

# TABLE OF AUTHORITIES
### (continued)

**Statutes and Regulation (continued)**                                         **Page(s)**

15 U.S.C. § 46(f) ................................................................................................11

15 U.S.C. § 46(g) ..............................................................................2, 11, 12, 16

15 U.S.C. § 46(h) ...............................................................................................11

15 U.S.C. § 46(i) ................................................................................................11

15 U.S.C. § 46(j) ................................................................................................11

15 U.S.C. § 57a ..................................................................................................12

Packers and Stockyards Act, 7 U.S.C. § 181 *et seq.*......................................13

Pub. L. No. 75-447, § 3, 52 Stat. 111 (1938).................................................12

Sherman Act, 15 U.S.C. § 1 *et seq.*..................................................................6

Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) ......................... *passim*

**Other Authorities**

AIC, *Comment on Proposed Non-Compete Clause Rule* (Apr. 19, 2023) ........................... *passim*

*Annual Report of the Federal Trade Commission* (1922) ...........................................12

Chris Dolmetsch, *Jane Street's 'Secret' Strategy Concerns Options in India*,
Bloomberg (Apr. 19, 2024).......................................................................................7

FIA PTG, *Comment on Proposed Non-Compete Clause Rule* (Apr. 19, 2023) ............................5

*FTC, Policy Statement Regarding the Scope of Unfair Methods of Competition
Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022)................................14

MFA, *Comment on Proposed Non-Compete Rule* (Apr. 19, 2023)........................................ *passim*

SEC No. 34-73954; File No. SR-FINRA-2014-037 (Dec. 30, 2014)................................9

SIFMA, *Comment on Proposed Non-Compete Clause Rule* (Apr. 19, 2023) ...................... *passim*

## INTEREST OF THE *AMICI CURIAE*

SIFMA, FIA, MFA, and AIC are among the leading trade associations in the financial-services industry.  Their members include banks, broker-dealers, trading firms, asset managers, funds, futures commission merchants, and other organizations that collectively employ over a million people in the United States.  Many of *amici*'s members have entered into noncompete agreements with current and former employees – agreements under which the employees agree that they will not work for certain competitors for a limited time after they leave their employers.

The FTC has promulgated a rule, the Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) (the Rule), that would ban nearly all noncompete agreements in the United States. Plaintiff ATS Tree Services, LLC has challenged the validity of the Rule.  *Amici* have a significant interest in this case given the harmful effects that the Rule would have on the industry if it is allowed to go into effect.  *Amici* file this brief to provide their unique perspective to the Court.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The FTC's Rule would impose a near-total ban on new noncompete agreements across the nation and would invalidate the vast majority of existing noncompete agreements.  Many companies in the financial-services industry rely on noncompete agreements to protect their investment in their employees and to safeguard the confidential information that gives them a competitive edge, such as their proprietary investment strategies.  Those protections help competition, because they ensure that companies in the industry can invest time and money to develop their people, products, and processes to better serve their customers, investors, and shareholders without fearing that competitors will free-ride on their efforts.  The Rule thus would significantly harm competition in the industry.  Further, in response to the Rule, employers in the industry likely would change their business practices to account for the Rule in ways that would reduce productivity and ultimately harm the industry.

1

The Rule also would harm employees in the financial-services industry.  Employers share information with employees more readily when they can rely on noncompete agreements. Employers in the industry also typically pay employees for not competing during their noncompete period, even if those individuals work for other companies or organizations that do not compete with the employers.  The Rule would deprive employees of those benefits – in fact, it would deny employees the choice to enter into noncompete agreements altogether.  Further, the Rule likely would force employers to re-negotiate existing agreements to include new provisions to safeguard confidential information, which could leave employees worse off than they were before.

The Rule not only is bad policy, but also is unlawful.  First, the FTC simply does not have the authority to promulgate nationwide Rules regulating unfair methods of competition.  The FTC cites Sections 5 and 6(g) of the FTC Act, 15 U.S.C. §§ 45 and 46(g), but neither provides the FTC with the authority to promulgate the Rule.  Section 6(g) is a housekeeping provision that allows the FTC to issue procedural rules, not a sweeping grant of authority to regulate the entire national economy.  Section 5 gives the FTC authority to investigate methods of unfair competition on a case-by-case basis, not to promulgate blanket rules.  And neither provision gives the FTC power to promulgate rules with retroactive effect.  The Rule is contrary to law and invalid under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (APA).

The Rule also is invalid under the APA because the FTC does not engage in reasoned decision-making.  The Rule's cost-benefit analysis is irredeemably flawed:  The FTC ignores significant costs and grossly underestimates the costs it considers, while failing to establish any of the Rule's purported benefits.

*Amici* urge the Court to preliminarily enjoin the Rule.

**ARGUMENT**

**I.      The Rule Would Hurt Competition And Employees In The Financial-Services Industry**

Noncompete agreements provide significant benefits both to competition and to employees in the financial-services industry – benefits that would be lost if the Rule were to go into effect. Further, the Rule would impose additional costs on businesses that would ultimately undermine businesses' productivity and effectiveness, harm employees, and impose new costs that would be passed on to consumers.

**A.      The Rule Would Eviscerate The Significant Competitive Benefits Of Noncompete Agreements**

Noncompete agreements have important pro-competitive effects, especially in the financial-services industry.  In particular, noncompete agreements encourage companies to invest in their employees' development and to share confidential information broadly with employees and across teams.

**1.      Noncompete Agreements Incentivize Employee Training**

Noncompete agreements "increase an employer's incentive to make productive investments" – such as "training its workers" – "because employers may be more likely to make such investments if they know workers are not going to depart for or establish a competing firm." SIFMA, *Comment on Proposed Non-Compete Clause Rule* 5-6 (Apr. 19, 2023), bit.ly/4akss6Q (SIFMA Comment) (internal quotation marks omitted).  As the FTC acknowledges, multiple studies have shown that noncompete agreements "increase employee human capital investment." 89 Fed. Reg. at 38,423.  That is common sense:  Companies are more likely to invest in employee training when they can ensure that their competitors cannot free-ride off those investments.  *See id.*

More employee training is better for competition.  Training and other similar investments in employee development improve employee productivity, which allows their employers to compete more effectively in the marketplace.  It also is good for the employees who receive that increased investment, because they develop skills that they can put to use after they leave their employers (so long as they do not directly compete with the employers right away) or use to bargain for higher wages with their employers.

The FTC asserts that there are viable alternatives to noncompete agreements to protect employee training and development.  *See* 89 Fed. Reg. at 38,426.  Yet the FTC proposes only two supposed alternatives – "fixed duration contracts" and "competing on the merits."  *Id.*  Neither is an adequate substitute for noncompete agreements.  The FTC contends that employers could use fixed-duration contracts to retain employees for the length of time needed for the employers to recoup their investments in training and development.  *Id.* at 38,426.  But at-will employment is the norm in 49 states, *First Tower Loan, LLC v. Broussard*, No. 15-cv-385, 2015 WL 13942412, at *2 n.6 (S.D. Miss. July 7, 2015); it simply is unrealistic to propose that companies "forgo[] at-will employment" and enter into fixed-duration contracts every time they provide employees with training, 89 Fed. Reg. at 38,403.  Further, fixed-duration contracts are much riskier for employers, because employers cannot easily terminate the contracts during the employment period.  *See* AIC, *Comment on Proposed Non-Compete Clause Rule* 22 (Apr. 19, 2023), bit.ly/3UX0J7M (AIC Comment).  If forced to choose between not providing training or providing training *and* bearing the risks of a fixed-duration contract, many employers would choose the former.

The FTC also contends that employers could "compete on the merits" to protect their investments in their employees – meaning offer high wages to retain their newly trained employees.  89 Fed. Reg. at 38,426.  But that would just add to the costs of training employees.

4

And the employer providing the training would be at a disadvantage in seeking to retain an employee, because a competitor could offer higher wages without also bearing the costs of the training in the first place.  *See* AIC Comment 22.  In other words, it always would cost less for the competitor that did not provide the training.   The inescapable conclusion is that banning noncompete agreements would reduce employers' incentives to invest in their employees.

> **2.    Noncompete    Agreements    Protect    Companies'    Confidential Information**

A second key benefit of noncompete agreements is that they protect companies' confidential information, including their trade secrets, intellectual property, and other know-how. As a result, companies are more likely to share information with employees and across teams, which increases productivity and helps foster innovation.

Companies, particularly in the financial-services industry, spend significant resources developing proprietary strategies, tools, and other information to gain competitive advantages. *See, e.g.*, AIC Comment 19-20; MFA, *Comment on Proposed Non-Compete Rule* 4-5 (Apr. 19, 2023), bit.ly/3WBBb1n (MFA Comment); FIA PTG, *Comment on Proposed Non-Compete Clause Rule* 1-2 (Apr. 19, 2023), bit.ly/4bDr93X.  For example, investment funds often create new funds that are centered around specific portfolio managers and that use proprietary investment strategies to identify investment options, manage risk, and generate attractive returns.  MFA Comment 4.  It takes a considerable investment of time, effort, and resources to develop and refine a strategy and then to build a sufficient track record and reputation to market that strategy to potential investors. *Id.*  Companies in the industry need to ensure that they can protect those strategies and other proprietary information, or they will not invest in developing them.

Noncompete agreements are critical to protecting those investments.  They ensure that companies can share confidential information with executives and other employees without the

danger that competitors will recruit those employees and thereby gain access to the companies' most important secrets.   MFA Comment 19.   Even when employees do not intend to misappropriate trade secrets, they retain opinions, insight, and other information learned from their former employer that subconsciously influence their behavior and decision-making – and in the financial-services industry, even remembering the slightest detail of, for example, a trading strategy can make all the difference.   AIC Comment 20.   Noncompete agreements act as a "prophylactic measure" to ensure that executives and employees cannot use confidential information to benefit competitors.   *Id.*

The FTC does not dispute that by protecting confidential information, noncompete agreements can benefit competition.   *See* 89 Fed. Reg. at 38,422.   Indeed, courts have upheld noncompete agreements under the Sherman Act, 15 U.S.C. § 1 *et seq.*, on this basis for over a century.   *See, e.g.*, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281-82 (6th Cir. 1898).

The FTC asserts that trade-secret law and non-disclosure agreements (NDAs) can provide adequate protection.   89 Fed. Reg. at 38,424.   That is wrong: Trade-secret law and NDAs are not as effective as noncompete agreements, because compliance is much harder to determine.   SIFMA Comment 9; AIC Comment 21.   It is easy to determine whether a former employee is working for a competitor in violation of a noncompete agreement.   In contrast, once a former employee has started with a competitor, a former employer does not have insight into what the employee is working on and whether the employee is using or disclosing information in violation of trade-secret law or an NDA.   SIFMA Comment 9.

Even if the former employer has a reasonable basis for bringing a lawsuit for trade-secret appropriation or to enforce an NDA, that lawsuit does not protect confidential information as well as a noncompete agreement.   To begin with, litigation necessarily is after-the-fact.   Even if the

former employer ultimately prevails, the harm has been done because the information has been shared.  MFA Comment 5.  Litigation also is expensive and time-consuming.  The median time for a trade-secret case to go to trial is over 26 months – longer than the typical noncompete agreement in the financial-services industry.  AIC Comment 21.  Finally, litigation may not be successful.  Direct evidence of misappropriation or wrongful disclosure often is difficult to obtain because sophisticated employees know to cover their tracks, and it often can be difficult to quantify damages with any certainty.  And, perversely, the former employer may need to disclose the very information it seeks to protect to prove its claim in litigation, MFA Comment 5 – or that information may be leaked during the course of litigation, *see, e.g.*, Chris Dolmetsch, *Jane Street's 'Secret' Strategy Concerns Options in India*, Bloomberg (Apr. 19, 2024).

Thus, if the Rule were to go into effect, companies would have to take additional measures to safeguard their confidential information.  Companies likely would restructure their organizations or change their business practices to severely curtail the number of employees receiving confidential information.  AIC Comment 15-16; MFA Comment 2-3.  Siloing information in that way would make businesses less efficient, ultimately harming productivity and increasing costs – all of which would hurt competition.  MFA Comment 3.  Companies also would innovate less because they would face an increased risk that investing in new products or services would benefit their competitors.  That would be bad for the industry, bad for employees, bad for investors, and bad for the economy.

### B.    The Rule Would Harm Employees

Noncompete agreements also benefit employees in the financial-services industry.  In particular, many employees receive additional compensation and job opportunities in return for entering into those agreements.  Further, noncompete agreements often are part of deferred

compensation and retirement arrangements, which allow employees to receive more money when they leave their employers.

1.    **The Rule Would Deprive Employees Of The Benefits Of Noncompete Agreements**

Employees in the financial-services industry are highly skilled and many are very well compensated.  *See* AIC Comment 15.  Many employees specifically negotiate their compensation packages with the advice of counsel.  *Id.* at 15-16.  A significant number of those employees choose to enter into noncompete agreements because those agreements come with certain benefits.  *See* MFA Comment 3.

Many employees subject to noncompete agreements receive higher compensation.  AIC Comment 16.  That compensation can come in the form of increased salaries, additional bonuses, noncompete payments, grants of equity, or severance guarantees.  *Id.*; *see* MFA Comment 3 (employees in the investment-management industry typically are compensated during noncompete periods).  During noncompete periods, the employees are precluded only from working for competitors, but still can work for non-competing companies and organizations.  And employers in the industry often agree to make noncompete payments even when the employees continue working for non-competitors.  Thus, for example, a departing employee could work for a nonprofit organization while continuing to receive noncompete payments, which benefits both the employee and society at large.

Further, under many noncompete agreements in the financial-services industry (known as forfeiture-for-competition agreements), employees can make fully informed choices between competing and receiving extra bargained-for benefits.  SIFMA Comment 6.  Under those agreements, employees forgo those benefits only if they choose to work for competitors.  *Id.*  As many courts have recognized, these types of voluntary noncompete agreements benefit employees

8

and help competition.  *See, e.g.*, *Morris v. Schroder Cap. Mgmt. Int'l*, 859 N.E. 2d 503, 620-21 (N.Y. 2006).  Indeed, many courts do not consider these agreements to be noncompete agreements at all.  *See, e.g.*, *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 691 (Del. 2024).

Finally, many employees enter into noncompete agreements as part of their retirement packages.  For example, the Financial Industry Regulatory Authority (FINRA) has issued a rule, Rule 2040, which requires its members to enter into noncompete agreements with their retiring investment advisors in order to continue paying commissions to the advisors.  SIFMA Comment 11 (citing FINRA Rule 2040(b) (2022)).  Under this rule, FINRA members have paid millions of dollars to retiring advisors on the condition that the advisors transition their clients to other advisors and leave the securities industry.  *Id.* at 11-12.  The rule benefits investors by promoting the continuity of client services.  *See id.* at 12.  Notably, the Securities and Exchange Commission has recognized the validity of these agreements.  *See id.* (citing SEC No. 34-73954; File No. SR-FINRA-2014-037, at 9-10 (Dec. 30, 2014)).

The Rule would upend those retirement arrangements.  It would invalidate all existing noncompete agreements except those for a narrowly defined category of "senior executives" who occupy "policy-making position[s]."  89 Fed. Reg. at 38,413.  The Rule thus would invalidate the noncompete provisions of many retired advisors' retirement packages – even though their former employers have paid them significant amounts under those packages and may be required to continue paying them even without the noncompete provisions.

The bottom line is that noncompete agreements in the financial-services industry can significantly benefit employees and are neither exploitative nor coercive.  The Rule would not only deprive all employees of those benefits, but also would deprive them of the choice to receive those benefits.

### 2. Substitutes For Noncompete Agreements Generally Are Worse For Employees

The Rule also likely would lead employers to take steps to protect their confidential information that would be detrimental to employees.

If the Rule goes into effect, employers likely would be much more restrictive in sharing their confidential information internally.  MFA Comment 3, 5.  Many employees would be relegated to working on discrete projects, without understanding the broader implications of their work.  *Id.* at 3.  That will hurt employees, because they will have less access to information that could help them better do their jobs, and will cause them to miss out on career-advancing learning opportunities that often lead to increased compensation.  *Id.*

Employers also likely would restructure compensation agreements to protect confidential information in ways that are less beneficial to employees.  For example, rather than providing deferred compensation that employees would forfeit if they competed, employers may provide deferred compensation that employees forfeit if they leave for any reason regardless of whether they compete.  *See* MFA Comment 4-5.  This could cause employees to stay at their jobs even if they would like to move elsewhere and engage in work for a non-competitor – or cause employees to forfeit the compensation altogether.  *Id.* at 5.

Thus, the Rule not only would deprive employees of the many benefits of the agreements, but likely would lead to additional costs and restrictions that ultimately would harm the very employees the Rule claims to protect.

## II. The Rule Exceeds The FTC's Statutory Authority

The FTC invokes two bases for the Rule – Sections 5 and 6(g) of FTC Act.  *See* 89 Fed. Reg. at 38,346.  Neither provides the FTC statutory authority to promulgate substantive unfair-competition rules like the Rule.  Any doubts on that score should be resolved against the FTC

under the major-questions doctrine, particularly since the Rule has retroactive effect.  Because the FTC does not have the authority to promulgate the Rule, it is contrary to law under the APA.  *See* 5 U.S.C. § 706(2)(C).

A.     **Section 6(g) Does Not Authorize The FTC To Make Substantive Competition Rules**

The FTC argues that Section 6(g) of the FTC Act, 15 U.S.C. § 46(g), gives it the authority to promulgate binding rules to regulate unfair methods of competition.  *See* 89 Fed. Reg. at 38,349. It is wrong.

The text of Section 6(g) shows its limited scope.  Section 6(g) has been in the FTC Act since Congress first enacted the Act in 1914.  It provides that the FTC may "[f]rom time to time classify corporations and . . . make rules and regulations for the purpose of carrying out the provisions of this subchapter."  15 U.S.C. § 46(g).  By its terms, any rules and regulations issued under Section 6(g) must be to carry out another provision of the FTC Act; Section 6(g) itself does not provide the FTC with substantive authority.  Section 6(g) thus is a housekeeping provision that allows the FTC to "regulate its own affairs," *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979) – not an authorization to issue regulations that bind private parties.

The statutory context confirms Section 6(g)'s limited scope.  In Section 5 of the Act, Congress set out a comprehensive statutory scheme for the FTC to address unfair methods of competition through case-by-case adjudication.  15 U.S.C. § 45; *see* p. 13-14, *infra*.  Then, in Section 6, Congress set out twelve ancillary "[a]dditional powers of [the] Commission."  15 U.S.C. § 46 (title).  Those principally are the FTC's investigatory powers and powers to publish reports. *See id.* § 46(a)-(f), (h)-(j).

Section 6(g) is seventh on the list and starts with the purely procedural power to "[f]rom time to time classify corporations" before including, in its second half, the language on which the

FTC now relies.  15 U.S.C. § 46(g).  It is impossible to believe that Congress intended to grant the FTC the authority to issue substantive rules regulating unfair methods of competition nationwide in the back half of a procedural provision about classifying corporations.  That is far too big an elephant for that mousehole.  *See Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 468 (2001).

Notably, the FTC itself initially disclaimed any authority to issue substantive rules.  In 1922, just eight years after the passage of the FTC Act, the Commission told Congress that it would be a "mistake" to "suppose" that the FTC could "issue orders, rulings, or *regulations* unconnected with any proceedings before it."  *Annual Report of the Federal Trade Commission* 36 (1922) (emphasis added).

Subsequent amendments to the FTC Act reflect that understanding.  In 1938, Congress amended Section 5 to allow the FTC to regulate "unfair or deceptive acts or practices."  Pub. L. No. 75-447, § 3, 52 Stat. 111 (1938).  Then in 1975, Congress enacted Section 18, which expressly authorized the FTC to issue binding regulations related to those acts and practices if it followed certain procedural requirements.  *See* 15 U.S.C. § 57a.  That Congress expressly granted the FTC the power to promulgate rules with respect to unfair or deceptive practices, but not with respect to unfair methods of competition, shows that it intended to exclude the latter.  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002).  Further, interpreting Section 6(g) as a broad grant of substantive rulemaking authority would make Section 18 (and its procedural requirements) superfluous.  *See Cortez-Amador v. Att'y Gen.*, 66 F.4th 429, 433 & n.9 (3d Cir. 2023).

The FTC principally relies on a fifty-year-old D.C. Circuit decision, *National Petroleum Refiners Association v. FTC*, 482 F.2d 672 (D.C. Cir. 1973), to support its view of Section 6(g).  *See* 89 Fed. Reg. at 38,350.  That decision is not binding on this Court and is out of step with modern jurisprudence.  *National Petroleum Refiners* concluded that Section 6(g) gives the FTC

the authority to "promulgate substantive rules of business conduct" based on a supposed "need to interpret liberally broad grants of rule-making authority." 482 F.2d at 673, 680. But if there ever was such a canon of construction, it since has long been repudiated by the Supreme Court, which recognizes that agencies have only the powers that Congress expressly granted to them. *E.g.*, *Whitman*, 531 U.S. at 468. *National Petroleum Refiners* was wrong when it was decided, and it should not be followed now.

### B.  Section 5 Does Not Authorize The FTC To Declare That A Practice Harms Competition In The Aggregate

Because the FTC relies on Sections 5 and 6(g) together to support the Rule, *see* 89 Fed. Reg. at 38,349, the lack of authority in Section 6(g) is enough to invalidate the Rule. That said, Section 5 also does not support the Rule.

Section 5 authorizes the FTC to prevent a business covered by the FTC Act from engaging in an "unfair method[] of competition." 15 U.S.C. § 45(a)(2).[1] Section 5 sets out the process the FTC must follow whenever it "ha[s] reason to believe" that a business is using an unfair method of competition: The FTC must engage in case-by-case adjudication by "issu[ing] and serv[ing]" a "complaint" on the business, holding a "hearing," and issuing a "report in writing," before it can enter a cease-and-desist order. *Id.* § 45(b). Section 5, by its terms, does not provide a process for the FTC to categorically prohibit a particular method of competition.

Further, to show that a practice is an unfair method of competition under Section 5, the FTC must show that the practice harms competition. *E.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244 (3d Cir. 2015). The FTC's policy statement on Section 5 makes this clear: To

---

[1]  Section 5 does not apply to banks, savings and loans institutions, federal credit unions, common carriers, air carriers, and companies subject to the Packers and Stockyards Act, 7 U.S.C. § 181 *et seq. See* 15 U.S.C. § 45(a)(2).

be an unfair method of competition, a practice must have a "tendency to negatively affect competitive conditions."  FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* 9 (Nov. 10, 2022).

The FTC has not attempted to show that every noncompete agreement harms competition or even has a "tendency" to do so.  To the contrary, the FTC admits that individual noncompete agreements can benefit competition, *see* 89 Fed. Reg. at 38,422, and the only time the FTC found that a noncompete agreement restricted competition and tried to defend that finding in court, the Seventh Circuit reversed the FTC's finding as "lacking support in the record," *Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 837-38 (7th Cir. 1963).  Indeed, the Rule exempts existing noncompete agreements for certain senior executives, 89 Fed. Reg. at 38,439, which implicitly recognizes that noncompete agreements are not always anti-competitive.  So the most that the FTC can claim is that noncompete agreements harm competition in the aggregate.  *See, e.g.*, *id.* at 38,422.  But Section 5 does not speak of aggregate harms or otherwise allow the FTC to regulate one employer's use of a method because of the cumulative effects of other employers' different uses of that method.

## C.   Any Doubts About The FTC's Power To Promulgate The Rule Should Be Resolved Against The FTC

If there was any doubt about the scope of the FTC's authority here, those doubts should be resolved against the FTC under the major-questions doctrine.  Under the doctrine, an agency can regulate an issue "of deep economic and political significance" only if Congress gives the agency "clear" authority to do so.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (internal quotation marks omitted).

The major-questions doctrine applies because the Rule is a significant new constraint that applies across almost all of the U.S. economy.  The FTC itself estimates that the Rule will

14

invalidate 30 million existing noncompete agreements nationwide and that its economic impact will be hundreds of billions of dollars.  89 Fed. Reg. at 38,343, 38,433.

Further, courts apply the major-questions doctrine when agencies purport to "discover in a long-extant statute an unheralded power representing a transformative expansion in [its] regulatory authority."  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (internal quotation marks omitted).  That is true here:  This is the first time that the FTC has claimed authority under Section 6(g) to issue a substantive rule regulating a purported unfair method of competition in nearly 50 years.[2]

Finally, courts apply the major-questions doctrine when an agency seeks to "intrude[] into an area that is the particular domain of state law."  *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021).  That also is true here.  States have regulated noncompete agreements since the Founding era.  *See, e.g.*, *Pierce v. Fuller*, 8 Mass. 223 (1811).  Each state has developed a robust body of case law to determine what types of agreements are allowed and in what circumstances, with only four states generally prohibiting noncompete agreements.  *See* 89 Fed. Reg. at 38,424 n.767.  In contrast, until this Rule, no federal agency has *ever* sought to categorically regulate noncompete agreements.

This is the first time in its 110-year history that the FTC has used the supposed aggregate harms of a method of competition to categorically prohibit that method nationwide.  If Congress had intended to give the FTC that immense power, it would have done so clearly and expressly.

### D.    The FTC Lacks Authority To Enact Retroactive Rules

Even if the FTC had authority to make rules regulating unfair competition, it does not have authority to make retroactive rules.  A rule has retroactive effect if it "takes away or impairs vested

---

[2]    Between 1963 and 1978, the FTC issued rules under Section 6(g) that targeted practices as unfair methods of competition and as unfair or deceptive acts or practices.  *See* 89 Fed. Reg. at 38,349-50.  That stopped after Congress enacted Section 18 of the FTC Act.  *See id.* at 38,350.

rights[,] . . . creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994) (internal quotation marks omitted). Here, the Rule is retroactive because it invalidates all existing noncompete agreements, except for those of certain senior executives, 89 Fed. Reg. at 38,439 – thereby "tak[ing] away" rights employers bargained and paid for with respect to those agreements and requiring employers to rescind and modify the agreements.

Congress must grant an agency authority to make retroactive rules "in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). This standard is "demanding," *INS v. St. Cyr*, 533 U.S. 289, 316-17 (2001); the statutory language must be "so clear that it could sustain only one interpretation," *Lindh v. Murphy*, 521 U.S. 320, 328 n.4 (1997).

The FTC has not pointed to any statutory provision that authorizes it to enact retroactive regulations. The only statutory provisions on which it relies, Sections 5 and 6(g), do not say anything about retroactive rulemaking. *See* 15 U.S.C. §§ 45, 46(g). Instead, the FTC argues that the Rule is not impermissibly retroactive because it only prohibits employers from enforcing existing noncompete agreements going forward, rather than imposing sanctions for past conduct. *See* 89 Fed. Reg. at 38,439.

The FTC takes too narrow a view of retroactivity. Imposing sanctions for past conduct is not the only way a rule can have a retroactive effect; a rule also has retroactive effect if it alters "vested rights" or "imposes a new duty" with respect to transactions "already past." *Landgraf*, 511 U.S. at 269 (internal quotation marks omitted). Here, the Rule would deprive employers across the financial-services industry of the benefits of noncompete agreements for which they paid millions of dollars in consideration – altering the employers' "vested rights." The Rule also would require employers across the industry to rescind existing noncompete agreements, modify

existing employment contracts, and inform current and former employees of the changes.  Those are "new dut[ies]" with respect to transactions "already past" (*i.e.*, the existing contracts).  The retroactive provisions in the Rule therefore are invalid.

### III.   The Rule Does Not Contain An Adequate Cost-Benefit Analysis And Otherwise Is Not Supported By The Record

The Rule also should be "h[e]ld unlawful and set aside" under the APA because it is arbitrary and capricious.  5 U.S.C. § 706.  A rule is arbitrary and capricious if the agency relies on a cost-benefit analysis as part of its rulemaking but that analysis rests on a "serious flaw" that undermines its validity.  *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012).  The agency relies on a cost-benefit analysis here, *see* 89 Fed. Reg. at 38,469, but its analysis is fatally flawed in at least two respects.  First, the agency seriously underestimates the costs that the Rule will impose on employers.  And second, the agency fails to quantify the purported benefits from the Rule.

#### A.   The FTC Underestimates The Rule's Costs

The FTC fails to reasonably estimate the full costs of the Rule.  Courts set aside a rule when the agency's cost estimate is incomplete or unreasonably low.  *See, e.g.*, *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1149 (D.C. Cir. 2011).

Here, the FTC fails to estimate significant costs of the rule.  In particular, the FTC disregards the costs to businesses of protecting their confidential information.  As explained, the FTC asserts that other protections, such as trade-secret law and NDAs, can provide similar benefits to noncompete agreements.  89 Fed. Reg. at 38,424.  But an action for misappropriation of trade secrets or to enforce an NDA is far more time-consuming and costly than an action to enforce a noncompete agreement.  *See* pp. 6-7, *supra*.  Indeed, the FTC acknowledges that "trade secret litigation, and litigation over post-employment restrictions other than non-competes, may be

costly." 89 Fed. Reg. at 38,469.  Yet the FTC declines to quantify those costs, instead asserting without foundation that the costs "would likely" be offset by decreased costs of litigation over noncompete agreements.  *Id.*

The FTC also expressly declines to quantify the costs of decreased sharing of confidential information.  89 Fed. Reg. at 38,469.  It instead asserts that it did not expect any such costs because trade-secret law and NDAs can provide comparable protection to noncompete agreements.  *Id.*  As explained, that view is wrong – employers will take measures to limit the dissemination of confidential information, which will impose considerable costs to innovation and competition.  *See* p. 7, *supra*.  The FTC's cost-benefit analysis is incomplete because it fails to consider the increased costs required to protect confidential information under the Rule.

The FTC estimates some costs of complying with the Rule, but its estimate is unreasonable. The FTC asserts that it would cost each business affected by the Rule just one hour (at a cost of $134) to have legal counsel review and modify standard contracts and human-resources materials, and just four to eight hours (at a cost of $536-$1072) for legal counsel to identify which employees are covered by the Rule and to update their contracts.  89 Fed. Reg. at 38,482.  Those estimates lack foundation and are implausible on their face.  Many of *amici*'s members have individually negotiated noncompete agreements with thousands of current and former employees, and it will take far more than eight hours each to review those existing contracts.  For this reason as well, the FTC's cost-benefit analysis is unreasonable.

### B.     The FTC Fails To Establish The Rule's Benefits

The FTC's assessment of the Rule's supposed benefits is just as flawed as its costs analysis. The FTC claims that the Rule will increase innovation and new firm formation, increase employees' earnings, and decrease prices, but it fails to substantiate those purported benefits.

To begin with, the FTC does not establish any benefits from increased innovation. The FTC estimates that under the Rule, the number of patents issued would increase by 11-20% each year for ten years. 89 Fed. Reg. at 38,476. Yet it acknowledges that it cannot determine whether that increase actually represents a net economic benefit, and accordingly declines to "monetize the estimated effects on innovative output." *Id.* at 38,477. The FTC also asserts that under the Rule, existing companies would spend less on research and development (R&D), which the FTC touts as a potential benefit. *Id.* But as the FTC acknowledges, its analysis does not take into account any increase in R&D from new companies – and thus does not monetize this supposed benefit. *Id.* The FTC thus does not attribute any dollar amount to the supposed benefits from innovation.

The FTC's estimates of the supposed benefits of new firm formation also are flawed. The FTC estimates that the Rule would lead to a 2.7% increase in new firm formation, but then admits it cannot determine whether that increase would actually lead to any benefits to employees or consumers, or whether any benefits would be offset by existing firms exiting the market. 89 Fed. Reg. at 38,485. The FTC speculates that new firm entry would lead to a net benefit, because the new firms "may" increase innovation and might "possibly contribut[e]" to decreases in prices. *Id.* Those conclusions simply do not follow from the shortcomings that the FTC itself acknowledges.

The FTC's estimates for gains to workers' earnings similarly are speculative. The FTC estimates that the Rule would lead to up to $488 billion in increased earnings. 89 Fed. Reg. at 38,475. But the FTC acknowledges that it cannot estimate with any certainty what portion of that amount would represent a net economic benefit. *Id.* at 38,475-76. The FTC hypothesizes that some part of the increased earnings truly represents a net economic benefit, but it relies on studies that are dated and that involved state regulations nowhere near as sweeping as the Rule. *See id.*;

SIFMA Comment 13.  Given the lack of any comparable precedent, the FTC's claim of a net benefit in employee earnings is just speculation.

The FTC asserts that prices could fall under the Rule, but once again concedes that there was no supporting evidence.  89 Fed. Reg. at 38,478.  The FTC attempts to estimate the change in prices for only the healthcare industry, and even then, the FTC acknowledges that any decrease in prices might not actually represent a net economic benefit.  *Id.*  So the FTC ultimately does not estimate any dollar amount of economic benefits from decreased prices.  *Id.* at 38,478-79.

In sum, the FTC entirely fails to prove the Rule's supposed benefits, and its assumption that the Rule would have certain benefits is unreasonable.

## CONCLUSION

The Court should grant the motion for a stay the effective date and a preliminary injunction.

Respectfully submitted,

**MAYER BROWN LLP**

By:  /s/ *Miranda Z. Katz*
Nicole A. Saharsky (*pro hac vice* pending)
Gail F. Levine (*pro hac vice* pending)
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3135
nsaharsky@mayerbrown.com

Miranda Z. Katz (SBN 332801)
1221 Avenue of the Americas
New York, N.Y. 10020
(212) 506-2500

*Counsel for* Amici Curiae *the Securities Industry and Financial Markets Association, the Futures Industry Association, the Managed Funds Association, and the American Investment Council*

Dated:  June 25, 2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing complies with the Judicial Policies and Procedures for cases assigned to Judge Kelley B. Hodge and that foregoing is set in 12-point Times New Roman type with one-inch margins.

Date:  June 25, 2024

By:   /s/ *Miranda Z. Katz*
      Miranda Z. Katz