# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ATS TREE SERVICES, LLC,<br><br>     Plaintiff,<br><br>v.<br><br>FEDERAL TRADE COMMISSION; LINA M. KHAN, in her official capacity as Chair of the Federal Trade Commission; and REBECCA KELLY SLAUGHTER, ALVARO BEDOYA, ANDREW N. FERGUSON, AND MELISSA HOLYOAK, in their official capacities as Commissioners of the Federal Trade Commission,<br><br>     Defendants. | No. 2:24-cv-01743-KBH |

## <u>JOINT APPENDIX</u>

Pursuant to the Court's June 24, 2024 Order, ECF No. 52, the parties hereby file a joint appendix for the pending motion for stay of effective date and preliminary injunction.

Dated: July 1, 2024

<table>
<tr><td>

*/s/ Sean Radomski*
SEAN RADOMSKI
Pennsylvania Bar No. 319732
JOSHUA M. ROBBINS*
Virginia Bar No. 91020
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd.
Suite 1000
Arlington, VA 22201
Tel: (202) 888-6881
SRadomski@pacificlegal.org
JRobbins@pacificlegal.org

</td><td>

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY R. FARBY
Assistant Branch Director

*/s/ Arjun Mody*
RACHAEL L. WESTMORELAND
TAISA M. GOODNATURE
ARJUN MODY (DC # 90013383)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch

</td></tr>
</table>

LUKE WAKE*

California Bar No. 264647

PACIFIC LEGAL FOUNDATION

555 Capitol Mall, Suite 1290

Sacramento, CA

Tel: (916) 419-7111

LWake@pacificlegal.org

*Attorneys for Plaintiff*

*admitted Pro Hac Vice*

1100 L Street, NW

Washington, D.C. 20005

Tel: (202) 451-7723

E-mail: arjun.a.mody@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed electronically and is available for viewing and downloading from the ECF system.

/s/ Arjun Mody
ARJUN MODY

# TABLE OF CONTENTS

Page(s)

Federal Trade Commission, Non-Compete Clause Rule, 89 Fed. Reg. 38,342
(May 7, 2024) ............................................................................................. JA0001

Federal Trade Commission, Proposed Non-Compete Clause Rule, 88 Fed. Reg. 3,482
(Jan. 19, 2023) ............................................................................................. JA0166

Federal Trade Commission, Policy Statement Regarding the Scope of Unfair Methods
of Competition Under Section 5 of the Federal Trade Commission Act 8, Comm'n
File No. P221202 (Nov. 10, 2022) ……….................................................... JA0231

Harlan M. Blake, Employee Agreements Not to Compete, 73 Harv. L. Rev. 625
(1960) ............................................................................................................ JA0247

Thomas W. Merrill & Kathryn Tongue Watts, Agency Rules with the Force of Law:
The Original Convention, 116 Harv. L. Rev. 467 (2002) ………………….............. JA0315

Thomas W. Merrill, Antitrust Rulemaking: The FTC's Delegation Deficit, 75 Admin.
L. Rev. 277 (2023) ....................................................................................... JA0441

Russell Beck, Employee Noncompetes, A State-by-State Survey (Aug. 17, 2022) ……... JA0481

## FEDERAL TRADE COMMISSION

### 16 CFR Parts 910 and 912

**RIN 3084–AB74**

### Non-Compete Clause Rule

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule.

**SUMMARY:** Pursuant to the Federal Trade Commission Act ("FTC Act"), the Federal Trade Commission ("Commission") is issuing the Non-Compete Clause Rule ("the final rule"). The final rule provides that it is an unfair method of competition for persons to, among other things, enter into non-compete clauses ("non-competes") with workers on or after the final rule's effective date. With respect to existing non-competes—*i.e.,* non-competes entered into before the effective date—the final rule adopts a different approach for senior executives than for other workers. For senior executives, existing non-competes can remain in force, while existing non-competes with other workers are not enforceable after the effective date.

**DATES:** The final rule is effective September 4, 2024.

**FOR FURTHER INFORMATION CONTACT:** Benjamin Cady or Karuna Patel, Office of Policy Planning, 202–326–2939 (Cady), 202–326–2510 (Patel), Federal Trade Commission, 600 Pennsylvania Avenue NW, Mail Stop CC–6316, Washington, DC 20580.

**SUPPLEMENTARY INFORMATION:**

### I. Background

*A. Summary of the Final Rule's Provisions*

The Commission proposed the Non-Compete Clause Rule on January 19, 2023 pursuant to sections 5 and 6(g) of the FTC Act.[1] Based on the Commission's expertise and after careful review and consideration of the entire rulemaking record—including empirical research on how non-competes affect competition and over 26,000 public comments—the Commission adopts this final rule addressing non-competes.

The final rule provides that it is an unfair method of competition—and therefore a violation of section 5—for employers to, *inter alia,* enter into non-compete clauses with workers on or after the final rule's effective date.[2] The Commission thus adopts a comprehensive ban on new non-competes with all workers.

With respect to existing non-competes, *i.e.,* non-competes entered into before the final rule's effective date, the Commission adopts a different approach for senior executives[3] than for other workers. Existing non-competes with senior executives can remain in force; the final rule does not cover such agreements.[4] The final rule allows existing non-competes with senior executives to remain in force because this subset of workers is less likely to be subject to the kind of acute, ongoing harms currently being suffered by other workers subject to existing non-competes and because commenters raised credible concerns about the practical impacts of extinguishing existing non-competes for senior executives. For workers who are not senior executives, existing non-competes are no longer enforceable after the final rule's effective date.[5] Employers must provide such workers with existing non-competes notice that they are no longer enforceable.[6] To facilitate compliance and minimize burden, the final rule includes model language that satisfies this notice requirement.[7]

The final rule contains separate provisions defining unfair methods of competition for the two subcategories of workers. Specifically, the final rule provides that, with respect to a worker other than a senior executive, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; to enforce or attempt to enforce a non-compete clause; or to represent that the worker is subject to a non-compete clause.[8] The Commission describes the basis for its finding that these practices are unfair methods of competition in Parts IV.B.1 through IV.B.3.

The final rule provides that, with respect to a senior executive, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; to enforce or attempt to enforce a non-compete clause entered into after the effective date; or to represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date.[9] The Commission describes the basis for its finding that these practices are unfair methods of competition in Part IV.C.2.

The final rule defines "non-compete clause" as "a term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from (1) seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (2) operating a business in the United States after the conclusion of the employment that includes the term or condition." [10] The final rule further provides that, for purposes of the final rule, "term or condition of employment" includes, but is not limited to, a contractual term or workplace policy, whether written or oral.[11] The final rule further defines "employment" as "work for a person." [12]

The final rule defines "worker" as "a natural person who works or who previously worked, whether paid or unpaid, without regard to the worker's title or the worker's status under any other State or Federal laws, including, but not limited to, whether the worker is an employee, independent contractor, extern, intern, volunteer, apprentice, or a sole proprietor who provides a service to a person." [13] The definition further states that the term "worker" includes a natural person who works for a franchisee or franchisor, but does not include a franchisee in the context of a franchisee-franchisor relationship.[14]

The final rule does not apply to non-competes entered into by a person pursuant to a bona fide sale of a business entity.[15] In addition, the final rule does not apply where a cause of action related to a non-compete accrued prior to the effective date.[16] The final rule further provides that it is not an unfair method of competition to enforce or attempt to enforce a non-compete or to make representations about a non-compete where a person has a good-faith basis to believe that the final rule is inapplicable.[17]

The final rule does not limit or affect enforcement of State laws that restrict non-competes where the State laws do not conflict with the final rule, but it preempts State laws that conflict with the final rule.[18] Furthermore, the final

---

[1] Non-Compete Clause Rule, NPRM, 88 FR 3482 (Jan. 19, 2023) (hereinafter "NPRM").

[2] § 910.2(a)(1)(i) and § 910.2(a)(2)(i).

[3] *See* § 910.1 (defining "senior executive").

[4] *See* Part IV.C.3.

[5] § 910.2(a)(1)(ii).

[6] § 910.2(b)(1).

[7] § 910.2(b)(4).

[8] § 910.2(a)(1).

[9] § 910.2(a)(2).

[10] § 910.1.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] § 910.3(a).

[16] § 910.3(b).

[17] § 910.3(c); *see also* Part V.C.

[18] § 910.4.

rule includes a severability clause clarifying the Commission's intent that, if a reviewing court were to hold any part of any provision or application of the final rule invalid or unenforceable—including, for example, an aspect of the terms or conditions defined as non-competes, one or more of the particular restrictions on non-competes, or the standards for or application to one or more category of workers—the remainder of the final rule shall remain in effect.[19] The final rule has an effective date of September 4, 2024.[20]

### B. Context for the Rulemaking

1. Growing Concerns Regarding the Harmful Effects of Non-Competes

The purpose of this rulemaking is to address conduct that harms fair competition. Concern about non-competes dates back centuries, and the evidence of harms has increased substantially in recent years. However, the existing case-by-case and State-by-State approaches to non-competes have proven insufficient to address the tendency of non-competes to harm competitive conditions in labor, product, and service markets.

The ability of employers[21] to enforce non-competes has always been restricted, based on public policy concerns that courts have recognized for centuries. For example, in *Mitchel* v. *Reynolds* (1711), an English case that provided the foundation for American common law on non-competes,[22] the court noted that workers were vulnerable to exploitation through non-competes and that non-competes threatened a worker's ability to practice a trade and earn a living.[23] These concerns have persisted. Today, non-competes between employers and workers are generally subject to greater scrutiny under State common law than other employment terms "because they are often the product of unequal bargaining power and because the employee is likely to give scant

attention to the hardship he may later suffer through loss of his livelihood." [24] For these reasons, State courts often characterize non-competes as "disfavored." [25]

Furthermore, as "contract[s] . . . in restraint of trade," [26] non-competes have always been subject to our nation's antitrust laws.[27] As early as 1911, in the formative antitrust case of *United States* v. *American Tobacco Co.*, the Supreme Court held that several tobacco companies violated both section 1 and section 2 of the Sherman Act because of the "constantly recurring" use of non-competes, among other practices.[28]

Concerns about non-competes have increased substantially in recent years in light of empirical research showing that they tend to harm competitive conditions in labor, product, and service markets. Changes in State laws governing non-competes [29] in recent decades have allowed researchers to better isolate the effects of non-competes, giving rise to a body of empirical research documenting these harms. This research has shown that the use of non-competes by employers tends to negatively affect competition in labor markets, suppressing earnings for workers across the labor force—including even workers not subject to non-competes.[30] This research has also shown that non-competes tend to negatively affect competition in product and service markets, suppressing new business formation and innovation.[31]

Alongside this large body of empirical work, news reports revealed that employers subject even middle-income and low-wage workers to non-competes

on a widespread basis.[32] Workers came forward to recount how—by blocking them from taking a better job or starting their own business, and subjecting them to threats and litigation from their employers—non-competes derailed their careers, destroyed their finances, and upended their lives.[33]

Yet despite the mounting empirical and qualitative evidence confirming these harms and the efforts of many States to ban them, non-competes remain prevalent in the U.S. economy. Based on the available evidence, the Commission estimates that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete.[34] The evidence also indicates that employers frequently use non-competes even when they are unenforceable under State law.[35] This suggests that employers may believe workers are unaware of their legal rights; that employers may be seeking to take advantage of workers' lack of knowledge of their legal rights; or that workers are unable to enforce their rights through case-by-case litigation.[36] In addition, the ability of States to regulate non-competes effectively is constrained by employers' use of choice-of-law provisions, significant variation in how courts apply choice-of-law rules in disputes over non-competes, and the increasingly interstate nature of work. As the public comments attest, this patchwork of laws and legal uncertainty has become extremely burdensome for both employers and workers.[37]

As concern about the harmful effects of non-competes increased, the Commission began exploring the potential for Federal rulemaking on non-competes. In 2018 and 2019, the Commission held several hearings on twenty-first century competition and consumer protection issues, including "the use of non-competition agreements

---

[19] § 910.5.

[20] § 910.6.

[21] For ease of reference, the Commission uses the term "employer" in this Supplementary Information to refer to a person for whom a worker works. The text of part 910 does not use the term "employer."

[22] Harlan Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 629–31 (1960).

[23] The *Mitchel* court expressed concern that non-competes threaten "the loss of [the worker's] livelihood, and the subsistence of his family." *Mitchel* v. *Reynolds*, 1 P. Wms. 181, 190 (Q.B. 1711). The court likewise emphasized "the great abuses these voluntary restraints" are subject to—for example, "from masters, who are apt to give their apprentices much vexation" by using "many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come to set up for themselves." *Id.*

[24] Restatement (Second) of Contracts sec. 188, cmt. g (1981).

[25] *See, e.g.*, *Navarre Chevrolet, Inc.* v. *Begnaud*, 205 So. 3d 973, 975 (La. Ct. App. 3d 2016); *Eastman Kodak Co.* v. *Carmosino*, 77 A.D.3d 1434, 1435 (N.Y. App. Div. 4th 2010); *Access Organics, Inc.* v. *Hernandez*, 175 P.3d 899, 904 (Mont. 2008); *Bybee* v. *Isaac*, 178 P.3d 616, 621 (Idaho 2008); *Softchoice, Inc.* v. *Schmidt*, 763 NW2d 660, 666 (Minn. Ct. App. 2009).

[26] 15 U.S.C. 1.

[27] *See, e.g.*, *Newburger, Loeb & Co., Inc.* v. *Gross*, 563 F.2d 1057, 1082 (2d Cir. 1977) ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.") (internal citation omitted).

[28] 221 U.S. 106, 181–83 (1911).

[29] NPRM at 3494 (describing recent legislative activity at the State level).

[30] *See* Parts IV.B.3.a and IV.C.2.c.ii.

[31] *See* Parts IV.B.3.b and IV.C.2.c.i.

[32] *See, e.g.*, Dave Jamieson, *Jimmy John's Makes Low-Wage Workers Sign 'Oppressive' Noncompete Agreements*, HuffPost, Oct. 13, 2014, *https://www.huffpost.com/entry/jimmy-johns-non-compete_n_5978180*; Spencer Woodman, *Exclusive: Amazon Makes Even Temporary Warehouse Workers Sign 18-Month Non-Competes*, The Verge, Mar. 26, 2015, *https://www.theverge.com/2015/3/26/8280309/amazon-warehouse-jobs-exclusive-noncompete-contracts*.

[33] *See, e.g.*, Conor Dougherty, *How Noncompete Clauses Keep Workers Locked In*, N.Y. Times, May 13, 2017, *https://www.nytimes.com/2017/05/13/business/noncompete-clauses.html*; Lauren Weber, *The Noncompete Clause Gets a Closer Look*, Wall St. J., Jul. 21, 2021, *https://www.wsj.com/articles/the-noncompete-clause-gets-a-closer-look-11626872430*.

[34] *See* Part I.B.2. As described therein, this is likely a conservative estimate.

[35] *See* Part IV.B.2.b.i.

[36] *See id.*

[37] *See* Part IX.C.2.

and the conditions under which their use may be inconsistent with the antitrust laws.'' [38] In January 2020, the Commission held a public workshop on non-competes. The speakers and panelists who participated in the workshop—and the hundreds of public comments the Commission received in response to the workshop—addressed a wide range of issues, including statutory and judicial treatment of non-competes; the economic literature regarding the effects of non-competes; and whether the Commission should initiate a Federal rulemaking on non-competes. [39] The Commission also sought public comment on non-competes as part of an August 2021 solicitation for public comment on contract terms that may harm competition and a December 2021 public workshop on competition in labor markets. [40] The Commission has also addressed non-competes in connection with its merger review work. [41]

In 2021, the Commission initiated investigations into the use of non-competes. In 2023, the Commission secured final consent orders settling charges that certain firms engaged in an unfair method of competition in violation of section 5 because their use of non-competes tended to impede rivals' access to the restricted employees' labor, harming workers, consumers, and competitive conditions. [42]

The Commission also secured a final consent order settling charges that another firm violated section 5 by using non-competes with its employees. [43] The

Commission's complaint alleged the firm's imposition of non-competes took advantage of the unequal bargaining power between the firm and its employees, including low-wage security guard employees, and thus reduced workers' job mobility; limited competition for workers' services; and ultimately deprived workers of higher wages and more favorable working conditions. [44]

Based on the feedback obtained from years of extensive public outreach and fact-gathering, in January 2023, the Commission published a notice of proposed rulemaking (NPRM) concerning non-competes. [45] The proposed rule would have categorically banned employers from using non-competes with all workers and required rescission of all existing non-competes. [46]

In response to the NPRM, the Commission received over 26,000 public comments. [47] The comments reflected a diverse cross-section of the U.S. The Commission received comments from employers and workers in a wide range of industries and from every State; [48] from small, medium, and large businesses; and from workers with wide-ranging income levels. [49] The Commission also received comments from representatives of different industries through trade and professional groups as well as from

academics and researchers. Federal, State, and local governmental representatives also submitted public comments.

Among these comments, over 25,000 expressed support for the Commission's proposal to categorically ban non-competes. Among the public commenters were thousands of workers who described how non-competes prevented them from taking a better job or starting a competing business, as well as numerous small businesses who struggled to hire talented workers. Commenters stated that non-competes have suppressed their wages, harmed working conditions, negatively affected their quality of life, reduced the quality of the product or service their company provided, prevented their business from growing and thriving, and created a climate of fear that deters competitive activity. The following examples are illustrative of the comments the Commission received: [50]

• I currently work in sales for an asphalt company in Michigan. The company had me sign a two year non-compete agreement to not work for any other asphalt company within 50 miles if I decide to resign. After two years with the company I have been disheartened at how poorly customers are being treated and how often product quality is sub-par. I would love to start my own business because I see this as an opportunity to provide a better service at a lower cost. However, the non-compete agreement stands in the way even though there are no trade secrets and too many customers in this market. [51]

• [I] signed a non-compete clause for power-washing out of duress. My boss said that if I didn't sign before the end of the week, not to come in the next week. . . . I'd like to start my own business but I would have to find another job and wait 5 years. All I know is power-washing and these business owners all want me to sign a non-compete clause. It's one big circle of wealthy business owners keeping the little man down. Essentially, non-compete clauses limit an employee's opportunity to excel in whatever skill or trade they're familiar with. In the land of the free, we should be free to start a business not limited by greedy business owners. [52]

• In October 2020, I started working as a bartender at a company called [REDACTED] for $10 an hour. On my first day, I

---

[38] Hearings on Competition and Consumer Protection in the 21st Century, Notice, 83 FR 38307, 38309 (Aug. 6, 2018).

[39] FTC, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues* (Jan. 9, 2020), *https://www.ftc.gov/news-events/events/2020/01/non-competes-workplace-examining-antitrust-consumer-protection-issues.*

[40] FTC, *Solicitation for Public Comments on Contract Terms that May Harm Competition* (Aug 5, 2021), *https://www.regulations.gov/document/FTC-2021-0036-0022;* FTC, *Making Competition Work: Promoting Competition in Labor Markets* (Dec. 6–7, 2021), *https://www.regulations.gov/docket/FTC-2021-0057/comments.*

[41] *See* NPRM at 3498–99.

[42] FTC, *FTC Approves Final Orders Requiring Two Glass Container Manufacturers to Drop Noncompete Restrictions That They Imposed on Workers* (Feb. 23, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-approves-final-orders-requiring-two-glass-container-manufacturers-drop-noncompete-restrictions;* FTC, Press Release, *FTC Approves Final Order Requiring Anchor Glass Container Corp. to Drop Noncompete Restrictions That It Imposed on Workers* (June 2, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/06/ftc-approves-final-order-requiring-anchor-glass-container-corp-drop-noncompete-restrictions-it.*

[43] FTC, Press Release, *FTC Approves Final Order Requiring Michigan-Based Security Companies to*

*Drop Noncompete Restrictions That They Imposed on Workers* (Mar. 8, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-approves-final-order-requiring-michigan-based-security-companies-drop-noncompete-restrictions.*

[44] FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In re Prudential Sec., Inc. et al.* at 1 (Jan. 4, 2023).

[45] NPRM, *supra* note 1.

[46] *Id.* at 3482–83.

[47] The public comments are available online. *See Regulations.gov,* Non-Compete Clause Rule (NPRM), FTC–2023–0007, *https://www.regulations.gov/docket/FTC-2023-0007/comments.* The Commission cannot quantify the number of individuals or entities represented by the comments. The number of comments undercounts the number of individuals or entities represented by the comments because many comments, including comments from different types of organizations, jointly represent the opinions or interests of many.

[48] This reflects information provided by commenters. Commenters self-identify their State and are not required to include geographic information.

[49] Though most commenters identifying as workers did not provide information regarding their income or compensation levels, many provided information about their particular jobs or industries from which the Commission was able to infer a broad range of income levels based on occupational data from the Bureau of Labor Statistics ("BLS"). BLS wage data for each year can be found at Occupational Employment and Wage Statistics, *Tables Created by BLS, https://www.bls.gov/oes/tables.htm* (hereinafter "BLS Occupational Employment and Wage Statistics"). The Commission used data from the May 2022 National XLS table, generally for private ownership.

[50] To be clear, the Commission does not rely on any particular individual comment submission for its findings, but rather provides here (and throughout this final rule) examples of comments that were illustrative of themes that spanned many comments. The Commission's findings are based on consideration of the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition.

[51] Individual commenter, FTC–2023–0007–2215. Comment excerpts have been cleaned up for grammar, spelling, and punctuation.

[52] Individual commenter, FTC–2023–0007–12689.

**JA0003**

unknowingly signed a 2-year non-compete, slipped between other paperwork while my boss rushed me, and downplayed its importance. . . . At [REDACTED], I was sexually harassed and emotionally abused. I needed money, so I searched for a new job while remaining at [REDACTED] for one year. I was eventually offered a bartending job at a family-owned bar with better wages, conditions, and opportunities. Upon resigning, I was threatened with a non-compete I didn't know existed. Still, I couldn't take it anymore, so believing it was an unenforceable scare tactic, I took the new job, thinking our legal system wouldn't allow a massive company with over 20 locations to sue a young entry-level worker with no degree. In December 2021, I was sued for $30,000 in ''considerable and irreparable damages'' for violating the non-compete. . . .[53]

• I am a physician in a rural underserved area of Appalachia. . . . ''[N]on-compete'' clauses have become ubiquitous in the healthcare industry. With hospital systems merging, providers with aggressive non compete clauses must abandon the community that they serve if they chose to leave their employer. . . . Healthcare providers feel trapped in their current employment situation, leading to significant burnout that can shorten their career longevity. Many are forced to retire early or take a prolonged pause in their career when they have no other recourse to combat their employer.[54]

• I am a practicing physician who signed an employment contract containing a noncompete agreement in 2012, entering into this agreement with an organization that no longer exists. My original employer merged with, and was made subsidiary to, a new organization that is run under religious principles in conflict with my own. . . . I would have never signed such an agreement with my new employer, yet I am bound to this organization under threat of legal coercion. To be clear, the forced compromise of my religious principles does direct harm to me. My only recourse to this coercion is to give up medical practice anywhere covered by my current medical license, which is injurious to the patients in my care, and to myself.[55]

• I am the owner of a small-midsize freight brokerage, and non-competes of large brokerages have time and time again constrained talent from my business. Countless employees of [a] mega brokerage . . . have left and applied for our company and we must turn them away. These are skilled brokers that are serving the market and their clients well due to THEIR skillsets. . . . These non-competes affect not just me but the clients they work with as these skilled brokers are forced out of the entire logistics market for an entire year and possibly a lifetime when they pick up a new career in a different field because of these aggressive non-competes. . . .[56]

• I was laid off from my company in 2008 due to the economy, not to any fault of my own. However, when I was offered a job at another company, my former company threatened them and my offer was rescinded. I was unable to find gainful employment for months, despite opportunities in my field, and had to utilize unemployment when I otherwise would not have needed it. To find work, I ultimately had to switch fields, start part time somewhere, and just continue to work my way up. All of this because I was laid off to no fault of my own.[57]

• I was terminated by a large hospital organization suddenly with a thriving, full Pediatric practice. . . . My lawyer and I believe the non-compete does not apply in my circumstances and that the noncompete is overly broad, restrictive and harmful to the public (my patients). I started seeing my patients mostly gratuitously in their homes so they would not go without the care they wanted and needed . . . The judge awarded the order and I was told I cannot talk to patients on the phone, text patients, zoom visits or provide any pediatric care within my non-compete area. Patients are angry and panicked. I'm worried every day about my patients and how I can continue to care for them. . . . Patients have a right to choose and keep their doctor. The trust built between a patient and his doctor is crucial to keeping a patient healthy. It's not a relationship that can or should be replaced. . . . Patients should always come first and that is not happening.[58]

• When I first graduated veterinary school I signed a noncompete clause that was for 7 years. I tried to negotiate it to a more reasonable time period but the employer wouldn't budge. There weren't many job openings for new graduates at the time and I had student loans to pay back so I signed it. . . . I moved back home to a small town and took a job that required a 10-radial-mile, 2-year noncompete (this is currently considered ''reasonable/standard'' in my industry). Unfortunately since it's a rural area the 10 miles blocked me out of the locations of all other veterinary clinics in the county and I had to commute an hour each way to work in the next metropolitan area. This put a lot of stress on my family since I have young children. Some days I didn't even get to see them when they were awake.[59]

• I work for a large electronic health records company . . . that is known for hiring staff right out of college, myself included. I was impressed with their starting salary and well-advertised benefits, so I was quick to accept their offer. After accepting their offer, I was surprised to receive a contract outlining a strict non-compete agreement . . . I feel disappointed that this information was not made apparent to me prior to my acceptance of the position, and now I feel stuck in a job that I've quickly discovered is not a good long-term fit for me. I am certain that many other recent graduates often find themselves in a similar position— they accept shiny offers from a workplace, not knowing whether the company and position will be the right fit for them, and find themselves trapped by such contracts as mine.[60]

• Non competes are awful. I am being sued right now for going into business on my own in Boston, Massachusetts, by my former employer who says I signed a non-compete in 2003, 20 years ago. . . . I am fighting them in court. Hopefully I will prevail. . . . [The] corporation I worked for is a billion-dollar corporation. And they just keep trying scare tactics to make me back down. They went as far as trying to get a preliminary injunction ordered against me. And the judge refused but I still have to spend $1,000 an hour to defend myself.[61]

• I have been working in the field of multi-media in the DC/Baltimore region since the early 2000s. . . . I was 26 when I first became employed, and at that time a requirement was that I sign a non-compete agreement. . . . This means I can't be an entrepreneur- which kills any opportunities for me to grow something of my own- which could potentially provide jobs for others in the future. So what this non-compete does is basically enables businesses to be small monopolies. I could literally have a new lease on my career if non competes were abolished. As of now, when I think of working someplace else I have to consider changing careers altogether.[62]

• A former employer had me sign a non-compete when I started employment at an internship in college. It was a part-time position of 20 hours of work as an electrical engineer, while I finished university. After university, I worked for this employer another 4 years full time, but then found a better job in another state. It was not a competitor, but a customer of my former employer. My former employer waited till the day after my 4-week notice to tell me that I had signed a non-compete agreement and that it [barred] me from working for any competitor, customer or any potential customer up to 5 years after leaving the company with no geographic limitations. This was effectively the entire semi-conductor industry and put my entire career at risk.[63]

• Non-competes serve little more purpose than to codify and entrench inefficiencies. I have seen this firsthand in the context of a sophisticated management consulting environment where company owners provided ever less support in terms of contributing to projects or even to sales of new business while still feeling secure through agreements that substantially limited anyone from working in the relevant industry for two years on a global basis after leaving. . . . The reality is that there are innumerable retention mechanisms (such as good working conditions, compensation, culture, management, growth trajectory and/or strategy) that can contribute to loyal employees without the need for non-competes.[64]

The Commission has undertaken careful review of the public comments

[53] Individual commenter, FTC–2023–0007–8852.
[54] Individual commenter, FTC–2023–0007–0026.
[55] Individual commenter, FTC–2023–0007–9671.
[56] Individual commenter, FTC–2023–0007–6142.
[57] Individual commenter, FTC–2023–0007–15497.
[58] Individual commenter, FTC–2023–0007–14956.
[59] Individual commenter, FTC–2023–0007–0922.
[60] Individual commenter, FTC–2023–0007–10729.
[61] Individual commenter, FTC–2023–0007–10871.
[62] Individual commenter, FTC–2023–0007–10968.
[63] Individual commenter, FTC–2023–0007–16347.
[64] Individual commenter, FTC–2023–0007–3963.

**38346**    **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

and the entirety of the rulemaking record. Based on this record and the Commission's experience and expertise in competition matters, the Commission issues this final rule pursuant to its authority under sections 5 and 6(g) of the FTC Act.

2. Prevalence of Non-Competes

Based on its own data analysis, studies published by economists, and the comment record, the Commission finds that non-competes are in widespread use throughout the economy and pervasive across industries and demographic groups, albeit with some differences in the magnitude of the prevalence based on industries and demographics. The Commission estimates that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete.[65]

As described in Part II.F, the inquiry as to whether conduct is an unfair method of competition under section 5 focuses on the nature and tendency of the conduct, not whether or to what degree the conduct caused actual harm.[66] Although a finding that non-competes are prevalent is not necessary to support the Commission's determination that the use of non-competes by employers is an unfair method of competition, the Commission finds that non-competes are prevalent and in widespread use throughout the economy, which is why researchers have observed such significant negative actual effects from non-competes on competitive conditions in labor markets and markets for products and services.[67]

A 2014 survey of workers finds that 18% of respondents work under a non-compete and 38% of respondents have worked under one at some point in their lives.[68] This study has the broadest and likely the most representative coverage of the U.S. labor force among the prevalence studies discussed here.[69] This study reports robust results contradicting the prior assumptions of some that non-competes were, in most cases, bespoke agreements with

sophisticated and highly-paid workers. It finds that, among workers without a bachelor's degree, 14% of respondents reported working under a non-compete at the time surveyed and 35% reported having worked under one at some point in their lives.[70] For workers earning less than $40,000 per year, 13% of respondents were working under a non-compete and 33% worked under one at some point in their lives.[71] Furthermore, this survey finds that 53% of workers covered by non-competes are hourly workers.[72] The survey suggests that a large share of workers subject to non-competes are relatively low-earning workers. In addition, a survey from the Federal Reserve Board of Governors found that 11.4% of workers have non-competes, including workers with relatively low earnings and low levels of education. The survey finds some degree of geographic heterogeneity, though it finds that large numbers of workers in all regions of the country have non-competes (including 7.0% of workers in States which broadly do not enforce non-competes).[73]

Furthermore, a survey of workers conducted in 2017 estimates that 24.2% of workers are subject to a non-compete.[74] This survey also finds that non-competes are often used together with other restrictive employment agreements, including non-disclosure agreements ("NDAs") and non-recruitment and non-solicitation agreements.[75] A methodological limitation of this survey is that it is a convenience sample of individuals who visited *Payscale.com* during the time period of the survey and is therefore unlikely to be fully representative of the U.S. working population. While weighting based on demographics helps, it does not fully mitigate this concern.

Additionally, a 2017 survey of business establishments with 50 or more employees estimates that 49% of such

establishments use non-competes for at least some of their employees, and 32% of such establishments use non-competes for all of their employees.[76]

Other estimates of non-compete use cover subsets of the U.S. labor force. One 2022 study is based on National Longitudinal Survey of Youth (NLSY) data.[77] The NLSY is an often-used labor survey conducted by the Bureau of Labor Statistics ("BLS") that consists of a nationally representative sample of 8,984 men and women born from 1980–84 and living in the U.S. at the time of the initial survey in 1997; it is a subset of the workforce by age of worker.[78] The 2022 study using NLSY data reports prevalence of non-competes to be 18%, in line with the number estimated based on the 2014 survey of workers directed solely at calculating the prevalence of non-competes.[79]

Non-competes are pervasive across occupations. For example, a survey of independent hair salon owners finds that 30% of hair stylists worked under a non-compete in 2015.[80] A survey of electrical and electronic engineers finds that 43% of respondents signed a non-compete.[81] A different study finds that 45% of physicians worked under a non-compete in 2007.[82] One study published in 2021 finds that 62% of CEOs worked under a non-compete between 1992 and 2014.[83] Another, published in 2023, supports that finding and reflects an upward trend in the use of non-competes among executives—specifically, the proportion of executives working under a non-compete rose from "57% in the early 1990s to 67% in the mid-2010s." [84] The 2014 survey reports industry-specific rates ranging from 9% in the Agriculture and Hunting category to 32% in the

---

[65] This is likely a conservative estimate. Surveys of workers likely underreport the share of workers subject to non-competes, since many workers may not know they are subject to a non-compete. *See, e.g.,* Alexander J.S. Colvin & Heidi Shierholz, Econ. Policy Inst., *Noncompete Agreements,* Report (Dec. 10, 2019) at 3.

[66] *See infra* note 288 and accompanying text.

[67] *See* Parts IV.A through IV.C (describing this evidence).

[68] Evan P. Starr, J.J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the US Labor Force,* 64 J. L. & Econ. 53, 53 (2021).

[69] The final survey sample of 11,505 responses represented individuals from nearly every demographic in the labor force. *Id.* at 58.

[70] *Id.* at 63.

[71] *Id.*

[72] Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements,* 68 Mgmt. Sci. 143, 144 (2022) (analyzing data from the Starr, Prescott, & Bishara survey).

[73] Tyler Boesch, Jacob Lockwood, Ryan Nunn, & Mike Zabek, *New Data on Non-Compete Contracts and What They Mean for Workers* (2023), *https://www.minneapolisfed.org/article/2023/new-data-on-non-compete-contracts-and-what-they-mean-for-workers.*

[74] Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Employment Restrictions on Resource Transferability and Value Appropriation from Employees* (Jan. 18, 2024), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3814403.*

[75] *Id.* at 11 (reporting that if a worker has a non-compete, there is a 70%–75% chance that all three restrictive covenants are present).

[76] Colvin & Shierholz, *supra* note 65 at 1.

[77] Donna S. Rothstein & Evan Starr, *Noncompete Agreements, Bargaining, and Wages: Evidence from the National Longitudinal Survey of Youth 1997,* June 2022 Mthly. Lab. Rev. (2022).

[78] BLS, *NLSY97 Data Overview, https://www.bls.gov/nls/nlsy97.htm.*

[79] Rothstein & Starr, *supra* note 77 at 1.

[80] Matthew S. Johnson & Michael Lipsitz, *Why Are Low-Wage Workers Signing Noncompete Agreements?,* 57 J. Hum. Res. 689, 700 (2022).

[81] Matt Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals,* 76 a.m. Socio. Rev. 695, 702 (2011). Calculated as 92.60% who signed a non-compete of the 46.80% who were asked to sign a non-compete.

[82] Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians,* 55 J. Hum. Res. 1025, 1042 (2020).

[83] Omesh Kini, Ryan Williams, & Sirui Yin, *CEO Noncompete Agreements, Job Risk, and Compensation,* 34 Rev. Fin. Stud. 4701, 4707 (2021).

[84] Liyan Shi, *Optimal Regulation of Noncompete Contracts,* 91 Econometrica 425, 447 (2023).

Information category.[85] The Balasubramaian et al. survey reports industry-specific rates ranging from 12% in the Arts, Entertainment, and Recreation category to 30% in the Professional, Scientific, and Technical category.[86] The same survey also reports occupation-specific rates ranging from 8% in the Community and Social Services category to 32% in the Computer and Mathematical category.[87]

In addition, commenters presented survey data on the prevalence of non-competes in various occupations and industries. The Commission does not rely on these surveys to support its finding that non-competes are in widespread use throughout the economy. Because the Commission lacked access to a detailed description of the methodology for these surveys (unlike for the surveys described previously), the Commission cannot evaluate how credible their research designs are. However, they generally confirm the Commission's finding that non-competes are in widespread use throughout the economy and pervasive across industries and demographic groups.

For example, commenters reported that 33% of practitioners in the applied behavioral analysis field reported being subject to a non-compete,[88] along with 68% of cardiologists,[89] 42% of colorectal surgeons,[90] 72% of members of the American Association of Hip and Knee Surgeons,[91] and 31% of wireless telecommunications retail workers.[92] Other commenters cited a 2019 study finding that 29% of businesses where the average wage is below $13 per hour use non-competes for all their workers.[93]

Several trade organizations included information in their comments about the percentage of their members that use non-competes for at least some of their workers, based on surveys of their membership. For the National Association of Wholesaler-Distributors, this figure was 80%;[94] for the Independent Lubricant Manufacturing Association, 69%;[95] for the Michigan Chamber of Commerce, 73%;[96] for the Gas and Welding Distributors Association, 80%;[97] and for the National Association of Manufacturers, 70%.[98] One industry organization said its survey found that 57% of respondents require workers earning over $150,000 to sign non-competes.[99] A survey by the Authors Guild finds that 19.2% of respondents reported that non-competes prevented them from publishing a similar or competing book.[100] The HR Policy Association stated that 75% of respondents indicated they use non-competes for less than 10% of their workers, and nearly one third indicated they use non-competes for less than 1% of their workers.[101] The association stated that its survey covered 3 million workers and argued that its survey finding less usage of non-competes was more representative than studies cited in the NPRM.[102] However, the commenter did not provide the data underlying its claims. The Retail Industry Leaders Association stated that a recent survey of its members indicated that, among members that use non-competes, the majority do so with less than 1% of their workforce and an additional quarter use non-competes with less than 10% of their workforce.[103] Additionally, a commenter referenced a survey of small business owners finding that 48% use non-competes for their own business.[104]

Several commenters misrepresented the Commission's finding related to prevalence as based on "a single study from 2021" (Starr, Prescott, and Bishara, 2021), which relied on survey data from 2014. The Commission's finding is not based on a single study. The NLSY study reaches similar conclusions about the prevalence of non-competes across the economy,[105] and the occupation-specific studies indicate that non-competes are pervasive in various occupations.[106] Furthermore, despite its methodological limitations, the data submitted by commenters generally comport with the estimates reported in the academic literature. One commenter stated the respondents to the Starr, Prescott, and Bishara survey were not necessarily representative of the population. The Commission believes that the weighting of the data sufficiently addresses this concern.

Another commenter argued that individuals may misunderstand contracts that they have signed, leading them to mistakenly believe they are bound by a non-compete. The Commission does not find this to be a plausible explanation for the high numbers of workers, businesses, and trade associations that report that non-competes are prevalent.

The Commission appreciates the additional estimates provided by commenters. The comments broadly corroborate the Commission's finding that non-competes are used across the workforce, with some heterogeneity in the magnitude of the prevalence. The

---

[85] Starr, Prescott, & Bishara, *supra* note 68 at 67.

[86] Balasubramanian et al., *supra* note 74 at 47.

[87] *Id.*

[88] Kristopher J. Brown, Stephen R. Flora, & Mary K. Brown, *Noncompete Clauses in Applied Behavior Analysis: A Prevalence and Practice Impact Survey*, 13 Behavioral Analysis Practice 924 (2020) (survey of 610 workers).

[89] Comment of Am. Coll. of Cardiology, FTC–2023–0007–18077, at 2. The comment did not provide a citation to the survey or the underlying data, including the number of respondents or the time period.

[90] William C. Cirocco. *Restrictive Covenants in Physician Contracts: An American Society of Colon and Rectal Surgeons' Survey*, 54 Diseases of the Colon and Rectum 482 (2011). The survey examined 157 colorectal surgeons who had completed their residency in the prior decade.

[91] Comment of Am. Ass'n of Hip and Knee Surgeons, FTC–2023–0007–21076, at 4. The comment said the internal poll was conducted in early 2023, but the comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[92] Comm. Workers of Am. and Nat'l Employment L. Project, *Broken Network: Workers Expose Harms of Wireless Telecom Carriers' Outsourcing to 'Authorized Retailers'* (Feb. 2023), *https://cwa-union.org/sites/default/files/2023/02/20230206_BrokenNetwork.pdf*, at 12. The survey had 204 respondents.

[93] Colvin & Shierholz, *supra* note 65 at 13.

[94] Comment of Nat'l Assoc. of Wholesaler-Distribs., FTC–2023–0007–19347, at 2. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[95] Comment of Indep. Lubricant Mfrs. Ass'n, FTC–2023–0007–19445, at 3. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[96] Calculated as 77%*95% (assuming that the 95% reported in their comment applies to the 77% who reported using restrictive covenants). Comment of Mich. Chamber of Com., FTC–2023–0007–20855. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[97] Comment of Gas and Welding Distribs. Ass'n, FTC–2023–0007–20934, at 2–3. The comment did not provide a citation to the survey or the underlying data. The comment said the survey took place after the NPRM was proposed and had 161 respondents.

[98] Comment of Nat'l Ass'n of Mfrs., FTC–2023–0007–20939, at 2 (citing Nat'l Ass'n of Mfrs., Noncompete Survey Data Report, *https://www.nam.org/wp-content/uploads/2023/03/Noncompete_Survey_Data_Report.pdf*). The survey had 150 respondents.

[99] Comment of Soc. for Hum. Res. Mgmt., FTC–2023–0007–20903, at 5 n.2. The comment did not provide a citation to the survey or the underlying data, including the number of respondents.

[100] Comment of The Authors Guild, FTC–2023–0007–20854, at 7. The comment did not provide a citation to the survey or the underlying data, but said it had 630 respondents.

[101] Comment of HR Policy Ass'n, FTC–2023–0007–20998, at 8.

[102] *Id.*

[103] Comment of Retail Indus. Leaders Ass'n, FTC–2023–0007–20989, at 6. The comment did not provide a citation to the survey or the underlying data, including the number of respondents or the time period.

[104] Comment of Sm. Bus. Majority, FTC–2023–0007–21093 (citing Small Business Majority, Opinion Poll: Small Business Owners Support Banning Non-Compete Agreements (Apr. 13, 2013), *https://smallbusinessmajority.org/sites/default/files/research-reports/2023-non-compete-poll-report.pdf*).

[105] See Rothstein & Starr, *supra* note 77 and accompanying text.

[106] See *supra* notes 80–87 and accompanying text.

Commission finds that this heterogeneity is insufficient to warrant industry-specific exclusions from coverage under the final rule in part because employers' use of non-competes is prevalent across labor markets and for the reasons discussed in Part V.D regarding requests for exclusions.

## II. Legal Authority

### A. The History of the Commission and Section 5 of the FTC Act

The FTC Act was enacted in 1914.[107] Section 5 of that Act "declared" that "unfair methods of competition in commerce" are "unlawful," and it "empowered and directed" the Commission "to prevent" entities subject to its jurisdiction from "using" such methods.[108] Congress removed certain enumerated industries, activities, or entities—such as banks [109]—from the Commission's jurisdiction but otherwise envisioned a Commission whose purview would cover commerce across the national economy.

The term "'unfair methods of competition' . . . was an expression new in the law" when it first appeared in the FTC Act.[110] Congress purposely introduced this phrase to distinguish the Commission's authority from the definition of "unfair competition" at common law. Because the "meaning which the common law had given to ['unfair competition'] was . . . too narrow," Congress adopted "the broader and more flexible phrase 'unfair methods of competition.' " [111] Using this new phrase also made clear that Congress designed section 5 to extend beyond the reach of other antitrust laws—most notably, the Sherman Act—whose text did not include the term

"unfair methods of competition." [112] In particular, Congress wanted the Commission to apply a standard that would reach conduct not captured by other antitrust laws and the rule of reason, which courts applied when interpreting the Sherman Act, making it "impossible to predict with any certainty" whether courts would condemn the many "practices that seriously interfere with competition." [113] Allowing the Commission to prevent unfair methods of competition would also help the Commission achieve a core purpose of the Act: to stop "trade restraints in their incipiency" before they grew into violations of other antitrust laws.[114]

By design, the new phrase "unfair methods of competition" did "not 'admit of precise definition.' " [115] Congress intentionally gave the Commission flexibility to adapt to changing circumstances.[116] The Supreme Court has affirmed the more inclusive scope of section 5 on numerous occasions [117] and has affirmed the Commission's power under the Act to condemn coercive and otherwise unfair practices that have a tendency to stifle or impair competition.[118] Federal appellate courts have likewise consistently held that the Commission's authority under section 5 extends beyond "the letter" of other antitrust laws.[119]

Congress further expanded the Commission's jurisdiction over time. Congress extended the Commission's authority in 1938 by adding the further

prohibition on "unfair or deceptive acts or practices." [120] And in 1975, Congress amended the phrase "in commerce" in section 5 to "in or affecting commerce," a change that was "specifically designed to expand the Commission's jurisdiction . . . to make it coextensive with the constitutional power of Congress under the Commerce Clause." [121]

Congress gave careful thought to the structure of the FTC as an independent agency entrusted with this considerable responsibility. The Commission would consist of five members, no more than three of whom could be part of the same political party, who would serve for terms of seven years.[122] The Commission would draw on trained expert staff to develop the body of law regarding what constitutes unfair methods of competition (and, later, unfair and deceptive practices),[123] both through acting as "a quasi judicial body" [124] that determines whether conduct is an unfair method of competition in adjudications and through authority to promulgate legislative rules delineating conduct that constitutes an unfair method of competition. Recognizing that the Commission is an expert agency in making such determinations about anticompetitive conduct, courts reviewing Commission determinations as to what practices constitute an unfair method of competition have given the Commission's decisions "great weight." [125]

The FTC Act today reflects a careful balance from Congress. Congress has directed the Commission to proceed

---

[107] Federal Trade Commission Act of 1914, Public Law 63–203, 38 Stat. 717, 719 (hereinafter "FTC Act of 1914").

[108] FTC Act of 1914, 38 Stat. at 719. Section 5 is codified as amended at 15 U.S.C. 45. Congress later amended the term "in commerce" to "in or affecting commerce." The Supreme Court has explained that this amended phrase makes section 5 of the FTC Act "coextensive with the constitutional power of Congress under the Commerce Clause." *United States* v. *Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 277 n.6 (1975). For simplicity, this statement of basis and purpose often refers to "unfair methods of competition" without the commerce requirement, but the Commission acknowledges that it has power to prevent only such methods that are in or affect commerce as that term is defined in the Act. *See* 15 U.S.C. 44.

[109] *See* 15 U.S.C. 45(a)(2).

[110] *A.L.A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 532 (1935).

[111] *See* FTC v. *R. F. Keppel & Bro., Inc.*, 291 U.S. 304, 310–11 (1934); *see also Schechter Poultry*, 295 U.S. at 532.

[112] *See E.I. du Pont de Nemours v. FTC* (*Ethyl*), 729 F.2d 128, 136 (2d Cir. 1984) ("Congress' aim was to protect society against oppressive anti-competitive conduct and thus assure that the conduct prohibited by the Sherman and Clayton Acts would be supplemented as necessary and any interstices filled.").

[113] S. Rep. No. 62–1326, at 14 (1913) (hereinafter "Cummins Report"). After analyzing a series of Supreme Court decisions interpreting the Sherman Act—*e.g.*, *Standard Oil Co. of New Jersey* v. *United States*, 221 U.S. 1, 60 (1911)—the Senate committee feared that the rule of reason meant that "in each instance it [would be] for the court to determine whether the established restraint of trade is a due restraint or an undue restraint" and that this made it "imperative to enact additional legislation." Cummins Report at 11–12.

[114] *FTC v. Brown Shoe Co.*, 384 U.S. 316, 322 (1966); *see also FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394–95 (1953).

[115] *R.F. Keppel & Bro.*, 291 U.S. at 312.

[116] *Id.* at 311 n.2.

[117] *See, e.g., id.* at 311; *A.L.A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 532 (1935); *Brown Shoe Co.*, 384 U.S. at 320–22.

[118] *FTC v. Texaco*, 393 U.S. 223, 225–26 (1968) (citing *Atl. Refin. Co.* v. *FTC*, 381 U.S. 357, 376 (1965)).

[119] *Spiegel, Inc.* v. *FTC*, 540 F.2d 287, 292 (7th Cir. 1976) (quoting *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972)); *cf., Chuck's Feed & Seed Co.* v. *Ralston Purina Co.*, 810 F.2d 1289, 1292–93 (4th Cir. 1987).

[120] Federal Trade Commission Act, Public Law 447, 75th Cong., 3d Sess. (March 21, 1938) c. 49; 52 Stat. 111 (1938).

[121] *United States* v. *Am. Bldg. Maintenance Indus.*, 422 U.S. 271, 277 n.6 (1975). As noted, the Commission's authority does not reach certain enumerated industries or activities—a list that has also grown over time. *See* 15 U.S.C. 45(a)(2); *see also* Part II.E.1. Some of these industries are statutorily prohibited from engaging in unfair or deceptive practices or unfair methods of competition under different laws overseen by other agencies. *See, e.g.*, 49 U.S.C. 41712(a) (allowing the Secretary of Transportation to "decide whether an air carrier, foreign air carrier, or ticket agent" has engaged in such conduct).

[122] 15 U.S.C. 41.

[123] *Id.* (anticipating that the Commission would "build up a comprehensive body of information for the use and advantage of the Government and the business world"); *id.* at 11,092 ("[W]e want trained experts; we want precedents; we want a body of administrative law built up.").

[124] *A.L.A. Schechter Poultry Corp.* v. *United States*, 295 U.S. 495, 533 (1935).

[125] *FTC v. Cement Inst.*, 333 U.S. 683, 720 (1948); *Atl. Ref. Co.* v. *FTC*, 381 U.S. 357, 368 (1965); *FTC v. Texaco*, 393 U.S. 223, 226 (1968); *Official Airline Guides, Inc.* v. *FTC*, 630 F.2d 920, 927 (2d. Cir. 1980) (quoting *Cement Inst.*, 333 U.S. at 720); *see also FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 396 (1953); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986).

against a broader range of anticompetitive conduct than other antitrust laws like the Sherman and Clayton Acts can reach. On the other hand, Congress has never established a private right of action under section 5,[126] nor has it authorized the Commission to recover civil penalties or other monetary relief from parties who engage in unfair methods of competition.[127] Instead, the Commission may either pursue an adjudication under section 5(b) or seek an injunction in Federal court under section 13(b) against a party that has engaged in an unfair method of competition.[128] As explained below, it may also promulgate rules prohibiting unfair methods of competition. The Commission cannot obtain civil penalties or other monetary relief against parties for using an unfair method of competition, although it can obtain civil penalties in court if a party is ordered to cease and desist from a violation and fails to do so.[129]

*B. The Commission's Authority To Promulgate the Rule*

Alongside section 5, Congress adopted section 6(g) of the Act, in which it authorized the Commission to "make rules and regulations for the purpose of carrying out the provisions of" the FTC Act, which include the Act's prohibition of unfair methods of competition.[130] The plain text of section 5 and section 6(g), taken together, empower the Commission to promulgate rules for the purpose of preventing unfair methods of competition. That includes legislative rules defining certain conduct as an unfair method of competition.

The Commission has exercised its authority under section 6(g) to promulgate legislative rules on many occasions stretching back more than half a century. Between 1963 and 1978,[131]

the Commission relied on section 6(g) to promulgate the following rules: (1) a rule declaring it an unfair method of competition ("UMC") and an unfair or deceptive act or practice ("UDAP") to mislead consumers about the size of sleeping bags by representing that the "cut size" represents the finished size;[132] (2) a rule declaring it a UMC and UDAP to use the word "automatic" or similar words to describe household electric sewing machines;[133] (3) a rule declaring it a UMC and UDAP to misrepresent nonprismatic instruments as prismatic;[134] (4) a rule declaring it a UMC and UDAP to advertise or market dry cell batteries as "leakproof;"[135] (5) a rule declaring it a UMC and UDAP to misrepresent the "cut size" as the finished size of tablecloths and similar products;[136] (6) a rule declaring it a UMC and UDAP to misrepresent that belts are made of leather if they are made of other materials;[137] (7) a rule declaring it a UMC and UDAP to represent used lubricating oil as new;[138] (8) a rule declaring it a UDAP to fail to disclose certain health warnings in cigarette advertising and on cigarette packaging ("Cigarette Rule");[139] (9) a rule declaring it a UMC and UDAP to fail to disclose certain features of light bulbs on packaging;[140] (10) a rule declaring it a UMC and UDAP to

misrepresent the actual size of the viewable picture area on a TV;[141] (11) a rule declaring a presumption of a violation of section 2(d) and (e) of the amended Clayton Act for certain advertising and promotional practices in the men's and boy's clothing industry;[142] (12) a rule declaring it a UMC and UDAP to fail to make certain disclosures about the handling of glass fiber products and contact with certain products containing glass fiber;[143] (13) a rule declaring it a UMC and UDAP to make certain misrepresentations about transistors in radios;[144] (14) a rule declaring it a UDAP to fail to disclose certain effects about inhaling certain aerosol sprays;[145] (15) a rule declaring it a UMC and UDAP to misrepresent the length or size of extension ladders;[146] (16) a rule declaring it a UDAP to make certain misrepresentations, or fail to disclose certain information, about games of chance;[147] (17) a rule declaring it a UMC and UDAP to mail unsolicited credit cards;[148] (18) a rule declaring it a UMC and UDAP to fail to disclose the minimum octane number on gasoline pumps ("Octane Rule");[149] (19) a rule declaring it a UMC and UDAP to sell finished articles of clothing without a permanent tag or label disclosing care and maintenance

---

[126] *See, e.g., Holloway* v. *Bristol-Myers Corp.,* 485 F.2d 986, 988–89 (D.C. Cir. 1973); *Liu* v. *Amerco,* 677 F.3d 489, 492 (1st Cir. 2012).

[127] Congress has authorized the FTC to seek civil monetary remedies against parties who engage in unfair or deceptive acts or practices under some circumstances. *See* 15 U.S.C. 45(m); 15 U.S.C. 57b.

[128] *See* 15 U.S.C. 45(b); 15 U.S.C. 53(b).

[129] *See* 15 U.S.C. 45(l).

[130] 15 U.S.C. 46(g).

[131] As explained in more detail later in this Part, Congress added section 18 to the FTC Act in 1975, and that section provides the process the Commission must go through to promulgate rules defining unfair or deceptive acts or practices. *See* Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Public Law 93–637, 88 Stat. 2183 (Jan. 4, 1975) (hereinafter "Magnuson-Moss Act"); 15 U.S.C. 57a. Congress provided, however, that "[a]ny proposed rule under section 6(g) . . . with respect to which presentation of data, views, and arguments were substantially completed before" section 18 was enacted "may be

promulgated in the same manner and with the same validity as such rule could have been promulgated had" section 18 "not been enacted." 88 Stat. 2198; 15 U.S.C. 57a note. This list therefore includes a handful of rules promulgated under section 6(g) but after 1975 because those rules were substantially completed before section 18's enactment.

[132] Advertising and Labeling as to Size of Sleeping Bags, 28 FR 10900 (Oct. 11, 1963), *repealed by* 60 FR 65528 (Dec. 20, 1995).

[133] Misuse of "Automatic" or Terms of Similar Import as Descriptive of Household Electric Sewing Machines, 30 FR 8900 (Jul. 15, 1965), *repealed by* 55 FR 23900 (June 13, 1990).

[134] Deception as to Nonprismatic and Partially Prismatic Instruments Being Prismatic Binoculars, 29 FR 7316 (Jun. 5, 1964), *repealed by* 60 FR 65529 (Dec. 20, 1995).

[135] Deceptive Use of "Leakproof," "Guaranteed Leakproof," etc., as Descriptive of Dry Cell Batteries, 29 FR 6535 (May 20, 1964), *repealed by* 62 FR 61225 (Nov. 17, 1997).

[136] Deceptive Advertising and Labeling as to Size of Tablecloths and Related Products, 29 FR 11261 (Aug. 5, 1964), *repealed by* 60 FR 65530 (Dec. 20, 1995).

[137] Misbranding and Deception as to Leather Content of Waist Belts, 29 FR 8166 (Jun. 27, 1964), *repealed by* 61 FR 25560 (May 22, 1996).

[138] Deceptive Advertising and Labeling of Previously Used Lubricating Oil, 29 FR 11650 (Aug. 14, 1964), *repealed by* 61 FR 55095 (Oct. 24, 1996).

[139] Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 FR 8324 (July 2, 1964), *repealed by* 30 FR 9485 (July 29, 1965). As explained in more detail herein, Congress superseded this rule with legislation.

[140] Incandescent Lamp (Light Bulb) Industry, 35 FR 11784 (Jul. 23, 1970), *repealed by* 61 FR 33308 (Jun. 27, 1996).

[141] Deceptive Advertising as to Sizes of Viewable Pictures Shown by Television Receiving Sets, 31 FR 3342 (Mar. 3, 1966), *repealed by* 83 FR 50484 (Oct. 9, 2018).

[142] Discriminatory Practices in Men's and Boys' Tailored Clothing Industry, 32 FR 15584 (Nov. 9, 1967), *repealed by* 59 FR 8527 (Feb. 23, 1994).

[143] Failure to Disclose that Skin Irritation May Result from Washing or Handling Glass Fiber Curtains and Draperies and Glass Fiber Curtain and Drapery Fabrics, 32 FR 11023 (Jul. 28, 1967), *repealed by* 60 FR 65532 (Dec. 20, 1995).

[144] Deception as to Transistor Count of Radio Receiving Sets, Including Transceivers, 33 FR 8446 (Jun. 7, 1968), *repealed by* 55 FR 25090 (Jun. 20, 1990).

[145] Failure to Disclose the Lethal Effects of Inhaling Quick-Freeze Aerosol Spray Products Used for Frosting Cocktail Glasses, 34 FR 2417 (Feb. 20, 1969), *repealed by* 60 FR 66071 (Dec. 21, 1995).

[146] Deceptive Advertising and Labeling as to Length of Extension Ladders, 34 FR 929 (Jan. 22, 1969), *repealed by* 60 FR 65533 (Dec. 20, 1995).

[147] Games of Chance in the Food Retailing and Gasoline Industries, 34 FR 13302 (Aug. 16, 1969), *repealed by* 61 FR 68143 (Dec. 27, 1996).

[148] Unsolicited Mailing of Credit Cards, 35 FR 4614 (Mar. 17, 1970), *repealed by* 36 FR 45 (Jan. 5, 1971). This rule was rescinded in response to an amendment to the Truth in Lending Act that prohibited similar conduct. *See* Public Law 91–508, 84 Stat. 1126 (1970).

[149] Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 FR 23871 (Dec. 16, 1971), *repealed by* 43 FR 43022 (Sept. 22, 1978). This rule was superseded by the Petroleum Marketing Practices Act, Public Law 95–297, 92 Stat. 333 (June 19, 1978). A similar regulation was promulgated under that law at 16 CFR part 306.

instructions; [150] (20) a rule declaring a UMC and UDAP for a grocery store to offer products for sale at a stated price if those products will not be readily available to consumers ("Unavailability Rule"); [151] (21) a rule declaring it a UMC and UDAP for a seller to fail to make certain disclosures in connection with a negative option plan ("Negative Options Rule"); [152] (22) a rule declaring it a UDAP for door-to-door sellers to fail to furnish certain information to buyers; [153] (23) a rule declaring it a UMC and UDAP to fail to make certain disclosures about sound power amplification for home entertainment products; [154] (24) a rule declaring it a UDAP for sellers failing to include certain contract provisions preserving claims and defenses in consumer credit contracts ("Holder Rule"); [155] (25) a rule declaring it a UMC and UDAP to solicit mail order merchandise from a buyer unless the seller can ship the merchandise within 30 days ("Mail Order Rule"); [156] and (26) a rule declaring it a UDAP for a franchisor to fail to furnish a franchisee with certain information. [157]

Some of these rules attracted significant attention. For instance, the Commission began the rulemaking process to require warnings on cigarette packages just one week after the Surgeon General's "landmark report" that determined smoking is a health hazard, [158] and that rule was front-page news. [159] Following a lobbying campaign by the tobacco industry, [160] Congress supplanted the Commission's rulemaking with the Cigarette Labeling and Advertising Act but did not disturb the Commission's rulemaking authority. [161] The Unavailability Rule was likewise front-page news upon its release in 1971, and Congress left it intact. [162]

In *National Petroleum Refiners Association* v. *FTC* ("*Petroleum Refiners*"), the D.C. Circuit expressly upheld the Octane Rule as a proper exercise of the Commission's power under section 6(g) to make rules regulating both unfair methods of competition and unfair or deceptive acts or practices. [163] After construing "the words of the statute creating the Commission and delineating its powers," the court held "that under the terms of its governing statute . . . and under Section 6(g) . . . the Federal Trade Commission is authorized to promulgate rules defining the meaning of the statutory standards of the illegality the Commission is empowered to prevent." [164] That interpretation was also "reinforced by the construction courts have given similar provisions in the authorizing statutes of other administrative agencies." [165] The Seventh Circuit later agreed with the D.C. Circuit's decision and "incorporate[d] [it] by reference" when rejecting a challenge to the Mail Order Rule. [166]

Following such rulemakings and the D.C. Circuit's confirmation of the Commission's rulemaking power in *Petroleum Refiners,* Congress in 1975 enacted a new section 18 of the FTC Act. This new section introduced special procedures, beyond those required under the Administrative Procedure Act, for promulgating rules for unfair or deceptive acts or practices, and it eliminated the Commission's authority to issue such rules under section 6(g). [167] But Congress pointedly chose not to restrict the Commission's authority to promulgate rules regulating unfair methods of competition under section 6(g). That choice was deliberate. While considering this legislation, Congress knew that the Commission had promulgated rules regulating unfair methods of competition and that the D.C. Circuit in *Petroleum Refiners* had confirmed the Commission's authority to do so. [168] And Congress expressly considered—but rejected—an amendment to the FTC Act under which "[t]he FTC would have been prohibited from prescribing rules with respect to unfair competitive practices." [169]

Instead, the enacted section 18 confirmed the Commission's authority to make rules under section 6(g). The law expressly preserved "any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce." [170] Congress also made clear that Section 18 "shall not affect the validity of any rule which was promulgated under section 6(g)." [171] And it provided that "[a]ny proposed rule under section 6(g)" with certain components that were "substantially completed before" section 18's enactment "may be promulgated in the same manner and with the same validity as such rule could have been promulgated had this section not been enacted." [172] Among the substantially completed rules at the time was the Mail Order Rule, which proposed to define—and upon promulgation did define—certain conduct as both an unfair method of competition and an unfair or deceptive act or practice. [173] The 1975 legislation thus expressly permitted the Commission to promulgate a rule under section 6(g) that defined an unfair method of competition and evinces Congress's

---

[150] Care Labeling of Textile Wearing Apparel, 36 FR 23883 (Dec. 16, 1971).

[151] Retail Food Store Advertising and Marketing Practices, 36 FR 8777 (May 13, 1971).

[152] Use of Negative Option Plans by Sellers in Commerce, 38 FR 4896 (Feb. 22, 1973).

[153] Cooling-off Period for Door-to-Door Sales, 37 FR 22934 (Oct. 26, 1972).

[154] Power Output Claims for Amplifiers Used in Home Entertainment Products, 39 FR 15387 (May 3, 1974).

[155] Preservation of Consumers' Claims and Defenses, 40 FR 53506 (Nov. 18, 1975).

[156] Mail Order Merchandise, 40 FR 49492 (Oct. 22, 1975) (regulatory text); 40 FR 51582 (Nov. 5, 1975) (statement of basis and purpose). The Mail Order Rule has since been updated to become the Mail, internet, or Telephone Order Merchandise Rule, or MITOR. *See* 79 FR 55619 (Sept. 17, 2014). The updates to the rule were based on the Commission's authority to regulate unfair or deceptive acts or practices.

[157] Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 43 FR 59614 (Dec. 21, 1978).

[158] Teresa Moran Schwartz & Alice Saker Hrdy, *FTC Rulemaking: Three Bold Initiatives and Their Legal Impact,* 2–3 (Sept. 22, 2004).

[159] *U.S. to Require Health Warning for Cigarettes,* N.Y. Times (June 25, 1964) at 1, 15 (tobacco industry indicating plans to immediately challenge the Commission's authority to issue the regulation), *https://www.nytimes.com/1964/06/25/archives/us-to-require-health-warning-for-cigarettes-trade-commission-orders.html.*

[160] Tobacco Inst., *Tobacco—A Vital U.S. Industry* (1965), *https://acsc.lib.udel.edu/exhibits/show/legislation/cigarette-labeling.*

[161] Public Law 89–92, 79 Stat. 282 (July 27, 1965); *see* 15 U.S.C. 1331 *et seq.*

[162] *FTC Bars Grocery Ads for Unavailable Specials,* N.Y. Times (May 13, 1971) at 1, *https://www.nytimes.com/1971/05/13/archives/f-t-c-bars-grocery-ads-for-unavailable-specials-bars-grocery;* 16 CFR 424.1 and 424.2. The rule was amended after its enactment in 1971 to add an exception and defenses but otherwise remains intact as promulgated. Amendment to Trade Regulation Rule Concerning Retail Food Store Advertising and Marketing Practices, 54 FR 35456–08 (Aug. 28, 1989); *see also* Retail Food Store Advertising and Marketing Practices Rule, 79 FR 70053–01 (Nov. 25, 2014).

[163] *Nat'l Petroleum Refiners Ass'n* v. *FTC,* 482 F.2d 672 (D.C. Cir. 1973).

[164] *Nat'l Petroleum Refiners,* 482 F.2d at 674, 698; *see also Am. Fin. Servs. Ass'n* v. *FTC,* 767 F.2d 957, 967 (D.C. Cir. 1985) (concluding, after extensive review of the legislative history related to the FTC's rulemaking authority originating in 1914 and extending through amendments to the FTC Act in 1980, that "Congress has not at any time withdrawn the broad discretionary authority originally granted the Commission in 1914 to define unfair practices on a flexible, incremental basis.").

[165] *Nat'l Petroleum Refiners,* 482 F.2d at 678.

[166] *United States* v. *JS & A Grp., Inc.,* 716 F.2d 451, 454 (7th Cir. 1983).

[167] Magnuson-Moss Act, 88 Stat. 2183; *see* 15 U.S.C. 57a.

[168] S. Rep. No. 93–151, at 32 (1973).

[169] H.R. Conf. Rep. No. 93–1606, at 30 (1974).

[170] 15 U.S.C. 57a(a)(2).

[171] Magnuson-Moss Act, 88 Stat. 2183.

[172] Magnuson-Moss Act, 88 Stat. 2183.

[173] *See* Undelivered Mail Order Merchandise and Services, 36 FR 19092 (Sept. 28, 1971) (initial NPRM); 39 FR 9201 (Mar. 8, 1974) (amended NPRM); 40 FR 49492 (Oct. 22, 1975) (final regulatory text).

intent to leave in place the Commission's authority to promulgate such rules under section 6(g). As the Seventh Circuit later put it, "Congress . . . considered the controversy surrounding the Commission's substantive rulemaking power under Section 6(g) to have been settled by the *Octane Rating* case." [174]

Congress again confirmed the Commission's authority to promulgate rules regulating unfair methods of competition under section 6(g) when it enacted section 22 of the FTC Act as part of the Federal Trade Commission Improvements Act of 1980.[175] Section 22 imposes certain procedural requirements the Commission must follow when it promulgates any "rule." Section 22(a) defines "rule" as "any rule promulgated by the Commission under section 6 or section 18" while *excluding* from that definition "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice." [176] Thus, by its terms, section 22(a) demonstrates the 1980 Congress's understanding that the Commission maintained authority to promulgate rules under section 6 that are not merely "interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice." [177] Section 22 envisions rules that will have the force of law as legislative rules and defines "rule" based on whether it may "have an annual effect on the national economy of $100,000,000 or more," "cause a substantial change in the cost or price of goods or services," or "have a significant impact upon" persons and consumers.[178] Section 22(b) of the Act similarly contemplates authority to make legislative rules by imposing regulatory analysis obligations on any rules that the Commission promulgates under section 6.[179] The specific obligations in section 22(b), such as the requirement for the Commission to conduct a cost-benefit analysis, assume that section 6(g) authorizes substantive and economically significant rules.

Both the 1975 and 1980 amendments to the FTC Act thus indicate that Congress understood the Commission possessed substantive rulemaking power under section 6(g) and chose to leave that

authority in place.[180] As the Supreme Court has observed, "[t]he long time failure of Congress to alter" a statutory provision, like section 6(g) here, "after it had been judicially construed, and the enactment by Congress of legislation which implicitly recognizes the judicial construction as effective, is persuasive of legislative recognition that the judicial construction is the correct one." [181] That is especially true when, as here, "the matter has been fully brought to the attention of the public and the Congress, the latter has not seen fit to change the statute." [182] Were there any doubt that the 1914 Congress granted the Commission the authority to make rules under section 6(g) to prevent unfair methods of competition, the Congresses of 1975 and 1980 eliminated such doubt by ratifying the D.C. Circuit's decision holding that the Commission has such authority.

### C. Comments and Responses Regarding the Commission's Legal Authority

The Commission received many comments supporting, discussing, or questioning its authority to promulgate the final rule. Numerous commenters supported that the Commission has such authority, including, among others, legal scholars and businesses.[183] In addition, hundreds of small businesses—hailing from 45 States and the District of Columbia—joined a comment by the Small Business Majority supporting the final rule.[184]

Commenters questioning the Commission's authority typically advanced one of three arguments. First, some commenters claimed the FTC Act does not grant the Commission authority to promulgate the rule. Second, some commenters contended that the validity of non-competes is a major question that Congress has not given the Commission the authority to address. And third, some commenters argued that Congress had impermissibly delegated to the Commission authority to promulgate nationwide rules governing methods of competition. A smaller number of comments asserted other, miscellaneous reasons the Commission allegedly lacked authority

to promulgate the rule. The Commission has considered these comments and disagrees for the reasons explained below.

### 1. The Commission's Authority Under the FTC Act

The Commission received numerous comments claiming that it lacks authority under the FTC Act to promulgate rules prohibiting unfair methods of competition. The Commission disagrees. Congress expressly granted the Commission authority to promulgate such rules in the original FTC Act of 1914, Congress enacted legislation in 1975 expressly preserving that authority,[185] and it imposed requirements in 1980 that presumed that authority.

The Commission is not persuaded by commenters' arguments in opposition to its authority. For instance, some commenters argued that Congress's choice to exclude certain industries from the Commission's jurisdiction indicates that Congress did not intend to give the Commission the power to pass rules that affect commerce across the national economy.[186] But Congress expressly "empowered and directed" the Commission to prevent unfair methods of competition throughout the economy,[187] in any activities "in or affecting commerce," subject only to limited exceptions. The final rule will apply only to the extent that the Commission has jurisdiction under the FTC Act. The Act does not limit the Commission's authority to pursue, for example, industry-specific rulemaking. Where Congress wished to limit the scope of the Commission's authority over particular entities or activities, it did so expressly, demonstrating its intent to give the Commission broad enforcement authority over activities in or affecting commerce outside the scope of the enumerated exceptions.[188] That section 22 of the FTC Act requires the Commission to perform a regulatory analysis for amendments to rules based on, *inter alia*, "their annual effect on the

---

[174] *United States* v. *JS & A Grp.*, 716 F.2d 451, 454 (7th Cir. 1983).

[175] Public Law 96–252, 94 Stat. 374 (1980).

[176] *Id.; see* 15 U.S.C. 57b–3(a)(1).

[177] 15 U.S.C. 57b–3(a)(1).

[178] *Id.*

[179] 15 U.S.C. 57b–3(b).

[180] Congress has also amended section 6 since the D.C. Circuit decided *Petroleum Refiners*, but it left section 6(g) untouched. *See* Public Law 109–455, 120 Stat. 3372 (2006).

[181] *Apex Hosiery Co.* v. *Leader*, 310 U.S. 469, 488 (1940).

[182] *Id.* at 489.

[183] *See, e.g.,* Comment of Lev Menand et al., FTC–2023–0007–20871; Comment of Peter Shane et al., FTC–2023–0007–21024; Comment of Yelp, FTC–2023–0007–20974; Comment of Veeva Systems, FTC–2023–0007–18078.

[184] Comment of Sm. Bus. Majority, FTC–2023–0007–21022.

[185] Some commenters argued that the 1975 Magnuson-Moss Act, which created additional procedures the Commission must use to promulgate rules regulating unfair or deceptive acts or practices, implies that the Commission entirely lacks authority to promulgate rules regulating unfair methods of competition. The Commission disagrees with these comments and notes the effect of the 1975 legislation, which preserved the Commission's existing rulemaking authority.

[186] *E.g.,* Comment of Fed'n of Am. Hosps., FTC–2023–0007–21034.

[187] 15 U.S.C. 45(a)(2).

[188] 15 U.S.C. 45(a)(2), (3).

national economy'' confirms the same.[189]

Other commenters argued that the Commission is relying on vague or ancillary provisions for its authority and invoked the familiar refrain that Congress ''does not . . . hide elephants in mouseholes.'' [190] None of the provisions on which the Commission is relying are either vague or ancillary. As explained earlier, preventing unfair methods of competition is at the core of the Commission's mandate, the plain text of the Act gives the Commission rulemaking authority to carry out that mandate, and the Commission has exercised this rulemaking authority before.[191] The D.C. Circuit and Seventh Circuits have upheld that exercise of authority, and Congress preserved this authority in subsequent amendments to the Act following the D.C. Circuit's decision.[192]

Additional commenters cited select legislative history from the 1914 FTC Act to suggest the Commission lacks authority to promulgate rules regulating competition.[193] ''[T]here is no reason to resort to legislative history'' when, as here, the text of the statute speaks plainly.[194] Even if that were not the case, however, the legislative history does not unambiguously compel a different conclusion. Faced with similar arguments to those raised by commenters here, in *National Petroleum Refiners,* the D.C. Circuit conducted an exhaustive review of the 1914 FTC Act and concluded ''the legislative history of section 5 and Section 6(g) is ambiguous'' and ''certainly does not compel the conclusion that the Commission was not meant to exercise the power to make substantive rules with binding effect[.]'' [195] As the D.C. Circuit explained, even individual statements by some Congresspeople that might suggest otherwise,[196] when properly contextualized, ''can be read to

support substantive rule-making of the kind asserted by'' the Commission.[197]

Statements from the enactment of the 1975 Magnuson Moss Act, which added section 18 to the FTC Act, confirm the Commission's authority to promulgate rules under section 6(g). That legislative history reveals Congress in 1975 made a considered decision to reject an effort to overturn the D.C. Circuit's interpretation of the FTC Act and instead confirmed that section 6(g) authorizes the Commission to promulgate legislative rules concerning unfair methods of competition.[198] More importantly, these sorts of individual statements cannot trump the plain text of the Act that Congress passed,[199] which gave the Commission authority ''to make rules and regulations for the purpose of carrying out the provisions'' of the FTC Act. Indeed, even if the legislative history were to be selectively read to cut against the Commission's authority, the Commission would still conclude that section 6(g) confers authority to promulgate this final rule because the plain text of the statute (including both the original 1914 Act and subsequent enacted amendments to the FTC Act) unambiguously confers that authority.

In short, neither the legislative history of the FTC Act, nor any of the other arguments commenters raised about the Commission's rulemaking authority overcome the plain meaning of the Act or Congress's ratification of the Commission's power to make rules

preventing unfair methods of competition, as discussed in Part II.B.[200]

The Commission acknowledges that individual members of the Commission have, at times, disclaimed the Commission's authority to promulgate rules regulating unfair methods of competition.[201] The statement of an individual Commissioner does not reflect the views of or bind ''[t]he Commission itself,'' which has concluded—just as it did when it issued such rules in the past—that it does possess such authority.[202] In any event, the Commission has reviewed these statements, along with the many comments it received, and does not believe any of the arguments raised in support of that position overcome the plain meaning of the FTC Act provisions.

### 2. Major Questions Doctrine

Many commenters assert that the Commission lacks the authority to adopt the final rule based on the major questions doctrine. That doctrine, as the Supreme Court recently explained in *West Virginia* v. *EPA,* ''teaches that there are extraordinary cases . . . in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority.'' [203] In such cases, ''something more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to clear congressional authorization for the power it claims.'' [204] Having considered the factors that the Supreme Court has used to identify major questions, the Commission concludes that the final rule does not implicate the major questions doctrine. And even if that doctrine did apply, the Commission concludes that Congress provided clear authorization for the Commission to promulgate this rule.[205]

---

[189] 15 U.S.C. 57b–3 (outlining requirements of the Commission's rulemaking process for new rules and amendments); *see also* Part II.E (discussing the Commission's jurisdiction).

[190] *Whitman* v. *Am. Trucking Ass'ns,* 531 U.S. 457, 468 (2001); *see, e.g.,* Comment of La. And 12 Other States, FTC–2023–0007–21094.

[191] *See* Part II.B (discussing the Commission's history of using section 6(g) to promulgate rules).

[192] *Id.*

[193] *E.g.,* Comment of Nat'l Ass'n of Mfrs., FTC–2023–0007–20939; Comment of La. And 12 Other States, FTC–2023–0007–21094.

[194] *United States* v. *Gonzales,* 520 U.S. 1, 6 (1997).

[195] *Nat'l Petroleum Refiners Ass'n* v. *FTC,* 482 F.2d 672, 686 (D.C. Cir. 1973).

[196] *Id.* at 704; *see also, e.g.,* Comment from La. and 12 Other States, FTC–2023–0007–21094 (identifying statements and failed bills that, the commenters say, show the Commission was not intended to possess rulemaking authority).

[197] *Nat'l Petroleum Refiners,* 482 F.2d at 709.

[198] For example, while the Senate was considering amendments to the FTC Act, Senator Hart read excerpts of *Nat'l Petroleum Refiners* into the record. *See* 120 Cong. Rec. 40712 (Dec. 18, 1974). These short excerpts included the court acknowledging that it was considering whether the Commission ''is empowered to promulgate substantive rules'' that would ''give greater specificity and clarity to the broad standard of illegality—'unfair methods of competition' . . .— which the agency is empowered to prevent.'' *Id.* (quoting *Nat'l Petroleum Refiners,* 482 F.2d at 673). Senator Hart then explained that the ''procedural requirements . . . respecting FTC rulemaking'' in the bill under consideration ''are limited to unfair or deceptive acts or practices rules.'' *Id.* ''These provisions and limitations,'' he explained, ''are not intended to affect the Commission's authority to prescribe and enforce rules respecting unfair methods of competition.'' *Id.* ''Rules respecting unfair methods of competition,'' Senator Hart said, ''should continue to be prescribed in accordance with'' the APA. *Id.; see also* Comment of Lev Menand et al., FTC–2023–0007–20871 at 3–6 (recounting legislative history that preceded the 1975 amendments to the FTC Act).

[199] *See Barnhart* v. *Sigmon Coal Co.,* 534 U.S. 438, 457 (2002) (''Floor statements from two Senators [who were sponsors of the bill] cannot amend the clear and unambiguous language of a statute.'').

[200] This includes arguments about the legislative intent, structure, or post-enactment history of the 1914 FTC Act.

[201] *See, e.g., Nat'l Petroleum Refiners,* 482 F.2d at 695–96 & n. 32, 38–39; NPRM at 3544 (dissenting statement of Commissioner Wilson).

[202] *Nat'l Petroleum Refiners,* 482 F.2d at 694; *see also* 16 CFR 4.14(c) (''Commission action'' requires ''the affirmative concurrence of a majority of the participating Commissioners'').

[203] *W. Va.* v. *EPA,* 597 U.S. 697, 721 (2022) (cleaned up).

[204] *Id.* at 723 (cleaned up).

[205] The Commission notes that some commenters either implicitly or explicitly focused on the Commission's rulemaking authority, as opposed to the Commission's authority to define non-competes as an unfair method of competition, as a major question. The Commission has already addressed

The agency authority underlying this final rule rests on firm historical footing. There is nothing novel about the Commission's assertion of authority to promulgate legislative rules under section 6(g).[206] As explained in Part II.B, the Commission has used this authority for more than 60 years to promulgate many rules defining unfair methods of competition and/or unfair or deceptive acts or practices.[207] The Commission's use of this power sometimes garnered significant attention, such as when it made national news by requiring cigarette warnings in the immediate wake of the Surgeon General's groundbreaking report on the health effects of smoking.[208] And the Commission's rulemaking authority was long ago "addressed"—and affirmed—"by a court."[209] Moreover, after that high-profile rulemaking and judicial affirmation, Congress considered—and twice reaffirmed—the Commission's authority to issue legislative rules defining unfair methods of competition under section 6(g).[210] Indeed, even when Congress decided to displace the FTC's Cigarette Rule with legislation, it left the Commission's rulemaking authority in place.[211] Likewise, when Congress added procedural steps the Commission must take when promulgating rules concerning unfair or deceptive acts or practices, it expressly allowed the Commission to complete certain ongoing rulemakings, including one that relied on section 6(g) to define an unfair method of competition.[212] This is not a situation where Congress "conspicuously and repeatedly" declined to grant the agency the claimed power.[213]

Nor does the substance of the rule represent any departure from the Commission's past practices. Since its establishment in 1914, the Commission has had the authority to determine whether given practices constitute unfair methods of competition. Rather than trying to define all the many and varied practices that are unfair, Congress empowered the Commission to respond to changing market conditions and to bring specialized expertise to bear when making unfairness determinations.[214] As noted in Part I.B, the Commission has previously secured consent orders premised on the use of non-competes being an unfair method of competition,[215] and there is little question that the Commission has the authority to determine that non-competes are unfair methods of competition through adjudication.[216] Indeed, one commenter who asserted the rule would violate the major questions doctrine expressly agreed that the Commission could determine that a specific non-compete is an unfair method of competition through case-by-case adjudication.[217] The Commission is making the same kind of determination here through rulemaking rather than adjudication.[218] And because the rulemaking process allows all interested parties a chance to weigh in, this process "may actually be fairer to parties than total reliance on case-by-case adjudication."[219] This is thus not a situation where the agency's action would fundamentally change the nature of the regulatory scheme. Determining whether a practice is an "unfair method of competition" under section 5 has been a core task of the Commission for more than a century—and, indeed, goes to the heart of its mandate.

Additionally, non-competes have already been the subject of FTC scrutiny and enforcement actions, so subjecting them to rulemaking is a more incremental—and thus less significant—step than it would be for an agency to wade into an area not currently subject to its enforcement authority. And the present rulemaking is consistent with both Congress's intent for the Commission and the Commission's prior practice. Congress "empowered and directed" the Commission "to prevent persons, partnerships, or corporations" within the Commission's jurisdiction "from using unfair methods of competition in or affecting commerce."[220] Following that directive, the Commission has previously used its section 6(g) authority to promulgate rules that reach industries across the economy. For example, the Mail Order Rule placed restrictions on any sale conducted by mail,[221] and the Negative Option Rule requires certain disclosures for some negative option plans. These rules—promulgated nearly 50 or more years ago—applied across the industries within the FTC's jurisdiction, yet no court has held that they exceeded the Commission's authority.[222] Indeed, the Seventh Circuit upheld the Mail Order Rule as a valid exercise of that authority.[223]

Congress itself recognized that the Commission's authority will sometimes affect firms across the economy. Indeed, addressing unfair methods of competition and unfair and deceptive practices across industries (other than the industries, activities, or entities Congress expressly exempted) is the core of the Commission's mandate—and the Commission has long pursued that mandate through both rulemaking[224] and adjudication.[225] Congress imposed

---

[206] *W. Va.* v. *EPA,* 597 U.S. at 725.

[207] *See* Part II.B (discussing the Commission's history of promulgating rules under section 6(g)).

[208] *See* Part II.B (discussing Cigarette Rule and Holder Rule); *see also* "U.S. to Require Health Warning for Cigarettes," N.Y. Times (June 25, 1964) at 1, 15 (tobacco industry indicating plans to immediately challenge the Commission's authority to issue the regulation).

[209] *W. Va.* v. *EPA,* 597 U.S. at 725; *see* Part II.B (discussing decisions from the D.C. Circuit and Seventh Circuit affirming the Commission's rulemaking power under section 6(g)).

[210] *See* Part II.B (discussing the history and content of sections 18 and 22 of the FTC Act).

[211] *See* Federal Cigarette Labeling and Advertising Act, Public Law 89–92, 79 Stat. 282 (July 27, 1965).

[212] 15 U.S.C. 57a(a)(2); *see* Part II.B (discussing the Mail Order Rule).

[213] *W. Va.* v. *EPA,* 597 U.S. at 724.

[214] *See, e.g., FTC* v. *R.F. Keppel & Bro.,* 291 U.S. 304, 311 n.2, 314 (1934).

[215] In those orders, the party agreed, *inter alia,* to cease and desist from enforcing or attempting to enforce existing non-competes and from entering into or attempting to enter into new ones, and also agreed to provide notice to affected employees that they are no longer subject to a non-compete. *See* Part I.B n.42–44 (citing recent Commission investigations and consent orders involving non-competes).

[216] To the extent that any commenters argued the Commission lacked authority over the entire subject matter of non-compete agreements, the Commission did not see any compelling explanation that an agreement not to compete falls outside the meaning of a "method of competition."

[217] Comment of Int'l Ctr. For L. & Econs., FTC–2023–0007–20753, at 75–76.

[218] *Nat'l Petroleum Refiners Ass'n* v. *FTC,* 482 F.2d 672 at 685 (D.C. Cir. 1973) (recognizing that the Commission may "choose[ ]to elaborate" section 5's "comprehensive statutory standards through rule-making or through case-by-case adjudication").

[219] *Id.* at 681; *see generally* Part IX.C.2 (discussing the value of rulemaking).

[220] 15 U.S.C. 45(a)(2).

[221] *Mail Order Merchandise,* 40 FR 49492 (Oct. 22, 1975); *see* 16 CFR part 435.

[222] *See* Part II.B (listing rules promulgated by the FTC exercising authority under sections 5 and 6(g)).

[223] *United States* v. *JS & A Grp.,* 716 F.2d 451, 454 (7th Cir. 1983).

[224] *See* Part II.B.

[225] The Commission's adjudicatory power, like its rulemaking power, stretches across the national economy. For instance, the Commission has found companies in a variety of industries participated in price-fixing conspiracies that violated section 5 and ordered them to cease and desist from such practices following an adjudication. *See, e.g., Eugene Dietzgen Co.* v. *FTC,* 142 F.2d 321 (7th Cir. 1944) (scientific instruments); *U.S. Maltsters Ass'n* v. *FTC,* 152 F.2d 161 (7th Cir. 1945) (malt manufacturers); *Keasbey & Mattison Co.* v. *FTC,* 159 F.2d 940 (6th Cir. 1947) (asbestos insulation); *Allied Paper Mills* v. *FTC,* 168 F.2d 600 (7th Cir. 1948) (book paper manufacturers); *Bond Crown & Cork. Co.* v. *FTC,* 176 F.2d 974 (4th Cir. 1949) (bottle cap manufacturers). Price-fixing is just one example. The Commission's adjudicatory power also supported a cease-and-desist order concerning a food manufacturer's resale practices more than 100 years ago. *FTC* v. *Beech-Nut Packing,* 257 U.S. 441 (1922). And it supported a cease-and-desist order

Continued

certain requirements in section 22 on any amendment to a Commission rule promulgated under section 6 (or section 18) that would have certain substantial effects on the national economy, the price of goods or services, or regulated entities and consumers.[226] Congress thus anticipated—and intended—that the Commission's rulemaking power carried the potential to affect the economy in considerable ways, and Congress already considered and specified the necessary steps and checks to ensure the Commission's exercise of that power is appropriate. For all these reasons, the final rule does not involve a ''major question'' as the Supreme Court has used that term.

Even if the final rule does present a major question, the final rule passes muster because the FTC Act provides clear authorization for the Commission's action. In cases involving major questions, courts expect Congress to ''speak clearly'' if it wishes to assign the disputed power.[227] Congress did so when it ''declared unlawful'' in the FTC Act ''[u]nfair methods of competition'' and empowered the Commission ''to make rules and regulations for the purpose of carrying out the provisions of th[e] Act.''[228] Congress ''[i]n large measure'' left ''the task of defining 'unfair methods of competition' . . . to the Commission.''[229] That is precisely what the Commission has done here, for the reasons elaborated in Part IV. Finally, there is no doubt that the Commission has expertise in the field (competition) it is regulating here.[230] For these reasons, even if the final rule involves a major question, Congress has

clearly delegated to the Commission the authority to address that question.

### 3. Non-Delegation Doctrine

Some commenters also objected that Congress violated the non-delegation doctrine by empowering the Commission to promulgate rules regulating unfair methods of competition. The Commission disagrees. The non-delegation doctrine provides that ''Congress generally cannot delegate its legislative power to another Branch.''[231] But the Constitution does not ''prevent Congress from obtaining the assistance of its coordinate Branches.''[232] ''So long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.''[233] Applying this rule, the Supreme Court has ''over and over upheld even very broad delegations'' including those directing agencies ''to regulate in 'the public interest,' . . . to set 'fair and equitable' prices and 'just and reasonable' rates,'' and ''to issue whatever air quality standards are 'requisite to protect the public health.' ''[234] ''The Supreme Court has'' also ''explained that the general policy and boundaries of a delegation 'need not be tested in isolation' '' and ''[i]nstead, the statutory language may derive content from the 'purpose of the Act, its factual background and the statutory context in which they appear.' ''[235]

Here, Congress ''declared unlawful'' any ''unfair methods of competition in or affecting commerce'' and ''empowered and directed'' the Commission ''to prevent'' entities within its jurisdiction ''from using unfair methods of competition.''[236] Congress also instructed the Commission to ''make rules and regulations for the purpose of carrying out the provisions'' of the FTC Act.[237] Congress's stated purpose and policy in section 5 provides the Commission with

an intelligible principle to guide its section 6(g) rulemaking authority.[238]

Were there any doubt, the Supreme Court has laid it to rest in *A.L.A. Schechter Poultry Corp.* v. *United States.*[239] *Schechter Poultry* marked one of two occasions ''in this country's history'' that the Supreme Court ''found a delegation excessive,'' and ''in each case . . . Congress had failed to articulate *any* policy or standard to confine discretion.''[240] The Court offered the FTC Act, however, as a counterexample of proper Congressional delegation. The Court recognized that the phrase ''unfair methods of competition'' in the FTC Act was ''an expression new in the law'' without ''precise definition,'' but that Congress had empowered the Commission to ''determine[ ] in particular instances, upon evidence, in the light of particular competitive conditions and of what is found to be a specific and substantial public interest'' whether a method of competition is unfair.[241] The FTC Act stood in contrast, the Court explained, to the National Industrial Recovery Act (''NIRA''), which the Court held included an unconstitutional delegation.[242]

The Commission recognizes that *Schechter Poultry* approved of the FTC Act's adjudicatory process for determining unfair methods of competition without commenting on the Act's rulemaking provision. But the ''unfair method of competition'' authority the Court approvingly cited in *Schechter Poultry* is the same intelligible principle the Commission is applying in this rulemaking. And just as the adjudication process provides for a ''formal complaint, for notice and hearing, for appropriate findings of fact supported by adequate evidence, and for judicial review,''[243] the APA rulemaking process provides for a public notice of proposed rulemaking, the opportunity to ''submi[t] . . . written data, views, or arguments,'' agency consideration of those comments, and judicial review.[244] If Congress may permissibly delegate the

---

within the past few years enjoining a pharmaceutical company from entering into reverse payment settlement schemes. *Impax Labs., Inc.* v. *FTC,* 994 F.3d 484 (5th Cir. 2021). In the century between, the Commission has found section 5 violations based on false advertising, monopoly maintenance, exclusive dealing, and more in diverse sectors throughout the country.

[226] 15 U.S.C. 57b–3; *see also* Part II.B.

[227] *W. Va.* v. *EPA,* 597 U.S. 697, 716, 723 (2002).

[228] FTC Act of 1914, 38 Stat. at 721–22; *see* 15 U.S.C. 45(a), 46(g); *see also* Part II.A (discussing the Commission's rulemaking authority).

[229] *FTC* v. *Texaco, Inc.,* 393 U.S. 223, 225 (1968).

[230] *Cf. W. Va.* v. *EPA,* 597 U.S. at 729 (noting the Court's view that the EPA had traditionally lacked the expertise needed to develop the rule at issue); *Ala. Ass'n of Realtors* v. *HHS,* 594 U.S. 758, at 764–65 (2021) (questioning the link between the Center for Disease Control and an eviction moratorium); *see also* Part II.A (discussing Congress's creation of the Commission as an expert body); Parts IV.B and IV.C (discussing the rationale for the rule and explaining the negative effects non-competes have on competition). The Commission also notes that through, *inter alia,* the roundtables and enforcement actions described in Part I.B, and through this rulemaking process, it has acquired expertise on non-competes specifically. The Commission further notes that non-competes are, inherently, a method of competition.

[231] *Mistretta* v. *United States,* 488 U.S. 361, 372 (1989).

[232] *Id.*

[233] *Id.* (alteration in original).

[234] *Gundy* v. *United States,* 139 S. Ct. 2116, 2121 (2019) (citing *Nat'l Broadcasting Co.* v. *United States,* 319 U.S. 190, 216 (1943); *N.Y. Cent. Secs. Corp.* v. *United States,* 287 U.S. 12, 24 (1932); *Yakus* v. *United States,* 321 U.S. 414, 422 (1944); *Fed. Power Comm'n* v. *Hope Natural Gas Co.,* 320 U.S. 591 (1944); and *Whitman* v. *Am. Trucking Ass'ns,* 531 U.S. 457, 472 (2001)).

[235] *TOMAC, Taxpayers of Mich. Against Casinos* v. *Norton,* 433 F.3d 852, 866 (D.C. Cir. 2006) (quoting *Am. Power & Light Co.* v. *SEC,* 329 U.S. 90, 104 (1946)).

[236] 15 U.S.C. 45(a)(1)–(2).

[237] 15 U.S.C. 46(g).

[238] As the D.C. Circuit noted in *Nat'l Petroleum Refiners Ass'n* v. *FTC,* ''the Supreme Court has ruled that the powers specified in Section 6 do not stand isolated from the Commission's enforcement and law applying role laid out in Section 5.'' 482 F.2d 672, 677 (D.C. Cir. 1973) (citing *United States* v. *Morton Salt Co.,* 338 U.S. 632 (1950)).

[239] *A.L.A. Schechter Poultry Corp.* v. *United States,* 295 U.S. 495 (1935).

[240] *Gundy,* 588 U.S. at 2129 (internal quotation omitted); *cf. also Panama Refin. Co.* v. *Ryan,* 293 U.S. 388 (1935) (finding impermissible delegation).

[241] *Schechter Poultry,* 295 U.S. at 532–33.

[242] *Id.* at 529–42.

[243] *Id.* at 533.

[244] 5 U.S.C. 553, 702.

authority to determine through adjudication whether a given practice is an unfair method of competition, it may also permit the Commission to do the same through rulemaking.[245]

For these reasons, the Commission concludes that its authority to promulgate rules regulating unfair methods of competition is not an impermissible delegation of legislative authority.

4. Other Challenges to the Commission's Authority

Finally, a handful of comments raised other, miscellaneous arguments contending that the Commission lacks authority to promulgate the rule. The Commission has reviewed and considered these comments and concludes they do not undercut the Commission's authority to promulgate the final rule.

The Commission received several comments about the Commerce Clause. That clause allows Congress ''to regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes.''[246] Consistent with that clause, the FTC Act empowers the Commission to prevent unfair methods of competition ''in or affecting commerce,'' which the Act also defines consistently with the Constitution.[247] One commenter wrote to support the rule and emphasized that non-competes restrict the free flow of interstate commerce. Others argued that the proposed rule would violate the Commerce Clause by regulating local commerce. The Commission has considered these comments and concludes that it may promulgate the final rule consistent with the Commerce Clause. The final rule extends to the full extent of the FTC's jurisdiction, which in turn extends no further than the Commerce Clause permits. As the Supreme Court has explained, the phrase ''in or affecting commerce'' in section 5 of the FTC Act is ''coextensive with the constitutional power of Congress under the Commerce Clause.''[248] In this final rule, the Commission finds the use of non-

competes by employers substantially affects commerce as that term is defined in the FTC Act. The final rule is therefore a lawful exercise of Congress's delegated power.[249]

Relatedly, one commenter objected that the rule would violate the Tenth Amendment, which provides that ''[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.''[250] But as just explained, the Constitution grants Congress the power to regulate interstate commerce, and pursuant to that power Congress granted the Commission authority to prevent unfair methods of competition in or affecting commerce. The Commission is not intruding on any power reserved to the States.

Some commenters objected that the rule infringes on the right to contract. One of these commenters acknowledged that the Constitution's Contracts Clause does not apply to the Federal government.[251] Regardless, even assuming the Constitution protects a right to contract that can be asserted against a Federal regulation, that right sounds in substantive due process, and the Commission must offer only a rational basis for the rule.[252] As relevant here, the final rule advances the Commission's congressional mandate to prevent unfair methods of competition and will promote competition and further innovation among its many benefits.[253] There is a rational relationship between regulating non-competes and these legitimate government purposes.

One commenter argued that the proposed rule was unconstitutionally vague. This commenter's objection focused on the proposed provision governing *de facto* non-competes. The Commission is not adopting that proposed language in the final rule. Instead, the Commission has clarified the scope of its definition of non-compete clause. Whether a specific clause falls within the scope of the final rule will necessarily depend on the precise language of the agreement at

issue, but the text of the final rule provides regulated parties with sufficient notice of what the law demands to satisfy any due process vagueness concerns.

*D. Compliance With the Administrative Procedure Act (''APA'')*

Some commenters also contended that the Commission has not complied with the Administrative Procedure Act (''APA'').[254] At a high level, the APA requires prior public notice, an opportunity to comment, and consideration of those comments before an agency can promulgate a legislative rule.[255] The Commission has engaged in that process, which has led to this final rule and the accompanying explanation. Some comments failed to recognize the NPRM was a preliminary step that did not fossilize the Commission's consideration of arguments or weighing of evidence. Moreover, the APA ''limits causes of action under the APA to final agency action.''[256] It is this final rule, not the NPRM, that constitutes final agency action. Before adopting this final rule, the Commission reviewed and considered all comments received. In many instances, the Commission has made changes relative to the proposed rule to address concerns that commenters raised. In all cases, however, the Commission has complied with the APA.

*E. The Commission's Jurisdiction Under the FTC Act*

The Commission's jurisdiction derives from the FTC Act. Employers that are outside the Commission's jurisdiction under the FTC Act are not subject to the final rule. The Commission clarifies in the definition of person in § 910.1, that the rule applies only to those within the Commission's jurisdiction. Some commenters sought a more detailed accounting of the

---

[245] *Nat'l Petroleum Refiners Ass'n* v. *FTC,* 482 F.2d 672, 685 (D.C. Cir. 1973); *cf. SEC* v. *Chenery Corp.,* 332 U.S. 194, 202–03 (1947) (''Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.'').

[246] U.S. Const. art. I, sec. 8, cl. 3.

[247] 15 U.S.C. 44, 45(a)(1).

[248] *United States* v. *Am. Bldg. Maintenance Indus.,* 422 U.S. 271, 277, n.6 (1975).

[249] *See Nat'l Fed'n of Indep. Bus.* v. *Sebelius,* 567 U.S. 519, 549 (2012) (''Congress's power'' under the Commerce Clause ''is not limited to regulation of an activity that by itself substantially affects interstate commerce, but also extends to activities that do so only when aggregated with similar activities of others.''); *see also* Part I.B.2 (discussing prevalence of non-competes) and Part IX.C.2 (addressing the need for a nationwide regulation prohibiting non-competes).

[250] U.S. Const. amend. X.

[251] *See* U.S. Const. art. I, sec. 10, cl. 1.

[252] *See, e.g., L & H Sanitation, Inc.* v. *Lake City Sanitation, Inc.,* 769 F.2d 517, 522 (8th Cir. 1985).

[253] *See* Parts IV.B and IV.C, Part X.F.6.

[254] This includes, for example, a commenter who argued that the NPRM was not the product of reasoned decision-making, asserting that the Commission had failed to consider key aspects of the rule or misconstrued evidence; commenters who argued that the rule was arbitrary and capricious for failing to consider less restrictive alternatives; commenters who argued that the NPRM failed to consider State policy or that the Commission would be acting arbitrarily by not passing a uniform rule; and commenters who argued that the Commission had failed to consider reliance interests. The Commission has addressed the concerns underlying these comments in other parts of this statement of basis and purpose.

[255] 5 U.S.C. 553; *see also Elec. Priv. Info. Ctr.* v. *DHS,* 653 F.3d 1, 5 (D.C. Cir. 2011) (APA ''generally require[s] an agency to publish notice of a proposed rule in the **Federal Register** and to solicit and consider public comments upon its proposal.'').

[256] *Trudeau v. FTC,* 456 F.3d 178, 188–89 (D.C. Cir. 2006) (internal quotation marks omitted); *see* 5 U.S.C. 704.

Commission's jurisdiction under the FTC Act. The Commission addresses those comments in this section. Comments seeking an exclusion for entities within the Commission's jurisdiction are addressed in Parts V.D.3 and V.D.4.

### 1. Generally

Certain entities that would otherwise be subject to the final rule may fall outside the FTC's jurisdiction under the FTC Act. The FTC Act exempts certain entities or activities from the Commission's enforcement jurisdiction, which otherwise applies to "persons, partnerships, or corporations."[257] For example, the Act exempts "banks" and "persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act."[258] And the Act excludes from its definition of "corporation" any entity that is not "organized to carry on business for its own profit or that of its members."[259] The NPRM explained that, where an employer is exempt from coverage under the FTC Act, the employer would not be subject to the rule.[260] The NPRM also explained State and local government entities—as well as some private entities—may not be subject to the rule when engaging in activity protected by the State action doctrine.[261] Some commenters stated that the Commission should restate, clarify, interpret, or limit the reach of its authority under the FTC Act in the rule.

In response, the Commission explains that the final rule extends to covered persons that are within the Commission's jurisdiction. The Commission does not believe restating or further specifying each jurisdictional limit in the final rule's text is necessary; the FTC Act defines the limits of the Commission's jurisdiction and those limits govern this rule. Moreover, the Commission cannot here provide guidance that applies to every fact and circumstance. Whether an entity falls under the Commission's jurisdiction can be a fact-specific determination. An attempt by the Commission to capture all potential interpretations of the laws governing exclusions from the FTC Act may create confusion rather than clarity. In response to commenters who asked the Commission to affirm that the final rule does not bind agencies that regulate firms outside the Commission's

jurisdiction under the FTC Act, the Commission affirms that the Commission applies the final rule only to entities that are covered by the FTC Act.[262]

A State government agency commenter suggested that the Commission explicitly exempt State and local governments from the rule. The commenter pointed to conflicts-of-interest policies used by some State agencies to preclude former employees from working on related projects or jobs in the private sector, which the commenter stated do not implicate the policy concerns the FTC seeks to address in the rule. The commenter also noted the complexity of when the Commission's jurisdiction might extend to State and local governments. The Commission clarifies in the definition of "person" in § 910.1 that the final rule applies only to a legal entity within the Commission's jurisdiction. The Commission also explains in Part III.E that the definition of "person" is coextensive with the Commission's authority to issue civil investigative demands. Nothing in this rule changes the extent of the Commission's jurisdiction over State and local governments. The Commission declines to specify all circumstances under which a governmental entity or quasi-governmental entity would or would not be subject to the Commission's jurisdiction and, thus, this final rule. In any event, with respect to the government ethics policies referenced by the commenter, to the extent the commenter is referring to traditional "cooling off" policies that preclude former government employees from working on discrete, specific projects that fell within the scope of their former official governmental position to address ethical concerns, such policies would not meet the definition of "non-compete clause" in § 910.1 because they do not prohibit, penalize or function to prevent a worker from switching jobs or starting a new business.

### 2. Jurisdiction Over Entities Claiming Nonprofit Status Under the FTC Act or the Internal Revenue Code

Commenters from the healthcare industry argued that the Commission should restate, clarify, interpret, or limit the reach of its authority under the FTC Act specifically for the healthcare industry. They pointed to the prevalence of healthcare organizations registered under section 501(c) of the Internal Revenue Code claiming tax-exempt status as nonprofits. Commenters contended that these organizations are categorically outside the Commission's authority under the FTC Act. In fact, under existing law, these organizations are not categorically beyond the Commission's jurisdiction. To dispel this misunderstanding, the Commission summarizes the existing law pertaining to its jurisdiction over non-profits.

#### a. Comments Received

Business and trade industry commenters from the healthcare industry, including, for example, hospitals, physician practices, and surgery centers, focused on whether the Commission has jurisdiction over nonprofit organizations registered under section 501(c)(3) of the Internal Revenue Code in light of the FTC Act's definition of "corporation." Section 501(c)(3) exempts from taxation certain religious, charitable, scientific, educational, and other corporations, "no part of the net earnings of which inure[] to the benefit of any private shareholder or individual."[263] An entity is a "corporation" under the FTC Act only if it is "organized to carry on business for its own profit or that of its members."[264] Several industry commenters argued the Commission does not have jurisdiction over entities that claim tax-exempt status as nonprofits because they are, by definition, not "organized to carry on business for [their] own profit or that of [their] members." The Commission presumes that commenters self-identifying as or referring to "nonprofits," "not-for-profits," or other similar terms without further explanation are referencing entities claiming tax-exempt status under section 501(c)(3) or other provisions of the Internal Revenue Code. Some commenters contended that, to avoid confusion, the rule should state it does

---

[257] 15 U.S.C. 45(a)(2); *see also FTC* v. *AT&T Mobility LLC*, 883 F.3d 848, 853–56 (9th Cir. 2018) (*en banc*).

[258] 15 U.S.C. 45(a)(2).

[259] 15 U.S.C. 44.

[260] NPRM at 3510.

[261] *Id.* (citing *Parker* v. *Brown*, 317 U.S. 341, 350–51 (1943)).

[262] For example, a few community bank commenters expressed concern that because the Federal Deposit Insurance Corporation ("FDIC") can enforce the FTC Act against banks, the rule could be applied by the FDIC to banks. The FTC Act is the Commission's organic statute, and interpretive authority of the FTC Act rests with the Commission. Whether other agencies enforce section 5 or apply the rule to entities under their own jurisdiction is a question for those agencies. At the same time, as discussed in this Part II.E.1, the Commission applies and enforces the rule only to the extent of its jurisdiction.

[263] 26 U.S.C. 501(c)(3). Other, less frequently invoked paragraphs of section 501(c) also identify corporations and organizations that qualify for tax-exempt status. The distinctions between these entities and those claiming tax-exempt status under 501(c)(3) are analyzed under the same standard.

[264] 15 U.S.C. 44.

not apply to entities claiming tax-exempt status as non-profits. At least one commenter stated that the Commission should clarify whether and how the rule would apply to healthcare entities claiming tax-exempt status as nonprofits and then reopen the comment period. One commenter sought clarification on how ownership interest in a for-profit entity or joint venture with a for-profit partner by an entity that claims tax-exempt status as a nonprofit would affect the rule's applicability.

b. The Final Rule

The final rule applies to the full scope of the Commission's jurisdiction. Many of the comments about nonprofits erroneously assume that the FTC's jurisdiction does not capture any entity claiming tax-exempt status as a nonprofit. Given these comments, the Commission summarizes Commission precedent and judicial decisions construing the scope of the Commission's jurisdiction as it relates to entities that claim tax-exempt status as nonprofits and to other entities that may or may not be organized to carry on business for their own profit or the profit of their members.

Congress empowered the Commission to "prevent persons, partnerships, or corporations" from engaging in unfair methods of competition.[265] To fall within the definition of "corporation" under the FTC Act, an entity must be "organized to carry on business for its own profit or that of its members."[266] These FTC Act provisions, taken together, have been interpreted in Commission precedent[267] and judicial decisions[268] to mean that the Commission lacks jurisdiction to prevent section 5 violations by a corporation not organized to carry on business for its own profit or that of its members.

The Commission stresses, however, that both judicial precedent and Commission precedent recognize that not all entities claiming tax-exempt status as nonprofits fall outside the Commission's jurisdiction. As the Eighth Circuit has explained, "Congress took pains in drafting § 4 [15 U.S.C. 44] to authorize the Commission to regulate so-called nonprofit corporations,

associations and all other entities if they are in fact profit-making enterprises."[269] The Commission applies a two-part test to determine whether a corporation is organized for profit and thus within the Commission's jurisdiction. As the Commission has explained, "[t]he not-for profit jurisdictional exemption under Section 4 requires both that there be an adequate nexus between an organization's activities and its alleged public purposes and that its net proceeds be properly devoted to recognized public, rather than private, interests."[270] Alternatively stated, the Commission looks to both "the source of the income, i.e., to whether the corporation is organized for and actually engaged in business for only charitable purposes, and to the destination of the income, i.e., to whether either the corporation or its members derive a profit."[271] This test reflects the Eighth Circuit's analysis in Community Blood Bank of Kansas City Area, Inc. v. FTC and "the analogous body of federal law which governs treatment of not-for-profit organizations under the Internal Revenue Code."[272] Under this test, a corporation's "tax-exempt status is certainly one factor to be considered," but that status "does not obviate the relevance of further inquiry into a [corporation's] operations and goals."[273]

Merely claiming tax-exempt status in tax filings is not dispositive. At the same time, if the Internal Revenue Service ("IRS") concludes that an entity does not qualify for tax-exempt status, such a finding would be meaningful to the Commission's analysis of whether the same entity is a corporation under the FTC Act. Administrative proceedings and judicial decisions involving the Commission or the IRS[274] have identified numerous private benefits that, if offered, could render an entity a corporation organized for its own profit or that of its members under the FTC Act, bringing it within the

Commission's jurisdiction. For instance, the Commission has exercised jurisdiction in a section 5 enforcement action over a physician-hospital organization because the organization engaged in business on behalf of for-profit physician members.[275] That organization, which consisted of over 100 private physicians and one non-profit hospital, claimed tax-exempt status as a nonprofit.[276] Similarly, the Commission has exercised jurisdiction over an independent physician association claiming tax-exempt status as a nonprofit. The association consisted of private, independent physicians and private, small group practices.[277] That association was organized for the pecuniary benefit of its for-profit members because it "contract[ed] with payers, on behalf of its [for-profit] physician members, for the provision of physician services for a fee."[278] Under IRS precedent in the context of purportedly tax-exempt nonprofit hospitals and other related entities that partner with for-profit entities, where the purportedly nonprofit entity "has ceded effective control" to a for-profit partner, "conferring impermissible private benefit," the entity loses tax-exempt status.[279] The IRS has also rejected claims of nonprofit tax-exempt status for entities that pay unreasonable compensation, including percentage-based compensation, to founders, board members, their families, or other insiders.[280]

These examples are illustrative. As has been the case for decades, under Commission precedent and judicial

[265] 15 U.S.C. 45(a)(2). The Commission focuses on coverage as "corporations" in this section.

[266] 15 U.S.C. 44.

[267] In the Matter of Coll. Football Ass'n, 117 F.T.C. 971, 992–999 (1990).

[268] California Dental Ass'n v. FTC, 526 U.S. 756, 766 (1999); Cmty. Blood Bank of Kansas City Area, Inc. v. FTC, 405 F.2d 1011, 1016 (8th Cir. 1969); FTC v. Univ. Health, Inc., 938 F.2d 1206, 1214 (11th Cir. 1991).

[269] Blood Bank, 405 F.2d at 1018; see also, e.g., FTC v. Nat'l Comm'n on Egg Nutrition, 517 F.2d 485, 488 (7th Cir. 1975).

[270] Coll. Football Ass'n, 117 F.T.C. at 998.

[271] Id. at 994 (internal quotation and citation omitted).

[272] Id. at 994.

[273] Id. at 994.

[274] In the Matter of the Am. Med. Assoc., 94 F.T.C. 701, 1979 WL 199033, at *221 (Oct. 12, 1979).

[275] The Commission offers examples of decisions from the IRS and Tax Court as examples that the Commission may deem persuasive. Although "[r]ulings of the Internal Revenue Services are not binding upon the Commission," the Commission has recognized that "a determination by another Federal agency that a respondent is or is not organized and operated exclusively for eleemosynary purposes should not be disregarded." Am. Med. Assoc., 1979 WL 199033 at *221.

[275] In the Matter of Preferred Health Servs., Inc., FTC No. 41–0099, 2005 WL 593181, at *1 (Mar. 2, 2005).

[276] Id. at *1.

[277] In the Matter of Boulder Valley Individual Prac. Assoc., 149 F.T.C. 1147, 2010 WL 9434809, at *2 (Apr. 2, 2010).

[278] Boulder Valley, 2010 WL 9434809, at *2. The Commission has similarly exercised jurisdiction where an entity claiming nonprofit tax-exempt status provides pecuniary benefit to for-profit entities or individuals. See, e.g., In the Matter of Mem'l Hermann Health Network Providers, 137 F.T.C. 90, 92 (2004); Preferred Health, 2005 WL 593181, at *1–*2; Advoc. Health Partners, F.T.C. No. 31–0021, 2007 WL 643035, at *3–*4 (Feb. 7, 2007); Conn. Chiropractic Ass'n, F.T.C. No. 71–0074, 2008 WL 625339, at *2 (Mar. 5, 2008); Am. Med. Ass'n v. FTC, 638 F.2d 443 (2d Cir. 1980), aff'd, 455 U.S. 676 (1982).

[279] Redlands Surgical Servs. v. Comm'r, 242 F.3d 904, 904–05 (9th Cir. 2001); see also St. David's Health Care Sys. v. United States, 349 F.3d 232, 239 (5th Cir. 2003).

[280] See Fam. Tr. of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 155–156 (D.D.C. 2012); I.R.S. G.C.M. 39,674 (Oct. 23, 1987); Bubbling Well Church of Universal Love, Inc. v. Comm'r, No. 5717–79X, 1980 WL 4453 (T.C. June 9, 1980) ("[E]xcessive payments made purportedly as compensation constitute benefit inurement in contravention of section 501(c)(3).").

decisions construing the scope of the Commission's jurisdiction, any entity satisfying the two-prong test falls within the Commission's jurisdiction. Such entities would thus be bound by the final rule.[281]

### F. The Legal Standard for Unfair Methods of Competition Under Section 5

In section 5 of the FTC Act, "unfair methods of competition in or affecting commerce" are "declared unlawful."[282] In enacting section 5, Congress intentionally did not mirror either the common law or the text or judicial interpretations of the Sherman Act, but instead adopted this new term.[283] As the Supreme Court has confirmed, this different term reflects a distinct standard.[284] Under section 5, the Commission assesses two elements: (1) whether the conduct is a method of competition, as opposed to a condition of the marketplace, and (2) whether it is unfair, meaning that it goes beyond competition on the merits. The latter inquiry has two components: (a) whether the conduct has indicia of unfairness and (b) whether the conduct tends to negatively affect competitive conditions. These two components are weighed according to a sliding scale.

Indicia of unfairness include the extent to which the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature.[285] Indicia of unfairness

may also be present if the conduct is otherwise restrictive or exclusionary, depending on the circumstances, such as the nature of the commercial setting and the current and potential future effects of the conduct.[286] Notably, section 5 does not limit indicia of unfairness to conduct that benefits one or more firms and necessarily disadvantages others. Instead, restrictive and exclusionary conduct may also be unlawful where it benefits specific firms while tending to negatively affect competitive conditions.[287]

The second prong, whether conduct tends to negatively affect competitive conditions, focuses on the nature and tendency of the conduct. It does not turn on whether the conduct directly caused actual harm in the specific instance at issue and therefore does not require a detailed economic analysis or current anticompetitive effects.[288]

Instead, the inquiry examines whether the conduct has a tendency to negatively affect competitive conditions, including by raising prices, reducing output, limiting choice, lowering quality, reducing innovation, impairing or excluding other market participants, reducing the likelihood of potential or nascent competition, reducing labor mobility, suppressing worker compensation or degrading working conditions for workers. These concerns may arise when the conduct is examined in the aggregate along with the conduct of others engaging in the same or similar conduct.[289] Section 5 does not require a separate showing of market power or market definition.[290] Nor does section 5 import the rule-of-reason analysis applied under other antitrust laws, including in some Sherman Act cases.[291]

The Commission weighs the two elements—indicia of unfairness and tendency to negatively affect competitive conditions—on a sliding scale. Where the indicia of unfairness are clear, conduct may be an unfair method of competition with only a limited showing of a tendency to negatively affect competitive conditions.[292] For example, conduct that is coercive and exploitative evinces facial unfairness and weighs heavily as clear indicia of unfairness.[293] Where indicia of unfairness are clear, conduct may still violate section 5 where it tends to negatively affect

---

[281] The Commission cannot predict precisely how many entities claiming nonprofit tax-exempt status may be subject to the final rule. The Commission finds that the benefits of the final rule justify implementing it no matter how many nonprofit entities claiming tax-exempt status it ultimately reaches—including under the unlikely assumption that it does not reach any of them.

[282] 15 U.S.C. 45(a)(1).

[283] The Clayton Antitrust Act (38 Stat. 730, ch. 323, Pub. L. 63–212, Oct. 15, 1914) was signed into law weeks after the FTC Act of 1914, 38 Stat. 717.

[284] See FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 454 (1986); FTC v. Sperry & Hutchinson, 405 U.S. 233, 243–44 (1972); FTC v. Brown Shoe Co., 384 U.S. 316, 321 (1966); FTC v. Motion Picture Advert. Serv., 344 U.S. 392, 394–95 (1953); FTC v. R.F. Keppel & Bro., 291 U.S. 304, 309–10 (1934). While some commenters argued the Commission should apply the rule of reason in this rule, as outlined in Parts II.A, II.B, II.C, and II.F, neither the text of section 5, the Supreme Court and other courts' interpretation of section 5, nor the legislative history support the conclusion that the Commission should apply the rule of reason to determine whether conduct violates section 5 as an unfair method of competition. The Commission outlines the legal standard for finding certain uses of non-competes to be unfair methods of competition in the final rule in this Part II.F.

[285] See e.g., Sperry & Hutchinson Co., 405 U.S. at 243 (holding section 5 reaches conduct shown to exploit consumers, citing R.F. Keppel & Bro., 291 U.S. at 313); Atl. Refin. Co. v. FTC, 381 U.S. 357, 369 (1965) (holding that the "utilization of

economic power in one market to curtail competition in another . . . bolstered by actual threats and coercive practices" was an unfair method of competition); FTC v. Texaco, 393 U.S. 223, 228–29 (1968) (finding that use of "dominant economic power . . . in a manner which tended to foreclose competition" is an unfair method of competition); E.I. du Pont de Nemours v. FTC (Ethyl), 729 F.2d 128, 137, 140 (2d Cir. 1984) (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive or deceitful" as well as "exclusionary").

[286] See, e.g., Motion Picture Advert. Serv. Co., 344 U.S. at 395–96; Luria Bros. & Co. v. FTC, 389 F.2d 847, 860–61 (3d Cir. 1968). As the Supreme Court has made clear, the inquiry into the nature of the commercial setting does not, however, require market definition or proof of market power. See, e.g., Atl. Refin. Co., 381 U.S. at 371 (finding it "unnecessary to embark upon a full scale economic analysis of competitive effect"). On November 10, 2022, the Commission issued a policy statement describing the key principles of general applicability concerning whether conduct is an unfair method of competition under section 5. FTC, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022) (hereinafter "FTC Policy Statement"). The FTC Policy Statement cites a number of cases explaining that section 5 does not require market definition or proof of market power. Id. at 10.

[287] See, e.g., Brown Shoe Co., 384 U.S. at 320 ("Thus the question . . . is whether the Federal Trade Commission can declare it to be an unfair practice for Brown, the second largest manufacturer of shoes in the Nation, to pay a valuable consideration to hundreds of retail shoe purchasers in order to secure a contractual promise from them that they will deal primarily with Brown and will not purchase conflicting lines of shoes from Brown's competitors. We hold that the Commission has power to find, on the record here, such an anticompetitive practice unfair . . . .")

[288] Atl. Refin. Co., 381 U.S. at 371 (It is "unnecessary to embark upon a full scale economic analysis of competitive effect."); Texaco, 393 U.S. at 230 ("It is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce."); Union Circulation Co. v. FTC, 241 F.2d 652, 657 (2d Cir. 1957) ("The agreements should be struck down if their reasonable tendency, as distinguished from actual past effect, is to injure

or obstruct competition. Under the Federal Trade Commission Act, industry agreements and practices have been enjoined without an actual showing of injury to competition . . . ."). See also Sperry & Hutchinson Co., 405 U.S. at 244 ("[U]nfair competitive practices [are] not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws."); Ethyl, 729 F.2d at 138 (finding that evidence of actual harm is not required); In re Coca-Cola Co., 117 F.T.C. 795, 915 n.25 (1994) (rejecting argument that section 5 violation requires showing of "anticompetitive effects").

[289] Motion Picture Advert. Serv. Co., 344 U.S. at 395; Union Circulation Co., 241 F.2d at 658 ("The tendency of the 'no-switching' agreements is to discourage labor mobility, and thereby the magazine-selling industry may well become static in its composition to the obvious advantage of the large, well-established signatory agencies and to the disadvantage of infant organizations.").

[290] Atl. Refin. Co., 381 U.S. at 371; Texaco, 393 U.S. at 230; L.G. Balfour Co. v. FTC, 442 F.2d 1, 19–20 (7th Cir. 1971) (no proof of foreclosure of a relevant market necessary in an exclusive dealing contract case under section 5 (citing Brown Shoe)).

[291] See Part II.A.

[292] See, e.g., Ethyl, 729 F.2d at 137–39; FTC Policy Statement, supra note 286, at 9.

[293] See e.g., Sperry & Hutchinson Co., 405 U.S. at 243; Ethyl, 729 F.2d at 139, 140 (finding that unfair methods of competition include practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); FTC Policy Statement, supra note 286, at 7, 9.

competitive conditions, but a stronger showing of such tendency is required.

In many cases the Commission (and courts) have held conduct to constitute an unfair method of competition by pointing to clear indicia of unfairness, including coercive or exploitative conduct, without conducting a detailed economic analysis of its effects. In *Atlantic Refining Co.* v. *FTC* and *FTC* v. *Texaco, Inc.,* the Supreme Court held that the Commission established an unfair method of competition where an oil company used its economic power over its gas stations to coerce them into buying certain tires, batteries, or accessories only from firms that paid the oil company a commission.[294] The Court determined in *Atlantic Refining* that "a full-scale economic analysis of competitive effect" was not required and the Commission needed only to show that the conduct burdened "a not insubstantial portion of commerce."[295] The Court reiterated this standard in *Texaco* holding that, even though the impact was less harmful than the conduct in *Atlantic Refining,* "the anticompetitive tendencies of [the challenged] system are clear, and . . . the Commission was properly fulfilling the task that Congress assigned it in halting this practice in its incipiency."[296] As the Court observed, "[t]he Commission is not required to show that a practice it condemns has totally eliminated competition."[297] In *FTC* v. *R.F. Keppel & Brother, Inc.,* the Supreme Court held that the Commission established an unfair method of competition where a manufacturer exploited the inability of children to protect themselves in the marketplace by marketing inferior goods to them through use of a gambling scheme.[298] The Court considered the extent of the practice and concluded "[the practice] is successful in diverting trade from competitors" without

engaging in a full-scale economic analysis.[299]

In other cases, the Commission (and courts) have held exclusionary or restrictive conduct was an unfair method of competition based on evidence of the conduct's tendency to negatively affect competitive conditions without focusing on the indicia of unfairness, including whether the conduct is coercive or exploitative. But an evidentiary showing or detailed economic analysis that such conduct generated actual anticompetitive effects or would do so in the future still was not required. For example, in *Union Circulation Company* v. *FTC,* the Second Circuit held the Commission established an unfair method of competition where a group of door-to-door subscription solicitation agencies agreed not to hire workers who were previously employed by another signatory agency.[300] The Court looked to whether the "reasonably foreseeable effect" of the agencies' conduct would be to "impair or diminish competition between existing [competitors]" or prevent potential new rivals.[301] In finding the conduct was an unfair method of competition, the court concluded that "[t]he tendency of the . . . agreements is to discourage labor mobility, and thereby the magazine-selling industry may well become static in its composition to the obvious advantage of the large, well established signatory agencies and to the disadvantage of infant organizations."[302] In *FTC* v. *Brown Shoe Co.,* the Supreme Court held that an exclusive dealing arrangement under which the Brown Shoe Company offered shoe retailers "a valuable consideration . . . to secure a contractual promise from them that they will deal primarily with Brown and will not purchase

conflicting lines of shoes from Brown's competitors" violated section 5 consistent with the Commission's authority "to arrest trade restraints in their incipiency."[303] Of course, evidence of actual adverse effects on competition meets the requirement to show a tendency to negatively affect competitive conditions. For example, in *FTC* v. *Motion Picture Advertising Service Co.,* the Supreme Court held that an exclusive dealing arrangement violated section 5 where there was "substantial evidence" that the contracts "unreasonably restrain competition."[304]

Respondents in unfair method of competition cases sometimes assert purported justifications as an affirmative defense. Some courts have declined to consider justifications altogether. However, where defendants raise justifications as an affirmative defense, the Commission and courts have consistently held that pecuniary benefit to the party responsible for the conduct in question is not cognizable as a justification.[305] Additionally, to the extent justifications are asserted, they must be legally cognizable,[306] non-pretextual,[307] and any restriction used to bring about the benefit must be narrowly tailored to limit any adverse impact on competitive conditions.[308]

---

[294] *Atl. Refin. Co.,* 381 U.S. at 369–70; *Texaco,* 393 U.S. at 228–29.

[295] *Atl. Refin. Co.,* 381 U.S. at 371. *See also Texaco,* 393 U.S. at 230 (finding that the practice unfairly burdened competition for a not insignificant volume of commerce); *FTC* v. *R.F. Keppel & Bro.,* 291 U.S. 304, 309 (1934) ("A practice so widespread and so far reaching in its consequences is of public concern if in other respects within the purview of the statute.").

[296] *Texaco,* 393 U.S. at 230 (further noting that "[i]t is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce.").

[297] *Id.* at 230. *See also Shell Oil Co.* v. *FTC,* 360 F.2d 470, 487 (5th Cir. 1966) ("A man operating a gas station is bound to be overawed by the great corporation that is his supplier, his banker, and his landlord.").

[298] 291 U.S. 304, 313.

[299] 291 U.S. at 308–09.

[300] 241 F.2d 652, 655 (2d Cir. 1957).

[301] *Id.* at 658. Notably, the court also considered facially coercive conduct by which the door-to-door subscription agencies coerced magazine publishers into not doing business with one of their competitors because the competitor hired their former workers. *Id.* at 655–56. The court upheld the Commission's order concluding this conduct was an unfair method of competition under section 5. The court did not conduct any related economic analysis and simply concluded that the "illegal scheme of coercion . . . is clearly unjustified." *Id.*

[302] *Id.* at 658; *see also Nichols* v. *Spencer Intern. Press, Inc.,* 371 F.2d 332, 334 (7th Cir. 1967) ("Granting that the antitrust laws were not enacted for the purpose of preserving freedom in the labor market, nor of regulating employment practices as such, nevertheless it seems clear that agreements among supposed competitors not to employ each other's employees not only restrict freedom to enter into employment relationships, but may also, depending upon the circumstances, impair full and free competition in the supply of a service or commodity to the public.")

[303] *FTC* v. *Brown Shoe Co.,* 384 U.S. 316, 320, 322 (1966).

[304] *FTC* v. *Motion Picture Advert. Serv. Co.,* 344 U.S. 392, 395–96 (1953); *see also L.G. Balfour Co.* v. *FTC,* 442 F.2d 1, 14 (7th Cir. 1971) (holding that a firm's exclusive dealing contracts violated section 5 where such contracts were "anti-competitive' ").

[305] *Atl. Refin. Co.* v. *FTC,* 381 U.S. 357, 371 (1965) (considering that defendant's distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); *FTC* v. *Texaco,* 393 U.S. 223, 230 (1968) (following the same reasoning as *Atlantic Refining* and finding that the "anticompetitive tendencies of such system [were] clear"); *Balfour,* 442 F.2d at 15 (while relevant to consider the advantages of a trade practice on individual companies, this cannot excuse an otherwise illegal business practice). For provisions of the antitrust laws where courts have not accepted justifications as part of the legal analysis, the Commission will similarly not accept justifications when these claims are pursued through section 5.

[306] *See, e.g., FTC* v. *Ind. Fed. Dentists,* 476 U.S. 447, 463 (1986); *Fashion Originators' Guild of Am.* v. *FTC,* 312 U.S. 457, 468 (1941); *FTC* v. *Superior Ct. Trial Lawyers Ass'n,* 493 U.S. 411, 423–24 (1990).

[307] *See, e.g., Ind. Fed'n of Dentists,* 476 U.S. at 464. *See also United States* v. *Microsoft Corp.,* 253 F.3d 35, 62–64, 72, 74, 76–77 (D.C. Cir. 2001); *Eastman Kodak Co.* v. *Image Technical Tech. Svcs,* 504 U.S. 541, 472, 484–85 (1992); *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.,* 472 U.S. 585, 608–10 (1985).

[308] *NCAA* v. *Alston,* 594 U.S. 69, 100–101 (2021); *Polygram Holding, Inc.* v. *FTC,* 416 F.3d 29, 38

Continued

**38360**   Federal Register / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

## III. Section 910.1: Definitions

Section 910.1 sets forth definitions of several terms used in the final rule.

### A. Definition of "Business Entity"

The Commission adopts the definition of "business entity" as proposed.

#### 1. Proposed Definition

The Commission proposed to define "business entity" as "a partnership, corporation, association, limited liability company, or other legal entity, or a division or subsidiary thereof."[309] The term "business entity" was used in two places: (1) in proposed § 910.3, which contained an exception for certain non-competes entered into in the context of a sale of a business by a substantial owner of, or substantial member or substantial partner in, the business entity,[310] and (2) in proposed § 910.1(e), which defined "substantial owner, substantial member, or substantial partner" as an owner, member, or partner holding at least a 25% ownership interest in a business entity.

The Commission explained in the NPRM that it proposed including divisions and subsidiaries in the definition of "business entity" to apply the sale-of-a-business exception where a person is selling a division or subsidiary of a business entity.[311] The Commission stated the primary rationale for the sale-of-business exception—to help protect the value of a business acquired by a buyer—also applies where a person is selling a division or subsidiary of a business entity.[312]

#### 2. Comments Received

Two commenters specifically addressed the definition of business entity. One commenter suggested a new definition using a functional test that the commenter asserted would prevent employers from structuring their businesses as several smaller legal entities in order to fall within the sale-of-a-business exception. Another commenter also suggested that the definition be amended to explicitly include "general partnerships" and trusts.

#### 3. The Final Rule

The Commission adopts the definition of "business entity" as proposed. The

Commission declines to adopt a functional test for the definition of "business entity." As described in greater detail in Part V.A, the sale-of-a-business exception in the final rule does not contain a 25% ownership threshold, so employers will not have an incentive to structure their businesses as several smaller legal entities in order to fall within the sale-of-a-business exception. The Commission also believes replacing the current bright-line definition of "business entity" with a functional test would make it more difficult for workers and employers to know whether a given non-compete is enforceable in the context of the sale of a business. The Commission concludes adding the terms "general partnerships" and "trusts" to the definition is unnecessary, because the phrase "other legal entity" already includes those entity types.

### B. Definition of "Employment"

The Commission proposed to define "employment" as "work for an employer, as the term employer is defined in § 910.1(c)."[313] That provision defined "employer" as "a person, as defined in 15 U.S.C. 57b–1(a)(6) [section 20 of the FTC Act], that hires or contracts with a worker to work for the person."[314] Section 20 defines "person" as "any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law." The Commission intended the proposed definition of "employer" to clarify that an employment relationship exists, for purposes of the final rule, regardless of whether an employment relationship exists under another law, such as a Federal or State labor law.[315] The final rule clarifies the definitions to better reflect that intent.

While commenters generally did not address the proposed definition of "employment," many commenters expressed concern that the proposed definition of "employer" would exclude workers hired by one entity to work for another, such as workers hired through a staffing agency. To avoid excluding such workers, and consistent with the Commission's intent to cover workers irrespective of whether they are classified as in an "employer-employee" relationship under other State and Federal laws, the final rule defines "employment" as "work for a person" and makes corresponding changes to the definition of "employer," described in Part III.C. This definition of

"employment" better clarifies that an employment relationship exists, for purposes of the final rule, regardless of whether an employment relationship exists under another law, such as a Federal or State labor law.

### C. Proposed Definition of "Employer"

The Commission proposed to define employer as a "person, as defined in 15 U.S.C. 57b–1(a)(6) [section 20 of the FTC Act], that hires or contracts with a worker to work for the person."[316] Section 20 defines "person" as "any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law."[317] The Commission clarified in the NPRM that a person meeting the definition of an employer under proposed § 910.1(c) would be an employer regardless of whether the person meets another legal definition of employer, such as a definition in Federal or State labor law.[318] In response to concerns raised by commenters, the final rule does not adopt a definition of "employer."

#### 1. Comments Received

Several commenters expressed support for the proposed definition of "employer." A few commenters suggested changes to the definition of "employer" to maximize the final rule's coverage and close potential loopholes. Worker and employer advocates noted the proposed definition appeared to exclude certain persons who are commonly understood to be a worker's employer because it assumed that a worker's employer is the same legal entity that hired or contracted with the worker. These commenters contended the proposed definition would not cover arrangements such as when a worker is employed through a contractual relationship with a professional employer organization or staffing agency; under a short-term "loan-out arrangement," during which a worker hired by one employer may work for another employer; under contract with a parent, subsidiary, or affiliate of the business who hired them; or by persons or entities who share common control over the worker's work. A few of these commenters also stated that the proposed definition creates a loophole allowing evasion of the rule through third-party hiring. Most commenters that addressed this issue suggested listing one or more such arrangements in the definition of "employer" to

---

(D.C. Cir. 2005); 2000 Collaboration Guidelines, sec. 3.36b. *See also Union Circulation Co.* v. *FTC*, 241 F.2d 652, 658 (2d Cir. 1957) ("The agreements here went beyond what was necessary to curtail and eliminate fraudulent practices.").

[309] NPRM, proposed § 910.1(a).

[310] *Id.* at 3508.

[311] *Id.* at 3509.

[312] *Id.*

[313] *Id.*, proposed § 910.1(d).

[314] *Id.*, proposed § 910.1(c).

[315] *Id.* at 3510.

[316] *Id.*, proposed § 910.1(c).

[317] 15 U.S.C. 57b–1(a)(6).

[318] NPRM at 3510.

**Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations   **38361**

ensure these kinds of arrangements are covered.

One worker advocacy group argued the term "hires or contracts" in the proposed definition of "employer" is in tension with the Commission's stated intent to broadly cover all workers, including externs, interns, and volunteers. This commenter suggested the definition of "employer" incorporate language from the Fair Labor Standards Act ("FLSA") definition of "employ," which includes to "suffer or permit to work." [319] The commenter suggested this language because of its breadth, noting the language originated in State laws designed to reach businesses that use third parties to illegally hire and supervise children.

One industry trade organization argued that, to minimize inconsistencies with the FLSA, the Commission should incorporate the FLSA's definition of "employer."

### 2. Final Rule

After considering the comments, the Commission has revised the definitions of "non-compete clause" and "worker" as described in Parts III.D and III.G. These revisions make the definition of "employer" unnecessary, so the Commission is not finalizing a definition of "employer."

These revisions clarify that the final rule covers all workers regardless of whether they work for the same person that hired or contracted with them to work. As explained in Part III.D, in the definition of "non-compete clause," the Commission has revised the phrase "contractual term between an employer and a worker" to read "term or condition of employment" and has revised the phrase "after the conclusion of the worker's employment with the employer" to read "after the conclusion of the employment that includes the term or condition." Furthermore, as explained in Part III.G, in the definition of "worker," the Commission has revised the phrase "a natural person who works, whether paid or unpaid, for an employer" to read "a natural person who works or who previously worked, whether paid or unpaid."

The Commission is adopting this more general language, rather than listing the exact kinds of contractual arrangements and entities (e.g., staffing agencies, affiliates, joint employers, etc.) to avoid unnecessary or confusing terminology, evasion of the final rule through complex employment relationships, and the need to specify myriad fact-specific scenarios. The

language is designed to capture indirect employment relationships as a general matter without regard to the label used.

### D. Definition of "Non-Compete Clause"

Based on the comments received, the Commission adopts a slightly modified definition of "non-compete clause" in § 910.1. Section 910.1 defines a "non-compete clause" as a term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from (A) seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (B) operating a business in the United States after the conclusion of the employment that includes the term or condition. Section 910.1 further provides that, for purposes of the final rule, "term or condition of employment "includes, but is not limited to, a contractual term or workplace policy, whether written or oral." Similar to the proposed rule, the final rule applies to terms and conditions that expressly prohibit a worker from seeking or accepting other work or starting a business after their employment ends, as well as agreements that penalize or effectively prevent a worker from doing the same.

### 1. Proposed Definition

The Commission's proposed definition of "non-compete clause" consisted of proposed § 910.1(b)(1) and (b)(2). Proposed § 910.1(b)(1) would have defined "non-compete clause" as "a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer." Proposed § 910.1(b)(2) would have provided that the definition in proposed § 910.1(b)(1) includes "a contractual term that is a *de facto* non-compete clause because it has the effect of prohibiting the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer."

The Commission explained that the proposed definition of non-compete clause would be limited to non-competes between employers and workers and would not apply to other types of non-competes, for example, non-competes between two businesses. [320] The Commission further explained the definition would be

limited to post-employment restraints (*i.e.*, restrictions on what the worker may do after the conclusion of the worker's employment) and would not apply to concurrent-employment restraints (*i.e.*, restrictions on what the worker may do during the worker's employment). [321]

In the NPRM, the Commission noted that, rather than expressly prohibiting a worker from competing against their employer, some non-competes require workers to pay damages if they compete against their employer. The Commission explained that courts generally view these contractual terms as non-competes and that proposed § 910.1(b)(1) encompassed them. [322]

The Commission also expressed concern that workplace policies—for example, a term in an employee handbook stating that workers are prohibited from working for certain types of firms or in certain fields after their employment ends—could have the same effects as a contractual non-compete even if they are not enforceable, because workers may believe they are bound by the policy. The Commission sought comment on whether the term "non-compete clause" should expressly include a provision in a workplace policy. [323]

The Commission stated that proposed § 910.1(b)(1) was a generally accepted definition of non-compete clause that covers both express non-competes and terms purporting to bind a worker that have the same functional effect as non-competes. [324] The Commission stated that the definition would generally not apply to other types of restrictive employment agreements that do not altogether prevent a worker from seeking or accepting other work or starting a business after their employment ends and do not generally prevent other employers from competing for that worker's labor. [325] At the same time, the Commission expressed concern about unusually restrictive employment agreements that, while not formally triggered by seeking or accepting other work or starting a business after their employment ends, nevertheless restrain such an unusually large scope of activity that they have the same functional effect as non-competes. [326] The Commission noted judicial opinions finding some such

---

[319] 29 U.S.C. 203(g).

[320] NPRM at 3509.

[321] *Id.*
[322] *Id.*
[323] *Id.* at 3510.
[324] *Id.* at 3509.
[325] *Id.*
[326] *Id.*

**38362** **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

restrictive employment agreements to be *de facto* non-competes.[327]

Proposed § 910.1(b)(2) accordingly sought to clarify that the definition in proposed § 910.1(b)(1) includes contractual terms that are *de facto* non-competes because they have the effect of prohibiting the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer. It then provided two illustrative, non-exhaustive examples of contractual terms that may be such functional non-competes: (1) an NDA between an employer and a worker written so broadly that it effectively precludes the worker from working in the same field after the conclusion of the worker's employment with the employer; and (2) a training-repayment agreement ("TRAP") that requires the worker to pay the employer or a third-party entity for training costs if the worker's employment terminates within a specified time period, where the required payment is not reasonably related to the costs the employer incurred to train the worker.[328]

### 2. Coverage of the Definition

#### a. Comments Received

Most of the comments on the definition of "non-compete clause" addressed whether, and under what circumstances, the rule should apply to functional non-competes.[329] Many commenters that generally supported the NPRM agreed the definition of non-compete clause should cover other restrictive employment agreements when they function as non-competes. These commenters argued that, when restraints on labor mobility are banned, companies switch to functionally equivalent restraints. Some commenters asked the Commission to adopt a broader definition of functional non-competes or to expand the rule to ban

additional types of restrictive employment agreements altogether. A few commenters asked the Commission to broaden proposed § 910.1(b)(1) and (2) by replacing the terms "prevent" and "prohibit" with "restrains" and "limits."

In contrast, many commenters who generally opposed the NPRM stated that proposed § 910.1(b)(2) was overinclusive. Many such commenters also asserted the definition was vague and could lead to confusion and significant litigation. Several comments suggested clarifications, such as including additional examples of functional non-competes; creating safe harbors for certain restrictive employment covenants; replacing proposed § 910.1(b)(2) with a standard based on antitrust law's "quick look" test;[330] or revising the provision to focus on the "primary purpose" of a restrictive employment covenant. Several commenters argued the Commission failed to cite evidence that functional non-competes are anti-competitive. Other commenters expressed concern that prohibiting functional non-competes would undermine the rule's intent to permit less restrictive alternatives to non-competes.

At least one commenter argued that proposed § 910.1(b)(2) should be removed because it was redundant, as the proposed definition of non-compete clause in proposed § 910.1(b)(1) already captured any term that prevents an employee from seeking alternative employment, without regard to how the term is labeled. Some commenters who generally supported the NPRM also expressed concern that ambiguity in proposed § 910.1(b)(2) could enable employers to intimidate workers by suggesting that restrictive employment agreements used to evade a final rule are not non-competes under the functional test. Other commenters who generally supported the rule asked for greater specificity in proposed § 910.1(b)(2) to prevent adverse judicial interpretations that could undermine the effectiveness of the rule.

Many commenters addressed issues specific to other types of restrictive employment agreements, including NDAs (also sometimes referred to as confidentiality agreements), TRAPs, non-solicitation agreements, and garden leave and severance agreements.

With respect to NDAs, some commenters stated that the Commission rightly identified overbroad NDAs as a potential method of evasion of the rule

and supported the Commission's recognition of overbroad NDAs as functional non-competes. In contrast, some commenters contended that by covering functional non-competes, the proposed rule would limit their ability to use NDAs. Some commenters argued that providing that overbroad NDAs may be functional non-competes would be inconsistent with the proposed rule's separate preliminary finding that NDAs are less restrictive alternatives to non-competes. Similarly, some commenters contended that a functional test may frustrate employers' ability to use NDAs to protect legitimate trade secrets or to enjoin a former worker employed with a competitor under the Defend Trade Secrets Act of 2016, in part because they would be concerned about potential legal liability. Some commenters contended that the example of an overbroad NDA in proposed § 910.1(b)(2) would discourage the use of NDAs, including the use of narrowly tailored NDAs, and undermine confidence in their enforceability. Some commenters stated that reference to cases, including *Brown* v. *TGS Management Co.*[331] and similar cases, represent outliers that are likely to cause more confusion than clarity.

Other commenters addressed the proposed definition's application to TRAPs, which are agreements in which the worker agrees to pay the employer for purported training expenses if the worker leaves their job before a certain date. Several commenters asked the Commission to ban all forms of TRAPs. These commenters argued that employers are increasingly adopting TRAPs and that abusive TRAPs are pervasive throughout the economy. Some commenters asserted millions of workers are likely bound by TRAPs. Commenters stated TRAPs may impose penalties that are disproportionate to the value of training workers received or require the worker to pay alleged training expenses for on-the-job training. Some commenters contended TRAPs may be even more harmful than non-competes, because while non-competes prohibit or prevent workers from seeking or accepting other work or starting a business after they leave their job, TRAPs can prevent workers from leaving their job for any reason.

Some commenters expressed concern that the example in proposed § 910.1(b)(2)(ii) of a TRAP that was a functional non-compete was too narrow, and that the Commission should not imply that TRAPs with penalties that *are* reasonably related to an employer's training expenses cannot be functional

---

[327] *Wegman* v. *London*, 648 F.2d 1072, 1073 (5th Cir. 1981) (holding that liquidated damages provisions in a partnership agreement were *de facto* non-compete clauses "given the prohibitive magnitudes of liquidated damages they specify"); *Brown* v. *TGS Mgmt. Co., LLC*, 57 Cal. App. 5th 303, 306, 319 (Cal. Ct. App. 2020) (holding that an NDA that defined "confidential information" "so broadly as to prevent [the plaintiff] in perpetuity from doing any work in the securities field" operated as a *de facto* non-compete clause and therefore could not be enforced under California law, which generally prohibits enforcement of non-compete clauses).

[328] NPRM, proposed § 910.1(b)(2).

[329] While the NPRM generally used the term "*de facto* non-competes," the final rule uses the term "functional non-competes." The Commission believes this term more clearly conveys that certain terms are considered non-competes under the final rule where they function to prevent workers from seeking or accepting other work or starting a business after their employment ends.

[330] *See, e.g.*, Cal. Dental Ass'n v. *FTC*, 526 U.S. 756, 770–71 (1999).

[331] *See supra* note 327 and accompanying text.

non-competes. One commenter asked the Commission to adopt the standard for TRAPs in the Uniform Restrictive Employment Agreement Act.[332] Another commenter suggested that the Commission ban TRAPs below an income threshold of $75,000. Another commenter asked the Commission to clarify that costs that are inherent in any employer-employee relationship—such as time spent by a supervisor training a new employee how to perform routine business procedures typical for their position or role—should not be considered costs that are "reasonably related to the costs" of training.

At least one commenter urged the Commission to treat as functional non-competes other employment terms similar to TRAPs such as equipment loans, where employers provide employees with a loan to purchase equipment that the worker needs in order to perform their job, and damages provisions containing open-ended costs related to the employee's departure—including hiring and training replacements or vague harms such as reputational damages, loss of good will or lost profits. In contrast, some commenters argued that TRAPs should be excluded from coverage under proposed § 910.1(b)(2) because they are not unfair or anti-competitive.

Regarding non-solicitation agreements—which prohibit a worker from soliciting former clients or customers of the employer—a few commenters expressed concern that overbroad non-solicitation agreements may be permitted because they were not listed in the regulatory text for proposed § 910.1(b)(2) as examples of functional non-competes (although the Commission described them in the preamble to the proposed rule as restrictive employment agreements that may fall within the definition of non-compete clause if they restrain such an unusually large scope of activity that they are *de facto* non-compete clauses).[333] These commenters asked the Commission to revise proposed § 910.1(b)(2) to expressly cover non-solicitation agreements that prohibit workers from doing business with prospective or actual customers to an extent that would effectively preclude them from continuing to work in the same field or that prevent a worker from doing business with their former employer's client where the client solicits the worker directly. Other commenters, however, expressed concern that the proposed rule could

undermine employers' confidence in the enforceability of non-solicitation agreements and asked that the final rule clarify that non-solicitation agreements are generally not prohibited, or exclude them altogether.

Some comments addressed no-hire clauses, which bar former workers from hiring their former colleagues. One employment lawyer stated that these are less restrictive than non-compete clauses. Other commenters stated that no-hire clauses can still limit careers or make it hard for new businesses to find staff. Some commenters expressed concerns with no-business or non-dealing clauses, which bar former workers from doing business with former clients or customers even if the clients or customers sought them out. These commenters stated such agreements limit the options of clients and customers.

Many commenters raised questions about forfeiture-for-competition clauses, which they stated are often a component of deferred compensation arrangements for executives. Commenters stated that deferred compensation plans often include forfeiture clauses, or contingencies on receiving the promised compensation, to incentivize their recipients to act in ways that benefit the employer. These commenters stated that agreements not to compete for a period of time after employment ends are a common feature of forfeiture clauses. Some commenters stated that such forfeiture-for-competition clauses are non-competes and have the same negative effects as non-competes because they are contingent on competition—they require workers to give up bonus pay or other post-employment benefits if they work for a competing employer or start a competing business, and they keep other employers from being able to hire those workers. Other commenters stated forfeiture-for-competition clauses are a common and important component of deferred compensation arrangements for highly compensated employees and senior executives.[334] Other commenters argued the clauses allow workers to choose between receiving the deferred compensation and forfeiting it if they choose to work for a competitor, and thus they are not non-competes. Other commenters urged the Commission to either clarify that forfeiture-for-competition clauses are not non-competes or to carve them out explicitly.

Many commenters also addressed the application of the rule to garden leave agreements. In using the term "garden leave," commenters seemed to be referring to a number of different types of agreements. Some commenters referred to garden leave agreements as those in which, before a worker left their job, they remained employed and received full pay for a specified period of time but their access to co-workers and company facilities was restricted. In contrast, other commenters considered "garden leave" an arrangement to make payments to a worker after their employment concluded. Commenters used different terminology to refer to these kinds of agreements, including severance pay, partial pay, and full pay akin to administrative leave, in exchange for an agreement not to compete. Some commenters argued it is coercive for a worker to sign a non-compete in exchange for severance pay and argued garden leave arrangements are non-competes because they limit a worker's options to work for a competitor. Some commenters asked the Commission to adopt a durational limit for garden leave. At least one commenter also urged the Commission to clarify that an employer cannot unilaterally terminate garden leave.

Other commenters requested clarification that garden leave was not a non-compete on the basis that garden leave does not create a legal obligation on the part of the worker to refrain from competing. Some commenters requested a specific exclusion for garden-leave arrangements. They argued that by forcing employers to pay workers, garden leave would reduce the overuse of non-competes. One talent industry commenter argued that the rule should expressly allow for "fee tails," which require talent agents to pay a portion of future commissions to former employers.

*b. The Final Rule*

After considering the comments, the Commission has slightly modified the definition of non-compete clause to clarify its scope. In the final rule, § 910.1 defines "non-compete clause" as a term or condition of employment that either "prohibits" a worker from, "penalizes" a worker for, or "functions to prevent" a worker from (A) seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (B) operating a business in the United States after the conclusion of the employment that includes the term or condition.

---

[332] *See* ULC, *Uniform Restrictive Employment Agreement Act* (2021), sec. 14.

[333] NPRM at 3509.

[334] Commenters also provided purported business justifications for forfeiture-for-competition clauses, which are addressed in Part IV.D.2.

Pursuant to the term "prohibits," the definition applies to terms and conditions that expressly prohibit a worker from seeking or accepting other work or starting a business after their employment ends. Examples of such agreements would be a contractual term between a national sandwich shop chain and its workers stating that, for two years after the worker leaves their job, they cannot work for another sandwich shop within three miles of any of the chain's locations,[335] or a contractual term between a steelmaker and one of its executives prohibiting the executive from working for any competing business anywhere in the world for one year after the end of the executive's employment.[336] The vast majority of existing agreements covered by the final rule fall into this category of agreements that expressly prohibit a worker from seeking or accepting other work or starting a business after their employment ends.

Pursuant to the term "penalizes," the definition also applies to terms and conditions that require a worker to pay a penalty for seeking or accepting other work or starting a business after their employment ends. One example of such a term is a term providing that, for two years after the worker's employment ends, the worker may not engage in any business within a certain geographic area that competes with the employer unless the worker pays the employer liquidated damages of $50,000.[337] Because such an agreement penalizes the worker for seeking or accepting other work or for starting a business after the worker leaves their job, it would be a non-compete clause under § 910.1. Indeed, where an agreement restricts who a worker can work for or their ability to start a business after they leave their job, State courts generally characterize the agreement as a non-compete, regardless of whether the agreement contains an express

prohibition or requires the worker to pay liquidated damages.[338]

Another example of a term that "penalizes" a worker, under § 910.1, is an agreement that extinguishes a person's obligation to provide promised compensation or to pay benefits as a result of a worker seeking or accepting other work or starting a business after they leave their job. One example of such an agreement is a forfeiture-for-competition clause, which, similar to the agreement with liquidated damages described previously, imposes adverse financial consequences on a former employee as a result of the termination of an employment relationship, expressly conditioned on the employee seeking or accepting other work or starting a business after their employment ends. An additional example of a term that "penalizes" a worker under § 910.1 is a severance arrangement in which the worker is paid only if they refrain from competing. The Commission also notes that a payment to a prospective competitor to stay out of the market may also violate the antitrust laws even if it is not a non-compete under this rule.[339]

The common thread that makes each of these types of agreements non-compete clauses, whether they "prohibit" or "penalize" a worker, is that on their face, they are triggered where a worker seeks to work for another person or start a business after they leave their job—*i.e.*, they prohibit or penalize post-employment work for another employer or business. As elaborated in Part IV, such non-competes are inherently restrictive and exclusionary conduct, and they tend to negatively affect competitive conditions in both labor and product and service markets by restricting the mobility of workers and preventing competitors from gaining access to those workers.

Pursuant to the term "functions to prevent," the definition of non-compete clause also applies to terms and conditions that restrain such a large scope of activity that they function to prevent a worker from seeking or accepting other work or starting a new business after their employment ends, although they are not expressly

triggered by these specific undertakings. This prong of the definition does not categorically prohibit other types of restrictive employment agreements, for example, NDAs, TRAPs, and non-solicitation agreements. These types of agreements do not by their terms prohibit a worker from or penalize a worker for seeking or accepting other work or starting a business after they leave their job, and in many instances may not have that functional effect, either. However, the term "functions to prevent" clarifies that, if an employer adopts a term or condition that is so broad or onerous that it has the same functional effect as a term or condition prohibiting or penalizing a worker from seeking or accepting other work or starting a business after their employment ends, such a term is a non-compete clause under the final rule.

In response to the comments alleging that covering "de facto" or "functional" non-competes is overinclusive or vague, the Commission notes that the definition's three prongs—"prohibit," "penalize," and "function to prevent"—are consistent with the current legal landscape governing whether a particular agreement is a non-compete. In addition to generally accepted definitions of non-competes encompassing the "prohibits" prong of the definition, terms that "penalize" workers for seeking or accepting other work or starting a business after they leave their job (for example, by requiring them to pay liquidated damages) are typically considered non-competes under State law.[340] And the "functions to prevent" prong of the definition is likewise consistent with legal decisions holding that restrictive employment agreements other than non-competes may be analyzed under the State law test applicable to non-competes where they function similarly to non-competes.[341] As the First Circuit stated in a recent opinion, "[O]verly broad nondisclosure agreements, while not specifically prohibiting an employee from entering into competition with the former employer, raise the same policy concerns about restraining competition as noncompete clauses where, as here, they have the effect of preventing the defendant from competing with the plaintiff." [342] The fact that whether a given restrictive covenant rises to the level of being a functional non-compete will turn on the facts and circumstances

[335] This example is based on the agreements described in Jamieson, *supra* note 32. The company agreed to remove the non-competes in 2016 as part of a settlement. Office of the Att'y Gen. of the State of N.Y., Press Release, *A.G. Schneiderman Announces Settlement With Jimmy John's To Stop Including Non-Compete Agreements In Hiring Packets* (June 22, 2016), *https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-settlement-jimmy-johns-stop-including-non-compete.*

[336] This example is based on *AK Steel Corp.* v. *ArcelorMittal USA, LLC,* 55 NE3d 1152, 1156 (Ohio Ct. App. 2016).

[337] This example is based on *Press-A-Dent, Inc.* v. *Weigel,* 849 NE2d 661, 668–70 (Ind. Ct. App. 2006) (holding that the agreement was an unlawful non-compete).

[338] *See, e.g., Wichita Clinic, P.A.* v. *Louis,* 185 P.3d 946, 951 (Kan. Ct. App. 2008); *Grayhawk Homes, Inc.* v. *Addison,* 845 SE2d 356 (Ga. Ct. App. 2020); *Salewski* v. *Pilchuck Veterinary Hosp., Inc.,* 359 P.3d 884 (Wash. Ct. App. 2015).

[339] *See., e.g., Palmer* v. *BRG of Ga., Inc.,* 498 U.S. 46, 49–50 (1990) ("[A]greements between competitors to allocate territories to minimize competition are illegal" (citing *United States* v. *Topco Assocs., Inc.,* 405 U.S. 596 (1972)); *FTC* v. *Actavis, Inc.,* 570 U.S. 136, 154 (2013) ("payment in return for staying out of the market" may violate the antitrust laws).

[340] *See supra* note 338 and accompanying text.

[341] *See, e.g., Brown* v. *TGS Mgmt. Co., LLC,* 57 Cal. App. 5th 303, 306, 316–19 (Cal. Ct. App. 2020); *Wegmann* v. *London,* 648 F.2d 1072, 1073 (5th Cir. 1981); *TLS Mgmt. & Mktg. Servs.* v. *Rodríguez-Toledo,* 966 F.3d 46, 59–60 (1st Cir. 2020).

[342] *TLS Mgmt. & Mktg. Servs.,* 966 F.3d at 57.

of particular covenants and the surrounding market context does not render this aspect of the final rule overinclusive or vague. Such covenants would be subject to case-by-case adjudication for whether they constitute an unfair method of competition even in the absence of the final rule.

In response to the comments alleging the Commission failed to cite evidence that functional non-competes harm competition, the Commission disagrees. This final rule is based on a robust evidentiary record that includes significant empirical evidence and thousands of public comments, as well as the Commission's longstanding expertise in evaluating competition issues. Based on this record, the Commission finds that non-competes are restrictive and exclusionary conduct that tends to negatively affect competitive conditions in labor markets and markets for products and services.[343] In addition, the Commission finds that, with respect to workers other than senior executives, non-competes are exploitative and coercive.[344] The Commission finds that the functional equivalents of non-competes—because they prevent workers from engaging in the same types of activity—are likewise restrictive and exclusionary conduct that tends to negatively affect competitive conditions in a similar way. In response to the commenters who expressed concern that prohibiting functional non-competes would undermine the rule's intent to permit reasonable substitutes, the Commission stresses that, as described throughout this Part III.D, the "functions to prevent" prong of the definition of non-compete clause captures only agreements that function to prevent a worker from seeking or accepting other work or starting a business after they leave their job—not appropriately tailored NDAs or TRAPs that do not have that functional effect.

While many commenters requested the Commission state expressly in the final rule whether various specific restrictive employment agreements satisfy the definition of non-compete clause, the Commission declines to adopt a definition that attempts to capture or carve out every edge case. Rather, the final rule focuses on providing a clear, understandable, and generally applicable definition of non-compete clause that reflects the need for case-by-case consideration of whether certain restrictive covenants rise to the level of being functional non-competes—which is fully consonant

with the legal landscape employers generally face today. The Commission nevertheless here responds to comments regarding the restrictive clauses that commenters contended should be expressly addressed in the rule.

As noted in this Part III.D, restrictive employment agreements other than non-competes—such as NDAs, non-solicitation agreements, and TRAPs—do not by their terms or necessarily in their effect prevent a worker from seeking or accepting work with a person or operating a business after the worker leaves their job. For example, a garden-variety NDA in which the worker agrees not to disclose certain confidential information to a competitor would not prevent a worker from seeking work with a competitor or from accepting such work after the worker leaves their job. Put another way, an NDA would not be a non-compete under § 910.1 where the NDA's prohibitions on disclosure do not apply to information that (1) arises from the worker's general training, knowledge, skill or experience, gained on the job or otherwise; or (2) is readily ascertainable to other employers or the general public.[345]

However, NDAs may be non-competes under the "functions to prevent" prong of the definition where they span such a large scope of information that they function to prevent workers from seeking or accepting other work or starting a business after they leave their job. Examples of such an agreement may include an NDA that bars a worker from disclosing, in a future job, any information that is "usable in" or "relates to" the industry in which they work.[346] Such an agreement would effectively prevent the worker from working for another employer in that industry. A second example would be an NDA that bars a worker from disclosing any information or knowledge the worker may obtain during their employment whatsoever, including publicly available information.[347] These agreements are so broadly written that, for practical purposes, they function to prevent a worker from working for another employer in the same field and are therefore non-competes under § 910.1.

Under the final rule's definition of non-compete clause, the same inquiry applies to non-solicitation agreements. Non-solicitation agreements are generally not non-compete clauses under the final rule because, while they restrict who a worker may contact after they leave their job, they do not by their terms or necessarily in their effect prevent a worker from seeking or accepting other work or starting a business. However, non-solicitation agreements can satisfy the definition of non-compete clause in § 910.1 where they function to prevent a worker from seeking or accepting other work or starting a business after their employment ends. Whether a non-solicitation agreement—or a no-hire agreement or a no-business agreement, both of which were referenced by commenters, as discussed previously—meets this threshold is a fact-specific inquiry. The Commission further notes that—like all the restrictive employment agreements described in this Part III.D—non-solicitation agreements, no-hire, and no-business agreements are subject to section 5's prohibition of unfair methods of competition, irrespective of whether they are covered by the final rule.

Depending on the facts and circumstances, a TRAP can also function to prevent a worker from working for another firm or starting a business. For example, one commenter cited a TRAP that required entry-level workers at an IT staffing agency who were earning minimum wage or nothing at all during their training periods to pay over $20,000 if they failed to complete a certain number of billable hours.[348] The commenter also cited a TRAP requiring nurses to work for three years or else repay all they have earned, plus paying the company's "future profits," attorney's fees, and arbitration costs.[349] These types of TRAPs may be functional non-competes because when faced with significant out-of-pocket costs for leaving their employment—dependent on the context of the facts and circumstances—workers may be forced to remain in their current jobs, effectively prevented from seeking or accepting other work or starting a business.

In response to the comments, the Commission declines at this time to either categorically prohibit all TRAPs related to leaving employment, or to exempt such provisions altogether. The Commission agrees with comments raising substantial concerns about the

---

[343] *See* Parts IV.B and IV.C.
[344] *See* Part IV.B.2.b.

[345] This example is based on sec. 9 of the Uniform Restrictive Employment Agreement Act, *supra* note 332.

[346] This example is based on *Brown* v. *TGS Mgmt.*, 57 Cal. App. 5th at 316–19 ("Collectively, these overly restrictive provisions [in the NDA at issue] operate as a de facto noncompete provision; they plainly bar Brown in perpetuity from doing any work in the securities field.").

[347] This example is based on *TLS Mgmt. & Mktg. Servs.*, 966 F.3d at 57 (holding that the NDA was unenforceable).

[348] Comment of Jonathan F. Harris, Dalié Jiménez, & Jonathan Glater, FTC–2023–0007–20873 at 4.
[349] *Id.* at 6–7.

potential effects of such agreements on competitive conditions. As noted in the summary of the comments, commenters cited TRAPs that impose penalties disproportionate to the value of training workers received and/or that claimed training expenses for on-the-job training. However, the evidentiary record before the Commission principally relates to non-competes, meaning on the present record the Commission cannot ascertain whether there are any legitimate uses of TRAPs that do not tend to negatively affect competitive conditions. When TRAPs function to prevent a worker from seeking or accepting other work or starting a business after the employment associated with the TRAP, they are non-competes under § 910.1.

The Commission notes that clauses requiring repayment of a bonus when a worker leaves their job would not be non-competes under § 910.1 where they do not penalize or function to prevent a worker from seeking or accepting work with a person or operating a business after the worker leaves their job. For example, a provision requiring the repayment of a bonus if the worker leaves before a certain period of time would not be a non-compete under § 910.1 where the repayment amount is no more than the bonus that was received, and the agreement is not tied to who the worker can work for, or their ability to start a business, after they leave their job. Similarly, a term or condition under which a worker loses accrued sick leave when their employment ends would not function to prevent a worker from seeking or accepting work with a person or operating a business after the worker leaves their job.

With respect to garden leave agreements, as noted previously, commenters used the term "garden leave" to refer to a wide variety of agreements. The Commission declines to opine on how the definition of non-compete clause in § 910.1 would apply in every potential factual scenario. However, the Commission notes that an agreement whereby the worker is still employed and receiving the same total annual compensation and benefits on a *pro rata* basis would not be a non-compete clause under the definition,[350] because such an agreement is not a post-

employment restriction. Instead, the worker continues to be employed, even though the worker's job duties or access to colleagues or the workplace may be significantly or entirely curtailed. Furthermore, where a worker does not meet a condition to earn a particular aspect of their expected compensation, like a prerequisite for a bonus, the Commission would still consider the arrangement "garden leave" that is not a non-compete clause under this final rule even if the employer did not pay the bonus or other expected compensation. Similarly, a severance agreement that imposes no restrictions on where the worker may work following the employment associated with the severance agreement is not a non-compete clause under § 910.1, because it does not impose a post-employment restriction.

The Commission declines a commenter's request to replace the term "prevent" with "restrains" or "limits." Commenters generally did not express concern about the term "prevent" and the Commission is concerned that different language could greatly expand the scope of the definition and reduce its clarity.

The Commission also declines to adopt alternative *de facto* tests raised by commenters, such as a version of the "quick look" test. As described in Part II.F, the legal standard under section 5 of the FTC Act is distinct from that of the Sherman Act. The Commission also declines to adopt a test that would consider the primary purpose of a restrictive employment agreement. The Commission believes that it can be difficult to establish an employer's subjective "purpose" in entering into an agreement. In addition, such a test could allow extremely overbroad agreements that dramatically restrict a worker's ability to compete against the employer—and have the negative effects described in Parts IV.B and IV.C—as long as the employer entered into the agreement without the subjective intent to restrict competition.

The Commission agrees with the commenter who stated that proposed § 910.1(b)(2) was redundant because proposed § 910.1(b)(1) was already a functional definition. In the final rule, the Commission has revised the text of the definition of non-compete clause to address confusion among commenters about whether proposed § 910.1(b)(2) clarified the definition or extended it.

In response to the commenters requesting that the Commission clarify the circumstances under which the definition would apply to various other types of restrictive employment agreements, the Commission declines at

this time to enumerate every circumstance that may arise. As noted, a restrictive employment covenant may be a non-compete clause under § 910.1 if it expressly prohibits a worker from, or penalizes a worker for, seeking or accepting other work or starting a business, or if it does not do so expressly but is so broad or onerous in scope that it functionally has the same effect of preventing a worker from doing the same.

### 3. International Application of the Rule

#### a. Comments Received

The Commission received several comments expressing concern about whether the final rule would apply to non-competes that restrict work outside the U.S. In response, the final rule's definition of non-compete clause clarifies that it applies only to work in the U.S. or operating a business in the U.S.

Some commenters raised concerns about the cross-border movement of workers. A research center commenter asserted there is a global shortage of science and technology workers and stated that the final rule's adoption could exacerbate the U.S. shortage by allowing other countries to more easily poach U.S. workers. An academic commenter argued that banning non-competes might deter foreign investors from sending workers to the U.S. if the final rule would invalidate their non-competes.

Some commenters argued that legal systems in the People's Republic of China or other jurisdictions provide insufficient protection for U.S. companies' trade secrets, confidential information, or patent rights, and contended employers need non-competes as *ex ante* protection. These commenters generally say that trade secrets litigation is more challenging in some jurisdictions outside the U.S., for example because of less extensive discovery processes, less frequent use of preliminary injunctions, insufficient remedies, and a lower propensity to prosecute criminal intellectual property cases. An academic commenter argued that some courts may have fewer protections for confidential information compared to the U.S., so a suit concerning only a non-compete is less likely to reveal trade secrets through the course of litigation and thus more effectively prevent technologies from leaking to other governments and protecting U.S. national security interests. However, the comments provided limited evidence on non-competes and trade secret protection outside the U.S., and collectively only

---

[350] The term and practice of "garden leave" appears to have a British origin and is recognized by the Government of the United Kingdom. *See Gov.UK, Handing in your notice, https://www.gov.uk/handing-in-your-notice/gardening-leave* ("Your employer may ask you not to come into work, or to work at home or another location during your notice period. This is called 'gardening leave'.").

**JA0025**

discussed evidence from a few jurisdictions. One commenter noted that legal information and data from some jurisdictions may not be fully accurate because not all court decisions are public.

Two commenters highlighted the domestic semiconductor industry and the CHIPS Act of 2022, arguing the Chinese government seeks to acquire IP related to semiconductors and semiconductor experts with relevant knowledge and information. Those comments expressed concern that a ban on non-competes would damage the semiconductor industry, which relies on skilled workers and trade secrets, by weakening trade secrets protection and disincentivizing investment. Another commenter argued the proposed rule would undermine export controls designed to prevent foreign countries from acquiring U.S. technology and knowledge by allowing workers to move to foreign competitors. One commenter argued the proposed rule conflicts with an October 2022 Bureau of Industry and Security ("BIS") export control rulemaking, stating that the rulemaking limits worker mobility in certain industries from the U.S. to the People's Republic of China. Another commenter suggested the proposed rule would violate the World Trade Organization's Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS), which requires that persons "shall have the possibility of preventing information lawfully within their control from being disclosed to, acquired by, or used by others without their consent . . . ."[351] Finally, one commenter argued that by making it more difficult for businesses to protect against international theft of their intellectual property, the rule is at odds with the purposes of the Protecting American Intellectual Property Act of 2022.[352]

Some of these commenters made recommendations for the final rule. A law firm suggested that the final rule prevent evasion by barring employers from selecting the law of non-U.S. jurisdictions to govern employment contracts with U.S.-based workers. A trade association requested that the final rule cover only agreements subject to the law of a U.S. State. An academic commenter suggested revisions to the text of the proposed rule to ensure the final rule applies only within the U.S. The commenter also recommended stating that a non-compete restricting

work outside the U.S. is not a *per se* unfair method of competition and providing guidance on how employers should evaluate international non-competes, using factors such as the business justification for the non-compete and the impact on the worker. The commenter recommended applying the law of the jurisdiction where the worker seeks to be employed.

b. The Final Rule

In response to commenters' concerns, in this final rule the Commission adopts changes to the definition of "non-compete clause" that expressly limit the definition of non-compete to terms or conditions that prevent workers from seeking or accepting work in the U.S. or operating a business in the U.S. The final rule does not apply to non-competes if they restrict only work outside the U.S. or starting a business outside the U.S.

This revision clarifies for stakeholders the scope of the final rule and confirms it does not prohibit employers from using non-competes that restrict work outside the U.S., in compliance with those jurisdictions' own laws. The Commission understands that, as a commenter noted, some companies operating or competing globally already draft non-competes that comply with the laws of multiple jurisdictions and, thus, amending their non-competes to reflect this application of the final rule would not pose a significant challenge for those entities.

The Commission's revision clarifying the final rule's application to work or starting a business only in the U.S. also addresses the concerns from some commenters about key U.S. workers and technology flowing overseas, because the final rule does not ban non-competes that restrict workers from working or starting a business outside the U.S. It also clarifies that the final rule would not invalidate non-competes entered into by foreign companies with foreign workers unless they restrict a worker's ability to work or start a business inside the U.S. Other questions about the final rule's application to cross-border or non-U.S. employment are also addressed by the Foreign Trade Antitrust Improvements Act, codified at 15 U.S.C. 45(a)(3).

The Commission agrees with the academic commenter that, for non-competes that apply outside the U.S., the law of the relevant jurisdiction should govern any issue other than restricting work or starting a business in the U.S. However, the Commission declines to adopt a balancing test for non-competes restricting a worker's ability to work or start a business

outside the U.S., as a bright-line rule that applies only to work or starting a business in the U.S. is more administrable. In addition, the Commission declines to add language in the final rule stating that it does not apply to overseas employers or to non-competes not subject to U.S. State law. The final rule may apply to overseas employers if the non-compete purports to restrict work or starting a business in the U.S. and the reviewing court applies U.S. law.

The empirical evidence cited in the NPRM focused on the U.S., primarily consisting of studies based on the effects of changes in State laws in the U.S. The comments provided limited evidence on non-competes and trade secret protection outside the U.S., leaving many issues and most jurisdictions unaddressed. The Commission also notes, as one commenter did, that legal information and data from some jurisdictions may not be fully accurate because not all court decisions are public. On the current record, the Commission cannot reach conclusions on whether other jurisdictions have sufficient alternatives to non-competes, the scope of any potential risk, and many of the other issues raised. As a result, the Commission limits application of the final rule to work in the U.S., where the Commission has ample evidence on non-competes' negative effects.

One commenter argued the rule conflicts with BIS's October 2022 export control rulemaking, which restricts the ability of U.S. persons to support development or production at certain semiconductor facilities in the People's Republic of China without a license from BIS.[353] While the revision addresses the commenter's underlying concern about protection of sensitive technology from other governments by not banning non-competes that restrict the movement of workers to and in other jurisdictions, neither the NPRM nor the final rule is inconsistent with the BIS rule. The final rule will not affect BIS's ability to grant or decline to grant a license. With respect to the commenter that suggested the rule would violate TRIPS, the Commission has found that U.S. law provides alternative means of protecting trade secrets,[354] and TRIPS does not require enforcement of non-competes.

With respect to the commenter that stated that the final rule should include

[351] Agreement on Trade-Related Aspects of Intellectual Property Rights, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, sec. 7, art. 39, para. 2, 33 I.L.M. 81 (as amended Jan. 23, 2017).

[352] 50 U.S.C. 1709.

[353] Implementation of Additional Export Controls: Certain Advanced Computing and Semiconductor Manufacturing Items; Supercomputer and Semiconductor End Use; Entity List Modification, Interim Final Rule, 87 FR 62186 (Oct. 13, 2022).

[354] *See* Part IV.D.2.

a choice-of-law provision to prevent evasion, there is an existing body of law in the U.S. governing choice of law and conflict of law issues. Accordingly, the Commission declines to add any provisions concerning choice of law or conflict of law to the final rule. Rather, such questions are left to the relevant jurisdiction, whether that is a U.S. State, the Federal government, or another jurisdiction, as determined by applicable law.

### 4. Other Issues Relating to the Definition

#### a. Comments Received

While most commenters focused on the proposed definition's application to functional non-competes or international application, some commenters addressed other issues relating to the proposed definition. Several commenters stated that the definition should cover workplace policies or handbooks, to minimize confusion and make clear that employers are prohibited from including non-competes in workplace policies or handbooks, even if such clauses are unenforceable because they are not formal binding contracts. Some commenters stated that such policies or handbooks can affect a worker's decision to leave their job to work with a competitor or start their own businesses. Others stated the same about oral agreements. One commenter stated that the definition should not cover workplace policies because they apply only during, not after, employment.

A few commenters said the Commission should state explicitly in the definition of "non-compete clause" that restrictions on concurrent employment, such as prohibitions on "moonlighting" with competitors, are excluded. Other commenters urged the Commission to expand the definition to include restraints on concurrent employment because workers often need to take additional jobs during economic downturns, and low-wage workers generally need to take on additional jobs.

An organized labor commenter argued that no-raid agreements, which the commenter described as agreements between labor organizations not to attempt to organize workers already under representation by another union, should be exempted from the definition. An industry trade organization asked the Commission to clarify whether the definition would apply to non-competes in agreements between motor carriers and brokers in the trucking industry. In addition, a few commenters stated that proposed § 910.1(b)(1) was too broad or

potentially ambiguous without pointing to any specific features of the definition.

#### b. The Final Rule

To address the concerns raised by commenters about workplace policies and handbooks, the definition of non-compete clause in § 910.1 uses the phrase "a term or condition of employment" instead of "contractual term." The definition further clarifies that term or condition of employment includes "a contractual term or workplace policy, whether written or oral." The Commission finds that employers have used restrictions in handbooks, workplace policies, or other vehicles that are not formal written contracts to successfully prevent workers from seeking or accepting other employment or starting a new business. The Commission finds, consistent with the views expressed by commenters, that such restrictions in handbooks, workplace policies, or other such vehicles have the same tendency to negatively affect competitive conditions as a formal binding contract term. To provide that such conduct is covered by the definition of non-compete clause, this language clarifies that the definition of non-compete clause is not limited to clauses in written, legally enforceable contracts and applies to all forms a non-compete might take, including workplace policies or handbooks and informal contracts. Given the comments expressing concern about oral representations, the Commission clarifies in the definition of non-compete clause that clauses that purport to bind a worker are covered, whether written or oral, and provides in § 910.2(a)(1) and (2) that it is an unfair method of competition to make representations that a worker is subject to a non-compete. (However, as explained in Part V.C, such representations are not prohibited where the person has a good-faith basis to believe that the final rule is inapplicable.)

The Commission declines to extend the reach of the final rule to restraints on concurrent employment. Although several commenters raised this issue, the evidentiary record before the Commission at this time principally relates to post-employment restraints, not concurrent-employment restraints. The fact that the Commission is not covering concurrent-employment restraints in this final rule does not represent a finding or determination as to whether these terms are beneficial or harmful to competition. The Commission relatedly clarifies that fixed-duration employment contracts, *i.e.*, contracts between employers and

workers whereby a worker agrees to remain employed with an employer for a fixed term and the employer agrees to employ the worker for that period, are not non-compete clauses under the final rule because they do not restrain post-employment conduct.

While the final rule does not extend to restraints on concurrent employment, the Commission has made a technical edit to the definition of non-compete to clarify how it relates to seeking and accepting employment. Proposed § 910.1(b) defined non-compete clause as a contractual term that "prevents the worker from seeking or accepting employment with a person . . . after the conclusion of the worker's employment with the employer." Because, as a technical matter, non-competes can also prevent workers from seeking or accepting future employment with another person before their work for their previous employer has concluded, the Commission has clarified the relevant language to read "that prevents a worker from seeking or accepting work in the United States with a different person *where such work would begin after* the conclusion of the employment that includes the term or condition" and "that prevents a worker from operating a business in the United States *after the conclusion of the employment* that includes the term or condition" (emphases added).

In addition, in response to comments expressing concern about evasion of the rule through third-party hiring,[355] the Commission has revised the phrase "after the conclusion of the worker's employment with the employer" to read "after the conclusion of the employment that includes the term or condition." The Commission recognizes that non-competes can cover workers who are hired by one party but work for another, such as workers hired through staffing agencies. The Commission intends for the final rule to apply to such non-competes, and for this revision to eliminate any ambiguity as to whether such clauses are covered by the definition of non-compete clause in § 910.1.

With respect to the comment about union no-raid agreements, the Commission notes that the definition would apply only to the extent the agreement is a "term or condition of employment" and only if the agreement "prevents a worker from seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or

---

[355] These comments are described in greater detail in Part III.G.

condition'' or ''operating a business in the United States after the conclusion of the employment that includes the term or condition.''[356] The Commission's understanding is that union no-raid agreements are not terms and conditions of employment that prevent workers from seeking or accepting work or operating a business.

With respect to the comment asking whether the definition would apply to non-competes in agreements between motor carriers and brokers in the trucking industry, the Commission notes as a general matter that the definition would not apply to non-competes between businesses, but the Commission declines to opine on specific factual circumstances.

### E. Definition of ''Person''

The proposed rule did not separately define the term ''person.'' Instead, proposed § 910.1(c)—the proposed definition of ''employer''—stated that an employer ''means a person, as defined in 15 U.S.C. 57b–1(a)(6), that hires or contracts with a worker to work for the person.'' The statutory provision cross-referenced in proposed § 910.1(c) is section 20(a)(6) of the FTC Act, which defines ''person'' for purposes of the Commission's authority to issue civil investigative demands. Section 20(a)(6) defines ''person'' as ''any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law.'' No comments were received concerning the use of ''person'' in proposed § 910.1(c).

As explained in Part III.C, the Commission has removed the defined term ''employer'' from the regulatory text of the final rule. However, the regulatory text still uses the term ''person.'' For example, § 910.2(a)(1) prohibits a ''person'' from, among other things, entering into a non-compete clause. As a result, the Commission has adopted a separate definition of the term ''person.'' Section 910.1 defines ''person'' as ''any natural person, partnership, corporation, association, or other legal entity within the Commission's jurisdiction, including any person acting under color or authority of State law.'' This text consists of the proposed definition from section 20(a)(6), plus the phrase ''within the Commission's jurisdiction,'' which clarifies that only persons within the Commission's jurisdiction are subject to the final rule.

### F. Definitions Related to Senior Executives

With respect to existing non-competes, *i.e.*, non-competes entered into before the final rule's effective date, the Commission adopts a different approach for ''senior executives'' than for other workers. Existing non-competes with senior executives can remain in force; the final rule does not cover such agreements.[357] For workers who are not senior executives, existing non-competes are no longer enforceable after the final rule's effective date.[358] The Commission describes its rationale for the final rule's differential treatment of senior executives in Part IV.C.

Section 910.1 defines the term ''senior executive'' as well as related terms. Because the Commission's rationale for the final rule's differential treatment of senior executives provides important context for these definitions, the Commission describes these definitions in Part IV.C.4.

### G. Definition of ''Worker''

#### 1. Proposed Definition

In the NPRM, the Commission proposed to define ''worker'' in proposed § 910.1(f) as ''a natural person who works, whether paid or unpaid, for an employer.''[359] Proposed § 910.1(f) also stated that ''the term [worker] includes, without limitation, an employee, individual classified as an independent contractor, extern, intern, volunteer, apprentice, or sole proprietor who provides a service to a client or customer.''[360]

In the NPRM, the Commission explained it intended the term ''worker'' to include not only employees, but also individuals classified as independent contractors, as well as other kinds of workers.[361] The Commission explained that, under proposed § 910.1(f), the term ''worker'' would include any natural person who works, whether paid or unpaid, for an employer, without regard to whether the worker is classified as an ''employee'' under the FLSA or any other statute that draws a distinction between ''employees'' and other types of workers.[362]

The Commission stated in the NPRM that it was concerned that if the rule were to define workers as ''employees'' according to, for example, the FLSA definition, employers may misclassify employees as independent contractors

to evade the rule's requirements.[363] The Commission explained it had no reason to believe non-competes that apply to workers who are treated as independent contractors under the FLSA or interns tend to negatively affect competitive conditions to a lesser degree than non-competes that apply to employees, and that such non-competes may, in fact, be more harmful to competition, given that these other types of workers tend to have shorter working relationships.[364] In addition, the Commission explained that the purported business justifications for applying non-competes to independent contractors would not be different or more cognizable from those related to employees.[365]

Proposed § 910.1(f) also stated the term worker ''does not include a franchisee in the context of a franchisee-franchisor relationship.''[366] The Commission explained that the relationship between a franchisor and franchisee may in some cases be more analogous to the relationship between two businesses than the relationship between an employer and a worker, and that the evidentiary record before the Commission related primarily to non-competes arising solely out of employment.[367] The Commission therefore stated that it believed it would be appropriate to clarify that a franchisee—in the context of a franchisor-franchisee relationship—is not a ''worker'' for purposes of proposed § 910.1(f).[368]

Proposed § 910.1(f) further clarified, however, that the term worker ''includes a natural person who works for the franchisee or franchisor,'' and that ''non-competes between franchisors and franchisees remain subject to [F]ederal antitrust law as well as all other applicable law.''[369] The Commission explained that these laws include State laws that apply to non-competes in the franchise context.[370] The Commission also clarified that it was not proposing to find that non-competes between franchisors and franchisees are beneficial to competition.[371]

#### 2. Comments Received

Several commenters stated that they agreed with the proposed definition of ''worker'' because it applies to all workers without regard to their classification. Many of these

---

[357] *See* Part IV.C.3.
[358] *See* § 910.2(a)(1)(i).
[359] NPRM, proposed § 910.1(f).
[360] *Id.*
[361] *Id.* at 3511.
[362] *Id.*

[363] *Id.*
[364] *Id.*
[365] *Id.*
[366] *Id.* at 3511, 3520.
[367] *Id.*
[368] *Id.*
[369] *Id.* at 3511.
[370] *Id.*
[371] *Id.*

commenters specifically urged the Commission to adopt a final definition that includes all categories of workers regardless of whether they are classified as employees, including independent contractors, "gig" workers, and others. These commenters pointed to the Commission's preliminary finding that non-competes are widely used across the economy. They cited employers' frequent misclassification of workers as independent contractors, agreeing with concerns raised in the NPRM that, if "worker" excludes independent contractors, employers may misclassify workers as independent contractors to avoid complying with the rule. Many commenters stated that millions of workers are misclassified as independent contractors, including a disproportionate number of women, people of color, and low-income workers. These commenters expressed concern that, if the rule excluded independent contractors from coverage, it would fail to benefit these groups, for whom non-competes may be particularly exploitative and coercive.

On the other hand, several commenters suggested removing bona fide independent contractors and sole proprietors from the definition of "worker." Two industry groups contended that there is a lack of data regarding the prevalence and effects of non-competes among independent contractors as opposed to other kinds of workers and that, as a legal matter, the evidence is insufficient to justify including independent contractors as "workers" under the rule. A few industry organizations also contended that, because they have more control over their work and generally work for more than one employer, independent contractors have greater bargaining power than other workers. One academic commenter suggested that non-competes between employers and independent contractors are more akin to agreements between businesses than agreements between employers and workers. A few of these industry organizations also contended that non-competes are justified because independent contractors provide services outside the scope of their employers' expertise and thus have greater access to sensitive information than other workers. Other industry organizations contended that small businesses employ more independent contractors than their larger rivals. These commenters stated that, to protect small businesses from being impacted disproportionately by the rule, the definition of "worker" should exclude independent contractors. Finally, a few

industry trade organizations and an academic commenter stated that independent contractors should be excluded from coverage under the rule to avoid "free riding," in which a contractor working for one firm can use that firm's assets—like tools or databases—to benefit another firm.

Several commenters suggested changes to the definition of "worker" to maximize the rule's coverage and close potential loopholes. One worker advocacy group noted that, combined with the proposed definition of "employer," the proposed definition of "worker"—a natural person who works "for an employer"—appeared to exclude workers who work for a person other than the person who hired or contracted with them to work. The commenter noted that workers are often employed indirectly—by way of a contractual relationship with a staffing agency, an affiliate of their common-law employer, or some entity other than their common-law employer—and that non-competes are often imposed on workers by the non-hiring party. In order to ensure these workers are covered by the rule, the commenter suggested that the definition of "worker" should also cover a person who works "directly or indirectly" for an employer and that the definition specifically include "a person who works for the employer under an arrangement with a professional employer organization, statutory employer, wholly owned entity of which the person is the sole or principal employee or service provider, loan-out arrangement or similar arrangement."

The same commenter also argued that employers often impose non-competes on workers who own a portion of the business while not applying the same restriction to outside investors who do not work for the company, and that such worker-owner non-competes should be treated as employment-related non-competes. In order to ensure these workers are covered by the rule, the commenter suggested that "worker" should also include "a person who holds direct or indirect equity or other interest in the employer and who provides services to or for the benefit of the employer." Another commenter suggested that, for clarity, "worker" should specifically exclude a "substantial owner, member or partner" as defined in the sale-of-business exception.

Several State attorneys general, local government commenters, academic commenters, and a worker advocacy group warned that categorically excluding franchisees from the definition of "worker" would lead employers to misclassify workers as

franchisees to evade the rule's requirements. Some commenters suggested incorporating the "ABC" test—a common law test designed to determine whether a worker is an employee based on fact-specific conditions—into the definition of "worker" to prevent evasion.[372]

Some commenters requested that the Commission revise the definition of "worker" to exclude or include certain workers from coverage under the rule. These comments are addressed in Part IV.C (comments requesting an exclusion for senior executives) and in Part V.D (comments requesting exclusions for other categories of workers).

### 3. The Final Rule

After considering the comments, the Commission revised the definition of "worker" in three ways to clarify that the term covers all current and former workers, regardless of which entity hired or contracted with them to work, and regardless of a worker's title or status under any other applicable law.

First, the Commission added "or who previously worked" to the basic definition of "worker" as "a natural person who works." This revision is designed to clarify that former workers are considered "workers" under the final rule, such as where an employer is required to notify a former worker that their non-compete is no longer enforceable.[373]

Second, the Commission removed "for an employer" from the definition. This revision is designed to ensure that the final rule covers workers who are hired by one party but work for another, closing the unintended loophole identified by commenters regarding third-party hiring.

Third, the Commission added "without regard to the worker's title or the worker's status under any other State or Federal laws" prior to the list of examples of different categories of workers that the definition covers. This change is designed to make more explicit that the term "worker" includes all workers regardless of their titles, status under other laws, or the details of the contractual relationship with their employer.

The Commission has made two additional changes to the definition for clarity. First, the Commission has revised the phrase "individual classified as an independent contractor" to "independent contractor." Second, the Commission has added "a natural person who works for a franchisee or

---

[372] *See, e.g., Dynamex Operations W. v. Superior Ct.,* 4 Cal. 5th 903, 955–957 (Cal. 2018).

[373] *See* § 910.2(b).

franchisor'' to the non-exclusive list of examples of types of workers that would be covered by the definition. This language is simply moved from elsewhere in the definition. Third, the Commission has removed the sentence reading "[n]on-competes between franchisors and franchisees would remain subject to Federal antitrust law as well as all other applicable law'' from the definition to avoid the implication that only such non-competes remain subject to Federal antitrust law and other applicable law.

The Commission declines to specify that a "worker" includes an owner who provides services to or for the benefit of their business because the definition already encompasses the same.

The Commission is not persuaded by commenters' arguments that independent contractors or sole proprietors are inherently different from other kinds of workers with respect to non-competes, and therefore declines to exclude them from the definition of "worker." Commenters did not present persuasive evidence that non-competes that apply to independent contractors or sole proprietors tend to negatively affect competitive conditions to a lesser degree—or are restrictive, exclusionary, exploitative, or coercive to a lesser degree—than non-competes that apply to other workers. As noted by commenters who supported including independent contractors, non-competes' tendency to negatively affect competitive conditions by restricting workers' ability to change jobs or start businesses is not contingent on whether the worker is an employee or an independent contractor. While some commenters contended that independent contractors have more independence and more access to intellectual property than other workers, commenters did not provide evidence that this is the case. Moreover, even were this to be true, it would not justify an exclusion, because the Commission generally declines to exclude workers based on their access to intellectual capital or their independence for the reasons explained in Part V.D.

Furthermore, whether a worker is an employee or an independent contractor does not impact employers' ability to exploit imbalances of bargaining power or limit employers' ability to use less restrictive alternatives to non-competes to protect their intellectual property. While commenters who supported excluding independent contractors contended that independent contractors have more bargaining power than other workers, this contention is not backed by evidence. While some economists hypothesize that, theoretically,

independent contractors may have more bargaining power vis-à-vis employers than employees do, they do not provide empirical evidence to support that assertion. Furthermore, as described by a report from the Treasury Department that was based on an extensive literature review, independent contractors may have less bargaining power than employees in many respects.[374]

The Commission is also not persuaded that non-competes are necessary to prevent "free riding" by independent contractors who use one firm's assets to benefit another. The final rule prohibits agreements that restrain a worker from working after the scope of employment has ended and does not prohibit agreements which prevent a worker from working for two firms simultaneously. In addition, any "free riding" may be addressed through less restrictive means, including through agreements prohibiting an independent contractor from using assets provided by one firm to benefit another.

Nor is the Commission persuaded that small businesses will be disproportionately harmed by a rule which prohibits non-competes for independent contractors. Commenters did not provide evidence to support their assertion that small businesses employ more independent contractors than larger ones.

The Commission agrees with the commenters who contended that excluding independent contractors may have the effect of excluding misclassified workers, who may be among the most vulnerable to exploitation and coercion. The recent overview by the U.S. Department of Labor ("DOL") of the evidence on misclassification led it to conclude that although the prevalence of misclassification of employees as independent contractors is unclear, there is evidence that it is nonetheless "substantial" and has a disproportionate effect on workers who are people of color or immigrants because of the disparity in occupations most affected by misclassification, which include jobs in construction, trucking, delivery, home care, agriculture, personal care, ride-hailing services, and janitorial and building services.[375] The Commission also agrees with commenters' contentions that excluding independent contractors from the definition of

"worker" could increase employers' incentive to misclassify workers as independent contractors. Indeed, misclassification is often motivated by attempts to evade the application of laws.

Because there is no reason to believe non-competes that apply to independent contractors or sole proprietors tend to negatively affect competitive conditions to a lesser degree, or are restrictive, exclusionary, exploitative, or coercive to a lesser degree, than non-competes that apply to employees—and in light of substantial evidence of widespread employee misclassification—the Commission declines to exclude independent contractors from the definition of "worker." For this reason, the Commission also declines to incorporate the "ABC" test or other tests designed to differentiate between independent contractors and employees.

## IV. Section 910.2: Unfair Methods of Competition

### A. Introduction

#### 1. Overview of the Commission's Findings and Determinations

In the NPRM, the Commission proposed to categorically ban employers from using non-competes with all workers, including existing agreements. However, the Commission sought comment on whether it should adopt different standards for non-competes with senior executives, and, if so, how it should define senior executives.[376] Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission in this final rule finds that non-competes with all workers are an unfair method of competition—although its rationale differs with respect to workers who are and are not senior executives.

The final rule provides that it is an unfair method of competition—and therefore a violation of section 5—for employers to, *inter alia,* enter into non-competes with workers on or after the final rule's effective date.[377] The Commission thus adopts a comprehensive ban on new non-competes with all workers. With respect to existing non-competes, *i.e.,* non-competes entered into before the final rule's effective date, the Commission adopts a different approach for senior executives[378] than for other workers.

---

[374] U.S. Treasury Dep't, Report, *The State of Labor Market Competition* (Mar. 7, 2022) (hereinafter "Treasury Labor Market Competition Report").

[375] Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 89 FR 1638, 1735 (Jan. 10, 2024).

[376] NPRM at 3519.

[377] *See* § 910.2(a)(1)(i) and § 910.2(a)(2)(i).

[378] *See* § 910.1 (defining "senior executive").

Existing non-competes with senior executives can remain in force; the final rule does not cover them.[379] For workers who are not senior executives, existing non-competes are no longer enforceable after the final rule's effective date.[380] Employers must provide such workers with existing non-competes notice that the non-competes will not be enforced after the final rule's effective date.[381]

Specifically, with respect to workers who are not senior executives, the Commission determines that it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; enforce or attempt to enforce a non-compete clause; or represent to the worker that the worker is subject to a non-compete clause.[382] The Commission finds that with respect to these workers, these practices are unfair methods of competition in several independent ways:

• The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in labor markets.

• The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in product and service markets.

• The use of non-competes is exploitative and coercive conduct that tends to negatively affect competitive conditions in labor markets.

• The use of non-competes is exploitative and coercive conduct that tends to negatively affect competitive conditions in product and service markets.

In contrast, with respect to senior executives, the Commission determines that it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; enforce or attempt to enforce a non-compete clause entered into after the effective date; or represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date. The Commission does not find that non-competes with senior executives are exploitative and coercive. With respect to senior executives, the Commission finds that non-competes are unfair methods of competition in two independent ways:

• The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect

competitive conditions in product and service markets.

• The use of non-competes is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in labor markets.

The final rule allows existing non-competes with senior executives to remain in force. Because the harm of these non-competes is principally that they tend to negatively affect competitive conditions (rather than exploiting or coercing the executives themselves), and due to practical concerns with extinguishing existing non-competes for such executives, the final rule prohibits employers only from entering into or enforcing new non-competes with senior executives.

Parts IV.B and IV.C set forth the findings that provide the basis for the Commission's determinations that the foregoing practices are unfair methods of competition under section 5 for these two categories of workers, respectively.[383] In these sections, the Commission also describes and responds to comments regarding the preliminary findings in the NPRM that informed its preliminary determinations related to unfair methods of competition.

## 2. Analytical Framework for Assessing Empirical Evidence

Before turning to the basis for its findings, the Commission describes the analytical framework it has applied in assessing the empirical evidence on non-competes. In the NPRM, the Commission discussed the existing empirical literature on non-competes and its assessment of those studies, including its preliminary view of which studies were more robust and thus should be given more weight.[384] In response, some commenters argued the Commission gave too much weight to certain studies or too little weight to others.[385]

The Commission notes that the methodologies of empirical studies on

the effects of non-competes vary widely. In this final rule, based on the Commission's longstanding expertise assessing empirical evidence relating to the effects of various practices on competition, the Commission gives more weight to studies with methodologies that it finds are more likely to yield accurate, reliable, and precise results. In evaluating studies, the Commission utilized the following five principles that reflect best practices in the economic literature.

First, the Commission gives more weight to studies examining the effects of a change in legal status or a change in the enforceability of non-competes, and less weight to studies that simply compare differences between workers who are subject to non-competes and those who are not. Studies that look at what happens before and after a change in State law that affects the enforceability of non-competes provide a reliable way to study the effects of the change. This is especially true when only the enforceability of non-competes changes, and not other factors affecting firms and workers. If other substantial changes do not also occur around the same time, this study design often allows the researcher to infer that the change caused the effects—since the likelihood that confounding variables are driving the effects or outcomes is minimal.[386]

In contrast, other studies of the use of non-competes compare a sample of workers who are subject to non-competes with a sample of workers who are not subject to non-competes. The shortcoming of these studies is that they cannot easily differentiate between correlation and causation. For example, if such a study shows that workers with non-competes earn more, there could be many confounding reasons for this result. For example, employers may be more likely to enter into non-competes with workers who earn more. In contrast, a study showing that workers' earnings increase or decrease when non-

---

[379] *See* Part IV.C.3.

[380] *See* § 910.2(a)(1)(ii) and § 910.2(a)(1)(iii).

[381] *See* § 910.2(b).

[382] *See* § 910.2(a)(1).

[383] In addition to the findings described in Parts IV.B and C, the Commission finds that the use of non-competes by employers substantially affects commerce as that term is defined in section 5 and burdens a not insubstantial portion of commerce. The findings in Parts IV.B and C apply with respect to senior executives and other workers, whether considered together or respectively. The evidence establishes that non-competes affect labor mobility, workers' earnings, new business formation, and innovation, including empirical evidence specifically identifying cross-border effects with respect to earnings, *see infra* notes 464–468 and accompanying text, and innovation, *see infra* note 563 and accompanying text.

[384] *See* NPRM at 3484–93.

[385] The Commission discusses comments addressing specific studies in Parts IV.B, IV.C, and IV.D.

[386] In Parts IV.B and C, the Commission describes how these "enforceability" studies show that increased enforceability of non-competes results in various harms, such as reduced earnings, new business formation, and innovation. Notably, the available evidence also shows that workers are chilled from engaging in competitive activity even where a non-compete is likely unenforceable—for example, because they are unaware of the law or unable to afford a legal battle against the employer. *See* Part IV.B.3.a.i. The fact that many workers may not adjust their behavior in response to changes in State-level enforceability of non-competes suggests that the final rule could result in even greater effects than those observed in the research, particularly because it would require employers to provide workers with notice that their non-compete is no longer in effect, which would help correct for workers' lack of knowledge of the law. *See* § 910.2(b).

competes are made more or less enforceable provides much stronger evidence regarding the effect of non-competes, in isolation. Researchers studying non-competes are aware of this bias and frequently caution that estimates of the correlation between outcomes and the use of non-competes should not be misinterpreted as causal.[387]

Second, the Commission gives more weight to studies examining the effects of changes in non-compete enforceability and less weight to studies that simply compare economic outcomes between States where non-competes are more enforceable and States where non-competes are less enforceable. This latter category of studies is known as "cross-sectional studies of enforceability." Like studies based on the use of non-competes, these cross-sectional studies of enforceability cannot easily differentiate between correlation and causation. This is because differences between States that are unrelated to non-competes and their enforceability can easily pollute comparisons. For example, non-competes are less enforceable in California than in Mississippi, and the cost of living is higher in California than in Mississippi. However, the difference in the cost of living is likely to be due to underlying differences between the economies and geographies of the two States, rather than being attributable to non-competes. In contrast, studies examining how changes in enforceability of non-competes affect various outcomes—studies that look at what happens within States before and after a change in State law that affects the enforceability of non-competes—allow researchers to infer that the change caused the effects.[388]

Despite having this limitation, the Commission believes that cross-sectional studies of enforceability are still superior to the "use" studies described under the first principle. This is because although comparisons of different States may have unreliable results due to confounding variables—depending on which States are

compared—"use" studies are inherently unreliable due to confounding effects. For example, because employers enter into non-competes more often with highly paid workers, all "use" studies related to worker earnings are inherently unreliable, although studies that utilize data on the use of non-competes but employ a design that plausibly identifies a causal effect may be less unreliable.

Third, the Commission gives more weight to studies assessing changes in the enforceability of non-competes in multiple States. This reduces the possibility that the observed change in economic outcomes was driven by an idiosyncratic factor unique to a particular State. For example, assume State X changed its laws to make non-competes less enforceable, and new business formation subsequently increased compared with other States. However, around the same time it changed its non-compete law, State X also enacted legislation to provide attractive tax incentives to entrepreneurs. It would be difficult to isolate the effect of the change in non-compete law from the effect of the tax law change. For this reason, the Commission gives more weight to studies that analyze the effects of multiple changes in enforceability. For example, if a study shows that, compared with other States that did not change their non-compete laws, new business formation rose not only in State X, but also in several other States that changed their laws to make non-competes less enforceable, the Commission would be more confident inferring that changes in non-compete law caused these effects.

Fourth, the Commission gives more weight to studies that use sophisticated, nuanced measures of enforceability, such as non-binary measures of non-compete enforceability that capture multiple dimensions of non-compete enforceability. This fourth guiding principle ensures accuracy and granularity in the measurement of non-compete enforceability.

A variety of different factors affect the enforceability of non-competes from State to State, including (among others) the permissible geographic scope and duration of non-competes and how high the employer's burden of proof is to establish that a non-compete is enforceable. Given the different factors involved, the overall level of non-compete enforceability from State to State falls along a spectrum; it is not as simple as whether non-competes are enforceable or not. Thus, scales which use binary measures miss nuance between States. This is true for

enforceability overall (*e.g.*, scales which simply assign States to "enforcing" or "non-enforcing" categories) and for elements of enforceability (*e.g.*, scales which assess whether a non-compete is enforceable if a worker is fired with a yes or no answer). While no scale is perfect, scales which allow for multidimensionality and granularity measure non-compete enforceability (and thus the effects that stem from it) with a higher degree of accuracy.[389]

Fifth, the Commission gives more weight to studies in which the outcome studied by the researchers is the same as the outcome the Commission is interested in or is an effective proxy for the outcome the Commission is interested in. It gives less weight to studies that use ineffective proxies. For example, some outcomes are relatively easy to study. There is extensive data on workers' earnings at the State level, so researchers can simply use this data to study how changes in non-compete enforceability affect workers' earnings in a State. Other outcomes, however, may be more challenging to quantify directly, and thus researchers may use proxies for understanding the effect they are studying. For example, there is no single metric that measures innovation in the economy. For this reason, to learn about how non-competes affect innovation, a researcher might study the effect of changes in non-compete enforceability on the number of patents issued in the State as a proxy for innovation. However, proxies can sometimes be ineffective or inapt. For example, a study that analyzes the effect of non-compete enforceability on the number of patents issued is generally a weaker proxy for innovation than a study that also takes into account the quality of patents issued. For this reason, the Commission gives more weight to studies that measure the exact outcome of interest or studies that use effective proxies.

While these five guiding principles are important indicators of the relative strength of empirical studies evaluated by the Commission for the purpose of this final rule, the Commission's assessment of empirical studies was holistic and relied on its economic expertise. In addition to the guiding principles described in this Part IV.A.2, the Commission's holistic, expert assessment of the empirical evidence also included considering characteristics of studies important in any context, such as data quality, statistical precision, and other factors.

---

[387] *See, e.g.,* Starr, Prescott, & Bishara, *supra* note 68 at 73 ("Our analysis of the relationships between noncompete use and labor market outcomes . . . is best taken as descriptive and should not be interpreted causally."); Johnson & Lipsitz, *supra* note 80 at 711 ("These regressions [of firm investment on non-compete use] should be interpreted as correlations rather than causation, since the decisions to make these investments and use [non-competes] are made jointly.").

[388] Matthew S. Johnson, Kurt J. Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility,* Nat'l Bureau of Econ. Rsch. 2 (2023) (". . . cross-sectional variation in enforceability might be correlated with other unobserved differences across states.").

[389] Jonathan M. Barnett & Ted Sichelman, *The Case for Noncompetes,* 87 U. Chi. L. Rev. 953 (2020).

**JA0032**

In some instances, the Commission cites studies beyond those discussed in the NPRM. The Commission cites such studies only where they check or confirm analyses discussed in the NPRM, or where the Commission is responding to comments raising them. The Commission's findings do not rest on these studies, however, and they are not necessary to support its findings.

## B. Section 910.2(a)(1): Unfair Methods of Competition—Non-Competes With Workers Other Than Senior Executives

The Commission now turns to the basis for its findings that non-competes with workers other than senior executives are an unfair method of competition. As explained in Part II.F, under section 5, the Commission assesses two elements: (1) whether the conduct is a method of competition, as opposed to a condition of the marketplace, and (2) whether it is unfair, meaning that it goes beyond competition on the merits. The latter inquiry has two components: (a) whether the conduct has indicia of unfairness, and (b) whether the conduct tends to negatively affect competitive conditions. These two components are weighed according to a sliding scale.

Non-competes with workers other than senior executives satisfy all the elements of the section 5 inquiry.[390] As described in Part IV.B.2, such non-competes are facially unfair because they are restrictive and exclusionary, and because they are exploitative and coercive. And as described in Part IV.B.3, such non-competes tend to negatively affect competitive conditions in labor markets and markets for products and services. As explained in Part II.F, the legal standard for an unfair method of competition under section 5 requires only a tendency to negatively affect competitive conditions. The inquiry does not turn on whether the conduct directly caused actual harm in a specific instance. Here, the tendency of non-competes to impair competition is obvious from their nature and function. And even if this tendency were not facially obvious, the evidence confirms that non-competes do in fact have a negative effect on competitive conditions.

The Commission finds that the empirical research described in this Part IV.B supports findings related to workers other than senior executives.[391]

### 1. The Commission Finds That Non-Competes Are a Method of Competition, Not a Condition of the Marketplace

With respect to the first element, whether the conduct is a method of competition, the Commission preliminarily found in the NPRM that non-competes are a method of competition under section 5 because they are specific conduct undertaken by an actor in a marketplace, as opposed to merely a condition of the marketplace.[392] No commenters disagreed with this finding, and the Commission reaffirms its preliminary finding that non-competes are a method of competition.

### 2. The Commission Finds That Non-Competes Are Facially Unfair Conduct

The Commission finds that non-competes are facially unfair conduct under section 5 because they are restrictive and exclusionary. The Commission further finds that non-competes are facially unfair under section 5 because they are exploitative and coercive.

#### a. Non-Competes Are Restrictive and Exclusionary Conduct

Under section 5, indicia of unfairness may be present where conduct is restrictive or exclusionary, provided that the conduct also tends to negatively affect competitive conditions.[393] In the NPRM, the Commission explained that non-competes are restrictive conduct.[394] No commenters disputed this analysis, and the Commission reaffirms its preliminary finding that non-competes are restrictive.

The restrictive nature of non-competes is evident from their name and function: non-competes restrict competitive activity. They do so by restricting a worker's ability to seek or accept other work or start a business after the worker leaves their job, and by restricting competitors from hiring that worker. Because non-competes facially restrict competitive activity, courts have long held they are restraints of trade and proper subjects for scrutiny under the antitrust laws.[395]

The restrictions that non-competes impose on workers are often substantial. Non-competes can severely restrict a worker's ability to compete against a former employer. For most workers, the most natural alternative employment options are jobs in the same geographic area and in the same field. These are the very jobs that non-competes typically prevent workers from taking. Furthermore, for most workers, the most practical entrepreneurship option is starting a business in the same field. This is the very opportunity that non-competes typically prevent workers from pursuing. Moreover, the record before the Commission reflects that non-competes are often so broad as to force a worker to sit out of the labor market altogether.

In the NPRM, the Commission used the term "restrictive" to encompass both restrictive and exclusionary conduct.[396] In this final rule, in addition to finding that they are restrictive conduct, the Commission separately finds that non-competes are exclusionary conduct because they tend to impair the opportunities of rivals. Where a worker is subject to a non-compete, the ability of a rival firm to hire that worker is impaired. In addition, where many workers in a market are subject to non-competes, the ability of firms to expand into that market, or entrepreneurs to start new businesses in that market, is impaired.

For the foregoing reasons, the Commission finds that the use of non-competes with workers other than senior executives is facially unfair under section 5 because it is conduct that is restrictive or exclusionary.

#### b. Non-Competes Are Exploitative and Coercive Conduct

Conduct may violate section 5 where it is exploitative or coercive and tends to negatively affect competitive conditions.[397] Indeed, where conduct is exploitative or coercive, it evidences

---

[390] For the sake of readability, in this Part IV.B, the Commission refers to non-competes with workers other than senior executives as "non-competes."

[391] Some of the studies described in Part IV.B analyze non-competes between employers and workers across the labor force. Other studies analyze non-competes with particular populations of workers. In each of the studies described in Part IV.B, non-competes with workers other than senior executives represented a large enough segment of the sample that the study supports findings related to the effects of non-competes for such workers. Studies that focus primarily on non-competes for senior executives are described in Part IV.C, which explains the Commission's findings related to non-competes with senior executives.

[392] NPRM at 3504.

[393] See Part II.F.

[394] NPRM at 3500.

[395] See, e.g., Am. Tobacco Co., 221 U.S. 106, 181–83 (1911) (holding that several tobacco companies violated Sections 1 and 2 of the Sherman Act due to the collective effect of six of the companies' practices, one of which was the "constantly recurring" use of non-competes); Newburger, Loeb & Co., Inc., 563 F.2d 1057, 1082 (2d Cir.) ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.") (internal citation omitted).

[396] NPRM at 3500 ("Non-competes also restrict rivals from competing against the employer to attract their workers.").

[397] See Part II.F.

clear indicia of unfairness, and less may be necessary to show a tendency to negatively affect competitive conditions.[398]

In the NPRM, the Commission preliminarily found that non-competes with workers other than senior executives were exploitative and coercive because in imposing them on workers, employers take advantage of their unequal bargaining power.[399] The Commission also preliminarily found that non-competes are exploitative and coercive at the time of the worker's potential departure, because they force a worker to either stay in a job the worker wants to leave or force the worker to bear other significant harms and costs, such as leaving the workforce or their field for a period of time; relocating to a different area; violating the non-compete and facing the risk of expensive and protracted litigation; or attempting to pay the employer to waive the non-compete.[400]

The Commission received an outpouring of comments on the question of whether non-competes were exploitative or coercive. Thousands of workers described non-competes as pernicious forces in their lives that took advantage of their lack of bargaining power and forced them to make choices detrimental to their finances, their careers, and their families. Above all, the predominant themes that emerged from the comments were powerlessness and fear.

Thousands of workers reported feeling powerless to avoid non-competes, either because the worker needed the job or because non-competes were pervasive in the worker's field. Hundreds of workers reported non-competes were unilaterally imposed on them. Workers overwhelmingly reported that they did not bargain over non-competes, did not receive compensation for non-competes, and were not represented by counsel in connection with non-competes, with only rare exceptions.

And hundreds of workers reported that even where they wanted a job with better pay or working conditions, or to strike out on their own, the fear of litigation from a deep-pocketed employer or the fear of being without work prevented them from doing so. Hundreds of workers described how this fear coerced them into remaining in jobs with poor conditions or pay, including dangerous or toxic work environments; into leaving an industry or profession that they invested, trained, studied, or

were experienced in, damaging or derailing their careers; into moving away from their home, uprooting or separating their families; or into enduring long-distance commutes, which made it harder to care for and spend precious time with their loved ones. Many workers described how this fear hung above them even if they thought the non-compete was overbroad and probably unenforceable under State law, because having to defend a lawsuit from an employer for any length of time would devastate their finances.

Based on the entirety of the record, for the following reasons, the Commission finds non-competes with workers other than senior executives are exploitative and coercive because they are unilaterally imposed by a party with superior bargaining power, typically without meaningful negotiation or compensation, and because they trap workers in worse jobs or otherwise force workers to bear significant harms and costs.

### i. Non-Competes With Workers Other Than Senior Executives Are Unilaterally Imposed

The Commission finds that employers almost always unilaterally impose non-competes, exploiting their superior bargaining power to impose—without any meaningful negotiation or compensation—significant restrictions on workers' abilities to leave for better jobs or to engage in competitive activity.

The Commission finds that employers have significantly more bargaining power than workers. Most workers, especially workers other than senior executives, depend on income from their jobs to get by—to pay their rent or mortgage, pay their bills, and put food on the table. The loss of a job or a job opportunity can severely damage workers' finances and is far more likely to have serious financial consequences for a worker than the loss of a worker or a job candidate would have for most employers.

The Treasury Department, in a report based on an extensive literature review, finds that firms generally have considerable labor market power.[401] The report states that concentration in particular industries and locations can increase employers' labor market power.[402] However, the report explains that, even in the absence of concentration, firms have significant labor market power due to a variety of factors.

As the report notes, some of these factors are inherent in the firm-worker relationship. The report states that workers are at an informational disadvantage relative to firms, often not knowing what other workers earn or the competitive wages for their labor.[403] The report states further that workers often have limited or no ability to switch locations and occupations quickly and may lack the financial resources to support themselves while they search for jobs that pay more and better match their skills and abilities.[404] According to the report, these conditions often enable firms to exert market power even in labor markets that are not highly concentrated.[405]

In addition to factors inherent to the employer-worker relationship, the report concludes that firms use a wide range of practices to restrain competition for workers, including sharing wage information and conspiring to fix wages with other firms; agreeing not to hire other firms' workers; and adopting non-competes, mandatory arbitration agreements, and overbroad NDAs.[406] The report also states that practices such as outsourcing and worker misclassification have further diminished workers' market power.[407] Overall, the report finds that employers' labor market power has resulted in a 20% decrease in wages relative to the level in a fully competitive market.[408]

The Commission finds that employers are able to exploit their considerable labor market power—and indeed routinely do so—with respect to non-competes imposed on workers other than senior executives. Employers are repeat players likely to have greater experience and skill at bargaining than individual workers in the context of negotiating employment terms such as non-competes.[409] Research has found that employers present non-competes in standard-form contracts,[410] which workers are unlikely to read,[411] and that

[398] *See id.*

[399] NPRM at 3502–04.

[400] *Id.* at 3504.

[401] Treasury Labor Market Competition Report, *supra* note 374 at i–ii.

[402] *Id.* at i.

[403] *Id.*

[404] *Id.*

[405] *Id.*

[406] *Id.*

[407] *Id.* at ii.

[408] *Id.*

[409] *See, e.g., Samuel Stores, Inc.* v. *Abrams*, 108 A. 541, 543 (Conn. 1919); *Sunder Energy, LLC* v. *Jackson*, 305 A.3d 723, 753 (Del. Ct. Chancery 2023).

[410] Starr, Prescott, & Bishara, *supra* note 68 at 72 ("Taken together, the evidence in this section indicates that employers present (or employees receive) noncompete proposals as take-it-or-leave-it propositions.").

[411] *See, e.g.,* Todd D. Rakoff, *Contracts of Adhesion: An Essay in Reconstruction*, 96 Harv. L. Rev. 1173 (1983); Russell Korobkin, *Bounded Rationality, Standard-Form Contracts, and*

Continued

workers rarely bargain over non-competes and rarely seek the assistance of counsel in reviewing non-competes.[412] Many workers also lack the legal training or legal knowledge necessary to understand whether a particular non-compete is enforceable or the consequences of entering into a non-compete. The available evidence indicates that many workers are not aware of the applicable law governing non-competes or their rights under those laws.[413] Research has also found that employers exploit their power over workers by providing them with non-competes after they have accepted the job offer—and in many cases, on or after their first day of work—when the worker's negotiating power is at its weakest, since the worker may have turned down other job offers or left their previous job.[414]

The comment record provides strong support for the Commission's finding that non-competes are coercive and exploitative because they are typically unilaterally imposed by employers on workers other than senior executives. Illustrative examples of the comments the Commission received include the following:

• I am a practicing OB/GYN physician in Shreveport, LA. . . . I was put into a non-negotiable, vague non-compete with NO expiration date. . . . I needed a job. I was in a large amount of debt with accumulating interest during my four years of residency with a minimal salary. Honestly, I could not afford an attorney. So naively I trusted that the people that had been training me for the past 4 years would not take advantage of me in a contract. I did not have the ability to seek advice on ''how'' to negotiate a contract with my mentors since my mentors were the ones who wrote the contract.[415]

• As [a] physician who recently negotiated a new contract, I support FTC changes to the non-compete rules. . . . All three institutions [I considered working for] had unreasonable and onerous non-competes. Essentially making it impossible to get another job in the entire state of NJ—not just a few mile radius but two thirds of the state. . . . Non-competes are never negotiable even when hiring a lawyer to review and negotiate the contract. Hospitals refused to negotiate on the majority of the contract citing it is [an] across the board provision that cannot be altered.[416]

• I'm a worker that has had to consider whether to take a job that requires signing a no-compete agreement . . . . Several times

in my career, after weeks of interviewing and salary negotiation, I've found myself facing a required no-compete agreement that would drastically limit my future career options and negotiating power. Several times I've accepted these agreements because I had already turned down competing offers and found myself with limited options.[417]

• I'm a project manager at an Interior Design & Home Staging company in Manhattan; we're the largest staging company on the East Coast. After I accepted my job offer and went in to file paperwork, I was very briefly walked through what this non-compete means (the details were not made entirely clear; I believe they left it intentionally murky) and it was buried deep in the new employee rules and regulations packet I needed to read and sign at my onboarding. I personally am very against these agreements because, as mine states, I cannot work with ''a competing staging company'' or for any of the clients of my current company. Again, we're the largest staging firm on the east coast and have a lot of clients (we do over 100 stagings per year). Essentially, I am completely shut out of working in the industry in NYC as there are only a handful of other staging companies that can pay me a living wage to do so.[418]

• You might say that we might be able to negotiate out of a non-compete in our contract, but that is simply not true. In my hospital, I was already established, owning a house and having kids in school in a spouse in a career when the Hospital came forward and sit on my next contract renewal that I had no choice, but to sign a noncompete. They had me over a barrel. At my next contract negotiation, I try to negotiate out of the noncompete, with less salary or less benefits, and it was a nonstarter. There is zero tolerance for negotiating out of the noncompete.[419]

• At the end of 2018, as a Manager at a small business (150 employees) in a niche technology industry, I was offered shares in our company as we were acquired by a Private Equity firm. . . . I worked with a company-provided attorney on an Employment Agreement. This agreement offered a 6-month severance with a 1-year non-compete period, which I negotiated down to a 6-month non-compete to match the severance period. Later that month, I was sent an additional, previously unseen 120-page Share Agreement that governed how I would vest the shares I had earned. I didn't realize it at the time, but buried toward the end of this document was another non-compete that had a much longer timeframe dictated—1 year from when I no longer held any shares. As it would potentially take up to 6 years for the company to sell again, that meant an incredibly long and indefinite sounding time period. I was given only one business day to review this agreement, and was sent a signature packet the following day. I honestly thought I was signing my

Employment Agreement negotiated with a company attorney, not the share agreement that neither myself nor the attorney had reviewed, and which I had only received the day prior.[420]

• Desperate to obtain an entry level job in the Accounting field in which I am currently obtaining my Associate's degree, I was presented with an offer of employment and a non-compete agreement contract to sign. Because I needed to pay rent, I signed it.[421]

• On the first day of my husband's employment, without prior notice, an extensive 2 year non-compete clause was put in his employment contract and while it was noted within the clause he could seek counsel, when you are in the middle of your first day of work it's not practical. In addition, for most people, if it is your first experience with a non-compete, you likely do not have the funds to pay a $750 per hour lawyer to advise and negotiate on your behalf, nor realize the possible long-term consequences.[422]

Many commenters agreed with the Commission's preliminarily finding that employers generally have considerable labor market power. Even commenters opposing the NPRM did not generally dispute the notion that there is unequal bargaining power between employers and workers. Many workers stated that non-competes are pervasive in their industry, meaning they could not find a job without one. Many commenters stated that high wages or skills do not automatically translate into more bargaining power or sufficiently mitigate the harms from non-competes, especially in concentrated markets or markets where so many employers use non-competes that workers effectively have no choice but to sign them. Commenters also said that underrepresented groups may have even less bargaining power to negotiate non-competes and are less likely to have the resources for litigation, which could have an increased deterrent effect on worker mobility.

Hundreds of commenters stated that workers are rarely, if ever, able to negotiate their non-competes because non-competes are typically presented in a take-it-or-leave-it fashion. These comments spanned both lower-wage workers and workers in high-wage industries.[423] Workers often stated that they were ''forced'' to sign a non-

---

*Unconscionability*, 70 U. Chi. L. Rev. 1203, 1217 (2003).

[412] Starr, Prescott, & Bishara, *supra* note 68 at 72.

[413] J.J. Prescott & Evan Starr, *Subjective Beliefs About Contract Enforceability*, Forthcoming, J. L. Stud. 10–11 (2022).

[414] Marx (2011), *supra* note 81 at 706.

[415] Individual commenter, FTC–2023–0007–4414.

[416] Individual commenter, FTC–2023–0007–10547.

[417] Individual commenter, FTC–2023–0007–12428.

[418] Individual commenter, FTC–2023–0007–12480.

[419] Individual commenter, FTC–2023–0007–14706.

[420] Individual commenter, FTC–2023–0007–2347.

[421] Individual commenter, FTC–2023–0007–2600.

[422] Individual commenter, FTC–2023–0007–5933.

[423] Industries that the Commission considered as higher wage industries included but were not limited to engineers, entertainment (namely on-air talent), entrepreneurs, financial services, dentists, physicians, sales workers, tech industry workers, and veterinarians. Industries were assessed as high wage based on BLS occupational wage data. BLS, *Occupational Employment and Wage Statistics*, https://www.bls.gov/oes/tables.htm (based on the May 2022 National XLS table).

**JA0035**

compete. Very few workers said they were able to decline signing a non-compete and still be hired or employed. An employment law firm also agreed with the Commission and stated that non-competes are rarely subject to negotiation.

Confirming the research described in this Part IV.B.2.b.i, many workers—including highly paid and highly skilled workers—stated that they did not receive notice that they would be required to sign a non-compete until after accepting a job offer. Some workers said they were told of the non-compete after accepting the job but before starting work. Many workers who described when they were notified of a non-compete said it was on their first day of work or even later. Many workers stated that they were required to sign their non-compete after a merger or acquisition—*i.e.*, after they were already on the job but there was a change in ownership of the company. For example, a trade organization stated that it is common for the purchaser of a business to impose non-competes on its workers, which may trap workers in an organization different from the one they originally agreed to work for. An employment law firm commented that even highly paid or highly skilled workers do not always receive notice of non-competes with the employment offer.

Many workers also stated that non-competes are often hidden or obscured. Several workers said their non-compete was buried in other paperwork or confusingly worded or vague. Some commenters stated that their employer refused to allow them to have a copy of their non-compete. Many workers said their employers gave them misleading or incorrect information about the terms or enforcement of non-competes. Each of the above categories included not only workers from low-wage industries, but also workers from high-wage industries. While these practices appear to be commonplace, based on the comments, the Commission also notes that even workers who knew about non-competes before accepting the job offer—and who did not report being misled about the non-compete—did not report bargaining or negotiating over it.

Only a small number of workers reported any negotiating over non-competes. For example, a sales worker said they were able to negotiate a non-compete, though that worker still supported the proposed rule. A surgeon group stated hospitals were willing to negotiate over non-competes, but that hospitals use the non-competes as a negotiating tactic to drive down surgeon salaries.

Few workers who submitted comments reported being compensated for signing a non-compete. Among those workers who did report receiving compensation, most still said they considered their non-competes to be exploitative or coercive. For example, some workers said they were laid off and then required to sign a non-compete as a condition for receiving severance. A few workers said their employer had threatened to withhold their commissions and/or pay on departure if they did not sign a non-compete. One worker reported never receiving the compensation associated with a non-compete, because they were terminated two months after signing.

In addition, the Commission finds that employers frequently impose non-competes even when they are unenforceable under State law. An economist suggested that non-competes may be used in States in which they are unenforceable because the employer hopes the State's policy might change, or the employer might be able to forum-shop to apply the law of another jurisdiction more favorable to non-competes. Some commenters stated that firms may remind workers they are subject to a non-compete upon departure even when those non-competes are unenforceable because they hope that workers and competitors will abide by them.

These comments that employers often use unenforceable non-competes are supported by research finding that employers frequently use non-competes even when they are unenforceable under State law.[424] This research suggests that employers may believe workers are unaware of their legal rights, or that employers may be seeking to take advantage of workers' lack of knowledge of their legal rights or the challenges workers face enforcing their rights.

A far smaller number of commenters—a group that included many businesses and trade organizations, and very few workers—argued that non-competes were not exploitative or coercive. An industry organization said non-competes are understandable to a layperson with respect to their geographic scope, time in effect, and industry to which they apply, while an alternative trade secret case would be more complex. But even if workers understand the basic terms of non-competes, that does not alter the Commission's core concern that non-competes are exploitative and coercive because they take advantage of unequal bargaining power between employers

and workers and force workers to stay in jobs they want to leave or otherwise bear significant harms or costs. It also does not alter the Commission's concern that non-competes tend to negatively affect competitive conditions. Moreover, the Commission notes that the available evidence indicates that many workers are not aware of the applicable law governing non-competes or their rights under those laws.[425] In addition, many commenters stated that non-competes were not disclosed to them before they started their job. Furthermore, the Commission addresses why trade secret law is a less restrictive alternative for protect employers' legitimate interests in Part IV.D.2.

A few commenters stated that unequal bargaining power does not constitute an unfair method of competition. In response, the Commission notes that it does not find that unequal bargaining power itself is an unfair method of competition; rather, unequal bargaining power informs its analysis of exploitation and coercion.

The comment record indicates that while some highly paid workers may seek the assistance of counsel when negotiating non-competes, many do not. Commenters did not present studies or other quantitative evidence that undermines the finding in Starr, Prescott, & Bishara that less than 8% of workers seek assistance of counsel in connection with non-competes.[426] The Commission thus finds that the vast majority of workers lack assistance of counsel in connection with entering non-competes. The Commission believes that its definition of senior executives, discussed in Part IV.C.4, captures those workers who are most likely to seek assistance of counsel. To the extent any other individual workers seek assistance of counsel and/or are able to actually bargain over non-competes sufficient that a given non-compete is not exploitative and coercive, the Commission still finds that such non-competes are unfair methods of competition for the independent reason that they are restrictive and exclusionary conduct that tends to negatively affect competitive conditions.

Overall, the comments provide strong support for the Commission's finding that, with respect to workers other than senior executives, employers almost always unilaterally impose non-competes—exploiting their superior bargaining power to significantly restrict workers' abilities to leave for better jobs or engage in competitive activity.

---

[424] Starr, Prescott, & Bishara, *supra* note 68 at 81.

[425] *See supra* note 413 and accompanying text.

[426] Starr, Prescott, & Bishara, *supra* note 68 at 72.

ii. Non-Competes With Workers Other Than Senior Executives Trap Workers in Jobs or Force Them to Otherwise Bear Significant Harms and Costs

The Commission finds that non-competes are exploitative and coercive because they force workers to either stay in jobs they want to leave or bear other significant harms and costs, such as leaving the workforce or their field for a period of time; relocating out of their area; or violating the non-compete and facing the risk of expensive and protracted litigation. In addition, the Commission finds non-competes exert a powerful *in terrorem* effect: they trap workers in jobs and force them to bear these harms and costs even where workers believe the non-competes are overbroad and unenforceable, due to workers' fear that having to defend a lawsuit from their employer for any length of time would devastate their finances or ruin their professional reputations.

The comment record provides strong support for this finding. Many workers submitted comments supportive of the Commission's preliminary finding that non-competes coerce workers into remaining in their current jobs. Many workers reported staying in their jobs because they feared harm to their careers if they were forced out of their field; feared having to relocate or endure a lengthy commute due to a non-compete; or feared their non-competes would cause them to be unemployed if they left. Several workers reported they were unable to take a specific desired job because of a non-compete. Many workers recounted how non-competes trapped them in jobs with poor working conditions or where they were subject to illegal conduct, including sexual harassment.[427] Some workers said they were subject to particularly broad, even global, non-competes, meaning leaving their field was their only option if they left their current job. These comments spanned both lower-wage workers and workers in high-wage industries.

Illustrative examples of the comments the Commission received include the following:

• I am a journalist who has been forced to move across the country three times, and leave my field entirely for one year, in order to comply with stringent non-compete agreements. . . . In [one] situation, I was stuck working for abusive management who fostered a toxic and abusive workplace, and I had to work there for more than a year until I could find a job in another city entirely because they had threatened to sue me under the non-compete if I left and worked for

another local station. . . . [E]ven if these clauses are unenforceable, as we've all heard before, who can afford the legal representation to go up against a corporation and their lawyers when the lawsuit threat comes? My life would have been very different if I weren't trapped by non-competes at points in my career.[428]

• As a veterinarian I support the elimination of non-compete agreements. In our profession they still are overwhelmingly the normal expectation with contracts. . . . [C]ompanies use the fear of litigation to enforce them. As veterinary medicine very quickly becomes more corporate owned, basically they pit us as a singular employee against large corporations that have substantial means both financially and legally. No reasonable employee wants to take on that battle or even can financially take on that battle. So regardless if the clauses are 'unenforceable' they are enforced via intimidation. . . . When [my] job was a terrible fit and my boss ultimately ended up 'not renewing my contract' I was still left with a noncompete. This basically eliminated my ability to work within a reasonable distance of our home. I ended up commuting an hour and 15 minutes one way for 10 months until my husband, myself, and my very young child were able to move closer to my new job. While it was likely legally unreasonable in nature, I did not have the resources financially to even consider the legal battle that would have had to happen for reconsideration and I desperately needed an income to continue to pay the student debt that comes with being a young doctor. Furthermore I had a baby that needed my focus as well.[429]

• I was fired unjustly 11/2021 for declining the Covid vaccine. My medical and religious exemptions were both denied. In addition to this, I was required by my former employer contract to abide by the two-year 10 mile restrictive covenant. This greatly hindered my ability to find employment, and I was out of work for approximately three months. I could only find part-time work for a fraction of my former salary. Had I not had the noncompete clause, I could have found a full-time job almost immediately.[430]

• Unfortunately, the average dental school graduate has nearly $300,000 in student loan debt, and most new dentists are unable to make their practice-ownership dreams a reality immediately after residency. Thus, we rely on entry-level associate dentist positions to gain experience, pay off debt, and become fiscally/professionally prepared to become practice owners. Much to my dismay, upon interviewing for my first associate dentist position, I quickly realized how non-competes are being used in the dental profession to prevent vulnerable young dentists like myself from taking the next step in our careers. . . . Although dental associate positions come with relatively high compensation, it doesn't make this issue any less problematic.[431]

• My daughter had an inter-state non-compete enforced as a minimum wage

medical scribe. Originally she was working with a medical scribe company in Indiana prior to Covid. Due to COVID and graduating from college she then moved to our home in Oregon. She applied for a medical scribe job in Oregon with a company that did not provide any scribe services in Indiana. But her original scribe company had 1 "office" they were providing scribe services to in Salem, Oregon. My daughter had applied with the local scribe company to provide services but when examined further found that her original scribe company from Indiana was going to enforce a $5000 non-compete buy-out fee on her to provide the services in Salem, Oregon that were within the sphere of restriction for her "new" local scribe opportunity.[432]

Many commenters explained that non-competes forced them to relocate and described the toll the relocation took on their families. Other commenters stated that their families have been forced to live apart, or they had been separated from elderly relatives, due to a non-compete forcing the relocation of one of the family members. Many commenters described how long commutes undertaken to avoid non-competes increased transportation costs and caused the worker to lose precious time with their families.

The comment record bolsters the Commission's finding that employers wield non-competes to coerce and exploit workers into refraining from competitive activity even where non-competes are unenforceable. Many workers explained that they—and others in their industry—abided by non-competes, even where they believed the non-compete was overbroad and likely unenforceable. According to a law firm specializing in executive compensation, even workers who can afford counsel may be unwilling to mount a long and uncertain legal battle to challenge a non-compete. The firm said employers almost always have deeper pockets and more access to counsel than individual workers, making workers more reluctant to litigate. Commenters further stated that employers may be able to deduct litigation costs as a business expense, giving them the wherewithal to enforce their non-competes.

Many workers with non-competes stated that they feared legal action from their employer or enormous legal fees if they left their current job, and most of those workers said they could not afford litigation. Workers also stated that they are reluctant to engage in litigation against an employer because it would harm their reputation in their industry.

Many workers reported being threatened with litigation over a non-

---

[427] These comments are addressed in greater detail in Part IV.B.3.a.iii.

[428] Individual commenter, FTC–2023–0007–0747.
[429] Individual commenter, FTC–2023–0007–2855
[430] Individual commenter, FTC–2023–0007–7561.
[431] Individual commenter, FTC–2023–0007–8858.

[432] Individual commenter, FTC–2023–0007–15249.

compete when they attempted to leave an employer. Some commenters said their non-competes contained additional clauses making litigation more difficult, such as attorneys' fee-shifting provisions or forced arbitration. Other workers feared having to pay financial penalties or feared having their compensation clawed back if their employer claimed they violated the non-compete. Each of the above comment categories included numerous comments from workers in high-wage industries.

Commenters asserted that employers have several advantages in litigation, further increasing the risk of challenging a non-compete. A commenter said even an extremely overbroad non-compete may be enforceable because a court can modify it to reduce its scope or duration. An employment attorney said employers who use overbroad non-competes to stifle competition suffer few if any negative consequences for doing so. The employment attorney further said that most employers do well even in a legal regime that nominally disfavors non-competes, due to the chilling effect of the threat of litigation. One researcher cited in the NPRM stated that non-competes have a powerful chilling effect because State laws generally do not prohibit employers from requiring employees to sign overbroad non-competes. Accordingly, the researcher recommended that non-competes be banned rather than restricted in scope, thereby preventing the possibility of lawsuits (and the threat thereof).

No commenters submitted studies or empirical evidence to contradict or otherwise call into question the research cited in the NPRM finding employers frequently use non-competes even when they are unenforceable under State law. Many commenters said they perceived non-competes to be a tool used to intimidate workers, and others specifically said they had been intimidated when their employers took legal action against other workers who left. These comments spanned workers in both lower-wage and high-wage industries.

The comments reflected that fields with high compensation levels were not immune from coercion and exploitation, and that, to the contrary, specialization can increase employers' ability to coerce and exploit workers. For example, some commenters said highly trained and/or specialized workers face heightened challenges in finding a job that does not violate a non-compete without relocating or become entirely unemployable, given the smaller number of such specialized jobs

available. One commenter said that many workers are compensated highly because they are in a small field or have a niche skillset, meaning non-competes significantly limit their ability to find another job in their field. Some commenters in professions requiring advanced education also submitted comments stating that significant student loan debt decreased their bargaining power or increased the financial risk of attempting to change jobs. An employment law firm stated that highly paid or highly skilled workers in roles that are not limited to a single industry or business, such as finance or human resources, are more likely to be able to find employment in another industry, while those with training and expertise in a particular industry or type of business are at a greater risk of unemployment. Some medical organizations and others pointed out that non-competes can be particularly exploitative and coercive for professions such as physicians that require State licenses, credentials, and insurance, making relocation even more difficult.

A far smaller number of commenters claimed non-competes are not exploitative or coercive and do not trap workers in jobs or force workers to bear significant harms or costs. Several commenters argued that, because non-competes are often not exploitative and coercive at the time of contracting, they are also not exploitative and coercive at the time workers seek to leave their jobs. According to these commenters, to the extent a non-compete is bargained for and fairly compensated, that same non-compete does not become exploitative and coercive at the time of departure. In response, the Commission notes that commenters overwhelmingly reported workers rarely bargain in connection with, or receive compensation for, non-competes,[433] and the mere existence of compensation does not automatically make that compensation fair.

Some business and business association commenters contended that workers with higher earnings can more easily forgo wages to wait out non-competes, and thus do not feel forced to stay in their jobs. These commenters also argued that non-competes for these workers are often tied to equity or severance, which the worker can choose to forego if they want to compete. These comments are contrary to the extensive comment record indicating that even workers with higher earnings cannot afford to forgo compensation and feel forced to stay in jobs they want to leave due to non-competes. To the extent any

such individual workers bargained for or received compensation for a non-compete, the Commission still finds that such non-competes are unfair methods of competition for the independent reason that they are restrictive and exclusionary conduct that tends to negatively affect competitive conditions.

Overall, the comments provide strong support for the Commission's finding that non-competes are exploitative and coercive because they trap workers in jobs or force them to bear significant harms and costs.

For the foregoing reasons, the Commission finds that non-competes with workers other than senior executives are exploitative and coercive and thus facially unfair under section 5.

### 3. The Commission Finds That Non-Competes Tend To Negatively Affect Competitive Conditions

Based on the Commission's expertise and after careful review of the rulemaking record, including the empirical research and the public comments, the Commission finds that non-competes tend to negatively affect competitive conditions in labor markets for the reasons explained in this Part IV.B.3.a. (As explained in Part IV.B.3.b, the Commission further finds that non-competes tend to negatively affect competitive conditions in markets for products and services.)

As explained in Part II.F, the legal standard for an unfair method of competition under section 5 requires only a tendency to negatively affect competitive conditions. The inquiry does not turn on whether the conduct directly caused actual harm in a specific instance. Here, the tendency of non-competes to impair competition is clear from their nature and function. In any event, the evidence confirms that non-competes do in fact have a negative effect on competitive conditions.

The Commission turns now to the significant evidence of harm to competition in labor markets from non-competes, including evidence of suppressed labor mobility, suppressed earnings, and reduced job quality.

### a. Non-Competes Tend to Negatively Affect Competitive Conditions in Labor Markets

The Commission finds that non-competes tend to negatively affect competitive conditions in labor markets by inhibiting efficient matching between workers and employers.

Labor markets function by matching workers and employers. In a competitive labor market, workers compete for jobs by offering their skills and time (*i.e.*, their labor services) to

---

[433] *See* Part IV.B.2.b.i.

employers, and employers in turn compete for those labor services by offering better pay, benefits, or other elements of job satisfaction.[434] A worker who is seeking a better job—more pay, better hours, better working conditions, more enjoyable work, or whatever the worker may be seeking—can enter the labor market by looking for work. Prospective employers can compete for the worker's services, and the worker's current employer may also compete by seeking to retain the worker—*e.g.,* by offering a raise, promotion, or other enticement.[435] Ultimately, the worker chooses the job that best meets their objectives, and the employer chooses the worker who best meets theirs. In general, the more jobs and the more workers that are available—*i.e.,* the more competing options the worker and employer each have—the stronger the match will be.

Thus, a key component of a competitive labor market is voluntary labor mobility. Choice—the ability of market participants to satisfy their preferences where possible—facilitates competition. In the labor market, voluntary labor mobility reflects both the choices or preferences of workers and that of rival competitors.

However, non-competes introduce a major friction that tends to impair the competitive functioning of labor markets. Non-competes inhibit the efficient matching between workers and employers via the competitive process because, even if a competing employer offers a better job and the worker wants to accept that better job, the non-compete will prevent the worker from accepting it if the new job is within the scope of the non-compete (or if the worker is unsure or afraid it may be). Meanwhile, the employer who would like to hire the worker is prevented from competing to attract that talent. The result is less competition among employers for the worker's services and less competition among workers for available jobs. Since the worker is prevented from taking many jobs that would otherwise be available, the worker may decide not to look for a job at all. Or the worker may enter the labor market but take a job in which they are less productive, such as when a non-compete forces a worker to leave their field of expertise and training.

In this way, non-competes frustrate competitive processes in labor markets. In competitive markets, the "unrestrained interaction of competitive forces" yields a variety of benefits such

as lower prices for consumers, better wages and working conditions for workers, and higher quality products.[436] In contrast, when "[i]ndividual competitors lose their freedom to compete" in the labor market, the importance of worker preference in setting the level of wages and working conditions is reduced, which is "not consistent with [the] fundamental goal of antitrust law." [437] The restraint imposed by non-competes on the interaction of competing employers and competing workers directly undercuts the functioning of the competitive process in determining wages and working conditions. Accordingly, non-competes facially harm the competitive process and tend to negatively affect competitive conditions in labor markets. Evidence that non-competes have in fact had actual detrimental impacts on outcomes of the competitive process—such as workers' earnings, new business formation, and innovation—demonstrate that non-competes do in fact harm competition.

The Commission notes that the actual effect of any one individual non-compete on the overall level of competition in a particular labor market may be marginal or impossible to discern statistically. However, as explained in Part I.B.2, non-competes are prevalent across the U.S. labor force. The empirical literature and other record evidence discussed in this section reflect that non-competes, in the aggregate, negatively affect competitive conditions in labor markets—resulting in harm not only to workers subject to non-competes and the employers seeking to hire them, but also workers and employers who lack non-competes.

The Commission finds that evidence of the effects of non-competes on workers' labor mobility and earnings is sufficient to support its finding that non-competes tend to negatively affect competitive conditions in labor markets.[438] In addition, the Commission believes that this finding is further bolstered by strong qualitative evidence that non-competes reduce job quality.[439]

The Commission's findings relating to labor mobility and earnings are principally based on the empirical evidence described in Parts IV.B.3.a.i and ii. However, the comments provide strong qualitative evidence that bolsters these findings. Furthermore, the Commission notes that the legal

standard for an unfair method of competition under section 5 requires only a tendency to negatively affect competitive conditions; empirical evidence of actual harm is not necessary to establish that conduct is an unfair method of competition. In the case of non-competes, however, there is extensive empirical evidence, as well as extensive corroborating public comments, that non-competes negatively affect competitive conditions in labor markets.

#### i. Non-Competes Suppress Labor Mobility

*Evidence of Suppressed Labor Mobility*

The Commission finds that non-competes tend to negatively affect competitive conditions in labor markets by suppressing labor mobility, which inhibits efficient matching between workers and employers. The evidence indicates that non-competes reduce labor mobility. Several empirical studies find that non-competes limit the movement of workers between firms and reduce the pool of labor available to existing employers and potential entrants.[440]

In the NPRM, the Commission described the empirical research on non-competes and labor mobility.[441] The Commission stated that, across the board, studies of non-competes and labor mobility find decreased rates of mobility, measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within-industry and between-industry mobility.[442] Based on that body of empirical evidence and its review of the record as a whole following the comment period, the Commission finds that non-competes reduce labor mobility.

Several empirical studies find that non-competes reduce labor mobility. Some of these studies analyze the effects of non-competes on labor mobility across the labor force.

A study by Johnson, Lavetti, and Lipsitz examined the impact on labor mobility of all legal changes in the enforceability of non-competes from 1991 to 2014 across the entire labor force.[443] This study finds that

---

[434] *See* Treasury Labor Market Competition Report at 3–4.

[435] *See id.*

[436] *See N. Pac. Ry. Co.* v. *United States,* 356 U.S. 1, 4 (1958).

[437] *See NCAA* v. *Bd. of Regents of Univ. of Okla.,* 468 U.S. 85, 106–07 (1984).

[438] *See* Part IV.B.3.a.i–ii.

[439] *See* Part IV.B.3.a.iii.

[440] As the Commission stated in the NPRM, it does not view reduced labor mobility as a harm in and of itself. *See* NPRM at 3490. Instead, the Commission finds that the empirical evidence showing non-competes reduce labor mobility is powerful evidence that non-competes do indeed restrict labor market competition by inhibiting the movement of workers between firms—and therefore efficient matching between workers and firms.

[441] NPRM at 3489.

[442] *Id.*

[443] Johnson, Lavetti, & Lipsitz, *supra* note 388. This study was updated in 2023. The updated

substantial decreases in non-compete enforceability cause a significant increase in job-to-job mobility in industries that use non-competes at a high rate.[444]

Evan Starr's study comparing workers in occupations that use non-competes at a high versus low rate finds that a State moving from mean enforceability to no enforceability would cause a decrease in employee tenure for workers in high-use occupations of 8.2%, compared with those in low-use occupations. Tenure in this study serves as a proxy for mobility, since tenure is the absence of prior mobility.[445] This use of a proxy means the outcome of interest is not precisely measured, and the study is less robust than those that examine changes in legal enforceability of non-competes. The study's findings are, however, consistent with the other studies finding that non-competes reduce labor mobility.

Starr, Prescott, and Bishara's study of non-compete use likewise finds that having a non-compete was associated with a 35% decrease in the likelihood that a worker would leave for a competitor.[446] While this finding is based on the use of non-competes (and is accordingly given less weight), the authors also survey workers, who report that the cause of their reduced mobility is their non-compete. The study finds that the mechanism underlying reduced mobility is not whether non-competes are legally enforceable or not, but rather, it is the worker's belief about the likelihood that their employer would seek to enforce a non-compete. Workers who did not believe that employers would enforce non-competes in court were more likely to report they would be willing to leave for a competitor.[447] This study thus not only supports the Commission's finding that the use of non-competes impacts labor mobility, but also supports the Commission's finding that non-competes can exert an *in terrorem* effect on labor mobility even where they are unenforceable.[448] This supports the need to ensure that

workers are aware of the prohibition on non-competes.[449]

Other studies analyze how non-competes affect the labor mobility of specific populations of workers. A study by Jessica Jeffers finds that decreases in non-compete enforceability were associated with a substantial increase in departure rates of workers, especially for other employers in the same industry.[450] This study's sample is limited to knowledge workers (*i.e.,* workers whose primary asset is applying their mental skills to tasks), and the study uses a binary—rather than continuous—measure of non-compete enforceability. It does, however, examine several changes in the enforceability of non-competes to generate its results, making it fairly robust.

In addition, two recent studies examined subgroups of the population that were affected by State law changes and find major effects on those populations' labor force mobility. Balasubramanian et al., in 2022, focused on Hawaii's ban of non-competes for high-tech workers and find that the ban increased mobility by 12.5%.[451] Lipsitz and Starr, in 2022, focused on Oregon's ban of non-competes for hourly workers and find that mobility increased by 17.3%.[452]

Comments Pertaining to Labor Mobility Evidence and Commission Responses

The Commission's finding that non-competes suppress labor mobility is principally based on the empirical evidence described in this Part IV.B.3.a.i. However, the comments provide strong qualitative evidence that bolsters this finding.

Many commenters agreed with the Commission's preliminary finding that non-competes suppress labor mobility and stated that this reduction in labor mobility leads to less labor market competition and poorer wages and working conditions.

In response to the NPRM's discussion of this literature, some commenters questioned the adequacy of the studies. For example, one commenter stated that

the available research is either limited to specific sectors of the economy, limited geographically, or limited by small sample sizes. Some commenters claimed the empirical research lacked appropriate counterfactuals.

The Commission acknowledges that some of the studies focus on specific industries or specific geographies, and that the studies vary in the methodologies the authors rely on. These arguments do not undermine the utility of the studies, particularly given that they all find that non-competes reduce labor mobility. Moreover, the Commission finds that each of the studies discussed in this Part IV.B.3.a.i conduct their analyses against appropriate counterfactuals. And while there may be some variation in the magnitude of the effect on mobility among industries, several of the empirical studies find economy-wide effects. That evidence shows that non-competes restrict the movement of workers to a significant degree.

Additionally, the record is replete with examples of commenters who recounted personal stories that accord with the empirical literature. The Commission received comments from several thousand individual workers stating that their mobility is or has been restricted by a non-compete. While some commenters who opposed the proposed rule disputed that non-competes prevent workers from finding other jobs in their industry, the Commission finds the weight of the evidence clearly demonstrates a significant effect on labor mobility.

The Commission further notes that many commenters' submissions substantiated its finding that non-competes can have an *in terrorem* effect on labor mobility even where they would not ultimately be enforceable in court.[453] As many commenters explained, the high costs and complexities of non-compete litigation can have a chilling effect on workers and thus reduce worker mobility regardless of whether a court would enforce the non-compete. For this reason, the very existence of a non-compete is likely to deter workers from switching jobs or starting their own business, even if it would ultimately not be enforced. This supports the Commission's view that not only should non-competes' enforcement be prohibited, it is also important to provide a readily understandable,

version of the study reports results slightly differently than the 2022 version cited in the NPRM, but the analysis and results themselves do no meaningfully change. Accordingly, the update to Johnson, Lavetti, and Lipsitz does not materially affect the Commission's analysis of the study.

[444] *Id.* at 21.

[445] Evan Starr, *Consider This: Training, Wages, and the Enforceability of Covenants Not to Compete,* 72 I.L.R. Rev. 783 (2019). The value is calculated as 8.2% = 0.56/6.46, where 0.56 is the reported impact on tenure and 6.46 is mean tenure in the sample.

[446] Evan Starr, J.J. Prescott, & Norman Bishara, *The Behavioral Effects of (Unenforceable) Contracts,* 36 J. L., Econ., & Org. 633, 652 (2020).

[447] *Id.* at 664.

[448] *See* Part IV.B.2.b.ii.

[449] *See* Part IV.E (describing the final rule's notice requirement).

[450] Jessica S. Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship,* 37 Rev. Fin. Stud. 1 (2024). The 2024 version of Jeffers' paper finds a decline in the departure rate of 7% of the sample mean, and a decline in the within-industry departure rate of 10%.

[451] Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers,* 57 J. Hum. Res. S349, S351 (2022).

[452] Lipsitz & Starr, *supra* note 72 at 157.

[453] *See* Part IV.B.2.b.ii.

uniform Federal approach, and notice to workers of unenforceability.[454]

Some commenters who generally opposed the rule questioned the virtue of labor mobility, arguing that when colleagues leave, remaining workers can experience increased workloads or harm to their employer. However, this comment ignores the benefits that will also accrue from those same firms having more ready access to incoming potential colleagues as well. The Commission also notes that unfair conduct cannot be justified on the basis that it provides the firm undertaking the conduct with pecuniary benefits.[455]

Some commenters argued labor mobility has generally been increasing in the U.S. labor market. Setting aside whether this is true, it is not probative of whether the practice of using non-competes reduces labor mobility or negatively affects labor market competition.

For these reasons, the empirical evidence that non-competes suppress labor mobility supports the Commission's finding that non-competes tend to negatively affect competitive conditions in labor markets.

ii. Non-Competes Suppress Workers' Earnings

Evidence of Suppressed Earnings

The Commission finds that non-competes suppress workers' earnings as a result, in part, of decreased labor mobility, supporting the Commission's finding that non-competes tend to negatively affect competitive conditions in labor markets. As the NPRM explained, many studies find increased enforceability of non-competes reduces earnings for workers across the labor market generally; for specific types of workers; and even for workers not subject to non-competes.[456] Several major empirical studies of how changes in non-compete enforceability affect workers' earnings show that increased enforceability of non-competes suppresses workers' earnings.

A study conducted by Johnson, Lavetti, and Lipsitz finds that non-competes limit workers' ability to leverage favorable labor markets to receive greater pay.[457] The authors find that when non-competes are more enforceable, workers' earnings are less responsive to low unemployment rates, which workers typically leverage to negotiate pay raises. The authors estimate that a nationwide ban on non-competes would increase average earnings by approximately 3–14%.[458] Of the studies of how non-competes affect earnings, this study has the broadest coverage. It spans the years 1991 to 2014, examines workers across the labor force, and uses all known common law and statutory changes in non-compete enforceability to arrive at its estimates. This study is very robust, as it satisfies all of the principles outlined in Part IV.A.2.

The same study also finds that non-competes increase racial and gender wage gaps by disproportionately suppressing the wages of women and non-White workers. While the study estimates that earnings of White men would increase substantially if a nationwide ban on non-competes is enacted, the comparable earnings increase for workers in other demographic groups would be up to twice as large, depending on the characteristics of the group.[459] The authors estimate that making non-competes unenforceable would close racial and gender wage gaps by meaningful amounts, although the mechanism behind this effect is unclear.[460]

Furthermore, a study conducted by Evan Starr estimates that earnings fall by about 4% where a State shifts its policy from non-enforcement of non-competes to a higher level of enforceability.[461] This study covers a sample which is broadly representative of the entire labor force from 1996 to 2008. Unlike many of the other studies described in this Part IV.B.3, this study does not use a change in enforceability of non-competes to analyze the impact of enforceability. Rather, it examines the differential impact of enforceability on workers in occupations that use non-competes at a high rate versus workers in occupations that use non-competes at a low rate. As described in Part IV.A.2, studies comparing differential usage of non-competes are generally less informative than studies examining changes in enforceability, although in this particular study the comparison between workers in high- and low-use occupations may effectively control for State-level differences between labor markets, lending more credibility to the estimates. More importantly, the Commission notes that the study corroborates the estimates from other studies that rely on more credible research designs, and therefore is appropriately viewed as additional evidence supporting the range of estimated effects on wages across the labor market.

Two additional studies analyze effects of non-competes on earnings for specific populations of workers. A study conducted by Lipsitz and Starr focuses on a natural experiment in Oregon, where non-competes were banned for hourly workers with relatively low earnings. The study estimates that when Oregon stopped enforcing non-competes for hourly workers, their wages increased by 2–3% relative to workers in States that did not experience legal changes. The study also finds a greater effect (4.6%) on workers in occupations that used non-competes at a relatively high rate.[462] The authors additionally find that women's earnings increased at a higher rate, with earnings increases after the non-compete ban of 3.5% for women, versus 1.5% for men.

A study by Balasubramanian et al. focuses on a natural experiment in Hawaii, which banned non-competes for high-tech workers in 2015. The study finds earnings of new hires increased by about 4% after the ban, relative to earnings in other States without bans.[463]

In addition to this research, which shows that increased enforceability of

---

[454] See Part IX.C. See also supra note 386 (explaining that studies assessing changes in enforceability of non-competes likely underestimate the effects of non-competes, given that workers may refrain from seeking or accepting work or starting a business even if the non-compete is likely unenforceable, and explaining the importance of notice to workers).

[455] Atl. Refin. Co. v. FTC, 381 U.S. 357, 371 (1965) (considering that defendant's distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); FTC v. Texaco, 393 U.S. 223, 230 (1968) (following the same reasoning as Atlantic Refining and finding that the "anticompetitive tendencies of such a system [were] clear"); L.G. Balfour Co. v. FTC, 442 F.2d 1, 15 (7th Cir. 1971) ("While it is relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice."). Justifications that are not cognizable under other antitrust laws are also not cognizable under section 5.

[456] NPRM at 3486–88.

[457] Johnson, Lavetti & Lipsitz, supra note 388 at 37.

[458] Id. at 3. The NPRM reported an increase in average earnings of 3.3–13.9%. Those numbers were taken from an earlier version of the Johnson, Lavetti, and Lipsitz paper. The updated paper finds an increase in average earnings of 3.2–14.2%. The change does not materially affect the paper's findings or the Commission's analysis of the paper.

[459] Id. at 42. The 2023 version of the paper by Johnson, Lavetti, and Lipsitz reports earnings increases of 1.3% for White men, and increases between 1.5–3.2% for workers in other demographic groups, corresponding to a change in non-compete enforceability equal to the difference between the 75th and 25th percentiles. These differences are statistically significant for Black men and non-White, non-Black women.

[460] Id. The 2023 version of the paper reports that the earnings gaps would close by 1.5–3.8% given a change in non-compete enforceability equal to the difference between the 75th and 25th percentiles.

[461] Starr, supra note 445 at 783.

[462] Lipsitz & Starr, supra note 72 at 143.

[463] Balasubramanian et al., supra note 451 at S349.

non-competes reduces workers' earnings across the labor market generally and for specific types of workers, two empirical studies find that increased enforceability of non-competes suppresses earnings even for workers who are *not* subject to non-competes.

The Johnson, Lavetti, and Lipsitz study, in a separate analysis, isolates the impact of a State's enforceability policy on workers not directly affected by that policy to demonstrate that non-competes affect not just the workers subject to non-competes, but the broader labor market as well. The study finds that increases in non-compete enforceability in one State have negative impacts on workers' earnings in bordering States, and that the effects are nearly as large as the effects in the State in which enforceability changed (but taper off as the distance to the bordering State increases).[464] The study estimates that a legal change in one State has an effect on the earnings of workers just across that State's border that is 76% as great as for workers in the State in which the law was changed.[465] In other words, when one State changes its law to be more permissive of non-competes and itself experiences a decrease in workers' earnings of 4%, workers just across the border (*i.e.,* workers who share a labor market)[466] would experience decreased earnings of 3%.[467] The authors conclude that, since the workers across the border are not directly affected by the law change (*i.e.,* contracts that they have signed do not become more or less enforceable), this effect must be due to changes in the local labor market.[468] The researchers based their analysis on where workers worked, rather than their residence, so the results are not tainted by workers

who worked in the State where the law changed but lived across the border.

The second of these studies, a study conducted by Starr, Frake, and Agarwal, analyzed workers without non-competes who worked in States and industries in which non-competes were used at a high rate.[469] The authors find that, when the rate of use of non-competes in an industry in a State is higher, wages are lower for workers who do not have non-competes but who work in the same State and industry. This study also finds that this effect is stronger where non-competes are more enforceable.[470]

The authors show that the reduction in earnings (and in labor mobility) is due to a reduction in the rate of job offers. Individuals in State/industry combinations that use non-competes at a high rate do not receive job offers as frequently as individuals in State/industry combinations in which non-competes are not frequently used.[471] The authors also demonstrate that decreased mobility and earnings are not due to increased job satisfaction (*i.e.,* if workers are more satisfied with their jobs, they may be less likely to change jobs, and more likely to accept lower pay).[472]

Given some methodological limitations of this study, the Commission views it as supporting the other evidence that non-competes have negative spillover effects on earnings for workers without non-competes and reduce labor mobility. Namely, the research design relies on cross-sectional differences in enforceability of non-competes. Although this study also examines the use of non-competes, it does not compare individuals who are bound by non-competes to individuals who are not. Instead, it examines the rate of use across industries and States, and therefore avoids the statistical biases inherent in studies which compare individuals with and without non-competes. The authors also employ tests to increase confidence in the causal interpretation of these results, but they cannot conclusively rule out explanations outside of the scope of their data.

Several additional studies examine the association between non-compete use—rather than enforceability—and earnings. For the reasons described in Part IV.A.2, the Commission finds that these studies are less credible in

measuring how non-competes affect earnings, and accordingly the Commission gives these studies minimal weight.

In one such study, Starr, Prescott, and Bishara examine survey results and find that non-compete use is associated with 6.6% to 11% higher earnings.[473] In another study, using Payscale.com data, Balasubramanian, Starr, and Yamaguchi find that individuals with non-competes (regardless of what other post-contractual restrictions they had) had 2.1–8.2% greater earnings than individuals with no post-contractual restrictions. However, this positive association may be due to non-competes often being bundled with NDAs. The authors find that, compared with individuals subject only to NDAs, non-competes are associated with a 3.0–7.3% *decrease* in earnings, though the authors do not disentangle this effect from the effects of non-solicitation and non-recruitment provisions.[474] Another study, by Lavetti, Simon, and White, finds that use of non-competes among physicians is correlated with greater earnings (by 14%) and greater earnings growth.[475] Finally, Rothstein and Starr find that greater use of non-competes is correlated with higher earnings.[476]

Because these studies merely reflect correlation and are unlikely to reflect causation, the Commission gives them little weight. The NPRM noted that the Lavetti, Simon, and White physician study partially mitigates this methodological flaw by comparing earnings effects in a high- versus a low-enforceability State (Illinois versus California). However, at best, this comparison is a cross-sectional comparison with a minimally small number of States being compared. The study does not consider changes in non-compete enforceability over time. Therefore, it is impossible to disentangle underlying differences in those two States from the effects of non-compete enforceability. The Commission accordingly gives this study, like the other studies reliant on comparisons of populations using non-competes and not using non-competes, little weight, though the shortcoming is slightly mitigated in the case of this study. While this study is specific to physicians, the Commission nonetheless finds that studies employing stronger methodologies (especially studies of

---

[464] The NPRM cited an earlier version of Johnson, Lavetti, and Lipsitz's study that estimated that a legal change in one State would have an effect on the earnings of workers just across that State's border that was 87% as great as for workers in the State in which the law was changed. NPRM at 3488. The data cited in this final rule reflect an updated version of this study.

[465] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 51. Seventy-six percent is calculated as the coefficient on the donor State NCA score (−.137) divided by the coefficient on own State NCA score (−.181).

[466] See U.S. Econ. Rsch. Serv., Commuting Zones and Labor Market Areas, *https://www.ers.usda.gov/data-products/commuting-zones-and-labor-market-areas/*.

[467] The Commission notes that the estimates in the updated version of Johnson, Lavetti, and Lipsitz's study are slightly different, but qualitatively similar to the earlier estimates noted in the NPRM. The results remain statistically significant and do not materially affect the Commission's analysis.

[468] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 30.

[469] Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities,* 30 Org. Sci. 961 (2019), online ahead of print at *https://pubsonline.informs.org/doi/abs/10.1287/orsc.2018.1252* at 6.

[470] *Id.* at 11.

[471] *Id.* at 10.

[472] *Id.* at 13.

[473] Starr, Prescott, & Bishara *supra* note 68 at 75.

[474] Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 40. The percentage range is calculated as $e^{-0.030} - 1$ and $e^{-0.076} - 1$, respectively.

[475] Lavetti, Simon, & White, *supra* note 82 at 1051. The increase in earnings is calculated as $e^{0.131} - 1$.

[476] Rothstein & Starr, *supra* note 77 at 1.

workers positioned similarly in the income distribution [477] and studies which broadly represent the U.S. workforce [478] provide compelling evidence that non-competes significantly suppress wages.

Comments Pertaining to Suppressed Earnings and Commission Responses

The Commission's finding that non-competes suppress earnings is principally based on the empirical evidence described in this Part IV.B.3.a.ii. However, the comments provide strong qualitative evidence that bolsters this finding.

The Commission received thousands of comments from workers describing how non-competes suppressed their earnings. These commenters spanned a wide variety of industries, hailed from across the U.S., and recounted a common experience: a non-compete prevented them from earning more. Illustrative examples of these comments include the following:

• I worked at a TV station. A corporation owned us and forced me to sign a yearly non-compete in order to remain in my position. After a few years, I was offered a management job with a much bigger title and much more money. . . . However, the corporation that owned us wouldn't even talk about letting me out of the non-compete. They wouldn't even discuss a settlement. They totally refused to allow me to pursue a much higher salary and a much higher position, no matter what was offered. I was forced to choose between staying in my current job, and not being able to improve my job or money, or being unemployed for 6 months.[479]

• I have been subject to a non-compete for 11 years in aggregate as a physician. Because of my non-compete, I am unable to take a position with another organization without having to drive much farther outside of my non-compete stipulated geographic restrictions (which would add to the time that I am away from my family, and costs more in fuel and vehicle maintenance). Because of my non-compete, I haven't had a raise in 6 years, because I can't negotiate with my employer because I have no bargaining position to negotiate from if I don't have options of alternate employment within the restrictions of my non-compete.[480]

• I recently received two job offers with better compensation, but I had my non-compete reviewed by an attorney and learned that it would open myself up to a significant lawsuit and potential fines. I most likely have to sit out a year and either work completely outside my field where I have advanced degrees or not work at all. Since I am the primary breadwinner, this is not financially possible for my family, so I have to stick with

my current employer who has not given me a pay increase in 2 years.[481]

• I am a Certified Nurse Practitioner and signed [a non-compete]. I live in Minnesota and would be required to travel one hour one way in order to fulfill [the] agreement. . . . My employer increased my responsibilities (on-call hours added) without additional pay using vague language in my binding agreement. I would have to hire a lawyer and spend thousands of dollars to file a lawsuit to get the agreement releasing me. . . . My employer took advantage of my binding agreement and did not increase my [Relative Value Unit] rate in 5 years for my or other Nurse Practitioners in our organization.[482]

• I was just starting out in my career when I finally got a part time job in my field of geology. Unfortunately, it didn't last long and I was let go. But because of a non compete agreement I had to sign I couldn't take another job in my field even though I had a good lead on one. Instead I had to take a job as a waitress making less than minimum wage.[483]

• I work for an IT company, low-level employee just above minimum wage, and I had to sign one of these to get the job even though I don't know any knowledge above what someone could learn in 10 or 15 hours on YouTube, yet I still had to sign this which makes it so I can't compete . . . if they offered me better pay.[484]

• I began working for my employer 10 years ago as a very young and inexperienced single mother. I desperately needed a job that could pay more than minimum wage, and I eagerly accepted my position and non-compete status. I have now been working at almost the same rate of pay (as raises are not readily given to us regardless of recessions or cost of living increases)—for a DECADE. My children are approaching college age, and I will absolutely need a higher income to help fund their educations.[485]

• I am in the laboratory medicine field and was laid off from a job as an implementation rep for an instrument vendor. Other companies were the competition, and I was held to a non-compete. This caused me to go from a six figure salary with great benefits back to the hospital making barely 60k as a single mother with twins and no emergency fund saved! I later went into the UV disinfection field and developed a tremendous amount of knowledge regarding minimizing the spread of infections in hospitals (pre-covid). After 5 years, I was laid off and prevented from continuing in this niche field that I had spent so much time developing a skillset and statistics within. I was only given a 2 week severance (along with a reminder of legal action if I worked for the competition). Companies use this as a bully tactic![486]

In addition to receiving thousands of comments recounting personal stories of non-competes stymieing the commenters' ability to get a better-paying job or a raise, many commenters also described how, over the long term, non-competes can lower wages and diminish career prospects for workers forced to sit out of the market or start over in a new field. The Commission also received numerous comments stating that non-competes exacerbate wage gaps based on gender and race, including by decreasing entrepreneurship and wages to a greater extent for women and people of color and by giving firms more power to engage in wage discrimination.[487]

With respect to the empirical literature, numerous commenters agreed that there is a wealth of empirical evidence to support the Commission's preliminary finding that, by inhibiting efficient matching between workers and employers, the use of non-competes is harming workers by suppressing their earnings. In addition to the literature discussed in the NPRM and in this final rule, some commenters pointed to a 2016 report from the Treasury Department that examines the correlation between non-compete enforceability and both earnings and earnings growth at the State level. The Treasury report finds that a one-standard-deviation increase in State-level enforceability of non-competes is correlated with 1.38% to 1.86% lower earnings, which can be found in both lower earnings upon starting a job and lower earnings growth.[488] The Commission agrees with commenters that this provides additional support for the final rule. However, the Commission gives less weight to cross-sectional studies of enforceability, like the 2016 Treasury report, that examine the correlation between non-compete enforceability and earnings growth.[489] The Commission relies more heavily on the studies that find that non-competes suppress earnings based on examining natural experiments.

Some commenters opposing the rule argued that studies of non-compete use, including the studies described in this Part IV.B.3.a.ii, show a positive association between non-compete use and earnings, especially when early notice of non-competes is provided,

---

[477] Balasubramanian et al., *supra* note 451.

[478] Johnson, Lavetti, & Lipsitz, *supra* note 388.

[479] Individual commenter, FTC–2023–0007–8067.

[480] Individual commenter, FTC–2023–0007–0616.

[481] Individual commenter, FTC–2023–0007–0651.

[482] Individual commenter, FTC–2023–0007–0857. Relative value units are a component of a methodology that calculates earnings for some healthcare workers.

[483] Individual commenter, FTC–2023–0007–11973.

[484] Individual commenter, FTC–2023–0007–11137.

[485] Individual commenter, FTC–2023–0007–7238.

[486] Individual commenter, FTC–2023–0007–2416.

[487] *See also* Part IV.B.3.a.iii (summarizing comments from workers and worker advocates stating that non-competes increase illegal conduct by employers and make it harder for workers to report illegal conduct).

[488] Dept. of the Treasury, *Non-Compete Contracts: Economic Effects and Policy Implications* (March 2016) at 20.

[489] *See* Part IV.A.2.

while others cautioned against interpreting these relationships as causal. The Commission agrees with commenters who caution against a causal interpretation of these studies, which are unable to determine whether non-compete use causes differences in earnings, whether earnings cause differences in non-compete use, or whether a third factor simultaneously determines both, as discussed in Part IV.A.2.

Some commenters opposing the rule stated that the most comprehensive study of the earnings effects of non-competes (the Johnson, Lavetti, and Lipsitz study described in this Part IV.B.3.a.ii) examines only relatively incremental changes in laws governing the enforceability of non-competes (*i.e.*, changes other than full bans), and claimed that this study thus does not shed light on the effects of a full prohibition. In response, the Commission notes that the analysis in Johnson, Lavetti, and Lipsitz finds that the effects of changes in non-compete enforceability are broadly linear. This means the effect of a change in enforceability twice the size of another change results in a change in workers' earnings that is approximately twice as large. As a result, the Commission finds that it would be appropriate to extrapolate from the effects of incremental changes in non-compete laws to the effects of prohibitions, at least in the context of worker earnings.[490] In other words, if incremental changes in enforceability lead to a certain level of earnings effects, it is reasonable to presume—based on the linearity of the relationship between changes in enforceability and workers' earnings—larger changes will lead to larger effects.

That said, in the regulatory impact analysis, the Commission does not extrapolate from the incremental changes observed in these studies with respect to earnings effects.[491] Instead, the Commission follows a conservative approach and assumes that the prohibition in the final rule, even though it is comprehensive, will have the same effects on earnings as the incremental legal changes observed in these studies. Therefore, even if the effects of changes in non-compete enforceability are not linear, the Commission's analysis of the economic impacts of the final rule is not undermined because, if anything, it underestimates the benefits of the rule.

A commenter argued that the Johnson, Lavetti, and Lipsitz dataset is outdated because it examines enforceability between 1991 and 2014. In response, the Commission finds that while the enforceability measures contained in that dataset do not perfectly reflect current enforceability due to changes in State law in the intervening several years, the measures still reflect the impacts of non-compete enforceability on economic outcomes, and likely still have strong predictive power.

Some commenters opposing the rule asserted that the overall competitiveness of U.S. labor markets undermines the argument that workers suffer from non-competes. In response, the Commission notes that a range of factors have weakened competition in labor markets.[492] In any event, the level of competitiveness of a labor market does not justify use of a practice that tends to negatively affect competitive conditions.

Some commenters opposing the rule pointed to academic writings, including a summary of the research by an FTC economist writing in his personal capacity in 2019, stating that there was limited evidence on the effects of such clauses. The Commission finds that these writings are generally outdated and disagrees with them. As the various explanations of the empirical research in Parts IV.B and IV.C illustrate, much of the strongest evidence on the effects of non-competes has been published in recent years. The Commission notes further that Evan Starr, one expert who voiced concerns over the state of the evidence in the past, submitted a comment that was broadly supportive of the interpretation of the evidence in the NPRM and of the proposed rule.[493]

Other comments opposing the rule stated that the heterogeneity of the impact of a non-compete ban on earnings undermined the Commission's preliminary finding regarding the effects of non-competes on earnings. These commenters asked whether the population-wide average effects noted in certain studies apply across the workforce or only to certain individuals (*e.g.,* at certain points in the income distribution), certain professions, or in certain geographies (*e.g.,* where local labor markets tend to be more concentrated). Another commenter argued that if a ban on non-competes drives up earnings for highly skilled

workers, wages might decrease for other categories of workers.[494]

In response to these comments, the Commission finds that, while estimates of the magnitude of the effect of non-competes on earnings vary to some extent across groups of workers, the effects are directionally and qualitatively similar across groups. For example, while Balasubramanian et al. do not report a table with average earnings for workers in their study, workers in the high tech jobs studied tend to be relatively highly paid, and the study finds non-competes suppress these workers' earnings.[495] On the lower end of the earnings spectrum, Lipsitz and Starr report average earnings of $16.41 per hour for workers in their study, which corresponds to annual earnings of approximately $34,133 per year (assuming 2,080 hours worked per year), and their study likewise finds that non-competes suppress the earnings of these workers.[496]

Additionally, Johnson, Lavetti, and Lipsitz's study of workers across the economy shows that, while college-educated workers and workers in occupations and industries in which non-competes are used at a high rate experience relatively larger adverse effects on their earnings from non-compete enforceability, the estimated effect of increased enforceability on other workers is still negative (albeit statistically insignificant in this study).[497] In short, while these studies do not estimate the magnitude of negative effects for every subset of the population, the finding of negative effects on earnings is consistent across dissimilar subsets of the population.

A commenter that opposed the NPRM asserted that a categorical ban could decrease wages for highly paid workers, arguing that such workers could negotiate higher wages in exchange for the non-compete that they would lose with a ban. This speculative assertion is belied by the comment record, which indicates that the highly paid, highly skilled workers who are not senior

---

[490] *See* Figure 3; Johnson, Lavetti, & Lipsitz, *supra* note 388 at 17.

[491] *See* Part X.F.5.

[492] See Treasury Labor Market Competition Report at i.

[493] Comment of Evan Starr, FTC–2023–0007–20878.

[494] These commenters were generally referring to higher-wage workers, but not senior executives. Comments that focused on senior executives are addressed in Part IV.C.

[495] Workers in the occupation Computer and Information Research Scientists (SOC code 15–1221) in the private sector had median earnings of $156,620 in 2022, while Software Developers (SOC code 15–1252) in the private sector had median earnings of $127,870 in 2022. BLS, Occupational Employment and Wage Statistics, *https://www.bls.gov/oes/tables.htm.* These private-sector data are from the May 2022 National industry-specific and by ownership XLS table (*see* table labeled "national_owner_M2022_dl").

[496] Lipsitz & Starr, *supra* note 72 at 148.

[497] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 57.

executives are also unlikely to negotiate non-competes.[498] It is also belied by empirical evidence that non-competes suppress earnings for highly paid workers.[499]

Similarly, commenters opposing the rule questioned whether earnings effects merely result from firms hiring different types of workers after changes in non-compete enforceability (for example, workers with different levels of experience or education). In response to these comments, the Commission first notes that the studies find adverse impacts across the labor force. Therefore, even if a different mix of types of workers were hired due to non-compete enforceability, the evidence shows workers' wages are suppressed across the labor force when non-competes are more enforceable. Additionally, the Commission notes that the study by Lipsitz and Starr compares the earnings growth of individual workers before and after the legal change in Oregon, showing that earnings growth increased after the non-compete ban. This provides some evidence that the effects observed in the literature are not simply due to substitution, since individual workers' earnings trajectories would not be changed if all the effects were simply due to firms substituting one type of worker for another.[500]

Some commenters opposing the rule asserted that enforceability indices are likely measured with substantial error. These commenters argue that the indices are based on qualitative analyses of State laws and not data on how frequently non-competes are actually enforced or the results of these enforcement cases. The Commission finds the enforceability indices are sufficiently reliable, because they are generated through careful analysis of State law that takes into account variation in legal enforceability along multiple dimensions.[501] Moreover, a 2024 study using enforcement outcome data finds that a non-compete ban in Washington increased earnings, consistent with the studies using enforceability indices.[502]

Some commenters opposing the rule asserted that Hawaii's prohibition of non-competes in the technology industry may not have covered the workers claimed (in particular, omitting workers in the broadcast industry).[503] These commenters also asserted that Hawaii simultaneously banned non-solicitation clauses.

The Commission finds the study of Hawaii's non-compete ban to be informative, despite these limitations. First, any workers omitted from coverage by the statute, but considered as affected in the study, would lead to a phenomenon known as "attenuation bias," which causes estimated effects to underestimate the true impact.[504] Second, the non-solicitation agreements banned by the Hawaii law were non-solicitation of coworker agreements (otherwise known as non-recruitment agreements)—agreements under which workers are barred from recruiting former coworkers, as opposed to non-solicitation of client agreements, under which workers are barred from soliciting former clients. While non-solicitation of coworker agreements may have a marginal impact on workers' earnings (*e.g.*, in situations in which workers only find out about job opportunities via past coworkers), the Commission does not find it likely that they have a major effect on workers' earnings. They may prevent some workers from hearing about some job opportunities, but unlike non-competes, they do not prevent workers from taking those opportunities. And unlike non-solicitation of client agreements, they do not frustrate workers' ability to build up a client base after moving to a new employer. The Commission therefore finds it likely that much of the impact identified in the study of the Hawaii law is due to non-competes. The Commission also notes that the Hawaii study is directionally consistent with the results from other more robust studies that use different methodologies.

Some commenters opposing the rule argued that the impact of Oregon banning non-competes for low-wage workers may have been limited because the law did not affect existing non-competes; because non-competes were already disfavored in Oregon before the law change; and because the law included multiple carve-outs. Commenters also argued the negative effects on earnings found in Oregon may have been confounded by the Great Recession.

The Commission finds that those concerns are not a compelling reason to discard the study. The study carefully examines multiple comparisons of workers within Oregon and across States. The results therefore cannot be explained by a differential response of Oregon to the Great Recession, a differential response of hourly workers to the Great Recession, or even a differential response of hourly workers in Oregon to the Great Recession. The Commission also does not believe that the study is undermined because the law did not affect existing non-competes and included multiple carve-outs, or because non-competes were disfavored in Oregon before the law changed. These factors likely mitigated the magnitude of the law's negative effect on earnings, rather than exaggerating it.

Some commenters opposing the rule argued that Johnson, Lavetti, and Lipsitz[505] claim that "[t]he overall effect of [non-compete] enforceability on earnings is ambiguous," and that this undermines the Commission's preliminary findings. However, these commenters take this quote out of context. The authors were referring to a theoretical model, not to the empirical work in their paper. When economists do empirical research, they often begin by constructing a theoretical model and describing what the theory would predict; they then describe their empirical findings, which may show a different result. The authors described that it is unclear, theoretically, whether non-compete enforceability would increase or decrease earnings. However, the empirical findings of the study were clear: as the authors stated, "We find that increases in [non-compete] enforceability decrease workers' earnings."[506] The fact that the authors described the theoretical results of a hypothesized model as ambiguous does not undermine the fact that their study had clear empirical results.

Some healthcare businesses and trade organizations opposing the rule argued that, without non-competes, physician shortages would increase physicians' wages beyond what the commenters view as fair. The commenters provided no empirical evidence to support these assertions, and the Commission is unaware of any such evidence. Contrary to commenters' claim that the rule would increase physicians' earnings beyond a "fair" level, the weight of the evidence indicates that the final rule

---

[498] *See* Parts IV.B.2.b.i and IV.C.1.

[499] *See, e.g.*, Balasubramanian et al., *supra* note 451.

[500] Lipsitz & Starr, *supra* note 72, Online Appendix at 18.

[501] Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Covenants Not to Compete, Trends, and Implications for Employee Mobility Policy*, 13 U. Pa. J. Bus. L. 751 (2011); Barnett & Sichelman, *supra* note 389.

[502] Takuya Hiraiwa, Michael Lipsitz, & Evan Starr, *Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach* (2024), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4364674*.

[503] Balasubramanian et al., *supra* note 451.

[504] Attenuation bias occurs when the independent variable (here, whether a worker is covered by the ban) is measured with error.

[505] Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* (2021) at 11; *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381*.

[506] *Id.* at 2.

will lead to fairer wages by prohibiting a practice that suppresses workers' earnings by preventing competition; that is, the final rule will simply help ensure that wages are determined via fair competition. The Commission also notes that it received a large number of comments from physicians and other healthcare workers stating that non-competes exacerbate physician shortages.[507]

One commenter opposing the rule criticized the analysis in the Johnson, Lavetti, and Lipsitz study, suggesting that data on where individuals live are not necessarily indicative of where individuals work, and that identified spillover effects may simply be due to cross-border commuters. The Commission disagrees, because, as noted, the study considers whether the workers are subject to enforceable non-competes based on their work location.

A commenter also argued that if the absence of non-competes helped workers, one would expect California, North Dakota, and Oklahoma to have the highest median incomes among all the States. The Commission believes this expectation is inapt. Given the evidence that non-competes suppress workers' earnings, earnings in California, North Dakota, and Oklahoma are likely higher than they would be if non-competes were enforceable, but there is no reason to expect they would necessarily be higher than all other States.

One commenter opposing the rule asserted that the Commission's citation of one study in the NPRM was insufficient to show that non-competes are directly tied to discriminatory behavior by employers, or that non-competes worsen racial or gender wage gaps. The Commission does not rest its finding in this final rule that non-competes tend to negatively affect competitive conditions on findings of increased discriminatory behavior or exacerbation of gender and wage gaps. The Commission merely notes that there are two empirical studies—described under "Evidence of suppressed earnings"—that find that non-competes do, in fact, exacerbate earnings gaps.

One commenter opposing the rule stated that closing racial and gender wage gaps may harm racial minorities and women if their wages were to fall in absolute terms. Another commenter argued that the proposed rule would reduce capital investment and output, which would decrease White male workers' wages. In response, the Commission notes that the study by Johnson, Lavetti, and Lipsitz shows that the impact of a decrease in non-compete enforceability on earnings is positive for workers in each of these groups.

The empirical evidence makes clear that, by restricting a worker's ability to leave their current job to work for a competitor or to start a competing business, non-competes reduce workers' earnings, supporting the Commission's finding that non-competes tend to negatively affect competitive conditions in labor markets.

### iii. Non-Competes Reduce Job Quality

In the NPRM, the Commission recognized that non-competes may also negatively affect working conditions, *i.e.,* job quality,[508] although this had not been studied in the empirical literature (likely because it is harder to quantify). Competition in labor markets yields not only higher earnings for workers, but also better working conditions.[509] In a well-functioning labor market, workers who are subject to poor working conditions can offer their labor services to an employer with better working conditions. Such workers can also start businesses, giving them more control over working conditions. Non-competes frustrate this competitive process by restricting a worker's ability to switch jobs or start a business. Furthermore, in a well-functioning labor market, employers compete to retain their workers by improving working conditions. Where workers are locked into a job—because their alternative employment options are restricted—those competitive forces are diminished and working conditions can suffer. The Commission accordingly sought comment on this topic.

In response, thousands of workers with non-competes described how, by frustrating these competitive processes, non-competes prevent them from escaping poor working conditions or demanding better working conditions. Based on the large number of comments the Commission received on this issue and the wide variety of negative and severe impacts commenters described, the Commission finds that, in addition to suppressing earnings, non-competes negatively affect working conditions for a significant number of workers.

The Commission finds that the effects of non-competes on labor mobility and workers' earnings are sufficient, standing alone, to support its finding that non-competes with workers other than senior executives tend to negatively affect competitive conditions in labor markets. However, the Commission believes its finding that non-competes are an unfair method of competition is further bolstered by this strong qualitative evidence related to non-competes degrading working conditions.

Numerous workers and worker advocacy organizations described how non-competes compel workers to endure jobs with poor working conditions. Illustrative examples of these comments include the following:

• In March 2018, I was fired from a job in local news for refusing to go into an unsafe situation. I'd recently received a letter from a man threatening to kidnap me. When my boss decided he would still send me out alone in the field, I fought him on it, lost, and was terminated. Three weeks later, I found out I was pregnant. Unable to work in my field because of a noncompete enforced even AFTER I was terminated, I had no choice but to apply for WIC and government assistance, and work at a retail job making half my previous salary. I wanted to work. I wanted money to support my child. I wanted money to move closer to home, to escape a domestic violence situation. My noncompete kept me in a horrible spot, and nearly cost me my life.[510]

• I started my first job as a Nurse Practitioner in 2019. All positions I interviewed for required a non-compete. . . . In my case, I work for an employer that is hostile, discriminated against me during pregnancy and maternity leave and has raised his voice at me in meetings. He told me I was lucky to even have a job after becoming pregnant. I learned after starting at the practice that he has shown this pattern before with previous employees. I say this because all of these above-mentioned reasons are why I have the right to want to quit my job and move on. I desperately want to leave and start another job but I can't because of the non compete. I feel like a prisoner to my job. I feel depressed in my work conditions and I feel like I have no way out.[511]

• I'm a barber and violated a non-compete about 6 months ago. . . . I worked for my previous employer for two years in a toxic environment. I told my employer how work was affecting my home life on more than one occasion and she did nothing. . . . How was I to know that I would be working in a toxic environment when I applied? So ultimately, I decided in order to be happy and make a living wage, I'd have no choice but to violate my non-compete. She came after me in no time flat. Now I'm paying legal fees and at risk of going to court and losing my job for 6 more months. . . . [I]f I'm working in poor working conditions, I should be able to work where I please. For two years my job and employer affected my mental health. I chose to take anti-depressants after things got bad at work, upped my dosage twice as work

---

[507] *See* Part IV.B.3.b.iv for a more detailed summary of these comments.

[508] NPRM at 3504.

[509] Treasury Labor Market Competition Report at i.

[510] Individual commenter, FTC–2023–0007–12813.

[511] Individual commenter, FTC–2023–0007–4989.

became progressively worse and since I've left, I've stopped taking my medication.[512]

• I am a commissioned employee in the mortgage world, and I had a non-compete with my former company in Ohio. Near the end of my time at this company, they merged with another company and put the new company in charge of the sales staff. It was miserable. We started having issues, even with having basic supplies, and it went from just harming me to harming my ability to get business complete, which harms the consumer. I left and I was sued for a three year period. . . . I really do not feel that [non-competes] should be allowed. You are stuck at employers and they can treat you in any manner that they please because they know that they can make your life a living hell if you leave them.[513]

• Like many new graduates in the medical field, I signed on with a company that made numerous empty promises. . . . What I was not prepared for, was the company's strategic increase in facilities in which I was to perform services under this contract. In the short span of 2 years, I did neurophysiological monitoring for 24 facilities . . . . When working conditions fell apart regardless of my requests for adequate sleep following 36 hours straight of working on call at my designated stroke hospital, time for meals or breaks within 18+ hour work days, and a reasonable travel distance within the area the company demanded I relocate to, I was met with threats from HR regarding my non-compete if I were to leave. . . . Working conditions became so intense, I was placed on migraine medications at the recommendations of my doctor and required three separate trips in the ER for medical conditions related to stress, inability to eat or drink while tied within tens of hours long surgeries . . . . Again I was met with threats from HR and now their legal team.[514]

Many commenters stated that non-competes harm working conditions for lower-wage workers. However, there were many commenters in higher-wage jobs who also stated that non-competes harmed their working conditions. For example, numerous physicians explained that they were trapped in jobs with poor working conditions because of non-competes. Many of these physicians described how non-competes accelerate burnout in their profession by making it harder for workers to escape bad working conditions or demand better working conditions. Many commenters recounted how they left poor work environments but non-competes harmed them by forcing them to leave their field, move out of the area where they lived, or spend time and money defending themselves from legal action. Many commenters argued that prohibiting non-competes would increase workers' bargaining power and

in turn incentivize employers to provide better work environments.

Workers in both high-wage and low-wage professions, as well as worker advocacy groups, stated that by diminishing workers' competitive alternatives, non-competes keep workers trapped in jobs where they experience dangerous, abusive, or toxic conditions; discrimination; sexual harassment; and other forms of harassment. These commenters also described how non-competes trap some workers in jobs where their employer commits wage and hour violations, such as wage theft, as employers that use non-competes can insulate themselves from the free and fair functioning of competitive markets and are thus more likely to be able to steal worker wages with impunity. Several commenters said they were unable to receive benefits because a non-compete rendered them unable to switch to a job with better benefits or rendered them unable to leave their job when their employer took their benefits away. A professional membership network for survivors of human trafficking explained that traffickers masquerading as legitimate businesses use non-competes to prevent trafficking victims from leaving.

Some workers and advocacy organizations stated that non-competes increase the potential for harm from retaliation. These commenters stated that restricting a worker's employment opportunities makes it even harder for workers to find new jobs after experiencing retaliation. These commenters argued that this discourages workers from reporting fraud, harassment, discrimination, or labor violations. A labor union commented that, by making it harder for workers to find new jobs, non-competes can deter unionization and chill activities protected by the National Labor Relations Act, including activities to address unsafe, unfair, or unsatisfactory working conditions. According to a trade organization of attorneys, whistleblower protections may come too late for a fired whistleblower who cannot obtain another job because of a non-compete. Several commenters provided survey or case evidence showing that workers who report sexual harassment, wage theft, or poor working conditions are frequently retaliated against, including by being fired.[515] These commenters

stated that, because non-competes make it harder for these workers to find new jobs, non-competes decrease the likelihood that workers report these kinds of harms.

Many workers described how, by limiting their ability to get out of harmful workplace environments, non-competes contributed to stress-related physical and mental health problems. Many commenters, particularly in the healthcare profession, stated that suicide is a major problem in their profession and described non-competes as one of the stressors, because non-competes make it harder to leave jobs with unsustainable demands, leaving workers feeling trapped.

While thousands of commenters described, often in personal terms, how non-competes have negatively affected their working conditions, the Commission received few comments from workers or worker advocates stating that non-competes improved working conditions. The few comments received stated that workers who remain with an employer can be harmed by departing and competing colleagues, via increased workloads or harm to their employer.

Taken together, these comments provide strong qualitative evidence that non-competes degrade working conditions, which supports the Commission's finding that non-competes tend to negatively affect competition in labor markets.

b. Non-Competes Tend to Negatively Affect Competitive Conditions in Product and Service Markets

Based on the Commission's expertise and after careful review of the rulemaking record, including the empirical research and the public comments, the Commission finds that non-competes tend to negatively affect competitive conditions in markets for products and services by inhibiting new business formation and innovation.

New businesses are formed when new firms are founded by entrepreneurs or spun off from existing firms. New business formation increases competition by reducing concentration, bringing new ideas to market, and forcing incumbent firms to respond to new firms' ideas instead of stagnating. New businesses disproportionately create new jobs and are, as a group, more resilient to economic

---

[512] Individual commenter, FTC–2023–0007–3323.

[513] Individual commenter, FTC–2023–0007–3955.

[514] Individual commenter, FTC–2023–0007–1252.

[515] For example, the National Women's Law Center, which operates and administers the TIME'S UP Legal Defense Fund, reported that among individuals who contacted the Fund to request legal assistance related to sexual harassment in the workplace, 72% reported facing retaliation, and, among those, 36% had been fired. Comment of Nat'l

Women's L. Ctr., FTC–2023–0007–20297 at 5 (citing Jasmine Tucker & Jennifer Mondino, *Coming Forward: Key Trends and Data from the TIME'S UP Legal Defense Fund*, 4 (Oct. 2020), *https://nwlc.org/wp-content/uploads/2020/10/NWLC-Intake-Report_FINAL_2020-10-13.pdf*).

downturns.[516] With respect to spinoffs, research shows that spinoffs within the same industry are highly successful relative to other entrepreneurial ventures.[517]

Non-competes, however, tend to negatively affect competitive conditions in product and service markets by inhibiting new business formation in two ways. First, since many new businesses are formed by workers who leave their jobs to start firms in the same industry, non-competes reduce the number of new businesses that are formed in the first place.[518] Second, non-competes deter potential entrepreneurs from starting or spinning off new businesses—and firms from expanding their businesses—by locking up talented workers.[519] Non-competes thus create substantial barriers to potential new entrants into markets and also stymie competitors' ability to grow by making it difficult for those entrants to find skilled workers.

Innovation refers to the process by which new ideas result in new products or services or improvements to existing products or services. Innovation may directly improve economic outcomes by increasing product quality or decreasing prices, and innovation by one firm may also prompt other firms to compete and improve their own products and services. However, non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting innovation.

Non-competes tend to reduce innovation in three ways. First, non-competes prevent workers from starting businesses in which they can pursue innovative new ideas.[520] Second, non-competes inhibit efficient matching between workers and firms.[521] Where workers are less able to match with jobs that maximize their talents, employers' ability to innovate is constrained. Third, and relatedly, non-competes reduce the movement of workers between firms.[522]

This decreases knowledge flow between firms, which limits the cross-pollination of innovative ideas.

As described in Parts IV.B.3.b.i and ii, the Commission finds that the effects of non-competes on new business formation and innovation are sufficient to support its finding that non-competes tend to negatively affect competitive conditions in product and service markets. In addition, as described in Parts IV.B.3.b.iii and iv, the Commission believes this finding is further bolstered by evidence that non-competes increase concentration and consumer prices, as well as evidence that non-competes reduce product quality.

The Commission's findings relating to new business formation and innovation are principally based on the empirical evidence described in Parts IV.B.3.b.i and ii. However, the comments provide strong qualitative evidence that bolsters these findings. Furthermore, the Commission notes that the legal standard for an unfair method of competition under section 5 requires only a tendency to negatively affect competitive conditions; empirical evidence of actual harm is not necessary to establish that conduct is an unfair method of competition. In the case of non-competes, however, there is extensive empirical evidence, as well as extensive corroborating public comments, that non-competes negatively affect competitive conditions in product and service markets.

i. Non-Competes Inhibit New Business Formation

Evidence of Inhibited New Business Formation

The Commission finds that non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting new business formation. The weight of the empirical evidence establishes that when non-competes become more enforceable, the rate of new business formation (*i.e.*, the number of new businesses formed) declines.

Several empirical studies assess the effects of non-competes on the rate of new business formation. A study conducted by Jessica Jeffers examines several State law changes in the technology sector and the professional, scientific, and technical services sector and finds a decline in new firm entry when non-competes become more enforceable. Jeffers finds that as non-competes became more enforceable, the entry rate of new firms decreases substantially.[523] Jeffers' study uses

several changes in non-compete enforceability that are measured in a binary fashion. While this study therefore does not satisfy all the principles outlined in Part IV.A.2, it satisfies most of them and is accordingly quite robust and weighted highly.

Another study, conducted by Matt Marx, examines the impact of several changes in non-compete enforceability between 1991 and 2014 on new business formation, and likewise finds a negative effect of non-competes on new business formation.[524] Marx finds that, when non-competes become more enforceable, men are less likely to found a rival startup after leaving their employer, that women are even less likely to do so (15% less likely than men), and that the difference is statistically significant.[525] This study therefore supports both that non-competes inhibit new business formation and that non-competes tend to have more negative impacts for women than for men. Marx uses several changes in non-compete enforceability measured in a continuous fashion. The study therefore satisfies the principles outlined in Part IV.A.2 and is weighted highly.

In addition, Johnson, Lipsitz, and Pei analyze the extent to which non-compete enforceability affects the rate of firm entry in high-tech industries. They find that an average increase in non-compete enforceability decreases the establishment entry rate by 3.2%.[526] Outside of examining only innovative industries, this study's methodology is otherwise strong, and the study is therefore weighted highly. While this study uses multiple changes in a granular measure of non-compete enforceability, a quite robust methodology, the study is limited to high-tech industries.

In addition, a study conducted by Can and Fossen indicates that decreases in enforceability of non-competes in Utah and Massachusetts increased entrepreneurship among low-wage workers.[527] Can and Fossen examine just two changes in non-compete enforceability, measured in a binary fashion, and the study is therefore given slightly less weight than studies which

---

[516] *See, e.g., The Importance of Young Firms for Economic Growth*, Policy Brief, Ewing Marion Kauffman Foundation (Sept. 24, 2015).

[517] Aaron K. Chatterji, *Spawned With a Silver Spoon? Entrepreneurial Performance and Innovation in the Medical Device Industry*, 30 Strategic Mgmt. J. 185 (2009).

[518] *See, e.g.,* Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms*, 64 Mgmt. Sci. 552 (2018).

[519] *See, e.g.,* Shi, *supra* note 84.

[520] *See* Part IV.B.3.b.i.

[521] *See* Part IV.B.3.a. While the Commission focuses on the most direct negative effects on competition in product and service markets in this Part IV.B.3.b, inefficient matching between workers and firms may have additional negative effects, including on output.

[522] *See* Part IV.B.3.a.i.

[523] Jeffers, *supra* note 450. The 2024 version of Jeffers' study reports a 7% impact.

[524] Matt Marx, *Employee Non-Compete Agreements, Gender, and Entrepreneurship*, 33 Org. Sci. 1756 (2022).

[525] *Id.* at 1763.

[526] Matthew S. Johnson, Michael Lipsitz, & Alison Pei, *Innovation and the Enforceability of Non-Compete Agreements*, Nat'l. Bur. Of Econ. Rsch. (2023) at 36.

[527] Ege Can and Frank M. Fossen, *The Enforceability of Non-Compete Agreements and Different Types of Entrepreneurship: Evidence From Utah and Massachusetts*, 11 J. of Entrepreneurship and Pub. Pol. 223 (2022).

examine more changes or use a more granular measure of enforceability. The study corroborates the results of studies using these stronger methodologies.

Furthermore, a study conducted by Benjamin Glasner focused on high-tech industries finds that technology workers increased entrepreneurial activity in Hawaii after non-competes were restricted, but finds no effect on entrepreneurial activity from Oregon's restriction on non-competes with low-wage workers.[528] Similar to the study by Can and Fossen, this study by Glasner uses two changes in non-compete enforceability measured in a binary fashion. Additionally, a study published by Stuart and Sorenson shows that increased enforceability of non-competes decreases the amount by which firm acquisitions and IPOs induce additional local business formation.[529] This study uses cross-sectional variation in non-compete enforceability measured in a binary fashion, and studying the amount by which firm acquisitions and IPOs induce additional local business formation does not cover all entrepreneurship. These studies are thus given more limited weight, but generally are in line with other evidence that non-competes reduce new business formation and innovation.

Additionally, a study conducted by Starr, Balasubramanian, and Sakakibara analyzes the effect of non-compete enforceability on spinouts (*i.e.*, when a firm creates a new business by splitting off part of its existing business). The authors find that, when non-compete enforceability increases by one standard deviation, the rate of spinouts within the same industry decreases by 32.5%—a major decrease in new business formation.[530] Research shows that spinouts within the same industry are highly successful, on average, when compared with typical entrepreneurial ventures.[531] This study uses cross-sectional differences in non-compete

enforceability, measured in a continuous fashion, though it attempts to avoid problems related to the use of cross-sectional differences in non-compete enforceability by using law firms—which likely do not use non-competes due to ethical limits in the legal profession [532]—as a control group. The Commission therefore gives this study somewhat less weight than studies of changes in non-compete enforceability, though the findings corroborate the findings of the studies by Jeffers and Marx.

In addition, a study by Salomé Baslandze shows that non-competes reduce new business formation, finding that greater non-compete enforceability inhibits entry by spinouts founded by former employees of existing firms.[533] Baslandze notes that spinouts tend to innovate more and are relatively higher quality than other new firms. This study examines changes in non-compete enforceability on a continuous measure but assumes that changes over a 19-year period occur smoothly over time instead of identifying exactly when the legal changes were made. While this study uses changes in non-compete enforceability and corroborates the findings of the aforementioned studies on new business formation, the assumption regarding the timing of changes yields an imprecise measure of non-compete enforceability over time. The Commission therefore gives this study somewhat less weight than studies which precisely identify the timing of changes in non-compete enforceability.

Finally, in a 2011 study, Samila and Sorenson find that when non-competes are more enforceable, rates of entrepreneurship, patenting, and employment growth slow. They find that an increase in venture capital funding creates three times as many new firms where non-competes are unenforceable, compared to where non-competes are enforceable.[534] This study

uses cross-sectional variation in non-compete enforceability along two dimensions, both of which are measured in a binary fashion. Due to this measurement, the Commission gives this study less weight, though its results corroborate the findings of the other studies on new business formation.

The Commission gives minimal weight to two additional studies. One of these estimates the job creation rate at startups increased by 7.8% when Michigan increased non-compete enforceability.[535] However, the Commission places less weight on this study than the studies discussed previously because it examines only one legal change in one State and because the change to non-compete enforceability was accompanied by several other simultaneous changes to Michigan's antitrust laws. Thus, it is not possible to isolate the effect of the change in non-compete enforceability standing alone.

The other study finds mixed effects of non-compete enforceability on the entry of businesses into Florida. The study examines a legal change in Florida which made non-competes more enforceable. The authors find larger businesses entered the State more frequently (by 8.5%) but smaller businesses entered less frequently (by 5.6%) following the change.[536] Similarly, Kang and Fleming find that employment at large businesses rose by 15.8% following the change, while employment at smaller businesses effectively did not change.[537] This study examines a single change in non-compete enforceability. However, the Commission gives this study minimal weight because the study does not examine new business formation specifically; instead, it assesses the number of "business entries," which does not necessarily reflect new business formation because it also captures existing businesses moving to the State.

Additional research analyzes the effects of non-competes on the number of jobs created by new businesses.[538]

[528] Benjamin Glasner, *The Effects of Noncompete Agreement Reforms on Business Formation: A Comparison of Hawaii and Oregon*, Econ. Innovation Group White Paper (2023), *https://eig.org/noncompetes-research-note/*.

[529] Toby E. Stuart & Olav Sorenson, *Liquidity Events and the Geographic Distribution of Entrepreneurial Activity*, 48 Admin. Sci. Q. 175 (2003).

[530] Starr, Balasubramanian, & Sakakibara, *supra* note 518 at 561. 32.5% is calculated as 0.0013/0.004, where 0.0013 is the coefficient reported in Table 2, Column 6, and 0.004 is the mean WSO entry rate reported in Table 1 for "nonlaw" firms.

[531] For reviews of the literature, *see, e.g.*, Steven Klepper, *Spinoffs: A Review and Synthesis*, 6 European Mgmt. Rev. 159 (2009) and April Franco, *Employee Entrepreneurship: Recent Research and Future Directions*, in Handbook of Entrepreneurship Research 81 (2005).

[532] *See* Am. Bar Ass'n, Model Rule 5.6, *https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/rule_5_6_restrictions_on_rights_to_practice/*.

[533] Salomé Baslandze, *Entrepreneurship Through Employee Mobility, Innovation, and Growth*, Fed. Res. Bank of Atlanta Working Paper No. 2022–10 (2022), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4277191*.

[534] Samila & Sorenson find that a 1% increase in venture capital funding increased the number of new firms by 0.8% when non-competes were enforceable, and by 2.3% when non-competes were not enforceable. Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth*, 57 Mgmt. Sci. 425, 432 (2011). The values are calculated as 0.8% = $e^{0.00755} - 1$ and 2.3% = $e^{0.00755 + 0.0155} - 1$, respectively.

[535] Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment*, Fed. Res. Bank of Phila. Working Paper No. 21–26 at 16 (2021).

[536] Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and Concentration: Evidence From a Florida Case Study*, 29 J. Econ. & Mgmt. Strategy 663, 673 (2020).

[537] *Id.* at 674. The value is calculated as 15.8% = $e^{0.1468} - 1$.

[538] In the NPRM, the Commission stated that the evidence relating to the effects of non-competes on job creation was inconclusive. However, in the final rule, the Commission does not make a separate finding that non-competes reduce job creation.

While the research described previously shows that non-competes inhibit the rate of new business formation, this research indicates that even where new businesses are created, these new businesses have fewer workers where non-competes are more enforceable. This evidence suggests that non-competes not only prevent small businesses from being formed, but they also hinder entrepreneurship by tending to reduce the number of employees new firms are able to hire.

In addition to analyzing the rate of firm entry in high-tech industries, Johnson, Lipsitz, and Pei analyzes the number of jobs created at newly founded firms in innovative industries.[539] Using evidence from several State law changes, the authors find that increases in non-compete enforceability lead to a reduction in the number of jobs created at newly founded firms in innovative industries (though not necessarily across all industries or all types of firms) by 7.2%.[540]

A study by Starr, Balasubramanian, and Sakakibara finds that increases in non-compete enforceability decreased average per-firm employment at new firms.[541] In the NPRM, the Commission stated that this study found that several increases in non-compete enforceability were associated with a 1.4% increase in average per-firm employment at new firms.[542] However, upon further review of the study, the Commission interprets this study as finding that increases in non-compete enforceability decreased average per-firm employment at new firms—both for spinouts within the same industry and spinouts into a different industry.[543] For spinouts into a different industry, average per-firm employment at the time of founding decreases by 1.4% due to greater non-compete enforceability. For spinouts into the same industry, average per-firm employment decreases by 0.3%.[544] At

seven years after founding, the results are similar: spinouts into a different industry have average per-firm employment that is 1.5% lower due to greater non-compete enforceability, while spinouts into the same industry have per-firm employment that is 0.7% lower.[545] The Commission notes that this study compares States with different levels of enforceability, using law firms as a control group, instead of considering changes in non-compete enforceability. It is therefore given less weight than studies with stronger methodologies.[546]

Comments Pertaining to Inhibited New Business Formation and the Commission's Responses

The Commission's finding that non-competes inhibit new business formation is principally based on the empirical evidence described in this Part IV.B.3.b.i. However, the comments provide strong qualitative evidence that bolsters this finding.

Hundreds of commenters agreed with the Commission's preliminary finding that non-competes reduce new business formation. Illustrative examples of comments the Commission received include the following:

• I am a hairstylist . . . and have been with the company for 11 years. Our work conditions have changed drastically over the years and Covid has really sent us on a sharp decline. It is not the same salon I signed on to work for. That being said, a few coworkers want to open a salon and take some of us with them to bring back the caliber of service we want to give our clients. Our non-compete contracts state that we can't work within 30 miles of this salon. We didn't expect that

standards would drop so low and they would raise prices so high that we lost so many clients. . . . We have all had enough of the toxic environment and need to be free of this unfair contract.[547]

• I am a veterinarian that has had to suffer under non-compete clauses my entire career. I have had to sell my home and relocate several times including moving out of State due to non-compete clauses. I'm currently stuck in a [non-compete covering a] 30 mile radius of all 4 practices of a group of hospitals I work for. This basically keeps me from working in an enormous area. I had to sign it due to circumstances out of my control and they took advantage of my situation. I recently tried to start my own business, not related to the type of practice that I have the non-compete clause with, and had to abandon the idea because I couldn't get funding without my current employer releasing me from the contract or by relocating again out of the huge area of non-compete.[548]

• We own a small family practice in urban Wisconsin. I previously was employed by a large healthcare organization and burned out. When I left to star[t] my own business, I was restricted from working close by, by a non-compete. I spent $24,000 [in] legal fees challenging this successfully. . . . Now as a business owner for 5 years, we have the opportunity to hire some physician assistants who have been terminated without cause from my prior employer. I am unable to do so because they also had to sign non-competes. I have seen many disgruntled patients who have delayed care because of this.[549]

• I am aesthetic nurse practitioner wanting to start my own business but I am tied to a 2 year 10 mile non compete. I was basically obligated to sign the non-compete when I needed to reduce my hours to finish my master's degree (that I paid for and they wanted me to get). I feel forced to stay at a job that is not paying me what I am worth.[550]

• I am a licensed social worker with a non-compete which is hindering my employment options. . . . I would like to start my own business as the mental health facility I work for is not supportive of mental health. This rule would be a great benefit for mental health professionals and those seeking quality mental health services.[551]

• As a recently graduated physician, I wanted to start my own practice and become a small business owner. However, I also needed a source of income to start out and wanted to work part time at a local hospital for income and benefits. However, due to a non-compete clause in their contracts, I could not start my own business and practice in the same city if I was to work with them. This hindered my ability to work as much as I wanted (ended up having to work as an independent contractor for significantly less

---

Instead, cite the research described herein—which relates solely to job creation at newly founded firms—to support its finding that non-competes inhibit new business formation.

[539] Johnson, Lipsitz, and Pei, *supra* note 526 at 36.

[540] *Id.* While this study satisfies each of the other metrics outlined in Part IV.A.2, the sample is restricted to firms in innovative industries, and therefore the outcome of interest is not reflective of the entire population.

[541] Starr, Balasubramanian, & Sakakibara, *supra* note 518 at 552.

[542] NPRM at 3488–89.

[543] While this study satisfies some of the principles for robust design outlined in Part IV.A.2, the Commission notes that average per-firm employment does not precisely correspond to the economic outcome of interest, which is overall employment or job creation.

[544] Calculated as 1.4% − 1.1%, based on the effect for non-within-industry spinouts (1.4%) and the

relative impact on within-industry spinouts compared with non-within-industry spinouts (−1.1%). *See* Starr, Balasubramanian, & Sakakibara, *supra* note 518 at 561.

[545] Calculated as 1.5% − 0.7%, based on the effect for non-within-industry spinouts (1.5%) and the relative impact on within-industry spinouts compared with non-within-industry spinouts (−0.8%). *See id.* at 563.

[546] There are also two studies analyzing how non-competes affect job creation or employment generally. Neither study relates to new business formation specifically. Goudou finds a decreased job creation rate from an increase in non-compete enforceability in Florida. Felicien Goudou, *The Employment Effects of Non-compete Contracts: Job Retention versus Job Creation* (2023), *https://www.jesugogoudou.me/uploads/JMP_Felicien_G.pdf*. This study considers just one change in non-compete enforceability, and is therefore given less weight, though the results corroborate findings in papers which satisfy more of the guideposts in Part IV.A.2. Additionally, the 2023 version of Johnson, Lavetti, & Lipsitz, *supra* note 388, finds that increased non-compete enforceability reduces employment by 1.9%, though they do not estimate the impact on job creation directly. Rather, the authors look only at the closely related metric of changes in overall employment. This study otherwise has a strong methodology, as discussed in Part IV.B.3.a.ii.

[547] Individual commenter, FTC–2023–0007–3299.

[548] Individual commenter, FTC–2023–0007–1448.

[549] Comment of Three Oaks Health, FTC–2023–0007–1397.

[550] Individual commenter, FTC–2023–0007–10157.

[551] Individual commenter, FTC–2023–0007–11922.

shifts per month and no benefits), and made it more difficult to get my business off the ground due to expenses for providing my own benefits. Banning non-compete clauses would significantly help the ability for citizens to pursue starting small businesses or other work to increase their income and prosperity.[552]

• Mr. Z had worked for a company for over 15 years installing windshields in vehicles. He was a lower-level employee making $18.50 an hour and did not learn any trade secrets or confidential information. After years of working for the company the employer refused to raise his wages despite his experience, so he decided to start his own business. Shortly after giving notice and beginning his new endeavor, he received a letter from his previous employer informing him that he was in breach of his non-compete agreement and the employer would enforce it if he continued with his business plan.[553]

• Non-competes have prohibited me from making a living as a fitness and wellness professional to such an extent, that it hurt me economically. I opened up my own business that was different than my previous employer, even though it was different and I told him I was going to focus on a different area in wellness, my previous employer sued me. I ended up having to hire an attorney to defend myself and when it was all said and done, I spent close to 12,000 in fees and penalties.[554]

• Non compete agreements are detrimental to the average worker, preventing them from pursuing better paying job offers or from starting their own business in the same industry. I am directly affected by a non-compete clause I had signed as part of a job acceptance. I am now forming my own business in the same industry as my employer, and cannot do business within a 50-mile radius of my employer. That radius covers the hometown I live in. Even though we are in the same industry, we have very different target markets.[555]

As these comment excerpts reflect, many potential entrepreneurs wrote to the Commission to describe how they wanted to strike out on their own, but a non-compete preventing them from doing so. These comments indicate that non-competes have deprived communities of homegrown businesses—with respect to everything ranging from tech companies, to hair salons, to physician practices, and many more types of firms. This deprives markets of competing firms that can reduce concentration—which in turn has benefits for lowering prices and raising the quality of products and services, and increasing innovation in bringing new ideas to market—as well

as depriving communities of opportunities for new job creation.

Even where entrepreneurs were able to start businesses, they explained how non-competes prevented them from hiring talented workers and made it harder for their nascent businesses to grow and thrive. Many other commenters described personal experiences in which their newly formed businesses were threatened by litigation costs related to non-competes. Other commenters stated that the threat of litigation related to non-competes increases the risk and cost of starting a new business, particularly if that business intends to compete against a large incumbent firm. One commenter stated that incumbent firms can use non-compete litigation as a mechanism to chill startup formation where startups lack the resources to contest a non-compete.

Numerous small businesses and organizations representing small businesses submitted comments expressing support for the proposed rule and describing how it would help small business owners. These commenters contend that categorically prohibiting non-competes will empower small businesses by providing them with new access to critical talent and will drive small business creation as entrepreneurial employees will be free to compete against their former employers. Many small businesses also argued that non-competes can hinder small business formation and can keep small businesses from growing once they are formed. The extensive comments the Commission received from small businesses are also addressed in Part XI.C.

Some small businesses said they spent tens or hundreds of thousands of dollars defending themselves from non-compete lawsuits. A one-person surveying firm said it has to regularly turn down work because of the former employer's threat to sue over a non-compete. A small, five-worker firm said it was sued by a billion-dollar company for violating a non-compete despite the fact that the firm waited out the non-compete period and did not use proprietary information or pursue the former employer's customers; it fears the legal fees will force it out of business. A legal aid organization relayed the story of a client, a self-employed beauty worker who was unable to provide their service during a non-compete lawsuit despite working outside the non-compete geographic radius. The CEO of one small transport and logistics company said a ban would remove a tool used mostly by the largest companies in each industry to maintain

their market dominance, as small competitors cannot match their legal budgets. Further, many workers said they would open their own business if non-competes were banned.

Many small businesses shared their experiences of how non-competes have made hiring more difficult. For example, a small physician practice said non-competes made it difficult to compete with larger practices to attract and retain physicians. A small business and a medical association said small businesses could not afford a lawsuit when hiring workers. An IT startup tried to hire an executive who had retired from a large firm, but the large firm sued the startup to enforce what the startup said was an unenforceable non-compete. According to the startup, because a lawsuit would have cost up to $200,000, it was forced to settle and could not work with numerous potential clients, and its growth was significantly slowed. It stated that it continues to turn away many potential hires to avoid being sued over non-competes.

Other commenters raised additional issues relevant to hiring. According to one technology startup organization, the inability to assemble the right team is a major reason startups fail, and small businesses lose opportunities because they must avoid hiring workers who are subject to even unenforceable non-competes. That organization also said startups currently face legal and time costs from navigating the patchwork and complexity of State non-compete laws, especially when trying to determine if a potential hire's non-compete is enforceable; the time and expense of navigating this landscape will thus often cause the startups to forego that hire. That organization said some non-competes prevent experienced workers from counseling, advising, or investing in startups, and such mentoring can double a startup's survival rate.

Several self-identified entrepreneurs commented that because of their non-competes, they feared not being able to operate, build, or expand their business. Numerous workers reported that they wanted to or planned to start their own business, but their non-compete made them too afraid to do so. A public policy organization referenced the Census Bureau's Annual Business Survey to argue that a majority of business owners and an even higher majority of Black business owners view starting their own business as the best avenue for their ideas, and that non-competes may prevent these potential entrepreneurs' ideas from coming to market.

Several commenters stated that non-competes make it harder for new businesses to hire workers with relevant

---

[552] Individual commenter, FTC–2023–0007–11777.

[553] Comment of NW Workers' Justice Project, FTC–2023–0007–15199 (discussing a client).

[554] Individual commenter, FTC–2023–0007–12904.

[555] Individual commenter, FTC–2023–0007–12697.

experience or industry knowledge. Some commenters argued that non-compete bans, such as in California, have contributed to higher rates of successful start-ups, while new firms in States where non-competes are more enforceable tend to be smaller and are more likely to fail.

In contrast, several commenters opposed to the rule argued that non-competes promote new business formation by protecting small and new firms' investments, knowledge, and workers from appropriation by dominant firms poaching their employees. Commenters also theorized that, while non-competes directly inhibit employee spinoffs, they may encourage businesses to enter the market by enhancing their ability to protect their investments. As described in Part IV.D.2, the Commission finds that firms have viable alternatives for protecting these investments that burden competition to a less significant degree than non-competes. The Commission further notes that these commenters did not provide evidence to support their assertions.

In addition, when assessing how non-competes affect new business formation, the Commission believes it is important to consider the net impact. It is possible that the effects described by these commenters and the effects described by the Commission earlier in this Part IV.B.3.b.i can be occurring at the same time. That is, a non-compete might in some instances be protecting a firm's investments in a manner that is productivity-enhancing holding all else equal. But even that same non-compete can—and certainly non-competes in the aggregate do—inhibit new business formation by prohibiting workers from starting new businesses and by locking up talented workers, preventing the worker from efficiently matching with the job that is the highest and best use of their talents. What the empirical evidence shows is that non-competes reduce new business formation, overall and on net, indicating that the tendency of non-competes to inhibit new business formation more than counteracts any tendency of non-competes to promote new business formation.

Other commenters said non-competes protect firms' value and assets for sale in future acquisitions, which they said drives seed capital investment in start-ups. An investment industry organization commented that private-equity financing, particularly for early-stage companies, often includes non-competes and is used to support growth, in turn increasing competition. In response, the Commission notes that these commenters provided no empirical evidence that decreases in non-compete enforceability have affected seed capital investment and private-equity financing. Moreover, the Commission notes that there is no indication that small businesses or early-stage companies in States that have banned or limited non-competes have been unable to obtain financing. To the contrary, California, where non-competes are unenforceable, has a thriving start-up culture.

Other commenters addressed empirical research related to new business formation. Some commenters similarly argued that research on the average quality of employee spinouts due to changes in non-compete enforceability may imply negative effects of the rule (*e.g.,* if prohibiting non-competes decreases average employment or average survival rates of new firms). Some commenters also noted that the Baslandze study finds that weaker non-compete enforceability increases the rate at which spinouts form but result in a lower proportion of high-quality spinouts.[556]

In response to these comments, the Commission notes commenters primarily referenced Starr, Balasubramanian, & Sakakibara[557] to support this view. The findings in this study have been misinterpreted by commenters. This study actually finds that spinouts that form when non-compete enforceability is stricter are *lower* quality (*i.e.,* create fewer jobs), but that the effect is less drastic for spinouts within the same industry versus spinouts into different industries. Coupled with other evidence discussed in Part IV.B.3.b.i, the weight of which points to increased job creation due to the rule, the Commission finds that empirical studies have not established that non-competes lead to higher-quality startups or higher-quality spinouts. The Commission also notes that the result in the Baslandze study regarding the quality of spinouts is theoretical, and the study does not test this theory empirically.

Commenters also argued that non-competes may have different effects on different types of workers—for example, across different industries, occupations, or levels of pay—and that these differences may affect the impacts of non-competes on new business formation. In response, the Commission notes that the studies show negative effects across a range of industries and are directionally consistent, even if they do not provide results for all subgroups.

Commenters asserted that non-competes may affect job creation through several different mechanisms. The Commission agrees and finds that, regardless of the specific mechanism, the weight of the evidence indicates that non-competes inhibit job creation.

Commenters opposing the rule also questioned the usefulness of studies of Michigan's law change, given that existing non-competes remained enforceable under the Michigan law; they state that as a result, it would take longer for effects from the law to be realized. As noted under ''Evidence of inhibited new business formation,'' the Commission gives minimal weight to this study, but for other reasons.

In an ex parte communication entered into the record, the author of the study of the Michigan law change expressed concern over the Commission's interpretation of the study.[558] In particular, he stated that his methodology mitigated concerns that the study's findings of an increase in the job creation rate may be due to decreases in that rate's denominator (total employment). While the Commission does not agree with this assessment,[559] the Commission places less weight on the study for different reasons, as noted.

Some commenters who opposed the rule also addressed the evidence relating to non-competes and job creation, although these commenters generally did not focus on job creation related to new businesses specifically. Some of these commenters asserted that the studies addressed in the NPRM indicated that non-competes are associated with a greater number of jobs available and increased rates of job creation, rather than decreased rates of job creation. Some asserted that the evidence on job creation is mixed and that the issue is understudied. In the NPRM, the Commission stated that the evidence relating to the effects of non-competes on job creation was inconclusive. However, in the final rule,

---

[556] Baslandze, *supra* note 533 at 40.

[557] Starr, Balasubramanian, & Sakakibara, *supra* note 518.

[558] Ex Parte Communication: Email from G. Carlino to E. Wilkins (Jan. 30, 2023), *https://www.ftc.gov/system/files?file=ftc_gov/pdf/P201200 NonCompeteNPRMExParteCarlinoRedacted.pdf.*

[559] In particular, the long time period and the difference-in-difference methodology used in the study do not mitigate concerns that decreases in employment due to non-compete enforceability could drive increases in the job creation rate. The concern is not that the findings somehow represent effects on anything other than the average job creation rate (as noted by the author in his ex parte communication), but that a rate is comprised of a numerator and denominator, and effects on either may drive effects on the rate as a whole. This concern is shared by at least two empirical studies of non-competes. *See* Johnson, Lavetti, & Lipsitz *supra* note 388 at 19 and Johnson, Lipsitz, & Pei *supra* note 526 at 19.

the Commission does not make a separate finding that non-competes reduce job creation. Instead, it cites the research described herein—which relates to job creation at newly founded firms—to support its finding that non-competes inhibit new business formation.

## ii. Non-Competes Inhibit Innovation

### Evidence of Inhibited Innovation

The Commission finds that non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting innovation. Three highly reliable empirical studies find that non-competes reduce innovation.

One such study, a study by Zhaozhao He, finds that the value of patents, relative to the assets of the firm, increases by about 31% when non-compete enforceability decreases.[560] In contrast to some other studies of innovation discussed here, He's study focuses on the value of patents, rather than the mere number of patents. The study does so to mitigate concerns that patenting volume may not represent innovation.[561] The study analyzes the impact of several legal changes to non-compete enforceability, using a binary measure of non-compete enforceability. While this study therefore does not satisfy all the principles outlined in Part IV.A.2, it nonetheless satisfies many of them and contains a reasonably strong methodology.

A second study, by Johnson, Lipsitz, and Pei, finds that increased enforceability of non-competes decreases the rate of "breakthrough" innovations and innovations which make up the most cited patents. This study lends weight to the finding that non-competes harm both the quantity and the quality of innovation.[562] The authors also show that when non-compete enforceability decreases, patenting increases even in industries where most new innovations are patented. These increases imply that the effect is a true increase in innovation, rather than firms substituting between patents and non-competes.

Johnson, Lipsitz, and Pei also show that State-level changes in non-compete policy do not simply reallocate innovative activity across State lines, which would result in no change in innovation at the national level. Instead, they find that decreasing non-compete

enforceability, even in one State, increases innovative activity nationally.[563] Johnson, Lipsitz, and Pei's study uses several legal changes to analyze the impact of enforceability. It also uses several metrics of quality and quantity to mitigate concerns over whether patenting is an accurate reflection of innovation, especially in this context. The study thus satisfies all the principles outlined in Part IV.A.2 and is therefore given substantial weight by the Commission.

A third study, by Rockall and Reinmuth, finds that non-competes have a significant negative impact on innovation. They further find that this effect is not driven solely by the entry of new businesses. Their work suggests a potentially central role for knowledge spillovers, which are hampered when worker mobility is diminished. The study uses many changes to non-compete enforceability quantified on a continuous basis and considers several metrics which represent the quantity and quality of patenting, in order to accurately capture the relationship between non-competes and innovation.[564] Similar to the study by Johnson, Lipsitz, and Pei, this study therefore satisfies all the principles described in Part IV.A.2 and is given substantial weight.

The Commission places the greatest weight on the foregoing three studies, in which factors unrelated to the legal changes at issue are less likely to drive the results. There are additional studies that relate to non-competes and innovation, but the Commission gives them less weight.

A study by Samila and Sorenson finds that venture capital induced less patenting by 6.6 percentage points when non-competes are enforceable.[565] However, the authors note that patenting may or may not reflect the true level of innovation, as firms may use patenting as a substitute for non-competes where they seek to protect sensitive information.[566] Furthermore, this study assesses only the quantity of patents and does not take into account the quality of patents, which would be a better proxy for innovation. For this reason, the Commission gives less weight to this study (although its findings are directionally consistent with the first three studies described herein). This study also uses cross-

sectional variation in non-compete enforceability, which is measured along two dimensions in a binary fashion. In addition, a study by Gerald Carlino examined how patenting activity in Michigan was affected by an increase in non-compete enforceability. The study finds that mechanical patenting increased following the change in the law, but that drug patenting fell, and that the quality of computer patents fell.[567] However, the increase in mechanical patenting appears to have primarily occurred approximately 14 years after non-compete enforceability changed. This suggests that some other mechanism may have led to the increase in patenting activity.[568] Moreover, the study uses a single change in non-compete enforceability to generate its results, and it uses only one measure of innovation outside of patent quantity—quality as measured by patent citations. Finally, this study examines a change to non-compete enforceability which was accompanied by several other changes to Michigan's antitrust laws, making it impossible to identify the effect of the change in non-compete enforceability standing alone. For these reasons, the Commission gives less weight to this study.

A study by Clemens Mueller does not estimate the overall impact of non-compete policy on innovation, but instead focuses on career detours of inventors.[569] Mueller shows that inventors are more likely to take "career detours"—that is, to change industries to avoid the reach of their non-compete—when enforceability of non-competes is stricter. Due to the lower match quality between that inventor and their new industry, the innovative productivity of those inventors suffers after they take career detours. However, the Commission assigns this study less weight because, while its methodology satisfies the principles outlined in Part IV.A.2, the study is only informative of the productivity of individuals taking career detours. It does not address whether innovation in the aggregate increases. Mueller uses several changes in non-compete enforceability to generate results, but those changes are measured in binary—rather than continuous—fashion.

Coombs and Taylor examine the impact of non-compete enforceability on innovation. They find that research

---

[560] Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency* 21 (2023), *https://ssrn.com/abstract=3846964*. Thirty one percent is calculated as $e^{0.272} - 1$.

[561] *Id.* at 17.

[562] Johnson, Lipsitz, & Pei, *supra* note 526.

[563] *Id.*

[564] Emma Rockall & Kate Reinmuth, *Protect or Prevent? Non-Compete Agreements and Innovation* (2023), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4459683*.

[565] Samila & Sorenson, *supra* note 534 at 432. The value is calculated as $6.6\% = e^{0.0208 + 0.0630} - e^{0.0208}$.

[566] *Id.*

[567] Carlino, *supra* note 535 at 40.

[568] *Id.* at 48.

[569] Clemens Mueller, *Non-Compete Agreements and Labor Allocation Across Product Markets*, Proceedings of the EUROFIDAI-ESSEC Paris December Finance Meeting 2023 (2023), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4283878*.

JA0053

productivity, as measured by the number of products in biotechnology firms' prospectuses, was lower in California than other States, which they suggest implies that California's ban on non-competes hampers research productivity.[570] However, this study is purely cross-sectional, and results may be due to other differences between California and other States; the Commission accordingly places less weight on this study.

Two additional studies address firm strategies related to innovation. However, the Commission gives them little weight because the outcomes studied do not inform how non-competes would affect the overall level of innovation in the economy. The first, by Raffaele Conti, uses two changes in non-compete enforceability (in Texas and Florida), and indicates that firms engage in riskier strategies with respect to research and development ("R&D") when non-compete enforceability is greater.[571] However, this study does not address whether these riskier strategies lead to greater innovation. The second, by Fenglong Xiao, finds that increases in non-compete enforceability led to increases in exploitative innovation (*i.e.*, innovation which stays within the bounds of the innovating firm's existing competences) in the medical device industry.[572] The study finds this increase in exploitative innovation leads to an increase in the rate at which new medical devices are introduced. However, the study also finds that explorative innovation (*i.e.*, innovation which moves outside those bounds) decreased, and explorative innovation is the mode of innovation which the empirical literature has found to be associated with high growth firms.[573] The net impact on innovation from this study is thus unclear. The study examines several changes in non-compete enforceability, measured with a binary indicator of non-compete enforceability.

## Comments Pertaining to Inhibited Innovation and the Commission's Responses

The Commission's finding that non-competes inhibit innovation is principally based on the empirical evidence described in this Part IV.B.3.b.ii. However, the comments provide strong qualitative evidence that bolsters this finding.

Several academics and economic research groups, among other commenters, agreed with the Commission's preliminary finding that non-competes inhibit innovation. Commenters argued that non-competes reduce knowledge flow and collaboration, force workers to leave their field of expertise, and discourage within-industry spinouts that promote innovation. Many commenters stated that banning non-competes would make it easier for workers to pursue innovative ideas and to hire the best talent to help develop those ideas. Illustrative examples of comments the Commission received include the following:

• I am a geneticist at Stanford University, and I am co-founding a biotech startup that aims to discover new cancer immunotherapies. Many of the most talented geneticists, immunologists, cancer biologists, and other scientists with unique and valuable skillsets for drug development are bound by non-competes that prevent them from leaving jobs at big pharma companies to join biotech startups like mine. The result is artificial scarcity in the market for top scientific talent—a phenomenon that precludes healthy competition between industry incumbents and new entrants. Given that much of our country's most cutting-edge translational research happens within biotech startups, and given that many of the most successful drugs on the market originate in biotech startups, non-competes in pharma and biotech prevent the most talented scientists from working on the most innovative science and obstruct the development of new treatments and cures for human disease—leaving our society worse off.[574]

• As a practicing Physician for over thirty years, and one who trained fellows in pain management, who followed many of their students' careers, I was able to see the detriments of unfair Non-Compete clauses in their contracts. Often a physician would have a job, and if it did not work out, the restrictions were so severe, that they would need to move to a new geographic location in order to be employed. . . . Other scenarios exist as well. Where large institutions can block scientific discovery of their research physicians from moving to other institutions which may be better able to support their research, potentially blocking the promotion of scientific discovery.[575]

• I am an engineer in the orthopedic space. I have an idea for a truly innovative foot and ankle plating system that I believe could become the standard of care for fracture fixation and foot deformity correction. It could save 10–15 minutes of operating room time per surgery, which studies show carries a cost of $1000 (times millions of surgeries annually). It does not directly compete with my former employer's product, but I have to wait a year to start engaging surgeons about it because of a very broad non-compete, for a product that does not even compete.[576]

• I currently work as a mid-level technical employee at a company that enforces long (a year or longer) noncompetes. . . . After working for larger companies for a few years after college, many of my friends started their own companies. Some succeeded massively and some didn't but what was common among most of them was that the companies they started were somewhat related to what they were working on before. They either saw a gap in the industry while working for a larger company, or had a bold idea in their domains that they wanted to quit their jobs and try executing it. All this risk taking has in turn resulted in innovation, more competition, and hundreds of jobs. This would not have been possible if these people were under non-compete agreements from their previous employers. In fact, many of my friends who are currently working for companies that have non-competes have personally told me that they want to try a different approach than the current incumbents in their industry, but they simply can't take this risk because of the long non-competes they are under. Note that non-competes are even more consequential for workers of relatively less experience because sitting out for 1 year while only having 3 to 4 years of experience is a lot more detrimental to one's career when compared to an individual with 20 years of experience. Given that younger workers are more willing to take risks and try new ideas, the impact of non-competes on innovation is far worse than many think.[577]

• I am an engineer who has worked on software and hardware in several domains, including the semiconductor industry. I perceive non-competes to not only be detrimental to free trade but also to be detrimental to American innovation and manufacturing. If the United States is serious about supporting the growth of the semiconductor industry in the U.S., it must ensure that semiconductor companies inside the United States truly act to benefit American innovation. . . . The FTC would act prudently to ban such agreements.[578]

• I am a physician. I have worked for public entities for my entire career. I have worked under non-competes for my entire career. The result of these non-compete clauses is that myself and my colleagues keep our imagination and creativity locked away. We see novel applications of pharmaceuticals and medical devices which our leadership

---

[570] Porcher L. Taylor, III, and Joseph E. Coombs, *Non-Competition Agreements and Research Productivity in the Biotechnology Industry*, 26 Frontiers of Entrepreneurship Res. 1 (2006).

[571] Raffaele Conti, *Do Non-Competition Agreements Lead Firms to Pursue Risky R&D Strategies?*, 35 Strategic Mgmt. J. 1230 (2014).

[572] Fenglong Xiao, *Non-Competes and Innovation: Evidence from Medical Devices*, 51 Rsch. Pol'y 1 (2022).

[573] Alessandra Colombelli, Jackie Krafft & Francesco Quatraro, *High-Growth Firms and Technological Knowledge: Do Gazelles Follow Exploration or Exploitation Strategies?*, 23 Indus. And Corp. Change 262 (2014).

[574] Individual commenter, FTC–2023–0007–0198.

[575] Individual commenter, FTC–2023–0007–3885.

[576] Individual commenter, FTC–2023–0007–0760.

[577] Individual commenter, FTC–2023–0007–19807.

[578] Individual commenter, FTC–2023–0007–12872.

does not want to pursue, and we are also precluded from pursuing these ideas due to the noncompete. We see new ways to reach people and help people with our unique skill sets, and our noncompete keeps us from being able to reach them. The noncompete allows our employer to own us. They monopolize the talent of their workforce and this deprives the community of the innovation that may stem from the unleashing of the creativity of the physician workforce. I see the direct impact of non-compete clauses. The public has so much to gain by releasing healthcare workers from their noncompete clauses. These talented individuals, once released from their noncompetes, will begin to contribute to their communities with new ideas and innovation that will serve their communities. Many entities have so many reasons to avoid innovation and this stifles the individuals who work for them and oppresses new ideas. Once released from the bureaucracy and burden of non-competes I believe you will see an abundance of community outreach, device innovation and community service from many physicians currently subjugated by their noncompete clauses.[579]

A research organization said a ban on non-competes would increase the value workers realize from creativity and inventiveness, though it also asserted that non-competes can incentivize firms to create and share information. Some workers commented that they had innovative ideas or research that their employer was unwilling to pursue, but the worker could not leave to pursue their ideas elsewhere. A commenter also argued that captive workforces can stifle competition for workers and for clients or patients that leads to innovation. According to several commenters, trapping workers in jobs can also lead to decreased productivity and so-called "quiet quitting."

Some commenters contended that California's ban on non-competes helped Silicon Valley and other industries in California thrive. For example, a public policy organization pointed to industry clusters where studies have identified job hopping, which may otherwise be prohibited by non-competes, as the primary mechanism of knowledge diffusion and argued that restricting non-competes for knowledge workers would improve the U.S.'s competitiveness. Other commenters questioned whether non-competes played a role in Silicon Valley's growth. In response, the Commission notes that it does not attribute California's success in the technology industry to its non-compete laws. The Commission merely notes (in Part IV.D) that the technology industry is highly dependent on protecting trade secrets and that it has thrived in

California despite the inability of employers to enforce non-competes, suggesting that employers have less restrictive alternatives for protecting trade secrets.

Other commenters opposing the rule argued that non-competes may promote innovation by encouraging firms to make productivity-enhancing investments and by decreasing the risk of workers leaving. These commenters stated that non-competes protect firms' investments in workers, R&D, intellectual capital, and innovation. The Commission does not believe that non-competes are needed to protect valuable firm investments. As described in Part IV.D.2, the Commission finds that firms have less restrictive alternatives that protect these investments adequately while burdening competition to a less significant degree.

In addition, when assessing how non-competes affect innovation, the Commission believes it is important to consider the net impact. It is possible that the effects described by these commenters and the effects described by the Commission earlier in this Part IV.B.3.b.ii can be occurring at the same time. That is, a non-compete might in some instances be protecting a firm's investments in a manner that is productivity-enhancing holding all else equal. But even that same non-compete can—and certainly non-competes in the aggregate do—inhibit innovation by preventing workers from starting new businesses in which they can pursue innovative ideas; inhibiting efficient matching between workers and firms; and reducing the movement of workers between firms. What the empirical evidence shows is that non-competes reduce innovation, overall and on net, indicating that the tendency of non-competes to inhibit innovation more than counteracts any tendency of non-competes to promote innovation.

The Commission addresses the available evidence on the relationship between non-competes and firm investment in Part IV.D.1.

A business commenter contended that worker mobility does not necessarily improve innovation since the new firm may be unable or unwilling to use the worker's knowledge or ideas, or the new start-up may fail and leave consumers with less innovative products and services. In response, the Commission notes that it is certainly possible that some workers switch jobs to firms that are unable or unwilling to use their knowledge or ideas, or to startups that may fail. However, the fact that the empirical evidence shows that reduced non-compete enforceability increases innovation suggests that these effects are

outweighed by workers who can switch jobs to firms that make better use of their talents, or to startups that thrive and bring innovative new products to market.

Other commenters stated that non-competes promote the sharing of ideas and information within firms and incentivize risk-taking. The Commission is not aware of evidence that non-competes promote the sharing of ideas within firms specifically, but in any event the Commission explains in Part IV.D.2 that trade secrets and NDAs provide less restrictive means than non-competes for protecting confidential information. With respect to risk-taking, the Commission notes that the Conti study finds that firms engage in riskier R&D strategies when non-compete enforceability is greater, but it is not clear whether these riskier R&D strategies translate into increased innovation.

Commenters also argued that non-competes may have different effects on different types of workers—for example, across different industries, occupations, or levels of pay—and that these differences may affect the impacts of non-competes on innovation. In response, the Commission notes that the most methodologically robust studies show negative effects across a range of industries and are directionally consistent, even if they do not provide results for all subgroups.

A research organization argued that non-competes decrease the likelihood that innovative technologies are developed outside the U.S. and that non-competes promote economic growth, competitiveness, and national security. The Commission is not aware of any reliable evidence of the effects of non-competes on whether innovative technologies are developed outside the U.S. However, the weight of the empirical evidence indicates that non-competes reduce the amount of innovation occurring within the U.S.

Some commenters noted that innovation hubs have emerged in States that enforce non-competes. In response, the Commission notes that it does not find that it is impossible for innovation hubs to emerge where non-competes are enforceable. Instead, the Commission finds that, overall, non-competes inhibit innovation.

One commenter performed an empirical exercise in which he correlated Global Innovation Index rankings of innovation clusters with the enforceability of non-competes in each location. The commenter found that only one of the top five clusters bans non-competes, and only three others in the top 100 ban non-competes. The

---

[579] Individual commenter, FTC–2023–0007–2340.

commenter cited the success of Chinese innovation clusters, noting that non-competes are permitted in each of them.[580] The Commission does not find this evidence persuasive. Other differences across countries may explain these results better than policy towards non-competes, which is one factor among many that affect the level of innovation in an economy.

Some commenters argued that the empirical research cited in the NPRM has mixed results. These commenters point to the study by Xiao (2022) showing that non-competes increase exploitative innovation (innovation that incrementally extends firms' existing capabilities), but not explorative innovation (innovation that extends the scope of firms' capabilities). In response, the Commission notes that, within this particular study, the net impact of non-competes on innovation was unclear. But the Commission does not believe the evidence overall is mixed, given that the three empirical studies of the effects of non-competes on innovation that use the most reliable empirical methods all find that non-competes reduce innovation.

Some commenters claimed that two studies cited in the NPRM—the Xiao and Conti studies—had findings that were omitted or misinterpreted: first, the Xiao finding that non-compete enforceability increases the rate of new discoveries of medical devices due to increases in the rate of exploitative innovation but not explorative innovation; and second, the Conti finding that greater non-compete enforceability leads to riskier innovation, which these commenters assert is a positive outcome.[581] In response, the Commission notes that the NPRM described both of these findings and did not omit or misinterpret them.[582] The Commission explains why it gives these studies little weight under "Evidence of inhibited innovation."

A commenter asserted that the He study is insufficient evidence to support a finding, and that the study examines the effects of non-compete enforceability on the value of patents, which the commenter asserts misses other aspects of innovation. In response, the Commission believes that the He study is methodologically robust and that, while no single metric can capture all aspects of innovation, the value of patents is a meaningful proxy. The Commission also notes that the effects

observed in the He study are considerable, as the study finds that the value of patents, relative to the assets of the firm, increases by about 31% when non-compete enforceability decreases. In addition, the Commission notes that the comment record provides substantial qualitative support in line with the empirical findings. Furthermore, additional research, published since the release of the NPRM, helps confirm the Commission's finding regarding the effect of non-competes on innovation. As described under "Evidence of inhibited innovation," this evidence moves beyond assessing the impact of non-competes on the value of patents or the number of patents to identify the quality of new innovation, as well as the mechanisms underlying these effects.

Many commenters referred to a law review article, which was also submitted as a comment itself, that critiques the literature on non-competes and innovation.[583] First, the authors argue that a measure of enforceability used in part of the economic literature is incorrect and that a more recently developed measure is imperfect but better.[584] The Commission agrees with the authors that the more recently developed measure of enforceability, the scale based on Bishara (2011), is stronger than other measures of enforceability due to its granularity. This metric is used in many studies cited in this final rule, including the Johnson, Lipsitz, and Pei study, which largely reinforces the conclusions in the He study, lending weight to the conclusions in these studies that non-competes suppress the overall level of innovation in the economy.

Second, the authors argue that a given non-compete may be governed by the laws of a State other than the State where the worker lives, which undermines the reliability of studies analyzing the effects of non-compete enforceability. The authors argue that cross-border enforcement of non-competes may be a difficult issue to properly address in empirical work and has not been accounted for in the work to date. In response, the Commission notes that if the State law that applied to a given non-compete were totally random—for example, if a non-compete

in Oregon was no more likely to be governed by Oregon's law than any other State's law—we would expect to observe no effects on economic outcomes (such as earnings, innovation, and new business formation) from changes in State law. Instead, the empirical research shows that changes in State law have clear impacts on economic outcomes in particular States. This indicates that enough non-competes within a particular State are subject to that State's law for changes in that State's law to affect economic outcomes in that State.

Third, the authors argue that there is a lack of data on the use of non-competes and that such data are needed to completely assess the effects of non-competes. Although there is not comprehensive data on individual workers' employment agreements, the Commission believes the studies that examine changes in enforceability do so based on sufficient data to be reliable and are otherwise methodologically sound. These studies are also highly probative with respect to the effects of the final rule because what they are examining—how changes in the enforceability of non-competes affect various outcomes—matches closely with what the final rule does. The Commission also notes that there is considerable data regarding the prevalence of non-competes, which it discussed in Part I.B.2.

Fourth, the article argues that some studies of non-competes have small sample sizes, which may lead to measurement error. In response to concerns about small sample sizes, the Commission notes that the most recent studies use a greater breadth of variation in the legal environment surrounding non-competes, overcoming this obstacle. Fifth, the article expresses concern about certain studies that are based on legal changes in Michigan. The Commission takes this critique into account throughout this final rule and notes it when discussing the applicable studies that examine legal changes in Michigan, including under "Evidence of inhibited innovation."

In an ex parte communication included in the public record, the author of one of the studies of innovation stated that studies which examine multiple legal changes may be biased, since affected parties may anticipate the legal change and adjust their behavior prior to the date that the legal change is made. The author stated that examination of the legal change in Michigan was therefore preferable, since it was "inadvertent" and therefore not

---

[580] Comment of Mark Cohen, FTC–2023–0007–12064, at 12–13.

[581] Referring to Xiao, *supra* note 572 and Conti, *supra* note 571.

[582] NPRM at 3492–93.

[583] Barnett & Sichelman, *supra* note 389.

[584] The allegedly flawed measures use binary indicators for enforcement versus non-enforcement, or binary indicators for several facets of enforceability (Stuart and Sorenson, *supra* note 529; Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment,* 27 J. L., Econ., & Org. (2011)), and the more recent measure is more nuanced (Bishara, *supra* note 501).

subject to anticipation effects.[585] The Commission agrees that, in general, anticipation effects can bias the findings of empirical studies. However, empirical work shows that the legal changes used in much of the literature on non-competes are not subject to anticipation effects.[586] This may be because the vast majority are changes based on judicial decisions, rather than statutory changes, as hypothesized by researchers.[587] Moreover, even if anticipation effects occur in studies of non-compete enforceability, that would likely not change the measurable observed benefits of reducing non-compete enforceability, and may indeed lead to underestimation of observed benefits. Underestimation would occur if parties were adjusting their behavior in advance of the change in enforceability in the same direction as the effects observed after the change. This would occur if, for example, firms began to decrease use of non-competes in advance of a decrease in non-compete enforceability, knowing that those non-competes would soon be less enforceable. This ultimately would mean that the actual effects on labor mobility, earnings, new business formation, innovation, and other outcomes could be even greater. Additionally, the legal change in Michigan is subject to other criticism, as discussed under ''Evidence of inhibited innovation'' and by commenters.

### iii. Non-Competes May Increase Concentration and Consumer Prices

Evidence of Increased Concentration and Consumer Prices

As described in Parts IV.B.3.b.i and ii, the Commission finds that non-competes tend to negatively affect competitive conditions in product and service markets by inhibiting new business formation and innovation, and have in fact done so. The Commission finds that these effects, standing alone, are sufficient to support its finding that non-competes tend to negatively affect competitive conditions in product and service markets.

However, the Commission notes that there is also evidence that non-competes increase industrial concentration more broadly, which in turn tends to raise consumer prices. The empirical literature on these effects is less developed than the empirical work documenting declines in new business formation and innovation; specifically,

the empirical evidence on consumer prices relates only to healthcare markets (though the evidence on concentration spans all industries in the economy). For this reason, the Commission does not rest its finding that non-competes tend to negatively affect competitive conditions in product and service markets on a finding that non-competes increase concentration and consumer prices. However, there are several reliable studies finding that non-competes increase concentration and/or consumer prices, bolstering the Commission's finding that non-competes tend to negatively affect competitive conditions in product and service markets.

The Commission finds that non-competes reduce new business formation.[588] By doing so, non-competes may increase concentration. Non-competes may also stunt the growth of existing firms that would otherwise better challenge dominant firms, for example, by limiting potential competitors' access to talented workers.[589]

Non-competes may also affect prices in a variety of ways. By suppressing workers' earnings, non-competes decrease firms' costs, which firms may theoretically pass through to consumers in the form of lower prices. However, non-competes may also have several countervailing effects that would tend to increase prices. First, non-competes may increase concentration, which could lead to less competition between firms on price, and therefore higher prices for consumers. Second, by inhibiting efficient matching between workers and firms, non-competes may reduce the productivity of a firm's workforce, which may lead to higher prices. Third, by inhibiting innovation, non-competes may hinder the development of lower-cost products or more efficient manufacturing processes.

One study, by Hausman and Lavetti, focuses on physician markets. The study finds that as the enforceability of non-competes increases, these markets become more concentrated, and prices for consumers for physician services increase. The study finds that while non-competes allow physician practices to allocate clients more efficiently across physicians, this comes at the cost of greater concentration and higher consumer prices. This study examines several changes in non-compete enforceability measured continuously. The authors note that, in theory, if

decreased non-compete enforceability decreases earnings, then the fall in prices may simply be due to pass-through of labor costs. However, empirical research shows that decreased non-compete enforceability increases earnings (as discussed in Part IV.B.3.a.ii). Even if that were not the case, Hausman and Lavetti show that labor cost pass-through cannot explain their findings.[590] This study satisfies all of the principles described in Part IV.A.2, and is accordingly weighted highly by the Commission.

Another study, by Lipsitz and Tremblay, examines all industries in the economy and shows empirically that increased enforceability of non-competes at the State level increases concentration.[591] Lipsitz and Tremblay theorize that non-competes inhibit entrepreneurial ventures that could otherwise enhance competition in goods and service markets. The authors show that the potential for harm is greatest in the industries in which non-competes are likely to be used at the highest rate.[592]

If the general causal link governing the relationship between enforceability of non-competes, concentration, and consumer prices acts similarly to that identified in the study by Hausman and Lavetti, then it is plausible that increases in concentration identified by Lipsitz and Tremblay would lead to higher prices in a broader set of industries than healthcare. Lipsitz and Tremblay use several changes in non-compete enforceability measured in a continuous fashion, but do not measure the impact on consumer prices or welfare. The Commission therefore finds the study's conclusion that non-competes increase concentration highly robust, but the study is not itself direct empirical evidence of a relationship between non-competes and prices.

Two additional studies assess the effects of non-competes on concentration and prices. However, the Commission gives these studies little weight.

A study of physician non-competes by Lavetti, Simon, and White finds that prices charged by physicians with non-competes are similar to those charged by physicians without non-competes.[593]

---

[585] Ex Parte Communication: Email from G. Carlino, *supra* note 558.

[586] Johnson, Lavetti & Lipsitz, *supra* note 388 at 12–14.

[587] *Id.* at 12.

[588] *See* Part IV.B.3.b.i.

[589] *See* Part IV.C.2.c.i (describing a study addressing how non-competes force firms to make inefficiently high buyout payments).

[590] Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 Am Econ. J. Applied Econ. 278 (2021).

[591] Michael Lipsitz & Mark Tremblay, *Noncompete Agreements and the Welfare of Consumers* 6 (2021), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3975864*. Concentration is measured by an employment-based Herfindahl-Hirschman Index (HHI).

[592] *Id.* at 3.

[593] *See* Lavetti, Simon, & White, *supra* note 82.

The Commission gives this study less weight because it merely analyzes differences between workers based on the use of non-competes.[594]

A study by Younge, Tong, and Fleming finds that non-competes contribute to economic concentration because non-compete enforceability increases the rate of mergers and acquisitions.[595] This study uses one change in non-compete enforceability—in Michigan—to generate its results. However, in addition to its use of a single legal change in a single State, the change to non-compete enforceability was accompanied by several other changes to Michigan's antitrust laws, so it is not possible to identify the effect of the change in non-compete enforceability standing alone.

Comments Pertaining to Increased Concentration and Consumer Prices and the Commission's Responses

Several commenters addressed the question of whether non-competes affect concentration and consumer prices. Some commenters asserted that the rule would lower consumer prices by improving matches between employers and workers, increasing productivity. Commenters also argued that locking up talent, particularly in specialized markets, prevents entrepreneurship and new business formation and can thus contribute to increased concentration.

Some commenters opposing the NPRM claimed that banning non-competes could increase concentration. These commenters argued that larger firms could discourage companies from expanding into new and underserved markets by poaching, or threatening to poach, their key employees, leading to increased costs that could force some firms out of business. These commenters also argued that non-competes protect small businesses from dominant consolidators, as high recruitment, retention, and other costs may induce small businesses to sell or larger businesses may hire away their workers. A medical trade organization stated that without non-competes, independent practices might not be able to afford to hire and thus may be unable to grow or compete.[596]

While these commenters theorize that prohibiting non-competes would increase concentration, the Commission notes that the available evidence indicates that non-competes increase concentration, rather than reducing it. The Commission further notes that these theories are inconsistent with the robust empirical literature finding that non-competes reduce new business formation, as well as with the hundreds of comments from small businesses, including physician practices, recounting how non-competes stymied their ability to enter markets or grow because they make it harder to hire talent.

Several commenters claimed that prohibiting non-competes would increase worker earnings and increase transaction costs related to hiring, which firms would pass through to consumers in the form of higher prices. However, the only study of how non-competes affect prices—the Hausman and Lavetti study—finds that decreased non-compete enforceability *decreases* prices in the healthcare market, rather than increasing them. Moreover, while it is theoretically possible that higher labor costs could be passed on to consumers in the form of higher prices, there are several countervailing effects from prohibiting non-competes that would tend to lower prices. Additionally, empirical research shows that labor cost pass-through cannot explain decreases in prices in healthcare markets associated with non-competes becoming less enforceable.[597]

An insurance company stated that insurance premiums would increase if the rule allows non-profit hospitals to dominate the hospital market and have more leverage in network negotiations. These commenters do not provide any empirical evidence to support this assertion. Moreover, for the reasons described in Part V.D.5, the Commission disagrees that the ability to use non-competes will provide a material competitive advantage to non-profit hospitals. Another commenter stated that if non-competes are prohibited, physicians will leave States with lower market reimbursement rates for those with higher rates, increasing healthcare costs and shortages. Commenters did not cite any empirical evidence that supports this hypothetical assertion that the final rule would increase healthcare costs or shortages due to physicians leaving States with lower reimbursement rates, and the Commission is aware of none. However, the Commission notes that it received many comments from doctors, nurses, and other healthcare professionals asserting that non-competes worsen healthcare shortages.[598]

Some commenters stated that non-competes may improve access to physicians due to non-compete-led consolidation or more efficient patient-sharing within practices, and that Hausman and Lavetti's study is unable to quantify these benefits. In response, the Commission notes that there is no empirical literature bearing out this theory, and that the commenters overwhelmingly stated that non-competes decrease patients' access to the physicians of their choice, increase healthcare shortages, and negatively affect the quality of health care.[599]

iv. Non-Competes May Reduce Product and Service Quality and Consumer Choice

The negative effects of non-competes on competition may also degrade product and service quality and consumer choice. Competition encourages firms to expand their product offerings and innovate in ways that lead to new and better products and services.[600] However, by inhibiting new business formation, increasing concentration, and reducing innovation, non-competes reduce competitive pressure in product and service markets, which may reduce product quality and consumer choice. In addition, poor working conditions and less optimal matching of workers and firms may lead to reductions in the quality of products and services. For these reasons, non-competes may tend to negatively affect competitive conditions in product and service markets by reducing product quality and consumers' options.

Such effects are less readily quantifiable than the other negative effects of non-competes on product and service markets—*i.e.,* the negative effects on new business formation, innovation, concentration, and consumer prices. It is thus unsurprising that there are not reliable empirical studies of these effects. However, the Commission received an outpouring of public comments on this issue. Hundreds of commenters, primarily from the healthcare field, described how

---

[594] *See* Part IV.A.2 (describing the shortcomings of such studies).

[595] Kenneth A. Younge, Tony W. Tong, & Lee Fleming, *How Anticipated Employee Mobility Affects Acquisition Likelihood: Evidence From a Natural Experiment,* 36 Strategic Mgmt. J. 686 (2015).

[596] *See also* Part XI.C.2, which addresses these types of comments in greater detail.

[597] Hausman & Lavetti, *supra* note 590.

[598] These comments are summarized in greater detail in Part IV.B.3.b.iv.

[599] *See* Part IV.B.3.b.iv.

[600] In the NPRM, the Commission noted that innovation and entrepreneurship can, in turn, have positive effects on product quality. *See* NPRM at 3492. The Commission did not make specific findings on the effect of non-competes on consumer choice. However, the Commission discussed the closely related questions of how non-competes affect new business formation, innovation, concentration, and consumer prices. *See id.* at 3490–93.

non-competes reduce product and service quality and consumer choice.

The large number of comments the Commission received on this issue, the wide variety of impacts commenters describe, and the fact that the impacts commenters describe are overwhelmingly negative, indicate that non-competes reduce product quality and consumer choice, further bolstering the Commission's finding that non-competes tend to negatively affect competitive conditions in product and service markets.[601]

The commenters who addressed the effects of non-competes on product quality and consumer choice primarily discussed the healthcare industry. The majority of these comments focused on how non-competes harm patient care. Hundreds of physicians and other commenters in the healthcare industry stated that non-competes negatively affect physicians' ability to provide quality care and limit patient access to care, including emergency care. Many of these commenters stated that non-competes restrict physicians from leaving practices and increase the risk of retaliation if physicians object to the practices' operations, poor care or services, workload demands, or corporate interference with their clinical judgment. Other commenters from the healthcare industry said that, like other industries, non-competes bar competitors from the market and prevent providers from moving to or starting competing firms, thus limiting access to care and patient choice. Physicians and physician organizations said non-competes contribute to burnout and job dissatisfaction, and said burnout negatively impacts patient care.

In addition, physicians and physician organizations stated that, to escape non-competes, physicians often leave the area, and that this severs many physician/patient relationships. These commenters stated that non-competes therefore cause patients to lose the knowledge, trust, and compatibility that comes with long-established relationships. These commenters also said that strong physician/patient relationships and continuity of care improve health outcomes, particularly for complex, chronic conditions or patients who need multiple surgeries. These commenters described how patients who lose their physicians to non-competes either travel long

distances to see that physician, switch physicians, or lose access entirely if no other physicians are available. One physician argued that taking away a patient's ability to choose their provider violates the Patients' Bill of Rights.[602]

One medical society cited a 2022 survey of Louisiana surgeons in which 64.4% of the surgeons believed non-competes force patients to drive long distances to maintain continuity of care, and 76.7% believed they force surgeons to abandon their patients if they seek new employment.[603] This study had a small sample size and thus the Commission gives it limited weight, but the Commission notes that it accords with the many comments the Commission received describing how patients must drive long distances to maintain continuity of care—or are unable to do so, resulting in harms to their health. Illustrative comments on how non-competes affect the quality of patient care include the following:

• As a primary care physician I truly hope to see [the rule] move forward. I recently left my position at one company and for a year commuted an hour to be outside of my non-compete radius. I recently returned to my community and discovered I have more patients than I can count who simply didn't get care for over a year because they didn't want to find a new [primary care physician] but also couldn't make the hour drive to see me at my new practice. The commute was annoying for me, but ultimately the only ones truly hurt were patients. Let's stop hurting our patients by restricting their ability to see their physicians.[604]

• My practice has operated since the 1990s in Danville, Kentucky. We are the only cardiology practice that has been present and has worked tirelessly to serve this rural community. The practice was a private practice originally. Unfortunately, just as most cardiac practices throughout the country have had to, our practice had to come under the control of these hospital systems to maintain its viability. . . . The CEO and the administration . . . have squeezed us out and forced us to leave the area with the employment contract non-compete in place. . . . I have spent the last 6 months hugging patients, medical staff, nursing who are stricken by the fact that we are being pushed out. Patients desperately ask me how they can maintain care if they have to travel up to an hour to see their

doctors with this change. They worry how they can pay for the steep gas prices to see their doctors. . . . They are truly concerned for the health of their families. All the while all I can do is tell them that my non-compete does not allow me, their cardiologist for the past decade, to give them any advice on how to maintain their care.[605]

• As a Physician, I had a non compete clause in my contract that extended two counties wide (100 square miles). . . . [W]hen I would not sign a contract amendment regarding pay that was very unfavorable and nebulous I was called in and summarily dismissed 'no cause.' Because of that I had to work out of state and my patients were instantly without a physician. The community did not have enough physicians to be able to care for the patients who now had no medical provider. During COVID this lack of access to healthcare for patients most certainly led to increased unnecessary illness and death. . . . Patients are suffering with access to healthcare, and physician shortages are being exacerbated because every time a physician has to leave because of a non compete clause they start hiring and credentialing all over again and it can take months for them to be able to work again.[606]

• Being a therapist, non-competes are extremely scary when it comes to patient care. Some include date ranges in which we cannot communicate with our patients, some of whom have severe trauma histories or suicidal ideations. If a clinician changes companies but is unable to continue meeting a patient, who is at fault if there is an injury or death? . . . Some non-competes include mileage in which a clinician cannot create their own company or rent out an office within a certain radius—how is this a safe practice? How can clients continue to work on their mental health and desire to stay alive if they have to change clinicians due to a noncompete clause?[607]

• Due to mistreatment and to escape workplace toxicity, one of my colleagues left our practice in compliance to our non-compete conditions, even though they caused great hardship. I, too, wanted to leave, but could not because doing so would have harmed my family's well being. What I witnessed in the aftermath was unconscionable. There was a void in patient care and months later, there still is a void. Not only was this physician required to move quite a distance from the practice, he was forbidden to even inform his patients that he was leaving. The practice in turn, did not inform the patients, and when asked, just informed them that he was no longer with the practice. Consequently, wait times to treat cancers doubled and now have tripled.[608]

• I would like to open a new clinic in my town, but my noncompete would disallow that from happening immediately. Furthermore, I worry that my patients that need medical care wouldn't be able to access it at my current clinic because the providers

[601] As described in Parts IV.B.3.b.i and ii, the Commission finds that the effects of non-competes on new business formation and innovation, standing alone, are sufficient to sustain its finding that non-competes tend to negatively affect competitive conditions in product and service markets.

[602] *See* President's Advisory Commission on Consumer Protection and Quality in the Health Care Industry, *Consumer Bill of Rights and Responsibilities, Executive Summary* (1997), *https://govinfo.library.unt.edu/hcquality/cborr/index.htm.*

[603] *See* William F. Sherman et al., *The Impact of a Non-Compete Clause on Patient Care and Orthopaedic Surgeons in the State of Louisiana: Afraid of a Little Competition?,* 14 Orthopedic Revs. (Oct. 2022), *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9569414/.*

[604] Individual commenter, FTC–2023–0007–19853.

[605] Individual commenter, FTC–2023–0007–4072.

[606] Individual commenter, FTC–2023–0007–4440.

[607] Individual commenter, FTC–2023–0007–4270.

[608] Individual commenter, FTC–2023–0007–2384.

are booked out 6+ months, and if one left that would make those immediately increase to nearly a year, which could potentially cause my patient lasting damage. If I could open my own clinic locally without the constraints of the noncompete, those patients would be able to continue care as necessary with me, and I wouldn't feel stuck with poor management worsening patient care for my patients.[609]

• As a veterinarian, I can personally assure the FTC that such restrictions have caused both death and permanent disability of pets. . . . In nearly every scenario I have heard of, the veterinary business that requires and enforces non-compete clauses is underserving the pet-owning public. This is the current situation for veterinary medicine on a national level. Hospitals are so overwhelmed that they are not accepting new patients, turning away emergency cases, and imposing extremely long (several months or more) waiting lists for appointments and/or scheduled procedures. If a hospital cannot accommodate the patients who require veterinary care, that hospital is not able to compete with the existing demand for services. . . . Is it fair for pet owners who cannot get their pets in to see a veterinarian (even on emergency situations) to have the veterinary hospitals who refuse to see their pets remove other options for care via non-compete clauses? These clauses are being blatantly abused by certain large veterinary businesses so that these organizations can maintain a pool of potential patients (on waiting lists) to draw from. Unfortunately, many of these dogs and cats die while waiting to be seen. At least in my profession, the non-compete concept has reached an epitome of unethical conduct. In addition, economic growth has been stunted due to self-serving greedy people in power. Please get rid of this horrible clause and lets make sure pets and their owners get what they need, when they need it.[610]

Some hospital associations argued that a study of physician markets [611] shows that non-competes improve patient care. According to these commenters, this research finds that non-competes make in-practice referrals more likely, increasing revenue and wages and providing patients with more integrated and better care. In response, the Commission notes that while the study finds that non-competes make physicians more likely to refer patients to other physicians within their practice—increasing revenue for the practice—it makes no findings on the impact on the quality of patient care. The Commission further notes that pecuniary benefits to a firm cannot justify an unfair method of competition.[612]

Some medical practices argued that within-group referrals allow physicians

to coordinate care plans and simplify logistics, and that non-competes protect the stability of those care teams to patients' benefit. Some industry associations and hospitals argued that non-competes improve patient choice and continuity of care because they stop physicians from leaving a health provider, benefiting patients who cannot follow the provider due to geographic or insurance limitations. One physician association said physicians leaving jobs can be costly to patients, who must transfer records and reevaluate insurance coverage.

The Commission notes that the vast majority of comments from physicians and other stakeholders in the healthcare industry assert that non-competes result in worse patient care. The Commission further notes that the American Medical Association discourages the use of non-competes because they "can disrupt continuity of care, and may limit access to care." [613] In addition, there are alternatives for improving patient choice and quality of care, and for retaining physicians, that burden competition to a much less significant degree than non-competes.

A related issue frequently raised in the comments is the impact non-competes have on healthcare shortages. According to many commenters, non-competes contribute to shortages by preventing physicians from moving to areas where their skills and specialties are needed; forcing physicians out of such areas; or forcing them out of practice entirely due to contractual restrictions or burnout. Such shortages, according to these commenters, decrease access to care, increase wait times, lead to canceled procedures, and decrease the quality of care. Many commenters stated that these effects of non-competes are particularly acute in rural, underserved, and less affluent areas that already have difficulty attracting healthcare professionals. Some commenters argued that provider shortages can, in combination with non-competes, create monopolies.

A smaller number of commenters from the healthcare industry argued that non-competes alleviate healthcare

shortages and prevent hospital or facility closures by keeping physicians from leaving underserved areas and reducing fluctuations in labor costs. Some of these commenters asserted that a ban on non-competes would upend healthcare labor markets, thereby exacerbating healthcare workforce shortages, especially in rural and underserved areas. A medical society argued that non-competes can allow groups to meet contractual obligations to hospitals, as physicians leaving can prevent the group from ensuring safe care. As the Commission notes, there are not reliable empirical studies of these effects, and these commenters do not provide any. However, the Commission notes that the rule will increase labor mobility generally, which makes it easier for firms to hire qualified workers.

Commenters in a variety of industries beyond healthcare markets also provided a wide range of examples of how non-competes diminish the quality of goods and services, including preventing businesses from hiring experienced staff and creating worker shortages. Commenters stated that, where firms in a market use non-competes, it can be difficult for other firms to remain in the market, and consumers thus lose the freedom to choose providers. Several comments pointed favorably to the American Bar Association's longstanding ban on non-competes for most lawyers to protect clients' freedom to choose their lawyer, in contrast with other highly paid and highly skilled professions such as physicians and their patients or clients.[614]

Commenters from outside the healthcare industry mainly focused on how non-competes increase concentration within industries, which reduces firms' incentive to innovate and results in consumers having fewer choices. Other commenters described how non-competes lock highly talented workers out of their fields or force them into jobs where they are less productive, depriving the marketplace of the products and services they would have developed. Illustrative examples of these comments include the following:

• As a software developer who often works under contracts containing sections stipulating non-compete agreements, I have observed first hand how they can harm the economy by bolstering monopolies, such as in sectors where clientele only have a single choice for meeting their engineering needs. Often, these clients have no other options and are forced to meet whatever arbitrary price point is set by the leading (sole)

---

[609] Individual commenter, FTC–2023–0007–1206.

[610] Individual commenter, FTC–2023–0007–0677.

[611] Lavetti, Simon, & White, *supra* note 82.

[612] *See supra* note 305 and accompanying text.

[613] *See, e.g.,* Comment of Am. Med. Ass'n, FTC–2023–0007–21017, at 4–5 (citing AMA *Code of Medical Ethics* Opinion 11.2.3.1). After the comment period closed, the AMA adopted a policy supporting banning non-competes for physicians in clinical practice who are employed by hospitals, hospital systems, or staffing companies, though not those employed by private practices. This policy change does not have legal effect. Andis Robeznieks, *AMA Backs Effort to Ban Many Physician Noncompete Provisions,* Am. Med. Ass'n (Jun. 13, 2023), *https://www.ama-assn.org/medical-residents/transition-resident-attending/ama-backs-effort-ban-many-physician-noncompete.*

[614] *See* Model Rule 5.6, *supra* note 532.

company, and that company may in turn operate howsoever they choose without feeling the need to adopt reasonable business practices that might exist were there competition.[615]

• As an aspiring tree care professional, non-compete agreements prevent me from switching employers/companies to access better work conditions or opportunities. No tree service company has ever invested in me. I learned to climb and saw while working for Federal agencies (USDA and NPS), and also through self-education and practice on my own. I believe that non-compete agreements have adversely limited competition in the tree service industry. This hurts employees who could do better if they were free to change their place of employment, and it hurts consumers who have fewer tree service providers to choose from.[616]

• I worked in a business supplying technology and materiel considered critical for national defense. I was labeled an expert in the field by my DoD customers and commended multiple times for solving logistical and technical problems with protective equipment during the previous two wars. I lead development contracts from the DoD to advance the state-of-the-art in warfighter protection, which set multiple records for figures of merit within my business, and which our program manager volunteered was the most exciting technology she had ever managed. When my business decided to discontinue that technology and transfer me, my noncompete agreement prevented me from continuing to support the DoD. I was removed from consideration at another firm in the third round of interviews because of my noncompete agreement—again, for a technology my business had decided to not pursue and had transferred me out of. So, instead of having the opportunity to advance my career into management in the service of protecting warfighters, I had to exit that industry and move laterally, into a different industry that cannot value 20 years of my expertise, and which will not further the defense of my country. If the FTC had nationalized a prohibition on noncompete clauses two years ago, this would not have happened, and I would have had the opportunity to advance my career, improve my family's economic fortune, and continue to contribute to our nation's defense.[617]

Overall, the Commission believes that the large number of comments it received on the issue of product quality and consumer choice and the wide variety of overwhelmingly negative impacts commenters describe further bolsters the Commission's finding that non-competes tend to negatively affect competitive conditions in product and service markets.

### 4. Prohibitions in Section 910.2(a)(1)

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission adopts § 910.2(a)(1), which defines unfair methods of competition related to non-competes with respect to workers other than senior executives. Section 910.2(a)(1) provides that, with respect to a worker other than a senior executive, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete clause; enforce or attempt to enforce a non-compete clause; or represent that the worker is subject to a non-compete clause.

Part IV.A sets forth the Commission's determination that the foregoing practices are unfair methods of competition under section 5, and Parts IV.B.1 through IV.B.3 explain the findings that provide the basis for this determination. In this Part IV.B.4, the Commission explains the three prongs of § 910.2(a)(1) and addresses comments on proposed § 910.2(a).[618]

#### a. Entering Into or Attempting To Enter Into (§ 910.2(a)(1)(i))

Proposed § 910.2(a) would have provided that it is an unfair method of competition for an employer to, among other things, ''enter into or attempt to enter into a non-compete clause with a worker.'' The Commission adopts this same language in the final rule in § 910.2(a)(1)(i). As a result, the final rule prohibits persons from entering into or attempting to enter into non-competes with workers other than senior executives as of the effective date. (Section 910.2(a)(2)(i) separately prohibits persons from entering into or attempting to enter into non-competes with senior executives as of the effective date.)

A business commenter requested that the Commission remove ''attempt to enter into'' from § 910.2(a) on the basis that it may encourage workers to sue employers for contractual provisions that have no practical effect on the worker or which are not finalized in any employment agreement. The Commission disagrees that conduct that would be covered by the attempt provision—such as presenting the worker with a non-compete, even if the employer and worker do not ultimately execute the non-compete—has no practical effect on the worker. The Commission is concerned that such attempts to enter into non-competes still have *in terrorem* effects that deter competition. For example, workers presented with non-competes may not realize they are not bound by them. Such workers may therefore refrain from seeking or accepting other work or starting a business, yielding the same tendency of non-competes to negatively affect competitive conditions that motivate this final rule.

The Commission accordingly finalizes the language as proposed.

#### b. Enforcing or Attempting To Enforce (§ 910.2(a)(1)(ii))

Proposed § 910.2(a) would have provided that it is an unfair method of competition for an employer to, among other things, ''maintain with a worker a non-compete clause.'' In addition, proposed § 910.2(b)(1) would have provided that, to comply with this prohibition on maintaining a non-compete, an employer that entered into a non-compete with a worker prior to the compliance date must ''rescind the non-compete no later than the compliance date.''

As elaborated in Part IV.E, the Commission has decided not to finalize a rescission requirement. As a result, the Commission also removes ''maintain'' from the text of § 910.2(a), to avoid any ambiguity about whether the final rule contains a rescission requirement. Instead of a rescission requirement, the final rule focuses more narrowly on the future enforcement of existing non-competes with workers other than senior executives. It provides that, with respect to a worker other than a senior executive, it is an unfair method of competition for a person to enforce or attempt to enforce a non-compete clause. An employer attempts to enforce a non-compete where, for example, it takes steps toward initiating legal action to enforce the non-compete, even if the court does not enter a final order enforcing the non-compete.

For workers other than senior executives, this prohibition on enforcing a non-compete applies to all non-competes, but affects only enforcement or attempted enforcement conduct taken after the effective date of the rule. In so doing, the Commission reduces the burden on employers by eliminating the need to take steps to formally rescind provisions of existing contracts, instead simply requiring that employers refrain from enforcing or attempting to enforce in the future (after the effective date) non-competes that are rendered unenforceable by this provision of the rule.

As explained in Part IV.C, the Commission in the final rule does not prohibit the future enforcement or attempted enforcement of existing non-

---

[615] Individual commenter, FTC–2023–0007–5818.
[616] Individual commenter, FTC–2023–0007–1980.
[617] Individual commenter, FTC–2023–0007–4446.

[618] Several commenters requested changes to proposed § 910.2(a) to provide various exceptions to coverage under the final rule. The Commission addresses these comments in Part V.C.

competes with senior executives. The Commission considered whether to take this approach for workers other than senior executives, but based on the totality of the evidentiary record concludes that such non-competes should not remain in force after the effective date for three main reasons. First, existing non-competes with workers other than senior executives negatively affect competitive conditions to a significant degree, for the same reasons as new non-competes. The Commission believes that non-competes with such workers that were entered into before the effective date implicate the concerns described in Part IV.B.3—relating to the negative effects of non-competes on competitive conditions in labor, product, or service markets—to the same degree as non-competes entered into as of the effective date. Of course, the Commission notes that the empirical evidence quantifying the harms to competition from non-competes by definition relates to existing non-competes.

Second, for workers other than senior executives, existing non-competes not only impose acute, ongoing harms to competition, they also impose such harms on individual workers by restricting them from engaging in competitive activity by seeking or accepting work or starting their own business after their employment ends. As described in Part IV.B.2.b, the Commission received thousands of comments from workers that described non-competes as pernicious forces in their lives that forced them to make choices that were detrimental to their finances, their careers, and their families. These concerns are less present for senior executives, who are far more likely than other workers to have negotiated their non-compete and received compensation in return, thereby mitigating this kind of acute, ongoing harm.

Third, because the Commission finds that non-competes with workers other than senior executives generally are not bargained for and such workers generally do not receive meaningful, if any, compensation for non-competes, the practical considerations that are present with respect to existing non-competes for senior executives (discussed in Part IV.C.3) are far less likely to be present for other workers. For these reasons, the Commission concludes that, consistent with the proposed rule, existing non-competes with workers other than senior executives should not remain in force after the effective date.

Several commenters argued that the Commission should allow all existing

non-competes to remain in effect. Some of these commenters argued that the rule would upset bargained-for agreements. Commenters asserted that workers who received benefits in exchange for agreeing to non-competes would receive a windfall if such clauses cannot be maintained and are no longer enforceable. A few of these commenters also argued that invalidating existing non-compete agreements will upset workers' economic interests because they will lose out on enhanced compensation that they have received or expect to receive in exchange for their non-competes. Some commenters contended that invalidating existing non-competes would be especially harmful to workers' interests in non-competes tied to particularly large amounts of compensation, complex compensation arrangements, or unique forms of compensation such as equity grants. Relatedly, some commenters expressed concern that the NPRM did not explain whether employers could recoup benefits already paid in exchange for non-competes. A few commenters suggested that they have given workers confidential and trade secret information in exchange for the worker agreeing to a non-compete that may no longer be enforceable.

The Commission is not persuaded by comments arguing that the rule would upset existing bargained-for agreements. As noted in Part IV.B and Part IV.C, the Commission finds that workers who are not senior executives are unlikely to negotiate non-competes or to receive compensation for them. Moreover, the Commission has also determined that non-competes with senior executives that predate the effective date may be enforced,[619] which will substantially reduce the number of workers with complex compensation arrangements whose non-competes are rendered unenforceable after the effective date.

Other commenters argued that employers relied on the expectation of a non-compete when deciding how much to invest in training their workers or the extent to which they share trade secrets with their workers. In response, the Commission notes that firms that are concerned about retention have tools other than non-competes for retaining workers, including fixed-duration employment contracts (*i.e.,* forgoing at-will employment and instead making a mutual contractual commitment to a period of employment) and providing improved pay and benefits (*i.e.,* competing on the merits to retain the worker's labor services). In addition, while some workers that have received

training may leave a firm for a competitor, firms will also be able to attract highly trained workers *from* competitors, and this increased job-switching will likely lead to more efficient matching between workers and employers overall.[620]

The Commission is not persuaded by commenters who contended that invalidating existing non-competes would disturb employer expectations with respect to sharing trade secrets or other commercially sensitive information. As explained in Part IV.D.2, the Commission finds that employers have adequate alternatives to non-competes to protect these interests, including trade secret law and NDAs, and that these alternatives do not impose the same burden on competition as non-competes. Some commenters contended that employers may not have adequate alternatives in place for existing non-competes and that former workers may not agree to new NDAs. But the Commission finds that it is rare for an employer who entered into a non-compete agreement as a means of protecting trade secrets or commercially sensitive information to have not also entered into an NDA with the worker.[621] This is especially true given that non-competes are generally less enforceable than NDAs.[622] In any event, nothing in the final rule prevents employers from entering new NDAs with workers.

Some commenters contended that invalidating existing non-competes would enable new employers to "free ride" off former employers' investments in training. The Commission addresses comments about "free riding" and training investments in Part IV.D.2.

Several comments argued that a final rule should not invalidate existing non-competes because the economic impact is too unpredictable. These commenters maintained that the number of individual employment contracts that would be invalidated means that the economic impact would be exceptionally widespread, and likely impossible to accurately predict. In response, the Commission notes that it

---

[619] *See* Part IV.C.3.

[620] *See* Part IV.B.3.a.

[621] *See, e.g.,* Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 35 (finding that 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and 74.7% of workers with non-competes are subject to all three provisions).

[622] Camilla A. Hrdy & Christopher B. Seaman, *Beyond Trade Secrecy: Confidentiality Agreements that Act Like Noncompetes,* 133 Yale L. J. 669, 676 (2024) ("Courts across jurisdictions routinely give confidentiality agreements 'more favorable treatment' than noncompetes. And confidentiality agreements are not typically subject to the same limitations that are applied to noncompetes. . . . Overall, courts tend to apply a default rule of enforceability.") (internal citations omitted).

has assessed the benefits and costs of the final rule and finds that the final rule has substantial benefits that clearly justify the costs (even in the absence of full monetization).[623]

### c. Representing (§ 910.2(a)(1)(iii))

Proposed § 910.2(a) would have provided that it is an unfair method of competition for an employer to, among other things, "represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe that the worker is subject to an enforceable non-compete clause." The Commission adopts the same language in the final rule. Pursuant to § 910.2(a)(1)(iii), it is an unfair method of competition for an employer to represent that a worker other than a senior executive is subject to a non-compete clause. The "good faith" language remains in the final rule but, for clarity, it has been moved to § 910.3, which contains exceptions to the final rule.[624]

Under this "representation" prong, the final rule prohibits an employer from, among other things, threatening to enforce a non-compete against the worker; advising the worker that, due to a non-compete, they should not pursue a particular job opportunity; or telling the worker that the worker is subject to a non-compete. The Commission believes that this prohibition on representation is important because workers often lack knowledge of whether employers may enforce non-competes.[625] In addition, the evidence indicates that employers frequently use non-competes even when they are unenforceable under State law, suggesting that employers may believe workers are unaware of or unable to vindicate their legal rights.[626] Employers can exploit the fact that many workers lack knowledge of whether non-competes are unenforceable under State law by representing to workers that they are subject to a non-compete when they are not or when the non-compete is unenforceable. Such misrepresentations can have *in terrorem* effects on workers, causing them to refrain from looking for work or taking another job, thereby furthering the adverse effects on competition that the Commission is concerned about.

In addition, threats to litigate against a worker—even where the worker is aware of the Commission's rule and

believes the non-compete is unenforceable—may deter the worker from seeking or accepting work or starting their own business. As explained in Part IV.B.2.b.ii, many commenters—including highly paid workers—explained in their comments that they believed their non-compete was unenforceable, but they nevertheless refrained from seeking or accepting work or starting their own business because they could not afford to litigate against their employer for any length of time. For this reason, the Commission believes it is important for the final rule to prohibit employers not only from enforcing or attempting to enforce non-competes against workers other than senior executives, but also threatening to do so.

A commenter suggested limiting the "representation" prong to instances where the employer has no good-faith basis to believe the non-compete is valid "under local or State law," even if the non-compete is invalid under the final rule. The Commission does not adopt this approach because representing to workers that they are subject to a non-compete, where the rule provides that the non-compete is unenforceable, would mislead the worker and would tend to deter them from competing against the employer by seeking or accepting work or starting a business.

### *C. Section 910.2(a)(2): Unfair Methods of Competition—Non-Competes With Senior Executives*

In the NPRM, the Commission proposed to prohibit non-competes—including non-competes entered into before the effective date—with all workers.[627] The Commission preliminarily found that all non-competes, whether with senior executives or other workers, were restrictive conduct that negatively affected competitive conditions.[628] However, while the Commission preliminarily found that non-competes with workers other than senior executives were exploitative and coercive, the Commission stated that this finding did not apply to senior executives.[629] The Commission requested comment on that preliminary finding, as well as on whether non-competes with senior executives should be excluded from the rule or otherwise subject to a different standard. The NPRM did not define the term "senior executive," but sought comment on

potential approaches to defining the term.[630]

In the final rule, the Commission does not find that senior executives—specifically, highly paid workers with the highest levels of authority in an organization—are exploited or coerced in connection with non-competes, and it describes the record on this issue in Part IV.C.1. The Commission does, however, find that non-competes with senior executives are an unfair method of competition, based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that impair competitive conditions in the economy. Specifically, the Commission finds that such non-competes are restrictive and exclusionary conduct that tends to negatively affect competitive conditions in product and service markets and labor markets. Indeed, non-competes with senior executives may tend to negatively affect competitive conditions in product and service markets to an even greater degree than non-competes with other workers, given the outsized role senior executives play in forming new businesses and setting the strategic direction of firms with respect to innovation. The Commission explains the basis for these findings in Part IV.C.2.

Because non-competes with senior executives are not exploitative or coercive, however, this subset of workers is less likely to be subject to the kind of acute, ongoing harms currently being suffered by other workers subject to existing non-competes. In addition, commenters raised credible concerns about the practical impacts of extinguishing existing non-competes for senior executives. For these reasons, as described in Part IV.C.3, the Commission allows existing non-competes with senior executives to remain in force—unlike existing non-competes with all other workers, which employers may not enforce after the effective date.

In Part IV.C.4, the Commission explains the final rule's definition of "senior executive" and the related definitions it is adopting.[631] The Commission finds that the final rule's definition of "senior executive" appropriately captures the workers that are more likely to have complex compensation packages that present practical challenges to untangle, and who are less likely to be exploited or coerced in connection with their non-competes. To capture this subset of

---

[623] *See* Part X.E.

[624] *See* Part V.C.

[625] *See* Prescott & Starr, *supra* note 413 at 10–11.

[626] *See* Starr, Prescott, & Bishara, *supra* note 68 at 81.

[627] NPRM, proposed § 910.2(a).

[628] *Id.* at 3500.

[629] *Id.* at 3502–04.

[630] *Id.* at 3520.

[631] *See* § 910.1.

workers for whom the Commission decides to leave existing non-competes unaffected, the final rule adopts a definition of senior executive that uses both an earnings test and a job duties test. Specifically, the final rule defines the term "senior executive" to refer to workers earning more than $151,164 who are in a "policy-making position" as defined in the final rule.[632]

Finally, in Part IV.C.5, the Commission explains the regulatory text it is adopting in § 910.2(a)(2), which defines unfair methods of competition related to non-competes with senior executives.

### 1. The Commission Does Not Find That Non-Competes With Senior Executives Are Exploitative or Coercive

The Commission stated in the NPRM that its preliminary finding that non-competes are exploitative and coercive did not apply to senior executives. The Commission stated that non-competes with senior executives are unlikely to be exploitative or coercive at the time of contracting, because senior executives are likely to negotiate the terms of their employment and may often do so with the assistance of counsel.[633] The Commission also stated that such non-competes are unlikely to be exploitative or coercive at the time of the executive's potential departure, because senior executives are likely to have bargained for a higher wage or more generous severance package in exchange for agreeing to the non-compete.[634] The Commission sought comment on whether there are other categories of highly paid or highly skilled workers (*i.e.,* other than senior executives) who are not exploited or coerced in connection with non-competes.[635]

Based on the totality of the record, including the many comments submitted on these questions, the Commission finds that senior executives—specifically, highly paid workers with the highest levels of authority in an organization—are substantially less likely than other workers to be exploited or coerced in connection with non-competes. For these reasons, the Commission does not find that non-competes with senior executives are exploitative or coercive.

There is little empirical evidence on the question of whether non-competes with senior executives are exploitative or coercive. A 2006 study of non-competes with CEOs finds that many of these workers negotiated a severance

period as long or longer than their non-compete period, making it easier to sit out of the market.[636] However, this study was limited to very-high-earning CEOs at large public companies—the average total compensation of the CEOs studied was $1.65 million[637]—so its findings do not necessarily capture the experiences of other senior executives. Many Americans work in positions with "senior executive" classifications. According to BLS, there were almost 3.4 million "top executives" in the U.S. in 2022 at firms under private ownership, and the median income for these workers was $99,240.[638]

The comment record on whether senior executives experience exploitation and coercion in relation to their non-competes is mixed. Many commenters asserted that, because some senior executives negotiate their non-competes with the assistance of expert counsel, they are likely to have bargained for a higher wage or more generous severance package in exchange for agreeing to the non-compete, and thus their non-competes are not exploitative or coercive. Several commenters stated that senior executives frequently negotiate non-competes for valuable consideration and/or typically agree to non-competes only in exchange for compensation. Some senior executives said they were not exploited or coerced in connection with non-competes.[639] Several commenters agreed with the Commission's preliminary finding that senior executives often obtain the assistance of counsel with respect to non-competes. Some commenters stated that to the extent a non-compete is not exploitative or coercive at the time of contracting, it is also not exploitative or coercive at the time of departure. One CEO stated that non-competes should be permissible for senior executives when they are entered into in exchange for severance and when the senior executive leaves voluntarily.

The Commission notes that a relatively small number of self-identified senior executives submitted

comments in their personal capacity. While the Commission did receive some comments from self-identified senior executives suggesting that their non-competes were exploitative and coercive, such comments were far less common than for other workers. However, some senior executives did report experiencing similar issues of exploitation and coercion. Several senior executives said that their non-competes were required and non-negotiable. Multiple senior executives described their own non-competes as "one-sided" in favor of the employer. Some senior executives said they were not given consideration for the non-compete, and even some who said they received consideration still said their non-competes were exploitative and coercive. For example, some senior executives said they: (1) were required to sign a non-compete under threat of losing their job or their earned compensation; (2) were forced into a stock share buyout that included a non-compete; or (3) could obtain long-term compensation only if they signed a non-compete. Two advocacy groups stated that many senior executives may lack power to avoid non-competes and that employers still hold most of the leverage in employment negotiations, even with respect to senior executives. An employment law firm stated that in its experience, it had not seen higher compensation for senior executives and other highly paid workers in jurisdictions where non-competes were allowed, and that employers rarely provide compensation for non-competes. The firm said that senior executives and other highly paid workers are more likely to receive severance payments, but such payments are paid only in some cases. It said that even when paid, the severance payments often do not fully compensate for what a senior executive could have otherwise earned during the non-compete period.

Furthermore, several self-identified senior executives said they felt unable to leave their company because of their non-competes. Many of these commenters said they feared being unemployed. Some senior executives said they feared or could not afford litigation, while two senior executives said that they could not afford to fight non-competes they believed were unenforceable. Several self-identified senior executives, having spent their careers in one industry, said they were forced to sit out of the market for long periods, forgoing earnings and the ability to work. Others reported struggling to find a job and suffering

---

[632] *Id.*

[633] NPRM at 3503.

[634] *Id.* at 3504.

[635] *Id.* at 3503–04.

[636] Stewart J. Schwab & Randall S. Thomas, *An Empirical Analysis of CEO Employment Contracts: What Do Top Executives Bargain For?,* 63 Wash. & Lee L. Rev. 231, 256–57 (2006).

[637] *Id.* at 244.

[638] BLS, Occupational Employment and Wage Statistics, *Tables Created by BLS, https:// www.bls.gov/oes.tables.htm.* These data are from the May 2022 National XLS table for Top Executives under private ownership.

[639] For the sake of readability, the Commission refers to the commenters based on how they described themselves. For example, if a commenter said they were a senior executive, the Commission refers to them as a senior executive (rather than as a "self-described senior executive").

financially, including living on Social Security or nearing bankruptcy.

One law firm specializing in executive compensation said many senior executives may have achieved top roles at companies because they have spent decades in the same industry and would struggle to find work with firms other than competitors. Another law firm said senior executives blocked from an industry could lose their long-cultivated reputation in the industry and, as a result, time out of an industry could harm their careers. Worker advocacy organizations and a law firm said senior executives tend to be relatively older and, as older workers are forced out of the job market, they are likely to be losing out on increasingly scarce employment opportunities relative to their younger counterparts. Another advocacy group argued that the Commission did not provide sufficient evidence to support its preliminary finding that non-competes are not exploitative and coercive for senior executives. A few commenters suggested that senior executives from historically marginalized groups may be paid less and have less bargaining power than other senior executives.[640]

Critically, the Commission received an outpouring of comments indicating that highly paid workers who are *not* senior executives (*i.e.,* who are not workers with the highest levels of authority in an organization) are often coerced or exploited via non-competes. The Commission received many comments from workers in relatively higher-wage fields—such as medicine, engineering, finance and insurance, and technology—who stated that employers exploited and coerced them through the use of non-competes.[641] The vast

majority of higher-wage workers who are not senior executives reported that they lacked bargaining power in relation to their employer; did not negotiate their non-compete or receive compensation for it; and/or were not informed of the non-compete until after they received the job offer. Many of these workers stated that their non-compete was hidden or obscured; that their employers misled them about the terms of a non-compete; and/or that the non-compete was confusingly worded or vague. In addition, many high-wage workers recounted how non-competes coerced them into refraining from competing against their employer by forcing them to stay in jobs they wanted to leave or forcing them to leave their profession, move their families far away, and/or commute long distances. And a large share of high-wage workers argued that even where their non-competes were overbroad and likely unenforceable, they were deterred from seeking or accepting other work or starting a business by the threat of a lawsuit from their employer, which they said would be ruinous to their finances and professional reputations.[642] The Commission accordingly finds that higher-wage workers who are not senior executives are often exploited and coerced through employers' use of non-competes.

In addition, the Commission believes it is appropriate to conclude that lower-earning workers, regardless of their job title or function in an organization, are more likely to be exploited or coerced in connection with non-competes. As noted, many workers classified as "top executives" make under $100,000. Commenters did not self-report their income, so the Commission cannot definitively determine that the self-identified senior executives who reported exploitation and coercion are lower-wage senior executives. Because of their incomes, however, lower-wage senior executives are likely subject to many of the same exploitative and coercive factors that affect other workers, such as the inability to afford a non-compete lawsuit, forgo work for a lengthy period, leave the field, or relocate.[643] Comments from some senior executives confirmed that they did not have sufficient bargaining power to negotiate the non-compete or consideration for it, suffered serious financial harm from non-competes, and could not afford to litigate their non-competes. Accordingly, the Commission finds that a mere job title alone is insufficient to confer bargaining power

on a worker, and lower-wage senior executives can be subject to the same exploitation and coercion that other workers face.

However, having considered the comments and the available empirical evidence on this question, the Commission does not find that non-competes with highly paid workers who are also senior executives are likely to be exploitative or coercive. The Commission stresses that it is not affirmatively finding that such non-competes can never be exploitative or coercive. The Commission has simply determined the record before it is insufficient to support such a finding at this time.

### 2. The Use of Non-Competes With Senior Executives is an Unfair Method of Competition Under Section 5

While the Commission does not find that non-competes with senior executives are exploitative and coercive, the Commission determines that these non-competes are nonetheless unfair methods of competition, for the reasons described herein.

To determine whether conduct is an unfair method of competition under section 5, the Commission assesses two elements: (1) whether the conduct is a method of competition, as opposed to a condition of the marketplace and (2) whether it is unfair, meaning that it goes beyond competition on the merits. The latter inquiry has two components: (a) whether the conduct has indicia of unfairness and (b) whether the conduct tends to negatively affect competitive conditions. These two components are weighed according to a sliding scale.[644]

Non-competes with senior executives satisfy all the elements of the section 5 inquiry. As described in Part IV.C.2.a, these non-competes are methods of competition. As described in Part IV.C.2.b, these non-competes are facially unfair conduct because they are restrictive and exclusionary. And as described in Part IV.C.2.c, these non-competes tend to negatively affect competitive conditions in product and service markets and in labor markets. Because the Commission finds that non-competes with senior executives are unfair methods of competition, the Commission declines to exclude them from the final rule. However, as described in Part IV.C.3, the final rule allows existing non-competes with senior executives to remain in effect, due to the considerations described therein.

---

[640] One of those commenters cited two *USA Today* articles that examined Federal workforce records for 88 companies in the S&P 100 to assess the number of Asian and Latina women in executive positions. The articles did not include the underlying data used for the evaluation. *See* Jessica Guynn & Jayme Fraser, *Asian Women Are Shut Out of Leadership at America's Top Companies. Our Data Shows Why,* USA Today (Apr. 25, 2022), *https://www.usatoday.com/money/2022/04/25/asian-women-executives-discrimination-us-companies/7308310001/?gnt-cfr=1;* Jessica Guynn & Jayme Fraser, *Only Two Latinas Have Been CEOs at a Fortune 500 Company: Why So Few Hispanics Make It to the Top,* USA Today (Aug. 2, 2022), *https://www.usatoday.com/story/money/2022/08/02/hispanic-latina-business-demographics-executive//?gnt-cfr=1.* These news reports find a disparity in the number of Asian and Latina women in senior executive roles at these companies but make no specific findings on bargaining power. While lack of representation and other factors may impact bargaining power, the Commission believes that these two articles (with no underlying data provided) are insufficient evidence at this time to find exploitation and coercion with respect to this subset of senior executives.

[641] *See* Part IV.B.2.b.i–ii.

[642] *See* Part IV.B.2.b.ii.

[643] *See id.*

[644] *See* Part II.F.

a. The Commission Finds That Non-Competes With Senior Executives are a Method of Competition, Not a Condition of the Marketplace

With respect to the first element—whether conduct is a method of competition—the Commission finds that non-competes with senior executives are a method of competition for the same reasons as non-competes with other workers.[645]

b. Non-Competes With Senior Executives are Facially Unfair Conduct Because They are Restrictive and Exclusionary

In Part IV.B.2.a, the Commission finds that non-competes with workers other than senior executives are facially unfair conduct because they are restrictive and exclusionary. The Commission finds that non-competes with senior executives are facially unfair conduct for the same reasons.

Like non-competes for all other workers, the restrictive nature of non-competes with senior executives is evident from their name and function: non-competes restrict competitive activity. They prevent senior executives from seeking or accepting other work or starting a business after leaving their job. And like non-competes for all other workers, non-competes with senior executives are exclusionary because they impair the opportunities of rivals. Where a worker is subject to a non-compete, the ability of a rival firm to hire that worker is impaired. In addition, where many workers in a market are subject to non-competes, the ability of firms to expand into that market, or entrepreneurs to start new businesses in that market, is impaired. While non-competes may impair the opportunities of rivals in all labor markets, non-competes for senior executives are especially pernicious in this regard. Senior executives are relatively few in number, are bound by non-competes at high rates,[646] and have highly specialized knowledge and skills. Therefore, it can be extremely difficult for existing firms and potential new entrants to hire executive talent and to form the most productive matches.

Because senior executives are often compensated in return for their promise not to compete, some commenters argue that non-competes with senior executives are not unfair methods of competition. However, agreements can present concerns under the antitrust laws even when both parties benefit.

Here, non-competes with senior executives are not unfair methods of competition under section 5 because they are unfair to the individual executive, but because they tend to negatively impact competitive conditions—*i.e.,* harm competition in product and service markets, as well as in labor markets—by imposing serious negative externalities on other workers, rivals, and consumers.[647]

c. Non-Competes With Senior Executives Tend To Negatively Affect Competitive Conditions

The Commission finds non-competes with senior executives tend to negatively affect competitive conditions in product and service markets and in labor markets. As explained in Part II.F, the legal standard for an unfair method of competition under section 5 requires only a tendency to negatively affect competitive conditions. The inquiry does not turn on whether the conduct directly caused actual harm in a specific instance. Here, the tendency of non-competes to impair competition is obvious from their nature and function, as it is for non-competes with workers who are not senior executives. And even if this tendency were not facially obvious, the evidence confirms that non-competes with senior executives do in fact negatively affect competitive conditions.

i. Non-Competes With Senior Executives Tend To Negatively Affect Competitive Conditions in Product and Service Markets

In the NPRM, the Commission stated that non-competes with senior executives may harm competition in product and service markets in unique ways.[648] The Commission stated that non-competes with senior executives may contribute more to negative effects on new business formation and innovation than non-competes with other workers, to the extent that senior executives may be likely to start competing businesses, be hired by potential entrants or competitors, or develop innovative products and services.[649] The Commission also stated that non-competes with senior executives may also block potential entrants, or raise their costs, to a high degree, because such workers are likely to be in high demand by potential entrants.[650] The Commission

preliminarily concluded that, as a result, prohibiting non-competes for senior executives may have relatively greater benefits for consumers than prohibiting non-competes for other workers.[651]

Based on the Commission's expertise and after careful review of the rulemaking record, including the empirical research and the public comments, the Commission finds that non-competes with senior executives tend to negatively affect competitive conditions in markets for products and services, inhibiting new business formation and innovation.

Non-Competes With Senior Executives Inhibit New Business Formation and Innovation

In Part IV.B.3.b, the Commission described the extensive empirical evidence indicating that non-competes inhibit new business formation and innovation. The Commission's finding in Part IV.B.3.b that non-competes inhibit new business formation and innovation does not examine non-competes with senior executives specifically. However, the Commission finds that non-competes with senior executives inhibit new business formation and innovation at least as much as non-competes with other workers and likely to a greater extent, given the outsized role of senior executives in forming new businesses, serving on new businesses' executive teams, and setting the strategic direction of businesses with respect to innovation.

Specifically, non-competes with senior executives tend to negatively affect competitive conditions in product and service markets in three ways. First, non-competes with senior executives inhibit new business formation. In Part IV.B.3.b.i, the Commission finds that non-competes with workers other than senior executives inhibit new business formation. The Commission finds that non-competes with senior executives inhibit new business formation as much as non-competes with other workers and likely to a greater extent, due to the important role senior executives play in new business formation.

Senior executives are particularly well-positioned to form new businesses because of their strategic expertise and business acumen; knowledge of multiple facets of their industries; experience making policy decisions for businesses; and ability to secure financing. Senior executives are also often crucial to the formation of startups, because startups often begin by

---

[645] *See* Part IV.B.1.

[646] *See* Part I.B.2 (noting studies estimating that about two-thirds of senior executives work under non-competes).

[647] *See* Part IV.C.2.i–ii (describing the negative effects of non-competes with senior executives on markets for products and services and labor markets).

[648] NPRM at 3502.

[649] *Id.* at 3513.

[650] *Id.*

[651] *Id.*

forming a leadership team, which is often comprised of experienced and knowledgeable executives from elsewhere in the industry.[652] Empirical research shows that when startups hire top management teams from other firms, they are more likely to grow beyond their initial stages [653] and that top managers' experience in an industry allows startups to grow more quickly.[654] Additionally, empirical research finds that startups that hire top management teams with experience are more likely to become successful businesses.[655] Empirical research also finds that, in addition to experience, top management teams that have worked together in the past are more successful than those that have not.[656] For these reasons, non-competes with senior executives not only inhibit new business formation by blocking the executives from forming new businesses; they also prevent other potential founders from forming new businesses, because potential founders are less likely to start new businesses when they are unable to assemble the executive team they need because so many executives in the industry are tied up by non-competes. By inhibiting new business formation, these non-competes deprive product and service markets of beneficial competition from new entrants—competition that in turn tends to benefit consumers through lower prices or better product quality.

Second, non-competes with senior executives inhibit innovation. In Part IV.B.3.b.ii, the Commission finds that non-competes with workers other than senior executives inhibit innovation. The Commission finds that non-competes with senior executives inhibit innovation at least as much as non-competes with other workers and likely to a greater extent, because senior executives play a crucial role in setting the strategic direction of firms with respect to innovation.

Non-competes with senior executives inhibit innovation by impeding efficient matching between workers and firms. As described in Part IV.B.3.a, labor markets function by matching workers and employers. The same is true for senior executives. Executives compete for roles at firms, and firms compete to attract (often highly sought-after) executives; executives choose the role that best meets their objectives, and firms choose the executive who best meets theirs. Non-competes impede this competitive process by blocking executives from pursuing new opportunities (*i.e.,* positions that are within the scope of their non-compete) and by preventing firms from competing to attract their talent. Thus, because non-competes are prevalent, the quality of the matches between executives and firms suffers.

By inhibiting efficient matching between firms and executives, non-competes frustrate the ability of firms to hire executives who can best maximize the firm's capacity for innovation. Senior executives play an important role in advancing innovation at firms.[657] Senior executives are often a fundamental part of the innovative process, guiding the strategic direction of the firm in terms of topics of new research and the depth of new research; determining the allocation of R&D funding; and making the decision to develop (and supervising the development of) new products and services.[658]

Research shows that labor mobility among senior executives may tend to foster innovation. Empirical research finds that executives with shorter job tenures tend to engage in more innovation than those who are longer tenured at firms.[659] In addition, empirical research shows that the strength of executives' external networks—which are likely stronger among executives hired externally—

increase the rate of innovation.[660] Finally, when senior executives are hired by new companies, they bring their experience and understanding of the industry, which may cross-pollinate with the capabilities of the new company, cultivating new research which would not otherwise be achieved.[661] By inhibiting efficient matching between executives and firms, non-competes impede the ability of firms to develop innovative products and services that benefit consumers.

Furthermore, empirical research shows that better matching among executives and firms drives productivity as well as innovation. When firms and executives have a higher quality match, the firm as a whole is more productive.[662] By inhibiting efficient matching between executives and firms, non-competes tend to reduce the productivity of firms.

In theory, firms that seek to hire an executive could just pay the executive's employer (or former employer) to escape the non-compete. However, research by Liyan Shi describes how non-competes with senior executives force firms to make inefficiently high buyout payments. Shi ultimately concludes that ''imposing a complete ban on noncompete clauses would be close to implementing the social optimum.'' [663]

Shi explains that firms and executives jointly create market power by entering into non-competes and excluding rivals from hiring experienced labor in a competitive labor market. The existence of a non-compete forces rivals to make an inefficiently high buyout payment, where the inefficiency arises due to the market power of the incumbent firm created by the non-compete. Rival firms must either make these payments, which therefore lead to deadweight economic loss, or forgo the payment—and, consequently, the ability to hire a talented executive (and perhaps the ability to enter the market at all, for potential new firms).[664] New and small businesses in particular might be unable to afford these buyouts. By calibrating

[652] *See, e.g.,* Leslie Crowe, *How to Hire Your First Leadership Team* (Oct. 24, 2023), *https://baincapitalventures.com/insight/how-to-hire-your-first-leadership-team-as-a-startup-founder/*.

[653] Bradley Hendricks, Travis Howell, & Christopher Bingham, *How Much Do Top Management Teams Matter in Founder-Led Firms?,* 40 Strategic Mgmt. J. 959 (2019).

[654] Yasemin Y. Kor, *Experience-Based Top Management Team Competence and Sustained Growth,* 14 Org. Sci. 707 (2003).

[655] Agnieszka Kurczewska & Michał Mackiewicz, *Are Jacks-of-All-Trades Successful Entrepreneurs? Revisiting Lazear's Theory of Entrepreneurship,* 15 Baltic J. of Mgmt. 411 (2020).

[656] Kathleen M. Eisenhardt, *Top Management Teams and the Performance of Entrepreneurial Firms,* 40 Small Bus. Econ. 805 (2013).

[657] *See, e.g.,* Jean-Philippe Deschamps, *Innovation Leaders: How Senior Executives Stimulate, Steer and Sustain Innovation* (John Wiley & Sons, 2009); Jean-Philippe Deschamps & Beebe Nelson, *Innovation Governance: How Top Management Organizes and Mobilizes For Innovation* (John Wiley & Sons, 2014).

[658] Christopher Kurzhals, Lorenz Graf-Vlachy, & Andreas König, *Strategic Leadership and Technological Innovation: A Comprehensive Review and Research Agenda,* 28 Corp. Governance: An Int'l Review 437 (2020); Pascal Back & Andreas Bausch, *Not If, But How CEOs Affect Product Innovation: A Systematic Review and Research Agenda,* 16 Int'l J. of Innovation and Tech. Mgmt. 1930001 (2019); Vassilis Papadakis & Dimitris Bourantas, *The Chief Executive Officer as Corporate Champion of Technological Innovation: An Empirical Investigation,* 10 Tech. Analysis & Strategic Mgmt. 89 (1998) (finding that CEO characteristics significantly influence technological innovation, and that the influence is particularly powerful for new product introductions).

[659] Vincent L. Barker III & George C. Mueller, *CEO Characteristics and Firm R&D Spending,* 48 Mgmt. Sci. 782 (2002).

[660] Qing Cao, Zeki Simsek, & Hongping Zhang, *Modelling the Joint Impact of the CEO and the TMT on Organizational Ambidexterity,* 47 J. of Mgmt. Stud. 1272 (2010); Olubunmi Faleye, Tunde Kovacs, & Anand Venkateswaran, *Do Better-Connected CEOs Innovate More?,* 49 J. of Fin. And Quant. Analysis 1201 (2014).

[661] *See, e.g.,* Orly Lobel, *Talent Wants to Be Free* (Yale Univ. Press, 2013).

[662] Yihui Pan, *The Determinants and Impact of Executive-Firm Matches,* 63 Mgmt. Sci. 185 (2017); Matthew Ma, Jing Pan, & Xue Wang, *An Examination of Firm-Manager Match Quality in the Executive Labor Market* (2021), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3067808.*

[663] Shi, *supra* note 84 at 427.

[664] *Id.*

this theoretical model to data on executive non-competes and executive compensation, the study shows that banning non-competes would result in nearly optimal social welfare gains.

Shi notes that such a mechanism could be tempered by the ability of a labor market to provide viable alternative workers for new or competing businesses. However, when a particular type of labor is somewhat scarce, when on-the-job experience matters significantly, or when frictions prevent workers from moving to new jobs—all of which tend to be the case for senior executives—there is no way for the market to fill the gap created by non-competes.

Some of the evidence in this study arises from analysis of non-compete use coupled with non-compete enforceability. Other evidence in the study, including the finding that a ban on non-competes is close to optimal, relies not on use at the individual level, but on prevalence of non-competes across a labor market. The latter approach does not rely, therefore, on comparing individuals with and without non-competes, and is therefore not subject to the estimation bias that leads the Commission to give less weight to evidence based on the use of non-competes.

Relevant Comments and Commission Responses

Many commenters stated that non-competes with senior executives reduce new business formation and innovation, confirming the Commission's findings. Several senior executives recounted personal experiences in which a non-compete prevented them from starting a business. A tech executive stated that they knew many tech executives who would have left their roles to start within-industry spinoffs if not for their non-competes. A senior executive stated that they had planned to start a small business that would not have harmed the former employer but had signed a non-compete that prevented them from doing so. A former executive stated that they were sued after starting a new business despite confirming with the CEO of their former employer that doing so would not violate the non-compete. Another senior executive said their non-compete prevented them from taking a job at a smaller, more innovative company in their industry. Some commenters warned that permitting non-competes for senior executives would reinforce dominant positions for industry incumbents who can foreclose new entrants from access to critical talent and expertise. An advocate for startups stated that small businesses

significantly benefit from mentorship from experienced founders, which can be inhibited by non-competes.

Other commenters argued that the Commission should exclude senior executives from coverage under the final rule because doing so would benefit competition in product and service markets. These commenters generally stated that non-competes may promote innovation by encouraging firms to make productivity-enhancing investments, such as investments in developing trade secrets. The Commission does not believe that non-competes are needed to protect valuable firm investments. As discussed in Part IV.D, the Commission finds that employers have less restrictive alternatives for protecting valuable investments and that these alternatives are available for senior executives as well as for other workers.

In addition, when assessing how non-competes with senior executives affect competition in product and service markets, the Commission believes it is important to consider the net impact. It is possible that the effects described by these commenters and the effects described by the Commission earlier in this Part IV.C.2.c.i can be occurring at the same time. That is, a non-compete with a senior executive might in some instances be protecting a firm's investments in a manner that is productivity-enhancing, holding all else equal. At the same time, however, that same non-compete may restrict the executive's ability to start a new business after leaving the firm. And even that same non-compete can—and certainly non-competes in the aggregate do—prevent the most efficient match between senior executives and the firms that can make the highest and best use of their talents, and decrease knowledge flow between firms, which limits the cross-pollination of innovative ideas. What the empirical evidence shows is that overall, *i.e.*, in net effect, non-competes reduce new business formation and innovation,[665] indicating that the tendency of non-competes to inhibit new business formation and innovation more than counteracts any effect of non-competes on promoting new business formation and innovation by protecting a firm's investments.

A commenter—referencing the Shi study—argued that banning buyout clauses in non-competes would enhance economic efficiency relative to banning non-competes altogether. Other commenters, including Shi, the author of the study, disagreed with this

claim.[666] In response to these comments, the Commission finds that prohibiting buyout clauses would not enhance efficiency relative to prohibiting non-competes altogether. The Commission does not believe prohibiting buyout clauses would address the tendency of non-competes for senior executives to negatively affect competitive conditions, because it would mean that fewer executives could escape their non-competes, reducing labor mobility and efficient matching between executives and firms even further.

Some commenters disputed the Commission's legal rationale for prohibiting non-competes with senior executives. One comment stated that the NPRM did not cite any case law where a non-compete for a senior executive violated antitrust law and argued that there is no widespread case law to support a *per se* ban. In response, the Commission notes that it is determining that non-competes are an unfair method of competition under section 5, not a *per se* violation of the Sherman Act. For the reasons described in this Part IV.C.2, the Commission finds that non-competes are restrictive and exclusionary and that, based on the totality of the evidence, they tend to negatively affect competitive conditions at least as much as non-competes with other workers, and likely even more so, given the outsize role of senior executives in new business formation and innovation. For these reasons, the Commission finds that these non-competes are an unfair method of competition under section 5.

Another commenter stated that the NPRM did not satisfy the standard for finding a tendency to negatively affect competitive conditions for senior executives as set forth in the Commission's section 5 Policy Statement.[667] The commenter stated that a *per se* ban on non-competes considers neither the size, power, or purpose of the firm nor how non-competes interact with individual markets. The commenter argued that the evidence cannot justify an economy-wide ban.

The Commission finds that non-competes for senior executives are an unfair method of competition under section 5 for all the reasons described in this Part IV.C.2. The Commission states the applicable legal standard under section 5 in Part II.F, which is consistent with the standard set forth in the Policy Statement. As noted in Part

---

[665] *See* Part IV.B.3.b.i–ii.

[666] Comment of Liyan Shi, FTC–2023–0007– 19810.

[667] *See* FTC Policy Statement, *supra* note 286.

**JA0068**

II.F, the Commission need not make a separate showing of market power or market definition. Nor must the Commission show that the conduct directly caused actual harm in the specific instance at issue. Instead, the inquiry under section 5 focuses on the nature and tendency of the conduct. Moreover, as noted in Part II.F, the Commission may consider the aggregate effect of conduct as well. The language in the Policy Statement stating that the size, power, and purpose of the respondent may be relevant is not limiting, but instead provides guidance regarding factors the Commission may consider in evaluating potentially unfair methods of competition. This guidance may be especially relevant in individual cases and less so in section 5 rulemakings. Finally, as described in Part II.F, a finding that conduct is an unfair method of competition does not require definition of a market or consideration of individual markets. Moreover, as described in Part V.D, the Commission considered and finds no basis for excluding particular industries or workers.

ii. Non-Competes With Senior Executives Tend to Negatively Affect Competitive Conditions in Labor Markets

The effects of non-competes with senior executives on product and service markets are the primary reason why the Commission finds that non-competes with senior executives are an unfair method of competition. However, non-competes also tend to negatively affect competitive conditions in labor markets.

Non-Competes With Senior Executives Suppress Labor Mobility and Earnings

In Part IV.B.3.a, the Commission describes extensive empirical evidence that non-competes reduce labor mobility and worker earnings. The Commission's finding in Part IV.B.3.a that non-competes suppress labor mobility and earnings does not examine non-competes with senior executives specifically. However, the evidence cited by the Commission is also probative with respect to non-competes with senior executives.

Non-competes reduce labor mobility for senior executives for the same reasons they reduce labor mobility for other workers—they directly restrict workers from seeking or accepting other work or starting a business after they leave their job. In Part IV.B.3.a.i, the Commission cites empirical evidence that non-competes reduce labor mobility. This evidence shows that non-competes reduce labor mobility for all

subgroups of workers that have been studied, including inventors, high-tech workers, low-wage workers, and workers across the labor force. The impact of non-competes on labor mobility is direct, since non-competes directly prohibit certain types of mobility. Therefore, the Commission finds the non-competes restrict the labor mobility of senior executives as well.

This finding is supported by Mark Garmaise's study of the relationship between non-compete enforceability and the labor mobility and earnings of executives.[668] Garmaise finds that stricter non-compete enforceability reduces within-industry executive mobility by 47% and across-industry executive mobility by 25%. The study, which is limited to senior executives, uses multiple legal changes in non-compete enforceability, measured along multiple dimensions in a binary fashion. The Shi study qualitatively confirms these results—that executives experience greater labor mobility in the absence of non-competes.[669] However, that study examines use, and not just enforceability, of non-competes, so the Commission gives it less weight.

Furthermore, by inhibiting efficient matching between executives and firms—through a similar mechanism as for all other workers[670]—non-competes reduce executives' earnings. Like non-competes for other workers, non-competes block senior executives from switching to a job in which they would be better paid. And by doing so, non-competes decrease opportunities (and earnings) for senior executives who are not subject to non-competes—as well as for workers who are not senior executives, but who would otherwise move into one of those roles.

As described in Part IV.B.3.a.ii, the empirical research indicates that non-competes suppress wages for a wide range of subgroups of workers across the spectrum of income and job function, including workers who are not subject to non-competes. Importantly, an empirical study that does focus on senior executives finds that non-competes suppress earnings of senior executives. The Garmaise study finds that decreased enforceability of non-competes increases executives' earnings by 12.7%.[671] Garmaise also finds that decreased enforceability of non-competes increases earnings growth for CEOs by 8.2%. Since much of the

increase in earnings is attributable to an increase in earnings growth (as opposed to earnings at the start of the employment relationship), Garmaise hypothesizes that earnings increase because CEOs are more likely to invest in their own human capital when they have no non-compete.[672] However, Garmaise also notes that while non-competes may offer benefits to firms which use them, there may be negative impacts across the labor markets in which they are used.[673] This is the only study of executive earnings that does not examine the use of non-competes: it examines multiple legal changes in non-compete enforceability, measured along multiple dimensions (though in a binary fashion).

As noted in Part IV.C.1, many senior executives negotiate valuable consideration for non-competes. However, the evidence suggests that non-competes still have a net negative effect on senior executives' earnings, because the suppression of earnings through reduced labor market competition more than cancels out the compensation that some of these executives individually receive for their non-competes.

A second study, by Kini, Williams, and Yin,[674] simultaneously estimates the impact of non-compete enforceability and non-compete use on earnings and finds a positive correlation. The Commission gives this study less weight because it analyzes the use of non-competes. As described in Part IV.A.2, such studies cannot easily differentiate between correlation and causation. Kini, Williams, and Yin use an enforceability measure to generate their estimates, but do not estimate models that omit use of non-competes, meaning that the Commission does not interpret the findings as representing a causal relationship.

Relevant Comments and Commission Responses

Many commenters addressed negative effects of non-competes with senior executives on competition in labor markets. Non-competes, these commenters stated, can negatively affect a senior executive's career when they leave their field or sit out of the workforce for a period, causing their skills and knowledge (particularly in fast-paced fields) to stagnate and affecting their reputations. Like other workers, some senior executives said their non-compete limited their options and earnings in their specialized field.

---

[668] Garmaise, *supra* note 584.

[669] Shi, *supra* note 84.

[670] *See* Part IV.B.3.a.

[671] Garmaise, *supra* note 584 at 403. The reduction in earnings is calculated as $e^{-1.3575 \times 0.1} - 1$, where $-1.3575$ is taken from Table 4.

[672] *Id.* at 402.

[673] *Id.* at 379.

[674] Kini, Williams, & Yin, *supra* note 83.

Other commenters argued the Commission should exclude senior executives from the rule because they earn more compensation, including higher wages, for non-competes than they would gain under the final rule. Many of these commenters argued that because senior executives have bargaining power, any findings on decreased wages would not apply to them. Some employers stated they compensated their senior executives for non-competes. Some industry organizations stated that some additional compensation and bonuses might not be offered if non-competes are banned. One business stated the compensation it pays executives takes their non-competes into account. Another business stated it provides severance benefits in exchange for non-competes that fully compensate the executive for the duration of the non-compete.

In response to these comments, the Commission notes the Garmaise study indicates that non-competes have a net negative effect on earnings for senior executives in the aggregate because they suppress competition, even if individual senior executives receive some amount of compensation for their personal non-compete. Garmaise's analysis accounts for any compensation the executive receives for the non-compete.

An industry trade organization stated that non-competes create job opportunities for executives and other highly skilled workers, rather than restricting them, because, without non-competes to protect confidential information, employers will often be reluctant to expand their executive teams. The Commission notes this assertion is unsupported by empirical evidence, and the Commission finds that firms have less restrictive alternatives for protecting confidential information.[675]

An investment industry organization stated that the Commission cannot assume senior executives will be equally or more effective at new firms compared to their old firms. In response, the Commission notes that voluntary labor mobility—for senior executives and all workers—typically reflects a mutually beneficial outcome. To the extent a firm is willing to pay more to attract a particular worker to come work for them, it is typically because the firm places a higher value on the worker's productivity than the worker's current employer. In addition, the Commission notes that many commenters stated that non-competes often force senior executives to sit out

of the workforce, causing them to lose valuable knowledge and skills. In general, senior executives are more likely to be effective when they can remain in the industry in which they have experience and expertise, rather than starting over in a new industry because of a non-compete.

An industry trade organization stated that the Commission's assertion that wages are reduced across the labor market is inconsistent with the NPRM's preliminary finding that non-competes are not coercive or exploitative for senior executives, because when more issues are left for negotiation, the job market is increasingly competitive, as workers can differentiate themselves through their terms and tailor their terms to each employer. The Commission does not believe these findings are in tension. Agreements do not need to be exploitative or coercive to inhibit efficient matching between workers and firms or to negatively affect competitive conditions. Furthermore, the Commission believes that executives have many other ways to differentiate themselves other than based on non-compete terms.

One commenter argued that the findings in the Kini, Williams, and Yin study should not be interpreted as representing a causal relationship. Upon further consideration, the Commission agrees with this comment and does not interpret this study causally, as described in this Part IV.C.2.c.ii.

For these reasons, the Commission finds that non-competes with senior executives are an unfair method of competition. As a result, the Commission declines to exclude senior executives from the final rule altogether.

### 3. The Final Rule Allows Existing Non-Competes With Senior Executives To Remain in Effect

The final rule prohibits employers from, among other things, entering into or enforcing new non-competes with senior executives—*i.e.,* non-competes entered into on or after the effective date.[676] However, the Commission decides to allow existing non-competes with senior executives—*i.e.,* non-competes entered into before the effective date—to remain in effect. The Commission describes the basis for this determination in this Part IV.C.3.

The Commission believes the evidence could provide a basis for prohibiting employers from enforcing existing non-competes with senior executives, as the final rule does for all other workers, given the tendency of such agreements to negatively affect

competitive conditions.[677] However, the Commission has decided to allow existing non-competes for senior executives to remain in effect, based on two practical considerations that are far more likely to be present for senior executives than other workers. First, as described in Part IV.C.1, senior executives are substantially less likely than other workers to be exploited or coerced in connection with non-competes. As a result, this subset of workers is substantially less likely to be subject to the kind of acute, ongoing harms currently being suffered by other workers with existing non-competes (even if senior executive's existing non-competes are still harming competitive conditions in the economy overall). Second, commenters raised credible concerns about the practical impacts of extinguishing existing non-competes for senior executives, as described in this Part IV.C.3.[678]

Numerous businesses and trade associations argued that, if the final rule were to invalidate existing non-competes for senior executives, that would present practical challenges for employers, because many such non-competes were exchanged for substantial consideration. According to commenters, consideration exchanged for non-competes includes long-term incentive plans, bonuses, stock awards, options, or severance payments, among other arrangements.

Some commenters were concerned about a potential windfall for workers. They argued that if the non-compete portion of the contract were rescinded or otherwise invalidated, the worker may be left with any benefits already received in exchange for the non-compete, such as equity or bonuses, and could also compete. An industry association stated that some of its members' workers have already received thousands or hundreds of thousands of dollars in additional compensation alongside non-competes, though it was unclear what each worker received. Some business associations said businesses do not have a clear way to recover those payments or benefits. A commenter asked whether a worker who forfeited equity for competing could get the equity back or if executives who were compensated by their new

---

[675] *See* Part IV.D.2.

[676] § 910.2(a)(2).

[677] *See* Part IV.C.2

[678] Because the Commission proposed to require employers to rescind existing non-competes—*see* NPRM, proposed § 910.2(b)(1)—many of these comments addressed the proposed rescission requirement specifically. Comments that pertain only to the issue of rescission, and that do not apply to whether non-competes for senior executives may remain in effect generally, are addressed in Part IV.E.

employers for the non-compete would be paid twice.

The Commission views the problem as more complex than these commenters suggest. First, the empirical evidence and comments illustrate that in many cases, non-competes are currently trapping workers, including senior executives, in their jobs, meaning the employer is getting not only the benefit of trapping that individual worker, but also the benefit of non-competition.[679] In such circumstances, employers may have already received part or all of the benefit they sought from entering a non-compete, though the value would be difficult if not impossible to quantitatively assess. Moreover, it is impracticable for the Commission to untangle whether, to the extent some workers received compensation that was denominated consideration for a non-compete, that non-compete simultaneously suppressed other compensation to the worker such as wages. For example, some commenters who described negotiating their non-competes stated the employer used it as a tactic to drive down wages.

In addition, most workers subject to a non-compete are subject to other restrictive covenants,[680] both mitigating any purported harm and complicating any quantitative valuation of a non-compete.

The Commission also notes that, to the extent equity was provided as consideration, owning a share in the prior employer may induce workers not to risk lowering the value of that equity by competing. However, the concern about workers seeking already-forfeited compensation is misplaced, as the final rule will not impact workers who forfeited compensation for competing under a then-valid non-compete.

Overall, however, where an employer has provided meaningful consideration in exchange for a non-compete, the comments indicate that being unable to enforce that non-compete may complicate that exchange in a way that would be difficult to value and untangle. These difficult practical assessments indicate that the final rule should contain a limited, easily administrable exception for existing non-competes with senior executives, who are considerably more likely than other workers to have negotiated non-competes and received substantial consideration in return.

In addition, an employment attorney suggested that employers may suspend any mid-stream benefits and terminate unvested options and stock and cancel bonuses. One commenter suggested employers may seek refunds from workers, which could create uncertainty. Similarly, an industry association said senior workers who signed a non-compete as part of a severance agreement might see their severance payments taken away, as employers would need to decide whether to continue paying despite the elimination of non-competes or, to the extent they legally can, attempt to renegotiate any outstanding severance agreements. Finally, a business said executives in the middle of their contracts might need to renegotiate those contracts. The Commission shares these concerns about the practicalities of untangling non-competes that are more likely to have been bargained for. Senior executives who engaged in a fair bargaining process may have obtained significant consideration and planned accordingly, as have their employers. While employers' ability to stop payments or claw back consideration is uncertain, any efforts to do so could be disruptive.

Other commenters stated that they believed rescission could result in litigation against workers. An employment lawyer said litigation was difficult to predict but that there could be litigation seeking declarations from courts on how the rule impacts existing contracts. A group of commenters stated that rescinding or invalidating agreements would lead to increased litigation against workers who received the benefit of the bargain but were no longer bound by a non-compete in exchange, and that such litigation would seek to nullify severance agreements, employment agreements, clawback agreements, and others.

One business said the NPRM was silent on how to address specially taxed arrangements, but the business did not provide additional details on any such arrangements. A law firm said workers who received consideration in a prior year would have paid taxes on it and would now need to amend their prior tax return to get a refund if they have to pay back that consideration, while employers might have to amend their return to reflect the loss of a deduction. That law firm also said some executives and other workers use and plan for non-competes to reduce their "golden parachute" tax burden.

Finally, an accountant explained that valuations of senior executive non-competes are conducted during many merger and acquisition transactions.

Similarly, an industry association said acquisition prices may include the value of non-competes that ensure the buyer retains certain talent, so if non-competes were rescinded or invalidated the buyer would lose the value of what they paid for with no way to recoup the costs. The commenter stated that the bargained-for value of such sales may decrease if existing senior executive non-competes cannot be enforced. The exemption for existing non-competes addresses this concern. Moreover, this concern does not exist for future transactions in any event, since they would not account for non-competes that have been banned.

In response to the foregoing comments, the Commission finds it plausible that rendering existing non-competes with senior executives enforceable could create some of these practical implementation challenges. The Commission accordingly elects to exclude existing non-competes with senior executives from the rule, reducing the burden of implementation of the final rule.

The Commission also understands that some of these practical concerns could arise for workers other than senior executives if they received substantial consideration in exchange for a non-compete. However, the evidence indicates that any such agreements with workers other than senior executives are very rare, and that such workers are more likely to experience exploitation and coercion in connection with non-competes. Therefore, allowing only existing non-competes with senior executives to remain in force will significantly reduce these practical concerns for employers. In contrast, a wider exemption for all existing agreements would leave in place a large number of non-competes that tend to harm competitive conditions, including a large number of exploitative and coercive non-competes for which no meaningful consideration was received.

Some commenters suggested the Commission exempt from the final rule non-competes in exchange for which the worker received consideration. One business asked for an exception to the final rule for paid non-competes, asserting that such an exception would allow workers to receive guaranteed payments while accessing information and training and would allow workers to start their own businesses after the non-compete period. Another business recommended allowing non-competes that provide severance equal to a worker's salary for the non-compete period. An employment attorney suggested an exception from the rule for non-competes that are part of a severance agreement or where the

---

[679] *See* Part IV.B.2.b.

[680] *See* Balasubramanian, Starr, & Yamaguchi, *supra* note 74 (finding that 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or non-recruitment agreement, and 74.7% of workers with non-competes are also subject to all three other types of provisions).

worker receives a paid non-compete period or garden leave, which the attorney says do not align with the Commission's concerns about non-competes and represent a balanced trade-off.

The Commission declines to adopt an exception for non-competes in exchange for which the worker received consideration (whether under an existing or future non-compete). The fact that a worker received compensation for a non-compete does not mean the worker received fair compensation, *i.e.,* compensation commensurate with earnings that would be received in a competitive labor market. In addition, such an exception would raise significant administrability concerns. For example, a rule that exempts non-competes exchanged for "substantial consideration" or "meaningful consideration" would not provide sufficient clarity to employers and workers to avoid significant compliance costs and litigation risks. Requiring a brighter-line specific amount (or standard) of compensation would be unlikely to appropriately capture highly fact-specific, varying financial circumstances of workers and firms. Moreover, it would be difficult to prevent employers from suppressing compensation or benefits along other dimensions (*e.g.,* a requirement for severance equal to the worker's salary during the non-compete period as one commenter suggested could lead to the salary being suppressed). The Commission also notes, however, that while it is not adopting a blanket exemption from the final rule for non-competes in exchange for which the worker received consideration, it is satisfying this request to some extent by adopting an exemption for existing non-competes for senior executives, which are the non-competes most likely to have been exchanged for consideration.

Finally, the Commission concludes that allowing existing non-competes for senior executives to remain in effect is appropriate despite the significant negative effects of such non-competes on competition described in Part IV.C.2. The Commission took into consideration that non-competes with senior executives are less likely to be causing ongoing harm to individuals by preventing them from seeking or accepting other work or starting their own business, because such non-competes were likely to have been negotiated or exchanged for consideration. In addition, the negative effects of these non-competes on competitive conditions will subside over time as these non-competes expire.

## 4. Defining Senior Executives

As noted earlier, the Commission did not define the term "senior executive" in the NPRM. Instead, the Commission requested comment on how the term should be defined.[681] In this final rule, the Commission adopts a definition of "senior executive" to isolate the workers who are least likely to have experienced exploitation and coercion and most likely to have bargained for meaningful compensation for their non-compete. Workers for whom exploitation and coercion concerns are likely most relevant and who are unlikely to have bargained for or received meaningful consideration for a non-compete—namely, lower-earning workers, and relatively higher paid or highly skilled workers who lack policy-making authority in an organization—do not fall within this final definition.

This definition is relevant because, as explained in Part IV.C.2, the basis for the Commission's findings that non-competes with senior executives are unfair methods of competition differs in some ways from the evidence and rationales underpinning its findings that non-competes with other workers are unfair methods of competition. Furthermore, as explained in Part IV.C.3, the final rule allows existing non-competes with senior executives to remain in force, while prohibiting employers from enforcing existing non-competes with other workers after the effective date.

The Commission defines "senior executives" based on an earnings test and a job duties test. In general, the term "senior executives" refers to workers earning more than $151,164 [682] who are in a "policy-making position" as defined in the final rule. The Commission adopted this definition after considering the many comments on who senior executives are and how to define them. Notably, the Commission concluded that, unlike highly paid senior executives, highly paid workers other than senior executives and lower-wage workers with senior executive titles as a formal matter likely experience exploitation and coercion and are unlikely to have engaged in bargaining in connection with non-competes, much like lower-wage workers.[683] In other words, the Commission finds that the only group of workers that is likely to have bargained for meaningful compensation in exchange for their non-compete is

senior executives who are both highly paid and, as a functional matter, exercise the highest levels of authority in an organization.[684] The Commission estimates that approximately 0.75% of workers are such senior executives.[685]

### a. Definition of "Senior Executive"

The NPRM requested comment on how to define senior executives while providing sufficient clarity to employers and workers.[686] The NPRM stated that there is no generally accepted legal definition of "senior executive" and that the term is challenging to define given the variety of organizational structures used by employers.[687] The NPRM raised the possibility of looking to existing Securities and Exchange Commission ("SEC") definitions; adopting a definition closely based on a definition in an existing Federal regulation; adopting a new definition; defining the category according to a worker's earnings; using some combination of these approaches; or using a different approach.[688] Commenters proposed a wide variety of definitions, largely focused on two types: an exception based on a worker's job duties or title, and an exception based on a compensation threshold. Upon review of the full record, the Commission determines that a test that combines both of these criteria best captures the subset of workers who are likely to have bargained for meaningful compensation in exchange for their non-compete in a readily administrable manner.

### i. The Need for a Two-Part Test

Many commenters suggested combining a compensation threshold with a job duties test. For example, one business supported excepting workers who met a combination of tests based on a compensation threshold, FLSA exemption status, and access to trade secrets. A law firm suggested the final rule should account for both pay, exempting only low-wage hourly workers, and job duties in determining an exception. One commenter suggested defining "senior executive" based on total compensation, job title, and job duties. Though the Commission does not adopt these specific duties and wage combinations, the Commission agrees that a combined approach is necessary.

The Commission has determined that the definition of "senior executive" should include both a compensation threshold and job duties test, similar to

---

[681] NPRM at 3520.
[682] This threshold is based on the 85th percentile of earnings of full-time salaried workers nationally. *See* Part IV.C.4.b.
[683] *See* Part IV.C.1.

[684] *See id.*
[685] *See* Part X.F.11.
[686] NPRM at 3520.
[687] *Id.*
[688] *Id.*

the DOL regulations that define and delimit the FLSA's exemption for executive employees.[689] The key advantage of a compensation threshold, as one industry organization commenter stated, is that compensation thresholds are objective and easily understood by all stakeholders—yielding significant administrability benefits. However, since not all workers above any given compensation threshold are senior executives, a job duties test is also needed to identify senior executives.

The two-part test isolates the workers most likely to have bargaining power to negotiate meaningful consideration for a non-compete and least likely to experience exploitation and coercion in connection with non-competes. A compensation threshold ensures that stakeholders do not need to spend time assessing the job duties of workers below the threshold—minimizing the amount of detailed analysis stakeholders must undertake. A compensation threshold also helps ensure that workers who work in positions with "senior executive" classifications but likely lack meaningful bargaining power due to their relatively low incomes and who likely did not receive meaningful consideration for a non-compete are excluded from the definition. The job duties test ensures that the definition identifies the individuals most likely to have bespoke, negotiated agreements—those with the highest level of authority over the organization—while also ensuring that high-earning workers who are not senior executives, who likely experience exploitation and coercion from non-competes and do not generally bargain over them, are not captured by the definition.[690]

Clarity from a compensation threshold is essential, as without clarity workers and employers would often be uncertain about a non-compete's enforceability (absent adjudication), and such uncertainty often fosters *in terrorem* effects.[691] For example, an attorney commenter stated that an exception for executive, management, and professional employees and those with access to trade secrets would inherently lack clarity. A lack of clarity could also facilitate evasion by employers, as one law firm commented.

While there may be some workers other than senior executives as defined here who may have bargained for consideration for a non-compete, the benefits to workers and employers of a clear and administrable definition outweigh the risk that some bargained-for non-competes are invalidated. In Part IV, the Commission finds even bargained-for non-competes tend to negatively affect competitive conditions. The Commission finds that the need to avoid an overinclusive exception that increases those harms to competitive conditions outweighs the risk that in rare instances private parties with non-competes other than with senior executives may need to restructure their employment agreements to utilize less restrictive alternatives that burden competition to a lesser degree.

Many commenters sought an exception for senior executives and/or highly paid and highly skilled workers based on justifications such as access to trade secrets or confidential information, rather than compensation thresholds. Some argued that compensation thresholds do not align with or allow individualized assessments of which workers meet a given justification such as access to confidential information. One law firm commented that a bright-line compensation threshold would eliminate non-competes for lower wage workers while allowing non-competes for what the commenter viewed as legitimate business purposes. Some commenters opposed an exception for senior executives because they believed "senior executive" would be too difficult to define. In Part IV.D.2, the Commission explains why it is not adopting an exception for workers based on their access to trade secrets and other intellectual property. Further, in the Commission's view, eliminating the need for individualized assessments for most workers is the primary advantage of a compensation threshold, not a drawback (although the Commission declines to adopt a compensation threshold alone for reasons stated previously and in Part V.D.1). However, the evidence indicates that an exception for existing senior executive non-competes is appropriate, which the Commission defines here.

Commenters, both those supporting and opposing the rule, pointed out several issues with compensation thresholds standing alone. Some commenters were concerned a compensation threshold would exclude some workers, such as many physicians, from the final rule's benefits based on their income level. Two commenters said an exception would penalize the advancement of workers near a threshold and those workers may have to choose between higher wages or being free from a non-compete.

Including the job duties tests alongside the compensation threshold mitigates the risk of such cliff effects, assuming they exist (which is far from clear).

Some commenters asserted a threshold would need to be updated for inflation, while one law firm commented that frequent updates would make the final rule more difficult to understand and implement. Commenters also pointed out the need to explain when the threshold would be measured. While adjusting for inflation could be important to ensure the final rule continues serving its intended function if the compensation threshold governed a total exemption from the rule (as these commenters assume), it is unnecessary to the final rule because the exception adopted applies only to existing non-competes (*i.e.*, it has only one-time application). The Commission explains in Part IV.C.4.b its reasons for declining to adopt a locality adjustment.

ii. The Final Rule's Definition of "Senior Executive"

Based on the considerations described in Part IV.C.4.a.i, the Commission adopts a two-pronged definition of "senior executive" in § 910.1. Under § 910.1, a senior executive is a worker who was in a policy-making position and who received from a person for the employment:

• Total annual compensation of at least $151,164 in the preceding year (under paragraph (2)(i)); or

• Total compensation of at least $151,164 when annualized if the worker was employed during only part of the preceding year (under paragraph (2)(ii)); or

• Total compensation of at least $151,164 when annualized in the preceding year prior to the worker's departure if the worker departed from employment prior to the preceding year and the worker is subject to a non-compete (under paragraph (2)(iii)).

Paragraph (2)(ii) applies to workers who were in a policy-making position during only part of the preceding year, which includes workers who were hired or who left a business entity within the preceding year as well as workers who were promoted to or demoted from a policy-making position in the preceding year. Paragraph (2)(iii) ensures that the exception applies to senior executives who departed from the employer more than one year before the effective date but are still subject to a non-compete (*e.g.*, a worker who left more than a year ago and has a non-compete term of 18 months). To account for those senior executives, paragraph (2)(iii) considers total annual compensation in the year preceding their departure.

---

[689] The FLSA is the Federal statute establishing minimum wage, overtime, recordkeeping, and youth employment standards. *See* 29 U.S.C. 201 *et seq.*

[690] *See* Part IV.C.1.

[691] *See* Part IX.C.

To clarify the definition's compensation threshold, the final rule includes definitions of "total annual compensation" and "preceding year." To clarify the job duties test, the final rule includes definitions of "policy-making position" as well as two additional terms that are in the definition of "policy-making position": "officer" and "policy-making authority." These definitions are described in Parts IV.C.4.b and IV.C.4.c.

b. Defining the Compensation Threshold

Pursuant to § 910.1, the senior executive exception applies only to workers who received total annual compensation of at least $151,164 from a person for employment in a policy-making position in the most relevant preceding year. Section 910.1 further defines "total annual compensation" and "preceding year," respectively. This threshold is based on the 85th percentile of earnings of full-time salaried workers nationally.[692]

The Commission draws this line between more highly paid and less highly paid workers based on its assessment of which workers are more likely to experience exploitation and coercion and less likely to have engaged in bargaining in connection with non-competes and the need to implement a two-part test. As commenters noted, there is no single compensation threshold above which zero workers will have been coerced and exploited and below which zero workers will have been uncompensated for the non-compete that binds them. Based on the Commission's expertise and after careful review of the rulemaking record, including relevant data, the empirical research, and the public comments, the Commission concludes $151,164 in total annual compensation reflects a compensation threshold under which workers are likely to experience such exploitation and coercion and are less likely to have bargained for their non-competes, while providing employers a readily administrable line. With this line, market participants can easily know that workers below the line cannot be subject to non-competes, minimizing both *in terrorem* effects and eliminating the administrative burden of conducting a job duties test for those workers.

The Commission looked to several sources and suggestions from the comments in selecting a threshold. Numerous commenters suggested the Commission should look to the FLSA, and some specifically recommended the FLSA regulations' threshold for highly compensated employees.[693] DOL sets the compensation threshold for highly compensated employees in its overtime regulations under the FLSA based on earnings of full-time salaried workers. Since January 2020, based on a regulation adopted in 2019, that threshold is $107,432 and reflects the 80th percentile of full-time salaried workers nationally using combined 2018 and 2019 data.[694] In September 2023, DOL proposed raising that threshold to the 85th percentile of full-time salaried workers nationally and, *inter alia*, updating the amount to reflect more current earnings data. For 2023, the 85th percentile of full-time salaried workers nationally is $151,164.[695] The Commission recognizes DOL's expertise in determining who qualifies as a highly compensated worker and employers' likely familiarity with DOL regulations. Given this familiarity, the Commission borrows from DOL's definition of compensation to minimize compliance burdens on employers.

Another Federal regulatory threshold for high wage workers noted by commenters also aligns with the 85th percentile of full-time salaried workers nationally in 2023 or approximately $150,000. In the retirement context, the IRS sets a threshold for highly compensated employees at $150,000 for 2023 and $155,000 for 2024.[696] Additionally, the District of Columbia bans non-competes for workers making less than $150,000.[697]

The Commission analyzed occupational wage data to identify a threshold that would capture more highly paid senior executives, who are likely to have bespoke, negotiated non-competes. BLS's most recent wage data indicates that workers in the "chief executive" category have a median wage of $209,810.[698] Thus, most "chief executives," most if not all of whom would meet the duties component of the two-part test in this final rule, earn well above the $151,164 compensation threshold, ensuring that the threshold is likely not underinclusive. The Commission notes that some very high-wage occupations have a median wage above $151,164, including: physicians; surgeons; computer and information systems managers; and dentists.[699] To qualify for the exemptions, these workers would have to also meet the job duties portion of the senior executive test, which is appropriate because the Commission finds that workers in these professions are often subject to coercion and exploitation and rarely have bespoke, negotiated non-competes.

The Commission also considered a lower wage threshold of approximately $100,000, which would be closer in range to the DOL highly compensated employee threshold of $107,432 that DOL adopted in 2019. According to 2022 BLS data, the median wage for "top executives" in the U.S. is $99,240.[700] Workers in the "top executive" category include "chief executives," but also include officials with less authority like "general and operations managers." The latter have an annual median wage of $97,030 with their earnings at the 75th percentile being $154,440.[701] The Commission believes that a significant number of general and operations managers (some of whom may be in a policy-making position) likely do not have bespoke, negotiated non-competes. For example, a vice president of operations of a local retail chain with only a few locations would likely be in this category. The same vice president—unlike the vice president of a multinational

---

[692] BLS, Labor Force Statistics from the Current Population Survey, *https://www.bls.gov/cps///nonhourly-workers.htm* (based on the data from the table "Annual average 2023").

[693] However, at the time of commenting the highly compensated employee threshold was $107,432 and the Department had not proposed a new threshold.

[694] 29 CFR 541.601; *see also* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees, NPRM, 88 FR 62152, 62157 (Sept. 8, 2023) (hereinafter "2023 FLSA NPRM").

[695] *See* Bur. Of Labor Stats., Research Series on Percentiles of Usual Weekly Earnings of Nonhourly Full-Time Workers, at *https://www.bls.gov/cps/research/nonhourly/earnings-nonhourly-workers.htm* (based on the table "Annual average 2023"); 2023 FLSA NPRM at 62153. The DOL proposed a threshold at $143,998, the 85th percentile of full-time salaried workers at the time the 2023 FLSA NPRM was proposed. When the highly compensated employee test was originally created in 2004, its $100,000 threshold exceeded the annual earnings of 93.7% of salaried workers. *Id.* at 62159.

[696] IRS, *Definitions*, (Aug. 29, 2023) (Highly Compensated Employees), *https://www.irs.gov/retirement-plans/plan-participant-employee/definitions*; IRS, *COLA Increases for Dollar Limitations on Benefits and Contributions*, (updated Nov. 7, 2023), *https://www.irs.gov/retirement-plans/cola-increases-for-dollar-limitations-on-benefits-and-contributions*.

[697] DC Code sec. 32–581.02(a)(1) (effective Oct. 1, 2022) (where the employee's compensation is less than $150,000, or less than $250,000 if the employee is a medical specialist, employers may not require or request that the employee sign an agreement or comply with a workplace policy that includes a non-compete).

[698] BLS Occupational Employment and Wage Statistics, *supra* note 49. These data are from the May 2022 National XLS table for Chief Executives under private ownership.

[699] *See id.* These data are from the May 2022 National XLS table for private ownership.

[700] *Id.* These data are from the May 2022 National XLS table for Top Executives under private ownership.

[701] *Id.* These data are from the May 2022 National XLS table for General and Operations Managers under private ownership.

**JA0074**

corporation—is unlikely to possess the same bargaining power or to have a bespoke, negotiated employment agreement. Moreover, to the extent an individual's total compensation is under $151,164, in the unlikely event the individual received consideration for their non-compete, such consideration is unlikely to represent a significant part of their compensation.

Similarly, the Commission believes a $107,432 (or thereabouts) threshold would be overinclusive and individuals who likely do not have bespoke, negotiated non-competes—and who were likely to be exploited and coerced—could meet the threshold test. The $107,432 threshold was adopted based on earnings in 2018 and 2019. Adjusting for inflation, $107,432 in June 2019 is the equivalent of $130,158 in February 2024. Moreover, as noted previously, BLS data reflect that chief executives generally earn significantly more than $130,158. In contrast, occupations with a median wage below $151,164 but above $107,432 include: advertising, marketing, promotions, public relations, purchasing, and sales managers; financial managers; software developers; physician assistants; optometrists; nurse practitioners; and pharmacists.[702] These are occupations that the comment record reflects often experience coercion and exploitation with respect to non-competes and rarely have negotiated or compensated non-competes. A civic organization commenter also argued that the DOL regulations' "highly compensated employee" definition's $107,432 threshold was close to the median wage in some industries and areas and cited several cases that it said demonstrate that adopting this threshold would exclude workers who are vulnerable to exploitation and coercion.

Accordingly, the Commission adopts a threshold of $151,164. This threshold, combined with the duties test, reflects highly compensated individuals who are most likely to have the bespoke, complex non-competes that the Commission elects to leave undisturbed, and who the Commission finds are less likely to experience coercion and exploitation. This threshold also has significant administrability benefits, as it is calculated in accord with definitions used in FLSA compliance, with which employers are generally familiar. This alignment will yield efficiency benefits that reduce compliance burdens on employers.

After careful review, the Commission decided not to choose a threshold higher or lower in part because as the

compensation threshold in the rule increased, fewer small businesses and firms in areas with lower wages and costs of living would have senior executives with non-competes who would qualify for the exception as compared to larger businesses. Similarly, the lower a threshold is, the more workers who live in areas with higher wages and costs of living would fall above the threshold.[703]

The Commission also declines to adopt a locality adjustment. Some commenters said that a uniform national threshold could lead to geographic disparities because of the different cost of living and average incomes in different areas. Geographic disparities are difficult to resolve, as disparities often exist not just between States, but, for example, between urban and rural areas within a State. The Commission considered this factor in selecting the $151,164 threshold compared to other options. Tailoring a compensation threshold to every locality or even State or region would be burdensome and generate significant confusion for workers and employers. The Commission finds that the importance of a uniform threshold to avoid confusion and for administrability outweighs the drawbacks of any geographic disparities, particularly in light of comments from employers stating that the existing patchwork of State laws is burdensome to navigate. The Commission notes that neither DOL nor IRS have adopted thresholds for highly compensated individuals that vary geographically. Given the rise in remote work, applying geographic variation to employers and workers would also prove burdensome. Moreover, total annual compensation under § 910.1 includes traditional bonuses or compensation a senior executive might receive, such as a bonus tied to performance that is paid pursuant to any prior contract, agreement, or promise. The rule also allows for the entire amount of such bonuses to be credited to total annual compensation, thus, increasing the likelihood of capturing highly compensated policy-making individuals across the nation.

The Commission estimates that approximately 92% of workers will fall below this compensation threshold, ensuring that existing non-competes will be unenforceable for the vast majority of workers most likely to experience exploitation and coercion in connection with non-competes.[704] The

Commission also estimates that approximately 0.75% of workers are likely to be considered senior executives.[705] The compensation threshold reflects the Commission's finding that non-competes are very rarely bargained for, and to the extent they are, below $151,164 such bargaining is almost non-existent and consideration for a non-compete, if any, is likely to be relatively small. Pairing the compensation threshold with the duties test will also minimize compliance costs, as employers and the Commission will not need to conduct job duties tests for those workers whose compensation fall below the threshold.

i. Definition of "Total Annual Compensation"

Section 910.1 provides that "total annual compensation" is based on the worker's earnings over the preceding year. It is based on DOL's regulation defining "total annual compensation" for highly compensated employees in 29 CFR 541.601(b)(1) and matches DOL's determination of what types of compensation can count towards total annual compensation for highly compensated employees.

Section 910.1, like DOL's definition, states that total annual compensation may include salary, commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during that 52-week period. Nondiscretionary bonuses and compensation includes compensation paid pursuant to any prior contract, agreement, or promise, including performance bonuses the terms of which the worker knows and can expect.[706] The definition further states that total annual compensation does not include board, lodging and other facilities as defined in 29 CFR 541.606, and does not include payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other similar fringe benefits. Section 541.606 is part of DOL's regulations concerning salary requirements for employees employed in a bona fide executive, administrative, or professional capacity, and applies to

---

[702] *Id.*

[703] *See also* 2023 FLSA NPRM at 62176.
[704] *See* Steven Ruggles, Sarah Flood, Matthew Sobek, Daniel Backman, Annie Chen, Grace Cooper,

Stephanie Richards, Renae Rodgers, & Megan Schouweiler. IPUMS USA: Version 15.0 [dataset]. Minneapolis, MN: IPUMS, 2024. *https://doi.org/10.18128/D010.V15.0* (American Community Survey 2022 data, adjusted to 2023 dollars and excluding government and non-profit workers).
[705] *See* Part X.F.11.
[706] 29 CFR 778.211(c); *see also* U.S. DOL, Fact Sheet #56C: Bonuses under the Fair Labor Standards Act (FLSA) (Dec. 2019), *https://www.dol.gov/agencies/whd/fact-sheets/56c-bonuses*.

JA0075

highly compensated employees.[707] That regulation cross-references DOL's regulations on wage payments under the FLSA in 29 CFR part 531, including the term "other facilities" defined in 29 CFR 531.32.

This regulatory text makes one modification to the DOL approach to correspond to the final rule's purposes and the non-compete context. Based on comments received, the Commission decided not to adopt DOL's base salary requirement for highly compensated employees in its definition of compensation, which serves a different purpose than the definition adopted here. The 2019 DOL regulation requires that a portion of the worker's total annual compensation must be paid on a salary or fee basis in order to qualify as a highly compensated employee, to ensure that the worker receives at least a base salary and to guard against potential abuses.[708] In contrast, the exception in § 910.2(a)(2) applies only to senior executives. The Commission understands that compensation for senior executives can be structured in many different ways. A law firm commented that senior executive compensation can be particularly complex, as base salary may be 20% or less of a senior executive's annual pay, and much of their pay is variable and does not vest until the end of the year. One comment said some CEOs receive only a $1 salary and receive the rest of their compensation in other forms. The definition of total annual compensation in the final rule is designed to allow for different forms of nondiscretionary compensation without requiring employers to pay a particular amount as salary.

### ii. Definition of "Preceding Year"

The definitions of "senior executive" and "total annual compensation" in § 910.1 use the term "preceding year." To provide clarity and facilitate compliance, the Commission defines the term "preceding year" in § 910.1 as a person's choice among the following time periods: the most recent 52-week year, the most recent calendar year, the most recent fiscal year, or the most recent anniversary of hire year. The term "preceding year" is drawn from DOL's FLSA regulations in 29 CFR 541.601(b)(4), which states that "[t]he employer may utilize any 52-week period as the year, such as a calendar year, a fiscal year, or an anniversary of hire year. If the employer does not identify some other year period in advance, the calendar year will apply." Here, the Commission similarly gives employers flexibility to minimize compliance costs, as many employers may have compensation more readily available based on the last calendar year, their fiscal year, or the anniversary of a worker's hire as part of tax and other reporting requirements.

### iii. Other Proposed Compensation Thresholds

In seeking to exempt senior executives and highly paid workers from the rule altogether, commenters suggested several possible wage-related thresholds, including specific dollar thresholds (*e.g.,* $100,000) not tied to any existing metric or standard; whether the worker is an hourly worker; annual compensation at or above some multiple of the Federal poverty level or minimum wage, as in New Hampshire, Maine, and Rhode Island statutes; State average wages or ten times the local median wage; and $330,000, the IRS annual compensation limit for 401(k) retirement contributions.[709]

As explained in Part V.D, the Commission declines to exempt workers from the rule altogether based on their earnings. With respect to defining the workers whose *existing* non-competes the Commission exempts, the Commission also declines to use these thresholds or standards. For the reasons described in this Part IV.C.4.b, the Commission believes the compensation threshold it is adopting—in combination with the job duties test it is adopting—most effectively isolates the workers (namely, senior executives) who are likely to bargain with employers and receive compensation for their non-competes and who are unlikely to be exploited or coerced in connection with non-competes. While thresholds based on State lines or metrics would reflect differences in wages and costs of living among States, they would not reflect differences between, for example, urban and rural areas within a State and could generate confusion where the threshold varies between States, in addition to increasing compliance burdens by requiring employers to assess which State adjustment applies—a particularly challenging task in increasingly cross-border and remote work environments. Using the local median wage would generate too much unpredictability for employers and workers and would face the same administrability and confusion challenges to an even higher degree. In contrast, a uniform national compensation threshold as part of the test provides clarity that reduces the risks of *in terrorem* effects and increases ease of compliance. Finally, the $330,000 threshold is an annual compensation limit, while the IRS has a different test to identify highly compensated employees. A $330,000 threshold would be too high for employers in areas with lower average incomes and costs of living and would likely exclude from the definition many senior executives who bargained for their non-compete in exchange for consideration.

One business recommended an exception for individuals in the top 10% income tier at their respective employers to exempt workers at start-ups that might not be able to compensate their workers at a high level but whose workers may still be exposed to trade secrets. Another proposed using Internal Revenue Code section 414(q), defining highly compensated employee as the highest paid 1% or 250 employees in the corporation. A percentage threshold, however, has significant practical issues including workers entering and exiting, earnings changes, and factoring in independent contractors, workers at subsidiaries, or workers at parent companies. It would also lead to disparities between large and small firms, as large firms could use non-competes for far more workers than could small firms.

Other commenters pointed to State laws setting a compensation threshold to support excluding highly paid workers from the final rule or suggested the Commission look to those States as an example. A public policy organization that supported a categorical ban said any threshold should be at least higher than $100,000, citing research on Washington's non-compete reforms that indicated employers did not value non-competes up to that threshold.[710] The compensation threshold the

---

[707] 29 CFR 541.601(a)(1) ("[A]n employee with total annual compensation of at least $107,432 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee as identified in subparts B, C or D of this part.").

[708] 29 CFR 541.601(b)(1); Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 FR 22122, 22175 (Apr. 23, 2004) ("This change will ensure that highly compensated employees will receive at least the same base salary throughout the year as required for exempt employees under the standard tests, while still allowing highly compensated employees to receive additional income in the form of commissions and nondiscretionary bonuses.").

[709] IRS, *COLA Increases for Dollar Limitations on Benefits and Contributions,* (updated Nov. 7, 2023), *https://www.irs.gov/retirement-plans/cola-increases-for-dollar-limitations-on-benefits-and-contributions;* Treas. Reg. sec. 1.401(a)(17)–1.

[710] Hiraiwa, Lipsitz & Starr, *supra* note 502.

**38418** **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

Commission is adopting is higher than this amount.

c. Defining the Job Duties Component

i. Definitions of "Officer," "Policy-Making Authority," and "Policy-Making Position"

In NPRM, the Commission suggested that the final rule's definition of senior executive could be based on SEC Rule 3b–7.[711] The Commission did not receive comments specifically addressing this option, but the Commission carefully considered arguments for and against job duties or job title distinctions as well as numerous comments on potential job duties tests, alone or in combination with compensation thresholds, before determining that a modified version of SEC Rule 3b–7's job duties requirements would best meet the exception's goals. The duties test adopted by the Commission is precise and more tailored than the other definitions proposed by commenters[712] and minimizes the risk that workers who likely experienced exploitation and coercion are included in the definition of senior executive. The test focuses primarily on job duties, rather than solely on job titles, because businesses do not all use the same job titles, and a job title might not reflect the worker's actual level of authority in an organization, which is a key indicator of whether a worker is likely to face exploitation and coercion or to have bargained in connection with non-competes.

Section 910.1 defines "policy-making position" as a business entity's president, chief executive officer or the equivalent, any other officer of a business entity who has policy-making authority, or any other natural person who has policy-making authority for the business entity similar to an officer with policy-making authority. The definition of "policy-making position" further states that an officer of a subsidiary or affiliate of a business entity that is part of a common enterprise who has policy-making authority for the common enterprise may be deemed to have a policy-making position for the business entity for purposes of this paragraph. Finally, the definition of "policy-making position" states that a natural person who does not have policy-making authority over a common enterprise may not be deemed to have a policy-making position even if the person has policy-making authority over a subsidiary or affiliate of a business

entity that is part of the common enterprise.

Section 910.1 also defines terms used in the definition of "policy-making position." Section 910.1 defines "officer" as a president, vice president, secretary, treasurer or principal financial officer, comptroller or principal accounting officer, and any natural person routinely performing corresponding functions with respect to any business entity whether incorporated or unincorporated. To account for differences in the way business entities may use and define job titles, the definition includes workers in equivalent roles. By incorporating this definition of "officer," "senior executive" applies to workers at the highest levels of a business entity.

This definition is nearly verbatim of the SEC definition of "officer" in 17 CFR 240.3b–2. That term "officer" is used in SEC Rule 3b–7.[713] To maintain consistency with the SEC regulations by ensuring that "officer" has the same meaning, and to utilize the SEC's expertise in this area, the Commission adopts the SEC's definition of "officer."

Section 910.1 defines "policy-making authority" as final authority to make policy decisions that control significant aspects of a business entity or a common enterprise. The definition further states that policy-making authority does not include authority limited to advising or exerting influence over such policy decisions or having final authority to make policy decisions for only a subsidiary of or affiliate of a common enterprise.

Accordingly, for a worker to be a senior executive, in addition to meeting the compensation threshold, the worker must be at the level of a president, chief executive officer or the equivalent, officer (defined in § 910.1), or in a position that has similar authority to a president or officer. Further, an officer or other qualifying person must have policy-making authority. Presidents, chief executive officers, and their equivalents are presumed to be senior

executives (i.e., employers do not need to consider the further element of "policy-making authority"). The term "chief executive officer or the equivalent" was added to the definition of "policy-making position" to increase clarity on who was included and to reflect the wider range of businesses with various structures that are subject to the final rule (as compared to SEC Rule 3b–7). The definition of "policy-making position" includes workers with equivalent authority because job titles and specific duties may vary between companies. This ensures that the term "senior executive" is broad enough to cover more than just a president or chief executive officer, especially for larger companies, as others may have final policy-making authority over significant aspects of a business entity.

For example, many executives in what is often called the "C-suite" will likely be senior executives if they are making decisions that have a significant impact on the business, such as important policies that affect most or all of the business. Partners in a business, such as physician partners of an independent physician practice, would also generally qualify as senior executives under the duties prong, assuming the partners have authority to make policy decisions about the business. The Commission notes that such partners would also likely fall under the sale of business exception in § 910.3 if the partner leaves the practice and sells their shares of the practice. In contrast, a physician who works within a hospital system but does not have policymaking authority over the organization as a whole would not qualify.

The Commission changed some aspects of SEC Rule 3b–7 to fit the context of this rulemaking. First, because § 910.2(a)(2) will extend to non-public companies, unlike SEC regulations, the final rule's definition of "policy-making position" does not include the phrase "any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance)" in the definition of "executive officer."[714] The Commission believes that in the context of this final rule, in which the definition is relevant to a broader array of entities than public companies, that phrase would encompass workers who, despite their titles, are among those who are likely to be coerced or exploited by non-competes. For example, this aspect of the definition can be too easily applied to managers of small departments, who the Commission finds

---

[711] 17 CFR 240.3b–7; NPRM at 3520.

[712] See Part IV.C.4.c.ii.

[713] 17 CFR 240.3b–7 ("The term executive officer, when used with reference to a registrant, means its president, any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance), any other officer who performs a policy making function or any other person who performs similar policy making functions for the registrant. Executive officers of subsidiaries may be deemed executive officers of the registrant if they perform such policy making functions for the registrant."); 17 CFR 240.3b–2 ("The term officer means a president, vice president, secretary, treasury or principal financial officer, comptroller or principal accounting officer, and any person routinely performing corresponding functions with respect to any organization whether incorporated or unincorporated.").

[714] 17 CFR 240.3b–7.

are unlikely to have bargained for their non-competes. At the same time, a manager who does in fact have policy-making authority would meet the definition of "officer" in § 910.1 and thus be included in the definition of senior executives (if the manager also meets the compensation threshold). Similarly, depending on the organization, a vice president may have final policy-making authority over significant aspects of a business entity. The adapted definition is based on functional job duties rather than formal job titles.

Second, SEC Rule 3b–7 uses the term "policy making function" as part of its definition of the types of job duties that could classify a person as an "executive officer." [715] While the term "policy making function" is undefined in SEC Rule 3b–7 and other SEC regulations, the Commission believes that defining the term "policy-making authority" in § 910.1 would provide greater clarity and facilitate compliance with the final rule. The final rule applies to a wider range of business entities than SEC rules, and the Commission seeks to minimize the need to consult with counsel about the meaning of this term. The Commission is also concerned that if the term is left undefined, employers could, inadvertently or otherwise, label too many workers who have any involvement in the employer's policy making as senior executives, especially workers without bargaining power.

In defining this term, the Commission seeks to broadly align with the SEC's definition of "executive officer" while focusing on senior executives in a wider variety of entities, who are less likely to experience exploitation and coercion. As explained in Part IV.C.4.b with respect to the compensation threshold, there is no job duties test that will exclude every worker who experiences exploitation and coercion with respect to non-competes while including every worker who does not. Building on the SEC definition provides firms and workers with a more administrable definition that isolates workers at the most senior level of an organization.

To ensure that the final rule's job duties test for senior executives broadly aligns with the SEC definition, the Commission looked to case law interpreting that SEC definition. Few courts have interpreted SEC Rule 3b–7's "policy making function" language, though some courts view it as an officer test. [716] In the most in-depth discussion,

the U.S. District Court for DC considered a defendant who was a member of a corporate body that discussed important policy decisions and made recommendations to the CEO, and supervised and had "substantial influence" over a major aspect of the company's business. However, the court held that only the CEO, and not the defendant, had authority to make company policy and ultimate decisions on significant issues. [717] The court conducted a fact-intensive analysis of the defendant's duties and held that the defendant did not have the authority to make policy. The court also held that the term did not include individuals solely "involved in discussing company strategy and policy." [718]

The Commission finds this case law instructive and thus defines "policy-making authority" in the final rule as "final authority to make policy decisions that control significant aspects of a business entity and does not include authority limited to advising or exerting influence over such policy decisions." Adding this definition provides stakeholders with additional clarity as to what type of authority meets the definition of "senior executive" and prevents overbroad application of the definition. It expressly does not include workers who merely advise on or influence policy, as a wide range of workers in an organization can advise on or influence policy without being a senior executive.

In order to ensure that lower-level workers, whom the Commission finds likely experience exploitation and coercion, are not included in the definition of senior executive, policy-making authority is assessed based on the business as a whole, not a particular office, department, or other sublevel. It considers the authority a worker has to make policy decisions that control a significant aspect of a business entity without needing a higher-level worker's approval. For example, if the head of a marketing division in a manufacturing firm only makes policy decisions for the marketing division, and those decisions do not control significant aspects of the

business (which would likely be decisions that impact the business outside the marketing division), that worker would not be considered a senior executive. Similarly, in the medical context, neither the head of a hospital's surgery practice nor a physician who runs an internal medical practice that is part of a hospital system would be senior executives, assuming they are decision-makers only for their particular division. The definition is limited to the workers with sufficient pay and authority such that they are more likely to have meaningful bargaining power and actually negotiated their non-competes.

For the same reason, the Commission added language to the definitions of "policy-making authority" and "policy-making position" to exclude from the definition of "senior executives" workers with policy-making authority over only a subsidiary or affiliate of a common enterprise who do not have policy-making authority over the common enterprise. One commenter argued that the proposed definition of "business entity" would allow firms to divide themselves into separate entities to evade the final rule. In addition to sharing this concern, the Commission is concerned that executives of subsidiaries or affiliates of a common enterprise [719] could rely on their final authority to make policy decisions for only that subsidiary or affiliate to classify the head of each office as a senior executive even though that individual only has authority over one component of a coordinated common enterprise. Rather, the worker must have policy-making authority with respect to the common enterprise as a whole, not just a segment of it, to be a senior executive. Workers who head a subsidiary or affiliate of a common enterprise are similar to department heads; the senior executives controlling the entire common enterprise control those individual subsidiaries and affiliates. As the Commission has explained, the Commission finds that department heads and other highly paid non-senior executives do not have sufficient bargaining power to avoid exploitation and coercion and are unlikely to have bargained in connection with non-competes. The job duties test identifies the workers with the highest levels of authority in an organization, *i.e.*, the workers most likely to have bargaining power and a bespoke, negotiated agreement, and a

---

[715] *Id.*

[716] *See, e.g., SEC* v. *Enters. Solutions,* 142 F. Supp. 2d 561, 570, 574 (S.D.N.Y. 2001) (finding that a so-called consultant's role was "sufficiently

similar to the duties of an officer or director of the company that his involvement, along with his history of criminal and regulatory violations, ought to have been disclosed" where the consultant controlled the company, including hiring the CEO, arranging loans from companies controlled by the consultant, negotiating acquisitions, and putting his daughter on the board in his place); *In re Weeks,* SEC Release No. 8313 at *9 (Oct. 23, 2003) (finding a consultant was *de facto* in charge of the company while the officers and directors were figureheads who lacked authority and influence over the company).

[717] *SEC* v. *Prince,* 942 F. Supp. 2d 108, 133–36 (D.D.C. 2013).

[718] *Id.* at 136.

[719] *FTC* v. *WV Universal Mgmt., LLC,* 877 F.3d 1234, 1240 (11th Cir. 2017) ("[C]ourts have justly imposed joint and several liability where a common enterprise exists").

common enterprise is effectively a single organization. Such workers may have a senior executive job title, but they are unlikely to meet the job duties test.

To be considered a "common enterprise" for the purposes of defining policy-making authority and policy-making position, the Commission looks beyond legal corporate entities to whether there is a common enterprise of "integrated business entities." [720] This means that the various components of the common enterprise have, for example, one or more of the following characteristics: maintain officers, directors, and workers in common; operate under common control; share offices; commingle funds; and share advertising and marketing.[721] Therefore, the definitions of policy-making authority and policy-making position include provisions whose purpose is to exclude those executives of a subsidiary or affiliate of a common enterprise from being considered senior executives. For example, if a business operates in several States and its operations in each State are organized as their own corporation, assuming these businesses and the parent company meet the criteria for a common enterprise, the head of each State corporation would not be a senior executive. Rather, only the senior executives of the parent company (or whichever company is making policy decisions for the common enterprise) could qualify as senior executives for purposes of this final rule, because they are the workers with the highest level of authority in the organization and most likely to have bargaining power and a bespoke, negotiated agreement. However, a worker could qualify as a senior executive even if they were an executive of one or more subsidiaries or affiliates of the common enterprise, so long as that senior executive exercised policy-making authority over the common enterprise in its entirety. These provisions are consistent with the approach taken elsewhere in this final rule to focus on real-world implications and authority rather than formal titles, labels, or designations. This exclusion from the definitions of "policy-making authority" and "policy-making position" applies only to common enterprises; for subsidiaries or affiliates that are not part of a common enterprise, a worker could qualify as a senior executive if they have policy-making authority over that subsidiary or affiliate and meet all of the requirements.

The Commission has also substituted "business entity" in the definitions of "officer" and "policy-making position" where SEC Rule 3b–7 uses the word "registrant" and 17 CFR 240.3b–2 uses "organization," because "registrant" has a specific meaning in the SEC context that is inapplicable to the wider array of business entities covered by this final rule and because "business entity" is defined in § 910.1 and is used throughout this final rule. The Commission substituted "natural person" where SEC Rule 3b–7 and 17 CFR 240.3b–2 use "person" because "person" is separately defined for purposes of this final rule in § 910.1.

ii. Other Proposed Job Duties Tests

The FLSA

Numerous commenters suggested basing a job duties test on the categories of occupations that are exempt from requirements under the FLSA. Some commenters suggested using only some of the exemptions such as executive employees,[722] administrative employees, learned or creative professionals, or workers in the practice of medicine.[723] DOL's regulations also set a salary threshold at not less than $684 per week ($35,568 annually),[724] though other commenters suggested using a higher compensation threshold.

One civic organization opposed applying any FLSA exemptions, stating that the FLSA provides numerous exemptions that do not relate to any non-compete policy considerations, and an exception or more lenient standards for FLSA-exempt workers would not solve the problems caused by non-competes. It opposed using the FLSA's executive, administrative, or professional exemptions, arguing that updates to the FLSA's salary threshold are often delayed and outdated, often falling below the poverty threshold, and the duties test serves as a loophole for wage and hour protections.

Commenters offered several reasons for adopting the FLSA exemptions: these categories are already well-established in Federal law; nonexempt workers under the FLSA tend not to have access to trade secrets or be able to take an employer's goodwill and are thus less likely to harm the employer; the exemptions would capture both wage and job duties tests; some States use a similar standard to the FLSA in their non-compete statutes; and the exemptions would ban non-competes for low-skilled workers for whom there are insufficient justifications for non-competes. An employment attorney also pushed back on the NPRM's concerns that the FLSA exemptions could enable misclassification,[725] asserting that misclassification under the FLSA is unlawful and penalized, and thus usually inadvertent.

The Commission does not adopt the FLSA exemptions for purposes of this final rule because it would exempt millions of non-competes that harm competition and workers. For example, the FLSA exempts most highly paid and highly skilled workers,[726] who the Commission finds experience exploitation and coercion (except where those workers are also senior executives).[727] The Commission also adopts brighter-line rules than the FLSA to ease compliance burdens and address *in terrorem* effects that result from uncertainty about whether a non-compete is unenforceable.[728] Although the Commission does not believe that the FLSA job duties tests are appropriate for this final rule, it does view the FLSA wage threshold methodology for "highly compensated employees" as a useful benchmark.[729]

Trade Secret and Confidential Information Exceptions

Numerous commenters urged the Commission not to ban non-competes for workers who have access to trade secrets and confidential information, often noting this justification is commonly used for highly paid and highly skilled workers, including senior executives. One comment expressly stated that this exception should apply regardless of earnings, though many

---

[720] See *FTC* v. *E.M.A. Nationwide, Inc.*, 767 F.3d 611, 636–37 (6th Cir. 2014).

[721] See *id.* ("'If the structure, organization, and pattern of a business venture reveal a 'common enterprise' or a 'maze' of integrated business entities, the FTC Act disregards corporateness. Courts generally find that a common enterprise exists 'if, for example, businesses (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing.'") (quoting *FTC* v. *Wash. Data. Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012)). In assessing a common enterprise, "no one factor is controlling," and "federal courts routinely consider a variety of factors." *FTC* v. *Wyndham Worldwide Corp.*, No. CIV.A. 13–1887 ES, 2014 WL 2812049, at *7 (D.N.J. Jun. 23, 2014); *see also Del. Watch Co.* v. *FTC*, 332 F.2d 745, 746 (2d Cir. 1964) ("[T]he pattern and frame-work of the whole enterprise must be taken into consideration.")

[722] See 29 CFR 541.100(a).

[723] See DOL, Fact Sheet #17A: Exemption for Executive, Administrative, Professional, Computer & Outside Sales Employees Under the Fair Labor Standards Act (FLSA) (revised Sept. 2019), *https://www.dol.gov/agencies/whd/fact-sheets/17a-overtime.*

[724] *Id.*

[725] See NPRM at 3511.

[726] See 2023 FLSA NPRM at 62190 (estimating that 36.4 million salaried, white-collar employees currently qualify as FLSA-exempt executive, administrative, or professional employees).

[727] See Part IV.C.1.

[728] See Part IX.C.

[729] See Part IV.C.4.b.

others did not mention compensation thresholds. One business suggested a bright-line rule for the types of confidential business information that can be protected by a non-compete based on existing State statutes, to increase certainty about what is allowed. Commenters suggested exceptions based on a variety of job types they viewed as more likely to be exposed to trade secrets and confidential information, including all highly skilled workers; key scientific, technical, R&D, or sales workers; or workers with highly detailed knowledge of business and marketing plans. The Commission explains why it is not adopting exceptions based on access to trade secrets or other intellectual property in Parts V.D.1 and V.D.2.

*Additional Proposed Job Duties and Job Title Tests*

The Commission carefully considered several other proposed tests. The NPRM stated that the Commission could base the definition of senior executive on SEC Regulation S–K's definition of senior executives.[730] Commenters did not discuss this potential option. The Commission is not adopting this approach because it bears little relation to the likelihood that a senior executive bargained for a non-compete, and because it would designate roughly seven individuals per company as "senior executives" regardless of their compensation level or the size of the company, meaning it would not apply equally among employers or workers.[731] For example, a ten-person company could potentially use non-competes for most of its workforce irrespective of whether they are senior executives, whereas a company with ten thousand employees would be limited to the same number.[732]

One commenter proposed adopting a definition similar to the tax code provision on "golden parachute payments."[733] Several commenters drafted their own definition of senior executive based on job duties, titles, or ownership status, such as C-suite

executives and their immediate subordinates, partners and equity holders, managers, workers involved in strategic decision-making, and more.

The Commission carefully considered each proposed definition and how it would operate in practice before selecting the two-part test. Elements of some of these proposals, such as strategy development or decision-making, are also similar to the job duties test the Commission is finalizing. The Commission believes that definitions based on job titles alone would be inadequate because, as one industry association commented, employers define job titles differently, and a title might not accurately reflect a worker's job duties. The other definitions proposed by commenters, such as the provision on golden parachute payments, would generally require a more fact-intensive analysis than the job duties test the Commission is adopting. Market participants would need to conduct the analysis for more workers, including workers who are exploited and coerced by non-competes. A more fact-intensive analysis would require more resources for litigation and is thus likely to have *in terrorem* effects for lower-wage workers.[734] Moreover, many of these proposals would exempt more workers than the Commission's definition, such as managers, even though workers in such roles and occupations are often coerced and exploited by non-competes.

As explained in this Part, the Commission pairs a relatively easy-to-apply job duties test with a compensation threshold to maximize administrability and clarity while identifying those senior executives most likely to have bargained for non-competes. In addition, proposals to except partners, shareholders, and similar groups are likely covered by the sale of business exception if they sell their share of the business upon leaving.

5. Prohibitions in Section 910.2(a)(2)

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission adopts § 910.2(a)(2), which defines unfair methods of competition related to non-competes with respect to senior executives. Section 910.2(a)(2) provides that, with respect to a senior executive, it is an unfair method of competition for a person: (i) to enter into or attempt to enter into a non-compete clause; (ii) to enforce or attempt to enforce a non-compete clause

entered into after the effective date; or (iii) to represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date. Part IV.A.1 sets forth the Commission's determination that the foregoing practices are unfair methods of competition under section 5, and Part IV.C.2 explains the findings that provide the basis for this determination.

Section 910.2(a)(2) uses similar language as § 910.2(a)(1); however, there are two key differences. First, the prohibition in § 910.2(a)(2)(ii) on enforcing or attempting to enforce a non-compete applies only to non-competes entered into after the effective date. Second, the prohibition in § 910.2(a)(2)(iii) on representing that a senior executive is subject to a non-compete applies only where the non-compete was entered into after the effective date. Sections 910.2(a)(2)(ii) and (iii) include this language because, for the reasons described in Part IV.C.3, the Commission has determined not to prohibit existing non-competes with senior executives—*i.e.,* non-competes entered into before the effective date—from remaining in effect.

Otherwise, the explanation of the three prongs of § 910.2(a)(1) in Part IV.B.4—relating to issues such as, for example, what "attempt to enter into" and "attempt to enforce" mean, and what conduct the "representation" prong applies to—is applicable to the corresponding language in § 910.2(a)(2). The good-faith exception in § 910.3 is also applicable to the relevant prohibitions with respect to senior executives and is explained in Part V.C.

*D. Claimed Justifications for Non-Competes Do Not Alter the Commission's Finding That Non-Competes Are an Unfair Method of Competition*

For the reasons described in Parts IV.B and IV.C, the Commission determines that certain practices related to non-competes are unfair methods of competition under section 5. In this Part IV.D, the Commission finds the claimed justifications for non-competes do not alter the Commission's determination that non-competes are an unfair method of competition.

As noted in Part II.F, some courts have declined to consider justifications altogether and the Commission and courts have consistently held that pecuniary benefit to the party responsible for the conduct in question

---

[730] *See* NPRM at 3520 (citing 17 CFR 229.402(a)(3)).

[731] *See* 17 CFR 229.402(a)(3).

[732] Additionally, while the reporting obligations of public companies may provide them with an incentive to avoid generating a profusion of "senior executives," privately held companies would not face a similar constraint and could potentially avoid any "per-company" limitations through corporate restructuring.

[733] This provision determines who is an "officer" "on the basis of all the facts and circumstances in the particular case (such as the source of the individual's authority, the term for which the individual is elected or appointed, and the nature and extent of the individual's duties) . . . ." Treas. Reg. sec. 1.280G–1, Q/A–18.

[734] *See* Part IX.C.

is not cognizable as a justification.[735] However, where defendants raise justifications as an affirmative defense, they must be legally cognizable,[736] and non-pretextual,[737] and any restriction used to bring about the benefit must be narrowly tailored to limit any adverse impact on competitive conditions.[738]

In the NPRM, the Commission considered the commonly cited business justifications for non-competes and preliminarily found they did not alter the Commission's determination that non-competes are an unfair method of competition.[739] The Commission has reviewed and considered the comments on its analysis of the justifications for non-competes. For two reasons, the claimed justifications for non-competes do not alter the Commission's determination that non-competes are an unfair method of competition. First, employers have more narrowly tailored alternatives to non-competes for protecting valuable investments that tend to negatively affect competitive conditions to a lesser degree. Second, the asserted benefits from the claimed business justifications from non-competes do not justify the considerable harm from non-competes.

1. Claimed Business Justifications for Non-Competes and Empirical Evidence

Claimed business justifications for non-competes relate to increasing

employers' incentives to make productive investments, such as investments in worker human capital (worker training), client and customer attraction and retention, or in creating or sharing trade secrets or other confidential information with workers. According to these asserted justifications, without non-competes, employment relationships are subject to an investment hold-up problem. Investment hold-up would occur where an employer—faced with the possibility that a worker may depart after receiving some sort of valuable investment or obtaining valuable information—opts not to make that investment in the first place, thereby decreasing the firm's productivity and overall social welfare. For example, according to this claimed justification, an employer may be more reticent to make capital investments or invest in workers' human capital by training its workers if it knows the worker may depart for or may establish a competing firm. Similarly, commenters argued that employers may decrease investments or experience harm if a worker takes a trade secret or other confidential information to a competitor.

Courts have cited these justifications when upholding non-competes under State common law and in cases challenging non-competes under the Sherman Act.[740] However, courts have not considered non-competes' aggregate harms, and neither legislatures nor courts have had occasion to consider these justifications in the context of section 5. The Commission has considered them and found them unavailing in cases in which it has successfully obtained consent decrees against non-competes alleged to be an unfair method of competition in violation of section 5.[741]

There is some empirical evidence that non-competes increase investment in human capital of workers, capital investment, and R&D investment. However, the Commission also finds that there are alternatives that burden

competition to a lesser degree,[742] and, in any event, these claimed benefits do not justify the harms from non-competes.[743]

As explained in the NPRM, a study by Evan Starr finds that moving from mean non-compete enforceability to no non-compete enforceability would decrease the number of workers receiving training by 14.7% in occupations that use non-competes at a high rate (relative to a control group of occupations that use non-competes at a low rate).[744] The study further finds that changes in training are primarily due to changes in firm-sponsored, rather than employee-sponsored, training.[745]

Firm-sponsored training is the type of investment in human capital that non-competes are often theorized to protect, as the firm may be unwilling to make an unprotected investment. However, the study does not distinguish between core training, *i.e.,* training required to perform job duties, and advanced training, *i.e.,* training with potential to increase productivity beyond the baseline requirements for job performance. When non-competes are more enforceable, workers may receive additional core training rather than advanced training, but this may actually reflect a reduction in efficiency. When non-competes are more enforceable, labor mobility decreases and workers may also move to new industries to avoid potentially triggering non-compete clause violations (as discussed in Part IV.B.2.b.ii), both of which make experienced workers less often available for hire. Firms therefore may need to train workers at a greater rate because they will hire inexperienced workers who require more core training. On the other hand, advanced training can be associated with productivity gains, and firms using non-competes may increase rates of advanced training for experienced workers because non-competes increase the likelihood that firms receive a return on the training investment. The study does not distinguish between these types of training, and thus leaves unclear whether the observed increases in training reflect productivity gains or losses (or neither in net).

Additionally, the Starr study uses data on the use of non-competes, comparing high- and low-use occupations, rather than changes in enforceability; however, the study does not examine differences between individuals who are bound by non-

[735] *Atl. Refin. Co.,* 381 U.S. at 371 (considering that defendant's distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); *FTC* v. *Texaco,* 393 U.S. 223, 230 (1968) (following the same reasoning as *Atlantic Refining* and finding that the "anticompetitive tendencies of such system [were] clear"); *L.G. Balfour Co.* v. *FTC,* 442 F.2d 1, 15 (7th Cir. 1971) ("While it is relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice."). For provisions of the antitrust laws where courts have not accepted justifications as part of the legal analysis, the Commission will similarly not accept justifications when these claims are pursued through section 5.

[736] See, e.g., *FTC* v. *Ind. Fed'n of Dentists,* 476 U.S. 447, 463 (1986); *Fashion Originators' Guild of Am.* v. *FTC,* 312 U.S. 457, 467–68 (1941); *FTC* v. *Superior Ct. Trial Lawyers Ass'n,* 493 U.S. 411, 423–24 (1990).

[737] See, e.g., *Ind. Fed'n of Dentists,* 476 U.S. at 464. *See also United States* v. *Microsoft Corp.,* 253 F.3d 35, 62–64, 74 (D.C. Cir. 2001); *Eastman Kodak Co.* v. *Image Tech. Svcs.,* 504 U.S. 451, 484–85 (1992); *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.,* 472 U.S. 585, 608–10 (1985).

[738] *NCAA* v. *Alston,* 594 U.S. 69, 99–104 (2021); *Polygram Holding, Inc.* v. *FTC,* 416 F.3d 29, 38 (D.C. Cir. 2005); 2000 Collaboration Guidelines, sec. 3.36b. *See also Union Circulation Co.* v. *FTC,* 241 F.2d 652, 658 (2d Cir. 1957) ("The agreements here went beyond what was necessary to curtail and eliminate fraudulent practices.").

[739] NPRM at 3504–08.

[740] See, e.g., *United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271, 281 (6th Cir. 1898); *Polk Bros., Inc.* v. *Forest City Enters.,* 776 F.2d 185, 189 (7th Cir. 1985).

[741] See FTC, *In the Matter of O–I Glass, Inc and In the Matter of Ardagh Group S.A., Ardagh Glass Inc., and Ardagh Glass Packaging Inc.,* Analysis of Agreements Containing Consent Order to Aid Public Comment, FTC File No. 2110182 (Jan. 4, 2023) at 6–7; FTC, *In the Matter of Prudential Security, Inc., et al.,* Analysis of Agreement Containing Consent Order to Aid Public Comment, FTC File No. 2210026 (Jan. 4, 2023) at 7; FTC, *In the Matter of Anchor Glass Container Corp. et al.,* FTC File No. 2210182 Analysis of Agreement Containing Consent Order to Aid Public Comment (Mar. 15, 2023) at 6.

[742] *See* Part IV.D.2.

[743] *See* Part IV.D.3.

[744] Starr, *supra* note 445 at 796–97.

[745] *Id.* at 797.

**JA0081**

competes and individuals who are not. This study is the only study that attempts to identify the causal link between non-competes and worker human capital investment, and the Commission gives it some weight, though not as much weight as it would receive if it examined changes in non-compete enforceability. The Commission also weights it less highly because it does not distinguish between core and advanced training.

The second study, by Jessica Jeffers, finds knowledge-intensive firms invest substantially less in capital equipment following decreases in the enforceability of non-competes, though the effect is much more muted (and statistically insignificant) when considering all industries.[746] While firms may invest in capital equipment for many different reasons, Jeffers examines this outcome (as opposed to labor-focused outcomes) to avoid looking at R&D expenditure as a whole, which is in large part composed of labor expenses. This allows the study to isolate the effects of non-compete enforceability on investment from other effects of non-competes, such as reduced worker earnings.

Jeffers finds that there are likely two mechanisms driving these effects: first, that firms may be more likely to invest in capital when they train their workers because worker training and capital expenditure are complementary (i.e., the return on investment in capital equipment is greater when workers are more highly trained); and second, that non-competes reduce competition, and firms' returns to capital expenditure are greater when competition is lower, incentivizing firms to invest more in capital.[747] Jeffers does not find any impact of non-compete enforceability on R&D expenditure (intangible investment). The sample in this study's examination of capital investment is limited to incumbent firms, and the study also finds decreases in new firm entry due to increases in non-compete enforceability. The study therefore does not offer clear insights into the overall net effect on capital investment (which includes investment by incumbent firms as well as investment by entering firms). Additionally, the Commission notes that if Jeffers' hypothesis—that firms increase investment in capital because of decreased competition—is correct, then this increased capital investment

may not necessarily reflect increased economic efficiency. Jeffers uses multiple changes in non-compete enforceability, measured in a binary fashion, and the Commission therefore gives this study substantial weight, but less weight than studies which additionally measure enforceability in a non-binary fashion.

Two studies published after the release of the NPRM also assess the effects of non-competes on firm investments. A study by Johnson, Lipsitz, and Pei revisits the form of the regressions used by Jeffers. The authors find that greater non-compete enforceability increases R&D expenditure.[748] This is consistent with the NPRM's preliminary finding, and the finding of the Jeffers study, that there is evidence that non-competes increase employee human capital investment and other forms of investment. The Commission gives this study substantial weight because it examines multiple changes in non-compete enforceability measured in a non-binary fashion.

Similarly, a study by Liyan Shi examines the relationship between non-compete enforceability, the use of non-competes among executives, and firm investment.[749] Shi finds that intangible capital (expenditure on R&D) is positively associated with use of non-competes, especially in States that enforce non-competes more strictly. However, Shi finds that—unlike in the Jeffers study—physical capital expenditure has no relationship with the use of non-competes, even in high enforceability States. The Commission notes that this evidence pertains specifically to non-competes with highly paid senior executives: the executives in Shi's study earned $770,000 in cash compensation, on average. The Commission also notes that this evidence arises from analysis of non-compete use coupled with non-compete enforceability. The Commission therefore gives less weight to these empirical findings.

As the NPRM described, there are also two studies examining the impact of non-compete use (as opposed to non-compete enforceability) on investment. However, these studies simply compare differences between samples of workers that do and do not use non-competes, a methodology the Commission gives less weight to.[750] The first is a study by Starr, Prescott, and Bishara using their 2014 survey of non-compete use. They find no statistically significant

association with either training or the sharing of trade secrets (after inclusion of control variables) but do not examine other investment outcomes.[751] The second study, by Johnson and Lipsitz, examines investment in the hair salon industry. That study finds that firms that use non-competes train their employees at a higher rate and invest in customer attraction through the use of digital coupons (on so-called "deal sites") to attract customers at a higher rate, both by 11 percentage points.[752]

As the Commission stated in the NPRM, it gives these two studies (the 2021 Starr, Prescott, and Bishara studies and the 2021 Johnson and Lipsitz studies) minimal weight, because they do not necessarily represent causal relationships, a point recognized by the authors of both of these studies.[753] Similar to other studies of non-compete use—as opposed to changes in non-compete enforceability—these studies are less reliable because the use of non-competes and the decision to invest may be jointly determined by other characteristics of the firms, labor markets, or product markets.[754]

One additional study, by Younge and Marx, finds that the value of publicly traded firms increased by 9% due to an increase in non-compete enforceability.[755] As the Commission noted in the NPRM, the authors attribute this increase to the value of retaining employees, which comes with the negative effects to parties other than the firm (employees, competitors, and consumers) described in Parts IV.B and IV.C. As the NPRM stated, if the benefits to the firm arise primarily from reductions in labor costs, then the increase in the value of firms is in part a transfer from workers to firms and is therefore not necessarily a benefit of non-competes. However, the authors do not explore the extent to which increases in firm value arise from decreases in labor costs. The authors additionally note that since the time frame used in the study is short, "there may be deleterious effects of non-competes in the long run" which are absent in their findings.[756] This study

[746] Jeffers, supra note 450 at 28. Jeffers reports 34%–39% increases in capital investment due to increases in non-compete enforceability at knowledge-intensive firms in the 2024 version of the study, and the Commission calculates increases of 7.9% across all sectors (see Part X.F.9.a.i).

[747] Id. at 29.

[748] Johnson, Lipsitz, and Pei, supra note 526.

[749] Shi, supra note 84.

[750] See Part IV.A.2.

[751] Starr, Prescott, & Bishara, supra note 68 at 76.

[752] Johnson & Lipsitz, supra note 80 at 711.

[753] Starr, Prescott, & Bishara, supra note 68 at 73; Johnson & Lipsitz, supra note 80 at 711.

[754] See Part IV.A.2 (describing the analytical framework the Commission is applying to weigh the empirical studies, including why it assigns greater weight to studies assessing changes in non-compete enforceability than to studies of non-compete use).

[755] Kenneth A. Younge & Matt Marx, The Value of Employee Retention: Evidence from a Natural Experiment, 25 J. Econ. & Mgmt. Strategy 652 (2016).

[756] Id. at 674.

does not address the effects of non-competes on firm investments specifically.

As the Commission stated in the NPRM, it is unaware of any evidence of a relationship between the enforceability of non-competes and the rate at which companies invest in creating or sharing trade secrets.[757] Similarly, the Commission is unaware of any evidence non-competes reduce trade secret misappropriation or the loss of other types of confidential information, difficult areas for researchers to study given the lack of reliable data on firms' trade secrets and confidential information.[758] As explained in Part IV.D.2, even assuming non-competes do reduce misappropriation or information loss, the Commission finds that there are alternatives to protect these investments that burden competition to a lesser degree.

2. Employers Have Alternatives to Non-Competes for Protecting Valuable Investments

a. The Proposed Rule

In the NPRM, the Commission preliminarily found that employers have alternatives to non-competes for protecting valuable investments.[759] The Commission stated that these alternatives may not be as protective as employers would like, but they reasonably accomplish the same purposes as non-competes while burdening competition to a less significant degree.[760] The Commission stated that trade secret law—a form of intellectual property law that protects confidential business information—already provides significant legal protections for an employer's trade secrets.[761] The Commission also stated that employers that seek to protect valuable investments are able to enter into NDAs with their workers. NDAs, which are also commonly known as confidentiality agreements, are contracts in which a party agrees not to disclose

or use information designated as confidential.[762] The Commission further stated that, if an employer wants to prevent a worker from leaving right after receiving valuable investment in their human capital, the employer can sign the worker to an employment contract with a fixed duration.[763] In addition, the Commission stated that employers that wish to retain their workers can also pay their workers more, offer them better hours or better working conditions, or otherwise improve the conditions of their employment—*i.e.,* compete to retain their labor services.[764]

The Commission also noted that in three States—California, North Dakota, and Oklahoma—employers generally cannot enforce non-competes, so they must protect their investments using one or more of these less restrictive alternatives.[765] The Commission stated that the economic success in these three States of industries that are highly dependent on trade secrets and other confidential information illustrates that companies have viable alternatives to non-competes for protecting valuable investments.[766]

b. The Commission's Final Findings

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission in this final rule finds that the asserted business justifications for non-competes do not alter the Commission's determination that non-competes are an unfair method of competition. Employers have alternatives to non-competes for protecting valuable investments that burden competition to a less significant degree. Rather than restraining a broad scope of beneficial competitive activity—by barring workers altogether from leaving work with the employer or starting a business and by barring competing employers and businesses from hiring those workers—these alternatives are much more narrowly tailored to limit impacts on competitive conditions.

For the protection of trade secrets and other confidential information, these alternatives include enforcement of intellectual property rights under trade secret and patent law, NDAs, and invention assignment agreements.

Employers also have alternative mechanisms to protect their investments in worker human capital, including fixed duration contracts, and competing on the merits to retain workers by providing better pay and working conditions.

The experiences of certain States in banning non-competes bolster this conclusion. Non-competes have been void in California, North Dakota, and Oklahoma since the 1800s.[767] In these three States, employers generally cannot enforce non-competes, so they must protect their investments using one or more less restrictive alternatives. There is no evidence that employers in these States have been unable to protect their investments (whether in human capital, physical capital, intangible assets, or otherwise) or have been disincentivized from making them to any discernible degree. Rather, in each of these States, industries that depend on highly trained workers and trade secrets and other confidential information have flourished. California, for example, is home to four of the world's ten largest companies by market capitalization, and it also maintains a vibrant startup culture.[768] Technology firms are highly dependent on highly-trained and skilled workers as well as protecting trade secrets and other confidential information—and, since the 1980s, California has become the epicenter of the global technology sector, even though employers cannot enforce non-competes.[769] Indeed, researchers have posited that high-tech clusters in California may have been aided by increased labor mobility due to the unenforceability of non-competes.[770] In

---

[757] Recent evidence suggests that trade secret litigation does not increase following bans on non-competes. Brad N. Greenwood, Bruce Kobayashi, Evan Starr, *Can You Keep a Secret? Banning Noncompetes Does Not Increase Trade Secret Litigation* (2024), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4771171.* The Commission does not rely on this study to support the findings described in this Part IV.D.

[758] *See, e.g.,* David S. Levine & Christopher B. Seaman, *The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act,* 53 Wake Forest L. Rev. 106, 120–22 (2018).

[759] NPRM at 3505–07.

[760] *Id.*

[761] *Id.* at 3505–06.

[762] *Id.* at 3506–07.

[763] *Id.* at 3507.

[764] *Id.*

[765] Since the NPRM was issued, Minnesota has become the fourth State to make non-competes unenforceable. *See* Minn. Stat. Ann. sec. 181.988 (effective July 1, 2023).

[766] NPRM at 3507.

[767] Non-competes have been void in California since 1872, in North Dakota since 1865, and in Oklahoma since 1890. *See* Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Non-Compete Clauses,* 74 N.Y.U. L. Rev. 575, 616 (1999) (California); *Werlinger* v. *Mut. Serv. Casualty Ins. Co.,* 496 NW2d 26, 30 (N.D. 1993) (North Dakota); Brandon Kemp, *Noncompetes in Oklahoma Mergers and Acquisitions,* 88 Okla. Bar J. 128 (2017) (Oklahoma). Minnesota also recently prohibited non-competes, through a law that took effect in July 2023. *See* Minn. Stat. sec. 181.988. However, Minnesota's experience is too new to draw conclusions about the ability of industries that depend on trade secrets to thrive where non-competes are unenforceable.

[768] Josh Dylan, *What Is Market Cap In Stocks?,* Nasdaq.com (Aug, 12, 2022), *https://www.nasdaq.com/articles/whatmarketcap-in-stocks;* Ewing Marion Kauffman Found., *State Entrepreneurship Rankings, https://www.com/public_affairs//02/25/_foundation_state_entrepreneurship_rankings.html.*

[769] *See, e.g.,* Gilson, *supra* note 767 at 594–95.

[770] *See, e.g., id.* at 585–86, 590–97; Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster,* 88 Rev. Econ. & Statistics 472, 477 (2006).

North Dakota and Oklahoma, the energy industry has thrived, and firms in the energy industry depend on highly-trained workers as well as the ability to protect trade secrets and other confidential information.

The Commission finds that the economic success in these three States of industries that are highly dependent on highly trained workers, trade secrets, and other confidential information illustrates that non-competes are not necessary to protect employers' legitimate interests in trained workers or securing their intellectual property and confidential information. These alternatives are available to employers and viable both with respect to senior executives and to workers other than senior executives. The Commission addresses these alternatives in this Part IV.D.2.b and summarizes and responds to the comments on these alternatives in Part IV.D.2.c.

i. Trade Secret Law

The Commission finds that trade secret law provides employers with a viable, well-established means of protecting investments in trade secrets, without the need to resort to the use of non-competes with their attendant harms to competition. Trade secret law is a form of intellectual property law that is specifically focused on providing employers with the ability to protect their investments in trade secrets.[771]

Forty-seven States and DC have adopted the Uniform Trade Secrets Act ("UTSA").[772] The UTSA provides a civil cause of action for trade secret misappropriation, which refers to disclosure or use of a trade secret by a former employee without express or implied consent.[773] The UTSA also provides for injunctive and monetary relief, including compensatory damages, punitive damages, and attorney's fees.[774]

In addition, in 2016, Congress enacted the Defend Trade Secrets Act of 2016 ("DTSA"), which established a civil cause of action under Federal law for trade secret misappropriation.[775] The DTSA brought the rights of trade secret owners "into alignment with those long

enjoyed by owners of other forms of intellectual property, including copyrights, patents, and trademarks."[776] Similar to State laws modeled on the UTSA, the DTSA authorizes civil remedies for trade secret misappropriation, including injunctive relief, damages (including punitive damages), and attorney's fees.[777] The DTSA also authorizes a court, in "extraordinary circumstances," to issue civil ex parte orders for the "seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action."[778] There is thus a clear Federal statutory protection that specifically governs protection of trade secrets.

Trade secret theft is also a Federal crime. The Economic Espionage Act of 1996 ("EEA") makes it a Federal crime to steal a trade secret for either (1) the benefit of a foreign entity ("economic espionage") or (2) the economic benefit of anyone other than the owner ("theft of trade secrets").[779] The EEA authorizes substantial criminal fines and penalties for these crimes.[780] The EEA further authorizes criminal or civil forfeiture, including of "any property constituting or derived from any proceeds obtained directly or indirectly as a result of" an EEA offense.[781] The EEA also requires offenders to pay restitution to victims of trade secret theft.[782]

Under the UTSA, DTSA, and EEA, the term "trade secret" is defined expansively and includes a wide range of confidential information.[783] The

viability of trade secret law as a means for redressing trade secret theft is illustrated by the fact that firms regularly bring claims under trade secret law. A recent analysis by the legal analytics firm Lex Machina finds that 1,156 trade secret lawsuits were filed in Federal court in 2022.[784] In addition, an analysis by the law firm Morrison Foerster finds that 1,103 trade secret cases were filed in State courts in 2019.[785] The number of cases filed in State court has held steady since 2015, when 1,161 cases were filed.[786] The fact that a considerable number of trade secret lawsuits are filed in Federal and State courts—over 2,200 cases per year—and the fact that this number has held relatively steady for several years suggests that many employers themselves view trade secret law as a viable means of obtaining redress for trade secret theft.

The use of trade secret law burdens competition to a lesser degree than the use of non-competes. Trade secret law provides firms with a viable means of redressing trade secret misappropriation—and deterring trade secret misappropriation by workers—without blocking beneficial competitive activity, such as workers switching to jobs in which they can be more productive or starting their own businesses.

ii. NDAs

NDAs provide employers with another well-established, viable means for protecting valuable investments.[787]

---

[771] Brian T. Yeh, *Protection of Trade Secrets: Overview of Current Law and Legislation*, Cong. Rsch. Serv. 4 (Apr. 22, 2016) (Report R43714), *https://sgp.fas.org/crs/secrecy/R43714.pdf*.

[772] *See* Levine & Seaman, *supra* note 758 at 113. The three States that have not adopted the UTSA offer protection to trade secrets under a different statute or under common law. Yeh, *supra* note 771 at 6 n.37.

[773] Uniform Trade Secrets Act with 1985 Amendments (Feb. 11, 1986) at sec. 1(2).

[774] *Id.* at secs. 2–4.

[775] Defend Trade Secrets Act of 2016, Public Law 114–153, 130 Stat. 376, 379 (2016).

[776] U.S. Senate, Report to Accompany S. 1890, the Defend Trade Secrets Act of 2016, S. Rep. No. 114–220 at 3 (2016).

[777] 18 U.S.C. 1836(b)(3).

[778] 18 U.S.C. 1836(b)(2).

[779] 18 U.S.C. 1831 (economic espionage); 18 U.S.C. 1832 (theft of trade secrets).

[780] 18 U.S.C. 1831 through 1832.

[781] 18 U.S.C. 1834, 2323.

[782] 18 U.S.C. 1834, 2323.

[783] The UTSA generally defines a "trade secret" as information that (1) derives independent economic value from not being generally known to other persons who can obtain economic value from its disclosure or use and (2) is the subject of reasonable efforts to maintain its secrecy. UTSA, *supra* note 773 at sec. 1(4). The DTSA and EEA use a similar definition. 18 U.S.C. 1839(3). The Supreme Court has held that "some novelty" is required for information to be a trade secret, because "that which does not possess novelty is usually known." *Kewanee Oil Co.* v. *Bicron Corp.*, 416 U.S. 470, 476 (1974). As the high court of one State noted in applying a State statute based on the UTSA, "business information may . . . fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures." *U.S. West Commc'ns, Inc.* v. *Off. of Consumer Advoc.*, 498 NW2d 711, 714 (Iowa 1993). *See also Confold Pac., Inc.* v. *Polaris Indus., Inc.*, 433 F.3d 952, 959 (7th Cir. 2006) ("A trade secret is really just a piece of information

(such as a customer list, or a method of production, or a secret formula for a soft drink) that the holder tries to keep secret by executing confidentiality agreements with employees and others and by hiding the information from outsiders by means of fences, safes, encryption, and other means of concealment, so that the only way the secret can be unmasked is by a breach of contract or a tort.").

[784] Gloria Huang, *Lex Machina Releases its 2023 Trade Secret Litigation Report*, Lex Machina (Jul. 13, 2023), https://.com/blog/lex-machina-releases-its-2023-trade-secret-litigation-report/.

[785] Kenneth A. Kuwayti & John R. Lanham, Morrison Foerster, Client Alert, *Happy Anniversary, DTSA: The Defend Trade Secrets Act at Five* (May 25, 2021), *https://www.mofo.com///210525-defend-trade-secrets-act-dtsa*.

[786] *Id.* at n.5.

[787] The Commission uses the term "NDA" to refer to contractual provisions that are designed to protect trade secrets or other business information that has economic value. Employers may also seek to use NDAs to protect other kinds of information, such as information about discrimination, harassment, sexual assault, corporate wrongdoing, or information that may disparage the company or its executives or employees. These types of NDAs have been widely criticized for, among other things, their pernicious effects on workers. *See, e.g.*, Rachel S. Arnow-Richman et al., *Supporting Market Accountability, Workplace Equity, and Fair Competition by Reining In Non-Disclosure Agreements*, UC-Hastings Research Paper 2–6 (Jan. 2022), https://papers.ssrn.com/sol3/.?abstract_=.

NDAs are contracts in which a party agrees not to disclose and/or use information designated as confidential. If a worker violates an NDA, the worker may be liable for breach of contract.[788] Employers regularly use NDAs to protect trade secrets and other confidential business information. Researchers estimate that between 33% and 57% of U.S. workers are subject to at least one NDA.[789] One study finds that 95.6% of workers with non-competes are also subject to an NDA; 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement; and 74.7% of workers with non-competes are subject to all three provisions.[790] In most States, NDAs are more enforceable than non-competes.[791] While some commenters argued that NDAs would not be an adequate alternative to non-competes because of the NPRM's proposed functional definition of ''non-compete clause,'' the final rule will not prevent employers from adopting garden-variety NDAs; rather, it prohibits only NDAs that are so overbroad as to function to prevent a worker from seeking or accepting employment or operating a business.[792]

Appropriately tailored NDAs burden competition to a lesser degree than non-competes. Such NDAs may prevent workers from disclosing or using certain information, but they generally do not prevent workers from seeking or accepting other work, or starting their own business, after their employment ends. As the Tenth Circuit has stated, workers subject to NDAs, unlike workers subject to non-competes, ''remain free to work for whomever they wish, wherever they wish, and at whatever they wish,'' subject only to the terms that prohibit them from disclosing or using certain information.[793]

### iii. Other Means of Protecting Valuable Investments

The Commission finds that employers have additional well-established means of protecting valuable investments in addition to trade secret law and NDAs.

For the protection of trade secrets and other confidential information, the Commission finds that these additional means include patent law and invention assignment agreements. Patent law provides inventors with the right, for a certain period of time, to exclude others from making, using, offering for sale, or selling an invention or importing it into the U.S.[794] During the period when patent protection is effective, patents grant the patent holder these exclusive rights, while other firms may use trade secrets if they are independently developed, reverse-engineered, or inadvertently disclosed.[795] In some cases, however, firms may choose to keep their invention a trade secret rather than seeking a patent because patent protection only lasts a certain number of years, after which the invention becomes part of the public domain.[796] Where a technology, process, design, or formula is able to meet the rigorous standards for patentability, patent law provides companies with a less restrictive alternative than non-competes for protecting it.[797]

Employers can further protect their property interests in these forms of intellectual property through appropriately tailored invention assignment agreements. These are agreements that give the employer certain rights to inventions created by the employee during their employment with a firm.[798] Like patent law, this tool, when appropriately tailored, provides employers with additional protection for some of their most valuable intellectual property interests.

With respect to investments in worker human capital, the Commission finds that these less restrictive alternatives include fixed duration contracts and competing on the merits to retain workers. If an employer wants to prevent a worker from leaving right after receiving valuable training, the employer can sign the worker to an employment contract with a fixed duration. An employer can establish a term that is long enough for the employer to recoup its human capital investment, without restricting who the worker can work for, or their ability to start a business, after their employment ends. In doing so, the employer makes

a commitment to the worker and vice versa.

Finally, instead of using non-competes to lock in workers, the Commission finds that employers that wish to retain their workers can also compete on the merits for the worker's labor services—*i.e.*, they can provide a better job than competing employers by paying their workers more, offering them better hours or better working conditions, or otherwise improving the conditions or desirability of their employment. These are all viable tools for protecting human capital investments and other investments an employer may make that do not rely on suppressing competition.

### c. Comments and Responses to Comments

Many commenters agreed with the Commission's preliminary finding that employers have less restrictive alternatives to non-competes. These commenters asserted that trade secret law, combined with NDAs, creates a powerful deterrent to post-employment disclosures of trade secrets and confidential information, and that these tools adequately protect valuable investments in the absence of non-competes. The Commission agrees with these commenters. Other commenters asserted that the alternatives to non-competes identified in the NPRM are inadequate for protecting employer investments. The Commission summarizes and responds to the comments it received on less restrictive alternatives in this Part IV.D.2.c.

### i. Comments and Responses to Comments on Trade Secrets and Other Confidential Information

Several commenters who generally supported the proposed rule stated that trade secret law and NDAs offer meaningful enforcement advantages to employers compared with non-competes. A few commenters stated that, unlike non-competes, trade secret law and NDAs are broadly enforceable in all fifty States. A few commenters stated that, while monetary penalties for breaching non-competes are ordinarily difficult to obtain, employers can obtain substantial monetary recovery for trade secret law and NDA violations. The Commission agrees with these comments.

Several commenters stated that the scope of trade secret law is limited in various respects. Several commenters stated, for example, that customer lists, pricing, and bid development information are typically excluded from the definition of ''trade secret'' under the DTSA and the law of many States.

---

[788] *See* Chris Montville, *Reforming the Law of Proprietary Information*, 56 Duke L.J. 1159, 1168 (2007).

[789] Arnow-Richman, *supra* note 787 at 2–3.

[790] Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 44. The value 97.5% is calculated as (1 − 0.6%/24.2%), where 0.6% represents the proportion of workers with only a non-compete (see Table 1 on page 36), and no other post-employment restriction, and 24.2% represents the proportion of workers with a non-compete, regardless of what other post-employment restrictions they have.

[791] Montville, *supra* note 788 at 1179–83.

[792] *See* Part III.D.2.b.

[793] *MAI Basic Four, Inc.* v. *Basis, Inc.*, 880 F.2d 286, 288 (10th Cir. 1989).

[794] 35 U.S.C. 271.

[795] Yeh, *supra* note 771 at 3–4.

[796] *Id.* at 4–5. *See also United States* v. *Dubilier Condenser Corp.*, 289 U.S. 178, 186 (1933) (rather than seeking a patent, an inventor ''may keep his invention secret and reap its fruits indefinitely.'').

[797] Yeh, *supra* note 771 at 4–5.

[798] *See, e.g.*, *Milliken & Co.* v. *Morin*, 731 SE2d 288, 294–95 (S.C. 2012); *Revere Transducers, Inc.* v. *Deere & Co.*, 595 NW2d 751, 759–60 (Iowa 1999); *Ingersoll-Rand Co.* v. *Ciavatta*, 542 A.2d 879, 886–87 (N.J. 1988).

In response to these comments, the Commission notes that customer information may be classified as trade secrets under certain circumstances, such as when the information is not generally known or not otherwise easy to obtain and when a firm has taken measures to protect the confidentiality of the information.[799] Employers may also use NDAs to protect such information. NDAs broadly protect all information defined as confidential, regardless of whether such information constitutes a ''trade secret'' under State or Federal law.[800]

Some commenters argued that other tools under intellectual property law, such as patent and trademark law, are inadequate to protect employers' investments. These commenters misinterpret the Commission's findings. The Commission did not find in the NPRM, nor does it find in this final rule, that patent law standing alone or trademark law standing alone provide employers benefits equal to the benefits they may reap from an unfair method of competition, namely the use of non-competes. Rather, the Commission finds that patent law can be used, together with the other tools the Commission cites, including NDAs and fixed-term employment contracts, to protect legitimate investments in intellectual property and worker human capital investment and therefore that these tools, taken together, are viable alternatives to non-competes.

A number of commenters stated that there are enforceability disadvantages to trade secret law and NDAs compared to non-competes. Several commenters stated that trade secret law and NDAs are inadequate to protect employer investments prophylactically because employers can enforce them only after the trade secrets or other confidential information have already been disclosed. These commenters stated that trade secrets and confidential information can be highly valuable, and its value could be destroyed as soon as a worker discloses such information to a competing employer. Additionally, some commenters argued that trade secret law and NDAs are inadequate to protect employers' investments because enforcement outcomes for trade secrets and NDAs are less predictable and certain than with non-competes. Some comments suggested that this purported clarity of non-competes benefits workers, arguing that non-competes offer bright lines workers can follow to ensure against unintended violations. Other commenters assert that non-competes themselves are not necessarily effective as a prophylactic remedy, because it is often unclear whether a particular non-compete is enforceable, and non-competes are difficult to enforce in many jurisdictions. A few commenters stated that prophylactic remedies are already available under trade secret law in almost half of U.S. States where the doctrine of inevitable disclosure is recognized, while other commenters were concerned that not all States recognize the doctrine. Other commenters argued the inevitable disclosure doctrine may be worse for workers, and one commenter argued that the final rule would increase the use of the inevitable disclosure doctrine and thus reduce worker mobility.

Some commenters stated that prophylactic remedies are necessary to adequately protect trade secrets and confidential information because workers can exploit their former employers' trade secrets and confidential information without ever disclosing the information themselves, thus leaving aggrieved employers with no recourse under trade secret law or an NDA. Specifically, these commenters argued that when workers take new roles, they will inevitably use their knowledge of former employers' confidential information. For example, where a worker has experience with attempts and failures to develop new ideas or products with a former employer, they will likely use this knowledge to prevent a new employer from making similar mistakes, thus free riding off the former employer's development efforts, costs, and time. A commenter argued that preventing non-competes from restricting this type of misappropriation would discourage investment and harm innovation in the long run.

The Commission believes that what some commenters describe as the ''prophylactic'' benefits of non-competes—that an employer can block a worker from taking another job, without respect to any alleged misconduct—is also the source of their overbreadth because it enables employers to restrict competition in both labor markets and product and service markets, as detailed in Parts IV.B and IV.C. That employers prefer to wield non-competes as a blunt instrument on top of or in lieu of the specific legal tools designed to protect legitimate investments in intellectual property and other investments cannot justify an unfair method of competition. The Commission also disagrees that banning non-competes would discourage investment and would harm innovation in the long run. As discussed in Part IV.B.3.b.ii, the Commission finds that the weight of the evidence indicates that non-competes reduce innovation by preventing workers from starting businesses in which they can pursue innovative new ideas; inhibiting efficient matching between workers and firms (making it less likely that workers match with firms that can maximize their talent and productivity); and decreasing the cross-pollination of ideas.

Additionally, the Commission notes that non-compete agreements themselves cannot be said to provide ironclad ''prophylactic'' protections against disclosure of trade secrets and other confidential information. As other commenters point out, in the absence of this rule, it is often unclear whether and to what extent a specific non-compete is enforceable, and they are difficult to enforce in many jurisdictions. Moreover, non-competes do not prevent the worker from disclosing trade secrets or confidential information after the end of the non-compete period or outside of the clause's geographic restriction. The Commission also notes that, as a few commenters stated, prophylactic remedies are already available under trade secret law in almost half of U.S. States where the doctrine of inevitable disclosure is recognized.[801]

Several commenters argued that detecting and proving violations of NDAs and trade secret law is more

---

[799] *See U.S. West Commc'ns, Inc.* v. *Off. of Consumer Advoc.,* 498 NW2d 711, 714 (Iowa 1993) (''business information may . . . fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs . . .''); *Guy Carpenter & Co.* v. *Provenzale,* 334 F.3d 459, 467 (5th Cir. 2003) (''A customer list may be a trade secret, but not all customer lists are trade secrets under Texas law. The broader rule of trade secrets, that they must be *secret,* applies to customer lists''); *Home Paramount Pest Control Cos.* v. *FMC Corporation/Agricultural Prods. Group,* 107 F. Supp. 2d 684, 692 (D. Md. 2000) (''There is no question that a customer list can constitute a trade secret.''); *Liebert Corp.* v. *Mazur,* 827 NE2d 909, 922 (2005) (''[W]hether customer lists are trade secrets depends on the facts of each case.'').

[800] *See, e.g., Tendeka, Inc.* v. *Glover,* No. CIV.A. H–13–1764, 2015 WL 2212601 at *14 (S.D. Tex. May 11, 2015).

[801] In some States, under the ''inevitable disclosure doctrine,'' courts may enjoin a worker from working for a competitor of the worker's employer where it is ''inevitable'' the worker will disclose trade secrets in the performance of the worker's job duties. *See, e.g., PepsiCo, Inc.* v. *Redmond,* 54 F.3d 1262, 1269, 1272 (7th Cir. 1995). The inevitable disclosure doctrine is controversial. Several States have declined to adopt it altogether, citing the doctrine's harsh effects on worker mobility. *See Bayer Corp.* v. *Roche Molecular Sys., Inc.,* 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999); *LeJeune* v. *Coin Acceptors, Inc.,* 849 A.2d 451, 470– 71 (Md. 2004). Other States have required employers to meet high evidentiary burdens related to inevitability, irreparable harm, and bad faith before issuing an injunction pursuant to the doctrine. *See generally* Eleanore R. Godfrey, *Inevitable Disclosure of Trade Secrets: Employee Mobility* v. *Employer Rights,* 3. J. High Tech. L. 161 (2004).

difficult than for non-competes, and that enforcement is accordingly more expensive, because it is more difficult to detect and obtain evidence of the disclosure or use of confidential information than it is to determine that a former worker has moved to a competitor. Some commenters asserted that trade secret litigation is expensive because the cases are fact-intensive and involve litigating multiple challenging issues. Some commenters argued that as a result, the proposed rule conflicted with Congressional intent underlying the DTSA. A few commenters similarly argued that breaches of non-solicitation agreements are difficult to detect and can be enforced only after the solicitation has occurred. While the Commission recognizes that trade secrets litigation and NDA and non-solicitation enforcement may be more costly than non-compete enforcement in some instances, the Commission is not persuaded that higher costs associated with alternative tools make those tools inadequate. The comments do not establish that pursuing remedies through trade secrets litigation or NDA enforcement are prohibitively expensive. In any event, the Commission and courts have consistently held that pecuniary benefit to the party responsible for the conduct in question is not cognizable as a justification.[802] While employers may find that protecting trade secrets and confidential information or customer relationships by using non-competes to restrict worker mobility, regardless of whether that worker would misappropriate confidential information or solicit customers, is easier for them, the Commission finds that same overbreadth of non-competes imposes significant negative externalities on workers, consumers, businesses, and competition as a whole.[803] This overbreadth that employers benefit from wielding is what causes the harms from non-competes relative to more narrowly-tailored alternatives.

Some commenters contended that higher burdens for establishing violations of trade secret and IP laws will harm employer incentives to share trade secrets with workers and to invest in valuable skills training. The Commission is not persuaded that higher evidentiary burdens render trade secret law and NDAs inadequate for protecting employers' valuable investments. Heightened standards are a valuable mechanism to filter out overbroad restrictions on beneficial competitive activity. The comment

record is replete with examples of workers bound by non-competes who lacked knowledge of trade secrets or whose employment with a competitor never threatened their previous employer's investments. To the extent trade secret law and NDAs require higher evidentiary showings, that makes these alternatives more tailored tools for protecting employers' valuable investments without unduly restricting a worker from engaging in competitive activity.

Some commenters argued that, without non-competes, employers would limit access to valuable trade secrets within the workplace because trade secret law requires employers to show reasonable efforts to maintain the secrecy of an alleged trade secret to prove a violation, and that reduced rates of intrafirm trade secrets sharing will ultimately harm innovation as well as workers. In response, the Commission notes that the empirical evidence indicates otherwise: when non-competes are more enforceable, the overall level of innovation decreases.[804] Furthermore, these comments seem to overstate the burden of reasonable efforts to keep information secret. Under the DTSA, courts have found that employers meet this requirement by sharing information at issue only among workers bound by NDAs or maintaining such information in password-protected digital spaces.[805] Accordingly, assertions that employers will need to take extraordinary precautions to maintain secrecy over trade secrets and confidential information are inconsistent with standards courts typically recognize for determining whether reasonable efforts were taken to keep such information confidential. The Commission is not persuaded that requirements in trade secret law to show reasonable efforts to maintain secrecy will deter intrafirm information sharing, or otherwise make alternative tools inadequate.

Several commenters argued that the Commission should not find that employers have adequate alternatives to protecting their valuable investments because there is a lack of empirical evidence specifically showing that trade secret law and NDAs are effective for the purpose of protecting trade secrets and confidential information. In response, the Commission notes that trade secret law is a body of law that is specifically designed to protect the

interests being asserted; employers consistently bring cases under this body of law; and a preference among firms for a blunter instrument for protecting trade secrets and confidential information cannot justify an unfair method of competition that imposes significant negative externalities on workers, other firms, consumers, and the economy.[806] An industry trade organization commenter stated that neither fixed-duration employment contracts nor improved pay, benefits, or working conditions specifically protect against the disclosure of confidential information. In response, the Commission notes that firms can protect against the disclosure of confidential information using trade secret law and NDAs, and, where applicable, patent law and invention assignment agreements. And in response to these commenters, the Commission notes that companies in California, North Dakota, and Oklahoma have been able to protect their trade secrets and other confidential information adequately using tools other than non-competes since the late nineteenth century. Industries that are highly dependent on trade secrets and other confidential information have flourished in those States even though non-competes have been unenforceable.

A few commenters disputed the NPRM's contention that the rate at which employers pursue trade secrets litigation is evidence of the viability of trade secret law as a means for redressing trade secret theft or protecting confidential information, in part because those employers were not necessarily relying exclusively on trade secret law. The Commission does not assert that these data, alone, conclusively establish trade secret law is a perfect vehicle for redressing trade secret theft. Rather, the data show trade secret litigation is more than a mere theoretical possibility—it is an avenue many companies choose to redress trade secret theft and indeed it is the body of law designed and developed for this very purpose. Accordingly, the Commission believes that the fact that many companies bring claims under the well-established body of State and Federal law on trade secrets is relevant evidence that trade secret law provides a viable means for redressing trade secret theft.

Some commenters suggested a higher volume of trade secrets litigation in California may reflect a higher rate of trade secret disclosure due to the State's policy against enforcing non-competes. However, these commenters did not

---

[802] See supra note 305 and accompanying text.
[803] See Parts IV.B and IV.C.

[804] See Part IV.B.3.b.ii.
[805] See e.g., In re Adegoke, 632 B.R. 154, 167 (Bankr. N.D. Ill. 2021); Houser v. Feldman, 569 F. Supp. 3d 216, 230 n.7 (E.D. Pa. 2021); AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp., 663 F.3d 966, 974 (8th Cir. 2011).

[806] See Parts IV.B and IV.C (describing the negative externalities from non-competes).

provide evidence to support this hypothesis. The Commission also notes industries in California that depend on protecting trade secrets have thrived despite the inability to enforce non-competes; indeed, the State is the capital of the global technology industry. Therefore, regardless of whether there is a higher rate of trade secret litigation in California, the less restrictive alternatives identified in this Part IV.D have provided sufficient protection to enable these companies to grow, thrive, and innovate. Furthermore, the rate of trade secret litigation in California may result from factors unique to California's economy, such as California's high concentration of technology companies relative to other States. As such, the Commission does not believe there is credible evidence to suggest trade secrets are disclosed at a higher rate in California than in other jurisdictions.[807]

Many commenters agreed with the Commission's preliminary conclusion that the economic success in California, North Dakota, and Oklahoma of industries highly dependent on trade secrets and other confidential information illustrates that companies have viable alternatives to non-competes for protecting valuable investments. In contrast, a few commenters argued that the Commission mischaracterized California's non-compete ban because they claim that California permits non-competes to protect trade secrets, citing dicta from the 1965 California Supreme Court case *Muggill* v. *Reuben H. Donnelley Corp.*[808] However, the Commission is unaware of any cases in which a California court has actually upheld a non-compete agreement under California law based on the dicta in this opinion, and commenters do not point to any.[809] To the contrary, California courts have consistently refused to enforce non-competes even where employers alleged they were needed to protect trade secrets.[810]

Another commenter argued that California's experience does not necessarily demonstrate anything about the effect of banning non-competes because California employers impose non-competes at rates comparable to

other States. In response, the Commission notes that while Starr, Prescott, and Bishara state that workers are covered by non-competes at "roughly the same rate" in States where non-competes are unenforceable and enforceable,[811] when the authors control for employee characteristics to compare "observationally equivalent employees," they find that non-competes are less common (by 4–5 percentage points) in nonenforcing States compared to States that permit vigorous enforcement of non-competes.[812] Additionally, California, North Dakota, and Oklahoma are still distinct from other States because employers may not actually enforce non-competes, even if employers in those States continue to enter into them.

A commenter argued that the Commission misattributes California's success in the technology industry and North Dakota's and Oklahoma's success in the energy industry to their non-compete laws, rather than the presence of top universities and venture capital firms in the State (in the case of California) or of abundant natural resources in the State (in the case of North Dakota and Oklahoma). The Commission believes that this commenter mischaracterizes its analysis. The Commission does not attribute California's success in the technology industry and North Dakota's and Oklahoma's success in the energy industry to their non-compete laws. The Commission merely notes that these industries are highly dependent on protecting trade secrets and having highly trained workers, and that these industries have thrived in these States despite the inability of employers to enforce non-competes.

One commenter argued that there are no alternatives that adequately protect employers' legitimate interests because other restrictive employment agreements do not sweep as broadly as non-competes. In this Part IV.D, the Commission concludes that less restrictive alternatives such as trade secret law, IP law, and NDAs are adequate to protect trade secrets and other confidential information even where they do not sweep as broadly as non-competes. Indeed, the Commission believes that non-competes are overbroad with respect to protecting trade secrets and other confidential information, because they enable employers to restrict a wide swath of beneficial competitive activity without respect to any alleged misconduct. That employers prefer to wield non-competes

as a blunt instrument on top of or in lieu of the specific legal tools designed to protect legitimate investments in intellectual property and other investments cannot justify an unfair method of competition.

ii. Comments and Responses to Comments on Human and Physical Capital Investment

Several commenters addressed the evidence concerning the effects of non-competes on human capital investment and other investment. Several commenters asserted that, even if non-competes increased human capital investment, they still left workers worse off because they suppressed workers' mobility and wages overall. Workers and worker advocates also argued that workers lose the value of their skills and human capital investment when non-competes force them to sit out of the workforce, and non-competes can decrease their incentive to engage in human capital investment since they cannot capitalize on their skills and knowledge. These commenters stated that many workers, particularly highly skilled workers, have had some form of education prior to working for their employer, diminishing any potential need for non-competes to protect the employers' human capital investment. For example, many physicians pointed out that they had to go through medical school, residency, internships, and/or fellowships—significant investments that they made, not their employers.

Some commenters questioned the link between increased human capital investment and non-compete enforcement, arguing that employer human capital investment will still be provided without non-competes. Other commenters also stated that prohibiting non-competes would make it easier for firms to hire trained workers, because it would be easier for them to switch jobs. More generally, one advocacy organization said that employers frequently make investments that do not work out and should not place the risk of that investment onto their workers. A commenter who discussed physician non-competes argued that investment-based justifications for non-competes overestimate the value added by employers while failing to recognize the value physicians bring to employers.

Some businesses and trade organizations argued that employers invest significant time and money into training workers who lack the specific skills needed for the job. These commenters stated that, without non-competes, employers risk the worker taking that investment to a competitor. Some commenters state that this risk is

---

[807] *See* NPRM at 3507.

[808] 62 Cal. 2d 239, 242 (Cal. 1965).

[809] *See generally* David R. Trossen, Edwards *and Covenants Not to Compete in California: Leave Well Enough Alone,* 24 Berkeley Tech. L.J. 539, 546 (2009).

[810] *See, e.g., D'sa* v. *Playhut, Inc.,* 102 Cal. Rptr. 2nd 495, 497–501 (Cal. Ct. App. 2nd 2000); *Dowell* v. *Biosense Webster, Inc.,* 102 Cal. Rptr. 3d 1, 11 (Cal. Ct. App. 2nd 2009); *Arthur J. Gallagher & Co.* v. *Lang,* 2014 WL 2195062 (N.D. Cal. May 23, 2014) at *4 n.3.

[811] Starr, Prescott & Bishara, *supra* note 68 at 81.

[812] *Id.* at 68.

**38430** **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

greatest in underserved areas and when there are worker shortages. Several commenters said that employment restrictions such as non-competes incentivize businesses to pay for credentials, training, and advanced education that low-wage and other workers would be unable to afford on their own, facilitating upward mobility. For highly educated workers, such as physicians, some employers said they need non-competes to protect payments for continuing education as well as mentorships and on the job training. Businesses and their advocates asserted that in some industries, many new employees are unprofitable for a significant period, requiring up-front investment and training from employers who want to recoup that investment.

In response, the Commission notes that, as described in Part IV.D.2.b.iii, firms have less restrictive alternatives for protecting human capital investments, including fixed-duration contracts and competing on the merits for the worker's labor services through better pay, benefits, or working conditions. Through these means, employers can retain workers without restricting who they can work for, or their ability to start a business, after their employment ends. The Commission also notes that these commenters often inaccurately describe the increased labor mobility afforded by the final rule as a one-way street. While it will be easier under the final rule for workers to switch jobs and work for a competitor, it will also be easier for firms to hire talented workers, since those workers are not subject to non-competes. In general, firms will benefit from access to a wider pool of labor, because the rule eliminates the friction non-competes impose on the free functioning of competition in labor markets. Whether this will be a net benefit to a particular firm, or not, will depend on the firm's ability to compete for workers on the merits to attract and retain talent.

A group of healthcare policy researchers stated that the investment justifications offered by corporate owners of physician practices are misleading since the true value of the investment in the practice is the book of business and referrals. These researchers suggested that non-competes are used to circumvent laws that prohibit payment for physician referrals. The Commission notes that this comment aligns with a statement by researcher Kurt Lavetti at the Commission's 2020 forum on non-competes. Lavetti stated that patient referrals are a valuable asset, but buying or selling those referrals is illegal, so

non-competes are a secondary method of protecting that asset.[813]

Commenters also stated that non-competes protect investments other than in human capital, capital expenditures, and R&D, including recruiting and hiring, providing client and customer service, facilities, marketing, and technology, among others. The Commission is unaware of any empirical evidence showing that non-competes increase these types of investments, and commenters did not provide any. In general, however, firms can protect investments in trade secrets and confidential information, and investments in workers, through the less restrictive alternatives described in Part IV.D.2.b.

Two trade organizations stated that prohibiting non-competes could cause businesses to lose staff, and that losing staff could cause them to reduce investments that may be based on staffing assumptions. These commenters did not provide empirical evidence to support these arguments. The Commission also notes that firms would not necessarily lose workers because of the final rule. As described previously, some firms may lose workers because it will be easier for workers to leave for better opportunities, while some firms may gain workers by attracting workers from other firms. Additionally, firms can retain workers by competing on the merits for their labor services—*i.e.*, by offering better jobs than their competitors.

Commenters asserted that Starr, Prescott, and Bishara[814] found that notice of non-competes alongside a job offer is positively correlated with training compared to later notice. In response, the Commission notes that the evidence is a correlation between early notice and training, not a causal finding, so the Commission gives it minimal weight. In addition, regardless of whether there is an increase in training where notice of non-competes is provided along with the job offer instead of later on, this data is not salient on the question of whether employers have less restrictive alternatives to protecting training investments.

A few commenters stated non-competes protect against the "disclosure" of general trade knowledge and skills, while the less restrictive alternatives cited in the NPRM do not.

Relatedly, some commenters argued prohibiting non-competes and broadly enabling workers to take general trade knowledge and skills to competitors will mean that their new employers will free ride off investments the former employers made in their human capital, which will discourage future investment in human capital. The Commission does not believe preventing workers from using their general trade knowledge and skills, including their gains in trade knowledge and skills through experience with a particular employer, is a legally cognizable or legitimate justification for non-competes. Under State common law, preventing a worker from using their general knowledge and skills with another employer is not a legitimate interest that can justify a non-compete.[815] Indeed, there is a general principle in the law of restrictive employment agreements—and trade secret law as well—that these tools cannot be used to prevent workers from using their general trade knowledge and skills.[816] The Commission does not view the inability to prevent disclosure or use of general skills and knowledge as a shortcoming of trade secret law and NDAs; instead, it considers the use of general skills and knowledge as beneficial competitive activity. Moreover, the Commission notes that sectoral job training strategies can be a tool for employers and workers to access worker training that is transferrable across employers.[817]

One commenter asserted trade secret law and NDAs are inadequate to protect employers' goodwill, while another commenter asserted these tools are inadequate to protect investments in relationships with clients. Regarding whether trade secret law and NDAs are adequate to protect employers' client relationships, the Commission interprets this to refer to employers' concern that a client will follow a worker to a competitor. The Commission believes that employers have alternatives for protecting these investments, including fixed-duration contracts (in the case of goodwill), NDAs (in the case of client lists), and competing on the merits to retain workers and/or clients. Firms can seek to protect client relationships by offering superior service and value—through the free and fair functioning of competition. These more narrowly

---

[813] Kurt Lavetti, *Economic Welfare Aspects of Non-Compete Agreements*, Remarks at the FTC Workshop on Non-Competes in the Workplace, at 145–46 (Jan. 9, 2020), at *https://www.ftc.gov//files//_events/1556256/non-compete-workshop-transcript-full.pdf*.

[814] Starr, Prescott & Bishara, *supra* note 68 at 53.

[815] *See* NPRM at 3495 n.162.

[816] *See* Montville, *supra* note 788 at 1161.

[817] *See, e.g.,* Mayu Takeuchi & Joseph Parilla, *Federal Investments in Sector-Based Training Can Boost Workers' Upward Mobility*, Brookings Inst. (Dec. 7, 2023), *https://www.brookings.edu/articles/federal-investments-in-sector-based-training-can-boost-workers-upward-mobility/*.

tailored alternatives reasonably protect the applicable interest while burdening competition to a lesser degree because they do not restrict the worker's ability to seek or accept work or start a business after their employment ends. Therefore, while trade secret law and NDAs may not protect goodwill or client relationships, the Commission finds that employers have adequate alternative tools to protect these interests. Furthermore, the Commission notes the final rule does not restrict employers from using trade secret law and NDAs in tandem—along with other alternatives—to protect their investments, and comments maintaining that employers lack adequate alternatives to non-competes because the commenter views just one of these mechanisms as inadequate are unpersuasive.

A commenter argued the final rule may implicate the ability of Federal contractors to provide letters of commitment, which are often required by government agencies and require contractors to identify key personnel who will work on an awarded contract, sometimes for years in the future. In response, the Commission notes that contractors have alternatives to non-competes to retain key personnel, including by using fixed-term employment contracts or providing the key personnel a better job than competitors.

A commenter stated that fixed-duration employment contracts are not necessarily effective at protecting human capital investments because employers may not know at the time of hiring when they will be providing training to a worker. This commenter also stated that improving the pay, benefits, and working conditions of workers is not necessarily an effective means for protecting human capital investments. In response, the Commission notes employers may enter into fixed-duration employment contracts with their workers at any time, not just at the outset of the employment relationship. It further notes competing to retain a trained worker will not work in every instance, but it is an important option available to employers and the provision of training can itself be a competitive differentiator for an employer.

A commenter also asserted California has the highest cost of living and, if this is attributable to the absence of non-competes, the proposed rule could risk increasing the cost of living nationwide. The commenter did not provide evidence to support the existence of an inverse relationship between non-compete enforceability and cost of living, and the Commission is aware of no such evidence. The Commission thus does not believe that there is a basis to conclude the final rule would increase the cost of living nationwide.

iii. Comments Regarding Alternatives to Non-Competes for Senior Executives

Commenters offered the same justifications for non-competes with senior executives: that they increase employers' incentive to make productive investments. However, many commenters argued senior executives are more likely than other workers to have knowledge of trade secrets and other competitively sensitive information or to have customer relationships and thus non-competes for senior executives are necessary, and other tools such as trade secret law and NDAs are not viable alternatives.

In response, the Commission finds that these tools—trade secret law, NDAs, patents, and invention assignment agreements—provide viable means of protecting valuable investments against disclosure by senior executives, just as they do for all other workers. Commenters do not identify any reasons why senior executives are uniquely situated with respect to these less restrictive alternatives—*i.e.*, why trade secret law or NDAs may not adequately protect firm investments from disclosure by senior executives specifically—and the Commission is not aware of any such reasons.

Some commenters argued non-competes with executives and high-wage workers promote competition because they encourage innovation in businesses by providing investors with more confidence that executives will not share trade secrets with competitors, decreasing competition. An industry organization asserted that non-competes allow executives to share ideas and business decisions with other workers within the business and collaborate to make strategic decisions. A commenter stated that an executive leaving to start a competing product could also delay the timeline for both the former employer's product and the competing product. As noted previously, the Commission does not believe there is reliable empirical data on the relationship between non-competes and disclosure of confidential information, but employers have alternatives to protect such information. Further, the empirical evidence shows non-competes overall inhibit innovation on the output side; therefore, to the extent any of these effects are occurring, they are more than outweighed by the negative effects of non-competes on innovation.[818]

According to some commenters, an executive moving to a competitor could unfairly advantage the competitor and irreparably harm the former employer. In response, the Commission notes that there is nothing inherently unfair about an executive moving to a competitor, particularly if this results from competition on the merits (such as the competitor paying more or otherwise making a more attractive offer). If companies seek to retain their executives, they have other means for doing so—such as increasing the executives' compensation or entering fixed-duration contracts—that do not impose significant negative externalities on other workers and on consumers, as non-competes do.[819]

Some commenters also said senior executives may have more client, business partner, and customer relationships than other employees and may contribute substantially to a firm's goodwill. The Commission believes that employers have alternatives for protecting goodwill and client/customer relationships. For example, if a firm wants to keep a worker from departing and taking goodwill or clients or customers with them, it can enter a fixed-duration contract with the worker, otherwise seek to retain the worker through competition on the merits, or seek to retain the client/customer through competition on the merits.

An accountant with experience analyzing executive non-competes for business valuations said such valuations are calculated based on the potential harm if the executive violated the non-compete. In addition, some commenters argued non-competes for senior executives and other important workers increase the value of firms in mergers and acquisitions because they ensure such valuable workers stay after the sale. An investment industry organization said investors seek to ensure the right workers who know the business stay and run the newly acquired business. In addition, that organization said some institutional investors may require contracts retaining key workers.

In response, the Commission notes that valuation of senior executive non-competes in such contexts is part of the reason the Commission is allowing such existing senior executive non-competes to remain in force.[820] In future

---

[818] *See* Part IV.B.3.b.ii.

[819] *See* Part IV.C.2 (describing the negative externalities of non-competes for senior executives).

[820] *See* Part IV.C.3.

transactions, businesses and investors have other methods of incentivizing senior executives and other workers to remain, including fixed duration contracts and competing to retain workers on the merits, and thereby enhancing the value of firms and transactions—methods that do not impose such significant externalities on other workers and consumers.

Some industry organizations said non-competes increase employer investment in management and leadership training for executives. An investment industry organization said non-competes allow senior executives to access training and experience for their own benefit and the benefit of investors in the firm. In response, the Commission notes that employers have alternative mechanisms to protect their investments in worker training, including fixed-duration contracts and improved compensation.

Some commenters argued that non-competes may improve executive performance, as some executives have non-competes tied to deferred compensation and other future benefits, which encourages long-term value creation by incentivizing executives to focus on long-term rather than short-term gains. A law firm said that forfeiture-for-competition clauses are an important component of deferred compensation agreements, and deferred compensation incentivizes long-term value-building and penalizes, via reduction or forfeiture, harm to the business, which the commenter said includes working for a competitor. The commenter claimed that if forfeiture-for-competition clauses are banned, firms would shift some of the deferred compensation to more short-term awards, which would in turn increase risk-taking and decrease overall wealth accumulation. The commenter cited a review by the Federal Reserve after the 2008 financial crisis which found that deferred compensation can mitigate executive risk-taking activities.[821] It also cited other Federal agencies and court decisions recognizing the value of deferred compensation to mitigate risk. Separately, the firm argued that without forfeiture-for-competition clauses, an executive who moves to a competitor will compete less against their former employer so as not to devalue their equity award, thus degrading competition. Commenters also

contended that State courts have recognized forfeiture-for-competition clauses to be reasonable and that some State statutes governing non-competes carve them out.

In response, the Commission recognizes that many existing deferred compensation contracts may have been negotiated to include non-competes or forfeiture-for-competition clauses that may not be easily separated, and the final rule allows existing senior executive non-competes to remain in force.[822] However, the Commission is not persuaded that non-competes are necessary for future deferred compensation agreements. The Federal Reserve study on the value of deferred compensation does not mention non-competes or forfeiture-for-competition clauses. While the study states that clawback provisions may discourage specific types of behavior, it notes that they do not affect most risk-related decisions.[823] The commenter did not explain why non-competes are necessary for deferred compensation to reduce risk-taking or how post-employment competition could impact performance while at the firm. The commenter also did not explain why firms would forgo the benefits of deferred compensation even without a forfeiture-for-competition clause. The commenter separately argued that an executive who moves to a competitor will be conflicted and compete less against their former employer so as not to devalue their equity award. The comment framed this as an anticompetitive problem akin to interlocking directorates under the Clayton Act, as it could increase collusion (though the commenter provided no support for this argument). The commenter did not, however, explain why an executive would move to a competitor if doing so would devalue their own equity. The Commission also does not believe that the solution to this type of anticompetitive behavior, even if it were to occur, is to further restrict competition by blocking the executive from moving to the competitor in the first place.

Some commenters argued that forfeiture-for-competition clauses, which are sometimes attached to deferred compensation arrangements, were also justified. Some commenters contended that workers subject to forfeiture-for-competition clauses who choose to work for a competitor are likely to be compensated by the

competitor for whom they will be working. Separately, a law firm and an investment industry organization stated that it would be unfair for companies to continue making deferred compensation or other payments to former workers who now work for a competitor if forfeiture-for-competition clauses were banned. A law firm also stated that forfeiture-for-competition clauses allow senior executives to retire without losing their deferred compensation, which in turn clears a path for younger workers to move up, while protecting senior executives' retirement benefits. In response, the Commission notes that pre-existing agreements for senior executives are not banned under the final rule.[824] The Commission also sees no reason why deferred compensation, including for retiring workers, cannot be used without forfeiture-for-competition clauses.

Some commenters stated that the study by Kini, Williams, and Yin, discussed in the NPRM with respect to senior executive earnings,[825] finds that CEOs with non-competes are more frequently forced to resign their position. Commenters note that Kini, Williams, and Yin also find that CEO contracts more closely align the incentives of executives (with respect to stock prices and risk taking) with shareholders when the executives have non-competes or when those non-competes are more enforceable. In response, the Commission notes that, as indicated by commenters, this study examines the use of non-competes in conjunction with their enforceability. The Commission therefore finds that the results may not reflect a causal relationship. For example, the use of non-competes and the propensity of the board to force an executive to resign may be jointly determined by the strength of the relationship or the trust between management and the board, rather than the use of non-competes causing forced turnover. The Commission also notes that—as shown in the study—there are other methods by which boards may encourage executives to perform, such as by structuring financial incentives to encourage or discourage risk taking, according to the preferences of the board. Boards can also fire poorly performing executives even without non-competes.

One commenter said that a ban on non-competes may encourage U.S. companies to relocate their executive teams outside the U.S. in order to continue using non-competes. The

---

[821] *See* Bd. of Govs. of the Fed. Reserve Sys., *Incentive Compensation Practices: A Report on the Horizontal Review of Practices at Large Banking Organizations* (Oct. 2011), *https://www.federalreserve.gov/publications/other-reports/incentive-compensation-practices-report-201110.pdf.*

[822] *See* Part IV.C.3.

[823] Federal Reserve Report on Incentive Compensation Practices, *supra* note 821 at 16–17.

[824] *See* § 910.2(a)(2).

[825] *See* Kini, Williams, & Yin, *supra* note 83.

commenter did not provide specific evidence to support this assertion. The Commission believes that firms' decisions on where to locate their executive teams are likely influenced by a multitude of factors other than whether the firm may or may not use non-competes.

3. The Asserted Benefits From These Justifications Do Not Justify the Harms From Non-Competes

a. The Commission's Final Findings

Based on the totality of the evidence, including its review of the empirical literature, its review of the full comment record, and its expertise in identifying practices that harm competition, the Commission in this final rule finds that the claimed business justifications for non-competes do not justify the harms from non-competes—for either senior executives or for workers other than senior executives, whether considered together or separately—because the evidence indicates that increasing enforceability of non-competes has a net negative impact along a variety of measures. Whether the benefits from a practice outweigh the harms is not necessarily an element of section 5,[826] but, in any event, the benefits from the justifications cited in Part IV.D.1 clearly do not justify the harms from non-competes.

Not all the harms from non-competes are readily susceptible to monetization.[827] However, even the quantifiable harms from non-competes are substantial and clearly not justified by the purported benefits. Non-competes cause considerable harm to competition in labor markets and product and service markets. Non-competes obstruct competition in labor markets because they inhibit optimal matches from being made between employers and workers across the labor force through the process of competition on the merits for labor services. The available evidence indicates that increased enforceability of non-competes substantially suppresses workers' earnings, on average, across the labor force generally and for specific types of workers.[828]

In addition to the evidence showing that non-competes reduce earnings for workers across the labor force, there is also evidence that non-competes reduce earnings specifically for workers who

are not subject to non-competes.[829] These workers are harmed by non-competes, because their wages are depressed, but they do not necessarily benefit from any purported incentives for increased human capital investment that non-competes may provide. Overall, these harms to labor markets are significant. The Commission estimates the final rule will increase workers' total earnings by an estimated $400 billion to $488 billion over ten years, at the ten-year present discounted value.[830]

The available evidence also indicates non-competes negatively affect competition in product and service markets. The weight of the evidence indicates non-competes have a negative impact on new business formation and innovation.[831] There is evidence that non-competes increase consumer prices and concentration in the health care sector.[832] There is also evidence non-competes foreclose the ability of competitors to access talent.[833] While available data do not allow for precise quantification of some of these effects, they are nonetheless substantial: the Commission estimates that the rule will reduce spending on physician services over ten years by $74–194 billion in present discounted value, will result in thousands to tens of thousands of additional patents per year, and will increase in the rate of new firm formation by 2.7%.[834]

In the Commission's view, the asserted benefits from non-competes do not justify their harms. Even if the businesses using non-competes benefit, pecuniary benefits to the party undertaking the unfair method of competition are not a sufficient justification under section 5.[835] As described in Part IV.D.1, the most commonly cited justifications for non-competes are that they increase employers' incentive to make productive investments in, for example, trade secrets, customer lists, and human and physical capital investment. There is some evidence that non-competes increase human and physical capital investment, as noted previously.[836] However, the empirical literature does not show the extent to which human capital investment and other investment benefits from non-competes accrue to any party besides the employer, and to

the extent it addresses this issue it suggests otherwise. For example, in theory, if increased human capital investment from non-competes benefited workers, they would likely have higher earnings when non-competes are more readily available to firms (i.e., when legal enforceability of non-competes increases). However, as explained in Parts IV.B.3.a.ii and IV.C.2.c.ii, the empirical evidence indicates that, on net, greater enforceability of non-competes reduces workers' earnings. Likewise, in theory, if increased human capital investment increased innovation that redounds to the benefit of the economy and society as a whole, one would expect to see legal enforceability of non-competes yield such benefits, but as elaborated in Part IV, the empirical evidence on innovation effects indicates the opposite.

Moreover, the Commission is also not aware of any evidence that these potential benefits of non-competes lead to reduced prices. Indeed, the only empirical study of the effects of non-competes on consumer prices—in the health care sector—finds increased prices as the enforceability of non-competes increases.[837] That study, which finds that non-compete enforceability increased physician pay, also finds that labor cost pass-through is not driving price decreases.[838]

Furthermore, there is no evidence that, in the three States in which non-competes are generally void, the inability to enforce non-competes has materially harmed employers, consumers, innovation (or economic conditions more generally), or workers. As a result, the Commission finds that the asserted benefits from non-competes do not justify the harms they cause.

The Commission finds that the harms from non-competes are clearly not justified by the purported benefits, regardless of whether one considers senior executives or workers other than senior executives together or separately. In this Part IV.D.3, the Commission explains why, for workers overall, the asserted benefits from non-competes do not justify the harms they cause. This is at least as true for senior executives as for other workers. As described in Part IV.C.2.c.i, non-competes with senior executives tend to negatively affect competitive conditions in product and service markets at least as much as non-competes with other workers—and likely to a greater extent—given the outsized role of senior executives in forming new businesses, serving on new

---

[826] See Part II.F (stating that the inquiry as to whether conduct tends to negatively affect competitive conditions focuses on the nature and tendency of the conduct and does not require a detailed economic analysis).

[827] See, e.g., Parts IV.B.3.a.iii and IV.B.3.b.iv.

[828] See Part IV.B.3.a.ii; Part IV.C.2.c.ii.

[829] See Part IV.B.3.a.ii.

[830] See Part X.F.6.

[831] See Part IV.B.3.b.i-ii; Part IV.C.2.c.i.

[832] See Part IV.B.3.b.iii.

[833] See Part IV.C.2.c.i.

[834] See Part X.F.6.

[835] See Part II.F.

[836] See Part IV.D.1.

[837] See Part IV.B.3.b.iii.

[838] See Hausman & Lavetti, supra note 590 at 278.

**38434**    **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

businesses' executive teams, and setting the strategic direction of businesses with respect to innovation. At the same time, firms have the same less restrictive alternatives available for senior executives as they do for other workers, as described in Part IV.D.2.c.iii. For these reasons, whether one considers non-competes with senior executives or non-competes with other workers, the claimed business justifications for non-competes do not justify the harms from non-competes.

#### b. Responses to Comments

Commenters focused on the question of whether employers have adequate alternatives to non-competes and the analysis of costs and benefits of the proposed rule in the preliminary regulatory impact analysis, rather than the balancing analysis discussed in this Part IV.D.3 specifically. These comments are addressed in Part IV.D.2 and in Part X, respectively.

#### E. Section 910.2(b): Notice Requirement for Existing Non-Competes

The Commission proposed to require employers to rescind (*i.e.*, legally modify) existing non-competes and provide notice to inform workers that they are no longer bound by existing non-competes.[839] Based on comments, the Commission is not adopting a rescission requirement in the final rule. Rather than require employers to legally modify existing non-competes, the final rule prohibits employers from enforcing existing non-competes with workers other than senior executives after the compliance date.

The final rule adopts the notice requirement—for workers who are not senior executives—with minor revisions to facilitate compliance and to improve the likelihood of workers being meaningfully informed. The revisions include an option for employers to make the notice more accessible to workers who speak a language other than English. The final rule also simplifies compliance and ensures that workers have prompt notice that their non-competes are no longer in force by requiring employers to provide notice by the effective date, rather than 45 days thereafter.

#### 1. The Proposed Rule

Proposed § 910.2(b)(1) would have required employers to rescind existing non-competes with all workers. Proposed § 910.2(b)(2) would have required employers that rescinded non-competes to provide notice to the affected workers that their non-compete

is no longer in effect and may not be enforced.

As proposed, § 910.2(b)(2) had three subparagraphs that imposed various requirements related to the notice. Proposed § 910.2(b)(2)(i) stated that an employer that rescinds a non-compete pursuant to § 910.2(b)(1) must provide notice in an individualized communication to the worker that the worker's non-compete is no longer in effect and may not be enforced. The Commission stated in the NPRM that an employer could not satisfy the notice requirement by, for example, posting a notice at the employer's workplace.[840] Proposed § 910.2(b)(2)(i) also stated that the employer must provide the notice in writing on paper or in a digital format such as an email or text message within 45 days of rescinding the non-compete.

Proposed § 910.2(b)(2)(ii) stated that the employer must provide the notice to both current workers and former workers when the employer has the former worker's contact information readily available. To ease the burden of compliance, proposed § 910.2(b)(2)(iii) provided model language that would satisfy the notice requirement. Proposed § 910.2(b)(2)(iii) and § 910.2(b)(3) provided a safe harbor for employers using the model language, while also permitting an employer to use different language, provided that the language communicates to the worker that the worker's non-compete is no longer in effect and may not be enforced.[841]

In the NPRM, the Commission stated that the purpose of the proposed notice requirement was to ensure that workers are informed that their existing non-competes are no longer in effect. The Commission cited evidence indicating that many workers are not aware of the applicable law governing non-competes or their rights under those laws, and stated that it was therefore concerned that, absent a notice requirement, workers may not know that their non-competes are no longer enforceable as of the effective date.[842]

#### 2. The Final Rule

a. The Final Rule Does Not Require Rescission (Legal Modification) of Existing Non-Competes

The Commission has eliminated the proposed rule's requirement that employers rescind (*i.e.*, legally modify) existing non-competes. The Commission believes the proposed rescission requirement would have imposed unnecessary burdens on employers, as other aspects of the final rule provide

less burdensome means of ensuring that workers other than senior executives will not be bound or chilled from competitive activity by non-competes after the effective date. Under § 910.2(a)(1)(ii), it is an unfair method of competition for a person to enforce or attempt to enforce a non-compete (except where, under § 910.3 the person has a good-faith basis to believe that the final rule is inapplicable). Further, under § 910.2(b)(1), the person who entered into the non-compete must provide clear and conspicuous notice to the worker by the effective date that the worker's non-compete clause is no longer in effect and will not be, and cannot legally be, enforced against the worker. These provisions are sufficient to achieve the purposes of the proposed rescission requirement without requiring any affirmative conduct beyond the notice requirement.

The Commission has also eliminated the proposed rescission requirement in response to comments expressing confusion about the requirement and concern about its practical implications. Some comments interpreted the proposed rescission requirement to mean that the worker and employer must be returned to their original positions (*i.e.*, on the day they entered into the non-compete) and presumed to not have entered into it or that it mandated wholly new contracts to replace any existing agreements that contained non-competes. Some commenters objected to what they considered the high compliance costs of rescinding and revising every employment contract with a non-compete. Some businesses said their contracts with senior executives and potentially other workers would be unwound by a rescission requirement. Other commenters said that if the Commission promulgated the proposed rescission requirement, it would be disregarding the role non-competes played in the overall value of the exchange for an employment contract. An industry association said rescission would require assessment of each contract's severability under relevant State law, and the answers would vary widely.

The Commission does not intend for the final rule to have such effect and has omitted the rescission requirement proposed in the NPRM. The Commission also adopts § 910.3(b), which provides an exception for causes of action that accrued before the effective date, to be clear that the final rule does not render any existing non-competes unenforceable or invalid from the date of their origin. Instead, it is an unfair method of competition to enforce

---

[839] *See* NPRM, proposed § 910.2(b).

[840] *Id.* at 3513.

[841] *Id.* at 3514.

[842] *Id.* at 3513.

certain non-competes beginning on the effective date. Actions taken before the effective date—for example, enforcing an existing non-compete or making representations related to an existing non-compete—are not unfair methods of competition under the final rule. As noted elsewhere, the Commission also exempts from the rule future enforcement of existing non-competes with senior executives.

Commenters also argued that a rescission requirement would be impermissibly retroactive, present due process concerns, and/or constitute an impermissible taking under the Fifth Amendment. The Commission responds to these comments in Part V.B.

Numerous commenters opposed the proposed rescission requirement based on perceived challenges presented by proposed § 910.1(b)(2), which addressed *de facto* non-competes, and its purported ambiguity with respect to which contractual terms employers would be required to rescind. The Commission has removed the rescission requirement for the reasons described in this Part IV.E.2.a and has also revised the proposed rule's language concerning *de facto* non-competes to clarify the scope of the definition.

b. The Final Rule's Notice Requirement

While the final rule does not require rescission (*i.e.*, legal modification) of existing non-competes, the final rule does prohibit enforcement of existing non-competes after the effective date and requires the person who entered into the non-compete with the worker to provide clear and conspicuous notice to the worker, by the effective date, that the worker's non-compete will not be, and cannot legally be, enforced against the worker.[843] The notice must identify the person who entered into the non-compete with the worker and must be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker.[844]

Several commenters emphasized the importance of notice, especially for former workers who may be actively refraining from competitive activity (in compliance with a non-compete), and who may continue to do so if they are not informed that their non-compete is no longer in effect. One commenter highlighted the importance of notice, because a non-compete may be coercive regardless of its enforceability. Many commenters emphasized the need for clear and concise language in the notices, including in languages other than English. One commenter asked the Commission to use concrete, lay-friendly terms to help reduce workers' fears of being sued. A commenter that recommended notice in languages other than English suggested that such a requirement apply to medium and large businesses with a threshold percentage of workers (such as 10%) who primarily speak a language other than English.

Commenters also suggested changes in notice procedures to improve the chances of workers receiving and understanding the notice. One commenter stated that text messages should not qualify as a primary means of individual notice because they are too casual, may be automatically deleted, and the sender may not be identifiable. However, in this commenter's view, text messages could be a secondary form of notice. Some commenters suggested that in addition to individual notice, the final rule should require an employer to post a copy of the notice in the workplace and/or online.

A number of commenters asserted that the requirement for employers to provide notice to former workers when "the employer has the worker's contact information readily available" was confusing or burdensome. A commenter stated that employers do not update former employees' contact information, so such information is likely incomplete and might be inaccurate. One commenter asserted that a requirement to provide notice within 45 days of the effective date is too difficult for small businesses. Another commenter suggested that the final rule should require contacting only former workers who left the firm two years or less before the effective date, unless the non-compete has elapsed.[845] Some commenters expressed concern that former workers might not be notified under the "readily available" standard. A commenter stated that, to avoid confusion and evasion, employers should be required to send notice to

former workers at the worker's last known home address, email address, or cell phone number. Commenters also contended that the meaning of "individualized communication" was not clear or that compliance with it would be too difficult or burdensome.

The Commission finalizes the proposed rule's notice requirement largely as proposed, with minor revisions to facilitate compliance, reduce burdens on employers, and improve accessibility for non-English speakers.[846] The final rule also requires covered businesses to provide notice by the effective date, rather than 45 days thereafter, to simplify the final rule and to secure its benefits for competition in labor markets and product and service markets as soon as practicable.

The Commission finalizes a notice requirement because the available evidence indicates that many workers are not aware of the applicable law governing non-competes or their rights under those laws, or are unable to enforce their rights—and are chilled from engaging in competitive activity as a result. The evidence shows that even when employers impose non-competes that are unenforceable under State law, many workers believe they are bound by them (or are otherwise unable to enforce their rights to be free of non-competes).[847] As a result, the Commission finds that even after the final rule is in effect, absent a clear notice requirement, many workers may be unaware that, because of the final rule, their employer cannot enforce a non-compete and that the Commission has the authority to take action against employers who violate the final rule. Accordingly, absent notice, these workers may continue to be chilled from switching jobs or starting their own business. This would tend to negatively affect competitive conditions in the

---

[843] § 910.2(b)(1).

[844] This language mirrors language in other Federal regulations. *See, e.g.*, 17 CFR 9.11 (notice of disciplinary action must be made personally by mail at the person's last known address or last known email address); 29 CFR 38.79 (written notice must be sent to a "complainant's last known address, email address [or another known method of contacting the complainant in writing]"); 16 CFR 318.5 (providing for written notification at an individual's last known address, or email if the individual chooses that option).

[845] Under the final rule, notice is only required for existing non-competes, *i.e.*, those that have not elapsed.

[846] The Commission notes that this required notice is a routine disclosure of valuable, factual information to workers that does not implicate the First Amendment. *See Milavetz, Gallop & Milavetz, P.A.* v. *United States*, 559 U.S. 229, 249–53 (2010) (citing *Zauderer* v. *Off. of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)). As described in this Part IV.E, the Commission adopts this notice requirement to ensure workers do not wrongly believe they remain bound by unenforceable non-competes after the rule goes into effect. The Commission's conclusion that such notice is necessary to achieve the full benefits of the final rule is based on its expertise and on empirical evidence supporting the Commission's finding of an *in terrorem* effect related to non-competes.

[847] *See* Prescott & Starr, *supra* note 413; *see also* Part IV.B.2.b.ii (describing the Commission's finding that non-competes are exploitative and coercive where they trap workers in jobs or force them to bear significant harms or costs, even where workers believe the non-compete is unenforceable).

same manner as if non-competes were in full force and effect.

A notice requirement helps address this concern by informing individual workers, to the extent possible, that after the effective date the employer will not enforce any non-compete against the worker. The Commission believes that prompt and clear notice to workers other than senior executives that non-competes are no longer enforceable is essential to furthering the purposes of the final rule—to allow workers to seek or accept another job or to leave to start and run a business, and to allow other employers to compete freely for workers. Indeed, the Commission has refined the model language to make it shorter and clearer than the proposed model language.

While the proposed rule would have required employers to provide the notice no later than 45 days after the compliance date, the final rule requires notice no later than the effective date (*i.e.*, no later than 120 days after the final rule is published in the **Federal Register**). The Commission believes that it is practicable and reasonable for employers to provide the notice by the effective date. The Commission has designed the notice requirement to make compliance as easy as possible for employers. The final rule provides safe harbor model language that satisfies the notice requirement;[848] gives employers several options for providing the notice—on paper, by mail, by email, or by text;[849] and exempts employers from the notice requirement where the employer has no record of a street address, email address, or mobile telephone number for the worker.[850]

In addition, while the model language in the proposed rule used the phrase "the non-compete clause in your contract is no longer in effect,"[851] the model language in the final rule uses the phrase "[EMPLOYER NAME] will not enforce any non-compete clause against you."[852] Because this language does not identify the recipient as having a non-compete, the employer does not need to determine which of its workers have non-competes; instead, it can simply send a mass communication such as a mass email to current and former workers.

Furthermore, requiring notice by the effective date simplifies the final rule and allows its benefits to begin sooner. In response to commenters that contended that they need more time to

provide workers notice, the Commission believes that providing notice should not be time-consuming, even for small businesses, particularly given that the final rule provides model language, allows use of the worker's last known contact information for notice, allows digital notice, and (unlike in the proposed rule) categorically exempts an employer who has no such information from the notice requirement. Moreover, as described in Part IV.B.2.b.ii, non-competes trap workers in jobs or force them to bear other significant harms or costs—even where workers believe the non-compete is unenforceable. Given the limited burdens associated with providing notice only to workers whose last known contact information is on file and employers' option to simply copy and paste the safe harbor model notice, as well as the known and currently ongoing acute harms of non-competes (including their *in terrorem* effects) and the importance of workers knowing as soon as possible that their non-compete is unenforceable, the Commission declines to extend the time to provide notice.[853] The Commission finds that 120 days is more than adequate for employers to complete this task.

In response to comments expressing concern that the NPRM's "individualized communication" requirement was unclear or burdensome, the Commission has removed that language. Instead, the final rule ensures each worker will receive notice while specifying several permissible methods for providing the notice, which furthers compliance certainty while giving employers a range of options and an efficient means of complying. By allowing a number of formats for such communications, including digital formats, employers are more likely to be able to contact workers rapidly, individually, and have flexibility to do so at low cost. Accordingly, § 910.2(b)(2) of the final rule allows for notice by text message, by email, as well as paper notice by hand or by mail to the worker's last known street address. The final rule gives employers flexibility to choose among these methods. In responses to the concerns expressed by the commenter about text messages, the Commission believes that text messages should be a permissible method for providing the notice because they are widely used, delivered quickly, low-cost for employers, and an effective means of communication for workers who do not have email accounts.

In response to comments contending that notice to former workers is too burdensome or difficult, the Commission believes that providing notice to former workers is critical because former workers may be refraining from competitive activity because they believe they are subject to a non-compete. The Commission disagrees that providing notice to former workers will be burdensome. The Commission believes that most employers have contact information for former workers who may be subject to non-competes.[854] And under the final rule, in those rare cases in which an employer has no record of a street address, email address, mobile telephone number, or other method of contacting the worker or former worker, § 910.2(b)(3) exempts the employer from the final rule's notice requirement with respect to the worker. Furthermore, by specifying the circumstances under which notice may not be provided, this exemption also addresses concerns expressed by some commenters that ambiguity in the proposed rule's "readily available" standard for notifying former workers would lead to fewer former workers being notified.

In response to comments contending that notice to former workers is too burdensome or difficult, the Commission believes that providing notice to former workers is critical because former workers may be refraining from competitive activity because they believe they are subject to a non-compete. In light of the comments about the proposed "readily available" contact information standard, the Commission in this final rule does not adopt that language and instead requires that the notice must be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker. The Commission agrees with commenters that stated that most employers have such contact information for both present and former workers. For those rare cases in which

---

[848] § 910.2(b)(4)–(5).

[849] § 910.2(b)(2)(ii).

[850] § 910.2(b)(3).

[851] NPRM, proposed § 910.2(b)(2)(iii).

[852] § 910.2(b)(4).

[853] The Commission addresses the effective date in Part VIII.

[854] Employers have many record-keeping requirements under State and Federal laws under which they may retain the contact information described in § 910.2(b)(2)(ii). *See, e.g.*, IRS, Circular E, Employer's Tax Guide, Pub. 15, 8 (2024) ("Keep all records of employment taxes for at least 4 years," including addresses of employees and recipients and forms with addresses.); USCIS, Handbook for Employers M–274, Sec. 10.0, Retaining Form I–9 (requiring retention of I–9 form, which includes employees' addresses, email addresses, and telephone numbers).

an employer has no record of a street address, email address, mobile telephone number, or other method of contacting the worker or former worker, § 910.2(b)(3) exempts the employer from the final rule's notice requirement.

The Commission agrees with comments that notices in other languages spoken by workers would help achieve the goal of informing workers that their non-competes are no longer enforceable and help employers to comply with the final rule. However, to avoid imposing a burden of translation on employers, § 910.2(b)(6) makes it optional to provide notices in languages other than English. The Commission encourages employers to provide this notice to workers who speak languages other than English. To facilitate the provision of notices in other languages, the final rule provides a model notice in English and links to translations of other languages that are commonly spoken in U.S. homes, including Spanish, Chinese, Arabic, Vietnamese, Tagalog, and Korean.[855]

## V. Section 910.3: Exceptions

### A. Section 910.3(a): Exception for Persons Selling a Business Entity

In the NPRM, the Commission proposed an exception for certain non-competes between the seller and the buyer of a business that applied only to a substantial owner, member, or partner, defined as an owner, member, or partner with at least 25% ownership interest in the business entity being sold. Based on comments, the Commission adopts an exception for the bona fide sale of a business without requiring that the seller have at least a 25% ownership interest.

### 1. The Proposed Rule

Proposed § 910.3 allowed non-competes where the restricted party is "a person who is selling a business entity or otherwise disposing of all of the person's ownership interest in the business entity, or . . . selling all or substantially all of a business entity's operating assets," and is also "a substantial owner, of, or substantial member or substantial partner in, the business entity at the time the person enters into the non-compete."[856] The Commission proposed to define "substantial owner, substantial member, and substantial partner" as "an owner, member, or partner holding at least a 25 percent ownership interest in a business entity."[857] The text of proposed § 910.3 stated that non-competes allowed under the proposed exception would remain subject to Federal antitrust law and all other applicable law.

The Commission stated in the NPRM that its proposal to exempt from the rule non-competes between the seller and the buyer of a business did not reflect a finding that such non-competes are beneficial to competition.[858] Rather, the Commission explained that such non-competes may implicate unique interests and have unique effects, and the evidentiary record did not permit the Commission to thoroughly assess the full implications of restricting their enforceability.[859] The Commission noted that because all States permit non-competes between the seller and the buyer of a business to some degree, and because the laws that apply to these types of non-competes have seen fewer changes recently than the laws applicable to non-competes that arise solely out of employment, there have not been natural experiments allowing researchers to assess this type of non-compete's effect on competition.[860]

### 2. Comments Received

A few commenters suggested eliminating the proposed exception. These commenters contended that non-competes between the seller and the buyer of a business may still be exploitative and coercive, particularly in the case of small business owners in transactions with larger, better-resourced corporations. However, most commenters who addressed the issue supported an exception that would allow certain non-competes between the seller and the buyer of a business. These commenters agreed with the NPRM that State common law generally applies less-intensive scrutiny to non-competes ancillary to the sale of a business and that every State statute banning non-competes has an exception which allows some or all non-competes between the seller and the buyer of a business. Most of the commenters who supported some form of exception for non-competes between the seller and the buyer of a business contended that they are necessary to protect the value of the sale by ensuring the effective transfer of the business's goodwill. According to these commenters, a buyer will be less willing to pay for a business if they cannot obtain assurance that they will be protected from future competition by the seller, and so a failure to exempt related non-competes may chill acquisitions. Commenters stated that sellers of a business have more bargaining power than workers do and generally receive a portion of the sales price, making exploitation and coercion less likely. They also noted that non-competes between the seller and the buyer of a business remain subject to State limitations on scope, duration, and reasonableness.

Some commenters supported the proposed 25% ownership threshold. However, most commenters who otherwise supported the exception stated that the proposed 25% ownership threshold is too high. They argued that the 25% threshold does not account for the reality of most transactions, in which owners with less than 25% interest in a business may have significant goodwill and receive significant proceeds from a sale. Some commenters focused on the tax costs of the threshold, pointing to IRS provisions that currently allow taxpayers to deduct from their taxable income the portion of the sales price made in exchange for non-competes. Others argued that the 25% threshold would disincentivize equity-based consideration. To avoid these harms, these commenters suggested a variety of other thresholds, including the 5% ownership threshold used in SEC regulations.[861] Some commenters contended that the Commission failed to provide evidence justifying the proposed 25% ownership threshold. Others questioned the effectiveness of ownership as a proxy for goodwill or the likelihood of exploitation and coercion. As examples, these commenters pointed to passive investors who may have significant ownership stakes in a business but none of its goodwill, and owners whose interests may be purchased for less than fair market value or who are excluded from sales negotiations.

A few commenters argued that the proposed 25% threshold would preempt the laws of California and other States which ban non-competes except in the sale of a business, none of which require that the seller have a substantial ownership stake. They pointed to cases in which California courts applied the exception and allowed enforcement of non-competes against shareholders holding as little as a 3% ownership interest. In light of these statutes, some of these commenters urged the Commission to adopt an exception for

---

[855] *See* Sandy Dietrich & Erik Hernandez, Census Bureau, *Nearly 68 Million People Spoke a Language Other Than English at Home in 2019* (Dec. 6, 2022) at Table 1, *https://www.census.gov/library/stories/2022/12/languages-we-speak-in-united-states.html*.

[856] NPRM, proposed § 910.3.

[857] *Id.*, proposed § 910.1(e).

[858] *Id.* at 3515.

[859] *Id.* at 3514–15.

[860] *Id.*

[861] *See, e.g.,* 17 CFR 240.13d–1 (requiring reporting by beneficial owners holding more than 5% interest in an equity security).

agreements that involve the sale of a business or equity in a company without a threshold ownership requirement.

Some commenters urged the Commission to adopt a case-by-case assessment of business sales based on State law, such as a "totality of the circumstances" or "reasonableness" test. Others proposed replacing the ownership-based exception with an exception for founders, key workers with IP access, and/or those with goodwill. At least one commenter asked the Commission to use a bright-line rule rather than a functional or definitional test that would require adjudication and interpretation by courts.

Some commenters presented empirical evidence to justify a lower ownership threshold. A few commenters pointed to data suggesting that more than 96% of CEOs of the 3,000 largest publicly traded companies own less than 25% of their company. One commenter pointed to data suggesting that the average duration of a startup's life from fundraising to acquisition is 6.1 years, arguing that it is unlikely for venture-capital backed businesses to operate and grow for that period of time without accepting funding that dilutes founders' and key employees' equity stake in the business. Other commenters supporting a lower threshold provided anecdotal evidence that businesses cede large shares to financial backers, resulting in many owner-operators holding significantly less than a 25% share in their business.

Finally, some commenters focused on eliminating potential loopholes to the proposed exception. Some commenters expressed concern that employers may set up sham transactions with wholly owned subsidiaries in order to impose non-competes that would otherwise be prohibited under the rule, urging the Commission to clarify that the exception applies only to bona fide transfers to an independent third party. Some commenters contended that firms may use "springing" non-competes (in which a worker must agree at the time of hiring to a non-compete in the event of some future sale) and repurchase rights, mandatory stock redemption programs, or similar stock-transfer schemes (pursuant to which a worker may be required to sell their shares if a certain event occurs) to impose non-competes on their workers which would otherwise be prohibited. They urged the Commission to address those instances specifically, including by defining the exception by the percentage of total equity value received in liquid proceeds at the time of the relevant transaction.

## 3. The Final Rule

The Commission adopts a sale of business exception for substantially the same reasons articulated in the NPRM. However, in response to comments concerning the ownership percentage threshold, the Commission modifies § 910.3(a) so that it no longer includes the proposed requirement that the restricted party be "a substantial owner of, or substantial member or substantial partner in, the business entity" to fall under the exception. The Commission otherwise adopts this provision largely as proposed. To address commenters' concerns that employers will use sham transactions, stock-transfer schemes or other mechanisms designed to evade the rule, § 910.3(a) requires that, to fall under the exemption, a non-compete must be entered into pursuant to a bona fide sale.

The Commission reiterates that § 910.3(a) does not reflect a finding that non-competes between the seller and the buyer of a business are beneficial to competition or that they are not restrictive and exclusionary or exploitative and coercive. Indeed, the Commission acknowledges that some non-competes between the seller and buyer of a business may be exploitative and coercive due to an imbalance in bargaining power and/or may tend to harm competitive conditions. However, commenters did not present empirical research on the prevalence of non-competes between the seller and the buyer of a business or on the aggregate economic effects of applying additional legal restrictions to non-competes between the seller and buyer of a business. The Commission's decision to adopt § 910.3(a) reflects the view of the Commission and most commenters that, compared to non-competes arising solely out of an employment relationship, non-competes between the sellers and buyers of businesses may implicate unique interests and have unique effects that this rulemaking record does not address.[862]

The proposed requirement that an excepted non-compete bind only a "substantial" owner, member or partner of the business entity being sold was designed to allow those non-competes between the seller and the buyer of a business which are critical to effectively transfer goodwill while prohibiting those which are more likely to be exploitative and coercive due to an imbalance of bargaining power between the seller and the buyer. However, commenters persuasively argued that the proposed 25% ownership threshold

was too high because it failed to reflect the relatively low ownership interest held by many owners, members, and partners with significant goodwill in their business. The Commission declines to maintain the "substantial" interest requirement with a lower percentage threshold for the same reason.

The Commission also declines to adopt a threshold of $1 million, $250,000, or some other dollar limit on the proceeds received by the seller. On the current record, these thresholds were not sufficiently correlated to sellers' goodwill or bargaining power for a broadly generalizable approach. The Commission declines to adopt a "totality of the circumstances" or "reasonableness" test in the text of § 910.3(a) because they would provide little meaningful guidance to buyers and sellers and would be difficult to administer. For the same reasons, the Commission declines to replace the ownership-based exception with an exception for founders, key workers, workers with access to intellectual property, and/or workers with goodwill. Furthermore, non-competes allowed under the exception will continue to be governed by State law, which generally requires a showing that a non-compete is necessary to protect the value of the business being sold, as well as Federal antitrust law.[863]

Finally, the Commission agrees with commenters' concerns about the risks that firms may abuse the exception through sham transactions with wholly owned subsidiaries, "springing" non-competes, repurchase rights, mandatory stock redemption programs, or similar evasion schemes. The Commission adds the term "bona fide" and makes changes clarifying that any excepted non-compete must be made "pursuant to a bona fide sale" to ensure that such schemes are prohibited under the rule. A bona fide sale is one made in good faith as opposed to, for example, a transaction whose sole purpose is to evade the final rule.[864] In general, the Commission considers a bona fide sale to be one that is made between two

---

[862] See NPRM at 3514–15.

[863] See, e.g., U.S. v. Addyston Pipe & Steel Co., 85 F. 271, 281 (6th Cir. 1898) ("For the reasons given, then, covenants in partial restraint of trade are generally upheld as valid when they are agreements [inter alia] by the seller of property or business not to compete with the buyer in such a way as to derogate from the value of the property or business sold . . . . Before such agreements are upheld, however, the court must find that the restraints attempted thereby are reasonably necessary . . . to the enjoyment by the buyer of the property, good will, or interest in the partnership bought. . . .").

[864] Black's Law Dictionary defines bona fide as "[m]ade in good faith; without fraud or deceit," and "[s]incere; genuine." (11th ed. 2019).

independent parties at arm's length, and in which the seller has a reasonable opportunity to negotiate the terms of the sale. So-called "springing" non-competes and non-competes arising out of repurchase rights or mandatory stock redemption programs are not entered into pursuant to a bona fide sale because, in each case, the worker has no good will that they are exchanging for the non-compete or knowledge of or ability to negotiate the terms or conditions of the sale at the time of contracting. Similarly, sham transactions between wholly owned subsidiaries are not bona fide sales because they are not made between two independent parties.

The Commission declines to specifically delineate each kind of sales transaction which is not a bona fide sale under the exception to avoid the appearance that any arrangement not listed is allowed under the exception. Courts have effectively identified and prohibited such schemes pursuant to State statutes prohibiting non-competes.[865] In addition, non-competes allowed under the sale-of-business exception remain subject to Federal and State antitrust laws, including section 5 of the FTC Act.

### B. Section 910.3(b): Exception for Existing Causes of Action

Proposed § 910.2(a) would have prohibited employers from maintaining an existing non-compete with a worker. The proposed rule also would have required employers to rescind existing non-competes.[866] Commenters argued that any invalidation or rescission required of existing non-competes would be impermissibly retroactive, present due process concerns, and/or constitute an impermissible taking under the Fifth Amendment.

As described in Part IV.C.5, the Commission adopts a modified § 910.2(a) under which existing non-competes for workers who are not senior executives are no longer enforceable. The Commission adds an exception in § 910.3(b) in response to comments raising concerns related to retroactivity. Section 910.3(b) specifies that the final rule does not apply if a cause of action related to a non-compete provision accrued prior to the effective date. This

includes, for example, where an employer alleges that a worker accepted employment in breach of a non-compete if the alleged breach occurred prior to the effective date. This provision responds to concerns that the final rule would apply retroactively by extinguishing or impairing vested rights acquired under existing law prior to the effective date.[867] In this Part V.B, the Commission addresses commenters' arguments regarding retroactivity, due process, and impermissible taking under the Fifth Amendment.

#### 1. Retroactivity

A number of commenters asserted that applying the final rule to prohibit the enforcement of existing non-competes would render the final rule impermissibly retroactive. The Commission disagrees. A rule "does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the [rule's] enactment, or upsets expectations based in prior law."[868] Rather, courts have explained that an "administrative . . . rule is retroactive [only] if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already passed."[869] "A rule that 'alter[s]' the past legal consequences of 'past action' is retroactive," while a rule that "'alter[s] only the 'future effect' of past actions, in contrast, is not."[870] Agency action "that only upsets expectations based on prior law is not retroactive."[871]

The final rule is not impermissibly retroactive because it does not impose any legal consequences on conduct predating the effective date. The Commission is not creating any new obligations, imposing any new duties, or

attaching any new disabilities for past conduct.[872] And to minimize concerns about retroactivity, the Commission adopts § 910.3(b), which states that the final rule does not apply where a cause of action related to a non-compete accrues before the effective date. The notice requirement in § 910.2(b) likewise does not render the final rule impermissibly retroactive because that requirement merely requires notice that non-competes that exist after the effective date will not be enforced in the future with respect to workers other than senior executives. No penalties attach to persons who entered non-competes before the effective date.

This final rule is analogous to the FCC rulemaking upheld in *National Cable & Telecommunications Ass'n* v. *FCC.* There, the agency promulgated a rule that "forbade cable operators not only from entering into new exclusivity contracts, but also from enforcing old ones."[873] The court upheld the rule against a retroactivity challenge because the FCC had "impaired the future value of past bargains but ha[d] not rendered past actions illegal or otherwise sanctionable."[874] This final rule does the same with existing non-competes. The final rule does not render it illegal or otherwise sanctionable for parties to have entered into non-competes before the effective date; it merely provides that persons cannot enforce or attempt to enforce such agreements with workers other than senior executives or represent to such workers that they are bound by an enforceable non-compete after the effective date. It is thus not impermissibly retroactive.

In *National Cable,* the court also considered whether the agency had "balance[d] the harmful 'secondary retroactivity' of upsetting prior expectations or existing investments against the benefits of applying [its] rules to those preexisting interests."[875] While commenters did not frame their objection as one of "secondary retroactivity," some did object that the final rule would upset the benefits of pre-existing bargains. As in *National Cable,* however, the Commission has "expressly consider[ed] the relative benefits and burdens of applying its rule

---

[865] *See, e.g., Bosley Med. Grp.* v. *Abramson,* 161 Cal. App. 3d 284, 291 (Cal. Ct. App. 1984) (refusing to enforce non-compete imposed on physician under agreement requiring physician to purchase 9% of stock at hiring and resell to corporation upon termination because agreement "was devised to permit plaintiffs to accomplish that which the law otherwise prohibited: an agreement to prevent defendant from leaving plaintiff medical group and opening a competitive practice").

[866] *See* proposed § 910.2(b)(1).

[867] As discussed in Part V.B.1, courts have explained that an "administrative . . . rule is retroactive [only] if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already passed." *Regents of the Univ. of Cal.* v. *Burwell,* 155 F. Supp. 3d 31, 44 (D.D.C. 2016) (alteration in original) (quoting *Nat'l Min. Ass'n* v. *DOL,* 292 F.3d 849, 859 (D.C. Cir. 2002)). But a regulation is *not* retroactive simply because it "impair[s] the future value of past bargains" if it does not also "render[ ] past actions illegal or otherwise sanctionable." *Nat'l Cable & Telecomms. Ass'n* v. *FCC,* 567 F.3d 659, 670 (D.C. Cir. 2009).

[868] *Landgraf* v. *USI Film Prods.,* 511 U.S. 244, 269 (1994).

[869] *Burwell,* 155 F. Supp. 3d at 44 (alteration in original) (quoting *Nat'l Min. Ass'n,* 292 F.3d at 859).

[870] *Id.* (alterations in original) (quoting *Ne. Hosp. Corp.* v. *Sebelius,* 657 F.3d 1, 14 (D.C. Cir. 2011)).

[871] *Nat'l Cable,* 567 F.3d at 670 (internal quotation omitted) (quoting *Mobile Relay Assocs.* v. *FCC,* 457 F.3d 1, 11 (D.C. Cir. 2006)).

[872] For instance, the D.C. Circuit found that agency action impermissibly attached a "new disability" when a Department of Interior rule made mine operators ineligible for a surface mining permit based on "pre-rule violations." *Nat'l Min. Ass'n* v. *U.S. DOI,* 177 F.3d 1, 8 (D.C. Cir. 1999). Here, the final rule imposes no penalties or other disabilities on persons who entered into non-competes before the effective date.

[873] *Nat'l Cable,* 567 F.3d at 661.

[874] *Id.* at 670.

[875] *Id.* at 670.

to existing contracts.'' [876] This consideration led the Commission to adopt the various exceptions described in the final rule, including the decision not to apply the final rule to non-competes entered into with senior executives before the effective date. As explained in Part IV.B, however, the Commission has determined that, for workers other than senior executives, there are substantial benefits to applying the rule to prohibit the future enforcement of non-competes entered into before the effective date. These benefits include the anticipated increase in worker earnings, new business formation, and innovation.[877] Additionally, the Commission finds such agreements are generally coercive and exploitative, so prohibiting their future enforcement is also a benefit.[878]

In the Commission's view, these significant benefits justify any burdens of applying the final rule to the future enforcement of pre-existing agreements with workers other than senior executives. Having balanced the burdens and benefits of so applying the final rule, the Commission has satisfied its obligation to consider the secondary retroactivity effects of the final rule. Moreover, the Commission notes that non-competes were already subject to case-by-case adjudication under section 5.[879] Employers were thus already responsible, even before the final rule, for ensuring their non-competes are not unfair methods of competition.

## 2. Takings

The Commission also disagrees with commenters who contended that applying the final rule to non-competes entered into before the effective date would violate the Fifth Amendment by effecting a taking without due compensation. Some comments interpreted the proposed rescission requirement to mean that the worker and employer must be returned to their original positions (*i.e.*, on the day they entered into the non-compete) and presumed to not have entered the agreement, or that the rule would mandate wholly new contracts to replace any existing agreements that contained non-competes. The Commission does not intend the final rule to have such effect and has omitted the rescission requirement proposed in the NPRM. The Commission also adopts § 910.3(b), which provides an exception for causes of action that accrued before the effective date, to clarify that the final

rule is purely prospective. The final rule does not render any existing non-competes unenforceable or invalid from the date of their origin. Instead, under the final rule, it is an unfair method of competition to enforce certain non-competes beginning on the effective date. Action taken before the effective date to enforce an existing non-compete or representations made before the effective date related to an existing non-compete are not an unfair method of competition under the final rule. The final rule does not effectuate a taking.

The Takings Clause provides that ''private property'' shall not ''be taken for public use, without just compensation.'' [880] When, as here, ''the government, rather than appropriating private property for itself or a third party, imposes regulations that restrict an owner's ability to use his own property,'' courts consider whether the regulation ''goes too far'' and constitutes a ''regulatory taking.'' [881] Consistent with the Supreme Court's decision in *Penn Central Transportation Co.* v. *City of New York* (''*Penn Central*''), this is necessarily an ''ad hoc, factual inquir[y]'' and focuses on three factors: ''the economic impact of the regulation on the claimant''; ''the extent to which the regulation has interfered with distinct investment-backed expectations''; and ''the character of the governmental action.'' [882] ''[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.'' [883] As a general matter, ''the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking.'' [884]

Under the *Penn Central* test, the final rule does not effect a taking as a matter of law. First, the economic impact of the regulation on employers with existing non-competes with workers who are not senior executives is insufficient to constitute a taking.[885] The Commission has found that such agreements are rarely the product of bargaining, and that little to nothing is offered in

exchange for them. And research has confirmed that for many such agreements, employers do not value the ability to enforce the agreements.[886] The final rule also includes provisions that allow employers and workers to ''moderate and mitigate the economic impact'' of the final rule.[887] The Commission has made clear that employers may continue to use reasonable NDAs and trade secrets law to protect their interests, including customer goodwill.[888] In fact, one study finds that 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and 74.7% of workers with non-competes are subject to all three provisions.[889] And in cases where non-competes with workers other than senior executives were tied to benefits like cash or equity, the Commission has provided time for those agreements to be renegotiated if necessary.[890] For senior executives, the Commission allows existing agreements to continue to be enforced.

The character of the governmental action here also counsels against viewing the final rule as a taking. ''A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.'' [891] There is no physical invasion here, and the final rule is promulgated under the Commission's authority to identify and prohibit unfair methods of competition.[892] Among other economic benefits described in Part IV.B, the Commission finds economy-wide benefits, including increases in new business formation and innovation. The Commission also finds that the final rule will increase earnings for workers by preventing enforcement of agreements that suppress their earnings. Moreover, non-competes have long been subject to government regulation, including not only section 5 of the FTC Act, but also State common

---

[876] *Id.* at 671.

[877] *See* Part IV.B.

[878] *See* Part IV.B.2.b.

[879] Part I.B.1.

[880] U.S. Const. amend. V.

[881] *Cedar Point Nursery* v. *Hassid*, 594 U.S. 139, 148 (2021).

[882] *Penn Cent. Transp. Co.* v. *City of N.Y.*, 438 U.S. 104 (1978).

[883] *Lingle* v. *Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005).

[884] *Connolly* v. *Pension Ben. Guar. Corp.*, 475 U.S. 211, 224 (1986); *see also Nat'l Min. Ass'n* v. *Babbitt*, 172 F.3d 906, 917 (D.C. Cir. 1999) (applying *Connolly* to a Takings challenge to an administrative rule).

[885] *Murr* v. *Wis.*, 582 U.S. 383, 405 (2017); *see also Connolly*, 475 U.S. at 225.

[886] *See* Hiraiwa, Lipsitz, & Starr (2023) (showing that firms do not value the ability to enforce non-competes for workers earning up to $100,000 per year and potentially more).

[887] *Connolly*, 475 U.S. at 225–26.

[888] *See* Part IV.D.2.

[889] Balasubramanian, Starr, & Yamaguchi, supra note 74 at 35.

[890] *See* § 910.6.

[891] *Penn Cent. Transp. Co.* v. *City of N.Y.*, 438 U.S. 104, 124 (1978) (internal citation omitted).

[892] *See* 15 U.S.C. 45(a); *see also* Parts IV.B and C (the Commission's findings outlining the public benefits of the final rule and the public harm from the use of non-competes).

law, State enactments, and other Federal antitrust laws.

Finally, the final rule does not upset investment-backed expectations to the extent necessary to constitute a taking. Even in States that prohibit some or all non-competes, employers make many investments in workers that they would continue to make regardless of their ability to use non-competes, such as training, or that would be protected by other mechanisms, such as reasonable NDAs, trade secret law, and/or fixed term contracts. In other words, non-competes are not a prerequisite to employers' productivity and output, in large part because (as described in Part IV.D) employers have reasonable alternatives to protecting the investments they make. The Commission has also lessened the economic burden of the final rule by creating an exception for situations where a cause of action accrued before the effective date.[893] Furthermore, States and the Federal government have regulated and considered further regulating non-competes for years, and the Commission issued the NPRM more than 18 months before the effective date—and began exploring whether to regulate non-compete agreements more than five years ago.[894] There has thus been ample notice that non-competes may become unenforceable by rule,[895] and prior to this rule non-competes were already subject to case-by-case adjudication under section 5. For all these reasons, the Commission does not believe the final rule constitutes a taking.

### 3. Due Process

Similarly, the Commission disagrees with commenters who argued that applying the final rule to existing non-competes would present due process concerns. Assuming that these due process concerns are independent of other constitutional concerns like the alleged retroactive application of the final rule,[896] which are addressed in Parts V.B.1 and V.B.2, the Commission disagrees that there is any due process infirmity. Due process requires the government, at a minimum, to provide notice and an opportunity to be heard before depriving any person of

property.[897] By issuing the NPRM and engaging in notice-and-comment rulemaking, the Commission has provided sufficient due process. And on top of the notice-and-comment process, there will be further process in an administrative adjudication or in court before any person is found to have violated the rule.

### C. Section 910.3(c): Good Faith Exception

The Commission adds an exception in § 910.3(c) in an abundance of caution to ensure the final rule does not infringe on activity that is protected by the First Amendment[898] and to improve clarity in § 910.2(a). The exception states: "It is not an unfair method of competition to enforce or attempt to enforce a non-compete clause or to make representations about a non-compete clause where a person has a good-faith basis to believe that this part 910 is inapplicable." A similar "good-faith basis" clause was in proposed § 910.2(a).

As described in Parts IV.B.4 and IV.C.5, the final rule includes a prohibition on enforcing or attempting to enforce non-competes in both § 910.2(a)(1) and (2). Under the *Noerr-Pennington* doctrine, filing a lawsuit—even if the suit may tend to restrict competition and is ultimately unsuccessful—is typically protected under the First Amendment right to petition and immune from antitrust scrutiny.[899] However, courts have recognized that where a lawsuit is a "sham," *i.e.*, objectively baseless and subjectively designed solely to prevent competition, it is not protected.[900] For a non-compete covered by the final rule, enforcing or attempting to enforce the non-compete would likely be considered a "sham" lawsuit. Accordingly, such a lawsuit would not enjoy protection under the First Amendment. Section 910.3(b) ensures, however, that if a circumstance arises under which an employer's enforcement of or attempt to enforce a non-compete

is protected by the First Amendment, the final rule does not run afoul of it.

As explained in Parts IV.B.4 and IV.C.5, the Commission adopts a prohibition on "representing" that a worker is subject to a non-compete in §§ 910.2(a)(1)(iii) and 910.2(a)(2)(iii). In § 910.3(c), the Commission incorporates a "good-faith" exception that applies to the prohibition on "representing" the worker is subject to a non-compete. Taken together, these provisions of the final rule prohibit an employer from representing to a worker that the worker is subject to a non-compete unless the employer has a good-faith basis to believe the worker is subject to an enforceable non-compete.

The Supreme Court has held "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."[901] Accordingly, "[t]he government may ban forms of communication more likely to deceive the public than to inform it, . . . or commercial speech related to illegal activity."[902] The final rule does not cover protected speech because it prohibits only misrepresentations about whether a non-compete covered by the rule is enforceable. The good-faith exception in § 910.3(b) ensures, however, that the final rule does not run afoul of the First Amendment if a circumstance arises under which an employer's representation that a worker is subject to a non-compete is protected by that Amendment.

In the NPRM, the Commission stated that an employer would have no good faith basis to believe that a worker is subject to an enforceable non-compete "where the validity of the rule . . . has been adjudicated and upheld." Some commenters stated that legal challenges to the final rule will create uncertainty and unpredictability related to compliance. The Commission believes the foregoing statement in the NPRM would contribute to this confusion and does not adopt it in this final rule. The Commission clarifies that the absence of a judicial ruling on the validity of the final rule does not create a good-faith basis for non-compliance. If the rule is in effect, employers must comply.

### D. Requests To Expand Final Rule Coverage or To Provide an Exception From Coverage Under the Final Rule

In the NPRM, the Commission preliminarily concluded that applying the rule uniformly to all employers and workers would advance the proposed

---

[893] *See* § 910.3(b).

[894] *See* Part I.B.

[895] *Connolly* v. *Pension Ben. Guar. Corp.,* 475 U.S. 211, 226 (1986).

[896] Commenters invoking a due process concern outside the retroactivity context provided little contextual detail on the precise substance of the concern, nor did they explain what further process would be due before the Commission could promulgate the rule.

[897] *See, e.g., N. Am. Butterfly Ass'n* v. *Wolf,* 977 F.3d 1244, 1265 (D.C. Cir. 2020) (citing *Mathews* v. *Eldridge,* 424 U.S. 319, 333–34 (1976)).

[898] The Commission adopts § 910.3(b)(3) out of an abundance of caution and does not believe that any of the requirements in the final rule run afoul of the First Amendment because the Commission finds that the use of certain existing non-competes is an unlawful unfair method of competition.

[899] *See E.R.R. Presidents' Conference* v. *Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); *United Mine Workers of Am.* v. *Pennington,* 381 U.S. 657 (1965).

[900] *Pro. Real Est. Invs., Inc.* v. *Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60 (1993).

[901] *Cent. Hudson Gas & Elec.* v. *Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 563 (1980).

[902] *Id.* at 563–64.

rule's objectives to a greater degree than differentiating among workers on the basis of industry or occupation, earnings, another factor, or some combination of factors, and that it would better ensure workers are aware of their rights under the rule.[903] The Commission sought comment on this topic, including what specific parameters or thresholds, if any, should apply in a rule differentiating among workers.[904]

The vast majority of commenters supported the Commission's proposal to ban non-competes categorically for all workers.[905] Commenters from a broad spectrum of job types and industries stated that non-competes harm competition in a way that hurts workers and employers.

Commenters also supported the rule with perspectives specific to particular industries. In response to the Commission's request for comment on the issue, some commenters argued that the Commission should further expand the rule to cover non-competes between franchisors and franchisees.

Other commenters argued the Commission should differentiate among workers and employers along different parameters. They stated that workers with higher earnings, higher skills, specific job titles, or access to specific types of information should be excluded. Some stated that particular industries should be excluded wholesale, including all workers in an industry regardless of their job duties, while some stated that only certain workers in particular industries should be excluded.

In adopting the final rule, the Commission considered each request for exclusion from or expansion of coverage under the final rule and concludes that the use of covered non-competes is an unfair method of competition. The Commission also concludes that applying the final rule as adopted in part 910 to the full extent of the Commission's jurisdiction with respect to covered workers advances the final rule's objectives to a greater degree than differentiating among workers. In response to, *inter alia,* comments regarding the potential costs and difficulties that may result from

invalidating existing non-competes for certain senior executives, however, the final rule differentiates between senior executives and other workers by allowing existing non-competes for senior executives to remain in force. The final rule adopts a uniform rule categorically banning new non-competes for all workers. The Commission substantiates its finding that the use of non-competes with workers is an unfair method of competition in Parts IV.B and IV.C.

In this Part V.D, the Commission addresses comments related to differentiation or exclusion of certain workers, employers, or industries. Comments related to expanding or limiting the definition of worker or employer are addressed in Parts III.C and III.G. Comments related to the Commission's jurisdiction and exclusions from the Commission's jurisdiction in the FTC Act are addressed in Part II.E. Comments related to the prevalence of non-competes within and across industries are addressed in Part I.B.2.

Overall, the Commission is committed to stopping unlawful conduct related to the use of certain non-competes to the full extent of its authority and jurisdiction. The Commission finds every use of a non-compete covered by the final rule to be an unfair method of competition under section 5 of the FTC Act for the reasons in Parts IV.B and IV.C. The use of an unfair method of competition cannot be justified on the basis that it provides a firm with pecuniary benefits.[906] To the extent commenters argue for an exception based on this justification, the Commission declines to create any exception on that basis. Moreover, a uniform rule carries significant benefits, which many commenters who otherwise opposed the NPRM acknowledged.[907] Among those benefits is the certainty for both workers and employers from a uniform rule, which also lessens the likelihood of litigation over uncertain applications. Exceptions for certain industries or types of workers would likely increase uncertainty and litigation costs, as parties would dispute whether a specific business falls within an industry-wide exception. Most importantly, exceptions would fail to

remedy the tendency of non-competes to negatively affect competitive conditions in the excepted industries or for excepted types of workers and would likely have *in terrorem* effects.

### 1. Differentiation by Worker Compensation or Skills

Many commenters sought an exception for highly paid or highly skilled workers, often alongside requests for an exception for senior executives, while many others asked the Commission to keep these workers within the scope of the final rule. Commenters seeking an exception argued that highly paid and highly skilled workers in particular did not experience exploitation and coercion and were more likely to have access to confidential information or client or customer relationships, along with the other justifications for non-competes discussed in Part IV.D. Commenters' specific arguments on the evidence concerning highly paid or highly skilled workers are considered in the relevant subsections of Part IV.B. Many commenters proposed using a compensation threshold to differentiate highly paid workers and senior executives, discussed in IV.C.4.b. Other commenters suggested an exception based on the FLSA exemptions or the worker's level of access to confidential information, discussed in Parts IV.C.4. and V.D.2.

The Commission finds that non-competes have a tendency to negatively affect competitive conditions in labor markets and product and service markets, including non-competes binding highly paid and highly skilled workers. The evidence shows that, among the other effects described in Part IV.B, non-competes for highly paid and highly skilled workers suppress wages for these workers,[908] restrict competitors' access to highly skilled workers,[909] and restrict entrepreneurship.[910] Notably, as described in Parts IV.B.2 and IV.C.1, the Commission concludes that non-competes for highly paid or highly skilled workers who are not senior executives are generally exploitative and coercive. The Commission finds that highly paid and highly skilled workers who are not senior executives only rarely negotiate meaningful consideration in exchange for a non-compete. As the Commission finds, the overwhelming response from commenters, particularly workers, was that non-competes are exploitative and

---

[903] NPRM at 3518. The NPRM's proposed definition of "worker" excluded franchisees in the context of franchisee-franchisor relationships. *Id.* at 3520. The NPRM also proposed an exception for certain non-competes between the seller and the buyer of a business.

[904] NPRM at 3519.

[905] The Commission received over 26,000 public comments from a wide range of stakeholders. Among these comments, over 25,000 expressed support for the Commission's proposal to categorically ban non-competes.

[906] *See, e.g., Atl. Refin. Co.* v. *FTC,* 381 U.S. 357, 371 (1965) ("Upon considering the destructive effect on commerce that would result from the widespread use of these contracts by major oil companies and suppliers, we conclude that the Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves."); *see also* Part II.F.

[907] *See* Part IX.C.

[908] *See* Part IV.B.3.a.ii.

[909] *See* Part IV.C.2.c.i.

[910] *See* Part IV.B.3.b.i.

coercive for many workers in highly paid professions other than senior executives.[911] While there may be highly paid or highly skilled workers who do not meet the definition of ''senior executive'' and who are not exploited or coerced, including workers above the definition's total compensation threshold, the Commission explains in Part IV.C.4 why a compensation threshold is necessary—but not sufficient—for purposes of defining senior executives whose existing non-competes may remain in force under the final rule. Further, the Commission finds that employers have sufficient alternatives to non-competes for highly paid and highly skilled workers.[912] The Commission also explains why it is not exempting all non-competes that were exchanged for consideration in Part IV.C.3. Accordingly, the final rule does not include any workers other than highly paid senior executives in the exception from the ban on enforcing existing non-competes. To ensure that only workers for whom there is insufficient evidence of exploitation and coercion are included in the exception, the final rule narrowly defines senior executive in § 910.1.[913]

2. Differentiation by Worker Access to Information

Some commenters suggested excluding workers with access to trade secrets, confidential business information, or other intellectual capital. Commenters contended these workers are uniquely situated because of their access to valuable employer information. Many commenters responded to these arguments and disagreed with them. Some commenters stated that employers overstate the proportion of workers who have access to such information. Commenters also stated that employers exaggerate the amount or quality of information that should be appropriately considered a trade secret, confidential business information, or other intellectual capital, and therefore exaggerate the purported cost to the firm of not being able to use non-competes. Commenters also stated that employers have alternatives to non-competes that generate less harm to competition, to workers, to the economy, and to rival firms, including NDAs and fixed-term employment contracts.

The Commission declines to adopt an exclusion based on workers' access to trade secrets, confidential business information, or other intellectual capital because it finds such an exclusion would be unnecessary, unjustified, unworkable, and prone to evasion. The Commission finds the use of non-competes to be an unfair method of competition and addresses claimed justifications related to trade secrets, confidential business information, or other intellectual capital in Part IV.D. The Commission finds that protecting trade secrets, confidential information, and other intellectual capital is an insufficient justification for non-competes because employers have less restrictive alternatives for protecting such information. Moreover, if the Commission were to exempt workers with access to confidential information, employers could argue that most or all workers fall under the exception, requiring workers to engage in complex and fact-specific litigation over the protected status of the underlying information. As explained in Part IX.C, such case-by-case adjudication of the enforceability of non-competes has an *in terrorem* effect that would significantly undermine the Commission's objective to address non-competes' tendency to negatively affect competitive conditions in a final rule.

3. Differentiation by Industry Other Than Healthcare

Some businesses and organizations argued that specific industries should be exempt from the final rule. The Commission carefully considered these comments and declines to adopt any industry-based exceptions. The Commission notes that while some commenters characterized purported justifications for an exclusion from the final rule as unique to a particular industry, the purported justifications were in fact the same as the those addressed in Part IV.D, namely, the need to protect investments in labor, trade secrets, confidential business information, or other intellectual capital. The Commission addresses those arguments in full in Part IV.D, but in this Part V.C.3 further discusses examples of comments seeking industry-based exceptions.

a. Client- and Sales-Based Industries

Some commenters in client- or sales-based industries, including real estate and insurance, argued they are unique and should be excluded from any rule. A real estate commenter argued that job switching by real estate employees is similar to the sale of a business where the goodwill and book of business generated by the departing employee must remain with the business. A timeshare industry commenter claimed the industry had unique features justifying the use of non-competes with highly paid workers, such as the cost of marketing and cultivation of relationships to bring in and maintain customers as well as the need to protect proprietary targets and strategies for resort development, due in part to the limited number of available resort contracts. A commenter representing insurance marketing organizations (IMOs), which serve as facilitators between insurance carriers, agents, and consumers similarly argued for an exclusion, citing client goodwill, purported trade secrets in sales methods, sales leads, unique compensation structures, and company analyses, and consumer harm from potential agent misconduct if the agent moves to a new IMO and changes the consumer's policy. Some businesses stated that non-competes rarely impact a worker's ability to find other work in their industry, sometimes because the new employer ''buys out'' the non-compete.

The majority of commenters from the real estate and insurance industry workers and small, independent insurance agencies, supported a comprehensive ban. These comments painted a picture consistent with the Commission's findings in Part IV.B regarding indicia of unfairness, including facial unfairness, and the tendency of non-competes to negatively affect competitive conditions in the labor and product and service markets. A worker from the real estate industry stated that non-competes are standard in the industry for all workers, regardless of their position in a company. Commenters stated that they were asked to sign after starting their job, with one worker stating that they faced the option of either signing the non-compete or leaving and losing future commissions for work they had done. Workers noted that they were terminated without cause and still required to comply with a non-compete, and that they had no bargaining power for promotion or wage increases. The following examples are illustrative of the comments the Commission received:

• As an aspiring entrepreneur in the real estate space, I am in a relatively small market where one company dominates. I recently ended my employment with them. They use non-competes to restrict competition and trap employees. The abolition of non-competes is paramount as small towns/cities grow. . . .[914]
• I signed a non-compete after working at a Real Estate Brokerage for several months. I

---

[912] *See* Part IV.D.2.

[913] For a more detailed discussion of proposed § 910.1(i), *see* Part IV.C.4.a.

[914] Individual commenter, FTC–2023–0007–10710.

was told I had to sign it or I would not be paid on the transactions I had pending. The non-compete was so overreaching—there was no geographical scope, the penalty was more than prohibitive. I was told that no one really enforces them or attempts to. I signed it, collected my outstanding pay and left the company within 90 days. Fast forward 4 years, I have been defending myself in litigation over this non-compete for over 3 years. Unable to afford qualified representation.[915]

• I am a business owner and have had 40 independent contractors under my business at my peak. They were all under non-compete, and if I could go back, I would eliminate the non-compete. It doesn't help the employee or contractor, and it doesn't help the business either. It spurs an unhealthy work environment. Clogs up the judicial system with frivolous cases where they try and scare people from earning a living. . . . I 100% support this ban, and it should go into effect immediately.[916]

Commenters stated that non-competes are standard in the insurance industry and that the industry is facing significant consolidation, fueled in part by private equity firms. These commenters argued that workers in the insurance industry are prohibited from seeking jobs with higher pay and better benefits in their specialty. Commenters stated that they were not able to negotiate better conditions at their current job and that employers can change the employment terms at will, so workers face reduced commissions and pay while still being held to a non-compete. Commenters stated that insurance agents are highly trained and specialized, and non-competes force them to leave their specialty and start over in a new specialty for less pay. Commenters also argued that non-competes thwart consumer choice because insurance agents create relationships with their customers, and customers lose the ability to choose the same agent if the agent is bound by a non-compete. Commenters also noted that standard employment agreements in the insurance industry require workers to pay their own costs to defend against noncompete litigation even if the worker is successful in the challenge such that even if a worker does not violate the terms of a noncompete, or the noncompete is not enforceable, workers who change jobs or start a new agency are often faced with significant legal bills. Commenters noted that although independent licensing agents are meant to be able to contract with multiple insurance companies, they are heavily restricted by non-competes, creating regional monopolies. The

following examples are illustrative of the comments the Commission received:

• As a captive "Independent Contractor" for a large insurance company, this rule would be a lifeline should I decide to pursue an independent agent opportunity. The insurance company I represent, has gradually cut commissions over the past few years . . . that makes it extremely uncompetitive compared to peers. There is absolutely no reason why I should be held prisoner and not be able to pursue far more favorable, and beneficial opportunities, for both myself and my family.[917]

• Ideally I would like to start my own insurance agency but am currently prevented from doing so due to a non-compete clause. We are already somewhat limited in employment opportunities here in rural West Texas . . . . I'm finding it difficult to find a path to provide for my family during the two year period [of the non-compete], and therefore am considering scrapping the new business idea and remaining at my current job. . . . In a sense, I feel trapped at my current job, and ultimately I feel hobbled from achieving my full potential as a future small business owner.[918]

The Commission declines to adopt an exclusion for client- or sales-based industries such as real estate and insurance. The use of non-competes is an unfair method of competition and the purported justifications raised by commenters do not change the Commission's finding. The Commission also notes that, to the extent commenters seeking an exception are referencing different restrictive covenants, including some garden variety non-solicitation agreements, which do not prohibit or function to prevent a worker from switching jobs or starting a new business as described in Part III.D, the final rule does not apply to them. Thus, the Commission focuses on commenters' purported need for an exclusion based on non-competes alone.

In response to commenters arguing that information and techniques related to sales, including strategy on developing business, is confidential or proprietary and that workers' ability to move to another job or start a business would thus harm them, the Commission notes that any specific information or truly proprietary techniques can be protected by much less restrictive alternatives, such as trade secret law and NDAs. For example, proprietary targets and strategies for timeshares or unique compensation structures or company analyses cited by IMOs can be otherwise protected. Moreover, companies can compete on the merits to retain their customers by offering better

products and services. Requiring workers to leave the industry or the workforce is an overbroad restriction that tends to negatively affect—and actually harms—competition with attendant harms to workers and rivals, as outlined in Part IV.B.

With respect to commenter arguments that non-competes are needed to protect specialization related to particular products and skills related to sales, as the Commission finds in Part IV.D, preventing workers from using their general trade knowledge and skills, including their gains in the same through experience with a particular employer, is not a legally cognizable justification for non-competes. That a real estate, insurance, or any other sales agent inherently learns skills and gains knowledge in the performance of their job, becoming a more effective salesperson over time, is not itself a cognizable justification for preventing the worker from re-entering the labor market as a worker or business owner. Employers' efforts to use non-competes to prevent workers from using general trade knowledge and skills is an unfair method of competition under section 5 because it is an attempt to avoid competition on the merits.[919] To the extent employers seek to protect legitimate investments in training, the Commission finds employers have less restrictive alternatives, including fixed duration contracts and better pay or other terms and conditions of employment to retain the worker. Finally, the Commission notes that because all covered employers can no longer maintain or enforce non-competes with workers who are not senior executives, employers may also have a larger pool of trained and experienced workers to hire from.

The Commission disagrees with commenters arguing that a worker leaving a sales position is akin to the sale of a business. Unlike the seller of a business, a worker is in an unequal bargaining position and does not receive compensation when leaving the firm. The fact that a worker generates goodwill for an employer is not a cognizable justification for non-competes. First, it not clear that the employer would lose goodwill associated with their business if a particular worker leaves. Moreover, commenters do not specify the extent to which their legitimate investment in the worker—separate from employing the

[915] Individual commenter, FTC–2023–0007–5502.
[916] Individual commenter, FTC–2023–0007–6782.

[917] Individual commenter, FTC–2023–0007–10919.
[918] Individual commenter, FTC–2023–0007–19441.

[919] See Nat'l Soc'y of Prof. Engrs. v. United States, 435 U.S. 679 (1978) (confirming that limiting competition, even if based on the specific advantages of doing so because of the particular nature of an industry, is not a cognizable justification).

worker to use their general skills and knowledge to successfully perform the job—generates such goodwill. To the extent employers do seek to protect investments in goodwill, the employer has less restrictive alternatives to attract and retain workers and customers or clients.

b. Industries With Apprenticeships or Other Required Training

Some commenters representing industries with apprenticeships or that require training as a part of employment, such as real estate appraisers, plumbers, and veterinarians, argued their industry should be excluded from the final rule. These commenters contended that a significant investment is needed to make workers productive in their industries and that they need to use non-competes to protect that investment. Each commenter cited an apprenticeship or training period during which they are not able to bill or must bill a lower amount for a worker's labor.

Worker commenters from these industries stated that non-competes leave them unable to launch or progress in their career because non-competes tie them to their first employer. Some appraiser commenters noted that, while their share of the appraisal fee rises to some extent after completing their apprenticeship, they cannot negotiate higher shares of the fee or other better working conditions because of non-competes. A union commenter representing plumbers noted that plumbers with non-competes are not able to accept better offers of employment, with better pay and benefits, including union positions. Other worker commenters mentioned geographic overbreadth and excessively long non-competes of two years. Many veterinarian commenters supported the proposed rule, stating that non-competes artificially held down their compensation and did not allow them to start new practices in areas where the need for more veterinary services is great, with some commenters stating that this contributed to consolidation.

The Commission declines to exclude industries, such as real estate appraisal, plumbing, and veterinary medicine, in which an industry must purportedly invest in significant training or apprenticeship of workers before the employer considers them to be productive. The Commission finds that these employers have less restrictive alternatives—namely fixed duration contracts—to protect their investment in worker training. A return on investment in the training does not require that the worker be unable to work for a period

after leaving employment. Moreover, employers stand to benefit from the final rule through having access to a broader labor supply—including incoming experienced workers—with fewer frictions in matching with the best worker for the job.

c. Financial Services

Some commenters representing financial services companies opposed the rule, arguing non-competes are necessary for the industry and their industry is unique because non-competes have been used for decades, while numerous firms have entered the market, workers are mobile, and there is no evidence of blocked or curbed entry, lack of access to talent, lower innovation, or other negative impacts in that market. These commenters mention that mobility and access to talent is possible because new employers often "buy out" a worker's non-compete to hire a worker who may be otherwise bound by a non-compete. Several commenters also contend that non-competes are especially vital to firms that focus on securities or commodities trading because disclosure of commercially sensitive information to competitors can be extremely damaging to their former employers' profitability.

Commenters identified three studies which they contend suggest that non-competes improve worker productivity. First, commenters identified two studies on the Broker Protocol, an agreement among financial advisory firms which ostensibly limited the use of NDAs, non-solicitation agreements, and non-competes simultaneously. One study by Gurun, Stoffman, and Yonker finds that firms that joined the Protocol experienced higher rates of employee misconduct and earned increased fees.[920] The other study, by Clifford and Gerken, finds that firms which joined the Protocol invested more heavily in licensure and experienced fewer customer complaints.[921] Commenters noted that these two studies have conflicting findings on advisor misconduct. The authors themselves discuss these findings, with each criticizing the approach of the other. One commenter stated that, from a technical standpoint, the Clifford and Gerken study has a superior approach due to its substantially larger sample size and its analysis of the assumptions

underlying the methodologies used in both studies. A third study—a study of the mutual fund industry by Cici, Hendriock, and Kempf—finds that mutual fund managers increase their firms' revenue when non-competes are more enforceable by investing in higher performing funds, attracting new clients, and increasing revenue from fees.[922] This study uses three changes in non-compete enforceability, measured in a binary fashion.

A commenter representing a large group of public equity investors supported the rule, stating that a comprehensive ban would create an inclusive labor market, which is integral to long-term corporate value and a dynamic, innovative, and equitable economy. Financial services worker commenters also supported the rule, citing to their failure to be paid for their skills over time, the threat of litigation in seeking new employment, and the overbroad nature of non-competes in the industry. The following example is illustrative of the comments the Commission received:

• I am a female finance professional with strong qualifications and experience. I am subject to an extremely long and comprehensive non compete contract which I was induced to sign at a young age. I have been offered many positions at other firms who would be more willing to provide me with leadership opportunities and a path to further advancement, but I am unable to consider them and I am essentially trapped at my firm. . . .[923]

The Commission declines to exclude financial services companies over which it has jurisdiction from the final rule. The Commission finds in Part IV.C that non-competes are restrictive, exclusionary, and as exploitative and coercive for higher wage and highly skilled workers, including workers in finance. The Commission also finds in Part IV.B and IV.C that non-competes tend to negatively affect competitive conditions in labor market through reduced labor mobility and in the product and services market through reduced innovation and new business formation. Evidence that new employers sometimes buy out non-competes also suggests that such clauses harm competition by raising the cost to compete and creating deadweight economic loss for the new employer.[924]

The empirical evidence provided by commenters arguing for differentiation

---

[920] Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. of Fin. Econ. 1218–43 (2021).

[921] Christopher P. Clifford & William C. Gerken, *Property Rights to Client Relationships and Financial Advisor Incentives*, 76 J. of Fin. 2409–45 (2021).

[922] Gjergji Cici, Mario Hendriock, & Alexander Kempf, *The Impact of Labor Mobility Restrictions on Managerial Actions: Evidence from the Mutual Fund Industry*, 122 J. of Banking & Fin. 105994 (2021).

[923] Individual commenter, FTC–2023–0007–0953.

[924] *See* Part IV.C.2.c.i.

**38446**   **Federal Register**/Vol. 89, No. 89/Tuesday, May 7, 2024/Rules and Regulations

for the finance industry does not support their claims. The Commission finds that it is difficult to weigh the evidence in the two studies of the Broker Protocol because they reach conflicting results, though the Commission agrees that the technical approach in the Clifford and Gerken study is superior due to its larger sample size. More importantly, both studies primarily concerned non-solicitation agreements, and do not isolate any effects of non-competes. So even if the studies did not reach conflicting results, the Commission believes they still would yield little reliable information about the effects of non-competes specifically. With respect to the study of the mutual fund industry, the Commission notes that under section 5, firms may not justify unfair methods of competition based on pecuniary benefit to themselves.[925] The study does not establish that there were societal benefits from the attraction of new clients or the increased fee revenue—just that the firms benefited. Therefore, this study does not establish a business justification that the Commission considers cognizable under section 5.

d. On-Air Talent

Some commenters opposing the rule stated that investment in on-air talent would be considerably reduced without non-competes. Commenters argued that on-air talent becomes well-known because of employers' investment and reputation and that employers must be able to use non-competes to protect this investment. The Commission also received a number of comments from and on behalf of on-air talent. Those commenters stated that non-competes are ubiquitous for on-air talent, that they are often localized geographically, that they suppress compensation, and that they force workers seeking a better match to move out of their localities. The following example is illustrative of the comments the Commission received:

• I am a professional broadcast journalist subject to a non-compete agreement with every employment contract I have ever signed, which is the industry standard. I understand the need for contractual agreements with on-air talent and some off-air talent, but non-compete agreements have historically offered nothing to employees besides restricting where they work, and how much money they are able to earn . . . [while] knowing that employees would have to completely relocate if they wanted to seek or accept another opportunity.[926]

The Commission declines to exclude on-air talent from the final rule. The Commission finds the use of non-compete agreements is an unfair method of competition as outlined in Part IV.B, and commenters do not provide evidence that a purported reduction in investment in on-air talent would be so great as to overcome that finding. Specifically, the success of on-air talent is a combination of the employer's investment and the talent of the worker, both of which benefit the employer. As noted in Part IV.D, other less restrictive alternatives, including fixed duration contracts and competing on the merits to retain the talent, allow employers to make a return on their own investments. Moreover, as stated in Part II.F, firms may not justify unfair methods of competition based on pecuniary benefit to themselves. Employers in this context do not establish that there are societal benefits from their investment in on-air talent, but only that the firms benefited.

e. Construction

A commenter representing companies who provide skilled workers in construction stated that the Commission should exclude the industry from the rule because non-competes are necessary to the industry's success. The commenter states that non-competes are necessary for investment in innovation and productivity in the industry. The comment cites to three studies. Two of the studies find a general reduction in productivity in construction and conclude, *inter alia,* further study is warranted to better understand the trend—Goolsbee and Syverson[927] and Huang, Chapman, and Burty ("NIST study"[928]). The third study is a McKinsey & Company report published in 2020 predicting innovation in the construction industry in the coming years.[929]

The evidence cited by this commenter is exclusively about broad trends in productivity in the industry, and what may impact those trends. None of the studies explicitly examines non-competes, and they do not support inferences on the effects of non-competes in this particular industry. Indeed, the Commission finds that the final rule addresses issues raised by the commenter. For example, the commenter notes that productivity in the industry has been declining for years. Notably, this downward trend exists with non-competes in use in the industry. The Commission notes that, under its analysis of the effect of the final rule, productivity will benefit because the final rule frees up labor and allows for greater innovation. The NIST study raises "skilled labor availability" as the very first factor that affects productivity. The Commission finds in Part IV that non-competes suppress labor mobility and the Commission believes the final rule will result in firms having access to workers who are a better, more productive fit. The McKinsey & Company report notes that changes in the industry will require adaptation by firms. The Commission believes the final rule will facilitate this adaptation by sharing non-confidential know-how across firms through increased mobility of workers. The rule may also help mitigate, and certainly will not exacerbate, concerns over increased concentration in the industry raised in the McKinsey & Company report, as the Commission finds that non-competes inhibit new business formation in Part IV.B.3.b.i. Moreover, the Commission believes non-competes may increase concentration, as discussed in Part IV.B.3.b.iii.

Additionally, the Commission finds that less restrictive alternatives, including appropriately tailored NDAs and non-solicitation agreements, are sufficient to address disclosure of confidential information and concerns related to client business. With respect to concerns that the construction industry as a whole is suffering from under-investment in capital and that the final rule may further disincentivize capital investment, as the Commission finds in Part IV.B.3.b.i, non-competes inhibit new business formation. The increase in new business formation from the final rule will bring new capital to bear in the industry. The Commission addresses the empirical literature and comments related to capital investment in detail Part IV.D.1. The Commission notes here that it is not clear any purported capital investment associated with non-competes is entirely beneficial because it may be the result of firms over-investing in capital because they do not face competition on the merits. Even if there is some net decrease in capital investment due to the final rule, commenters provide no reason to believe it would be a material amount.

---

[925] *Id.*

[926] Individual commenter, FTC–2023–0007–12779.

[927] Austan Goolsbee & Chad Syverson, *The Strange and Awful Path of Productivity in the U.S. Construction Sector* (NBER Working Paper 30845, Jan. 2023).

[928] Allison L. Huang, Robert E. Chapman, & David Burty, *Metrics and Tools for Measuring Construction Productivity: Technical and Empirical Considerations,* Nat'l Inst. of Standards and Tech., Bldg. and Fire Rsch. Lab., NIST Special Publication 110 (September 2009).

[929] McKinsey & Co., *The Next Normal in Construction: How Disruption is Reshaping the World's Largest Ecosystem* (June 2020).

### 4. Exclusion for Covered Market Participants That Have Competitors Outside the FTC's Jurisdiction

The Commission explained in the NPRM that some entities that would otherwise be employers may not be subject to the final rule to the extent they are exempted from coverage under the FTC Act.[930] As described in Part II.E.1, the Act exempts, *inter alia,* "banks," "persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act of 1921"[931] as well as an entity that is not "organized to carry on business for its own profit or that of its members."[932] A few business and trade organization commenters argued the Commission should rescind the proposal or should not promulgate the rule because limits on the Commission's jurisdiction mean that the rule will distort competitive conditions where coverage by the final rule may not be universal. These commenters identified industries where employers excluded from the Commission's jurisdiction compete with covered persons, including livestock and meatpacking industries, and areas where government or private employers subject to the State action doctrine compete with covered employers. They contended that excluded employers will be able to use non-competes while their covered competitors are legally prohibited from doing so, advantaging excluded employers.

The Commission declines to rescind the proposal or otherwise refrain from promulgating a rule simply because the rule would not cover firms outside the Commission's jurisdiction. As an initial matter, jurisdictional limits are not unique to the Commission. All agencies have limits on their jurisdiction—many of which do not neatly map to all competitors in a particular market. Moreover, as explained in Parts IV and X, the final rule will have substantial benefits notwithstanding the FTC Act's jurisdictional limits, including increases in worker earnings, new firm formation, competition, innovation, and a decrease in health care prices (and potentially other prices). Furthermore, the Commission finds the risk of material disparate impact in markets where some but not all employers are covered by the final rule is minimal and, in any event, the final rule's overall benefits justify any such potential impact. As commenters acknowledged, excluded employers already compete with covered employers in the same markets.

That is, coverage under the FTC Act— whether an employer is subject to the FTC Act and enforcement by the FTC— differs across a range of topics and long predates this final rule, which does not materially alter the status quo in that respect. Moreover, even in the absence of the rule, firms within the jurisdiction of the FTC Act are already subject to potential FTC enforcement against unfair methods of competition, including against non-competes, while firms outside the FTC's jurisdiction are not. The final rule does not alter that basic landscape.

At least one financial services industry commenter stated that national banks are outside of the Commission's jurisdiction and argued the final rule should exclude bank holding companies, subsidiaries, and other affiliates of Federally regulated banks to avoid disparate treatment of workers employed by different affiliates within the same organization, and because those entities are already heavily regulated. The Commission declines to exclude bank holding companies, subsidiaries, and other affiliates of Federally regulated banks that fall within the Commission's jurisdiction. While these institutions may be highly regulated, and depending on the corporate structure non-competes may be allowed for some workers but not others, the Commission finds that neither factor justifies excluding them from the final rule. If Federally regulated banks are concerned about disparate treatment of workers employed by their own different affiliates, they have the option to stop using non-competes across all their affiliates.

A corporation wholly owned by an Indian tribe asserted that the Commission should exclude Indian tribes and their wholly owned business entities from the definition of "employer." The commenter asserted that the FTC Act does not explicitly grant jurisdiction over Indian tribes and their corporate arms. The commenter further argued that critical tribal revenue will be lost if tribal businesses' ability to retain skilled workers is impacted. The Commission declines to categorically exclude tribes or tribal businesses from coverage under the final rule. The FTC Act is a law of general applicability that applies to Indians, Indian Tribes, and tribal businesses.[933] The Commission

recognizes, however, that in some instances these entities may be organized in such a way that they are outside the Commission's jurisdiction.[934] Whether a given Tribe or tribal business is a corporation within the FTC Act will be a fact-dependent inquiry. The Commission is aware of no evidence suggesting the final rule would disproportionately impact tribes or tribal businesses.[935]

### 5. Coverage of Healthcare Industry

Many commenters representing healthcare organizations and industry trade associations stated the Commission should exclude some or all of the healthcare industry from the rule because they believe it is uniquely situated in various ways. The Commission declines to adopt an exception specifically for the healthcare industry. The Commission is not persuaded that the healthcare industry is uniquely situated in a way that justifies an exemption from the final rule. The Commission finds use of non-competes to be an unfair method of competition that tends to negatively affect labor and product and services markets, including in this vital industry; the Commission also specifically finds that non-competes increase healthcare costs. Moreover, the Commission is unconvinced that prohibiting the use of non-competes in the healthcare industry will have the claimed negative effects.

#### a. Comments Received

Many business and trade industry commenters from the healthcare industry seeking an exception,

---

[930] NPRM at 3510.

[931] *Id.* (citing 15 U.S.C. 45(a)(2)).

[932] *Id.* (citing 15 U.S.C. 44).

[933] *See Fed. Power Comm'n* v. *Tuscarora Indian Nation,* 362 U.S. 99, 116–17 (1960) (examining case law supporting the conclusion that "a general statute in terms applying to all persons includes Indians and their property interests"); *FTC* v. *AMG Servs., Inc.,* No. 2:12–CV–00536–GMN, 2013 WL 7870795, at *16–*21 (D. Nev. July 16, 2013), *report and recommendation adopted,* No. 2:12–CV–00536–GMN, 2014 WL 910302 (D. Nev. Mar. 7, 2014) (discussing the FTC Act's applicability to Indian Tribes and tribal businesses).

[934] *See, e.g., AMG Servs.,* 2013 WL 7870795, at *22 (finding genuine dispute of material fact barring summary judgment on question of whether tribal chartered corporations were corporations under the FTC Act).

[935] The commenter also asked the Commission to engage Indian tribes about the proposed rule, citing Executive Order 13175. However, the Commission notes that Executive Order 13175, which requires consultation with Indian Tribes before promulgating certain rules, does not apply to independent regulatory agencies such as the Commission. E.O. No. 13175, 65 FR 67249 (Nov. 6, 2000) (stating that the term "agency," which governs the applicability of the executive order, excludes agencies "considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(5)"); 44 U.S.C. 3502(5) (listing the Commission as an "independent regulatory agency"). The Commission did, however, provide extensive opportunities for public input from any and all stakeholders, including a 120-day comment period (extended from 90 days) and a public forum held on February 16, 2023, that provided an opportunity to directly share experiences with non-competes.

including, for example, hospitals, physician practices, and surgery centers, focused on whether the Commission has jurisdiction to regulate nonprofit entities registered under section 501(c) of the Internal Revenue Code. The Commission addresses its jurisdiction in Part II.E and considers comments related to requests for an industry-based exclusion for all or part of the healthcare industry in this section. As stated in Part II.E, entities claiming tax exempt status as nonprofits are not categorically beyond the Commission's jurisdiction, but the Commission recognizes that not all entities in the healthcare industry fall under its jurisdiction.

Based on the assumption that entities claiming tax-exempt status as nonprofits and publicly owned healthcare organizations would be exempt, many industry commenters contended that for-profit healthcare organizations must be also exempted from the rule as a matter of equal treatment. Commenters cited data from the American Hospital Association (AHA) indicating that as many as 58% of all U.S. hospital systems claim tax-exempt status as nonprofits, 24% are for-profit hospitals, and 19% are State and local government hospitals. One commenter cited AHA data indicating that 78.8% of for-profit hospitals are located in the same Hospital Referral Region (HRR) as at least one entity that claims tax-exempt status as a nonprofit. Many commenters argued that for-profit entities and entities that claim nonprofit status compete for patients, physician and non-physician staff, and market share. These commenters contended that a rule covering only for-profit healthcare entities will distort the market in favor of entities claiming tax-exempt status as nonprofits, which would continue using non-competes. One commenter identifying as an entity claiming nonprofit tax-exempt status argued that such entities need to rely on non-competes to compete with for-profit competitors because, unlike for-profit health systems, they invest significantly in specialized training and mentorship, and offer a guaranteed minimum salary to recent graduates.

Some commenters contended that favoring entities claiming tax-exempt status as nonprofits would have negative effects. Some commenters argued that disparate coverage under the rule may exacerbate consolidation in the healthcare industry by advantaging entities that claim tax-exempt status as nonprofits. They stated that increased consolidation would reduce the available supply of skilled labor for for-profit hospitals, increasing labor costs and contributing to higher prices paid

by patients. Commenters noted a trend in physicians increasingly leaving private practice to work at large hospital groups claiming tax-exempt status as nonprofits, which, they contended, may continue to lock those physicians up using non-competes. Industry commenters also argued that insurance premiums will rise more than they would absent the rule because of the greater market power and resulting leverage of entities that claim tax-exempt status as nonprofits in provider network negotiations. One manufacturing industry association commenter argued that the burden of rising premiums will be passed on to manufacturers who provide health insurance to their employees.

Commenters also argued that a rule covering for-profit healthcare providers would cause independent, physician-owned practices, and small community practices to suffer a competitive disadvantage compared to larger entities that claim tax-exempt status as nonprofits and public hospital groups, reducing the number of these practices and interrupting continuity of care for their patients. Commenters stated that such practices will suffer these consequences acutely in States or localities that are particularly saturated with entities that claim tax-exempt status as nonprofits or exempt State or local hospitals, and cited New York and Mississippi as examples. A commenter claimed that public hospitals regulated by the Commission will incur losses because of their reduced ability to hire and retain physicians that perform profitable procedures. One commenter cited a 1996 Commission study to contend that, all else equal, hospitals that claim tax-exempt status as nonprofits set higher prices when they have more market power. A business commenter contended that, given what they considered a large-scale exemption of certain physician employers from the Commission's jurisdiction, the States are more appropriate regulators of non-competes between physicians and employers. Other commenters claimed that the Commission must further study the consequences of differential treatment.

Conversely, many commenters vociferously opposed exempting entities that claim tax-exempt status as nonprofits from coverage under the final rule. Several commenters contended that, in practice, many entities that claim tax-exempt status as nonprofits are in fact "organized to carry on business for [their] own profit or that of [their] members" such that they are "corporations" under the FTC Act. These commenters cited reports by

investigative journalists to contend that some hospitals claiming tax-exempt status as nonprofits have excess revenue and operate like for-profit entities. A few commenters stated that consolidation in the healthcare industry is largely driven by entities that claim tax-exempt status as nonprofits as opposed to their for-profit competitors, which are sometimes forced to consolidate to compete with the larger hospital groups that claim tax-exempt status as nonprofits. Commenters also contended that many hospitals claiming tax-exempt status as nonprofits use self-serving interpretations of the IRS's "community benefit" standard to fulfill requirements for tax exemption, suggesting that the best way to address unfairness and consolidation in the healthcare industry is to strictly enforce the IRS's standards and to remove the tax-exempt status of organizations that do not comply. An academic commenter argued that the distinction between for-profit hospitals and nonprofit hospitals has become less clear over time, and that the Commission should presumptively treat hospitals claiming nonprofit tax-exempt status as operating for profit unless they can establish that they fall outside of the Commission's jurisdiction.

The Commission also received many comments about coverage of the health care sector generally under the rule. Some commenters urged the Commission to ensure that health care workers, including doctors and physicians, were covered by the final rule. Several commenters stated that eliminating non-competes would allow doctors wishing to change jobs to stay in the same geographic area, fostering patient choice and improving continuity of care. Other commenters urged the Commission to create an exception for health care workers. Some argued that the evidence does not support the Commission's conclusion that non-competes depress earnings in health care. Other reasons commenters cited in support of an exception included concerns about continuity and quality of care for patients, the increased costs for employers of health care workers, physicians' negotiating power with their employers, and the effect on incentives for employers to train their health care workers.[936]

Thousands of healthcare workers submitted comments supporting a ban on non-competes. Worker commenters

---

[936] Some commenters also contended that the health care industry should be exempt from the rule because many health care providers fall outside of the Commission's jurisdiction. The Commission summarizes and responds to those commenters in Part II.E.2.

did not always identify whether they were working at for-profit organizations, entities that claim tax-exempt status as nonprofits, or State or local healthcare organizations, but each category was represented in the comments. These commenters detailed the negative effects of non-competes on their families, their mental health, their financial health, and their career advancement, as elaborated in Part IV.B.2.b.ii. Specifically, healthcare workers commented that because non-competes prohibited them from switching jobs or starting their own businesses, they had to stay at jobs with unsafe and hostile working conditions, to take jobs with long commutes, to relocate their families, to give up training opportunities, and to abandon patients who wanted to continue seeing them. Illustrative comments are highlighted in Parts I and IV.

Additionally, commenters stated the hardship patients have suffered because of non-competes when, for example, their physician was required to move out of their area to work for a different employer. The Commission highlights some of these comments in Part IV.B.2.b.ii and includes two further illustrative comments here:

• As a patient, non compete clauses are affecting mine and my [family's] ability to receive medical care. Our pediatrician left a practice and we aren't able to be informed where they are going. When we find out, it is an hour away [because] of the non compete. And when we look for other [doctors] closer they aren't accepting new patients. So for an entire year we are driving 2 [hours] round trip to see our pediatrician until they can move back to a local medical group. The non compete clause is not just affecting the life of the [doctor], but is also impacting many of us who rely on their services.[937]

• As a family physician this has caused much grief and obstructs my desire to work and provide care for underserved populations. I am a NHSC scholarship recipient and due to non compete clauses was unable to continue working in the town I served due to its rurality. This created a maternity desert in the region I served. Now in a more metropolitan area, there has been an exodus of physicians in the area due to non compete clauses that has caused worsening access to primary care, specialty services, including behavioral health and substance use disorder treatment.[938]

A number of physician group commenters stated that nonprofit healthcare organizations regularly impose non-competes on physicians, and that the impact of the rule would be limited if nonprofits are not required to

comply. Some physician group commenters urged the Commission to work with other agencies to fill in gaps in applying the rule based on the Commission's jurisdiction, citing the importance of banning non-competes as widely as possible because of the harms they impose on physicians and patients irrespective of employer status. Specifically, commenters suggested that the Commission use its antitrust and referral authority to aggressively monitor nonprofit organizations for antitrust violations, to collaborate with other Federal agencies, including the IRS, and to provide incentives and guidance to States, which can enact measures to ensure that a prohibition on non-competes is implemented comprehensively. One commenter also noted that a ban would bring scrutiny to non-competes and would likely intensify pressure to eliminate them. A few commenters also contended that entities claiming tax-exempt status as nonprofits are subject to the Commission's jurisdiction as "persons" under the FTC Act.

**b. The Final Rule**

After carefully considering commenters' arguments, the Commission declines to exempt for-profit healthcare employers or to exempt the healthcare industry altogether.

First, as described in Part IV, the Commission finds that certain uses of non-competes are an unfair method of competition. The use of unfair methods of competition cannot be justified on the basis that it provides a firm with pecuniary benefits to help them compete with other firms that use similar tactics.[939] In this case, for-profit and other covered entities have urged the Commission to allow them to continue to employ an unfair method of competition (*i.e.*, use non-competes) because some competitors are not prohibited from doing so as they are beyond the Commission's jurisdiction. The Commission is committed to stopping unlawful conduct to the full extent of its jurisdiction. For example, the Commission would not refrain from seeking to enjoin unlawful price fixing by a for-profit within its jurisdiction because entities outside its jurisdiction

under the FTC Act would not be subject to the same FTC action.

Second, the Commission disagrees with commenters' contention that all hospitals and healthcare entities claiming tax-exempt status as nonprofits necessarily fall outside the Commission's jurisdiction and, thus, the final rule's purview. As explained in Part II.E.2, a corporation's "tax-exempt status is certainly one factor to be considered," but that status is not coterminous with the FTC's jurisdiction and therefore "does not obviate the relevance of further inquiry into a [corporation's] operations and goals."[940] Accordingly, as noted by commenters, entities that claim tax-exempt nonprofit status may in fact fall under the Commission's jurisdiction. Similarly, whether the final rule would apply to quasi-public entities or certain private entities that partner with States or localities, such as hospitals affiliated with or run in collaboration with States or localities, depends on whether the particular entity or action is an act of the State itself under the State action doctrine, which is a well-established, fact-specific inquiry.[941] Thus, some portion of the 58% of hospitals that claim tax-exempt status as nonprofits and the 19% of hospitals that are identified as State or local government hospitals in the data cited by AHA likely fall under the Commission's jurisdiction and the final rule's purview. Further, many States have banned non-competes for a variety of healthcare professionals in both for-profit and nonprofits entities by statute.[942] Even if

---

[937] Individual commenter, FTC–2023–0007–10085.

[938] Individual commenter, FTC–2023–0007–0924.

[939] *See Atl. Refin. Co.* v. *FTC,* 381 U.S. 357, 371 (1965) ("Upon considering the destructive effect on commerce that would result from the widespread use of these contracts by major oil companies and suppliers, we conclude that the Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves.").

[940] *In the Matter of the Am. Med. Assoc.,* 94 F.T.C. 701, 1979 WL 199033 (FTC Oct. 12, 1979).

[941] *In the Matter of Ky. Household Goods Carriers Ass'n, Inc.,* 139 F.T.C. 404, 405 (2005) ("The Supreme Court has made clear that the state action doctrine only applies when (1) the challenged restraint is clearly articulated and affirmatively expressed as state policy, and (2) the policy is actively supervised by the State itself.") (citation and alterations omitted); *see also id.* at 410–13 (applying test); *Elec. Inspectors, Inc.* v. *Vill. of East Hills,* 320 F.3d 110, 117–19 (2d Cir. 2003).

[942] Colo. Rev. Stat. sec. 8–2–113(5)(a) (Colorado statute banning non-competes for physicians); D.C. Code sec. 32–581.01 (D.C. statute banning non-competes for medical specialists earning less than $250,000, compared to $150,000 for other workers); Fla. Stat. sec. 542.336 (Florida statute banning non-competes for physician specialists in certain circumstances); Ind. Code Ann. secs. 25–22.5–5.5–2 and 2.5(b) (Indiana statute banning non-competes for primary care physicians and restricting non-competes for other physicians); Iowa Code sec. 135Q.2(3)(a) (banning non-competes for health care employment agency workers who provide nursing services); Ky. Rev. Stat. sec. 216.724(1)(a) (Kentucky statute banning non-competes for temporary direct care staff of health care services agencies); N.M. Stat. Ann. secs. 24–1I–1 and 2 (New Mexico statute banning non-competes for several types of health care practitioners); S.D. Codified Laws secs. 53–9–11.1–11.2 (South Dakota statute banning non-
Continued

the final rule's coverage extends only to hospitals that do not identify as tax-exempt non-profits based on AHA data, as explained in Part IV.A.1, the Commission finds every use of covered non-competes to be an unfair method of competition and concludes that the evidence supports the Commission's decision to promulgate this final rule, which covers the healthcare industry to the full extent of the Commission's authority.

Relatedly, in response to commenters' concern that large numbers of healthcare workers will not benefit from the final rule because they work for entities that the final rule does not cover, the Commission notes many workers at hospitals, including those that claims tax-exempt status as a nonprofit or government-owned hospital, contract with or otherwise work for a for-profit entity, such as a staffing agency or physician group. Although some of these individuals may work at an excluded hospital, the final rule applies to their employer—the staffing agency or for-profit physician group—because it is covered by the final rule.

The Commission disagrees with commenters stating the ability to use non-competes will provide a material competitive advantage to entities claiming tax-exempt status as nonprofit or publicly owned entities that are beyond the Commission's jurisdiction. To the contrary, those entities outside FTC jurisdiction that continue to deploy non-competes may be at a self-inflicted disadvantage in their ability to recruit workers, even if they derive some short-term benefit from trapping current workers in their employment. Furthermore, commenters' concern that for-profit healthcare entities will be at a competitive disadvantage is based on the false premise that entities outside the jurisdiction of the FTC will not be otherwise regulated or scrutinized with respect to the use of non-competes. States currently regulate non-competes by statute, regulation, and common law. According to the AHA data cited by commenters, over 12% (398/3,113) of nonprofit hospitals and 13% of government hospitals (187/1,409) are in States that ban non-competes for all employers. In any event, even if true, arguments that for-profit and other covered entities could suffer competitive harm by not being able to employ an unfair method of competition would not change the Commission's

competes for several types of healthcare practitioners); Tex. Bus. & Com. Code secs. 15.50–.52 (Texas statute restricting the use of non-competes for physicians).

finding that use of certain non-competes is an unfair method of competition, as further discussed in Part IV.

While the Commission shares commenters' concerns about consolidation in healthcare, it disagrees with commenters' contention that the purported competitive disadvantage to for-profit entities stemming from the final rule would exacerbate this problem. As some commenters stated, the Commission notes that hospitals claiming tax-exempt status as nonprofits are under increasing public scrutiny. Public and private studies and reports reveal that some such hospitals are operating to maximize profits, paying multi-million-dollar salaries to executives, deploying aggressive collection tactics with low-income patients, and spending less on community benefits than they receive in tax exemptions.[943] Economic studies by FTC staff demonstrate that these hospitals can and do exercise market power and raise prices similar to for-profit hospitals.[944] Thus, as courts have

[943] *See, e.g.,* Press Release, Office of U.S. Sen. Chuck Grassley, *Bipartisan Senators Probe Potential Abuse Of Tax-Exempt Status By Nonprofit Hospitals* (Aug. 9, 2023), *https:// www.grassley.senate.gov/news/news-releases/ bipartisan-senators-probe-potential-abuse-of-tax-exempt-status-by-nonprofit-hospitals;* Request for Information Regarding Medical Payment Products, 88 FR 44281 (July 12, 2023); U.S. Gov't Accountability Off., Testimony Before the Subcommittee on Oversight, Committee on Ways and Means, House of Representatives, *Tax Administration: IRS Oversight of Hospital's Tax-Exempt Status,* GAO–23–106777 (Apr. 26, 2023), *https://www.gao.gov/assets/gao-23-106777.pdf; Pottstown Sch. Dist.* v. *Montgomery Cnty. Bd. of Assessment Appeals,* 289 A.3d 1142 (Pa. Commw. Ct. 2023) (holding that for-profit hospitals purchased by nonprofit claiming tax exempt status under Federal law do not qualify under State law for nonprofit tax exemption); *Phoenixville Hosp., LLC* v. *Cnty. of Chester Bd. of Assessment Appeals,* 293 A.3d 1248 (Pa. Commw. Ct. 2023); *Brandywine Hosp., LLC* v. *Cnty. of Chester Bd. of Assessment Appeals,* 291 A.3d 467 (Pa. Commw. Ct. 2023); *Jennersville Hosp., LLC* v. *Cnty of Chester Bd. of Assessment Appeals,* 293 A.3d 1248 (Pa. Commw. Ct. 2023); The Daily, *How Nonprofit Hospitals Put Profits Over Patients* (Jan. 5, 2023), *https:// www.nytimes.com/2023/01/25/podcasts/the-daily/ nonprofit-hospitals-investigation.html;* Gov't Accountability Off., *Tax Administration: Opportunities Exist to Improve Oversight of Hospitals' Tax-Exempt Status,* GAO–20–679 (Sept. 17, 2020), *https://www.gao.gov/products/gao-20-679;* Danielle Ofri, *Why Are Nonprofit Hospitals So Highly Profitable?,* N.Y. Times, Feb. 20, 2020, *https://www.nytimes.com/2020/02/20/opinion/ nonprofit-hospitals.html;* Maya Miller & Beena Raghavendran, *Thousands of Poor Patients Face Lawsuits From Nonprofit Hospitals That Trap Them in Debt,* ProPublica (Sept. 13, 2019), *https:// www.propublica.org/article/thousands-of-poor-patients-face-lawsuits-from-nonprofit-hospitals-that-trap-them-in-debt.*

[944] *See, e.g.,* Michael G. Vita & Seth Sacher, *The Competitive Effects of Not-For-Profit Hospital Mergers: A Case Study,* 49 J. Indus. Econ. 63 (2001), *http://onlinelibrary.wiley.com/doi/10.1111/1467-6451.00138/epdf* (finding substantial price

recognized, the tax-exempt status as nonprofits of merging hospitals does not mitigate the potential for harm to competitive conditions.[945]

Commenters provide no empirical evidence, and the Commission is unaware of any such evidence, to support the theory that prohibiting non-competes would increase consolidation or raise prices. To the contrary, as elaborated in Parts IV.B.3.a and IV.B.3.b, the empirical literature suggests, and the Commission finds, that the final rule will increase competition and efficiency in healthcare markets, as workers at for-profit healthcare entities will be able to spin off new practices or work for different employers where their productivity is greater. This is true even if the Commission does not reach some portion of healthcare entities. While the Commission's prior research may indicate, as one commenter suggested, that nonprofit hospitals set higher prices when they have more market power, the Commission finds that the final rule is not likely to increase healthcare prices

increases resulting from a merger of nonprofit, community-based hospitals, and determining that mergers involving nonprofit hospitals are a legitimate focus of antitrust concern); Steven Tenn, *The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction,* 18 Int'l J. Econ. Bus. 65, 79 (2011), *http://www.tandfonline.com/ doi/full/10.1080/13571516.2011.542956* (finding evidence of post-merger price increases ranging from 28%–44%, and concluding that "[o]ur results demonstrate that nonprofit hospitals may still raise price quite substantially after they merge. This suggests that mergers involving nonprofit hospitals should perhaps attract as much antitrust scrutiny as other hospital mergers.").

[945] *See, e.g., FTC* v. *OSF Healthcare Sys.,* 852 F. Supp. 2d 1069, 1081 (N.D. Ill. 2012) ("[T]he evidence in this case reflects that nonprofit hospitals do seek to maximize the reimbursement rates they receive."); *FTC* v. *ProMedica,* No. 3:11 CV 47, 2011 WL 1219281 at *22 (N.D. Ohio Mar. 29, 2011) (finding that a nonprofit hospital entity "exercises its bargaining leverage to obtain the most favorable reimbursement rates possible from commercial health plans."); *United States* v. *Rockford Mem'l Corp.,* 898 F.2d 1278, 1284–87 (7th Cir. 1990) (rejecting the contention that nonprofit hospitals would not seek to maximize profits by exercising their market power); *FTC* v. *Univ. Health, Inc.,* 938 F.2d 1206, 1213–14 (11th Cir. 1991) ("'[T]he district court's assumption that University Health, as a nonprofit entity, would not act anticompetitively was improper.'"); *Hospital Corp. of America* v. *FTC,* 807 F.2d 1381, 1390–91 (7th Cir. 1986) (rejecting the contention that nonprofit hospitals would not engage in anticompetitive behavior). *See also* FTC & Dep't of Jusitce, *Improving Health Care: A Dose of Competition* 29–33 (2004), *https://www.ftc.gov/ sites/default/files/documents/reports/improving-health-care-dose-competition-report-federal-trade-commission-and-department-justice/ 040723healthcarerpt.pdf* (discussing the significance of nonprofit status in hospital merger cases, and concluding that the best available empirical evidence indicates that nonprofit hospitals exploit market power when given the opportunity and that "the profit/nonprofit status of the merging hospitals should not be considered a factor in predicting whether a hospital merger is likely to be anticompetitive").

through this same mechanism because it is unlikely to lead to significant increases in healthcare nonprofits' market share, if at all.

Moreover, the Commission has other tools to address consolidation in healthcare markets and is committed to using them. The Clayton Act grants the Commission authority to enforce compliance with, *inter alia*, section 7 of the Clayton Act. The Clayton Act does not include any carveout for entities that are nonprofit or otherwise do not operate for profit—and the FTC's jurisdictional limit based on the definition of ''corporation'' in the FTC Act does not apply in this context.[946] Accordingly, the Commission has authority under the Clayton Act to review and challenge mergers and acquisitions involving healthcare entities or hospitals regardless of nonprofit status.[947] Thus, even if the jurisdictional limitations of the final rule were to somehow incentivize some hospitals and other healthcare entities claiming non-profit status to consolidate, the Commission will continue to scrutinize those mergers and work with State partners to vigorously defend competition.[948] For the same reason, the Commission disagrees with commenters who contended that the effects of consolidation and staffing shortages will be worse in areas highly saturated with nonprofits claiming tax-exempt status.

Finally, the Commission disagrees with commenters that stated the Commission must further study the final rule's effect on healthcare workers and entities. The Commission has specific, long-time expertise in the healthcare market as anticompetitive mergers and conduct in healthcare markets have long been a focus of FTC law enforcement, research, and advocacy.[949] This work

includes economic analyses of the effects of mergers involving nonprofit hospitals and studies of the impacts of hospital mergers.[950] Accordingly, given this expertise and the extensive record in the rulemaking, the Commission finds it has sufficient understanding of healthcare markets and that the evidence supports the final rule's application to the healthcare industry.

### 6. Coverage of Franchisors Vis-à-Vis Franchisees

#### a. The Proposed Rule

The Commission proposed to exclude franchisees from the definition of ''worker'' and requested comment on whether and to what extent the rule should cover non-competes between franchisors and franchisees (''franchisor/franchisee non-competes'').[951] The Commission explained that it proposed to exclude franchisees from the definition of ''worker'' because, in some cases, the relationship between a franchisor and franchisee may be more analogous to the relationship between two businesses than the relationship between an employer and a worker.[952] The Commission also noted that the evidentiary record relates primarily to non-competes that arise out of employment. However, the Commission stated that, in some cases, franchisor/franchisee non-competes may present concerns under section 5 similar to the concerns presented by non-competes between employers and workers and sought comment on coverage of franchisor/franchisee non-competes.[953]

#### b. Comments Received

Many commenters requested that the final rule cover franchisor/franchisee

non-competes. Numerous commenters contended the franchisee-franchisor relationship is closer to a relationship between a worker and an employer than a relationship between businesses. These commenters argued that franchisees are often individual business owners who, like workers, lack bargaining power to negotiate over non-competes. One commenter stated that the Commission acknowledged in the Franchise Rule that franchisees generally lack bargaining power.[954] Several commenters, including industry commenters representing franchisees, argued that franchisees tend to suffer even greater power imbalances than workers because many risk significant personal assets to start their franchises. According to these commenters, this risk places acute strain on franchisees' bargaining leverage when negotiating to renew franchise agreements because, if they choose to reject a new agreement, they not only lose the opportunity to continue working in the same field due to their non-compete, but also the value of their investment.

Commenters seeking coverage of franchisor/franchisee non-competes also stated that these non-competes do not protect legitimate interests because franchisors generally do not entrust franchisees with trade secrets or details about their broader commercial strategy. These commenters stated that, even if franchisees do receive such information, franchisors have less restrictive alternatives for protecting it, including NDAs and trade secret law. Some commenters also stated that non-competes have anticompetitive effects because franchisors may degrade the quality of inputs or raise input prices without fearing that their existing franchisees will leave for a competitor.

Many franchisee commenters also stated their desire to compete after exiting their franchise relationships. Franchisees also stated that their non-competes harm their negotiating position in bargaining over franchise renewal terms. These franchisees stated that franchisors can impose higher royalty fees or other less favorable terms over time as the franchisees feel powerless to refuse or make effective counteroffers, due to their non-competes. Many franchisees asserted that their non-competes are overbroad because they restrain individual owners' spouses and other close relatives from competing in the same industry. Some franchisees stated that their non-competes include penalties for choosing

[946] 15 U.S.C. 18; 15 U.S.C. 45; *Univ. Health, Inc.*, 938 F.2d at 1214–16.

[947] *Id.*

[948] *See, e.g., In the Matter of RWJ Barnabas Health and Saint Peters Healthcare Sys.*, Docket No. 9409 (Jun. 2, 2022) (complaint); *FTC v. Advoc. Health Care*, No. 15 C 11473, 2017 WL 1022015, at *1 (N.D. Ill. Mar. 16, 2017); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 332 (3d Cir. 2016).

[949] *See, e.g.*, FTC, *Competition in the Health Care Marketplace, https://www.ftc.gov/tips-advice/competition-guidance/industry-guidance/health-care; FTC, Overview of FTC Actions in Health Care Services and Products* (2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/2022.04.08%20Overview%20Healthcare%20%28final%29.pdf;* Joseph Farrell et al., *Economics at the FTC: Retrospective Merger Analysis with a Focus on Hospitals*, 35 Rev. Indus. Org. 369 (2009), *http://link.springer.com/content/pdf/10.1007%2Fs11151-009-9231-2.pdf;* FTC, *Examining Health Care Competition* (Mar. 20–21, 2014), *https://www.ftc.gov/news-events/events-calendar/2014/03/examining-health-care-competition;* FTC & Dep't of Justice, *Examining*

*Health Care Competition* (Feb. 24–25, 2015), *https://www.ftc.gov/news-events/events-calendar/2015/02/examining-health-care-competition; Improving Health Care: A Dose of Competition, supra* note 945.

[950] *See, e.g.*, FTC, *FTC Policy Perspectives on Certificates of Public Advantage* (Aug. 15, 2022), *www.ftc.gov/copa;* FTC, *Physician Group and Healthcare Facility Merger Study* (ongoing, initiated Jan. 2020), *https://www.ftc.gov/enforcement/competition-matters/2021/04/physician-group-healthcare-facility-merger-study;* Christopher Garmon, *The Accuracy of Hospital Merger Screening Methods*, 48 RAND J. of Econ. 1068 (2017), *https://www.ftc.gov/system/files/documents/reports/accuracy-hospital-merger-screening-methods/rwp_326.pdf;* Joseph Farrell, et al., *Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets*, 39 Rev. Indus. Org. 271 (2011), *http://link.springer.com/content/pdf/10.1007%2Fs11151-011-9320-x.pdf;* Devesh Raval, Ted Rosenbaum, & Steve Tenn, *A Semiparametric Discrete Choice Model: An Application to Hospital Mergers*, 55 Econ. Inquiry 1919 (2017).

[951] NPRM at 3511, 3520.

[952] *Id.* at 3511.

[953] *Id.* at 3520.

[954] Trade Regulation Rule on Franchising and Business Opportunity Ventures, 43 FR 59614, 59625 (Dec. 21, 1978).

not to renew their contracts even if they do not compete.

Other commenters, primarily franchisors and trade organizations, stated that franchisor/franchisee non-competes should be excluded from the final rule. Many of these commenters argued that franchisor/franchisee non-competes are more similar to restrictive covenants between businesses than non-competes between employers and workers. Some of these commenters argued that franchisor/franchisee non-competes are more justified than non-competes in the employment context because, unlike employment relationships, entering into a franchise agreement is completely voluntary. Some commenters argued that, unlike non-competes in the employment context, franchisor/franchisee non-competes are only entered into by individuals with access to substantial capital and who therefore always have the option of starting their own businesses.

Many of these commenters argued that prohibiting non-competes for franchisees would threaten to severely disrupt or destroy the franchise business model, and that this would harm franchisors and franchisees alike, as franchising offers a unique opportunity for working people to become entrepreneurs with established brands. Commenters asserted non-competes are critical to the franchise business model because they offer both franchisors and franchisees confidence that existing franchisees will likely stay with a brand and refrain from using a franchise's trade secrets to unfairly compete against the franchisor. Commenters also asserted that franchisees are often exposed to proprietary information through training manuals and operational support and that non-competes help protect this information. In addition, commenters contended franchisor/franchisee non-competes protect investments made by other franchisees and maintain a franchise's goodwill.

Commenters supporting the exclusion of franchisor/franchisee non-competes from the final rule also asserted that the Commission lacked an evidentiary basis for covering such non-competes. These commenters also claimed no State has prohibited non-competes for franchisees, and the Commission would therefore lack data from natural experiments to justify extending a final rule to the franchise context.

### c. The Final Rule

The Commission continues to believe that, as many commenters attested, franchisor/franchisee non-competes

may in some cases present concerns under section 5 similar to the concerns presented by non-competes between employers and workers. The comments from franchisors, franchisees, and others provide the Commission with further information about non-competes in the context of the franchisor/franchisee relationship, but the evidentiary record before the Commission continues to relate primarily to non-competes that arise out of employment. Accordingly, the final rule does not cover franchisor/franchisee non-competes. Non-competes used in the context of franchisor/franchisee relationships remain subject to State common law and Federal and State antitrust laws, including section 5 of the FTC Act.

## VI. Section 910.4: Relation to State Laws and Preservation of State Authority and Private Rights of Action

In proposed § 910.4, the Commission addressed State laws and preemption. Based on comments, the Commission adopts a modified provision clarifying and explaining that States may continue to enforce laws that restrict non-competes and do not conflict with the final rule, even if the scope of the State restrictions is narrower than the final rule.[955]

### A. The Proposed Rule

The NPRM contained an express preemption provision, proposed § 910.4, that explained the proposed rule preempted State laws inconsistent with the rule and did not preempt State laws that offer greater protection than the rule. The NPRM explained that when a State law offers greater protection than the rule, employers would be able to comply with both the NPRM and the State law. Thus, the proposed rule would have established a regulatory floor, but not a ceiling. The NPRM provided two hypothetical examples, one of a State law that would be inconsistent with, and therefore preempted by, proposed § 910.2(a) and one that would not because it satisfied the savings clause by offering greater protection and was not inconsistent with proposed part 910.[956]

### B. Authority for Preemption

Numerous commenters supported the preemption of inconsistent State laws. Some commenters asserted the Commission lacks the legal authority to preempt State laws, including State common law, on non-competes because Congress allegedly did not confer the

necessary authority to the Commission or because of federalism principles. They argued there must be clear Congressional intent to preempt State laws relating to non-competes.[957] Numerous commenters asserted the Commission lacks clear authority from Congress to preempt State laws on non-competes, arguing the FTC's statutory authority neither expressly nor impliedly authorizes preemption of non-competes. Commenters made similar points based on cases about the preemptive force of the Commission's UDAP regulations. For example, one commenter asserted the FTC may not have the authority to preempt less restrictive State laws, citing *American Optometric Association* v. *FTC*, in which the court noted the need for congressional authorization for the Commission to preempt an entire field of State laws that arise from the State's police powers.[958]

The Commission finds it has the authority to promulgate regulations that preempt inconsistent State laws under section 6(g), together with section 5, of the FTC Act. Even without an express preemption provision, Federal statutes and regulations preempt conflicting State laws. Under the Supreme Court's conflict preemption doctrine, a Federal statute or regulation impliedly preempts State laws when it is impossible for the regulated parties to comply with both the Federal and the State law, or when a State law is an obstacle to achieving the full purposes and objectives of the Federal law.[959] "Federal regulations have no less pre-emptive effect than Federal statutes." [960] Indeed, even commenters who questioned the FTC's authority to preempt State laws agreed that if a Federal agency promulgates a rule pursuant to its Congressionally conferred authority, the rule preempts conflicting State laws.

As discussed in Parts II.A, II.B, and II.C, the Commission has the authority to promulgate this final rule. Accordingly, the final rule preempts conflicting State laws. To provide a clear explanation of the Commission's intent and the scope of preemption effected by the final rule, the final rule includes an express preemption

---

[955] State statutes, regulations, orders, or interpretations, including State common law, are referred to as "State laws" for ease of reference.

[956] NPRM at 3515.

[957] Comments on the Commission's authority to promulgate this final rule, separate from the issue of preemption of State law, are summarized in Part II.

[958] *Am. Optometric Ass'n* v. *FTC*, 626 F.2d 896, 910 (1980).

[959] *See, e.g., Federal Preemption: A Legal Primer,* Cong. Rsch. Serv., 23 (May 18, 2023) (Report R45825), *https://crsreports.congress.gov/product/pdf/R/R45825/3.*

[960] *Fid. Fed. Sav. & Loan Ass'n* v. *de la Cuesta,* 458 U.S. 141, 153 (1982).

provision at § 910.4.[961] As discussed in Part VI.D, the Commission has modified proposed § 910.4 to make clear that even when the scope of non-compete prohibitions under a State law is less than that of the final rule, State authorities and persons may enforce the State law by, for example, bringing actions against non-competes that are illegal under the State law.

*C. The Benefits of Preemption*

Numerous commenters stated that variations in State laws chill worker mobility and expressed support for a uniform Federal standard. Some commenters explained that a preemption clause could bring clarity to the law's effect.

The U.S. Department of Justice commented that, due to the patchwork of State laws, a worker may be free to switch jobs in one jurisdiction but subject to a non-compete in another, creating uncertainty as to the non-compete's enforceability for both firms and workers.[962] In another commenter's view, the variation in State non-compete laws creates competitive disadvantages for companies in States that ban such clauses, necessitating a Federal ban.

Another commenter pointed out that most States have not passed statutes that ban or restrict non-competes, and that existing statutes cover different categories of workers and different wage levels, making it difficult for workers to know whether employers can enforce a particular non-compete. The commenter stated that variations in the legal authority of State attorneys general to take action on the public's behalf also limit the effectiveness of State restrictions on non-competes. A number of commenters explained that the difficulties arising from variations in State non-compete laws are exacerbated by the increase in remote and hybrid work, and workers who travel to work across State lines. Accordingly, many commenters favored a uniform Federal standard that would promote certainty for employers and workers. Even some commenters who generally opposed banning non-competes favored preemption to eliminate the patchwork of State laws that makes it difficult for workers to know the applicable law and encourages forum shopping by employers who want to bring suits in sympathetic jurisdictions.

Other commenters opposed preemption, asserting that State legislatures and courts are best situated to address non-competes and that the States have historically regulated this area. They contended States should be allowed to continue adjusting the scope of restrictions on non-competes including applicability to different types of workers, time span, and geographic scope.

The Commission finds that preemption of State laws, including State common law, that conflict with the final rule best mitigates the negative effects of the patchwork of State laws, including chilling worker mobility and undercutting competitive conditions in labor and product and services markets.[963] Preempting this patchwork with a Federal floor is particularly important given the increase in work across State lines, and remote and hybrid work, since the COVID–19 pandemic.

Moreover, as discussed in Part IX.C, preemption furthers a primary goal of the final rule: to provide a uniform, high level of protection for competition that is easy for both employers and workers to understand and makes it less likely that employers will subject workers to illegal non-competes or forum shop. Indeed, some commenters who otherwise opposed the proposed ban on non-competes regarded the patchwork itself burdensome to employers as well as workers and noted the rule would reduce burden by eliminating uncertainty and confusion caused by State law variations.[964] As described in Part IX.C, the Commission has determined that declining to issue this final rule and continuing to rely solely on State laws and case-by-case adjudication would be less effective than issuing a clear national standard. The Commission concludes, however, that supplementing the final rule with additional State authority and resources, so long as the State laws are not inconsistent with the final rule, will assist in protecting both workers and competition.

*D. The Extent of Preemption*

Some commenters strongly supported the NPRM but expressed concern that the preemption provision as proposed could undermine States' efforts to curb non-competes and would thereby undercut the final rule's effectiveness. These commenters stated that under one interpretation, proposed § 910.4 could preempt State laws that prohibit non-competes for workers earning less than a specified income because the law as a whole may not be deemed to provide greater protection than the final rule. In their view, such an interpretation would not further the final rule's goals, because States with income-based restrictions on non-competes rather than complete bans may offer covered workers protections against non-competes that the FTC's proposed rule would not provide, such as State enforcement, private rights of action, and certain financial penalties.[965]

These commenters also asserted that in many cases, State agencies and residents could be better positioned to respond to unlawful non-compete use specific to a particular State, but they would be unable to do so and dependent on the Commission if their laws were fully preempted. To enable concurrent enforcement of State laws that restrict the use of non-competes, thereby increasing the enforcement resources devoted to the issue, they recommended a "savings clause" that would exempt from preemption State laws that provide workers with protections substantially similar to or greater than those afforded by the

---

[961] Many FTC regulations, including regulations promulgated under section 6(g) of the FTC Act, include provisions addressing State laws and preemption. *See, e.g.,* Funeral Rule, 16 CFR 453.9 (exempting from preemption State laws that "afford an *overall* level of protection that is *as great as, or greater than,* the protection afforded by" the FTC's Rule) (emphasis added); Concerning Cooling Off Period for Sales Made at Homes or at Certain Other Locations, 16 CFR 429.2(b) (exempting laws and ordinances that provide "a right to cancel a door-to-door sale that is *substantially the same or greater* than that provided in this part") (emphasis added); Business Opportunity Rule, 16 CFR 437.9(b) ("The FTC does not intend to preempt the business opportunity sales practices laws of any [S]tate or local government, except to the extent of any conflict with this part. A law is not in conflict with this Rule if it affords prospective purchasers *equal or greater protection*[.]") (emphasis added); Mail, internet, or Telephone Order Merchandise Rule, 16 CFR 435.3(b) ("This part does supersede those provisions of any State law, municipal ordinance, or other local regulation which are inconsistent with this part to the extent that those provisions do not provide a buyer with rights which are *equal to or greater* than those rights granted a buyer by this part.") (emphasis added); Franchise Rule, 16 CFR 436.10(b) ("The FTC does not intend to preempt the franchise practices laws of any [S]tate or local government, except to the extent of any inconsistency with part 436. A law is not inconsistent with part 436 if it affords prospective franchisees *equal or greater protection*[.]") (emphasis added); Labeling and Advertising of Home Insulation, 16 CFR 460.24(b) (preemption of "State and local laws and regulations that are inconsistent with, or frustrate the purposes of this regulation"). *See also* Part II.B.

[962] Comment of Dep't of Justice Antitrust Div., FTC–2023–0007–20872 at 7.

[963] *See* Part IX.C.

[964] *See, e.g.,* Comment of Mech. Contractors Ass'n of Am., FTC–2023–0007–18218 (although opposed to the proposed rule, MCCA's position supports a single Federal rule and some level of preemption).

[965] *See* Comment of the Attys. Gen. of 17 States and DC, FTC–2023–0007–21043, at 14–15 ("jurisdictions like Colorado, Illinois, Washington, and the District of Columbia have passed laws that ban non-competes for workers making under a specified income threshold and also include remedies provisions that authorize [S]tate agencies and residents to enforce the law"); *id.* at 9–11 (discussing State enforcement, private action, and damages in several State non-compete laws).

rule.[966] They also recommended that the rule not preempt State antitrust and consumer protection laws that may protect workers against non-competes and other restrictive employment arrangements as those laws can provide another enforcement avenue for State agencies and residents.

Another commenter recommended including a narrow reverse preemption provision so that relevant State laws in States that enact the Uniform Restrictive Employment Agreement Act[967] would not be preempted.[968] The comment asserted that by doing so, a final rule would preserve a role for the States and encourage their cooperation with the Commission, and also provide greater protections for employees than the proposed rule provided in several ways, such as allowing for greater enforcement and including classes of employers that the final rule would not cover.[969] The uniform law would ban non-competes for workers earning at or below the State's annual mean wage and would allow non-competes for those earning more, but apply limits and require disclosures for any non-compete.

Based on comments, the Commission has modified the final rule's preemption provision to clarify and explain that State laws that restrict non-competes and do not conflict with the final rule are not preempted. Section 910.4 also expressly references State common law, antitrust law, and consumer protection law, so that the intended scope of preemption is clear. State common law is expressly referenced because many States do not have a general non-compete statute, and the common law varies considerably.

Section 910.4(b) reflects the Commission's intent that States may continue to enforce in parallel laws that restrict non-competes and do not conflict with the final rule, even if the scope of the State restrictions is narrower than that of the final rule. That is, State laws cannot authorize non-competes that are prohibited under this final rule, but States may, for example, continue to pursue enforcement actions under their laws prohibiting non-competes even if the State laws prohibit a narrower subset of non-competes than this rule prohibits.

Accordingly, § 910.4(a) states that the final rule will not be construed to annul, or exempt any person from complying with, any State statute, regulation, order, or interpretation applicable to a non-compete, including, but not limited to, State antitrust and consumer protection laws and State common law. Rather, the final rule supersedes such laws to the extent, and only to the extent, that such laws would otherwise permit or authorize a person to engage in conduct that is an unfair method of competition under § 910.2(a) or conflict with the notice requirement in § 910.2(b).[970] These revisions provide that when States have restricted non-competes and their laws do not conflict with the final rule, employers must adhere to both provisions, and workers are protected by both provisions (including State restrictions and penalties that exceed those in Federal law).

For example, § 910.4 makes clear that the final rule does not preempt State law enforcement where a State bans non-competes only for workers earning below a certain amount and thus has a ban that is narrower than the final rule. Thus, if a State's law bars non-competes only for workers who earn less than $150,000 per year, the final rule and the law are different in scope of protection but not directly inconsistent. The State may continue to enforce its ban for workers earning less than $150,000, but all non-competes covered by the final rule, regardless of a worker's earnings, remain an unfair method of competition under the final rule and are therefore unlawful.

In response to concerns raised by commenters and to further bolster the consistent use of State laws, the Commission expressly recognizes State authority and the existence of private rights of action arising under State laws that restrict non-competes or bar unfair methods of competition. This is set forth in § 910.4, now titled "Relation to State laws and preservation of State authority and private rights of action," and is detailed in § 910.4(b). That section provides that unless a State law conflicts with the final rule and is superseded as described in § 910.4(a), part 910 does not limit or affect the authority of State attorneys general and other State agencies or the rights of a person to bring a claim or regulatory action arising under State laws, including State antitrust and consumer protection laws and State common law. Section 910.4(b) also explains that

persons retain the right to bring a claim or regulatory action under State laws unless the laws conflict with the final rule and have been superseded as described in § 910.4(a).

These modifications are consistent with many commenters' recommendations and recognize State-based enforcement as a potent force that supplements Federal enforcement. In addition, the modifications, particularly those that explain § 910.4 does not exempt any person from complying with State laws, are intended to curb the use of preemption as a defense against State restrictions of non-competes.[971] Under the final rule, States may continue to play a critical role in restricting the use of non-competes. In contrast to the FTC Act, which cannot be enforced by private persons or State authorities,[972] the non-compete laws of numerous States provide for such enforcement.[973] Non-competes that are outside the FTC's jurisdiction or otherwise outside the scope of the final rule may be covered by State non-compete laws.[974] State penalties can be substantial and may be particularly important as a deterrent.

The modifications also reflect the Commission's long history of working in concert with States and encouraging concurrent enforcement of State laws to pursue common goals. While the Commission recognizes this will leave some variation in the enforcement exposure covered persons face among States, that variation will be greatly reduced by the final rule, which sets a

---

[966] Another comment recommended a similar formulation, which would exempt from preemption State laws that offer workers protection that is equal to or greater than the protection provided by the final rule. This commenter asserted that this formulation would allow existing State law to stand.

[967] See Uniform Restrictive Employment Agreement Act, supra note 332 at sec. 5, sec. 8.

[968] See Comment of ULC, FTC–2023–0007–20940.

[969] See also Part II.E (discussing comments on the Commission's jurisdiction under the FTC Act).

[970] The effect of part 910 is limited to non-competes. It would not broadly preempt other uses of State antitrust and consumer protection law.

[971] See, e.g., Sprietsma v. Mercury Marine, 537 U.S. 51, 62–70 (2002) (finding Federal Boat Safety Act did not relieve defendant from liability for State common law tort claim because it did not expressly nor impliedly preempt State common law).

[972] See, e.g., FTC, A Brief Overview of the Federal Trade Commission's Investigative, Law Enforcement, and Rulemaking Authority App. A (May 2021), https://www.ftc.gov/about-ftc/mission/enforcement-authority; Holloway v. Bristol-Myers Corp., 485 F.2d 986, 997 (D.C. Cir. 1973).

[973] Comment of the Attys. Gen. of 17 States and DC, FTC–2023–0007–21043 at 7 ("jurisdictions like Colorado, Illinois, Washington, and the District of Columbia have passed laws that ban non-competes for workers making under a specified income threshold and also include remedies provisions that authorize state agencies and residents to enforce the law"). See also 2023 Cal. Legis. Serv. Ch. 157 (S.B. 699) West (adding Cal. Bus. & Prof. Code sec. 16600.5, Sept. 1, 2023) (providing for a private right of action in regard to California's non-compete statute).

[974] See Part II.E (discussing the Commission's jurisdiction under the FTC Act). See, e.g., Cal. Bus. & Prof. Code secs. 16600–16602 (broad coverage); Minn. Stat. Ann. sec. 181.988, subdiv. 1 (b) ("'Employer' means any individual, partnership, association, corporation, business, trust, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee.").

floor that applies nationally.[975] As it has done in the past, the Commission will ''share the field'' with States and partner with them in the battle against abusive non-competes.[976] As set out in Part IX.C, the Commission considered and rejected the alternative of relying on existing State laws alone. Consistent with that determination, the Commission declines to adopt the suggestion from a comment that relevant State laws in States that enact the Uniform Restrictive Employment Agreement Act not be preempted.

## VII. Section 910.5: Severability

The Commission stated in the NPRM that it may adopt a severability clause [977] and it received a comment stating the Commission should adopt such a clause to protect the rights and securities of workers if one part of the rule or one category of workers were invalidated. The Commission adds § 910.5, together with this section, to clarify the Commission's intent.[978]

Section 910.5 states that if any provision of the final rule is held to be invalid or unenforceable either facially, or as applied to any person or circumstance, or stayed pending further agency action, such invalidity shall not affect the application of the provision to other persons or circumstances or the validity or application of other provisions. Section 910.5 also states that if any provision or application of the final rule is held to be invalid or unenforceable, the provision or application shall be severable from the final rule and shall not affect the remainder thereof. This provision confirms the Commission's intent that the remainder of the final rule remain in effect in the event that a reviewing court stays or invalidates any provision, any part of any provision, or any application of the rule—including, for example, an aspect of the terms and conditions defined as non-competes, one or more of the particular restrictions on non-competes, or the standards for or application to one or more categories of workers.

The Commission finds that each of the provisions, parts of the provisions, and applications of the final rule operate independently and that the evidence and findings supporting each provision, part of each provision, and application of each provision stand independent of one another. In this final rule, the Commission determines that certain conduct is an unfair method of competition in Part IV.B and Part IV.C and differentiates between senior executives and workers who are not senior executives with respect to existing non-competes. The final rule distinguishes between the two in both the final rule's operation and in the bases for adopting the final rule. The difference in restrictions among different workers, and the distinct bases for adopting the restrictions, is described in detail in Parts IV.B and IV.C. The Commission also estimates the effect of excluding senior executives entirely from the rule in Part X.F.11 and finds that the benefits of covering only those workers who are not senior executives justify the costs.

The Commission promulgates each provision, part of each provision, and application of each provision as a valid exercise of its legal authority. Were any provision, part of any provision, or any application of any provision of the final rule stayed or held inapplicable to a particular category of workers, to particular conduct, or to particular circumstances, the Commission intends the remaining elements or applications of the final rule to prohibit a non-compete between covered persons and covered workers as an unfair method of competition.

In Parts IV.B and IV.C, the Commission finds that the use of non-competes is an unlawful unfair method of competition under section 5 of the FTC Act because it is restrictive and exclusionary conduct that tends to negatively affect competitive conditions in several independent ways. In support of its finding that the use of non-competes is an unlawful unfair method of competition for workers who are not senior executives, the Commission additionally finds that the use of non-competes is exploitative and coercive in Part IV.B.2.b.

The Commission relies principally on empirical evidence regarding the effects of changes in non-compete enforceability, both when finding in Part IV.B.3.a and Part IV.C.2.c.ii that the use of non-competes tends to negatively affect competitive conditions in labor markets, and when finding in Part IV.B.3.b and Part IV.C.2.c.i that the use of non-competes tends to negatively affect competitive conditions in product

and service markets. The Commission further analyzes and quantifies these effects in Part X.F.6, including sensitivity analyses that compare the estimated effects of smaller changes in enforceability and larger changes in enforceability.

Based on this empirical evidence and analysis, the Commission believes that more limited application of the rule—which might result were a court to render the final rule inapplicable in some way—may be equivalent to smaller changes in the enforceability of non-competes in the empirical literature. As described in Part IV.B.3.a and IV.B.3.b, smaller changes in enforceability change the magnitude, but not the directional nature, of the labor market and product and service market effects.[979] Accordingly, consistent with the findings related to the use of certain non-competes being an unfair method of competition in Part IV, the empirical evidence on the use of non-competes, the regulatory impact analysis in Part X, and its expertise, the Commission finds that any smaller reduction in enforceability resulting from circumstances in which a court stays or invalidates some application of the final rule would not impair the function of the remaining parts of the final rule nor would it undermine the justification or necessity for the final rule as applied to other persons, conduct, or circumstances. The Commission intends for any remaining application of the final rule to be in force because it is committed to stopping any and all unlawful conduct related to the use of certain non-competes and the Commission finds every use of a non-compete covered by the final rule to be an unlawful unfair method of competition under section 5 of the FTC Act.[980]

In Part X, the Commission conducts a regulatory impact analysis for the final rule as applied to all workers, as applied to all workers other than senior executives, and as applied to senior executives. The Commission finds that the asserted benefits of the use of non-competes do not justify the harms from the use of non-competes for any category of workers. The Commission's findings and differential analysis demonstrate that the asserted benefits from the use of non-competes do not justify the harms from the use of non-competes for higher- or lower-wage earners, including, for example, lower-wage workers defined as workers whose total annual compensation is less than $151,164.

---

[975] The Commission has taken this position in previous regulations. *See, e.g.*, Part 429—Cooling-Off Period for Door-to-Door Sales, 37 FR 22934 (Oct. 26, 1972).

[976] For a previous example, *see* Trade Regulation Rule; Funeral Industry Practices, 47 FR 42260, 42287 (Sept 24, 1982) (noting the purpose of the rule's provision addressing relation of the rule to State law is ''to encourage [F]ederal-[S]tate cooperation by permitting appropriate [S]tate agencies to enforce their own [S]tate laws that are equal to or more stringent than the trade regulation rule'').

[977] NPRM at 3518–19 & n.429.

[978] In the NPRM, proposed § 910.5 addressed the compliance date.

[979] *See also* Part X.F.6.

[980] *See* NPRM at 3518–19.

**JA0114**

For instance, if, for any reason, a reviewing court were to stay or invalidate the final rule as applied to senior executives, the Commission would intend for the remainder of the final rule to apply to all workers other than senior executives. Likewise, if a reviewing court were to stay or invalidate the final rule to apply to workers other than senior executives, the Commission would intend for the remainder of the final rule to apply to senior executives. Additionally, if a reviewing court were to stay or invalidate the final rule as applied to some other subset of workers, the Commission would intend for the remainder of the final rule to apply to all but those workers. So, for example, if a reviewing court were to stay or invalidate the final rule as applied to workers other than lower-wage workers—defined as workers whose total annual compensation is less than $151,164—the Commission would intend for the remainder of the final rule to apply to those workers, and further notes the evidentiary record demonstrates that application of the rule to those remaining workers would be beneficial and achieve lawful objectives. In the same way, if a reviewing court were to stay or invalidate the provision of the final rule regarding enforcing an existing non-compete or the notice requirement, the Commission would intend for the remainder of the final rule to apply. As described in Part IX.C, although the Commission concludes that a national standard is most effective, a number of States currently apply different standards to different workers and States also apply a myriad of legal standards to non-competes generally. Accordingly, were a reviewing court to stay or invalidate a particular application of the final rule, a covered person could simply comply with the provisions, parts of provisions, or applications of the final rule that remain in effect.

The Commission's adoption of the final rule does not hinge on the same restrictions applying to all non-competes, on the final rule applying to all workers, or on joint adoption or operation of each provision. Accordingly, the Commission considers each of the provisions adopted in the final rule to be severable, both within each provision and from other provisions in part 910. In the event of a stay or invalidation of any provision, any part of any provision, or of any provision as it applies to certain conduct or workers, the Commission's intent is to otherwise preserve and enforce the final rule to the fullest possible extent.

**VIII. Section 910.6: Effective Date**

The Commission adopts a uniform effective date of 120 days after publication of the final rule in the **Federal Register**. The final rule will go into effect, and compliance with the final rule will be required, on that date. Based on comments urging the Commission to reduce the compliance period from the 180-day period proposed in the NPRM so that the benefits of the final rule may be obtained as soon as possible, the Commission's findings that the use of non-competes is exploitative and coercive for the vast majority of workers, and modifications in the final rule that reduce covered entities' compliance burden, the Commission modifies the date that compliance with the final rule is required from 180 days to 120 days after publication in the **Federal Register**.

*A. The Proposed Rule*

In the NPRM the Commission proposed a compliance date of 180 days after publication of the final rule in the **Federal Register**. The Commission stated that, during the compliance period, employers would need to: (1) assess whether to implement replacements for existing non-competes (such as NDAs), draft those covenants, and then negotiate and enter into those covenants with the relevant workers; (2) remove any non-competes from employment contracts that they provide to new workers; and (3) rescind, no later than the date that compliance is required, any non-competes that it entered into prior to the compliance date.[981] The Commission preliminarily found that 180 days would be enough time for employers to accomplish all of these tasks.[982] The NPRM would have also required employers to provide the notice specified in proposed § 910.2(b)(2) within 45 days of rescinding the non-compete.[983]

The Commission also stated that it proposed to establish an effective date of 60 days after the final rule is published in the **Federal Register** even though compliance would not be required for 180 days.

*B. Comments Received*

Many worker commenters urged the Commission to act as quickly as possible to bring the final rule into force, citing the current acute, ongoing harms to their earnings, mobility, quality of life, and other significant impacts and noting the final rule's potential for immediate relief if their non-compete was no longer in force. Representatives of many local governments from different States contended that the negative effects of non-competes and the anticipated benefits of the proposed rule justified allowing the Commission's rule to go into effect as soon as possible. Other commenters supported the compliance date as proposed or favored other measures to obtain the anticipated benefits of the final rule as soon as practicable. Another commenter contended that the 180-day compliance period was sufficient to allow businesses to ensure compliance and suggested that the Commission move the effective date back to the day or the day after the final rule is published.[984]

Several commenters suggested the Commission adopt a longer compliance period of one year, 18 months, or two years. These commenters generally stated that businesses need more time to adjust their compensation packages, contracting practices, and employee policies to comply with the rule and to protect their intellectual property. At least one commenter also argued the Commission should adopt a two-year compliance period to allow courts sufficient time to hear and resolve challenges to the final rule. One commenter asserted that the compliance period would be especially burdensome for smaller business. Another industry commenter argued application of the rule should be phased in over time.

*C. The Final Rule*

The Commission adopts a 120-day compliance period. As outlined in Parts IV.B and IV.C, based on both voluminous comments from the public as well as a significant body of empirical evidence, the Commission finds that the use of non-competes is coercive and exploitative for the vast majority of workers across different earnings levels and occupations and that for all workers it tends to negatively affect competitive conditions in labor markets and also tends to negatively affect competitive conditions in product and service markets—and that such actual harms are in fact currently ongoing. The Commission adopts a 120-

---

[981] *Id.* at 3483, 3515–16. In the NPRM and herein, the Commission refers to the period between the publication of the final rule and the date on which compliance with the final rule is required as the "compliance period." *See id.* at 3515.

[982] *Id.* at 3516.

[983] *Id.* (addressing compliance with proposed § 910.2(b)(2)).

[984] The comment did not consider the limitations on the effective date imposed by the CRA.

day compliance period to stop these unfair methods of competition as soon as practicable. The Commission finds that a 120-day period appropriately balances the interests at hand.

The Commission has taken several steps in the final rule to make compliance as simple as possible for employers. These steps make it practicable and reasonable to require compliance within 120 days. The final rule allows regulated entities to enforce existing non-competes with senior executives, who commenters contended are most likely to have complex compensation arrangements that include non-competes. Accordingly, there is no need for a lengthy compliance period, as the most complex existing arrangements are left in place. The Commission also eliminated the rescission requirement for all workers. Under the final rule, employers will not need to rescind (*i.e.,* legally modify) existing non-competes for any workers; rather, employers will simply be prohibited from enforcing them after the effective date of the final rule and will be required to provide the notice in § 910.2(b)(1).[985] While employers are required to provide notice to workers with existing non-competes who are not senior executives, under § 910.2(b), the final rule provides model safe harbor language that satisfies the notice requirement.[986] The final rule gives employers several options for providing the notice—on paper, by mail, by email, or by text.[987] And employers are exempt from the notice requirement where the employer has no record of a street address, email address, or mobile telephone number for the worker.[988] Furthermore, as explained in Part IV.E, the Commission has simplified the notice requirement to facilitate employers' ability to comply by simply sending a mass communication such as a mass email to current and former workers.

Starting on the effective date of the final rule, employers will be prohibited from entering into new non-competes barred by this final rule and from enforcing non-competes that the employer entered into prior to that date with workers other than senior executives. Prior to the effective date employers will need to identify each of their workers with existing non-compete agreements and can assess which, if any, are senior executives and determine if they wish to maintain those

non-competes. Employers will also need to assess and revise, if necessary, any employment policies or handbooks that purport to bind workers even after the effective date.

To the extent they have confidential business information, trade secrets, or other investments to protect with respect to a particular worker, employers will be able to assess their options to lawfully protect that information. However, new protections will be unnecessary in many cases, because, for example, 95.6% of workers subject to non-competes are already subject to an NDA.[989] In the rare case where compensation might be tied to a non-compete that is not with a senior executive, the employer and worker can determine whether to amend their original employment agreement. The Commission concludes that the 120-day compliance period gives employers more than sufficient time to complete these tasks. For example, firms routinely complete entire onboarding processes for new employees in much shorter timeframes than 120 days.

The Commission also finds that the 120-day compliance period gives small businesses enough time to comply with the final rule. Although small businesses may have limited staff and funds compared to larger firms, they also have fewer workers, and the exclusion for existing non-competes for senior executives will relieve the compliance burden altogether for those small firms that use non-competes only with those workers. Moreover, the steps the Commission has taken to reduce the compliance burden of § 910.2(b) will further simplify and streamline compliance for small businesses.

The Commission has also determined it is not necessary to extend the compliance period to give courts time to adjudicate pending non-compete litigation because, as described in Part V.C.3, the Commission has adopted § 910.3(b), which provides that the final rule does not apply where a cause of action related to a non-compete arose prior to the effective date. The Commission also finds that a longer compliance period is not needed to hear and resolve challenges to the final rule, especially given the ability of a challenger to seek a preliminary injunction.

In sum, the Commission finds that due to modifications reducing covered entities' burden to comply with the final rule, a compliance period of 120 days is sufficient time to comply with the final rule. Given these changes the longer

compliance period proposed in the NPRM is no longer warranted and would allow the use of certain non-competes that are an unfair method of competition—and their related harms and costs—to continue for longer than necessary. The substantial benefits to competition and to workers of the final rule taking effect as soon as possible outweigh any concerns about potential difficulties in meeting an earlier compliance date.

The Commission also adopts a 120-day effective date. The Commission concludes that it would ease the burden of implementation and reduce possible confusion by having a uniform date for when the final rule goes into effect and when compliance under the final rule is required. A 120-day effective date complies with the requirements of the Congressional Review Act that a "major rule" may not take effect fewer than 60 days after the rule is published in the **Federal Register**.

## IX. Alternative Policy Options Considered

The Commission proposed to ban non-competes categorically, with a limited exception for non-competes entered into by a person who is selling a business entity. In the NPRM, the Commission discussed and sought comment on potential alternatives to the proposed categorical ban, including discrete alternatives that would implement a rebuttable presumption of unlawfulness or apply different standards to different categories of workers.[990] The Commission also sought comment on whether a rule should apply a different standard to senior executives and, whether, in lieu of the proposed rule, the Commission should adopt a disclosure rule or reporting rule.[991] The Commission sought comment on all aspects of potential alternatives, including whether the Commission should adopt one of the identified alternatives or some other alternative instead of the proposed rule.[992] The Commission also sought comment on the extent to which a uniform Federal standard for non-competes would promote certainty for employers and workers.[993]

The Commission received many comments on these questions, as well as on the question of whether the Commission should issue a Federal standard for non-competes or continue relying on existing law and case-by-case litigation to address harms from non-

---

[985] *See* Part IV.E (describing why the Commission is not finalizing a rescission requirement).

[986] § 910.2(b)(4) and (5).

[987] § 910.2(b)(2)(ii).

[988] § 910.2(b)(3).

[989] Balasubramanian, Starr, & Yamaguchi, *supra* note 74 at 44.

[990] NPRM at 3516.

[991] *Id.* at 3519–21.

[992] *Id.* at 3521.

[993] *Id.* at 3497.

competes. In this section, the Commission discusses the comments received regarding these alternatives and the reasons it has decided not to adopt them. This Part IX addresses these comments but does not address alternatives related to the design of specific regulatory provisions, which are discussed in the Part addressing the relevant provision.

*A. Categorical Ban vs. Rebuttable Presumption*

1. The Rebuttable Presumption Alternative Generally

While preliminarily finding that a categorical ban would best achieve the proposed rule's objectives, the Commission nevertheless sought comment on the alternative of a rebuttable presumption, under which it would be presumptively unlawful for an employer to use a non-compete, but a non-compete would be permitted if the employer could meet a certain evidentiary burden or standard.[994] The Commission also sought feedback on the form any rebuttable presumption should take.[995]

Most commenters that addressed this issue, including those both supporting and opposing the proposed rule, discouraged the Commission from including a rebuttable presumption in the final rule. These commenters contended that a rebuttable presumption would add complexity and uncertainty to the rule.

Supporters of the proposed rule asserted that a rebuttable presumption would undermine the rule's effectiveness, failing to deter employers from imposing non-competes while making litigation too uncertain and costly for most workers to pursue. Some of these commenters contended that a rebuttable presumption would also do little to reduce the chilling effects of non-competes. They argued that employers would continue to impose non-competes that are unlikely to survive a rebuttable presumption.

Many commenters critical of the proposed rule opposed a rebuttable presumption for essentially the same reasons they opposed the rule in general. They contended that, in States where non-competes are generally enforceable, a rebuttable presumption would inappropriately shift the burden of proof from workers to employers. Many of these commenters specifically opposed a rebuttable presumption that would use a test similar to antitrust law's "quick look" analysis, contending

that the Commission's analysis of empirical research on non-competes cannot substitute for the lengthy experience courts usually have with a particular restraint before giving it quick-look treatment. A few commenters contended that a rebuttable presumption would increase litigation and raise employers' compliance costs by complicating the determination of whether a given non-compete is likely valid, requiring more lawyer involvement in drafting clauses and more reliance on courts to determine a non-compete's validity.

A few commenters supported a rebuttable presumption, arguing the Commission's proposed ban on non-competes was too blunt an instrument. Some also contended that a rebuttable presumption would offer a more flexible approach akin to the majority of State law approaches. At least one commenter stated a rebuttable presumption would make the final rule more likely to survive judicial review. A few commenters stated a rebuttable presumption would provide more protections than most State laws by allowing only non-competes that the commenter considered are not unfair to the worker, such as where highly paid workers agree to narrow non-competes in exchange for bargained-for consideration. One commenter argued a rebuttable presumption would enable the Commission to accrue more experience adjudicating non-competes and assessing their impact on competition.

Commenters advocating for a rebuttable presumption generally preferred a test focusing on one or more factors, including: the non-compete's geographic scope and duration; the presence and amount of any liquidated damages or penalty provision; whether the clause is narrowly tailored to prevent competition with actual competitors; the restrained worker's duties and income; and the availability of less restrictive alternatives. A few commenters supported a "preponderance" (as opposed to a "clear and convincing") standard to permit as many non-competes as possible but acknowledged that such a rule may be so similar to the existing common law as to be redundant.

After carefully reviewing and considering the comments, the Commission concludes that a rule implementing a rebuttable presumption is not preferable to the final rule as adopted. Based on the Commission's expertise, including careful review and consideration of the entire rulemaking record, the Commission finds that a rebuttable presumption would be less

effective than the final rule for achieving the Commission's stated goals. A rebuttable presumption also presents administrability concerns that the final rule does not.

Overall, the comments reinforced the Commission's concerns that a rebuttable presumption would foster substantial uncertainty about the validity of a given non-compete and would do little to reduce the *in terrorem* effects of non-competes. Research demonstrates that employers maintain non-competes even where they likely cannot enforce them,[996] that many workers are not aware of the applicable law governing non-competes or their rights under those laws,[997] and that the degree to which non-competes inhibit worker mobility is affected not only by whether a non-compete is actually enforceable but also on whether a worker believes their employer may enforce it.[998] Accordingly, the Commission concludes that a rule implementing a rebuttable presumption would be inadequate to reduce the prevalence of non-competes, their chilling effect on worker mobility, or their tendency to negatively affect competitive conditions. Relatedly, the Commission believes a rebuttable presumption would increase litigation costs for workers and employers relative to the final rule as adopted.

The Commission also believes that, in important respects, a rebuttable presumption for non-competes is inconsistent with the Commission's findings in this final rule. As discussed in greater detail in Part IX.C, a rule that provides for case-by-case, individualized assessment of non-competes is unlikely to address the negative effects of non-competes on competition in the aggregate. In addition, by focusing on considerations specific to the worker and the employer, a rebuttable presumption is unlikely to address the external effects of non-competes (*i.e.,* the effects on persons other than the parties to the non-compete), including their negative effects on the earnings of workers who are not covered by non-competes.

The Commission recognizes there may be some benefits to a rebuttable presumption relative to the status quo. Because it puts the burden of proof on employers, a rebuttable resumption would be stricter than the current law in States where non-competes are allowed, and research suggests even a small decrease in enforceability would increase worker mobility, raise wages,

---

[994] *Id.* at 3517.

[995] *Id.* at 3517–19.

[996] *See* Part IV.B.2.b.

[997] *See* Prescott & Starr, *supra* note 413.

[998] Starr, Prescott, & Bishara, *supra* note 68 at 633, 652, 664.

and promote innovation.[999] But the categorical ban adopted in the final rule would have greater benefits in these respects without the drawbacks explained in this Part IX.A.1.

## 2. Discrete Alternatives Related to Rebuttable Presumptions

In the NPRM, the Commission also sought comment on four discrete alternatives to the proposed rule: Alternative #1 (categorical ban below some threshold, rebuttable presumption above); Alternative #2 (categorical ban below some threshold, no requirements above); Alternative #3 (rebuttable presumption for all workers); and Alternative #4 (rebuttable presumption below some threshold, no requirements above).[1000]

As explained in Part IX.A.1, the Commission finds a rebuttable presumption would be ineffective in addressing the harms to competitive conditions caused by non-competes. For the same reasons, the Commission declines to adopt Alternatives #1, #3, and #4, all of which contemplated a rebuttable presumption for some or all workers.

While the vast majority of commenters supported the Commission's proposal to ban non-competes categorically for all workers, a number of commenters suggested that the Commission permit non-competes with senior executives (or other highly skilled or highly paid workers) and other workers. The Commission addresses these comments in Part IV.C and V.D.1, where it finds that such non-competes tend to negatively affect competitive conditions in labor markets and in product and service markets, and that non-competes are also exploitative and coercive for workers other than senior executives. For these reasons, the Commission declines to adopt Alternative #2, which contemplated imposing no requirements on workers above a certain wage or other threshold.

### B. Other Discrete Alternatives

#### 1. Disclosure Rule

In the NPRM, the Commission sought comment on the potential alternative of adopting disclosure requirements related to non-competes.[1001] The Commission explained that the rule

could, for example, require an employer to disclose to a worker prior to making an employment offer that the worker will be subject to a non-compete and/or to explain the terms of the non-compete and how the worker would be affected by signing it.[1002] The Commission noted that a 2021 study by Starr, Prescott, and Bishara finds that disclosure of non-competes to workers prior to the acceptance of a job offer was associated with increased earnings, rates of training, and job satisfaction.[1003] The authors of the study, however, cautioned that their analysis "should not be interpreted causally," a point the Commission noted in explaining why it gave minimal weight to the study.[1004] The Commission preliminarily concluded in the NPRM that a disclosure requirement would not achieve the objectives of the proposed rule.[1005]

In general, commenters stated they agreed with the Commission's preliminary view that, while there may be some benefits to a disclosure rule, it would not achieve the objectives of the rule. Workers and worker advocacy groups stated that non-competes are often presented to workers on their first day on the job, or after they accept an employment offer. Although these commenters generally supported a comprehensive ban, they noted that if the Commission did not pursue a ban, a disclosure requirement may help improve workers' awareness of non-competes before accepting an offer. On the other hand, these commenters contended that a disclosure rule would do little to reduce the prevalence of non-competes, because workers have little choice but to accept non-competes, which are typically presented as "take-it-or-leave-it" terms and are ubiquitous in many fields.

Many trade organizations, advocacy groups, and academics who were generally supportive of the rule stated that a disclosure rule would fail to mitigate the competitive harms caused by non-competes in the aggregate. While acknowledging a disclosure rule may ameliorate some problems related to worker awareness of non-competes, these commenters contended that non-competes are unfair and coercive because employees generally lack adequate bargaining power to refuse to sign or bargain over non-competes even when they are presented at the time of

an employment offer, and that a disclosure rule would therefore not have the effect of making non-competes less unfair or coercive. A few commenters opposed a disclosure rule generally but urged the Commission to adopt a disclosure requirement for any non-competes permitted by the final rule, including for any non-competes entered into by a person who is selling a business.

On the other hand, some trade organizations, advocacy groups, and businesses that generally opposed the rule advocated for the Commission to adopt a disclosure rule in lieu of the proposed categorical ban. These commenters contended that a disclosure rule would substantially mitigate the unfairness of non-competes that are entered into without adequate notice to the worker without drastically altering the legal status quo, thereby maintaining the protections for trade secrets, training expenditures, and intellectual property they contend that non-competes provide. They stated that eight States and the District of Columbia have statutory notice requirements for non-competes.

Most of the commenters who supported a disclosure rule also argued that rather than demonstrating that non-competes tend to negatively affect competitive conditions, the available evidence merely demonstrates opportunistic behavior by employers (such as presenting non-competes only after prospective workers have taken hard-to-reverse steps towards accepting employment) and workers (such as seeking to be excused from a non-compete after recognizing its impact on future job prospects). These commenters asserted that a disclosure rule would be better suited to address these types of opportunistic behaviors than a categorical ban.

Some commenters based their support for a disclosure rule on their contention that workers have sufficient bargaining power to negotiate over non-competes when they are provided with notice of them. One such commenter pointed to the cited research by Starr, Prescott, and Bishara finding that disclosure of non-competes to workers prior to acceptance of a job offer may increase earnings, increase rates of training, and increase job satisfaction.[1006] The commenter also referenced the study's finding that of those workers who did not attempt to negotiate a non-compete, 52% reported that they thought the terms were reasonable and 41% reported that they assumed the terms to be non-

---

[999] Johnson, Lavetti, & Lipsitz, *supra* note 388 (decreasing enforceability increases worker mobility and earnings); Johnson, Lipsitz, & Pei, *supra* note 526 at 2–5 (enforceability negatively impacts patent quantity and quality).

[1000] NPRM at 3519.

[1001] *Id.* at 3521 n.446 (noting certain provisions in the Commission's Franchise Rule (16 CFR part 436), such as § 436.5(i) and (q), require non-competes to be disclosed to a franchisee).

[1002] *Id.* at 3521.

[1003] *Id.*, citing Starr, Prescott, & Bishara, *supra* note 68 at 75.

[1004] *Id.* at 3487, citing Starr, Prescott, & Bishara, *supra* note 68 at 73.

[1005] *Id.* at 3521.

[1006] Starr, Prescott, & Bishara, *supra* note 68 at 75.

negotiable.[1007] The commenter contended that a disclosure rule would decrease the number of workers who assumed non-competes were non-negotiable.

A few commenters contended a disclosure rule may be more likely to withstand judicial review because the Commission could promulgate a disclosure rule in this context under its UDAP authority pursuant to the Magnuson-Moss Act. In addition, a few commenters requested the Commission adopt timing rules for when the disclosure must be provided, such as by requiring that employers disclose a non-compete in the job advertisement, at the time of the job offer, or at least five business days prior to the worker's deadline to sign an employment agreement.

The Commission declines to adopt a disclosure rule.[1008] The Commission finds that merely ensuring workers are informed about non-competes would not address the negative externalities non-competes impose on workers, rivals, and consumers. As described in Part IV.B.3.a.ii, non-competes suppress wages for workers across the labor force, including workers who are not subject to non-competes. Ensuring that a worker who enters into a non-compete is informed about the non-compete does not address the harm to these other workers. In addition, it does not address the ways in which non-competes harm consumers and the economy through reduced new business formation and innovation, described in Part IV.B.3.b. In other words, non-competes have negative spillover effects on workers, consumers, businesses, and the economy that disclosure cannot remediate.

The Commission also finds that a disclosure requirement would not be as effective as a categorical ban in addressing the exploitation and coercion of workers through non-competes. As described in Part IV.B.2.b.i, there is a significant imbalance in bargaining power between employers and most workers, which is particularly acute in the context of negotiating employment terms such as non-competes. And, as many comments from workers and worker advocacy groups attest, non-competes are often included in standard-form contracts and offered on a take-it-or-leave-it basis.[1009]

As a result, workers have limited practical ability to negotiate non-competes even if they are notified of such clauses prior to accepting their employment offer. Indeed, as described in Part IV.B.2.b.i, the comment record reflects that very few workers (other than senior executives) bargain over their non-competes—whether the worker knew about the non-compete before the job offer and understood its terms, or not.

The Commission gives the findings of the Starr, Prescott, and Bishara study on the impacts of disclosure little weight because the study reflects only correlation, not causation, with respect to the effects of a disclosure rule (similar to the "use" studies the Commission gives little weight to, as described in Part IV.A.2). The study merely compares a set of workers whose firms disclosed the non-compete and workers whose firms did not, and any correlation may thus be attributable to confounding factors. This comparison—similar to comparisons of workers with and without non-competes—may be polluted by differences between firms that opt to disclose non-competes and those that do not, or differences between workers who are the beneficiaries of disclosure versus those who are not.[1010] For example, it is possible that firms that disclose non-competes are also more responsible employers in general that tend to pay their workers more, train their workers more, and have more satisfied workers. The Commission therefore does not find that this evidence represents a causal relationship between the disclosure of non-competes and earnings and other outcomes. Moreover, the weight of the evidence discussed in Parts IV.B and IV.C finding increased earnings, new business formation, and innovation from the final rule significantly surpass the potential effects of disclosing non-competes.

One commenter stated that the Starr, Prescott, and Bishara study suggests that a disclosure rule would decrease the number of workers who assume a non-compete with which they are presented is non-negotiable. The study suggests that the potential effects of a disclosure rule in this respect would be, at best, limited.[1011] For the reasons described in this Part IX.B.1, the Commission is skeptical that a disclosure requirement

would meaningfully increase the share of workers who actually bargain over non-competes.

A disclosure rule may address some deceptive or misleading practices in connection with non-competes. However, considering that a disclosure rule is not likely to significantly reduce the negative competitive impacts of non-competes on labor markets and on product and service markets, this benefit is significantly outweighed by the limitations of a disclosure rule.[1012]

The Commission further concludes that a disclosure rule is not necessary for non-competes in the context of sales of a business entity. As described in Part V.A, persons selling a business entity tend to have bargaining power in the context of the transaction, and the Commission is unaware of evidence that deceptive and misleading practices in connection with non-competes (such as waiting to disclose a non-compete until after the job offer) are common with respect to business sales.

### 2. Reporting Rule

In the NPRM, the Commission sought comment on a reporting rule as a potential alternative to the proposed rule.[1013] The Commission stated that it could require employers to report certain information to the Commission relating to their use of non-competes; for example, employers that use non-competes could be required to submit a copy of the non-compete to the Commission.[1014] As the Commission explained, a reporting rule might enable the Commission to monitor the use of non-competes and could potentially discourage employers from using non-competes that are not clearly justified under existing law.[1015]

The Commission stated in the NPRM that it did not believe a reporting rule would achieve the objectives of the proposed rule. The Commission stated that merely requiring employers to report their non-competes to the Commission would not meaningfully reduce the prevalence of non-competes and would therefore fail to reduce the negative effects non-competes have on competitive conditions in labor markets and product and service markets.[1016] At the same time, the Commission stated that a reporting rule would impose

---

[1007] *Id.* at 72.

[1008] The Commission notes that the Franchise Rule requires franchisors to disclose any non-compete that franchisees must impose on managers. 16 CFR 436.5(o)(3). These non-competes are prohibited by the final rule. *See* Parts III.D and V.D.6.

[1009] *See* Part IV.B.2.b.i.

[1010] Indeed, the authors of this study note that "unobservables may more plausibly account for these estimates." *See* Starr, Prescott, & Bishara, *supra* note 68 at 77 n.35.

[1011] *Id.* at 72. The study finds that 38% of workers asked to sign a non-compete before accepting a job offer assumed they could not negotiate, versus 48% of workers asked after accepting a job offer.

[1012] The Commission considered whether a disclosure rule would be appropriate for senior executives, but concludes that it is not because it would fail to address many of the ways in which non-competes are restrictive and exclusionary and tend to negatively affect competitive conditions.

[1013] *Id.* at 3521.

[1014] *Id.*

[1015] *Id.*

[1016] *Id.*

significant and recurring compliance costs on employers.[1017]

Most commenters addressing this topic agreed with the Commission's preliminary view that a reporting rule would not achieve the goals of the proposed rule. At least one business opposed any reporting requirement due to the cost of compliance and to avoid exposing any confidential information contained in employment agreements. At the same time, some commenters stated that a reporting rule may assist enforcement and provide quantitative data sets to measure compliance, while recognizing that such benefits would lose significance if the Commission were to adopt the proposed rule. One commenter suggested that, to improve the effectiveness of any reporting rule, any such rule should include a provision stating that any non-competes which were not properly disclosed to State and Federal authorities are null and void.

The Commission declines to adopt a reporting rule. A reporting rule would impose recurring compliance costs on employers, compared with the proposed rule, which largely imposes one-time costs. At the same time, a reporting rule would be inadequate to address the negative effects of non-competes on competitive conditions in labor markets and product and service markets, or the Commission's concerns about exploitation and coercion through the use of non-competes, since it would allow for the continued use of non-competes.

### 3. Limitations on Scope and Duration

In addition to those alternatives listed in the NPRM, a few commenters suggested adopting an alternative rule that allows non-competes but sets a limitation on their geographic scope and/or duration. Some commenters suggested a geographic limit of five, ten, or thirty miles and/or a temporal limit of six months or one, two, or three years, while others suggested a fact-specific requirement that the geographic scope or duration of a non-compete be "reasonable." Many of these commenters cited State laws that take a similar approach.

A few commenters opposed this alternative. One worker advocacy group argued that any bright-line limit may end up serving as a default, encouraging employers to impose non-competes of the maximum allowable scope or duration even if that limit is longer or broader than they otherwise would have imposed. At least one academic commenter argued that setting

geographic scope or duration limitations on non-competes is unlikely to have a substantial impact, pointing to the continued prevalence of overly broad non-competes despite State laws designed to set upper limits on geographic scope and duration.

The Commission declines to adopt a standard providing that the geographic scope or duration of non-competes must be "reasonable." The Commission is concerned a reasonableness standard would foster significant uncertainty among workers and businesses about the enforceability of non-competes, for the same reasons a rebuttable presumption would. In addition, as described in Part II.C.1 of the NPRM, all States where non-competes are enforceable currently apply a reasonableness standard, so a Federal reasonableness standard would not mitigate the negative effects of non-competes that are presently occurring.

The Commission also declines to adopt the alternative of imposing limits on the scope and duration of non-competes. Such a rule would be insufficient to address the negative effects of non-competes on competitive conditions in labor markets or products and services markets. Although a non-compete that lasts for a shorter duration or within a smaller geographic area curtails job mobility for the individual worker it binds to a lesser degree, it nonetheless curtails the worker's job mobility and the ability of competing employers to recruit and access talent. Non-competes limited in duration and scope still tend to inhibit efficient matching between workers and employers, with spillover effects on new business formation and innovation through the mechanisms described in Parts IV.B and IV.C. Furthermore, limitations on the scope and duration of non-competes would not address the spillover effects from non-competes on other workers and consumers. In short, even if a non-compete applies only to a relatively delimited location or time period, it still—by design—cuts off free and fair competition in labor and product and service markets.

In addition, most of the commenters who stated that they were exploited and coerced by non-competes did not do so on the basis that the non-compete was overbroad in scope or duration. Instead, most of the commenters who described the terms of their non-competes described limits on scope and duration that were within the bounds of what is typically permissible under State law.[1018] Some of these commenters even stated expressly that they were subject

to the non-compete that was standard or typical in their field. Even these commenters, however, explained how they were exploited and coerced in connection with non-competes because the non-compete was unilaterally imposed and because the non-compete trapped them in worse jobs or forced them to bear significant harms or costs. For these reasons, the Commission declines to adopt bright-line limits on the scope and duration of non-competes.

### 4. Compensation Requirement

Some commenters requested that the Commission adopt an alternative that would permit non-competes so long as the worker is compensated. Some commenters pointed to Massachusetts and Oregon law governing non-competes under which, for certain workers, non-competes may be enforced if, *inter alia,* they include a minimum level of compensation or consideration to the worker separate from compensation for employment.[1019]

The Commission declines to adopt a rule requiring compensation for non-competes. First, such a rule would not address the harms to competitive conditions that non-competes cause, which result in harm to other workers, to rivals of employers, and to consumers. The Commission finds in Parts IV.B.3.a.ii and IV.C.2.c.ii. that non-competes harm workers other than the workers who sign them, by reducing the number of job opportunities and thereby inhibiting efficient matching for all workers. The Commission further finds in Parts IV.B.3.b and IV.C.2.c.i that non-competes inhibit new business formation and innovation, which affects consumers. Therefore, even if a worker were fully compensated for a non-compete, the fact of that compensation would not redress these negative externalities. Second, this alternative would be ineffective or significantly less effective because of the *in terrorem* effect of non-competes, which the Commission finds to be grounded in empirical evidence and supported by the comment record described in Part IV.B.2.b. Third, such a rule would be difficult to administer and potentially easy to evade, as employers could suppress other wages or job quality while labeling some compensation as attributable to the non-compete.

### 5. Combination of Different Alternatives

Some commenters suggested the possibility of combining two or more of the alternatives discussed in this Part IX

---

[1017] *Id.*

[1018] *See* Part IV.B.2.b.

[1019] Mass. Gen. Laws Ann. ch. 149, sec. 24L; Or. Rev. Stat. Ann. sec. 653.295.

in place of a categorical ban. While a combination of these regulations or limitations might modulate some of the ways in which non-competes are exploitative and coercive, they would not be as effective as a comprehensive ban. In particular, a combination approach would lack the clarity of a comprehensive ban and thus would not be as effective as a categorical ban in addressing the exploitation and coercion of workers through non-competes. Moreover, as noted previously, the alternatives discussed would do little to address the tendency of non-competes to negatively affect competitive conditions and to cause spillover effects on other workers and on consumers. Accordingly, a combination of these alternative regulations or limitations would fail to remedy the aggregate and spillover effects of non-competes and thus would not achieve the Commission's stated goals.

*C. The No-Action Alternative: Reliance on Existing Legal Frameworks Instead of a Clear National Standard*

The Commission sought comment on whether a Federal standard for non-competes would promote certainty for employers and workers.[1020] The Commission finds that a clear national standard for non-competes will more effectively address non-competes' tendency to negatively affect competitive conditions than case-by-case adjudication or relying on existing law alone. The Commission also finds that declining to adopt the final rule, and instead relying on case-by-case adjudication or existing law alone, would not address the exploitation and coercion of workers through non-competes.

1. Comments Received

Many commenters expressed support for the NPRM because they viewed current laws as insufficient to protect all workers, rivals, or consumers, regardless of where they are located, from the negative effects of non-competes on competitive conditions in labor markets and markets for products and services. Numerous workers, businesses, and other commenters said the patchwork of State laws and confusion about those laws, particularly reasonableness tests, makes it difficult for workers and businesses to understand the law and in turn contributes to the use of unenforceable or overbroad non-competes and chills worker mobility. Several commenters also said that case-by-case adjudication and reasonableness

tests make it difficult for parties to predict outcomes, which in turn raises litigation costs. Even some organizations opposed to the proposed rule or who supported a different policy believed that a Federal rule could be beneficial, such as to businesses operating in multiple jurisdictions.

In addition, according to commenters, case-by-case adjudication under State law cannot address the harms caused by non-competes through their use in the aggregate. Some commenters also asserted that the patchwork of State laws is complicated by remote and hybrid workers. Others argued that State laws are skewed in favor of employers or leave workers vulnerable to unreasonable agreements. Some argued that many workers, businesses, non-competes, and labor markets cross State lines, demonstrating the need for one standard. Several State Attorneys General also said that numerous complications arise when localities span more than one State and those States have different laws on non-competes; workers become confused and enforcement of non-competes can have spillover effects in another State.[1021]

In contrast, many commenters stated that case-by-case adjudication is preferable to a Federal rule because it allows individual facts to be considered. In addition, many commenters argued that existing State legislative and judicial decisions are sufficient to impose limitations on non-competes while recognizing legitimate business interests. Commenters also argued that States should be allowed to continue their natural experiments with non-competes; that non-competes historically have been and should remain an issue of State law; and that States are best suited to make policy judgments for their citizens.

Some commenters argued that unenforceable or overly broad non-competes are not a problem because courts can strike down or reform them. Some employers asserted that they specifically, or employers more generally, did not enter into unenforceable non-competes. Other commenters argued that employers did not use choice of law clauses to evade State laws, stating the clauses are the products of arms-length bargaining and provide certainty and predictability.

2. Responses to Comments and the Commission's Findings

a. The Value of Rulemaking

The Commission has the authority to make rules and regulations to carry out

the FTC Act's prohibition on unfair methods of competition under sections 5 and 6(g) of the FTC Act as described in Parts II.A through II.C, and the Supreme Court has stated that agencies generally have discretion to choose between rulemaking and adjudication.[1022] Based on the empirical evidence, the comments, and the Commission's expertise, the Commission finds that rulemaking is the appropriate method of addressing non-competes.

The prevalence of non-competes across the economy, described in Part I.B.2, and the scale of the harms they cause, described in Parts IV.B and IV.C, show that it is more efficient to address the harms to competition from non-competes via rulemaking compared to case-by-case adjudication. As the D.C. Circuit stated in ruling that the Commission had the authority to promulgate unfair methods of competition rules, "the availability of substantive rule-making gives any agency an invaluable resource-saving flexibility in carrying out its task of regulating parties subject to its statutory mandate." [1023] The Commission estimates that there are 2.92 million firms using non-competes in the U.S.[1024] Adjudicating individual cases against even just one-tenth of 1% of these employers would be slow, inefficient, and costly for the Commission, employers, and workers. Rulemaking provides notice of the application of section 5 to non-competes in a clearer and more accessible way than piecemeal litigation and avoids compliance delays.[1025] The final rule will provide all market participants greater clarity about their obligations under section 5 of the FTC Act, facilitating compliance. Additionally,

---

[1020] NPRM at 3497.

[1021] Comment of the Attys. Gen. of 17 States and DC, FTC–2023–0007–21043 at 11.

[1022] *SEC* v. *Chenery Corp.*, 332 U.S. 194, 203 (1947); *NLRB* v. *Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 293 (1974); Wright & Miller, Federal Practice and Procedure sec. 8117 (2d ed. 2023).

[1023] *Nat'l Petroleum Refiners Ass'n* v. *FTC*, 482 F.2d 672, 681–82 (D.C. Cir. 1973); *see also id.* at 690 (stating that "the historic case-by-case purely adjudicatory method of elaborating the Section 5 standard and applying it to discrete business practices has not only produced considerable uncertainty" but has also spawned lengthy litigation).

[1024] *See* Part X.F.6 (estimating that 49.4% of the 5.91 million firms in the U.S. use non-competes).

[1025] *See* Wright & Miller, Federal Practice and Procedure sec. 8117 (2d ed. 2023); *Nat'l Petroleum Refiners*, 482 F.2d at 690 ("[W]hen delay in agency proceedings is minimized by using rules, those violating the statutory standard lose an opportunity to turn litigation into a profitable and lengthy game of postponing the effect of the rule on their current practice. As a result, substantive rules will protect the companies which willingly comply with the law against what amounts to the unfair competition of those who would profit from delayed enforcement as to them.") (citation omitted).

the final rule will simplify enforcement proceedings by streamlining the proof required.[1026]

In addition, the principal harms from non-competes arise from their tendency to negatively affect competitive conditions in the aggregate. A single non-compete with a single worker may not do much to inhibit efficient matching between workers and employers across a labor market or suppress new business formation or innovation (and what effects it does have would be difficult to measure), but the Commission finds based on empirical evidence that the use of many non-competes across the labor market does have these aggregate net negative effects.[1027] For this reason, rulemaking is preferable to individual litigation for addressing the negative effects of non-competes. Past Commission experience has also illustrated that case-by-case enforcement, education, and other enforcement mechanisms are not always sufficient to stop widespread harms.[1028] A Federal rulemaking is the most efficient method to address the scale of harm to competitive conditions in labor, product, and service markets caused by non-competes.

Finally, "utilizing rule-making procedures opens up the process of agency policy innovation to a broad range of criticism, advice and data that is ordinarily less likely to be forthcoming in adjudication."[1029] Rulemaking is particularly beneficial when, as here, "a vast amount of data had to be compiled and analyzed, and the Commission, armed with these data, had to weigh the conflicting policies."[1030] Rulemaking also allows for more fulsome engagement from the public by providing for public comment on a complete regulatory scheme. The Commission greatly benefited from the submitted comments.

b. Case-by-Case Litigation Alone Cannot Address the Negative Effects of Non-Competes on Competition

The Commission finds that case-by-case litigation alone is insufficient to address the harms to competition from non-competes due to the cost of litigation, which deters many workers from challenging non-competes, and the limited resources of public enforcement agencies. In addition, individual litigation is not well-suited to redress the negative externalities non-competes impose on other workers, other employers, consumers, and the economy from their use in the aggregate.

Many commenters addressed the shortcomings of individual litigation as a means for addressing the harms of non-competes. Numerous commenters noted that litigation is costly and many workers cannot afford to litigate their non-competes.[1031] Many commenters, including workers, entrepreneurs, and employment attorneys, shared examples of five-figure and six-figure litigation costs related to non-compete lawsuits. Numerous commenters reported that the fear of litigation costs induced them to refrain from seeking or accepting other work or starting a business, even though they thought the non-compete was likely unenforceable. Many other commenters stated that they complied with a non-compete after they were threatened with enforcement, even though they were unsure about the non-compete's enforceability. One study finds that 53% of workers subject to non-competes are hourly workers,[1032] who are particularly unlikely to be able to afford a court challenge.

Commenters also noted some non-competes include liquidated damages clauses or fee-shifting provisions requiring the worker to pay the employer's attorney and other costs if the employer wins, further increasing the costs (and risks) of challenging a non-compete. In addition, commenters stated that litigation is time-consuming and could take as long or longer than the non-compete period. For example, one commenter shared a decision in the commenter's own case where the appellate court found the non-compete violated public policy by leaving an area with only one surgeon in a specialty—but reached that decision only after the two-year non-compete had already run its course.[1033] Commenters also said

workers who sued their employer could experience reputational harm and difficulty finding work going forward.

Litigation can be even riskier if a court might reform a non-compete, which leaves the worker subject to some restrictions even if the initial non-compete was impermissibly broad. Several commenters cited a *Harvard Law Review* article that discusses the consequences of allowing courts to sever or reform overboard non-competes:

For every covenant that finds its way to court, there are thousands which exercise an *in terrorem* effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly relations with their competitors. Thus, the mobility of untold numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable.[1034]

If there is no penalty for drafting overbroad non-competes (as is true in most States),[1035] employers have little incentive to draft non-competes narrowly, particularly if a court is likely to revise it rather than strike it down, or if a worker is unlikely to be able to litigate at all. An employment attorney commented it is particularly difficult to advise workers about whether their specific non-compete is enforceable when it is possible a court may modify the underlying non-compete.

Case-by-case litigation under other antitrust laws alone is also insufficient to address the harms from non-competes. Non-competes restrain trade and therefore are subject to the Sherman Act.[1036] While private litigants may bring private causes of action to enforce the Sherman Act,[1037] the Commission views private litigation under the Sherman Act as an ineffectual response in the context of non-competes based on the history of cases by private litigants arising under that Act, as explained in the NPRM.[1038] For an individual litigant, proving harm to competition in the relevant geographic and product markets is a resource-intensive task that

[1026] *See Nat'l Petroleum Refiners,* 482 F.2d at 690 ("With the issues in Section 5 proceedings reduced by the existence of a rule delineating what is a violation of the statute or what presumptions the Commission proposes to rely upon, proceedings will be speeded up.").

[1027] *See* Part IV.B.3.a–b.

[1028] *See, e.g.,* Combating Auto Retail Scams Trade Regulation Rule, 89 FR 590, 600 (Jan. 4, 2024) (stating that rulemaking was necessary because certain unfair and deceptive acts and practices had persisted despite more than a decade of Federal and State enforcement, education, and other action in the motor vehicle dealer marketplace).

[1029] *Nat'l Petroleum Refiners,* 482 F.2d at 683 (citations omitted); *see also* Wright & Miller, Federal Practice and Procedure sec. 8117 (2d ed. 2023).

[1030] *Nat'l Petroleum Refiners,* 482 F.2d at 683 (citations omitted).

[1031] *See also* Part IV.B.2.b.ii (describing exploitative and coercive effects of the risk and cost of being subject to a non-compete suit).

[1032] Lipsitz & Starr, *supra* note 72 at 144 (analyzing data from the Starr, Prescott, & Bishara survey).

[1033] *Graham* v. *Cirocco,* 69 P.3d 194, 200 (Kan. App. 2003).

[1034] Blake, *supra* note 22 at 682–83 (noting that this may not be applicable if the worker has bargaining power and it may be inefficient to tailor non-competes to each worker, and recommending that courts only sever when they determine the employer acted fairly).

[1035] *See* NPRM at 3495.

[1036] *See* Part I.B.1.

[1037] *See* 15 U.S.C. 15.

[1038] NPRM at 3496.

typically requires expert testimony.[1039] This makes an already expensive proposition even less palatable for most workers and further tips the risk-versus-reward calculus away from litigation. In addition, to succeed on a Sherman Act claim, a plaintiff must show harm to competition as a whole, not just to themselves. It may be difficult or impossible for a worker to establish that their individual non-compete—or a single firm's use of a non-compete—adversely affected competition in a labor market or product/service market sufficiently to violate the Sherman Act.[1040] Section 5, on the other hand, is more inclusive than the Sherman Act.[1041] As outlined in Part II.F, section 5 requires a showing of indicia of unfairness and a tendency to negatively affect competitive conditions. It does not require a separate showing of market power or market definition—nor does it require proof of harm to competition by each non-compete.[1042]

Case-by-case litigation by public enforcers, such as the Commission or State attorneys general, is a potential alternative or supplement to private litigation under other antitrust laws. But the ability of public enforcers to engage in effective case-by-case litigation related to non-competes, absent a rule, is limited.

As cited in Parts I.B. and II.C.2, the FTC has previously secured consent orders premised on the use of non-competes being an unfair method of competition under section 5, and the Commission has the authority to determine that non-competes are unfair methods of competition through adjudication. However, FTC resource constraints limit the potential effectiveness of enforcement of section 5 on a purely case-by-case basis. The Commission is an independent agency that works to promote fair and open markets and protect the entire American public from unfair and deceptive business practices. The Commission has fewer than 1,500 employees for its entire body of work related to this mission,[1043] which includes investigating, challenging, and litigating anticompetitive mergers and conduct;

processing and reviewing merger filings; and investigating and challenging a wide range of consumer protection issues.[1044]

Similarly, several State Attorneys General commented that the multi-factor common law approaches to non-compete law result in piecemeal decisions that do not address the non-compete problem in a uniform manner.[1045] These State Attorneys General also noted that some State enforcement agencies lack straightforward authority to enforce existing common law protections related to non-competes and argued that the challenges associated with common law enforcement underscore the need for a Federal rule.[1046] And the resource limitations to pursue non-competes comprehensively through enforcement limit States equally—if not more.

The Commission estimates that there are approximately 30 million individual non-competes in the U.S.[1047] In contrast to the large volume of non-competes, the resources of public enforcement agencies are limited. Public enforcers must balance competing demands for resources and priorities when they bring public enforcement actions. Public enforcers cannot conceivably investigate the specific details of every non-compete or initiate litigation concerning more than a small fraction of unlawful non-competes. A Federal rule provides clarity to market participants, engages all stakeholders in the development of the rule, and more effectively ceases an unfair method of competition.

The significant limitations on the ability of private and public litigants to challenge unlawful non-competes have practical implications. Courts cannot strike down an unenforceable non-compete that they never had the opportunity to review. Moreover, as detailed in Part IV.B.2.b, non-compete restrictions may still have significant *in terrorem* effects when workers are uncertain about the enforceability of their non-competes or lack the ability to challenge their use.

Furthermore, case-by-case litigation is insufficient to address negative externalities from non-competes (*i.e.,* harms non-competes cause to persons other than the parties to the non-compete). As described in Parts IV.B and IV.C, non-competes impose significant negative externalities on other workers, other firms, consumers, and the economy. Individual non-

compete cases are not well-suited for redressing these harms. For example, while the precise reasonability test for non-competes differs from State to State, the test typically considers the business interest asserted by the employer; the harm to the worker; and the injury to the public from the loss of the worker's services.[1048] This test does not generally account for the harms experienced by other workers, other firms, consumers, and the economy resulting from the negative effects of non-competes on competition.

Furthermore, because the significant harms of non-competes result from their aggregate use, they are unlikely to be captured by an assessment of an individual worker's non-compete or an individual firm's use of non-competes. This is true regardless of whether those non-competes are challenged under State non-compete laws or under other antitrust laws. It is likewise true regardless of whether non-competes are challenged by private litigants or public enforcers. Accordingly, the Commission finds that case-by-case litigation alone is insufficient to address the negative externalities of non-competes.

The Commission, by contrast, is well-positioned to evaluate non-competes holistically. The Commission is an expert agency and has used its expertise to assess the weight of the empirical evidence and comment record to evaluate the aggregate effects of non-competes. The Commission here implements a clear national standard through notice-and-comment rulemaking to protect competition, based on the evidence that the use of non-competes in the aggregate negatively affects competition and harms workers and consumers.

For all these reasons, the Commission finds that case-by-case litigation is not a viable alternative to the final rule.[1049]

---

[1039] *See, e.g., U.S. Healthcare, Inc.* v. *Healthsource, Inc.,* 986 F.2d 589, 599 (1st Cir. 1993) ("In practice, the frustrating but routine question how to define the product market is answered in antitrust cases by asking expert economists to testify.").

[1040] *See* NPRM at 3496–97 (discussing non-compete cases that have been brought under the antitrust laws).

[1041] *See* Part II.A.

[1042] *See* Part II.F.

[1043] FTC, *Congressional Budget Justification—Fiscal Year 2025,* at 8 (2024), *https://www.ftc.gov/system/files/ftc_gov/pdf/fy25-cbj.pdf.*

[1044] *Id.*

[1045] Comment of the Attys. Gen. of 17 States and DC, FTC–2023–0007–21043 at 7.

[1046] *Id.*

[1047] *See* Part I.B.2.

[1048] *See* NPRM at 3494–95.

[1049] A few commenters suggested that the Commission could create guidelines instead of a rule to explain what factors the agency would look at in an enforcement action. By definition, however, a guidance document would "not have the force and effect of law." *Perez* v. *Mortg. Bankers Ass'n,* 575 U.S. 92, 97 (2015) (quoting *Shalala* v. *Guernsey Mem'l Hosp.,* 514 U.S. 87, 99 (1995)). Guidelines would not bind employers or courts and would not provide workers with the same clarity about the enforceability of their non-competes. Moreover, case-by-case litigation itself is not suited to address the negative externalities of non-competes, a concern the issuance of guidelines would not address. The Commission finds that the issuance of guidelines is not a viable alternative to the final rule for the same reasons that it finds that the no-action alternative generally is not a viable alternative to the final rule.

## c. State Law Alone Cannot Address the Negative Effects of Non-Competes on Competition

The Commission appreciates that States have enacted legislation in recent years to ban or restrict non-competes and ameliorate their negative effects.[1050] The Commission has long recognized the value of concurrent enforcement of Federal and State law and believes States have an important role to play in restricting the use of non-competes. Indeed, in this final rule, the Commission has revised § 910.4 to ensure that States may continue to enforce laws that restrict non-competes and do not conflict with the final rule. However, the Commission believes that reliance on State law alone is insufficient to address the negative effects of non-competes on competition. The practical ability of States to address the harms to their residents from non-competes is limited by various factors, including employers' use of choice-of-law, forum-selection, and arbitration clauses; significant confusion among both employers and workers resulting from the patchwork of State law, which chills workers from engaging in competitive activity even where non-competes are likely unenforceable under State law and also increases employers' compliance costs, particularly given the increase in interstate remote work; spillover effects from other States' laws; and incentives for States to adopt permissive non-compete policies.

Many States have adopted statutory restrictions or compete bans on non-competes. Four States—California, Minnesota, North Dakota, and Oklahoma—have adopted statutes rendering non-competes void for nearly all workers.[1051] The majority of the remaining 46 States have statutory provisions or case law that ban or limit the enforceability of non-competes for workers in certain specified occupations.[1052] The general language of the test for whether a non-compete is reasonable is fairly consistent from State to State.[1053] However, the specifics of the application of the standard differ from State to State. For example, States vary in how narrowly or broadly they define legitimate business interests and the extent to which courts are permitted to modify an unenforceable non-compete. States also differ with respect to statutory restrictions on non-competes.[1054] As a result, among the 46 States where non-competes may be enforced, variation exists with respect to the enforceability of non-competes.[1055]

State law also differs with respect to the steps courts take when they conclude that a non-compete is unenforceable as drafted. As noted in the NPRM, the majority of States have adopted the "reformation" or "equitable reform" doctrines, which allow courts to revise the text of an unenforceable non-compete to make it enforceable.[1056]

Because the enforceability of non-competes and courts' positions with respect to unenforceable non-competes vary from State to State, the question of which State's law applies in a legal dispute can determine the outcome of a non-compete case. Non-competes often contain choice-of-law provisions designating a particular State's law for resolution of any future dispute.[1057] Furthermore, some non-competes include forum-selection provisions specifying the court and location where a dispute may be heard.[1058] The default rule under conflict-of-laws principles is that the court honors the parties' choice of law, meaning that the burden is typically on the worker—the vast majority of whom the Commission finds are exploited and coerced when entering into a non-compete—to negotiate for the law of a different forum to apply.[1059]

There is significant variation, however, in how courts apply choice of law rules in disputes over non-competes.[1060] As a result, it can be difficult for employers and workers to predict how disputes over choice of law (and, in turn, the enforceability of the non-compete) will be resolved.[1061] Several commenters agreed that a Federal rule would alleviate these problems.

Choice of law provisions may also mean that workers lose their own State's protections. For example, workers from States where non-competes are banned commented that they faced enforcement of non-competes that selected the law of another State. This raises the concern that choice of law clauses can be used to evade State bans or restrictions by forum shopping.[1062] As two scholars note, when "the parties or issues involved have connections to multiple jurisdictions," the law "confounds lawyers and commentators because of its complexity and unpredictability."[1063]

Employers may also impose arbitration clauses, which require that legal disputes with the employer—including disputes related to non-competes—be resolved through binding arbitration rather than in court.[1064] Where such clauses are valid, the Federal Arbitration Act requires that courts enforce them.[1065] Choice of law, forum selection, and arbitration clauses create opportunities for employers to forum-shop in ways that undermine any given State's ability to effectively regulate non-competes.

Numerous workers, businesses, and other commenters said the patchwork of State laws and confusion about those laws makes it difficult for workers and businesses to understand whether a particular non-compete would be enforceable. The lack of a clear national standard, and resulting confusion,

[1050] See NPRM at 3494 (summarizing recent State non-compete legislation).

[1051] See Cal. Bus. & Prof. Code sec. 16600; N.D. Cent. Code sec. 9–08–06; Okla. Stat. Ann. tit. 15, sec. 219A. Minnesota banned non-competes signed on or after July 1, 2023, after the comment period closed. Minn. Stat. Ann. sec. 181.988.

[1052] In most States, those limits apply to just one or two occupations (most commonly, physicians). See Beck Reden LLP, Employee Noncompetes: A State-by-State Survey (Feb. 19, 2024), https://beckreedriden.com/wp-content/uploads/2024/02/BRR-Noncompetes-20240219-50-State-Noncompete-Survey-Chart.pdf [hereinafter "Beck Reed Riden Chart"].

[1053] See NPRM at 3494–95.

[1054] See, e.g., Beck Reed Riden Chart, supra note 1052.

[1055] NPRM at 3495.

[1056] Id.

[1057] Gillian Lester & Elizabeth Ryan, Choice of Law and Employee Restrictive Covenants: An American Perspective, 31 Comp. Lab. & Pol'y J. 389, 396–402 (2010).

[1058] Id. at 402–04.

[1059] Id. at 397 ("In general, courts defer to choice of law clauses because they are presumed to represent the express intention of the parties."). Cf. Cal. Lab. Code sec. 925(a) (stating that employers shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would either (1) require the employee to adjudicate outside of California a claim arising in California or (2) deprive the employee of the substantive protection of California law with respect to a controversy arising in California).

[1060] Lester & Ryan, supra note 1057 at 394–95.

[1061] Id. at 395 ("The state of the law is perhaps characterized more by inconsistency than anything else, so much so that commentators lament the 'disarray' and 'mish-mash' of the law, and criticize courts for their 'post-hoc rationalizing of intuitions' or their use of a 'hodgepodge of factors, often with insignificant explanation of how they decide what weight to give each.'") (internal citations omitted).

[1062] See generally Timothy P. Glynn, Interjurisdictional Competition in Enforcing Non-Compete Agreements: Regulatory Risk Management and the Race to the Bottom, 65 Wash. & Lee L. Rev. 1381, 1386 (2008) (noting "judicial attempts to preempt other courts from disregarding the parties' choice of law"). Some States have attempted to defend against this by enacting statutes banning selection of a different State's law for a non-compete. See Minn. Stat. Ann. sec. 181.988(3)(a) (Minnesota); Cal. Lab. Code sec. 925 (California); Colo. Rev. Stat. sec. 8–2–113(6) (Colorado); Mass. Gen. Laws ch. 149, sec. 24L(e) (Massachusetts); La. Rev. Stats. 23:921(2) (Louisiana). Many of these statutes are relatively recent, however, and it remains to be seen how effective they will be.

[1063] Lester & Ryan, supra note 1057 at 389.

[1064] See, e.g., Alexander J.S. Colvin, Econ. Pol'y Inst., Report, The Growing Use of Mandatory Arbitration (Apr. 6, 2018).

[1065] See, e.g., Nitro-Lift Techs. v. Howard, 568 U.S. 17, 20–22 (2012).

contributes to non-competes being used in jurisdictions where they are unenforceable. Starr, Prescott, and Bishara find that employers frequently use non-competes even when they are unenforceable under State law.[1066] Similarly, Colvin and Shierholz find that 45.1% of workplaces in California use non-competes even though they are unenforceable there.[1067] Anecdotally, an economist commented that the Commission's *Prudential Security* case, in which the employer continued using non-competes after they were held unenforceable by a court, was an example of employers enforcing unenforceable non-competes.[1068]

While the Commission has no doubt that many employers aim to ensure their contracts comply with applicable law, the empirical evidence indicates that at least some employers are using unenforceable non-competes, and some workers are turning down jobs where their non-competes are likely unenforceable. Some commenters referenced Starr, Prescott, and Bishara's finding that workers frequently cite non-competes as a factor in turning down job offers in both States that enforce non-competes and in those that do not.[1069] The study also finds that workers are more likely to report that they would be willing to leave for a competitor when they did not believe their employer would attempt to enforce a non-compete in court.[1070] The study suggests that whether a worker's non-compete is enforceable may matter less than whether the employer is willing to try to enforce it.[1071] The Commission notes that this study does not necessarily indicate a causal relationship, but it does indicate that for many workers, the *in terrorem* effect of non-competes may outweigh any State protections.

Furthermore, the ability of States to address harms to their residents from non-competes is limited by spillover effects from other States. The economies of States are closely interconnected. Therefore, even where a State adopts a law that strictly regulates non-competes, such a law can be undermined by permissive non-compete laws in a nearby State.[1072]

Finally, several comments argued that State regulation of non-competes should continue by quoting Justice Brandeis's dissent in *New State Ice Co.* v. *Leibmann:* "[i]t is one of the happy incidents of the [F]ederal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."[1073] The Commission disagrees that further laboratory testing by States is needed. States have been experimenting with non-compete regulation for more than a century, with laws ranging from full bans to notice requirements, compensation thresholds, bans for specific professions, reasonableness tests, and more.[1074] Past State experimentation and legal changes yielded a considerable body of empirical research, which as described in Parts IV.B and IV.C, demonstrates that non-competes negatively affect competitive conditions in labor markets and in product and service markets. This evidence supports the Commission's finding that non-competes are an unfair method of competition.

Individual States' non-compete policies can cause spillover effects that negatively affect competitive conditions in other States. Individual States' non-compete policies can also affect the operation of legal regimes in other States. Choice of law provisions cause confusion for workers even in States where non-competes are unenforceable. There are incentives for some States to adopt extremely permissive non-compete policies to attract employers that favor non-competes, and potentially even to enable employers to "export" those permissive policies to other States through choice-of-law provisions.[1075] In short, States are interconnected with respect to non-competes. Without a uniform standard through the final rule, States are forced to balance the benefit to their residents of laws regulating non-competes against the fear that some employers may shift jobs to States where non-competes are more enforceable. One benefit of the

Commission's rulemaking is it resolves this problem. The rulemaking record shows banning non-competes will improve competitive conditions in all States and will benefit workers in all States.

## X. Regulatory Analysis

### A. Introduction

The Commission has examined the economic impacts of the final rule as required by section 22 of the FTC Act (15 U.S.C. 57b–3). Section 22 directs the Commission to issue a final regulatory analysis that analyzes the projected benefits and any adverse economic effects and any other effects of the final rule. The final regulatory analysis must also summarize and assess any significant issues raised by comments submitted during the public comment period in response to the preliminary regulatory analysis.[1076]

### B. Preliminary Analysis

Pursuant to section 22 of the FTC Act, the Commission issued a preliminary regulatory analysis of its proposed rule.[1077] The preliminary regulatory analysis contained (1) a concise description of the need for, and objectives of, the proposed rule; (2) a description of any reasonable alternatives to the proposed rule that may accomplish the stated objective of the final rule in a manner consistent with applicable law; and (3) for the proposed rule and for each of the alternatives described, a preliminary analysis of the projected benefits and any adverse economic effects and any other effects.[1078]

In the preliminary regulatory analysis, the Commission described the anticipated effects of the proposed rule and quantified the benefits and costs to the extent possible. For each benefit or cost quantified, the analysis identified the data sources relied upon and, where relevant, the quantitative assumptions made. The preliminary analysis measured the benefits and costs of the proposed rule against a baseline in which the Commission did not promulgate a rule regarding non-competes and included in the scope of the analysis the broadest set of economic actors possible. Several of the benefits and costs were quantifiable, but not monetizable—especially with respect to differentiating between transfers, benefits, and costs. The Commission preliminarily found that others were not quantifiable. The

---

[1066] Starr, Prescott, & Bishara, *supra* note 68 at 53, 81.

[1067] Colvin & Shierholz, *supra* note 65 at 5–6.

[1068] *See* FTC, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In re Prudential Sec., Inc. et al.*, Matter No. 211 0026 at 1, 5–7 (Dec. 28, 2022).

[1069] Starr, Prescott, & Bishara, *supra* note 68 at 633, 663.

[1070] *Id.* at 633, 652, 664.

[1071] *Id.*

[1072] *See, e.g.,* Johnson, Lavetti, & Lipsitz, *supra* note 388 (finding that increases in non-compete enforceability in one State have negative impacts on

workers' earnings in bordering States, and that the effects are nearly as large as the effects in the State in which enforceability changed, but taper off as the distance to the bordering State increases).

[1073] *New State Ice Co.* v. *Leibmann,* 285 U.S. 262, 311 (1932) (Brandeis, dissenting).

[1074] *See* Beck Reed Riden Chart, *supra* note 1052.

[1075] *See, e.g.,* Glynn, *supra* note 1062 at 1385–86 (stating that "because employers typically are the first movers in [non-compete] litigation, they often can litigate in a hospitable judicial forum," and noting a rise in interjurisdictional disputes related to non-compete enforcement and "judicial attempts to preempt other courts from disregarding the parties' choice of law").

[1076] 15 U.S.C. 57b–3(b)(2)(C), (E).

[1077] NPRM at 3521–31.

[1078] *See* 15 U.S.C. 57b–3(b)(1)(A) through (C).

preliminary analysis discussed any bases for uncertainty in the estimates.

The Commission preliminarily found substantial positive effects of the proposed rule: an increase in workers' earnings by $250–$296 billion annually (with some portion representing an economic transfer from firms to workers); an increase in new firm formation and competition; a reduction in health care prices (and prices in other markets may also fall); and an increase in innovation. The Commission noted that several of these benefits overlap (*e.g.,* increases in competition may fully or in part drive decreases in prices and increases in innovation). The Commission also preliminarily found some costs of the proposed rule. Direct compliance and contract updating would result in $1.02 to $1.77 billion in one-time costs, and firm investment in human capital and capital assets would fall.

The Commission preliminarily concluded that the substantial labor market and product and service market benefits of the proposed rule would exceed the costs. Furthermore, the Commission preliminarily found the benefits would persist over a substantially longer time horizon than most costs of compliance and contract updating.

*C. Public Comments on the Preliminary Regulatory Impact Analysis*

Based on the comments received, the final regulatory analysis reflects greater quantification where possible and includes sensitivity analyses to reflect different assumptions, including assumptions commenters suggested. The final regulatory analysis concludes, consistent with the preliminary analysis, that the benefits of the final rule justify the costs.

Some commenters urged the Commission to quantify the costs and benefits to a greater degree. In the final analysis, the Commission incorporates greater quantification where possible. That some effects cannot be quantified or monetized does not, however, undermine the Commission's conclusion that the benefits justify the costs.

Some commenters focused on the methodology used to estimate earnings effects in the preliminary analysis, stating that extrapolating estimated effects on earnings based on linear predictions may result in incorrect estimates. These commenters stated that linear predictions might be particularly unreliable outside the range observed in the data. While as a general matter, linear extrapolation may not be appropriate in all circumstances,

especially in the absence of data supporting such an approach, the Commission notes the linear effect of non-compete enforceability on earnings was statistically tested in the economic literature.[1079]

Nevertheless, to test and confirm the robustness of the conclusions drawn in the preliminary analysis from the linear approach, in this final analysis, the Commission uses several estimation approaches. For its primary analysis, the Commission adopts an approach that does not rely on extrapolation. Specifically, the Commission assumes that the historical average change [1080] in non-compete enforceability observed at the State level represents the total change in enforceability that results from the rule. This approach is hereafter referred to as the "average enforceability change approach." It likely underestimates the effects of the rule because the State-level changes that would occur under the rule (which adopts a near comprehensive ban) would be substantially larger than the changes observed historically. The Commission also conducted sensitivity analyses with two other approaches— described further in Parts X.C and X.F.6.a—that use linear extrapolation to scale up the effects estimated in the literature to estimate the effects of the final rule (*i.e.,* a near comprehensive ban).

Some commenters alleged the proposed rule would increase inflation. Some commenters also stated the proposed rule would harm shareholders by decreasing corporate profits. In response, the Commission notes that the regulatory analysis attempts to quantify and monetize real costs and benefits of the final rule as opposed to nominal costs and benefits. Therefore, net benefits are benefits that represent increased economic efficiency resulting from the final rule rather than increases in the dollar value of output that may be due to inflation. Additionally, earnings increases are due, at least in part, to increased economic efficiency, which would likely lower prices. Accordingly, the Commission does not expect that prices will rise because of the rule. Indeed, empirical evidence shows that in physician clinics, prices fall with decreased non-compete

enforceability.[1081] Similarly, while the effect of the final rule on corporate profits is unclear,[1082] the Commission's analysis is focused on overall gains or losses in economic surplus—*i.e.,* the net benefits to society, not to individual corporations.

Some commenters stated that certain costs may be missing from the preliminary analysis, including costs related to worker misconduct and litigation over the validity of the final rule. The Commission finds no evidence or compelling arguments directly linking non-competes to worker misconduct and therefore does not consider such costs.[1083] Costs related to litigation over the validity of the rule are outside the scope of the regulatory analysis under section 22, which is concerned with costs and benefits should the final rule be implemented.

Some commenters stated the rule may have beneficial tax ramifications for businesses and workers with non-competes that are no longer enforceable, including based on changes in amortization schedules. In response, the Commission notes that any tax savings under the final rule represent transfers from the government to firms that previously used non-competes. Significantly, the Commission is allowing existing non-competes with senior executives, who may be most likely to have non-competes with tax implications, to remain in effect. This will mitigate the need for tax-related administrative work. In response to comments on the tax ramifications of clawed back pay, the final rule does not encourage or require firms to "claw back" compensation and given the exclusion for senior executives' existing non-competes in the final rule, situations in which a firm would be in a position to consider clawing back pay are likely to be extremely limited, if any.

Some commenters stated workers may be harmed if firms claw back workers' earnings, if workers lose long-term incentive payments, retention bonuses, and severance payments, or if workers must pay for training out of pocket in response to the rule. First, in Parts IV.B.3.a.iiv and X.F.6.a, the Commission finds earnings increases overall associated with decreases in non-compete enforceability. With respect to existing non-competes, non-competes

---

[1079] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 17.

[1080] In other words, taking all changes in non-compete enforceability between 1991 and 2014 (the range studied in the relevant literature) into account, the Commission considers a change whose magnitude is equal to the average of the magnitudes of all those changes. *See* Johnson, Lavetti, & Lipsitz, *supra* note 388 for more details.

[1081] Hausman & Lavetti, *supra* note 590.

[1082] The evidence in the empirical literature is mixed. Younge & Marx (*supra* note 755) find an increase in firm value when non-competes became enforceable in Michigan. Hiraiwa, Lipsitz, & Starr (*supra* note 502) find no effect on firm value when non-competes were prohibited for the majority of workers in Washington.

[1083] *See* Part V.D.3.

with senior executives, which are most likely to be structured with incentive payments, bonuses, and severance, may remain in effect under the final rule. To the extent any other existing non-competes with such structures are not excluded from the final rule, as noted in Parts III.D and IV.D, deferred compensation and other structured payments generally have many material contingencies other than a non-compete, which means incentive payments and retention bonuses will continue to retain value for the employer. Going forward, under the final rule, agreements for deferred compensation and other structured payments may be permissible as long as they do not fall within the definition of non-compete clause in § 910.1. With respect to payments for training, the Commission notes evidence that worker-sponsored training is unaffected by legal enforceability of non-competes,[1084] and it is therefore unlikely that workers will incur costs related to training as a result of the final rule.

Some commenters disagreed with the Commission's use of patenting activity as a proxy for innovation in the preliminary analysis, stating that the value of innovation may not be captured in patenting, in part because employers may use patents as a substitute for non-competes. First, the Commission agrees that innovation likely has value above and beyond patenting. That patenting does not capture the full value of innovation is not a basis for dismissing its value as a proxy altogether. Second, while it is theoretically possible firms may substitute from the use of non-competes to the use of patents to protect intellectual property, the empirical literature shows increases in innovation do not follow from the simple substitution of protections between non-competes and patents. Specifically, the empirical literature confirms that innovations prompted by decreased non-compete enforceability are qualitatively valuable, and—examining the relationship between non-compete enforceability and patenting for drugs and medical devices, where patenting is ubiquitous [1085]—it shows the patents reflect true net increases in innovation (as opposed to substitutions). One commenter stated there can be difficulty ascertaining the value of patenting. The Commission finds that there are several estimates of the private value of a patent (e.g., the value to the patenting firm) in the literature, but no estimates of the social value of a patent, as further

discussed in Part X.F.6.b. The Commission therefore stops short of monetizing this benefit. The final analysis addresses effects on innovation in greater detail in Part X.F.6.b.

Some commenters asserted the research related to investment in human capital does not distinguish between two different types of training: core training, i.e., training required to perform job duties, and advanced training, i.e., training with potential to increase productivity beyond the baseline requirements for job performance.[1086] Commenters stated that when non-competes are more enforceable, workers may receive additional core training rather than advanced training. In other words, when non-competes are more enforceable, labor mobility decreases and workers may also move to new industries to avoid potentially triggering non-compete clause violations (as discussed in Part IV.B.3.b.ii), both of which make experienced workers less often available for hire. Firms therefore may need to train workers at a greater rate because they will hire inexperienced workers who require more core training. Research finding increases in training associated with increases in non-compete enforceability therefore may not imply increases in advanced training—i.e., the kind of training that increases productivity of workers already able to perform job duties, with net benefits for society as a whole. In response, the Commission agrees that decreases in training under the final rule may represent decreases in core, rather than advanced, training. It is not possible to discern whether the observed effects on training in the literature represent core versus advanced training because evidence that would facilitate such an analysis does not exist. Importantly, a decrease in core training would be economically beneficial because it would reflect a more efficient use of the labor force. Therefore, to the extent a decrease in training reflects a change in core training, this would be a net benefit of the final rule—not a cost. On the other hand, to the extent a decrease in training is due to a change in advanced training, this would represent a net cost of the final rule. The Commission further discusses investment in human capital in Part X.F.7.a.

Some commenters stated that costs associated with rescinding existing non-competes and updating contractual practices may be greater than estimated

in the NPRM and attributed the greater cost to the need for high-cost outside counsel. In response, the Commission finds it likely that many firms will not need to use costly outside counsel (or indeed, any counsel) to comply with the final rule. This is especially true since the final rule allows non-competes for senior executives to remain in effect, since it does not require rescission of any existing contracts, and since it provides a model safe harbor notice for other workers and makes other adjustments to simplify the notice process. In response to commenters stating that firms will need more time to implement than estimated in the NPRM, the Commission conducts an updated analysis in Part X.F.7.b. The Commission notes that the model language provided in the final rule and allowing employers to use the last known address, mail or electronic, will significantly simplify the notice process for employers. Additionally, the Commission performs two sensitivity analyses in Part X.F.7.b. The first assumes an attorney's time is more costly—it replaces the primary estimate of the average hourly productivity of an attorney ($134.62 per hour, based on BLS earnings data) with an estimated rate of the cost of outside counsel who is a tenth-year attorney ($483 per hour).[1087] The second makes different assumptions about the time spent by employers related to existing non-competes that will be no longer be enforceable and updating contractual practices. Finally, the Commission clarifies the definition of "non-compete clause" in Part III.D to reduce confusion and give employers and workers a clearer understanding of what is prohibited. This, in turn, will reduce compliance costs and potential litigation costs over what constitutes a non-compete.

One commenter from the retail industry claimed the cost of implementing the proposed rule could

---

[1084] Starr, supra note 445.

[1085] See Part IV.B.3.b.ii, discussing Johnson, Lipsitz, & Pei, supra note 526.

---

[1086] Commenters used the words "requisite" and "discretionary" in lieu of "core" and "advanced," respectively.

---

[1087] This estimate is drawn from the Fitzpatrick Matrix, which is a fee schedule used by many U.S. courts for determining the reasonable hourly rates in the District of Columbia for attorneys' fee awards under Federal fee-shifting statutes. It is used here as a proxy for market rates for litigation counsel in the Washington, DC area, which likely represent the high end of rates for litigation counsel in the U.S. The estimate is therefore adjusted to reflect a national rate by multiplying by the ratio of the hourly wage of attorneys nationwide to the hourly wage of attorneys in the Washington, DC metro area, based on BLS Occupational Employment and Wage Statistics data. The Commission conservatively uses the rates of a tenth-year attorney—a much more experienced attorney than is likely to be needed (and indeed no attorney at all may be needed). See Fitzpatrick Matrix, https://www.justice.gov/usao-dc/page/file/1504361/dl?inline. See BLS Occupational Employment and Wage Statistics, https://www.bls.gov/oes/data.htm.

be $100,000 to $200,000 per firm but did not support this assertion with any evidence. The Commission disagrees with this assertion, which does not align with its careful estimates based on empirical evidence and significant expertise presented in Part X.F.7.b.ii. The Commission's estimates also acknowledge and account for potentially heterogeneous costs across firms.

Some commenters stated that employers would need to spend substantial resources to litigate trade secret disputes and violations of post-employment restrictions other than non-competes. One commenter stated that the cost of a trade secret case may range from $550,000 to $7.4 million, depending on the monetary value of the trade secret claim. The Commission analyzes costs of litigation in Part X.F.7.c. The Commission agrees with commenters that trade secret litigation, and litigation over post-employment restrictions other than non-competes, may be costly. However, the Commission notes that no evidence exists to support the hypothesis that litigation on these fronts will increase because of the final rule. Indeed, recent evidence suggests that trade secret litigation does not increase following bans on non-competes.[1088] Moreover, the final rule, with its clear and bright-line standard (as compared to the current patchwork of State laws), would likely decrease litigation attempting to enforce non-competes, including litigation initiated by former employers against workers who start their own business or who find a new employer. While the Commission does not have evidence on the frequency of these different types of litigation, it expects the decrease in non-compete litigation would likely offset potential increases in other litigation.

Positing that firms will be reluctant to share trade secrets with workers under the rule, some commenters also stated that the costs of lessened sharing of trade secrets should be taken into account. Since no data exists on the effect of non-competes on the monetary value of shared trade secrets, the Commission does not quantify or monetize this effect. Moreover, there is no evidence that employers will lessen the extent to which they share trade

secrets under the final rule, much less that any change would be material. As detailed in Part IV.D, employers have less restrictive alternatives to non-competes that mitigate these concerns.

Some commenters reference the Starr, Balasubramanian, and Sakakibara study[1089] and the Commission's interpretation of it in the NPRM to assert that firms founded because of the rule may be of lower quality than existing firms in terms of average employment and survival rates, and adjustments should be made to the Commission's analysis to account for these differences. Upon further review, the Commission interprets the authors' findings to show that within-industry spinouts resulting from lessened non-compete enforceability tend to be lower quality than non-within industry spinouts resulting from lessened non-compete enforceability. However, both types of spinouts are better, on average, than spinouts that form under stricter non-compete enforceability. The study's results therefore suggest that, if anything, the Commission underestimates the final rule's benefits from new business formation, because the estimates do not adjust for quality.

Some commenters asserted that, because of the positive effects of the proposed rule on labor mobility, firms may face greater costs associated with turnover (especially firms that currently use non-competes) due to the cost of finding a replacement, the cost of training a replacement, and the cost of lost productivity. Based on Pivateau (2011),[1090] one commenter estimated that turnover costs 25% of the annual salary of a worker. Some commenters also argued that some firms may face decreased costs of turnover, because more plentiful availability of labor can reduce the cost of hiring. The Commission finds that there may be distributional effects of increased turnover—benefits for firms that face a lower cost of hiring and costs for firms losing workers who had been bound by non-competes—and assesses the same in Part X.F.9.c.

Some commenters offered additional empirical evidence not discussed in the NPRM that was not specific to the proposed regulatory analysis. The Commission responds to those comments in Part IV.

### D. Summary of Changes to the Regulatory Analysis

In the final regulatory analysis presented in Part X.F, the Commission updates its analyses based on the parameters of the final rule, comments received, supporting empirical evidence raised by commenters, changes in the status quo regarding regulation of non-competes, and reanalysis of evidence presented in the NPRM.[1091] This includes the Commission's attempt to quantify and monetize, to the extent feasible, all costs and benefits of the final rule, as well as transfers and distributional effects. The Commission additionally analyzes hypothetical scenarios to assess what otherwise unmonetized benefits and costs would lead to a final rule that is net beneficial. Finally, the Commission elects to include an analysis of an alternative the Commission considered, namely an analysis of fully excluding senior executives.[1092]

Under the final rule, existing non-competes with senior executives may remain in effect. While this change likely affects some costs and benefits associated with the final rule temporarily, the Commission does not specifically quantify or monetize those effects. The effect on persistent costs and benefits would be temporary, as senior executives will eventually move out of their jobs and retire or move into new jobs, to which the final rule will apply. The Commission notes throughout its analysis, however, how different estimates may be affected by this differential treatment of senior executives even if it cannot quantify the precise effect.

### E. Summary of Benefits and Costs

The Commission considered several effects of the final rule on economic outcomes: earnings, innovation, entrepreneurship, distributional effects on workers, investment in human capital, capital investment, legal and administrative costs, prices, labor mobility and turnover, and litigation costs.

The Commission describes the primary estimates of benefits, transfers, costs, and distributional effects associated with each of these outcomes in Table 1. Table 1 also reports whether the outcome for each effect is quantifiable or monetizable and

---

[1088] Greenwood, Kobayashi & Starr, *supra* note 757. The Commission notes that this study supplements—but is not necessary to support—its finding that no evidence supports the conclusion that litigation costs will increase under the final rule. That finding is based on the Commission's expertise and the rulemaking record, including relevant comments. This study was published after the close of the comment period.

[1089] Starr, Balasubramanian, & Sakakibara, *supra* note 518.

[1090] Griffin Toronjo Pivateau, *Preserving Human Capital: Using the Noncompete Agreement to Achieve Competitive Advantage*, 4 J. Bus. Entrepreneurship & L. 319 (2010).

[1091] As described in detail in this Part X, the Commission's final analysis, including its quantification and monetization of effects, therefore is not precisely the same as its preliminary analysis.

[1092] The Commission is not required to analyze costs and benefits of regulatory alternatives in its final regulatory analysis. *See* 15 U.S.C. 57b–3(b)(2)(B).

discusses important nuance or uncertainty.

TABLE 1

| Category | Extent of characterization | Description of estimate | Discussion |
|---|---|---|---|
| Earnings | Quantified | The estimated ten-year present discounted value of increased worker earnings is $400-$488 billion. Effect on earnings partially represents a transfer and partially represents a benefit of the final rule. | The extent to which the estimated increase in worker earnings represents a benefit versus a transfer is unclear, though there is evidence to suggest that a substantial portion is a benefit. |
| Innovation | Quantified | Annual count of new patents estimated to rise by 3,111–5,337 in the first year, rising to 31,110–53,372 in the tenth year. Annual spending on R&D estimated to fall by $0-$47 billion. Effect on innovation represents a benefit of the final rule. | Estimates of the societal value of innovation are not available. The two effects on innovation together represent a benefit because more output (amount of innovation) is produced with less input (R&D spending). |
| Prices | Partially Quantified | The estimated ten-year present discounted value of decreases in spending on physician and clinical services is $74-$194 billion. Prices in other sectors may decrease as well but are not quantified. The effect on prices partially represents a transfer and partially represents a benefit of the final rule. | Price changes encompass transfers (from firms to consumers) and benefits (since price changes are likely due to increased competition); however, the exact split is not clear. Increased competition may also increase consumer quantity, choice, and quality. Prices outside of physician and clinical services may fall due to changes in competition because of new entrants; however, the literature has not quantified this effect. |
| Investment in Human Capital | Monetized | The estimated ten-year present discounted value of the net effect of the final rule on investment in human capital ranges from a benefit of $32 billion to a cost of $41 billion. The effect on investment in human capital may represent a cost or benefit of the final rule. | The range in estimates reflects uncertainty over whether decreased investment in human capital under the final rule reflects reductions in advanced investment (which the firms opt into to increase productivity) or core investment (which is no longer necessary if more experienced workers are hired) and uncertainty over the workers for whom investment in human capital (all workers or workers in occupations which use non-competes at a high rate) is affected. |
| Legal and Administrative Costs | Monetized | One-time legal and administrative costs are estimated to total $2.1–$3.7 billion. Legal and administrative costs represent a cost of the final rule. | |
| Litigation Effects | Not quantified or monetized | The final rule may increase or decrease litigation costs. Effects on litigation costs may represent a cost or benefit of the final rule. | Estimates of the effect of the final rule on total litigation costs are not quantifiable. Litigation costs may rise or fall depending on firms' subsequent use of other contractual provisions and trade secret law and how the costs of such litigation compare to the cost of non-compete litigation, as well as the decreased uncertainty associated with a bright-line rule on non-competes. |

TABLE 1—Continued

| Category | Extent of characterization | Description of estimate | Discussion |
|---|---|---|---|
| Firm Expansion and Formation ..... | Quantified ...................................... | The final rule is estimated to increase new firm formation by 2.7–3.2% and decrease capital investment at incumbent firms by 0–7.9%. These effects represent a shift in productive capacity from incumbent firms to new firms. The overall effect on firm expansion and formation represents a distributional effect of the final rule. | New firm formation is generally a benefit, but may also crowd out incumbent firms and is therefore not a pure benefit. Decreased capital investment at incumbent firms may be counterbalanced by increased capital investment at new firms or rebalancing across industries, and therefore may or may not be a cost in net. |
| Distributional Effects on Workers .. | Not quantified or monetized ......... | The rule may reduce the gender and racial earnings gap, may disproportionately encourage entrepreneurship among women, and may mitigate legal uncertainty for workers, especially relatively low-paid workers. The differential effect on different groups of workers represents a distributional effect of the final rule. | |
| Labor Mobility .................................. | Partially Monetized ....................... | Some firms may save on turnover costs (due to easier hiring as more potential workers are available), while some firms may have greater turnover costs (due to lost workers newly free from non-competes). The latter is estimated to be no more than $131 per worker with a non-compete, while estimates are not available to monetize the former. While it is unclear whether labor mobility costs represent a net cost or benefit of the final rule, they likely represent a distributional effect (costing firms which use non-competes and helping firms which do not) of the final rule. | The estimate of the increase in turnover costs for firms using non-competes is an upper bound, since it encompasses effects on investment in workers' human capital, hiring workers, and lost productivity of workers, all of which are expected to diminish under the final rule. |

**Note:** Present values are calculated using discount rates of 2%, 3%, and 7%.

The Commission finds that, even in the absence of a full monetization of all costs and benefits of the final rule, the final rule has substantial benefits that clearly justify the costs. While data limitations make it challenging to monetize all the expected effects of the final rule, the Commission believes it has quantified the effects of the final rule likely to be the most significant in magnitude, and thus, potentially drive whether and the extent to which the final rule is net beneficial. This includes both benefits and costs. Based on those quantifications, the Commission is able to make conservative assumptions, based on its expertise, under which the final rule would be net beneficial. In this context, by conservative assumption, the Commission means that it is presuming the benefits it quantifies to be relatively low in value for purposes of this analysis, *i.e.,* lower

than it believes is likely the case. With respect to costs, the Commission assumes costs are on the higher end of the estimated range, which is higher than the Commission believes is likely to be the case. Through this analysis, provided in detail in Part X.F.10, the Commission further bolsters its finding that the benefits of the final rule justify the costs.[1093]

Specifically, the Commission finds that even if only 5.5% of the estimated $400–$488 billion increase in worker

[1093] The Commission notes that it does not believe there is a likely scenario in which firm exit and lost capital investment, especially when balanced against firm entry and gained capital investment at new firms, would change this outcome. Firm exit and lost capital investment, which are not quantified and are discussed as distributional effects in Part X.F.9, would not, for example, result in costs large enough to overcome the break-even analyses (even if, for example, the value of earnings representing productivity increases or the social value of patents had to be marginally higher) or the finding that the benefits justify the costs.

earnings represents increased productivity resulting from improved, more productive matches between workers and employers, the benefits will outweigh the costs. In Part X.F.6.a, the Commission explains that the economic literature does not provide a way to separate increased productivity from the total effect on earnings (*i.e.,* transfers versus benefits in the regulatory impact analysis sense). However, the Commission finds that based on the literature, some part of the increase in worker earnings represents increased productivity and believes that 5.5%, and likely more, represents increased productivity. Similarly, even presuming that no part of the effect on earnings is a benefit (as opposed to a transfer), the Commission finds that if the social value of a patent were at least $297,144, then the monetizable benefits will exceed monetized costs. Notably, the literature finds that the average private value of a patent may be as high

as $32,459,680, again making this assumption regarding the social value of a patent quite conservative. Finally, even presuming none of the earnings are benefits (rather than transfers) and that the social value of a patent is zero (an implausibly low estimate), if all the lost investment in human capital is core, the monetized benefits would also exceed monetized costs. Notably, in conducting these analyses, in each instance, the Commission further makes the very conservative assumption that monetizable benefits other than the benefit being analyzed are zero. That is, the Commission assumes that patents have no social value and that no reduced investment in human capital is core when considering how much of earnings must represent increased productivity in order for the monetized benefits to exceed the monetized costs. This break-even analysis shows that while data limitations making it challenging to monetize all of the expected benefits of the rule, the Commission finds that the final rule can be shown to be net beneficial even under very conservative assumptions.

*F. Final Regulatory Analysis*

1. Background

As discussed in Part IV.B.3.a, non-competes inhibit worker mobility, creating worse matches between workers and firms and decreasing workers' productivity and therefore their earnings. Non-competes also prevent firms from hiring talented and experienced workers; inhibit new business formation; and reduce the flow of innovative workers between firms, harming innovation. The final rule increases competition in labor markets by allowing workers to move more freely between jobs and increases competition in product and service markets by ensuring that firms are able to hire appropriate workers, that workers are able to create new entrepreneurial ventures, and that worker flow between firms enhances innovation.

2. Economic Rationale for the Final Rule

The final rule addresses two primary economic problems. First, non-competes tend to harm competitive conditions in labor markets. Non-competes increase barriers to voluntary labor mobility and prevent firms from competing for workers' services, thus creating frictions and obstructing the functioning of labor markets. These frictions inhibit the formation of optimal and efficient matches in the labor market, resulting in diminished worker and firm productivity and in lower wages.

The second economic problem is that non-competes tend to harm competitive conditions in product and service markets. Non-competes create a barrier to new business formation and entrepreneurial growth, which negatively affects consumers by lessening competition in product and service markets. Non-competes also make it difficult for competitors to hire talented workers, which reduces these competitors' ability to effectively compete in the marketplace. Additionally, non-competes impede innovation by preventing the churn [1094] of innovative workers between firms, limiting the spread and recombination of novel ideas, which may negatively affect technological growth rates.

3. Purpose of the Final Rule

The final rule provides that, with respect to a worker other than a senior executive, it is an unfair method of competition—and thus a violation of section 5 of the FTC Act—for a person to enter into or attempt to enter into a non-compete; enforce or attempt to enforce a non-compete; or represent that the worker is subject to a non-compete.[1095] The final rule also provides that, with respect to senior executives, it is an unfair method of competition—and thus a violation of section 5 of the FTC Act—for a person to enter into or attempt to enter into a non-compete; enforce or attempt to enforce a non-compete entered into after the effective date; or represent that the worker is subject to a non-compete, where the non-compete was entered into after the effective date.[1096]

4. Baseline Conditions

a. Estimate of the Affected Workforce

As described in Part II.E, some workers may not be subject to the final rule to the extent they are employed by an entity or in a capacity that is exempted from coverage under the FTC Act. The Commission estimates the fraction of the workforce who would be covered under the final rule (the "coverage rate") by applying conservative assumptions to individual-level data on the characteristics of the workforce from the American Community Survey (ACS) for 2017 to 2021.[1097] Residents of four States (California, Minnesota, North Dakota, and Oklahoma) are excluded from the sample used for the computation, since these States already generally do not enforce non-compete agreements.

To estimate the coverage rate, workers are classified according to three criteria: (1) whether the individual is identified as working for the government; (2) whether the individual is identified as working for a non-profit organization; and (3) whether the individual works in an industry or in a capacity that is likely to be outside the jurisdiction of the FTC Act. Government employment consists of employment with local, State, and Federal governments, in addition to individuals on active duty in the U.S. Armed Forces or Commissioned Corps. Nonprofit status is self-reported by survey respondents. Industries are defined based on the North American Industry Classification System (NAICS).

Such a classification of workers is necessarily imperfect as the FTC's jurisdiction does not exclude all workers that may be identified in the data as government employees or map directly into the data on non-profit status or the NAICS classifications that are available within the ACS. For example, the FTC Act is likely to exempt some firms that are classified as non-profits but not others, as described in Part II.E. Also, in some instances, only a subset of a given NAICS category (and not the entire category) appeared likely to fall outside the jurisdiction of the FTC Act. When ambiguity arose, the Commission was overinclusive in excluding workers. For example, the Commission classified all nonprofits as outside the coverage of the final rule for the purposes of estimating the coverage rate. Moreover, in estimating the coverage rate, the Commission excluded entire industries in calculating the coverage rate when some subset of that industry appeared to be outside the Commission's jurisdiction. This over-inclusiveness has the effect of underestimating the coverage rate of the final rule, and thus the overall net effect of the final rule will be conservative.

Using data from the ACS and the assumptions detailed in Part X.F.4, the Commission estimates that the final rule is likely to cover 80% of the private U.S. workforce.

b. Non-Compete Enforceability

For regulatory analyses, the effects of the final rule are measured against a baseline representing conditions that would exist in the absence of the rule. The extent of the final rule's costs and benefits depends on the degree to which it will change the enforceability of non-competes relative to what it would be in the baseline. Currently, non-competes are broadly prohibited in four States:

---

[1094] Churn in this context means turnover that is neither job creation nor job destruction—essentially the movement of workers among jobs.

[1095] *See* § 910.2(a)(1).

[1096] *See* § 910.2(a)(2).

[1097] The preliminary analysis in the NPRM did not estimate or apply a coverage rate based on jurisdiction.

California, North Dakota, Oklahoma, and Minnesota. In some other States, non-competes are prohibited for some, but not all, workers. For non-competes that are not prohibited expressly by statute, some version of a reasonableness test is used under State law to determine whether a given non-compete is enforceable or not. These reasonableness tests examine whether the restraint is greater than needed to protect an employer's purported business interest. Non-competes can also be found unreasonable where the employer's need for the non-compete is outweighed by the hardship to the worker or the likely injury to the public. Because these cases arise in the context of individual litigation, courts focus the "likely injury to the public" inquiry on the loss of the individual worker's services and not on the aggregate effects of non-competes on competition in the relevant market or overall in the economy.[1098]

Researchers have used various scoring systems to capture the enforceability of non-competes State by State over time. As described in Part IV.A.2, the Commission gives greatest weight to studies that measure enforceability granularly (i.e., not using a binary score but, for example, an integer scale) and along various dimensions (e.g., the employer's burden of proof in non-compete litigation and the extent to which courts are permitted to modify unenforceable non-competes to make them enforceable). The scoring system which fits these criteria best[1099] has been used to study the effect of non-compete enforceability on several economic outcomes. This score, which varies across States and across years, measures non-compete enforceability along a scale which runs from zero to one.[1100] A score of zero indicates enforceability equal to that of the State which enforces non-competes least (North Dakota). A score of one indicates enforceability equal to that of the State which enforces non-competes most readily (Florida). The final analysis relies on this score heavily as a granular and reliable scoring system that allows

the Commission to consider the effect of non-compete enforceability on several economic outcomes. The studies that use this score form much of the basis for the final regulatory analysis.

5. Estimating the Effect of the Rule on a State-Level Enforceability Metric

In the absence of the rule, the average State enforceability score—in States that do not broadly prohibit them—when measured on a scale of 0 (lowest enforceability) to 1 (highest enforceability), is 0.78. The final rule will result in State-level enforceability of non-competes falling from its level in the absence of the rule to zero (i.e., an average decrease of 0.78, excluding States that broadly prohibit non-competes).[1101] Using data on scores from 1991 to 2014, researchers report that the average magnitude of a change in the score (i.e., the size of the change, regardless of whether it was a score increase or decrease) from year to year was 0.081.[1102] In other words, when a State's score changed from one year to the next, the average magnitude of that change was 0.081, on a scale of zero to one. Since the decrease that will result from the final rule is significantly larger than the average decrease considered in the literature (0.78 v. 0.081), the Commission considered different methods for the preferred estimate in this final analysis. Consistent with the NPRM, this final analysis could attempt to scale up, or extrapolate, estimated effects to account for this larger decrease. As discussed in Part X.C, some commenters criticized this approach, stating that it may result in

unreliable estimates absent evidence that the economic effects the Commission is attempting to measure would scale up linearly.

The Commission notes in X.C that empirical studies show a linear extrapolation is appropriate for measuring earnings effects.[1103] However, similar evidence supporting the use of linear extrapolation is not available for all economic outcomes the Commission is measuring in this final analysis. To maintain consistent reporting across economic outcomes and to avoid extrapolation, the final analysis considers the effect of a change equal to 0.081 when possible.[1104] That is, for the purposes of the final analysis, the Commission conservatively assumes the projected effects on economic outcomes due to the final rule are equal to the effects the economic literature associates with an average magnitude change in the non-compete enforceability score from year to year. The economic literature reports enforceability changes as simply increases or decreases in some studies,[1105] and the magnitude of those legal changes in this final analysis is assumed to mirror the average magnitude change of 0.081. The Commission makes these assumptions to avoid the possibility of inadvertently inflating the effects of changes in the enforceability score. The final rule will result in greater changes in enforceability than the changes examined in empirical studies. There is a possibility that the magnitude of change for particular economic outcomes will not be the same in response to every reduction in enforceability. For example, it is possible that for some economic outcomes, as enforceability gets closer to zero, the changes in the outcome being measured will be lower with each change in enforceability.

At the same time, the Commission notes that this may result in underestimating benefits of the final rule—the average magnitude change of 0.081 is much smaller than the average 0.78 change it would take for enforceability to reflect the final rule. To reflect this possibility, the final analysis includes sensitivity analyses which extrapolate beyond an average magnitude change. In these sensitivity

---

[1098] See NPRM at 3493–97 (describing the law governing non-competes at the time the NPRM was published). Minnesota prohibited non-competes after the publication of the NPRM. See Minn. Stat. Ann. sec. 181.988.

[1099] Bishara, supra note 501 at 751.

[1100] Different researchers have rescaled this score in different ways (e.g., from zero to 470, or scaled such that the mean score is zero and the standard deviation of the score is one). The Commission uses the scaling from zero to one because that is the way it is used in the majority of the studies which are relied on in the final analysis, as well as for easy interpretability and consistency across the final analysis.

[1101] Calculated using data from 2009, the most recent year with publicly available data, and rescaled to a zero to one scale. See Starr, supra note 445.

[1102] Changes of zero (i.e., years in which the score in a given State was the same as the prior year) were excluded from this calculation. The Commission notes that the study which reports this average (Johnson, Lipsitz, & Pei, supra note 526) was released after publication of the NPRM. The Commission also notes that the data underlying this calculation were used in other studies discussed in the NPRM; Johnson, Lipsitz, & Pei report the average score in the most accessible fashion and is therefore used here. The average they report is the average change in the analysis sample they select, which is chosen for analytical reasons to ensure accuracy of their estimates. Use of the underlying data to re-calculate the average score or use of scores provided by other researchers would not change the overall outcomes, conditional on sample selection. Moreover, the Commission reports the estimates resulting from a full extrapolation in this final analysis, which does not use this average score change in its sensitivity analysis, and is the method used in the NPRM. As noted, the Commission believes that the full extrapolation method is a valid, but potentially less precise method. Accordingly, the use of this score supplements—but is not necessary to support—the Commission's ultimate finding that the benefits to the final rule justify the costs.

[1103] Johnson, Lavetti, & Lipsitz, supra note 388 at 17.

[1104] When considering studies which do not report the relationship between non-compete enforceability and economic outcomes based on a numeric score, the Commission is unable to scale the effect to reflect the average magnitude change of 0.081.

[1105] See, e.g., Jeffers, supra note 450.

analyses, the estimated effects from the empirical literature are scaled up on a State-by-State basis (rather than taking the average) to account for the estimated size of the decrease in each State's score. The Commission notes that linear extrapolation provides a robust estimate of earnings changes based on the empirical literature, but for consistency, the Commission reports effects based on the average magnitude change as its primary analysis.

6. Benefits of the Rule

The Commission finds several benefits attributable to the final rule, as reflected in part by the effects of the rule on earnings and prices, and all the effects on output and innovation, as summarized in Table 1 in Part X.E.

a. Earnings

The Commission finds labor markets will function more efficiently under the final rule, which will lead to an increase in earnings or earnings growth. Specifically, in this regulatory analysis, the Commission finds that the estimated ten-year present discounted value of increased worker earnings is $400–$488 billion. The final rule will result in additional earnings stemming from improvements in allocative efficiency due to more productive matching between businesses, which are economic benefits. In other words, the increase in worker mobility will allow employers to hire workers who are a better, more productive fit with the positions they are seeking to fill, which in turn will increase productivity overall. A portion of the additional earnings are transfers from firms to workers resulting from more plentiful employment options outside the firm,[1106] as workers who are not bound by non-competes will be in a different bargaining position with their employer. To the extent other better opportunities with different employers exist for a given worker, their current employers will now be competing with those other employers and may increase worker compensation to keep those workers. The Commission finds that the economic literature does not provide a way to separate the total effect on workers' earnings into transfers and benefits.

The increase in worker earnings resulting from the final rule is calculated as follows:

*Increase in worker earnings = (%
   Increase in Earnings caused by the
   change in enforceability of non-
   competes) * (Total Affected
   Earnings)*

The primary approach in this analysis is to estimate the percentage increase in earnings assuming that the effect of the final rule will be the same as the effect of an average magnitude change in non-compete enforceability, as discussed in Part X.F.5. The Commission estimates the percentage increase in workers' earnings to be 0.86%.[1107] The Commission estimates total affected annual earnings to be $6.2 trillion (in 2023 dollars).[1108]

Multiplying the percentage effect (0.86%) by overall affected annual earnings ($6.2 trillion) results in an annual earnings effect of $53 billion. The ten-year effect on earnings, discounted separately by 2%, 3%, and 7%, is reported in the first row of Table 2.[1109]

This primary approach requires no extrapolation (*i.e.*, it does not scale the effect on economic outcomes to account for the fact that the effect of the rule on enforceability scores will be greater than the changes studied in the economic

literature). However, it may understate the increase in workers' earnings resulting from the final rule. Thus, the Commission conducts two sensitivity analyses to assess how the estimated effect of the rule would change if effects are extrapolated to represent changes in enforceability scores greater than those examined in the literature.

The first sensitivity analysis, hereafter referred to as the ''full extrapolation'' approach, calculates the effect on worker earnings in an identical fashion to the primary analysis but relies on an estimate of the percentage increase in worker earnings which extrapolates to the effect of a complete prohibition on the use of non-competes. This results in an effect on worker earnings equal to 3.2% (instead of 0.86% in the primary analysis).[1110] For this estimate, total affected earnings are equal to $7.3 trillion in 2023 dollars.[1111] The estimated effect on earnings across the workforce for this first sensitivity analysis is therefore given by the percentage effect on earnings (3.2%) multiplied by the total annual wages in the U.S. for the affected population ($7.3 trillion). This results in an annual

---

[1106] By transfers, the Commission refers to ''a gain for one group and an equal-dollar-value loss for another group.'' *See* Off. of Mgmt. & Budget, *Circular A–4* (Nov. 9, 2023), 57, *https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf*.

[1107] Calculated as $-(e^{-0.107 \times 0.081} - 1)$, where $-0.107$ is the estimated coefficient of earnings on non-compete enforceability score in Johnson, Lavetti, & Lipsitz (*supra* note 388), and 0.081 represents the size of an average magnitude change calculated in Johnson, Lipsitz, & Pei (*supra* note 526) which scales the effect to represent the effect of an average sized change in the non-compete enforceability score.

[1108] This figure represents total annual earnings in the U.S. in the most recent year with data available (2022), adjusted to 2023 dollars: see *https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=0&year=2022&qtr=A&own=5&ind=10&supp=0*. Earnings from California, North Dakota, Oklahoma, and Minnesota (States which broadly do not enforce non-competes) are subtracted out, since enforceability in those States will be broadly unaffected by the rule. The estimate is additionally adjusted to account for the proportion of the workforce the Commission estimates are currently covered by the Commission's jurisdiction (80%), as discussed in Part X.F.4.a. Numerically, $6.2 trillion is calculated as ($9.1 trillion − $1.6 trillion) * 80% = $6.0 trillion, adjusted to $6.2 trillion to adjust to 2023 dollars. $9.1 trillion is total private earnings in 2022 in the U.S. (the most recent year with data available), and $1.6 trillion is total private earnings in 2022 in CA, ND, OK, and MN.

[1109] For illustrative purposes, State-specific estimates are displayed in Appendix Table A.1. In this table, the estimated number of covered workers is calculated as 80% * (total employed population in the State); the estimated increase in total earnings is calculated as 0.86% * (estimated total covered earnings), where estimated total covered earnings is calculated as (estimated number of covered workers) * (average annual earnings); and the estimated increase in average earnings is calculated as 0.86% * (average annual earnings). Total employed population and average annual earnings are taken from the Census Bureau Quarterly Census of Employment and Wages for 2022 (see *https://www.bls.gov/cew/data.htm*).

[1110] The percentage effect, 3.2%, is reported by Johnson, Lavetti, & Lipsitz (*supra* note 388) as the lower end of a range of possible effects of a ban on non-competes, relative to non-compete enforceability in 2014. The estimate is constructed by calculating the change in the enforceability score in each State which would bring that State's score to zero (representing no enforceability of non-competes) and scaling the estimated effect on worker earnings by that amount. The Commission uses the low end of the reported range in order to exercise caution against extrapolation, since the estimate uses an out-of-sample approximation: the changes in most States necessary to arrive at a score of zero are greater than the changes examined in the study (though this approximation is consistent with the results of a test in Johnson, Lavetti, and Lipsitz which shows that the effect of enforceability on earnings is roughly linear; namely, a change in enforceability that is twice as large results in a change in earnings that is twice as large). The Commission also notes that the estimated range is based on enforceability in 2014. Since then, some changes in State law have made non-competes more difficult to enforce for subsets of their workforces so that a prohibition on non-competes today is likely to have a slightly lesser effect than a prohibition would have had in 2014.

[1111] This estimate differs from total affected earnings for the primary analysis because the estimate of 3.2% takes into account enforceability in California, North Dakota, and Oklahoma. Earnings in those States is therefore added back into total affected earnings. However, earnings in Minnesota are still omitted, since the prohibition in that State was enacted after the conclusion of the study period in Johnson, Lavetti, and Lipsitz (2023): see Minn. Stat. sec. 181.988. Total annual earnings in the U.S. for the affected population excluding MN are calculated as ($9.1 trillion − $0.2 trillion) * 80%, adjusted to adjust to 2023 dollars. $9.1 trillion is earnings for all workers in the US in 2022 (the most recent year with available data) and $0.2 trillion is earnings for workers in MN. *See https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=0&year=2022&qtr=A&own=5&ind=10&supp=0*.

estimated earnings gain of $234 billion.[1112] The ten-year effect, discounted at 2%, 3%, and 7%, is displayed in the second row of Table 2.

The second sensitivity analysis, hereafter referred to as the "partial extrapolation" approach, uses the same formula as the other two analyses (% effect on earnings * total affected earnings) but is more conservative in its estimate of the percent effect on earnings than the full extrapolation estimate. The full extrapolation approach assumes that enforceability scores fall to zero. The partial extrapolation approach instead assumes that enforceability scores fall to the minimum observed enforceability score ignoring scores in States that broadly prohibit non-competes (a more moderate extrapolation). The minimum observed enforceability score excluding States that broadly prohibit non-competes is 0.53 (on a scale of zero to one), which is the enforceability score in New York.[1113] This analysis calculates the change in each State's score that would bring it to 0.53, and scales the effect on worker earnings estimated in the empirical literature by that amount.[1114] For example, West Virginia's enforceability score is 0.59. To change to New York's enforceability score would imply a decrease in West Virginia's score of 0.06 (calculated as 0.59—0.53). This implies a percent effect on earnings in West Virginia of 0.64%.[1115]

Total affected earnings in each State are calculated by multiplying total earnings in that State (adjusted to 2023 dollars) by the estimated percentage of covered workers (80%). For example, in West Virginia, total earnings are estimated to be $0.24 trillion.[1116]

Next, the percent increase in earnings in each State is multiplied by total affected earnings in that State. In West Virginia, this results in an earnings increase of 0.64% * $0.24 trillion = $152 million. Finally, the earnings increases are added across States. The overall estimated effect is an annual increase in earnings of $161 billion. The ten-year effect, discounted at 2%, 3%, and 7%, is displayed in the third row of Table 2.

### TABLE 2

| | Estimated ten-year increase in earnings ($ billions), assuming: | | |
| --- | --- | --- | --- |
| | 2% Discount rate | 3% Discount rate | 7% Discount rate |
| Primary estimate (average enforceability change) ........................................................ | $488 | $468 | $400 |
| Estimate (full extrapolation) ........................................................................................... | 2,148 | 2,060 | 1,762 |
| Estimate (partial extrapolation) ..................................................................................... | 1,488 | 1,427 | 1,221 |

The estimated effects on earnings in Table 2 are based on estimates of the percentage change in earnings from a study in the empirical literature that aligns with the metrics outlined in Part IV.A.2. Another study in the literature estimates earnings effects using a comparison between workers in occupations that use non-competes at a high rate versus a low rate.[1117] After adjusting the finding from that study to the average magnitude enforceability change, the estimated effect on worker earnings is 0.5%,[1118] or $31 billion annually.[1119]

The Commission notes that, as discussed in Part X.E, earnings of senior executives who continue to work under non-competes are included in the calculations in this Part X.F.6.a. If the Commission were able to identify those senior executives, their omission from the calculations would decrease the earnings effect of the final rule, since the earnings effect for those senior executives (and others, because of spillovers) would be pushed further into the future, causing steeper discounting. However, while senior executives are paid relatively highly, there are relatively few of them: for example, based on BLS data on earnings by occupation, Chief Executives' earnings comprise just 0.5% of all earnings.[1120] Therefore, the impact on the earnings calculations of omitting or pushing

forward the earnings of senior executives who would continue to work under a non-compete is limited.

Discussion of Transfers Versus Benefits

It is difficult to determine the extent to which the earnings effects represent transfers versus benefits. Transfers, in this context, refer to "a gain for one group and an equal-dollar-value loss for another group."[1121] Such transfers do not represent a net benefit or cost to the economy as a whole for purposes of regulatory impact analysis.

To the extent a prohibition on non-competes leads to greater competition in the labor market and a more efficient allocation of labor by allowing workers to sort into their most productive

---

[1112] This estimate is comparable to the estimate of $250 billion per year reported in the NPRM. *See* NPRM at 3523. The estimate in the NPRM was based on earnings in 2020 (as opposed to 2022 in this final regulatory analysis), included earnings in Minnesota (which has since passed a bill prohibition non-competes), and did not adjust for the estimate of the affected workforce discussed in Part X.F.4.a.

[1113] Enforceability score data come from Starr (2019), which reports scores for 2009 (the most recent data available). Scores are adjusted to a scale of zero to one.

[1114] In particular, for each State, the Commission calculates the percentage effect on earnings as $e^{(0.107 * \Delta Enf)} - 1$, where $\Delta Enf$ is equal to the enforceability score in that State minus the lowest observed enforceability score, excluding CA, ND, OK, and MN (0.53).

[1115] Calculated as $-(e^{-0.107 * 0.064} - 1)$, where $-0.107$ is the estimated coefficient of earnings on

non-compete enforceability score in Johnson, Lavetti, & Lipsitz (*supra* note 388), and 0.064 represents the scaling factor due to West Virginia's score change.

[1116] Calculated as $0.29$ trillion * 80%, where $0.29 trillion is earnings in WV in 2022 (the most recent year with data available) adjusted to 2023 dollars. See *https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=0&year=2022&qtr=A&own=5&ind=10&supp=0*.

[1117] For further discussion of this study, see the discussion in Part IV.B.3.a.ii of Starr, *supra* note 445.

[1118] The change in enforceability which generates the estimate in Starr (*supra* note 445) is a one standard deviation change, as measured using non-compete enforceability scores for all 50 States and the District of Columbia in 1991, which is a change on a scale of zero to one of approximately 0.17, calculated as $1/[1.60 - (-4.23)]$. Scaling the estimate, a change equal to 0.081 would result in

an earnings effect of 0.5%, calculated as $e^{(0.0099 * 0.081/0.172)} - 1$.

[1119] Calculated as $6.2 trillion * 0.5%.

[1120] Calculated as $(199,240 * 246,440)/(147,886,000 * 61,900)$, where 199,240 and 147,886,000 are employment for Chief Executives and All Workers, respectively, and 246,440 and 61,900 are dollar earnings for Chief Executives and All Workers, respectively, in 2022. See Occupation Employment and Wage Statistics, BLS, *https://www.bls.gov/oes/tables.htm*. The Commission notes that Chief Executives are used as an illustrative example, and are an imperfect proxy for senior executives: some Chief Executives (as classified by BLS) may not be senior executives under the final rule, and some senior executives under the rule may not be Chief Executives.

[1121] Off. of Mgmt. & Budget, *Circular A–4* (Nov. 9, 2023) at 57.

matches with firms (including new firms that may be formed), then the resulting earnings increases may reflect higher productivity and so represent a net benefit to the economy. However, some increases in earnings when non-competes are prohibited may simply represent a transfer of income from firms to workers (or, if firms pass labor costs on to consumers, from consumers to workers).

Several pieces of evidence support the Commission's finding that at least part of the increase in earnings represents a social benefit or net benefit to the economy, rather than just a transfer. As described in Part IV.B.3.a.ii, two studies have sought to estimate the external effect of non-compete use or enforceability: that is, the effect of use or enforceability on individuals other than those directly affected by non-compete use or enforceability.

One study directly estimates the external effect of a change in non-compete enforceability.[1122] While use of non-competes is not observed in the study, the effects of changes in a State's laws are assessed on outcomes in a neighboring State. Since the enforceability of the contracts of workers in neighboring States are not affected by these law changes, the effect must represent a change related to the labor market which workers in both States share. The estimate suggests that workers in the neighboring State experience effects on their earnings that are 76% as large as workers in the State in which enforceability changed.[1123] In other words, two workers who share a labor market would experience nearly the same increase in their earnings from a prohibition on non-competes, even if the prohibition only affects one worker. While the study does not directly estimate the differential effects by use, the effects on workers unaffected by a change in enforceability may be similar to the effects on workers not bound by non-competes.

A second study demonstrates that when the use of non-competes by employers increases, wages decrease for workers who do not have non-competes but who work in the same State and industry. This study also finds that this effect is stronger where non-competes are more enforceable.[1124] Since the affected workers are not bound by non-competes themselves, the differential in earnings likely does not completely represent a transfer resulting from a

change in bargaining power between a worker bound by a non-compete and their employer.

Overall, these studies suggest there are market-level dynamics governing the relationship between earnings and the enforceability of non-competes: specifically, restrictions on the enforceability of non-competes affect competition in labor markets by alleviating frictions and allowing for more productive matching. Changes in enforceability or use of non-competes have spillover effects on the earnings of those workers who should not be directly affected because they do not have non-competes or they work in nearby labor markets that did not experience changes in enforceability. If non-competes simply changed the relative bargaining power of workers and firms, without affecting market frictions or competition, then these patterns are less likely to be observed. Additionally, new business formation when non-competes are less enforceable (see Part IV.B.3.b.i for a discussion of the evidence) may create new productive opportunities for workers.

Due to the uncertainty related to earnings as transfers versus benefits, the Commission analyzes various scenarios that allocate the percent of the earnings effect to a benefit at different levels in Part X.F.10. This does not represent a finding that no part or only a small part of the effect on earnings is a benefit; rather, it is to ensure that the total estimated effect of the final rule is robust for the purposes of the regulatory impact analysis to the possibility that a small percentage of the effect on earnings represents a net benefit.[1125]

b. Innovation

The Commission finds that an additional benefit of the rule would be to increase the annual count of new patents by 3,111–5,337 in the first year, rising to 31,110–53,372 in the tenth year. By alleviating barriers to knowledge-sharing that inhibit innovation, and by allowing workers greater opportunity to form innovative new businesses, the final rule will increase innovation. Studies have sought to directly quantify this effect, primarily focused on patenting activity. The Commission therefore considers the effect on patenting in support of its

findings related to innovation. Lacking an estimate of the social value of a patent, the Commission does not monetize this benefit. The Commission also finds that the rule will reduce expenditure on R&D by $0 to $47 billion per year. In light of the increase in overall innovation, this reduction is a cost savings for firms, but may not reflect a market-level effect because it does not measure potential expenditure on R&D by new firms formed as a result of the final rule. The change in patenting due to the rule for each year is calculated as follows:

*Increase in # of Patents = (% Increase in Patenting) * (Total # of Affected Patents)*

The Commission estimates the percentage increase in patenting to average 10.9%–18.7% annually over a ten-year period,[1126] which is the percentage effect on patenting of an average magnitude change in non-compete enforceability, as discussed in Part X.F.5. The Commission assumes that the full effect on patenting phases in over the course of a ten-year period, resulting in an effect of 2.0%–3.4% in the first year, increasing to 19.8%–34.0% by the tenth year.[1127] The total number of affected patents in each year is 156,976.[1128]

The results of the analysis, for the top and bottom end of the reported range of percentage increases in patenting, are displayed in Table 3.

As a sensitivity analysis, mirroring the analysis in Part X.F.6.a, the Commission assumes that enforceability scores in each State will fall to the lowest observed score among States which do not broadly prohibit non-competes. The Commission calculates the percentage change in patenting in each State by extrapolating the

---

[1122] Johnson, Lavetti, & Lipsitz, *supra* note 388.

[1123] *Id.* (note: a new version of this paper, posted in 2023 after the NPRM was published, revised this estimate slightly).

[1124] Starr, Frake, & Agarwal, *supra* note 469.

[1125] The Commission notes that Part IV.B.3.a.ii does not measure or consider whether earnings are transfers or benefits because to the extent that the earnings that are transfers represent firms' ability to suppress earnings using an unfair method of competition, the transfer of such earnings from firms to workers through the use of non-competes still reflect the tendency of non-competes to negatively affect competitive conditions in the labor market.

[1126] These values represent the range reported in Johnson, Lipsitz, & Pei, *supra* note 526, considering both raw patent counts and patent counts weighted by a measure of their quality: the number of citations received in the five years after the patent is granted. The findings by Johnson, Lipsitz, & Pei are qualitatively confirmed in the literature, with similar estimates generated by He (*supra* note 560)—a study discussed in the NPRM—and Rockall & Reinmuth (*supra* note 564).

[1127] This analysis assumes that the effect on patenting increases by an identical amount each year (2.0–3.4%), ensuring that the overall average annual change is equal to that reported in Johnson, Lipsitz, & Pei (*supra* note 526).

[1128] This is the number of granted utility patents, which are patents for new or improved innovation and are the types of patents studied by Johnson, Lipsitz, & Pei (*Id.*). The figure comes from 2020, which is the most recent data available from the U.S. Patent and Trademark Office. It excludes States in which non-competes are not enforceable (California, Oklahoma, North Dakota, and Minnesota). Data available at *https://www.uspto.gov/web/offices/ac/ido/oeip/taf/st_co_20.htm*.

percentage increase in patenting to reflect the size of the change in that State's enforceability score. For example, as noted in Part X.F.6.a, West Virginia's score would fall from 0.59 to 0.53 as a result of this change. The percentage change in patenting in West Virginia would therefore average 9.0%–16.6%,[1129] resulting in an increase of 1.9%–3.6% in the first year, rising to 19.2%–35.6% by the tenth year.

The annual State-specific percentage changes are multiplied by the number of annual patents granted in each State.[1130] Finally, the changes in patenting across States are combined across States for a national estimate. The results are reported in Table 3. As States have broadly decreased legal enforceability of non-competes in recent years, the changes necessary to move to lower enforceability are likely overestimated in this sensitivity analysis. This causes the values estimated by this method to likely overestimate the true extent of the benefit.

### TABLE 3

| Year relative to publication of the rule | Estimated annual count of additional patents using low estimate of innovation effect | Estimated annual count of additional patents using high estimate of innovation effect | Estimated annual count of additional patents using low estimate of innovation effect and extrapolation approach | Estimated annual count of additional patents using high estimate of innovation effect and extrapolation approach |
|---|---|---|---|---|
| 1 | 3,111 | 5,337 | 8,927 | 19,306 |
| 2 | 6,222 | 10,674 | 17,853 | 38,611 |
| 3 | 9,333 | 16,012 | 26,780 | 57,917 |
| 4 | 12,444 | 21,349 | 35,706 | 77,222 |
| 5 | 15,555 | 26,686 | 44,633 | 96,528 |
| 6 | 18,666 | 32,023 | 53,560 | 115,833 |
| 7 | 21,777 | 37,360 | 62,486 | 135,139 |
| 8 | 24,888 | 42,697 | 71,413 | 154,444 |
| 9 | 27,999 | 48,035 | 80,339 | 173,750 |
| 10 | 31,110 | 53,372 | 89,266 | 193,055 |

The Commission is not aware of estimates that assess the overall social value of a patent and therefore the Commission does not monetize the estimated effects on innovative output. Estimates of the effect of a patent on a firm's value in the stock market exist in the empirical literature,[1131] as do estimates of the sale value of a patent at auction.[1132] However, those estimates do not include the effects on follow-on innovation, consumers (who may benefit from more innovative products), competitors, or the rents that are shared with workers, and instead reflect solely the private effect of a patent to the relevant firms.

The Commission notes that patent counts may not perfectly proxy for innovation. However, by using citation-weighted patents, as well as other measures of quality, the study by Johnson, Lipsitz, and Pei shows that patent quality, not just patent quantity, increase when non-competes become less enforceable.[1133] Similarly, the study by He shows that the value of patents also increases when non-competes become less enforceable.[1134]

The second effect of the final rule associated with innovation is a possible change in spending on R&D. The change in R&D spending due to the final rule is calculated as follows:

Reduction in R&D Spending = (% Reduction in Spending) * (Total Affected Spending)

The Commission estimates that the percentage reduction in spending is 0–8.1%, with the broad range reflecting disagreement in the empirical literature.[1135] Total affected spending is $575 billion (in 2023 dollars).[1136] Multiplying the percentage effect by total affected spending, the overall annual effect is a reduction of $0-$47 billion in R&D spending in 2023 dollars.

The Commission notes that, in light of the increases in innovation identified in this Part X.F.6.b, reductions in R&D spending represent a cost savings for firms. Put differently, reductions in R&D spending may cause commensurate reductions in innovative output. Insofar as reductions in R&D spending resulting from the rule could have countervailing effects on innovation, the estimated increase in innovative output represents the net effect, which would otherwise be even larger, if R&D spending were held constant.

Notably, empirical estimates of R&D spending are based on observed changes among incumbent firms and therefore may not reflect market-level effects. Decreased investment at the firm level (the level of estimation in the studies that report effects of enforceability on R&D spending) does not necessarily mean that investment would decrease at the market level, since new firms entering the market may contribute additional R&D spending not captured in the referenced studies. For these reasons, the Commission stops short of classifying the effect on R&D spending as a benefit of the final rule.

The Commission notes that, as discussed in Part X.E, the estimated effects on innovation do not take into account that some senior executives

[1129] Calculated as e^(1.43*0.06) − 1 and e^(2.56*0.06) − 1, where 1.43 and 2.56 represent the coefficients reported in Johnson, Lipsitz, & Pei (*Id.*) as the lower and upper bounds of the reported coefficient range, and 0.06 is the decline in the enforceability score in West Virginia.

[1130] Data available at *https://www.uspto.gov/web/offices/ac/ido/oeip/taf/st_co_20.htm*.

[1131] Leonid Kogan, Dimitris Papanikolaou, Amit Seru, & Noah Stoffman, *Technological Innovation, Resource Allocation, and Growth*, 132 The Quarterly J. of Econ. 665 (2017).

[1132] Ariel Pakes, *Patents as Options: Some Estimates of the Value of Holding European Patent Stocks*, 54 Econometrica 755 (1986).

[1133] Johnson, Lipsitz, & Pei, *supra* note 526.

[1134] He, *supra* note 560.

[1135] Johnson, Lipsitz & Pei (*supra* note 526) find a negative effect on R&D spending of 8.1% due to an average magnitude change in non-compete enforceability, while Jeffers (*supra* note 450) finds no economically or statistically significant effect on R&D spending.

[1136] Total U.S. R&D spending was estimated by the NSF in 2019, the most recent available year with finalized estimates, excluding nonprofits, higher education, and nonfederal and Federal government. Nat'l Ctr. for Sci. and Engrg. Stats., *New Data on U.S. R&D: Summary Statistics from the 2019–20 Edition of National Patterns of R&D Resources* (Dec. 27, 2021), *https://ncses.nsf.gov/pubs/nsf22314*; Nat'l Ctr. for Sci. and Engrg. Stats., *U.S. R&D Increased by $51 Billion in 2020 to $717 Billion; Estimate for 2021 Indicates Further Increase to $792 Billion* (Jan. 4, 2023), *https://ncses.nsf.gov/pubs/nsf23320*. Note that the data are not broken out by State, and therefore the final analysis cannot exclude CA, ND, OK, and MN.

may continue to work under non-competes under the rule. The Commission is unable to separate the effects of senior executives' non-competes from other workers' non-competes on innovation. Some effects estimated in this Part X.F.6.b may occur further in the future than assumed in this analysis, based on the extent of continued use of non-competes for senior executives.

Overall, the Commission finds that the final rule will significantly increase innovation. Furthermore, the increase in innovation may be accompanied by a decrease in spending on R&D that would, thus, be a cost saving to firms.

c. Prices

The Commission finds that consumer prices may fall under the final rule because of increased competition. The only empirical study of this effect concerns physician practice prices. Based on this study, the Commission estimates the ten-year present value reduction in spending for physician and clinical services from the decrease in

prices is $74–$194 billion. The Commission finds some of the price effects may represent transfers from firms to consumers and some may represent benefits due to increased economic efficiency. Some of the benefits may overlap with benefits otherwise categorized, such as benefits related to innovation.

The decrease in prices for physician services because of the final rule is calculated as follows:

*Decrease in Prices = (% Decrease in Prices) * (Total Affected Spending)*

The Commission estimates the percentage decrease in prices for physician services to be 3.5%.[1137] Total spending on physician and clinical services was $801 billion in 2023 dollars, excluding States that broadly do not enforce non-competes.[1138] The Commission separately multiplies spending by 35%, 61.9%, and 75% (estimates of the proportion of hospitals covered by the Commission's jurisdiction as a proxy for total physician and clinical services spending covered by the Commission's

jurisdiction) to arrive at total affected spending.[1139] The ten-year sum of discounted spending decreases for these analyses are presented in Table 4.

As a sensitivity analysis, mirroring the analysis in Part X.F.6.a, the Commission assumes that enforceability scores in each State will fall to the lowest observed score among States which do not broadly prohibit non-competes. The Commission calculates the percentage change in prices in each State by extrapolating the percentage decrease in prices to reflect the size of the change in that State's enforceability score. As noted in Part X.F.6.a, West Virginia's score would fall from 0.59 to 0.53 as a result of this analysis. The percentage decrease in prices in West Virginia would therefore be 2.5%.[1140] This percentage decrease is multiplied by State-specific physician spending, adjusted by the relevant multiplier to account for the Commission's jurisdiction, and summed over States.

The ten-year present discounted value of the spending decreases estimated by this analysis are presented in Table 4.

TABLE 4

| | Assumed percent of physicians covered (%) | Estimated spending reduction over ten years (billions of dollars) assuming: | | |
| --- | --- | --- | --- | --- |
| | | 2% Discount rate | 3% Discount rate | 7% Discount rate |
| Primary estimate (average magnitude enforceability change) ........................ | 35 | $90 | $87 | $74 |
| | 61.9 | 160 | 153 | 131 |
| | 75 | 194 | 186 | 159 |
| Sensitivity analysis (partial extrapolation approach) ........................................ | 35 | 257 | 247 | 211 |
| | 61.9 | 455 | 437 | 373 |
| | 75 | 552 | 529 | 459 |

Several effects of the final rule, including changes in capital investment, new firm formation, and innovation, may possibly filter through to consumer prices. Prices, therefore, may act as a summary metric for the effects on consumers. The Commission notes, however, that prices are an imperfect measure for the effect on consumers. For example, increased innovation catalyzed by the final rule could result

in quality increases in products, which might increase prices (all else equal), but nevertheless, consumers may be better off. New firm formation may result in a broader set of product offerings, even if prices are unaffected. Finally, some portion of this effect may represent a transfer from physician practices to consumers. For all these reasons, as well as to avoid double-counting (since prices may reflect

changes in innovation, investment, market structure, wages, and other outcomes that are measured elsewhere), the Commission considers evidence on prices to be corroborating evidence, rather than a unique cost or benefit, though some portion of the total effect likely represents a standalone benefit of the rule. The Commission also notes increased competition brought about by the final rule will likely increase

---

[1137] 3.5% is calculated as −(e^(0.427 * 0.081) − 1), where 0.427 is the coefficient relating non-compete enforceability and physician prices in Hausman & Lavetti (*supra* note 590), and 0.081 represents the average magnitude non-compete enforceability score, as described in Part X.F.5.

[1138] See *https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Data/NationalHealthExpendData/NationalHealthAccountsStateHealthAccountsProvider.* Spending in 2020, the most recent year with available data, was $679 billion, which is $801 billion adjusted to 2023 dollars. CA, ND, OK, and MN are omitted.

[1139] In the absence of data on the percentage of physician practices that are non-profit, the Commission uses a range of three different assumptions on the share of covered hospitals. In the first two scenarios, the Commission assumes that the set of covered hospitals is all hospitals that are not non-profit. The first scenario uses 2020 data from the American Hospital Association indicating that 65% of hospitals report that they are non-profits (based on data available at *https://www.ahadata.com/aha-dataquery*). The second scenario uses 2017–2021 data from the American Community Survey indicating that 38.1% of hospital employment is at non-profits (see *https://www.washingtonpost.com/business/2023/05/12/*

*force-behind-americas-fast-growing-nonprofit-sector-more*). Finally, consistent with the Commission's findings in Part V.D.4, the percentages of firms that report themselves as nonprofit in the data, which reflects registered tax-exempt status under IRS regulations, does not equate to the Commission's jurisdiction. It is likely the Commission may have jurisdiction over some hospitals and other healthcare organizations identified as nonprofits. Therefore, the third scenario assumes that 75% are covered.

[1140] Calculated as e^(0.427 * 0.06) − 1, where 0.427 is the coefficient reported in Hausman and Lavetti (*supra* note 590), and 0.06 is the decline in the enforceability score in West Virginia.

**JA0137**

consumer quantity, choice, and quality. These effects are not quantified in the literature.

To draw inferences to other industries, the Commission notes that if the relationship between non-compete enforceability and prices observed in healthcare markets holds in other industries, then under the final rule prices would likely decrease, and product and service quality would likely increase. Insofar as such effects may be driven by increases in competition, as discussed in Part IV.B.3.b.iii, *e.g.*, because of new firm formation, it is likely output would also increase. However, the evidence in the literature addresses only healthcare markets and therefore the Commission cannot say with certainty that similar price effects would be present for other products and services.

In many settings, it is possible that increases in worker earnings from restricting non-competes may increase consumer prices because of higher firms' costs.[1141] There is no empirical evidence that enforceability of non-competes increase prices due to increased labor costs. Additionally, greater wages for workers freed from non-competes may result from better worker-firm matching, which could simultaneously increase wages and increase productivity, leading to lower prices.

The Commission notes that, as discussed in Part X.E, the estimates of the effect of the rule on prices do not separately account for the effect of senior executives who may continue to have non-competes under the rule. The Commission is unable to monetize or quantify these effects separately because there is no accounting in the applicable literature of why, nor to which groups of workers, the observed price effects occur. If such non-competes have a large impact, some of the effects estimated in this section may occur further in the future than described in this Part X.F.6.c.

### 7. Costs of the Final Rule

The Commission finds costs associated with the final rule, including legal and administrative costs, and possibly costs related to investment in human capital and litigation, as summarized in Table 1 in Part X.E. The Commission notes the final analysis includes effects on investment in human capital and litigation costs in this Part X.F.7 discussing costs

associated with the final rule, though it is not clear whether effects associated with investment in human capital are costs or benefits, and it is not clear whether litigation costs would rise or fall under the final rule.

#### a. Investment in Human Capital

The Commission estimates the ten-year present discounted value of the net effect of the final rule on investment in human capital (*i.e.*, worker training) ranges from a benefit of $32 billion to a cost of $41 billion. The Commission notes that this wide range represents substantial uncertainty in the interpretation of the estimates that exist in the economic literature. The estimates contained in this Part X.F.7.a are separated along lines created by that uncertainty.

There are two primary sources of uncertainty. The first pertains to the extent to which lost investment in human capital is "core" versus "advanced." As discussed in Part IV.B.3.b.ii, when non-competes are enforceable, fewer workers will be available due to decreased labor mobility, including workers who would be a good skills match for a particular job, as well as workers moving to new industries to avoid triggering a potential non-compete clause violation. This may require retraining of workers forced into a new field that would not otherwise be necessary for an experienced worker within the same industry. The departure of experienced workers from the industry also means firms will be required to invest in the human capital of inexperienced workers who replace them. This type of investment in training to address a skills mismatch—which is referred to as the "core" training scenario—contrasts with what is referred to as the "advanced" training scenario, which is investment in training that builds upon the productivity of workers who may already be experienced in an industry. Insofar as reductions in investment in human capital due to the final rule represent reductions in core investment, the rule will save firms money and will additionally not require workers to forgo time spent producing goods and services to train. Therefore, such reductions would represent a benefit of the final rule. However, insofar as reductions in investment in human capital from the final rule represent reductions in advanced investment, there may be productivity losses for workers. The estimates in the literature do not allow the Commission to distinguish between the types of forgone human capital investment in the final analysis. This final analysis therefore

separately estimates the effects assuming lost investment in human capital is core and assuming it is advanced.

The second source of uncertainty pertains to the specific estimates of the effect of non-compete enforceability on investment of human capital. Starr (2019) estimates the differential effect of non-compete enforceability on training in occupations which use non-competes at a high rate versus those that use non-competes at a low rate but does not estimate the absolute effect on investment across the workforce. Therefore, this final analysis separately estimates the effects on training under two different assumptions—that the increase in training due to greater non-compete enforceability affects all workers, or only workers in high-use occupations—to demonstrate how this uncertainty affects the estimates.[1142]

The Commission notes that some of the estimates described in this Part X.F.7 may overlap with estimates reported in other sections of the regulatory analysis. For example, if decreased enforceability of non-competes decreases investment in workers' human capital, and this decreased investment would be reflected in lower wages for workers, then the estimate of the wage increase resulting from the final rule will already account for the extent to which decreased investment decreases wages. That is, if investment were held constant, the earnings increase associated with the final rule may be even larger.

#### i. Estimates Assuming Lost Investment in Human Capital Is Core Training

The first set of estimates assumes that all lost training is core. This results in estimated effects of the final rule that represent upper bounds on the benefits associated with the final rule's effect on investment in human capital. In these scenarios, the final rule will allow firms to hire experienced workers instead of needing to provide costly training to workers new to the industry or a position. The change in investment in core training brought about by the rule is calculated as follows:

*Effect of Decreased Investment in Core Training = Additional Output of*

---

[1141] Sebastian Heise, Fatih Karahan, & Ayşegül Şahin *The Missing Inflation Puzzle: The Role of the Wage-Price Pass-Through,* 54 J. Money, Credit & Banking 7 (2022).

[1142] Whether this assumption yields an overestimate or underestimate depends on what happens to training of workers in occupations with a low-rate of non-competes use when the enforceability of non-competes changes. If the effect of a change in non-compete enforceability on workers in occupations that use non-competes at a low rate is small, this assumption yields an overestimate of the overall effect on training. If the effect on those workers is large, it results in an underestimate.

*Workers Resulting From Less Time Spent Training + Reduced Direct Outlays on Training*

Additional Output of Workers Resulting From Less Time Spent Training

The first component is additional output of workers resulting from less time spent on otherwise unnecessary training if they were better matched with firm and industry. The change in the output of workers from less time spent training because of the final rule is calculated as follows:

*Additional Output of Workers Resulting From Less Time Spent Training = (Total # of Affected Workers) * (Percentage Point Decrease in Trained Workers) * (Average Hours Spent Training Per Worker) * (Average Hourly Output of Workers)*

The Commission estimates the total number of affected workers as 101.1 million workers, assuming all workers are affected, and 45.3 million workers, assuming only workers in high-use occupations are affected.[1143] The percentage point decrease in trained workers is estimated to be 0.4.[1144] Average hours spent training per worker is estimated to be 85 hours per year.[1145]

Average hourly output of workers is estimated to be $60.77.[1146]

The total additional output due to forgone training time is therefore calculated as $1.9 billion per year when all workers are assumed to be affected, or $0.8 billion per year when only workers in high-use occupations are assumed to be affected.

Reduced Direct Outlays on Human Capital Investment

The second component of the economic effect calculated in the final analysis is reduced direct outlays on human capital investment—or the out-of-pocket cost to firms for training. The change in direct outlays on human capital investment resulting from the rule is calculated as follows:

*Reduced Direct Outlays = [(Total Direct Outlays)/(# of Workers Receiving Training)] * [(Total # of Affected Workers) * (Percentage Point Decrease in Trained Workers)]*

Total direct outlays on human capital investment are estimated to be $105 billion in 2023 dollars.[1147] The estimated number of workers receiving training is 23.5 million workers.[1148] The Commission estimates the total number of affected workers as 101.1 million workers, assuming all workers are affected, and 45.3 million workers, assuming only workers in high-use occupations are affected.[1149] The

percentage point decrease in trained workers is estimated to be 0.4.[1150]

This calculation results in annual cost savings of $1.6 billion, assuming the training rates of workers in all occupations are affected and $0.7 billion assuming the training rates of workers only in high-use occupations are affected. The ten-year present value effects of the final rule on investment in human capital, assuming that lost investment is core investment, discounted at 2%, 3%, and 7% and separately assuming effects on workers in all occupations versus just workers in occupations that use non-competes at a high rate, are presented in the first two rows of Table 5.

ii. Estimates Assuming Lost Investment in Human Capital Is Advanced Training

The second set of estimates of the effects on human capital investment in the final analysis assumes all training is advanced. The Commission begins with the same approach (calculated in Part X.F.7.a.i) to estimate the direct gain in output of workers and reduced direct outlays from foregone advanced human capital investment because such investment is costly for firms and results in decreased time spent on productive activities by workers, regardless of whether the investment is core or advanced. The major difference is that the Commission nets out an additional component which represents lost long-term productivity of workers caused by lost investment in their human capital. The Commission nets out this additional component based on the assumption that advanced human capital investment results in some increased long-term productivity in workers (because it assumes that firms would not otherwise make such a costly investment). This results in estimated effects of the final rule that represent upper bounds on the costs associated with changes in investment in human capital. Therefore, the estimated effect of the rule on advanced human capital investment is calculated as follows:

*Effect of Decreased Investment in Advanced Training = Additional Output of Workers Resulting from Less Time Spent Training + Reduced Direct Outlays on Training − Lost Output Resulting from Foregone Advanced Training*

The first two components—additional output of workers due to less time spent training and reduced direct outlays on training—are calculated in Part X.F.7.a.i. The lost output of workers due to lost investment in their human

---

[1143] Excluding States which broadly prohibit non-competes (CA, ND, OK, and MN), the BLS reports employment of 126.4 million individuals in May 2022 (the most recent year with occupation-specific data available), 56.6 million of whom work in occupations that use non-competes at a high rate, as defined in Starr, *supra* note 445; *see https://www.bls.gov/oes/tables.htm*. The Commission estimates that 80% of employed individuals are covered by the Commission's jurisdiction (see Part X.F.4.a), resulting in 101.1 million covered workers, 45.3 million of whom work in high-use occupations. The Commission notes that these estimates include public employment, as data on occupation-specific employment at the State level are not available by firm ownership. Occupation-specific employment data are necessary to split workers into low- and high-use occupations. Workers including those estimated to be bound by non-competes and those who are not are included in this estimate, since the empirical estimate of the increase in training reflects a sample representative of the increase in training due to an average magnitude change of 0.081, not just those bound by non-competes.

[1144] The coefficient reported by Starr (*supra* note 445), 0.77%, corresponds to a one standard deviation increase on Starr's scale, and represents the percentage point effect on the percentage of workers trained (rather than the amount of training they receive). Rescaling to a scale of zero to one, a one standard deviation increase is equal to a change in the enforceability measure of 0.17. Since estimates for earnings and innovation use a mean enforceability change of 0.081 on a scale of zero to one, the coefficient in Starr is rescaled to 0.77 * (0.081/0.17) = 0.364%, which represents the change in the fraction of covered workers receiving training due to an average magnitude change of 0.081.

[1145] 85 hours per year is calculated as 5.7 weeks per year * 20.1 hours per week * 73.9%, where 73.9% is the percentage of training that is firm-sponsored (the type of training likely to be affected by the final rule). These three estimates (5.7 weeks per year, 20.1 hours per week, and 73.9% of training being firm sponsored) are estimated in

Harley J. Frazis & James R. Spletzer, *Worker Training: What We've Learned from the NLSY79,* 128 Monthly Lab. Rev. 48 (2005).

[1146] The Commission assumes that the average hourly output of workers is twice their average earnings and estimates average earnings to be $30.38 per hour, which is the average hourly earnings for workers in training ages 22–64 currently holding one job in the Survey of Income and Program Participation for all waves from 1996 to 2008. The dollar value is adjusted to 2023 dollars.

[1147] 2022 Training Industry Report, Training Magazine (Nov. 2022) at 17.

[1148] Calculated as 15.8% * 148.9 million, where 15.8% is the percentage of workers who receive training, according to Frazis & Spletzer *supra* note 1145 at 48. 148.9 million is the estimated number of workers in the U.S. in May 2022 according to *https://www.bls.gov/oes/tables.htm*. Note that all workers are included in this estimate (not just workers in States which enforce non-competes) because the estimate of training expenditures also covers all workers.

[1149] Excluding States which broadly prohibit non-competes (CA, ND, OK, and MN), the BLS reports employment of 126.4 million individuals in May 2022 (the most recent year with occupation-specific data available), 56.6 million of whom work in occupations that use non-competes at a high rate, as defined in Starr (*supra* note 445) (*see https://www.bls.gov/oes/tables.htm*). The Commission estimates that 80% of employed individuals are covered by the Commission's jurisdiction (see Part X.F.4.a), resulting in 101.1 million covered workers, 45.3 million of whom work in high-use occupations. *See supra* note 1143.

[1150] As discussed in Part X.F.7.a.i.

capital due to the rule in each year is calculated as follows:

*Lost Output from Lost Investment in Human Capital = (Total # of Affected Workers) * (Percentage Point Decrease in Trained Workers) * (Average Hourly Output of Workers) * (Average Hours Worked per Year) * (% Productivity Loss)*

The Commission estimates the total number of affected workers as 101.1 million workers, assuming all workers are affected, and 45.3 million workers, assuming only workers in high-use occupations are affected.[1151] The percentage point decrease in trained workers is estimated to be 0.4.[1152] Average hourly output of workers is estimated to be $60.77.[1153] The average number of hours worked per year is 1,784.[1154] The Commission assumes the percent productivity loss to be 6.4%.[1155]

In the first year, this yields a total estimate of lost output from lost investment in human capital of $1.5 billion or $0.7 billion (under the separate assumptions of all workers being affected and only high-use occupation workers being affected). Since the returns to advanced training persist to some extent over time, in the second year, returns to advanced training from the first year are assumed to depreciate by 20%,[1156] and the calculation is redone according to the depreciated return to advanced training. In the third year, training from the first year again depreciates, and so on until the tenth year (the end of the horizon considered).

Additionally, in the second year, a new round of advanced training is forgone. An additional $1.5 billion or $0.7 billion in lost output is therefore incurred in the second year under the final rule, and the depreciation calculations are again repeated for the new round of advanced training until year ten. New rounds of advanced training are forgone in each year through the tenth. Lost output from lost advanced training in the tenth year is therefore the sum of a depreciated return to training from each of the prior nine years plus lost output from lost training in the tenth year itself.

To arrive at estimates of overall lost productivity due to lost advanced training, lost productivity in each year (separately due to lost training in each prior year) is added together. Finally, lost productivity due to lost advanced training is subtracted from the two components calculated in Part X.F.7.a.i (additional output of workers from less time spent training and reduced direct outlays). The ten-year discounted effects of the final rule on investment in human capital, assuming lost investment is advanced training investment, discounted at 2%, 3%, and 7%, and separately assuming workers in all occupations versus just workers in occupations that use non-competes at a high rate, are presented in the last two rows of Table 5.

TABLE 5

| | 2% Discount rate | 3% Discount rate | 7% Discount rate |
|---|---|---|---|
| Estimated discounted ten-year effect assuming lost training is core and workers in all occupations are affected ........... | $32 | $31 | $27 |
| Estimated discounted ten-year effect assuming lost training is core and workers in high-use occupations are affected ........... | 14 | 14 | 12 |
| Estimated discounted ten-year effect assuming lost training is advanced and workers in all occupations are affected ........... | −41 | −39 | −31 |
| Estimated discounted ten-year effect assuming lost training is advanced and workers in high-use occupations are affected ........... | −19 | −17 | −14 |

**Note:** All values in billions of 2023 dollars. Negative values represent net cost estimates, while positive values represent net benefit estimates.

As discussed in Part X.E, the Commission notes that the estimates in this Part X.F do not account for senior executives who continue to work under non-competes under the rule. If the effects on training are due to effects on such senior executives, then the effects discussed herein would occur further into the future than discussed.

b. Legal and Administrative Costs Related to Compliance

The Commission finds that firms with existing non-competes will have related legal and administrative compliance costs as a result of the final rule. The Commission quantifies and monetizes these costs and conducts related sensitivity analyses.

i. Legal Costs

The Commission finds one-time legal costs related to firms' compliance with the final rule are estimated to total $2.1-$3.7 billion. The Commission estimates two main components of legal costs: (1) updating existing employment agreements or terms to ensure new hire employment terms comply with the final rule; and (2) advising employers about potential operational or contractual changes for workers who will no longer have enforceable non-competes. The latter includes determination of workers whose non-competes are no longer enforceable

---

[1151] Excluding States which broadly prohibit non-competes (CA, ND, OK, and MN), the BLS reports employment of 126.4 million individuals in May, 2022 (the most recent year with occupation-specific data available). 56.6 million of whom work in occupations that use non-competes at a high rate, as defined in Starr (*Id.*) (see *https://www.bls.gov/oes/tables.htm*). The Commission estimates that 80% of employed individuals are covered by the Commission's jurisdiction (see Part X.F.4.a), resulting in 101.1 million covered workers, 45.3 million of whom work in high-use occupations. *See supra* note 1143.

[1152] As discussed in Part X.F.7.a.i.

[1153] The Commission assumes that the average hourly output of workers is twice their average

earnings and estimates average earnings to be $30.38 per hour, which is the average hourly earnings for workers in training ages 22–64 currently holding one job in the Survey of Income and Program Participation for all waves from 1996 to 2008. The dollar value is adjusted to November 2023 dollars using *https://www.bls.gov/data/inflation_calculator.htm*.

[1154] See *https://fred.stlouisfed.org/release/tables?rid=50&eid=6462&snid=6449*, which reports average weekly hours and overtime of all employees on private nonfarm payrolls by industry sector, seasonally adjusted. The reported value, 34.3, is multiplied by 52 to get annual hours worked.

[1155] This figure is the midpoint of two estimates in the literature: Harley Frazis & Mark A.

Loewenstein, *Reexamining the Returns to Training: Functional Form, Magnitude, and Interpretation,* 40 J. Hum. Res. 453 (2005) [3.7%] and Gueorgui Kambourov, Iourii Manovskii, & Miana Plesca, *Occupational Mobility and the Returns to Training,* 53 Can. J. of Econ. 174 (2020) [9.1%].

[1156] There is no perfect estimate of the rate of human capital depreciation in the economic literature. Studies typically make assumptions they deem reasonable to estimate this rate, with 20% representing neither the low end nor the high end of the range of such assumptions. *See, e.g.,* Rita Almeida & Pedro Carneiro, *The Return to Firm Investments in Human Capital,* 16 Lab. Econs. 97 (2009), who assume that the human capital depreciation rate may range from 5% to 100%.

**JA0140**

under the rule, as opposed to those that fall under the exemption for senior executives.

For the first component, firms must consider what changes to their contractual practices are needed to ensure that incoming workers are not offered or subject to non-competes and what revisions to human resources materials and manuals are needed to ensure they are not misused on a forward-going basis. Firms may respond by removing specific non-compete language from standard contracts and human resources (H.R.) materials and manuals used for future employees. The second component involves strategic decisions and changes in response to the final rule. For example, firms may adjust other contractual provisions such as NDAs. This legal work is not mandated or required by the rule; it would be undertaken only by the subset of firms and workers for whom firms conclude that such alternatives would be desirable. Additionally, such adjustments are likely unnecessary for senior executives whose non-competes continue to be enforceable under the rule. Therefore, this component additionally involves identifying senior executives whose existing non-competes are unaffected. For any such legal work, firms may use in-house counsel or outside counsel.

Legal costs are therefore calculated as follows:

*Legal Costs = Modify Standard Contract Language/H.R. Materials and Manuals Costs + Revise Contractual Practices Costs*

One component of the legal cost will be due to the modification of standard contracts to remove prohibited language regarding non-competes which is calculated as follows:

*Modify Standard Contract Language/ H.R. Materials and Manuals = (Average Hours Necessary for Modification) * (Cost per Hour) * (# of Affected Businesses)*

The Commission estimates that, on average, modifying standard contract language and H.R. materials and manuals would take the equivalent of one hour of a lawyer's time.[1157] The estimated cost per hour is $134.62 in 2023 dollars,[1158] and the number of

affected businesses is 3.4 million.[1159] This results in a total one-time modification cost of $457 million.

Another component of legal costs relates to any firm-level revision to their contractual practices, including identification of senior executives, which is calculated as follows:

*Revise Contractual Practices Costs = (Average Hours Necessary to Update Contractual Practices) * (Cost per Hour) * (# of Affected Businesses)*

The Commission estimates the average firm employs the equivalent of four to eight hours of a lawyer's time to update its contractual practices and determine which employees may fall under the final rule's exemption.[1160] The Commission estimates the cost of a lawyer's time to be $134.62 as discussed in this Part X.F.7.b.i. The number of affected businesses is estimated to be 2.9 million.[1161]

---

*lawyers.htm.* As in Part X.F.7.a, the Commission doubles this number to reflect the lost productivity of the worker.

[1159] Calculated as 6.88 million * 0.494. Here, 6.88 million is the number of establishments in the U.S. (excluding California, North Dakota, Oklahoma, and Minnesota, where non-competes are broadly unenforceable) in 2021 (the most recent year with data available): see *https://www.census.gov/data/ tables/2021/econ/susb/2021-susb-annual.html.* This value is multiplied by 49.4%, the percentage of firms using non-competes in the U.S. according to Colvin & Shierholz (*supra* note 65).

[1160] The Commission emphasizes that this is an average to underscore there would likely be large differences in the extent to which firms update their contractual practices. Many firms, including those that use non-competes only with workers who do not have access to sensitive information, or those which are already using other types of restrictive employment provisions to protect sensitive information, may opt to do nothing. There is evidence indicating firms that use non-competes are already using other types of restrictive employment provisions: Balasubramanian et al. (2024) find that 95.6% of workers with non-competes are also subject to an NDA, 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and that 74.7% of workers with non-competes are also subject to all three other types of provisions. See Balasubramanian, Starr, & Yamaguchi (*supra* note 74). Other firms may employ several hours or multiple days of lawyers' time to arrive at a new contract. The estimated range of four to eight hours represents an average taken across these different possibilities. For example, if two-thirds of firms that currently use non-competes opt to make no changes to their contractual practices (for example, because they are one of the 97.5% of firms which already implement other post-employment restrictions, or because they will rely on trade secret law in the future, or because they are using non-competes with workers who do not have access to sensitive information), and one-third of such firms spend (on average) the equivalent of 1.5 to 3 days of an attorney's time, this would result in the estimate of 4–8 hours on average.

[1161] Calculated as 5.91 million * 0.494. Here, 5.91 million is the number of firms in the U.S. (excluding California, North Dakota, Oklahoma, and Minnesota, where non-competes are broadly unenforceable) in 2021 (the most recent year with data available): see *https://www.census.gov/data/*

---

Under the assumption that the average firm that uses a non-compete employs the equivalent of four to eight hours of a lawyer's time, the total one-time expenditure on revising contractual practices would range from $1.6 billion (assuming four hours are necessary) to $3.1 billion (assuming eight hours are necessary).

Some commenters indicated that some firms may use outside counsel, which is more costly to firms, to remove non-competes from contracts of incoming workers and to update contractual practices. While commenters did not provide data to support this assertion, as a sensitivity analysis, the Commission replaces the estimate of the hourly earnings of a lawyer with an estimate of the cost of outside counsel ($483 per hour), conservatively overestimating costs by using the estimated rate of a tenth-year lawyer.[1162] Under this sensitivity analysis, the Commission estimates the total cost of ensuring that incoming workers' contracts do not contain non-competes would be $1.6 billion and the cost of updating contractual practices would be $5.6–$11.3 billion. Some commenters stated that the hourly cost of lawyers' time may be even greater than the value assumed in the sensitivity analysis ($483 per hour). The Commission finds that the sensitivity analysis assuming a rate of $438 per hour provides a reasonable estimate of the costs under the assumption that outside counsel would be used, and that higher rates (*e.g.,* $749 per hour, as stated by one commenter) are unreasonably high, especially as an average across many firms.

The Commission believes the exclusion of existing non-competes with senior executives could result in lower net legal costs than the Commission's estimate. First, for senior executives who currently work under a non-compete, firms will have a longer time period during which they may update

---

*tables/2021/econ/susb/2021-susb-annual.html.* This value is multiplied by 49.4%, the percentage of firms using non-competes in the U.S. according to Colvin & Shierholz (*supra* note 65). The Commission notes that this analysis assumes that decisions regarding protection of sensitive information and contract updating are made at the firm (a collection of establishments under shared ownership and operational control), rather than establishment, level, since sensitive information is likely shared across business establishments of a firm. This explains the difference between the number of businesses used here (2.9 million) versus the number used to calculate the cost of contract revision (3.4 million).

[1162] This estimate is drawn from the Fitzpatrick Matrix. *See supra* note 1087 and accompanying text. Note that the Commission does not double this number to reflect productivity, since the cost of outside counsel's time likely already reflects the productivity of that worker.

---

[1157] This process would likely be straightforward for most firms (*i.e.,* simply not using non-competes or removing one section from a boilerplate contract). There may be firms for which it is more difficult and requires more time. This analysis uses an average time spent of one hour, which conservatively represents the *average* time spent to do so, and accounts for variation across firms.

[1158] According to BLS, the median wage for a lawyer was $65.26 per hour in 2022, or $67.31 in 2023 dollars. See *https://www.bls.gov/ooh/legal/*

---

JA0141

contractual practices. For example, for a senior executive who does not change jobs for 5 years after the compliance date of the final rule, the firm will have 5 years to determine how it wants to update contractual practices for an incoming senior executive who replaces the current one. Delaying costs in this way reduces their economic effect due to discounting. Additionally, if a senior executive remains in their job for over ten years, then the cost of updating contractual practices would fall outside the scope of the Commission's estimates altogether.

At the same time, when the final rule goes into effect, firms will need to identify senior executives whose existing non-competes are not covered by the final rule in order to determine which contractual practices they may need to update immediately. The Commission does not include a separate legal cost for identifying senior executives and estimates the range of attorney time for revising contractual practices under the final rule, which encompasses identifying senior executives, to be the same as the estimate for the proposed rule—4 to 8 hours. This is in part because the strategic considerations involved in revision of contractual practices will likely include such identification. Moreover, the Commission believes the identification of such workers will not be difficult or time consuming. Firms can use the compensation threshold to rule out the vast majority of workers from the exemption and the definition of senior executive in § 910.1 includes clear duties to determine whether any executives who meet the compensation threshold are senior executives under the final rule. It also provides that the CEO and/or president of a firm is a senior executive without the need to conduct any duties analysis.

Another reason the Commission does not add to its estimate of 4 to 8 hours to account for identification of senior executives is that excluding existing non-competes with senior executives would otherwise decrease this estimate, likely to a greater degree than the cost of identifying senior executives. As noted, a significant amount of time spent by attorneys as estimated in the NPRM was intended to account for revising contractual practices for more complex agreements. Commenters noted that employment terms with senior executives are often individualized so that attorney and firm time would be spent on their agreements regardless of whether a non-compete may be included. Since firms use non-competes

for senior executives at a high rate,[1163] revising contractual practices for senior executives may constitute a significant portion of the overall estimate of the cost of revising contractual practices, and given their exclusion, the Commission finds that the cost estimate for revising contractual practices likely represents an overestimate overall. The Commission does not, however, reduce its final cost estimates to account for this change. As noted in Part X.D, this final analysis generally does not account for the temporal difference in coverage of non-competes for senior executives. The same is true here and, to be consistent across the estimates in this final regulatory analysis, the Commission does not estimate a reduction in legal cost but notes potential bases for differences in estimates where relevant.

Overall, the Commission acknowledges that there may be substantial heterogeneity in the costs for individual firms; however, these numbers may be overestimates. For firms whose costs of removing non-competes for incoming workers is greater, the work of ensuring that contracts comply with the law would overlap substantially with the costs of updating contractual practices.

ii. Administrative Costs for Notification Requirement

The Commission finds the total one-time costs for implementing the notification requirement are estimated to be $94 million. These costs relate to the provision of notice to workers other than senior executives as required by § 910.2(b). Notably, firms may use the model notice language provided by the Commission, and the form of this model notice enables firms to choose to send the notice to workers regardless of whether they have non-competes as described in Part IV.E. The notice provision cost is calculated as follows:
Notice Provision Cost = Digital Notice Provision Cost + Mailed Notice Provision Cost

The first component, digital notice provision costs, are calculated as follows:
Digital Notice Provision Costs = (Average Hours Necessary to Compose and Send Notice) * (Cost per Hour) * (# of Affected Businesses)

The Commission estimates that 20 minutes (¹⁄₃ of one hour) are necessary for a human resources specialist to compose and send this notice in a digital format to all of a firm's workers

who are not senior executives [1164] and applicable former workers, on average.[1165] The cost per hour is estimated to be $63.70.[1166] The estimated number of affected businesses is 3.4 million.[1167] The digital notice provision cost is therefore estimated to be $72 million.

Businesses may not have digital contact information for some workers. The cost of mailed notice provision would include the cost of postage and the cost of a human resource professional's time. Mailed notice provision costs are therefore calculated as follows:

Cost of Mailed Notice Provision = Number of Workers with Non-competes Receiving Physical Notice * (Cost of One Printed Page + Mailing Cost + Cost of Human Resource Professional's Time)

The number of workers with non-competes receiving physical notice is the total number of covered workers (101.1 million; see Part X.F.7.a.i) times the percentage of workers who have non-competes (18.1%) times the percentage of workers who require mailed notice (assumed to be 66% of workers [1168]), for a total of 12.3 million workers. The Commission notes that the percentage of workers who require mailed notice is likely a substantial overestimate, since it is estimated based on the percentage of individuals who receive health information digitally. The Commission believes employers are more likely to have digital means of providing the notice to their current workers especially, but also to their

---

[1163] More than 60%; see Part I.B.2.

[1164] The Commission notes that identification of such workers is accounted for in revision of contract costs calculated in Part X.F.7.b.i.

[1165] See, e.g., the supporting statement for the Notice of Rescission of Coverage and Disclosure Requirements for Patient Protection under the Affordable Care Act (CMS–10330/OMB Control No. 0938–1094) at 5, which estimates time spent customizing and sending similar notice. Available at https://www.reginfo.gov/public/do/DownloadDocument?objectID=119319401.

[1166] According to BLS, the median wage for a human resources specialist was $30.88 per hour in 2022, which is equivalent to $31.85 in November 2023 dollars, updated for inflation using https://www.bls.gov/data/inflation_calculator.htm. See https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm. As in Part X.F.7.a, the Commission doubles this number to reflect the lost productivity of the worker.

[1167] As calculated in Part X.F.7.b.i., the Commission conservatively assumes that each establishment—a physical location of a business—must engage in its own communication, and that each establishment has digital contact information for at least one worker, and will therefore engage in digital notice provision.

[1168] See infra note 1165 (CMS Supporting Statement assumes 66% of workers require mailed notice from their health insurance companies).

former workers. The Commission adopts this estimate as an upper bound.

The cost per worker is estimated as 5 cents for one printed page plus mailing cost of 70 cents plus one minute of an HR professional's time, at $63.70 per hour, for a total of $1.81 per notice. The overall cost of mailed notice provision is therefore estimated to be $22 million. The total cost of the notice provision is therefore $94 million.

Commenters stated that it may take two hours of a legal professional's time to provide notice. The Commission finds this estimated time to be a substantial overestimate and reiterates that this analysis incorporates a legal professional's time necessary to identify senior executives and to strategize updates to firm contractual practices into its estimate of legal costs in

X.F.7.b.i. The model notice language alleviates the need for a legal professional's time and the Commission finds it unreasonable to assume such a notice would need to actually be sent by a legal professional. While firms may opt to use original language drafted by an attorney to notify workers, the Commission notes that the model language satisfies the notification requirement and therefore does not include the cost of original language as a regulatory cost estimate in the final analysis. However, under these assumptions, the cost of providing the notice is estimated at $5.2 billion.

The Commission notes that communication is conducted at the establishment level and time costs do not vary based on the number of

existing senior executives with non-competes that the final rule does not cover. While establishments with only senior executives with non-competes would not incur any notification costs because the final rule does not cover existing non-competes with senior executives, without an estimate of the percentage of firms for which this is true, the Commission conservatively assumes that all establishments estimated to use non-competes engage in this notification.

Legal and administrative costs are summarized in Table 6. The Commission notes that, since all costs are assumed to be borne in the first year, there is no discounting applied and therefore only one estimate for each analysis is presented.

TABLE 6

|  | $ billions |
| --- | --- |
| **Cost of modifying standard contract language/H.R. materials and manuals** | |
| Primary ............................................................................................................................................................ | $0.5 |
| Sensitivity analysis (outside counsel cost of $483) ......................................................................................... | 1.6 |
| **Cost of reviewing and revising contractual practices** | |
| Primary, four hours ........................................................................................................................................... | 1.6 |
| Primary, eight hours .......................................................................................................................................... | 3.1 |
| Sensitivity analysis (four hours, outside counsel cost of $483) ....................................................................... | 5.6 |
| Sensitivity analysis (eight hours, outside counsel cost of $483) ..................................................................... | 11.3 |
| **Administrative Costs for Notification Requirement** | |
| Primary .............................................................................................................................................................. | 0.09 |

c. Litigation Effects

Theoretically, under the final rule, certain litigation costs may fall. Litigation related to non-competes may decrease because the final rule creates bright line rules, reducing uncertainty about the enforceability of non-competes. On the other hand, litigation costs may rise if firms turn to litigation to protect trade secrets and if litigation is more expensive than enforcing (or threatening to enforce) non-competes, and/or if firms elect to litigate over what constitutes a non-compete.

The Commission finds there are plausible but directionally opposite theoretical outcomes for the different types of litigation that may be affected by the final rule. In fact, some recent evidence suggests trade secret litigation falls as a result of bans on non-competes taking effect.[1169] The Commission finds

no evidence increased litigation will result in increased costs associated with the final rule. The Commission cannot quantify or monetize the overall effect as a cost or benefit, but estimates the magnitude of any change would be sufficiently small as to be immaterial to the Commission's assessment of whether the benefits of the rule justify its costs.

8. Transfers

As discussed in Part X.F.6.a, some portion of the earnings effect associated with the final rule represents a transfer: while workers may earn more with greater productivity resulting from the rule, some of their earnings increase may result from enhanced bargaining power, which constitutes a transfer from firms to workers.

Similarly, some portion of the price effects associated with the final rule represents a transfer: while consumers may achieve greater surplus with increased competition, the price decrease itself is partially a transfer from firms to consumers.

9. Distributional Effects

The Commission finds several distributional effects associated with the final rule, including those associated with firm expansion and formation, distributional effects on workers, and labor mobility, as summarized in Table 1 in Part X.E.

a. Firm Expansion and Formation

When non-competes are prohibited, new firms may enter the market but incumbent firms may opt to invest less in capital, leaving the overall effect on total capital investment unclear. Similarly, while new firms may enter the market, it is theoretically possible that incumbent firms may exit the market without the ability to use non-competes (though no evidence of this

[1169] Greenwood, Kobayashi, & Starr, *supra* note 757. The Commission notes that this study supplements—but is not necessary to support—its finding that no evidence supports the conclusion

that litigation costs will increase under the final rule. That finding is based on the Commission's expertise and the rulemaking record, including relevant comments. This study was published after the close of the comment period.

effect exists) or contract. Research finds that decreased non-compete enforceability increases new firm formation by 2.7% and may have no effect on capital investment or may decrease capital investment at incumbent firms by up to 7.9%. To the extent there may be a decrease in capital investment at incumbent firms as a result of the final rule, it may represent a shift in productive capacity from incumbent firms to new firms. As discussed in Part IV.D, another purported justification for non-competes is that they allow firms to protect trade secrets, which in theory might allow firms to share those trade secrets more freely with workers, and so improve productivity. However, no empirical evidence substantiates this claim or would allow quantification or monetization of this effect.

Empirical evidence has studied parts, but not all, of the contrasting effects on capital investment and new firm formation. Studies have examined effects of non-competes on capital investment by large, publicly traded firms, who are likely incumbents.[1170] However, no study examines the effect of capital investment economy-wide, nor does any study specifically examine capital investment for new firms. Similarly, studies have examined new firm formation, but no studies look at firm exit among incumbents.

It is thus not possible to measure the benefit and costs of the full economy-wide effects on firm expansion and formation. The calculations that may be performed using available data will necessarily omit components of the tradeoff. The final analysis therefore quantifies the effects that the literature has examined but does not monetize those effects.

### i. Capital Investment

Research finds that capital investment for incumbent firms at the firm level may decrease under the final rule for the economy as a whole, though effects for high-tech industries may be positive, negative, or close to zero. The Commission notes that the capital investment discussed in this Part X.F.9 relates to tangible capital, does not reflect capital investment by newly-formed firms, and is distinct from R&D spending, which is discussed in Part X.F.6.b.

One estimate of the overall effect of non-compete enforceability on capital investment by incumbent firms, which some commenters pointed to, is estimated with substantial uncertainty

and is statistically indistinguishable from zero (*i.e.,* statistically insignificant): a decline in capital investment of 7.9% for the average incumbent publicly-traded firm.[1171] Another study finds no effect on capital investment, but includes the use of non-competes in its estimating procedure, leading to concerns that the finding does not support a causal interpretation, as explained in Part IV.A.2.[1172]

The Commission notes two additional estimates specific to high-tech or knowledge firms: a decline in capital investment among incumbent publicly-traded firms of 34%–39% (an estimate which corresponds to the estimate of a decline of 7.9% when all publicly traded firms are examined),[1173] and an increase in capital investment of 3.1% for the average publicly-traded high-tech firm (an estimate that is statistically insignificant).[1174] The Commission notes the study finding an increase in capital investment of 3.1% uses a more granular measure of non-compete enforceability than the study finding a decrease of 34%–39%, and the Commission therefore gives it more weight.[1175]

The Commission reiterates that any change in investment at the firm level does not necessarily mean investment would change at the market level, since increased firm entry may also increase the employed capital stock and investment in that capital stock, which may offset any possible decreases in investment for incumbent firms. These potential positive offsetting effects are not captured in the estimates herein.

### ii. New Firm Formation

Research finds that new firm formation increases by 2.7% across the economy due to decreases in non-compete enforceability.[1176] The

Commission also notes an estimate specific to high-tech industries: that decreases in non-compete enforceability led to a 3.2% increase in the establishment entry rate.[1177]

The benefits associated with new firm entry may include added surplus for consumers (*e.g.,* from increased competition) or workers (from expanded labor demand). However, the Commission is unable to quantify those beneficial effects, though some may be captured by the effect on prices discussed in Part X.F.6.c. Nor is it able to quantify whether existing firms might exit or contract in response to this new firm entry (*i.e.,* whether the new firms' output would be wholly additive or crowd out some amount of existing firms' output). New firm entry may also drive some of the innovative effects of the final rule if new firms are engaging in substantial innovation.

Overall, the Commission finds that the rule will likely result in a 2.7% increase in new firm formation and is unable to quantify the net effects of this on the productive capacity of the economy. Benefits from new firm entry and possible costs from decreased capital investment may offset each other but the degree to which this happens is not quantifiable. The effect of the final rule on firm expansion and formation likely results in productive capacity shifting from incumbent firms to new firms. Consistent with findings in Part IV.B.3.b.iii, productive capacity shifting from incumbent to new firms may decrease concentration, possibly contributing to decreases in prices, as discussed in Part X.F.6.c.

---

[1170] Jeffers, *supra* note 450; Johnson, Lipsitz, & Pei, *supra* note 526.

[1171] The increase, 7.9%, is calculated as 0.00317/0.04, where 0.00317 is the reported coefficient (Table 4, Panel A, Column 1), and 0.04 is the mean investment per million dollars of assets ratio, across all firms (Table 2, Panel C). Due to statistical uncertainty, the estimate cannot rule out (with 95% confidence) values ranging from a *gain* in capital investment equal to 6.7% to a *loss* in capital investment equal to 22.5% for the average firm. See Jeffers, *supra* note 450.

[1172] Shi, *supra* note 84.

[1173] Jeffers, *supra* note 450. The estimate pertains to firms in Technology and Professional, Scientific, and Technical Services.

[1174] Johnson, Lipsitz, & Pei, *supra* note 526. The estimate pertains to firms classified as high-technology by the National Science Foundation: see *https://nsf.gov/statistics/seind14/index.cfm/chapter-8/tt08-a.htm.*

[1175] The two studies are otherwise identical in the extent to which they satisfy the criteria for assessing empirical research laid out in Part IV.A.2.

[1176] Jeffers (*supra* note 450) does not report an effect for the economy as a whole. However, Jeffers reports coefficients of −0.103 for the effect of

increased non-compete enforceability on firms founded per million people in knowledge-sector industries and 0.008 for non-knowledge sector industries, with respective sample sizes of 78,273 and 190,665 (Table 9, Panel A, Columns 1 and 2). Using the sample sizes as weights, the Commission estimates a weighted average of these coefficients of −0.024. Applying this estimate to the average number of firms founded per million people (Table 2, Panel B) results in an estimated increase in new firm formation of 2.7%. The Commission did not calculate the effect for the economy as a whole in the NPRM. The NPRM reported that increases in non-compete enforceability decreased new firm entry by "0.06 firms per million people (against a mean of 0.38) for firms in the knowledge sector," NPRM at 3526, which was consistent with the version of the Jeffers study cited in the NPRM. The final rule cites the updated version of the Jeffers study, published in 2024. The Commission notes that estimation of the uncertainty in the combined estimated coefficients, which is not reported in Jeffers' study. See Jeffers, *supra* note 450.

[1177] Johnson, Lipsitz, & Pei, *supra* note 526. The estimate pertains to firms classified as high-technology by the National Science Foundation: see *https://nsf.gov/statistics/seind14/index.cfm/chapter-8/tt08-a.htm.*

### b. Distributional Effects on Workers

The Commission finds that the final rule may reduce gender and racial earnings gaps, may especially encourage entrepreneurship among women, and may mitigate legal uncertainty for workers, especially relatively low-paid workers.

Specifically, the Commission finds gender and racial wage gaps may close significantly under a nationwide prohibition on non-competes, according to economic estimates.[1178] Another estimate indicates that the negative effect of non-compete enforceability on within-industry entrepreneurship is significantly greater for women than for men.[1179]

The Commission finds the rule may be especially helpful for relatively low-paid workers, for whom access to legal services may be prohibitively expensive. Workers generally may not be willing to file lawsuits against deep-pocketed employers to challenge their non-competes, even if they predict a high probability of success. The Commission finds that the bright-line prohibition in the final rule, which the Commission could enforce, may mitigate uncertainty for workers.[1180]

### c. Labor Mobility

The Commission finds the overall effect of the final rule on turnover costs due to increased labor mobility is ambiguous and represents a distributional effect of the rule. The Commission finds turnover costs for firms seeking new workers may fall with a greater availability of experienced labor. For firms losing workers newly freed from non-competes, the Commission estimates the effect of the final rule to be $131 per worker with a non-compete. The Commission therefore finds the effect on turnover costs represents a distributional effect of the final rule because it costs firms that use non-competes to constrain workers and benefits firms that do not.

To calculate the potential $131 increase in turnover costs for workers whose non-competes are no longer enforceable after the rule, this final analysis calculates:

*Additional Turnover Cost per Worker with a Non-compete = (Baseline Turnover Rate) * (% Increase in Turnover) * (Rate of Use of Non-competes in Affected Industries) * (Overall Earnings of Affected Workers) * (Cost of Turnover as % of Earnings)/(Number of Workers in*

*Affected Industries with Non-competes)*

The Commission estimates the baseline turnover rate, *i.e.,* the turnover rate in the status quo, to be 47% annually.[1181] The estimated percent increase in turnover from the final rule is 1.0%.[1182] The estimated rate of use of non-competes in affected industries is 23.9%.[1183] Estimated overall earnings of affected workers is $5.25 trillion.[1184] The estimated cost of turnover as a percentage of earnings is 25%.[1185] Finally, the estimated number of workers in affected industries with non-competes is 11.8 million.[1186]

The annual estimated increase in turnover costs per worker with a non-compete is $131.

The Commission notes the actual costs of turnover to businesses may be substantially lower under the final rule than this estimate reflects. This is because the specific components of turnover costs—finding a replacement, training, and productivity—are likely to be affected by the final rule. An increased availability of experienced workers results when non-competes no longer constrain those workers, and finding replacements will be less costly to firms. Additionally, training should not be counted in the costs of turnover presented in this Part X.F.9.c, since it is separately accounted for in Part X.F.7.a, but is nevertheless included in the 25% estimate used to arrive at the estimate of $131 per worker with a non-compete, since there is no reliable way to remove training costs from that estimate; it is thus double-counted. Finally, because the Commission finds increased labor mobility will likely increase worker

productivity due to better matching between workers and firms, the cost of lost productivity will be lower. The cost of lost productivity will also be lessened because the pool of workers available to firms may be more talented or experienced, since such workers would no longer be bound by non-competes (relative to new entrants to the workforce, who are not experienced and also are not bound by non-competes). This would allow firms to recruit workers who are more likely to be highly productive upon entry at a new job.

The Commission reiterates its finding that the costs of turnover for many firms may diminish due to a more plentiful supply of available labor. Without estimates of the effect of the final rule on the cost of recruiting a worker, the net effect of the final rule on turnover costs is not quantified.

### 10. Break-Even Analysis

The Commission believes it has quantified the effects of the final rule that are likely to be the most significant in magnitude, but data limitations make it challenging to monetize all the expected effects of the final rule, *i.e.,* to numerically estimate the impact of particular effects on the economy as a whole. Most of the estimated costs of the final rule are monetized in Part X.F.7. However, the Commission is unable to monetize the estimated benefits of the final rule without additional assumptions. Two of the major benefits—innovation and earnings—are quantified but they are not monetized because a particular parameter or data point that would allow the Commission to estimate their effect in dollars is unavailable. For earnings, this parameter is an estimate of the percentage of the effect on earnings that represents a benefit versus a transfer.[1187] For innovation, this parameter is an estimate of the social value of a patent. Making an assumption about these parameters allows the Commission to monetize the benefits associated with the effect on earnings and innovation. A break-even analysis based on such assumptions confirms the Commission's finding that the benefits of the rule clearly justify the costs.

The analysis in this Part X.F.10 calculates the sum of the monetizable costs of the rule, separately under the assumption that lost investment in human capital is core training (in which case monetizable costs are direct

[1178] Johnson, Lavetti, & Lipsitz, *supra* note 388 at 38.

[1179] Marx (2022), *supra* note 524 at 8.

[1180] NPRM at 3531.

[1181] Based on annual worker mobility rates (separations divided by employment) in 2022 as calculated using the Job Openings and Labor Turnover Survey, provided by BLS.

[1182] Calculated as $-e((-0.241+0.112)*0.081) - 1)$, where $-0.241+0.112$ represents the estimated effect in Johnson, Lavetti, and Lipsitz (*supra* note 388) on workers in high use industries. The corresponding estimate for other industries is statistically indistinguishable from zero and those industries are therefore omitted from calculations. The multiplier 0.081 is the average magnitude change in non-compete enforceability, as discussed in Part X.F.5.

[1183] Calculated as the average usage rate in high-use industries in Starr, Prescott & Bishara (*supra* note 68).

[1184] Based on data from BLS for industries classified as high-use in Starr, Prescott & Bishara (*supra* note 68), excluding CA, ND, OK, and MN. See *https://data.bls.gov/cew/apps/data_views/data_views.htm#tab=Tables.*

[1185] See Pivateau, *supra* note 1090.

[1186] Calculated as 49.4 million * 23.9%. 49.4 million is equal to 0.8 * 61.8 million, where 0.8 is the coverage rate (see Part X.F.4.a) and 61.8 million is the number of workers in high-use industries (*https://data.bls.gov/cew/apps/data_views/data_views.htm#tab=Tables*). 23.9% is the average usage rate in high-use industries in Starr, Prescott, & Bishara (*supra* note 68).

[1187] Though the estimated effect on earnings is presented in dollars, the Commission considers this value to be quantified, but not monetized, since some part of the estimate may represent a transfer and not a benefit.

compliance costs and the cost of updating contractual practices), and under the assumption that lost investment in human capital is advanced training (in which case monetizable costs are the net cost of lost productivity from decreased human capital investment, direct compliance costs, and the cost of updating contractual practices). The analysis conservatively assumes that training for all workers is affected (versus just those in high-use occupations, as described in Part X.F.7.a).

If the Commission assumes the decrease in human capital investment is a decrease in core training, the final rule results in net benefits without monetizing or counting any positive effects on the economy from earnings or innovation. The savings or benefit to the economy from reduced core training would be greater than the combined monetized costs of the final rule in X.F.7.b. In other words, even if the benefit to the economy from earnings and innovation were assumed to be zero (an implausible and extremely conservative assumption), the final rule would be net beneficial under the assumption that estimates of reduced training reflect better matching of workers and firms and therefore a reduced need to provide workers with core training.

Under the assumption that lost human capital investment is advanced, the Commission calculates values of the social value of a patent and the benefit percentage of the earnings effect that would fully offset the net monetizable costs of the final rule.

### a. Estimate of Net Benefit Assuming Lost Human Capital Investment Is Core Training

Under the assumption that lost human capital investment is core, the sum of the present discounted value of direct compliance costs and the cost of contractual updating (the monetizable costs of the rule), using a 3% discount rate, is $3.7 billion. In this case, the final rule is net beneficial even ignoring the benefits associated with innovation and earnings. This is because the net monetized cost ($3.7 billion) is less than the monetized benefit associated with investment in human capital ($31 billion or $13.9 billion, when all occupations are assumed to be affected versus just high-use occupations, respectively). The net monetizable benefit of the final rule—even ignoring benefits associated with innovation and earnings—is therefore $27.3 billion or $10.2 billion, respectively.

### b. Estimate of Net Benefit Assuming Lost Human Capital Investment Is Advanced Training

In this Part X.F.10.b, the Commission calculates the net monetizable costs and benefits of the final rule assuming that lost human capital investment is advanced training, and under varying assumptions about the values of the two monetization parameters identified (the social value of a patent and the percentage of the earnings effect that represents a benefit). Then, the Commission calculates break-even points: values for the monetization parameters which would fully offset the net monetizable costs of the final rule.

Break even points are calculated by finding the values of the social value of a patent and the benefit percent of the earnings increase such that:

*(Net Costs Associated with Investment in Human Capital) + (Direct Compliance Costs) + (Costs of Updating Contracts) = (Earnings Increase) * (Benefit % of Earnings Increase) + (Patent Increase) * (Social Value of Patent)*

As calculated in Part X.F.7, assuming a 3% discount rate, the net cost associated with investment in human capital is $39.0 billion.[1188] Direct compliance costs plus the cost of updating contracts are estimated to be $3.7 billion.[1189] Net monetizable costs therefore total $42.7 billion.

The estimated earnings increase of the final rule over ten years, discounted at 3% is $468 billion. The estimated effect of the rule on innovation (using the low end of the primary estimate) ranges from an additional 3,111 patents per year to 31,110 patents per year, increasing as time goes on.[1190]

The Commission presents estimates that demonstrate break-even points by making an assumption for the value of one of the two monetization parameters, and calculating the value of the other which implies equal monetized costs and benefits. Based on estimates of the private value of a patent, the Commission separately assumes that the social value of a patent is $94,886, $234,399, $5,865,833, or $32,459,680.[1191] In addition to spanning

a wide range of possible valuations, these values all represent the private value of a patent to certain actors (*e.g.*, the purchaser or seller of a patent, or shareholders of a patenting company). These values do not account for innovative spillovers (*e.g.*, follow-on innovation) or product market spillovers to competitors (who may lose business to innovating firms), and therefore do not necessarily represent the social value of a patent. However, they serve as benchmarks against which to assess the breakeven points of the analysis of the final rule.

No studies have assessed what percentage of the earnings effect of non-compete enforceability is a benefit versus a transfer. The Commission separately assumes that the percentage is equal to 0%, 5%, 10%, and 25%.

The computed breakeven points are reported in Table 7, under the assumption that lost investment in human capital is advanced. Panel A reports necessary benefit percentages, under each of the four assumed social values of a patent, that would cause the rule to result in zero net monetized benefit. A reported value of 0% indicates that the assumed value of a patent itself covers the net monetized costs of the final rule. Panel B reports the necessary social value of a patent, under each of the four assumed benefit percentages, that would cause the rule to result in zero net monetized benefit. A reported value of $0 indicates that the benefits associated with earnings cover the net monetized costs of the final rule on their own.

### TABLE 7

| Assumed social value of a patent | Necessary benefit percentage on earnings |
| --- | --- |
| **Panel A** | |
| $94,886 ......................... | 5.5 |
| $234,399 ....................... | 1.7 |
| $5,865,833 .................... | 0.0 |

value of a patent, but has explored the *private* value of a patent, with highly varied conclusions (all reported here adjusted to 2023 dollars). Serrano estimates the average value of a patent (in terms of its sale price at auction) to be between $234,399 and $289,022. Pakes estimates the average value of a patent (in terms of stock market reactions to announcements) to be $5,865,833. Kogan et al. estimate the average value of a patent (also in terms of stock market reactions to announcements) to be $32,459,680. Outside of the academic literature, a Richardson Oliver Insights report notes that the average sale price of U.S. issued patents on a brokered market was $94,886. *See* Carlos J. Serrano, *Estimating the Gains from Trade in the Market for Patent Rights,* 59 Int'l Econ. Rev. 1877 (2018); Pakes, *supra* note 1132; Kogan, et al., *supra* note 1131; Richardson Oliver Insights Report (2022): *https://www.roipatents.com/secondary-market-report.*

---

[1188] Note that this calculation considers the net cost of lost investment in human capital (*i.e.*, the cost of lost productivity, minus the savings on direct outlays and gained output due to less time spent training). The Commission reiterates that this calculation assumes that lost human capital investment is advanced, rather than core.

[1189] This calculation assumes that updating contractual practices takes, on average, eight hours per firm.

[1190] The estimates presented here conservatively assume zero effect on R&D spending.

[1191] The Commission points out that the economic literature has not explored the *social*

TABLE 7—Continued

| Assumed social value of a patent | Necessary benefit percentage on earnings |
|---|---|
| $32,459,680 ................... | 0.0 |

| Assumed benefit percentage on earnings | Necessary patent value |
|---|---|

**Panel B**

| | |
|---|---|
| 0% .................................... | $297,144 |
| 5% .................................... | 134,202 |
| 10% .................................... | 0 |
| 25% .................................... | 0 |

Panel A shows that, even assuming a value of patenting ($94,886) that is substantially lower than the estimates in the economic literature, only 5.5% of the earnings effect must be an economic benefit (as opposed to a transfer) for the benefits associated with innovation and earnings to outweigh the monetized costs of the rule. Panel B shows that, even if no part of the earnings effect of the final rule reflects an economic benefit (which the Commission finds to be unlikely, in light of the evidence discussed in Part IV.B.3.a.ii), the social value of a patent would need to be only $297,144 in order to cover the monetized costs of the rule—well within the range of (private) values of a patent found in the literature.

The Commission additionally notes that Table 7 omits other benefits of the rule. The estimated benefits do not include the benefits arising from decreased consumer prices or increased workforce output. The estimates also omit possible changes in litigation costs associated with the rule. The Commission finds it likely that the omitted benefits substantially exceed the omitted costs, and additionally reiterates that the estimated values in Table 7 assume that lost investment in human capital is fully advanced. Therefore, the Commission views the values reported in Table 7 as conservative estimates of the breakeven points of the rule under those scenarios.

11. Analysis of Alternative Related to Senior Executives

The Commission elects to provide an analysis of the effects of an alternative with more limited coverage. Specifically, the Commission provides an analysis of a rule that would cover—and therefore ban—non-competes with all workers except senior executives. As compared to the final rule, under this alternative, it would not be an unfair method of competition to enter into non-competes with senior executives after the effective date. The Commission finds that excluding all non-competes

with senior executives from coverage under the rule (as opposed to the final rule, which excludes only existing non-competes with senior executives) would diminish both costs and benefits, but would still result in substantial benefits on net.

a. Analysis of Lost Benefits and Costs if Senior Executives Are Excluded

Several costs and benefits may be affected if senior executives are excluded from coverage by the final rule. The Commission now discusses each of those costs and benefits relative to the final rule.

The Commission finds that some benefits related to labor market competition and workers' earnings would be lost if senior executives were entirely excluded from the final rule. This is especially true because those workers have high earnings, meaning that a given percentage increase in their earnings yields a greater overall effect compared with relatively lower earning individuals. However, those workers make up a small portion of the workforce—approximately 0.75% of the workforce, based on data from the American Community Survey.[1192] The overall change in the earnings benefit is therefore limited, but would exceed senior executives' share of the workforce. Support for this finding is discussed in Part IV.C. Garmaise (2011) finds that earnings of senior executives are negatively affected by non-competes. Countervailing evidence exists, but it is based on evaluation of the use of non-competes, which the Commission gives less weight.[1193] The Commission notes the definition of senior executive used in Garmaise (2011) does not map perfectly to the definition of senior executives in this final rule, though there is likely substantial overlap.

The Commission is unable to quantify the lost benefits related to innovation if senior executives were excluded from coverage under the final rule but finds their exclusion would diminish the innovation benefits of the final rule. Senior executives are involved in determination of the strategic path of the firm and its execution, which likely has a substantial effect on innovation.

The Commission cannot quantify what percentage of the innovation effect is due to senior executives versus other workers, though it is likely shared by both groups.

The Commission finds that benefits related to consumer prices would fall significantly if senior executives were excluded from coverage. By increasing competition, increases in new firm formation and increased ability to hire talented workers may be key drivers of the effect of the final rule on consumer prices. As discussed in Part IV.C, senior executives have the knowledge and skills necessary to found new firms, or to be key members of other firms. Therefore, if senior executives are excluded from the final rule, some benefits associated with new firm foundation and innovation would be lost, though the exact proportion cannot be estimated. The Commission notes that benefits associated with lower prices through increased competition might also be lost but cannot be quantified.

Turning to costs, the Commission finds that costs associated with investment in human capital may fall if senior executives were excluded from the rule. The productivity of senior executives may benefit from investment in their human capital.[1194] The precise monetary contribution of investment in senior executives' human capital to the productivity of firms has not been estimated, nor has the empirical literature separately assessed the effect of non-competes on human capital investment for senior executives. If senior executives benefit from advanced, rather than core, training investment (as described in Part X.F.7.a), their exclusion will reduce costs. Because senior executives are a small part of the workforce and must be highly skilled, locking them up with non-competes could theoretically mean that firms would need to invest in relatively more core training for senior executives if they were excluded from the final rule.

The Commission finds that the direct costs of compliance with the final rule may be partially affected if senior executives were categorically excluded. The final rule allows employers to enforce existing non-competes for senior executives, so there are no notice and re-negotiation costs for senior executives. However, in this scenario, costs associated with ensuring incoming

[1192] In particular, 0.75% represents the percentage of employed individuals from 2017–21 ages 22–64, excluding residents of CA, ND, OK, and MN, and excluding workers reporting working for non-profits or the government, whose earnings are above the inflation-adjusted threshold and who are coded as having occupation "Top Executive." The Commission notes that this estimate may not exactly match the definition in the final rule but the Commission believes that this provides a reasonable estimate.

[1193] See Part IV.A.2 (explaining the Commission's concerns with these types of studies).

[1194] Solomon Akrofi, *Evaluating the Effects of Executive Learning and Development on Organisational Performance: Implications for Developing Senior Manager and Executive Capabilities*, 20 Int'l. J. of Training and Dev. 177 (2016).

senior executives' contracts do not have non-competes would be substantially reduced. Because senior executives' contracts are generally more complex than other workers' contracts, this reduction may be relatively large, even though there are relatively few senior executives in the workforce (approximately 0.75%). With respect to the costs of updating contractual practices, commenters noted the costs of updating senior executives' contracts may be greater than for other workers because of the complexity of their contracts. Therefore, excluding senior executives categorically might reduce costs associated with updating contractual practices substantially. At the same time, senior executives' contracts may already be bespoke and individualized to such an extent that removing a non-compete would not considerably raise the costs associated with revising contractual practices. Moreover, these contracts may be even more likely than other workers to already include NDAs and other similar provisions.

Finally, the Commission finds exclusion of senior executives may reduce litigation costs from the final rule, though the overall effect is unclear. Senior executives are highly likely to have access to sensitive business information. To the extent costs associated with trade secret litigation or litigation over other restrictive covenants increase under the final rule, though no evidence supports this possibility, then exclusion of senior executives may substantially reduce these costs. Litigation related to whether a worker meets the definition of a senior executive may also increase if senior executives are categorically excluded.

Overall, excluding senior executives from the final rule would substantially reduce the benefits of the rule—especially those associated with new firm formation, innovation, and prices—but would also likely reduce costs, especially those associated with investment in human capital and updating contractual practices. The Commission finds that the benefits of a rule excluding senior executives would justify the costs of such a rule.

b. Analysis of Benefits and Costs to Workers Other Than Senior Executives

Now, the Commission turns to an analysis of the benefits and costs that remain if senior executives are excluded from the rule.

The Commission finds there would be substantial benefits to labor market competition and workers' earnings even if senior executives were categorically excluded. The evidence on earnings

discussed in Part IV.B.3.a.ii does not exclude senior executives, but based on the percentage of the population that represents senior executives, the evidence largely pertains to workers other than senior executives. Therefore, while studies focused on senior executives (largely) do not apply, studies of the entire workforce mostly reflect the effects of non-competes on other workers. In addition to the broader evidence on earnings discussed in Part IV.B.3.a.ii, one study analyzes a population exclusively comprised of hourly workers, nearly all of whom are highly likely not to be senior executives, supporting the finding that even with senior executives excluded from a rule, there would be substantial benefits to labor market competition and workers' earnings.[1195]

The Commission is unable to quantify to what extent the estimated effects on innovation are driven by senior executives versus other workers, but still finds that a final rule excluding these senior executives would result in substantial benefits to innovation. First, there is evidence that productivity of inventors decreases when they take career detours because of non-competes.[1196] Second, insofar as effects on innovation are driven by increased idea recombination, having access to those ideas (which innovators actively engaged in R&D must) implies that moving to new firms would increase innovation. Empirical studies have not quantified the size of these effects relative to the overall effect of banning non-competes for workers including senior executives on innovation, however.

The Commission finds that a rule excluding senior executives would still yield substantial benefits with respect to consumer prices. Many entrepreneurs were not formerly senior executives, meaning that encouraging entrepreneurship among workers who are not senior executives by prohibiting non-competes will yield more business formation. That business formation increases competition, which may lead to lower prices. Additionally, firms will not be foreclosed access to talent (which is likely important across the spectrum of workers, though evidence only specifically exists for senior executives), which may also lead to lower prices. In the absence of empirical evidence demonstrating which workers' non-competes affect consumer prices, the Commission cannot estimate how much of the effect is due to coverage of which workers.

The Commission finds that a rule excluding senior executives would result in decreased levels of investment in workers' human capital. The empirical literature has not separately assessed the effect of non-competes on investment in human capital for senior executives versus other workers, though the study finding that training decreases with greater non-compete enforceability includes both workers who are and are not senior executives. The Commission therefore believes that some or much of any cost or benefit of the rule from changing investment in human capital would pertain to workers who are not senior executives. However, the Commission notes that, as discussed in Part X.F.7.a, if lost training under the rule is lost ''core'' (as opposed to ''advanced'') training, then the final rule will cause a cost *savings* for firms, which will have greater access to experienced workers and will therefore spend less on ''core'' training.

The Commission finds that the direct costs of compliance with the final rule may be partially diminished if senior executives were excluded. First, the Commission reiterates that notice is not required for senior executives under the final rule. Therefore, that component of the direct costs of compliance would not be affected. However, even with those senior executives excluded, costs associated with ensuring incoming workers' contracts do not have non-competes would still be present. Insofar as senior executives' contracts may be more complex than other workers' contracts, this cost may be substantially diminished, however. Similarly, with respect to the costs of updating contractual practices, as noted by commenters, these costs may be substantially greater for the contracts of senior executives due to the complexity of their contracts and the sensitivity of the information they possess. Therefore, while some costs associated with updating contractual practices would survive if senior executives were excluded, their exclusion may reduce costs associated with the rule disproportionately to their (relatively low) share of the workforce.

Finally, some litigation costs may still be present if senior executives are excluded. Litigation costs associated with non-competes would still likely fall for workers other than senior executives due to the bright-line coverage in the rule. Costs associated with litigation other than non-compete litigation may rise if firms turn to those methods, though no evidence suggests they will.

Overall, a rule that excludes senior executives will likely result in

---

[1195] Lipsitz & Starr, *supra* note 72.
[1196] Mueller, *supra* note 569.

substantial benefits, as well as some costs. While the Commission largely cannot quantify the extent to which benefits and costs would fall if senior executives were excluded from coverage under the rule, the Commission finds that the benefits quantified and monetized elsewhere in this impact analysis would likely be diminished relative to the final rule as adopted, especially those associated with innovation and prices, but costs would also be diminished, especially those associated with investment in human capital and updating contractual practices. The Commission finds that, even in the absence of a full monetization of all costs and benefits of the final rule, the final rule has substantial benefits that clearly justify the costs, which remains true even if senior executives were excluded from coverage.

## XI. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to provide an Initial Regulatory Flexibility Analysis ("IRFA") and Final Regulatory Flexibility Analysis ("FRFA") of any final rule subject to notice-and-comment requirements, unless the agency head certifies that the regulatory action will not have a significant economic impact on a substantial number of small entities.[1197] In the NPRM, the Commission provided an IRFA, stated its belief that the proposal will not have a significant economic impact on small entities, and solicited comments on the burden on any small entities that would be covered.[1198] In addition to publishing the NPRM in the **Federal Register**, the Commission announced the proposed rule through press and other releases,[1199] as well as through other outreach including hosting a public forum on the proposed rule [1200] and attending the U.S. Small Business Administration Office of Advocacy's ("SBA Advocacy") roundtable on the proposed rule with small entities,[1201] in

keeping with the Commission's history of small business guidance and outreach.[1202]

The Commission thereafter received over 26,000 public comments, many of which identified themselves as being from small businesses, industry associations that represent small businesses, and workers at small businesses.[1203] The Commission greatly appreciates and thoroughly considered the feedback it received from such stakeholders in developing the final rule. The Commission made changes from the proposed rule in response to such feedback and will continue to engage with small business stakeholders to facilitate implementation of the final rule. Further, the Commission is publishing compliance material to assist small entities in complying with the final rule.

Specifically, based on the Commission's expertise and after careful review and consideration of the entire rulemaking record—including empirical research on how non-competes affect competition and over 26,000 public comments—the Commission adopts this final rule, including with changes relative to the proposal to reduce compliance burdens on small business and other entities. For example, the Commission allows existing non-competes with senior executives to remain in force,[1204] amends the safe harbor notice requirement to ease compliance,[1205] removes the requirement to rescind existing non-competes, and removes the ownership threshold from the sale of business exception.[1206] In light of the comments, the Commission has carefully considered whether to certify that the final rule will not have a significant impact on a substantial number of small

entities. The Commission continues to believe the final rule's impact will not be substantial in the case of most small entities, and in many cases the final rule will likely have a positive impact on small businesses. However, the Commission cannot fully quantify the impact the final rule will have on such entities. Therefore, in the interest of thoroughness and an abundance of caution, the Commission has prepared the following FRFA with this final rule.

Although small entities across all industrial classes—*i.e.*, all NAICS codes—would likely be affected, the estimated impact on each entity would be relatively small. The Small Business Administration ("SBA") states that, as a rule of thumb, the impact of a rule could be significant if the cost of the rule (a) eliminates more than 10% of the businesses' profits; (b) exceeds 1% of the gross revenues of the entities in a particular sector; or (c) exceeds 5% of the labor costs of the entities in the sector.[1207] As calculated in Part XI.F, the Commission estimates that legal and administrative costs would result in costs on average of $712.45 to $1,250.93 for single-establishment firms with 10 workers.[1208] These costs would exceed the SBA's recommended thresholds for significant impact only if the average profit of regulated entities with 10 workers is $7,125 to $12,509, average revenue is $71,245 to $125,093, or average labor costs are $14,249 to $25,019, respectively. Furthermore, while there are additional nonmonetizable costs associated with the final rule, there are also nonmonetizable benefits which would at least partially offset those costs, as explained in Part X.F.6.

### A. Reasons for the Rule

The Commission describes the reasons for the final rule in Parts IV.B and IV.C.

### B. Statement of Objectives and Legal Basis

The Commission describes the objectives and legal basis for the final rule in Part IV.B and IV.C and the legal authority for the final rule in Part II.

---

[1197] 5 U.S.C. 603–605.

[1198] NPRM at 3531.

[1199] FTC, Press Release, *FTC Proposes Rule to Ban Noncompete Clauses, Which Hurt Workers and Harm Competition* (Jan. 5, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-proposes-rule-ban-noncompete-clauses-which-hurt-workers-harm-competition.*

[1200] FTC, FTC Forum Examining Proposed Rule to Ban Noncompete Clauses (Feb. 16, 2023), *https://www.ftc.gov/news-events/events/2023/02/ftc-forum-examining-proposed-rule-ban-noncompete-clauses.*

[1201] Commission staff attended the February 28, 2023, roundtable. *See also* Comment from SBA Off. of Advocacy, FTC–2023–0007–21110 at 2.

[1202] Each year since FY2002, the Small Business Administration (SBA) Office of the National Ombudsman has rated the Federal Trade Commission an "A" on its small business compliance assistance work. *See, e.g.*, SBA Office of the Nat'l Ombudsman, 2021 Annual Report to Congress at 47.

[1203] The Commission received over 26,000 comment submissions in response to its NPRM. *See Regulations.gov, Non-Compete Clause Rule* (Jan. 9, 2023), *https://www.regulations.gov/document/FTC-2023-0007-0001.* To facilitate public access, 20,697 such comments have been posted publicly at *www.regulations.gov. Id.* (noting posted comments). Posted comment counts reflect the number of comments that the agency has posted to *Regulations.gov* to be publicly viewable. Agencies may redact or withhold certain submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign. Gen. Servs. Admin., *Regulations.gov Frequently Asked Questions, https://regulations.gov/faq.*

[1204] *See* Part IV.C.3.

[1205] *See* Part IV.E.

[1206] *See* Part V.A.

[1207] SBA, *A Guide for Government Agencies: How to Comply With the Regulatory Flexibility Act*, at 19 (Aug. 2017) *https://advocacy.sba.gov/resources/the-regulatory-flexibility-act/a-guide-for-government-agencies-how-to-comply-with-the-regulatory-flexibility-act/* (hereinafter "RFA Compliance Guide").

[1208] Ten workers is chosen as an illustrative example. For this example, the Commission calculates the cost of notification based on 10 workers and applies legal costs consistent with the average per establishment cost calculated in X.F.7.

*C. Issues Raised by Comments, the Commission's Assessment and Response, and Any Changes Made as a Result*

1. Comments [1209] on Benefits to Small Businesses and the Commission's Findings [1210]

a. Comments

Numerous small businesses and small business owners generally supported the proposed rule and shared two primary reasons, among others, that the rule may uniquely benefit small business owners. First, because non-competes are expressly designed to prevent workers from starting new businesses within the industry and geographic market that worker is experienced in, commenters said non-competes prevent new business formation and threaten new small businesses. Thus, consistent with the empirical evidence,[1211] commenters said a ban on non-competes will drive small business creation as entrepreneurial employees will be free to compete against their former employers. Second, commenters said non-competes harm small businesses by preventing them from hiring experienced workers. The Commission considered all comments related to small businesses and addresses many of them in Parts IV.B and IV.C and throughout this document.

Many comments from small businesses align with the findings in Part IV.B.3.b.i, namely that non-competes inhibit new business formation. A vast majority of such new businesses will be small businesses. For example, Kang and Fleming find that when Florida made non-competes more enforceable, larger businesses entered the State and increased employment while small businesses entered less

frequently, and employment for them did not change.[1212] An economist stated the NPRM's findings show that non-competes harm small business formation and that firms struggle to hire and grow in States that are more likely to enforce non-competes. Another commenter identified an additional study showing that Hawaii's ban on non-competes in the technology industry increased the number of technology startups.[1213]

Some commenters cited the Small Business Majority's polling data on non-competes. The survey finds that 67% of small businesses that currently use non-competes support the proposed ban [1214] and 46% of small business owners have been subject to a non-compete that prevented them from starting or expanding their own businesses.[1215] Additionally, 35% of small business respondents reported that they have been prevented from hiring an employee because of a non-compete.[1216] The survey also finds that of the 312 small businesses that responded, 59% expressed agreement that NDAs could likely protect confidential information or trade secrets as effectively as a non-compete.[1217] The online survey had a small sample size of 312 small business owners and decision-makers, and had a margin of error of +/−6%.[1218] An economist commented that these survey findings provide specific evidence underlying the mechanisms identified in the empirical studies finding that non-competes decrease new business formation and prevent new firms from hiring and growing. While the survey has too small of a sample size to be fully representative of small businesses, the survey illustrates that non-competes have prevented or delayed small businesses from starting or expanding.

Small businesses stated non-competes hindered their small business, including through costly lawsuits from former employers. Many commenters said non-competes were preventing them from starting a business.[1219] One technology startup organization cited the thousands of startups formed by alumni of five leading tech companies as well as key within-industry spinoffs in the

aerospace industry and suggested the number of spinoffs could be greater with a nationwide ban on non-competes. The commenter stated that even delays in founding a startup slow innovation. The commenter looked at the employment history of these aerospace startup founders and stated that, while it could not determine whether they had non-competes, their work history suggested they were not constrained in the labor market.

Many small businesses commented that non-competes prevented them from hiring the right talent and harmed their businesses, often because small businesses could not afford a lawsuit or even the legal costs of determining whether a non-compete with a perspective employee was unenforceable.[1220] A technology startup organization stated that startups are much more likely to survive with experienced counselors and mentors.[1221] A policy organization stated that non-competes favor established and large companies, because they can use non-compete litigation strategically to chill movement of experienced executives to startups and smaller firms that lack the resources to contest the non-competes in court. The policy organization also stated workers with non-competes often go to an established competitor that has the resources to protect them in case of a suit rather than a small firm, meaning small firms are disadvantaged in hiring. Similarly, a law firm commenter stated that small firms are less able to compensate new hires who have forfeiture-for-competition clauses compared to larger firms.

Commenters made several other arguments in favor of the rule covering small businesses. Several commenters pointed out that small businesses have not struggled to thrive in States where non-competes have long been prohibited, including California, Oklahoma, and North Dakota. A startup organization agreed with data cited in the NPRM indicating non-competes disproportionately reduce entrepreneurship for women, and argued that disproportionate financial challenges for women mean women entrepreneurs have fewer resources to withstand other harms from non-competes, including lack of access to talent.[1222] A law firm stated that a small business exception to the rule would lead to an inefficient "cliff" effect, where small businesses who previously fell within the exception would need to

---

[1209] The U.S. SBA publishes a Table of Small Business Size Standards based on the North American Industry Classification System (NAICS), determining the maximum number of employees or annual receipts allowed for a concern and its affiliates to be considered small. 13 CFR 121.201; *see also* Small Bus. Admin., *Table of Size Standards, https://www.sba.gov/document/support-table-size-standards.* Because commenters did not provide their NAICS number or annual receipts, and many did not provide the number of workers, the Commission is unable to determine whether each individual commenter meets the SBA's definition of a small business. Instead, for purposes of considering comments from small businesses, the Commission relies on the commenter's self-description of being a small business or start-up.

[1210] This section captures comments related to the potential benefits of the final rule for small businesses. These comments do not directly address the IRFA. Comments on the IRFA are captured in Part XI.G. Many comments and issues concerning small businesses are also discussed in Part IV.B.3.b.i.

[1211] *See* Part IV.B.3.b.i.

[1212] Kang & Fleming, *supra* note 536.

[1213] *See* Glasner, *supra* note 528.

[1214] Sm. Bus. Majority, Opinion Poll, *Small Business Owners Support Banning Non-Compete Agreements* 2 (Apr. 13, 2023). The survey also finds that 51% of small businesses that do not use non-competes support the proposed ban.

[1215] *Id.*

[1216] *Id.*

[1217] *Id.* at 3 (finding that 24% strongly agreed and 35% somewhat agreed).

[1218] *Id.* at 2.

[1219] *See* Part IV.B.3.b.i (summarizing these comments).

[1220] *Id.*

[1221] *Id.*

[1222] *See also* Marx (2022), *supra* note 519.

**38492** **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

rescind their existing non-competes after surpassing a threshold. Finally, and importantly, numerous workers at small businesses reported substantial harms from non-competes consistent with the harms cited in Part IV.B.2 and IV.B.3.a, just as workers for large employers did.

b. Responses to Comments

As the Commission explained in Parts IV.B.3.b and IV.C.2.c, the weight of the empirical evidence supports the conclusion that non-competes inhibit new business formation and foreclose small and other businesses from accessing the talent they need to grow and succeed. Most new businesses are small, and non-competes are expressly designed to prevent workers from starting new businesses in the fields they know best. The Commission appreciates the small businesses and entrepreneurs who shared their experiences in the comments. These comments and the many comments discussed in Parts IV.B.2 and IV.B.3 from small businesses align with and bolster the empirical evidence. The comments illustrate the real-world impacts of non-competes on entrepreneurs and would-be entrepreneurs, both before and after formation of a business. Moreover, the labor market effects—including reducing labor mobility and artificially suppressing wages and job quality—are not different or mitigated when a worker works for a small business rather than a large one. Studies finding harm from non-competes examined both large and small businesses, and the Commission believes that small businesses' use of non-competes causes the same harms set forth in Parts IV.B and IV.C, including harm to other small businesses.

Based on these and other comments, the Commission believes that many small businesses are blocked from hiring workers that could help their business grow and have fewer resources than larger businesses to evaluate the risk of hiring a worker subject to a non-compete, to pay to "release" a worker they want to hire from a non-compete, such as a forfeiture-for-competition clause, and defend themselves from a non-compete suit.

In response to the comments on small business successes in States where non-competes are banned, the Commission notes that it recognizes that there are many successful small businesses in States that ban non-competes, but is not aware of any empirical evidence considering success rates of small businesses based on enforceability of non-competes.

In response to the comment discussing startups in the aerospace industry, the Commission notes that the conclusions of the commenter align with the empirical evidence that the most successful startups are within-industry spinoffs.[1223] However, the Commission notes that according to the data presented in the comment, some of the founders the comment described as being unrestrained in the labor market have significant gaps in their work history, though the Commission cannot determine the cause of any gaps.

As explained in Part IV.C, the Commission adopts a partial exception in § 910.2(a)(2) for senior executives under which their existing non-competes—non-competes entered into before the effective date—are not covered by the final rule. Employers cannot, however, enter into new non-competes with senior executives as of the effective date. The evidence and comments describing the importance of freeing senior executives from non-competes with respect to founding and supporting new and small businesses contributed to the Commission's decision to ban future non-competes for senior executives instead of excepting senior executives entirely from the final rule. The Commission is aware that existing non-competes with senior executives will reduce some of the benefits for new and small businesses as fewer senior executives will be free to join or found those businesses beginning on September 4, 2024. However, senior executives are a small, narrowly defined group, meaning there will still be numerous experienced workers freed from non-competes that can found or support small businesses, and senior executive non-competes will eventually become phased out. In addition, the Commission expects small businesses to receive the other anticipated benefits of the final rule.

2. Comments Arguing the Rule Will Harm Small Businesses and the Commission's Findings[1224]

a. Comments

Some small businesses and industry groups stated they believe a ban on non-competes would harm small businesses. Several commenters requested an exception for small businesses or certain types of small businesses, such as independent medical practices. The Commission addresses these comments in this Part XI.C.2 and addresses direct potential costs in Part XI.E. The Commission appreciates the small businesses and entrepreneurs who shared their experiences in the comments.

Commenters raised concerns that eliminating non-competes for all businesses would allow larger businesses and incumbents to easily hire away talent from smaller competitors and startups. Other small businesses said they had been harmed in the past by former workers competing against them, including by recruiting clients and other workers, or by large competitors hiring their workers. Similarly, some industry associations and small businesses said non-competes protect independent businesses, including medical practices, from dominant consolidators, as high recruitment, retention, and other costs may induce small businesses to sell their business to consolidators. Relatedly, some healthcare organizations argued a ban that does not cover nonprofit hospitals and health systems would provide those large nonprofits with an unfair advantage over independent medical practices.

Some small businesses offered the same justifications as other businesses for using non-competes but emphasized the heightened potential damage to smaller businesses less able to bear costs, including being forced to close or sell.[1225] Many of these comments asserted that small businesses relying on legitimate trade secrets would be especially harmed if a worker took that information to a competitor or new business, particularly because they would be least equipped to detect theft or retain sophisticated legal counsel to litigate potential trade secrets or NDA claims, thus reducing investment and innovation.[1226] A law firm argued that trade secrets litigation often costs millions, and few attorneys are willing to work on contingency, so startups would struggle to litigate against larger well-financed firms, especially as large firms can drive costs up to force the startup out of the litigation. SBA Advocacy asserted that if competitive information is not protected, some small businesses could face a serious risk of loss or potential closure and could not afford alternative means of protection.

One industry organization stated more generally that protecting information is a high priority for emerging growth companies. Some small businesses

---

[1223] *See* Part IV.B.3.b.i.

[1224] This section captures comments that do not directly address the IRFA but that are related to the potential costs of the final rule for small businesses. Comments directly addressing the IRFA are captured in Part XI.G. Many comments concerning small businesses are also discussed in Part IV.B.3.b.i.

[1225] *See, e.g.,* SBA Off. of Advocacy, FTC–2023–0007–21110 at 3.

[1226] *Id.*

stated if non-competes are banned, they might silo workers and information to limit the potential harm from a worker leaving for a larger competitor and would harm the business. One business stated that while banning non-competes might allow more market entrants, those new entrants will be more likely to fail without the protection of non-competes for worker retention and confidential information. Some business associations stated small business owners often rely on independent contractors and sole proprietors such as marketers to build their businesses and share proprietary information with them (meaning contractors may have access to information from multiple competitors) and covering such groups under the rule would harm their growth.

Small businesses also stated they use non-competes to protect investments, including in training, to prevent workers from taking clients or customers, and to increase retention and stability. For example, some small businesses shared that they started using non-competes after workers they had trained extensively went to a larger competitor or started their own business. One small business organization stated the proposed requirement to relate "costs incurred" to TRAPs would be harder for small businesses who are more likely to train on the job. A physician practice stated a partner leaving for a hospital would destabilize and increase costs for the practice, but a non-compete that is bought out helps practices afford those extra costs or otherwise prevents destabilization.

Commenters provided additional reasons small businesses use non-competes. A business stated that they could not afford to pay workers as much as larger businesses, so will be unable to find workers. A small business association stated that banning non-competes would exacerbate the labor shortage for small businesses by decreasing investment in training, when there are already insufficient qualified applicants. A commenter stated that the NPRM did not provide any examples of small businesses using non-competes in an unfair way. SBA Advocacy also stated that some small business employment contracts compensate workers for non-competes. One business stated small businesses may not be able to afford to fight larger businesses using borderline *de facto* non-competes.

A banking association stated that new businesses that cannot protect their business would be less able to attract capital than more established businesses, while a community bank similarly said it may be unable to lend

to small businesses that cannot protect their workers, customers, and proprietary information with non-competes. A small business stated that NDAs and non-solicitation clauses were too difficult to enforce, as it was told by judges that in order to win a non-solicitation suit against a former worker who purportedly took clients, the business would need to subpoena its own former clients to testify, which would damage the business's reputation.

A physician said they were able to start an independent practice while complying with a non-compete and hire others in compliance with their non-competes. One small business said they were able to work out solutions when hiring a worker subject to a non-compete to avoid violating it.

SBA Advocacy relayed the concern of one 8(a)[1227] small business that feared if entities in the 8(a) business development program cannot control their talent, the money the Federal government has spent helping these companies would be wasted. Accordingly, SBA Advocacy asserted that the proposed rule conflicted with the Congressional law creating the 8(a) program.[1228]

A small Federal contractor stated that larger companies could poach workers who are skilled and/or who are already cleared by the government to work on projects from small businesses, potentially putting them out of business, and would damage contractors' ability to provide stability to the agencies.

Some commenters expressed concern that the proposed 25% threshold[1229] for the sale of business exception would cause small businesses to lose value when acquired because owners and key workers are critical contributors to the business and non-competes are intangible assets, making buyers less likely to buy. Some commenters requesting a small business exception suggested various definitions of "small business," including based on the number of employees.

Finally, SBA Advocacy encouraged the Commission to adopt an approach

addressing the different concerns of small entities and consider, analyze, and tailor alternatives to the size and type of entity to minimize adverse impacts to small entities.[1230] It stated that a categorical ban was inappropriate given the range of industries and nature of economic impacts.[1231] One business requested an exception for highly paid workers at small businesses, to create a predictable bright-line rule while leveling the playing field for small businesses. An industry association asked for an exception for newly formed businesses to encourage capital formation among start-up entities.

b. Responses to Comments

First and foremost, the Commission finds, based on its expertise, the empirical evidence, and the record before it, that non-competes tend to negatively affect competitive conditions in both labor and product and service markets, including by inhibiting new business formation.[1232] The Commission is not aware of any empirical research on existing firm closures—including small business closures—being correlated with decreased non-compete enforceability. The Commission is also not aware of empirical research on specific business closure patterns. Rather, the empirical evidence shows that non-competes overall increase new business formation and decrease concentration, indicating that the final rule will likely increase the overall number of small businesses. The Commission is focused on the aggregate effects of non-competes on competitive conditions and here considers the overall effect on small businesses. While an individual small business may benefit from prohibiting one of its workers from joining a competitor or from keeping a competitor from entering the market, non-competes have a substantial net negative aggregate impact on competitive conditions in both labor markets and product and services markets, including negative spillover effects on other small businesses that do not use non-competes.[1233]

The Commission has assessed the evidence on protection of trade secrets and proprietary information in Part IV.D and finds that businesses have sufficient, less restrictive alternatives to protect such information. These options, such as NDAs, protection under trade secrets law, and importantly, competing

---

[1227] Sections 7(j)(10) and 8(a) of the Small Business Act (15 U.S.C. 636(j)(10) and 637(a)) authorize the SBA to establish a business development program, which is known as the 8(a) Business Development Program. The 8(a) program is a robust nine-year program created to help firms owned and controlled by socially and economically disadvantaged individuals. SBA, *8(a) Business Development Program* (last updated Jan. 25, 2024), *https://www.sba.gov/federal-contracting/contracting-assistance-programs/8a-business-development-program*.

[1228] SBA Off. of Advocacy, FTC–2023–0007–21110 at 3.

[1229] NPRM, proposed § 910.1(e).

[1230] SBA Off. of Advocacy, FTC–2023–0007–21110 at 3.

[1231] *Id.*

[1232] *See* Parts IV.B and IV.C.

[1233] *See id.*

on the merits to retain workers, are also accessible to small businesses. On the latter, small businesses have potentially distinct options from larger firms because of their greater ability to be flexible and responsive to their workers' preferences. Moreover, the Commission notes that no evidence exists to support the hypothesis that trade secret litigation will increase after the final rule takes effect. Recent evidence suggests trade secret litigation does not increase following bans on non-competes.[1234] With a bright-line rule banning non-competes, small businesses, like other business, will not face or have to undertake litigation related to non-competes, which may partially offset other litigation costs if firms do substitute other litigation. In fact, the purported dynamic where small firms are outspent and outmatched by large firms that drive up the cost of trade secrets litigation, is the exact dynamic many small businesses face when sued over a non-compete, which can also force small businesses to close.[1235] While the Commission does not have data on the frequency of each type of litigation or how often it forces small businesses to close, these comments indicate that this alleged legal threat is already present in a different form. Moreover, the overbreadth of non-competes that employers cite as the source of their benefits for reducing litigation costs is also the source of the negative effects of non-competes on competitive conditions, and pecuniary benefits to a firm engaged in an anticompetitive practice are not a cognizable justification for an anticompetitive practice.[1236]

Additionally, the Commission is unaware of any evidence that small businesses in States where non-competes are less enforceable are more likely to experience trade secret misappropriation, or evidence that small businesses are at a distinct disadvantage in these States. Finally, the Commission notes that despite claims that using non-competes to protect trade secrets supports innovation, the empirical evidence shows increased enforceability of non-competes on net in the aggregate harms innovation. Again, the Commission

considers the overall effect on all business, including small businesses, and finds that the final rule will not reduce innovation by small business.

In response to the comments that businesses would limit sharing confidential information with their workers or that a small business's inability to protect confidential information would cause new businesses to fail, the Commission notes that use of less restrictive alternatives, including, for example, NDAs, fixed term contracts, and worker retention policies, would allow small businesses to maintain the same or near same level of protection for the confidential information they might share and want to protect. Accordingly, to the extent it is productive for a small business to protect such information or share it with a worker, the firm would adopt these alternatives and be able to continue to operate with the same or similar use of confidential information. Moreover, the Commission is not aware of any empirical evidence supporting the conclusion that firms would share less confidential information or be less able to protect it. In fact, the evidence shows that both within-industry and non-within industry spinouts are better quality, on average, when non-competes are less enforceable, which reinforces the conclusion that small businesses do not rely on non-competes to thrive.[1237] Indeed, no empirical evidence shows new businesses fail at a higher rate when (or because) non-competes are less enforceable. To the extent some businesses may choose to limit information sharing (as some individual comments suggest), the Commission concludes that the benefits of the final rule with respect to earnings, new business formation, and innovation justify any limited resulting negative effect.

In Parts IV.D.1 and X.F.7.a, the Commission examines the evidence on human capital investment and other investment and finds uncertainty regarding whether the effects on training and other investment will be benefits or costs under the final rule. The Commission distinguishes between core training and advanced training, finding that businesses may be able to spend less on core training under the final rule to the extent businesses are able to better match workers with their needs. The Commission similarly finds that new business formation under the final rule could result in an increase in overall capital investment or serve to offset any decreased capital investment in incumbent firms. As noted in

comments from small businesses, non-competes limit their ability to hire experienced, productive workers. While it may be true in some cases that large businesses will be able to "poach" workers from smaller business, smaller businesses would also be better able to hire talent from large (or other) businesses under the final rule. In fact, theoretically, the final rule would be more beneficial to smaller businesses because they would no longer be hamstring by the threat of non-compete litigation by large firms when hiring experienced workers from those firms. To the extent large firms can afford to pay out a worker non-compete or to litigate or threaten litigation to secure talent they want from a small firm, a ban on non-competes will better level the playing field between small and large firms competing for talent. While as stated by one commenter, some small businesses may be successful if they are able to use non-competes, the empirical evidence supports the conclusion that new business formation will increase overall under the final rule, and the Commission is not aware of any evidence of small business closure patterns. Businesses also have other alternatives to retain workers.[1238] Finally, the empirical evidence demonstrates ways in which non-competes advantage large businesses against smaller ones.[1239]

In response to comments that argued non-competes were needed to promote stability and worker retention, the Commission notes there is no evidence that stability and worker retention are economically productive in and of themselves. The overall evidence on the harms from non-competes demonstrates that retention of workers through non-competes has considerable costs to both labor markets and product and service markets. Importantly, businesses also have other, less restrictive alternatives—that do not tend to negatively affect competitive conditions—to retain workers as discussed in this Part and in Part IV.D.2. In response to the comment that small businesses will be less likely to afford retaining workers than large businesses that can pay more, the Commission notes that increases in innovation are likely to make small businesses more productive and successful, allowing them to better compete with their larger competitors. Moreover, the Commission notes that, in addition to those retention alternatives, many workers commented that their non-competes prevented them from seeking jobs with better working

---

[1234] Greenwood, Kobayashi, & Starr, *supra* note 757. The Commission notes that this study supplements—but is not necessary to support—its finding that no evidence supports the conclusion that litigation costs will increase under the final rule. That finding is based on the Commission's expertise and the rulemaking record, including relevant comments. This study was published after the close of the comment period.

[1235] *See* Parts IV.D and X.F.7.c.

[1236] *See* Part II.F.

[1237] *See* Part X.F.9.a.

[1238] *See* Part IV.D.2.

[1239] *See* Part IV.B.3.b.

JA0153

conditions, shorter commutes, more flexible hours, or more career advancement opportunities, among others.[1240] Small businesses have ways to compete for workers beyond wages alone.

Many of the comments from small businesses, as well as from other commenters, appear to confuse non-competes with other types of agreements, such as non-solicitation agreements or NDAs, and argue that non-competes are needed to prevent former workers from taking the employer's customers or clients or disclosing confidential information. The final rule does not ban non-solicitation clauses unless they meet the definition of non-compete clause.[1241] While one commenter argued that non-solicitation clauses may be more difficult to enforce than non-competes, the Commission weighs the cost of this potential increased difficulty against the harms from non-competes and finds that any marginal benefit compared to a non-solicitation clause does not justify the costs of non-competes. And as explained previously, pecuniary benefits to a firm from an anticompetitive practice are not a cognizable defense.[1242]

In response to comments that small businesses are more reliant on independent contractors and without non-competes independent contractors might have access to confidential information for multiple competitors, the Commission first notes that the final rule does not prohibit agreements preventing a worker from working for two firms simultaneously.[1243] Many alternatives to non-competes allow businesses working with independent contracts to protect their confidential information, including maintaining security of confidential information as well as NDAs and other such agreements, as described in Part IV.D. There is no evidence that independent contractors are more likely to use or share confidential business information and, in fact, they are likely to be working under an agreement detailing their responsibilities and to be more familiar with ways to assure clients that any confidential business information shared with them will remain confidential.

In response to comments that banks might decrease lending without non-competes, the Commission notes that there is no indication that small businesses in States that have banned or limited non-competes have been unable to obtain financing and commenters provide no related evidence. Again, small businesses will have less restrictive alternatives as a means of protecting confidential information. Moreover, with respect to new business formation, workers seeking to start their own businesses will be able to reassure banks that their business will not face the threat of litigation or a court enjoining them from continuing with their business because of a non-compete.

In response to SBA Advocacy's comment on compensation for non-competes, the Commission considered this issue in Part IV.C. and decided to allow existing non-competes with senior executives, which the Commission finds are most likely to have involved consideration, to remain in force.

In response to the comment on the 8(a) business development program, the Commission notes that there are likely program participants in States where non-competes are banned or partially banned and, thus, are not able to use non-competes. Moreover, the program aims to help firms owned and controlled by socially and economically disadvantaged individuals with various supports and assistance to improve their success in securing government contracts. There is no basis to believe such assistance hinges on these small businesses being able to use non-competes with their workers. Like other firms, program participants have viable, less restrictive alternatives that do not tend to negatively affect competitive conditions. The evidence presented in this Part shows that on the whole, small businesses—including 8(a) participants—are expected to benefit from the ban on non-competes by, for example, having a larger pool of talent from which to hire workers.

In response to the comment that large businesses may use borderline *de facto* non-competes, the Commission notes that it provides greater clarity on the definition of non-compete clause in Part III.D, which the Commission believes will reduce both confusion and evasion. To the extent the commenter is raising the possibility that such other restrictive employment terms may tend to negatively affect competitive conditions, the Commission notes that section 5 and the other antitrust laws apply to those terms and govern whether such terms might be unlawful.

In response to comments on the proposed sale of business threshold, as explained in Part V.A, the Commission is eliminating the 25% threshold, meaning more small businesses will be able to utilize non-competes for more owners when they are selling their business. While individual businesses might see decreased value in a sale from being unable to use non-competes for workers, any decrease is justified by the net aggregate benefits of freeing labor markets and product and service markets from non-competes. Again, pecuniary benefits to a firm engaged in an anticompetitive practice is not a cognizable defense.[1244]

In response to the proposed definitions of "small business," first, as explained in Part X.H, the Commission declines to create an exception for small businesses. Second, the SBA already defines "small business" based on size standards set forth in 13 CFR 121.201, and agencies are prohibited from deviating from this definition without following the procedures set out in 13 CFR 121.903.[1245]

In response to the comments arguing that the Commission's jurisdiction does not extend to tax-exempt nonprofit hospitals and healthcare organizations and that the final rule would, thus, give large nonprofits an unfair advantage over small practices, the Commission addresses this question in Parts II.E.2 and V.D.4. In response to the comment on difficulties in using TRAPs under the proposed rule, the Commission notes the final rule does not ban TRAPs, but covers terms and conditions of employment that meet the definition of non-compete clause as delineated in § 910.1 and described in Part III.D.

The commenter asserting that the final rule would exacerbate a labor shortage for small businesses did not provide evidence to support this claim. The Commission, however, finds that a ban on non-competes will increase labor mobility and enable skilled workers who are currently trapped by non-competes to work for others in the industry.

Finally, the Commission notes that numerous workers at small businesses have shared how non-competes have harmed them.

The Commission has carefully considered all of SBA Advocacy's and other stakeholders' comments, including those requesting a small business exception. The Commission has made the following changes, which the Commission believes will benefit small entities: adding an exception for existing senior executive non-competes; amending the notice requirement to ease compliance; and eliminating the sale of

---

[1240] *See* Part IV.B.3.a.iii.

[1241] *See* Part III.D.

[1242] *See* Part II.F.

[1243] *See* Part III.D.

[1244] *See* Part II.F.

[1245] RFA Compliance Guide, *supra* note 1207 at 14. One business suggested that the SBA definition is prone to confusion and litigation but did not provide any additional information to explain why or how.

business ownership threshold. The Commission believes that the final rule will benefit small businesses overall. The Commission notes that no State has exempted small businesses from any State statutes regulating non-competes.[1246] There is no empirical evidence that a small business exception is necessary or appropriate. Further, the evidence indicating that a ban on non-competes will benefit the economy accounts for non-competes used by both large and small businesses. In sum, the evidence indicates the final rule will, in the aggregate, benefit both small businesses and workers who work for small businesses—not to mention the consumers who in turn benefit. More small businesses are expected to enter the market, and the final rule will remove barriers to their growth.

*D. Comments by the Chief Counsel for Advocacy of the SBA, the Commission's Assessment and Response, and Any Changes Made as a Result*

The Commission received and carefully reviewed the comment from the SBA.[1247] The issues raised by the SBA and the Commission's responses are included in Parts XI.C and XI.F.

*E. Description and Estimated Number of Small Entities to Which the Rule Will Apply*

The final rule will impact all small businesses, across all industry classes, that use non-competes. It may also impact some small businesses that do not use non-competes but are impacted by other businesses' use of non-competes. The Commission does not expect that there are classes of businesses which will face disproportionate impacts from the final rule.

For the vast majority of industries, there is no nationwide granular data regarding the percentage of firms that use non-competes, which would facilitate calculating the number of small entities in a given industry using non-competes. Because of this data limitation and given the relatively stable percentage of firms using non-competes across the size distribution,[1248] the

Commission estimates the total number of small firms across all industries in the U.S. economy. The Commission then calculates the number of firms estimated to use non-competes by applying an estimate of the percentage of firms using non-competes to that total. Using the size standards set by the SBA,[1249] the Commission calculates that there are 5.25 million small firms and 5.48 million small establishments in the U.S.[1250] Assuming that 49.4% of firms or establishments use non-competes,[1251] an estimated 2.59 million small firms, comprising 2.71 million small establishments, would be affected by the final rule. These calculations—the counts of businesses and the percentage of businesses that use non-competes—are based on small businesses with employees, since sole proprietorships are unlikely to use non-competes. Since the estimate cannot account for differential use of non-competes across industries, these firms span all industries and various sizes below the standards set in the SBA's size standards.

The Commission sought comments on all aspects of the IRFA, including the description and estimated number of small entities to which the rule would apply. A business association claimed the IRFA estimated the number of small businesses solely based on one incomplete study, the Colvin and Shierholz study, which it argued counted only firms with no union members who said all employees signed

[1249] *See* Small Bus. Admin., *Table of Size Standards, https://www.sba.gov/document/support-table-size-standards.*

[1250] The Commission uses the latest data available from the Census Bureau's Statistics of U.S. Businesses database, available based on firm revenue and firm size. Census Bureau, *Statistics of U.S. Businesses (SUSB)* (last revised Nov. 17, 2023), *https://www.census.gov/programs-surveys/susb.html.* Values are deflated to current dollars using *https://www.bls.gov/data/inflation_calculator.htm.* As used in this analysis, per the Census Bureau, "a firm is a business organization consisting of one or more domestic establishments in the same geographic area and industry that were specified under common ownership or control." On the other hand, "an establishment is a single physical location at which business is conducted or services or industrial operations are performed." *See* Census Bureau, *Glossary, https://www.census.gov/programs-surveys/susb/about/glossary.html.* The number of small firms calculated here has decreased compared to the IRFA based on the updated Census Bureau data and SBA size standards.

[1251] *See* Colvin & Shierholz, *supra* note 65. The Commission notes that the estimated percentage of firms which use non-competes is based on a survey of businesses with employees. In addition, the Small Business Majority's recent survey of small businesses finds that 48% of respondents use non-competes. Sm. Bus. Majority Opinion Poll, supra note 1214. The Commission does not find that this survey has a sufficiently representative sample size to be considered definitive but notes that it aligns with the Colvin & Shierholz estimate.

non-competes, risking significantly undercounting the number of impacted businesses. This comment misreads the study. The cited statement explained that when tabulating the share of businesses where all employees sign non-competes, the study counted only firms with no union members as it did not have information on whether union members signed non-competes.[1252] That does not mean that only firms with no union members where all employees signed non-competes were included in the study. In fact, the study divided its results between the share of workplaces where all employees and only some employees were subject to non-competes.[1253] The comment cites to only one component of the study results. Moreover, the study states that anecdotal evidence indicates it is rare for unions to agree to non-competes,[1254] and comments the Commission received align with that anecdotal evidence.

*F. Projected Reporting, Recordkeeping, and Other Compliance Requirements*

To comply with the final rule, small entities must do three things. First, to comply with §§ 910.2(a)(1)(i) and 910.2(a)(2)(i), which state it is an unfair method of competition to enter into a non-compete with a worker, small entities can no longer enter into new non-competes with incoming workers, including senior executives. This may include revising human resources materials and manuals and template or form contracts to ensure they are not misused on a forward-going basis, and making strategic decisions regarding workers' employment terms. Second, to comply with § 910.2(a)(1)(ii) and (iii), small entities cannot enforce (or make misrepresentations about) existing non-competes for workers other than senior executives after the effective date. That is, businesses must refrain from suing or threatening to sue workers other than senior executives regarding a non-compete after the effective date; but formal contract rescission is not required. Third, businesses must provide notice to workers other than senior executives that the worker's non-compete will not be enforced against the worker. The Commission provides a safe harbor notice that must be provided only to workers with known contact information. These foregoing steps entail some potential legal and administrative costs.

As calculated in Parts X.D.1.a and X.D.2.a, the Commission estimates the legal and administrative costs would

[1252] *See* Colvin & Shierholz, *supra* note 65.
[1253] *See generally id.*
[1254] *Id.*

[1246] *See generally* Beck Reed Riden Chart, *supra* note 1052. In 2023, Maryland increased its non-compete compensation threshold to $19.88 per hour and set a slightly lower threshold for small employers at $19.20 per hour. Md. Lab. & Empl. Code sec. 3–716.

[1247] SBA Off. of Advocacy, FTC–2023–0007–21110.

[1248] *See* Colvin & Shierholz, *supra* note 65 at 5. The Commission emphasizes that, since smaller firms generally use non-competes at a lower rate, based on the numbers reported in Table 1, the estimate of the number of affected small entities is likely larger than is true in practice.

total $538.48 to $1,076.96 for each small firm, plus an additional $155.85 for each establishment owned by that firm, plus an additional $1.81 per worker. A single-establishment firm with 10 workers, for example, would bear estimated costs of $712.45 to $1,250.93.[1255] Only a small portion of the average cost estimated for each small firm—$155.85 per establishment, plus $1.81 per worker—is required under the rule. The remainder of the estimated cost is attributable to legal costs which firms may (but are not required to) undertake to revise their contractual practices. The FRFA assumes that the value of human resource professionals' times and legal professionals' time is equal to twice their average wages, which results in updated estimates.[1256] In an abundance of caution, the Commission has erred on the side of overestimating costs.

As described in greater detail in Part X.F.7.a, the Commission also finds that firm investment in human capital may increase or decrease under the final rule, depending on the type of training affected. Given the evidence available, the Commission is unable to fully monetize the estimates of firm investment in human capital. It concludes, however, that even in the absence of a full monetization of all costs and benefits of the final rule, the final rule has substantial benefits that clearly justify the costs.

1. Legal Costs

To ensure that incoming workers' contracts do not include non-competes and that they fully comply with the final rule, firms may employ in-house counsel, outside counsel, or human resource specialists (depending on the complexity of the relevant non-compete). For many firms, this process would likely be straightforward (*i.e.,* simply not using non-competes or removing one section from a boilerplate contract). Other firms may have more complex agreements or choose to use more time. The Commission assumes that, on average, ensuring that contracts for incoming workers do not have non-competes would take the equivalent of one hour of a lawyer's time (valued at

$134.62),[1257] resulting in a total cost of $134.62*2.71 million = $364.8 million. There may be substantial heterogeneity in the costs for individual firms; however, the Commission believes this number is conservative. For firms whose costs of removing non-competes for incoming workers is greater, the work of ensuring that contracts comply with the law would overlap substantially with the costs of updating contractual practices, described in Part X.F.7.b.

For each establishment of each firm, estimated direct compliance costs total $21.23 + $134.62 = $155.85, plus $1.81 per worker with a non-compete.

Some business commenters have indicated that they may add or expand the scope of NDAs or other contractual provisions. This legal work is not mandated or required by the rule; it would be undertaken only by the subset of firms and workers for whom firms conclude that such alternatives would be desirable. Additionally, such adjustments are likely undertaken for senior executives whose non-competes continue to be enforceable under the final rule. Therefore, this component additionally involves identifying senior executives whose existing non-competes are unaffected. For any such legal work, firms may use in-house counsel or outside counsel. To do so, firms may use in-house counsel or outside counsel to revise current contracts or enter into new, different contracts with workers.

The Commission is not aware of empirical evidence on how much it costs firms to revise their contractual practices when they can no longer use non-competes, and commenters did not provide evidence on costs. However, there is evidence indicating that firms that use non-competes are already using other types of restrictive employment provisions. Balasubramanian et al. find that 95.6% of workers with non-competes are also subject to an NDA, 97.5% of workers with non-competes are also subject to a non-solicitation agreement, NDA, or a non-recruitment agreement, and that 74.7% of workers with non-competes are also subject to all three other types of provisions.[1258] Firms that are already using multiple

restrictive covenants may not need to expand the scope of existing restrictive employment provisions or enter into new ones.

Among the approximately one half of firms that use non-competes,[1259] the Commission assumes that the average firm employs the equivalent of four to eight hours of a lawyer's time to revise its contractual practices.[1260] The Commission emphasizes that this is an average to underline the fact that there would likely be large differences in the extent to which firms update their contractual practices. Many firms, including those that use non-competes only with workers who do not have access to sensitive information, or those that are already using other types of restrictive employment provisions to protect sensitive information, may opt to make no changes. Other firms may employ several hours or multiple days of lawyers' time to arrive at a new contract.[1261] The estimated range of four to eight hours represents an average taken across these different possibilities. For example, if two-thirds of firms that currently use non-competes opt to make no changes to their contractual practices (for example, because their workers are among the 97.5% of workers that already have other post-employment restrictions, or because they will rely on trade secret law in the future, or because they are using non-competes with workers who do not have access to sensitive information), and one-third of such firms spend (on average) the equivalent of 1.5 to 3 working days of an attorney's time, this would result in the estimate of 4–8 hours on average.

The Commission further emphasizes this estimate is an average across all employers that would be covered by the final rule. There is likely substantial heterogeneity in the amount of time firms would use to revise contractual practices; very large firms that use non-competes extensively would likely incur greater costs.

Under the assumption that the average firm that uses a non-compete employs the equivalent of four to eight hours of a lawyer's time, this analysis calculates the total expenditure on updating contractual practices to range from $134.62*4*2.59 million = $1.4 billion to $134.62*8*2.59 million = $2.8 billion. Note that this assumes decisions regarding protection of sensitive information and contract updating are

---

[1255] "Ten workers" is chosen as an illustrative example.

[1256] See Part X.F.7.b for a detailed description of the calculation and assumptions. The Commission notes that a typographical error in the IRFA resulted in the Commission reporting preliminary figures that were substantially larger than the comparable calculations in the preliminary section 22 analysis, which accounts for some of the differential between the preliminarily reported figures in the IRFA and the final estimates here.

[1257] BLS, *Occupational Outlook Handbook, Lawyers* (last modified Sept. 6, 2023), *https:// www.bls.gov/ooh/legal/lawyers.htm* (updated for inflation to 2023 dollars and based on updated BLS data). Assumed lost productivity is twice the median wage.

[1258] Balasubramanian, Starr, & Yamaguchi, *supra* note 74. The value 97.5% is calculated as (1–0.6%/ 24.2%), where 0.6% represents the proportion of workers with only a non-compete, and no other post-employment restriction, and 24.2% represents the proportion of workers with a non-compete, regardless of what other post-employment restrictions they have.

[1259] Colvin & Shierholz, *supra* note 65 at 1.

[1260] Part X.F.7.b.i.

[1261] These estimates are derived from outreach to employment attorneys active in assisting firms in writing their non-competes. Commenters did not provide additional information or data that could be used to update these estimates.

**38498** **Federal Register** / Vol. 89, No. 89 / Tuesday, May 7, 2024 / Rules and Regulations

made at the firm, rather than establishment, level, since sensitive information is likely shared across business establishments of a firm.

For each affected small business, the estimated cost of updating contractual practices is $134.62*4 = $538.48 to $134.62*8 = $1,076.96.

## 2. Administrative Costs for Notification Requirements

To reduce compliance costs and increase compliance certainty, § 910.2(b)(5) provides that an employer complies with the notice requirement in § 910.2(b)(1) where it provides notice to a worker pursuant to § 910.2(b)(4). Furthermore, § 910.2(b)(4) includes model language that constitutes notice to the worker that the worker's non-compete is no longer in effect. The Commission estimates that composing and sending this message in a digital format to all of a firm's workers and applicable former workers for whom digital contact information is available would take 20 minutes of a human resources specialist's time.[1262] According to BLS, the median wage for a human resources specialist was $31.85 per hour in 2023.[1263] The cost of compliance for currently employed workers with digital contact information available is therefore ($31.85*2)/3 = $21.23 per establishment. As estimated in Part XI.E, there are 2.59 million small firms, comprising 2.71 million small establishments, in the U.S. that use non-competes.[1264] Conservatively assuming that each establishment must engage in its own communication (*i.e.*, that a firm's headquarters does not have the ability to send a company-wide email, for example), this means that the total direct compliance cost for workers who are already employed and for whom digital contact information is available is $21.23*2.71 million = $57.5 million.

Each small firm must additionally mail notice to workers with non-competes for whom a physical address is available, but digital contact information is not. The cost per notice is estimated as 5 cents for one printed page plus mailing cost of 70 cents plus one minute of an HR professional's time, at $63.70 per hour, for a total of $1.81 per notice. Given an estimated count of affected workers with non-

competes at small businesses of 584,843,[1265] the overall cost of mailed notice provision is therefore estimated to be $1.1 million.

## G. Comments and Responses to Comments on the IRFA

The IRFA explained the Commission's preliminary assessment of the direct compliance costs for employers, both for rescinding non-competes for workers who are already employed as well as the costs of an attorney to ensure contracts for incoming workers do not have non-competes.[1266] The IRFA also explained the Commission's assessment of the costs of updating contractual practices, if the employer seeks to do so, by expanding the scope of other contractual provisions to protect trade secrets and other valuable investments.[1267] The Commission sought comment on all aspects of the IRFA.[1268]

In support of the proposed rule, one employment law firm said there are no significant recurring compliance costs to the final rule that would create an undue burden for small employers compared to larger employers. The Commission agrees. The final rule is designed to require only a one-time action and no recurring compliance requirements in order to minimize compliance costs for employers. A technology startup organization said the rule would save small businesses significant legal costs from the complex legal analysis currently necessary when trying to hire a worker subject to a non-compete, particularly when trying to assess the patchwork of State laws, "reasonableness" tests, and choice-of-law issues, which startups have few resources to pay.

Some commenters raised concerns about the preliminary assessment of direct compliance costs, primarily concerning unsubstantiated costs of consulting with counsel. Some commenters said small businesses would need to consult with outside counsel to ensure they properly comply with the final rule, though they did not explain why. Another business

association said most small businesses do not have the organizational development required to issue the notice and would need to hire outside counsel. A group of industry associations said the estimated costs of $317.68 to $563.84 were not realistic and did not reflect the cost of discussions with outside counsel on its existing agreements and contracts and its contract negotiation practices, but the comment did not provide information to support a different estimate. Some commenters argued that small businesses lacking internal counsel or employment lawyers on retainer would face substantial unplanned expenses when seeking outside counsel on whether other restrictive covenants violated the proposed *de facto* non-compete provision. These commenters did not provide cost estimates.

First, in response to the proposed rule's Preliminary Regulatory Impact Analysis, commenters discussed that the estimated compliance costs and costs of contractual updating may underestimate true costs for the broader business community and provided alternative estimates of the time employers might spend complying with the rule and updating contractual practices, as well as the charged rates of outside counsel. These comments are addressed in the sensitivity analyses presented in Part X.F.7. The Commission has also updated the estimated legal costs in this Part. Commenters also argued that small businesses would face greater costs associated with the use of outside counsel but did not quantify those costs for small businesses. Again, the Commission provides a sensitivity analysis reflecting the cost of experienced outside counsel for all firms in Part X.F.7.b.i. Moreover, as the Commission notes, the estimate reflects significant heterogeneity, so that it is likely that some firms will simply be able to remove the paper or electronic copy of the non-compete from their website or workplace manual—requiring no attorney time—while others, like the commenter, may spend more time consulting with counsel.

Second, in response to these and other comments and as explained in Part III.D, the definition of non-compete clause has been revised to reduce confusion and give employers and workers a clearer understanding of what is prohibited, which will in turn reduce compliance costs. Third, the FRFA includes updated compliance costs to reflect any remaining need to assess contracts under § 910.2(a). Fourth, the Commission has made the notice

---

[1262] *See* Part X.F.7.

[1263] *See* BLS, *Occupational Outlook Handbook, Human Resources Specialists, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm* (last modified Sept. 6, 2023) (updated for inflation to 2023 dollars).

[1264] The dataset is available at Census Bureau, *2021 SUSB Annual Data Tables by Establishment Industry*, Industry (Feb. 2022) (last revised Sept. 15, 2023), *https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html*.

[1265] Estimated as 80% * 18.1% * 66% * (33,271,644−27,151,987), where 80% is the percentage of covered workers (see Part X.F.4.a), 18.1% is the estimated percentage of workers with non-competes (see Starr, Prescott, & Bishara, *supra* note 68), 67% is the assumed percent of workers without digital contact information, and 6,119,657 = 33,271,644−27,151,987 is the count of workers at small businesses (see *https://advocacy.sba.gov/wp-content/uploads/2023/11/2023-Small-Business-Economic-Profile-US.pdf*).

[1266] *See* NPRM at 3532.

[1267] *See id.* at 3532−33.

[1268] *See id.* at 3531.

**JA0157**

requirement as simple as possible by providing model language for the notice in § 910.2(b)(4) and a safe harbor allowing employers to use a last known address and an exception for employers who do not have a workers' contact information. Employers can provide the notice by hand or through the mail, email, or a text message,[1269] and employers are not required to provide notice if they have no method of contacting a worker by paper or digital format.[1270] An employer is required only to notify workers that existing non-competes are no longer in effect and refrain from including non-competes in future contracts. This process is designed to be as easy as possible for employers. Employers should rarely need to seek outside legal assistance for complying with the notice requirement, and commenters do not provide an explanation of why legal assistance would be a necessary part of this process, though the cost of any such legal assistance (to identify senior executives for whom notice is not required) is accounted for in Part XI.F.1. Finally, the Commission will provide guidance materials for small entities to explain how to comply with the final rule.

The estimated compliance costs do not directly include any costs or savings from the senior executive exception, because the number of workers the exception might apply to is such a small portion of workers overall that any effect is *de minimis*. At an individual firm level, small businesses might not be impacted by the exception (if no workers earn above the total compensation threshold). Others might face increased compliance costs if they choose to use the exception and need to evaluate whether a worker meets the definition of senior executive (as accounted for in Part XI.F.1). However, the total compensation threshold included in the final rule's definition of "senior executive" is designed to ensure that employers and workers do not need to conduct a job duties assessment for every worker, only workers making above the threshold. In addition, in many cases it may be clear that a worker does or does not meet the test for whether a worker is a "senior executive" without a detailed assessment. For example, CEOs and Presidents are presumed to be in a policy-making position under § 910.1 and will not be otherwise subject to a job duties test, while highly paid workers in a non-executive role such as many physicians will not. Other small

businesses might see decreased or eliminated direct and indirect compliance costs if they can maintain existing senior executive non-competes.

Many commenters also stated there are other indirect costs. SBA Advocacy suggested that the IRFA did not account for additional potential costs, including the costs of services, including higher legal fees to protect information, potential increased training, hiring and retention costs, and process changes.[1271] Similarly, a business association argued small businesses could face additional costs for finding alternatives to protect assets and to alter hiring, training, and retention processes. Some business associations argued that the cost of updating contractual practices would be higher because businesses would need to consult counsel, and many small businesses may be unable to afford to do so. A business organization stated that the Commission should consider the costs from a small business diminishing in value to potential buyers because it cannot record the value of its non-competes.

Another business organization said costs to small businesses are not limited to updating contractual agreements, mentioning the use of non-competes to protect assets and investments. A law firm suggested that trade secrets litigation often costs unspecified millions in attorney and expert fees and investigations costs. A business association commented that the rule would likely trigger additional litigation costs for trade secret protection and satisfying standards for injunctive relief, as well as unspecified additional costs related to lost business relationships and ideas. The business association cited an article from the biotech industry as saying a ban will force biotech companies to find other ways to protect themselves, likely through increased trade secret litigation, and recognizing that non-competes are critical to startups in the industry.

Two comments requested that the Commission publish a supplemental IRFA to account for the rule's potential impact.

The Commission notes that agencies are generally not required to consider indirect costs, though it is considered a best practice.[1272] While commenters

raised categories of indirect costs that may be implicated (and it is not clear exactly what potential costs may fit into those categories), commenters did not provide any data or information that could enable the Commission to estimate any indirect costs. Some of these costs are also attenuated and speculative. Many of these concerns are also addressed in Parts IV.D and XI.C. The commenters also misunderstand the calculations in the IRFA and RIA; the estimates are an average across employers using non-competes, and there is likely to be substantial heterogeneity. The calculations account for the assumption that some firms may spend more than this amount. In response to comments on hiring costs, some firms may save on hiring costs from easier hiring, while others might have increased turnover costs.[1273] Businesses also have other options to compete on the merits besides raising wages, as many commenters indicated they sought jobs with better hours, more flexible schedules, shorter commutes, career opportunities, and other benefits.[1274] Businesses will be better able to hire workers experienced in their field who require less training than workers new to an industry.[1275]

Even if commenters' unsupported assertions that trade secret litigation and NDA enforcement may be more costly for businesses, including small businesses, are correct, such costs are justified by the benefits of the rule and in any event pecuniary benefits to a firm from an anticompetitive practice are not a cognizable justification.[1276] The Commission estimates that the final rule may increase or decrease overall litigation costs, and there is no evidence in the literature to allow the Commission to quantify those costs or benefits.[1277]

The comment citing an article on the biotech industry overstates the article's statements. The article said the existing increase in trade secrets litigation was likely to continue if the rule were adopted, did not cite any evidence for this prediction other than that non-competes are often used to protect trade secrets, and noted that companies may also use NDAs or restrict access to sensitive information.[1278] The article

---

[1269] § 910.2(b)(2).

[1270] § 910.2(b)(3).

[1271] SBA Off. of Advocacy, FTC–2023–0007–21110 at 3.

[1272] *Mid-Tex Elec. Co-op., Inc.* v. *FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985) ("[I]t is clear that Congress envisioned that the relevant 'economic impact' was the impact of compliance with the proposed rule on regulated small entities[,]" and the court inferred that "Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any

stratum of the national economy."); *see also* RFA Compliance Guide, *supra* note 1207 at 22–23, 64–68.

[1273] *See* Part X.F.9.

[1274] *See* Part XI.C.2.b.

[1275] *See* Part X.F.7.a.

[1276] *See* Parts IV.D.3, X.F.5–6, II.F.

[1277] *See* Part X.F.7.c.

[1278] Rosemary Scott, *FTC's Non-Compete Law Could Propel Rise in Trade Secrets Lawsuits,*

Continued

did not say that non-competes are critical to biotech startups.[1279]

The commenter asking the Commission to consider small business valuation changes did not provide any potential estimates of such a cost, nor did the commenter demonstrate that such costs exist. It is unclear whether this commenter was referring to the value of non-competes for owners or for workers, but some such non-competes may fall within the exceptions for existing senior executive non-competes or for owners in a sale of business.[1280] To the extent there are any remaining non-competes that increase the value of a business in a sale, the Commission finds that any marginal decrease is justified by the substantial overall benefits of the rule.

In response to the requests for a supplemental IRFA, one is not required by law, and this FRFA responds to all comments on the IRFA. A supplemental IRFA would not provide the public with additional relevant information that the IRFA did not.

### H. Discussion of Significant Alternatives

The RFA requires that agencies include a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.[1281] Statutory examples of "significant alternatives" include different requirements or timetables that take into account the resources available to small entities; the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for small entities; the use of performance rather than design standards; and an exemption from coverage of the rule, or any part thereof, for small entities.[1282]

In Part IX, the Commission discusses significant alternatives to the final rule. Part IX also includes an assessment determining that each of the significant alternatives would not accomplish the objectives of the final rule. The Commission did incorporate some of the alternatives proposed in the NPRM and

in comments into the final rule, namely the exception for existing senior executive non-competes, simplifying notice requirements, eliminating rescission requirements, and eliminating the 25% threshold for the sale of business exception. In addition, the Commission's analysis of benefits and costs in Part X includes an assessment of the benefits and costs of excluding senior executives. The Commission notes that it has designed the final rule to minimize compliance costs for all businesses and that the final rule does not include any reporting requirements. As stated in Part X.F.7.b, the Commission estimates that direct compliance costs and the costs of updating contractual practices would result in costs of $538.48 to $1,076.96 for each firm. As previously noted, the Commission does not believe the final rule imposes a significant economic impact on a substantial number of small entities. The Commission has also described how the final rule will benefit and increase the number of small businesses.

After careful consideration, the Commission is not creating an exception for small entities or different regulatory requirements for small entities. The final rule provides that for workers other than senior executives, it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete, enforce or attempt to enforce a non-compete, or represent that the worker is subject to a non-compete.[1283] For senior executives, the final rule provides that it is an unfair method of competition for a person to enter into or attempt to enter into a non-compete, enforce or attempt to enforce a non-compete entered into after the effective date, or represent that the worker is subject to a non-compete, where the non-compete was entered into after the effective date.[1284] Based on the available evidence, the Commission does not believe that the analysis in Parts IV.B and IV.C is fundamentally different for non-competes that are imposed by small entities. For this reason, the Commission is not creating an exception for small entities or different regulatory requirements for small entities.

The Commission is not delaying the effective date of the final for small entities. Under § 910.6, the final rule is effective 120 days after publication in the **Federal Register** on September 4, 2024. One small business asked that the final rule's effective date be delayed for two years to give the business time to

silo its intellectual property and implement safeguards to protect its information. In the Commission's view, the rule's effective date of September 4, 2024 will afford small entities a sufficient period of time to comply with the final rule, and commenters have not provided evidence that more time is necessary.[1285]

## XII. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 ("PRA"),[1286] Federal agencies must obtain approval from the Office of Management and Budget ("OMB") for each collection of information they conduct or sponsor. The term "collection of information" includes any requirement or request for persons to obtain, maintain, retain, report, or publicly disclose information.[1287] Under the PRA, the Commission may not conduct or sponsor, and, notwithstanding any other provision of law, a person is not required to respond to, an information collection unless the information collection displays a valid control number assigned by OMB.[1288]

### A. The Proposed Rule

In the NPRM, the Commission stated that it believed the proposed rule would contain a disclosure requirement that would constitute a collection of information requiring OMB approval under the PRA. The Commission stated that this disclosure requirement was proposed § 910.2(b)(2), which would have required employers to provide notice to a worker with an existing non-compete—i.e., a non-compete that was entered into prior to the effective date—that the non-compete is no longer in effect and may not be enforced against the worker.[1289] Conservatively assuming that each establishment must engage in its own communication—i.e., a firm's headquarters does not have the ability to send a company-wide email, for example—the Commission estimated that covered employers would incur an estimated labor cost burden of 1,310,747 hours to comply with this requirement (3,932,240 establishments × 20 minutes). The Commission estimated the associated labor cost for notifying affected workers who are already employed is $9.98 × 7.96 million × 0.494 = $39,243,755.[1290]

The Commission stated that the proposed rule would impose only *de minimis* capital and non-labor costs.

---

BioSpace (Feb. 8, 2023), *https://www.biospace.com/article/ftc-s-non-compete-law-could-propel-rise-in-trade-secrets-lawsuits-/*.

[1279] *Id.*

[1280] *See* § 910.3.

[1281] 5 U.S.C. 604(a)(6).

[1282] *See* 5 U.S.C. 603(c)(1)–(4).

[1283] *See* § 910.2(a)(1).

[1284] *See* § 910.2(a)(2).

[1285] *See* Part VIII.

[1286] 44 U.S.C. 3501 *et seq.*

[1287] 44 U.S.C. 3502(3); 5 CFR 1320.3(c).

[1288] 44 U.S.C. 3506(c)(1)(B); 5 CFR 1320.5(a)(3).

[1289] NPRM at 3533.

[1290] *Id.* at 3534.

The Commission anticipated that covered employers would already have in place existing systems to communicate with and provide employment-related disclosures to workers. While the proposed rule would require a one-time disclosure to some workers subject to a rescinded non-compete, the Commission anticipated that this one-time disclosure would not require substantial investments in new systems or other non-labor costs. The Commission noted that, moreover, many establishments are likely to provide the disclosure electronically, further reducing total costs.[1291]

The Commission sought comment on all aspects of its PRA analysis, including (1) whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information would have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) ways to minimize the burden of these information collections on respondents.

*B. Comments Received*

No commenters specifically addressed the PRA analysis in the NPRM. However, the Commission received extensive comments on its Preliminary Regulatory Impact Analysis and Initial Regulatory Flexibility Act Analysis, and many of these commenters addressed the Commission's estimates related to the cost of compliance. These comments are summarized in Parts X (the Commission's Final Regulatory Analysis) and XI (the Commission's Final Regulatory Flexibility Act Analysis). The Commission also received comments on the proposed notice requirement itself. These comments are summarized in Part IV.E.

*C. Final PRA Analysis*

The Commission finalizes the proposed rule's notice requirement largely as proposed, with some adjustments to even further ease compliance. In the final rule, § 910.2(a)(1)(ii) prohibits employers from enforcing existing non-competes—*i.e.,* non-competes entered into prior to the effective date—with respect to workers other than senior executives. Section 910.2(b)(1) as finalized states further that for each existing non-compete that it is an unfair method of competition to enforce or attempt to

enforce under § 910.2(a)(1)(ii)—*i.e.,* non-competes entered into with workers other than senior executives—the person who entered into the non-compete with the worker must provide clear and conspicuous notice to the worker by the effective date that the worker's non-compete will not be, and cannot legally be, enforced against the worker.

Pursuant to § 910.2(b)(2), the notice must (i) identify the person who entered into the non-compete with the worker and (ii) be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker.

Section 910.2(b)(3) provides an exception to the notice requirement in § 910.2(b)(1) where the person that would otherwise be required to provide the notice has no record of a street address, email address, or mobile telephone number.

Section 910.2(b)(4) provides model language that employers may use to comply with the notice requirement. Section 910.2(b)(5) states that an employer presumptively complies with the notice requirement in § 910.2(b)(1) where the employer provides a notice to the worker pursuant to § 910.2(b)(4). And § 910.2(b)(6) allows but does not require employers, in addition to providing the required notice in English, to provide the notice in another language (or languages). Section 910.2(b)(6) also permits employers to use any Commission-provided translation of the model language in § 910.2(b)(4).

The notice requirement has changed in two important respects from the proposed rule. First, employers are no longer required to provide the notice to senior executives with existing non-competes. Second, as long as employers provide the notice in English, they are permitted to provide the notice in a language other than English. However, neither of these changes significantly affects the burden of complying with the notice. Senior executives are only 0.75% of workers, so the cost savings to employers of not needing to provide the notice to senior executives are minimal. No employer is required to provide the notice in a different language, so the rule does not require employers to incur any compliance costs for doing so.

The Commission estimates that composing and sending the notice in a digital format to workers for whom digital contact information is available

would take 20 minutes of a human resources specialist's time. According to BLS, the median wage for a human resources specialist in 2022 was $31.85 per hour in 2023 dollars.[1292] The cost of compliance for currently employed workers is therefore ($31.85*2)/3=$21.23 per establishment.[1293] According to the Census Bureau's Statistics of U.S. Businesses database, in 2021 (the most recent year for which data are available), there were 5.91 million firms and 6.88 million establishments in the U.S.[1294] The Commission estimates the percentage of firms using non-competes in the U.S. at 49.4%.[1295] The Commission conservatively assumes that each establishment must engage in its own communication—*i.e.,* that a firm's headquarters does not have the ability to send a company-wide email, for example. This yields an estimated 3,397,545 covered establishments which would incur an estimated labor cost burden of 1,132,515 hours to comply with this requirement (3,397,545 establishments × 20 minutes). The Commission estimates the associated labor cost for notifying affected workers who are already employed and for whom digital contact information is available is $21.23 × 6.88 million × 0.494 = $72,141,201.

Businesses may not have digital contact information for workers. The number of workers with non-competes who must therefore receive physical notice is the total number of covered workers (101.1 million; see Part X.F.7.a.i) times the percentage of workers who have non-competes (18.1%) times the percentage of workers who require mailed notice (assumed to be 66% of workers [1296]), for a total of 12.1 million workers. The Commission notes that the percentage of workers who require mailed notice is likely a substantial overestimate, since it is estimated based on the percentage of individuals who receive health information digitally. The Commission believes that employers are more likely to have digital means of providing the notice to their current workers

---

[1292] BLS, *Occupational Outlook Handbook: Human Resources Specialists, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm.* The value in 2022 was $30.88, which was updated to 2023 dollars.

[1293] The lost productivity of workers is assumed to be twice the median wage. *See* Part X.F.7.b.ii.

[1294] Census Bureau, *2021 SUSB Annual Data Tables by Establishment Industry* (December 2023), *https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html.*

[1295] *See* Colvin & Shierholz, *supra* note 65 at 4.

[1296] *See supra* note 1165 (CMS Supporting Statement assumes 66% of workers require mailed notice from their health insurance companies).

especially, but also to their former workers. The Commission conservatively adopts this estimate as an upper bound. The cost of mailed notice provision includes some capital costs (the cost of postage and mailing materials) and the cost of a human resource professional's time. The cost per worker is estimated as 5 cents for one printed page plus mailing cost of 70 cents plus the cost of one minute of an HR professional's time, at $63.70 per hour, for a total of $1.81 per notice. The overall cost of mailed notice provision is therefore estimated to be $22 million.

As the Commission stated in the proposed rule, the Commission anticipates that covered employers already have in place existing systems to communicate with and provide employment-related disclosures to workers. While the final rule requires a one-time disclosure to some workers, the Commission anticipates this one-time disclosure will not require substantial investments in new systems or other non-labor costs. Moreover, many establishments are likely to provide the disclosure electronically, further reducing total costs.

## XIII. Other Matters

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this final rule as a ''major rule,'' as defined by 5 U.S.C. 804(2).

**List of Subjects in 16 CFR Part 910**

Antitrust.

■ For the reasons set forth above, and under the authority of Sections 5 and 6(g) of the Federal Trade Commission Act, the Federal Trade Commission adds subchapter J, consisting of parts 910 and 912, to chapter I in title 16 of the Code of Federal Regulations to read as follows:

**Subchapter J—Rules Concerning Unfair Methods of Competition**

## PART 910—NON-COMPETE CLAUSES

## PART 912—[RESERVED]

## PART 910—NON-COMPETE CLAUSES

Sec.
910.1.   Definitions.
910.2.   Unfair methods of competition.
910.3.   Exceptions.
910.4.   Relation to State laws and preservation of State authority and private rights of action.
910.5.   Severability.
910.6.   Effective date.

**Authority:** 15 U.S.C. 45 and 46(g).

## PART 910—NON-COMPETE CLAUSES

§ 910.1  Definitions.

As used in this part:

*Business entity* means a partnership, corporation, association, limited liability company, or other legal entity, or a division or subsidiary thereof.

*Employment* means work for a person.

*Non-compete clause* means:

(1) A term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from:

(i) Seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or

(ii) Operating a business in the United States after the conclusion of the employment that includes the term or condition.

(2) For the purposes of this part, term or condition of employment includes, but is not limited to, a contractual term or workplace policy, whether written or oral.

*Officer* means a president, vice president, secretary, treasurer or principal financial officer, comptroller or principal accounting officer, and any natural person routinely performing corresponding functions with respect to any business entity whether incorporated or unincorporated.

*Person* means any natural person, partnership, corporation, association, or other legal entity within the Commission's jurisdiction, including any person acting under color or authority of State law.

*Policy-making authority* means final authority to make policy decisions that control significant aspects of a business entity or common enterprise and does not include authority limited to advising or exerting influence over such policy decisions or having final authority to make policy decisions for only a subsidiary of or affiliate of a common enterprise.

*Policy-making position* means a business entity's president, chief executive officer or the equivalent, any other officer of a business entity who has policy-making authority, or any other natural person who has policy-making authority for the business entity similar to an officer with policy-making authority. An officer of a subsidiary or affiliate of a business entity that is part of a common enterprise who has policy-making authority for the common enterprise may be deemed to have a policy-making position for purposes of this paragraph. A natural person who does not have policy-making authority over a common enterprise may not be

deemed to have a policy-making position even if the person has policy-making authority over a subsidiary or affiliate of a business entity that is part of the common enterprise.

*Preceding year* means a person's choice among the following time periods: the most recent 52-week year, the most recent calendar year, the most recent fiscal year, or the most recent anniversary of hire year.

*Senior executive* means a worker who:

(1) Was in a policy-making position; and

(2) Received from a person for the employment:

(i) Total annual compensation of at least $151,164 in the preceding year; or

(ii) Total compensation of at least $151,164 when annualized if the worker was employed during only part of the preceding year; or

(iii) Total compensation of at least $151,164 when annualized in the preceding year prior to the worker's departure if the worker departed from employment prior to the preceding year and the worker is subject to a non-compete clause.

*Total annual compensation* is based on the worker's earnings over the preceding year. Total annual compensation may include salary, commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during that 52-week period. Total annual compensation does not include board, lodging and other facilities as defined in 29 CFR 541.606, and does not include payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other similar fringe benefits.

*Worker* means a natural person who works or who previously worked, whether paid or unpaid, without regard to the worker's title or the worker's status under any other State or Federal laws, including, but not limited to, whether the worker is an employee, independent contractor, extern, intern, volunteer, apprentice, or a sole proprietor who provides a service to a person. The term worker includes a natural person who works for a franchisee or franchisor, but does not include a franchisee in the context of a franchisee-franchisor relationship.

§ 910.2  Unfair methods of competition.

(a) *Unfair methods of competition*—(1) *Workers other than senior executives.* With respect to a worker other than a senior executive, it is an unfair method of competition for a person:

(i) To enter into or attempt to enter into a non-compete clause;

(ii) To enforce or attempt to enforce a non-compete clause; or

(iii) To represent that the worker is subject to a non-compete clause.

(2) *Senior executives.* With respect to a senior executive, it is an unfair method of competition for a person:

(i) To enter into or attempt to enter into a non-compete clause;

(ii) To enforce or attempt to enforce a non-compete clause entered into after the effective date; or

(iii) To represent that the senior executive is subject to a non-compete clause, where the non-compete clause was entered into after the effective date.

(b) *Notice requirement for existing non-compete clauses*—(1) *Notice required.* For each existing non-compete clause that it is an unfair method of competition to enforce or attempt to enforce under paragraph (a)(1)(ii) of this section, the person who entered into the non-compete clause with the worker must provide clear and conspicuous notice to the worker by the effective date that the worker's non-compete clause will not be, and cannot legally be, enforced against the worker.

(2) *Form of notice.* The notice to the worker required by paragraph (b)(1) of this section must:

(i) Identify the person who entered into the non-compete clause with the worker;

(ii) Be on paper delivered by hand to the worker, or by mail at the worker's last known personal street address, or by email at an email address belonging to the worker, including the worker's current work email address or last known personal email address, or by text message at a mobile telephone number belonging to the worker.

(3) *Exception.* If a person that is required to provide notice under paragraph (b)(1) of this section has no record of a street address, email address, or mobile telephone number, such person is exempt from the notice requirement in paragraph (b)(1) of this section with respect to such worker.

(4) *Model language.* For purposes of paragraph (b)(1) of this section, the following model language constitutes notice to the worker that the worker's non-compete clause cannot legally be enforced and will not be enforced against the worker.

BILLING CODE 6750–01–P

**Figure 1 to Paragraph (b)(4)—Model Language**

A new rule enforced by the Federal Trade Commission makes it unlawful for us to enforce a non-compete clause. As of [DATE EMPLOYER CHOOSES BUT NO LATER THAN EFFECTIVE DATE OF THE FINAL RULE], [EMPLOYER NAME] will not enforce any non-compete clause against you. This means that as of [DATE EMPLOYER CHOOSES BUT NO LATER THAN EFFECTIVE DATE OF THE FINAL RULE]:

- You may seek or accept a job with any company or any person—even if they compete with [EMPLOYER NAME].

- You may run your own business—even if it competes with [EMPLOYER NAME].

- You may compete with [EMPLOYER NAME] following your employment with [EMPLOYER NAME].

The FTC's new rule does not affect any other terms or conditions of your employment. For more information about the rule, visit [*link to final rule landing page*]. Complete and accurate translations of the notice in certain languages other than English, including Spanish, Chinese, Arabic, Vietnamese, Tagalog, and Korean, are available at [URL on FTC's website].

BILLING CODE 6750-01-C

(5) *Safe harbor.* A person complies with the requirement in paragraph (b)(1) of this section if the person provides notice to a worker pursuant to paragraph (b)(4) of this section.

(6) *Optional notice in additional languages.* In addition to providing the notice required in paragraph (b)(1) of this section in English, a person is permitted to provide such notice in a language (or in languages) other than English or to include internet links to translations in additional languages. If providing optional notice under this paragraph (b)(6), a person may use any

Commission-provided translation of the model language in paragraph (b)(4) of this section.

§ 910.3  Exceptions.

(a) *Bona fide sales of business.* The requirements of this part shall not apply to a non-compete clause that is entered into by a person pursuant to a bona fide sale of a business entity, of the person's ownership interest in a business entity, or of all or substantially all of a business entity's operating assets.

(b) *Existing causes of action.* The requirements of this part do not apply where a cause of action related to a non-

compete clause accrued prior to the effective date.

(c) *Good faith.* It is not an unfair method of competition to enforce or attempt to enforce a non-compete clause or to make representations about a non-compete clause where a person has a good-faith basis to believe that this part is inapplicable.

§ 910.4  Relation to State laws and preservation of State authority and private rights of action.

(a) This part will not be construed to annul, or exempt any person from complying with any State statute,

regulation, order, or interpretation applicable to a non-compete clause, including, but not limited to, State antitrust and consumer protection laws and State common law, except that this part supersedes such laws to the extent, and only to the extent, that such laws would otherwise permit or authorize a person to engage in conduct that is an unfair method of competition under § 910.2(a) or conflict with the notice requirement in § 910.2(b).

(b) Except with respect to laws superseded under paragraph (a) of this section, no provision of this part shall be construed as altering, limiting, or affecting the authority of a State attorney general or any other regulatory or enforcement agency or entity or the rights of a person to bring a claim or regulatory action arising under any State statute, regulation, order, or interpretation, including, but not limited to, State antitrust and consumer protection laws and State common law.

## § 910.5  Severability.

If any provision of this part is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further agency action, the provision shall be construed so as to continue to give the maximum effect to the provision permitted by law and such invalidity shall not affect the application of the provision to other persons or circumstances or the validity or application of other provisions. If any provision or application of this part is held to be invalid or unenforceable, the provision or application shall be severable from this part and shall not affect the remainder thereof.

## § 910.6  Effective date.

This part is effective September 4, 2024.

## PART 912—[RESERVED]

By direction of the Commission, Commissioners Holyoak and Ferguson dissenting.

**April J. Tabor,**

*Secretary.*

**Note:** The following appendix will not appear in the Code of Federal Regulations.

APPENDIX A—TABLE A.1

| State | Estimated number of covered workers | Estimated increase in total annual worker earnings | Estimated increase in average annual worker earnings |
|---|---|---|---|
| Alabama | 1,620,882 | $822,829,396 | $508 |
| Alaska | 251,167 | 145,317,588 | 579 |
| Arizona | 2,460,342 | 1,410,771,964 | 573 |
| Arkansas | 999,178 | 478,239,544 | 479 |
| California | .................. | .................. | .................. |
| Colorado | 2,251,980 | 1,484,772,427 | 659 |
| Connecticut | 1,314,029 | 945,571,637 | 720 |
| Delaware | 367,291 | 220,637,013 | 601 |
| District of Columbia | 598,990 | 604,415,889 | 1,009 |
| Florida | 7,486,582 | 4,229,047,004 | 565 |
| Georgia | 3,764,270 | 2,188,893,667 | 581 |
| Hawaii | 495,988 | 270,123,206 | 545 |
| Idaho | 656,688 | 315,487,683 | 480 |
| Illinois | 4,735,066 | 3,051,620,266 | 644 |
| Indiana | 2,490,735 | 1,280,797,352 | 514 |
| Iowa | 1,229,598 | 624,937,405 | 508 |
| Kansas | 1,112,654 | 553,683,941 | 498 |
| Kentucky | 1,536,365 | 759,416,081 | 494 |
| Louisiana | 1,492,474 | 747,953,455 | 501 |
| Maine | 501,216 | 258,101,666 | 515 |
| Maryland | 2,112,817 | 1,378,702,305 | 653 |
| Massachusetts | 2,876,506 | 2,288,111,777 | 795 |
| Michigan | 3,440,754 | 1,946,978,052 | 566 |
| Minnesota | .................. | .................. | .................. |
| Mississippi | 916,362 | 384,971,511 | 420 |
| Missouri | 2,256,955 | 1,184,012,673 | 525 |
| Montana | 396,982 | 191,696,465 | 483 |
| Nebraska | 787,174 | 399,373,568 | 507 |
| Nevada | 1,177,510 | 646,371,090 | 549 |
| New Hampshire | 538,516 | 343,360,391 | 640 |
| New Jersey | 3,307,696 | 2,301,979,408 | 696 |
| New Mexico | 666,290 | 326,156,344 | 490 |
| New York | 7,411,689 | 5,879,334,118 | 793 |
| North Carolina | 3,759,643 | 2,105,343,963 | 560 |
| North Dakota | .................. | .................. | .................. |
| Ohio | 4,314,090 | 2,330,837,261 | 540 |
| Oklahoma | .................. | .................. | .................. |
| Oregon | 1,560,619 | 916,694,759 | 587 |
| Pennsylvania | 4,690,586 | 2,795,472,689 | 596 |
| Rhode Island | 385,074 | 220,004,925 | 571 |
| South Carolina | 1,745,274 | 858,798,497 | 492 |
| South Dakota | 354,502 | 169,742,169 | 479 |
| Tennessee | 2,526,310 | 1,389,744,066 | 550 |
| Texas | 10,599,295 | 6,535,957,999 | 617 |
| Utah | 1,320,994 | 715,807,809 | 542 |
| Vermont | 241,017 | 127,248,043 | 528 |
| Virginia | 3,166,902 | 1,995,480,948 | 630 |

APPENDIX A—TABLE A.1—Continued

| State | Estimated number of covered workers | Estimated increase in total annual worker earnings | Estimated increase in average annual worker earnings |
|---|---|---|---|
| Washington | 2,809,814 | 2,090,953,114 | 744 |
| West Virginia | 539,026 | 253,817,680 | 471 |
| Wisconsin | 2,301,874 | 1,207,149,373 | 524 |
| Wyoming | 217,787 | 108,650,236 | 499 |
| Full US, excluding CA, ND, OK, MN | 101,785,552 | 53,291,058,349 | 524 |

**Note:** The estimated number of covered workers is calculated as 80% * (total employed population in the state); the estimated increase in total earnings is calculated as 0.86% * (estimated total covered earnings), where estimated total covered earnings is calculated as (estimated number of covered workers) * (average annual earnings); and the estimated increase in average earnings is calculated as 0.86% * (average annual earnings). Total employed population and average annual earnings are taken from the U.S. Census Bureau Quarterly Census of Employment and Wages for 2022 (see *https://www.bls.gov/cew/data.htm*). National totals may not equal the sum of state-specific estimates due to rounding.

[FR Doc. 2024–09171 Filed 4–30–24; 8:45 am]

**BILLING CODE 6750–01–P**

## FEDERAL TRADE COMMISSION

**16 CFR Part 910**

**RIN 3084–AB74**

### Non-Compete Clause Rule

**AGENCY:** Federal Trade Commission.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** Pursuant to Sections 5 and 6(g) of the Federal Trade Commission Act, the Federal Trade Commission ("Commission") is proposing the Non-Compete Clause Rule. The proposed rule would, among other things, provide that it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; to maintain with a worker a non-compete clause; or, under certain circumstances, to represent to a worker that the worker is subject to a non-compete clause.

**DATES:** Comments must be received on or before March 20, 2023.

**ADDRESSES:** Interested parties may file a comment online or on paper by following the instructions in the Request for Comment part of the **SUPPLEMENTARY INFORMATION** section below. Write "Non-Compete Clause Rulemaking, Matter No. P201200" on your comment, and file your comment online at *https://www.regulations.gov,* by following the instructions on the web-based form. If you prefer to file your comment on paper, mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610 (Annex C), Washington, DC 20580.

**FOR FURTHER INFORMATION CONTACT:** Shannon Lane (202–876–5651), Attorney, Office of Policy Planning, Federal Trade Commission.

**SUPPLEMENTARY INFORMATION:**

### I. Overview of the Proposed Rule

A non-compete clause is a contractual term between an employer and a worker that typically blocks the worker from working for a competing employer, or starting a competing business, within a certain geographic area and period of time after the worker's employment ends. Non-compete clauses limit competition by their express terms. As a result, non-compete clauses have always been considered proper subjects for scrutiny under the nation's antitrust laws.[1] In addition, non-compete clauses

between employers and workers are traditionally subject to more exacting review under state common law than other contractual terms, due, in part, to concerns about unequal bargaining power between employers and workers and the fact that non-compete clauses limit a worker's ability to practice their trade.[2]

In recent decades, important research has shed light on how the use of non-compete clauses by employers affects competition. Changes in state laws governing non-compete clauses have provided several natural experiments that have allowed researchers to study the impact of non-compete clauses on competition. This research has shown the use of non-compete clauses by employers has negatively affected competition in labor markets, resulting in reduced wages for workers across the labor force—including workers not bound by non-compete clauses.[3] This research has also shown that, by suppressing labor mobility, non-compete clauses have negatively affected competition in product and service markets in several ways.[4]

In this rulemaking, the Commission seeks to ensure competition policy is aligned with the current economic evidence about the consequences of non-compete clauses. In the Commission's view, the existing legal frameworks governing non-compete clauses—formed decades ago, without the benefit of this evidence—allow serious anticompetitive harm to labor, product, and service markets to go unchecked.

Section 5 of the Federal Trade Commission Act ("FTC Act") declares "unfair methods of competition" to be unlawful.[5] Section 5 further directs the Commission "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce."[6] Section 6(g) of the FTC Act authorizes the Commission to "make rules and regulations for the purpose of carrying out the provisions of" the FTC Act, including the Act's

prohibition of unfair methods of competition.[7]

Pursuant to Sections 5 and 6(g) of the FTC Act, the Commission proposes the Non-Compete Clause Rule. The proposed rule would provide it is an unfair method of competition—and therefore a violation of Section 5—for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or, under certain circumstances, represent to a worker that the worker is subject to a non-compete clause.[8]

The proposed rule would define the term "non-compete clause" as a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer.[9] The proposed rule would also clarify that whether a contractual provision is a non-compete clause would depend not on what the provision is called, but how the provision functions. As the Commission explains below, the definition of non-compete clause would generally not include other types of restrictive employment covenants—such as non-disclosure agreements ("NDAs") and client or customer non-solicitation agreements—because these covenants generally do not prevent a worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer. However, under the proposed definition of "non-compete clause," such covenants would be considered non-compete clauses where they are so unusually broad in scope that they function as such.[10]

The proposed rule would define "employer" as a person—as the term "person" is defined in 15 U.S.C. 57b–1(a)(6)—that hires or contracts with a worker to work for the person.[11] The proposed rule would define "worker" as a natural person who works, whether paid or unpaid, for an employer. The proposed rule would clarify that the term "worker" includes an employee, individual classified as an independent contractor, extern, intern, volunteer, apprentice, or sole proprietor who

---

[1] *See, e.g., U.S.* v. *Am. Tobacco Co.,* 221 U.S. 106, 181–83 (1911) (holding several tobacco companies violated Sections 1 and 2 of the Sherman Act due to the collective effect of six of the companies' practices, one of which was the "constantly

recurring" use of non-compete clauses); *Newburger, Loeb & Co., Inc.* v. *Gross,* 563 F.2d 1057, 1082 (2d Cir. 1977) ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.") (internal citation omitted).

[2] *See infra* Part II.C.

[3] *See infra* Part II.B.1.

[4] *See infra* Part II.B.2.

[5] 15 U.S.C. 45(a)(1).

[6] 15 U.S.C. 45(a)(2).

[7] 15 U.S.C. 46(g).

[8] *See* proposed § 910.2(a). For ease of reference, this NPRM employs the term "use of non-compete clauses" as a shorthand to refer to the conduct that the proposed rule would provide is an unfair method of competition.

[9] *See* proposed § 910.1(b)(1).

[10] *See infra* Part V (in the section-by-section analysis for proposed § 910.1(b)).

[11] *See* proposed § 910.1(c).

provides a service to a client or customer.[12]

In addition to prohibiting employers from entering into non-compete clauses with workers starting on the rule's compliance date, the proposed rule would require employers to rescind existing non-compete clauses no later than the rule's compliance date.[13] The proposed rule would also require an employer rescinding a non-compete clause to provide notice to the worker that the worker's non-compete clause is no longer in effect.[14] To facilitate compliance, the proposed rule would (1) include model language that would satisfy this notice requirement [15] and (2) establish a safe harbor whereby an employer would satisfy the rule's requirement to rescind existing non-compete clauses where it provides the worker with a notice that complies with this notice requirement.[16]

The proposed rule would include a limited exception for non-compete clauses between the seller and buyer of a business.[17] This exception would only be available where the party restricted by the non-compete clause is an owner, member, or partner holding at least a 25% ownership interest in a business entity.[18] The proposed regulatory text would clarify that non-compete clauses covered by this exception would remain subject to federal antitrust law as well as all other applicable law.

The proposed rule would establish an effective date of 60 days, and a compliance date of 180 days, after publication of a final rule in the **Federal Register**.[19]

In this notice of proposed rulemaking ("NPRM"), the Commission describes and seeks comment on several alternatives to the proposed rule, including whether non-compete clauses between employers and senior executives should be subject to a different standard than non-compete clauses with other workers.[20] The Commission also assesses the benefits and costs of the proposed rule, the impact of the proposed rule on small businesses, and compliance costs related to the proposed rule's notice requirement.[21]

The Commission seeks comment on all aspects of this NPRM. Comments

must be received on or before March 20, 2023.[22]

## II. Factual Background

### A. What are non-compete clauses?

A non-compete clause is a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer.[23] A typical non-compete clause blocks the worker from working for a competing employer, or starting a competing business, within a certain geographic area and period of time after their employment ends. A non-compete clause may be part of the worker's employment contract or may be contained in a standalone contract. Employers and workers may enter into non-compete clauses at the start of, during, or at the end of a worker's employment.

If a worker violates a non-compete clause, the employer may sue the worker for breach of contract. An employer may be able to obtain a preliminary injunction ordering the worker, for the duration of the lawsuit, to stop the conduct that allegedly violates the non-compete clause. If the employer wins the lawsuit, the employer may be able to obtain a permanent injunction ordering the worker to stop the conduct that violates the non-compete clause; a payment of monetary damages from the worker; or both.[24] Where workers are subject to arbitration clauses,[25] the employer may seek to enforce the non-compete clause through arbitration.

The below examples of non-compete clauses from recent news reports, legal settlements, and court opinions are illustrative.

• A contractual term between a security guard firm and its security guards requiring that, for two years following the conclusion of the security guards' employment with the firm, the security guard may not "[a]ccept employment with or be employed by" a competing business "within a one hundred (100) mile radius" of the security guard's primary jobsite with the firm and stating that the security guards may not "[a]ssist, aid or in any manner whatsoever help any firm, corporation, partnership or other business to compete with" the firm. The non-compete clause also contains a "liquidated damages" clause requiring the security guard to pay the firm $100,000 as a penalty for any conduct that contravenes the agreement.[26]

• A contractual term between a glass container manufacturing company and its workers typically requiring that, for two years following the conclusion of the worker's employment with the company, the worker may not directly or indirectly "perform or provide the same or substantially similar services" to those the worker performed for the company to any business in the U.S., Canada, or Mexico that is "involved with or that supports the sale, design, development, manufacture, or production of glass containers" in competition with the company.[27]

• A contractual term between a sandwich shop chain and its workers stating that, for two years after the worker leaves their job, the worker may not perform services for "any business which derives more than ten percent (10%) of its revenue from selling submarine, hero-type, deli-style, pita and/or wrapped or rolled sandwiches" located within three miles of any of the chain's more than 2,000 locations in the United States.[28]

• A contractual term between a steelmaker and one of its executives prohibiting the executive from working for "any business engaged directly or indirectly in competition with" the steelmaker anywhere in the world for

---

[12] See proposed § 910.1(f).

[13] See proposed § 910.2(b)(1).

[14] See proposed § 910.2(b)(2)(A).

[15] See proposed § 910.2(b)(2)(C).

[16] See proposed § 910.2(b)(3).

[17] See proposed § 910.3.

[18] See proposed §§ 910.3 and 910.1(e).

[19] See proposed § 910.5.

[20] See infra Part VI.

[21] See infra Parts VII–IX.

[22] Pursuant to Section 22(d)(4) of the FTC Act, 15 U.S.C. 57b–3(d)(4), this NPRM was not included in the Commission's Spring 2022 Regulatory Agenda because the Commission first considered it after the publication deadline for the Regulatory Agenda.

[23] See proposed § 910.1(b). The term "non-compete clause" has also been used describe agreements between one or more business not to compete against one another, see, e.g., Lumber Liquidators, Inc. v. Cabinets To Go, LLC, 415 F. Supp. 3d 703, 709 (E.D. Va. 2009), as well as certain kinds of moonlighting during a worker's employment, see, e.g., In the Matter of the Investigation by Barbara D. Underwood, Att'y Gen. of the State of N.Y. of WeWork Companies, Inc., Assurance of Discontinuance No. 18–101 (Sept. 18, 2018) at Exhibit B. As underscored above, however, this proposed rule focuses only on post-employment restraints that employers impose on workers.

[24] Donald J. Aspelund & Joan E. Beckner, Employee Noncompetition Law § 8:2, § 8:22 (Aug. 2021).

[25] See, e.g., Alexander J.S. Colvin, Econ. Pol'y Inst., Report, The Growing Use of Mandatory Arbitration (Apr. 6, 2018).

[26] Fed. Trade Comm'n, Complaint, In re Prudential Sec., Inc. et al., Matter No. 221 0026 at ¶ 12–¶ 13 (December 28, 2022).

[27] Fed. Trade Comm'n, Complaint, In re Ardagh Group S.A. et al., Matter No. 211 0182 at ¶ 9 (December 28, 2022).

[28] Dave Jamieson, Jimmy John's Makes Low-Wage Workers Sign 'Oppressive' Noncompete Agreements, HuffPost (Oct. 13, 2014). The company agreed to remove the non-compete clause in 2016 as part of a settlement. Office of the Att'y Gen. of the State of N.Y., Press Release, A.G. Schneiderman Announces Settlement With Jimmy John's To Stop Including Non-Compete Agreements In Hiring Packets (June 22, 2016).

one year following the termination of the executive's employment.[29]

• A contractual term between an office supply company and one of its sales representatives stating that, for two years after the sales representative's last day of employment, the sales representative is prohibited from "engag[ing] directly or indirectly, either personally or as an employee, associate, partner, or otherwise, or by means of any corporation or other legal entity, or otherwise, in any business in competition with Employer," within a 100-mile radius of the sales representative's employment location.[30]

• A contractual term between a nationwide payday lender and its workers stating that, for one year after the worker leaves their job, they are prohibited from performing any "consumer lending services or money transmission services" for any entity that provides such services, or to "sell products or services that are competitive with or similar to the products or services of the Company," within a 15-mile radius of any of the payday lender's 1,000 locations in the United States.[31]

• A contractual term between an online retailer and its warehouse workers prohibiting the workers, for 18 months after leaving their job, from "directly or indirectly . . . engag[ing] or support[ing] the development, manufacture, marketing, or sale of any product or service that competes or is intended to compete with any product or service sold, offered, or otherwise provided by" the retailer—or that is "intended to be sold, offered, or otherwise provided by [the retailer] in the future"—that the worker "worked on or supported" or about which the worker obtained or received confidential information.[32]

• A contractual term between a medical services firm and an ophthalmologist stating that, for two years after the termination of the ophthalmologist's employment with the firm, the ophthalmologist shall not engage in the practice of medicine in

two Idaho counties unless the ophthalmologist pays the firm a "practice fee" of either $250,000 or $500,000, depending on when the ophthalmologist's employment ends.[33]

In addition to non-compete clauses, other types of contractual provisions restrict what a worker may do after they leave their job. These other types of provisions include, among others:

• Non-disclosure agreements (NDAs)—also known as "confidentiality agreements"—which prohibit the worker from disclosing or using certain information;

• Client or customer non-solicitation agreements, which prohibit the worker from soliciting former clients or customers of the employer (referred to in this NPRM as "non-solicitation agreements");[34]

• No-business agreements, which prohibit the worker from doing business with former clients or customers of the employer, whether or not solicited by the worker;

• No-recruit agreements, which prohibit the worker from recruiting or hiring the employer's workers;

• Liquidated damages provisions, which require the worker to pay the employer a sum of money if the worker engages in certain conduct; and

• Training-repayment agreements (TRAs), a type of liquidated damages provision in which the worker agrees to pay the employer for the employer's training expenses if the worker leaves their job before a certain date.[35]

These other types of restrictive employment covenants can sometimes be so broad in scope that they serve as *de facto* non-compete clauses.[36]

In addition to restricting what workers may do after they leave their jobs, employers have also entered into agreements with other employers in which they agree not to compete for one another's workers. These include no-poach agreements, in which employers agree not to solicit or hire one another's workers, and wage-fixing agreements, in

which employers agree to limit wages or salaries (or other terms of compensation).[37]

The Commission seeks comment on its description in this Part II.A of non-compete clauses. The Commission also encourages workers, employers, and other members of the public to submit comments describing their experiences with non-compete clauses.

### B. Evidence Relating to the Effects of Non-Compete Clauses on Competition

Non-compete clauses have presented challenging legal issues for centuries.[38] But only in the last two decades has empirical evidence emerged to help regulators and the general public understand how non-compete clauses affect competition in labor markets and product and service markets.

In the early 2000s, researchers began to shed new light on the impacts of non-compete clauses on innovation and productivity. As this new body of research was evolving, news reports revealed non-compete clauses were being imposed even on low-wage workers.[39] These reports surprised many observers, who had assumed only highly skilled workers were subject to non-compete clauses.[40] Researchers responded by applying the tools of economic research to better understand how employers were using non-compete clauses and how they were affecting competition.

#### 1. Labor Markets

The empirical research on how non-compete clauses affect competition shows that the use of non-compete clauses in the aggregate is interfering with competitive conditions in labor markets.

Labor markets function by matching workers and employers. Workers offer their skills and time to employers. In return, employers offer pay, benefits, and job satisfaction.[41] In a well-functioning labor market, a worker who is seeking a better job—more pay, better hours, better working conditions, more enjoyable work, or whatever the worker may be seeking—can enter the labor market by looking for work. Employers who have positions available compete for the worker's services. The worker's

---

[29] *AK Steel Corp.* v. *ArcelorMittal USA, LLC,* 55 N.E.3d 1152, 1156 (Ohio Ct. App. 2016).

[30] *Osborne* v. *Brown & Saenger, Inc.,* 904 N.W.2d 34, 36 (N.D. 2017).

[31] *People of the State of Ill.* v. *Check Into Cash of Ill., LLC,* Complaint, 2017–CH–14224 (Ill. Circuit Ct. Oct. 25, 2017), ¶ 29, ¶ 74, *https://illinoisattorneygeneral.gov/pressroom/2017_10/Check_Into_Cash-Complaint.pdf.*

[32] Spencer Woodman, Exclusive: *Amazon makes even temporary warehouse workers sign 18-month non-compete clauses,* The Verge (Mar. 26, 2015). The company removed the non-compete clause following the media coverage. Josh Lowensohn, *Amazon does an about-face on controversial warehouse worker non-compete contracts,* The Verge (Mar. 27, 2015).

[33] *Intermountain Eye & Laser Ctrs. P.L.L.C.* v. *Miller,* 127 P.3d 121, 123 (Idaho 2005).

[34] The term "non-solicitation agreement" can also refer to a type of agreement between employers not to solicit one another's employees. In this NPRM, however, the term refers only to contractual provisions between employers and workers prohibiting the worker from soliciting clients or customers of the employer.

[35] *See, e.g.,* Norman D. Bishara, Kenneth J. Martin, and Randall S. Thomas, *An Empirical Analysis of Non-Competition Clauses and Other Restrictive Post-Employment Covenants,* 68 Vand. L. Rev. 1, 13 (2015); Uniform Law Comm'n, *Uniform Restrictive Employment Agreement Act,* Draft For Approval (2021) at § 2.

[36] *See, e.g., Wegmann* v. *London,* 648 F.2d 1072, 1073 (5th Cir. 1981); *Brown* v. *TGS Mgmt. Co., LLC,* 57 Cal. App. 5th 303, 306, 319 (Cal. Ct. App. 2020).

[37] Fed. Trade Comm'n & U.S. Dep't of Justice Antitrust Division, Antitrust Guidance for Human Resource Professionals (Oct. 2016) at 3.

[38] *See infra* Part II.C.

[39] *See, e.g.,* Jamieson, *supra* note 28.

[40] *See, e.g.,* Alan B. Krueger & Eric A. Posner, The Hamilton Project, Policy Proposal 2018–05, *A Proposal for Protecting Low-Income Workers from Monopsony and Collusion* (February 2018) at 7.

[41] *See, e.g.,* Dep't of the Treasury, Report, *The State of Labor Market Competition* (March 7, 2022) at 3.

current employer may also compete with these prospective workers by seeking to retain the worker—for example, by offering to raise the worker's pay or promote the worker. Ultimately, the worker chooses the job that best meets their objectives. In general, the more jobs available—*i.e.,* the more options the worker has—the stronger the match the worker will find.

Just as employers compete for workers in a well-functioning labor market, workers compete for jobs. An employer who needs a worker will make it known that the employer has a position available. Workers who learn of the opening will apply for the job. From among the workers who apply, the employer will choose the worker that best meets the employer's needs—in general, the worker most likely to be the most productive. In general, the more workers who are available—*i.e.,* the more options the employer has—the stronger the match the employer will find.

Through these processes—employers competing for workers, workers competing for jobs, and employers and workers matching with one another—competition in the labor market leads to higher earnings for workers, greater productivity for employers, and better economic conditions.

In a perfectly competitive labor market, if a job that a worker would prefer more—for example, because it has higher pay or is in a better location—were to become available, the worker could switch to it quickly and easily. Due to this ease of switching, in a perfectly competitive labor market, workers would easily match to the optimal job for them. If a worker were to find themselves in a job where the combination of their happiness and productivity is less than in some other job, they would simply switch jobs, making themselves better off.

However, this perfectly competitive labor market exists only in theory. In practice, labor markets deviate substantially from perfect competition. Non-compete clauses, in particular, impair competition in labor markets by restricting a worker's ability to change jobs. If a worker is bound by a non-compete clause, and the worker wants a better job, the non-compete clause will prevent the worker from accepting a new job that is within the scope of the non-compete clause. These are often the most natural alternative employment options for a worker: jobs in the same geographic area and in the worker's field of expertise. For example, a non-compete clause might prevent a nurse in Cleveland from working in the health care field in Northeast Ohio, or a

software engineer in Orlando from working for another technology company in Central Florida. The result is less competition among employers for the worker's services and less competition among workers for available jobs. Since the worker is prevented from taking these jobs, the worker may decide not to enter the labor market at all. Or the worker may enter the labor market but take a job in which they are less productive, such as a job outside their field.

Non-compete clauses affect competition in labor markets through their use in the aggregate. The effect of an individual worker's non-compete clause on competition in a particular labor market may be marginal or may be impossible to discern statistically. However, the use of a large number of non-compete clauses across a labor market markedly affects the opportunities of all workers in that market, not just those with non-compete clauses. By making it more difficult for many workers in a labor market to switch to new jobs, non-compete clauses inhibit optimal matches from being made between employers and workers across the labor market. As a result, where non-compete clauses are prevalent in a market, workers are more likely to remain in jobs that are less optimal with respect to the worker's ability to maximize their productive capacity. This materially reduces wages for workers—not only for workers who are subject to non-compete clauses, but for other workers in a labor market as well, since jobs that would otherwise be better matches for an unconstrained worker are filled by workers subject to non-compete clauses.

a. Estimates of Non-Compete Clause Use

Based on the available evidence, the Commission estimates that approximately one in five American workers—or approximately 30 million workers—is bound by a non-compete clause.

A 2014 survey of workers by Evan Starr, JJ Prescott, and Norman Bishara, which resulted in 11,505 responses, found 18% of respondents work under a non-compete clause and 38% of respondents have worked under one at some point in their lives.[42] Among the

studies of non-compete clause use discussed here, this study has the broadest and likely the most representative coverage of the U.S. labor force.[43] Starr, Prescott, and Bishara also found that, among workers without a bachelor's degree, 14% of respondents reported working under a non-compete clause at the time surveyed and 35% reported having worked under one at some point in their lives.[44] For workers earning less than $40,000 per year, 13% of respondents work under a non-compete clause and 33% worked under one at some point in their lives.[45] Furthermore, this survey shows 53% of workers who are covered by non-compete clauses are hourly workers.[46]

Starr, Prescott, and Bishara also found, in states where non-compete clauses are unenforceable, workers are covered by non-compete clauses at approximately the same rate as workers in other states.[47] This suggests employers maintain non-compete clauses even where they likely cannot enforce them.

Other estimates of non-compete clause use cover subsets of the U.S. labor force. One study, a 2021 study by Rothstein and Starr, is based on National Longitudinal Survey of Youth (NLSY) data.[48] The NLSY consists of a nationally representative sample of 8,984 men and women born from 1980–84 and living in the United States at the time of the initial survey in 1997.[49] The survey is an often-used labor survey conducted by the Bureau of Labor Statistics, rather than a one-off survey

---

found that non-compete clauses are often used together with other restrictive employment covenants, including non-disclosure, non-recruitment, and non-solicitation covenants. *Id.* at 17 (reporting that respondents that had a non-compete clause reported having all three of the other restrictive employment covenants 74.7% of the time). However, a key limitation of the *Payscale.com* survey is that it is a convenience sample of individuals who visited *Payscale.com* during the time period of the survey and is therefore unlikely to be fully representative of the U.S. working population. *Id.* at 13. While weighting based on demographics helps, it does not fully mitigate this concern.

[43] The final survey sample contained 11,505 responses, representing individuals from nearly every demographic in the labor force. *Id.* at 58.

[44] *Id.* at 63.

[45] *Id.*

[46] Michael Lipsitz & Evan Starr, *Low-Wage Workers and the Enforceability of Noncompete Agreements,* 68 Mgmt. Sci. 143, 144 (2021) (analyzing data from the Starr, Prescott, & Bishara survey).

[47] Starr, Prescott, & Bishara, *supra* note 42 at 81.

[48] Donna S. Rothstein & Evan Starr, *Mobility Restrictions, Bargaining, and Wages: Evidence from the National Longitudinal Survey of Youth 1997* (2021), *https://papers.ssrn.com/sol3/papers.cfm? abstract_id=3974897.*

[49] U.S. Bureau of Labor Statistics, *NLSY97 Data Overview, https://www.bls.gov/nls/nlsy97.htm.*

---

[42] Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force,* 64 J.L. & Econ. 53, 53 (2021). A survey of workers conducted in 2017 by *Payscale.com* reached similar results. This survey estimated that 24.2% of workers are subject to a non-compete clause. Natarajan Balasubramanian, Evan Starr, & Shotaro Yamaguchi, *Bundling Employment Restrictions and Value Appropriation from Employees* 35 (2022), *https://papers.ssrn.com/sol3/ papers.cfm?abstract_id=3814403.* This survey also

directed solely at calculating the prevalence of non-compete clauses. Using this data, Rothstein and Starr estimate the prevalence of non-compete clauses to be 18%, which is comparable to the number estimated by Starr, Prescott, and Bishara.[50]

Finally, four occupations have been studied individually: executives, physicians, hair stylists, and electrical and electronics engineers. Both Shi (2021) and Kini et al. (2021) estimate prevalence of non-compete clauses for executives. Shi (2021) finds the proportion of executives working under a non-compete clause rose from "57% in the early 1990s to 67% in the mid-2010s." [51] Kini et al. (2021) find that 62% of CEOs worked under a non-compete clause between 1992 and 2014.[52] Lavetti et al. (2020) find 45% of physicians worked under a non-compete clause in 2007.[53] In a survey of independent hair salon owners, Johnson and Lipsitz (2021) find 30% of hair stylists worked under a non-compete clause in 2015.[54] Finally, in a survey of electrical and electronic engineers, Marx (2011) finds that 43% of respondents signed a non-compete clause.[55]

Some observers have stated that the use of non-compete clauses by employers appears to have increased over time.[56] However, there is no consistent data available on the prevalence of non-compete clauses over time.

While many workers are bound by non-compete clauses, many workers do not know whether their non-compete clause is legally enforceable or not. As part of their 2014 survey, Starr et al.

asked surveyed individuals "Are noncompetes enforceable in your state?" Of the respondents, 37% indicated that they did not know whether or not their non-compete clause was enforceable.[57] Additionally, 11% of individuals were misinformed: they believed that non-compete clauses were enforceable in their state when they were not, or they believed that non-compete clauses were not enforceable when they were.[58]

Starr et al. also find that only 10.1% of workers with non-compete clauses report bargaining over it.[59] Additionally, only 7.9% report consulting a lawyer, and only 11.4% of respondents thought that they still would have been hired if they had refused to sign the non-compete clause.[60] Marx finds that only 30.5% of electrical engineers who signed non-compete clauses were asked to sign prior to accepting their job offer, and 47% of non-compete clause signers were asked to sign on or after their first day of work.[61]

### b. Earnings—Effects on Workers Across the Labor Force

By inhibiting optimal matches from being made between employers and workers across the labor force, non-compete clauses reduce the earnings of workers. Several studies have found that increased enforceability of non-compete clauses reduces workers' earnings across the labor market generally and for specific types of workers.

Each of the studies described below analyzes the effects of non-compete clause enforceability on earnings. While different studies have defined enforceability of non-compete clauses in slightly different ways, each uses enforceability as a proxy for the chance that a given non-compete clause will be enforced.[62]

These studies use "natural experiments" resulting from changes in state law to assess how changes in the enforceability of non-compete clauses affect workers' earnings. The use of a natural experiment allows for the

inference of causal effects, since the likelihood that other variables are driving the outcomes is minimal.

First, a study conducted by Matthew Johnson, Kurt Lavetti, and Michael Lipsitz finds that decreasing non-compete clause enforceability from the approximate enforceability level of the fifth-strictest state to that of the fifth-most-lax state would increase workers' earnings by 3–4%.[63] Johnson, Lavetti, and Lipsitz also estimate that a nationwide ban on non-compete clauses would increase average earnings by 3.3–13.9%.[64] The authors also find that non-compete clauses limit the ability of workers to leverage favorable labor markets to receive greater pay: when non-compete clauses are more enforceable, workers' earnings are less responsive to low unemployment rates (which workers may typically leverage to negotiate pay raises).[65]

The second study of the effects of non-compete clause enforceability on earnings, conducted by Evan Starr, estimates that if a state that does not enforce non-compete clauses shifted its policy to that of the state with an average level of enforceability, earnings would fall by about 4%.[66] Unlike many of the other studies described here, this study does not use a change in enforceability of non-compete clauses to analyze the impact of enforceability. Rather, it examines the differential impact of enforceability on workers in occupations which use non-compete clauses at a high rate versus workers in occupations which use non-compete clauses at a low rate. While the Commission believes that this research design may be less informative with respect to the proposed rule than designs which examine changes in enforceability, the study's estimated effects are in line with the rest of the literature.

The third study, conducted by Michael Lipsitz and Evan Starr, estimates that when Oregon stopped enforcing non-compete clauses for workers who are paid hourly, their wages increased by 2–3%, relative to workers in states which did not experience legal changes. The study also found a greater effect (4.6%) on workers

---

[50] Rothstein & Starr, *supra* note 48 at 7.

[51] Liyan Shi, *Optimal Regulation of Noncompete Contracts* 27 (2022), *https://static1.squarespace. com/static/59e19b282278e7ca5b9ff84f/t/ 626658ffb73adb2959bd4371/1650874624095/ noncompete_shi.pdf.*

[52] Omesh Kini, Ryan Williams, & Sirui Yin, *CEO Noncompete Agreements, Job Risk, and Compensation,* 34 Rev. Fin. Stud. 4701, 4707 (2021).

[53] Kurt Lavetti, Carol Simon, & William D. White, *The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians,* 55 J. Hum. Res. 1025, 1042 (2020).

[54] Matthew S. Johnson & Michael Lipsitz, *Why Are Low-Wage Workers Signing Noncompete Agreements?,* 57 J. Hum. Res. 689, 700 (2022).

[55] Matt Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals,* 76 Am. Socio. Rev. 695, 702 (2011). Calculated as 92.60% who signed a non-compete clause of the 46.80% who were asked to sign a non-compete clause.

[56] *See, e.g.,* Rachel Arnow-Richman, *Cubewrap Contracts and Worker Mobility: The Dilution of Employee Bargaining Power via Standard Form Noncompetes,* 2006 Mich. St. L. Rev. 963, 981 n.59; John W. Lettieri, American Enterprise Institute, Policy Brief, *A Better Bargain: How Noncompete Reform Can Benefit Workers and Boost Economic Dynamism* (December 2020) at 2.

[57] J.J. Prescott & Evan Starr, *Subjective Beliefs About Contract Enforceability* 10 (2022), *https:// papers.ssrn.com/sol3/papers.cfm?abstract_ id=3873638.*

[58] *Id.* at 11.

[59] Starr, Prescott, & Bishara, *supra* note 42, at 72.

[60] *Id.*

[61] Marx (2011), *supra* note 55 at 706. Forty-seven percent is calculated as the sum of 24.43% and 22.86%, the respective percentage of requests that were made on the first day or after the first day at the company.

[62] All the studies described below rely on twelve concepts of enforceability based on Malsberger's "Non-Compete Clauses: A State-by-State Survey" and Kini et al. supplemented with data from Beck, Reed, and Riden LLP's state-by-state survey of non-compete clauses.

[63] Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 2 (2020), *https:// papers.ssrn.com/sol3/papers.cfm?abstract_ id=3455381.*

[64] *Id.*

[65] *Id.* at 36.

[66] Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clauses,* 72 I.L.R. Rev. 783, 799 (2019).

in occupations that used non-compete clauses at a relatively high rate.[67]

The fourth study, conducted by Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, and Evan Starr, found that when Hawaii stopped enforcing non-compete clauses for high-tech workers, earnings of new hires increased by about 4%.[68]

The fifth and sixth studies both show that enforceable non-compete clauses reduce earnings for executives. One study, by Mark Garmaise, finds that decreased enforceability of non-compete clauses increases executives' earnings by 12.7%.[69] Another study, by Omesh Kini, Ryan Williams, and David Yin, finds that decreased enforceability of non-compete clauses led to lower earnings for CEOs when use of non-compete clauses is held constant. However, the study also finds use of non-compete clauses decreases when non-compete clause enforceability decreases. When that relationship is taken into account, decreased enforceability results in greater earnings for CEOs. For example, if the state which enforces non-compete clauses most strictly (Florida) hypothetically moved to a policy of non-enforcement, then a CEO who had a non-compete clause prior to the policy change would experience an estimated 11.4% increase in their earnings, assuming their non-compete clause was dropped.[70]

Among the studies listed above, Johnson, Lavetti, and Lipsitz likely has the broadest coverage. The study spans the years 1991 to 2014, examines workers across the labor force, and uses all known common law and statutory changes in non-compete clause enforceability to arrive at its estimates. The study by Starr also covers the entire labor force, from 1996 to 2008. However, the Starr study is only able to compare effects for occupations that use non-compete clauses at a high rate to those that use them at a low rate. The next two studies cover just one legal

change, and only a subset of the labor force: hourly workers in Oregon, in the case of Lipsitz and Starr, and high-tech workers in Hawaii, in the case of Balasubramanian et al. Finally, while the studies conducted by Garmaise and Kini et al. examine multiple legal changes, they focus solely on executives.

One limitation of studies of enforceability alone—*i.e.,* studies which do not consider the use of non-compete clauses—is that it is difficult to disentangle the effects of increased enforceability on workers who are subject to non-compete clauses and workers who are not subject to non-compete clauses. In other words, since effects are observed across the labor force (or some subset of it), they include both effects on workers with and without non-compete clauses. However, due to the research cited in the next subsection—indicating non-compete clauses reduce earnings for workers who are *not* subject to non-compete clauses—the Commission believes it is reasonable to conclude based on contextual evidence that the labor-force-wide effects described in the studies above include effects on both workers with and without non-compete clauses.

Three additional studies examine the association between non-compete clause use—rather than enforceability—and earnings. Using the 2014 survey described in Part II.B.1.a, Starr et al. find that the use of non-compete clauses is associated with 6.6% higher earnings in the model including the most control variables among those they observe.[71] Using the *Payscale.com* data, Balasubramanian et al. find that while non-compete clause use is associated with 2.1–8.2% greater earnings (compared with individuals with no post-contractual restrictions), this positive association is due to non-compete clauses often being bundled with non-disclosure agreements. Compared with individuals only using non-disclosure agreements, use of non-compete clauses is associated with a 3.0–7.3% *decrease* in earnings, though the authors do not disentangle this effect from the effects of use of non-solicitation and non-recruitment provisions.[72] Finally, Lavetti et al. find that use of non-compete clauses among physicians is associated with greater earnings (by 14%) and greater earnings growth.[73] (The Commission notes, however, this study does not consider

how changes in non-compete clause enforceability affect physicians' earnings. As described below in the cost-benefit analysis for the proposed rule, the Commission estimates the proposed rule may increase physicians' earnings, though the study does not allow for a precise calculation.[74])

However, the Commission does not believe that studies examining the association between non-compete clause use—rather than enforceability—and earnings are sufficiently probative of the effects of non-compete clauses on earnings. The Commission's concern is that non-compete clause use and earnings may both be determined by one or more confounding factors. It may be the case, for example, that employers who rely most on trade secrets both pay more and use non-compete clauses at a high rate (which would not necessarily be captured by the control variables observed in studies of non-compete clause use). This means these studies do not necessarily inform how restricting the use of non-compete clauses through a rule would impact earnings. This methodological limitation contrasts with studies examining enforceability of non-compete clauses, in which changes in enforceability are "natural experiments" that allow for the inference of causal effects, since the likelihood that other variables are driving the outcomes is minimal. A "natural experiment" refers to some kind of change in the real world that allows researchers to study the impact of the change on an outcome. In a natural experiment, the change is effectively random, uninfluenced by other factors which could have simultaneously affected the outcome. In such situations, it is therefore most likely the change itself caused any impact that is observed on the outcomes.

The belief that studies of non-compete clause use do not reflect causal estimates is shared by the authors of at least one of the studies of non-compete clause use. As noted in Starr et al., "Our analysis of the relationships between noncompete use and labor market outcomes . . . is best taken as descriptive and should not be interpreted causally."[75] As a result, the Commission gives these studies minimal weight. The study of physicians conducted by Lavetti et al. partially mitigates this concern by comparing earnings effects in high-versus low-enforcement states, though this analysis compares only California and Illinois, meaning that it is

---

[67] Lipsitz & Starr, *supra* note 46 at 143.

[68] Natarajan Balasubramanian, Jin Woo Chang, Mariko Sakakibara, Jagadeesh Sivadasan, & Evan Starr, *Locked In? The Enforceability of Non-Compete Clauses and the Careers of High-Tech Workers*, 57 J. Hum. Res. S349, S349 (2022).

[69] Mark J. Garmaise, *Ties that Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment*, 27 J.L., Econ., & Org. 376, 403 (2011). The reduction in earnings is calculated as $e^{-1.3575 \times 0.1} - 1$, where $-1.3575$ is taken from Table 4.

[70] Kini, Williams, & Yin, *supra* note 52 at 4731. The 11.4% increase is calculated as $e^X - 1$, where X is calculated as 9 times the coefficient on CEO Noncompete × HQ Enforce (0.047), where 9 is the enforceability index in Florida, plus the coefficient on CEO Noncompete ($-0.144$), plus 9 times the coefficient on HQ Enforce ($-0.043$).

[71] Starr, Prescott, & Bishara, *supra* note 42 at 75.

[72] Balasubramanian, Starr, & Yamaguchi, *supra* note 42 at 40. The percentage range is calculated as $e^{-0.030} - 1$ and $e^{-0.076} - 1$, respectively.

[73] Lavetti, Simon, & White, *supra* note 53 at 1051. The increase in earnings is calculated as $e^{0.131} - 1$.

[74] *See infra* Part VII.B.1.a.ii.

[75] Starr, Prescott, & Bishara, *supra* note 42 at 73.

impossible to disentangle underlying differences in those two states from the effects of non-compete clause enforceability.

c. Earnings—Effects on Workers Not Covered by Non-Compete Clauses

As described above, non-compete clauses negatively affect competition in labor markets, thereby inhibiting optimal matches from being made between employers and workers across the labor force. As a result, non-compete clauses reduce earnings not only for workers who are subject to non-compete clauses, but also for workers who are not subject to non-compete clauses.

Two studies show non-compete clauses reduce earnings for workers who are not subject to non-compete clauses. The first study, a 2019 study of the external effects of non-compete clauses conducted by Evan Starr, Justin Frake, and Rajshree Agarwal, analyzed workers without non-compete clauses who worked in states and industries in which non-compete clauses were used at a high rate.[76] They find that, when the use of non-compete clauses in a given state and industry combination increases by 10%, the earnings of workers who do not have non-compete clauses, but who work in that same state and industry, go down by about 6.12% more when that state has an average enforceability level, compared with a state which does not enforce non-compete clauses.[77] In effect, this study finds when the use of non-compete clauses by employers increases, that drives down wages for workers who do not have non-compete clauses but who work in the same state and industry. This study also finds this effect is stronger where non-compete clauses are more enforceable.

The Commission notes that, similar to some of the studies described above, this study relies on use of non-compete clauses, as well as cross-sectional differences in enforceability of non-compete clauses, to arrive at their conclusions. While this approach calls into question the causal relationship outlined in the study, the authors employ tests to increase confidence in the causal interpretation; however, the tests rely on what data the authors have available, and therefore cannot rule out explanations outside of the scope of their data. This study also analyzes the effect of non-compete clause use for certain workers on workers in a different firm, meaning that factors

simultaneously driving non-compete clause use and outcomes within a certain firm will not break the causal chain identified in the study.

Starr, Frake, and Agarwal show the reduction in earnings (and mobility, discussed below) is due to a reduction in the rate of the arrival of job offers. Individuals in state/industry combinations which use non-compete clauses at a high rate do not receive job offers as frequently as individuals in state/industry combinations where non-compete clauses are not frequently used.[78] The authors also demonstrate decreased mobility and earnings are *not* due to increased job satisfaction (*i.e.,* if workers are more satisfied with their jobs, they may be less likely to change jobs, and more likely to accept lower pay).[79] Finally, they show that decreased mobility and earnings are not because workers are searching for jobs less frequently, suggesting that job openings and firm behavior matter more to the underlying mechanism.[80]

The second study, conducted by Johnson, Lavetti, and Lipsitz, isolates the impact of a state's enforceability policy on workers not directly affected by that policy to demonstrate non-compete clauses affect not just the workers subject to those non-compete clauses, but the broader labor market as well. In particular, the study finds that increases in non-compete clause enforceability in one state have negative impacts on workers' earnings in bordering states, and the effects are nearly as large as the effects in the state in which enforceability changed. Johnson, Lavetti, and Lipsitz estimate that the impact on earnings of a law change in one state on workers just across that state's border is 87% as great as for workers in the state in which the law was changed (the effect tapers off as the distance to the bordering state increases).[81] When a law change in one state decreases workers' earnings in that state by 4%, that would therefore mean that workers just across the border (*i.e.,* workers who share a commuting zone—a delineation of a local economy[82]—but who live in another state) would experience decreased earnings of 3.5%. The authors conclude that, since the workers across the border are not

*directly* affected by the law change (*i.e.,* contracts that they have signed do not become more or less enforceable), this effect must be due to changes in the local labor market.[83]

d. Earnings—Distributional Effects

There is evidence that non-compete clauses increase racial and gender wage gaps by disproportionately reducing the wages of women and non-white workers. This may be, for example, because firms use the monopsony power which results from use of non-compete clauses as a means by which to wage discriminate. The study by Johnson, Lavetti, and Lipsitz finds that while earnings of white men would increase by about 3.2% if a state's enforceability moved from the fifth-strictest to the fifth most lax, the comparable earnings increase for workers in other demographic groups would be 3.7–7.7%, depending on the characteristics of the group (though it is not clear from the study whether or not the differences are statistically significant).[84] The authors estimate that banning non-compete clauses nationwide would close racial and gender wage gaps by 3.6–9.1%.[85]

e. Job Creation

While non-compete clauses may theoretically incentivize firms to create jobs by increasing the value associated with any given worker covered by a non-compete clause, the evidence is inconclusive. One study, by Gerald Carlino, estimates the job creation rate at startups increased by 7.8% when Michigan increased non-compete clause enforceability.[86] However, the job creation rate calculated in this study is the ratio of jobs created by startups to overall employment in the state: therefore, the job creation rate at startups may rise either because the number of jobs created by startups rose, or because employment overall fell. The study does not investigate which of these two factors drives the increase in the job creation rate at startups.

Another study finds that several increases in non-compete clause enforceability were associated with a 1.4% increase in average per-firm employment at new firms (though not necessarily total employment).[87] In this

---

[76] Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities,* 30 Org. Sci. 961, 6 (2019).

[77] *Id.* at 11.

[78] *Id.* at 10.

[79] *Id.* at 13.

[80] *Id.*

[81] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 51. Eighty seven percent is calculated as the coefficient on the donor state NCA score (−.181) divided by the coefficient on own state NCA score (−.207).

[82] See U.S. Econ. Rsch. Serv., Commuting Zones and Labor Market Areas, *https://www.ers.usda.gov/data-products/commuting-zones-and-labor-market-areas/.*

[83] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 30.

[84] *Id.* at 38.

[85] *Id.*

[86] Gerald A. Carlino, *Do Non-Compete Covenants Influence State Startup Activity? Evidence from the Michigan Experiment* at 16 (Fed. Reserve Bank of Phila. Working Paper 21–26, 2021).

[87] Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, *Screening Spinouts? How Noncompete Enforceability Affects the Creation,*

study, the authors attribute the increase in average employment to a change in the composition of newly founded firms. The increases in non-compete clause enforceability prevented the entry of relatively small startups which would otherwise have existed. Therefore, the firms which entered in spite of increases in non-compete clause enforceability had more workers on average: this increased the average job creation rate at new firms, because the average entering firm was relatively larger. However, if the mechanism identified by the authors is correct, increases in enforceability generate fewer total jobs, because the same number of large firms may enter (regardless of non-compete clause enforceability), but fewer small firms enter.

A similar mechanism may explain the results in both studies above. If that is indeed the case, then an increase in average per-firm employment among startups is not a positive effect of non-compete clause enforceability: instead, it could actually represent a negative effect, since non-compete clauses prevent small firms from existing in the first place, and overall job creation may decrease. The Commission therefore believes, with respect to job creation rates, the evidence is inconclusive.

## 2. Product and Service Markets

In addition to analyzing how non-compete clauses affect competition in labor markets, researchers have also analyzed whether non-compete clauses affect competition in markets for products and services. The available evidence indicates the use of non-compete clauses interferes with competitive conditions in product and service markets as well.

The adverse effects of non-compete clauses on product and service markets likely result from reduced voluntary labor mobility. Non-compete clauses directly impede voluntary labor mobility by restricting workers subject to non-compete clauses from moving to new jobs covered by their non-compete clause. Since non-compete clauses prevent some job openings from occurring (by keeping workers in their jobs), they also prevent workers who are not subject to non-compete clauses from finding new jobs (since the new jobs are already occupied by workers with non-compete clauses).

Influenced by Ronald Gilson's research positing that high-tech clusters in California may have been aided by increased labor mobility because non-compete clauses are generally unenforceable in that state,[88] many studies have examined how non-compete clauses affect labor mobility. Even literature primarily focused on other outcomes has examined labor mobility as a secondary outcome. Across the board, all studies have found decreased rates of mobility, measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within- and between-industry mobility. We briefly describe each of these studies in turn.

A 2006 study conducted by Fallick, Fleischman, and Rebitzer supported Gilson's hypothesis by showing that labor mobility in information technology industries in metropolitan statistical areas (MSAs) in California was 56% higher than in comparison MSAs outside California. They note, however, the estimates may not be fully (or at all) attributable to non-compete clause enforceability. Although the Commission therefore does not find this particular study to be sufficiently probative of the relationship between non-compete clauses and labor mobility, its qualitative findings are in line with the rest of the literature.[89]

To estimate the impacts of non-compete clause enforceability in a fashion that may more plausibly attribute causality to the relationship, in 2009, Marx, Strumsky, and Fleming examined the impact on labor mobility of Michigan's switch to enforcing non-compete clauses. They found that Michigan's increase in enforceability led to an 8.1% decline in the mobility of inventors.[90]

In 2011, Mark Garmaise examined how a suite of changes in non-compete clause enforceability affected labor mobility. Garmaise found executives made within-industry job changes 47% more often, between-industry job changes 25% more often (though this result was not statistically significant), and any job change 35% more often when non-compete clauses were less enforceable.[91]

A 2019 study by Jessica Jeffers uses several legal changes to analyze the impact of non-compete clauses on workers' mobility, finding that decreases in non-compete clause enforceability were associated with an 8.6% increase in departure rates of workers, and a 15.4% increase in within-industry departure rates of workers.[92]

Evan Starr's 2019 study comparing workers in occupations which use non-compete clauses at a high versus low rate found that a state moving from mean enforceability to no enforceability would cause a decrease in employee tenure for workers in high-use occupations of 8.2%, compared with those in low-use occupations. Here, tenure serves as a proxy for mobility, since tenure is the absence of prior mobility.[93]

Returning to an examination of executives, Liyan Shi's 2020 paper qualitatively confirmed Garmaise's results, showing that executives with enforceable non-compete clauses were 1.8 percentage points less likely to separate from their employers, compared with executives without enforceable non-compete clauses.[94]

Starr, Prescott, and Bishara's 2020 study found that having a non-compete clause was associated with a 35% decrease in the likelihood a worker would leave for a competitor.[95] However, they also found enforceability does not impact this prediction, in contrast with prior studies. Digging deeper into the mechanism, they find that what matters is the worker's belief about the likelihood their employer would seek to enforce a non-compete clause in court. Workers who did not believe employers would enforce non-compete clauses in court were more likely to report they would be willing to leave for a competitor.[96] This result confirms the need to ensure that workers are aware of the proposed rule, though it suffers from the same limitations as do previously discussed studies of the impacts of non-compete clause use, rather than enforceability: that studies of use are not causally interpretable, since they may conflate the effects of factors which cause use for the effects of use itself.

Two recent studies examined subgroups of the population affected by

---

Growth, and Survival of New Firms, 64 Mgmt. Sci. 552, 561 (2018).

[88] Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Non-Compete Clauses,* 74 N.Y.U. L. Rev. 575 (1999).

[89] Bruce Fallick, Charles A. Fleischman, & James B. Rebitzer, *Job-Hopping in Silicon Valley: Some Evidence Concerning the Microfoundations of a High-Technology Cluster,* 88 Rev. Econ. & Statistics 472, 477 (2006).

[90] Matt Marx, Deborah Strumsky, & Lee Fleming, *Mobility, Skills, and the Michigan Non-Compete Experiment,* 55 Mgmt. Sci. 875, 884 (2009).

[91] Garmaise, *supra* note 69 at 398.

[92] Jessica Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship* 22 (2019), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3040393.*

[93] Starr, *supra* note 66 at 798. The value is calculated as 8.2% = 0.56/6.46, where 0.56 is the reported impact on tenure and 6.46 is mean tenure in the sample.

[94] Shi, *supra* note 51 at 26.

[95] Evan Starr, J.J. Prescott, & Norm Bishara, *The Behavioral Effects of (Unenforceable) Contracts,* 36 J.L., Econ., & Org. 633, 652 (2020).

[96] *Id.* at 664.

state law changes. Balasubramanian et al., in 2022, focused on high-tech workers whose non-compete clauses were banned in Hawaii, and Lipsitz and Starr, in 2022, focused on hourly workers whose non-compete clauses were banned in Oregon. The former found that the ban increased mobility by 12.5% in the high-tech sector,[97] while the latter found that mobility of hourly workers increased by 17.3%.[98]

Finally, a 2022 study by Johnson, Lavetti, and Lipsitz examined the impact on labor mobility of all legal changes after 1991 across the entire labor force. They found moving from the enforceability level of the fifth strictest state to that of the fifth most lax state causes a 6.0% increase in job-to-job mobility in industries using non-compete clauses at a high rate.[99] Furthermore, they found when a state changes its non-compete clause enforceability in that fashion, workers in neighboring states experience 4.8% increases in mobility as measured by job separations, and 3.9% increases as measured by hiring rates, though neither result was statistically significant.[100]

As described below in Part IV.A.1.a.ii, the Commission does not view reduced labor mobility from non-compete clauses—in and of itself—as evidence non-compete clauses negatively affect competition in product and service markets. Instead, reduced labor mobility is best understood as the primary driver of effects in product and service markets that the Commission is concerned about. These effects are described below.

a. Consumer Prices and Concentration

There is evidence that non-compete clauses increase consumer prices and concentration in the health care sector. There is also evidence non-compete clauses increase industrial concentration more broadly. Non-compete clauses may have these effects by inhibiting entrepreneurial ventures (which could otherwise enhance competition in goods and service markets) or by foreclosing competitors' access to talented workers.

One study, by Naomi Hausman and Kurt Lavetti, finds increased concentration, as measured by the Herfindahl-Hirschman Index (HHI), at the firm level [101] and increased final

goods prices [102] as the enforceability of non-compete clauses increases. Hausman and Lavetti's study focuses on physician markets, showing that while non-compete clauses allow physician practices to allocate clients more efficiently across physicians, this comes at the cost of greater concentration and prices for consumers. Generally, greater concentration may or may not lead to greater prices in all situations and may arise for reasons which simultaneously cause higher prices (indicating, therefore, a noncausal relationship between concentration and prices). In this case, the authors claim that researching the direct link between changes in law governing non-compete clauses and changes in concentration allows them to identify a causal chain starting with greater enforceability of non-compete clauses, which leads to greater concentration, and higher consumer prices.

While there is no additional direct evidence on the link between non-compete clauses and consumer prices, another study, by Michael Lipsitz and Mark Tremblay, shows increased enforceability of non-compete clauses at the state level increases concentration, as measured by an employment-based HHI.[103] Lipsitz and Tremblay theorize non-compete clauses inhibit entrepreneurial ventures which could otherwise enhance competition in goods and service markets, and show that the potential for harm is greatest in exactly those industries in which non-compete clauses are likely to be used at the highest rate.[104] If the general causal link governing the relationship between enforceability of non-compete clauses, concentration, and consumer prices acts similarly to that identified in the study by Hausman and Lavetti, then it is plausible that increases in concentration identified in Lipsitz and Tremblay would lead to higher prices in a broader set of industries.

In many settings, it is also theoretically plausible that increases in worker earnings from restricting non-compete clauses may increase consumer prices by raising firms' costs (though there is countervailing evidence,

especially in goods manufacturing [105]). However, we are not aware of empirical evidence that this occurs, and there are also countervailing forces—such as the impacts on concentration described above and positive impacts on innovation [106]—that would tend to decrease consumer prices. Additionally, the greater wages observed for workers where non-compete clauses are less enforceable may be due to better worker-firm matching, which could simultaneously increase wages and increase productivity, which could lead to lower prices.

In addition, the only study of how non-compete clauses affect prices—the Hausman and Lavetti study described above—finds decreased non-compete clause enforceability decreases prices in the healthcare market, rather than increasing them. The study notes that, in theory, changes in non-compete clause enforceability could impact physicians' earnings, which could subsequently pass through to prices in healthcare markets. However, the authors show that, where prices decrease due to decreased non-compete clause enforceability, labor cost pass-through is not driving price decreases. As the authors note, if price decreases associated with non-compete clause enforceability decreases were due to pass-through of decreases in physicians' earnings, then the most labor-intensive procedures would likely experience the greatest price decreases when enforceability decreased. However, they find the opposite: there is little to no effect on prices for the most labor-intensive procedures, in contrast with procedures which use relatively less labor. As the authors explain, this shows that decreases in healthcare prices associated with decreases in non-compete clause enforceability are not due to pass-through of lower labor costs.[107]

b. Foreclosing Competitors' Ability To Access Talent

There is evidence that non-compete clauses foreclose the ability of competitors to access talent by effectively forcing future employers to buy out workers from their non-compete clauses if they want to hire them. Firms must either make inefficiently high payments to buy workers out of non-compete clauses with a former employer, which leads to deadweight economic loss, or forego the payment—

---

[97] Balasubramanian et al., *supra* note 68 at S351.

[98] Lipsitz & Starr, *supra* note 46 at 157.

[99] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 21.

[100] *Id.* at 76.

[101] Naomi Hausman & Kurt Lavetti, *Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes*, 13 a.m. Econ. J. Applied Econ. 258, 284 (2021). Note that Hausman and Lavetti find decreased HHI at the establishment

level (where an establishment is a physical location, and a firm is a company which may own multiple establishments). For the purposes of consumer outcomes such as a price or product quality, the relevant measure of concentration is at the firm level, since firms are unlikely to compete against themselves on price or quality.

[102] *Id.* at 280.

[103] Michael Lipsitz & Mark Tremblay, *Noncompete Agreements and the Welfare of Consumers* 6 (2021), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3975864.*

[104] *Id.* at 3.

[105] Sebastian Heise, Fatih Karahan, & Ayşegül Şahin *The Missing Inflation Puzzle: The Role of the Wage-Price Pass-Through*, 54 J. Money, Credit & Banking 7 (2022).

[106] *See infra* Part II.B.2.d.

[107] Hausman & Lavetti, *supra* note 101 at 278.

and, consequently, the access to the talent the firm seeks. Whatever choice a firm makes, its economic outcomes in the market are harmed, relative to a scenario in which no workers are bound by non-compete clauses.

Liyan Shi studies this effect in a 2022 paper. This paper finds non-compete clauses are used to ensure that potential new employers of executives make a buyout payment to the executive's current employer.[108] Such a mechanism could be tempered by the ability of a labor market to provide viable alternative workers for new or competing businesses. However, when a particular type of labor is somewhat scarce, when on-the-job experience matters significantly, or when frictions prevent workers from moving to new jobs, there is no way for the market to fill the gap created by non-compete clauses. By studying CEOs, who are difficult to replace and relatively scarce, Shi's paper shows that non-compete clauses foreclose the ability of competitors to access talent by effectively forcing them to make inefficiently high buyout payments. Shi ultimately concludes that "imposing a complete ban on noncompete clauses would be close to implementing the social optimum." [109]

#### c. New Business Formation

The weight of the evidence indicates non-compete clauses likely have a negative impact on new business formation. Three studies show that non-compete clauses and increased enforceability of non-compete clauses reduce entrepreneurship, new business formation, or both. A fourth study also finds that non-compete clauses reduce the rate at which men and women found new startups, though the result is not statistically significant for men. A fifth study finds mixed effects which likely support the theory that non-compete clauses reduce new business formation, and a sixth study finds no effect.

New business formation may refer to entrepreneurs creating new businesses from scratch or to businesses being spun off from existing businesses. New business formation increases competition first by bringing new ideas to market, and second, by forcing incumbent firms to respond to new firms' ideas instead of stagnating. New businesses disproportionately create new jobs and are, as a group, more resilient to economic downturns.[110]

Recent evidence that new business formation is trending downward has led to concerns that productivity and technological innovation are not as strong as they would have been had new business formation remained at higher levels.[111] Non-compete clauses restrain new business formation by preventing workers subject to non-compete clauses from starting their own businesses. In addition, firms are more willing to enter markets in which they know there are potential sources of skilled and experienced labor, unhampered by non-compete clauses.

Three studies show that non-compete clauses and increased enforceability of non-compete clauses reduce entrepreneurship and new business formation. First, Sampsa Samila and Olav Sorenson, in a 2011 study, examined the differential impacts of venture capital on business formation, patenting, and employment growth. They found when non-compete clauses are more enforceable, rates of entrepreneurship, patenting, and employment growth slow. They find that a 1% increase in venture capital funding increased the number of new firms by 0.8% when non-compete clauses were enforceable, and by 2.3% when non-compete clauses were not enforceable.[112] Similarly, a 1% increase in the rate of venture capital funding increased employment by 0.6% when non-compete clauses were enforceable, versus 2.5% where non-compete clauses were not enforceable.[113]

The second study, conducted by Jessica Jeffers in 2019, uses several state law changes to show a decline in new firm entry when non-compete clauses are more enforceable. When non-compete clause enforceability is made stricter (based on the relatively meaningful changes examined in her study), the entry rate of new firms decreased by 10% in the technology sector and the professional, scientific, and technical services sector.[114]

The third study, conducted by Evan Starr, Natarajan Balasubramanian, and Mariko Sakakibara in 2018, finds that the rate of within-industry spinouts (WSOs) decreases by 0.13 percentage points (against a mean of 0.4%) when non-compete clause enforceability

increases by one standard deviation.[115] The study's measured impact on the entry rate of non-WSOs (*i.e.,* spinoffs into other industries) is statistically indistinguishable from zero (0.07 percentage point increase associated with a one standard deviation increase in enforceability).[116] WSOs have been shown to be highly successful, on average, when compared with typical entrepreneurial ventures.[117] By reducing intra-industry spinoff activity, non-compete clauses prevent entrepreneurial activity that is likely to be highly successful.

The fourth study, published by Matt Marx in 2021, examines the impact of several changes in non-compete clause enforceability between 1991 and 2014.[118] Marx finds that, when non-compete clauses are more enforceable, men are 46% less likely to found a rival startup after leaving their employer (though this result is statistically insignificant), that women are 69% less likely to do so, and that the difference in the effect of non-compete clause enforceability on founding rates between men and women *is* statistically significant.[119] This study therefore supports both the theory that non-compete clauses inhibit new business formation and that non-compete clauses tend to have more negative impacts for women than for men.

A fifth study finds mixed effects of non-compete clause enforceability on the entry of businesses into the State of Florida. Hyo Kang and Lee Fleming, in a 2020 study, examine a legal change in Florida which made non-compete clauses more enforceable. This study finds that larger businesses entered the state more frequently (by 8.5%), but smaller businesses entered less frequently (by 5.6%) following the change.[120] Similarly, Kang and Fleming found that employment at large businesses rose by 15.8% following the change, while employment at smaller businesses effectively did not change.[121]

---

[108] Shi, *supra* note 51.

[109] *Id.* at 35.

[110] *See, e.g., The Importance of Young Firms for Economic Growth,* Policy Brief, Ewing Marion Kauffman Foundation (Sept. 24, 2015).

[111] *See, e.g.,* Cong. Budget Off., *Federal Policies in Response to Declining Entrepreneurship* (December 2020).

[112] Sampsa Samila & Olav Sorenson, *Noncompete Covenants: Incentives to Innovate or Impediments to Growth,* 57 Mgmt. Sci. 425, 432 (2011). The values are calculated as $0.8\% = e^{0.00755} - 1$ and $2.3\% = e^{0.00755 + 0.0155} - 1$, respectively.

[113] *Id.* at 433. The values are calculated as $0.6\% = e^{0.00562} - 1$ and $2.3\% = e^{0.00562 + 0.0192} - 1$, respectively.

[114] Jeffers, *supra* note 92 at 32.

[115] Starr, Balasubramanian, & Sakakibara, *supra* note 87 at 561.

[116] *Id.* at 561.

[117] For reviews of the literature, *see, e.g.,* Steven Klepper, *Spinoffs: A Review and Synthesis,* 6 European Mgmt. Rev. 159–71 (2009) and April Franco, *Employee Entrepreneurship: Recent Research and Future Directions,* in Handbook of Entrepreneurship Research (2005) 81–96.

[118] Matt Marx, *Employee Non-compete Agreements, Gender, and Entrepreneurship,* Org. Sci. (Online ahead of print) (2021).

[119] *Id.* at 9.

[120] Hyo Kang & Lee Fleming, *Non-Competes, Business Dynamism, and Concentration: Evidence From a Florida Case Study,* 29 J. Econ. & Mgmt. Strategy 663, 673 (2020).

[121] *Id.* at 674. The value is calculated as $15.8\% = e^{0.1468} - 1$.

In the Commission's view, however, the results of this study do not necessarily show how non-compete clauses affect new business formation. This study does not examine new business formation specifically; instead, it assesses the number of "business entries" into the state. As the authors acknowledge, many of these business entries are not new businesses being formed in Florida (*i.e.,* startups), but existing businesses that are moving to the state.[122] Because startups are almost never large businesses, the authors' finding that larger businesses entered the state more frequently is much more likely to reflect businesses moving to the state, rather than new businesses being formed in the state. (While a business's relocation to Florida may benefit Florida, it is not net beneficial from a national perspective, since the business is simply moving from somewhere else.) The authors' finding that increased non-compete clause enforceability decreased the entry of smaller businesses is more likely to reflect an effect of non-compete clause enforceability on new business formation, since smaller businesses are relatively more likely than larger businesses to be startups.

A sixth study finds no effect of non-compete clauses on new business formation. A 2021 study by Gerald Carlino analyzes the impact of a legal change in Michigan that allowed the courts to enforce non-compete clauses. This study finds no significant impact on new business formation.[123]

d. Innovation

The weight of the evidence indicates non-compete clauses decrease innovation. Innovation may directly improve economic outcomes by increasing product quality or decreasing prices, or may promote competition because successful new products and services force competing firms to improve their own products and services. Non-compete clauses affect innovation by reducing the movement of workers between firms, which decreases knowledge flow between firms. Non-compete clauses also prevent workers from starting businesses in which they can pursue innovative new ideas.

One study shows increased enforceability of non-compete clauses decreases the value of patenting, using a variety of legal changes. Another study shows that increased non-compete clause enforceability decreases the rate at which venture capital funding increases patenting. Finally, using a legal change in Michigan which increased enforceability, one study shows there were mixed effects on patenting in terms of both quantity and quality, but mechanical patenting (a large part of patenting in Michigan) increased.

The first study, a 2021 study by Zhaozhao He, finds the value of patents, relative to the assets of the firm, increase by about 31% when non-compete clause enforceability decreases.[124] In contrast to the other two studies of innovation, the study uses the value of patents, rather than the number of patents, to mitigate concerns that patenting activity may not represent innovation, but rather substitutions of protections (in other words, that when non-compete clauses are made less enforceable, firms may use patents instead of non-compete clauses to seek to protect sensitive information).[125] The study also analyzes the impact of several legal changes to non-compete clause enforceability, which means that the results may be most broadly applicable.

The second study, by Samila and Sorensen, found that, when non-compete clauses are enforceable, venture capital induced less patenting, by 6.6 percentage points.[126] However, as explained above, the authors note patenting may or may not reflect the true level of innovation, as firms may use patenting as a substitute for non-compete clauses where they seek to protect sensitive information.[127] The final study of innovation, a 2021 study by Gerald Carlino, examined how patenting activity in Michigan was affected by an increase in non-compete enforceability. The study finds that mechanical patenting increased following the law change, but drug patenting fell, and the quality of computer patents fell (as measured by citations).[128] The increase in mechanical patenting appears to have primarily occurred approximately 14 years after non-compete clause enforceability changed, however, suggesting some other mechanism may have led to the increase in patenting activity.[129] We place relatively greater weight on studies focused on multiple legal changes to non-compete clause

enforceability (such as the above referenced study by He), in which factors unrelated to the legal changes at issue are less likely to drive the results. The Carlino study also does not discuss whether patenting activity is an appropriate measure of innovation, though the other two studies suggest that it may be an unreliable measure at best. The study by Samila and Sorensen examines the enforceability of non-compete clauses across all states but does not consider changes in enforceability: they are therefore unable to rule out that their results could be due to underlying differences in the states rather than non-compete clause enforceability.

The Commission therefore places greatest weight on the study by He, which suggests innovation is largely harmed by non-compete clause enforceability. Though the results from Carlino countervail this finding, those results are subject to criticism (as is the corroborating evidence found in Samila and Sorensen).

Two additional studies address firm strategies related to innovation. The first, by Raffaele Conti, uses two changes in non-compete clause enforceability (in Texas and Florida), and indicates that firms engage in riskier strategies with respect to research and development when non-compete clause enforceability is greater.[130] Riskier research and development strategies lead to more breakthrough innovations, but also lead to more failures, leaving the net impact unclear. The paper does not quantify the total impact on innovation.

The second, by Fenglong Xiao, found increases in non-compete clause enforceability led to increases in exploitative innovation (*i.e.,* innovation which stays within the bounds of the innovating firm's existing competences), and decreases in exploratory innovation (*i.e.,* innovation which moves outside those bounds) in medical devices.[131] Overall, this leads to an increase in the quantity of innovation as measured by the introduction of new medical devices. This increase in quantity, however, is the net result of an increase in exploitative innovation and a decrease in explorative innovation, where the latter is the mode of innovation which the empirical

---

[122] *Id.* at 668.

[123] Carlino, *supra* note 86 at 36.

[124] Zhaozhao He, *Motivating Inventors: Non-Competes, Innovation Value and Efficiency* 21 (2021), *https://ssrn.com/abstract=3846964.* Thirty one percent is calculated as $e^{0.27} - 1$.

[125] *Id.* at 17.

[126] Samila & Sorenson, *supra* note 112 at 432. The value is calculated as $6.6\% = e^{0.0208 + 0.0630} - e^{0.0208}$.

[127] *Id.*

[128] Carlino, *supra* note 86 at 40.

[129] *Id.* at 48.

[130] Raffaele Conti, *Do Non-Competition Agreements Lead Firms to Pursue Riskier R&D Strategies?,* 35 Strategic Mgmt. J. 1230 (2014).

[131] Fenglong Xiao, *Non-Competes and Innovation: Evidence from Medical Devices,* 51 Rsch. Pol'y 1 (2022).

literature has found to be associated with high growth firms.[132]

While these two additional studies bring nuance to the changes in the types of innovation pursued by firms when non-compete clause enforceability changes, neither undermines the weight of the evidence described above: that increased non-compete clause enforceability broadly diminishes the rate of innovation.

e. Training and Other Investment

There is evidence that non-compete clauses increase employee training and other forms of investment. Four studies have examined investment outcomes: two examine the effects of non-compete clause enforceability on investment (both of which find positive impacts on investment), while two examine the relationship between non-compete clause use and investment (only one of which finds positive impacts on investment).

Of the two studies that examine the effects of non-compete clause enforceability on investment, one looks at employee training, and one looks at firm capital expenditures (*e.g.,* investment in physical assets, such as machines). The first study, a 2020 study by Evan Starr, finds that moving from mean non-compete clause enforceability to no non-compete clause enforceability would decrease the number of workers receiving training by 14.7% in occupations that use non-compete clauses at a high rate (relative to a control group of occupations that use non-compete clauses at a low rate).[133] The study further finds changes in training are primarily due to changes in firm-sponsored, rather than employee-sponsored, training.[134] Firm-sponsored training is the type of training non-compete clauses are often theorized to protect, as the firm may be unwilling to make an unprotected investment.

The second study, a 2021 study by Jessica Jeffers, finds knowledge-intensive firms invest 32% less in capital equipment following decreases in the enforceability of non-compete clauses.[135] While firms may invest in capital equipment for many different reasons, Jeffers examines this outcome (as opposed to labor-focused outcomes) to avoid looking at research and development expenditure as a whole, which is in large part composed of labor

expenses. This allows the study to isolate the effects of non-compete clause enforceability on investment from other effects of non-compete clauses, such as reduced worker earnings. Jeffers finds that there are likely two mechanisms driving these effects: first, that firms may be more likely to invest in capital when they train their workers because worker training and capital expenditure are complementary (*i.e.,* the return on investment in capital equipment is greater when workers are more highly trained); and second, that non-compete clauses reduce competition, and firms' returns to capital expenditure are greater when competition is lower, incentivizing firms to invest more in capital.[136]

The first study that examines the impact of non-compete clause use on investment is a 2021 study by Starr et. al. using their 2014 survey of non-compete clause use. They find no statistically significant impact on either training or the sharing of trade secrets (after inclusion of control variables) but cannot examine other investment outcomes.[137] The second study, a 2021 study by Johnson and Lipsitz, examines investment in the hair salon industry. It finds that firms that use non-compete clauses train their employees at a higher rate and invest in customer attraction through the use of digital coupons (on so-called "deal sites") to attract customers at a higher rate, both by 11 percentage points.[138] However, the authors of both studies caution that these results do not necessarily represent a causal relationship.[139] In each study, the use of non-compete clauses and the decision to invest may be jointly determined by other characteristics of the firms, labor markets, or product markets. For this reason, the Commission places relatively minimal weight on these studies in terms of how they inform the relationship between the proposed rule and future potential firm investment.

Overall, the additional incentive to invest (in assets like physical capital, human capital, or customer attraction, or in the sharing of trade secrets and confidential commercial information) is the primary justification for use of non-compete clauses. Any investment which is lost due to the inability of firms to use non-compete clauses would likely represent the greatest cost of the proposed rule. Indeed, one study, by Kenneth Younge and Matt Marx, finds

that the value of publicly traded firms increased by 9% due to an increase in non-compete clause enforceability.[140] However, they attribute this increase to the value of retaining employees, which comes with the negative effects to parties other than the firm (employees, competitors, and consumers) described in this Part II.B. In particular, if benefits to the firm arise primarily from reductions in labor costs, then the increase in the value of firms is in part a transfer from workers to firms, and is therefore not necessarily a procompetitive benefit of non-compete clauses. However, the authors do not explore the extent to which increases in firm value arise from decreases in labor costs. The authors additionally note that since the time frame used in the study is short, "there may be deleterious effects of non-competes in the long run" which are absent in their findings.[141]

The Commission requests comment on all aspects of its description, in this Part II.B, of the empirical evidence relating to non-compete clauses and their effects on competition. In particular, the Commission seeks submissions of additional data that could inform the Commission's understanding of these effects.

*C. Current Law Governing Non-Compete Clauses*

The states have always placed a variety of restrictions on the ability of employers to enforce non-compete clauses. These restrictions are based on public policy concerns American courts—and English courts before them—have recognized for centuries. For example, in the English opinion *Mitchel* v. *Reynolds* (1711), which provided the foundation for the American common law on non-compete clauses,[142] the court expressed concerns that workers were vulnerable to exploitation under non-compete clauses and these clauses threatened workers' ability to practice their trades and earn a living.[143]

Today, while the enforceability of non-compete clauses varies between

---

[132] Alessandra Colombelli, Jackie Krafft & Francesco Quatraro, *High-Growth Firms and Technical Knowledge: Do Gazelles Follow Exploration or Exploitation Strategies?*, 23.1 Industrial and Corporate Change 262 (2014).

[133] Starr, *supra* note 66 at 796–97.

[134] *Id.* at 797.

[135] Jeffers, *supra* note 92 at 28.

[136] *Id.* at 29.

[137] Starr, Prescott, & Bishara, *supra* note 42 at 76.

[138] Johnson & Lipsitz, *supra* note 54 at 711.

[139] Starr, Prescott, & Bishara, *supra* note 42 at 73; Johnson & Lipsitz, *supra* note 54 at 711.

[140] Kenneth A. Younge & Matt Marx, *The value of employee retention: evidence from a natural experiment*, 25 J. Econ. & Mgmt. Strategy 652 (2016).

[141] *Id.* at 674.

[142] Harlan Blake, *Employment Agreements Not to Compete*, 73 Harv. L. Rev. 625, 630–31 (1960).

[143] *Mitchel* v. *Reynolds*, 1 P. Wms. 181, 190 (Q.B. 1711) (expressing concern that non-compete clauses threaten "the loss of [the worker's] livelihood, and the subsistence of his family," and also "the great abuses these voluntary restraints are liable to," for example, "from masters, who are apt to give their apprentices much vexation" by using "many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come to set up for themselves.").

states, all fifty states restrict non-compete clauses between employers and workers to some degree.[144] Non-compete clauses between employers and workers are generally subject to greater scrutiny under state common law than other employment terms, due to ''the employee's disadvantageous bargaining position at the time of contracting and hardship at the time of enforcement.''[145] For these reasons, state courts often characterize non-compete clauses as ''disfavored.''[146]

In addition to state common law, non-compete clauses have always been considered proper subjects for scrutiny under the nation's antitrust laws.[147]

## 1. State Law on Non-Compete Clauses

The question of whether or under what conditions an employer can enforce a particular non-compete clause depends on the applicable state law. Three states—California, North Dakota, and Oklahoma—have adopted statutes rendering non-compete clauses void for nearly all workers.[148] Among the 47 states where non-compete clauses may be enforced under certain circumstances, 11 states and the District

of Columbia have enacted statutes making non-compete clauses void or unenforceable—or have banned employers from entering into non-compete clauses—based on the worker's earnings or a similar factor.[149] In addition, the majority of these 47 states have statutory provisions that ban or limit the enforceability of non-compete clauses for workers in certain specified occupations. In most states, those limits apply to just one or two occupations (most commonly, physicians).[150]

States have been particularly active in restricting non-compete clauses in recent years. Of the twelve state statutes

restricting non-compete clauses based on a worker's earnings or a similar factor (including the DC statute), eleven were enacted in the past ten years.[151] States have also recently passed legislation limiting the use of non-compete clauses for certain occupations.[152] Other recent state legislation has imposed additional requirements on employers that use non-compete clauses. For example, Oregon, Maine, Massachusetts, New Hampshire, and Washington have enacted laws requiring employers to provide prior notice that a non-compete clause will be required as a condition of employment.[153] Massachusetts and Oregon have enacted ''garden leave'' provisions, which require employers to compensate workers during the post-employment period in which the workers are bound by the non-compete clause.[154] Washington limited the permissible duration of non-compete clauses to 18 months,[155] and Massachusetts and Oregon limited it to one year.[156]

For workers not covered by these statutory restrictions, the question of whether or under what conditions a non-compete clause may be enforced against them depends on state common law.

In the 47 states where at least some non-compete clauses may be enforced, courts use a reasonableness inquiry to determine whether to enforce a non-compete clause, in addition to whatever statutory limits they are bound to apply. While the precise language of the test differs from state to state, states typically use a test similar to the test in the Restatement (Second) of Contracts:

A promise to refrain from competition that imposes a restraint that is ancillary

[144] Cynthia Estlund, *Between Rights and Contract: Arbitration Agreements and Non-Compete Covenants as a Hybrid Form of Employment Law,* 155 U. Pa. L. Rev. 379, 391 (2006).

[145] *Id.* cmt. g (1981) (''Postemployment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood.'').

[146] *See, e.g., Navarre Chevrolet, Inc.* v. *Begnaud,* 205 So. 3d 973, 975 (La. Ct. App. 3d 2016); *Eastman Kodak Co.* v. *Carmosino,* 77 A.D.3d 1434, 1435 (N.Y. App. Div. 4th 2010); *Access Organics, Inc.* v. *Hernandez,* 175 P.3d 899, 904 (Mont. 2008); *Bybee* v. *Isaac,* 178 P.3d 616, 621 (Idaho 2008); *Softchoice, Inc.* v. *Schmidt,* 763 NW2d 660, 666 (Minn. Ct. App. 2009).

[147] *See, e.g., Am. Tobacco Co.,* 221 U.S. at 181–83 (holding several tobacco companies violated Sections 1 and 2 of the Sherman Act due to the collective effect of six of the companies' practices, one of which was the ''constantly recurring'' use of non-compete clauses); *Newburger, Loeb & Co., Inc.,* 563 F.2d at 1082 (''Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.'') (internal citation omitted).

[148] *See* Cal. Bus. & Prof. Code sec. 16600; N.D. Cent. Code sec. 9–08–06; Okla. Stat. Ann. tit. 15, sec. 219A. While California law permits non-compete clauses if they are necessary to protect an employer's trade secrets, *see Muggill* v. *Reuben H. Donnelley Corp.,* 62 Cal. 2d 239, 242 (Cal. 1965), the scope of this exception is unclear. In a recent case, the California Supreme Court declined to address the issue. *Edwards* v. *Arthur Andersen LLP,* 189 P.3d 285, 289 n.4 (Cal. 2008).

[149] Colorado, Colo Rev. Stat. Ann. sec. 8–2–113(2)(a)–(b), as amended by H.B. 22–1317 (effective Aug. 10, 2022) (non-compete clauses are void except where they apply to a ''highly compensated worker,'' currently defined as a worker earning at least $101,250 annually, *see* Colo. Code Regs. sec. 1103–14:1.2); District of Columbia, DC Code sec. 32–581.02(a)(1) (effective Oct. 1, 2022) (where the employee's compensation is less than $150,000, or less than $250,000 if the employee is a medical specialist, employers may not require or request that the employee sign an agreement or comply with a workplace policy that includes a non-compete clause); Illinois, 820 Ill. Comp. Stat. 90/10(a) (effective Jan. 1, 2017) (no employer shall enter into a non-compete clause unless the worker's actual or expected earnings exceed $75,000/year); Maine, Me. Rev. Stat. Ann. tit. 26, sec. 599–A(3) (effective Sep. 19, 2019) (an employer may not require or permit an employee earning wages at or below 400% of the federal poverty level to enter into a non-compete clause with the employer); Maryland, Md. Code Ann., Lab. & Empl. sec. 3–716(a)(1)(i) (effective Oct. 1, 2019) (non-compete clauses are void where an employee earns equal to or less than $15 per hour or $31,200 per year); Massachusetts, Mass. Gen. Laws Ann. ch. 149, sec. 24L(c) (effective Jan. 14, 2021) (non-compete clauses shall not be enforceable against workers classified as nonexempt under the Fair Labor Standards Act (''FLSA'')); Nevada, Nev. Rev. Stat. sec. 613.195(3) (effective Oct. 1, 2021) (non-compete clauses may not apply to hourly workers); New Hampshire, N.H. Rev. Stat. Ann. sec. 275:70-a(II) (effective Sept. 8, 2019) (employers shall not require a worker who earns an hourly rate less than or equal to 200% of the federal minimum wage to enter into a non-compete clause, and non-compete clauses with such workers are void and unenforceable); Oregon, Or. Rev. Stat. sec. 653.295(1)(e) (effective Jan. 1, 2022) (non-compete clauses are void and unenforceable except where the worker's annualized gross salary and commissions at the time of the worker's termination exceed $100,533); Rhode Island, R.I. Gen Laws sec. 28–59–3(a)(1) (effective Jan. 15, 2020) (non-compete clauses shall not be enforceable against workers classified as nonexempt under the FLSA); Virginia, Va. Code Ann. sec. 40.1–28.7:8(B) (effective July 1, 2020) (no employer shall enter into, enforce, or threaten to enforce a non-compete clause with an employee whose average weekly earnings are less than the Commonwealth's average weekly wage); Washington, Wash. Rev. Code Ann. sec. 49.62.020(1)(b) and 49.62.030(1) (effective Jan. 1, 2020) (non-compete clause is void and unenforceable unless worker's annualized earnings exceed $100,000 for employees and $250,000 for independent contractors, to be adjusted for inflation).

[150] *See* Russell Beck, Beck Reed Riden LLP, *Employee Noncompetes: A State-by-State Survey* (August 17, 2022), (hereinafter ''Beck Reed Riden Chart'').

[151] *See supra* note 149.

[152] *See, e.g.,* Connecticut, Conn. Gen. Stat. Ann. sec. 20–681 (effective June 26, 2019) (home health care workers); Florida, Fla. Stat. Ann. sec. 542.336 (effective June 25, 2019) (certain physicians in certain counties); Hawaii, Haw. Rev. Stat. sec. 480–4(d) (effective July 1, 2015) (technology workers); Indiana, Ind. Code sec. 25–22.5–5.5–2 (effective July 1, 2020) (physicians); Utah, Utah Code Ann. sec. 34–51–201 (effective May 18, 2018) (broadcasting employees).

[153] Oregon, Or. Rev. Stat. sec. 653.295(1)(a)(A) (effective Jan. 1, 2008); Maine, Me. Rev. Stat. Ann. tit. 26, sec. 599–A(4) (effective Sep. 19, 2019); Massachusetts, Mass. Gen. Laws Ann. ch. 149, sec. 24L(b)(i) (effective Jan. 14, 2021); New Hampshire, N.H. Rev. Stat. Ann. sec. 275:70 (effective July 28, 2014); Washington, Wash. Rev. Code Ann. sec. 49.62.020(1)(a)(i) (effective Jan. 1, 2020).

[154] Massachusetts, Mass. Gen. Laws Ann. ch. 149, sec. 24L(b)(vii) (effective Jan. 14, 2021); Oregon, Or. Rev. Stat. sec. 653.295(7) (effective Jan. 1, 2022).

[155] Washington, Wash. Rev. Code Ann. sec. 49.62.020(2) (effective Jan. 1, 2020).

[156] Massachusetts, Mass. Gen. Laws Ann. ch. 149, sec. 24L(b)(iv) (effective Jan. 14, 2021); Oregon, Or. Rev. Stat. sec. 653.295(3) (effective Jan. 1, 2022).

to an otherwise valid transaction or relationship is unreasonably in restraint of trade if (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.[157]

The first basis on which a non-compete clause can be found unreasonable is where the restraint is greater than needed to protect the employer's legitimate interest. Nearly all states recognize the protection of an employer's trade secrets as a legitimate interest.[158] Some states also recognize an interest in protecting confidential information that is not a trade secret.[159] Some states also recognize an interest in protecting the employer's investment in training, although many of these states define the interest as protecting specialized training.[160] A few states recognize an interest in preventing an worker who provides "unique" services from working for a competitor.[161] Courts do not recognize protection from ordinary competition as a legitimate business interest.[162]

If the employer can demonstrate a legitimate interest, the employer must then show the non-compete clause is tailored to that interest. This analysis typically considers whether the non-compete clause prohibits a greater scope of activity than necessary to protect the employer's legitimate interests;[163] covers a geographic area more extensive than necessary to protect those interests;[164] or lasts longer than needed to protect those interests.[165]

The second basis on which a non-compete clause can be found unreasonable is where the employer's need for the non-compete clause is outweighed by the hardship to the

worker and the likely injury to the public. When assessing the "hardship to the worker" prong, courts typically consider whether the non-compete clause would be unreasonable in light of the worker's personal circumstances. For example, courts have invalidated non-compete clauses where they would destroy a worker's sole means of support.[166]

When assessing the "likely injury to the public" prong, the factor most frequently considered by courts is whether enforcing the non-compete clause against the worker would deprive the community of essential goods and services.[167] Because these cases arise in the context of individual litigation, courts focus the "likely injury to the public" inquiry on the loss of the individual worker's services and not on the aggregate effects of non-compete clauses on competition in the relevant market.

State law also differs with respect to the steps courts take when they conclude that a non-compete clause is unenforceable as drafted. The majority of states have adopted the "reformation" or "equitable reform" doctrine, which allows courts to revise the text of an unenforceable non-compete clause to make it enforceable.[168] Some states have adopted the "blue pencil" doctrine, under which courts may remove any defective provisions and may enforce the non-compete clause if the remaining provisions constitute a valid non-compete clause.[169] A few states have adopted the "red pencil" doctrine, under which courts declare an entire non-compete clause void if one or more of its provisions are found to be defective.[170]

As noted above, the general language of the test for whether a non-compete clause is reasonable is fairly consistent from state to state. However, the specifics of non-compete clause law differ from state to state. For example, states vary in how narrowly or broadly they define legitimate interests for using a non-compete clause and the extent to which courts are permitted to modify an unenforceable non-compete clause to

render it enforceable. As a result, among the 47 states where non-compete clauses may be enforced, variation exists with respect to the enforceability of non-compete clauses.[171]

Because the enforceability of non-compete clauses varies from state to state, the question of which state's law applies in a legal dispute between an employer and a worker can determine the outcome of the case. Non-compete clauses often contain choice-of-law provisions designating a particular state's law for resolution of any future dispute.[172] Some non-compete clauses include forum-selection provisions specifying the court and location where any dispute will be heard.[173] The default rule under conflict-of-laws principles is that the court honors the parties' choice of law, meaning the burden is typically on the worker to argue that the law of a different forum should apply.[174]

In addition, there is significant variation in how courts apply choice of law rules in disputes over non-compete clauses.[175] As a result, it can be difficult for employers and workers to predict how disputes over choice of law will be resolved.[176] Additionally—aside from the question of which state's law should apply—employers and workers may be uncertain about whether the non-compete clause is enforceable under the state's law. Furthermore, state non-compete law may change; as described above in Part II.C.1, there have been many changes in state non-compete law in recent years. The result is that employers and workers may face considerable uncertainty as to whether

---

[157] Restatement (Second) of Contracts sec. 188 (1981).

[158] *See. e.g., Reed, Roberts Assocs.* v. *Strauman,* 40 N.Y.2d 303, 308–09 (N.Y. 1976); *see* Beck Reed Riden Chart, *supra* note 150 (listing each state's approach).

[159] *See. e.g., Proudfoot Consulting Co.* v. *Gordon,* 576 F.3d 1223, 1233–34 (11th Cir. 2009); *see* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[160] *See. e.g., IDMWORKS LLC* v. *Pophaly,* 192 F. Supp. 3d 1335, 1342 (S.D. Fla. 2016); *see* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[161] *See. e.g., Ticor Title Ins.* v. *Cohen,* 173 F.3d 63, 70 (2d Cir. 1999); *see* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[162] *See. e.g., Valley Med. Specialists* v. *Farber,* 982 P.2d 1277, 1281 (Ariz. 1999).

[163] *See. e.g., Diversified Hum. Res. Grp., Inc.* v. *Levinson-Polakoff,* 752 SW2d 8, 11 (Tex. Ct. App. 1988).

[164] *See. e.g., Orkin Exterm. Co., Inc.* v. *Girardeau,* 301 So. 2d 38, 39 (Fla. Ct. App. 1st 1974).

[165] *See. e.g., Jorgensen* v. *Coppedge,* 181 P.3d 450, 454 (Idaho 2008).

[166] *See, e.g., Chavers* v. *Copy Prods. Co. of Mobile,* 519 So. 2d 942, 945 (Ala. 1988).

[167] *See, e.g., Dick* v. *Geist,* 693 P.2d 1133, 1136–37 (Idaho Ct. App. 1985).

[168] *See, e.g., Butler* v. *Arrow Mirror & Glass, Inc.,* 51 SW3d 787, 794 (Tex. Ct. App. 2001). *See also* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[169] *See, e.g., Compass Bank* v. *Hartley,* 430 F. Supp. 2d 973, 980 (D. Ariz. 2006). *See also* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[170] *See, e.g., Hassler* v. *Circle C Res.,* 505 P.3d 169, 178 (Wyo. 2022). *See also* Beck Reed Riden Chart, supra note 150 (listing each state's approach).

[171] Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Non-Compete Clauses, Trends, and Implications for Employee Mobility Policy,* 13 U. Pa. J. Bus. L. 751, 778–79 (2011).

[172] Gillian Lester & Elizabeth Ryan, *Choice of Law and Employee Restrictive Covenants: An American Perspective,* 31 Comp. Lab. & Pol'y J. 389, 396–402 (2010).

[173] *Id.* at 402–04.

[174] Lester & Ryan, *supra* note 172 at 394. *Cf.* Cal. Lab. Code § 925(a) (stating that employers shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would either (1) require the employee to adjudicate outside of California a claim arising in California or (2) deprive the employee of the substantive protection of California law with respect to a controversy arising in California.

[175] *Id.*

[176] *Id.* at 394–95 ("The state of the law is perhaps characterized more by inconsistency than anything else, so much so that commentators lament the 'disarray' and 'mish-mash' of the law, and criticize courts for their 'post-hoc rationalizing of intuitions' or their use of a 'hodgepodge of factors, often with insignificant explanation of how they decide what weight to give each.'") (internal citations omitted).

a particular non-compete clause may be enforced.

Workers may also be subject to arbitration clauses, which require that legal disputes with the employer—including disputes related to non-compete clauses—be resolved through binding arbitration rather than in court. Where such clauses are valid, the Federal Arbitration Act requires that courts enforce them.[177]

Most state courts apply different rules to non-compete clauses when they are entered into between the seller and buyer of a business, compared with non-compete clauses that arise solely out of the employment relationship.[178] The three states in which non-compete clauses are void in nearly all instances—California, North Dakota, and Oklahoma—permit enforcement when non-compete clauses are entered into between the seller and buyer of a business.[179] In most of the other states, non-compete clauses between the seller and buyer of a business are either exempted from the state's non-compete clause statute, subject to a more lenient test under the statute, or subject to more lenient standard under the state's case law.[180] Courts cite several different reasons for why they accord different treatment to non-compete clauses between the seller and buyer of a business. These reasons include the relatively equal bargaining power of both parties in the context of a business sale, relative to the employer-worker context, where there is more likely to be unequal bargaining power; the need to protect the buyer's right to the goodwill for which it has paid; and the fact that the proceeds from the sale will ensure that the seller of the business will not experience undue hardship.[181]

## 2. Non-Compete Clauses and Antitrust Law

Non-compete clauses are "contract[s] . . . in restraint of trade." Therefore,

they are subject to Section 1 of the Sherman Act.[182] The Commission has identified 17 cases in cases in which private plaintiffs or the federal government have challenged a non-compete clause between an employer and a worker under either Section 1 or an analogous provision in a state antitrust statute.[183] (Three of these 17 cases concerned non-compete clauses between the seller and buyer of a business,[184] and two of these 17 cases were brought under state antitrust statutes.[185])

In two of these 17 cases, the parties challenging the non-compete clause were successful to some degree. In the early antitrust case of *United States* v. *American Tobacco Co.,* the Supreme Court held that several tobacco companies violated both Section 1 and Section 2 of the Sherman Act because of the collective effect of six of the companies' practices, one of which was the "constantly recurring" use of non-compete clauses.[186] This is the only case the Commission has identified in which a court analyzed the collective, rather than isolated, use of non-compete clauses.

More recently, a federal district court denied a motion to dismiss a plaintiff's

claim that a non-compete clause between a concierge medicine firm and physicians violated Section 1. The court held that while the reasonableness of the non-compete clause ultimately would be a factual determination, the plaintiff stated a valid claim under Section 1 where it alleged the firm "includes post-contract non-compete clauses with an unreasonably large liquidated damage provision in its employment contracts," in addition to other practices.[187]

In the other 15 Sherman Act cases, the challenge to the individual non-compete clause was unsuccessful. These claims failed for three main reasons. First, in several of these cases, the parties challenging the non-compete clause argued solely that the non-compete clause they were challenging should be *per se* unlawful under Section 1. Courts rejected these arguments, reasoning that non-compete clauses may serve legitimate business interests in some instances[188] and that courts have had insufficient experience with non-compete clauses to warrant a *per se* categorization under Section 1.[189]

The second main reason these challenges have been unsuccessful is that, in the vast majority of these 15 cases, the party challenging the non-compete clause did not allege the non-compete clause adversely affected competition, which is an essential element of a Section 1 claim in rule of reason cases.[190] In only one case did the plaintiff appear to allege facts related to anticompetitive effect beyond the effect on the person bound by the non-compete clause. In that case, the court dismissed the plaintiff's claim because the plaintiff did not sufficiently allege "the amount of competition foreclosed by defendant."[191]

Third, courts have also rejected challenges to non-compete clauses based on reasoning that a corporation is not capable of conspiring with its employees as a matter of law.[192]

Plaintiffs have also challenged non-compete clauses between employers and workers under Section 2 of the Sherman Act, which prohibits monopolization or attempted monopolization.[193] The Commission is not aware of a case in which a Section 2 claim relating to an

---

[177] *See, e.g., Nitro-Lift Techs.* v. *Howard,* 568 U.S. 17, 21–22 (2012).

[178] Based on a review of the state cases in Malsberger (2017), *supra* note 62 and Fenwick & West LLC, *Summary of Non-Compete Clauses: A Global Perspective, https://assets.fenwick.com/legacy/FenwickDocuments/RS_Summary-of-Covenants.pdf.*

[179] Cal. Bus. & Prof. Code sec. 16601; N.D. Cent. Code sec. 9–08–06; Okla. Stat. Ann. tit. 15, sec. 218.

[180] *See, e.g.,* Colo. Rev. Stat. Ann. sec. 8–2–113(3)(c) (statutory exemption); Ga. Code Ann. sec. 13–8–57(d) (more lenient statutory test); *Jiffy Lube Int'l, Inc.* v. *Weiss Bros., Inc.,* 834 F. Supp. 683, 691 (D.N.J. 1993) (more lenient standard under case law).

[181] *See, e.g., Woodward* v. *Cadillac Overall Supply Co.,* 240 NW 2d 710, 715 (Mich. 1976) (bargaining power); *Bybee,* 178 P.3d at 622 (Idaho 2008) (goodwill); *Centorr-Vacuum Indus., Inc.* v. *Lavoie,* 609 A.2d 1213, 1215 (N.H. 1992) (undue hardship).

[182] *See, e.g., Newburger, Loeb & Co., Inc.,* 563 F.2d at 1082.

[183] *U.S.* v. *Am. Tobacco Co.,* 221 U.S. 106 (1911); *Alders* v. *AFA Corp. of Fla.,* 353 F. Supp. 654 (S.D. Fla. 1973) (non-compete clause between seller and buyer of a business); *Bradford* v. *N.Y. Times Co.,* 501 F.2d 51 (2d Cir. 1974); *Golden* v. *Kentile Floors, Inc.,* 512 F.2d 838 (5th Cir. 1975); *U.S.* v. *Empire Gas Corp.,* 537 F.2d 296 (8th Cir. 1976); *Newburger, Loeb & Co., Inc.* v. *Gross,* 563 F.2d 1057 (2d Cir. 1977); *Lektro-Vend Corp.* v. *Vendo Co.,* 660 F.2d 255 (7th Cir. 1981) (non-compete clause between seller and buyer of a business); *Aydin Corp.* v. *Loral Corp.,* 718 F.2d 897 (9th Cir. 1983); *Consultants & Designers, Inc.* v. *Butler Serv. Grp., Inc.,* 720 F.2d 1553 (11th Cir. 1983); *Caremark Homecare, Inc.* v. *New England Critical Care, Inc.,* 700 F. Supp. 1033 (D. Minn. 1988); *GTE Data Servs., Inc.* v. *Elec. Data Sys. Corp.,* 717 F. Supp. 1487 (M.D. Fla. 1989); *DeSantis* v. *Wackenhut Corp.,* 793 SW2d 670 (Tex. 1990) (state antitrust law case); *Borg-Warner Protective Servs. Corp.* v. *Guardsmark, Inc.,* 946 F. Supp. 495 (E.D. Ky. 1996); *Caudill* v. *Lancaster Bingo Co., Inc.,* 2005 WL 2738930 (S.D. Ohio Oct. 24, 2005); *Dallas South Mill, Inc.* v. *Kaolin Mushroom Farms, Inc.,* 2007 WL 9712116 (N.D. Tex. Feb. 23, 2007); *Cole* v. *Champion Enters., Inc.,* 496 F. Supp. 2d 613 (M.D.N.C. 2007) (non-compete clause between seller and buyer of a business) (state antitrust law case); *Signature MD, Inc.* v. *MDVIP, Inc.,* 2015 WL 3988959 (C.D. Cal. Apr. 21, 2015). There are also several opinions addressing whether non-compete clauses between businesses violate Section 1. Courts generally apply a less restrictive legal standard to non-compete clauses between businesses. *See, e.g., Lumber Liquidators, Inc.,* 415 F. Supp. 3d at 715–16.

[184] *Alders,* 353 F. Supp. 654; *Lektro-Vend,* 660 F.2d 255; *Cole,* 496 F. Supp. 2d 613.

[185] *DeSantis,* 793 SW2d 670; *Cole,* 496 F. Supp. 2d 613.

[186] *Am. Tobacco Co.,* 221 U.S. at 181–83. Section 2 of the Sherman Act, 15 U.S.C. 2, prohibits monopolization or attempted monopolization.

[187] *Signature MD, Inc.,* 2015 WL 3988959 at *7.

[188] *See, e.g., Lektro-Vend,* 660 F.2d at 265.

[189] *See, e.g., Aydin,* 718 F.2d at 900.

[190] *See, e.g., Ohio* v. *Am. Express Co.,* — U.S.— , 138 S. Ct. 2274, 2284 (2018).

[191] *GTE Data Servs.,* 717 F. Supp. at 1492.

[192] *See, e.g., Borg-Warner,* 946 F. Supp. 499; *Dallas South Mill,* 2007 WL 9712116 at *3.

[193] 15 U.S.C. 2. *See, e.g., BRFHH Shreveport, LLC.* v. *Willis Knighton Med. Ctr.,* 176 F. Supp. 3d 606, 616–26 (W.D. La. 2016).

employer's use of a non-compete clause has been successful.

### 3. Federal and State Enforcement Activity Related to Non-Compete Clauses

In recent years, state attorneys general in Illinois, New York, and Washington have sued companies for unlawfully using non-compete clauses. As of January 2020, state attorneys general have publicly announced settlements with seven companies regarding the use of non-compete clauses.[194] In February 2022, the Antitrust Division filed a statement of interest in a state non-compete clause case brought by private plaintiffs.[195]

The Antitrust Division and the Commission have also taken steps in recent years to address other types of contractual provisions that restrict competition in labor markets. The Antitrust Division has brought civil enforcement actions under Section 1 against several technology companies for entering into no-poach agreements with competitors. These enforcement actions ended with consent judgments against the companies.[196] In addition, the Antitrust Division has brought criminal charges for wage-fixing and no-poach agreements against companies and individuals.[197] The Commission too has brought civil enforcement actions against companies related to competition for employment, which ended in consent judgments against the

companies.[198] In addition, the attorney general of the State of Washington has entered into settlement agreements with over 200 companies in which the companies have agreed to stop using no-poach clauses.[199]

The Commission seeks comment on all aspects of its description, in this Part II.C, of the law currently governing non-compete clauses. The Commission specifically seeks comment on the extent to which employers use choice-of-law provisions to evade the laws of states where non-compete clauses are relatively less enforceable. The Commission also seeks comment on the extent to which a uniform federal standard for non-compete clauses would promote certainty for employers and workers.

### D. The Commission's Work on Non-Compete Clauses

This rulemaking represents the culmination of several years of activity by the Commission related to non-compete clauses and their effects on competition. This activity has included extensive public outreach and fact-gathering related to non-compete clauses, other restrictive employment covenants that may harm competition, and competition in labor markets generally. The Commission has also analyzed non-compete clauses in connection with its enforcement, research, and merger review work.

The Commission first began focusing on non-compete clauses in the mid-2010s, as a growing body of empirical research raised concerns about the anticompetitive effects of non-compete clauses. In 2018 and 2019, the Commission held several "Hearings on Competition and Consumer Protection in the 21st Century."[200] The Commission invited public comment on a wide range of topics, including "the use of non-competition agreements and the conditions under which their use may be inconsistent with the antitrust laws."[201] Participants addressed non-compete clauses at two of the hearings.[202]

Also in 2019, the Open Markets Institute, 19 labor and public interest organizations, and 46 individual advocates and scholars petitioned the Commission to initiate a rulemaking to prohibit non-compete clauses.[203]

As evidence mounted regarding the anticompetitive effects of non-compete clauses, the Commission's focus on this issue increased. On January 9, 2020, the Commission held a public workshop on non-compete clauses. At the workshop, speakers and panelists addressed topics including statutory and judicial treatment of non-compete clauses; the Commission's authority to address non-compete clauses; the economic literature regarding the effects of non-compete clauses; and whether the Commission should initiate a rulemaking on non-compete clauses.[204] In connection with the workshop, the Commission sought public comment on a wide range of topics related to a potential rulemaking on non-compete clauses. The Commission received 328 comments addressing these topics from researchers, advocates for workers, employers, trade associations, attorneys, members of Congress, state and local officials, unions, other organizations, and individual members of the public.[205]

In addition, on August 5, 2021, the Commission issued a solicitation for public comment on contract terms that may harm competition, including "non-compete clauses that prevent workers from seeking employment with other firms." The Commission received 280 comments on this solicitation from a wide range of stakeholders.[206] On December 6–7, 2021, the Commission and the Antitrust Division held a workshop entitled "Making Competition Work: Promoting Competition in Labor Markets." The Commission sought

---

[194] *See* Public Comments of 19 State Attorneys General in Response to the Federal Trade Commission's January 9, 2020 Workshop on Non-Compete Clauses in the Workplace at 6 n.23 (listing the settlements).

[195] Statement of Interest of the United States, *Beck* v. *Pickert Med. Grp.,* No. CV21–02092 (Nev. Dist. Ct. Feb. 25, 2022).

[196] *See* Antitrust Guidance for Human Resource Professionals, *supra* note 37 at 3–4 (citing cases).

[197] *U.S.* v. *Neeraj Jindal and John Rodgers,* No. 4:20–cr–358–ALM–KPJ (E.D. Tex. Dec. 9, 2020); *U.S.* v. *Surgical Care Affiliates, LLC and SCAI Holdings, LLC,* No. 3:21–cr–011–L (N.D. Tex. Jan. 5, 2021); *U.S.* v. *Ryan Hee and VDA OC, LLC,* formerly ADVANTAGE ON CALL, LLC, No. 2:21–cr–00098–RFB–BNW (D. Nev. Mar. 26, 2021); *U.S.* v. *DaVita, Inc. and Kent Thiry,* No. 21–cr–00229–RBJ (D. Colo. Nov. 3, 2021); *U.S.* v. *Patel, et al.,* 3:21–cr–220–VHB–RAR (D. Conn. Dec. 15, 2021); *U.S.* v. *Manahe, et al.,* 2:22–cr–00013–JAW (D. Me. Jan. 27, 2022). The defendants in the *Jindal* case were found not guilty of the wage-fixing charge, and the defendants in the *DaVita* cases were found not guilty of all charges. *Jindal,* Jury Verdict (E.D. Tex. Apr. 14, 2022); *DaVita,* Verdict (D. Colo. Apr. 15, 2022). However, both courts found that the conduct alleged in the indictment properly fell within the confines of the *per se* rule. *Jindal,* Memorandum Opinion and Order, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021) at *4–*8; *DaVita,* Order Denying Defendants' Motion to Dismiss, 2022 WL 266759 (D. Colo. Jan. 28, 2022) at *4–*8. The court in *Manahe* likewise recently denied a motion to dismiss, holding the indictment charged a recognized form of per se illegal conduct. 2022 WL 3161781, at **7, 9 (D. Me. Aug. 8, 2022).

[198] *See* Antitrust Guidance for Human Resource Professionals, *supra* note 37 at 4 (citing cases).

[199] Office of the Att'y Gen. of the State of Wash., Press Release, *AG Report: Ferguson's Initiative Ends No-Poach Practices Nationally at 237 Corporate Franchise Chains* (June 16, 2020).

[200] Fed. Trade Comm'n, *Hearings on Competition and Consumer Protection in the 21st Century, https://www.ftc.gov/enforcement-policy/hearings-competition-consumer-protection.*

[201] Fed. Trade Comm'n, Notice, *Hearings on Competition and Consumer Protection in the 21st Century,* 83 FR 38307, 38309 (Aug. 6, 2018).

[202] Fed. Trade Comm'n, Transcript, *Competition and Consumer Protection in the 21st Century* (Oct. 16, 2018), *https://www.ftc.gov/system/files/*

documents/public_events/1413712/ftc_hearings_session_3_transcript_day_2_10-16-18_1.pdf; Fed. Trade Comm'n, Transcript, *Competition and Consumer Protection in the 21st Century* (June 12, 2019), *https://www.ftc.gov/system/files/documents/public_events/1519667/ftc_hearings_session_14_transcript_6-12-19_0.pdf.*

[203] Open Markets Inst. et al., *Petition for Rulemaking to Prohibit Worker Non-Compete Clauses* (March 20, 2019).

[204] Fed. Trade Comm'n, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues, https://www.ftc.gov/news-events/events/2020/01/non-compete clauses-workplace-examining-antitrust-consumer-protection-issues.*

[205] Fed. Trade Comm'n, Docket FTC–2019–0093, *Workshop on Non-Compete Clauses Used in Employment Contracts, https://www.regulations.gov/document/FTC-2019-0093-0001/comment.*

[206] Fed. Trade Comm'n, *Solicitation for Public Comments on Contract Terms that May Harm Competition* (Aug 5, 2021), *https://www.regulations.gov/document/FTC-2021-0036-0022.*

comment from the public in connection with this event and received 27 comments.[207]

As it has developed this proposed rule, the Commission has closely considered the views expressed at these forums and the public comments it has received through these engagement efforts. The comments have informed the Commission's understanding of the evidence regarding the effects of non-compete clauses; the law currently governing non-compete clauses; and the options for how the Commission may seek to restrict the unfair use of non-compete clauses through rulemaking, among other topics.

The Commission has also focused on non-compete clauses in connection with its enforcement, merger review, and research work. With respect to enforcement, in 2021, the Commission initiated investigations into the use of non-compete clauses by manufacturers of glass containers used for food and beverage packaging. On December 28, 2022, the Commission accepted, subject to final approval, consent agreements with two manufacturers in the industry.[208] The glass container industry is highly concentrated and is characterized by substantial barriers to entry and expansion. Among these barriers, it is difficult to identify and employ personnel with skills and experience in glass container manufacturing.[209]

The complaints allege the manufacturers required employees across a variety of positions—including employees who work with the glass plants' furnaces and forming equipment and in other glass production, engineering, and quality assurance roles—to enter into non-compete clauses. The complaints allege this conduct has a tendency or likelihood to impede rivals' access to the restricted employees' labor, to limit workers' mobility, and thus to harm workers, consumers, competition, and the competitive process. As such, the complaints allege each company has engaged in an unfair method of competition in violation of Section 5 of

the FTC Act.[210] The proposed consent orders would prohibit each manufacturer from "entering or attempting to enter, maintaining or attempting to maintain, or enforcing or attempting to enforce a Non-Compete Restriction with an Employee, or communicating to an Employee or to a prospective or current employer of that Employee that the Employee is subject to a Non-Compete Restriction." [211]

In 2021, the Commission also initiated investigations into the use of non-compete clauses in the security guard services industry. On December 28, 2022, the Commission accepted, subject to final approval, a consent agreement with Prudential Security, Inc., Prudential Command Inc., and the firms' co-owners (collectively "Prudential Respondents"). Prudential Security, Inc. and Prudential Command Inc. provided security guard services to clients in several states.

The Commission's complaint alleges the Prudential Respondents' use of non-compete clauses is an unfair method of competition under Section 5 because it is restrictive, coercive, and exploitative and negatively affects competitive conditions.[212] The complaint further alleges the Prudential Respondents' imposition of non-compete clauses took advantage of the unequal bargaining power between Prudential Respondents and their employees, particularly low-wage security guard employees, and thus reduced workers' job mobility, limited competition for workers' services, and ultimately deprived workers of higher wages and more favorable working conditions.[213] Under the terms of the proposed order, Prudential Respondents—including any companies the co-owners may control in the future—must cease and desist from entering, maintaining, enforcing, or attempting to enforce any non-compete clause.[214]

These consent orders have been placed on the public record for 30 days in order to receive comments from interested persons. After 30 days, the Commission will again review the consent agreements and the comments received and will decide whether it should make the proposed orders final or take other appropriate action.[215]

In addition, as part of a 2020 settlement with the Commission, three national rent-to-own companies agreed to refrain from enforcing non-compete clauses that were entered into in connection with reciprocal purchase agreements.[216]

With respect to merger review, on August 11, 2015, the Commission approved a final order settling charges that Zimmer Holdings, Inc.'s acquisition of Biomet, Inc. would have eliminated competition between the companies in the markets for certain orthopedic medical products. Among other things, the order requires Zimmer to "remove any impediments or incentives" that may deter workers from accepting employment with the divested businesses, including non-compete clauses.[217]

On November 10, 2021, the Commission approved a final order settling charges that 7-Eleven's acquisition of Marathon Petroleum Corporation's Speedway subsidiary violated federal antitrust laws. Among other things, the order prohibits 7-Eleven from enforcing any non-compete clauses against any franchisees or employees working at or doing business with the divested assets.[218]

On January 10, 2022, the Commission approved a final order settling charges that dialysis service provider DaVita, Inc.'s acquisition of University of Utah Health's dialysis clinics would reduce competition in vital outpatient dialysis services in the Provo, Utah market. As part of the order, DaVita was required to remove certain non-compete clauses and prohibited from enforcing or entering into non-compete clauses with certain parties.[219] And on August 9, 2022, the Commission issued a final consent order in which ARKO Corp. and its subsidiary GPM agreed to roll back a sweeping non-compete clause they

---

[207] Fed. Trade Comm'n, Docket FTC–2021–0057, *Making Competition Work: Promoting Competition in Labor Markets, https://www.regulations.gov/ docket/FTC-2021-0057/comments.*

[208] Fed. Trade Comm'n, Decision and Order, *In re O–I Glass, Inc. et al,* Matter No. 211 0182 (December 28, 2022); Fed. Trade Comm'n, Decision and Order, *In re Ardagh Group S.A. et al,* Matter No. 211 0182 (December 28, 2022).

[209] Fed. Trade Comm'n, Analysis of Agreements Containing Consent Order to Aid Public Comment, *In re O–I Glass Inc. et al., In re Ardagh Group S.A. et al,* Matter No. 211 0182 (December 28, 2022) at 2.

[210] *Id.* at 1–2.

[211] *Id.* at 7.

[212] Fed. Trade Comm'n, Analysis of Agreement Containing Consent Order to Aid Public Comment, *In re Prudential Sec., Inc. et al.,* Matter No. 211 0026 at 1, 5–7 (December 28, 2022).

[213] *Id.* at 1.

[214] *Id.*

[215] *Id.* at 1–2; Glass Container Analysis to Aid Public Comment, *supra* note 209 at 1.

[216] Fed. Trade Comm'n, Press Release, *Rent-to-Own Operators Settle Charges that They Restrained Competition through Reciprocal Purchase Agreements* (Feb. 21, 2020), *https://www.ftc.gov/ news-events/news/press-releases/2020/02/rent-own-operators-settle-charges-they-restrained-competition-through-reciprocal-purchase-agreements.*

[217] Fed. Trade Comm'n, *In the Matter of Zimmer Holdings, Inc. et al.,* No. C–4534, Decision and Order (Aug. 11, 2015), *https://www.ftc.gov/system/ files/documents/cases/150820zimmerdo.pdf.*

[218] Fed. Trade Comm'n, Press Release, *FTC Approves Final Order Requiring Divestitures of Hundreds of Retail Gas and Diesel Fuel Stations Owned by 7-Eleven, Inc.* (Nov. 10, 2021), *https:// www.ftc.gov/news-events/news/press-releases/2021/ 11/ftc-approves-final-order-requiring-divestitures-hundreds-retail-gas-diesel-fuel-stations-owned-7.*

[219] Fed. Trade Comm'n, *In the Matter of Davita Inc. and Total Renal Care, Inc.,* No. C–4752, Decision and Order (Jan. 10, 2022) at 12–14, *https:// www.ftc.gov/system/files/documents/cases/211_ 0056_c4752_davita_utah_health_order.pdf.*

imposed on a company to which they sold 60 gas stations.[220]

With respect to research, in September 2021, the Commission issued a study analyzing acquisitions by five large technology companies that were not reported to the Commission and the U.S. Department of Justice under the Hart-Scott-Rodino Act.[221] The study found 76.7% of transactions included non-compete clauses for founders and key employees of the acquired entities. The study also found that higher-value transactions were more likely to use non-compete clauses.[222] The study does not explain why the companies used non-compete clauses or analyze the effects of these particular non-compete clauses on competition.

The Commission seeks comment on its description, in this Part II.D, of the Commission's work on non-compete clauses prior to this NPRM.

## III. Legal Authority

Section 5 of the FTC Act declares "unfair methods of competition" to be unlawful.[223] Section 5 further directs the Commission "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce." [224] Section 6(g) of the FTC Act authorizes the Commission to "make rules and regulations for the purpose of carrying out the provisions of" the FTC Act, including the Act's prohibition of unfair methods of competition.[225] Taken together, Sections 5 and 6(g) provide the Commission with the authority to issue regulations declaring practices to be unfair methods of competition.[226]

Courts have made clear Section 5's prohibition of unfair methods of competition encompasses all practices that violate either the Sherman or Clayton Acts.[227] However, courts have long held the scope of Section 5 is not confined to the conduct that is prohibited under the Sherman Act, Clayton Act, or common law.[228] Section 5 reaches incipient violations of the antitrust laws—conduct that, if left unrestrained, would grow into an antitrust violation in the foreseeable future.[229] Additionally, Section 5 reaches conduct that, while not prohibited by the Sherman or Clayton Acts, violates the spirit or policies underlying those statutes.[230]

## IV. The Commission's Preliminary Determination That Non-Compete Clauses Are an Unfair Method of Competition

The Commission preliminarily determines it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe the worker is subject to an enforceable non-compete clause.[231] This preliminary determination is the basis for this proposed rule, which would provide that each of these practices is an unfair method of competition under Section 5.[232] This Part IV sets forth a series of preliminary findings that provide the basis for this preliminary determination. The Commission's preliminary determination and each of these preliminary findings are subject to further consideration in light of the comments received and the Commission's additional analysis. The Commission seeks comment on all aspects of this Part IV.[233]

### A. Non-Compete Clauses Are an Unfair Method of Competition Under Section 5

#### 1. Non-Compete Clauses Are Unfair

Courts have held conduct is an "unfair method of competition" under Section 5 where the conduct is facially unfair. In *Atlantic Refining Co.* v. *FTC* and *FTC* v. *Texaco, Inc.,* the Court held the Commission established an unfair method of competition where an oil company used its economic power over its gas stations to coerce them into buying certain tires, batteries, or accessories only from firms that paid the oil company a commission.[234] In *Texaco,* the Court held the conduct was an unfair method of competition even though Texaco's conduct was not overtly coercive, reasoning that Texaco's conduct was "inherently coercive" because its "dominant economic power was used in a manner which tended to foreclose competition." [235] In *FTC* v. *R.F. Keppel & Bro.,* the Court held the Commission established an unfair method of competition where a manufacturer exploited the inability of children to protect themselves in the marketplace by marketing inferior goods to them through use of a gambling scheme.[236] In *E.I. du Pont de Nemours & Co.* v. *FTC (Ethyl),* the U.S. Court of Appeals for the Second Circuit reaffirmed that coercive conduct is quintessentially covered by Section 5's prohibition of unfair methods of competition.[237]

The Court has also held that, for coercive conduct to constitute unfair

---

[220] Fed. Trade Comm'n, Press Release, *FTC Approves Final Order Restoring Competitive Markets for Gasoline and Diesel in Michigan and Ohio* (Aug. 9, 2022), *https://www.ftc.gov/news-events/news-press-releases/2022/08/ftc-approves-final-order-restoring-competitive-markets-gasoline-diesel-michigan-ohio.*

[221] Fed. Trade Comm'n, *Non-HSR Reported Acquisitions by Select Technology Platforms, 2010–2019: An FTC Study* (September 2021) at 1.

[222] *Id.* at 21–22. The table states that the figure is 77.3%. The reason for this discrepancy is not clear.

[223] 15 U.S.C. 45(a)(1).

[224] 15 U.S.C. 45(a)(2).

[225] 15 U.S.C. 46(g).

[226] *Nat'l Petroleum Refiners Ass'n* v. *Fed. Trade Comm'n,* 482 F.2d 672, 697–98 (D.C. Cir. 1973).

[227] *See, e.g., Fed. Trade Comm'n* v. *Cement Inst.,* 333 U.S. 683, 693 (1948) (holding practices that violate the Sherman Act are unfair methods of competition); *Fashion Originators' Guild of Am.* v. *Fed. Trade Comm'n,* 312 U.S. 457, 464 (1941) (holding practices that violate the Clayton Act are unfair methods of competition).

[228] *See, e.g., Fed. Trade Comm'n* v. *Motion Picture Advert. Serv. Co.,* 344 U.S. 392, 394–95 (1953) ("The 'Unfair methods of competition', which are condemned by [Section] 5(a) of the [FTC] Act, are not confined to those that were illegal at common law or that were condemned by the Sherman Act. Congress advisedly left the concept flexible to be defined with particularity by the myriad of cases from the field of business.") (internal citations omitted).

[229] *See, e.g., Cement Inst.,* 333 U.S. at 708 ("A major purpose of [the FTC] Act was to enable the Commission to restrain practices as 'unfair' which, although not yet having grown into Sherman Act dimensions would most likely do so if left unrestrained."); *Fashion Originators' Guild,* 312 U.S. at 466; *Triangle Conduit & Cable Co.* v. *Fed. Trade Comm'n,* 168 F.2d 175, 176 (7th Cir. 1948).

[230] *See, e.g., Fashion Originators' Guild,* 312 U.S. at 463 (stating that "[i]f the purpose and practice of the combination of garment manufacturers and their affiliates runs counter to the public policy declared in the Sherman and Clayton Acts, the Federal Trade Commission has the power to suppress it as an unfair method of competition"); *E.I. du Pont de Nemours & Co.* v. *Fed. Trade Comm'n (Ethyl),* 729 F.2d 128, 136–37 (2d Cir. 1984) (finding that the Commission may bar "conduct which, although not a violation of the letter of the antitrust laws, is close to a violation or is contrary to their spirit"). On November 10, 2022, the Commission issued a policy statement describing the key principles of general applicability concerning whether conduct is an unfair method of competition under Section 5. Fed. Trade Comm'n, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act* (Nov. 10, 2022).

[231] For ease of reference, this Part IV employs the term "use of non-compete clauses" as a shorthand to refer to this conduct.

[232] *See* proposed § 910.2(a).

[233] The Commission intends for this Part IV to satisfy the requirements in Section 22 of the FTC Act that, in an NPRM, the Commission issue a preliminary regulatory analysis that contains "a concise statement of the need for, and the objectives of, the proposed rule." 15 U.S.C. 57b–3.

[234] *Atl. Refin. Co.,* 381 U.S. at 369–70; *Texaco, Inc.,* 393 U.S. at 228–29.

[235] 393 U.S. 223 at 228–29 (1968). *See also Shell Oil Co.* v. *Fed. Trade Comm'n,* 360 F.2d 470, 487 (5th Cir. 1966) ("A man operating a gas station is bound to be overawed by the great corporation that is his supplier, his banker, and his landlord.").

[236] 291 U.S. 304, 313 (1934).

[237] 729 F.2d 128, 140 (2d Cir. 1984) ("In short, in the absence of proof of a violation of the antitrust laws or evidence of collusive, coercive, predatory, or exclusionary conduct, business practices are not 'unfair' in violation of § 5 unless those practices either have an anticompetitive purpose or cannot be supported by an independent legitimate reason.").

method of competition, it must burden commerce. In *Atlantic Refining,* the Court determined "a full-scale economic analysis of competitive effect" was not required; due to the nature of the conduct at issue, the Commission merely needed to show the conduct burdened "a not insubstantial portion of commerce." [238]

In the cases described above, courts condemned conduct under Section 5 based on the facial unfairness of the conduct. In other cases, however, courts have condemned restrictive or exclusionary conduct under Section 5 based not on the facial unfairness of the conduct, but on the impact of the conduct on competition. For example, in *FTC* v. *Motion Picture Advertising Service Co.,* the Court held an exclusive dealing arrangement violated Section 5 where there was "substantial evidence" the contracts "unreasonably restrain competition." [239] Similarly, in *L.G. Balfour Co.* v. *FTC,* the U.S. Court of Appeals for the Seventh Circuit held a firm's exclusive dealing contracts violated Section 5 where such contracts were "anti-competitive." [240] As the U.S. Court of Appeals for the Sixth Circuit stated in *Hastings Manufacturing Co.* v. *FTC,* the Section 5 jurisprudence has established that "acts [that are] not in themselves illegal or criminal, or even immoral, may, when repeated and continued and their impact upon commerce is fully revealed, constitute an unfair method of competition within the scope of the Commission's authority to regulate and forbid." [241]

For the reasons described below, the Commission preliminarily finds the use by employers of non-compete clauses is an "unfair" method of competition under Section 5. The Commission's preliminary findings differ based on whether the worker is a senior executive. For workers who are not senior executives, the Commission preliminarily finds the use by employers of non-compete clauses is "unfair" under Section 5 in three independent ways. First, non-compete clauses are restrictive conduct that negatively affects competitive conditions. Second, non-compete clauses are exploitative and coercive at the time of contracting while burdening

a not insignificant volume of commerce. Third, non-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer while burdening a not insignificant volume of commerce.

For workers who are senior executives, the Commission preliminarily finds the use by employers of non-compete clauses is "unfair" under Section 5 because such non-compete clauses are restrictive conduct that negatively affects competitive conditions. As described below in Part IV.A.1.a.ii, the Commission preliminarily concludes non-compete clauses for senior executives may harm competition in product markets in unique ways. The second and third preliminary findings described above—that non-compete clauses are exploitative and coercive at the time of contracting and at the time of a worker's potential departure—do not apply to workers who are senior executives.[242]

The Commission seeks comment on whether this different unfairness analysis should apply to other highly paid or highly skilled workers who are not senior executives. Furthermore, in Part VI.C below, the Commission seeks comment on how this category of workers—whether "senior executives" or a broader category of highly paid or highly skilled workers—should be defined, and whether different regulatory standards should apply to this category of workers.

The Commission seeks comment on its preliminary finding that non-compete clauses are an "unfair" method of competition under Section 5.

### a. Non-Compete Clauses Are Restrictive Conduct That Negatively Affects Competitive Conditions

First, the Commission preliminarily finds non-compete clauses are an "unfair" method of competition under Section 5 because they are restrictive conduct that negatively affects competitive conditions.

As noted above, courts have condemned restrictive or exclusionary conduct under Section 5 based not on the facial unfairness of the conduct, but on the impact of the conduct on competition.[243] Non-compete clauses are restrictive conduct. By their express

terms, non-compete clauses restrict a worker's ability to work for a competitor of the employer—for example, by accepting a job with a competitor or starting a business that would compete against the employer. Non-compete clauses also restrict rivals from competing against the employer to attract their workers. Because non-compete clauses facially restrain competition in the labor market, courts have long held they are restraints of trade and proper subjects for scrutiny under the antitrust laws.[244] Furthermore, as described in detail in this NPRM, there is considerable empirical evidence showing non-compete clauses negatively affect competition in labor markets and product and service markets.[245] This evidence is summarized below.

#### i. Non-Compete Clauses Negatively Affect Competitive Conditions in Labor Markets

As described in greater detail above in Part II.B.1, non-compete clauses negatively affect competitive conditions in labor markets by obstructing the sorting of workers and employers into the strongest possible matches. Labor markets function by matching workers and employers. In a well-functioning labor market, a worker who is seeking a better job—more pay, better working conditions, more enjoyable work, or whatever the worker may be seeking—can enter the labor market by looking for work. Employers who have positions available compete for the worker's services. The worker's current employer may also compete with these prospective employers by seeking to retain the worker—for example, by offering to raise the worker's pay or promote the worker. Ultimately, the worker chooses the job that best meets their objectives. In general, the more jobs available—*i.e.,* the more options the worker has—the greater the possibility the worker will find a strong match.

Just as employers compete for workers in a well-functioning labor market,

---

[238] 381 U.S. at 370–71. *See also Texaco, Inc.,* 393 U.S. at 230 (finding that the practice unfairly burdened competition for a not insignificant volume of commerce); *R.F. Keppel & Bro.,* 291 U.S. at 309 ("A practice so widespread and so far reaching in its consequences is of public concern if in other respects within the purview of the statute.").

[239] 344 U.S. 392, 395–96 (1953).

[240] 442 F.2d 1, 14 (7th Cir. 1971).

[241] 153 F.2d 253, 257 (6th Cir. 1946).

[242] As described below in Part VII.B.1.a.iv, the Commission estimates that, when non-compete clauses are more enforceable, CEO earnings are reduced. This may result from the negative effects on competitive conditions that non-compete clauses have on labor markets (discussed in greater detail below in Part IV.A.1.a.i) rather than from exploitation or coercion.

[243] *See supra* Part IV.A.1.

[244] *See, e.g., Am. Tobacco Co.,* 221 U.S. at 181–83 (holding several tobacco companies violated Sections 1 and 2 of the Sherman Act due to the collective effect of six of the companies' practices, one of which was the "constantly recurring" use of non-compete clauses); *Newburger, Loeb & Co., Inc.,* 563 F.2d at 1082 ("Although such issues have not often been raised in the federal courts, employee agreements not to compete are proper subjects for scrutiny under section 1 of the Sherman Act. When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired. Moreover, employee-noncompetition clauses can tie up industry expertise and experience and thereby forestall new entry.").

[245] *See supra* Part II.B.

workers compete for jobs. In general, the more workers who are available—*i.e.,* the more options the employer has—the stronger the match the employer will find. Through these processes—employers competing for workers, workers competing for jobs, and employers and workers matching with one another—competition in the labor market leads to higher earnings for workers, greater productivity for employers, and better economic conditions.

In a perfectly competitive labor market, if a job that a worker would prefer more—for example, because it has higher pay or is in a better location—were to become available, the worker could switch to it quickly and easily. However, this perfectly competitive labor market exists only in theory. In practice, labor markets substantially deviate from perfect competition. Non-compete clauses, in particular, impair competition in labor markets by restricting a worker's ability to change jobs. If a worker is bound by a non-compete clause, and the worker wants a better job, the non-compete clause will prevent the worker from accepting a new job within the scope of the non-compete clause. These will often be the most natural alternative employment options for a worker: jobs in the same geographic area and in the worker's field of expertise. The result is less competition among employers for the worker's services. Since the worker is prevented from taking these jobs, the worker may decide not to enter the labor market at all, or the worker may enter the labor market but take a job outside of their field of expertise in which they are less productive.

Non-compete clauses affect competition in labor markets through their use in the aggregate. The effect of an individual worker's non-compete clause on competition in a particular labor market may be marginal or may be impossible to discern statistically. However, the use of a large number of non-compete clauses across a labor market demonstrably affects the opportunities of all workers in that market. By making it more difficult for many workers in a labor market to switch to new jobs, non-compete clauses inhibit optimal matches from being made between employers and workers across the labor force. As a result, where non-compete clauses are prevalent in a market, workers are more likely to remain in jobs that are less optimal with respect to the worker's ability to maximize their productive capacity. This materially reduces wages for workers—not only for workers who are subject to non-compete clauses, but

other workers in a labor market as well, since jobs that would otherwise be better matches for an unconstrained worker are filled by workers subject to non-compete clauses.

The Section 5 analysis as to whether conduct negatively affects competitive conditions does not require a showing that the conduct caused actual harm.[246] However, whether conduct causes actual harm can be relevant to whether it is an unfair method of competition.[247] There is significant empirical evidence that non-compete clauses cause actual harm to competition in labor markets, and that these harms are substantial.

As described above in Part II.B.1.a, the Commission estimates at least one in five American workers—or approximately 30 million workers—is bound by a non-compete clause. The proliferation of non-compete clauses is restraining competition in labor markets to such a degree that it is materially impacting workers' earnings—both across the labor force in general, and also specifically for workers who are not subject to non-compete clauses. The available evidence indicates increased enforceability of non-compete clauses substantially reduces workers' earnings, on average, across the labor market generally or for specific types of workers.[248] The Commission estimates the proposed rule, which would prohibit employers from using non-compete clauses, would increase workers' total earnings by $250 to $296 billion per year.[249]

In addition to the evidence showing non-compete clauses reduce earnings for workers across the labor force, there is also evidence non-compete clauses reduce earnings specifically for workers who are *not* subject to non-compete clauses.[250] One study finds when the use of non-compete clauses by employers increases, that drives down

wages for workers who do not have non-compete clauses but who work in the same state and industry. This study also finds this effect is stronger where non-compete clauses are more enforceable. This study shows the reduction in earnings (and also reduced labor mobility) is due to a reduction in the rate of the arrival of job offers.[251] Another study finds similarly that changes in non-compete clause enforceability in one state have negative impacts on workers' earnings in bordering states and that the effects are nearly as large as the effects in the state in which enforceability changed (though the effect tapers off as the distance to the bordering state increases).[252] The authors conclude that, since the workers across the border are not directly affected by the law change—because contracts that they have signed do not become more or less enforceable—this effect must be due to changes in the local labor market.[253]

The Commission preliminarily concludes non-compete clauses negatively affect competitive conditions in labor markets regardless of the worker's income or job function. Whether a worker is a senior executive or a security guard, non-compete clauses block the worker from switching to a job in which they would be better paid and more productive—restricting that worker's opportunities as well as the opportunities of other workers in the relevant labor market. The available data do not allow the Commission to estimate earnings effects for every occupation. However, the evidentiary record indicates non-compete clauses depress wages for a wide range of subgroups of workers across the spectrum of income and job function. The Commission therefore estimates the proposed rule would increase earnings for workers in all of the subgroups of the labor force for which sufficient data is available.[254]

The Commission seeks comment on its preliminary finding that non-compete clauses negatively affect competitive conditions in labor markets.

### ii. Non-Compete Clauses Negatively Affect Competitive Conditions in Markets for Products and Services

The adverse effects of non-compete clauses on product and service markets largely result from reduced labor mobility. Several studies show the use of non-compete clauses by employers

---

[246] *See Fed. Trade Comm'n* v. *Sperry & Hutchinson Co.,* 405 U.S. 233, 244 (1972) (explaining that "unfair competitive practices [are] not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws"); *In re Coca-Cola Co.,* 117 F.T.C. 795, 915 (FTC 1994) (rejecting argument that Section 5 violation requires showing "anticompetitive effects").

[247] *See Ethyl,* 729 F.2d at 138 (evidence of actual harm can be "a relevant factor in determining whether the challenged conduct is unfair").

[248] *See supra* Part II.B.1. While there is evidence that increased enforceability of non-compete clauses increases the rate of earnings growth for physicians, Lavetti, Simon, & White, *supra* note 53 at 1051, the Commission estimates that the proposed rule may increase physicians' earnings, although the study does not allow for a precise calculation. *See infra* Part VII.B.1.a.ii.

[249] *See infra* Part VII.B.1 (describing the Commission's assessment of the benefits of the proposed rule).

[250] *See supra* Part II.B.1.c.

[251] Starr, Frake, & Agarwal, *supra* note 76 at 4.

[252] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 51.

[253] *Id.* at 30.

[254] *See infra* Part VII.B.1.a.

reduces labor mobility. All of these studies have found decreased rates of labor mobility, as measured by job separations, hiring rates, job-to-job mobility, implicit mobility defined by job tenure, and within- and between-industry mobility.[255] The Commission does not view reduced labor mobility from non-compete clauses—in and of itself—as evidence that non-compete clauses negatively affect competition in product and service markets. Instead, reduced labor mobility is best understood as the primary driver of the effects in product and service markets the Commission is concerned about.

Reduced labor mobility from non-compete clauses negatively affects competitive conditions in product and service markets in several respects. First, there is evidence non-compete clauses increase consumer prices and concentration in the health care sector. There is also evidence non-compete clauses increase industrial concentration more broadly. Non-compete clauses may have these effects by inhibiting entrepreneurial ventures (which could otherwise enhance competition in goods and service markets) or by foreclosing competitors' access to talented workers.[256]

Second, non-compete clauses foreclose the ability of competitors to access talent by effectively forcing future employers to buy out workers from their non-compete clauses if they want to hire them. Firms must either make inefficiently high payments to buy workers out of non-compete clauses with a former employer, which leads to deadweight economic loss, or forego the payment—and, consequently, the access to the talent the firm seeks. Whatever choice a firm makes, its economic outcomes in the market are harmed, relative to a scenario in which no workers are bound by non-compete clauses. There is evidence of this mechanism in the market for CEOs.[257]

Third, the weight of the evidence indicates non-compete clauses have a negative impact on new business formation. New business formation increases competition first by bringing new ideas to market, and second, by forcing incumbent firms to respond to new firms' ideas instead of stagnating. Non-compete clauses restrain new business formation by preventing workers subject to non-compete clauses from starting their own businesses. In addition, firms are more willing to enter markets in which they know there are potential sources of skilled and experienced labor, unhampered by non-compete clauses.[258]

Fourth, the weight of the evidence indicates non-compete clauses decrease innovation. Innovation may directly improve economic outcomes by increasing product quality or decreasing prices, or may promote competition because successful new products and services force competing firms to improve their own products and services. Non-compete clauses affect innovation by reducing the movement of workers between firms, which decreases knowledge flow between firms. Non-compete clauses also prevent workers from starting businesses in which they can pursue innovative new ideas.[259]

As noted above in Part II.B.2.e, there is also evidence non-compete clauses increase employee training and other forms of investment. The Commission considers this evidence below in Part IV.B as part of its analysis of the justifications for non-compete clauses.

The Commission believes non-compete clauses for senior executives may harm competition in product markets in unique ways, to the extent that senior executives may be likely to start competing businesses, be hired by potential entrants or competitors, or lead the development of innovative products and services. Non-compete clauses for senior executives may also block potential entrants, or raise their costs, to a high degree, because such workers are likely to be in high demand by potential entrants. As a result, prohibiting non-compete clauses for senior executives may have relatively greater benefits for consumers than prohibiting non-compete clauses for other workers. The Commission seeks comment on this analysis as well as whether this reasoning may apply to highly paid and highly skilled workers who are not senior executives.

The Commission seeks comment on its preliminary finding that non-compete clauses negatively affect competitive conditions in markets for products and services.

### b. Non-Compete Clauses Are Exploitative and Coercive at the Time of Contracting

The Commission preliminarily finds non-compete clauses for workers other than senior executives are exploitative and coercive because they take advantage of unequal bargaining power between employers and workers at the time the employer and worker enter into the non-compete clause.

As noted above, courts have held conduct that is exploitative and coercive can violate Section 5 where it burdens a not insignificant volume of commerce.[260] Courts have long recognized bargaining power between employers and workers is unequal and, as a result, workers are vulnerable to exploitation and coercion through the use of non-compete clauses at the time of contracting. Courts have expressed this concern since at least the early eighteenth century. In the foundational English case *Mitchel* v. *Reynolds,* the court cited "the great abuses these voluntary restraints are liable to . . . from masters, who are apt to give their apprentices much vexation" by using "many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come to set up for themselves." [261] As another court stated, more recently:

The average, individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses. His individual bargaining power is seldom equal to that of his employer. . . . Under pressure of need and with little opportunity for choice, he is more likely than the seller to make a rash, improvident promise that, for the sake of present gain, may tend to impair his power to earn a living, impoverish him, render him a public charge or deprive the community of his skill and training.[262]

Indeed, courts have cited the imbalance of bargaining power between workers and employers as a central reason for imposing stricter scrutiny on non-compete clauses between employers and workers than on non-compete clauses between businesses or between the seller and buyer of a business.[263]

The imbalance of bargaining power between employers and workers results from several factors. Many of these

[255] *See supra* Part II.B.2.

[256] *See supra* Part II.B.2.a.

[257] *See supra* Part II.B.2.b.

[258] *See supra* Part II.B.2.c.

[259] *See supra* Part II.B.2.d.

[260] *See supra* Part IV.A.1.

[261] 1 P. Wms. at 190.

[262] *Arthur Murray Dance Studios of Cleveland* v. *Witter,* 105 NE2d 685, 703–04 (Ohio Ct. Com. Pl. 1952). *See also* Restatement (Second) of Contracts (1981) sec. 188 cmt. g ("Postemployment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood.").

[263] *See, e.g., Alexander & Alexander, Inc.* v. *Danahy,* 488 NE2d 22, 29 (Mass. App. Ct. 1986); *Diepholz* v. *Rutledge,* 659 NE 989, 991 (Ill. Ct. App. 1995); *Palmetto Mortuary Transp., Inc.* v. *Knight Sys., Inc.,* 818 SE2d 724, 731 (S.C. 2018).

factors relate to the nature of the employer-worker relationship in the United States generally. Most workers depend on income from their jobs to get by—to pay their rent or mortgage, pay their bills, and keep food on the table. For these workers, particularly the many workers who live paycheck to paycheck, loss of a job or a job opportunity can severely damage their finances.[264] For these reasons, the loss of a job or an employment opportunity is far more likely to have serious financial consequences for a worker than the loss of a worker or a job candidate would have for most employers. In addition, employers generally have considerable labor market power, due to factors such as concentration and the difficulty of searching for a job.[265] The considerable labor market power of employers has significantly diminished the bargaining power of U.S. workers.[266]

Several additional factors contribute to the imbalance of bargaining power between employers and workers generally. These include the decline in union membership, which forces more workers to negotiate with their employers individually;[267] increased reliance by employers on various forms of outsourcing, which allows employers to fill persistent vacancies without having to raise wages or improve conditions for incumbent workers;[268] and the proliferation of no-poaching agreements, which limit the mobility of workers and, as a result, their bargaining power.[269]

While the employer-worker relationship is defined by an imbalance of bargaining power generally, the imbalance of bargaining power is particularly acute in the context of negotiating employment terms such as

non-compete clauses, for several reasons. First, as courts have long recognized, employers are repeat players who are likely to have greater experience and skill at bargaining, in the context of negotiating employment terms, than individual workers.[270] Second, and relatedly, workers are not likely to seek the assistance of counsel in reviewing employment terms,[271] while employers are more likely to seek the assistance of counsel in drafting them.

Third, research indicates consumers exhibit cognitive biases in the way they consider contractual terms,[272] and the same may be true of workers. Consumers rarely read standard-form contracts.[273] Consumers also tend to focus their attention on a few salient terms of the transaction, such as price and quantity, and tend to disregard other terms, particularly terms that are relatively obscure.[274] Consumers are particularly likely to disregard contingent terms—terms concerning scenarios that may or may not come to pass—or to be unable to assess what the impact of those terms may be.[275] Consumers also tend to disregard onerous terms or terms that involve difficult trade-offs, such as giving up legal rights or future opportunities.[276] Workers likely display similar cognitive biases in the way they consider employment terms. These reasons explain why the imbalance of bargaining power between workers and employers is particularly high in the context of negotiating employment terms such as non-compete clauses.

There is considerable evidence employers are exploiting this imbalance of bargaining power through the use of non-compete clauses. Non-compete clauses are typically standard-form

contracts,[277] which, as noted above, workers are not likely to read. The evidence shows workers rarely bargain over non-compete clauses[278] and rarely seek the assistance of counsel in reviewing non-compete clauses.[279] Furthermore, research indicates that, in states where non-compete clauses are unenforceable, workers are covered by non-compete clauses at roughly the same rate as workers in other states,[280] suggesting that employers may believe workers are unaware of their legal rights, or that employers may be seeking to take advantage of workers' lack of knowledge of their legal rights. In addition, there is evidence employers often provide workers with non-compete clauses after they have accepted the job offer—in some cases, on or after their first day of work—when the worker's negotiating power is at its weakest, since the worker may have turned down other job offers or left their previous job.[281]

Because there is a considerable imbalance of bargaining power between workers and employers in the context of negotiating employment terms, and because employers take advantage of this imbalance of bargaining power through the use of non-compete clauses, the Commission preliminarily finds non-compete clauses are exploitative and coercive at the time of contracting.

As noted above, for coercive conduct to constitute unfair method of competition, it must also burden a not insignificant volume of commerce. The Commission preliminarily finds non-compete clauses burden a not insignificant volume of commerce due to their negative effects on competitive conditions in labor markets and product and service markets, which are described above.[282]

This preliminary finding does not apply to workers who are senior executives. Non-compete clauses for senior executives are unlikely to be exploitative or coercive at the time of contracting, because senior executives are likely to negotiate the terms of their employment and may often do so with the assistance of counsel. The Commission seeks comment on whether there are other categories of highly paid or highly skilled workers (*i.e.,* other

[264] *See, e.g.,* Jennie E. Brand, *The Far-Reaching Impact of Job Loss and Unemployment,* 41 Ann. Rev. of Socio. 359 (2015); CareerBuilder, *Living Paycheck to Paycheck is a Way of Life for Majority of U.S. Workers, According to New CareerBuilder Survey* (Aug. 24, 2017), *https://press.careerbuilder.com/2017-08-24-Living-Paycheck-to-Paycheck-is-a-Way-of-Life-for-Majority-of-U-S-Workers-According-to-New-CareerBuilder-Survey* (reporting that 78% of American workers live paycheck to paycheck); Jeff Ostrowski, Bankrate, *Survey: Fewer than 4 in 10 Americans could pay a surprise $1,000 bill from savings* (Jan. 11, 2021), *https://www.bankrate.com/banking/savings/financial-security-january-2021/.*

[265] Treasury Labor Market Competition Report, *supra* note 41 at i–ii.

[266] *Id.* at ii ("As this report highlights, a careful review of the credible academic studies places the decrease in wages at roughly 20 percent relative to the level in a fully competitive market").

[267] *See, e.g.,* Alan Krueger, *Luncheon Address: Reflections on Dwindling Worker Bargaining Power and Monetary Policy* at 272 (Aug. 24, 2018), *https://www.kansascityfed.org/Jackson%20Hole/documents/6984/Lunch_JH2018.pdf.*

[268] *Id.*

[269] *Id.* at 273.

[270] *See, e.g., Samuel Stores, Inc.* v. *Abrams,* 108 A. 541, 543 (Conn. 1919).

[271] In one survey, only 7.9% of workers with non-compete clauses reported consulting a lawyer in connection with the non-compete clause. Starr, Prescott, & Bishara, *supra* note 42, at 72.

[272] *See, e.g.,* Arnow-Richman (2006), *supra* note 56 at 981; Russell Korobkin, *Bounded Rationality, Standard Form Contracts, and Unconscionability,* 70 U. Chi. L. Rev. 1203, 1206 (2003); Robert Hillman & Jeffrey Rachlinski, *Standard-Form Contracting in the Electronic Age,* 77 N.Y.U. L. Rev. 429, 450–54 (2002).

[273] Korobkin, *supra* note 272 at 1216.

[274] Arnow-Richman (2006), *supra* note 56 at 981; Hillman & Rachlinski, *supra* note 272 at 452.

[275] *See, e.g.,* Estlund, *supra* note 144 at 413 (2006). *See also* Fed. Trade Comm'n, *Credit Practices Rule,* 49 FR 7740, 7744 (Mar. 1, 1984) (noting that consumers tend disregard contingent provisions and concentrate their search on factors such as interest rates and payment terms).

[276] Arnow-Richman (2006), *supra* note 56 at 981; Korobkin, *supra* note 272 at 1203–31.

[277] Starr, Prescott, & Bishara, *supra* note 42 at 72 ("Taken together, the evidence in this section indicates that employers present (or employees receive) noncompete proposals as take-it-or-leave-it propositions.").

[278] *Id.*

[279] *Id.*

[280] *Id.* at 81.

[281] Marx (2011), *supra* note 55 at 706.

[282] *See supra* Part IV.A.1.a.i–ii.

than senior executives) to whom this preliminary finding should not apply.

The Commission seeks comment on all aspects of its preliminary finding that non-compete clauses are exploitative and coercive at the time of contracting.

### c. Non-Compete Clauses Are Exploitative and Coercive at the Time of The Worker's Potential Departure From the Employer

The Commission preliminarily finds non-compete clauses for workers other than senior executives are exploitative and coercive at the time of the worker's potential departure from the employer, because they force a worker to either stay in a job they want to leave or choose an alternative that likely impacts their livelihood.

For most workers who want to leave their jobs, the most natural employment options will be work in the same field and in the same geographic area. However, where a worker is bound by a non-compete clause, the worker's employment options are significantly limited. A worker who is subject to a non-compete clause, and who wants to leave their job, faces an undesirable choice that will likely affect their livelihood: either move out of the area; leave the workforce for a period of time; leave their field for period of time; pay the employer a sum of money to waive the non-compete clause; or violate the non-compete clause and risk a lawsuit from the employer. By forcing a worker who wants to leave their job to either stay in their job or take an action that will likely negatively affect their livelihood, non-compete clauses coerce workers into remaining in their current jobs. Courts have long expressed concern about this coercive effect of non-compete clauses—that non-compete clauses may threaten a worker's livelihood if they leave their job.[283]

Workers have an inalienable right to quit their jobs.[284] The Supreme Court has described this "right to change employers" as a critical "defense against oppressive hours, pay, working conditions, or treatment."[285] Strictly speaking, non-compete clauses do not prevent workers from quitting their jobs. However, non-compete clauses "burden the ability to quit, and with it the ability to demand better wages and working conditions and to resist oppressive conditions in the current job."[286] Non-

compete clauses burden the ability to quit by forcing workers to either remain in their current job or, as described above, take an action—such as leaving the labor force for a period of time or taking a job in a different field—that would likely affect their livelihood. For this reason, the Commission finds non-compete clauses are exploitative and coercive at the time of the worker's potential departure.

As noted above, for coercive conduct to constitute unfair method of competition, it must also burden a not insignificant volume of commerce. The Commission preliminarily finds non-compete clauses burden a not insignificant volume of commerce due to their negative effects on competitive conditions in labor markets and product and service markets, which are described above.[287]

This preliminary finding does not apply to workers who are senior executives. Non-compete clauses for senior executives are unlikely to be exploitative or coercive at the time of the executive's departure. Because many senior executives negotiate their non-compete clauses with the assistance of expert counsel, they are likely to have bargained for a higher wage or more generous severance package in exchange for agreeing to the non-compete clause.[288] The Commission seeks comment on whether there are other categories of highly paid or highly skilled workers (*i.e.*, other than senior executives) to whom this preliminary finding should not apply.

The Commission seeks comment on all aspects of its preliminary finding that non-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer.

### 2. Non-Compete Clauses Are a Method of Competition

For conduct to be an "unfair method of competition" under Section 5, it must be both "unfair" and a "method of competition." In *Ethyl,* the court distinguished between a "condition" of a marketplace, such as an oligopolistic market structure, and a "method" of competition, which it described as "specific conduct which promotes" an anticompetitive result.[289] When an

employer uses a non-compete clause, it undertakes conduct in a marketplace. This conduct implicates competition; indeed, it has demonstrable effects on competition in both labor markets and markets for products and services.[290] For these reasons, the Commission preliminarily finds non-compete clauses are a method of competition under Section 5. The Commission seeks comment on this preliminary finding.

### B. The Justifications for Non-Compete Clauses Do Not Alter the Commission's Preliminary Determination

For the reasons described above in Part IV.A, the Commission preliminarily determines non-compete clauses are an unfair method of competition under Section 5. In this Part IV.B, the Commission preliminarily finds the justifications for non-compete clauses do not alter the Commission's preliminary determination that non-compete clauses are an unfair method of competition.

The circumstances under which a business justification can overcome a finding that conduct is an unfair method of competition are narrow. In *Fashion Originators' Guild of America* v. *FTC,* the Court held that, in light of "the purpose and object of this combination, its potential power, its tendency to monopoly, [and] the coercion it could and did practice upon a rival method of competition," the Commission did not err by refusing to hear evidence related to justifications, "for the reasonableness of the methods pursued by the combination to accomplish its unlawful object is no more material than would be the reasonableness of the prices fixed by unlawful combination."[291] In *Atlantic Refining,* the Court similarly held the Commission did not err by refusing to consider "evidence of economic justification for the program," because, while the arrangements at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers . . . the Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves."[292]

Similarly, in *L.G. Balfour Co.,* the Commission challenged as an unfair method of competition the use of exclusive dealing contracts by a firm that manufactured and sold jewelry and other items bearing the insignia of fraternities and high schools. The firm argued the contracts were justified, in

---

[283] *See, e.g., Mitchel,* 1 P. Wms. at 190 (citing "the mischief which may arise from [non-compete clauses] . . . . to the party, by the loss of his livelihood").

[284] *Bailey* v. *Alabama,* 219 U.S. 219, 242 (1911).

[285] *Pollock* v. *Williams,* 322 U.S. 4, 17–18 (1944).

[286] *See* Estlund, *supra* note 144 at 407.

[287] *See supra* Part IV.A.1.a.i–ii.

[288] *See, e.g.,* Stewart J. Schwab & Randall S. Thomas, *An Empirical Analysis of CEO Employment Contracts: What Do Top Executives Bargain For?,* 63 Wash. & Lee L. Rev. 231, 256–57 (2006) (noting that 84% of CEO employment contracts that included both a non-compete clause and a severance payment have a severance payment that is equal to or greater than the length of the non-competition period).

[289] 729 F.2d at 139.

[290] *See supra* Part II.B.

[291] 312 U.S. at 467–68.

[292] 381 U.S. at 371.

part because the fraternities and schools benefitted from uniformity in the design and workmanship of the items. The court reasoned ''[w]hile it is relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice.'' [293] The court found the exclusive contracts were not justified, because the fraternities and schools had other means for accomplishing the goal of maintaining high quality for their jewelry and because the firm did not establish that its competitors could not satisfy its customers' needs.[294]

In this Part IV.B, the Commission considers the commonly cited business justifications for non-compete clauses but preliminarily finds they do not alter the Commission's preliminary determination that non-compete clauses are an unfair method of competition, for two reasons. First, employers have alternatives to non-compete clauses that reasonably achieve the same purposes while burdening competition to a less significant degree. Second, the asserted benefits from these commonly cited justifications do not outweigh the considerable harm from non-compete clauses.

## 1. Commonly Cited Justifications for Non-Compete Clauses

The most cited justifications for non-compete clauses are that they increase employers' incentive to make productive investments, including in worker training, client attraction, or in creating or sharing trade secrets with workers. According to these justifications, without non-compete clauses, employment relationships are subject to an investment hold-up problem. Investment hold-up occurs where an employer—faced with the possibility a worker may depart after receiving some sort of valuable investment—opts not to make that investment in the first place, thereby decreasing the firm's productivity and overall social welfare. For example, according to these justifications, an employer may be more reticent to invest in trade secrets or other confidential information; to share this information with its workers; or to train its workers if it knows the worker may depart for or may establish a competing firm. Courts have cited these justifications when upholding non-compete clauses under state common law or antitrust law.[295]

As described above in Part II.B.2.e, there is evidence non-compete clauses increase worker training and capital investment (*e.g.,* investment in physical assets, such as machines). Non-compete clauses may increase an employer's incentive to train their workers or invest in capital equipment because workers bound by non-compete clauses are less likely to leave their jobs for competitors. The author of the study assessing effects on capital investment finds there are likely two mechanisms driving these effects. First, firms may be more likely to invest in capital when they train their workers because worker training and capital expenditure are complementary (*i.e.,* the return on investment in capital equipment is greater when workers are more highly trained). Second, non-compete clauses reduce competition, and firms' returns to capital expenditure are greater when competition is lower, incentivizing firms to invest more in capital.[296]

The Commission is not aware of any evidence of a relationship between the enforceability of non-compete clauses and the rate at which companies make other types of productive investments, such as investments in creating or sharing trade secrets. Similarly, the Commission is not aware of any evidence non-compete clauses reduce trade secret misappropriation or the loss of other types of confidential information. The Commission's understanding is there is little reliable empirical data on trade secret theft and firm investment in trade secrets in general, and no reliable data on how non-compete clauses affect these practices. The Commission understands these are difficult areas for researchers to study, due to, for example, the lack of a governmental registration requirement for trade secrets and the unwillingness of firms to disclose information about their practices related to trade secrets.[297]

The Commission is also not aware of any evidence that increased investment due to non-compete clauses leads to reduced prices for consumers. Indeed, the only empirical study of the effects of non-compete clauses on consumer prices—in the health care sector—finds increased final goods prices as the enforceability of non-compete clauses increases.[298]

## 2. Employers Have Alternatives to Non-Compete Clauses for Protecting Valuable Investments

There are two reasons why the business justifications for non-compete clauses do not alter the Commission's preliminary determination non-compete clauses are an unfair method of competition. The first is employers have alternatives to non-compete clauses for protecting valuable investments. These alternatives may not be as protective as employers would like, but they reasonably accomplish the same purposes as non-compete clauses while burdening competition to a less significant degree.

As noted above, the most commonly cited justifications for non-compete clauses are that they increase an employer's incentive to make productive investments—such as investing in trade secrets or other confidential information, sharing this information with its workers, or training its workers—because employers may be more likely to make such investments if they know workers are not going to depart for or establish a competing firm. However, non-compete clauses restrict considerably more activity than necessary to achieve these benefits. Rather than restraining a broad scope of beneficial competitive activity—by barring workers altogether from leaving work with the employer for a competitor and starting a business that would compete with the employer—employers have alternatives for protecting valuable investments that are much more narrowly tailored to limit impacts on competitive conditions. These alternatives restrict a considerably smaller scope of beneficial competitive activity than non-compete clauses because—while they may restrict an employee's ability to use or disclose certain information—they generally do not prevent workers from working for a competitor or starting their own business altogether.[299]

### a. Trade Secret Law

Trade secret law provides employers with an alternative means of protecting their investments in trade secrets. Trade secret law is a form of intellectual property law that protects confidential

---

[293] 442 F.2d at 15, *citing Motion Picture Advert. Serv. Co.,* 344 U.S. 392.

[294] *Id.* at 14–15.

[295] *See, e.g., U.S.* v. *Addyston Pipe & Steel Co.,* 85 F. 271, 281 (6th Cir. 1898); *Polk Bros., Inc.* v.

*Forest City Enters.,* 776 F.2d 185, 189 (7th Cir. 1985).

[296] Jeffers, *supra* note 92 at 29.

[297] *See, e.g.,* David S. Levine & Christopher B. Seaman, *The DTSA at One: An Empirical Study of the First Year of Litigation Under the Defend Trade Secrets Act,* 53 Wake Forest L. Rev. 105, 120–22 (2018).

[298] *See supra* Part II.B.2.a.

[299] *See, e.g., MAI Basic Four, Inc.* v. *Basis, Inc.,* 880 F.2d 286, 287–88 (10th Cir. 1989) (stating that workers subject to NDAs—unlike workers subject to non-compete clauses—''remain free to work for whomever they wish, wherever they wish, and at whatever they wish,'' subject only to the terms that prohibit them from disclosing or using certain information.'').

business information.[300] It also serves as an alternative to the patent system, "granting proprietary rights to particular technologies, processes, designs, or formulae that may not be able to satisfy the rigorous standards for patentability."[301] Even where information meets standards for patentability, companies may choose to rely on trade secret law and not obtain a patent, because they wish to keep information out of the public domain.[302]

Trade secret law has developed significantly in recent decades. Prior to the late 1970s, trade secret law across the states was inconsistent, leading to significant uncertainty regarding the scope of trade secret protections and the appropriate remedies for misappropriation.[303] Recognizing the need for more uniform laws, the American Bar Association approved the Uniform Trade Secrets Act ("UTSA") in 1979.[304] Forty-seven states and the District of Columbia have adopted the UTSA.[305] The three states that have not adopted the UTSA offer protection to trade secrets under a different statute or under common law.[306]

The UTSA provides a civil cause of action for trade secret misappropriation, which refers to disclosure or use of a trade secret by a former employee without express or implied consent.[307] The UTSA also provides for injunctive and monetary relief, including compensatory damages, punitive damages, and attorney's fees.[308] In some states, under the "inevitable disclosure doctrine," courts may enjoin a worker from working for a competitor of the worker's employer where it is inevitable the worker will disclose trade secrets in the performance of the worker's job duties.[309] The inevitable disclosure doctrine is highly controversial. Several states have declined to adopt it altogether, citing the doctrine's harsh effects on worker mobility.[310] Other states have required employers to meet

high evidentiary burdens related to inevitability, irreparable harm, and bad faith before issuing an injunction pursuant to the doctrine.[311]

In addition, in 2016, Congress enacted the Defend Trade Secrets Act of 2016 ("DTSA"), which established a civil cause of action under federal law for trade secret misappropriation.[312] The DTSA brought the rights of trade secret owners "into alignment with those long enjoyed by owners of other forms of intellectual property, including copyrights, patents, and trademarks."[313] Similar to state laws modeled on the UTSA, the DTSA authorizes civil remedies for trade secret misappropriation, including injunctive relief, damages (including punitive damages), and attorney's fees.[314] The DTSA also authorizes a court, in "extraordinary circumstances," to issue civil *ex parte* orders for the "seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action."[315]

Furthermore, trade secret theft is a federal crime. The Economic Espionage Act of 1996 ("EEA") makes it a federal crime to steal a trade secret for either (1) the benefit of a foreign entity ("economic espionage") or (2) the economic benefit of anyone other than the owner ("theft of trade secrets").[316] The EEA authorizes substantial criminal fines and penalties for these crimes.[317] The EEA further authorizes criminal or civil forfeiture, including of "any property constituting, or derived from, any proceeds obtained directly or indirectly as a result of" an EEA offense.[318] The EEA also requires offenders to pay restitution to victims of trade secret theft.[319]

Under these laws, the term "trade secret" is defined expansively and includes a wide range of confidential information. The UTSA generally defines a "trade secret" as information that (1) derives independent economic value from not being generally known to other persons who can obtain economic value from its disclosure or use and (2) is the subject of reasonable efforts to

maintain its secrecy.[320] The DTSA and EEA use a similar definition.[321] The Supreme Court has held "some novelty" is required for information to be a trade secret, because "that which does not possess novelty is usually known."[322] Overall, the definition of "trade secret" covers a wide range of information employers seek to protect from disclosure. As the high court of one state noted, "[t]here is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret."[323]

The viability of trade secret law as a means for redressing trade secret theft is illustrated by the fact that firms regularly bring claims under trade secret law. A recent analysis by the legal analytics firm Lex Machina finds 1,382 trade secret lawsuits were filed in federal court in 2021.[324] Perhaps due to the enactment of the DTSA, the number of cases filed increased 30% from 2015 to 2017—from 1,075 to 1,396 cases—and has remained steady ever since.[325] In addition, an analysis by the law firm Morrison Foerster finds 1,103 trade secret cases were filed in state courts in 2019.[326] The number of cases filed in state court has held steady since 2015, when 1,161 cases were filed.[327] The fact that a considerable number of trade secret lawsuits are filed in federal and state court—approximately 2,500 cases per year—and the fact that this number has held steady for several years suggests employers view trade secret law as a viable means of obtaining redress for trade secret theft.

In sum, intellectual property law already provides significant legal protections for an employer's trade secrets. Trade secret law may not be as protective as some firms might like, but overall, it provides employers with a viable means of protecting their investments in trade secrets.

b. Non-Disclosure Agreements

Employers that seek to protect valuable investments also have the

---

[300] Brian T. Yeh, Protection of Trade Secrets: Overview of Current Law and Legislation, Cong. Rsch. Serv. Report R43374 (April 22, 2016) at 4.
[301] *Id.*
[302] *Id.* at 4–5.
[303] Uniform Trade Secrets Act With 1985 Amendments (Feb. 11, 1986), Prefatory Note at 1.
[304] *Id.* Prefatory Note at 3.
[305] *See* Levine & Seaman, *supra* note 297 at 113.
[306] Yeh, *supra* note 300 at 6 n.37.
[307] UTSA, *supra* note 303 at sec. 1(2).
[308] *Id.* at secs. 2–4.
[309] *See, e.g., PepsiCo, Inc.* v. *Redmond,* 54 F.3d 1262 (7th Cir. 1995) (affirming the district court's order enjoining an employee from assuming his responsibilities at a competing employer for six months).
[310] *See Bayer Corp.* v. *Roche Molecular Sys., Inc.,* 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999); *LeJeune* v. *Coin Acceptors, Inc.,* 849 A.2d 451, 471 (Md. 2004).

[311] *See, e.g.,* Eleanore R. Godfrey, *Inevitable Disclosure of Trade Secrets: Employee Mobility v. Employer Rights,* 3. J. High Tech. L. 161 (2004).
[312] Defend Trade Secrets Act of 2016, Public Law 114–153, 130 Stat. 376 (May 11, 2016).
[313] U.S. Senate, Report to Accompany S. 1890, the Defend Trade Secrets Act of 2016, S. Rept. 114–220 at 3.
[314] 18 U.S.C. 1836(b)(3).
[315] 18 U.S.C. 1836(b)(2).
[316] 18 U.S.C. 1831 (economic espionage); 18 U.S.C. 1832 (theft of trade secrets).
[317] 18 U.S.C. 1831–1832.
[318] 18 U.S.C. 1834, 2323.
[319] 18 U.S.C. 1834, 2323.

[320] UTSA, *supra* note 303 at sec. 1(4).
[321] 18 U.S.C. 1839(3).
[322] *Kewanee Oil Co.* v. *Bicron Corp.,* 416 U.S. 470, 476 (1974).
[323] *U.S. West Commc'ns, Inc.* v. *Off. of Consumer Advoc.,* 498 NW2d 711, 714 (Iowa 1993). *See also Confold Pac., Inc.* v. *Polaris Indus., Inc.,* 433 F.3d 952 (7th Cir. 2006) (Posner, J.).
[324] Lex Machina, Infographic, *Trade Secret Litigation Report 2021, https://lexmachina.com/resources/infographic-trade-secret-report/.*
[325] Kenneth A. Kuwayti, John R. Lanham, & Candice F. Heinze, Morrison Foerster, Client Alert, *Happy Anniversary, DTSA: The Defend Trade Secrets Act at Five* (May 25, 2021).
[326] *Id.*
[327] *Id.*

ability to enter into NDAs with their workers.[328] NDAs, which are also commonly known as confidentiality agreements, are contracts in which a party agrees not to disclose information the contract designates as confidential. NDAs may also prohibit workers from using information that is designated as confidential. If a worker violates an NDA, the worker may be liable for breach of contract.

Employers regularly use NDAs to protect trade secrets and other confidential business information. Researchers estimate between 33% and 57% of U.S. workers are subject to at least one NDA.[329] In most states, NDAs are more enforceable than non-compete clauses.[330]

The widespread use of NDAs by firms has raised concerns that NDAs may inhibit innovation and worker mobility.[331] Scholars have also raised concerns that overbroad NDAs can function as *de facto* non-compete clauses.[332] However, the protection of trade secrets and other limited confidential business information is widely recognized as a legitimate use of NDAs.[333]

NDAs that are unusually broad in scope may function as *de facto* non-compete clauses, hence falling within the scope of the proposed rule.[334] However, appropriately tailored NDAs, which would fall outside the scope of the proposed rule,[335] burden competition to a lesser degree than non-compete clauses. Such NDAs may prevent workers from disclosing or

using certain information, but they generally do not prevent workers from working for a competitor or starting their own business altogether. As the U.S. Court of Appeals for the Tenth Circuit has stated, workers subject to NDAs—unlike workers subject to non-compete clauses—"remain free to work for whomever they wish, wherever they wish, and at whatever they wish," subject only to the terms that prohibit them from disclosing or using certain information.[336]

c. Other Means of Protecting Valuable Investments

In addition to trade secret law and NDAs, employers have additional means of protecting valuable investments. For example, if an employer wants to prevent a worker from leaving right after receiving valuable training, the employer can sign the worker to an employment contract with a fixed duration. An employer can establish a term of employment long enough for the employer to recoup its training investment without restricting a worker's ability to compete with the employer after the worker's employment ends. Employers that wish to retain their workers can also pay the worker more, offer them better hours or better working conditions, or otherwise improve the conditions of their employment. These are all viable alternatives for protecting training investments, and other investments an employer may make, that do not restrict a worker's ability to work for a competitor of the employer or a rival's ability to compete against the worker's employer to attract the worker.

Proponents of non-compete clauses sometimes assert that, without non-compete clauses, firms will be unable to protect their trade secrets or other valuable investments. However, there are three states in which non-compete clauses are generally unavailable to employers today: California, North Dakota, and Oklahoma. In these three states, employers generally cannot enforce non-compete clauses, so they must protect their investments using one or more of the alternatives described above. The experiences of these states suggest the alternatives described above are fundamentally viable for protecting valuable firm investments.

Non-compete clauses have been void in California since 1872, in North Dakota since 1877, and in Oklahoma since 1890.[337] California is a state where

large companies have succeeded—it is home to four of the world's ten largest companies by market capitalization—and it also maintains a vibrant startup culture.[338] Since the 1980s, California has become the global center of the technology sector, and technology firms are highly dependent on protecting trade secrets and other confidential information.[339] (Indeed, researchers have posited that high-tech clusters in California may have been aided by increased labor mobility due to the unenforceability of non-compete clauses.[340]) In North Dakota and Oklahoma, the energy industry has thrived, and firms in the energy industry depend on the ability to protect trade secrets and other confidential information.

The economic success in these three states of industries highly dependent on trade secrets and other confidential information illustrates that companies have viable alternatives to non-compete clauses for protecting valuable investments. Relative to non-compete clauses, these alternatives are more narrowly tailored to limit impacts on competitive conditions.

The Commission seeks comment on its preliminary finding that employers have reasonable alternatives to non-compete clauses for protecting their investments.

3. The Asserted Benefits From These Justifications Do Not Outweigh the Harms From Non-Compete Clauses

The second reason why the commonly cited business justifications for non-compete clauses do not alter the Commission's preliminary determination that non-compete clauses are an unfair method of competition is that, overall, the asserted benefits from these justifications do not outweigh the harms from non-compete clauses.

As described above, the Commission preliminarily finds that, for some workers, non-compete clauses are exploitative and coercive because they take advantage of unequal bargaining power between employers and workers at the time of contracting.[341] The

---

[328] In this NPRM, we use the term "NDA" to refer to contractual provisions that are designed to protect trade secrets or other business information that has economic value. Employers may also seek to use NDAs to protect other kinds of information, such as information about discrimination, harassment, sexual assault, corporate wrongdoing, or information that may disparage the company or its executives or employees. These types of NDAs have been widely criticized for, among other things, their pernicious effects on workers. *See, e.g.,* Rachel Arnow-Richman et al., *Supporting Market Accountability, Workplace Equity, and Fair Competition by Reining In Non-Disclosure Agreements,* UC-Hastings Research Paper Forthcoming at 2–6 (January 2022), *https:// papers.ssrn.com/sol3/papers.cfm?abstract_ id=4022812.*

[329] *Id.*

[330] *See* Chris Montville, *Reforming the Law of Proprietary Information,* 56 Duke L.J. 1159, 1179–83 (2007).

[331] *See* Rex N. Alley, *Business Information and Non-Disclosure Agreements: A Public Policy Framework,* 116 Nw. L. Rev. 817, 832 (2022).

[332] *See, e.g.,* Arnow-Richman et al., *supra* note 328 at 5. *See also Brown,* 57 Cal. App. 5th at 319.

[333] *See* Montville, *supra* note 330 at 1179–83.

[334] *See* proposed § 910.1(b)(2) (describing the functional test for whether a contractual term is a non-compete clause) and *infra* Part V (in the section-by-section analysis for proposed § 910.1(b)).

[335] *Id.*

[336] *MAI Basic Four, Inc.,* 880 F.2d at 287–88.

[337] Gilson, *supra* note 88 at 616 (California); *Werlinger v. Mutual Service Casualty Ins. Co.,* 496

N.W.2d 26, 30 (N.D. 1993) (North Dakota); Brandon Kemp, *Noncompetes in Oklahoma Mergers and Acquisitions,* 88 Okla. Bar J. 128 (Jan. 21, 2017) (Oklahoma).

[338] Josh Dylan, *What Is Market Cap In Stocks?, Nasdaq.com* (Aug. 12, 2022); Ewing Marion Kauffman Found., *State Entrepreneurship Rankings, https://www.realclearpublicaffairs.com/ public_affairs/2019/02/25/kauffman_foundation_ state_entrepreneurship_rankings.html.*

[339] *See, e.g.,* Gilson, *supra* note 88 at 594–95.

[340] *Id.;* Fallick, Fleischman, & Rebitzer, *supra* note 89.

[341] *See supra* Part IV.A.1.b.

Commission also preliminarily finds that, for some workers, non-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer because they force a worker to either stay in a job they want to leave or choose an alternative that likely impacts their livelihood.[342] For these workers, for whom non-competes are facially unfair, the justifications for non-compete clauses must overcome a high bar to alter the Commission's preliminary determination that non-compete clauses are an unfair method of competition.[343]

In addition, non-compete clauses cause considerable harm to competition in labor markets and product and service markets. There is evidence non-compete clauses harm both workers and consumers. Non-compete clauses obstruct competition in labor markets because they inhibit optimal matches from being made between employers and workers across the labor force. The available evidence indicates increased enforceability of non-compete clauses substantially reduces workers' earnings, on average, across the labor force generally and for specific types of workers.[344]

In addition to the evidence showing non-compete clauses reduce earnings for workers across the labor force, there is also evidence non-compete clauses reduce earnings specifically for workers who are not subject to non-compete clauses.[345] These workers are harmed by non-compete clauses, because their wages are depressed, but they do not necessarily benefit from any incentives for increased training that non-compete clauses may provide.

Overall, these harms to workers are significant. The Commission estimates that the proposed rule, which would prohibit employers from using non-compete clauses, would increase workers' total earnings by $250 to $296 billion per year.[346]

The available evidence also indicates non-compete clauses negatively affect competition in product and service markets. There is evidence non-compete clauses increase consumer prices and concentration in the health care sector.[347] There is also evidence non-compete clauses foreclose the ability of competitors to access talent by effectively forcing future employers to buy out workers from their non-compete

clauses if they want to hire them.[348] The weight of the evidence also indicates non-compete clauses have a negative impact on new business formation and innovation.[349] These harms are significant. For example, with respect to consumer prices in the health care sector alone, the Commission estimates health spending would decrease by $148 billion annually due to the proposed rule.[350]

In the Commission's preliminary view, the asserted benefits from non-compete clauses do not outweigh these harms. In short, while there is considerable evidence non-compete clauses harm both workers and consumers, the evidence that non-compete clauses benefit workers or consumers is scant.

As described above, the most common justification for non-compete clauses is they increase employers' incentive to make productive investments in, for example, trade secrets, customer lists, worker training, and capital investment. There is evidence non-compete clauses increase employee training and capital investment, as noted above.[351] However, the considerable harms to workers and consumers are not outweighed because an employer has some marginally greater ability to protect trade secrets, customer lists, and other firm investments, or because the worker is receiving increased training, or because the firm has increased capital investments. If they were, workers would have higher earnings when non-compete clauses are more readily available to firms (*i.e.,* when legal enforceability of non-compete clauses increases) or prices for consumers would be lower. However, the empirical economic literature shows workers generally have lower, not higher, earnings when non-compete clause enforceability increases.

Moreover, the Commission is also not aware of any evidence these potential benefits of non-compete clauses lead to reduced prices for consumers. Indeed, the only empirical study of the effects of non-compete clauses on consumer prices—in the health care sector—finds increased final goods prices as the enforceability of non-compete clauses increases.[352] Furthermore, the Commission is not aware of any evidence non-compete clauses reduce trade secret misappropriation or the loss of other types of confidential information. The Commission's

understanding is there is little reliable empirical data on trade secret theft and firm investment in trade secrets in general, and no reliable data on how non-compete clauses affect these practices. The Commission is also not aware of evidence that, in the three states in which non-compete clauses are generally void, the inability to enforce non-compete clauses has materially harmed workers or consumers in those states.

As a result, the Commission preliminarily finds the asserted benefits from non-compete clauses do not outweigh the harms. The Commission seeks comment on this preliminary finding.

## V. Section-by-Section Analysis

The Commission is proposing to create a new Subchapter J in Chapter 16 of the Code of Federal Regulations. Subchapter J would be titled "Rules Concerning Unfair Methods of Competition." Within Subchapter J, the Commission is proposing to create 16 CFR part 910—the Non-Compete Clause Rule.[353] The Commission describes each section of the proposed rule below.

*Section 910.1   Definitions*

Proposed § 910.1 would contain definitions of terms that would be used in the Rule.

### 1(a) Business Entity

Proposed § 910.1(a) would define the term business entity. This term would be used in proposed § 910.3, which would contain an exception for certain non-compete clauses. Under the exception, the Rule would not apply to a non-compete clause entered into by a person who is selling a business entity or otherwise disposing of all of the person's ownership interest in the business entity, or by a person who is selling all or substantially all of a business entity's operating assets, when the person restricted by the non-compete clause is a substantial owner of, or substantial member or substantial partner in, the business entity at the time the person enters into the non-compete clause. The proposed rule would also use the term business entity in proposed § 910.1(e), which would define substantial owner, substantial member, or substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity.

Proposed § 910.1(a) would define the term business entity as a partnership, corporation, association, limited

[342] *See supra* Part IV.A.1.c.

[343] *See, e.g., Fashion Originators' Guild,* 312 U.S. at 467–68; *Atl. Refining Co.,* 381 U.S. at 371.

[344] *See supra* Part II.B.1.b.

[345] *See supra* Part II.B.1.c.

[346] *See infra* Part VII.B.1.a.

[347] *See supra* Part II.B.2.a.

[348] *See supra* Part II.B.2.b.

[349] *See supra* Part II.B.2.c–d.

[350] *See infra* Part VII.B.2.c.

[351] *See supra* Part II.B.2.e.

[352] *See supra* Part II.B.2.a.

[353] For ease of reference, this Part V refers to proposed 16 CFR part 910 as "the Rule."

liability company, or other legal entity, or a division or subsidiary thereof. The Commission is proposing to include divisions and subsidiaries in the definition because it believes the exception in proposed § 910.3 should apply where a person is selling a division or subsidiary of a business entity. The primary rationale for the sale-of-a-business exception in proposed § 910.3—that the exception may help to protect the value of a business acquired by a buyer—would also apply where a person is selling a division or subsidiary of a business entity. Applying the sale-of-a-business exception where a person is selling a division or subsidiary of a business entity would also be consistent with many state laws that exempt non-compete clauses from certain requirements when they are between the seller and buyer of a business, including a division or subsidiary of the business.[354]

The Commission seeks comment on proposed § 910.1(a).

### 1(b) Non-Compete Clause

Proposed § 910.1(b)(1) would define non-compete clause as a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer. The Commission believes this is a generally accepted definition of the term non-compete clause.

Proposed § 910.1(b)(1) would limit the coverage of the Rule to non-compete clauses between employers and workers. The Rule would not apply to other types of non-compete clauses—for example, non-compete clauses between two businesses, where neither is a worker pursuant to the Rule's definition of "worker."[355] While such non-compete clauses would not be covered by the Rule, they would still be subject to federal antitrust law and all other applicable law.

Furthermore, pursuant to proposed § 910.1(b)(1), the Rule would apply only to post-employment restraints—*i.e.,* restrictions on what the worker may do after the conclusion of the worker's employment with the employer. The Rule would not apply to concurrent-employment restraints—*i.e.,* restrictions on what the worker may do during the worker's employment.

Some non-compete clauses do not use language that expressly prohibits a worker from competing against their employer, but instead have the same effect by requiring workers to pay damages if they compete against their employer. State courts generally view these contractual terms as non-compete clauses.[356] These contractual terms would also be non-compete clauses under proposed § 910.1(b)(1), because they prevent a worker from seeking or accepting work with a person or operating a business after the conclusion of the worker's employment with the employer (unless the damages specified in the contract are paid).

Proposed § 910.1(b)(2) would clarify the definition of non-compete clause in proposed § 910.1(b)(1) by explaining that whether a contractual term is a non-compete clause for purposes of the Rule would depend on a functional test. In other words, whether a contractual term is a non-compete clause would depend not on what the term is called, but how the term functions.

In addition to non-compete clauses, employers and workers enter into many other types of covenants that restrict what a worker may do after the worker leaves their job, including, among others, NDAs; non-solicitation agreements; and TRAs.[357] The definition of non-compete clause would generally not include these types of covenants, because these covenants generally do not prevent a worker from seeking or accepting work with a person or operating a business after the conclusion of the worker's employment with the employer. These other types of covenants may affect the way a worker competes with their former employer after the worker leaves their job. However, they do not generally prevent a worker from competing with their former employer altogether; and they do not generally prevent other employers from competing for that worker's labor. For example, if a worker leaves their job with their employer and goes to work for a competitor, an NDA the worker signed with their employer may prevent the worker from disclosing certain information to the competitor. However, a standard NDA would not prevent the worker from seeking or accepting work with the competitor.

The Commission is concerned, however, that some employers may seek to evade the requirements of the Rule by implementing restrictive employment covenants other than non-compete clauses that restrain such an unusually large scope of activity that they are *de facto* non-compete clauses. Under proposed § 910.1(b)(2), such functional equivalents would be non-compete clauses for purposes of the Rule, whether drafted for purposes of evasion or not.

Courts have taken this approach when analyzing whether a contractual term is a non-compete clause under state law. For example, in *Brown* v. *TGS Mgmt. Co., LLC,* a California state court held an NDA that defined confidential information "so broadly as to prevent [the plaintiff] from ever working again in securities trading" operated as a *de facto* non-compete clause and therefore could not be enforced under California law, which generally prohibits enforcement of non-compete clauses. The NDA in this case restrained a far broader scope of activity than a typical NDA. For example, it defined "confidential information" as any information that is "usable in" or "relates to" the securities industry. As a result, the court concluded it effectively prevented the worker from working in the securities industry after his employment ended and was therefore a *de facto* non-compete clause.[358] Similarly, in *Wegmann* v. *London,* the U.S. Court of Appeals for the Fifth Circuit concluded liquidated damages provisions in a partnership agreement were *de facto* non-compete clauses "given the prohibitive magnitudes of liquidated damages they specify." [359]

The purpose of § 910.1(b)(2) is to clarify that, if an employer implements a restrictive covenant not called a "non-compete clause" but so unusually broad in scope it functions as such, the covenant would be within the definition of non-compete clause in proposed § 910.1(b)(1). Proposed § 910.1(b)(2) would state that the term non-compete clause includes a contractual term that is a *de facto* non-compete clause because it has the effect of prohibiting the worker from seeking or accepting work with a person or operating a business after the conclusion of the worker's employment with the employer.

Proposed § 910.1(b)(2) would also provide two examples of contractual terms that may be de facto non-compete clauses. The first example, based on *Brown* v. *TGS Mgmt. Co., LLC,* would be a non-disclosure agreement between an employer and a worker written so broadly it effectively precludes the worker from working in the same field

---

[354] *See, e.g.,* Cal. Bus. & Prof. Code sec. 16601; Mass. Gen. Laws Ann. ch. 149, sec. 24L (definition of "noncompetition agreement"); R.I. Gen. Laws sec. 28–59–2(8)(iii).

[355] *See* proposed § 910.1(f).

[356] *See, e.g., Wichita Clinic, P.A.* v. *Louis,* 185 P.3d 946, 951 (Kan. Ct. App. 2008); *Intermountain Eye & Laser Ctrs.,* 127 P.3d 121, 127 (Idaho 2005); *BDO Seidman* v. *Hirshberg,* 712 NE2d 1220, 1222–23 (N.Y. 1999).

[357] *See supra* Part II.A.

[358] 57 Cal. App. 5th 303, 306, 316–319 (Cal. Ct. App. 2020).

[359] 648 F.2d 1072, 1073 (5th Cir. 1981).

after the conclusion of the worker's employment with the employer. The second example, based on *Wegmann* v. *London,* would be a covenant between an employer and a worker that requires the worker to pay the employer or a third-party entity for training costs if the worker's employment terminates within a specified time period, where the required payment is not reasonably related to the costs the employer incurred for training the worker.

The Commission stresses this list of examples would be a non-exclusive list. Restrictive employment covenants other than NDAs and TRAs may also constitute *de facto* non-compete clauses, depending on the facts. In addition, NDAs and TRAs may constitute *de facto* non-compete clauses under factual scenarios other than the scenarios outlined in these examples.

The Commission seeks comment on proposed § 910.1(b)(1) and (2). In addition, the Commission is concerned that workplace policies similar to non-compete clauses—such as a term in an employee handbook stating workers are prohibited from working for competitors after their employment ends—could potentially have negative effects similar to non-compete clauses if workers believe they are binding, even if they do not impose a contractual obligation. Therefore, the Commission also seeks comment on whether non-compete clause should be defined not only as a "contractual term" between an employer and a worker, but also as a provision in a workplace policy.[360]

### 1(c) Employer

The Rule would apply only to non-compete clauses between employers and workers.[361] Proposed § 910.1(c) would define employer as a person, as defined in 15 U.S.C. 57b–1(a)(6), that hires or contracts with a worker to work for the person. 15 U.S.C. 57b–1(a)(6) defines person as any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of state law. Thus, proposed § 910.1(c) would effectively define employer as any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of state law, that hires or contracts with a worker to work for the person.

A person, as defined in 15 U.S.C. 57b–1(a)(6), that hires or contracts with a worker to work for the person would be an employer under proposed § 910.1(c) regardless of whether the person meets another legal definition of employer, such as a definition in federal or state labor law.

Some entities that would otherwise be employers may not be subject to the Rule to the extent they are exempted from coverage under the FTC Act. These entities include certain banks, savings and loan institutions, federal credit unions, common carriers, air carriers and foreign air carriers, and persons subject to the Packers and Stockyards Act of 1921,[362] as well as an entity that is not "organized to carry on business for its own profit or that of its members."[363] Where an employer is exempt from coverage under the FTC Act, the employer would not be subject to the Rule.

Furthermore, state and local government entities—as well as some private entities—may not be subject to the Rule when engaging in action protected by the state action doctrine. States are subject to the antitrust laws.[364] However, under the state action doctrine, federal statutes do not limit the sovereign states' autonomous authority over their own officers, agents, and policies in the absence of clear congressional intent to do so.[365] The key question is whether the conduct at issue is "compelled by direction of the state acting as a sovereign."[366] The state action doctrine may also be invoked by private entities in certain limited scenarios—specifically, where (1) the challenged restraint is clearly articulated as and affirmatively expressed as state policy, and (2) the policy is actively supervised by the state itself.[367] Thus, some entities that would otherwise be employers under proposed § 910.1(c) may not be subject to the Rule when engaging in action protected by the state action doctrine. Where private entities are involved, this would likely require a highly fact-specific inquiry.

The Commission seeks comment on proposed § 910.1(c).

### 1(d) Employment

The proposed rule would define the term non-compete clause as a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer.

Proposed § 910.1(d) would define employment as work for an employer, as the term employer is defined in § 910.1(c). This proposed definition would clarify that an employment relationship exists, for purposes of the Rule, regardless of whether an employment relationship exists under another law, such as a federal or state labor law. The Commission seeks comment on proposed § 910.1(d).

### 1(e) Substantial Owner, Substantial Member, and Substantial Partner

The proposed rule would use the terms substantial owner, substantial member, and substantial partner in proposed § 910.3, which would exempt certain non-compete clauses from coverage under the Rule. This exception would only be available where the party restricted by the non-compete clause is a substantial owner of, or substantial member or substantial partner in, the business entity. Limiting the exception to substantial owners, substantial members, and substantial partners would ensure the exception is only available where the seller's stake in the business is large enough that a non-compete clause may be necessary to protect the value of the business acquired by the buyer.

Proposed § 910.1(e) would define substantial owner, substantial member, and substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity. The Commission is proposing a threshold of 25% ownership interest because the Commission believes the exception should be available where, for example, a few entrepreneurs sharing ownership interest in a startup sell their firm. In such a scenario, a non-compete clause may be necessary to protect the value of the business acquired by the buyer. For this reason, a threshold of, for example, 51% may be too high.

However, the Commission believes the exception should not be available where the ownership interest in question is so small the transfer of ownership interest would not be necessary to protect the value of the business acquired by the buyer. For example, the exception should not be available where a worker with a small amount of company stock sells stock back to the company as part of a stock redemption agreement when the worker's employment ends. The Commission believes a 25% threshold strikes the appropriate balance between a threshold that may be too high (and would exclude many scenarios in which a non-compete clause may be necessary to protect the value of the business acquired by the buyer) and a threshold

---

[360] *See, e.g.,* D.C. Code sec. 32–581.01(15).
[361] *See* proposed § 910.1(b)(1).

[362] 15 U.S.C. 45(a)(2).
[363] 15 U.S.C. 44.
[364] *Goldfarb* v. *Va. State Bar,* 421 U.S. 773, 791–92 (1975).
[365] *Parker* v. *Brown,* 317 U.S. 341, 350–51 (1943) (construing the Sherman Act).
[366] *Goldfarb,* 421 U.S. at 791.
[367] *Cal. Retail Liquor Dealers Ass'n* v. *Midcal Aluminum, Inc.,* 445 U.S. 97, 105 (1980).

that may be too low (and would allow the exception to apply more broadly than is needed to protect such an interest).

Instead of establishing a threshold, the Rule could simply use the terms substantial owner, substantial member, and substantial partner in proposed § 910.3 and leave the interpretation of those terms to case-by-case adjudication. However, if the Rule does not define a threshold, sellers of businesses may be unsure whether or not they are substantial owners, substantial members, and substantial partners under proposed § 910.3. Defining a threshold would provide greater clarity to the public and facilitate compliance with the Rule.

The Commission seeks comment on proposed § 910.1(e).

1(f) Worker

The Rule would apply only to non-compete clauses between employers and workers.[368] Proposed § 910.1(f) would define worker as a natural person who works, whether paid or unpaid, for an employer. Proposed § 910.1(f) would further state the term worker includes, without limitation, an employee, individual classified as an independent contractor, extern, intern, volunteer, apprentice, or sole proprietor who provides a service to a client or customer.

As this definition states, the term worker would include not only employees, but also individuals classified as independent contractors, as well as other kinds of workers. Under proposed § 910.1(f), the term worker would include any natural person who works, whether paid or unpaid, for an employer, without regard to whether the worker is classified as an "employee" under the Fair Labor Standards Act (FLSA) or any other statute that draws a distinction between "employees" and other types of workers. Thus, gig economy workers such as rideshare drivers would be considered workers for purposes of proposed § 910.1(f).

The Commission is concerned that, if the Rule were to define workers as "employees" according to, for example, the FLSA definition, employers may misclassify employees as independent contractors to evade the Rule's requirements. Furthermore, the Commission has no reason to believe non-compete clauses that apply to workers such as independent contractors or interns negatively affect competitive conditions to a lesser degree than non-compete clauses that apply to employees. Such non-compete

clauses may, in fact, be more harmful to competition, given that these other types of workers tend to have shorter employment relationships. In addition, the Commission does not believe employers have stronger business justifications for applying non-compete clauses to independent contractors than they would to employees.

Proposed § 910.1(f) would also state the term worker does not include a franchisee in the context of a franchisee-franchisor relationship. The Commission believes that, in some cases, the relationship between a franchisor and franchisee may be more analogous to the relationship between two businesses than the relationship between an employer and a worker. In addition, the evidentiary record before the Commission relates primarily to non-compete clauses that arise solely out of employment. The Commission has surveyed the available evidence relating to non-compete clauses and is not aware of research on the effects of applying additional legal restrictions to non-compete clauses between franchisors and franchisees. Therefore, the Commission believes it would be appropriate to clarify that a franchisee—in the context of a franchisor-franchisee relationship—is not a worker for purposes of proposed § 910.1(f).

Proposed § 910.1(f) would further clarify, however, the term worker includes a natural person who works for the franchisee or franchisor. In addition, proposed § 910.1(f) would clarify non-compete clauses between franchisors and franchisees would remain subject to federal antitrust law as well as all other applicable law. These laws include state laws that apply to non-compete clauses in the franchise context. The Commission is not proposing to find that non-compete clauses between franchisors and franchisees are beneficial to competition.

The Commission seeks comment on proposed § 910.1(f).

*Section 910.2  Unfair Methods of Competition*

2(a) Unfair Methods of Competition

Proposed § 910.2(a) would state it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe the worker is subject to an enforceable non-compete clause. In effect, proposed § 910.2(a) would categorically ban employers from using non-compete clauses, because—as

of the compliance date—employers would be prohibited from maintaining pre-existing non-compete clauses and entering into new non-compete clauses.[369]

Part IV above explains the legal basis for the Commission's preliminary determination that the practices listed in proposed § 910.2(a) are unfair methods of competition. This section-by-section analysis for proposed § 910.2(a) describes how each of the three prongs of proposed § 910.2(a) would function and explains why the Commission is proposing a categorical ban on non-compete clauses.

How Proposed § 910.2(a) Would Function

Proposed § 910.2(a) would prohibit an employer from entering into or attempting to enter into a non-compete clause with a worker and maintaining with a worker a non-compete clause. Proposed § 910.2(a) would use both the term "enter into" and the term "maintain" to make clear it is an unfair method of competition for an employer to either (1) enter into or attempt to enter into new non-compete clauses as of the Rule's compliance date or (2) maintain pre-existing non-compete clauses as of the compliance date. The Commission believes non-compete clauses entered into before the compliance date implicate the concerns described above in Part IV to the same degree as non-compete clauses entered into as of the compliance date.[370] As a result, the Commission believes it would be appropriate to require employers to rescind non-compete clauses entered into before the compliance date, as well as to refrain from entering into or attempting to enter into new non-compete clauses starting on the compliance date.

Furthermore, requiring employers to rescind existing non-compete clauses would not impose significant compliance costs, due to the safe harbor in proposed § 910.2(b)(3). Under this safe harbor, an employer could comply with the requirement to rescind existing non-compete clauses by providing notice to the affected workers. In addition, proposed § 910.2(b)(2)(C) would further reduce compliance costs by providing language that would presumptively meet this notice requirement.

---

[368] *See* proposed § 910.1(b)(1).

[369] However, employers could still use non-compete clauses where they qualify for the exception in proposed § 910.3 for non-compete clauses between the seller and buyer of a business.

[370] *See supra* Part IV (describing the reasons for the Commission's preliminary determination that non-compete clauses between employers and workers are an unfair method of competition).

Proposed § 910.2(a) would prohibit an employer from attempting to enter into a non-compete clause with a worker. An employer attempts to enter a non-compete clause with a worker where, for example, the employer provides the worker with the non-compete clause, but the worker does not sign it. The Commission is concerned that attempting to enter into a non-compete clause with a worker would have *in terrorem* effects because, in this situation, the worker may still believe they are subject to a non-compete clause even if they did not sign it. For example, the worker may not recall whether they signed the non-compete clause or may not realize they are not bound by the non-compete clause unless they signed it.

Proposed § 910.2(a) would also prohibit an employer from representing to a worker that the worker is covered by a non-compete clause where the employer has no good faith basis to believe the worker is subject to an enforceable non-compete clause. Workers often lack knowledge of whether employers may enforce non-compete clauses.[371] In addition, the available evidence indicates that, in states where non-compete clause are void, workers are subject to non-compete clauses at approximately the same rate as workers in other states, suggesting that employers may believe workers are unaware of their legal rights.[372] Because many workers lack knowledge of whether their employer may enforce a non-compete clause under state law, they may also be unaware of any final rule issued by the Commission prohibiting employers from entering into or maintaining non-compete clauses. Employers may seek to exploit this lack of awareness by representing to workers that they are subject to a non-compete clause when they are not. This would likely have an *in terrorem* effect on workers, causing them to refrain from looking for work or taking another job, thereby furthering the adverse effects on competition motivating this proposed rule. As a result, the Commission believes it is appropriate for the Rule to prohibit employers from representing to workers that they are covered by a non-compete clause.

In addition, workers—particularly low-income workers—may lack resources to litigate against their employers. As a result, mere threats to enforce a non-compete clause may deter workers from looking for work with a

competitor or starting their own business, which would result in the anticompetitive effects described above in Part IV.A.

Under this "representation" prong of proposed § 910.2(a), an employer would be prohibited from, among other things, threatening to enforce a non-compete clause against a worker; advising a worker that, due to a non-compete clause, they should not pursue a particular job opportunity; or simply telling the worker that the worker is covered by a non-compete clause. However, under proposed § 910.2(a), this prohibition on representation would only apply where the employer has no good faith basis to believe the worker is subject to an enforceable non-compete clause. Proposed § 910.2(a) includes this "no good faith basis" exception to ensure the representation prong is consistent with the First Amendment. The Supreme Court has held "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."[373] Accordingly, "[t]he government may ban forms of communication more likely to deceive the public than to inform it, or commercial speech related to illegal activity."[374] A rule that prohibits an employer from representing to a worker that the worker is subject to a non-compete clause—where the employer has no good faith basis to believe that the worker is subject to an enforceable non-compete clause—would meet this test because, under such circumstances, an employer would be making a false claim and asserting an illegal restraint on worker activity. An employer would have no good faith basis to believe that a worker is subject to an enforceable non-compete clause where non-compete clauses are not enforceable in the relevant state or where the validity of the Rule—which would prohibit employers from maintaining or entering into non-compete clauses—has been adjudicated and upheld.

Proposed § 910.2(a) would not apply retroactively. An employer would not violate proposed § 910.2(a) where—prior to the compliance date—it entered into or attempted to enter into a non-compete clause with a worker; maintained with a worker a non-compete clause; or represented to a worker that the worker is subject to a non-compete clause. Instead, proposed § 910.2(a) would require employers to

refrain from these practices starting on the compliance date.

Why the Commission Is Proposing a Categorical Ban on Non-Compete Clauses

Except for certain non-compete clauses between the seller and buyer of a business,[375] the proposed rule would categorically ban employers from using non-compete clauses with workers. The proposed rule would prohibit an employer from using a non-compete clause with any of its workers, without regard to the worker's earnings or job function.

The Commission is proposing a categorical ban on non-compete clauses because, fundamentally, non-compete clauses obstruct labor market competition through a similar mechanism for all workers. Non-compete clauses block workers in a labor market from switching to jobs in which they would be better paid and more productive. This harms workers who are subject to non-compete clauses. This also harms other workers in the labor market, since jobs that may be better matches for those workers are filled by workers who are unable to leave their jobs due to non-compete clauses.[376] And this harms other firms and potential entrants into the market, who have a more limited pool of workers from which to hire. Regardless of a worker's income or job status, non-compete clauses block workers from switching to jobs in which they would be better paid and more productive—restricting the opportunities of all workers in that labor market.

The available data do not allow the Commission to estimate earnings effects for every occupation. However, the evidentiary record indicates non-compete clauses depress wages for a wide range of subgroups of workers across the spectrum of income and job function—from hourly workers to highly paid, highly skilled workers such as executives. The Commission therefore estimates the proposed rule would increase earnings for workers in all of the subgroups of the labor force for which sufficient data is available.[377] Excluding these workers from the proposed rule would deny these workers the benefits of higher earnings through increased competition in the market for their labor.

The Commission recognizes there are compelling reasons for banning non-compete clauses that apply more strongly to lower-wage workers. Non-

[371] *See* Prescott & Starr, *supra* note 57 at 10–11.
[372] *See* Starr, Prescott, & Bishara, *supra* note 42 at 81.

[373] *Cent. Hudson Gas & Elec.* v. *Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).
[374] *Id.* at 563–64.

[375] *See* proposed § 910.3.
[376] *See supra* Part II.B.1.
[377] *See infra* Part VII.B.1.a.

compete clauses for lower-wage workers—such as sandwich shop workers, warehouse workers, or security guards [378]—may be more likely than non-compete clauses for higher-wage workers to be exploitative and coercive at the time of contracting and at the time of the worker's potential departure from the employer.[379] In addition, the most commonly cited justifications for non-compete clauses appear particularly weak when applied to relatively lower-wage workers, to the extent such workers are less likely to have access to trade secrets or confidential information.[380]

The Commission believes there are also compelling reasons for banning non-compete clauses that apply more strongly to highly paid or highly skilled workers such as senior executives. As described above, the weight of the available evidence indicates non-compete clauses negatively affect new business formation, innovation, and the ability of competitors to hire skilled workers.[381] Non-compete clauses for highly paid or highly skilled workers such as senior executives may be contributing more to these harms than non-compete clauses for some other workers, to the extent such workers may be likely to start competing businesses, be hired by potential entrants or competitors, or develop innovative products and services. Non-compete clauses for highly paid or highly skilled workers such as senior executives may also block potential entrants, or raise their costs, to a high degree, because such workers are likely to be in high demand by potential entrants. As a result, prohibiting non-compete clauses for highly paid or highly skilled workers such as senior executives may have relatively greater benefits for consumers than prohibiting non-compete clauses for other workers.

For these reasons, the Commission preliminarily believes a categorical ban on non-compete clauses would best achieve the objective of the proposed rule, which is to remedy the adverse effects of non-compete clauses on competition in labor markets and product and service markets. However, the Commission also believes several alternatives to a categorical ban may also accomplish the objectives of the proposed rule to some degree, including different standards for senior

executives. These alternatives are described in detail in Part VI.

The Commission seeks comment on proposed § 910.2(a).

### 2(b) Existing Non-Compete Clauses

Proposed § 910.2(b) would clarify employers' obligations, and impose additional requirements, related to non-compete clauses entered into by the employer prior to the compliance date ("existing non-compete clauses").

### 2(b)(1) Rescission Requirement

Proposed § 910.2(b)(1) would state that, to comply with proposed § 910.2(a)—which states it is an unfair method of competition for an employer to maintain with a worker a non-compete clause—an employer that entered into a non-compete clause with a worker prior to the compliance date must rescind the non-compete clause no later than the compliance date. The reasons why the Commission is proposing this rescission requirement are described above in the section-by-section analysis for proposed § 910.2(a).

The requirements in § 910.2(b)(1)–(3) do not apply where a worker's obligation not to compete elapsed prior to the compliance date. This is because the requirements in § 910.2(b)(1)–(3) derive from § 910.2(a), which establishes it is an unfair method of competition to maintain with a worker a non-compete clause. An employer does not maintain with a worker a non-compete clause, in violation of the Rule, where the obligation not to compete elapsed prior to the compliance date. For example, if a worker left their job in 2019 and was subject to a two-year obligation not to compete, that obligation would have elapsed in 2021, and the employer would not violate the Rule by failing to rescind the non-compete clause.

The Commission seeks comment on proposed § 910.2(b)(1).

### 2(b)(2) Notice Requirement

Proposed § 910.2(b)(2) would require that the employer provide notice to a worker that the worker's non-compete clause has been rescinded. Proposed § 910.2(b)(2) would have three subparagraphs that would impose various requirements related to the notice.

First, proposed § 910.2(b)(2)(A) would state that an employer that rescinds a non-compete clause pursuant to § 910.2(b)(1) must provide notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker. Proposed § 910.2(b)(2)(A) would contain a notice requirement because the

Commission believes the available evidence indicates that many workers are not aware of the applicable law governing non-compete clauses or their rights under those laws.[382] As a result, if the Commission were to issue a final Non-Compete Clause Rule, many workers who had entered into non-compete clauses may be unaware that, due to the Rule, their employer is no longer permitted to maintain the non-compete clause. As a result, these workers may continue to refrain from leaving their job to work for a competitor or start their own business. This would negatively affect competitive conditions in the same manner the Commission is concerned about.[383] A notice requirement would help address this concern by ensuring workers are informed that their non-compete clause is no longer in effect and may not be enforced against them.

Proposed § 910.2(b)(2)(A) would state further that the employer must provide the notice to the worker in an individualized communication. As such, an employer could not satisfy the notice requirement by, for example, posting a notice at the employer's workplace that workers' non-compete clauses are no longer in effect. Proposed § 910.2(b)(2)(A) would also state that the employer must provide the notice on paper or in a digital format such as, for example, an email or text message. As such, a notice communicated orally would not meet the notice requirement. Allowing employers to provide the notice in a digital format would also reduce compliance costs for employers. Proposed § 910.2(b)(2)(A) would also require the employer to provide the notice to the worker within 45 days of rescinding the non-compete clause.

Second, proposed § 910.2(b)(2)(B) would state that the employer must provide the notice to a worker who currently works for the employer. The Commission believes that most employers have contact information available for their current workers and can use this contact information to provide the notice.

Proposed § 910.2(b)(2)(B) would also state that the employer must provide the notice to a worker who formerly worked for the employer, provided that the employer has the worker's contact information readily available. Providing the notice to former workers may be even more vital than providing the notice to current workers because former workers may be refraining actively from competitive activity because they believe they are subject to

---

[378] *See supra* Part II.A (listing illustrative examples of non-compete clauses).

[379] *See infra* Part IV.A.1.b–c.

[380] *See supra* Part IV.B (describing the most commonly cited justifications for non-compete clauses).

[381] *See supra* Part II.B.2.b–d.

[382] *See* Prescott & Starr, *supra* note 57 at 10–11.

[383] *See supra* Part IV.A.1.a.

a non-compete clause. However, employers may not have contact information readily available for all former workers. Proposed § 910.2(b)(2)(B) would therefore require employers to provide the notice to former workers only where the employer has the worker's contact information readily available. The Commission believes that this requirement would strike the appropriate balance between providing notice to affected workers and minimizing compliance costs for employers.

Third, proposed § 910.2(b)(2)(C) would provide model language that would satisfy the requirement in proposed § 910.2(b)(2)(A) that the employer "provide notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker." The model language is designed to communicate the relevant information in a simple and straightforward manner. Proposed § 910.2(b)(2)(C) would also clarify that an employer may also use language that is different from the model language, provided that the language communicates to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker. Proposed § 910.2(b)(2)(C) would reduce compliance costs and increase compliance certainty for employers by providing employers with model language they could use, while simultaneously providing employers with the flexibility to use other language that would communicate the required information.

The Commission seeks comment on proposed § 910.2(b)(2)(A)–(C).

2(b)(3) Safe Harbor

Proposed § 910.2(b)(3) would contain a safe harbor for compliance with the rescission requirement in proposed § 910.2(b)(1). Proposed § 910.2(b)(3) would state that an employer complies with the rescission requirement described in § 910.2(b)(1) where it provides notice to a worker pursuant to § 910.2(b)(2). Consequently, to comply with the rescission requirement for purposes of the Rule, an employer could simply send a notice to a worker that is compliant with proposed § 910.2(b)(2). An employer that does so would not need to take any other steps to comply with the rescission requirement in proposed § 910.2(b)(1). The Commission believes that this safe harbor would strike an appropriate balance between ensuring that workers receive adequate notice of their rights under the Non-

Compete Clause Rule and minimizing compliance costs for employers.

The Commission seeks comment on proposed § 910.2(b)(3).

*Section 910.3   Exception*

Proposed § 910.3 would exempt certain non-compete clauses between the seller and buyer of a business from coverage under the Rule. Proposed § 910.3 would state that the requirements of the Rule shall not apply to a non-compete clause that is entered into by a person who is selling a business entity or otherwise disposing of all of the person's ownership interest in the business entity, or by a person who is selling all or substantially all of a business entity's operating assets, when the person restricted by the non-compete clause is a substantial owner of, or substantial member or substantial partner in, the business entity at the time the person enters into the non-compete clause. Proposed § 910.3 would also clarify that non-compete clauses covered by this exception would remain subject to federal antitrust law as well as all other applicable law.

The exception in proposed § 910.3 would apply only in a narrow set of circumstances. The Rule, as a whole, would only apply to non-compete clauses between employers and workers.[384] As a result, the exception in proposed § 910.3 would apply only where the party restricted by the non-compete clause is a worker (for example, where the seller of a business is going to work for the acquiring business). Where the person restricted by the non-compete clause is not a worker, the Rule would not apply as an initial matter.

The Commission is proposing the exception in § 910.3 because non-compete clauses between the seller and buyer of a business may be unique in certain respects from non-compete clauses arising solely out of employment. Specifically, non-compete clauses between the seller and buyer of a business may be distinct from non-compete clauses that arise solely out of employment because they may help protect the value of the business acquired by the buyer.

This view is consistent with the law of the majority of the states, under which non-compete clauses between the seller and buyer of a business are treated differently from non-compete clauses arising solely out of employment. For example, while non-compete clauses are generally void in California, North Dakota, and Oklahoma, each of these three states exempts non-compete

clauses between the seller and buyer of a business from this general rule.[385] In the majority of the 47 states that enforce non-compete clauses under some circumstances, non-compete clauses between sellers and buyers of businesses are reviewed under a more lenient standard than non-compete clauses that arise solely out of employment.[386] A frequently cited reason for this difference in treatment is that such non-compete clauses implicate an additional interest relative to non-compete clauses that arise solely out of employment: they protect the value of the business acquired by the buyer.[387] If non-compete clauses between the seller and buyer of a business help protect the value of the business acquired by the buyer, restricting these types of non-compete clauses could potentially affect business acquisitions, including the incentives of various market actors to start, sell, or buy businesses.

The Commission further notes that the evidentiary record described above in Part II.B relates primarily to non-compete clauses that arise solely out of employment. Unlike non-compete clauses that arise solely out of employment, there has been little empirical research on the prevalence of non-compete clauses between the seller and buyer of a business. The Commission is also not aware of empirical research on the economic effects of applying additional legal restrictions to these types of non-compete clauses. In part, this is because all states permit non-compete clauses between buyers and sellers of businesses to some degree, and because the laws that apply to these types of non-compete clauses have seen fewer changes recently than the laws that apply to non-compete clauses that arise solely out of employment. As a result, there have been few natural experiments that allow researchers to assess how restricting these types of non-compete clauses may affect competition, including any effects on business acquisitions.

For these reasons, the Commission believes it may be appropriate to exempt non-compete clauses between the seller

---

[384] *See* proposed § 910.1(b).

[385] Cal. Bus. & Prof. Code sec. 16601; N.D. Cent. Code sec. 9–08–06(1); Okla. Stat. Ann. tit. 15, secs. 218 (sale of a business) and 219 (dissolution of a partnership).

[386] *See, e.g.,* Fla. Stat. Ann. sec. 542.335(1)(d); *Hess Newmark Owens Wolf, Inc.* v. *Owens,* 415 F.3d 630, 634 (7th Cir. 2005); *Jiffy Lube Int'l, Inc.* v. *Weiss Bros., Inc.,* 834 F. Supp. 683, 691 (D.N.J. 1993).

[387] *See, e.g., Strategix, Ltd.* v. *Infocrossing West, Inc.,* 142 Cal. App. 4th 1068, 1072–73 (Cal. Ct. App. 4th 2006); *Reed Mill & Lumber Co.,* 165 P.3d at 736; *Bybee,* 178 P.3d at 622.

and buyer of a business from coverage under the Rule. Proposed § 910.3 would clarify, however, that these non-compete clauses would remain subject to federal antitrust law and all other applicable law, including state law requiring non-compete clauses to be tailored to protect a legitimate business interest and to be limited in duration, geographic area, and the scope of activity prohibited.

Exempting non-compete clauses between the seller and buyer of a business from coverage under the Rule would not represent a finding that such non-compete clauses are beneficial to competition. It would simply reflect the Commission's view that it would be appropriate to tailor the Rule to non-compete clauses that arise solely out of employment—given that non-compete clauses between the seller and buyer of a business may implicate unique interests and have unique effects, and that the evidentiary record does not permit the Commission to assess these potential effects as thoroughly as the potential effects of restricting non-compete clauses that arise solely out of employment.

The exception in proposed § 910.3 would only apply where the seller of the business is a substantial owner of, or substantial member or substantial partner in, the business at the time the person enters into the non-compete clause. Proposed § 910.1(e) would define substantial owner, substantial member, or substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity. The exception would therefore not allow non-compete clauses to be applied to a business's workers in connection with the sale of a business, where those workers are not substantial owners, members, or partners. The reasons for this proposed 25% threshold are described above in the section-by-section analysis for proposed § 910.1(e).

The Commission seeks comment on proposed § 910.3.

### Section 910.4   Relation to State Laws

The Supremacy Clause of the U.S. Constitution provides that the Constitution, and the laws of the United States made pursuant to the Constitution, "shall be the supreme Law of the Land." [388] Hence, federal law preempts any state law that conflicts with the exercise of federal power. [389]

Such conflict preemption occurs either "where it is impossible for a private party to comply with both state and federal law" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." [390] Congressional intent to preempt state law can be expressed in the statutory language itself (express preemption) or implied in the structure and purpose of federal law (implied preemption). [391] Federal regulations "have no less pre-emptive effect than federal statutes," [392] and agencies themselves, implementing federal statutes, can expressly preempt conflicting state laws and regulations. [393]

In some instances, a federal law may fully preempt contrary state laws. In others, federal law may impliedly or expressly respect the continuing and concurrent exercise of state power, thus setting a regulatory "floor" but not a "ceiling." [394] The Commission notes that "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies." [395]

The proposed rule would contain an express preemption provision. Proposed § 910.4 would provide that the Rule shall supersede any state statute, regulation, order, or interpretation to the extent that such statute, regulation, order, or interpretation is inconsistent with the Rule. [396] Proposed § 910.4 would further provide that a state statute, regulation, order, or interpretation is not inconsistent with the provisions of the Rule if the protection such statute, regulation, order, or interpretation affords any worker is greater than the protection provided under the Rule.

This preemption provision would reflect the Commission's intent that the Non-Compete Clause Rule establish a regulatory floor, not a ceiling. Under the proposed preemption provision, state laws that are inconsistent with the Rule would be preempted. One example would be a state law providing that an employer may enforce a non-compete clause against a worker where the non-compete clause is tailored to a legitimate business interest and

reasonably limited in duration, geographic area, and scope of activity prohibited. Such a law would be inconsistent with proposed § 910.2(a), which would state that it is an unfair method of competition—and therefore a violation of Section 5 of the FTC Act—for an employer to enter into, attempt to enter into, or maintain a non-compete clause with a worker. Under proposed § 910.4, proposed § 910.2(a) would preempt the contrary state law to the extent that it conflicts with proposed § 910.2(a).

However, under the second sentence of proposed § 910.4, a state law would not conflict with the provisions of the Rule if the state law afforded greater protection to the worker than the protection provided under the Rule. For example, as noted above, proposed § 910.3 would exempt certain non-compete clauses between the seller and buyer of a business from coverage under the Rule. If a state were to prohibit employers from entering into, attempting to enter into, or maintaining all non-compete clauses—including non-compete clauses between the seller and buyer of a business—an employer could comply with both the state law and the Rule by not entering into, attempting to enter into, or maintaining non-compete clauses between the seller and buyer of a business.

The Commission seeks comment on proposed § 910.4.

### Section 910.5   Compliance Date

The proposed rule would establish a separate effective date and compliance date. Under proposed § 910.5, the proposed rule's effective date would be the date that is 60 days after the final rule is published in the **Federal Register**. The proposed rule's compliance date would be the date that is 180 days after the final rule is published in the **Federal Register**. In this NPRM, the Commission refers to the 180-day period between the publication of the final rule and the compliance date as the "compliance period."

*Compliance With § 910.2(a).* The Commission expects that employers would need to undertake the following two types of tasks during the compliance period to be prepared to comply with § 910.2(a) starting on the compliance date. First, starting on the compliance date, employers would be prohibited from maintaining existing non-compete clauses (*i.e.,* non-compete clauses that the employer entered into with a worker prior to the compliance

---

[388] U.S. Const. art. VI, cl. 2.

[389] *Fid. Fed. Sav. & Loan Ass'n* v. *de la Cuesta,* 458 U.S. 141, 153 (1982) (citing roots in the Supremacy Clause); *McCulloch* v. *Md.,* U.S. Supreme Court, 4 Wheat 159 (1819) (citing the Supremacy Clause and the Necessary and Proper Clause (Article I, Section 8, clause 18)).

[390] *Crosby* v. *Nat'l Foreign Trade Council,* 530 U.S. 363, 372–73 (2000).

[391] *Cipollone* v. *Liggett Grp., Inc.,* 505 U.S. 504, 516 (1992); *Jones* v. *Rath Packing Co.,* 430 U.S. 519, 525 (1977).

[392] *Fid. Fed. Sav. & Loan Ass'n,* 458 U.S. at 153.

[393] *Id.; see also U.S.* v. *Shimer,* 367 U.S. 374, 383 (1961).

[394] *See, e.g., Oneok, Inc.* v. *Learjet, Inc.,* 575 U.S. 373, 384–85 (2015).

[395] *Cal.* v. *ARC Am. Corp.,* 490 U.S. 93, 102 (1989).

[396] In this Part V, we refer to state statutes, regulations, orders, or interpretations as "state laws" for ease of reference.

date).[397] As a result, during the compliance period, an employer would need to assess whether to implement replacements for existing non-compete clauses, such as NDAs; draft those covenants; and then negotiate and enter into those covenants with the relevant workers. Second, an employer would be prohibited from entering into new non-compete clauses starting on the compliance date.[398] As a result, during the compliance period, employers would need to, for example, remove any non-compete clauses from employment contracts that they provide to new workers. The Commission believes that 180 days—or approximately six months—would be enough time for employers to accomplish each of these two tasks.

*Compliance With § 910.2(b)(1)–(3).* To comply with § 910.2(b)(1)–(3) starting on the compliance date, an employer would be required to rescind, no later than the compliance date, any non-compete clauses that it entered into prior to the compliance date.[399] Where an employer rescinds a non-compete clause, the employer would be required to provide notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.[400] This notice may be provided in a digital format, such as an email or text message.[401] The Rule would require the employer to provide the notice to the worker within 45 days of rescinding the non-compete clause.[402] Employers would be required to provide the notice to current workers, as well as former workers where the employer has the former worker's contact information readily available.[403] To reduce compliance costs, the Rule would provide model language that employers may use for the notice.[404] However, employers would have the flexibility to use language other than the model language, provided that it communicates to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.[405] The Rule would also provide a safe harbor that would allow an employer to comply with the Rule's rescission requirement by providing a compliant notice.[406] The Commission believes that this would significantly reduce compliance costs.

The Commission believes that the 180-day compliance period would provide employers with sufficient time to prepare to rescind existing non-compete clauses no later than the compliance date.

The Commission is proposing an effective date of 60 days after publication of the final rule in the **Federal Register** because it expects that the final rule would likely be a major rule under the Congressional Review Act (CRA). Under the CRA, a "major rule" may not take effect fewer than 60 days after the rule is published in the **Federal Register**.[407] The CRA further states that a rule is a "major rule" if it has an annual effect on the economy of $100 million or more.[408] The Commission believes that the impacts of the proposed rule, if finalized, would be large enough that the final rule would be a major rule under the CRA.[409]

The Commission seeks comment on proposed § 910.5.

## VI. Alternatives to the Proposed Rule

In this Part VI, the Commission describes alternatives to the proposed rule.[410] This Part VI addresses the alternatives related to the rule's fundamental design. These alternatives flow from two key questions: (1) whether the rule should impose a categorical ban on non-compete clauses or a rebuttable presumption of unlawfulness, and (2) whether the rule should apply uniformly to all workers or whether there should be exemptions or different standards for different categories of workers. The different permutations of the answers to each of these questions yield the different alternatives for the rule's fundamental design.

This Part VI does not generally address alternatives related to the design of specific regulatory provisions. For example, proposed § 910.1(e) defines a substantial owner, substantial member, or substantial partner as an owner, member, or partner holding at least a 25% ownership interest in a business entity. In a final rule, the Commission could set this standard at a

different percentage level—for example, 50% or 10%. The Commission seeks comment on these types of granular questions not in this Part VI, but in the section-by-section analysis for the relevant provision in Part V above.

### A. Two Key Dimensions of Alternatives

In Part IV above, the Commission preliminarily finds that the use of non-compete clauses by employers is an "unfair" method of competition under Section 5. For workers who are not senior executives, the Commission preliminarily finds that non-compete clauses are "unfair" under Section 5 in three independent ways. First, the use by employers of non-compete clauses is restrictive conduct that negatively affects competitive conditions. Second, non-compete clauses are exploitative and coercive at the time of contracting while burdening a not insignificant volume of commerce. Third, non-compete clauses are exploitative and coercive at the time of the worker's potential departure from the employer while burdening a not insignificant volume of commerce.[411]

For workers who are senior executives, the Commission preliminarily finds that the use by employers of non-compete clauses is "unfair" under Section 5 because such non-compete clauses are restrictive conduct that negatively affects competitive conditions. Indeed, as described above in Part IV.A.1.a.ii, the Commission preliminarily believes that non-compete clauses for senior executives may harm competition in product markets in unique ways. (The second and third preliminary findings described above—that non-compete clauses are exploitative and coercive at the time of contracting and at the time of a worker's potential departure—do not apply to senior executives.) In Part IV, the Commission seeks comment on whether this different unfairness analysis should also apply to highly paid or highly skilled workers who are not senior executives.

The objective of the proposed rule is to remedy these adverse effects from the use of non-compete clauses. The proposed rule would seek to accomplish this objective by prohibiting an employer from entering into or attempting to enter into a non-compete clause with a worker; maintaining with a worker a non-compete clause; and, under certain circumstances,

---

[397] *See* proposed § 910.2(a).

[398] *Id.*

[399] *See* proposed § 910.2(b)(1).

[400] *See* proposed § 910.2(b)(2)(A)–(C).

[401] *See* proposed § 910.2(b)(2)(A).

[402] *Id.*

[403] *Id.*

[404] *See* proposed § 910.2(b)(2)(C).

[405] *Id.*

[406] *See* proposed § 910.2(b)(3).

[407] 5 U.S.C. 801(a)(3)(A).

[408] 5 U.S.C. 804(2).

[409] *See infra* Part VII (analyzing the costs and benefits of the proposed rule).

[410] The Commission intends for this Part VI to satisfy the requirements in Section 22 of the FTC Act that, in an NPRM, the Commission issue a preliminary regulatory analysis that shall contain "a description of any reasonable alternatives to the proposed rule which may accomplish the stated objective of the rule in a manner consistent with applicable law" and "a preliminary analysis of the effectiveness of the proposed rule and each alternative in meeting the stated objectives of the proposed rule." 15 U.S.C. 57b–3(b)(1)(B)–(C).

[411] *See supra* Part IV.A.1. The Commission also preliminarily finds that non-compete clauses are a "method of competition." *See supra* Part IV.A.2.

representing to a worker that the worker is subject to a non-compete clause.[412]

The proposed rule would ban non-compete clauses categorically, with a limited exception for certain non-compete clauses between the seller and buyer of a business.[413] In Part V, the Commission explains why it is proposing a categorical ban on non-compete clauses.[414]

There are two key dimensions of alternatives related to the rule's fundamental design. First, instead of a categorical ban, the Commission could adopt a rebuttable presumption of unlawfulness. Under this approach, it would be presumptively unlawful for an employer to use a non-compete clause, but the use of a non-compete clause would be permitted if the employer could meet a certain evidentiary burden, based on a standard that would be articulated in the rule. Second, instead of applying to all workers uniformly, the Rule could include exemptions or different standards for different categories of workers. These exemptions or different standards could be based on a worker's job functions, earnings, another factor, or some combination of factors.

### 1. Categorical Ban vs. Rebuttable Presumption

The Commission could adopt a rebuttable presumption of unlawfulness instead of a categorical ban. Under this approach, it would be presumptively unlawful for an employer to use a non-compete clause. However, the use of a non-compete clause would be permitted if the employer could meet a certain evidentiary burden, based on a standard that would be articulated in the rule. The rationale behind this approach would be that prohibiting employers from using non-compete clauses is an appropriate default rule in light of the adverse effects on competition from their use in the aggregate; however, there may be specific sets of facts under which their use may be justified, so it would be appropriate to permit employers to use them in those cases.

Conceptually, the rebuttable presumption approach would be similar to "quick look" analysis under antitrust law. In antitrust cases, most restraints are analyzed under the rule of reason, which entails an intensive, fact-specific assessment of market power and market structure to determine a restraint's actual effect on competition.[415] However, where "the great likelihood of anticompetitive effects can be easily ascertained," a court may also adopt a truncated, or "quick look," rule of reason analysis.[416] Courts apply quick look analysis where, "based upon economic learning and the experience of the market, it is obvious that a restraint of trade likely impairs competition." [417] In such cases, "the restraint is presumed unlawful and, in order to avoid liability, the defendant must either identify some reason the restraint is unlikely to harm consumers or identify some competitive benefit that plausibly offsets the apparent or anticipated harm." [418] A rebuttable presumption in the Rule would mirror this approach. Non-compete clauses would be presumed unlawful, based on the "economic learning and experience of the market" summarized in Part IV above, but the use of a non-compete clause would be permitted if the employer could make a showing that satisfies a certain standard.

The rebuttable presumption approach would also be similar in many respects to the current common law governing non-compete clauses. In most states, non-compete clauses are disfavored, but are permitted if an employer can identify a legitimate business interest and if the non-compete clause is reasonable with respect to geographic area, duration, and the scope of activity prohibited.[419] Similarly, under the rebuttable presumption approach, non-compete clauses would be presumptively unlawful but would be permitted under certain circumstances.

One important question related to the rebuttable presumption approach is what the test for rebutting the presumption should be. The Commission preliminarily believes that, if it were to adopt a rebuttable presumption in a final rule, it would adopt a test that is more restrictive than the current common-law standard. Otherwise, the Rule would be no more restrictive than current law, and the objective of the Rule—to remedy the adverse effects to competition from employers' use of non-compete clause—would not be achieved.

One option would be a test derived from the quick look test. For example, the rule could allow an employer to rebut the presumption where the employer "shows by clear and convincing evidence that the non-compete clause is unlikely to harm competition in labor markets or product or service markets, or identifies some competitive benefit that plausibly outweighs the apparent or anticipated harm." Alternatively, the test could focus exclusively on either of these two prongs: unlikeliness of harm to competition, or presence of a competitive benefit that plausibly outweighs the apparent or anticipated harm to competition. A term other than "clear and convincing evidence," such as "preponderance of the evidence," could also be used.

Another option would be a test that piggybacks on state law. For example, the rule could allow an employer to rebut the presumption where the employer "shows by clear and convincing evidence that a non-compete clause is necessary to protect a legitimate business interest." This would be a higher standard than the current common law test because it would require an employer to show not only that it has a "legitimate business interest" under state law, but that it cannot protect this interest in another way—for example, through the use of an NDA. The test could also use the term "reasonably necessary" instead of "necessary," or a term other than "clear and convincing evidence, such as "preponderance of the evidence." The Commission could also establish what "legitimate business interests" could justify a non-compete clause and which could not.

The Commission preliminarily believes the categorical ban in the proposed rule would advance the proposed rule's objectives to a greater degree than the rebuttable presumption approach. The Commission is concerned that the rebuttable presumption approach could foster confusion among employers and workers because the question of whether an employer may use a non-compete clause would depend on an abstract legal test rather than a bright-line rule. Under a categorical ban, it would be clear non-compete clauses are prohibited. In contrast, under the rebuttable presumption approach, it may be difficult for both employers and workers to know whether a particular non-compete clause meets the abstract legal test articulated in the rule. For example, it may be difficult for an employer or worker to know whether a particular non-compete clause is

---

[412] *See* proposed § 910.2(a). For ease of reference, this Part VI employs the term "use of non-compete clauses" to refer to the specific conduct that the proposed rule would prohibit.

[413] *See* proposed § 910.3. As described in Part V (in the section-by-section analysis for proposed § 910.1(c)), the proposed rule would also not apply to employers to the extent they are exempt under Section 5(a)(2) of the FTC Act, and the proposed rule may not apply under certain circumstances due to the state action doctrine.

[414] *See supra* Part V, in the section-by-section analysis for proposed § 910.2(a).

[415] *See, e.g., Am. Express Co.,* 138 S. Ct. at 2284.

[416] *See, e.g., Calif. Dental Ass'n v. Fed. Trade Comm'n,* 526 U.S. 756, 770 (1999).

[417] *Polygram Holding, Inc. v. Fed. Trade Comm'n,* 416 F.3d 29, 36 (D.C. Cir. 2005).

[418] *Id.*

[419] *See supra* Part II.C.1.

"unlikely to harm competition in labor markets or product or service markets," whether "there is some competitive benefit that plausibly outweighs the apparent or anticipated harm," or whether a non-compete clause is "necessary" to protect a legitimate business interest. Furthermore, because only the Commission can enforce a rule issued under Section 6(g), the development of the law—and therefore clarity for employers—would be slow in coming.

However, the rebuttable presumption could also have some advantages over a categorical ban. If there were to be specific factual scenarios, unanticipated by the Commission, in which a particular non-compete clause did not implicate the anticompetitive concerns the Commission is concerned about, the rebuttable presumption would allow the clause to be used.

The Commission seeks comment on whether it should adopt a rebuttable presumption instead of a categorical ban and what the test for rebutting the presumption should be.

2. Uniform Rule vs. Differentiation

In addition to establishing a categorical ban on non-compete clauses, the proposed rule would apply uniformly to all workers. Employers covered by the rule—*i.e.,* employers other than those exempt from coverage under the FTC Act[420]—would be prohibited from using a non-compete clause with a worker, except in limited scenarios where the non-compete clause is between the seller and buyer of a business.[421]

Rather than applying a rule uniformly to all workers, the Commission could apply different rules to different categories of workers based on a worker's job function, occupation, earnings, another factor, or some combination of factors. For example, the rule could ban non-compete clauses for workers generally, but could apply a rebuttable presumption to non-compete clauses for workers whose earnings are above a certain threshold (or could exempt such workers altogether).

This Part VI uses the term "more-lenient standards" to refer to the more relaxed regulatory standards that would apply to certain categories of workers— such as the workers above the earnings threshold in the example above—under this approach. This Part VI also uses the term "more-stringent standards" to refer to the stricter standards that would

apply to certain categories of workers, such as the workers below the earnings threshold in the second example above.

As described above in Part II.C.1, the recent non-compete clause statutes many states have enacted have generally differentiated among categories of workers. Most of these states have restricted non-compete clauses only for workers below a threshold based on the worker's earnings or a similar factor, such as whether the worker is non-exempt under the FLSA or whether the worker is an hourly worker.[422]

There are three main ways a rule could differentiate among workers. First, a rule could apply different standards to workers based on the workers' job functions or occupations. For example, a rule could apply more-lenient standards to non-compete clauses for senior executives or could exempt them from coverage altogether.

Second, a rule could apply different standards to workers based on some combination of job functions/ occupations and a worker's earnings. For example, the rule could apply more-lenient standards to workers who qualify for the FLSA exemptions for "executives" and "learned professionals."[423] Workers qualify for these FLSA exemptions (which exempt the worker from minimum-wage and overtime-pay rules) if they earn above a certain amount and perform certain types of job duties.[424] Another potential alternative could be to apply more-lenient standards to a worker who qualifies for any FLSA exemption.[425]

Third, like the recent state statutes described above, a rule could apply different standards based on the worker's earnings. An earnings threshold could be relatively high (as in, *e.g.,* the State of Washington, where a non-compete clause is void unless the worker's annual earnings exceed $100,000 for employees and $250,000 for independent contractors); in the middle (as in, *e.g.,* Virginia, where employers may not enter into, enforce, or threaten to enforce a non-compete clause with a worker whose average weekly earnings are less than the Commonwealth's average weekly wage); or relatively low (as in, *e.g.,* Maryland, where non-compete clauses are void

where a worker earns equal to or less than $15 per hour or $31,200 per year).[426] The Commission also believes if it were to adopt a threshold based on earnings, it would be appropriate to index the earnings level to inflation, to ensure as well as possible that the threshold continues to correspond to the Commission's justification for it.

A rule could also differentiate among workers based on a different factor, or based on some combination of factors.

The Commission preliminarily concludes applying the rule uniformly to all workers would advance the proposed rule's objectives to a greater degree than differentiating among workers. As described in Part V above, non-compete clauses obstruct labor market competition in a similar way for all workers, regardless of a worker's income or job status.[427] Whether a labor market includes high earners or low-wage workers, non-compete clauses block workers in that market from switching to jobs in which they would be better paid and more productive— restricting the opportunities of all workers in that labor market. The Commission estimates the proposed rule would increase earnings for workers across the labor force, as well as for workers in all of the subgroups of the labor force for which sufficient data are available—from hourly workers to highly paid, highly skilled workers such as executives.[428] Excluding these workers from the proposed rule would deny these workers the benefits of higher earnings through increased competition in the market for their labor.

The Commission also preliminarily concludes a rule that applies uniformly to all workers would better ensure workers are aware of their rights under the rule. For example, the Commission believes employers generally know whether a particular worker is exempt under the FLSA, but many workers may not know this themselves. Therefore, if the Rule were to prohibit non-compete clauses with FLSA non-exempt workers, and an employer were to enter into a non-compete clause with an FLSA non-exempt worker in violation of the Rule, the worker may not know whether the non-compete clause is valid.

If the Commission were to adopt a final rule differentiating among categories of workers, it may also adopt a severability clause indicating the Commission intends for the standards to

---

[420] *See supra* Part V, in the section-by-section analysis for proposed § 910.1(c), for additional discussion of this issue.

[421] *See* proposed § 910.3.

[422] *See supra* Part II.C.1.

[423] *See* 29 CFR 541.100; 29 CFR 541.200.

[424] *See* Dep't of Labor, *Fact Sheet #17A: Exemption for Executive, Administrative, Professional, Computer & Outside Sales Employees Under the Fair Labor Standards Act (FLSA)* (Sept. 2019).

[425] *See* Dep't of Labor, *Handy Reference Guide to the Fair Labor Standards Act*, entry under Exemptions, *https://www.dol.gov/agencies/whd/compliance-assistance/handy-reference-guide-flsa#8.*

[426] *See supra* note 149 and accompanying text.

[427] *See supra* Part V (in the section-by-section analysis for proposed § 910.2(a)).

[428] *See infra* Part VII.B.1.a.

be severable.[429] If a regulatory provision is severable, and one part of the provision is invalidated by a court, the court may allow the other parts of the provision to remain in effect.[430] When analyzing whether a provision is severable, courts consider both (a) the agency's intent and (b) whether severing the invalid parts of the provision would impair the function of the remaining parts.[431] Including a severability clause would clarify the Commission's intent that, if a court were to invalidate the standards for one category of workers, the other standards would remain in effect. The Commission also believes if it were to adopt a final rule differentiating between categories of workers, and a court were to strike down the rules for one category, that would not impair the function of the remaining provisions. If every worker falls into only one category, and one or more (but not all) of the standards were to be invalidated, an employer could simply comply with the standards that remain in effect.

The Commission seeks comment on whether it should differentiate between workers rather than adopting a rule that applies uniformly to all workers. In addition, the Commission seeks comment on what the specific threshold(s) should be.

### B. Discrete Alternatives

As described above, there are two key dimensions of alternatives related to the fundamental design of the rule. The first is whether the rule should impose a categorical ban on non-compete clauses or a rebuttable presumption of unlawfulness. The second is whether the rule should apply uniformly to all workers or whether there should be exemptions or different standards for different categories of workers, using one or more thresholds based on a worker's job functions, earnings, some other factor, or some combination of factors. The different permutations of the answers to each of these questions yield the different alternatives for the rule's fundamental design. As a result, the number of potential alternatives to the proposed rule is nearly limitless. However, for the purpose of focusing public comment, this Part VI.B describes four discrete alternatives to the proposed rule. The Commission preliminarily believes each of these alternatives may further the objectives of the proposed rule, to some degree.

For each of the alternatives described below, the Commission could adopt a variety of different thresholds. As described above in Part VI.A.2, a threshold could be based on job functions, the worker's occupation, earnings, some other factor, or some combination of factors. A threshold could be set relatively high, relatively low, or in the middle.

### 1. Alternative #1: Categorical Ban Below Threshold, Rebuttable Presumption Above

Under Alternative #1, the rule would categorically ban the use of non-compete clauses for some workers and apply a rebuttable presumption of unlawfulness to non-compete clauses for the other workers. For example, the rule could ban non-compete clauses generally, but apply a rebuttable presumption to workers who qualify for the FLSA exemptions for executives or learned professionals.[432] Or the rule could ban non-compete clauses but apply a rebuttable presumption to workers who earn more than $100,000 per year.

The Commission is not proposing this approach due to the preliminary concerns, described above in Parts VI.A.1 and VI.A.2, about the rebuttable presumption approach and about differentiating among categories of workers. However, the Commission seeks comment on this alternative.

### 2. Alternative #2: Categorical Ban Below Threshold, No Requirements Above

Under Alternative #2, the rule would categorically ban the use of non-compete clauses for some workers and not apply any requirements to the other workers. In effect, the other workers would simply be exempt from coverage under the rule. This approach would be similar to the recent non-compete clause statutes many states have enacted.[433] For example, like the recent State of Washington statute, the rule could prohibit the use of non-compete clauses for employees earning $100,000 or less per year and independent contractors earning less than $250,000 or less per year. Or, like the recent Massachusetts and Rhode Island statutes, the rule could prohibit the use of non-compete clauses for workers who are non-exempt under the FLSA.

The Commission is not proposing this approach due to its preliminary concerns, described above in Part VI.A.2, about differentiating among categories of workers. However, the

Commission seeks comment on this alternative.

### 3. Alternative #3: Rebuttable Presumption for All Workers

Under Alternative #3, the rule would apply a rebuttable presumption of unlawfulness to non-compete clauses for all workers. This approach would be similar to the proposed rule in that it would apply uniformly to all U.S. workers. However, instead of a categorical ban, the rule would apply a rebuttable presumption. The Commission is not proposing this approach due to its preliminary concerns with the rebuttable presumption approach, which are described above in Part VI.A.1. However, the Commission seeks comment on this alternative.

### 4. Alternative #4: Rebuttable Presumption Below Threshold, No Requirements Above

Under Alternative #4, the rule would apply a rebuttable presumption of unlawfulness to non-compete clauses for some workers and not apply any requirements to the other workers. This approach would be similar to Alternative #2, except that, instead of categorically banning non-compete clauses for workers below the threshold, the rule would apply a rebuttable presumption. The Commission is not proposing this approach due to the preliminary concerns, described above in Parts VI.A.1 and VI.A.2, about the rebuttable presumption approach and about differentiating among categories of workers. However, the Commission seeks comment on this alternative.

The Commission seeks comment on each of these alternatives described in this Part VI.B, including whether the alternative would advance the objectives of the proposed rule to a greater or lesser degree than the proposed rule, and how the Commission should design the rule if it were to adopt the alternative.

### C. Different Standards for Senior Executives

In addition to seeking comment generally on whether the rule should apply uniformly to all workers or differentiate between categories of workers,[434] the Commission seeks comment specifically on whether it should adopt different standards for non-compete clauses with senior executives.[435]

---

[429] The Commission may adopt a severability clause even if it did not apply different standards to the different categories of workers.

[430] *See, e.g., Davis Cnty. Solid Waste Mgmt.* v. *EPA,* 108 F.3d 1454, 1459 (D.C. Cir. 1997).

[431] *Id.* at 1460.

[432] *See supra* note 423–424 and accompanying text.

[433] *See supra* note 149.

[434] *See supra* Part VI.A.2.

[435] The Commission could also define senior executives as a separate category, but apply the
Continued

The proposed rule would categorically ban non-compete clauses for all workers, including senior executives. However, the Commission recognizes non-compete clauses for senior executives may present distinct concerns. As described in Part IV, the Commission preliminarily finds that, like non-compete clauses for other workers, non-compete clauses for senior executives negatively affect competitive conditions in labor markets.[436] The Commission also preliminarily finds non-compete clauses for senior executives negatively affect competitive conditions in product and service markets, and they may do so in unique ways.[437] However, unlike non-compete clauses for other workers, the Commission does not preliminarily find non-compete clauses for senior executives are exploitative and coercive at the time of contracting or at the time of the worker's potential departure.[438]

Given that non-compete clauses for senior executives may present distinct concerns, the Commission is interested in the public's views about whether different standards for senior executives would be appropriate. For example, the Commission could adopt a categorical ban on non-compete clauses for workers in general, but apply a rebuttable presumption of unlawfulness for senior executives or exempt senior executives altogether.

The Commission seeks comment on how, if the Commission were to adopt different standards for senior executives, this category of workers should be defined. The Commission is not aware of a generally accepted legal definition of "senior executive." This term may be challenging to define, given the variety of organizational structures used by employers. The Commission could cross-reference a definition in an existing federal regulation, such as the definition of "named executive officer" in Securities and Exchange Commission (SEC) Regulation S–K[439] or the definition of "executive officers" in SEC Rule 3b–7;[440] adopt a definition closely based on a definition in an existing federal regulation; adopt a new definition; define the category according to a worker's earnings; use some combination of these approaches; or use a different approach. The Commission seeks comment on what definition would draw the appropriate line—with

respect to which workers should be covered by the different standards—while providing sufficient clarity to employers and workers.

In addition, the Commission seeks comment on whether these different standards should also be applied to other highly paid or highly skilled workers who are not senior executives, including specifically how such a category should be defined.

### D. Coverage of Non-Compete Clauses Between Franchisors and Franchisees

The proposed rule would state the term "worker" does not include a franchisee in the context of a franchisee-franchisor relationship.[441] As a result, the proposed rule would not cover non-compete clauses between franchisors and franchisees.[442] As described above in Part V, the Commission believes that, in some cases, the relationship between a franchisor and franchisee may be more analogous to the relationship between two businesses than the relationship between an employer and a worker. In addition, the evidentiary record before the Commission relates primarily to non-compete clauses that arise solely out of employment; the Commission has surveyed the available evidence relating to non-compete clauses and is not aware of research on the effects of applying additional legal restrictions to non-compete clauses between franchisors and franchisees. Therefore, the Commission believes it is appropriate to clarify that a franchisee—in the context of a franchisor-franchisee relationship—is not a "worker" for purposes of proposed § 910.1(f).[443] (Proposed § 910.1(f) would explain, however, the term "worker" includes a natural person who works for the franchisee or franchisor, and non-compete clauses between franchisors and franchisees would remain subject to federal antitrust law as well as all other applicable law.)

While the Commission is not currently proposing to cover franchisor/franchisee non-compete clauses for these reasons, the Commission recognizes that, in some cases, these non-compete clauses may present concerns under Section 5 similar to the concerns presented by non-compete clauses between employers and workers. Many franchise agreements may contain non-compete clauses.[444] By

restricting a franchisee's ability to start a new business, franchisor/franchisee non-compete clauses could potentially stifle new business formation and innovation, reduce the earnings of franchisees, and have other negative effects on competitive conditions similar to non-compete clauses between employers and workers. Franchisor/franchisee non-compete clauses could also potentially be exploitative and coercive in some cases, such as where there is an imbalance of bargaining power between the parties. While the relationship between franchisors and franchisees may, in some cases, be more analogous to a business-to-business relationship, many franchisees lack bargaining power in the context of their relationship with franchisors and may be susceptible to exploitation and coercion through the use of non-compete clauses.[445]

For these reasons, the Commission seeks comment on whether the Rule should cover franchisor/franchisee non-compete clauses and why. The Commission also seeks comment on whether, if the Rule were to cover franchisor/franchisee non-compete clauses, they should be categorically banned or subject to a rebuttable presumption of unlawfulness (and if the latter, what the standard for rebutting the presumption should be). The Commission further seeks comment on whether, if the rule were to cover franchisor/franchisee non-compete clauses, the rule should apply uniformly to all such non-compete clauses or whether certain categories of franchisor/franchisee non-compete clauses should be exempted or subject to different standards. The Commission encourages commenters to submit data or other evidence that could inform the Commission's consideration of this issue.

### E. Other Alternatives

This Part VI.E describes two alternatives the Commission believes would likely not further the objectives of the proposed rule. However, this assessment is preliminary. Based on the public comments and the Commission's

---

same standards to senior executives as to other workers.

[436] *See supra* Part IV.A.1.a.i.

[437] *See supra* Part IV.A.1.a.ii.

[438] *See supra* Part IV.A.1.b–c.

[439] 17 CFR 229.402(a)(3).

[440] 17 CFR 203.501(f).

[441] *See* proposed § 910.1(f).

[442] For ease of reference, this Part VI refers to these types of non-compete clauses as "franchisor/franchisee non-compete clauses."

[443] *See supra* Part V (in the section-by-section analysis for proposed § 910.1(f)).

[444] *See, e.g.,* Brian Callaci, Sergio Pinto, Marshall Steinbaum, & Matthew Walsh, *Vertical Restraints*

*and Labor Markets in Franchised Industries* (July 6, 2022), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4155571* (finding that, in a sample of 530 franchising contracts, various types of vertical restraints were prevalent, while not specifically addressing non-compete clauses). The Commission has also frequently encountered non-compete clauses in franchise agreements. *See supra* Part II.D (describing consent orders that restricted a franchisor's ability to enforce non-compete clauses).

[445] *See, e.g.,* Brian Callaci & Sandeep Vaheesan, *Antitrust Remedies for Fissured Work,* Cornell L. Rev. (forthcoming), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4076274 at 21–22.*

additional analysis, the Commission could potentially decide to adopt one or both of the alternatives described below in a final rule instead of, or in addition to, the proposed rule or one of the alternatives described above. The Commission seeks comment on each of the two alternatives described in this Part VI.E, as well as whether there are other alternatives not described in Part VI that the Commission should consider.

### 1. Disclosure Rule

The Commission could potentially adopt disclosure requirements related to non-compete clauses.[446] For example, research suggests many workers often do not find out about non-compete clauses until after they have accepted an employment offer.[447] This concern could be addressed by requiring an employer to disclose to a worker, before making the employment offer, that the worker will be subject to a non-compete clause. The employer could also potentially be required to explain the terms of the non-compete clause and how the worker would be affected by signing the non-compete clause.

While there is evidence disclosure of non-compete clauses to workers prior to acceptance of a job offer may increase earnings, increase rates of training, and increase job satisfaction for that worker,[448] the Commission does not believe this alternative would achieve the objectives of the proposed rule. Merely ensuring workers are informed about non-compete clauses would not address one of the Commission's central concerns: that, in the aggregate, they are negatively affecting competitive conditions in labor markets—including impacts on workers who are not bound by non-compete clauses—and in markets for products and services. Moreover, the benefits of a disclosure rule may be limited due to the differential in bargaining power between many workers and their employers, which would hamper those workers' ability to negotiate for better employment terms.[449]

### 2. Reporting Rule

The Commission could also potentially require employers to report certain information to the Commission relating to their use of non-compete clauses. For example, employers that use non-compete clauses could be required to submit a copy of the non-compete clause to the Commission. This would enable the Commission to monitor the use of non-compete clauses. It would also potentially discourage employers from using non-compete clauses where they are clearly not justified under existing law.

However, the Commission does not believe a reporting rule would achieve the objectives of the proposed rule. Merely requiring employers to submit their non-compete clauses to the Commission may not meaningfully reduce the prevalence of non-compete clauses. As a result, it may not remedy the extent to which non-compete clauses adversely affect competitive conditions in labor markets and product and service markets. A reporting rule would also impose significant and recurring compliance costs on employers.

The Commission seeks comment on all aspects of this Part VI, including whether the Commission should adopt one of the alternatives described above, or a different alternative, instead of the proposed rule.

## VII. Analysis of Benefits and Costs of the Proposed Rule and Alternatives

The proposed rule would provide it is an unfair method of competition—and thus a violation of Section 5 of the FTC Act—for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe the worker is subject to an enforceable non-compete clause.[450] The proposed rule is targeted at increasing competition in labor markets by allowing workers to move more freely between jobs and increasing competition in product markets by ensuring firms are able to hire talented workers and workers are able to found entrepreneurial ventures.

The proposed rule is intended to alleviate two primary competitive problems. First, non-compete clauses anticompetitively interfere in the functioning of labor markets without generating compensating benefits. Non-compete clauses prevent firms from competing for workers' services and increase barriers to voluntary labor mobility, obstructing the smooth functioning of labor markets, resulting in lower wages and diminished worker and firm productivity.

The second competitive problem is non-compete clauses create negative spillovers in labor markets and in product and service markets. In labor markets, non-compete clauses negatively impact workers who are not themselves bound by non-compete clauses by preventing the opening of vacancies and thereby creating mismatches between labor and firms. In product and service markets, non-compete clauses prevent entrepreneurial growth, which negatively impacts consumers by reducing competition in those markets. Non-compete clauses also foreclose competitors' ability to access labor market talent, negatively affecting those competitors' ability to effectively compete in the marketplace. Additionally, non-compete clauses impede innovation, which may negatively impact technological growth rates.

Section 22 of the FTC Act requires the Commission to issue a preliminary regulatory analysis when publishing a proposed rule that would declare a practice to be an unfair method of competition under Section 5 of the FTC Act.[451] The preliminary regulatory analysis must contain (1) a concise description of the need for, and objectives of, the proposed rule; (2) a description of any reasonable alternatives to the proposed rule which may accomplish the stated objective of the rule in a manner consistent with applicable law; and (3) for the proposed rule, and for each of the alternatives described in the analysis, a preliminary analysis of the projected benefits and any adverse economic effects and any other effects.[452]

In the preliminary analysis below, we describe the anticipated impacts of the rule as proposed. Where possible, we quantify the benefits and costs. If a benefit or cost is quantified, we indicate the sources of the data relied upon. If an assumption is needed, the text makes clear which quantities are being assumed. We measure the benefits and costs of the rule against a baseline in which no rule regarding non-compete clauses has been promulgated by the Commission. The Commission solicits comments from the public to improve the assumptions used in this preliminary analysis before promulgation of any final rule.

This preliminary analysis attempts to include in its scope the broadest set of economic actors possible. The Commission invites submission of information pertaining to additional economic actors who would be affected by the proposed rule. Several of the benefits and costs described in this

---

[446] The Commission's Franchise Rule requires non-compete clauses to be disclosed to a franchisee. 16 CFR 436(i); 436(q).

[447] Marx (2011), *supra* note 55 at 706.

[448] Starr, Prescott, and Bishara, *supra* note 42 at 75.

[449] *See supra* Part IV.A.1.b.

[450] *See* proposed § 910.2(a).

[451] 15 U.S.C. 57b–3.

[452] 15 U.S.C. 57b–3(b)(1)(A)–(C).

analysis are either quantifiable, but not monetizable (especially with respect to separation between transfers, benefits, and costs), or not quantifiable at all. The Commission therefore also invites submission of information which could be applied to quantify or monetize estimates contained in the analysis.

For some of the economic effects of non-compete clauses, conflicting evidence exists in the academic literature. We classify these effects under both benefits and costs, and discuss divergences in the evidence, as well as relative strengths and weaknesses of the evidence.

The Commission seeks comment on all aspects of the preliminary analysis presented in this Part VII as well as submissions of additional data that could inform the Commission's analysis of the benefits, any adverse economic effects, and any other effects of the proposed rule.

### A. Overview of the Effects of the Proposed Rule

In this preliminary regulatory analysis, we have quantified and monetized those costs and benefits for which we are able and described all other costs and benefits. The Commission finds substantial benefits of the proposed rule: workers' earnings would likely increase by $250–$296 billion annually (though some portion of this represents an economic transfer from firms to workers), new firm formation and competition would increase, health care prices would fall (and prices in other markets may fall), and innovation would increase, though several of these benefits overlap (*e.g.*, increases in competition may fully or in part drive decreases in prices and increases in innovation). The Commission also finds some costs of the proposed rule: direct compliance and contract updating would result in $1.02 to $1.77 billion in one-time costs, and firm investment in worker training and capital assets would fall.

The nature of the estimates, however, creates substantial difficulty in calculating a bottom-line present value of the net benefit to the economy of the proposed rule. The Commission believes the substantial labor and product market benefits of the proposed rule would exceed the costs, and additionally would persist over a substantially longer time horizon than some of the one-time costs of compliance and contract updating. However, we do not present here an estimate of the net benefit, as it would necessarily omit major components of both costs and benefits. In particular, the numbers reported above are not

comparable in order to estimate the net benefit of the rule: as noted, some portion of the earnings increase estimate represents transfers rather than benefits; several benefits and costs are unmonetized in this analysis; and several of the annualized benefits and costs (including the portion of the earnings increase attributable to benefit) may persist indefinitely, as compared with the one-time compliance and contract updating costs.

### B. Estimated Benefits of the Proposed Rule

In this Part VII.B, we describe the beneficial impacts of the proposed rule; provide preliminary quantitative, monetized estimates where possible; and describe benefits we can only assess qualitatively. We enumerate benefits in two broad categories (further divided into subcategories): benefits related to labor markets and benefits related to goods and service markets.

Overall, the Commission estimates worker earnings would increase by $250–$296 billion annually as a result of the proposed rule. While the Commission believes some of this increase represents an economic benefit, some portion of this increase likely represents a transfer of income from firms to workers, or from consumers to workers if firms pass labor costs on to consumers. The Commission also finds, however, the proposed rule would increase the rate of new firm formation, the rate of innovation, and the extent of competition in product and service markets, which may lead to lower prices for consumers, though the sizes of these effects are not quantifiable based on the estimates in the economic literature (except in the case of healthcare).

#### 1. Benefits Related to Labor Markets

By preventing workers from changing employers or embarking upon entrepreneurial ventures, non-compete clauses prevent beneficial labor market competition in two primary ways. First, non-compete clauses prevent workers from leaving their job for higher-paying jobs, or from leveraging such an offer to increase their earnings at their current employer. Second, non-compete clauses reduce voluntary churn in labor markets. While churn is not necessarily beneficial in and of itself, voluntary churn allows workers (who would otherwise be bound by non-compete clauses) and firms to sort into the best possible matches and opens vacancies, which allow workers who are not necessarily bound by non-compete clauses to find better matches. Both mechanisms exhibit, at least in part, as earnings losses for workers when non-

compete clauses enforceability increases; however, the extent to which earnings gains associated with the proposed rule represent benefits versus transfers may depend on the mechanism. We describe in which cases we are and are not able to categorize, quantify, and monetize these estimates below.

#### a. Earnings

The primary impact of the proposed rule is an increase in earnings or earnings growth for workers, and more efficient functioning of labor markets. A full analysis of this benefit would seek to quantify the entire range of heterogeneity in the effect of the proposed rule on earnings. In other words, for any given worker, the likely impact on that worker's earnings is based on whether that worker has a non-compete clause, whether non-compete clauses are broadly used in their occupation/industry/local area, how much that worker earns, that worker's demographics, and much more. While some studies have sought to quantify heterogeneous impacts of non-compete clauses and their enforceability on subgroups of workers, this accounting is limited to fairly small sectors of the population. For this reason, we focus primarily on estimates of average effects across the American labor force, though we provide details on what heterogeneity has been analyzed below.

The study containing the most direct estimate of the increase in workers' earnings given a prohibition on non-compete clauses finds that earnings would increase across the labor force by an average of 3.3–13.9%.[453] For several reasons, we primarily focus on the low end of this range: in addition to generating the most conservative estimate, this range represents an out-of-sample approximation and is furthermore based on enforceability in 2014. Since then, some states have passed legislation causing non-compete clauses to be more difficult to enforce for subsets of their workforces, therefore causing a prohibition on non-compete clauses today to have a slightly lesser effect than a prohibition would have had in 2014.[454] Using total annual wage earnings in the United States for private employers in 2020 (the most recent year with finalized numbers) as a baseline,[455] we estimate a total annual earnings

---

[453] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 2.

[454] *See supra* Part II.C.1.

[455] National annual earnings are taken from Bureau of Labor Statistics, *Employment and Wages Data Viewer* (last visited Dec. 9, 2022), *https://data.bls.gov/cew/apps/data_views/data_views.htm#tab=Tables*.

increase of $250.05 billion. We also report the total annual earnings increase that is associated with other levels of the percentage increase in earnings that fall within the range reported in the study in Table 1, in addition to 10-year discounted earnings increases using both 3% and 7% discount rates.

TABLE 1

| Percentage increase in earnings (%) | Total annual earnings increase ($ billion) | Total 10-year earnings increase, 3% discount rate ($ billion) | Total 10-year earnings increase, 7% discount rate ($ billion) |
|---|---|---|---|
| 3.3 | 250.05 | 2,132.97 | 1,756.24 |
| 5.0 | 378.86 | 3,231.78 | 2,660.98 |
| 7.0 | 530.41 | 4,524.49 | 3,725.37 |
| 9.0 | 681.95 | 5,817.20 | 4,789.76 |
| 11.0 | 833.50 | 7,109.91 | 5,854.15 |
| 13.0 | 985.04 | 8,402.63 | 6,918.54 |
| 13.9 | 1,053.24 | 8,984.35 | 7,397.51 |

Another study estimates decreased non-compete clause enforceability would increase earnings by approximately 1%. This study uses, as a control group, occupations which use non-compete clauses at a low rate: the estimate therefore represents the differential effect on occupations which use non-compete clauses at a *high* rate, relative to the control group. While the study does estimate the separate impact of non-compete clause enforceability for each group, there is no way to disentangle this effect from state-specific effects (*e.g.,* that California does not typically enforce non-compete clauses, and also differs from other states in many ways).[455] Since workers in occupations which use non-compete clauses at a low rate may also be affected by changes in non-compete clause enforceability, the reported increase in earnings likely underestimates the impact on the entire labor force. The change in enforceability which generates this estimate is a one standard deviation change, as measured using non-compete clause enforceability scores[457] for all 50 states and the District of Columbia in 1991. Applying the 1% earnings effect estimate to each state (based on the scores in 2009), we calculate that each state moving to non-enforceability (as would be the case under the proposed rule) would result in an overall annual earnings increase of $295.9 billion.[458]

The Commission's preliminary finding is therefore the proposed rule would increase workers' earnings workforce-wide by $250–$296 billion annually. We discuss in Part VII.B.1.b the extent to which the Commission believes this increase represents a benefit of the proposed rule versus a transfer.

Four broad classes of workers merit specific attention, as researchers have generated empirical estimates of the effects of non-compete clause enforceability based specifically on those sectors. These classes are (a) high-tech workers; (b) physicians; (c) workers paid on an hourly basis; and (d) CEOs. We clarify that the effects we present on each of these specific classes of workers are contained within the broader estimates presented above: that is, the estimates above contain each of these classes of workers, plus the rest of the labor force. The specific estimates for each class of workers are therefore presented to indicate the range of effects observed in the labor market and to illustrate the scope of empirical work that has been performed on the topic.

i. High-Tech Workers

One study examines the impact of non-compete clause enforceability on high-tech workers in Hawaii.[459] That study includes estimates for the entirety of the high-tech work force, as well as for newly hired workers. Since the ban in Hawaii did not void previously signed non-compete clauses, while the proposed rule would, we use the

estimate for newly hired workers. This is because that estimate reflects the effects on those workers who were subject to a regime with no non-compete clause enforceability. Extrapolating from the estimates for Hawaii to the average impact on high-tech workers in each state, a prohibition such as the one in this proposed rule would increase earnings of high-tech workers in the average state by 4.8%.[460] Caution is recommended in interpreting this extrapolation, however, since results from one sector within one state may not necessarily inform outcomes that would occur in the rest of the country.

ii. Physicians

One study reports the effects of non-compete clause use and enforceability on the earnings growth of physicians.[461]

Due to the limitations of the study design, the main estimate concerns the impact of non-compete clause use on earnings growth, rather than the level of earnings.[462] However, assuming physicians begin at an identical level of earnings, a physician with a non-compete clause would have an estimated 89% earnings growth over a ten-year period, versus an estimated 36% for a physician without a non-compete clause. In other words, the physician with a non-compete clause would have earnings approximately

[456] Starr, *supra* note 66 at 792–93.

[457] Non-compete clause enforceability scores, used for this estimate as well as several others, are calculated using various methods based on legal descriptions provided in various editions of ''Non-Compete Clauses: A State-by-State Survey'' by Brian M. Malsberger.

[458] The total earnings increase is calculated as the sum over all states of:

$$(e^{0.0099*(\text{State's Enforceability Score} - \text{Lowest State Enforceability Score})} - 1)*(\text{Total Annual Wages of the State})$$

This calculation assumes that all workers benefit from the increase in earnings, as opposed to

calculating the benefits to those in high-use occupations versus those in low-use occupations. The benefit of this approach is that it yields a total predicted earnings increase for the economy as a whole, rather than a comparison between different types of workers. However, it is likely an overestimate for workers in low-use occupations, and an underestimate for those in high-use occupations.

[459] Balasubramanian et al., *supra* note 68 at S349.

[460] The increase in earnings in each state is calculated as

$$e^{0.0441*(\text{State's Enforceability Score} - \text{Lowest State Enforceability Score})} - 1,$$ where 0.0441 represents the impact of Hawaii's prohibition on log earnings for newly hired high-tech workers (Table 2, Panel A, Column 5).

[461] Lavetti, Simon, & White, *supra* note 53 at 1025.

[462] In Table 4 of the study, the table which reports earnings effects, the authors include a ''job-match'' fixed effect, which rules out several alternate explanations for the authors' findings but leaves the authors unable to estimate the base effect of having a non-compete clause on earnings.

39% greater than the physician without.[463]

This estimate, however, is based solely on non-compete clause use, and does not consider the impact of enforceability changing. Use of non-compete clauses is likely determined by several characteristics of an employer (*e.g.*, the value of trade secrets or client attraction, productivity gains associated with training, nearness of potential competitors), some of which may also cause changes in earnings levels or earnings growth. Taking the separate effect of non-compete clause enforceability into account, it is possible that the estimated effect on earnings growth would differ from the estimates reported above.

The combined effect of enforceability and use on earnings growth may separately be estimated using another model in the same study.[464] We note that the authors state this model presents only "suggestive evidence." Furthermore, while this model does estimate the effect of non-compete clause use on physicians' earnings (in contrast to that reported above, which only examines earnings growth), as well as the interaction between use and enforceability, it does not report the baseline effect of non-compete clause enforceability, independent of use.[465] Using those estimates, nonetheless, allows for estimation of the impact of simultaneously removing non-compete clause enforceability and non-compete clause use on earnings at various levels of experience (omitting the baseline effect of enforceability, which is not reported). For a physician with 10 years of experience in the state which enforces non-compete clauses most readily, the estimates suggest a prohibition on non-compete clauses and removing that physician's non-compete clause would lead to a 12.7% increase in earnings, in contrast with the results of the model reported above.[466] For the identical situation for a physician with just 1 year of experience, the increase in earnings would be 37.4%. We emphasize, however, that if the baseline effect of enforceability (which the authors are unable to estimate) is large,

it could qualitatively change the effect on earnings of a simultaneous change in enforceability and use that we report.

### iii. Workers Paid on an Hourly Basis

One study analyzed how Oregon's 2008 prohibition on non-compete clauses for hourly workers impacted their wages.[467] The study estimates Oregon's prohibition increased hourly workers' earnings by 2.3%, with twice the effect (4.6%) on workers in occupations which use non-compete clauses at a relatively high rate.[468] Extrapolating from the estimates for Oregon to the average impact on hourly workers in each state, a prohibition such as the one in this proposed rule would increase earnings of hourly workers in the average state by 2.3%.[469] Caution is recommended in interpreting this extrapolation, however, since results from one segment of the workforce within one state may not necessarily inform outcomes that would occur in the rest of the country.

### iv. CEOs

One estimate of the impact of non-compete clause enforceability finds that moving from full enforceability of non-compete clauses to a prohibition would increase earnings growth by 8.2% and the level of earnings by 12.7% for CEOs.[470] Again ignoring heterogeneity and implementing a linear extrapolation using 2009 enforceability scores, the average CEO would experience a 9.4% increase in earnings due to the prohibition in the proposed rule.[471]

Another study simultaneously examines the effect of *use* of a non-compete clause and the enforceability thereof.[472] This study finds that decreased enforceability of non-compete clauses led to lower earnings for CEOs when use of non-compete clauses is held constant. However, this study also finds that, when non-compete clause enforceability decreases (as it would

under the proposed rule), non-compete clause use does not stay constant; it decreases.[473] As a result, the Commission believes the appropriate way to extrapolate based on the findings of this study is to take into account both the impact of non-compete clause enforceability decreasing and the effect of non-compete clause use decreasing.

When this relationship is taken into account, decreases in non-compete clause enforceability (as would occur under the proposed rule) result in greater earnings for CEOs. The study estimates an increase in enforceability of 1 on a 0 to 12 scale increases CEO noncompete use by 10.2 percentage points in their sample: therefore, a prohibition on non-compete clauses would affect CEOs' earnings via the effect the study attributes to enforceability alone, as well as by changing the use of non-compete clauses by CEOs, which has its own effect on earnings, according to the study.[474]

Assuming a baseline level of enforceability, it is possible to use the estimates from this study to calculate the impact on CEOs' earnings of simultaneously decreasing enforceability and non-compete clause use to zero (which would mirror the effect of the proposed rule). At the highest level of enforceability (9; Florida from 1997–2014), setting enforceability to zero and eliminating non-compete clauses from contracts would increase CEOs' earnings by 11.4%, based on this study. From a lower baseline level of enforceability (for example, 3, as in New York from 1992 to 2014), setting enforceability to zero and eliminating non-compete clauses from contracts would increase earnings by 14.1%.[475]

Based on the results of these two studies, the Commission therefore believes total compensation for CEOs would increase by 9.4% as a result of the proposed rule. This estimate is based on the first study discussed: while the results from the second study are qualitatively similar, the extent to which its results can be extrapolated are murkier due to the reliance on the secondary estimate of how non-compete clause use changes with non-compete clause enforceability. Ultimately, this finding is in accordance with findings

---

[463] Calculated as 1.89/1.36 − 1 = 39%.

[464] The estimates are presented in Table 6, Column 2.

[465] In Table 6 of the study, the authors use local market fixed effects: again, these fixed effects are necessary to rule out alternate explanations for their findings, but prevent estimation of the baseline impact of non-compete clause enforceability on earnings.

[466] The increase in earnings are calculated as $e^B − 1$, where B is the sum of each of the coefficients on NCA, NCA*Log Exp, Bishara Score*NCA, Bishara Score*NCA*Log Exp, each multiplied by the relevant variable.

[467] Lipsitz & Starr, *supra* note 46 at 143.

[468] *Id.* at Table 3, columns 3 and 4, respectively; percent changes are calculated as $e^b − 1$, where b is the relevant reported coefficient.

[469] The increase in earnings in each state is calculated as

$e^{(0.023*(\text{State's Enforceability Score}) − \text{Lowest State Enforceability Score})/(\text{Oregon's Enforceability Score}) − \text{Lowest State's Enforceability Score})} − 1$, where 0.023 represents the impact of Oregon's prohibition on log earnings for hourly workers (Table 3, Column 3).

[470] Garmaise, *supra* note 69 at 376–425. We assume the average level of in-state competition for the estimate of the effect on the level of earnings, as reported in Table 1.

[471] We first calculate the difference between each state's score and the lowest score (which represents a full prohibition) after normalizing scores to a 0 to 1 scale. Then, we find the average of that difference (0.742) and multiply by the estimated change of 12.7% to arrive at 9.4%.

[472] Kini, Williams, & Yin, *supra* note 52 at 4701.

[473] The study estimates that an increase in enforceability of 1 on a 0 to 12 scale increases CEO noncompete use by 10.2 percentage points in their sample. *Id.* at 4718.

[474] *Id.*

[475] The estimated impact of an increase in enforceability on CEOs with non-compete clauses is calculated as the effect of the sum of the coefficients on CEO noncompete × HQ Enforce and HQ enforce (*i.e.*, 0.4% = $e^{(0.047 − 0.043)} − 1$).

**JA0208**

in other segments of the labor force. Similar to typical workers, non-compete clauses prevent employers from competing for the labor of CEOs, including by offering better remuneration. Therefore, CEOs, like other workers, are locked into jobs in ways that prevent them from taking advantage of positive changes in labor market conditions.

b. Discussion of Transfers Versus Benefits

It is difficult to determine the extent to which the earnings effects discussed above represent transfers versus benefits. In the context of this analysis, transfers refer to "monetary payments from one group to another that do not affect total resources available to society." [476] In other words, transfers do not represent a net benefit or cost to the economy as a whole.

Broad increases in earnings when non-compete clauses are prohibited may simply represent a transfer of income from firms to workers (or, if firms pass labor costs on to consumers, from consumers to workers). There may, however, be a related benefit if the earnings increase of workers is related to market power or efficiency in the labor market. In other words, if a prohibition on non-compete clauses leads to a more efficient allocation of labor in the market, perhaps due to a rebalancing of power between workers and employers which decreases monopsony power, then the resulting earnings increases may represent a net benefit to the economy.

Additionally, if earnings increases are due to higher quality matching which results from increased labor market churn, then increased pay reflects a benefit to the economy, since workers' higher pay reflects higher productivity.

Several pieces of evidence support the idea that at least part of the increase in earnings represents a social benefit, rather than just a transfer. As described above in Part II.B.1.c, two studies have sought to estimate the external impact of non-compete clause use or enforceability: that is, the effect of use or enforceability on individuals other than those directly affected by use or enforceability.

First, one study demonstrates when the use of non-compete clauses by employers increases, that decreases wages for workers who do not have non-compete clauses but who work in the same state and industry. This study also finds this effect is stronger where non-compete clauses are more

enforceable. [477] Since the affected workers are not bound by non-compete clauses themselves, the differential in earnings does not completely represent a transfer due to a change in bargaining power between a worker bound by a non-compete clause and their employer, though available data does not allow for an estimate of the magnitude of transfers versus the total increase in economic benefit.

A second study directly estimates the external impact of a change in non-compete clause enforceability. [478] While use of non-compete clauses is not observed in the study, the impacts of changes in a state's laws are assessed on outcomes in a neighboring state. Since the enforceability of the contracts of workers in neighboring states are not affected by these law changes, the effect must represent a change related to the labor market, which workers in both states share. The estimate suggests workers in the neighboring state experience impacts on their earnings that are 87% as large as workers in the state in which enforceability changed. [479] In other words, two workers who share a labor market would experience nearly the same increase in their earnings due to a prohibition on non-compete clauses, even if the prohibition only impacts one worker. While the study does not directly estimate the differential effects by use, the effects on workers unaffected by a change in enforceability may be similar to the effects on workers not bound by non-compete clauses.

Overall, these two studies suggest there are market-level dynamics governing the relationship between earnings and the enforceability of non-compete clauses: that restrictions on the enforceability of non-compete clauses impact competition in labor markets by alleviating frictions and allowing for more productive matching. Changes in enforceability or use of non-compete clauses affect earnings of workers who do not have non-compete clauses or who work in local labor markets near, but not in, locations which experience changes in enforceability. If non-compete clauses simply changed the relative bargaining power of workers and firms, without affecting market frictions or competition, then these patterns would not be observed.

With a full accounting of all other costs and benefits, one could perform a "sensitivity analysis" to estimate how

much the percentage of earnings increases that represent benefits, rather than transfers, would affect the net impact of the proposed rule. However, as discussed, we are unable to fully monetize, or even quantify, several costs and benefits associated with the proposed rule. We present, instead, a partial sensitivity analysis which answers the question: for a given level of costs, what percentage of the earnings increases would offset those costs? The costs may be interpreted as the overall *net* cost of the rule, excluding benefits associated with earnings increases: that is, the costs listed in the table are the direct compliance and contract updating costs, plus the nonquantifiable and nonmonetizable costs, minus all benefits, excluding benefits associated with earnings increases.

The estimates are presented in Table 2. In order to present the most conservative estimates possible, we assume the earnings increase represents the lowest end of the range we estimate from the empirical literature ($250.05 billion). We discount annually at the rate of 7% (which is more conservative than a 3% discount rate, given that the costs are more front-loaded than the benefits due to the upfront compliance costs and costs of contract updating), and assume that annualized benefits and costs persist for 10 years. The first estimate, for zero or negative net cost, demonstrates that, if the non-earnings-related benefits of the proposed rule outweigh the total costs of the proposed rule, then the costs are already offset, and no portion of the earnings increase must be a benefit. The next estimate for costs is the midpoint of the estimates presented for direct compliance and contract updating costs, as estimated in Part VII.C: if the costs of the proposed rule (excluding direct compliance and contract updating costs) exactly offset the benefits (excluding earnings-related benefits), then if 0.08% of the earnings increases are benefits, they would exactly offset the estimated $1.394 billion costs of direct compliance and contract updating (where that estimate is the midpoint of the estimated range). While the Commission does not have detailed or complete enough quantifiable and monetizable estimates to determine whether net costs are positive or negative, the rest of Table 2 presents estimates for the portion of the earnings increase which would offset net costs greater than $1.394 billion, should they exist.

[476] Off. of Mgmt. & Budget, *Circular A–4* (Sept. 17, 2003) at 38.

[477] Starr, Frake, & Agarwal, *supra* note 76 at 961–80.

[478] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 26.

[479] Calculated as −0.181/−0.207=87%. Coefficients taken from *id.* at Table 6, Column 2.

TABLE 2

| Net cost estimate ($ million) | Portion of earnings increase that offsets the cost estimate (%) |
| --- | --- |
| 0 or Negative ..................... | 0.00 |
| 1,394 ................................... | 0.08 |
| 5,000 ................................... | 0.28 |
| 10,000 ................................. | 0.57 |
| 15,000 ................................. | 0.85 |
| 20,000 ................................. | 1.14 |
| 25,000 ................................. | 1.42 |
| 30,000 ................................. | 1.71 |
| 35,000 ................................. | 1.99 |
| 40,000 ................................. | 2.28 |
| 45,000 ................................. | 2.56 |
| 50,000 ................................. | 2.85 |

2. Benefits Related to Product and Service Markets

There is evidence the proposed rule would positively impact the markets for products and services in multiple ways. Studies show that new firm formation would rise under a prohibition on non-compete clauses, for two primary reasons: first, workers would be free to form spin-offs which compete with their employers, contributing to increased competition and growth. Second, firms are more willing to enter markets in which they know there are potential sources of skilled and experienced labor, unhampered by non-compete clauses.

Another possible benefit of the proposed rule related to markets for products and services is that worker flows across employers contribute to knowledge sharing, resulting in increased levels of innovation.

We note that, to the extent productivity increases of firms may be shared with workers, some of the benefits outlined in this Part VII.B.2 may overlap with the earnings estimates outlined above in Part VII.B.1.a. Similarly, to the extent harms to incumbent firms (due to, *e.g.,* increased competition) may negatively impact workers, those would also be reflected in the earnings estimates.

a. Increased Firm Formation and Competition

Intra-industry employee spinoffs (*i.e.,* firms formed by entrepreneurs who previously worked for a firm against which they now compete—also known as within-industry spinouts or WSOs) have been shown to be highly successful, on average, when compared with typical entrepreneurial ventures.[480] Non-compete clauses

typically reduce the prevalence of intra-industry spinoffs, and therefore prevent entrepreneurial activity that is likely to be highly successful. One estimate implies that a one-standard-deviation increase in non-compete clause enforceability decreases the rate of WSOs by 0.13 percentage points (against a mean of 0.4%).[481] The proposed prohibition, by extrapolation, would result in an overall increase in the rate of WSOs by 0.56 percentage points, which would more than double the rate of WSOs. We note this is a linear approximation and cannot account for heterogeneous effects of enforceability across states, nor can it account for nonlinearities in the impact of enforceability (as neither analysis is reported in the study).

The study also estimates the impact on the entry rate of non-WSOs (*i.e.,* spinoffs into other industries), and calculates a coefficient statistically indistinguishable from zero (0.07 percentage point increase associated with a one standard deviation increase in enforceability).[482]

Another study similarly estimates the impacts of non-compete clause enforceability on departures of employees to found new firms, as well as on all new firm entry.[483] These outcomes differ slightly from the ones previously reported: for employee departures to found new firms, the target industry of the employee spinoff is not reported (so the effect encompasses both within-industry and out-of-industry spinoffs). The latter outcome encompasses all new firm entry, not just spinoffs. There are pros and cons of this approach, relative to studying only spinoffs. On the one hand, it examines an outcome less likely to be directly impacted by non-compete clauses. On the other hand, if firms are encouraged to enter when non-compete clauses are more easily enforceable (due to, *e.g.,* greater projected protection of knowledge assets), then this approach will likely identify effects that may appear only weakly when looking just at spinoffs.

For each outcome, the estimated effect of an increase in non-compete clause enforceability (which is, in this study, measured by a collection of discrete legal changes) is negative: an increase in non-compete clause enforceability decreases the rate at which employees

leave to become founders of firms by 0.78 percentage points, against a mean in the sample of 5% (though the result is statistically indistinguishable from zero),[484] and decreases the rate of new firm entry by 0.06 firms per million people (against a mean of 0.38) for firms in the knowledge sector, compared with firms in other sectors (for which there is no statistically significant effect). Due to the design of the study, the change in legal enforceability is not quantified, and therefore no extrapolation is possible to the country as a whole.

Three more estimates related to firm entry exist in the literature. One examines the differential impacts of venture capital ("VC") funding on firm entry: it finds a 1% increase in VC funding increases business formation by 2.3% when non-compete clauses are not enforceable, and by 0.8% when non-compete clauses are enforceable.[485] Another study examined the extent to which a legal enforceability increase in Michigan affected firm entry, and found that, among all sectors, there was no change in the entry rate of new firms (none of the estimated coefficients were statistically significant).[486] Among high-tech firms, the increase in enforceability was associated with a 40.3% increase in entry when compared with states that did not enforce non-compete clauses. However, the study also notes that, compared with its neighbors, or using a statistical technique to match Michigan's trend in firm entry (synthetic control method), the estimated effect was statistically indistinguishable from zero. Finally, a study examining the effect of an increase in enforceability in Florida found small firm (fewer than 50 employees) entry fell by 5.6%, while large firm (greater than 1,000 employees) entry increased by 8.5%. Similarly, employment at large businesses rose by 15.8% following the change, while employment at smaller businesses effectively did not change.[487] The net effect was a 4.4% increase in concentration, as measured by a Herfindahl-Hirschman Index, due to the overall increase in the size of

---

[480] For reviews of the literature, *see, e.g.,* Steven Klepper, *Spinoffs: A Review and Synthesis,* 6

European Mgmt. Rev. 159–71 (2009) and April Franco, *Employee Entrepreneurship: Recent Research and Future Directions,* in Handbook of Entrepreneurship Research (2005) 81–96.

[481] Starr, Balasubramanian, & Sakakibara, *supra* note 87 at 561.

[482] *Id.* at 561.

[483] Jeffers (2019), *supra* note 92 at 1.

[484] The estimated effect is statistically significant at the 10% level, and nearly doubles to 0.014, when attention is focused on firms which employ at least 40% of workers in the state in which their headquarters resides. This is important because it ensures that a greater portion of the workforce is subject to the local non-compete clause policy regime: a broadly dispersed company has workers subject to many different legal policies surrounding non-compete clauses, and it is therefore not surprising that the estimate is unable to distinguish a large impact of the policy changes.

[485] Samila & Sorenson, *supra* note 112 at 425–38.

[486] Carlino, *supra* note 86.

[487] Kang & Fleming, *supra* note 120 at 674.

firms. It is important to note that firm entry, in this study, is not necessarily new business formation. Indeed, the authors describe many business entries into Florida are existing businesses which are seeking to move or establish new franchises. The observed effects may therefore be due to relocations across state lines, which would likely not occur under the proposed rule.

For the previously mentioned three sets of estimates, it is again difficult to extrapolate to a population-wide measure of impact, since the "size" of the enforceability change is not quantified.

In Part II.B.2.c above, the Commission states the weight of the evidence demonstrates new firm formation would increase under the proposed rule; however, the Commission is unable to extrapolate from the studies which examine this outcome in order to quantify or monetize the effect.

b. Innovation

Scholars have posited that a lack of non-compete clause enforceability led Silicon Valley to become a hub of technological innovation. One paper theorizes that, as workers freely flowed between knowledge firms, those workers shared ideas and generated innovations greater than what a fixed set of workers, not interacting with outside workers, could have generated.[488] Studies have shown labor mobility is greater when non-compete clauses are more difficult to enforce.[489] However, those same studies did not directly show innovation is aided by the free flow of knowledge workers.

If non-compete clauses inhibit innovation by creating barriers to knowledge-sharing, then a prohibition on non-compete clauses, by alleviating those barriers, would increase innovation. Studies have sought to directly quantify this effect, primarily focused on patenting activity.

One study examined the impact of non-compete clause enforceability on venture capital's relationship with innovation. The study found that, when non-compete clauses are enforceable, venture capital induced less patenting, by 6.6 percentage points.[490] Two other studies directly focused on the relationship between non-compete clause enforceability and patenting. One, examining seven changes in non-compete clause enforceability, finds a 26.6% decline in the value of patents (as

measured by changes in stock prices surrounding the date a patent is granted) associated with increases in non-compete clause enforceability.[491] The other, examining the impact of a legal change in enforceability in Michigan, finds an increase in non-compete clause enforceability leads to an increase in the number of patents per 10,000 residents of 0.054 (against a mean of 2.20 in Michigan prior to the legal change).[492] There is no clear reason for this discrepancy in findings. It may be due to the setting being studied: the study finding a 26.6% decline in patent value considers several legal changes in non-compete clause enforceability, rather than just using one (as in the Michigan study) or relying on cross-sectional differences (as in the study of venture capital).

While the Commission believes the strongest evidence (due to the robustness of the findings across several legal changes) indicates innovation would likely increase under the proposed rule, as described above in Part II.B.2.d, the Commission is unable to extrapolate from the relevant studies to quantify or monetize this benefit.

c. Prices

Several of the effects discussed above, as well as costs of the proposed rule on products and service markets, may possibly filter through to consumer prices. Prices, therefore, may act as a summary metric for the impacts on consumers. We note this metric is highly imperfect: for example, increased innovation due to the proposed rule could cause quality increases in products, which drives prices up. Consumers may be better off, even though prices increased. For this reason, as well as to avoid double-counting (since prices may take into account changes in innovation, investment, market structure, wages, and other outcomes), we consider evidence on prices to be corroborating evidence, rather than a unique cost or benefit on its own.

One study estimates the impact of non-compete clause enforceability on consumer prices in the market for physician services.[493] The study estimates moving from the lowest observed non-compete clause enforceability score to the highest would increase prices by 53.3%. Extrapolating to the effect of the proposed prohibition nationwide (using 2009 enforceability scores), and applying percentage price decreases to

state-level physician spending,[494] we estimate health spending would decrease by $148.0 billion annually. We note, again, this is a large (linear) extrapolation from the estimate provided in the study. Furthermore, this amount is partially a transfer from physician practices to consumers, and additionally, we reiterate this estimate likely encompasses some of the prior estimates (i.e., those regarding new firm formation or innovation), and we therefore do not count it as a standalone benefit of the proposed rule.

With respect to other industries, if the relationship between non-compete clause enforceability and prices observed in healthcare markets holds, the Commission believes prices would decrease, product and service quality would increase, or both under the proposed rule. Insofar as such effects may be driven by increases in competition (see Part VII.B.2.a), it is likely output would also increase. However, the evidence in the economic literature is solely based on healthcare markets (which do comprise a large portion of spending in the United States, but are far from all consumer spending), and while there is evidence that there are relationships between non-compete clause enforceability and concentration, innovation, new firm formation, and other product market outcomes, the Commission cannot say with certainty similar effects would be present for other products and services.

In many settings, it is theoretically plausible increases in worker earnings from restricting non-compete clauses may increase consumer prices by raising firms' costs (though there is countervailing evidence, especially in goods manufacturing).[495] We note an absence of empirical evidence that this mechanism persists in practice, as well as countervailing forces, such as the impacts on concentration described above and positive impacts on innovation (see Part II.B.2.d). Additionally, greater wages for workers freed from non-compete clauses may be due to better worker-firm matching, which could simultaneously increase wages and increase productivity, which

---

[488] Gilson, *supra* note 88.

[489] See, *e.g.*, Fallick, Fleischman, & Rebitzer, *supra* note 89 at 472–81; Johnson, Lavetti, & Lipsitz, *supra* note 42.

[490] Samila & Sorenson, *supra* note 112 at 432.

[491] He, *supra* note 124 at 22.

[492] Carlino, *supra* note 86 at 40.

[493] Hausman & Lavetti, *supra* note 101 at 258.

[494] The latest available numbers are from 2014. *See* Ctrs. for Medicare & Medicaid Servs., *National Health Expenditure Data, Health Expenditures by State of Provider, 1980–2014* (last visited Dec. 9, 2022), *https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccounts StateHealthAccountsProvider.* We use physician and clinical spending in 2014 by state of provider.

[495] Sebastian Heise, Fatih Karahan, & Ayşegül Şahin *The Missing Inflation Puzzle: The Role of the Wage-Price Pass-Through,* 54 J. Money, Credit & Banking 7 (2022).

could lead to lower prices. Finally, as described in Part II.B.2.a, increases in healthcare prices are not due to pass-through of greater labor costs.

*C. Estimated Costs of the Proposed Rule*

In this Part VII.C, we describe the costs associated with the proposed rule; provide preliminary quantitative, monetized estimates where possible; and describe costs we can only assess qualitatively. We welcome public comment regarding the scope of the costs outlined in this Part VII.C, especially with respect to direct compliance costs and the costs of updating contractual practices.

The Commission estimates firms' direct compliance costs and the costs of firms updating their contractual practices would total $1.02 to $1.77 billion. The Commission also finds worker training and firm investment in capital assets would likely decrease under the proposed rule. Finally, the Commission finds inconclusive evidence that the job creation rate would diminish under the proposed rule. Given the evidence available, the Commission is unable to monetize the estimates of worker training, firm investment in capital assets, and job creation, however.

1. Direct Compliance Costs

In order to comply with the proposed rule, firms must remove non-compete clauses from workers' contracts in two ways. First, to comply with proposed § 910.2(a), which states it is an unfair method of competition to maintain with a worker a non-compete clause, firms would need to no longer include non-compete clauses in the contracts of incoming workers, which may include revising existing employment contracts. Second, to comply with proposed § 910.2(b)(1) and (2), firms would need to rescind existing non-compete clauses no later than the compliance date and provide notice to workers that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.

In order to reduce compliance costs and increase compliance certainty, proposed § 910.2(b)(3) would provide that an employer complies with the rescission requirement in proposed § 910.2(b)(1) where it provides notice to a worker pursuant to § 910.2(b)(2). Furthermore, proposed § 910.2(b)(2)(C) includes model language which may be provided to the worker in order to inform the worker that their non-compete clause is no longer in effect. We estimate composing and sending this message in a digital format to all of a firm's workers and applicable former

workers would take 20 minutes of a human resources specialist's time. According to the Bureau of Labor Statistics, the median wage for a human resources specialist was $29.95 per hour in 2021.[496] The cost of compliance for currently employed workers is therefore $29.95/3=$9.98 per firm. According to the U.S. Census Bureau's Statistics of U.S. Businesses database, in 2019 (the most recent year with data available), there were 6.10 million firms and 7.96 million establishments in the United States.[497] We estimate the percentage of firms using non-compete clauses in the U.S. at 49.4%. This estimate is based on Colvin and Shierholz's 2017 survey of business establishments. Colvin and Shierholz estimate 49% of establishments of more than 50 employees use non-compete clauses for at least some of their employees, and 32% of establishments use non-compete clauses for all of their employees.[498]

Conservatively assuming each establishment must engage in its own communication (*i.e.,* that a firm's headquarters does not have the ability to send a company-wide email, for example), this means the total direct compliance cost for rescinding existing non-compete clauses and providing notice is $9.98*7.96 million*0.494=$39.25 million.

To ensure incoming workers' contracts do not include non-compete clauses and they fully comply with the proposed rule, firms may employ in-house counsel, outside counsel, or human resource specialists (depending on the complexity of the relevant non-compete clause). For many firms, this process would likely be straightforward (*i.e.,* simply not using non-compete clauses or removing one section from a boilerplate contract). For other firms, it may be more difficult and require more time. We assume that, on average, ensuring contracts for incoming workers do not have non-compete clauses would take the equivalent of one hour of a lawyer's time (valued at $61.54),[499] resulting in a total cost of $61.54*7.96 million*0.494=$241.96 million. We acknowledge there may be substantial heterogeneity in the costs for individual

firms; however, we believe this number is conservative. For firms whose costs of removing non-compete clauses for incoming workers is greater, the work of ensuring contracts comply with the law would overlap substantially with the costs of updating contractual practices, described in the next section.

2. Costs of Updating Contractual Practices

Firms may seek to update their contractual practices by expanding the scope of non-disclosure agreements (NDAs) or other contractual provisions to ensure they are expansive enough to protect trade secrets and other valuable investments. To do so, firms may use in-house counsel or outside counsel to examine and amend current contracts or enter into new contracts with workers.

The Commission is not aware of empirical evidence on how much it costs firms to update their contractual practices when they can no longer use non-compete clauses. However, there is evidence indicating firms that use non-compete clauses are already using other types of restrictive employment provisions. Firms may be doing so because, among other things, they are uncertain whether a non-compete clause will be enforceable, or because they desire the additional protections NDAs and other types of restrictive employment provisions can offer. Balasubramanian et al. find that 97.5% of workers with non-compete clauses are also subject to a non-solicitation agreement, non-disclosure agreement, or a non-recruitment agreement, and 74.7% of workers with non-compete clauses are also subject to all three other types of provisions.[500] Firms that are already using multiple layers of protection may not need to expand the scope of existing restrictive employment provisions or enter into new ones.

Among the approximately one half of firms that use non-compete clauses,[501] we assume the average firm employs the equivalent of four to eight hours of a lawyer's time to update their contractual practices. We emphasize this is an average to underline the fact that there would likely be large differences in the extent to which firms update their contractual practices. Many firms, including those which use non-compete clauses only with workers who do not

---

[496] *See* Bureau of Lab. Stats., *Occupational Outlook Handbook, Human Resources Specialists, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm.*

[497] The dataset is available at U.S. Census Bureau, *2019 SUSB Annual Data Tables by Establishment Industry, https://www.census.gov/data/tables/2019/econ/susb/2019-susb-annual.html* (last visited Dec. 9, 2022).

[498] Alexander J.S. Colvin & Heidi Shierholz, Econ. Pol'y Inst., *Noncompete Agreements* (2019) at 1.

[499] Bureau of Lab. Stats., *Occupational Outlook Handbook: Lawyers, https://www.bls.gov/ooh/legal/lawyers.htm.*

[500] Balasubramanian, Starr, & Yamaguchi, supra note 40 at 35. We calculate 97.5% as (1–0.6%/ 24.2%), where 0.6% represents the proportion of workers with only a non-compete clause, and no other post-employment restriction, and 24.2% represents the proportion of workers with a non-compete clause, regardless of what other post-employment restrictions they have.

[501] Colvin & Shierholz, *supra* note 498 at 1.

have access to sensitive information, or those which are already using other types of restrictive employment provisions to protect sensitive information, may opt to do nothing. Other firms may employ several hours or multiple days of lawyers' time to arrive at a new contract.[502] Our estimated range of four to eight hours represents an average taken across these different possibilities. For example, if two-thirds of firms that currently use non-compete clauses opt to make no changes to their contractual practices (for example, because they are one of the 97.5% of firms which already implement other post-employment restrictions, or because they will rely on trade secret law in the future, or because they are using non-compete clauses with workers who do not have access to sensitive information), and one-third of such firms spend (on average) the equivalent of 1.5 to 3 days of an attorney's time, this would result in the estimate of 4–8 hours on average reported above.

We further emphasize this estimate is an average across all employers that would be covered by the rule. There is likely substantial heterogeneity in the amount of time firms would use to update contractual practices; very large firms that use non-compete clauses extensively would likely incur greater costs.

Under the assumption the average firm that uses a non-compete clause employs the equivalent of four to eight hours of a lawyer's time, we calculate the total expenditure on updating contractual practices to range from $61.54*4*49.4%*6,102,412=$742.07 million to $61.54*8*49.4%*6,102,412=$1.48 billion. Note that we assume decisions regarding protection of sensitive information and contract updating are made at the firm, rather than establishment, level, since sensitive information is likely shared across business establishments of a firm. The Commission seeks comment on this estimate.

### 3. Firm Investment

Non-compete clauses may impact investments made by firms in multiple ways.[503] First, a firm may anticipate a greater return on investment in a worker with a non-compete clause—since the worker is unable to take the skills they attain to a competitor—and may therefore provide greater levels of

training. Second, since non-compete clauses increase worker training, firms may increase investment that complements human capital when they are able to use non-compete clauses. Third, non-compete clauses decrease competition, which increases returns on investment at the firm level, inducing additional investment at the firm level. This increased investment at the firm level does not necessarily mean, however, investment would increase at the market level, since decreased competition may also decrease output, decreasing employed capital stock and investment in that capital stock.

Once again, the costs described in this section may overlap with estimates reported in preceding sections. For example, if increased enforceability of non-compete clauses increases training of workers, and increased training results in higher wages for workers, then the estimate of the wage decrease when enforceability increases already takes into account the extent to which increased training increases wages. That is, if training were held constant, the earnings increase associated with the proposed rule would likely be even larger.

With respect to worker training, one study finds that an increase in the non-compete clause enforceability index of one standard deviation (across states) results in an increase in the number of workers who reported receiving training of 14.7% for workers in occupations which use non-compete clauses at a high rate, relative to those in which non-compete clauses are used at a low rate.[504] Extending this estimate to the U.S. workforce implies that, on average, 3.1% fewer workers would receive training in a given year, as a result of the proposed rule.[505]

An estimate of the impact of non-compete clause enforceability on firm investment in capital assets implies that an increase in enforceability leads to an

increase in firms' net investment to asset ratio of 1.3 percentage points (against a mean of 3.5%). The magnitude of the enforceability increase which is associated with this change is not quantified according to the scale above, however, so it is not possible to extend this estimate to the population. Additionally, the estimate is constructed at the firm level, and it is not possible to extrapolate the estimate to the market level, given potential changes in the composition of the market associated with changes in non-compete clause enforceability.

The proposed rule may also impact the extent to which trade secrets are shared with workers. Non-compete clauses are commonly justified as a means by which firms are able to protect trade secrets, which may allow those trade secrets to be shared more freely with workers, positively impacting productivity. However, to the best of our knowledge, there is no available evidence on this topic which would allow us to quantify or monetize the cost, or identify whether it exists in practice.

### 4. Job Creation Rates

While non-compete clauses may, in theory, incentivize firms to create jobs by increasing the value associated with any given worker covered by a non-compete clause, the evidence is inconclusive. One estimate indicates the job creation rate at startups increased by 7.8% when Michigan increased non-compete clause enforceability.[506] However, the job creation rate calculated in this study is the ratio of jobs created by startups to overall employment in the state: therefore, the job creation rate at startups may rise either because the number of jobs created by startups rose, or because employment overall fell. The study does not investigate which of these two factors drives the increase in the job creation rate at startups.

Another study finds that several increases in non-compete clause enforceability were associated with a 1.4% increase in average employment at new firms.[507] However, the authors attribute the increase in average employment to a change in the composition of newly founded firms. The increases in enforceability prevented the entry of relatively small startups which would otherwise have existed. The remaining firms which entered were therefore larger on average: this increases the average job creation

---

[502] These estimates are derived from outreach to employment attorneys active in assisting firms in writing their non-compete clauses.

[503] For more discussion, see Jeffers (2019), *supra* note 92; Starr (2019), *supra* note 66 at 783–817.

[504] Starr (2019), *supra* note 66 at 796. Estimates are taken from Table 4, Column 4.

[505] The total training decrease is calculated as the weighted average (where weights are equal to employment in 2020, the latest year available, taken from *https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm*) over all states of:

$$(e^{-0.0077*(\text{State's Enforceability Score} - \text{Lowest State Enforceability Score})} - 1)$$

This calculation assumes that all workers are subject to the decrease in training, as opposed to calculating the decrease to those in high-use occupations versus those in low-use occupations. The benefit of this approach is that it yields a total predicted training decrease for the economy as a whole, rather than a comparison between different types of workers. However, it is likely an overestimate for workers in low-use occupations, and an underestimate for those in high-use occupations. It is the same methodology used to calculate earnings increases in Part VII.B.1.a for the estimate drawn from the same study.

[506] Carlino, *supra* note 86 at 16.

[507] Starr, Balasubramanian, & Sakakibara, *supra* note 87 at 561.

rate at new firms, because the average entering firm is relatively larger. However, in terms of total jobs created, it means that increases in enforceability generate fewer total jobs, if the mechanism identified by the authors is correct. A similar mechanism may explain the results in both studies above. If that is indeed the case, then an increased job creation rate among startups is not a cost of the proposed rule. Instead, it could actually be a benefit (albeit unquantifiable), since non-compete clauses prevent small firms from existing in the first place. The Commission therefore believes that, with respect to job creation rates, the evidence is inconclusive: it is unclear whether the negative results have causes which are actually benign, or even positive.

5. Litigation Costs

The proposed rule would likely reduce litigation costs associated with non-compete clauses, since there would be little to no uncertainty that the vast majority of those clauses are prohibited. However, it is also possible that costs associated with trade secret claims or other post-employment restrictions, such as non-disclosure agreements or non-solicitation agreements, would increase. The Commission is not aware of any evidence indicating the magnitude of the change in litigation costs associated with any of these claims, and it is therefore not clear whether the net impact on litigation costs would be a benefit or a cost of the proposed rule. The Commission seeks comment on the impact the rule would have on litigation costs.

*D. Discussion of Alternatives*

In Part VI of this NPRM, the Commission describes several alternatives to the proposed rule. Here, we discuss the extent to which implementation of each of these alternatives would change the analysis of benefits and costs presented above.

We treat Alternatives 1 and 3 first. Under Alternative 1, the rule would categorically ban the use of non-compete clauses for some workers and apply a rebuttable presumption of unlawfulness to non-compete clauses for other workers. For example, the rule could ban non-compete clauses generally, but apply the rebuttable presumption to workers who qualify for the FLSA exemptions for executives or learned professionals.[508] Or the rule could ban non-compete clauses but apply the rebuttable presumption to

workers who earn more than $100,000 per year. Under Alternative 3, non-compete clauses for all workers would be subject to a rebuttable presumption of illegality.

There are two primary ways in which a rebuttable presumption of illegality, rather than a prohibition, could affect the benefits and costs associated with the proposed rule. First, a rebuttable presumption may decrease costs associated with the proposed rule by allowing employers to use non-compete clauses in situations in which the true benefits of non-compete clauses exceed the costs. In other words, the non-compete clauses which survive a rebuttable presumption may contribute to economic efficiency to the extent a court is able to identify efficiency-enhancing non-compete clauses.

Second, a rebuttable presumption could increase costs by forcing cases involving non-compete clauses to be litigated more frequently, since the line defining a permissible non-compete clause would be less bright. Additionally, there may be situations in which the presumption would likely hold (*i.e.*, a given non-compete clause is likely prohibited under the presumption), but which are not fought by workers, fearing they might lose the case. In such cases, any costs and benefits associated with non-compete clauses (such as those outlined in the preceding sections) would accrue to the economy.

The two impacts of a change from a prohibition to a rebuttable presumption would likely be more drastic for workers above the threshold (for whom the presumption would be rebuttable under Alternative 1), as compared with those additional workers for whom the presumption would be rebuttable under Alternative 3. For the latter set of workers, there are fewer plausible cases in which the presumption would be rebutted, since higher-paid workers typically have access to greater levels of sensitive information. This means there is a smaller efficiency gain to be had from allowing non-compete clauses which could plausibly rebut the presumption; however, it also means there would likely be fewer litigated cases since there would be fewer marginal non-compete clauses. Therefore, the effect of moving from the proposed rule to Alternative 1 is likely more substantial than the effect of moving from Alternative 1 to Alternative 3.

The effects of Alternatives 2 and 4 may be analyzed similarly. Under Alternative 2, the rule would categorically ban the use of non-compete clauses for some workers and

not apply any requirements to other workers. For example, like the recent State of Washington statute, the rule could prohibit the use of non-compete clauses for employees earning $100,000 or less per year and independent contractors earning less than $250,000 or less per year. Or, like the recent Massachusetts and Rhode Island statutes, the rule could prohibit the use of non-compete clauses for workers who are non-exempt under the FLSA.[509] Under Alternative 4, the rule would apply a rebuttable presumption of unlawfulness to non-compete clauses for some workers and not apply any requirements to other workers. Workers above the threshold are most likely to be those workers for whom firm investment and training are valuable, but they are also often uniquely positioned to found new firms, since they hold knowledge gained by working in their industry. Therefore, a large portion of the benefits associated with the proposed rule would be lost if workers above the threshold were not covered; however, a large portion of the costs would also be lost, since the need to restructure contracts to protect sensitive information would no longer be present for those workers, and firms would continue to train and invest in those workers in the same way they currently do. Additionally, the earnings effects for relatively lower-wage workers appear to be less, based on empirical work, though the legal changes analyzed were not perfectly comparable. This could indicate, again, there are more substantial benefits to be had from prohibiting non-compete clauses for workers above the threshold based on harms to labor markets, compared with workers below the threshold.

The alternative under which the rule would use a different standard for senior executives, discussed in Part VI.C, would yield similar effects to the analyses discussed above. If a rebuttable presumption were applied to senior executives, if there are some non-compete clauses that are efficient, and if courts are able to appropriately identify efficient non-compete clauses, then some non-compete clauses would likely be used (and may survive challenges) which are indeed efficient. On the other hand, costs associated with legal challenges would likely increase due to an increased frequency of legal challenges associated with a less bright line. If no requirement is applied to senior executives, then a large portion of the benefit of the proposed rule, as it applies to senior executives, would be lost: benefits associated with increased

---

[508] *See supra* notes 423–424 and accompanying text.

[509] *See supra* Part VI.B.2.

product market competition and benefits associated with increased labor market competition. The costs of restructuring contracts, however, would be lost, as well.

Another alternative, discussed in Part VI.D, concerns whether non-compete clauses between a franchisor and a franchisee would be covered by the proposed rule. As noted in Part VI.D, evidence concerning the impact of prohibiting non-compete clauses between franchisors and franchisees does not exist. The Commission is therefore unable to estimate the extent to which the costs and benefits which would result from the proposed rule covering those parties would be similar to those resulting from prohibiting worker non-compete clauses.

### E. Other Major Effects

There are two substantial equity concerns associated with the proposed rule which are not captured above. The first relates to the economic outcomes of women and racial and ethnic minorities. Non-compete clauses may affect women and racial and ethnic minorities more negatively than other workers. For example, firms may use the monopsony power which results from use of non-compete clauses as a means by which to wage discriminate, or women (who may exhibit greater risk aversion, in practice [510]) may be more reluctant to start businesses when non-compete clauses are enforceable. One estimate indicates that gender and racial wage gaps would close by 3.6–9.1% under a nationwide prohibition on non-compete clauses.[511] Another estimate indicates the negative impact of non-compete clause enforceability on within-industry entrepreneurship is 15% greater for women than for men.[512]

The second equity concern related to non-compete clauses is that workers may not be willing to file lawsuits against deep-pocketed employers to challenge their non-compete clauses, even if they predict a high probability of success. The proposed rule would substantially mitigate this concern by enacting a bright-line prohibition, which the Commission could enforce. This would mitigate uncertainty for workers and would be especially helpful for relatively low-paid workers,

for whom access to legal services may be prohibitively expensive.

## VIII. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to either provide an Initial Regulatory Flexibility Analysis (IRFA) with a proposed rule or certify that the proposed rule would not have a significant impact on a substantial number of small entities.[513] The Commission does not expect the proposed rule, if adopted, would have a significant impact on a substantial number of small entities.

Although small entities across all industrial classes—*i.e.,* all North American Industry Classification System (NAICS) codes—would be affected, the estimated impact on each entity would be relatively small. The Small Business Administration (SBA) states that, as a rule of thumb, the impact of a proposed rule could be significant if the cost of the proposed rule (a) eliminates more than 10% of the businesses' profits; (b) exceeds 1% of the gross revenues of the entities in a particular sector, or (c) exceeds 5% of the labor costs of the entities in the sector.[514] As calculated in Part VIII.D, the Commission estimates direct compliance costs and the costs of updating contractual practices would result in costs of $317.68 to $563.84 for single-establishment firms. These costs would only exceed these sample limits if the average profit of regulated entities is $3,177 to $5,638, average revenue is $31,768 to $56,384, or average labor costs are $6,353 to $11,276, respectively. Furthermore, while there are additional nonmonetizable costs associated with the proposed rule, there are also nonmonetizable benefits which would at least partially offset those costs, as explained above in Part VII.

Although the Commission certifies under the RFA that the proposed rule would not have a significant impact on a substantial number of small entities, and hereby provides notice of that certification to the SBA, the Commission has determined it is appropriate to publish an IRFA in order to describe the impact of the proposed rule on small entities. The Commission seeks comment on all aspects of the IRFA in this Part VIII.

### A. Reasons for the Proposed Rule

The Commission describes the reasons for the proposed rule above in Part IV.

### B. Statement of Objectives and Legal Basis

The Commission describes the objectives and legal basis for the proposed rule above in Part IV and the legal authority for the rule above in Part III.

### C. Description and Estimated Number of Small Entities to Which the Rule Would Apply

The proposed rule would impact all small businesses, across all industry classes, that use non-compete clauses. The Commission does not expect there are classes of businesses that would face disproportionate impacts from the proposed rule.

For the vast majority of industries, there is no granular data regarding the percentage of firms that use non-compete clauses (which could then be used to calculate the number of small entities in that industry using non-compete clauses). Due to this data limitation and given the relatively stable percentage of firms using non-compete clauses across the size distribution,[515] we estimate the total number of small firms across all industries in the U.S. economy. We then calculate the number of firms estimated to use non-compete clauses by applying an estimate of the percentage of firms using non-compete clauses to that total. Using the size standards set by the SBA,[516] we calculate that there are 5.95 million small firms and 6.24 million small establishments in the U.S.[517] Assuming

---

[510] *See, e.g.,* Catherine C. Eckel & Philip J. Grossman, *Men, Women and Risk Aversion: Experimental Evidence, Handbook of Experimental Economics Results* 1 (2008) 1061–073 and Gary Charness & Uri Gneezy, *Strong Evidence For Gender Differences in Risk Taking,* 83 J. Econ. Behavior & Org. 50–58 (2012).

[511] Johnson, Lavetti, & Lipsitz, *supra* note 63 at 38.

[512] Marx (2021), *supra* note 118 at 8.

[513] 5 U.S.C. 603–605.

[514] Small Bus. Admin., *A Guide for Government Agencies: How to Comply With the Regulatory Flexibility Act* (August 2017) (hereinafter RFA Compliance Guide) at 19.

[515] *See* Colvin & Shierholz, *supra* note 498 at 5. We emphasize that, since smaller firms generally use non-compete clauses at a lower rate, based on the numbers reported in Table 1, our estimate of the number of affected small entities is likely larger than is true in practice.

[516] See Small Bus. Admin., *Table of Size Standards, https://www.sba.gov/document/support-table-size-standards.*

[517] We use the latest data available from the U.S. Census Bureau's Statistics of U.S. Businesses database, available based on firm revenue and firm size. U.S. Census Bureau, *Statistics of U.S. Businesses (SUSB), https://www.census.gov/programs-surveys/susb.html* (last visited Dec. 9, 2022). We deflate to current dollars using Historical Table 10.1. Off. of Mgmt. & Budget, *Historical Tables, https://www.whitehouse.gov/omb/budget/historical-tables/* (last visited Dec. 9, 2022). As used in this analysis, per the U.S. Census Bureau, "a firm is a business organization consisting of one or more domestic establishments in the same geographic area and industry that were specified under common ownership or control." On the other hand, "an establishment is a single physical location at which business is conducted or services or industrial operations are performed." *See* U.S. Census Bureau, *Glossary, https://www.census.gov/programs-surveys/susb/about/glossary.html.*

49.4% of firms or establishments use non-compete clauses,[518] we estimate 2.94 million small firms, comprising 3.08 million small establishments, would be affected by the proposed rule. Since our estimate spans differential use of non-compete clauses across industries (in the absence of more detailed data), these firms span all industries and various sizes below the standards set in the SBA's size standards.

*D. Projected Reporting, Recordkeeping, and Other Compliance Requirements*

As calculated in Parts VIII.D.1 and VIII.D.2, the Commission estimates the direct compliance costs and the costs of updating contractual practices would total $246.16 to $492.32 for each small firm, plus an additional $71.52 for each establishment owned by that firm. A single-establishment firm, for example, would bear estimated costs of $317.68 to $563.84, for example.

As described in greater detail in Part VII.C.3, the Commission also finds worker training and firm investment in capital assets would likely decrease under the proposed rule. Finally, as described in greater detail in Part VII.C.4, the Commission finds mixed evidence that the job creation rate would diminish under the proposed rule. Given the evidence available, the Commission is unable to monetize the estimates of worker training, firm investment in capital assets, and job creation, however.

1. Direct Compliance Costs

In order to comply with the proposed rule, small entities must remove non-compete clauses from workers' contracts in two ways. First, to comply with proposed § 910.2(a), which states it is an unfair method of competition to maintain with a worker a non-compete clause, small entities would need to no longer include non-compete clauses in the contracts of incoming workers, which may include revising existing employment contracts. Second, to comply with proposed § 910.2(b)(1) and (2), small entities would need to rescind existing non-compete clauses no later than the compliance date and provide notice to workers that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.

In order to reduce compliance costs and increase compliance certainty, proposed § 910.2(b)(3) would provide that an employer complies with the rescission requirement in proposed § 910.2(b)(1) where it provides notice to

a worker pursuant to § 910.2(b)(2). Furthermore, proposed § 910.2(b)(2)(C) includes model language which may be provided to the worker in order to inform the worker that their non-compete clause is no longer in effect. We estimate composing and sending this message in a digital format to all of a firm's workers and applicable former workers would take 20 minutes of a human resources specialist's time. According to the Bureau of Labor Statistics, the median wage for a human resources specialist was $29.95 per hour in 2021.[519] The cost of compliance for currently employed workers is therefore $29.95/3=$9.98 per firm. As calculated in Part VIII.C, we estimate there are 2.94 million small firms, comprising 3.08 million small establishments, in the United States which use non-compete clauses.[520] Conservatively assuming that each establishment must engage in its own communication (*i.e.,* a firm's headquarters does not have the ability to send a company-wide email, for example), this means the total direct compliance cost for workers who are already employed is $9.98*3.08 million=$30.74 million.

To ensure incoming workers' contracts do not include non-compete clauses and they fully comply with the proposed rule, firms may employ in-house counsel, outside counsel, or human resource specialists (depending on the complexity of the relevant non-compete clause). For many firms, this process would likely be straightforward (*i.e.,* simply not using non-compete clauses or removing one section from a boilerplate contract). For other firms, it may be more difficult and require more time. We assume that, on average, ensuring contracts for incoming workers do not have non-compete clauses would take the equivalent of one hour of a lawyer's time (valued at $61.54),[521] resulting in a total cost of $61.54*3.08 million=$189.54 million. We acknowledge there may be substantial heterogeneity in the costs for individual firms; however, we believe this number is conservative. For firms whose costs of removing non-compete clauses for incoming workers is greater, the work of ensuring that contracts comply with the law would overlap substantially with

the costs of updating contractual practices, described in the next section.

For each establishment of each firm, we estimate direct compliance costs would total $9.98+$61.54=$71.52.

2. Costs of Updating Contractual Practices

Firms may seek to update their contractual practices by expanding the scope of non-disclosure agreements (NDAs) or other contractual provisions to ensure they are expansive enough to protect trade secrets and other valuable investments. To do so, firms may use in-house counsel or outside counsel to examine and amend current contracts or enter into new contracts with workers.

The Commission is not aware of empirical evidence on how much it costs firms to update their contractual practices when they can no longer use non-compete clauses. However, there is evidence indicating firms that use non-compete clauses are already using other types of restrictive employment provisions. Firms may be doing so because, among other things, they are uncertain whether a non-compete clause will be enforceable, or because they desire the additional protections NDAs and other types of restrictive employment provisions can offer. Balasubramanian et al. find that 97.5% of workers with non-compete clauses are also subject to a non-solicitation agreement, non-disclosure agreement, or a non-recruitment agreement, and 74.7% of workers with non-compete clauses are also subject to all three other types of provisions.[522] Firms already using multiple layers of protection may not need to expand the scope of existing restrictive employment provisions or enter into new ones.

Among the approximately one half of firms that use non-compete clauses,[523] we assume the average firm employs the equivalent of four to eight hours of a lawyer's time to update their contractual practices. We emphasize this as an average to underline the likelihood of large differences in the extent to which firms update their contractual practices. Many firms, including those which use non-compete clauses only with workers who do not have access to sensitive information, or those which are already using other types of restrictive employment provisions to protect

---

[518] *See* Colvin & Shierholz, *supra* note 498 at 1.

[519] *See* U.S. Bureau of Lab. Stats., *Occupational Outlook Handbook, Human Resources Specialists, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm.*

[520] The dataset is available at U.S. Census Bureau, *2019 SUSB Annual Data Tables by Establishment Industry, https://www.census.gov/data/tables/2019/econ/susb/2019-susb-annual.html,* (last visited Dec. 9, 2022).

[521] U.S. Bureau of Lab. Stats., *Occupational Outlook Handbook, Lawyers, https://www.bls.gov/ooh/legal/lawyers.htm.*

[522] Balasubramanian, Starr, & Yamaguchi, supra note 40 at 35. We calculate 97.5% as (1−0.6%/24.2%), where 0.6% represents the proportion of workers with only a non-compete clause, and no other post-employment restriction, and 24.2% represents the proportion of workers with a non-compete clause, regardless of what other post-employment restrictions they have.

[523] Colvin & Shierholz, *supra* note 498 at 1.

sensitive information, may opt to do nothing. Other firms may employ several hours or multiple days of lawyers' time to arrive at a new contract.[524] Our estimated range of four to eight hours represents an average taken across these different possibilities. For example, if two-thirds of firms that currently use non-compete clauses opt to make no changes to their contractual practices (for example, because they are one of the 97.5% of firms which already implement other post-employment restrictions, or because they will rely on trade secret law in the future, or because they are using non-compete clauses with workers who do not have access to sensitive information), and one-third of such firms spend (on average) the equivalent of 1.5 to 3 days of an attorney's time, this would result in the estimate of 4–8 hours on average reported above.

We further emphasize this estimate is an average across all employers that would be covered by the rule. There is likely substantial heterogeneity in the amount of time firms would use to update contractual practices; very large firms that use non-compete clauses extensively would likely incur greater costs.

Under the assumption the average firm that uses a non-compete clause employs the equivalent of four to eight hours of a lawyer's time, we calculate the total expenditure on updating contractual practices to range from $61.54*4*2.94 million=$723.7 million to $61.54*8*2.94 million=$1.45 billion. Note that we assume decisions regarding protection of sensitive information and contract updating are made at the firm, rather than establishment, level, since sensitive information is likely shared across business establishments of a firm. The Commission seeks comment on this estimate.

For each firm, we estimate the cost of updating contractual practices would be $61.54*4=$246.16 to $61.54*8=$492.32.

*E. Identification of Duplicative, Overlapping, or Conflicting Federal Rules*

The Commission is not aware of any duplicative, overlapping, or conflicting federal rules. As described above in Part II.C.1, the enforceability of a non-compete clause currently depends on state law. Non-compete clauses are also subject to federal antitrust law. However, the Commission is not aware of any federal regulations that would

duplicate, overlap, or conflict with the proposed rule.

*F. Discussion of Significant Alternatives*

In Part VI above, the Commission discusses significant alternatives to the proposed rule. Part VI also includes a preliminary assessment of whether each of the significant alternatives would accomplish the objectives of the proposed rule. In addition, the Commission's analysis of benefits and costs in Part VII includes an assessment of the benefits and costs of various alternatives.[525]

The Commission is not proposing an exemption for small entities or different regulatory requirements for small entities. The proposed rule would provide it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or, under certain circumstances, to represent to a worker that the worker is subject to a non-compete clause.[526] For the reasons described above in Part IV, the Commission is proposing to provide these practices are an unfair method of competition under Section 5. Based on the available evidence, the Commission does not believe the analysis in Part IV above is fundamentally different for non-compete clauses imposed by small entities. For this reason, the Commission is not proposing an exemption for small entities or different regulatory requirements for small entities. The Commission seeks comment on whether it should propose a small entity exemption or different requirements for small entities, including whether non-compete clauses used by small entities are less likely to have the anticompetitive effects described in Part IV.A above, and whether employers that are small entities are less likely than other employers to have alternatives available for protecting their investments, as described in Part IV.B above.

The Commission is also not proposing a delayed compliance date for small entities. Under proposed § 910.5, compliance with the proposed rule would be required as of the proposed compliance date, which would be 180 days after publication of the final rule in the **Federal Register**.[527] In the Commission's preliminary view, this proposed compliance period would afford small entities a sufficient period of time to comply with the proposed

rule.[528] The Commission seeks comment on whether this is the case.

**IX. Paperwork Reduction Act**

Under the Paperwork Reduction Act of 1995 (PRA),[529] federal agencies must obtain approval from the Office of Management and Budget (OMB) for each collection of information they conduct or sponsor. The term ''collection of information'' includes any requirement or request for persons to obtain, maintain, retain, report, or publicly disclose information.[530] Under the PRA, the Commission may not conduct or sponsor, and, notwithstanding any other provision of law, a person is not required to respond to, an information collection unless the information collection displays a valid control number assigned by OMB.[531]

The Commission believes the proposed rule would contain a disclosure requirement that would constitute a collection of information requiring OMB approval under the PRA. Proposed § 910.2(a) would state it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or, under certain circumstances, represent to a worker that the worker is subject to a non-compete clause. Proposed § 910.2(b)(1) would state that, to comply with § 910.2(a), an employer that entered into a non-compete clause with a worker prior to the compliance date must rescind the non-compete clause no later than the compliance date.

Proposed § 910.2(b)(2)—the provision that would contain the disclosure requirement that would require OMB approval—would require employers to provide a notice to workers in certain circumstances. Specifically, proposed § 910.2(b)(2)(A) would require an employer that rescinds a non-compete clause pursuant to § 910.2(b)(1) to provide notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker. Proposed § 910.2(b)(2)(A) would also state the employer must provide the notice to the worker in an individualized communication and the employer must provide the notice on paper or in a digital format such as, for example, an email or text message. Proposed § 910.2(b)(2)(B) would state the employer must provide the notice to a

---

[524] These estimates are derived from outreach to employment attorneys active in assisting firms in writing their non-compete clauses.

[525] *See supra* Part VII.D.

[526] *See* proposed § 910.2(a).

[527] *See* proposed § 910.5.

[528] *See supra* Part V, in the section-by-section analysis for proposed § 910.5.

[529] 44 U.S.C. 3501 *et seq.*

[530] 44 U.S.C. 3502(3); 5 CFR 1320.3(c).

[531] 44 U.S.C. 3506(c)(1)(B); 5 CFR 1320.5(a)(3).

worker who currently works for the employer. Proposed § 910.2(b)(2)(B) would also state that the employer must also provide the notice to a worker who formerly worked for the employer, provided the employer has the worker's contact information readily available. Finally, proposed § 910.2(b)(2)(C) would provide model language that would satisfy the notice requirement. Proposed § 910.2(b)(2)(C) would also state that an employer may also use different language, provided the notice communicates to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.

The Commission estimates composing and sending this message in a digital format to all workers would take 20 minutes of a human resources specialist's time. According to the Bureau of Labor Statistics, the median wage for a human resources specialist in 2021 was $29.95 per hour.[532] The cost of compliance for currently employed workers is therefore $29.95/3 = $9.98 per firm. According to the U.S. Census Bureau's Statistics of U.S. Businesses database, in 2019 (the most recent year for which data are available), there were 6.10 million firms and 7.96 million establishments in the United States.[533] The Commission estimates the percentage of firms using non-compete clauses in the United States at 49.4%.[534] This yields an estimated 3,932,240 covered establishments. Conservatively assuming that each establishment must engage in its own communication—*i.e.,* a firm's headquarters does not have the ability to send a company-wide email, for example—this means covered employers would incur an estimated labor cost burden of 1,310,747 hours to comply with this requirement (3,932,240 establishments × 20 minutes). The Commission estimates the associated labor cost for notifying affected workers who are already employed is $9.98 × 7.96 million × 0.494 = $39,243,755.

The proposed rule would impose only *de minimis* capital and non-labor costs. The Commission anticipates covered employers already have in place existing systems to communicate with and provide employment-related disclosures to workers. While the proposed rule would require a one-time disclosure to some workers subject to a rescinded non-compete clause, the Commission anticipates this one-time disclosure would not require substantial investments in new systems or other non-labor costs. Moreover, many establishments are likely to provide the disclosure electronically, further reducing total costs.

The Commission invites comments on: (1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information would have practical utility; (2) the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (3) ways to enhance the quality, utility, and clarity of the information to be collected; and (4) ways to minimize the burden of these information collections on respondents. The Commission seeks comment on all aspects of this Part IX.

Comments on the proposed reporting requirements subject to Paperwork Reduction Act review by OMB should additionally be submitted to *www.reginfo.gov/public/do/PRAMain.* Find this particular information collection by selecting "Currently under 30-day Review—Open for Public Comments" or by using the search function. The *reginfo.gov* web link is a United States Government website operated by OMB and the General Services Administration (GSA). Under PRA requirements, OMB's Office of Information and Regulatory Affairs (OIRA) reviews federal information collections.

## X. Request for Comment

You can file a comment online or on paper. For the Commission to consider your comment, we must receive it on or before March 20, 2023. Write "Non-Compete Clause Rulemaking, Matter No. P201200" on your comment. Your comment—including your name and your state—will be placed on the public record of this proceeding, including the *https://www.regulations.gov* website.

Because of the public health emergency in response to the COVID–19 outbreak and the agency's heightened security screening, postal mail addressed to the Commission will be subject to delay. We strongly encourage you to submit your comments online through the *https://www.regulations.gov* website. To ensure the Commission considers your online comment, please follow the instructions on the web-based form.

If you file your comment on paper, write "Non-Compete Clause Rulemaking, Matter No. P201200" on your comment and on the envelope, and mail your comment to the following address: Federal Trade Commission, Office of the Secretary, 600 Pennsylvania Avenue NW, Suite CC–5610 (Annex C), Washington, DC 20580.

Because your comment will be placed on the publicly accessible website at *https://www.regulations.gov,* you are solely responsible for making sure your comment does not include any sensitive or confidential information. In particular, your comment should not include any sensitive personal information, such as your or anyone else's Social Security number; date of birth; driver's license number or other state identification number, or foreign country equivalent; passport number; financial account number; or credit or debit card number. You are also solely responsible for making sure your comment does not include any sensitive health information, such as medical records or other individually identifiable health information. In addition, your comment should not include any "trade secret or any commercial or financial information which . . . is privileged or confidential"—as provided by 15 U.S.C. 46(f) and 16 CFR 4.10(a)(2)—including, in particular, competitively sensitive information such as costs, sales statistics, inventories, formulas, patterns, devices, manufacturing processes, or customer names.

Comments containing material for which confidential treatment is requested must be filed in paper form, must be clearly labeled "Confidential," and must comply with 16 CFR 4.9(c). In particular, the written request for confidential treatment that accompanies the comment must include the factual and legal basis for the request, and must identify the specific portions of the comment to be withheld from the public record. Your comment will be kept confidential only if the General Counsel grants your request in accordance with the law and the public interest. Once your comment has been posted publicly at *https://www.regulations.gov*—as legally required by 16 CFR 4.9(b)—we cannot redact or remove your comment, unless you submit a confidentiality request that meets the requirements for such treatment under FTC Rule 4.9(c) and the General Counsel grants that request.

Visit the Commission's website, *www.ftc.gov,* to read this NPRM and the fact sheet describing it. The FTC Act and other laws the Commission administers permit the collection of

---

[532] U.S. Bureau of Lab. Stats., *Occupational Outlook Handbook: Human Resources Specialists, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm.*

[533] U.S. Census Bureau, 2019 SUSB Annual Data Tables by Establishment Industry (February 2022), *https://www.census.gov/data/tables/2019/econ/susb/2019-susb-annual.html* (last visited Dec. 9, 2022).

[534] *See* Colvin & Shierholz, *supra* note 498 at 4.

**JA0218**

public comments to consider and use in this proceeding as appropriate. The Commission will consider all timely and responsive public comments that it receives on or before March 20, 2023. For information on the Commission's privacy policy, including routine uses permitted by the Privacy Act, see *https://www.ftc.gov/site-information/privacy-policy.*

## XI. Communications by Outside Parties to Commissioners or Their Advisors

Written communications and summaries or transcripts of oral communications respecting the merits of this proceeding, from any outside party to any Commissioner or Commissioner's advisor, will be placed on the public record, per 16 CFR 1.26(b)(5).

## List of Subjects in 16 CFR Part 910 Antitrust

■ For the reasons set forth above, the Federal Trade Commission proposes to add a new subchapter J, consisting of part 910, to chapter I in title 16 of the Code of Federal Regulations to read as follows:

### Subchapter J—Rules Concerning Unfair Methods of Competition

## PART 910—NON–COMPETE CLAUSES

Sec.
910.1.   Definitions.
910.2.   Unfair methods of competition.
910.3.   Exception.
910.4.   Relation to State laws.
910.5.   Compliance date.

**Authority:** 15 U.S.C. 45 and 46(g).

### § 910.1   Definitions.

(a) *Business entity* means a partnership, corporation, association, limited liability company, or other legal entity, or a division or subsidiary thereof.

(b) *Non-compete clause,* as used in this part:

(1) *M*eans a contractual term between an employer and a worker that prevents the worker from seeking or accepting employment with a person, or operating a business, after the conclusion of the worker's employment with the employer.

(2) The term non-compete clause includes a contractual term that is a *de facto* non-compete clause because it has the effect of prohibiting the worker from seeking or accepting employment with a person or operating a business after the conclusion of the worker's employment with the employer. For example, the following types of contractual terms, among others, may be *de facto* non-compete clauses:

(i) A non-disclosure agreement between an employer and a worker that is written so broadly that it effectively precludes the worker from working in the same field after the conclusion of the worker's employment with the employer.

(ii) A contractual term between an employer and a worker that requires the worker to pay the employer or a third-party entity for training costs if the worker's employment terminates within a specified time period, where the required payment is not reasonably related to the costs the employer incurred for training the worker.

(c) *Employer* means a person, as defined in 15 U.S.C. 57b–1(a)(6), that hires or contracts with a worker to work for the person.

(d) *Employment* means work for an employer, as the term employer is defined in paragraph (c) of this section.

(e) *Substantial owner, substantial member,* and *substantial partner* mean an owner, member, or partner holding at least a 25 percent ownership interest in a business entity.

(f) *Worker* means a natural person who works, whether paid or unpaid, for an employer. The term includes, without limitation, an employee, individual classified as an independent contractor, extern, intern, volunteer, apprentice, or sole proprietor who provides a service to a client or customer. The term worker does not include a franchisee in the context of a franchisee-franchisor relationship; however, the term worker includes a natural person who works for the franchisee or franchisor. Non-compete clauses between franchisors and franchisees would remain subject to Federal antitrust law as well as all other applicable law.

### § 910.2   Unfair methods of competition.

(a) *Unfair methods of competition.* It is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker; maintain with a worker a non-compete clause; or represent to a worker that the worker is subject to a non-compete clause where the employer has no good faith basis to believe that the worker is subject to an enforceable non-compete clause.

(b) *Existing non-compete clauses.*

(1) *Rescission requirement.* To comply with paragraph (a) of this section, which states that it is an unfair method of competition for an employer to maintain with a worker a non-compete clause, an employer that entered into a non-compete clause with a worker prior to the compliance date must rescind the non-compete clause no later than the compliance date.

(2) *Notice requirement.*

(i) An employer that rescinds a non-compete clause pursuant to paragraph (b)(1) of this section must provide notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker. The employer must provide the notice to the worker in an individualized communication. The employer must provide the notice on paper or in a digital format such as, for example, an email or text message. The employer must provide the notice to the worker within 45 days of rescinding the non-compete clause.

(ii) The employer must provide the notice to a worker who currently works for the employer. The employer must also provide the notice to a worker who formerly worked for the employer, provided that the employer has the worker's contact information readily available.

(iii) The following model language constitutes notice to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker, for purposes of paragraph (b)(2)(i) of this section. An employer may also use different language, provided that the notice communicates to the worker that the worker's non-compete clause is no longer in effect and may not be enforced against the worker.

**Figure 1 to Paragraph (b)(2)(iii)—Model Language**

BILLING CODE 6750–01–P

---

A new rule enforced by the Federal Trade Commission makes it unlawful for us to maintain a non-compete clause in your employment contract. As of [DATE 180 DAYS AFTER DATE OF PUBLICATION OF THE FINAL RULE], the non-compete clause in your contract is no longer in effect. This means that once you stop working for [EMPLOYER NAME]:

- You may seek or accept a job with any company or any person—even if they compete with [EMPLOYER NAME].

- You may run your own business—even if it competes with [EMPLOYER NAME].

- You may compete with [EMPLOYER NAME] at any time following your employment with [EMPLOYER NAME].

The FTC's new rule does not affect any other terms of your employment contract. For more information about the rule, visit [*link to final rule landing page*].

---

BILLING CODE 6750–01–C

(3) *Safe harbor.* An employer complies with the rescission requirement in paragraph (b)(1) of this section where it provides notice to a worker pursuant to paragraph (b)(2) of this section.

### § 910.3   Exception.

The requirements of this part 910 shall not apply to a non-compete clause that is entered into by a person who is selling a business entity or otherwise disposing of all of the person's ownership interest in the business entity, or by a person who is selling all or substantially all of a business entity's operating assets, when the person restricted by the non-compete clause is a substantial owner of, or substantial member or substantial partner in, the business entity at the time the person enters into the non-compete clause. Non-compete clauses covered by this exception would remain subject to Federal antitrust law as well as all other applicable law.

### § 910.4   Relation to State laws.

This part 910 shall supersede any State statute, regulation, order, or interpretation to the extent that such statute, regulation, order, or interpretation is inconsistent with this part 910. A State statute, regulation, order, or interpretation is not inconsistent with the provisions of this part 910 if the protection such statute, regulation, order, or interpretation affords any worker is greater than the protection provided under this part 910.

### § 910.5   Compliance date.

Compliance with this part 910 is required as of [DATE 180 DAYS AFTER DATE OF PUBLICATION OF THE FINAL RULE].

By direction of the Commission, Commissioner Wilson dissenting.

**April J. Tabor,**

*Secretary.*

**Note:** the following statements will not appear in the Code of Federal Regulations.

**Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya**

Today the Federal Trade Commission is proposing a rule that would prohibit businesses from using noncompete clauses in contracts with workers. Noncompete clauses generally restrict a company's workers from working for—or launching—a competitor for a period of time even after they have stopped working for that company. Researchers estimate that about one in five American workers is bound by a noncompete clause.

By design, noncompetes often close off a worker's most natural alternative employment options: jobs in the same geographic area and professional field. These restrictions can undermine core economic liberties, burdening Americans' ability to freely switch jobs.[1]

[1] *Pollock* v. *Williams,* 322 U.S. 4, 17–18 (1944) (describing the "right to change employers" as a critical "defense against oppressive hours, pay, working conditions, or treatment").

JA0220

A recent Commission action illustrates the real-life stakes: Prudential, a security company in Michigan, enforced noncompetes against its workers, including security guards earning near-minimum wage.[2] These noncompetes included a $100,000 liquidated damages clause. On multiple occasions, Prudential sued former employees who left for competitors offering higher wages. In one case, Prudential successfully pressured a competitor to fire one of those new hires. Media reports document countless other instances in which Americans who wish to change jobs—be it to pursue a better opportunity, to escape harassment, or to express disagreement with new workplace policies—are trapped in place by noncompete clauses.

Notably, the aggregate economic impact of noncompete clauses goes beyond any individual worker. Initiatives by several states to limit the use of noncompetes has given researchers the opportunity to closely study their effects. The Notice of Proposed Rulemaking (NPRM) published today carefully reviews the empirical evidence available to date and highlights several key findings.[3]

First, noncompete clauses reduce competition in labor markets, suppressing earnings and opportunity even for workers who are not directly subject to a noncompete. When workers subject to noncompete clauses are blocked from switching to jobs in which they would be better paid and more productive, unconstrained workers in that market are simultaneously denied the opportunity to replace them. This collective decline in job mobility means fewer job offers and an overall drop in wages, as firms have less incentive to compete for workers by offering higher pay, better benefits, greater say over scheduling, or more favorable conditions. The FTC estimates that the proposed ban on noncompetes would increase workers' total earnings by close to $300 billion per year.[4]

Second, the existing evidence indicates that noncompete clauses reduce innovation and competition in product and service markets. Studies show that locking workers in place reduces innovation, likely by decreasing the flow of information and knowledge among firms. By preventing workers from starting their own businesses and limiting the pool of talent available for startups to hire, noncompetes also limit entrepreneurship and new business formation. This in turn reduces product quality while raising prices. Indeed, existing evidence from the health care sector suggests that the proposed ban would decrease consumer prices, potentially to the tune of $150 billion a year.[5]

A recent Commission action shows how depriving new businesses of access to skilled workers can thwart competition. In the highly concentrated glass manufacturing sector, incumbent firms imposed noncompetes on thousands of employees. These noncompetes locked up highly specialized workers, tending to impede the entry and expansion of rivals by depriving them of access to qualified employees.[6]

The empirical evidence available to date, coupled with the Commission's years of work on noncompetes, forms the basis for the proposed rule.[7] The proposal determines that employers' use of noncompetes is an unfair method of competition under Section 5 of the FTC Act. It recognizes that noncompetes may be unlawful in different contexts for different reasons; for example, employers' use of noncompetes to bind low-wage workers may be coercive and unfair in ways that the use of noncompetes to bind senior executives is not. Still, the proposal concludes that, in the aggregate, employers' use of noncompetes undermines competition across markets in ways that are harmful to workers and consumers and warrant a prohibition.

The proposed rule also draws on key lessons learned from state efforts to limit or ban the use of noncompetes. For example, research shows that some employers continue to use noncompetes even in states that have declared them null and void. As a result, workers in states where noncompetes are unenforceable are about as likely to have one in their contract as workers in other states.[8] In practice this causes confusion and uncertainty for workers about whether they are bound by an enforceable noncompete, which can dissuade them from seeking or accepting another job. To address this, the proposed rule would both prohibit employers from representing to workers

---

[2] Complaint, *In re Prudential Security, Inc.*, File No. 221–0026 (Jan. 4, 2022), *https://www.ftc.gov/ system/files/ftc_gov/pdf/ 2210026prudentialsecuritycomplaint.pdf*; *see* Press Release, Fed. Trade Comm'n, FTC Cracks Down on Companies That Impose Harmful Noncompete Restrictions on Thousands of Workers (Jan. 4, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers*.

[3] Notice of Proposed Rulemaking for Non-Compete Clause Rule ("NPRM"), Part II.B (Jan. 5, 2023).

[4] *See* NPRM Part VII.B.1 (describing the Commission's assessment of the benefits of the proposed rule).

[5] Drawing from a study on the financial industry, Commissioner Wilson suggests that suspending noncompetes here caused higher prices and more employee misconduct. *See* Umit G. Gurun, Noah Stoffman & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218 (2021). Notably, under the proposed rule, firms will still have contractual methods to protect their client lists, unlike the firms observed in this study, which were prohibited from using non-solicitation agreements in addition to noncompete clauses. Furthermore, the change in the financial industry may have curtailed beneficial entrepreneurship, since it only covered mobility of workers between member firms, and therefore continued to permit some noncompete clauses which could prevent workers from starting their own businesses.

[6] Complaint, *In re O-I Glass, Inc.*, File No. 211–0182 (Jan. 4, 2023), *https://www.ftc.gov/system/ files/ftc_gov/pdf/2110182o-iglasscomplaint.pdf*; Complaint, *In re Ardagh Group S.A.*, File No. 211–0182 (Jan. 4, 2023), *https://www.ftc.gov/system/ files/ftc_gov/pdf/2110182ardaghcomplaint.pdf*; *see* Press Release, Fed. Trade Comm'n, FTC Cracks Down on Companies That Impose Harmful Noncompete Restrictions on Thousands of Workers (Jan. 4, 2023), *https://www.ftc.gov/news-events/ news/press-releases/2023/01/ftc-cracks-down-companies-impose-harmful-noncompete-restrictions-thousands-workers*.

[7] The Commission has conducted extensive public outreach relating to noncompete clauses. *See, e.g.*, Fed. Trade Comm'n, *Hearings on Competition and Consumer Protection in the 21st Century*, *https://www.ftc.gov/enforcement-policy/ hearings-competition-consumer-protection* (including discussion of noncompete agreements during the Oct. 15–17, 2018 and June 12, 2019 hearings, and inviting public comment on topics

including "the use of non-competition agreements and the conditions under which their use may be inconsistent with the antitrust laws"); Fed. Trade Comm'n, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues* (Jan. 9, 2020), *https://www.ftc.gov/news-events/events/2020/01/non-competes-workplace-examining-antitrust-consumer-protection-issues*; Fed. Trade Comm'n, *Making Competition Work: Promoting Competition in Labor Markets* (Dec. 6–7, 2021), *https://www.ftc.gov/news-events/events/ 2021/12/making-competition-work-promoting-competition-labor-markets*; Fed. Trade Comm'n, *Solicitation for Public Comments on Contract Terms that May Harm Competition* (Aug 5, 2021), *https://www.regulations.gov/document/FTC-2021-0036-0022*. The FTC has also focused on noncompete clauses in connection with its merger review work. *See* Press Release, Fed. Trade Comm'n, FTC Approves Final Order Restoring Competitive Markets for Gasoline and Diesel in Michigan and Ohio (Aug. 9, 2022), *https:// www.ftc.gov/news-events/news/press-releases/2022/ 08/ftc-approves-final-order-restoring-competitive-markets-gasoline-diesel-michigan-ohio*; Press Release, Fed. Trade Comm'n, FTC Approves Final Order Imposing Strict Limits on Future Mergers by Dialysis Service Provider DaVita, Inc. (Jan. 12, 2022), *https://www.ftc.gov/news-events/news/press-releases/2022/01/ftc-approves-final-order-imposing-strict-limits-future-mergers-dialysis-service-provider-davita-inc*; Press Release, Fed. Trade Comm'n, FTC Approves Final Order Requiring Divestitures of Hundreds of Retail Gas and Diesel Fuel Stations Owned by 7-Eleven, Inc. (Nov. 10, 2021), *https://www.ftc.gov/news-events/news/press-releases/2021/11/ftc-approves-final-order-requiring-divestitures-hundreds-retail-gas-diesel-fuel-stations-owned-7*.

[8] Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 81 (2021).

that they are covered by a noncompete clause and require them to actively notify workers presently covered that these clauses are now void and cannot be enforced.

Action by federal enforcers is particularly appropriate here given that the harms from noncompetes flow across state lines. Many labor markets are spread across more than one state, and product markets are typically multistate as well, so the use of noncompetes in one state can harm workers and consumers in others. Moreover, employers may seek to circumvent state laws restricting noncompetes through the use of choice-of-law provisions and forum selection clauses, so that one state's lenient approach to noncompetes may have spillover effects into other states.[9]

The Federal Trade Commission is particularly well suited to this task. Congress designed the FTC to be an expert administrative agency that could enforce the prohibition against unfair methods of competition through rulemaking as well as through case-by-case adjudication. Although the Commission has primarily pursued antitrust enforcement through adjudication, rulemaking can deliver several benefits—including greater legal clarity and predictability, greater administrability and efficiency of enforcement, and greater public participation and airing of a maximally broad range of viewpoints and criticisms.[10]

Several factors seem to make noncompetes especially ripe for enforcement through rulemaking rather than adjudication, including the magnitude and scope of the apparent harms. Private litigation in this area may also be limited, given that there is no

private right of action under Section 5 of the FTC Act—and that arbitration clauses and class action waivers in employment contracts often can functionally preclude lawsuits by workers.

Moreover, the FTC has notable expertise in this area. The Commission began deepening its work on noncompetes under Chairman Joseph Simons four years ago. Since then, the agency has held multiple workshops and sought and received public comments on three separate occasions. Our staff have closely studied the available economic research and reviewed hundreds of comments from employers, advocates, trade associations, members of Congress, state and local officials, unions, and workers.

In her dissent, Commissioner Wilson questions the Commission's authority to engage in "unfair methods of competition" rulemaking.[11] But the rulemaking authority we are exercising today is firmly rooted in the text and structure of the FTC Act and supported both by judicial precedent interpreting the scope of the law as well as further statutory language from the 1970s.[12]

Commissioner Wilson also suggests that the Commission's authority for the NPRM will be challenged under the major questions doctrine, which the Supreme Court recently applied in *West Virginia* v. *EPA*. Here, however, the FTC is operating under clear statutory authority. Identifying and addressing unfair methods of competition is central to the mandate that Congress gave the Commission in the text of our authorizing statute. Indeed, a greater threat to the "vesting of federal legislative power in Congress" would be for this Commission to repudiate or ignore Congress's clear direction to the Commission to consider rules to address unfair methods of competition.[13]

This proposal is the first step in the FTC's rulemaking process. It identifies several potential alternative rules, including those that would cover only a subset of workers or that would apply different legal standards to different categories of workers. Receiving input from a broad set of market participants, including those who have experienced firsthand the effects of noncompete clauses, will be critical to our efforts. I urge members of the public to review our proposal and submit comments.

A few topics are especially worthy of close consideration. First, should the rule apply different standards to noncompetes that cover senior executives or other highly paid workers? As the NPRM notes, these workers may be less vulnerable to coercion, but restraining them through noncompetes may still harm competition—for example, by making it harder and more expensive for potential entrants to recruit individuals for leadership positions. I am keen for input on this question, including on how any such category of workers should be defined and what standards should be applied. For example, if the Commission were to adopt a "rebuttable presumption" of illegality for noncompetes affecting these workers, what showing should be required to overcome the presumption?

Second, should the rule cover noncompetes between franchisors and franchisees? The current proposal does not cover noncompetes used by franchisors to restrict franchisees, but we recognize that in some cases they may raise concerns that are analogous to those raised by noncompetes between employers and workers. We welcome the public's views on this topic, as well as data or other evidence that could inform our consideration of this issue.

Third, what tools other than noncompetes might employers use to

---

[9] Non-compete clauses often contain choice-of-law provisions designating a particular state's law for resolution of any future disputes. *See* Gillian Lester & Elizabeth Ryan, *Choice of Law and Employee Restrictive Covenants: An American Perspective*, 31 Comp. Lab. & Pol'y J. 389, 396–402 (2010). Some non-compete clauses include forum selection clauses, which specify the court and location where any dispute will be heard. *Id.* at 402–04. When contracting with workers in states with relatively stringent non-compete laws, companies may include choice-of-law and forum-selection provisions that designate jurisdictions with less stringent non-compete laws. The default rule under conflict-of-laws principles is that the court honors the parties' choice of law, meaning that the burden is on the worker to argue that the law of a different forum should apply. *Id.* at 394.

[10] *See, e.g.*, Rohit Chopra & Lina Khan, *The Case for "Unfair Methods of Competition" Rulemaking*, 87 U. Chi. L. Rev. 357 (2020); *Nat'l Petroleum Refiners Ass'n* v. *FTC*, 482 F.2d 672, 683 (D.C. Cir. 1973) (noting that "utilizing rule-making procedures opens up the process of agency policy innovation to a broad range of criticism, advice and data that is ordinarily less likely to be forthcoming in adjudication").

[11] Commissioner Wilson argues that our enforcement actions are in direct tension with a Seventh Circuit decision, *Snap-On Tools Corp.* v. *FTC*, 321 F.2d 825 (7th Cir. 1963). *Snap-On Tools* is distinguishable on several fronts, including the fact that it concerned noncompetes used in the business-to-business context, not those used by an employer to restrict its workers. Additionally, while the majority stated that it is "not prepared to say that [the termination restriction] is a per se violation of the antitrust laws," *id.* at 837, the Commission did not argue for a per se rule and so the issue was not litigated. *Id.* at 830–31; *id.* at 839 (Hastings, C.J., dissenting). Notably, the question before the Seventh Circuit was *not* whether the noncompete clause itself constituted an unfair method of competition. The Commission had held that the termination restriction provision was unlawful because it was used as an enforcement mechanism to ensure compliance with the other provisions. *Id.* at 836–37. Thus, once the court found that the other restrictive provisions in the agreement were lawful, it also held that the clause restricting competition upon termination did not violate the FTC Act. *Id.* at 837.

[12] The plain text of the FTC Act clearly authorizes the Commission to issue rules. Specifically, Section 6(g) enables the agency to "make rules and regulations for the purpose of carrying out the provisions" of the law. Several other provisions support the conclusion that Section 6(g) confers substantive rulemaking authority. For instance, Section 18 explicitly preserves "any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce." The D.C. Circuit endorsed this plain reading of 6(g) in *Petroleum Refiners*, 482 F.2d at 698, when it considered and rejected an argument that Section 6(g) only authorized the FTC to promulgate procedural or interpretive rules. *Petroleum Refiners* is the only case that directly addresses the FTC's Section 6(g) rulemaking authority. This holding—that the FTC may "promulgate rules defining the meaning of the statutory standards of the illegality [the agency was] empowered to prevent," *id.* at 698—represents the current state of the law.

[13] *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2617 (2022) (Gorsuch, J., concurring).

protect valuable investments, and how sufficient are these alternatives? The proposal identifies several potential mechanisms that employers may use—including trade secrets law and confidentiality agreements—and we preliminarily find that these alternatives reasonably achieve the goal of protecting investments without unduly burdening competition. We welcome feedback on the Commission's preliminary analysis of this issue.

I am deeply grateful to staff in the Office of Policy Planning, the Bureau of Competition, the Bureau of Economics, and the Office of General Counsel for their careful and thorough work on this proposal. I am also grateful to the many scholars, advocates, and journalists whose work in recent years has shed light on the proliferation of noncompetes and the resulting harms that can manifest.

While the NPRM is just the first step toward a final rule, it marks the Commission's commitment to exercising the full set of tools and authorities that Congress gave us and to ensuring that our work is protecting all Americans. I look forward to working closely with my colleagues to continue this critical effort.

## Statement of Commissioner Slaughter Joined by Commissioner Alvaro M. Bedoya

One of the great privileges of working at the Federal Trade Commission is the opportunity—and responsibility—we have to help real people in their everyday lives. We offer that help not only when we challenge massive mergers but also when we tackle the myriad smaller ways in which people are denied agency and autonomy. When we fight fraud, manipulative business opportunities, anticompetitive schemes, and bogus fees, we help restore meaningful choice and dignity to consumers and workers. These principles are the bedrock of a democratic society, but too often they are denied to Americans who are not rich and powerful. Addressing the scourge of noncompete clauses that restrict the job mobility of workers advances our mission by ensuring that workers have the chance to compete to earn a fair wage and family-supporting benefits.

I am therefore pleased to support the Commission's Notice of Proposed Rulemaking ("NPRM") on the Noncompete Clause Rule under Sections 5 and 6(g) of the Federal Trade Commission Act. I am grateful to the cross-agency team who worked on this NPRM and thank them for their hard work and collaborative drafting process.

I also want to thank the civil-society organizations and academics who filed a petition with the FTC in 2019 calling for a rulemaking to address noncompetes in employment contracts.[1] This petition increased the awareness of and knowledge about the issue not only within the agency but also with the public more broadly. That heightened focus was on display in the FTC's noncompete workshop in January 2020.[2] As I did at that workshop, I again thank the labor community for engaging with the competition community to tackle the pocketbook issues that sit at the intersection of labor and antitrust law and that have profound effects on workers.[3] Several years of activity by the Commission related to noncompete clauses in employment contracts have culminated in this NPRM, which is another milestone in our effort to more thoroughly incorporate labor competition and effects on workers into our antitrust law analyses.

I write separately to emphasize two points. First, noncompete clauses, and the restrictions they place on workers regarding their future employment or business creation, are deeply troubling. Based on the research discussed in the NPRM, they have serious ramifications for individual workers and labor competition broadly, as well as for consumers. Although sometimes referred to as noncompete "agreements," they rarely represent actual agreements. Instead, they are often imposed on workers with no ability to bargain as a condition of employment. Even when noncompetes have been ruled unenforceable by courts or outlawed by legislation, firms continue to use them, as was alleged in a recent case the FTC settled over noncompetes imposed on minimum wage-earning security guards.[4]

Workers restrained by noncompetes are unable to pursue certain job opportunities and are therefore deprived of higher wages and more favorable working conditions and benefits. Similarly, businesses that need to hire workers are inhibited from attracting and hiring noncompete-restrained workers through better working conditions, pay, and benefits.[5] Even more alarming is the evidence that shows noncompetes reduce earnings for workers not individually bound by them.[6] Studies also show reduced entrepreneurship, new-business formation, or both when workers are inhibited by noncompetes.[7] Finally, American consumers can suffer from noncompete clauses through paying higher prices for lower-quality goods and services.[8] For all these reasons, it is clear that it is more than appropriate for the FTC to use our rulemaking authority under Sections 5 and 6(g) to address noncompete clauses in employment contracts.

Second, I strongly encourage the public to share their lived experiences and perspectives with the Commission. I have heard personally about how noncompete clauses can strike fear into workers and make them anxious about their livelihoods. These stories come from a variety of different industries and

[1] Open Markets Inst. et al., Petition for Rulemaking to Prohibit Worker Non-Compete Clauses (March 20, 2019), *https://static1.squarespace.com/static/5e449c8c3ef68d752f3e70dc/t/5eaa04862ff52116d1dd04c1/1588200595775/Petition-for-Rulemaking-to-Prohibit-Worker-Non-Compete-Clauses.pdf*.

[2] Fed. Trade Comm'n, Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues, *https://www.ftc.gov/news-events/events/2020/01/non-compete-clauses-workplace-examining-antitrust-consumer-protection-issues*.

[3] *Remarks of FTC Commissioner Rebecca Kelly Slaughter*, New Decade, New Resolve to Protect and Promote Competitive Markets for Workers, FTC Workshop on Non-Compete Clauses in the Workplace (Jan. 9, 2020), *https://www.ftc.gov/system/files/documents/public_statements/1561475/slaughter_-_noncompete_clauses_workshop_remarks_1-9-20.pdf*.

[4] In the Matter of Prudential Security, Inc., a corporation; Prudential Command Inc., a corporation; Greg Wier, a natural person; and Matthew Keywell, FTC Matter/File Number

2210026 (January 4, 2023), Complaint ¶ 22, *https://www.ftc.gov/legal-library/browse/cases-proceedings/2210026-prudential-security-et-al-matter;* Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya In the Matters of Prudential Security, O–I Glass Inc., and Ardagh Group S.A, January 4, 2023, *https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-chair-lina-m-khan-joined-commissioners-slaughter-bedoya-matters-prudential-security-o-i*.

[5] Notice of Proposed Rulemaking, Non-Compete Clause Rule, Part II.B.1.

[6] *See* Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, The Labor Market Effects of Legal Restrictions on Worker Mobility 2 (2020), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381;* Evan Starr, Justin Frake, & Rajshree Agarwal, *Mobility Constraint Externalities*, 30 Org. Sci. 961, 6 (2019).

[7] *See* Sampsa Samila & Olav Sorenson, Noncompete Covenants: Incentives to Innovate or Impediments to Growth, 57 Mgmt. Sci. 425, 432 (2011); Jessica Jeffers, The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship 22 (2019), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3040393;* Evan Starr, Natarajan Balasubramanian, & Mariko Sakakibara, Screening Spinouts? How Noncompete Enforceability Affects the Creation, Growth, and Survival of New Firms, 64 Mgmt. Sci. 552, 561 (2018).

[8] *See* Naomi Hausman & Kurt Lavetti, Physician Practice Organization and Negotiated Prices: Evidence from State Law Changes, 13 a.m. Econ. J. Applied Econ. 258, 284 (2021); Michael Lipsitz & Mark Tremblay, Noncompete Agreements and the Welfare of Consumers 6 (2021), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3975864*.

professions, from fast-food workers to family physicians.[9] Public input from individuals who are or who have been bound by noncompetes and from firms that use them is a critically important step in the rulemaking process, and it will help the Commission weigh the proposed broad ban on noncompete clauses as well as the alternative approaches discussed in the NPRM. I look forward to working with my fellow Commissioners to achieve a just outcome that promotes fair competition.

## Dissenting Statement of Commissioner Christine S. Wilson

Today, the Commission announced a notice of proposed rulemaking ("NPRM") for a Non-Compete Clause Rule. "The proposed rule would provide that it is an unfair method of competition—and therefore a violation of Section 5—for an employer to enter into or attempt to enter into a non-compete clause with a worker; [or to] maintain with a worker a non-compete clause . . ." [1] For the many reasons described below, on the current record, I do not support initiating the proposed rulemaking and consequently dissent.

The proposed Non-Compete Clause Rule represents a radical departure from hundreds of years of legal precedent that employs a fact-specific inquiry into whether a non-compete clause is unreasonable in duration and scope, given the business justification for the restriction. The Commission undertakes this radical departure despite what appears at this time to be a lack of clear evidence to support the proposed rule. What little enforcement experience the agency has with employee non-compete provisions is very recent (within the last week) and fails to demonstrate harm to consumers and competition. Lacking enforcement experience, the Commission turns to academic literature—but the current record shows that studies in this area are scant, contain mixed results, and provide insufficient support for the scope of the proposed rule. And one study illustrates clearly, in the financial services sector, the negative unintended consequences of suspending non-compete provisions, including higher fees and broker misconduct. The suspension of non-competes across all industry sectors in the U.S. undoubtedly will impose a

much larger raft of unintended consequences.

Setting aside the substance of the rule, the Commission's competition rulemaking authority itself certainly will be challenged. The NPRM is vulnerable to meritorious challenges that (1) the Commission lacks authority to engage in "unfair methods of competition" rulemaking, (2) the major questions doctrine addressed in *West Virginia* v. *EPA* applies, and the Commission lacks clear Congressional authorization to undertake this initiative; and (3) assuming the agency does possess the authority to engage in this rulemaking, it is an impermissible delegation of legislative authority under the non-delegation doctrine, particularly because the Commission has replaced the consumer welfare standard with one of multiple goals. In short, today's proposed rule will lead to protracted litigation in which the Commission is unlikely to prevail.

The NPRM invites public comment on both a sweeping ban on non-competes and various alternatives pursuant to the Administrative Procedure Act, not the Magnuson-Moss Act. Stakeholders should note that this solicitation for public comment is likely the only opportunity they will have to provide input not just on the proposed ban, but also on the proposed alternatives. For this reason, I encourage all interested parties to respond fully to all parts of the NPRM's solicitation of public comments.

## Non-Compete Clauses Merit Fact-Specific Inquiry

Based on the current record, non-compete clauses constitute an inappropriate subject for rulemaking. The competitive effects of a non-compete agreement depend heavily on the context of the agreement, including the business justification that prompted its adoption. But don't take my word for it—the need for fact-specific inquiry aligns with hundreds of years of precedent. When assessing the legality of challenged non-compete agreements, state and federal courts (and English courts before them) have examined the duration and scope of non-compete clauses, as well as the asserted business justifications, to determine whether non-compete clauses are unreasonable and therefore unenforceable.[2]

The NPRM itself acknowledges, at least implicitly, the relevance of the circumstances surrounding adoption of

non-compete clauses. For example, the NPRM proposes an exception to the ban on non-compete clauses for provisions associated with the sale of a business, acknowledging that these non-compete clauses help protect the value of the business acquired by the buyer.[3] Recognizing that senior executives typically negotiate many facets of their employment agreements, the NPRM distinguishes situations in which senior executives are subject to non-compete provisions.[4] And to stave off potential legal challenges, the NPRM proposes more carefully tailored alternatives to a sweeping ban on non-compete clauses that instead would vary by employee category.

Despite the importance of context and the need for fact-specific inquiries, the Commission instead applies the approach of the newly issued Section 5 Policy Statement[5] to propose a near-complete ban on the use of non-compete clauses. Pursuant to this approach, the Commission invokes nefarious-sounding adjectives—here, "exploitive and coercive"—and replaces the evaluation of actual or likely competitive effects with an unsubstantiated conclusion about the "tendency" for the conduct to generate negative consequences by "affecting consumers, workers or other market participants." [6]

Using the approach of the Section 5 Policy Statement that enables the majority summarily to condemn conduct it finds distasteful, the Commission today proposes a rule that prohibits conduct 47 states have chosen

---

[9] *See People of the State of Ill.* v. *Jimmy John's Enters., LLC, No. 2016–CH–07746 (Cook County Cir. Ct. filed June 8, 2016); See also Kurt Lavetti, Carol Simon, & William D. White, The Impacts of Restricting Mobility of Skilled Service Workers Evidence from Physicians, 55 J. Hum. Res. 1025, 1042 (2020).*

[1] Notice of Proposed Rulemaking for Non-Compete Clause Rule ("NPRM") Part I (Jan. 5, 2023).

[2] *See, e.g., United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271, 281 (6th Cir. 1898) (Taft, J.), aff'd in relevant part, 175 U.S. 211 (1899); *Mitchel* v. *Reynolds,* 1 P. Wms. 181 (1711).

[3] NPRM Part V, Section 910.3.

[4] Accordingly, the Commission seeks comments on whether senior executives should be treated differently from the proposed ban on non-compete clauses. *See* NPRM Parts IV.A.1.b, IV.A.1.c. In a similar vein, recent consent agreements issued for public comment that prohibit the use of non-compete agreements in the glass container industry do not prohibit non-compete clauses for senior executives and employees involved in research and development. *See* O–I Glass, Inc., File No. 211–0182, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110182o-iglassdraftorderappxa.pdf* (Jan. 4, 2023) (Decision and Order Appendix A); Ardagh Glass Group S.A., File No. 211–0182, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110182ardaghdraftorderappxa.pdf* (Jan. 4, 2023) (Decision and Order Appendix A); Christine S. Wilson, Comm'r, Fed. Trade Comm'n, Dissenting Statement regarding In the Matter of O–I Glass, Inc. and In the Matter of Ardagh Group S.A. (Jan. 4, 2023), *https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/dissenting-statement-commissioner-christine-s-wilson-regarding-matters-o-i-glass-inc-ardagh-group-sa.*

[5] Fed. Trade Comm'n, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/p221202sec5enforcementpolicystatement_002.pdf.*

[6] *Id.* at 9.

to allow.[7] Similarly, the Commission's proposed rule bans conduct that courts have found to be legal,[8] a concern the Commission dismisses with a claim that the Section 5 prohibition on "unfair methods of competition" extends beyond the antitrust laws. But the majority's conclusions and today's proposed rule forbid conduct previously found lawful under Section 5 of the FTC Act. Specifically, applying FTC Act Section 5, the Seventh Circuit found that "[r]estrictive [non-compete] clauses . . . are legal unless they are unreasonable as to time or geographic scope[.]"[9] In other words, the Seventh Circuit found that a fact-specific inquiry is required under Section 5.

The NPRM announced today conflicts not only with the Seventh Circuit's holding, but also with several hundred years of precedent. With all due respect to the majority, I am dubious that three unelected technocrats[10] have somehow hit upon the right way to think about non-competes, and that all the preceding legal minds to examine this issue have gotten it wrong. The current rulemaking record does not convince me otherwise.

*I. Non-Compete Agreements—the First Application of the Section 5 Policy Statement*

The proposed Non-Compete Clause Rule "would provide that it is an unfair method of competition—and therefore a violation of Section 5—for an employer to enter into or attempt to enter into a non-compete clause with a worker; [or] to maintain with a worker a non-compete clause . . ."[11] The proposed ban on non-compete clauses is based only on alleged violations of Section 5 of the FTC Act; it is not premised on the illegality of non-compete clauses under the Sherman or Clayton Acts.

When the Commission issued the Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act ("Policy Statement") in November 2022, I warned that the approach described by the Policy Statement would enable the Commission majority to condemn conduct it disfavors, even when that conduct repeatedly has been found lawful.[12] I predicted that the approach to Section 5 enforcement contained in the Policy Statement would facilitate expansive enforcement, often without requiring evidence of anticompetitive effects. And I cautioned that subjects of investigations would not be able to defend their conduct because procompetitive justifications would not be credited. The Non-Compete Clause Rule NPRM provides a graphic illustration of these concerns.

*A. The NPRM's Determination That Non-Compete Clauses Are Unfair*

The NPRM states that there are 3 *independent* ways for classifying non-compete clauses as an "unfair" method of competition.[13] In November, I objected to the enforcement approach described in the Section 5 Policy Statement—specifically, permitting the Commission majority to condemn conduct merely by selecting and assigning to disfavored conduct one or more adjectives from a nefarious-sounding list.[14] Here, two of the three explanations the Commission provides for concluding that non-compete clauses are unfair rely on invocation of the adjectives "exploitive and coercive."[15] The third explanation for the illegality of non-compete clauses demonstrates how little evidence the majority requires to conclude that conduct causes harm.

According to the NPRM, "non-compete clauses are exploitive and coercive at the time of contracting."[16] The NPRM explains that the "clauses for workers other than senior executives are exploitive and coercive because they take advantage of unequal bargaining power[.]"[17] The business community will be surprised to learn that "unequal bargaining power" can lead to a conclusion that any negotiated outcome may be condemned as "exploitive and coercive," which then can be parlayed into a finding that the conduct violates Section 5. Indeed, this assertion is particularly troubling not merely because it presages an approach that is literally limitless, but also because the imbalance of bargaining power, as in this setting, arises wholly apart from any conduct by the business.[18] The reader may note that the NPRM cites legal decisions to support the assignment of adjectives. Yet, a careful reading of the courts' discussions of the imbalance of bargaining power between employers and employees reveals that while the imbalance may provide a reason to scrutinize non-compete clauses, it is not used to condemn or invalidate them.[19] Remarkably, in each case cited in footnote 253 of the NPRM, the court found the non-compete clauses to be enforceable.

Next, the NPRM finds that "non-compete clauses are exploitive and coercive at the time of the worker's potential departure from the employer[.]"[20] The NPRM reaches this conclusion regardless of whether the clauses are enforced. This conclusion is

---

[7] NPRM Part II.C.1. Further, the NPRM explains "[s]tates have been particularly active in restricting non-compete clauses in recent years." *Id.* The Commission's rulemaking will end states' varying approaches to address non-compete agreements. The Commission's preemption of states' approaches is premature to the extent that the Commission admits that it does not know where to draw lines regarding the treatment of non-compete provisions (*i.e.,* the Commission seeks comments on alternatives to the proposed ban based on earnings levels, job classifications, or presumptions). The Commission ignores the advice of Justice Brandeis and instead proposes to end states' experimentation to determine the optimal treatment of non-compete clauses. *See New State Ice Co.* v. *Liebmann*, 285 U.S. 262, 311 (1932) ("To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the nation. It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

[8] *See United States* v. *Empire Gas Corp.,* 537 F.2d 296, 307–08 (8th Cir. 1976); *Lektro-Vend Corp.* v. *Vendo Co.,* 660 F.2d 255, 267 (7th Cir. 1981); *Newburger, Loeb & Co., Inc.* v. *Gross,* 563 F.2d 1057, 1081–83 (2d Cir. 1977); *Bradford* v. *New York Times Co.,* 501 F.2d 51, 57–59 (2d Cir. 1974).

[9] *Snap-On Tools Corp.* v. *Fed. Trade Comm'n,* 321 F.2d 825, 837 (7th Cir. 1963).

[10] This characterization is not an insult, but a fact. I, too, am an unelected technocrat.

[11] NPRM Part I.

[12] *See* Christine S. Wilson, Comm'r, Fed. Trade Comm'n, Dissenting Statement Regarding the "Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act" (Nov. 10, 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/P221202Section5PolicyWilsonDissentStmt.pdf.*

[13] NPRM Part IV.A.1.

[14] *See* Wilson, *supra* note 12.

[15] The Policy Statement claimed that determinations of unfairness would be based on a sliding scale. Here, the NPRM identifies independent ways to determine that non-compete clauses are unfair; no sliding scale is applied.

[16] NPRM Part IV.A.1.b The NPRM explains that this conclusion does not apply to senior executives and also seeks comment on whether there is a broader category of highly paid or highly skilled employees for whom the conclusion is inappropriate. *Id.*

[17] *Id.*

[18] According to the NPRM, unequal bargaining power arises because employees depend on job income to pay bills, job searches entail significant transaction costs, the prevalence of unions has declined, employers outsource firm functions, employers have more experience negotiating because they have multiple employees, employees typically do not hire lawyers to negotiate agreements, and employees may not focus on the terms of their contracts. *Id.*

[19] *See Alexander & Alexander, Inc.* v. *Danahy,* 488 NE2d 22, 29 (Mass. App. Ct. 1986) (finding injunction to enforce non-compete agreement proper); *Diepholz* v. *Rutledge,* 659 NE 989, 991 (Ill. Ct. App. 1995) (finding non-compete agreement enforceable, but also finding no violation of terms of non-compete agreement); *Palmetto Mortuary Transp., Inc.* v. *Knight Sys., Inc.,* 818 SE2d 724, 731 (S.C. 2018) (finding non-compete agreement enforceable).

[20] NPRM Part IV.A.1.c. Again, the NPRM explains that this conclusion does not apply to senior executives and also invites comments on whether there is a broader category of highly paid or highly skilled employees for whom the conclusion is inappropriate. *Id.*

**3542** **Federal Register** / Vol. 88, No. 12 / Thursday, January 19, 2023 / Proposed Rules

contrary to legal precedent, which requires enforcement of non-compete provisions before finding harm.[21]

Finally, the NPRM finds that "non-compete clauses are restrictive conduct that negatively affects competitive conditions."[22] Although this basis for concluding that non-compete provisions are unfair does not rely solely on the selection of an adjective, here, the NPRM demonstrates how little evidence the majority requires before finding that conduct is unfair pursuant to the Section 5 Policy Statement.

Until yesterday, the Commission had announced no cases (and therefore had no experience and no evidence) to conclude that non-compete clauses harm competition in labor markets. In fact, the only litigated FTC case challenging a non-compete clause found that a non-compete provision covering franchise dealers did *not* violate Section 5 of the FTC Act.[23] Notably, the NPRM omits any reference to this case. The Commission has accepted settlements regarding non-compete clauses in contracts between businesses,[24] but the majority itself has distinguished those cases from non-compete clauses in labor contracts.[25] And in those B2B cases, the non-compete clauses were associated with the sale of a business, a situation that falls within the narrow exception to the ban provided in the proposed Non-Compete Clause Rule.

Just yesterday, though, the Commission rushed out the announcement of three consent agreements that resolve allegations that non-compete provisions constitute an unfair method of competition.[26] The first consent involves security guard services, and the other two involve the manufacturing of glass containers. These consents undoubtedly were designed to support assertions that the FTC now has experience with non-compete agreements in employee contracts. But even a cursory read of the complaints reveals the diaphanous nature of this "experience."

Remarkably, none of these cases provides evidence showing the anticompetitive effects of non-compete clauses beyond the conclusory allegations in the complaints. The complaints in the glass container industry assert that non-compete provisions may prevent entry or expansion by competitors, but contain no allegations regarding firms that have tried unsuccessfully to obtain personnel with industry-specific skills and experience.[27] Regarding the effects on employees, the complaints make no allegations that the non-compete clauses were enforced by respondents[28] and the Analysis to Aid Public Comment accompanying the consent agreements points only to studies not tied to the glass container industry. These cases provide no evidence that the non-compete provisions limited competition for employees with industry-specific expertise, thereby lowering wages or impacting job quality. Similarly, in the case against Prudential Security, Inc.,[29] the complaint alleges that individual former employees were limited in their ability to work for other firms in the security guard industry,[30] but contain no allegations that the firm's non-compete provisions had market effects on wages or effects in a properly defined market for security guard services.

The NPRM also asserts FTC experience with non-compete provisions by pointing to Commission merger consent agreements that restrict the use of non-compete agreements. The complaints in those cases did not allege harm from non-compete clauses and the provisions in the consent agreements were included to ensure that the buyers of divestiture assets could obtain employees familiar with the assets and necessary for the success of the divestitures at issue.

Finally, the NPRM claims Commission experience with non-compete agreements to support the Non-Compete Clause Rule from a Commission workshop in January 2020.[31] But the NPRM fails to reflect the variety of views expressed during that workshop, including testimony that the economic literature is "[s]till far from reaching a scientific standard for concluding [that non-compete agreements] are bad for overall welfare . . . Also [we] don't yet fully understand the distribution of effects on workers . . . Welfare tradeoffs are likely context-specific, and may be heterogeneous."[32]

Indeed, the NPRM ignores that testimony and instead focuses on economic literature that purportedly demonstrates that non-compete clauses are unfair because they negatively affect competitive conditions. But an objective review of that literature reveals a mixed bag. For example, the first study described in the NPRM[33] finds that "decreasing non-compete clause enforceability from the approximate enforceability level of the fifth-strictest state to that of the fifth-most-lax state would increase workers' earnings by 3–4%." Yet, this study also finds that these effects vary strongly across different groups of individuals. For example, the authors find that "enforceability has little to no effect on earnings for non-college educated workers" and instead find that enforceability primarily impacts college-educated workers. Similarly, it finds that strict non-compete clause enforceability has very different effects for different demographic groups: it has little to no effect on men, and much

---

[21] *See, e.g., O'Regan* v. *Arbitration Forums, Inc.,* 121 F.3d 1060, 1065–66 (7th Cir. 1997) ("to apply antitrust laws to restrictive employment covenants, there must be some attempted enforcement of an arguably overbroad portion of the covenant in order for there to be a federal antitrust violation."); *Lektro-Vend Corp.* v. *Vendo Co.,* 660 F.2d 255, 267 (7th Cir.1981) ("a section 1 violation requires proof that the defendant knowingly enforced the arguably overbroad section of the ancillary noncompetition covenant").

[22] NPRM Part IV.A.1.a.

[23] *See Snap-On Tools Corp.* v. *Fed. Trade Comm'n,* 321 F.2d at 837.

[24] *See* ARKO Corp., FTC File No. 211–0187, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110087C4773ArkoExpressComplaint.pdf* (Aug. 5, 2022); DTE Energy Co., FTC File No. 191–0068, *https://www.ftc.gov/system/files/documents/cases/191_0068_c-4691_dte-enbridge_complaint.pdf.* (Dec. 13, 2019).

[25] *See* Lina M. Khan, Chair, Fed. Trade Comm'n, Joined by Rebecca Kelly Slaughter and Alvaro M. Bedoya, Comm'rs, Fed. Trade Comm'n, Statement regarding In the Matter of ARKO Corp./Express Stop, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110187GPMExpressKhanStatement.pdf* (June 10, 2022) (distinguishing non-compete clauses in labor contracts and effects on workers from non-compete clause in merger agreement where both parties remain in market).

[26] On December 28, 2022, the Commission voted to accept for public comment three consent agreements involving non-compete agreements. For two of those matters, the Commission vote occurred less than a week after the Commission received the papers. *See* Ardagh Glass Group S.A., File No. 211–0182, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110182ardaghacco.pdf* (Jan. 4, 2023) (Agreement Containing Consent Order (signatures dated Dec. 21, 2022)).

[27] *See* O–I Glass, Inc., File No. 211–0182, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110182o-iglasscomplaint.pdf* (Jan. 4, 2023) (complaint ¶¶ 6, 8); Ardagh Glass Group S.A., File No. 211–0182, *https://www.ftc.gov/system/files/ftc_gov/pdf/2110182ardaghcomplaint.pdf* (Jan. 4, 2023) (complaint ¶¶ 6, 8).

[28] *See* Wilson, Dissenting Statement regarding In the Matter of O–I Glass, Inc. and In the Matter of Ardagh Glass Group S.A., *supra* note 4.

[29] Prudential Security, Inc., File No. 221–0026, *https://www.ftc.gov/system/files/ftc_gov/pdf/2210026prudentialsecuritycomplaint.pdf* (Dec. 28, 2022) (consent agreement accepted for public comment).

[30] *Id.* (complaint at ¶¶ 23, 25).

[31] Fed. Trade Comm'n, *Non-Competes in the Workplace: Examining Antitrust and Consumer Protection Issues, https://www.ftc.gov/news-events/events/2020/01/non-compete-clauses-workplace-examining-antitrust-consumer-protection-issues.*

[32] Kurt Lavetti, *Economic Welfare Aspects of Non-Compete Agreements,* Remarks at the Fed. Trade Comm'n Workshop on Non-Compete Clauses in the Workplace (Jan. 9, 2020), *https://www.ftc.gov/system/files/documents/public_events/1556256/non-compete=workshop-slides.pdf.*

[33] Matthew S. Johnson, Kurt Lavetti, & Michael Lipsitz, *The Labor Market Effects of Legal Restrictions on Worker Mobility* 2, *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3455381* (2020).

larger effects on women and Black men and women. The NPRM interprets these differential effects as facts in favor of the Non-Compete Clause Rule, as it would diminish race and gender wage gaps, but there is no corresponding discussion of the Rule's effect on the wage gap based on education. An alternative interpretation of these findings is that the scientific literature is still muddled as to who is helped and who is harmed by non-compete clauses, and that it would be better for the Commission to tailor a rule to those settings where a scientific consensus exists.

Similarly, the NPRM often bases its conclusions about the effects of non-compete clauses on limited support. For example, the NPRM contends that increased enforceability of non-compete clauses increases consumer prices. Yet, under the current record, this conclusion is based on only one study in healthcare markets and another study that considers the relationship between non-compete clauses and concentration.[34] The NPRM does not provide a basis to conclude that findings with respect to the market for physicians and healthcare are generalizable, instead acknowledging that no comparable evidence exists for other markets.[35] Also, the study that considers the effects of non-compete clauses on concentration does not draw conclusions about prices; the NPRM's conclusion that non-compete provisions lead to higher prices requires assumptions about a relationship between concentration and prices. Moreover, the NPRM omits studies showing that reducing the enforceability of non-compete restrictions leads to higher prices for consumers. A study by Gurun, Stoffman, and Yonker finds that an agreement not to enforce post-employment restrictions among financial advisory firms that were members of the Broker Protocol led brokers to depart their firms, and consumers to follow their brokers, at high rates. The study found, however, that clients of firms in the Broker Protocol paid higher fees and experienced higher levels of broker misconduct.[36] In other words, suspending non-competes resulted in higher prices and a decrease in the quality of service provided. These unintended consequences illustrate the inevitably far-reaching and unintended consequences that today's NPRM will visit upon employees, employers, competition, and the economy.

## B. The NPRM's Treatment of Business Justifications

The NPRM explains that "the additional incentive to invest (in assets like physical capital, human capital, or customer attraction, or in the sharing of trade secrets and confidential commercial information) is the primary justification for use of non-compete clauses." [37]

It acknowledges that "there is evidence that non-compete clauses increase employee training and other forms of investment," [38] and describes two studies demonstrating that increased non-compete clause enforceability increased firm-provided training and investment.[39] It also describes studies that examine non-compete clause use and investment.[40] Despite the studies, the NPRM concludes, "the evidence that non-compete clauses benefit workers or consumers is scant." [41] In other words, the NPRM treats asymmetrically the evidence of harms (mixed evidence given great credence) and benefits (robust evidence given no credence). These early examples of cherry-picking evidence that conforms to the narrative provide little confidence in the integrity of the rulemaking process or the ultimate outcome.

Implicitly, though, the NPRM credits some business justifications for non-compete provisions. It excludes from the ban those non-compete clauses associated with the sale of a business, implicitly acknowledging that these non-compete clauses are necessary to protect the goodwill of the transferred business. Also, the NPRM likely credits business justifications when it seeks comment on whether senior executives should be covered by the rule. Nonetheless, on its face, the NPRM expressly discounts business justifications and makes no effort to distinguish and determine circumstances where investment incentives are important.

The NPRM also discounts procompetitive business justifications by asserting that trade secret law, non-disclosure agreements, and other mechanisms can be used to protect firm investments. While the NPRM explains that these mechanisms may protect investments, the existing record provides no evidence that these mechanisms are effective substitutes for non-compete agreements.[42] The NPRM cites no instances where these mechanisms have been used effectively in lieu of non-compete clauses, even though natural experiments exist and could be studied (*e.g.*, when states have changed the enforceability of non-compete clauses). "[M]erely identifying alternative mechanisms to solve a potential employee investment problem does not provide . . . guidance as to which mechanism achieves the objective at the lowest social cost." [43] Moreover, the NPRM's observation that firms successfully operate in states where non-compete clauses are not enforceable is unpersuasive; the NPRM offers no meaningful cross-state comparisons and the observation does not show that firms and competition are equally or even more successful in those states than in states where non-compete clauses are permissible.

## II. The Proposed Non-Compete Clause Rule Will Trigger Numerous and Likely Successful Legal Challenges Regarding the Commission's Authority To Issue the Rule

This section describes the numerous, and meritorious, legal challenges that undoubtedly will be launched against the Non-Compete Clause Rule. Defending these challenges will entail lengthy litigation that will consume

---

[34] NPRM Part II.B.2.a.

[35] NPRM Part VII.B.2.c.

[36] Umit G. Gurun, Noah Stoffman, & Scott E. Yonker, *Unlocking Clients: The Importance of Relationships in the Financial Advisory Industry*, 141 J. Fin. Econ. 1218 (2021).

[37] NPRM Part II.B.2.e.

[38] *Id.*

[39] Evan Starr, *Consider This: Training, Wages, and the Enforceability of Non-Compete Clauses*, 72 I.L.R. Rev. 783, 799 (2019) (moving from mean non-compete enforceability to no non-compete clause enforceability would decrease the number of workers receiving training by 14.7% in occupations that use non-compete clauses at a high rate); Jessica Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship* 22 (2019), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3040393 (knowledge-intensive firms invest 32% less in capital equipment following decreases in the enforceability of non-compete clauses).

[40] Matthew S. Johnson & Michael Lipsitz, *Why Are Low-Wage Workers Signing Noncompete Agreements?*, 57 J. Hum. Res. 689, 700 (2022) (finding firms that use non-compete clauses in hair salon industry train employees at 11% higher rate and increase investment in particular customer-attraction device by 11%); Evan P. Starr, James J. Prescott, & Norman D. Bishara, *Noncompete Agreements in the U.S. Labor Force*, 64 J.L. & Econ. 53, 53 (2021) (finding no statistically significant impact on training and trade secrets from use of non-compete clauses, but unable to examine other types of investment).

[41] NPRM Part IV.B.3.

[42] There is a limited literature regarding the efficacy of trade secret protection and non-disclosure agreements. *See* Jie Gong & I.P.L. Png, *Trade Secrets Law and Inventory Efficiency: Empirical Evidence from U.S. Manufacturing, https://ssrn.com/abstract=2102304* (July 8, 2012) (investigating effects of operational know-how information spillovers under various levels of enforcement of trade secret law).

[43] Camila Ringeling, Joshua D. Wright, et. al, Noncompete Clauses Used in Employment Contracts, Comment of the Global Antitrust Institute 6 (Feb. 7, 2020), *https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3534374.*

substantial staff resources. I anticipate that the Rule will not withstand these challenges, so the Commission majority essentially is directing staff to embark on a demanding and futile effort. In the face of finite and scarce resources, this NPRM is hardly the best use of FTC bandwidth.

There are numerous paths for opponents to challenge the Commission's authority to promulgate the Non-Compete Clause Rule. First, I question whether the FTC Act provides authority for competition rulemaking. The NPRM states that the Commission proposes the Non-Compete Clause Rule pursuant to Sections 5 and 6(g) of the FTC Act. Section 6(g) of the FTC Act authorizes the Commission to "make rules and regulations for the purpose of carrying out the provisions of the subchapter" where Section 6(g) otherwise provides that the Commission may "from time to time classify corporations." [44] Section 6(g) was believed to provide authority only for the Commission to adopt the Commission's procedural rules. For decades, consistent with the statements in the FTC Act's legislative history, Commission leadership testified before Congress that the Commission lacked substantive competition rulemaking authority.[45]

Ignoring this history, the Commission embarked on a substantive rulemaking binge in the 1960s and 1970s.[46] The vast majority of these substantive rules pertained to consumer protection issues. Only one substantive rule was grounded solely in competition;[47] that rule was not enforced and subsequently was withdrawn.[48] Another substantive rule was grounded in both competition and consumer protection principles, and prompted a federal court challenge. There, the D.C. Circuit in 1973 held in *National Petroleum Refiners*[49] that the FTC did have the power to promulgate substantive rules.

Two years later, however, Congress enacted the Magnuson-Moss Act,[50] which required substantive consumer protection rules to be promulgated with heightened procedural safeguards under a new Section 18 of the FTC Act. Notably, the Magnuson-Moss Act expressly excluded rulemaking for unfair methods of competition from Section 18. FTC Chairman Miles Kirkpatrick (1970–73) explained that it was not clear whether Congress in the Magnuson-Moss Act sought to clarify existing rulemaking authority or to grant substantive rulemaking authority to the FTC for the first time.[51] If the latter, then the FTC only has substantive *consumer protection* rulemaking power, and lacks the authority to engage in substantive *competition* rulemaking. This uncertainty about the language of the statute will be a starting point for

challenges of the Non-Compete Clause Rule.

Second, the Commission's authority for the Rule likely will be challenged under the major questions doctrine, which the Supreme Court recently applied in *West Virginia* v. *EPA*.[52] Under the major questions doctrine, "where a statute . . . confers authority upon an administrative agency," a court asks "whether Congress in fact meant to confer the power the agency has asserted."[53] The Supreme Court explained in *West Virginia* v. *EPA* that an agency's exercise of statutory authority involved a major question where the "history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."[54]

Challengers will ask a court to determine whether today's NPRM constitutes a major question. Using Justice Gorsuch's concurrence as a guide, agency action will trigger the application of the major questions doctrine if the agency claims, among other things, the power to (1) resolve a matter of great political significance, (2) regulate a significant portion of the American economy, or (3) intrude in an area that is the particular domain of state law.[55] First, the regulation of non-compete clauses is a question of political significance; Congress has considered and rejected bills significantly limiting or banning non-competes on numerous occasions,[56] a strong indication that the Commission is trying to "work around" the legislative process to resolve a question of political significance.[57] Second, the Rule proposes to regulate a significant portion of the American economy through a ban on non-competes. According to the NPRM, the "Commission estimates that approximately one in five American workers—or approximately 30 million workers—is bound by a non-compete clause.[58] Thus, the Non-Compete Clause Rule indisputably will negate millions of private contractual agreements and impact employer/employee relationships in a wide variety of

---

[44] 15 U.S.C. 46(g). Section 6 of the FTC Act provides

§ 46. Additional powers of Commission
The Commission shall also have power . . .
(g) Classification of corporations; regulations
From time to time classify corporations and (except as provided in section 57a(a)(2) of this title) to make rules and regulations for the purpose of carrying out the provisions of this subchapter.

[45] *See Nat'l Petroleum Ref'rs Ass'n* v. *FTC,* 482 F.2d 672, 696 nn. 38, 39 (D.C. Cir. 1973). *See also* Noah Joshua Phillips, *Against Antitrust Regulation,* American Enterprise Institute Report 3, *https://www.aei.org/research-products/report/against-antitrust-regulation/* (Oct. 13, 2022) ("[T]he Conference Committee [considering legislation that created the Federal Trade Commission] was between two bills, neither of which contemplated substantive rulemaking. . . . The legislative history does not demonstrate congressional intent to give the FTC substantive rulemaking power: The House considered and rejected it, the Senate never proposed it, and neither the Conference Committee's report nor the final debates mentioned it."); 51 Cong. Rec. 12916 (1914), reprinted in The Legislative History of the Federal Antitrust Laws and Related Statutes 4368 (Earl W. Kintner ed., 1982) statement of Sen. Cummins) ("[I]f we were to attempt to go further in this act and to give the commission the authority to prescribe a code of rules governing the conduct of the business men of this country for the future, we would clash with the principle that we can not confer upon the commission in that respect legislative authority; but we have not made any such attempt as that, and no one proposes any attempt of that sort."); *id.* at 14932, reprinted in The Legislative History of the Federal Antitrust Laws and Related Statutes 4732 (Earl W. Kintner ed., 1982) (statement of Rep. Covington) ("The Federal trade commission will have no power to prescribe the methods of

competition to be used in the future. In issuing orders it will not be exercising power of a legislative nature . . . the function of the Federal trade commission will be to determine whether an existing method of competition is unfair, and, it is finds it to be unfair, to order the discontinuance of its use. In doing this it will exercise power of a judicial nature."); *id.* at 13317, reprinted in The Legislative History of the Federal Antitrust Laws and Related Statutes 4675 (Earl W. Kintner ed., 1982) (statement of Sen Walsh) ("We are not going to give to the trade commission the general power to regulate and prescribe rules under which the business of this country shall in the future be conducted; we propose simply to give it the power to denounce as unlawful a particular practice that is pursued by that business.").

[46] *See* Timothy J. Muris & Howard Beales, III, The Limits of Unfairness Under the Federal Trade Commission Act 13 (1991).

[47] FTC Men's and Boy's Tailored Clothing Rule, 16 CFR 412 (1968).

[48] Notice of Rule Repeal, 59 FR 8527 (1994).

[49] *Nat'l Petroleum Ref'rs Ass'n* v. *FTC,* 482 F.2d 672 (D.C. Cir. 1973).

[50] Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Public Law 93–637, 88 Stat. 2183 (1975).

[51] *See* Miles W. Kirkpatrick, *FTC Rulemaking in Historical Perspective* 48 Antitrust L.J. 1561, 1561 (1979) ("One of the most important aspects of the Magnuson-Moss Act was its granting, or confirmation, depending upon your reading of the law at that time, of the FTC's rulemaking powers.").

[52] *West Virginia* v. *EPA,* 142 S. Ct. 2587 (2022).

[53] *Id.* at 2608.

[54] *Id.*

[55] *Id.* at 2600–01 (Gorsuch, J. concurring).

[56] Russell Beck, *A Brief History of Noncompete Regulation,* Fair Competition Law (Oct. 11, 2021), *https://faircompetitionlaw.com/2021/10/11/a-brief-history-of-noncompete-regulation/.*

[57] *West Virginia* v. *EPA,* 142 S.Ct. at 2600 (Gorsuch, J. concurring).

[58] NPRM Part II.B.1.a.

industries across the United States. Third, regulation of non-compete agreements has been the particular domain of state law. As the NPRM explains, 47 states permit non-competes in some capacity, while three states have chosen to prohibit them entirely, and state legislatures have been active in this area recently.[59]

If a court were to conclude that the Non-Compete Clause Rule is a major question, the FTC would be required to identify clear Congressional authorization to impose a regulation banning non-compete clauses. Yet, as discussed above, that clear authorization is unavailable. The language in Section 6(b) is far from clear, and largely discusses the Commission's classification of corporations. I do not believe that Congress gave the FTC authority to enact substantive rules related to any provision of the FTC Act using this "oblique" and unclear language. In addition, the decision by Congress to omit unfair methods of *competition* rulemaking in the Magnuson-Moss Act, which immediately followed the decision in *National Petroleum Refiners,* is additional evidence that Congress has not clearly authorized the FTC to make competition rules that may have significant political or economic consequences. Moreover, Congress did not remove the known ambiguity when it enacted the FTC Improvements Act of 1980.[60]

Third, the authority for the Non-Compete Clause Rule may be challenged under the non-delegation doctrine. The doctrine is based on the principle that Congress cannot delegate its legislative power to another branch of government, including independent agencies.[61]

Since the 1920s, the Supreme Court has found that Congress has not made an improper delegation of legislative power so long as Congress has set out "an intelligible principle to which the person or body authorized to fix [rules] is directed to conform."[62] Applying this principle in *Schechter Poultry,*[63] the Supreme Court approved Congressional authorization for the FTC to prohibit unfair methods of competition, relying on the Commission's administrative enforcement proceedings where the Commission acts as "a quasi judicial body" and that "[p]rovision was made for formal complaint, for notice and hearing, for appropriate findings of fact supported by adequate evidence, and for judicial review . . . ."[64] The Court simultaneously found that provisions of the National Industrial Recovery Act to issue "codes of fair competition" were *improper* delegations of legislative power, distinguishing the impermissibly broad fair competition codes from the FTC Act's approach to address unfair methods of competition that are "determined in particular instances, upon evidence, in light of particular competitive conditions[.]"[65]

Notably, the Commission's proposed ban on non-compete clauses abandons the Commission's procedures that led the Supreme Court in *Schechter Poultry* to find that the Commission's enforcement of "unfair methods of competition" does not constitute an improper delegation of legislative power. In addition, to the extent that the Commission's Section 5 Policy Statement (which provides the basis for determining that non-compete clauses are an unfair method of competition) abandons the consumer welfare standard to pursue multiple goals, including protecting labor, the Commission's action more closely resembles the National Industrial Recovery Act codes that also sought to implement multiple goals under the guise of codes of fair competition.

## III. Comments Are Encouraged

The NPRM invites public comment on many issues. I strongly encourage the submission of comments from all interested stakeholders. After all, unlike rulemaking for consumer protection

rules under the Magnuson-Moss process, this is likely the only opportunity for public input before the Commission issues a final rule. For this reason, it is important for commenters to address the proposed alternatives to the near-complete ban on non-compete provisions. To the extent that the NPRM proposes alternatives to the current proposed rule, if the Commission were subsequently to adopt one of the alternatives, which would be a logical outgrowth of the current proposed rulemaking,[66] there would be no further opportunity for public comment. Moreover, the Commission believes that if it were to adopt alternatives that differentiate among categories of workers, the various rule provisions would be severable if a court were to invalidate one provision. Consequently, it is important for the public to address each of the alternatives proposed in the NPRM because the comment period on the proposed rule is the only opportunity for public input on those alternatives.

In addition to the issues for which the NPRM invites comments, I encourage stakeholders to address the following points:

• The NPRM references some academic studies regarding non-competes. What other academic literature addresses the issues in the NPRM, including the procompetitive justifications for non-compete provisions?

• The NPRM describes papers that exploit natural experiments to estimate the effects of enforcing non-compete clauses. While this approach ensures that the estimates are internally valid, it reflects the causal effects of non-compete agreements only in the contexts within which they are estimated. What should the Commission consider to understand whether and when these estimates are externally valid? How can the Commission know that the estimates calculated from the contexts of the literature are representative of the contexts outside of the literature?

• The NPRM draws conclusions based on "the weight of the literature," but the literature on the effects of non-compete agreements is limited, contains mixed results, and is sometimes industry-specific. Which conclusions in the NPRM are supported by the weight

---

[59] *Id.* Part II.C.1.

[60] *See* H.R. Rep. No. 96–917, 96th Cong., 2d sess. 29–30 (1980), reprinted in The Legislative History of the Federal Antitrust Laws and Related Statutes 5862 (Earl W. Kintner ed., 1982) (conference report on FTC Improvements Act of 1980 explaining that when adopting a restriction on standards and certification rulemaking brought as an unfair or deceptive act or practice, conferees were not taking a position on the Commission's authority to issue a trade regulation rule defining 'unfair methods of competition' pursuant to section 6(g). "The substitute leaves unaffected whatever authority the Commission might have under any other provision of the FTC Act to issue rules with respect to 'unfair methods of competition.' ").

[61] Five Supreme Court justices have expressed interest in reconsidering the Court's prior thinking on the doctrine, which increases the risk that a challenge may be successful. *See Gundy* v. *United States,* 139 S. Ct. 2116, 2131 (2019) (Alito, J. concurring) (stating with respect to the nondelegation doctrine that "[i]f a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort"); *id.* at 2131 (Gorsuch, J., dissenting, joined by Chief Justice Roberts and Justice Thomas) (expressing desire to "revisit" the Court's approach

to the nondelegation doctrine); *Paul* v. *United States,* 140 S. Ct. 342, 342 (2019) (statement of Kavanaugh, J. respecting the denial of certiorari); Amy Coney Barrett, *Suspension and Delegation,* 99 Cornell L. Rev. 251, 318 (2014).

[62] *J.W. Hampton, Jr., & Co.* v. *United States,* 276 U.S. 394, 409 (1928).

[63] *A.L.A. Schechter Poultry Corp.* v. *United States,* 295 U.S. 495 (1935).

[64] *Id.* at 533.

[65] *Id.*

[66] *See Owner-Operator Indep. Drivers Ass'n* v. *Fed. Motor Carrier Safety Admin.,* 494 F.3d 188, 210 (D.C. Cir. 2007); *see also Agape Church, Inc.* v. *FCC,* 738 F.3d 397, 412 (2013) (holding that FCC "sunset" rule was a logical outgrowth when proposed rule gave public notice that a viewability rule was in danger of being phased out, i.e., a sunset provision).

of the literature? Which conclusions in the NPRM contradict the weight of the literature? Which conclusions in the NPRM require additional evidence before they can be considered substantiated?

• Where the evidence provided in the NPRM is limited, is the evidence sufficient to support either the proposed ban on non-compete clauses or the proffered alternative approaches to the proposed ban?

• What are the benefits and drawbacks of the currently proposed ban compared to the proposed alternative rule that would find a presumption of unlawfulness, including the role of procompetitive justifications in rebutting a presumption?

[FR Doc. 2023–00414 Filed 1–18–23; 8:45 am]

**BILLING CODE 6750–01–P**

**Policy Statement Regarding the Scope of Unfair Methods of Competition
Under Section 5 of the Federal Trade Commission Act
Commission File No. P221202**

**November 10, 2022**

Section 5 of the Federal Trade Commission Act (FTC Act) prohibits "unfair methods of competition in or affecting commerce."[1] On July 1, 2021, the Federal Trade Commission (FTC) rescinded its 2015 Statement of Enforcement Principles Regarding "Unfair Methods of Competition" under Section 5 of the FTC Act.[2] This statement supersedes all prior FTC policy statements and advisory guidance on the scope and meaning of unfair methods of competition under Section 5 of the FTC Act.

## I.    Introduction

Pursuant to the FTC's analysis of the decided cases and prior enforcement actions, this policy statement describes the key principles of general applicability concerning whether conduct is an unfair method of competition. Consistent with the Supreme Court's interpretation of the FTC Act in at least twelve decisions, this statement makes clear that Section 5 reaches beyond the Sherman and Clayton Acts to encompass various types of unfair conduct that tend to negatively affect competitive conditions.[3]

---

[1] Pub. L. No. 63-203, 38 Stat. 717; 15 U.S.C. § 45(a)(1).

[2] Fed. Trade Comm'n, Statement of the Commission on the Withdrawal of the Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act (July 9, 2021), https://www.ftc.gov/legal-library/browse/statement-commission-withdrawal-statement-enforcement-principles-regarding-unfair-methods.

[3] *See, e.g. Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986) (holding that "[t]he standard of "unfairness" under the FTC Act is, by necessity, an elusive one, encompassing not only practices that violate the Sherman Act and the other antitrust laws"); *Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 242 (1972) (holding that "the Commission has broad powers to declare trade practices unfair."); *Fed. Trade Comm'n v. Texaco*, 393 U.S. 223, 262 (1968) (holding that "[i]n large measure the task of defining "unfair methods of competition" was left to the [FTC]. . . and that the legislative history shows that Congress concluded that the best check on unfair competition would be [a practical and expert administrative body] . . . [that applies] the rule enacted by Congress to particular business situations"); *Fed. Trade Comm'n v. Brown Shoe*, 384 U.S. 316, 321 (1966) (holding that the FTC "has broad powers to declare trade practices unfair[,] particularly . . . with regard to trade practices which conflict with the basic policies of the Sherman and Clayton Acts"); *Atlantic Refining Co. v. Fed. Trade Comm'n*, 381 U.S. 357, 369 (1965) (holding that all that is necessary is to discover conduct that runs counter to the public policy declared in the Act. . ." and that "there are many unfair methods of competition that do not assume the proportions of antitrust violations"); *Fed. Trade Comm'n v. Colgate-Palmolive et al.*, 380 U.S. 377, 384-85 (1965) (noting that the proscriptions in section 5 are flexible); *PAN AM v. United States*, 371 U.S. 296, 306 -308 (1963) ("[Section 5] was designed to bolster and strengthen antitrust enforcement[,] and the definitions are not limited to precise practices that can readily be catalogued. They take their meaning from the facts of each case and the impact of particular practices on competition and monopoly"); *Fed. Trade Comm'n v. Nat'l Lead Co.*, 352 U.S. 419, 428-29 (1957) (affirming past rulings finding that the commission is clothed with "wide discretion in. . . [bringing] an end to the unfair practices found to exist[;]. . . [is] 'the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed[;] . . . has wide latitude for

This statement is intended to assist the public, business community, and antitrust practitioners by laying out the key general principles that apply to whether business practices constitute unfair methods of competition under Section 5 of the FTC Act. In considering whether conduct, either in a specific instance or as a category, constitutes an unfair method of competition, the Commission will directly consult applicable law. This statement does not pertain to any other statutory provision within the FTC's jurisdiction.[4]

## II.    Background and Legislative History of Section 5 of the FTC Act

### A.    The text, structure, and legislative history of Section 5 show that its mandate extends beyond the Sherman and Clayton Acts and reaches unfair conduct with a tendency to negatively affect competitive conditions

As the Commission explained in its July 2021 withdrawal of the previous policy statement, the text, structure, and history of Section 5 reaches more broadly than the antitrust laws.[5] Congress passed the FTC Act to push back against the judiciary's adoption and use of the open-ended rule of reason for analyzing Sherman Act claims,[6] which it feared would deliver inconsistent and unpredictable results and "substitute the court in the place of Congress."[7]

---

judgment and[;]. . . [that] to attain the objectives Congress envisioned, [the FTC] cannot be required to confine its road block to the narrow lane the transgressor has traveled"); *American Airlines, Inc. v. North American Airlines, Inc*., 351 U.S. 79, 85 (1956) (finding that "[u]nfair or deceptive practices or unfair methods of competition". . . are broader concepts than the common-law idea of unfair competition"); *Fed. Trade Comm'n v. Motion Picture Advertising Service Co*., 344 U.S. 392, 394-95 (1953) (noting that "Congress advisedly left the concept [of unfair methods of competition] flexible . . . [and] designed it to supplement and bolster the Sherman Act and the Clayton Act[,] [so as] to stop . . . acts and practices [in their incipiency] which, when full blown, would violate those Acts[,]. . . as well as to condemn as "unfair methods of competition" existing violations of them"); *Fed. Trade Comm'n v. Cement Institute*, 333 U.S. 683, 708 (1948) (holding that conduct that falls short of violating the Sherman Act may violate Section 5); *Fed. Trade Comm'n v. R. F. Keppel & Bro., Inc.*, 291 U.S. 304, 310 (1934) (finding that unfair methods of competition not limited to those "which are forbidden at common law or which are likely to grow into violations of the Sherman Act").

[4] This statement does not address the Commission's authority to prevent unfair or deceptive acts or practices in 15 U.S.C. §§ 45(a),(n). This statement is limited to the scope of standalone unfair methods of competition Section 5 violations. Such standalone unfair methods of competition Section 5 claims may be brought under one or more of the theories set forth in this policy statement and combined with claims under other parts of the FTC Act or other statutes enforced by the Commission as warranted.
This statement does not address the language of 15 U.S.C. § 45(b), which states that the Commission will act when it has reason to believe such action is in the public interest. *See generally Hills Bros. v. Fed. Trade Comm'n*, 9 F.2d 481, 483–84 (9th Cir. 1926) ("the interest of the public, like the question whether the commission has reason to believe that any person, partnership, or corporation has been or is using any unfair method of competition in commerce, is committed to the discretion of the commission, is to be determined by the commission before proceedings are instituted, and is not thereafter a subject of controversy either before the commission or before the court, except in so far as the question of public interest is necessarily involved in the merits of the case, and, if the commission finds that the method of competition in question is prohibited by the act, no other or further finding on the question of public interest is required."); *see also Parke, Austin & Lipscomb, Inc., et al. v. Fed. Trade Comm'n*, 142 F.2d 437, 441 (2d Cir. 1944).

[5]  Statement of Commission, *supra* note 2.

[6]  *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 60 (1911).

[7] S. REP. NO. 62-1326, at 10 (1913) ("Cummins Report"). Senator Francis Newlands, one of the chief sponsors of the bill that became the FTC Act, expressed concern that *Standard Oil* left antitrust regulation "to the varying judgments of different courts." 47 CONG. REC. 1225 (1911). After analyzing a series of Supreme Court decisions

Congress therefore determined it would "establish[ ] a commission for the better administration of the law and to aid in its enforcement."[8] This led to the creation of the FTC in 1914 and to the enactment of a prohibition of "unfair methods of competition," a new standard in federal competition law.[9]

In enacting Section 5, Congress's aim was to create a new prohibition broader than, and different from, the Sherman and Clayton Acts. Congress purposely introduced the phrase, "unfair methods of competition," in the FTC Act to distinguish the FTC's authority from the definition of "unfair competition" at common law.[10] It also made clear that Section 5 was designed to extend beyond the reach of the antitrust laws.[11] Concluding that a static definition would soon become outdated,[12] Congress wanted to give the Commission flexibility to adapt to changing circumstances.[13]

The key function of the FTC in applying its mandate to combat unfair methods of competition, according to Congress, would be to identify *unfair* forms of competition.[14] The legislative record demonstrates that Congress enacted Section 5 to protect against various types of unfair or oppressive conduct in the marketplace.[15] During debates over the meaning of unfair

---

interpreting the Sherman Act, a Senate committee feared that the rule of reason resulted in a situation where, "in each instance it [would be] for the court to determine whether the established restraint of trade is a due restraint or an undue restraint." Cummins Report, at 10. It lamented that the rule of reason had made it "impossible to predict with any certainty" whether courts would condemn the many "practices that seriously interfere with competition" and found it inconceivable that "the courts . . . be permitted to test each restraint of trade by the economic standard which the individual members of the court may happen to approve." *Id*. at 10, 12. The committee believed this would result in a loss of confidence by the public in the courts and eventually lead to a "repudiat[ion] [of] the fundamental principles of representative government." *Id*. at 11.

[8] *Id*. at 12.

[9] Federal Trade Commission Act of 1914, Pub. L. No. 63-203, 38 Stat. 717 (codified as amended at 15 U.S.C. § 41–58). *See* 51 CONG. REC. 12146 (1914) (statement of Sen. Hollis) ("The Sherman Act is adequate for the abolition of monopoly; it is, however, but imperfectly adequate for the regulation of competition. The present Congress is charged with the duty of supplying the defect in the law").

[10] *See* 51 CONG. REC. 12936 (1914) (statement of Sen. Reed) ("It is my opinion that if we employ the term "unfair competition" as it is employed in this bill, without adding anything to it, the courts will adopt as the meaning of Congress that meaning which has been affixed to the term by all of the law dictionaries and by a great many legal authorities."). *See also* 51 CONG. REC. 12814 (1914) (statement of Sen. George Sutherland).

[11] *See E.I. du Pont de Nemours v. Fed. Trade Comm'n* (*Ethyl*), 729 F.2d 128, 136 (2d Cir. 1984) ("Congress' aim was to protect society against oppressive anti-competitive conduct and thus assure that the conduct prohibited by the Sherman and Clayton Acts would be supplemented as necessary and any interstices filled") (citing H.R. REP. NO. 63-1142, at 19 (1914) (Conf. Rep.)); 51 CONG. REC. 11236 (1914) (statement of Sen. Cummins) (stating that the purpose of Section 5 was "to make some things punishable, to prevent some things, that cannot be punished or prevented under the antitrust law").

[12] H.R. REP. NO. 63-1142, at 19.

[13] *See id*. at 18–19.

[14] *Id*. at 19.

[15] *Id*. at 2 (declaring "unfair and oppressive competition to be unlawful"); S. REP. NO. 63-597, at 17 (1914) (citing a previous version of the bill, S. 2941, which would allow the commission to revoke the registration of any corporation using "materially unfair or oppressive methods of competition"); 51 CONG. REC. 8861 (1914) (statement of Rep. Hinebaugh) (seeking to prevent "unfair or oppressive competition" and proceeding to list examples); *id*. at 8979 (statement of Rep. Murdock) (seeking to protect to protect "smaller, weaker business organizations from the oppressive and unfair competition of their more powerful rivals"); *id*. at 13117 (statement of Sen. Reed) ("intended to reach unfair, dishonest, crooked, oppressive, coercive acts. It is not intended to cover mere mistakes").

methods of competition, members of Congress had no difficulty identifying concrete examples.[16] One congressman noted that when it comes to unfair methods of competition, "[t]here is that in the common sense of fairness and right dealing which indicates plainly the distinction between close bargaining and oppression."[17] Both the House and Senate also expressed a common understanding that unfair methods of competition encompassed conduct that tended to undermine "competitive conditions" in the marketplace.[18]

Congress evinced a clear aim that "unfair methods of competition" need not require a showing of current anticompetitive harm or anticompetitive intent in every case. First, the legislative history is replete with statements to the effect that Congress wanted the FTC to stop monopolies in their "incipiency."[19] Requiring the FTC to show current anticompetitive effects,

---

[16] For instance, a Senate report referenced practices "such as local price cutting, interlocking directorates, and holding companies intended to restrain substantial competition." S. REP. NO. 63-597, at 13. In considering what conduct should be prohibited, the House distinguished between "artificial bases" of monopolistic power and "natural bases." *See* H.R. REP. NO. 63-533, at 23–25. The House viewed artificial bases of monopolistic power to include, for instance, the acceptance of rates or terms of service from common carriers not granted to other shippers; price discrimination not justified by differences in cost or distribution; procuring the secrets of competitors by bribery or any illegal means; procuring conduct on the part of employees of competitors inconsistent with their duties to their employers; making oppressive exclusive contracts; the maintenance of secret subsidiaries or secretly controlled agencies held out as independent; the destruction or material lessening of competition through the use of interlocking directorates; and the charging of exorbitant prices where the seller has a substantial monopoly. *Id.* Natural bases included control of natural resources, transportation facilities, financial resources, or any other economic condition inherent in the character of the industry, such as patent rights. *Id. See also* 51 CONG. REC. 11084–86 (1914) (statement of Sen. Newlands) (discussing jurisprudence on unfair competition); *id.* at 14928-14931 (statement of Rep. Covington) (discussing jurisprudence on unfair competition); *id.* at 11108 (statement of Sen. Newlands) (providing specific examples of unfair competition, such as local price cutting and organizing "bogus independent concerns . . . for the purpose of entering the field of the adversary and cutting prices with a view to his destruction[,]" among other things); *id.* at 11230 (statement of Sen. Robinson) (providing examples of unfair competition).

[17] 51 CONG. REC. 8979 (statement of Sen. Murdock).

[18] *See* S. REP. NO. 1326, at 3–4 (stating that "Congress should maintain the policy established by the anti-trust law" to "'maintain[ ] competitive conditions," and that "every possible effort to create and preserve competitive conditions should be made"); *id.* at 2, 3-4, 11, & 13; S. REP. NO. 63-597, at 10 ("a commission is a necessary adjunct to the preservation of competition and to the practical enforcement of the law"); H.R. Rep. No. 63-533, at 2 (1914) (reported by Rep. Covington) ("The administration idea and the idea of business men generally, is for the preservation of proper competitive conditions in our great interstate commerce."). The FTC Act's legislative history makes it clear that Congress intended the statute to protect a broad array of market participants including workers and rival businesses. *See* 51 CONG. REC. 13312 (1914) (statement of Sen. Reed) ("it is not required to show restraint of trade or monopoly, but that the acts complained of hinder the business of another, or prohibit another from engaging in business, or restrain trade"); *id.* (statement of Sen. White) ("one of the main objects of this legislation is to prevent a rival in business from using unfair competition to drive his competitor out of business and to prevent this before the business is destroyed"); 51 CONG. REC. 8979 (1914) (statement of Rep. Murdock) (purpose of new Commission "is to protect the smaller, weaker business organizations from the oppressive and unfair competition of their more powerful rivals"). The goals of "protecting consumers against the high prices and [guarding] the interests of employees" were expressed by the House. *See* H.R. REP. NO. 533, 63d Cong., 2d Sess. 14 (1914) (quoting from the Preliminary Report of the Industrial Commission, submitted to Congress in 1900). *See also* 51 CONG. REC. 8854 (1914) (statement of Rep. Morgan) (among goals of Section 5 "to secure labor the highest wage, the largest amount of employment under the most favorable conditions and circumstances").

[19] H.R. REP. NO. 63-1142, at 19 ("[t]he most certain way to stop monopoly at the threshold is to prevent unfair competition"); 51 CONG. REC. 13118) (1914) (statement of Sen. Reed) ("the same class of conspiracies exactly as the Sherman Antitrust Act deals with, except that we propose to strike those acts in their incipiency instead of after

---

which are typically seen only after the monopoly has passed the "embryonic" stage, would undercut Congress's hope to prohibit unfair business practices prior to, or near, monopoly power.[20] In addition, many of the practices listed by Congress as patently unfair do not automatically carry with them measurable effects.[21] Second, in considering and rejecting a definition of "unfair methods of competition" that would have required a showing of intent, legislators noted that such a requirement would inappropriately restrict the new provision to the metes and bounds of the antitrust laws and place an undue burden on the Commission in proving its cases.[22]

Congress struck an intentional balance when it enacted the FTC Act. It allowed the Commission to proceed against a broader range of anticompetitive conduct than can be reached under the Clayton and Sherman Acts, but it did not establish a private right of action under Section 5, and it limited the preclusive effects of the FTC's enforcement actions in private antitrust cases under the Sherman and Clayton Acts.[23]

---

they have been actually worked out into a complete system of monopoly or restraint of trade"); *id*. at 14941 (statement of Rep. Stevens) (noting that section five "[would] give to this commission the power of preventing in their conception and in their beginning some of these unfair processes in competition which have been the chief source of monopoly"); *id*. at 12030 (statement of Sen. Newlands) (remarking that a commission would "check monopoly in the embryo"); *id*. at 11455 (statement of Sen. Cummins) (stating that the new law would "seize the offender before his ravages have gone to the length necessary in order to bring him within the law that we already have"); *id*. at 11087 (statement of Sen. Newlands) (citing the Cummins Report, which anticipated that a commission "could be vastly more effectual than through the courts alone, which in most cases will take no cognizance of violations of the law for months or years after the violation occurred, and when the difficulty of awarding reparation for the wrong is almost insurmountable").

[20] 51 CONG. REC. 13118 (statement of Sen. Reed) (declaring that Congress intended "to do something that will strike a death blow to monopoly. . . to arrest it in its infancy . . . [and] to strike those acts in their incipiency instead of after they have been actually worked out into a complete system of monopoly or restraint of trade."); *id*. at 14927 (statement of Rep. Covington) ("the best and most, effective way to deal with the various practices of unfair or destructive competition which, if permitted to go on unchecked and uncontrolled, become potential for restraint of trade or monopoly"); *id*. at 14929 (statement of Rep. Covington) ("We are seeking . . . to deal, with those practices of unfair trade in their incipient stages which if left untrammeled and uncontrolled become the acts which constitute in their culmination restraint of trade and monopoly and the groundwork of the trusts which have menaced us industrially").

[21] 51 CONG. REC. 12217 (statement of Sen. Newlands) ("all you would have to prove would be an unfair method whose tendency was to stifle competition."); 51 CONG. REC. 13312 (statement of Sen. White) (stating that "one of the main objects of this legislation is to prevent a rival in business using unfair competition to drive his competitor out of business and to prevent this before the business is destroyed" and that "the unfair acts and practices had to have the effect to destroy or unreasonably hinder the business of another would neutralize this useful feature of the enactment"); 51 CONG. REC. 13311 (statement of Sen. Cummins) ("if the effect is to restrain trade or to create a monopoly[,] we have a complete and perfect prohibition in the antitrust law"); 51 CONG. REC. 13312 (1914) (statement of Sen. Reed) ("it is not required to show restraint of trade or monopoly, but that the acts complained of hinder the business of another, or prohibit another from engaging in business, or restrain trade"); 51 CONG. REC. 8979 (statement of Rep. Murdock) (purpose of new Commission "is to protect the smaller, weaker business organizations from the oppressive and unfair competition of their more powerful rivals.").

[22] 51 CONG. REC. 13311 (1914) (statement of Sen. Cummins) ("[t]here can be unfair competition in which the public is interested without any intent as described in the amendment"); *id*. ("[i]f the effect is to restrain trade or to create a monopoly we have a complete and perfect prohibition in the antitrust law"); *id*. at 13312 (statement of Sen. White) ("but we will have to carry the additional burden of proving the specific intent . . . [t]he proof of the specific intent with which an act was done is, as all lawyers know difficult to make").

[23] Treble damages are not available under the FTC Act. Civil penalties and Section 19's monetary remedies are limited to unfair and deceptive acts or practices. *See* 15 U.S.C. § 45(m)(1)(A); 15 U.S.C. § 57b. A finding that

The Supreme Court has affirmed this same broad view of the scope of Section 5 on numerous occasions.[24] It has condemned coercive and otherwise facially unfair practices that have a tendency to stifle or impair competition.[25] The federal circuit courts have likewise consistently held that the FTC's authority extends not only to "the letter," but also to "the spirit" of the antitrust laws.[26]

### B.   Congress created the FTC as an expert body charged with elucidating the meaning of Section 5

Congress was careful and deliberate when it created the FTC, an independent agency. The five Commissioners would serve for terms of seven years, which would "give them an opportunity to acquire the expertness" needed to determine what constitutes an unfair method of competition.[27] The Commission would provide guidance to the business community on the legality of business practices (including by issuing advisory opinions),[28] serve as an aid to the courts,[29] and act as an enforcer against unfair methods of competition.[30] Congress gave the Commission powers to conduct quasi-judicial hearings,[31] directly seek injunctive relief in federal court,[32] pursue investigations, prepare reports, and make rules.[33] To balance the Commission's powers, Congress created checks to ensure that the FTC would be accountable to it[34] and that the

---

conduct is an unfair method of competition under Section 5 is not given collateral estoppel effect in subsequent private antitrust actions. *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986 (D.C. Cir. 1973) (holding that private litigants cannot sue for violations of the FTC Act). *See also* 51 Cong. Rec. 13115 (1914) (statement of Sen. Newlands) ("I do not believe in the principle, of assessing threefold damages."); *id.* at 11317 (statement of Sen. McCumber) (moving to strike treble damages provision).

[24] *See supra*, note 3.

[25] *Texaco*, 393 U.S. at 225–26 (citing *Atlantic Refining Co.,* 381 U.S. at 376).

[26] *Ethyl*, 729 F.2d at 136–37 (citing *Sperry & Hutchinson*, 405 U.S. at 239); *Grand Union Co. v. Fed. Trade Comm'n,* 300 F.2d 92, 98–99 (2d Cir. 1962)). *Cf.*, *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1292–93 (4th Cir. 1987) (describing Section 5 "as a kind of penumbra around the federal antitrust statutes").

[27] S. Rep. No. 63-597 at 11. *See also id.* at 11 (anticipating that the Commission would "build up a comprehensive body of information for the use and advantage of the Government and the business world"); *id.* at 22 ("we want trained experts; we want precedents; we want a body of administrative law built up.").

[28] *See id.* at 6–7 (citing an address by President Wilson, stating that "the business men of the country . . . desire the advice, the definite guidance and information which can be supplied by an administrative body."); *id.* at 10 (anticipating that the Commission would "aid the business public.").

[29] *See* H.R. Rep. No. 63-533, at 8 (anticipating that the commission would use its investigatory powers in "aid of the courts.").

[30] S. Rep. No. 63-597, at 10 (anticipating that the Commission would have "sufficient power ancillary to the Department of Justice to aid materially and practically in the enforcement of the Sherman law and to aid the business public as well, and, incidentally, to build up a comprehensive body of information for the use and advantage of the Government and the business world"). *See also* H.R. Rep. No. 63-533, at 9.

[31] 15 U.S.C. § 45(b) (providing for adjudicatory hearings).

[32] 15 U.S.C. § 53(b).

[33] *Id.* § 46(a),(b) (authorizing the Commission to investigate corporations and require reports); *id.* § 46(g) (authorizing the Commission to "make rules and regulations for the purpose of carrying out the provisions of this subchapter"); *Nat'l Petroleum Refiners Ass'n v. Fed. Trade Comm'n*, 482 F.2d 672, 673 (D.C. Cir. 1973) (holding that "the Federal Trade Commission is authorized to promulgate rules defining the meaning of the statutory standards of the illegality the Commission is empowered to prevent").

[34] *See, e.g.*, 15 U.S.C. § 46(d),(f),(h) (requiring reports to Congress); *Id.* § 57a(f)(7) (requiring annual reports to Congress); *Id.* § 57b-2(d)(1)(A) (providing for disclosure of protected information to Congress). Congress also holds

FTC's decisions would be reviewable by federal courts of appeal.[35] In the ensuing years, Congress has conducted vigorous oversight of the FTC and the courts have not hesitated to review Commission decisions.[36]

Congress intended for the FTC to be entitled to deference from the courts as an independent, expert agency.[37] Over the years, courts have consistently held that FTC determinations as to what practices constitute an unfair method of competition deserve "great weight,"[38] recognizing that the Commission is an expert agency, rather than "a carbon copy of the Department of Justice."[39]

Even when courts have rejected the Commission's factual conclusions, they have consistently reaffirmed the scope of its Section 5 authority.[40] For example, *Ethyl*, *Boise*, and *OAG* cited prior decisions of the Supreme Court that affirm the distinctive scope of Section 5,[41] but ultimately found that the particular facts at issue lacked evidence of unfairness, either "some indicia of oppressiveness"[42] or some evidence that the conduct tended to negatively affect the market.[43] All three appellate decisions reiterated the well-accepted principle that the Commission "is not confined to [the] letter" of the antitrust laws, and that "[i]t may bar incipient violations of

---

the FTC accountable though the budgetary, appointment, and oversight processes, and through numerous statutory enactments and amendments relating to the FTC's powers over the course of the hundred-plus years since the passage of the Federal Trade Commission Act.

[35] 15 U.S.C. § 45(b). Respondents in adjudicative proceedings may receive judicial review of the Commission's decision in their circuit of residence or any circuit where they committed the conduct underlying the alleged violation: an unusually expansive form of judicial oversight. *See, e.g.*, J. Thomas Rosch Commissioner, Fed. Trade Comm'n, Three Questions About Part Three: Administrative Proceedings at the FTC, Remarks Before the American Bar Association Section of Antitrust Law Fall Forum, Washington, D.C. 18 (Nov. 8, 2012), https://www.ftc.gov/sites/default/files/documents/public_statements/three-questions-about-part-three-administrative-proceedings-ftc/121108fallforum.pdf.

[36] *See* William E. Kovacic, *The Federal Trade Commission and Congressional Oversight of Antitrust Enforcement*, 17 Tulsa L.J. 587, 623–27 (1982). *See also Ethyl*, 729 F.2d at 137; *Boise Cascade Corp. v. Fed. Trade Comm'n*, 637 F.2d 573, 581–82 (9th Cir. 1980); *Official Airline Guides, Inc. v. Fed. Trade Comm'n (OAG)*, 630 F.2d 920, 927 (2d Cir. 1980).

[37] S. Rep. No. 63-597 at 11, 22.

[38] *OAG*, 630 F.2d at 927 (quoting *Cement Inst*itute, 333 U.S. at 720); *Atlantic Refining Co.*, 381 U.S. at 368; *Fed. Trade Comm'n v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 314 (1934). *See also Ind. Fed'n of Dentists*, 476 U.S. at 455; *Texaco*, 393 U.S. at 226; *Motion Picture Advert. Serv. Co*., 344 U.S. at 396.

[39] *Fed. Trade Comm'n v. Dean Foods Co*., 384 U.S. 597, 618–19 (1966) (Fortas, J., dissenting). *See also* 51 Cong. Rec. 12146 (statement of Sen. Henry Hollis) (observing that the DOJ would be able to focus on "the great task of prosecuting suits for the dissolution of monopolies, leaving to the trade commission the important service of policing competition, so as to protect small business men, keep an open field for new enterprise, and prevent the development of trusts").

[40] *See, e.g., Ethyl*, 729 F.2d at 128; *Boise*, 637 F.2d at 573; *OAG*, 630 F.2d at 920.

[41] *Boise*, 637 F.2d at 581; *Ethyl*, 729 F.2d at 136–37; *OAG*, 630 F.2d at 927.

[42] *Ethyl*, 729 F.2d at 139 (holding that "before business conduct in an oligopolistic industry may be labelled "unfair" within the meaning of § 5 a minimum standard demands that, absent a tacit agreement, at least some indicia of oppressiveness must exist"); *OAG*, 630 F.2d at 927–28 (finding that the monopolist had "no purpose to restrain competition or to enhance or expand his monopoly, and [did] not act coercively").

[43] *Boise*, 637 F.2d at 581 (finding that "without proof of anticompetitive effects" it could not assume that there was a "deliberate restraint on competition"). *Boise*'s applicability to cases outside the realm of delivered pricing is limited – the court's decision was driven by the Commission's inconsistent position on delivered pricing practices in prior statements, its shifting litigation strategy, and the Commission's failure to meets its own standard. *Id*. at 575–77, 582.

those statutes."[44] They also agreed that Section 5 reaches "conduct which, although not a violation of the letter of the antitrust laws, is close to a violation or is contrary to their spirit,"[45] and further recognized the importance of deference to the Commission where it acts against conduct that is unfair.[46]

### III.     Unfair Methods of Competition

Relying on the text, structure, legislative history of Section 5, precedent, and the FTC's experience applying the law, this statement describes the most significant general principles concerning whether conduct is an unfair method of competition under Section 5 of the FTC Act.[47]

### 1.      The conduct must be a method of competition

Conduct must be a "method of competition" to violate Section 5. A method of competition is conduct undertaken by an actor in the marketplace—as opposed to merely a condition of the marketplace, not of the respondent's making, such as high concentration or barriers to entry.[48] The conduct must implicate competition, but the relationship can be indirect. For example, misuse of regulatory processes that can create or exploit impediments to competition (such as those related to licensing, patents, or standard setting) constitutes a method of competition.[49] Conversely, violations of generally applicable laws by themselves, such as environmental or tax laws, that merely give an actor a cost advantage would be unlikely to constitute a method of competition.

### 2.      That is unfair

The method of competition must be unfair, meaning that the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business acumen, truthful marketing and advertising practices,

---

[44] *Ethyl,* 729 F.2d at 136. *See also Boise,* 637 F.2d at 581.

[45] *Ethyl,* 729 F.2d at 136–37.

[46] *Ind. Fed'n Dentists*, 476 U.S. at 454.

[47] Whether the conduct violates accepted norms of unfairness derived from external standards expressed in statutes, common law, and regulations outside of the federal antitrust laws may also be relevant to whether the conduct is an unfair method competition. *See Ind. Fed'n of Dentists*, 476 U.S. at 454 ("The standard of "unfairness" under the FTC Act …encompass[es] not only practices that violate the Sherman Act and the other antitrust laws. . . but also practices that the Commission determines are against public policy for other reasons."). *See also Sperry & Hutchinson*, 405 U.S. at 244; *Motion Picture Advertising Co.,* 344 U.S. at 395; *R.F. Keppel & Bro.*, 291 U.S. at 313. This framework will not be used to analyze matters that constitute a violation of the letter of the antitrust laws.

[48] *See Ethyl*, 729 F.2d at 139.

[49] Statement of the Federal Trade Commission Regarding Google's Search Practices, In the Matter of Google, Inc., FTC File No. 111-0163 (Jan. 3, 2013), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-federal-trade-commission-regarding-googles-search-practices-matter-google-inc; Statement of the Federal Trade Commission In the Matter of Robert Bosch GmbH, FTC. File No. 121-0081 (Apr. 24. 2013); Analysis of Proposed Consent Decree to Aid in Public Comment: In the Matter of Negotiated Data Solutions, LLC, FTC File No. 051-0094 (Jan. 23, 2008); *In re Dell Computer Corp*., 121 F.T.C. 616 (1996) (consent order). *Cf.*, *Walker Process Eqpt., Inc. v. Food Machinery Corp.*, 382 U.S. 172 (1965) (fraud on the patent office may constitute antitrust violation).

investment in research and development that leads to innovative outputs, or attracting employees and workers through the offering of better employment terms. [50]

There are two key criteria to consider when evaluating whether conduct goes beyond competition on the merits. First, the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature. [51] It may also be otherwise restrictive or exclusionary, depending on the circumstances, as discussed below. Second, the conduct must tend to negatively affect competitive conditions. [52] This may include, for example, conduct that tends to foreclose or impair the opportunities of market participants, reduce competition between rivals, limit choice, or otherwise harm consumers.

These two principles are weighed according to a sliding scale. Where the indicia of unfairness are clear, less may be necessary to show a tendency to negatively affect competitive conditions. [53] Even when conduct is not facially unfair, it may violate Section 5. [54] In these circumstances, more information about the nature of the commercial setting may be necessary to determine whether there is a tendency to negatively affect competitive conditions. The size, power, and purpose of the respondent may be relevant, as are the current and potential future effects of the conduct.

The second principle addresses the tendency of the conduct to negatively affect competitive conditions—whether by affecting consumers, workers, or other market participants. In crafting Section 5, Congress recognized that unfair methods of competition may take myriad forms and hence that different types of evidence can demonstrate a tendency to interfere with competitive conditions. Because the Section 5 analysis is purposely focused on incipient threats to competitive conditions, [55] this inquiry does not turn to whether the conduct directly caused

---

[50] *See generally U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) *(*distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *U.S. v. Alum. Co. of America,* 148 F.2d 416, 430 (2d Cir. 1945) (distinguishing conduct based on "superior skill, foresight and industry.").

[51] *See e.g., Sperry & Hutchinson*, 405 U.S. at 905 (construing Section 5 to reach conduct shown to exploit consumers, citing *R.F. Keppel & Bro.*, 291 U.S. at 313); *Atlantic Refining Co.*, 381 U.S. at 369 (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices")*; Texaco*, 393 U.S. at 228-29 (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition")*; Ethyl, 729 F.2d* at 140 (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary").

[52] *See, e.g.,* S. REP. NO. 1326, at 3–4 (1913) (stating that "Congress should maintain the policy established by the anti-trust law" to "'maintain[ ] competitive conditions," and that "every possible effort to create and preserve competitive conditions should be made"). *Id.* at 2, 3-4, 11, & 13; *see also* H.R. Rep. No. 63-533, at 2 (1914) (reported by Rep. Covington) (The administration idea and the idea of business men generally, is for the preservation of proper competitive conditions in our great interstate commerce").

[53] *Ethyl*, 729 F.2d at 137-39.

[54] *Hastings Mfg. Co. v. Fed. Trade Comm'n*, 153 F.2d 253, 257 (6th Cir. 1946).

[55] *See generally supra* notes 11 & 18. *See also Fashion Originators' Guild Am. v. Fed. Trade Comm'n (FOGA)*, 312 U.S. 457, 466 (1941) (holding that it was not determinative that petitioners had not yet "achieved a complete monopoly"; rather it was "sufficient if it really tends to that end, and to deprive the public of the advantages which flow from free competition").

*actual* harm in the specific instance at issue.[56] Instead, the second part of the principle examines whether the respondent's conduct has a tendency to generate negative consequences; for instance, raising prices, reducing output, limiting choice, lowering quality, reducing innovation, impairing other market participants, or reducing the likelihood of potential or nascent competition. These consequences may arise when the conduct is examined in the aggregate along with the conduct of others engaging in the same or similar conduct,[57] or when the conduct is examined as part of the cumulative effect of a variety of different practices by the respondent.[58] Moreover, Section 5 does not require a separate showing of market power or market definition when the evidence indicates that such conduct tends to negatively affect competitive conditions.[59] Given the distinctive goals of Section 5, the inquiry will not focus on the "rule of reason" inquiries more common in cases under the Sherman Act, but will instead focus on stopping unfair methods of competition in their incipiency based on their tendency to harm competitive conditions.

## IV.     Potential Cognizable Justifications

In the event that conduct *prima facie* constitutes an unfair method of competition, liability normally ensues under Section 5 absent additional evidence. There is limited caselaw on what, if any, justifications may be cognizable in a standalone Section 5 unfair methods of competition case, and some courts have declined to consider justifications altogether.[60] In instances where a party chooses to assert justifications as an affirmative defense, the FTC can

---

[56] *See Sperry & Hutchinson*, 405 U.S. at 244 (explaining that "unfair competitive practices [are] not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws"); *Ethyl*, 729 F.2d at 138 (finding that evidence of actual harm can be "a relevant factor in determining whether the challenged conduct is unfair" but is not required); *Boise*, 637 F.2d at 581-82. *In re Coca-Cola Co.*, 117 F.T.C. 795, 915 (1994) (rejecting argument that Section 5 violation requires showing "anticompetitive effects"). *See also supra* notes 19-21 and accompanying text (explaining that a showing of an actual anticompetitive injury is unnecessary to prove a violation of Section 5 because that section was designed to stop in their incipiency acts and practices that could lead to violations of the Sherman and Clayton Acts).

[57] *Motion Picture Advertising*, 344 U.S. at 395.

[58] Consent Order, Statement in Support of Consent, *In the Matter of Intel Corp.*, File No. 061-0247 (Dkt. 9341) (July 28, 2010); *The Vons Co.*, FTC Complaints and Order, 1987-1993 Transfer Binder, Trade Reg. Rep. (CCH) ¶ 23,200 (Aug. 7, 1992).

[59] *Atlantic Refining Co.*, 381 U.S. at 371 ("unnecessary to embark upon a full scale economic analysis of competitive effects."); *Texaco*, 393 U.S. at 230 (holding that "[i]t is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce."); *L.G. Balfour Co. v. Fed. Trade Comm'n*, 442 F.2d 1, 19-20 (7th Cir. 1971) (No proof of foreclosure necessary in an exclusive dealing contract case under Section 5 (citing *Brown Shoe*).

[60] *Atlantic Refining Co.*, 381 U.S. at 371 (considering the defendant's argument that the distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and nonetheless holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); *Texaco*, 393 U.S. at 230 (following the same reasoning as *Atlantic Refining* and finding that the "anticompetitive tendencies of such system [were] clear"); *Balfour*, 442 F.2d at 15 (while relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice). For provisions of the antitrust laws where courts have not accepted justifications as part of the legal analysis, the Commission will similarly not accept justifications when these claims are pursued through Section 5.

draw on the Commission's long experience evaluating asserted justifications when enforcing Section 5, as well as its review of decided cases and past enforcement actions.[61]

First, it would be contrary to the text, meaning, and case law of Section 5 to justify facially unfair conduct on the grounds that the conduct provides the respondent with some pecuniary benefits.[62] At the same time, some practices may impact competitive conditions in a manner that both harms and benefits market participants other than the party; at times, the harms and benefits may redound to the same participants, and at times they may be disparately distributed – that is, a practice may harm some market participants while simultaneously providing legitimate benefits to others.

If parties in these cases choose to assert a justification, the subsequent inquiry would not be a net efficiencies test or a numerical cost-benefit analysis. The unfair methods of competition framework explicitly contemplates a variety of non-quantifiable harms, and justifications and purported benefits may be unquantifiable as well. The nature of the harm is highly relevant to the inquiry; the more facially unfair and injurious the harm, the less likely it is to be overcome by a countervailing justification of any kind.[63] In addition, whether harmed parties share in the purported benefits of the practice may be relevant to the inquiry.

Some well-established limitations on what defenses are permissible in an antitrust case apply in the Section 5 context as well. It is the party's burden to show that the asserted justification for the conduct is legally cognizable,[64] non-pretextual,[65] and that any restriction used to bring about the benefit is narrowly tailored to limit any adverse impact on competitive

---

[61] *See supra* § II (B) (discussing Congressional intent to create an expert Commission entitled to deference for its determinations).

[62] *Supra* note 51.

[63] *See FOGA*, 312 U.S. at 467-68 (finding the Commission did not need to hear evidence of justifications where "[t]he purpose and object of this combination, its potential power, its tendency to monopoly, the coercion it could and did practice upon a rival method of competition, all brought it within the policy of the prohibition declared by the Sherman and Clayton Acts").

[64] *See, e.g. Ind. Fed. Dentists*, 476 U.S. at 463 (making clear that justifications that run directly counter to the "basic policy of the Sherman Act," in this instance, limiting consumer access to relevant information because "an unrestrained market in which consumers are given access to the information they believe to be relevant to their choices will lead them to make unwise, and even dangerous, choices" are not cognizable); *id.* at 464 (affirming Commission's finding that there was insufficient evidence that the restraint conferred the claimed benefit at all). *See also Fed. Trade Comm'n v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 423-24 (1990); *NCAA v. Board of Regents*, 468 U.S. 85, 113-15 (1984); *United States v. Addyston Pipe Steel Co.* 85 F. 271 (6th Cir. 1898), *aff'd* 175 U.S. 211 (1899).

[65] Pretextual justifications include those that are not set forth in documents prior to, or contemporaneous with, the introduction of the conduct, or not plausibly based on the known facts. *See, e.g. Ind. Fed'n of Dentists*, 476 U.S. at 464 (affirming the Commission's finding that there was insufficient evidence that the restraint conferred the claimed benefit at all). *See also United States v. Microsoft Corp.*, 253 F.3d 35, 62-64, 72, 74, 76-77 (D.C. Cir. 2001); *Eastman Kodak Co. v. Image Technical Tech. Svcs*, 504 U.S. 541, 472, 484-85 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608-10 (1985); *Texas Specialty Physicians v. Fed. Trade Comm'n*, 528 F.3d 346, 368-70 (5th Cir. 2008); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196-97 (3d Cir. 2005). *See also* Fed. Trade Comm'n & U.S. Dep't of Justice, Antitrust Guidelines for Collaboration Among Competitors §3.36a (2000) (2000 Collaboration Guidelines) ("Efficiency claims are not considered if they are vague or speculative or otherwise cannot be verified by reasonable means").

conditions.[66] In addition, the asserted benefits must not be outside the market where the harm occurs.[67] Finally, it is the party's burden to show that, given all the circumstances, the asserted benefits outweigh the harm and are of the kind that courts have recognized as cognizable in standalone Section 5 cases.[68]

## V.        Historical Examples of Unfair Methods of Competition

For the purpose of providing further guidance, the FTC lists here a non-exclusive set of examples and citations of past decisions and consent decrees based on Section 5, and, where applicable, other antitrust laws, focusing on conduct that constitutes an incipient violation of the antitrust laws or that violates the spirit of the antitrust laws. These illustrative examples are drawn from case law and from FTC experience.

A non-exclusive set of examples of conduct that have been found to violate Section 5 include:

- Practices deemed to violate Sections 1 and 2 of the Sherman Act or the provisions of the Clayton Act, as amended (the antitrust laws).[69]

- Conduct deemed to be an incipient violation of the antitrust laws. Incipient violations include conduct by respondents who have not gained full-fledged monopoly or market power, or by conduct that has the tendency to ripen into violations of the antitrust laws.[70] Past examples of such use of Section 5 of the FTC Act include:

    - invitations to collude,[71]

---

[66] *NCAA v. Alston*, 141 S. Ct. 2141, 2162-64 (2021); *Polygram Holding, Inc. v.  Fed. Trade Comm'n*, 416 F.3d 29, 38 (D.C. Cir. 2005); 2000 Collaboration Guidelines § 3.36b.

[67] *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 370-71 (1963); 2000 Collaboration Guidelines § 3.36a.

[68] At all times, the burden of persuasion would remain with the Commission in administrative proceedings pursuant to 5 U.S.C. §556(d).

[69] *Motion Picture Advertising*, 344 U.S. at 395 (conduct fell "within the prohibitions of the Sherman Act and is therefore an unfair method of competition within the meaning of s. 5(a)."); *Cement Institute*, 333 U.S. at 683; *FOGA*, 312 U.S. at 463; *Fed. Trade Comm'n v. Pacific States Paper Trade Ass'n*, 273 U.S. 52 (1926).

[70] *FOGA*, 312 U.S. at 466 (FTC may challenge combinations "not merely in their fruition, but also in their incipiency combinations which could lead to . . .trade restraints and practices deemed undesirable"); *Motion Picture Advertising*, 344 U.S. at 394-95 ("[i]t is also clear that the Federal Trade Commission Act was designed to supplement and bolster the Sherman and the Clayton Act. . . to stop in their incipiency acts and practices which, when full blown, would violate those Acts."); *Cement Institute*, 333 U.S. at 708; *Triangle Conduit & Cable Co. v. Fed. Trade Comm'n*, 168 F.2d 175, 181 (7th Cir. 1948).

[71] The Commission has challenged both public and private invitations to collude as unfair methods of competition. This type of conduct, if consummated would constitute a per se violation of the antitrust laws. Invitations to collude, even if unaccepted, represent both an incipient violation as well as a violation of the spirit of the antitrust laws within the meaning of the 2022 Section 5 policy statement. Under either theory, an invitation to collude constitutes an unfair method of competition under Section 5. *In Re Quality Trailer Products Corp.*, 115 F.T.C. 944 (1992) (consent); *In re Valassis Communs.*, Dkt. C-4160, 2006 FTC LEXIS 25 (2006) (consent); *In re A.E. Clevite*, 116 F.T.C. 389 (1993) (consent); *In re YKK (USA)*, 108 F.T.C. 628 (1993) (consent); *In re Precision Moulding Co.*, 122 F.T.C. 104 (1996) (consent); *In re Stone Container Corp.*, 125 F.T.C. 853 (1998) (consent); *In re U-Haul Int'l, Inc.*, File No. 081-0157, 6 (2010) (consent); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F.Supp. 2d 1343,

- mergers, acquisitions, or joint ventures that have the tendency to ripen into violations of the antitrust laws,[72]

- a series of mergers, acquisitions, or joint ventures that tend to bring about the harms that the antitrust laws were designed to prevent, but individually may not have violated the antitrust laws,[73] and

- loyalty rebates, tying, bundling, and exclusive dealing arrangements that have the tendency to ripen into violations of the antitrust laws by virtue of industry conditions and the respondent's position within the industry.[74]

- Conduct that violates the spirit of the antitrust laws. This includes conduct that tends to cause potential harm similar to an antitrust violation, but that may or may not be covered by the literal language of the antitrust laws or that may or may not fall into a "gap" in those laws.[75] As such, the analysis may depart from prior precedent based on the provisions of the Sherman and Clayton Acts. Examples of such violations, to the extent not covered by the antitrust laws, include:

- practices that facilitate tacit coordination,[76]

- parallel exclusionary conduct that may cause aggregate harm,[77]

---

1369-70 (N.D. Ga. 2017), *aff'd sub. Nom.*, *Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 827 (2019). Depending on the circumstances, an invitation to collude may also constitute attempted monopolization under Section 2 of the Sherman Act, *United States v. American Airlines*, 743 F.2d 1114 (5th Cir. 1984), or wire fraud, *United States v. Ames Sintering*, 927 F.2d 232 (6th Cir. 1990).
Under appropriate circumstances, the Commission will refer evidence of per se illegal cartel agreements to the Department of Justice for criminal prosecution. *See* Commission Statement Regarding Criminal Referral and Partnership Process, File No. P094207 (Nov. 18, 2021),
https://www.ftc.gov/system/files/documents/public_statements/1598439/commission_statement_regarding_criminal_referrals_and_partnership_process_updated_p094207.pdf.
[72] *Yamaha Motor Co. v. Fed. Trade Comm'n*, 657 F.2d 971 (8th Cir. 1981), *cert. denied*, 456 U.S. 915 (1982).
[73] *Vons*, 1987-1993 Transfer Binder ¶ 23,200. Such series of acquisitions or related conduct may also constitute an unfair method competition as a violation of the spirit of the antitrust laws. *See infra* note 83 and cases cited therein.
[74] *Luria Bros. v. Fed. Trade Comm'n*, 389 F.2d 847, 864 (3d Cir. 1968), *cert. denied*, 393 U.S. 829 (1968).
[75] Remarks of Jon Leibowitz, Comm'r, Fed. Trade Comm'n, "Tales from the Crypt" Episodes '08 and '09: The Return of Section 5 ("Unfair Methods of Competition in Commerce are Hereby Declared Unlawful"), Section 5 Workshop, at 4 (Oct. 17, 2008), https://www.ftc.gov/sites/default/files/documents/public_events/section-5-ftc-act-competition-statute/jleibowitz.pdf ("Simply put, consumers can still suffer plenty of harm for reasons not encompassed by the Sherman Act as it is currently enforced in the federal courts.").
[76] *Cement Institute*, 333 U.S. at 709-21 (multiple basing point pricing system contributed to unlawful coordinated pricing); Analysis to Aid Public Comment, *In re BMG Music et. al*, 65 Fed. Reg. 31,319 (2000), Docket No. C-3973 (2000) (Decision & Order) (distributors of pre-recorded music, acting in parallel but without agreement, impose identical coercive limits on retailer advertising of discounts). *See generally* William E. Kovacic, *Antitrust Policy and Horizontal Collusion in the 21st Century*, 9 LOY. CONSUMER L. REV. 97, 107 (1997) ("[T]he FTC remains perhaps the best vehicle for articulating standards designed to discourage anticompetitive coordination among competitors.").
[77] *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 897 (2007) (holding that the extent of adoption of resale price maintenance across the industry is relevant to legality); *Motion Picture Advertising*, 344 U.S. at 395

13

o   conduct by a respondent that is undertaken with other acts and practices that cumulatively may tend to undermine competitive conditions in the market,[78]

o   fraudulent and inequitable practices that undermine the standard-setting process or that interfere with the Patent Office's full examination of patent applications,[79]

o   price discrimination claims such as knowingly inducing and receiving disproportionate promotional allowances against buyers not covered by Clayton Act,[80]

o   de facto tying, bundling, exclusive dealing, or loyalty rebates that use market power in one market to entrench that power or impede competition in the same or a related market,[81]

o   a series of mergers or acquisitions that tend to bring about the harms that the antitrust laws were designed to prevent, but individually may not have violated the antitrust laws,[82]

o   mergers or acquisitions of a potential or nascent competitor that may tend to lessen current or future competition,[83]

---

("respondent and the three other major companies have foreclosed to competitors 75 percent of all available outlets."); *Standard Oil Co. of California v. United States*, 337 U.S. 293, 309, 314 (1949) (taking into account extent of industry use of similar practices). *See also* C. Scott Hemphill & Tim Wu, *Parallel Exclusion*, 122 YALE L.J. 1182, 1243-45 (2012) ("parallel exclusion is a suitable subject for FTC enforcement under Section 5 of the FTC Act.").

[78] Intel Consent Order at 9341; *Vons*, 1987-1993 Transfer Binder ¶ 23,200.

[79] U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY § 6 (2017); *In re American Cyanamid Co.*, 72 F.T.C. 623, 684-85, *aff'd sub nom, Charles Pfizer & Co.*, 401 F.2d 574 (6th Cir. 1968), *cert. denied*, 394 U.S. 920 (1969) (actual or attempted enforcement of patents obtained by inequitable conduct falling short of fraud).

[80] *Alterman Foods v. Fed. Trade Comm'n*, 497 F.2d 993 (5th Cir. 1974); *Colonial Stores v. Fed. Trade Comm'n*, 450 F.2d 733 (5th Cir. 1971); *R.H. Macy & Co. v. Fed. Trade Comm'n*, 326 F.2d 445 (2d Cir. 1964); *American News Co. v. Fed. Trade Comm'n*, 300 F.2d 104 (2d Cir. 1962); *Grand Union Co. v. Fed. Trade Comm'n*, 300 F.2d 92 (2d Cir. 1962); *In re Foremost-McKesson, Inc.*, 109 F.T.C. 127 (1987).

[81] *Atlantic Refining Co.*, 381 U.S. at 357; *Texaco, Inc.*, 393 U.S. at 223; *Shell Oil Co. v. Fed. Trade Comm'n,* 360 F.2d 470 (5th Cir. 1966); *Brown Shoe*, 384 U.S. at 316.

[82] *The Vons Cos.*, 1987-1993 Transfer Binder ¶ 23,200. Section 5 has also been used to challenge individual transactions that do not meet the technical requirements of Section 7. *In re Beatrice Foods*, 67 F.T.C. 473 (1965), supplemented, 68 F.T.C. 1003 (1965), modified, 71 F.T.C. 797 (1967); *In re Dean Foods, Co.*, 70 F.T.C. 1146 (1966); *In re Foremost Dairies, Inc.*, 60 F.T.C. 944 (1962).

[83] *See, e.g., Fed. Trade Comm'n v. Facebook*, 581 F.Supp. 3d 34 (D.D.C. 2022) (denying motion to dismiss challenging acquisition of WhatsApp and Instagram); Analysis of Agreement Containing Consent Orders to Aid Public Comment, In the Matter of Novartis AG, File No. 141-0141 (consent decree requiring divestiture in transaction eliminating future competition in oncology compounds); Analysis of Agreement Containing Consent Orders to Aid Public Comment, *In the Matter of Össur Americas Holdings, Inc.*, File No. 191-0177 (consent decree requiring divestiture in transaction eliminating future competition in myoelectric elbows). *See also Fed. Trade Comm'n v. Procter & Gamble Co.*, 386 U.S. 568 (1967) (barring acquisition of leading firm where acquirer was most likely potential entrant). *See generally* PHILIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 701at p. 200 (4th ed. 2015) (acquisition of "an

- o using market power in one market to gain a competitive advantage in an adjacent market by, for example, utilizing technological incompatibilities to negatively impact competition in adjacent markets,[84]

- o conduct resulting in direct evidence of harm, or likely harm to competition, that does not rely upon market definition,[85]

- o interlocking directors and officers of competing firms not covered by the literal language of the Clayton Act,[86]

- o commercial bribery and corporate espionage that tends to create or maintain market power,[87]

- o false or deceptive advertising or marketing which tends to create or maintain market power,[88] or

---

actual or likely potential competitor is properly classified, for it tends to augment or reinforce the monopoly by means other than competition on the merits."); C. Scott Hemphill & Tim Wu, *Nascent Competitors*, 168 U. PA. L. REV. 1879 (2020).

[84] *Eastman Kodak*, 504 U.S. at 451; *Newcal Industries v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978); *LePage's v. 3M Co.*, 324 F.3d 141 (3d Cir. 2003) (en banc).

[85] *Ind. Fed'n of Dentists*, 476 U.S. at 460-61 (finding of sustained effects legally sufficient even in absence of elaborate market analysis); *Toy's "R" Us v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000) (finding "sufficient proof of anticompetitive effects [such] that no more elaborate market analysis was necessary"). *Cf.*, *Fed. Trade Comm'n v. Staples, Inc.*, 970 F.Supp. 1066, 1075-6 (D.D.C. 1997) (relying in part on direct evidence that pricing for key products from office superstores lower where three such stores exist in same metropolitan area and higher where only one or two such stores present).

[86] *Perpetual Federal Savings & Loan*, 90 F.T.C. 608 (1977) (complaint dismissed due to subsequent legislation). *Cf.*, *TRW, Inc. v. FTC*, 647 F.2d 942 (9th Cir. 1981) (noting automatic nature of liability under Clayton §8 when prerequisites of statute established).

[87] *See* Policy Statement of the Federal Trade Commission on Rebates and Fees in Exchange for Excluding Lower-Cost Drug Products (2022), at 6 n. 27 ("The Commission has a long history of addressing commercial bribery and will continue to do so."), https://www.ftc.gov/legal-library/browse/policy-statement-federal-trade-commission-rebates-fees-exchange-excluding-lower-cost-drug-products; See Hon. Garland S. Ferguson, Jr., Chairman, Fed. Trade Comm'n, Commercial Bribery: An Address to the Conf. on Com. Bribery to the Comm. Standards Council and the Better Bus. Bureau of N.Y. (Oct. 17, 1930) (explaining the Commission's focus on commercial bribery as an unfair method of competition even before it gained authority under the Robinson-Patman Act); *see also* Donald S. Clark, Sec'y, Fed. Trade Comm'n, Remarks Regarding The Robinson-Patman Act: Annual Update, Before the Robinson Patman Act Comm., Section of Antitrust Law, 46th Annual Spring Meeting (Apr. 2, 1998), *See e.g.*, *In re Lockheed Corp.*, 92 F.T.C. 968 (1978) (commercial bribery).

[88] *In re Coleco Industries*, 111 F.T.C. 651 (1989) *(*consent decree barring claims of product availability unless actually available or company has reasonable basis for such claim*); In re Xerox Corp.*, 86 F.T.C. 364 (1975) (repeated publicizing release date of new products with knowledge that products would not be available by that date); Analysis of Proposed Consent Order to Aid Public Comment: *In the Matter of Intel Corp.*, Dkt No. 9341 at 5-6 (describing acts of deception in Commission complaint). *Cf, Microsoft*, 253 F.3d at 76-77 (acts of deception relating to compatibility of Microsoft version of Java with competing software applications as unlawful monopoly maintenance under the Sherman Act). *See generally* Maurice E. Stucke, *When a Monopolist Deceives*, 76 ANTITRUST L.J. 823 (2010). *See also* DANIEL A. CRANE, THE INSTITUTIONAL STRUCTURE OF ANTITRUST ENFORCEMENT 138 (2011) (The Commission is on strongest ground when challenging market power created by fraud or deception).

     ○   discriminatory refusals to deal which tend to create or maintain market power.[89]

## VI.    The Path Forward

The FTC is committed to faithfully discharging its statutory obligations, including through enforcing and administering the prohibition against "unfair methods of competition" on a standalone basis, as laid out in Section 5 of the FTC Act, or in conjunction with its other statutory authorities.

---

[89] *Aspen*, 472 U.S. at 610-11 (affirming antitrust liability for termination of joint venture where no legitimate business justification present for such conduct); *Eastman Kodak*, 504 U.S. at 483-85 (denying summary judgment where defendant manufacturer of copiers refused to deal with third party service providers); *In re Grand Caillou Packing Co*., 65 F.T.C. 799 (1964), *aff'd in part and rev'd in part sub nom*., *LaPeyre v. Fed. Trade Comm'n*, 366 F.2d 117 (5th Cir. 1966) (violation of Section 5 for monopoly manufacturer of shrimp peeling machines to lease machines at substantially different rates in different regions of the US); Analysis of Proposed Consent Order to Aid Public Comment: In the Matter of Intel Corp., Dkt No. 9341 at 4 (describing alleged threatens of refusal to deal with customers who purchased non-Intel CPUs). *See generally* Brett Frischmann & Spencer Weber Waller, *Revitalizing Essential Facilities*, 75 ANTITRUST L.J. 1 (2008).

VOLUME 73          FEBRUARY 1960          NUMBER 4

# HARVARD LAW REVIEW

## EMPLOYEE AGREEMENTS NOT TO COMPETE †

*Harlan M. Blake* *

*Beginning with a historical discussion of the judicial treatment accorded to covenants in which an employee agrees not to compete with his employer after termination of employment, the author examines their present status and analyzes the factors which enter into their enforceability. In light of this analysis, Professor Blake suggests counseling and drafting techniques which may enable the employer to be more effectively protected against former employees' utilization of confidential information and customer relationships acquired during the period of employment.*

MANY of the employees of American business are parties to covenants not to compete with their former employers after termination of employment.[1] Such undertakings are most often ob-

---

† This article stems from a paper presented before the Antitrust Section of the American Bar Association at its August 1959 meeting. The author wishes to thank Professor Milton Handler, Chairman of the Committee on Information and Education of the Section, for stimulating his interest in the topic. Mr. Richard Young, a second-year student in the Minnesota Law School, rendered valuable research assistance.

* Professor of Law, The University of Minnesota. B.A., Chicago, 1946, M.A., 1947, J.D., 1954.

[1] The type of agreement under discussion is fairly accurately described by the cumbersome phrase "agreement, ancillary to an employment contract, not to compete with the employer after termination of employment." Even this is not quite complete, however. For example, it does not include "agency" or franchise agreements entered into between local retailers and manufacturers, in which the owner of the outlet, much like a branch manager in an integrated operation, undertakes not to compete. Such agreements are usually treated in much the same way as employment contracts. Nor does it clearly encompass agreements not to solicit customers or to assign future inventions, which are treated like agreements not to compete even though they are different in important respects.

Postemployment restraints may be found either in a covenant in the actual contract of employment or in a separate contract for which the supporting consideration is at least in part the continuing employment. No important distinction arises from this difference.

JA0247

tained from technical, sales, and managerial personnel who have access to confidential business information or develop close relationships with customers. A covenant typically provides that the employee shall not work for a competitor or set up a competitive business for himself for a specified period of time in a designated geographical area.[2]

Covenants of this type comprise one of the traditional common-law "restraints of trade" and present problems which have kept them before the courts for more than five hundred years.[3] Their treatment at the hands of the courts has reflected the evolution of industrial technology and business methods, as well as the ebb and

---

[2] There do not seem to have been any studies of the use of such covenants by employers, although some data is available on the use of related employee agreements to assign future inventions. See sources cited note 214 *infra.* Especially in recent years the number of cases has been very great. See Annots., 41 A.L.R.2d 15 (1955); 43 A.L.R.2d 94 (1955), for an extensive list of cases, grouped by jurisdiction and in terms of the duration and geographic extent of the restriction. These annotations represent the only work done on this topic in the United States during the last thirty years, other than general discussion in the contracts treatises, 6 CORBIN, CONTRACTS § 1394 (1951); 5 WILLISTON, CONTRACTS § 1643 (rev. ed. 1937), and a number of law-review case notes. For earlier studies which include discussion of employee covenants, see, *e.g.*, Carpenter, *Validity of Contracts Not To Compete,* 76 U. PA. L. REV. 244 (1928); Kales, *Contracts To Refrain From Doing Business or From Entering or Carrying on an Occupation,* 31 HARV. L. REV. 193 (1917). The English sources are set out in note 21 *infra*, and statutes affecting the problem of enforceability of employee restraints in several states appear in note 78 *infra.*

[3] See pp. 631–32 *infra.* The traditional common-law restraints are now commonly classified into two groups: (1) restraints "ancillary" to valid underlying contracts, including, in addition to employment agreements, contracts for the sale of a business or professional practice, partnership agreements, assignments of patent rights, leases of property for business purposes, and, more recently, employee-retirement agreements; (2) restraints not "ancillary" to valid underlying contracts, but typically undertaken to divide territory or markets, limit production, pool profits, fix prices, or buy out potential competitors. "Nonancillary" arrangements did not come to be commonly regarded as subject to the traditional "restraint of trade" doctrines either in the United States or England until the nineteenth century. The earliest known direct-restraint case was decided in 1798, Smith v. Scott, 4 Paton 17 (H.L. 1798) (Scot.); the first American case was Pierce v. Fuller, 8 Mass. 223 (1811). The present classification became an accepted part of law with Judge Taft's celebrated opinion in United States v. Addyston Pipe & Steel Co., 85 Fed. 271, 282–83 (6th Cir. 1898), *aff'd,* 175 U.S. 211 (1899). The "nonancillary" cases are discussed, and Taft's analysis criticized, in Peppin, *Price-Fixing Agreements Under the Sherman Anti-Trust Law,* 28 CALIF. L. REV. 667, 676–77 n.220 (1940). See also HANDLER, ANTITRUST IN PERSPECTIVE 9–13 (1957); Packer, Book Review, 67 YALE L.J. 1141 (1958); DEWEY, MONOPOLY IN ECONOMICS AND LAW 109–38 (1959). The distinction is adopted in RESTATEMENT, CONTRACTS § 515(e) (1932).

flow of such social values as freedom of contract, personal economic freedom, and business ethics. But the fundamental interests which come into conflict have not basically changed.

From the point of view of the employer, postemployment restraints are regarded as perhaps the only effective method of preventing unscrupulous competitors or employees from appropriating valuable trade information and customer relationships for their own benefit. Without the protection afforded by such covenants, it is argued, businessmen could not afford to stimulate research and improvement of business methods to a desirably high level, nor could they achieve the degree of freedom of communication within a company that is necessary for efficient operation.

The opposite view is that postemployment restraints reduce both the economic mobility of employees and their personal freedom to follow their own interests. These restraints also diminish competition by intimidating potential competitors and by slowing down the dissemination of ideas, processes, and methods. They unfairly weaken the individual employee's bargaining position vis-à-vis his employer and, from the social point of view, clog the market's channeling of manpower to employments in which its productivity is greatest.

Recently there has been evidence of new interest on the part of employers and their counsel in the subject of employee restraints. There are several reasons. The employment market — especially for highly trained technical, engineering, and research personnel, but for many other classes of employees as well — has been very competitive. Personnel offices report that hard-to-get, qualified men are refusing to agree to the impairment of mobility that such covenants entail, or are demanding other concessions because of them.[4] Furthermore, alert counsel have noted an increasing tendency on the part of courts to refuse to enforce the restraints in terms as broad as those in which they have been drawn.[5] As a result, many lawyers are reexamining the procedures and forms employed by their clients. Will they stand up in court in an important case? If the restraint is overly broad, will

---

[4] Assertions of fact regarding the increasing use of covenants and their "typical" form are based on opinions of lawyers, including house counsel, and businessmen with whom the problem has been discussed, and on the author's informal analysis of the numbers and types of covenants litigated.

[5] See p. 681 *infra.*

a court pare the covenant down to reasonable scope and enforce
it in an appropriate case, or will it be declared completely unen-
forceable? If validity is doubtful, how can procedures and forms
be modified to enhance their effectiveness? Is the protection af-
forded to the employer by such covenants worth the cost and dif-
ficulty of "tightening up"?

The history of common-law restraints retains some interest also
for students of the antitrust laws.[6] The Sherman Act makes il-
legal "every contract, combination . . . or conspiracy, in restraint
of trade or commerce . . . ."[7] In the first decades after the
act's passage, the common-law "restraint of trade" doctrine was
regarded as a major guide to determining the meaning of this
broad language. Even today when, paradoxically, the Sherman
Act is apparently never called into play against this traditional
type of contract in restraint of trade,[8] its history may cast some
light on the continuing debate between proponents of the "per se"
doctrines and those advocating extension of the "rule of reason."

---

[6] See secondary authorities cited note 3 *supra.*

[7] 26 Stat. 209 (1890), as amended, 15 U.S.C. § 1 (1958).

[8] When the required effect on commerce is present, unreasonable postemploy-
ment restraints would seem clearly to violate the Sherman Act, with the usual
consequences, including possible action by the attorney general and treble-damage
liability to the injured party. The legislative history and subsequent judicial dis-
cussion of the Sherman Act seem clearly to indicate that its purpose was certainly
not less than to make illegal those restraints which had been unenforceable at
common law. See ATT'Y GEN. NAT'L COMM. ANTITRUST REP. 5-12 (1955). How-
ever, the Antitrust Division has in all likelihood never turned its attention to such
agreements, and no treble-damage actions have been discovered among the re-
ported thousands of cases. Virtually all were suits brought by employers seeking
injunctive relief or damages, or both. Occasionally a declaratory judgment is sought
by a covenantor but in only one case that has been found was there combined a
claim of damages to the employee resulting from his unemployability; there is no
indication that treble damages were sought. The matter apparently never came to
trial. Herskovitz v. Todd Co., 85 N.Y.S.2d 707 (Sup. Ct. 1949).

The *in pari delicto* doctrine would seem not to bar the employee's suit, for he
is clearly one of the class sought to be protected by the statute. Furthermore,
presumably the employer is solely responsible for its execution in illegal form.
See generally 6 CORBIN, CONTRACTS §§ 1536-41 (1951). The explanation is un-
doubtedly in part the relative improbability of success of such an action, par-
ticularly since the standard of validity is so flexible, pp. 648-49 *infra,* and in view of
common judicial skepticism regarding treble damages generally. See Loevinger,
*Private Action — The Strongest Pillar of Antitrust,* 3 ANTITRUST BULL. 167-70
(1958). Furthermore, monetary damage would normally be difficult to show, par-
ticularly in light of the limitation imposed by the requirements of making rea-
sonable efforts to mitigate. RESTATEMENT, CONTRACTS § 336 (1932); 5 CORBIN,
CONTRACTS § 1039 (1951).

### I. MITCHEL V. REYNOLDS AND THE EARLY CASES

For 250 years the most cited case on common-law restraints of trade has been *Mitchel v. Reynolds*.[9] In that opinion Parker, C. J., later Earl of Macclesfield, thoroughly reviewed the early cases in search of a unifying principle to guide judicial decision in all subsequent cases in which an effort was made to enforce a covenant not to compete. The covenant in dispute in that case was not incident to an employment agreement but accompanied the transfer of a business. In assigning to the plaintiff the lease of a bake shop, the assignor, a journeyman baker, gave a bond that he would not practice his baker's art in the parish for the term of the lease. He violated the agreement. In the action on the bond, he pleaded that the bond was illegal as a restraint of trade because it interfered with the practice of his craft. Lord Macclesfield noted that there was a presumption that all restraints of trade are invalid, but held that it had been overcome. "[A] special consideration being set forth in the condition, which shews it was reasonable for the parties to enter into it, the same is good . . . . [A] man may, upon a valuable consideration, by his own consent, and for his own profit, give over his trade, and part with it to another . . . ."[10] The court pointed out that the presumption of invalidity stems from the "mischief" which the restraints may cause, first, in the possible loss of the covenantor's means of earning a livelihood and, second, in the loss to society of the services of a useful member. The court also noted that such covenants may be used by corporations as a means of monopolization. But to refuse to enforce reasonable restraints accompanying the transfer of a business would result in unnecessary hardship or loss to a craftsman ready to retire but forced to continue in trade or to sell out at a lower price because no one would risk the purchase of his business without the protection of an enforceable covenant not to compete.

The opinion noted, however, that the effects may be different in the case of covenants in employment agreements, for they are subject to "great abuses . . . from masters, who are apt to give their apprentices much vexation on this account, and to use many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come up to set

---

[9] 1 P. Wms. 181, 24 Eng. Rep. 347 (Q.B. 1711).
[10] *Id.* at 182, 186, 24 Eng. Rep. at 348, 349.

HARVARD LAW REVIEW                [Vol. 73:625

up for themselves." [11] The inference is clear that the burden of showing a just reason for the restraint might be greater in these cases.

To this sound method of analysis, Lord Macclesfield then added an elaboration, drawing a distinction — first enunciated by Lord Coke [12] — between "particular" and "general" restraints. A "general" restraint is an employment restriction which extends throughout the kingdom or, perhaps, indefinitely in time. A "particular" (or "partial") restraint is more limited in area or applied only to certain "persons," presumably clientele of the business involved. A partial restraint, such as that before the court, is upheld if there is "good and adequate consideration" to support the promise and circumstances set forth which make it appear to the court to be a "just and honest contract." [13] No general restraints could be held valid, however, because it would never be reasonable to keep a man from practicing his trade where this would be "of no benefit to either party" and thus "only oppressive." [14] This must be true "in all cases of general restraint throughout *England*; for what does it signify to a tradesman in *London*, what another does at *Newcastle*?" [15] Thus the notion of a general restraint appears to have been only an application of the rule of reason to the conditions of England in 1711, when it was not possible to conceive of competition in a nationwide market. In this respect, Macclesfield seems to have attempted to dispose of Lord Coke's precedent in much the same manner that Mr. Chief Justice White, two hundred years later, accommodated previous holdings involving price-fixing agreements into his formulation of the "rule of reason" in interpreting the Sherman Act.[16]

*Mitchel v. Reynolds* is a remarkable opinion for its method of balancing the social utility of certain types of restraints against their possible undesirable effects upon the covenantor and the public, and for its formulation of a rule of reason. There is very

---

[11] *Id.* at 190, 24 Eng. Rep. at 350.

[12] Rogers v. Parrey, 2 Bulst. 136, 80 Eng. Rep. 1012 (K.B. 1613).

[13] Mitchel v. Reynolds, 1 P. Wms. 181, 186, 197, 24 Eng. Rep. 347, 349, 352 (Q.B. 1711). The court rejected the distinction suggested in the older cases between a restraint undertaken in a bond and other promissory obligations, ruling that there is no policy that competent parties might not settle in advance the "*quantum* of damages." *Id.* at 194, 24 Eng. Rep. at 352.

[14] *Id.* at 182, 24 Eng. Rep. at 348.

[15] *Id.* at 190-91, 24 Eng. Rep. at 350.

[16] Standard Oil Co. v. United States, 221 U.S. 1 (1911); see HANDLER, ANTITRUST IN PERSPECTIVE 8 (1957).

little in the modern approach to the problem for which a basis cannot be found in Macclesfield's opinion. But the opinion also contained seeds of difficulty. First, it firmly wed into a "unitary" restraint-of-trade doctrine several not very closely related subjects, including, besides postemployment restrictions, sales of good will, restrictions incident to the transfer of property interests, and what are now called nonancillary restraints, such as price-fixing or division-of-territory agreements. The marriage certainly did not help the orderly development of legal doctrines to deal with the different problems. Second, its ingenious elaboration of the general-partial distinction attracted so much attention from later judges that the doctrine persisted long after Macclesfield's logic in advancing it would have required its abandonment. Finally, the "reasonableness" test was related to the consideration doctrine in such a way that when later decisions made it clear that adequacy of consideration was not to be investigated, many judges thought the reasonableness test had been abandoned as well. This misunderstanding set the stage for several decades of bad decisions in England at the end of the nineteenth century.[17] However, Lord Macclesfield should not bear all the blame for trying to subsume too many diverse problems under a single legal formulation. Earlier cases had begun the process of trying to create a unitary law of restraints of trade by citing approvingly cases dealing with the late medieval apprentice system in decisions dealing with transfers of property interests.[18] *Mitchel v. Reynolds* simply completed the marriage instead of performing the divorce which was needed.

The early cases discussed in *Mitchel v. Reynolds* fall into two distinct groups both in point of time and, it is submitted, in subject. The first four cases, starting with the celebrated *Dyer's Case*[19] in 1414, extend through the sixteenth century. In each the court declared the restraint before it void with no consideration of the reasonableness of its scope. These are the cases always cited in support of the proposition that originally the common

---

[17] See p. 640 *infra.*

[18] The first appears to be Broad v. Jollyfe, Cro. Jac. 596, 79 Eng. Rep. 509 (K.B. 1620), although Lord Coke's reported comments in Rogers v. Parrey, 2 Bulst. 136, 80 Eng. Rep. 1012 (K.B. 1613), indicate that he would not examine the underlying facts of a restraint. Letwin attributes to Coke "invention" of the idea that the common law opposed all monopolies. Letwin, *The English Common Law Concerning Monopolies*, 21 U. CHI. L. REV. 355, 356 (1954).

[19] Y.B. Mich. 2 Hen. 5, f. 5, pl. 26 (C.P. 1414).

law regarded all restraints as departures from the principle of economic freedom and therefore void. The second group of cases,[20] decided in the seventeenth century, distinguished between general and partial restraints and, in some instances, seemed to engage to a limited extent in the balancing of interests which characterizes *Mitchel v. Reynolds.* The cases in this second group involve restraints incident to the sale or transfer of a business interest.

What has not been noted with sufficient clarity is that all four of the early cases probably involved restraints undertaken by apprentices or journeymen. They appear to be cases of "unethical" masters attempting to prolong the traditional period of subservience of an apprentice or journeyman and to interfere with his traditional rights to enter the guilds as a craftsman, in violation of guild custom. If the early cases represent, in fact, the courts' attempt to assist the guilds and legislative bodies in shoring up the crumbling values of the medieval economic system, they cannot fairly be described as indicative of an attitude of economic liberalism. Thus, the usual statement of the early common law of restraints appears to require revision. It would seem more nearly correct to say that restraints incident to the transfer of business interests have always been held valid if reasonably tailored to the scope of the transaction; only restraints of future employment were originally held invalid without regard to the scope of the restriction, and this was so because they involved circumventions of the customary rules of apprenticeship.[21]

During the period in which the early group of cases was decided the craft guilds were the dominant vehicles of economic activity.[22]

---

[20] Rogers v. Parrey, 2 Bulst. 136, 80 Eng. Rep. 1012 (K.B. 1613); Broad v. Jollyfe, Cro. Jac. 596, 79 Eng. Rep. 509 (K.B. 1620); Bragge v. Stanner, Palm. 172, 81 Eng. Rep. 1031 (K.B. 1621); Prugnell v. Gosse, Aleyn 67, 82 Eng. Rep. 919 (K.B. 1648); Ferby v. Arrosmyth, 2 Keb. 377, 84 Eng. Rep. 236 (K.B. 1668); Anonymous, March 77, 82 Eng. Rep. 419 (C.P. 1640); Barrow v. Wood, March 191, 82 Eng. Rep. 470 (C.P. 1642).

[21] This distinction is perhaps implicit in Parsons' analysis of the early cases. See 2 PARSONS, CONTRACTS *748–51. The best textual treatment of the early cases, but with little analysis, is SANDERSON, RESTRAINT OF TRADE 7–20 (1926). See also, *e.g.,* POLLOCK, PRINCIPLES OF CONTRACT 326–31 (13th ed. 1950); MATTHEWS & ADLER, RESTRAINT OF TRADE (2d ed. 1907).

[22] The sources for the following material are 2 ASHLEY, ENGLISH ECONOMIC HISTORY 66–189 (4th ed. 1906); CHEYNEY, INDUSTRIAL AND SOCIAL HISTORY OF ENGLAND 116–52 (rev. ed. 1920); 1 LIPSON, ECONOMIC HISTORY OF ENGLAND 238–390 (5th ed. 1929). See also 8 HOLDSWORTH, HISTORY OF ENGLISH LAW 56–62 (2d ed. 1937). See generally GROSS, THE GILD MERCHANT (1890); KRAMER, THE

A craft guild comprised three classes of members — masters, journeymen, and apprentices. The apprenticeship system provided the master craftsman with his small labor force and was, in addition, a system of technical training through which young men were introduced into the skills and societal "mysteries" of a trade. The obligations and duties of both master and apprentice were defined by a contract — the indenture — whose terms varied from place to place and guild to guild, but were largely customary, or, during long periods, substantially defined by statute. In 1563, the Statute of Apprentices [23] made a seven-year apprentice period mandatory, but long before its enactment this period had been required by most of the guilds. A corollary of the long period of training, in which wages as such were either nonexistent or nominal, was that at its end the apprentice was to be free as a journeyman to practice his trade for hire wherever he chose until he could gain entry to the inner circle of craftsmen. Typically, he became a master craftsman in the town in which he had served his apprenticeship.

Occasional enterprising craftsmen would break or try to break from the traditional pattern and expand their activities, either by taking in extra apprentices or by seeking to bind their helpers to a longer period of apprenticeship. Lipson reports that "the number of apprentices which a master might employ developed in the fifteenth and sixteenth centuries into a subject of burning controversy." [24] Some guilds in effect extended the period of apprenticeship by requiring the apprentice to continue to serve his master for a year or more after the term of apprenticeship. During this era, the number of journeymen seeking to become craftsmen increased rapidly in many guilds and villages. The established craftsmen often sought to protect their position through an imaginative variety of restrictions. Often journeymen who had served their apprenticeship in other cities were excluded from the local guild. Examinations in the "mysteries" were made more

---

ENGLISH CRAFT GILDS (1927); UNWIN, THE GILDS AND COMPANIES OF LONDON (3d ed. 1938); DUNLOP & DENMAN, ENGLISH APPRENTICESHIP AND CHILD LABOUR (1912); ENGLISH GILDS (T. Smith ed. 1870). Interesting documents useful in understanding the era, including a typical apprenticeship indenture and examples of municipal regulations of the entry into trades, are reproduced in BLAND, BROWN & TAWNEY, ENGLISH ECONOMIC HISTORY — SELECT DOCUMENTS (3d imp. 1919). See also HANDLER, CASES ON TRADE REGULATION 18–32 (2d ed. 1951).

[23] 5 Eliz. 1, ch. 4, discussed in 2 ASHLEY, *op. cit. supra* note 22, at 94–95.

[24] 1 LIPSON, *op. cit. supra* note 22, at 285.

JA0255

difficult. Fees accompanying entrance into the guild were increased. Most important for our purposes, occasional "unethical" masters extracted obligations from their apprentices and journeymen which made it difficult or impossible for them to become full-fledged members of the guild upon expiration of their traditional term.

The guild system, however, was much more than a form of economic organization. Its regulations embodied "a whole social system" sanctioned "by the force of public opinion and the pressure of moral and social conventions." [25] It was deeply involved in religion and morality. Until the sixteenth century, when the decay of the guilds was well advanced, such incursions upon the traditional rules of apprenticeship were regarded by the populace and by the "ethical" masters — in all likelihood the senior members of most of the guilds — as morally wrong and subversive of custom and order. Many of the numerous statutes and ordinances of the period represent attempts to inhibit the erosion of the traditional practices. The Statute of Apprentices climaxed these endeavors. But most revealing is an Act for Avoiding of Exactions Taken Upon Apprentices, adopted a few years earlier, in 1536.[26] The act recited that masters had "by cautil and subtil means compassed and practiced to defraud and delude" in requiring apprentices as their term of service expired to undertake not to set up shop nor carry out their occupation "as freemen" without their master's assent. The statute made it illegal to "compel or cause any apprentice or journeyman, by oath or bond . . . that he, after his apprenticeship or term expired, shall not set up or keep any shop" nor take any money or property "for or concerning his or their freedom or occupation . . . ." The statute was not cited in any of the contemporary cases but its indication of the temper of the times sheds light on their significance.

Two of the early group of cases, decided in the latter part of the sixteenth century, clearly involved obligations obtained from apprentices. In an anonymous case [27] decided by the Court of Queen's Bench in 1578, the defendant had bound himself as a mercer's apprentice to a master in Nottingham, giving bond not to employ the craft within four years. After breach of the covenant,

---

[25] *Id.* at 296.

[26] 28 Hen. 8, ch. 5, reproduced in BLAND, BROWN & TAWNEY, *op. cit. supra* note 22, at 284–86.

[27] Moore K.B. 115, 72 Eng. Rep. 477 (Q.B. 1578).

the master brought an action of debt on the obligation, but the court held that it was not maintainable. The one-sentence report contains no discussion, and it is not entirely clear whether the restraint was to run after the end of the apprenticeship period or from the date of first employment. Twenty-four years later the Queen's Bench provided a somewhat more extensive discussion in *Colgate v. Bachcler*.[28] The defendant's son obligated himself to pay the plaintiff twenty pounds if he "either as apprentice, or servant, or for himself as master, or otherwise, use the trade of an haberdasher within the county of *Kent*, cities of *Canterbury*, or *Rochester*"[29] before a certain date. The court specifically noted the restraint was not a broad one but ruled that it was unlawful to restrain the practice of a trade "at any time, or at any place . . . ." The court reasoned that "for as well as he may restrain him for one time, or one place, he may restrain him for longer times, and more places, which is against the benefit of the Commonwealth . . . . [F]or he ought not to be abridged of his Trade, and Living."[30] This is the first enunciation in the known decisions of a "policy" reason for invalidating a restraint.

The case of the Blacksmiths of South-Mims,[31] a decision by the Court of Common Pleas in 1587, cannot be definitely identified as involving an apprentice. The obligor under a bond not to compete is identified only as "another black-smith." His obligation restrained him from practicing his craft in South-Mims without limit as to time, and might possibly have been given incident to a transfer of wares or a shop. However, when the obligee brought action on the bond after violation of the covenant, the local justices of the peace were persuaded to throw the suitor in jail. Although the 1536 statute was not cited in the report and indeed may have been lost sight of in the fifty-year interim, it seems likely that the severity of the justices' reaction is best explained by the same feeling that manifested itself in the statute. The court freed the plaintiff, on a writ of habeas corpus, for want of jurisdiction in the justices of the peace, but decided that the bond was "void, because it was against the law."

Each of these three cases cited *Dyer's Case*,[32] decided more than

---

[28] Cro. Eliz. 872, 78 Eng. Rep. 1097 (Q.B. 1602).
[29] *Ibid.*
[30] *Ibid.*
[31] 2 Leo. 210, 74 Eng. Rep. 485 (C.P. 1587).
[32] Y.B. Mich. 2 Hen. 5, f. 5, pl. 26 (C.P. 1414).

150 years earlier, but none discussed it. *Dyer's Case* is the first known case dealing with restrictions on the practice of a craft. The report is indeed sketchy. A writ of debt had been brought upon an obligation undertaken by the defendant, a dyer, who pleaded that, according to the "indenture" which he had undertaken, the obligation was to lose its force if he did not practice his trade for a period of six months in the plaintiff's town. He asserted that he had satisfied this requirement. Judge Hull then interposed his celebrated observation that the defendant might have demurred because the condition was illegal at common law and "per Dieu si le plaintiff fuit icy il irra al prison, tanque il ust fait fyne au Roye." [33] Although the language may not necessarily indicate quite the degree of indignation which one might think,[34] this was a powerful dictum, as the repeated later citations of it demonstrate. However, the plaintiff's lawyer was allowed to proceed and issue was joined. Subsequent proceedings in the case are unreported.

No facts as to the underlying transaction are known. However, there is some evidence that John Dyer, too, was an apprentice or journeyman who had been oppressed by a grasping master. Judge Hull's indignation is more easily explained by this hypothesis than if Dyer were a master who had freely sold his business. Furthermore, the restraint is of too short a duration, six months, to give a buyer much protection against a well-established tradesman's later decision to open a new shop. Even so brief a restraint, however, might discourage an impecunious and unventuresome journeyman from exercising his customary right to set up shop for himself. It is entirely possible, of course, that the bond may have been undertaken under totally different circumstances — perhaps, as Lord Macclesfield hypothesizes in *Mitchel v. Reynolds*, an owner had been victimized when despondent, "having just met with a great loss . . . ." [35] Again, however, the short duration of the restraint reduces the credibility of these hypotheses. Why would an enemy, creditor, or competitor settle for a restraint of so short a duration as to be commercially valueless?

These are the only known cases in which a restraint has been

---

[33] "By God, if the plaintiff were here he would go to prison until he paid a fine to the King."

[34] Pollock comments that such outbursts are not uncommon in the early rolls. POLLOCK, PRINCIPLES OF CONTRACT 328 n.19 (13th ed. 1950).

[35] 1 P. Wms. at 193, 24 Eng. Rep. at 351.

held void without regard to geographical scope, duration, or reasonableness in terms of the underlying facts. If, as seems likely, these cases represent reactions by the judges against erosions in the customs of the guilds by aggressive craftsmen, they have a significance almost the reverse of that usually attributed to them. They show judicial support of the customary concepts of "fair" commercial activity of the late medieval period rather than precocious premonitions of economic *laissez faire*. It was the "unethical" master craftsman, seeking to increase his scale of operations and making use of contracts to alter customary practices, who was moving in the direction of modern enterprise capitalism.

## II. The Development After Mitchel v. Reynolds

If there indeed existed, as the foregoing analysis suggests, a quite different approach by the courts to restraints incident to transfers of business interests from that made to those restraints impinging on the customs of the apprenticeship system, the distinctions — with their relevance to the changed industrial scene — were lost sight of for a period after *Mitchel v. Reynolds*, partly because of the way in which the opinion in that case reinforced the unitary approach to the restraint doctrine.

*Mitchel v. Reynolds* is even more clearly the starting place for the modern law of restraints in employment contracts than for other classes of restraints. *Dyer's Case* and its three successors were decided in the context of a social and economic system just entering into the long and difficult transition to entrepreneurial capitalism. As the transition was being completed in the late eighteenth and nineteenth centuries, the concepts of economic liberalism and the primacy of contractual obligation were developing deep roots in legal and economic thought.[36] In this intellectual environment, contractual postemployment restraints presented a philosophic dilemma which was not troublesome before the era in which freedom of contract was so highly regarded. Macclesfield's concern had been that a man might be deprived of his sustenance and society of his services, not that he was limited in his economic mobility. Nor were freedom-of-contract concepts of particular concern in that opinion; on the contrary, its author clearly felt that inequality of bargaining power might be a determinative consideration. But in the nineteenth century courts

---

[36] See pp. 640–41 *infra.*

saw the problem differently. For them the question was how to balance freedom of the market against freedom of contract when an employee entered into a contract limiting his economic mobility.

Industrial and technological changes, of course, had diminished the harshness of many such restraints. By the early nineteenth century the last vestiges of the apprentice system were disappearing.[37] Long apprenticeships no longer served as barriers to shifting from one field of employment to another. Factory labor was characterized by specialization; a skill or special training might be acquired in a year, or month, or week. Men had become more mobile geographically; to leave one's town no longer involved the economic risks and actual physical dangers of an earlier period. Local roots were less strong; hostility to strangers less a factor. On the other hand, operations were larger, personal relationships between master and servant were less important, and the employee was more completely dependent on his vocation for his livelihood than ever before. In short, the industrial revolution had set the stage for the development of a modern approach to the problem.

During the late eighteenth and nineteenth centuries a flood of cases reached the English courts.[38] With the breakdown of the customary norms and procedures of the apprenticeship system, contractual provisions to take their place had become more common. Employers wanted to protect themselves from future competition by employees, or at least from loss of customers or trade secrets to them. Employee restraints offered such protection in some degree. For their part, employees were willing or had no better alternative than to restrict their future freedom of action in order to obtain present employment and such training and experience as came with it. The fact that litigated cases were numerous is good evidence that such restraints had become a commonplace feature of employment contracts.

Until the end of the nineteenth century both English and Ameri-

---

[37] The long-dormant Statute of Apprentices was at last formally repealed in 1814. 54 Geo. 3, ch. 96.

[38] The texts cited in note 21 *supra* contain discussions of the English cases during this period, as do Moller, Voluntary Covenants in Restraint of Trade (1925); Hedges, Restraint of Trade (1932); Gare, Covenants in Restraint of Trade (1935). No attempt will be made here to duplicate that coverage other than to indicate the most important events in the exposition and refinement of the rule of reason announced in *Mitchel v. Reynolds*. See also the excellent history of the English development in Davies v. Davies, 36 Ch. D. 359 (C.A. 1887).

can courts regarded *Mitchel v. Reynolds* as the fundamental authority to be applied in employee-restraint cases. Indeed, cases which failed to cite it are difficult to find. Although a few courts and commentators adopted a strictly mechanical interpretation of the case,[39] most understood its method. The central problem was to formulate the "reasonableness" test in more specific terms and to give it content by deciding its application in the individual cases. Applying a rule of reason in restraint-of-trade cases brought about two results. First, as technology advanced, the general-partial distinction became meaningless, and thus unreasonable, and was narrowly applied and finally abandoned. Further, as the special considerations which are of decisive importance in employee restraints were considered in a number of cases, the law relating to such restraints became specialized and tended to break away from the broader doctrine. The nineteenth century cases reflected this evolution.

The first careful reformulation of the "reasonableness" test came in an English case decided in 1831. In *Horner v. Graves*,[40] Tindal, C.J., clarified *Mitchel v. Reynolds* by ruling that the element of reasonableness was not limited to the consideration stated in the contract but extended to all facts relevant to "whether the restraint is such only as to afford a fair protection to the interests of the party in favour of whom it is given, and not so large as to interfere with the interests of the public."[41] The court held that a restraint upon a dentist's assistant not to practice dentistry within 100 miles of his employer's town while the latter was practicing was unreasonably broad. The personal nature of the service made it impossible that so wide an area could

---

[39] The earliest American cases and commentators were particularly narrow in their interpretation of the rule of *Mitchel v. Reynolds*. For example, Mr. Justice Story's influential treatise on equity jurisprudence contained this statement:

> [T]he known and established distinction is between such bargains and contracts as are in general restraint of trade and such as are in restraint of it only as to particular places or persons. The latter, if founded upon a good and valuable consideration, are valid. The former are universally prohibited.

1 Story, Equity Jurisprudence § 407 (14th ed. 1918). A more misleading paraphrase of *Mitchel v. Reynolds* could hardly be devised; given "good and valuable" consideration, the determination of validity was made purely mechanical. No remnant of the "reasonableness" criterion nor room for distinguishing among types of restraints remained, nor did the logic of the general-particular dichotomy appear.

The mechanical view in the English cases is exemplified by Ward v. Byrne, 5 M. & W. 548, 151 Eng. Rep. 232 (Ex. 1839); Hinde v. Gray, 1 Man. & G. 195, 133 Eng. Rep. 302 (C.P. 1840).

[40] 7 Bing. 735, 131 Eng. Rep. 284 (C.P. 1831).

[41] *Id.* at 743, 131 Eng. Rep. at 287.

JA0261

ever be occupied beneficially by the employer. Tindal also took
the opportunity to note that the distinction between general and
particular restraints in *Mitchel v. Reynolds* was not intended as
a universal rule. The court's function was to determine "what is
a reasonable restraint with reference to the particular case." [42]
Although the case still followed the precedent of *Mitchel v. Rey-
nolds* in looking to the adequacy of the consideration for the re-
straining covenant, in every other respect it is perfectly modern
in method and reasoning and, it is submitted, correct in its in-
terpretation and application of *Mitchel v. Reynolds*.

In 1853, the Court of Queen's Bench reversed the traditional
rule that all restraints of trade are prima facie invalid by holding
that the burden was on the covenantor to show that the covenant
was unreasonable.[43] This view, doubtless rooted in strong free-
dom-of-contract views, prevailed in England until 1913 and is in
part responsible for the fact that during the latter part of the
nineteenth century in England virtually all such covenants, in
employment contracts or elsewhere, were upheld. Another factor
was the apparent confusion as to the meaning of the reversal in
*Hitchcock v. Coker* [44] of the rule that adequacy of consideration
must be examined. Some judges apparently interpreted this rul-
ing to mean that the reasonableness of the scope of a restraint was
no longer to be examined, even though the author of the opinion
was the same Tindal, C.J., whose exposition of the reasonableness
doctrine in *Horner v. Graves* was so notable. Probably the most
important factor, however, was the currency of the general phil-
osophic position exemplified by a pronouncement made by Jessel,
M.R., in an influential case [45] involving an alleged restraint of
trade in connection with an assignment of patent rights:

> It must not be forgotten that you are not to extend arbitrarily
> those rules which say that a given contract is void as being against
> public policy, because if there is one thing which more than another
> public policy requires it is that men of full age and competent un-
> derstanding shall have the utmost liberty of contracting, and that
> their contracts when entered into freely and voluntarily shall be
> held sacred and shall be enforced by Courts of justice. Therefore,

---

[42] *Ibid.*

[43] Tallis v. Tallis, 1 El. & B. 391, 118 Eng. Rep. 482 (Q.B. 1853). This reversal
of the rule of *Mitchel v. Reynolds* was in turn discarded, and the old rule rein-
stated. See Attwood v. Lamont, [1920] 3 K.B. 571, 588–89 (C.A.).

[44] 6 Ad. & E. 438, 112 Eng. Rep. 167 (Ex. 1837).

[45] Printing & Numerical Registering Co. v. Sampson, L.R. 19 Eq. 462 (1875).

you have this paramount public policy to consider — that you are not lightly to interfere with this freedom of contract.[46]

In spite of the insistence of the law judges, particularly, that the precedent of *Mitchel v. Reynolds* required that all nationwide restraints be held invalid,[47] this position could not survive in the face of the combined forces of the reasonableness approach and the commanding respect accorded to the terms of contracts. In at least two cases in which the facts were very favorable, equity judges upheld "general" restraints.[48] However, there appear to be no English cases, either in law or in equity, prior to *Rousillon v. Rousillon*[49] in which a restraint without spatial limitations in an employment contract was held enforceable.

In that case the nephew of the owners of a champagne distribution firm had agreed, while working for them as a clerk and representative in England and in other countries, not to represent another champagne house for two years after leaving their employ. Shortly thereafter his employers gave up their retail business and no longer required his services. He thereupon set himself up as a retail wine merchant and apparently annoyed his uncles by holding himself out as from a city in Champagne when in fact he had no establishment there. Justice Fry asserted boldly that there had never been an absolute rule that an unlimited restraint was void and that if reasonable protection of the covenantee required specific enforcement of the restraint beyond national boundaries, this would be done.[50]

The opinion does not explain why any protection should have been extended to the plaintiffs after they had abandoned their retail trade in England. In equity one might expect that a restriction would no longer be enforced after the reason for it had ceased to exist. Fortunately, the proposition that if a restraint was reasonable in scope at the time it was entered into changed circumstances should not defeat its enforcement has never gained wide acceptance in American courts. In the *Rousillon* case the absoluteness of freedom of contract had reached its high point. For

---

[46] *Id.* at 465.

[47] Ward v. Byrne, 5 M. & W. 548, 151 Eng. Rep. 232 (Ex. 1839); Hinde v. Gray, 1 Man. & G. 195, 133 Eng. Rep. 302 (C.P. 1840).

[48] Whittaker v. Howe, 3 Beav. 383, 49 Eng. Rep. 150 (Ch. 1841); Leather Cloth Co. v. Lorsont, L.R. 9 Eq. 345 (1869). *But cf.* Allsopp v. Wheatcroft, L.R. 15 Eq. 59 (1872).

[49] 14 Ch. D. 351 (1880).

[50] *Id.* at 366–69.

more than thirty years thereafter all restraints of trade, including postemployment restrictions, were examined with a presumption of validity if their scope was roughly coterminous with the area of the covenantee's business activity.

In the celebrated decision of the House of Lords in *Nordenfelt v. Maxim Nordenfelt Guns & Ammunition Co.*,[51] any lingering doubts about the validity of "general" restraints were finally resolved by the consensus of the Lords that a restraint no wider than reasonably necessary to protect the interests of the covenantee and not against the public interest should be upheld. Although the case involved a sale of a vast munitions business and a worldwide covenant not to compete, the court's rejection of the mechanical general-partial distinction clearly extended to employee restraints as well. However, in addition to its ruling that technological developments had made the old distinction outmoded, the case contained a warning that the extreme freedom-of-contract position exemplified by the *Rousillon* case might not long survive. Lord Macnaghten noted, as had Lord Macclesfield 183 years earlier, that "different considerations must apply in cases of apprenticeship . . . . A man is bound an apprentice because he wishes to learn a trade and to practice it . . . . [T]here is obviously more freedom of contract between buyer and seller than between master and servant or between an employer and a person seeking employment."[52] Nonetheless, for twenty years after this pronouncement, English courts continued to employ a rigorous freedom-of-contract approach to all restraint cases. The reasonableness test was always employed, but the values it embodied during the era were such that almost any restraint no larger than the market in which the covenantee did business was held suitable.[53]

But the dicta of *Mitchel v. Reynolds* and the *Nordenfelt* case were finally brought to fruition in two decisions of the House of Lords which today form the heart of the English law of employee

---

[51] [1894] A.C. 535, *affirming* [1893] 1 Ch. 630 (C.A. 1892).

[52] [1894] A.C. at 566.

[53] Matthews and Adler analyzed thirty-three cases decided during this period. Of these, in only seven were the restraints found to be unreasonable. Five found unreasonable were postemployment restraints; two were nonancillary restraints; none were invalidated in cases in which a business interest had been transferred. Thus there is some indication that even in this period some weight was occasionally given to the different nature of employee restraints. MATTHEWS & ADLER, *op. cit. supra* note 21, at 198–215.

Case 2:24-cv-01743-KBH   Document 62   Filed 07/01/24   Page 268 of 504

restraints. In *Mason v. Provident Clothing & Supply Co.*[54] and *Herbert Morris, Ltd. v. Saxelby*,[55] the Lords took note of changing values with respect to employer-employee relationships and undertook a thorough reexamination and reformulation of principles. These cases together established first, that the rule of reason required different measures to be applied in employee-restraint cases; second, that the employer must affirmatively show that the restraint sought to be enforced is no broader than needed for his reasonable protection; third, that the restraint must be reasonable, taking into account the interests of the employee as well as the employer; and finally, that a restraint could not be justified if its only purpose is to protect the employer from future competition, as such; in this respect postemployment restraints differ from those agreed to in connection with purchases of good will, for example.[56]

Thus, throughout the period since *Mitchel v. Reynolds*, and probably before, English courts almost uniformly adhered to a rule of reason with respect to employee restraints. Most courts recognized that the general-partial distinction was derived from application of the principle to a particular situation, and as technology advanced the distinction diminished in vigor and was finally abandoned. The rule of reason during the period derived much of its content from the predominant importance accorded freedom-of-contract ideas. Only in the House of Lords was an imbalance consistently noted and finally definitively redressed. Henceforth application of the rule of reason would put the courts in a more active role in protecting the employee from undue burdens. Macclesfield's methods and insights of two hundred years earlier had at last been fully understood and adapted to modern conditions.

The development of the law of postemployment restraints in America parallels the nineteenth-century English pattern, but with two characteristic differences. First, the courts had to struggle with the general-partial distinction in the context of state as well as national boundaries. Second, in the application of the reasonableness test, almost from the beginning more emphasis was

---

[54] [1913] A.C. 724.
[55] [1916] 1 A.C. 688.
[56] This summarizes the excellent synthesis contained in the opinion of Younger, L.J., in Attwood v. Lamont, [1920] 3 K.B. 571, 580 (C.A.).

placed on protecting the employee from overly heavy burdens and less on the conclusiveness of contractual terms.

The earliest cases, following the lead of American commentators,[57] provided an inauspicious start. In two New York cases it was stated that restraints extending over the entire state were void without regard to the circumstances.[58] But by 1866, in a case involving a restraint upon an employee, the high court of Pennsylvania, distinguishing the "sale of handicraft" from the sale of property, noted that an equity court should "regard the hardship of the bargain, and the prejudice to the public" and refused injunctive relief without reference to mechanical rules.[59]

In 1874, in *Oregon Steam Nav. Co. v. Winsor*,[60] the Supreme Court upheld a covenant, given in connection with the sale of a steamship, not to compete in the state of California. The Court noted that "in this country especially, where State lines interpose such a slight barrier to social and business intercourse . . . . cases may arise in which it would involve too narrow a view of the subject to condemn as invalid a contract not to carry on a particular business within a particular State." [61] Shortly thereafter, New York reversed its position,[62] Massachusetts also announced a rule of reason,[63] and Rhode Island, appropriately enough, became the first state to reject the relevance of state boundaries in a case involving an employee restraint.[64] The Rhode Island court also noted that the reasonableness of a restraint depended on "the nature and circumstances of the transaction" and could be expected to be quite different in the case of a restraint upon a "mere servant." In sum, within fifty years after the first American restraint-of-trade case, the "reasonableness" criterion was firmly established, and the Supreme Court and the most influential state courts had laid the groundwork for abandoning the mechanical general-partial distinction.[65]

---

[57] See, *e.g.*, note 39 *supra*.

[58] Lawrence v. Kidder, 10 Barb. 641 (N.Y. Sup. Ct. 1851); Dunlop v. Gregory, 10 N.Y. 241 (1851) (dictum).

[59] Keeler v. Taylor, 53 Pa. 467, 470 (1866).

[60] 87 U.S. (20 Wall.) 64 (1874).

[61] *Id.* at 67.

[62] Diamond Match Co. v. Roeber, 106 N.Y. 473, 13 N.E. 419 (1887).

[63] Morse Twist Drill & Mach. Co. v. Morse, 103 Mass. 73 (1869).

[64] Herreshoff v. Boutineau, 17 R.I. 3, 7, 19 Atl. 712, 713 (1890) (dictum).

[65] [T]he true test, in considering the legality of a condition of covenant in restraint of trade, is not whether the restraint covers the whole State or Nation, but it is whether the restraint is *reasonable* . . . . The latest decisions of the United States Supreme Court, the Court of Chancery in England, the Court

In at least one case, an American court had explored the special problems of employee restraints earlier and more thoroughly than any English court, with interesting results. Shortly after Justice Fry had decided the *Rousillon* case in strong freedom-of-contract terms, a New Jersey court, in *Mandeville v. Harman*,[66] was making a quite different appraisal. A well-established physician, having employed an assistant, renewed his contract, inserting a condition that the employee not engage in the practice of medicine or surgery in Newark at any later time. Shortly after the renewed contract expired, the defendant opened up an office in Newark, the reason for his termination with the plaintiff not appearing. Injunctive relief was denied. The court reasoned that although a restraint for the whole period of one's life might be reasonable in the case of the sale of good will, it was much longer than was necessary to protect the complainant on these facts. Most interesting is the court's analysis that "professional skill, experience and reputation are things which cannot be bought or sold."[67] If a physician seeks to sell his practice, all the purchaser can get is "immunity from competition with him."[68] Thus, inferentially, the risk of loss of clientele to his assistant was not sufficient to justify contractual protection; the only important effect was to prevent competition. Incomplete though this analysis is, and in spite of the debatable outcome of the case,[69] no earlier opinion, American or English, had gone as far in recognizing the essential dilemma of employee restraints and in discerning the differences which were soon to cause the development of the law concerning them to split off and go its own way.

Thus, by the end of the nineteenth century, courts in both England and the United States had fully accepted the method of decision on which modern refinements were to develop. This ap-

---

of Appeals of New York, and the Supreme Court of Rhode Island . . . are decisive of this subject . . . .

Eaton, *On Contracts in Restraint of Trade*, 4 HARV. L. REV. 128, 136–37 (1890). The author does not draw a distinction, also supportable in the American cases, between the application of the rule of reason in employee and other restraint cases. The early American cases are more exhaustively collected, and discussed, in Kerr, *Contracts in Restraint of Trade*, 22 AM. L. REV. 873 (1888).

[66] 42 N.J. Eq. 185, 7 Atl. 37 (Ch. 1886).

[67] *Id.* at 193, 7 Atl. at 40.

[68] *Id.* at 194, 7 Atl. at 41.

[69] Few later cases have followed the court's logic to the same conclusion in restraint on doctors' assistants. See Dodd, *Contracts Not To Practice Medicine*, 23 B.U.L. REV. 305 (1943); Annot., 58 A.L.R. 156 (1929).

proach, the rule of reason, once properly understood, inevitably led to the elimination of the artificial distinction which had grown from too literal a reading of *Mitchel v. Reynolds*. By the early years of the present century the reasonableness approach had also laid the groundwork for the divorce of the law of employee restraints from its rather unnatural marriage with the doctrines governing restraints of other types.

### III. THE RECENT DEVELOPMENTS — SOME GENERAL CONSIDERATIONS

Today the courts are in almost universal agreement that the restraint-of-trade doctrine is not unitary.[70] Decisions involving one type of restraint may have very little persuasive effect in a dispute involving another type.[71] The basic reasons recognized in *Mitchel v. Reynolds* have been formulated in much greater detail in the recent cases.

The considerations are these. A transfer of good will cannot be effectively accomplished without an enforceable agreement by the transferor not to act so as unreasonably to diminish the value of that which he is selling. The same is true in regard to any other property interest of which exclusive use is part of the value. The restraint on the transferor in such a case necessarily runs concurrently with the use of the property by the covenantee. Thus, such a restriction is analogous to a performer's contract for an exclusive appearance or a famed designer's agreement not to lend his name and talent to the design of a competing product. Indeed, some courts have thought that an employee restraint

---

[70] This development has not been without opposition. Although Professor Williston recognized that courts were less disposed to sustain employee restraints than others, he asserted that "the distinction . . . seems unadvisable as a positive rule of law." 3 WILLISTON, CONTRACTS § 1643 (1920). In a later edition, although still doubting the desirability of the distinction, he reported that "there is a tendency in the United States to follow the English courts in differentiating between contracts in restraint of trade and contracts in restraint of employment." 5 WILLISTON, CONTRACTS § 1643 (rev. ed. 1937). Professor Carpenter supported the distinction. Carpenter, *supra* note 2, at 267. Professor Corbin does not refer to the dispute. The *Restatement* recognizes differing tests of "reasonableness." RESTATEMENT, CONTRACTS § 515, comment *b* (1932).

[71] This is not to say that courts do not cite cases dealing with other classes of restraints in support of general propositions. See cases cited in Annot., 43 A.L.R.2d 94, 111 (1955). However, employee-restraint cases are not decided in terms of general propositions, but, as is universally agreed, on their individual facts. A factual analogy based on cases other than those involving employee restraints would not be particularly persuasive.

should be enforced only if the employee's services are unique.[72]
This is a natural confusion that arises from the analogy with
restraints incident to sales. The essential purpose of the post-
employment restraint is quite different, however. Its objective is
not to prevent the competitive use of the unique personal quali-
ties of the employee — either during or after the employment —
but to prevent competitive use, for a time, of information or re-
lationships which pertain peculiarly to the employer and which
the employee acquired in the course of the employment. Unlike
a restraint accompanying a sale of good will, an employee restraint
is not necessary for the employer to get the full value of the thing
being acquired — in this case, the employee's current services.
The promise not to act in certain ways after terminating employ-
ment is something additional which the employer may or may not
feel to be important and worth bargaining and paying for, de-
pending on the circumstances. A sale of good will implies some
obligation to deliver the thing sold by refraining from competi-
tion,[73] just as an employment contract implies some obligation
not to impair the value of the services rendered by competitive
activity during the period of employment.[74] But no such com-
mitment not to compete after employment can be implied from an
ordinary employment contract. Thus, courts properly should,
and do, look more critically to the circumstances of the origin of
postemployment restraints than to the circumstances of other
classes of restraints.

Making this investigation, they find that the parties to an em-

---

[72] The most dignified statement of this view was in Clark Paper & Mfg. Co. v.
Stenacher, 236 N.Y. 312, 140 N.E. 708 (1923). The New York courts no longer
require uniqueness, Foster v. White, 248 App. Div. 451, 290 N.Y. Supp. 394 (1936),
aff'd, 273 N.Y. 596, 7 N.E.2d 710 (1937), if they ever did, although the criterion
occasionally reappears, not as a requirement but as one of the alternative reasons
for enforcing a restraint. See, e.g., Bristol Insulation Co. v. Cuomo, 137 N.Y.S.2d
46, 47 (Sup. Ct. 1954). See also 3 DET. L. REV. 38, 41 (1932). The error of the
analysis is not often repeated, however, and is occasionally specifically noted and
avoided. Sarco Co. v. Gulliver, 3 N.J. Misc. 641, 129 Atl. 399 (Ch. 1925), aff'd,
99 N.J. Eq. 432, 131 Atl. 923 (Ct. Err. & App. 1926); Briggs v. Butler, 140 Ohio
St. 499, 510-11, 45 N.E.2d 757, 763 (1942).

[73] There are differences among courts concerning how extensive a restraint
should be implied. *Compare* Hall Mfg. Co. v. Western Steel & Iron Works, 227
Fed. 588 (7th Cir. 1915), *with* Saunders v. Piggly-Wiggly Corp., 30 F.2d 385
(6th Cir. 1924).

[74] This duty will be implied from general agency principles. RESTATEMENT
(SECOND), AGENCY § 393 (1958). This article is not concerned with either express
or implied contractual obligations not to compete during the period of actual con-
tinuing employment.

ployee covenant are often of unequal bargaining power and, thus, that there is less likelihood that the covenant was actually bargained for. They may find that the employee has improvidently given up his only valuable economic asset, specialized proficiency arising from experience or training. On the other hand, a seller of property is more likely to have other sources of income or, in any event, income from the capital arising from the sale. Finally, they find that an employee covenant has an inevitable tendency to reduce an employee's mobility and bargaining power during his employment. Because of these differences,[75] courts are more likely to declare an employee covenant invalid as unreasonable, or, in giving injunctive relief, they are more likely to require that an employer settle for less thoroughgoing protection than that accorded a transferee of a property interest.[76]

The formulation of the test of the validity of postemployment restraints most often cited in recent cases is that of the *Restatement of Contracts*.[77] A covenant restraining an employee from competing with his former employer on termination of employment is valid if it is reasonable in view of the circumstances of the particular case.[78] A restraint is reasonable only if it (1) is no

---

[75] These possible differences are discussed in many recent cases, notably Kadis v. Britt, 224 N.C. 154, 29 S.E.2d 543 (1944); Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 45–46, 105 N.E.2d 685, 704 (C.P. 1952).

[76] Originally, as was noted in the foregoing discussion, *Mitchel v. Reynolds* announced that the burden of proof to show the validity of the restraint was on the employer. In Tallis v. Tallis, 1 El. & B. 391, 118 Eng. Rep. 482 (Q.B. 1853), this presumption was reversed, but in Mason v. Provident Clothing & Supply Co., [1913] A.C. 724, the House of Lords reversed that holding and returned to the older rule. See Attwood v. Lamont, [1920] 3 K.B. 571, 588–89 (C.A.).

The vast majority of American jurisdictions place the burden on the proponent of the restraint. But Vermont, at least, seems to have adopted the other rule. Dyar Sales & Mach. Co. v. Bleiler, 106 Vt. 425, 175 Atl. 27 (1934). The employer, having a fuller "picture" of the company's interests and needs than any employee, should be in a much better position to show that a restraint is no more burdensome than needed to protect the employer's legitimate interest. The employee, on the other hand, would find it difficult to show that the restraint is unreasonable.

[77] RESTATEMENT, CONTRACTS §§ 513–15 (1932).

[78] In several states, covenants by the employee not to carry on a similar business or solicit old customers are controlled by statute. North Dakota, Louisiana, and Oklahoma declare void all contracts which restrain an employee from carrying on any profession, trade, or business. N.D. REV. CODE § 9–0806 (1943), Olson v. Swendiman, 62 N.D. 649, 244 N.W. 870 (1932); LA. REV. STAT. § 23:921 (1950), Baton Rouge Cigarette Serv., Inc. v. Bloomenstiel, 88 So. 2d 742 (La. Ct. App. 1956); OKLA. STAT. tit. 15, § 217 (1951), E. S. Miller Labs., Inc. v. Griffin, 200 Okla. 398, 194 P.2d 877 (1948). Alabama limits an employee's undertaking not to compete to the area of a specific city or county for as long as the employer carries on business there. ALA. CODE tit. 9, §§ 22, 23 (1940), Shelton v. Shelton, 238 Ala.

greater than is required for the protection of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public.[79]

Like rules of reason generally, this formulation is so general as to throw little light on specific detailed problems. Furthermore, it is artificial — even inaccurate — in its description of the deliberation which actually takes place. For example, the permissible limits of employer protection cannot be defined without simultaneous attention to the correlative interests of the employee; nor can such a balancing of employer and employee interests proceed without reference to the public interest in workable employer-employee relationships, on the one hand, and in individual economic freedom, on the other. Thus, some courts have reformulated the first branch of the test to state that a restraint is reasonable only if it is no greater than is required for the protection of the employer *in some legitimate interest.*[80] With this formulation, they find greater freedom to engage in a balancing of all the factors which they consider relevant. However, having completed the analysis of the extent of a protectible interest, courts usually find

---

489, 192 So. 55 (1939). California declares void all employee restraints of this nature. CAL. BUS. & PROF. CODE § 16600, Morris v. Harris, 127 Cal. App. 2d 476, 274 P.2d 22 (Dist. Ct. App. 1954). However, the statute has been construed to allow a covenant by the employee not to solicit the customers of the employer for a reasonable time. Gordon v. Landau, 49 Cal. 2d 690, 321 P.2d 456 (1958). Florida limits employee restraints to those "within a reasonably limited time and area . . . so long as such employer continues to carry on a like business therein." FLA. STAT. § 542.12 (1957), Atlas Travel Serv., Inc. v. Morelly, 98 So. 2d 816 (Fla. Dist. Ct. App. 1957). However, a majority of the Florida Supreme Court seemingly ignored the statute in a per curiam opinion affirming a lower court's refusal to enforce an apparently reasonable employee covenant. United Loan Corp. v. Weddle, 77 So. 2d 629 (Fla. 1955). Michigan allows an employee covenant not to carry on a similar business only when the employee has had access to route lists of the employer. In such situations, a covenant not to do business for ninety days in the territory covered by the route is allowed. MICH. COMP. LAWS §§ 445.761, .766 (1948), Wedin v. Atherholt, 298 Mich. 142, 298 N.W. 483 (1941). South Dakota declares void all employee covenants except when both parties are in a profession licensed by the state. In such cases, a covenant not to carry on a similar business for ten years within twenty-five miles of the former employer is permitted. S.D. CODE § 10.0706 (1939).

[79] This is an adaptation of the *Restatement*'s more general formulation to post-employment restraints, typical of those found in the cases. See Annot., 43 A.L.R.2d 94, 144 (1955). It is somewhat broader and more general than the *Restatement* in its formulation of the "injury to the public" test. The *Restatement* limits injury to the public to tendency or purpose to create a monopoly, to control prices, or to limit production. RESTATEMENT, CONTRACTS § 515 (1932).

[80] See, *e.g.*, Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 28, 105 N.E.2d 685, 691 (C.P. 1952).

the relevant considerations exhausted; the other branches of the *Restatement* formulation are seldom, as separate considerations, given much attention. This does not mean that the interests of the employee and the public are necessarily slighted, but only that "undue hardship" to the employee and "injury" to the public are measured against the urgency of the employer's claim to protection, rather than against some extrinsic standard. This is only to say that courts treat the problem as a normal exercise of judgment, while the *Restatement* formulation has a check-list conceptualism about it. In addition, although the "undue hardship" limitation might open the way for consideration of the personal circumstances of the restrained employee — his financial circumstances or other factors unrelated to the employment relationship — such considerations are not often treated in opinions. It seems reasonably clear that they should not be, except, perhaps, under most extraordinary circumstances.

Although the current formulation may be inelegant, its thrust is clear. Every postemployment restraint, for whatever reason imposed, has inevitable effects which in some degree oppose commonly shared community values. In view of our feeling that a man should not be able to barter away his personal freedom, even this small degree of servitude is distasteful. It is particularly distasteful if there is no effective bargaining between the parties — as in the situation in which the employer knows that everyone else in the industry insists on the covenant too, or when the employment officers have no authority to change the provisions of the employment contract form. The values offended are more social or political than economic. However, there are important economic considerations as well. Anything that impedes an employee's freedom of access to a job in which his productivity (and wages) would be higher, involves a cost in terms of the economy's welfare.

Balanced against these considerations are the needs of efficient business organization. When a business grows past the one-man size, important business information must be entrusted to an employee; as the business grows still larger such information must be entrusted to many more. Optimum division of labor and specialization cannot take place unless confidential business information relating to technology, processes, plans, development activity, customers, and the like, is entrusted to appropriate employees. The optimum amount of "entrusting" probably will not occur

unless the risk of loss to the employer through breach of the trust can be held to a minimum.

What most recent cases require to enforce a restraining covenant, although not stating the requirement in these terms, is that the employer show special circumstances which make it unfair for him to bear all the risk of placing the employee in a position in which a later breach of confidence might be costly. Only in this way can the employer justify a covenant which in effect shifts the burden of an important business risk to an employee.

Before examining the cases to see what these special circumstances may be, it is worthwhile to suggest one further note of theory. As a risk-distributing device the restraint on future employment is neither particularly efficient nor fair. First, it is not efficient because the cost (inconvenience) to the employees as a group bears no relation to the risk of injury; most employees burdened with such restrictions represent at any given moment no substantial risk, because most of the time neither their knowledge nor their personal contacts could actually result in damage to the employer. A restraint tailored to protect against circumstances when maximum damage could be done will necessarily "over-protect" most of the time. Second, the device is unfair in that its burdens are borne equally by honest and loyal employees and by those who are neither. A perfectly fair and efficient device would force any employee guilty of a breach of loyalty to reimburse the employer at once in the exact amount of any loss caused by the breach. No burden would be borne by any other employees. In theory, this is the exact result achieved by the usual action for damages. In practice, as will be noted later, it is clear that such a remedy is far from adequate.

## IV. PROTECTIBLE EMPLOYER INTERESTS

Whether an interest is ultimately protectible, in the sense that its presence will support an injunction to enforce a restraining covenant, depends in part on how burdensome a restraint is needed to protect it. However, some general observations can be made about the kinds of business interests which may be protected by suitably limited restraints.

First, a clarifying exclusion can be made. Even when job specialization and simplification have been carried to an advanced stage, many types of employment require a period of orientation or on-the-job training. During this period the employee's wage

or salary is likely to be somewhat greater than the current value of his services. The cost of the training represents an investment by the employer in the employee — one which he hopes to recapture, with an appropriate return, from the enhanced productivity of the employee's future services. However, the employer cannot be sure that the employee will stay on so that the investment will be rewarded, since contracts for personal services are not usually specifically enforced.[81] Thus the employer may feel justified in seeking to make it more difficult for the employee to leave — particularly to go into competitive employment — by any effective device at hand. A covenant against postemployment competition may have the desired effect. Furthermore, a plausible public-policy argument is available: Unless some enforceable commitment or effective deterrent is possible, employers will not be justified in making the optimum outlay on employee-training programs; even an employee eager for training will be unable to commit himself firmly enough to warrant the undertaking. This argument is a close counterpart of the strongest reason for enforcement of covenants not to compete in connection with the sale of a business: Only if the covenant is enforceable can the vendor effectively transfer, and be paid for, the good will which he has developed.[82]

These arguments have not proven sufficiently persuasive. It has been uniformly held that general knowledge, skill, or facility acquired through training or experience while working for an employer appertain exclusively to the employee. The fact that they were acquired or developed during the employment does not, by itself, give the employer a sufficient interest to support a restraining covenant,[83] even though the on-the-job training has been extensive and costly.[84] In the absence of special circumstances the risk of future competition from the employee falls upon the employer and cannot be shifted, even though the possible damage is greatly increased by experience gained in the course of the employment.[85]

---

[81] RESTATEMENT, CONTRACTS § 379 (1932).

[82] This is the argument, it will be remembered, which constituted the central rationale of the decision in *Mitchel v. Reynolds.* See p. 629 *supra.*

[83] See, *e.g.,* Mutual Loan Co. v. Pierce, 245 Iowa 1051, 65 N.W.2d 405 (1954); Dunfey Realty Co. v. Enwright, 101 N.H. 195, 138 A.2d 80 (1957); Herbert Morris, Ltd. v. Saxelby, [1916] 1 A.C. 688.

[84] Club Aluminum Co. v. Young, 263 Mass. 223, 160 N.E. 804 (1928).

[85] Although the foregoing principles can and should be stated squarely, the fact

This basic postulate is limited in its effectiveness by the inherent difficulty, on any set of facts, of drawing a line between training in the general skills and knowledge of the trade, and training which imparts information pertaining especially to the employer's business. This difficulty is the central problem of employee restraints. What special facts must exist in the employment relation to overcome the presumption against limiting post-employment competition? How broad a restriction on an employee's freedom do such special circumstances make permissible?

It should not be surprising that the business interests important enough to support an employee restraint are those which would have some degree of legal protection even in the absence of a contract. In order to enforce a restraint, the employee must present a substantial risk either to the employer's relationships with his customers or with respect to confidential business information. These will be seen to be closely related to the traditional "customer list" and "trade secret" doctrines of the law of unfair competition. However, postemployment restraints may in some cases legitimately extend protection somewhat beyond the special circumstances which those doctrines encompass, particularly in the area of customer relationships.

## A. Customer Relationships

In almost all commercial enterprises, except in the few cases in which the market approaches the ideal of perfect competition, contact with customers or clientele is a particularly sensitive aspect of the business. In smaller concerns, or even in large businesses with a relatively small clientele, sales and customer service are typically handled largely by the proprietor or one or more

---

is that in almost any case an employer can point to some information imparted which pertains exclusively to the company. If the court determines that this is sufficient to qualify as something over and above normal training in the general skills of the trade, it may then take into account the total "investment" the employer has made in the training process, as well as the experience and background which the employee brings to the job, in determining the reasonableness of the restraint. See cases cited in Annot., 43 A.L.R.2d 94, 203–04 (1955). This may appear to be an artificial process of decision, and perhaps it is. Yet it may be the only way to reconcile the courts' general agreement on the principle with the obvious fact that some weight is given to the overall balance between the employer's contribution and the employee's when the case is otherwise a close one. Any artificiality may be a reasonable price to pay to retain vigor in the principle that merely equipping an employee to be a potentially more dangerous competitor is not in itself enough to support a restraint.

of the partners or trusted officers, depending upon the form of business organization. In most businesses, however, as the size of the operation increases, selling and servicing activities must be at least in part decentralized and entrusted to employees whose financial interest in the business is limited to their compensation. The employer's sole or major contact with buyers is through these agents and the success or failure of the firm depends in part on their effectiveness. Although the employee's job may be limited to servicing an existing customer route or list, or dealing with those who come to the employer's place of business or do business by mail or telephone, in many cases he is expected to bring in new business. In any of these situations, the possibility is present that the customer will regard, or come to regard, the attributes of the employee as more important in his business dealings than any special qualities of the product or service of the employer, especially if the product is not greatly differentiated from others which are available. Thus, some customers may be persuaded, or even be very willing, to abandon the employer should the employee move to a competing organization or leave to set up a business of his own. Businessmen have very probably spent as much time worrying about this risk, and seeking legal techniques of reducing it, as they have for any other business problem. The protection available from traditional common-law doctrines has been very limited, reflecting in part the fact that balancing the employer's and the employee's claims in these circumstances is not easy.

The employer's point of view is that the company's clientele is an asset of value which has been acquired by virtue of effort and expenditures over a period of time, and which should be protected as a form of property. Certainly, the argument goes, the employee should have no equity in the custom which the business had developed before he was employed. Similarly, under traditional agency concepts, any new business or improvement in customer relations attributable to him during his employment is for the sole benefit of the principal. This is what he is being paid to do. When he leaves the company he should no more be permitted to try to divert to his own benefit the product of his employment than to abscond with the company's cash-box.

The employee's viewpoint is that if by fair means he can persuade those with whom he has dealt that keeping his services outweighs the reasons for staying put, his claim to the relationship is

superior to that of the employer. He urges that his duty as an employee to preserve customer relationships for the benefit of the employer terminates with the employment. Freedom to use business contacts for one's own benefit should not be impaired by restraints which have the effect of inhibiting competition.

In the difficult process of balancing these considerations, the courts have given more weight to the arguments of the former employee.[86] They have generally agreed that, in the absence of an express contract, he may not be restrained from competing with his former employer nor from soliciting his customers. However, at least two classes of possible exceptions have been recognized in addition, of course, to the ordinary duty not to misrepresent or mislead the customer about the change of circumstances. First, the employee may not use a secret list of customers prepared by the former employer, nor any other confidential information about the customer obtained by virtue of the former employment; this exception is almost uniformly recognized and the doctrines have been applied and refined in a multitude of cases. In addition, some courts recognize a fiduciary duty extending beyond that of the ordinary employee for an individual, such as an officer of a corporation, who was in a position of special trust.

To be protected, however, a customer list must be more than a listing of firms or individuals which could be compiled from directories or other generally available sources. Only when it represents a selective accumulation of information based on past selling experience, or when considerable time and effort have gone into compiling it, will appropriation and use in competition by the former employee be enjoined. However, in many jurisdictions a former employee cannot be prevented from using a list, prepared after leaving the employment, which is based on his own experience or made up from memory.

The customer-list doctrine and the "memory" exception have been extensively criticized, commentators making the entirely

---

[86] The following brief discussion of the legal doctrines applied in cases dealing with employee solicitation of the customers of a former employer, in the absence of express contractual restraints, relies upon, and may be supplemented by, the detailed discussion and cases cited in 2 CALLMANN, UNFAIR COMPETITION AND TRADE-MARKS 834–49 (2d ed. 1950) [hereinafter cited as CALLMANN]; ELLIS, TRADE SECRETS § 72 (1953) [herinafter cited as ELLIS]; 1 NIMS, UNFAIR COMPETITION AND TRADE MARKS § 157 (4th ed. 1947) [hereinafter cited as NIMS]; RESTATEMENT, TORTS §§ 708, 711–12 (1938); Annot., 126 A.L.R. 758 (1940); Notes, 34 ILL. L. REV. 365 (1939); 8 J.B.A. KAN. 285 (1939); 1 SYRACUSE L. REV. 110 (1949); 22 VA. L. REV. 359 (1936); 21 VA. L. REV. 330 (1935).

reasonable observation that the length of an employee's memory seems irrelevant to what is or is not fair postemployment activity.[87] Yet the distinction has survived, indeed remained vigorous, over a long period. This is some evidence that it is helpful to courts and probably approximates good sense in most cases. The explanation seems to be that the "memory" rule of thumb, in application, allows the former employee to solicit those customers whom he has played some personal role in obtaining or retaining for the former employer, giving him the benefit of a rather wide margin of doubt. Insofar as the employee has need of a written list to refresh his memory, it can be fairly assumed that he played *no significant role in developing or maintaining the relationship.* Thus, the customer-list doctrine may be interpreted as a judicial judgment to intervene, absent a special contract provision or other special circumstances, only when it is entirely clear that the employee has had no significant relationships with the customer. As will be noted, this approach to balancing the competing "claims" of the employer and employee is becoming of increasing importance in the employee-restraint cases.

In addition to policy reasons for thus severely limiting the employer's claim to his clientele, there is reluctance on the part of courts to extend the substantive scope of protection to circumstances for which effective remedies may be impossible to devise. Damages are necessarily highly speculative, for if the customer is willing to go with the former employee there is some reason to assume that he might not have continued the old relationship much longer in any event. As for equitable relief, it is difficult to think of a more easily frustrated order than an injunction against solicitation. It is certainly not desirable to order the former employee not to transact business with the customer even if the customer comes to him without solicitation;[88] yet if two parties who have had regular business dealings desire to make an arrangement, how the overtures were carried out — including

---

[87] *E.g.,* 2 CALLMANN, 844–45; McClain, *Injunctive Relief Against Employees Using Confidential Information,* 23 KY. L.J. 248, 259 (1935). The exception does not protect an employee when he acts under a carefully worked out plan which includes "stealing" the former employer's clientele built up through great effort and expense, *cf.* Reid v. Mass Co., 155 Cal. App. 2d 293, 318 P.2d 54 (Dist. Ct. App. 1957), or when there have been activities which involve grossly unfair competition of other kinds.

[88] Courts usually refuse to issue so broad an order, at least when nothing more is shown than competition by a former employee. Kramer, *Protection of Customer Lists in California,* 23 CALIF. L. REV. 399, 404 (1935), and cases cited therein.

whether a solicitation was made — will seldom be known to out-siders. Furthermore, the former employer is not likely to main-tain happy relations with a customer who learns that a court order has been obtained which prevents him from receiving an offer from an old business friend.[89]

For these reasons the employer is apt to regard his interests as inadequately protected by traditional legal remedies, and his arguments are not without merit. An enforceable employee cove-nant not to compete remedies this deficiency, and with a venge-ance. In at least three different ways such covenants may pro-vide protection beyond that which would otherwise be available. First, they may deter the employee from leaving his employment and thus from finding himself in a position to compete for custom-ers; second, if the former employee violates the covenant, he may be ordered out of the business entirely, rather than subjected only to the less effective order not to solicit; finally, an effective covenant may in some cases not only protect against solicitation of all the employer's actual customers but also guarantee his ex-clusive access to potential customers in the restricted area, rather than protect only against the misuse of customer lists.[90]

Courts in most jurisdictions have held that an employer has a sufficient interest in retaining his present customers to support an employee covenant whenever the employee's relationship with customers is such that there is a substantial risk that he may be able to divert all or part of their business.[91] This is the so-called "customer contact" basis.[92]

---

[89] Covenants not to solicit customers, which are commonly used, are really a narrow form of the type of postemployment restraint under discussion, and their enforceability is determined according to the principles being discussed. See gen-erally Hines, *Employees' Covenants Not To Solicit Former Patrons*, 20 CALIF. L. REV. 607 (1932). It should be noted that such a restraint is subject to most of the same practical enforcement problems as relief granted on grounds of unfair com-petition in the absence of a contract. However, if enforceable, it does increase the class of customers access to which will be protected beyond the coverage of the customer-list doctrine. This discrepancy has been criticized. Hannigan, *The Implied Obligation of an Employee*, 77 U. PA. L. REV. 970, 980 (1929).

[90] The third result will be shown to be less likely today than at an earlier date. Courts now tend not to enforce area restrictions in many situations when the area contains many potential customers who have not been solicited or serviced by the employee. Text accompanying note 180 *infra*.

[91] A useful catalogue of cases by jurisdiction under headings of types of employ-ment will be found in Annot., 41 A.L.R.2d 15, 92–102 (1955). The listing is essen-tially repeated in Annot., 43 A.L.R.2d 94, 164–75 (1955).

[92] An interesting discussion of this "theory" and its limitations will be found in Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 47–53, 105

This approach in its purest form is exemplified by a recent Utah decision.[93]  Allen, a registered pharmacist, had been hired to manage a drug store being built in an outlying section of Salt Lake City.  The employment contract contained a covenant that in the event of termination for any reason he would not "directly or indirectly compete, as an employee or principal in the operation of a drug store or pharmacy within a radius of two miles . . . for a period of five years thereafter." [94]  His activity was largely responsible for building up a good business within a short time, but at the end of a year he was fired to make room for a son of one of the directors of the company.  He sought a declaratory judgment as to the validity of the covenant.  The nature of the business was not such as to give rise to any trade secrets; the court specifically noted that "all prescriptions are prepared in conformance with specifications listed in United States Pharmacopoeia and National Formulary.  No methods of buying, displaying or the selling of merchandise were obtained by the plaintiff *from the defendant.*" [95] However, *the restraint was held valid in its full scope,* the court reasoning that in hiring plaintiff the pharmacy company was "purchasing the good will which might accrue to the business by reason of plaintiff's personal attributes. . . . In order to retain it after plaintiff's termination, a covenant was necessary which would prohibit him from drawing away all his close friends, but the defendant's customers, to another nearby drug store." [96]

The "customer contact" basis posits a substantial risk of loss of clientele to an employee because of the nature of his work.  Whether the risk will be sufficiently great to warrant a restriction, and how broad a restriction will be permitted, depends upon the extent to which the employee is likely to be identified in the cus-

---

N.E.2d 685, 705–09 (C.P. 1952), which is discussed at pp. 666–67 *infra.*  See also Kelite Prods. v. Brandt, 206 Ore. 636, 294 P.2d 320 (1956), which reproduces a substantial section of the record in which the defendant, on cross-examination, explains his view that "if a man has a good product they are pretty apt to follow the man." *Id.* at 645, 294 P.2d at 324. (All italicized in original.)  Defendant was engaged in the "highly competitive" business of selling industrial cleaning and maintenance compounds.

[93] Allen v. Rose Park Pharmacy, 120 Utah 608, 237 P.2d 823 (1951); *accord,* Torrington Creamery, Inc. v. Davenport, 126 Conn. 515, 12 A.2d 780 (1940).  Compare Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 108 Atl. 541 (1919); Nesko Corp. v. Fontaine, 19 Conn. Supp. 160, 110 A.2d 631 (C.P. 1954).

[94] 120 Utah at 610, 237 P.2d at 824.

[95] *Id.* at 614–15, 237 P.2d at 826.

[96] *Id.* at 617, 237 P.2d at 827.

tomer's mind with the product or service being sold.[97]  The most important factors seem to be (1) the frequency of the employee's contacts with customers and whether they are the employer's only relationships with those customers, (2) the locale of the contact, and (3) perhaps most important, the nature of the functions performed by the employee.

(*1*) *Frequency.* — The frequency of the employee's dealings with the customer is obviously important as a limiting factor.  If contacts are infrequent and irregular, there may be no sufficient risk to the employer to support any degree of restraint.[98]  When the commodity being sold is such that there are apt to be no "repeat" sales, such as residential real estate, or if sales are normally highly infrequent, as is true with major household appliances, a restraint may not be justifiable.  The same is true when the nature of a service is such that it is required only very occasionally or at irregular intervals.[99]

Frequency of contact may also control or affect the permissible period of the restraint.  Paradoxically, if the contact is less frequent, a longer period of restraint may be reasonable.  Here the controlling idea is that the employer should be given a reasonable period of time in which to overcome the former employee's personal hold over the client, usually by putting another man on the job.[100]  The employer's new representative should be given a reasonable opportunity to demonstrate to the customer that he will perform satisfactorily and to establish a working relationship.  Thus, the less frequent the contacts, other factors being equal, the longer the period needed by the new employee.

Even though the employee's dealings with the customer are very frequent, they may not be given much weight in situations in which other contacts between the employer and the customer are

---

[97] See Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 47–53, 105 N.E.2d 685, 705–09 (C.P. 1952).

[98] *E.g.*, Harry Livingston, Inc. v. Macher, 30 Del. Ch. 94, 54 A.2d 169 (Ch. 1947); Crowell v. Woodruff, 245 S.W.2d 447 (Ky. 1951); Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 246 N.W. 567 (1933). *But see* Erikson v. Hawley, 12 F.2d 491 (D.C. Cir. 1926).

[99] Bowler v. Lovegrove, [1921] 1 Ch. 642; see Northwest Side Lumber Co. v. Layton, 239 Ill. App. 82 (1925); Tawney v. Mutual Sys., Inc., 186 Md. 508, 47 A.2d 372 (1946). *But see* Interstate Fin. Corp. v. Wood, 69 F. Supp. 278 (E.D. Ill. 1946).

[100] See Tawney v. Mutual Sys., Inc., *supra* note 99; Deuerling v. City Baking Co., 155 Md. 280, 141 Atl. 542 (1928); Allen v. Rose Park Pharmacy, 120 Utah 608, 237 P.2d 823 (1951); Fullerton Lumber Co. v. Torborg, 270 Wis. 133, 70 N.W.2d 585 (1955).

important, particularly when there are other relationships with senior officers or employees.[101]

(2) *Locale.* — Even when the employee is the primary contact man, if the transactions take place under circumstances in which the employee is not the only link with the product, the customer is less likely to direct his loyalty primarily to the employee. Transactions which take place at the employer's place of business may involve less risk to the employer than do those which take place exclusively at the customer's home or business establishment. Thus, in most cases in which there are repeated visits to the customer's home, such as when it is part of a milk, laundry, or other route, some degree of restraint is supportable.[102] On the other hand, equally frequent contacts of much the same quality when a customer regularly visits a store or office are less likely, of themselves, to be sufficient.[103]

The locale of contact may also influence the permissible scope of the restraint. When a regular customers' route has been developed, courts are increasingly insisting that the restraint be limited to the route itself.[104] If a salesman has an assigned territory in which he solicits business and services customers, a restraint will seldom be upheld if it extends beyond the limits of the territory actually served.[105] On the other hand, if the point of contact is the employer's place of business, courts are faced with the problem whether to limit the restraint to solicitation of actual customers of the employer, or to permit the restraint to be effective throughout the geographical area from which custom is drawn. The answer to the question will usually be determined by other factors, such as the nature of the product and whether the product is sold to the general public or to business concerns.

---

[101] See, *e.g.*, Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 47–52, 105 N.E.2d 685, 705–08 (C.P. 1952); Lantieri Beauty Salon, Inc. v. Yale, 169 Misc. 547, 7 N.Y.S.2d 984 (Sup. Ct. 1938).

[102] The "route" cases are numberless. See Annot., 43 A.L.R.2d 94, 316–21 (1955). For an important limitation on the general rule that appropriate restraints against soliciting routes are enforceable, see pp. 663–64 *infra*.

[103] See cases cited note 101 *supra*. But see Shirk v. Loftis Bros., 148 Ga. 500, 97 S.E. 66 (1918).

[104] See, *e.g.*, Denny v. Roth, 296 S.W.2d 944 (Tex. Civ. App. 1956); *cf.* Meyer v. Wineburgh, 110 F. Supp. 957 (D.D.C. 1953); Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957).

[105] See R. L. Guttridge, Inc. v. Wean, 8 N.J. Super. 450, 73 A.2d 284 (Ch. 1950); Delmar Studios v. Kinsey, 233 S.C. 313, 104 S.E.2d 338 (1958); Spinks v. Riebold, 310 S.W.2d 668 (Tex. Civ. App. 1958). *But see* Renwood Food Prods., Inc., v. Schaefer, 240 Mo. App. 939, 223 S.W.2d 144 (1949).

Where the general public makes up the clientele, it is often impossible to devise a restraint other than in terms of the geographic area of the normal market.[106]

(*3*) *Nature of the Employee's Activity.* — The quality of customer contacts, perhaps the most important factor, depends primarily upon the nature of the product or service involved and the degree of authority and responsibility given the employee.[107] At opposite extremes, the door-to-door salesman of a simple consumer's good may be contrasted with the executive salesman of automated installations, or, dealing in services, an account executive in an advertising agency. The risk to the employer reaches a maximum in situations in which the employee must work closely with the client or customer over a long period of time, especially when his services are a significant part of the total transaction.[108]

The role the employee plays is apt to be related to another factor of importance. When the customer relationship calls for a high degree of executive skill, the employee is apt to occupy a relatively senior position in the company. Being a part of — or in close contact with — the higher echelons of management, he is usually in a position to bargain as an individual about the terms of his employment. It is more likely that any restraint he undertakes is tailored to the circumstances and bargained for, and thus less subject to skeptical review as a contract of adhesion.[109] Furthermore, a restraint applicable to such an individual is less likely to be based solely on his relationships with customers, because he is also apt to have access to confidential business information. Interestingly, however, there has been very little litigation concerning employment restraints on members of high-level management of large corporations.[110] Covenants undertaken by

---

[106] The problems presented by a restraint of this nature are discussed at pp. 679–81 *infra.*

[107] *Compare* Chemical Fireproofing Corp. v. Krouse, 155 F.2d 422 (D.C. Cir. 1946) (relief denied), *with* Conforming Matrix Corp. v. Faber, 104 Ohio App. 8, 146 N.E.2d 447 (1947) (relief granted).

[108] See, *e.g.*, May v. Young, 125 Conn. 1, 2 A.2d 385 (1938) (production engineer); Ebbeskotte v. Tyler, 127 Ind. App. 433, 142 N.E.2d 905 (1957) (accountant); Haysler v. Buttersfield, 240 Mo. App. 733, 218 S.W.2d 129 (1949) (placement counsellor); Spinks v. Riebold, 310 S.W.2d 668 (Tex. Civ. App. 1958) (salesman of highly specialized equipment).

[109] The relative bargaining power of the employer and employee is stressed in many cases both upholding and denying the validity of covenants. See note 161 *infra.*

[110] For instances of such litigation, see Wahlgren v. Bausch & Lomb Optical Co., 68 F.2d 660 (7th Cir.), *cert. denied*, 292 U.S. 639 (1934); Heinz v. Na-

"middle management" employees — branch managers, sales managers, and the like — are very apt to be upheld if the employee's position places him in contact with customers.[111] Restraints upon professional employees, such as associates or technical assistants of lawyers,[112] doctors,[113] architects,[114] accountants,[115] and dentists,[116] are also generally upheld when the customer relationships are substantial.[117] When the clientele being served is scattered throughout the country — as is often the case when customer contacts are at the executive level — courts are willing to enforce very broad territorial restraints,[118] although as will subsequently

---

tional Bank of Commerce, 237 Fed. 942 (8th Cir. 1916); Gilford Motor Co. v. Horne, [1933] Ch. 935. It should be noted that, except for the English case, none of the foregoing cases involved straight employment restraints of the usual sort.

[111] See, e.g., Stokes v. Moore, 262 Ala. 59, 77 So. 2d 331 (1955); Fatzinger v. DeLong, 10 Pa. D. & C.2d 53 (C.P. 1956); Ofsowitz v. Askin Stores, Inc., 306 S.W.2d 923 (Tex. Civ. App. 1957); Phillips v. Seiberling Rubber Co., 278 S.W.2d 293 (Tex. Civ. App. 1954); Fullerton Lumber Co. v. Torborg, 270 Wis. 133, 70 N.W.2d 585 (1955).

[112] See Toulmin v. Becker, 69 Ohio L. Abs. 109, 124 N.E.2d 778 (Ct. App. 1954). American lawyers apparently do not use such covenants extensively, or at least do not take them to court. There are many cases involving English solicitors' clerks, in all of which, except the most recent, Dickson v. Jones, [1939] 3 All E.R. 182 (Ch.), the restraint seems to have been upheld. In the latter case the court noted that some protection is "almost always necessary" in cases involving solicitors, but found the restraint too broad in area in view of its unlimited duration.

[113] See Dodd, Contracts Not To Practice Medicine, 23 B.U.L. REV. 305 (1943). More recent cases include Millet v. Slocum, 4 App. Div. 2d 528, 167 N.Y.S.2d 136 (1957) (dictum); Keen v. Schneider, 202 Misc. 298, 114 N.Y.S.2d 126 (Sup. Ct.), aff'd, 280 App. Div. 954, 116 N.Y.S.2d 494 (1952). In Foltz v. Struxness, 169 Kan. 714, 215 P.2d 133 (1950), a one-hundred mile radial restraint was severed and enforced as to the city in which the employing physician practiced. In cases involving the other branches of the healing professions courts are more strict. See Brecher v. Brown, 235 Iowa 627, 17 N.W.2d 377 (1945) (veterinary); Rudolph Bros. v. Greulick, 21 N.Y.S.2d 971 (Sup. Ct. 1940) (optometrist).

[114] See Continental Paper Grading Co. v. Howard T. Fisher & Associates, 3 Ill. App. 2d 118, 120 N.E.2d 577 (1954).

[115] See Ebbeskotte v. Tyler, 127 Ind. App. 433, 142 N.E.2d 905 (1957); Racine v. Bender, 141 Wash. 606, 252 Pac. 115 (1927).

[116] See cases cited in Annot., 43 A.L.R.2d 94, 165 (1955).

[117] In Skyland Broadcasting Corp. v. Hamby, 2 Ohio Op. 2d 426, 141 N.E.2d 783 (C.P. 1957), a covenant undertaken by a "disk jockey" was upheld when he tried to move to a competing radio station, the court reasoning that the employer had made a considerable investment in obtaining clientele by "building up" the employee as a "personality."

[118] See Wark v. Ervin Press Corp., 48 F.2d 152 (7th Cir. 1931); In re International Match Corp., 20 F. Supp. 420 (S.D.N.Y. 1937); Basic Food Sales Corp. v. Moyer, 55 F. Supp. 449 (W.D. Pa. 1944); Toulmin v. Becker, 69 Ohio L. Abs. 109, 124 N.E.2d 778 (Ct. App. 1954). Most of the employee cases in which a

be shown, there is increasing evidence of disfavor of geographical restrictions when sufficient protection may be available from a covenant not to solicit former customers.[119]

The mere fact of frequent customer contact is not enough to provide a basis for an enforceable covenant when the circumstances of the contact are such that the risk to the employer is low, such as when the employee is engaged in the collection of bills or delinquent customer accounts,[120] or is working under the close supervision of the employer or a senior employee, as is often the case with office workers,[121] clerks in retail stores,[122] auto mechanics,[123] repairmen,[124] and the like. Nor are the normal friendships and contacts one may have socially in the community a sufficient support for a restraint, even though these may include customers or potential customers of the employer.[125]

The foregoing threefold breakdown of factors affecting the degree of risk is not, of course, exhaustive. Other facts in a case may be controlling; for example, the inconvenience of following the employee to a new place of business may be great,[126] or the employer's product or service may be unique.[127]

Thus far the discussion has assumed that the presence of a substantial risk of losing customers to an employee is itself an adequate basis for a reasonably designed restraint. A substantial majority of the cases support this position. However, there is an important limitation to this general rule. When an employee,

---

nationwide restraint has been enforced, however, have involved trade secrets of a technical nature. See cases cited in Annot., 43 A.L.R.2d 94, 275–77 (1955).

[119] See discussion at p. 690 *infra*; Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 108 Atl. 541 (1919) (dictum); *cf.* New England Tree Expert Co. v. Russell, 306 Mass. 504, 28 N.E.2d 997 (1940); Tawney v. Mutual Sys., Inc., 186 Md. 508, 47 A.2d 372 (1946). *But see* John Roane, Inc. v. Tweed, 33 Del. Ch. 4, 89 A.2d 548 (Sup. Ct. 1952).

[120] See Kadis v. Britt, 224 N.C. 154, 29 S.E.2d 543 (1944); Interstate Tea Co. v. Alt, 271 N.Y. 76, 2 N.E.2d 51 (1936).

[121] See cases cited in Annot., 43 A.L.R.2d 94, 170–71 (1955).

[122] See cases cited *id.* at 174.

[123] See Ridley v. Krout, 63 Wyo. 252, 180 P.2d 124 (1947).

[124] See cases cited in Annot., 43 A.L.R.2d 94, 172 (1955).

[125] See Ridley v. Krout, 63 Wyo. 252, 180 P.2d 124 (1947). *But cf.* Allen v. Rose Park Pharmacy, 120 Utah 608, 237 P.2d 823 (1951).

[126] This point was made and carefully explored by Judge Hoover in Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 49, 105 N.E.2d 685, 706 (C.P. 1952).

[127] See, *e.g.*, Byers v. Trans-Pecos Abstract Co., 18 S.W.2d 1096 (Tex. Civ. App. 1929). It appears that a public utility would seldom be able to claim a customer-relationship basis for an employee covenant not to compete.

usually a salesman or route service man, actually brings custom-
ers with him when he takes employment, courts are reluctant
to prevent his soliciting them when he departs, regardless of the
existence of a covenant not to compete.[128] Furthermore, a few
older cases and a larger number of more recent decisions appear
to be extending this idea by investigating the nature of the
employer's claim to the custom served by the employee.

For example, in *Love v. Miami Laundry Co.*, [129] the employer
had what would seem to be a very strong case. The three em-
ployees against whom relief was sought had been route service-
men and the employer's only contact with the customers, whom
the employees visited regularly at their homes for over two years.
It does not appear that the employees had brought clients or ex-
perience when they came to the job. The covenant did not extend
over an area but only to actual customers of the laundry. The
injunction sought was even narrower, viz., relief against solicita-
tion of customers on the routes which defendants had actually
serviced. After a rehearing and over a vigorous dissent the court
refused injunctive relief, although it did not hold the covenant
void. The court reasoned that "friendships and confidence
[gained] amongst customers" are attributable to an employee's
"God-given, or self-cultivated, ingratiating personality" [130] in
which the employer has no property interest. Neither did the
laundry obtain any "special property right" in the customer. The
court noted that in many jurisdictions covenants based on such
an interest have been enforced but argued that those courts did

---

[128] See M. & S. Drapers v. Reynolds, [1957] 1 Weekly L.R. 9 (C.A. 1956);
Fleisig v. Kossoff, 85 N.Y.S.2d 449 (Sup. Ct. 1948), *aff'd*, 275 App. Div. 909, 90
N.Y.S.2d 273 (1949). *But see* Tawney v. Mutual Sys., Inc., 186 Md. 508, 47 A.2d
372 (1946).

[129] 118 Fla. 137, 160 So. 32 (1934); *accord*, J. Schaeffer, Inc. v. Hoppen, 127
Fla. 703, 173 So. 900 (1937). Since the *Love* case, Florida has enacted a statute
permitting employee covenants "within a reasonably limited time and area . . . so
long as [the] . . . employer continues to carry on a like business therein." FLA.
STAT. § 542.12 (1957). However, in United Loan Corp. v. Weddle, 77 So. 2d 629
(Fla. 1955), decided after the new statute was passed, the Florida Supreme Court
affirmed in a per curiam opinion a lower court's refusal to enforce a seemingly
reasonable employee restraint. A more recent lower-court decision cited the strong
dissent in the *Weddle* case and granted an injunction enforcing an employee re-
straint. Atlas Travel Serv., Inc., v. Morelly, 98 So. 2d 816 (Fla. Dist. Ct. App. 1957).
Thus the status of the *Love* case as Florida law is highly uncertain. The case is
included, however, primarily as an excellent example of the judicial attitude under
discussion which is increasingly evident in recent decisions.

[130] 118 Fla. at 147–48, 160 So. at 36.

not give adequate attention to the employee's interests and to the fact that employee covenants are not bargained for between equals.

Further limitations of the customer-relationship basis for restraints are found in two more recent decisions. *Welcome Wagon, Inc. v. Morris* [131] is the latest reported episode in the history of the Welcome Wagon organization.[132] The company enters into contracts with women in communities throughout the country under which they arrange with local merchants to sponsor welcoming visits to the homes of newcomers into the community, newly married couples, and others. The welcomer brings greetings, small gifts, and advertising messages from the sponsors, who hope in this way to win future patronage. The sponsors pay Welcome Wagon a fee based on the number of visits made. The hostess gets a percentage, but no salary or guaranteed minimum amount. In addition to recruiting sponsors and making the visits, the hostess takes care of all other local arrangements and pays expenses, except that in some instances the organization arranges with a local auto dealer to provide a car which bears the organization's name. As its history shows, Welcome Wagon stands in great need of protection of its customer contacts, for the temptation is great for the local merchants and hostess to save the fifty per cent or more of fees which the organization takes under the contract. Furthermore, the organization apparently has no contact with its local sponsors other than through the local hostess. Yet when Nancy Morris violated her contract's covenant not to compete and actually enlisted former Welcome Wagon sponsors in her community in a new enterprise of a similar nature, Welcome Wagon was denied relief. The Court of Appeals found the restraint's five-year duration "entirely too long" and the geographic coverage — the city itself and, in separate clauses, any other places where the plaintiff "is then engaged" or "has been or has signified his intention to be engaged" in the service — too broad. The court found "no deep trade secrets and no highly confiden-

---

[131] 224 F.2d 693 (4th Cir. 1955).

[132] Previous Welcome Wagon attempts to enforce covenants substantially similar to that in the present case met with mixed results. *Compare* Briggs v. Butler, 140 Ohio St. 499, 45 N.E.2d 757 (1942), *and* Briggs v. Glover, 167 Misc. 306, 3 N.Y.S.2d 979 (Sup. Ct. 1938), *with* Briggs v. Boston, 15 F. Supp. 763 (N.D. Iowa 1936). A case contemporaneous with the *Morris* case was successful in the Indiana appellate court. Welcome Wagon, Inc. v. Haschert, 125 Ind. App. 503, 127 N.E.2d 103 (1955).

JA0287

tial information," and by implication rejected any customer-contact basis for relief. Plaintiff requested that the covenant be reduced in scope by severance, but this also was denied.

In *Arthur Murray Dance Studios, Inc. v. Witter*,[133] the famous dancing master's organization suffered a reversal in its attempt to police the covenants not to compete which it requires of the instructors in its local establishments.[134] In an opinion already widely cited both for its result and its wit, the court rejected Murray's claim that the instruction it provided in the master's technique and methods provided sufficient basis for a restraint limited to professional dancing in the immediate area. The court also found the facts inappropriate for relief on the grounds of risk of loss of clientele. Although the opinion minimized the risk of injury in this respect, the court could hardly have failed to be aware that the personal following of individual instructors among their students is one of the major assets of such a school, and, indeed, doubtless the primary reason for the vigorous efforts by Murray to devise binding restraints and bring violators to court.

It is perhaps significant that in both the *Welcome Wagon* and *Arthur Murray* situations the employer's chief contributions to the enterprise appear to have been its name, some standardized procedures, and a very limited investment in entrepreneurial services. In each case the success or failure of the local venture depended to an unusual extent on the personal qualities of the employees. Even though the risk of diversion of the employer's clientele was substantial — in the *Welcome Wagon* case an accomplished fact — this alone was not considered a sufficient ground for even a comparatively modest limitation on the employee's future activities. Somewhat comparable circumstances were present in recent cases in which narrow covenants were refused enforcement against a salesman for an advertising agency,[135] a driver-solicitor for an equipment-rental service,[136] a real-estate and insurance salesman in a small community,[137] a salesman of barber- and beauty-shop

---

[133] 62 Ohio L. Abs. 17, 105 N.E.2d 685 (C.P. 1952).

[134] Other efforts are represented by Murray v. Cooper, 268 App. Div. 411, 51 N.Y.S.2d 935 (1944), *aff'd*, 294 N.Y. 658, 60 N.E.2d 387 (1945) (relief denied); Worrie v. Boze, 191 Va. 916, 62 S.E.2d 876 (1951) (relief allowed).

[135] Davis-Robertson Agency v. Duke, 119 F. Supp. 931 (E.D. Va. 1953).

[136] Thomas v. Coastal Industrial Servs., Inc., 214 Ga. 832, 108 S.E.2d 328 (1959).

[137] Dunfey Realty Co. v. Enwright, 101 N.H. 195, 138 A.2d 80 (1957).

equipment,[138] and a retail ice-cream salesman.[139]  It is submitted that these cases are indicative of a growing tendency on the part of courts not only to require a showing of substantial risk of losing clientele to the former employee, but also to balance the conflicting claims of the employer and employee to the customers in question. Where the employer's role in securing or retaining customers is limited in relation to the employee's, it appears to be increasingly likely that no protectible interest sufficient to support a restraining covenant will be recognized.

## B. Confidential Business Information

Although a commanding majority of the litigated employee-restraint cases represent attempts, usually by proprietors of small businesses, to preserve their clientele, many companies are primarily interested in restrictive covenants as a means of preventing valuable business information obtained by employees from being used by a competitor. The archetype of this class of protectible interests is the "trade secret," traditionally a "plan or process, tool, mechanism, or compound, known only to its owner and those of his employees to whom it is necessary to confide it." [140]  These business artifacts have been dignified with the label of "property" and are protected against disclosure or misuse during or after employment — or, indeed, whether or not the miscreant was ever an employee — for as long as they retain their confidential nature.[141]

The concept of the trade secret, however, has its roots in an era when business technology was less complex and dynamic than it is today.  The formula of a patent medicine or a secret process was often the cornerstone of a business whose methods and product remained unchanged for decades.  But the acceleration of the rate of growth of the economy, characterized by vastly broader markets and an avalanche of new products, has produced entirely new forms of business behavior.  Firms are increasingly producing a larger number of products.  Competition increasingly takes the form of rivalry among producers of products which are dif-

---

[138] Saul v. Thalis, 156 F. Supp. 408 (D.D.C. 1957).

[139] Kleinwaks v. Shiner, 10 Pa. D. & C.2d 419 (C.P. 1957).

[140] National Tube Co. v. Eastern Tube Co., 13–23 Ohio C.C. Dec. 468, 470 (1902), aff'd, 69 Ohio St. 560, 70 N.E. 1127 (1903); see RESTATEMENT, TORTS § 757, comment b (1939). See generally ELLIS §§ 1–16.

[141] See, e.g., 1 NIMS § 141; ELLIS § 6 and cases cited therein; Note, 23 COLUM. L. REV. 164 (1923).

ferentiated in large part by highly advertised brand names. A premium is placed on fast-moving industrial research resulting in new products, or in new designs or models of old products. In the intense rivalry for consumers' favor, beating competitors to market with something new or different increasingly characterizes successful competition. The new product of the research or design departments must be tested for quality and for consumer acceptability, trade marks and legal problems must be taken care of, packaging created, advertising campaigns planned and executed, salesmen briefed, and innumerable intermediate problems solved — often against the pressure of time. Not infrequently, the success of the venture depends on keeping information about it out of the hands of competitors. Acknowledging that legal protection of such confidential business matters might be appropriate, how were the courts to apply the once simple "trade secret" test to the complex facts of modern business methods? In modern laboratories, design centers, and planning conferences, where do trade secrets begin and the employee's intellectual tools of the trade end?

Mr. Justice Holmes had provided some conceptual clarification by noting that "the word property as applied to . . . trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied but the confidence cannot be." [142] At least where employees are concerned, most courts now treat the problem as one of breach of trust or confidence.[143] This formulation makes it conceptually less difficult to afford protection to confidential information of a transient nature, such as a plan for an advertising campaign, for example, but it does not provide an easy answer to the underlying question: Under what conditions and with respect to what kinds of information does a duty not to disclose arise? There can be no betrayal of confidence unless there is a confidence to betray and it is known to be a confidence.[144]

---

[142] E.I. du Pont de Nemours Powder Co. v. Masland, 244 U.S. 100, 102 (1917).

[143] This approach leaves to unfair-competition doctrines the problem of an outsider's appropriation of valuable business confidences. 2 CALLMANN 859–63.

[144] National Starch Prods., Inc. v. Polymer Indus., Inc., 273 App. Div. 732, 79 N.Y.S.2d 357 (1948).

Although the confidential-relation approach allows courts great freedom to examine all the circumstances of the case and flexibility in deciding when to accord protection, it has obvious limitations. Clearly, the boundaries of the protection cannot be stated with exactitude, so that in all but the clearest cases it is difficult to predict with certainty whether protection will be extended. In theory this problem can be solved without a restraint on future employment. The employer and employee can reach an agreement that information specifically described will not be used or divulged during or after the term of employment except for the benefit of the employer. The continuing employment will suffice as consideration,[145] and reducing the matter to contract will usually persuade a court that the information merits protection.[146] However, such contracts present practical difficulties. It is often impossible to spell out in advance in specific terms the confidential information for which protection will be desired, particularly when it may be of a transient nature. Describing it in general terms usually does not solve the problem of what is intended by the employer and understood by the employee to be included. Furthermore, the *important thing to the employer is not having a cause of action in case of a breach of confidence, but preventing the violation from occurring.* An injunction not to disclose can seldom undo or effectively prevent the doing of the real damage. Even in the

---

[145] There has been extensive debate over whether employment terminable at will could provide consideration for employee obligations of this nature or, perhaps more accurately, whether equity will enforce an obligation incident to a contract when the contract as a whole might not be specifically enforceable against the employer. This problem extends to covenants not to compete as well as to all the related types of undertakings in employment contracts. Although the question is occasionally discussed in the opinions, the almost universally accepted view now is that any substantial performance by the employer (*i.e.*, actual employment of the employee for any substantial period) makes the restraint enforceable against the employee. See 5 CORBIN, CONTRACTS § 1210 (1951); Note, *The Enforcibility of a Promise Not To Compete After an Employment at Will*, 29 COLUM. L. REV. 347 (1929).

[146] Indeed, if there is no serious question that the information attains the dignity of a "trade secret," the contract will be merely declarative of a preexisting right — the contract only "strengthens" the right to relief. Consolidated Boiler Corp. v. Bogue Elec. Co., 141 N.J. Eq. 550, 566–67, 58 A.2d 759, 769–70 (Ch. 1948); L. M. Rabinowitz & Co. v. Dasher, 82 N.Y.S.2d 431 (Sup. Ct. 1948); Todd Protectograph Co. v. Hirchberg, 100 Misc. 418, 165 N.Y. Supp. 906 (Sup. Ct. 1917). The contract is said to serve "as evidence of the confidential nature of the disclosure, thereby negating any inference of publication." Note, 42 COLUM. L. REV. 317, 318 (1942). But it will not preclude a court's examination into whether the information ultimately deserves protection. 2 CALLMANN 806–08.

best of good faith, a former technical or "creative" employee working for a competitor, or in business for himself in the same or a related field, can hardly prevent his knowledge of his former employer's confidential methods or data from showing up in his work.[147] And utmost good faith cannot always be expected. Thus, from the employer's point of view a more effective preventive is badly needed.

The public-interest question cannot be decisively answered, either. There is doubtless considerable social benefit in having the best "know-how" disseminated among competitors. Against this must be balanced some clear disadvantages. If valuable information cannot be effectively protected for at least a minimum period of time, part of the advantage of a vigorous program of research and development is lost. Research expenditures will not be carried to the optimum level. Furthermore, attempts to minimize the risk in other ways are very likely to result in reduction of intra-company exchange of ideas which may be important to effective research and coordination of operations. Finally, the creative employee may find his opportunities to develop in his technical specialty inhibited by such "security" barriers within the company.

The most effective protective device is an enforceable postemployment covenant not to compete. For reasons of the nature indicated, courts have more uniformly upheld covenants founded on protection of confidential business information than those based solely on protecting customer relationships. Indeed, to a considerable extent, the protection extended to customer relationships is an offshoot of the protection of confidential information. For example, many jurisdictions give preferred protection to customer lists or routes on the ground that they are trade secrets.[148] Information regarding the special needs and characteristics of company customers may be protected as confidential information even by courts reluctant to go so far as to base protection on the

---

[147] This point was forcefully made in Eastman Kodak Co. v. Powers Film Prods., Inc., 189 App. Div. 556, 561–62, 179 N.Y. Supp. 325, 330 (1919):

> [I]f he is permitted to enter this employ, injunctive relief in form against the imparting of such special knowledge is more than likely to prove inefficient. The mere rendition of the service along the lines of his training would almost necessarily impart such knowledge to some degree. . . . [Defendant] cannot be loyal both to his promise to his former employer and to his new obligations to the defendant company.

[148] New York is an outstanding example. See Note, *Protection of Customer Lists in New York*, 1 SYRACUSE L. REV. 110 (1949). See also cases cited in Annot., 43 A.L.R.2d 94, 191–93 (1955).

employee-customer relationship standing alone.[149] The line is so difficult to draw that employers' petitions for injunctive relief to protect customer relationships seldom fail to try to persuade the court that the employee has had access to confidential information regarding the customers or other facts of the business as well.

A recitation in general terms in an employee covenant that the employer is divulging trade secrets and confidential information to the employee does not prove that such facts were actually present to a sufficient degree to warrant enforcement of the restraint; however, it does inform the court that the employee knew that the employer regarded at least some aspects of his work as involving confidential information when he accepted the restraint.[150] Whether the facts will in fact be found sufficient appears to depend primarily on two factors: the nature of the information, including how it came into being, and the efforts of the employer to keep it confidential. Thus the analysis in the employee-restraint cases is not significantly different from that undertaken in cases involving trade secrets in the absence of a contract or in cases dealing with covenants not to disclose trade secrets.

(*1*) *The Nature of the Information.* — When the process or method is not unique or significantly different from those in use generally in the trade or industry, it will not serve as an adequate basis for a restraint.[151] But when a business is new or unusual, even its fairly routine methods may be worthy of protection, especially when the employer has established the new endeavor at considerable risk of financial loss.[152] In most cases, however, the most significant factor is whether the method, technique, or "know-how" has been developed by the employer through a considerable investment of time, effort, or money.[153] It is clearly not

---

[149] See, *e.g.*, Todd Protectograph Co. v. Hirchberg, 100 Misc. 418, 165 N.Y. Supp. 906 (Sup. Ct. 1917).

[150] In this respect the recitation in a covenant not to compete seems to be no different from the comparable recitation in a covenant not to disclose trade secrets. It may have evidentiary value as to the parties' understanding when the covenant was made. See note 146 *supra*.

[151] See generally Kaumagraph Co. v. Stampagraph Co., 235 N.Y. 1, 138 N.E. 485 (1923); Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387, 67 Atl. 339 (Ct. Err. & App. 1907). More recent decisions include Roy v. Bolduc, 140 Me. 103, 34 A.2d 479 (1943); Harry Livingston, Inc. v. Macher, 30 Del. Ch. 94, 54 A.2d 169 (Ch. 1947); Molina v. Barany, 56 N.Y.S.2d 124 (Sup. Ct. 1945).

[152] Thomas W. Briggs Co. v. Mason, 217 Ky. 269, 289 S.W. 295 (1926).

[153] See Kelite Corp. v. Khem Chems., Inc., 162 F. Supp. 332 (N.D. Ill. 1958); Lee v. Samburn, 94 U.S.P.Q. 153, 154 (Cal. Super. Ct. 1952); Eastman Kodak Co.

necessary that the methods be previously unknown or narrowly limited in use.[154] The fact that a successful product is being produced by a method well-known in another context, but previously unused for the product in question, is sufficient.[155] A trade secret can arise from combining elements widely used in the trade into a new combination or sequence.[156] The fact that a particular company is using a formula or process, even though the formula or process may be generally known in the trade, may itself be a protectible trade secret.

The problem with regard to scientific and technical information is especially difficult, because the more nearly information with business value approaches "pure science" the more persuasive the claim becomes that it is part of the public domain and thus properly regarded as part of the intellectual equipment of the employee as a research scientist or engineer rather than information pertaining especially to the employer's business.[157] It seems likely that this question will arise in an increasing number of cases.

Relatively unexplored as yet is the problem raised by "creative" ideas developed by personnel in nonscientific departments. It seems reasonable to assume that plans and ideas expressed in marketing strategies or advertising campaigns, for example, may provide a sufficient basis for some form of postemployment restraint.[158] Because of the highly ephemeral nature of such confidential information, however, a reasonably proportioned restraint will in most cases be quite short in duration.

---

v. Powers Film Prods., Inc., 189 App. Div. 556, 179 N.Y. Supp. 325 (1919); ELLIS § 14. *Contra*, 2 CALLMANN 799.

[154] Irvington Varnish & Insulator Co. v. Van Norde, 138 N.J. Eq. 99, 46 A.2d 201 (Ct. Err. & App. 1946); see 2 CALLMANN 803–15.

[155] See *id.* at 797–802.

[156] *Ibid.*

[157] Previously unknown natural phenomena are not patentable; neither can they be protected as trade secrets, though they be discovered at great expense by privately employed scientists, because of the public policy against restricting access to such knowledge, by analogy with the policy limiting patentability. See generally 2 CALLMANN 797–802.

[158] See Thomas W. Briggs Co. v. Mason, 217 Ky. 269, 289 S.W. 295 (1926). Trade secrets have to some extent been recognized in what Callmann designates "internal business facts," whose claim to protection derives not from an independent commercial value but from the fact that their being known to competitors would destroy all or part of their value. 2 CALLMANN 802–03. For example, if the timing of the launching of a new product or advertising program were known to a business rival, he might be able to adopt countervailing tactics.

A number of cases go to very extreme lengths in extending pro-
tection to business confidences of a rather routine nature.  Con-
siderable authority can be found for enforcing a restraint when
little more appears than the information necessarily known to a
person such as a branch manager of a small retail outlet about
retailing methods, sources of supply, customers' credit standing,
income and expense data, and the like.[159]  Although particular
business data of a company are in one sense unique to the company
and are typically not widely publicized, it is submitted that infor-
mation representing the normal accretion of day-to-day routines,
as contrasted with the valuable product of special creative en-
deavors, should seldom, of itself, be sufficient to support an em-
ployee restraint.  Trivial differences in methods and processes are
not recognized as trade secrets;[160] surely knowledge of the ordin-
ary routines of a particular business should not, of itself, support
a restriction on an employee's mobility.  Exceptions should per-
haps be recognized when the covenantor is at a sufficiently senior
level in management to warrant imposition of a fiduciary duty
higher than that of the ordinary employee.[161]

(2) *Employer Efforts to Keep Information Confidential.* —
Business information voluntarily made available to one not in a
confidential relation with the employer and not under a contrac-
tual obligation of secrecy usually loses its claim to legal protec-
tion.[162]  However, an implied term of all employment contracts is

---

[159] Many of the cases in which restraints against managers of retail stores are
enforced rely in part on this type of information. Annot., 43 A.L.R.2d 94, 168–70
(1955); see, *e.g.*, Park v. Essa Tex Corp., 315 S.W.2d 197 (Tex. Civ. App. 1958).

[160] See Victor Chem. Works v. Iliff, 299 Ill. 532, 132 N.E. 806 (1921); ELLIS
§ 15. Callmann urges that information that the employer purchases from a par-
ticular supplier or on certain terms should be a trade secret. 2 CALLMANN § 803.
At least for the enforcement of employee restraints, it is suggested that the better-
reasoned cases make a distinction between situations in which such internal in-
formation is fairly routine and situations involving unusual circumstances in which
the availability of supplies, for example, is a matter of special importance. *Compare*
Schreyer v. Casco Prods. Corp., 97 F. Supp. 159 (D. Conn. 1951), *with* Richard
M. Krause, Inc. v. Gardner, 99 N.Y.S.2d 592 (Sup. Ct. 1950).

[161] This factor will have a high correlation with whether the covenant was in
fact negotiated and bargained for, a factor which is regarded as highly persuasive.
See United Loan Corp. v. Weddle, 77 So. 2d 629 (Fla. 1955) (dissenting opinion);
Sonatone Corp. v. Baldwin, 227 N.C. 387, 42 S.E.2d 352 (1947).

[162] See 2 CALLMANN 806–08. And when the purpose of informing the employee
about the employer's "secret" method or process is to enable him to use it as a
sales argument, thus divulging it, no trade secret exists sufficient to support a re-
straint. Gates-McDonald Co. v. McQuilkin, 33 Ohio L. Abs. 481, 34 N.E.2d 443
(Ct. App. 1941).

that the employee will not divulge or use any information which he knows is confidential during or after employment; thus an employer's giving access to such information to employees who have occasion to use it does not destroy its confidential nature.[163] However, if the confidential nature of the information is to be the basis for restricting the freedom of an employee, the employer should be required to show that he has taken reasonable measures to protect its secrecy.[164] The most persuasive proof possible that information is worthy of legal protection is that the employer has taken every feasible step to protect it himself. This would require that disclosure be limited insofar as practicable even among employees. At a minimum, procedures should be shown which advise employees of the importance the employer attaches to the confidential nature of certain projects or classes of information.[165] Demonstration of a carefully administered program of intracompany security can hardly fail to be persuasive when an employee restraint is sought to be enforced on this basis. However, courts have not yet commonly required so extensive a showing.

## V. Scope of Restraint and the Problem of Severability

Even though the employer can show legitimate interests in the protection of clientele or confidential information, the employee restraint will not be enforced if under all the circumstances the restraining covenant is unduly restrictive of the employee's freedom. This is the traditional formulation.[166] But perhaps at the present time it is more nearly correct to say that the restraint will not be enforced if the specific competitive activity complained of is not unreasonable. This distinction is necessary because of the practice of most American courts of ignoring the reasonableness of the terms of the covenant as an abstract matter and concentrating on the reasonableness of what the former employee is actually doing in breach of his agreement. If in balancing the equities the

---

[163] The doctrine of "limited publication" is discussed at 2 Callmann 812–13. See also L. M. Rabinowitz & Co. v. Dasher, 82 N.Y.S.2d 431 (Sup. Ct. 1948).

[164] *E.g.*, Excelsior Steel Furnace Co. v. Williamson Heater Co., 269 Fed. 614 (6th Cir. 1921); Arthur Murray Dance Studios, Inc. v. Witter, 62 Ohio L. Abs. 17, 53–56, 105 N.E.2d 685, 709–11 (C.P. 1952); Restatement, Torts § 757, comment *b — secrecy* (1939).

[165] See O. Hommel Co. v. Fink, 115 W. Va. 686, 177 S.E. 619 (1934). No duty not to disclose exists if the employee could not reasonably be expected to know that the employer regards the information as confidential. *Cf.* 1 Nims § 150.

[166] See pp. 648–49 *supra.*

court decides that his activity would fall within the scope of a reasonable prohibition, it is apt to make use of the tool of severance, paring an unreasonable restraint down to appropriate size and enforcing it.[167]

The traditional dimensions of a restraint have been those of duration and geographic area. The "activity" dimension was not an issue in the earliest cases; a trade was a trade, set apart by separate guilds and the institution of apprenticeship, and there was no ambiguity in a promise not to "exercise the trade of a baker" or "enter into competition." But division of labor and specialization now make it of the utmost importance that a restraint define carefully the activities in which the employee is not to engage. Thus, in the modern cases the "time" dimension remains critical, but the "activity" restraint is, in many cases, replacing the "area" restraint. Restraints mainly concerned with protecting confidential information are likely to be inadequate if they contain any geographic limitation;[168] markets and competition are increasingly national, even international, in scope. And restraints centered on customer protection are increasingly being limited to actual customers of the employer.[169] Thus, geographic dimensions are not as favored as they once were.

A restraint is usually said to be reasonable, with reference to each of the three dimensions, only if its scope is necessary in its full extent to protect a legitimate interest of the employer.[170] However, it seems more accurate to say that a restraint is reasonable only if, taken as a whole, its dimensions are proportioned in relation to each other so as to keep the burden on the employee down to the minimum consistent with reasonable protection to the employer's legitimate interests. Thus, for example, whether a restraint's duration is reasonable may well turn on the scope of the limitation on activity, and which combination of the two is suitable, if any, will depend upon the facts of the particular employment relationship.

*(1) Activity Restrictions.* — Whether the prohibition of future activity is no broader than necessary to protect the employer

---

[167] See, *e.g.*, Conforming Matrix Corp. v. Faber, 104 Ohio App. 8, 146 N.E.2d 447 (1957) (dictum) ; Kelite Prods., Inc. v. Brandt, 206 Ore. 636, 294 P.2d 320 (1956). See also note 193 *infra*.

[168] National Starch Prods., Inc. v. Polymer Indus., Inc., 273 App. Div. 732, 79 N.Y.S.2d 357 (1948) (dictum).

[169] See cases cited note 104 *supra*.

[170] See Annot., 43 A.L.R.2d 94, 144–45 (1955).

depends upon the job the employee has held. Particularly in restraints to be entered into by highly skilled or specialized technical, creative, or managerial personnel, and when the employer is a large company with highly diversified activities, the reasonableness of this dimension of the restraint is likely to be carefully scrutinized.[171] An employee who has a considerable personal investment in education and training for specialized work may be badly hurt by any restraint which would require him to deviate substantially from a normal path of professional or vocational development. Yet the employer obtains no effective protection if the restraint does not provide a commercially significant leeway in time in which it can bring to fruition the confidential projects about which the employee has information. To balance these equities in a covenant which must usually be standardized to some degree, requires skillful and carefully considered drafting. For example, it would almost never seem reasonable for a large chemical manufacturer active in every field of industrial chemistry to attempt to restrain an industrial chemist from working for any competitor for even a relatively short period, for such a covenant would bar the chemist from virtually all activity. This kind of problem can be minimized, although not always entirely avoided, by confining the restraint to future work in the particular department or special activity of the present employment. Many of the same considerations are applicable to sales personnel who have specialized in products of a relatively technical nature, and to other service and managerial personnel.

When the primary purpose is protection of clientele, the very large or highly specialized company is again presented with special problems. If the company sells nationally, even an activity

---

[171] *E.g.*, Hydraulic Press Mfg. Co. v. Lake Erie Eng'r Corp., 132 F.2d 403 (2d Cir. 1942) (mechanical engineer); Kaumagraph Co. v. Stampagraph Co., 197 App. Div. 66, 188 N.Y. Supp. 678 (1921), *aff'd*, 235 N.Y. 1, 138 N.E. 485 (1923) (design-production expert); Herbert Morris, Ltd. v. Saxelby, [1916] 1 A.C. 688 (engineer and draftsman). In O. Hommel Co. v. Fink, 115 W. Va. 686, 177 S.E. 619 (1934), the court makes the important distinction between a skill sufficiently unspecialized that the restrained employee can turn elsewhere, if need be, and one learned before the relationship with the present employer or one on which the employee's livelihood depends. There are some cases, however, in which the highly specialized, technical employee has been successfully restrained because of his possession of confidential information. See, *e.g.*, Irvington Varnish & Insulator Co. v. Van Norde, 138 N.J. Eq. 99, 46 A.2d 201 (Ct. Err. & App. 1946) (plant engineer); Eastman Kodak Co. v. Powers Film Prods., 189 App. Div. 556, 179 N.Y. Supp. 325 (1919) (photographic technical specialist); Conforming Matrix Corp. v. Faber, 104 Ohio App. 8, 146 N.E.2d 447 (1957) (design and production engineer).

restraint in terms of soliciting the company's customers is likely
to close off so large a percentage of the total market as to require
the employee to shift fields completely.[172] This may present no
very important problem when the commodity being sold is simple
and the employee loses little by being required to shift his selling
activities to a different line of products. However, when the sell-
ing is specialized or complex, it may be necessary to limit the
restriction as narrowly as possible to particular products or to the
individual customers which the employee regularly serviced.[173]
When the employee's selling is confined to a particular region or
route the problem is simplified. A restraint against soliciting along
the route or in the region serviced by the employee does not bar
the employee from continuing to practice his specialty and — other
requirements being satisfied — will be upheld.[174]

(2) *Time restrictions.* — In determining whether a restraint
extends for a longer period of time than necessary to protect the
employer, the court must determine how much time is needed for
the risk of injury to be reasonably moderated. When the restraint
is for the purpose of protecting customer relationships, its dura-
tion is reasonable only if it is no longer than necessary for the
employer to put a new man on the job and for the new employee
to have a reasonable opportunity to demonstrate his effectiveness
to the customers.[175] If a restraint on this ground is justifiable at
all, it seems that a period of several months would usually be
reasonable. If the selling or servicing relationship is relatively
complex, a longer period may be called for. Courts seldom criti-
cize restraints of six months or a year on the grounds of duration
as such, and even longer restraints are often enforced. When the
selling relationship is important but still simple, as when consum-
ers' goods are being sold by house-to-house calls over a route, a

---

[172] Unless the covenant specifically indicates the intent was otherwise, a restraint
against solicitation of customers should be limited to customers at the time of ter-
mination. See Arkansas Dailies, Inc. v. Dan, 36 Tenn. App. 663, 675, 260 S.W.2d
200, 205 (1953) (dictum).

[173] See, *e.g.*, Interstate Tea Co. v. Alt, 271 N.Y. 76, 2 N.E.2d 51 (1936); Molina
v. Barany, 56 N.Y.S.2d 124 (Sup. Ct. 1945).

[174] *E.g.*, Sonotone Corp. v. Ellis, 2 N.J. Super. 419, 64 A.2d 255 (Ch.), *aff'd*, 4
N.J. Super. 331, 67 A.2d 186 (App. Div. 1949); Pilgrim Coat, Apron & Linen
Serv., Inc. v. Krzywulak, 141 N.J. Eq. 212, 56 A.2d 584 (Ch. 1948); Arkansas
Dailies, Inc. v. Dan, 36 Tenn. App. 663, 676, 260 S.W.2d 200, 205 (1953); Annot.,
41 A.L.R.2d 15, 127–30 (1955). See also Note, *Protection of Customer Lists in
New York*, 1 SYRACUSE L. REV. 110, 115–16 (1949).

[175] See cases cited note 100 *supra*; Eureka Laundry Co. v. Long, 146 Wis. 205,
131 N.W. 412 (1911).

very short period, however, might provide adequate protection.[176]

The permissible duration of a restraint when confidential information is being protected presents a more difficult problem. Traditionally, a covenant not to divulge a trade secret was enforceable against the promisor for as long as the secrecy remained, at least when the secret had been reduced to writing or practice.[177] An obligation not to disclose a relatively definite secret of the traditional kind does not necessarily materially impair an employee's opportunities for related employment. But with trade secrets now being defined broadly in terms of a fiduciary obligation, a general prohibition against divulging trade secrets or other confidences is much less narrow and specific, and, therefore, much more limiting of employment opportunities. Thus, it may be argued that a covenant in general terms not to disclose trade secrets should be treated in much the same way as a covenant not to compete.[178]

In any event, the presence of trade secrets or confidential information as a basis for a covenant not to compete does not justify a restraint of indefinite duration. In view of what may be a very onerous burden on the employee, reasonable protection to the employer in light of the facts of the case may be a much shorter time than the full life of the secret. On the other hand, when the confidential information known by the employee will lose its business significance in a short period of time, that period sets the outside limit for the effective duration of the restraint, in the absence of other supporting bases.[179]

---

[176] See Deuerling v. City Baking Co., 155 Md. 280, 141 Atl. 542 (1928).

[177] 2 CALLMANN 816.

[178] In Guth v. Minnesota Mining & Mfg. Co., 72 F.2d 385 (7th Cir. 1934), *cert. denied*, 294 U.S. 711 (1935), the court properly recognized that a covenant to assign future inventions so limited the employee's opportunities for competitive employment as a research man that it should be treated as a covenant not to compete. See the cases cited in COSTA, INVENTING IN EMPLOYMENT 112–31 (1953). In most cases the fact that an applicant is encumbered by a general covenant not to disclose trade secrets or confidential information will be at least as great a deterrent to a potential employer as an agreement to assign inventions, which can be effective as to new inventions only within narrow limits. See *id.* at 121–25. A distinction can be made, however; the duty not to divulge trade secrets exists in the absence of a contract, and, therefore, the employee's mobility is no more limited by a covenant not to disclose than by the existence of that duty in the absence of a covenant. Nims implies that a covenant not to disclose is generally treated like a covenant not to compete. 1 NIMS § 150, at 425.

[179] In Arkansas Dailies, Inc. v. Dan, 36 Tenn. App. 663, 676, 260 S.W.2d 200, 205 (1953), for example, the court determined the appropriate duration of the relief by determining when, on the average, contracts would have been renewed with

Case 2:24-cv-01743-KBH   Document 62   Filed 07/01/24   Page 304 of 504

*(3) Area restrictions.* — Most confidential business information worthy of any protection at all is appropriately protectible without geographic limitation, because once an employee has divulged a trade secret in any location the likelihood that it will become public knowledge available to immediate competitors is greatly increased. Information, unlike customers, is highly mobile. Thus restraints limited to a geographic area are typically associated with sales activities. Whether they are reasonable is measured by the location and nature of the employer's clientele.

If the employer's product or service is purveyed primarily at his place of business, the geographic area from which the bulk of his custom is drawn may be the only practicable way to define an effective restraint. Particularly when the area is populous and the product is one which is sold to the general public, however, enforcing such a restraint gives the employer a great deal more protection than he is entitled to under any theory of protectible interests.[180] He is necessarily protected not only in his actual trade but from competition by the employee with respect to a vast pool of merely potential customers. In cases involving traveling salesmen, most courts refuse to enforce restraints extending to areas in which the employer has no customers currently, but only potential customers.[181] These facts, added to the generalization that the employee's hold over the customer tends to be at a minimum when he works at the employer's place of business,[182] lead to the conclusion that under these circumstances area restraints are likely to be held invalid, or enforced only in narrower terms after severance.[183] The potential-customer population of the area and

---

subscriber-clients; with the renewals the value of defendant's confidential information regarding terms of the contract would lose much of its value. Usually, however, the determination of reasonableness of duration is a judgment, not based on very specific facts, of when the risk to the employer will be reasonably diminished, having regard to the burden placed on the employee.

[180] This fact has been repeatedly recognized, usually in connection with enforcing a geographic restraint only as to actual customers or a narrower area than that spelled out in the restraint. See, *e.g.*, Tawney v. Mutual Sys., 186 Md. 508, 47 A.2d 372 (1946); Menter Co. v. Brock, 147 Minn. 407, 180 N.W. 553 (1920).

[181] Cases cited in Annot., 43 A.L.R.2d 94, 181–82 (1955). *But cf.* New England Tree Expert Co. v. Russell, 306 Mass. 504, 28 N.E.2d 997 (1940), as an example of an exception sometimes made when the employee has reason to know that the employer may be planning to expand activities into a new area. See also Annot., 43 A.L.R.2d 94, 182–85 (1955). These cases cannot be supported in terms of any customer-relationship interest.

[182] See p. 660 *supra.*

[183] See pp. 681–84 *infra.*

the number of existing competitors are properly taken into consideration.[184]

An employee who deals with customers throughout the nation or in a large territory is usually selling to business clients or servicing them. Thus, in any geographic area there will be only a relatively limited number of actual or potential customers, all or most of whom he is apt to have solicited. Several types of restriction are possible in these cases. The restriction might be drafted (1) to extend to the entire area in which the employer has or solicits customers, regardless of the particular employee's activities, (2) to extend to the area in which the employee was active during the course of his employment, (3) to prohibit only solicitation of actual customers of the employer, or (4) to prohibit solicitation only of those customers with whom the employee has dealt. Other variations are possible, but these groupings include most of the cases. It will be noted that the first two are area restrictions while the last two might be considered as activity restrictions. Although some modern cases have allowed restraints as broad as the area of the employer's business activity,[185] the general rule is that the restraint may not extend beyond the area in which the employee was active.[186] In an increasing number of cases, however, injunctions have been issued only against solicitation of the former employer's actual customers or, even more narrowly, of customers with whom the employee has dealt.[187] This is one of the facts which supports the point made earlier that activity prohibitions are increasingly more important than area restrictions. Whether these distinctions make any significant difference, of course, de-

---

[184] Cases cited note 180 *supra.* See also Blackstock, *Covenants in Restraint of Trade in Contracts of Employment Terminable on Notice,* 66 S.A.L.J. 139, 148 (1949); Cowan, *Covenants Not To Compete After Termination of Employment,* 5 PEABODY L. REV. 79, 86 (1941).

[185] *E.g.,* Basic Foods Sales Corp. v. Moyer, 55 F. Supp. 449 (W.D. Pa. 1944); see New England Tree Expert Co. v. Russell, 306 Mass. 504, 28 N.E.2d 997 (1940); Annot., 43 A.L.R.2d 94, 306–12 (1955). In O. Hommel Co. v. Fink, 115 W. Va. 686, 177 S.E. 619 (1934), the restraint, which covered a broad geographical area, was cut down to cover the territory in which the employer did business, rather than the smaller area in which defendant had actually serviced customers.

[186] Cases cited in Annot., 43 A.L.R.2d 94, 175–76 (1955). More recent cases include Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618, 626, 636, 136 A.2d 838, 843, 848 (1957); Delmar Studios v. Kinsey, 233 S.C. 313, 104 S.E.2d 338 (1958); Spinks v. Riebold, 310 S.W.2d 668 (Tex. Civ. App. 1958).

[187] Ebbeskotte v. Tyler, 127 Ind. App. 433, 142 N.E.2d 905 (1957); Denny v. Roth, 296 S.W.2d 944 (Tex. Civ. App. 1957).

pends on the nature of the employer's business and how thoroughly selling activities have covered the area. Insofar as the employee has not had contacts with potential customers in the region, enforcing a geographic restraint inevitably involves restraint of competition without justification by the customer-contact theory of protectible interests.

Thus, it is submitted that in all but very unusual cases, any restraint which is limited only geographically is not justifiable in terms of the modern theory of employee restraints. Courts appear to be moving towards this view.

(4) *Severance.* — The general contract doctrine of severance has important consequences in the field of employee restraints. In the first employee case after *Mitchel v. Reynolds*, the court issued an order only after applying the "blue pencil" to a restraint too broad in area.[188]   The prohibition covered a certain area around the employer's shop or any other shop the employer "shall think proper to remove to." Because the employer might move anywhere, the restraint was said to be "general" and thus invalid as written. The court struck the second clause and issued an injunction covering the area around plaintiff's then place of business.  In the *Nordenfelt* case,[189] the prohibition extended not only to carrying on an ammunition business but also "any business competing or liable to compete in any way with that for the time being carried on by the company . . . ." The Court of Appeals, severing the broader restraint, enforced the narrower in the first known application of severance to an "activity" restriction.  None of the older cases, however, applied severance to the time dimension, presumably because draftsmen had not felt inclined to draft that term of the covenant in such a way that severance could be effected by mechanical striking out with the judicial blue pencil.

Although the blue-pencil theory of severability is still occasionally advanced as a reason for not enforcing a restraint drafted too broadly,[190] most courts either issue an injunction which is regarded as reasonable, even though narrower than the terms of the restrain-

---

[188] Chesman v. Nainby, 2 Str. 739, 93 Eng. Rep. 819 (K.B. 1726).

[189] Nordenfelt v. Maxim Nordenfelt Guns & Ammunition Co., [1894] A.C. 535, 536.

[190] See Interstate Fin. Corp. v. Wood, 69 F. Supp. 278 (E.D. Ill. 1946) ; Vendo Co. v. Long, 213 Ga. 774, 102 S.E.2d 173 (1958).

ing covenant,[191] or refuse enforcement altogether even though the restraint might be mechanically cut down.[192]

Courts and writers have engaged in hot debate over whether severance should ever be applied to an employee restraint.[193] The argument against doing so is persuasive. For every covenant that finds its way to court, there are thousands which exercise an *in terrorem* effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly relations with their competitors. Thus, the mobility of untold

---

[191] *E.g.*, Denny v. Roth, 296 S.W.2d 944 (Tex. Civ. App. 1957).

[192] *E.g.*, Welcome Wagon, Inc. v. Morris, 224 F.2d 693 (4th Cir. 1955); cases cited note 195 *infra*.

[193] See generally 6 CORBIN, CONTRACTS §§ 1390, 1394 (1951); 5 WILLISTON, CONTRACTS §§ 1659–60 (rev. ed. 1937). Section 518 of the *Restatement of Contracts* limits severability to restraints "divisible in terms" and refuses severability to reasonable segments of divisible restraints only when "the entire agreement is part of a plan to obtain a monopoly." No distinction is made in this respect between employee restraints and those ancillary to property transfers. Thus the *Restatement* rejects the rule of Mason v. Provident Clothing & Supply Co., [1913] A.C. 724, that in employee-restraint cases grammatical severability should not be recognized when the covenant as a whole is "deliberately framed in unreasonably wide terms" or the unreasonable excess is more than "trivial" or "technical." Professors Corbin and Williston both concluded that the *Restatement* erred in refusing enforcement to "indivisible" restraints unduly broad in terms when reasonable relief could be granted. Williston & Corbin, *On the Doctrine of Beit v. Beit*, 23 CONN. B.J. 40 (1949) (commenting on a Connecticut sale-of-property case, Beit v. Beit, 135 Conn. 195, 63 A.2d 161 (1948)). Neither scholar, unfortunately, discussed the question of whether the rule of the *Mason* case is preferable in employee-restraint cases. Williston, believing that employee restraints should not be distinguished from others, note 70 *supra*, would doubtless have rejected the *Mason* rule.

Many, perhaps most, American courts now follow Williston and Corbin in refusing to accept the *Restatement* position. They tend freely to reform restraints which are indivisible in terms. See cases cited note 167 *supra*. In addition, courts are increasingly subscribing to, or at least acting in accordance with, the *Mason* rule in distinguishing employee-restraint cases. See, *e.g.*, Welcome Wagon, Inc. v. Morris, 224 F.2d 693 (4th Cir. 1955); Fullerton Lumber Co. v. Torborg, 270 Wis. 133, 70 N.W.2d 585 (1955) (dictum); Thomas v. Coastal Industrial Servs., Inc., 214 Ga. 832, 108 S.E.2d 328 (1959). Nesko Corp. v. Fontaine, 19 Conn. Supp. 160, 166, 110 A.2d 631, 635 (C.P. 1954), is particularly interesting in that although it might have achieved its result, denial of severance, by following the modified blue-pencil approach of the Connecticut Supreme Court in Beit v. Beit, *supra*, it instead specifically adopted the English view and refused enforcement because in employee cases employers must not be permitted to "seek unnecessary and inequitable restraint or be unduly harsh on an employee."

On the extensive but not very illuminating law-review discussion of this problem, see, in addition to articles cited note 2 *supra*, 28 COLUM. L. REV. 81 (1928); 5 DUKE B.J. 115 (1956); 40 HARV. L. REV. 326 (1926); 54 MICH. L. REV. 416 (1956); 17 MINN. L. REV. 86 (1932). The English view is carefully explained in Farwell, *Covenants in Restraint of Trade as Between Employer and Employee*, 44 L.Q. REV. 66 (1928).

numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable. This smacks of having one's employee's cake, and eating it too.

Although this argument is impressive, it has certain limitations. First, it assumes that all employment contracts are contracts of adhesion, the burdens of which fall entirely on the employee by virtue of his lesser bargaining power. Although this may often be the case,[194] much of the current interest in reviewing employee restraints is a result of the unwillingness of hard-to-get, qualified technical workers and salesmen to sign such broad restrictions on their future mobility. Thus, at least when the employment market is highly competitive, the employer may indirectly bear much of the burden of the restraint himself in the form of the higher costs of less well-qualified personnel. Thus, it should not be assumed that intelligent employers will necessarily take unseemly advantage of the courts' willingness to sever.

The other major limitation has to do with the fact that in all but the smallest businesses it is administratively impossible to tailor each covenant to the particular requirements of an individual employee, to say nothing of revising the covenant with each change of the employee's responsibilities. A comparatively few forms must serve for large numbers of employees in quite different circumstances. Employees themselves may often be suspicious and resentful of unequal treatment. Thus, even when the employer acts in complete good faith, it may happen that in the situation that gets to court the restraint is somewhat more burdensome than would be necessary in the case of the violating party. Yet an injunction may be clearly appropriate.

The general approach to resolving the dilemma seems clear. If the court is persuaded that the employer's policy and practice with respect to employee restraints generally is fair and designed only to protect legitimate interests, the court should tailor the covenant to provide such protection with a minimum burden to the employee. When it seems likely that the employer exacts the restriction for whatever advantage he can get from limiting the employees' mobility and bargaining power, or that he has not accorded employees' interests sufficient weight in devising and administering the restraints, severance should be denied. Courts

---

[194] See p. 661 *supra.*

should not aid and abet a grasping or negligent employer by re-forming an unreasonably restrictive agreement.[195]

When severance seems necessary if a restraint is to be enforced, the employer should bear the burden of showing either that the terms of the covenant were actually negotiated with the individual employee or that the employer's policy and practice with regard to such restraints generally has been devised with reasonable regard to avoiding undue burdens on employees. The employer is in a better position to show the facts in this regard than is the employee.

## VI. Circumstances of the Employee

Most of the important factors relating to the circumstances of the employee have already been considered. As noted, it is impossible to discuss the boundaries of employers' legitimate interests without considering at the same time the position of the employee. However, in any particular case there may be unusual facts relating to the employee which will be given special weight. It may be useful to bring those factors together here.

( *1* ) *Factors having to do with the employment.* — If the employee brings to the job when he enters it extensive experience,[196] long and costly professional or vocational education or training,[197] wide acquaintance and good standing in a community,[198] or a high degree of specialized proficiency for any other reason, courts are apt to require a higher urgency of interest on the employer's part to support a restraint. This result seems entirely appropriate, for the loss to the individual and the economic loss to society are

---

[195] See, *e.g.*, Sonotone Corp. v. Baldwin, 227 N.C. 387, 42 S.E.2d 352 (1947) (dictum); Brecher v. Brown, 235 Iowa 627, 17 N.W.2d 377 (1945); *cf.* Mutual Loan Co. v. Pierce, 245 Iowa 1051, 65 N.W.2d 405 (1954).

[196] See, *e.g.*, Saul v. Thalis, 156 F. Supp. 408 (D.D.C. 1957); Kaumagraph Co. v. Stampagraph Co., 197 App. Div. 66, 188 N.Y. Supp. 678 (1921), *aff'd*, 235 N.Y. 1, 138 N.E. 485 (1923).

[197] See, *e.g.*, Hydraulic Press Mfg. Co. v. Lake Erie Eng'r Corp., 132 F.2d 403 (2d Cir. 1942); Herreshoff v. Boutineau, 17 R.I. 3, 19 Atl. 712 (1890). *But see, e.g.*, Eastman Kodak Co. v. Powers Film Prods., Inc., 189 App. Div. 556, 179 N.Y. Supp. 325 (1919); Conforming Matrix Corp. v. Faber, 104 Ohio App. 8, 146 N.E.2d 447 (1957). Note also that the nearly uniform enforcement of restraints against doctors, note 113 *supra*, and other professional people, limits the force of this argument. Perhaps it is usually the case that people of extensive education are put in positions of special confidence in terms of trade secrets or customers, thus bringing the two principles into frequent conflict.

[198] See, *e.g.*, Crowell v. Woodruff, 245 S.W.2d 447 (Ky. Ct. App. 1951); Ridley v. Krout, 63 Wyo. 252, 275, 180 P.2d 124, 131 (1947); Standard Oil Co. v. Bertelsen, 186 Minn. 483, 243 N.W. 701 (1932).

both greatest when a highly trained and specialized person is prevented from employing his special abilities. When such a person has been working for the employer for only a short period,[199] or when the employer's contribution to the enterprise is considered relatively insubstantial,[200] the courts are unlikely to find a sufficient interest to support a restraining covenant. This was noted particularly in the customer-contact cases.

Although not included in any of the formulations, another factor often mentioned in opinions, and perhaps more often an unmentioned consideration, is the circumstance of the termination of employment. Most covenants provide that they shall have effect no matter how the termination comes about; yet in some cases it is clear that this factor is taken into account.[201] Indeed, if the discharge is clearly inequitable, the employer may be denied enforcement, on general equitable principles, of an otherwise reasonable restraint.[202] On the other hand, if the employee leaves because he has been hired by a competitor as a part of a plan to divert customers or trade secrets, or if he is in a conspiracy with other employees to appropriate business values, injunctive relief may issue even when, under other circumstances, the employer's interest might be regarded as insufficient to support a restraint.[203]

*(2) Factors outside the employment relationship.* — In the *Restatement of Contracts* formulation, a basis for adjudging a re-

---

[199] See 6 CORBIN, CONTRACTS § 1394, at 523–25 (1951). Particularly when the employment is terminated by the employer, courts may be receptive to the argument that the employer should not be able to limit the employee's future activity after only a nominal period of employment. Although inadequacy of consideration cannot be raised, as such, this factor may still affect the scope of the equitable remedy. 6 CORBIN, CONTRACTS § 1395 (1951). In any event, it seems clear that an employer can jeopardize his right to enforcement of the restraint by terminating employment under questionable circumstances. See notes 201 & 202 *infra*. And although when the employer's business is sold the restraining covenants, which may be an important asset, are assignable, Comment, 19 U. CHI. L. REV. 97 (1951), the new employer may have a handicap to overcome in his enforcement efforts. Compare Crowell v. Woodruff, *supra* note 198; Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957).

[200] See discussion at pp. 666–67 *supra*.

[201] Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 195 N.E. 747 (1935); Weiss v. Levine, 134 N.J. Eq. 1, 34 A.2d 237 (Ch. 1943); Dictograph Prods., Inc. v. Morris, 54 N.Y.S.2d 211 (Sup. Ct. 1945); Lantieri Beauty Salon, Inc. v. Yale, 169 Misc. 547, 7 N.Y.S.2d 984 (Sup. Ct. 1938).

[202] The "clean hands" doctrine or a related equitable consideration of course may bar a covenantee. See RESTATEMENT, CONTRACTS § 367 (1932). See also 5 OHIO ST. L.J. 263, 267 & nn.29–32 (1939). Where the employer purposefully cuts wages to force the employee out, relief may be denied. Smith Baking Co. v. Behrens, 125 Neb. 718, 251 N.W. 826 (1933).

[203] Breed v. National Credit Ass'n, 211 Ga. 635, 88 S.E.2d 15 (1955).

straint of trade unreasonable is that it "imposes undue hardship upon the person restricted." [204] The comments are silent on the point, but the illustrations are limited to cases in which the hardship consists of an unreasonable limitation on future employment opportunities, taking into account only the professional or vocational status of the covenantor. However, in a small number of cases the opinions have explicitly taken into account accidental or personal factors, such as the employee's family situation, or his length of residence in a community, or the difficulty of getting a job during depression years. [205] Although such facts may occasionally be appealing, it should be kept in mind that invalidating an otherwise reasonable restraint on such grounds may jeopardize a conscientiously developed program which redounds to the benefit, generally, of employer and employees.

## VII. "Injury to Society"

For many decades the rule for all covenants not to compete was stated in terms of their being reasonable if they were no broader in scope than was necessary to protect the covenantee, and if they caused no substantial injury to society. [206] As applied to employee restraints, any consideration of the employee's interests had to be smuggled in under the second clause. [207] Today, although this formulation is still occasionally repeated, the recognized method of decision is that of balancing the employer's claims to protection against the burden on the employee. Once the judgment is made, almost never does a court proceed to consider possible injury to society as a separate matter.

This is not surprising, for the balancing process engaged in will almost always result in maximizing the social values as well ~~r~~ ~~~~

---

[204] Restatement, Contracts § 515(b) (1932).

[205] See, *e.g.*, several depression cases in which the effect of the covenant could not be reconciled with general economic conditions. *E.g.*, Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 195 N.E. 747 (1935); Lantieri Beauty Salon, Inc., v. Yale, 169 Misc. 547, 7 N.Y.S.2d 984 (Sup. Ct. 1938). When there is no apparent feasible alternative for the defendant other than to leave his home community, a court may be swayed. Standard Oil Co. v. Bertelsen, 186 Minn. 483, 243 N.W. 701 (1932); Kadis v. Britt, 224 N.C. 154, 29 S.E.2d 543 (1944); see Herbert Morris, Ltd. v. Saxelby, [1916] 1 A.C. 688, 706. Other personal factors are occasionally mentioned. *E.g.*, Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 246 N.W. 567 (1933) (physical handicap).

[206] See, *e.g.*, the statement in Eureka Laundry Co. v. Long, 146 Wis. 205, 209–10, 131 N.W. 412, 413 (1911).

[207] See p. 642 *supra*.

those of the parties. For example, the social cost of preventing an employee from going to a job at which he would be more productive is theoretically equal, given an efficient market, with the economic loss to the individual. One situation in which social cost might be different from private cost exists when the restraint is being used, either by the employer alone or in a bilateral arrangement with his employees, to monopolize the business in a specific community. This possibility is recognized both in the *Restatement* [208] and in occasional cases in which it appears to be relevant.[209]

## VIII. Conclusion

Speaking generally and excluding those jurisdictions with special statutory provisions,[210] a lawyer today can advise a client that effective restraints can be devised for employees working in positions of confidence either by virtue of access to valuable confidential information or of special relationships with clientele to whom the employer has a preponderant claim. Whether a particular covenant will in fact stand up in court depends not only on the lawyer's skill in drafting but, more important, on the employer's demonstrable good faith. First, the employer should be in a position to persuade a court that the motivating reason for the covenant is not to establish a hold upon the employee or to gain a bargaining advantage over him by inhibiting his freedom of movement but rather to protect legitimate business interests which are the product of substantial effort or investment by the employer. Second, and closely related, the employer should be able to show that it has made every effort to keep the burden upon the employee as small as possible consistent with reasonable protection of such interests. This involves a number of considerations: (1) The undertakings should be obtained only from those classes of employees whose positions are such that their future activities present a reasonably high probability of substantial damage. (2) When feasible, the covenant should be tailored to fit the circumstances of the individual employee; where this is not possible,

---

[208] A restraint is unreasonable if it "tends to create, or has for its purpose to create, a monopoly, or to control prices or to limit production artificially . . . ." Restatement, Contracts § 515(c) (1932).

[209] *E.g.*, Wilson v. Gamble, 180 Miss. 499, 177 So. 363 (1937); Parisian Live Dyers & Cleaners v. Springfield, 275 S.W. 1098 (Tex. Civ. App. 1925), in both of which the court considered whether enforcing the restraint would tend to create a monopoly and rejected the defense.

[210] See note 78 *supra.*

reasonable classifications of employees should be devised and the covenant tailored so that the burden on each class is held to a minimum. (3) The program should be administered in a flexible manner. For example, the employer should be willing to grant waivers of the restraint in many cases. It should not be unwilling to renegotiate the terms of a covenant with an employee when conditions change if this can be done on the facts of the individual case without loss of reasonable protection and without disruption of personnel relations. (4) In some cases, the employer may even wish to consider making financial arrangements to moderate the burden on the employee. For example, one progressive company undertakes, as a part of the agreement, to pay its technical personnel full salary and its sales personnel half salary during any time when a restraint results in a bona fide loss of suitable employment. This should be a highly persuasive demonstration to any court that a restraint is not being used for primarily oppressive purposes.

In sum, the most persuasive evidence that the employer's interests are deserving of protection is that he has himself devoted substantial effort and undertaken expense to put into effect a system reasonably adapted to protect his interests with as little burden as possible upon his employees. Even in the absence of such facts, of course, many jurisdictions remain liberal in their granting of injunctive relief. However, any employer who may have occasion to enforce a restraint outside of the state in which the employment takes place must assume that the most exacting standards may be applied to the covenant in a critical case.[211] Even a clause in the contract in which the parties purport to specify that the law of a particular state be applied is unlikely to be given effect.[212] Thus, most large companies are required to adopt cove-

---

[211] The resolution which will be made of the conflict-of-laws question which arises when an effort is made to enforce a multistate restraint outside the jurisdiction in which the employment took place is not easily predictable. Some courts will apply the law of the state where the covenant was made and the employment performed. John Roane, Inc. v. Tweed, 33 Del. Ch. 4, 89 A.2d 548 (Sup. Ct. 1952). Others refuse to enforce foreign restraints which violate the public policy of the forum. Super Maid Cook-Ware Corp. v. Hamil, 50 F.2d 830 (5th Cir. 1931) (dictum); Davis v. Jointless Fire Brick Co., 300 Fed. 1 (9th Cir. 1924); May v. Mulligan, 36 F. Supp. 596 (W.D. Mich. 1939), aff'd, 117 F.2d 259 (6th Cir. 1940), cert. denied, 312 U.S. 691 (1941); cf. Paulsen & Sovern, "Public Policy" in the Conflict of Laws, 56 COLUM. L. REV. 969, 1006 (1956). The moral for the draftsman is that generally when a multistate restraint is required, it should satisfy the requirements of reasonableness of the most exacting state included within the terms of the restraint.

[212] Davis v. Jointless Fire Brick Co., supra note 211; Super Maid Cook-Ware Corp. v. Hamil, supra note 211.

nants and procedures which will satisfy the most rigorous scrutiny.

In a field of law in which the broad criterion of reasonableness gives a court great freedom, it is of the utmost importance to bring to the court's attention full information concerning the confidential nature of the relationship and the reasonableness of the employer's procedures. Also, it is important to show that the employee knew that his position was regarded as one of confidence; otherwise it is difficult to argue a breach of duty.[213] An excellent way to accomplish both objectives is to include in the form of agreement thorough, although usually necessarily generalized, recitations of the kinds of confidential information or customer relationships which the employer must make available to employees of this classification. Also, the agreement may be the best way to place before the court information regarding the fairness and flexibility of the company's procedures. These matters can and should be carefully outlined either in preambles or in the actual text of the covenant. If in practice restraints are often waived, it may be advisable to consider spelling out in the contract the considerations taken into account and the procedure for securing waiver. Why the scope of the restrictions as to activity, area, or time is needed may also be appropriately recited. Similarly, a recitation that the employee has skills and abilities to do other types of work, or that he is willing to move to another community if the restraint so requires, may possibly be noticed by a court and seems unlikely to do harm.

For certain classes of employees it may be desirable to include covenants other than a straight covenant not to compete. For example, a technical employee may be asked to agree to inform the employer of and to assign future inventions based on confidential information to which the employee has had access.[214] Such an agreement to assign tends to reduce an employee's future employability and its reasonableness is therefore examined in the same manner as an outright postemployment restraint.[215] However, it may be regarded as valid, if appropriately limited, even though the basic covenant is refused enforcement. Also, a separate undertaking not to divulge confidential information may be called for. Some courts regard such an agreement as enforceable as long as

---

[213] For the possible value of such a recitation, see Worrie v. Boze, 191 Va. 916, 62 S.E.2d 876 (1951).

[214] Covenants to assign inventions are a complex problem in themselves. See COSTA, INVENTING IN EMPLOYMENT 112–31 (1953); Knoth, *Assignment of Future Inventions*, 27 CHI.-KENT L. REV. 295 (1949).

[215] See note 178 *supra*.

the information in question remains confidential; thus, such a clause may retain vitality long after the others have by their terms expired.[216] Such a covenant is often supplemented by an agreement to return to the employer any confidential documents or other material in the possession of the employee at the termination of employment. Finally, depending on the client's circumstances, it may be advisable to include a separate covenant not to solicit customers. In states such as California a covenant of this sort might be respected even though the employment restraint would be denied enforcement.[217] In states favoring the blue-pencil approach, such a clause may preserve some protection when an area restraint is considered to be unreasonably broad.[218]

However, there is a substantial tactical risk involved in deciding to make use of supplementary covenants. The presence of separate covenants not to disclose trade secrets and not to solicit customers may serve as an invitation to a court to deny enforcement to the more burdensome covenant not to compete and to rely, instead, on one or more of the less stringent remedies. In a recent Pennsylvania case,[219] for example, a one-year restraint extending 100 miles around Philadelphia was denied enforcement against door-to-door salesmen whom the employer had provided with confidential routes, the court relying on the separate covenants not to solicit customers whom the employee had been serving and not to divulge confidential customer information.[220] In some cases, the employer's circumstances may be such that an all-or-nothing approach is preferable, for example, when the nature of important confidential information is such that there would be no practical way to police whether or not a former employee is violating the covenant, or even an injunction against disclosure, while engaged in his own competing business or working for a competitor. Here there would be little or nothing to gain from a covenant not to disclose, yet it might tempt a court to deny effective relief on the grounds that an order not to disclose would

---

[216] See p. 678 *supra.*

[217] See note 78 *supra.*

[218] See note 190 *supra.*

[219] Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957).

[220] In this case the restraint was clearly too broad geographically. However, had the circumstances of the litigation made it appropriate, in the absence of the supplementary clauses, the court, which has not been reluctant to reform restraints, see Plunkett Chem. Co. v. Reeve, 373 Pa. 513, 95 A.2d 925 (1953), might have kept them out of the business entirely in Philadelphia. It should be noted, however, that no broader protection than that granted could be supported on the basis of the customer-contact theory, which the court appears to follow.

suffice. Perhaps the risk of supplementary covenants can be some-
what moderated by having them as separate documents.

There are no magic words or phrases in drafting employee cove-
nants. It is still probably advisable to draw the covenant so that
both activity and geographic-area descriptions are mechanically
severable.[221] There are perhaps a few clauses which can do no
harm and may do some good. For example, an agreement between
the parties that the law of the state of employment is intended to
apply is unlikely to be given any effect by a court which feels
strongly that the "public policy" of the state of the forum de-
mands that enforcement be denied,[222] but the clause may be given
some weight by other courts.[223] Similarly, an agreement that the
obligation of the employee is to be assignable in the event of a sale
of the company may aid a court in reaching that result at a later
date.[224] Courts occasionally note clauses in which the parties agree
that a violation will constitute irreparable injury envisaging in-
junctive relief, even though there is a further arrangement for the
deposit of a bond to be forfeited in case of breach.[225]

From an objective point of view, the employee covenant not to
compete is an inefficient and often unfair device for allocating the
burden of certain business risks. Yet in certain circumstances
such covenants are necessary, largely because other legal reme-
dies, although theoretically available, are relatively ineffective in
practice. There have been many cases of gross misuse of such
covenants in the past, in part because of the failure of many courts
to engage in a discriminating analysis of their impact before en-
forcing them. There is evidence that this attitude is rapidly
changing. This fact, added to an increasing awareness by em-
ployers that such covenants are not always costless, should bring
about a considerable tightening up of practices with respect to
them. This result can hardly fail to be beneficial to all concerned.

---

[221] A good example of a geographically severable covenant is found in Welcome
Wagon, Inc., v. Haschert, 125 Ind. App. 503, 127 N.E.2d 103 (1955). No example has
been found of comparable draftsmanship as to the time element, although some day
a draftsman may summon up the courage to try "for six months plus six months
plus . . . for a total of . . . years."

[222] See note 211 *supra.*

[223] See John Roane, Inc. v. Tweed, 33 Del. Ch. 4, 89 A.2d 548 (Sup. Ct. 1952).

[224] See Comment, *Assignability of Employees' Covenants Not To Compete,* 19
U. CHI. L. REV. 97 (1951).

[225] See clause used by Arthur Murray's organization. Worrie v. Boze, 191 Va.
916, 62 S.E.2d 876 (1951). Compare Stokes v. Moore, 262 Ala. 59, 77 So. 2d 331
(1955).

Copyright © 1960 by The Harvard Law Review Association.  Copyright of Harvard Law Review is the property of Harvard Law Review Association and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

VOLUME 116          DECEMBER 2002          NUMBER 2

# HARVARD LAW REVIEW

## ARTICLES

### AGENCY RULES WITH THE FORCE OF LAW: THE ORIGINAL CONVENTION

*Thomas W. Merrill and Kathryn Tongue Watts*

### TABLE OF CONTENTS

INTRODUCTION ................................................................................ 470

I. WHY THE MEANING OF RULEMAKING GRANTS MATTERS .......................... 476

II. TEXTUALIST INTERPRETATION OF FACIALLY AMBIGUOUS RULEMAKING GRANTS ...... 481

    A. *Language* .............................................................................. 482

    B. *Structure* .............................................................................. 483

    C. *Canons of Interpretation* ............................................................ 487

        1. The Rule of Lenity ................................................................ 487

        2. Nondelegation Canons ............................................................ 488

        3. The *Petroleum Refiners* Canon .................................................. 492

III. THE CONVENTION CREATED ............................................................ 493

    A. *Early History: The Diversity of Rulemaking Grants* .............................. 495

    B. *The Importance of* Eaton *and* Grimaud ............................................ 499

    C. *The Convention Emerges* .............................................................. 503

        1. Progressive-Era Rulemaking Grants ............................................ 504

        2. New Deal-Era Rulemaking Grants .............................................. 509

    D. *The Office of Legislative Counsel* ................................................... 520

    E. *The Administrative Procedure Act* .................................................. 523

    F. *Why a Convention?* ................................................................... 526

IV. THE CONVENTION IGNORED ............................................................ 528

    A. *Rulemaking Grants in the Supreme Court, 1943–1979* ........................... 529

        1. *National Broadcasting* (1943) *and* American Trucking (1953) ............... 529

        2. *Storer Broadcasting* (1956) *and* Texaco (1964) ............................... 532

        3. *Thorpe* (1969) *and* Mourning (1973) ........................................... 534

        4. *Gilbert* (1976) *and* Chrysler (1979) ............................................ 537

    B. *Why the Convention Was Ignored* .................................................. 540

JA0315

V. THE CONVENTION ERASED ........................................................................... 545
   A. *Commentators Advocate Expanded Use of Rulemaking* .......................... 546
   B. *The FTC, FDA, and NLRB Exercise Legislative Rulemaking Powers* ......... 549
      1. The FTC ................................................................................. 549
         (a) The FTC's Regulatory Practices from 1914 to 1962 ........... 551
         (b) The FTC Turns to Legislative Rulemaking ....................... 552
         (c) *National Petroleum Refiners Association* ....................... 554
      2. The FDA ................................................................................. 557
         (a) The Debate over the FDA's Rulemaking Powers Under Section 701(a) ............. 558
         (b) *Pharmaceutical Manufacturers* ................................... 562
      3. The NLRB ............................................................................... 565
VI. TAX EXCEPTIONALISM ............................................................................... 570
   A. *Section 7805(a) of the Internal Revenue Code* .................................... 571
   B. *The Supreme Court Confirms That Section 7805(a) Is Interpretive* ......... 573
   C. *Why the Tax World Thinks Section 7805(a) Is Interpretive* .................. 574
VII. WHAT THE CONVENTION MEANS TODAY ................................................. 576
   A. *The Role of the Convention in Statute-Specific Determinations of*
      *Legislative Intent* ......................................................................... 577
   B. *The Case for a Canon* .................................................................... 578
   C. *Choosing a Canon* ......................................................................... 581
      1. *The Queen and Crescent Case* Canon ..................................... 581
      2. The Convention as Canon ........................................................ 582
      3. The *Petroleum Refiners* Canon ............................................. 586
   D. *The Chevron Paradox* .................................................................... 587
CONCLUSION ................................................................................................... 590

# AGENCY RULES WITH THE FORCE OF LAW:
## THE ORIGINAL CONVENTION

### *Thomas W. Merrill\* and Kathryn Tongue Watts\*\**

*The Supreme Court recently held in* United States v. Mead Corp. *that agency interpretations should receive* Chevron *deference only when Congress has delegated power to the agency to make rules with the force of law and the agency has rendered its interpretation in the exercise of that power. The first step of this inquiry is difficult to apply to interpretations adopted through rulemaking, because often rulemaking grants authorize the agency to make "such rules and regulations as are necessary to carry out the provisions of this chapter" or words to that effect, without specifying whether "rules and regulations" encompasses rules that have the force of law, or includes only procedural and interpretive rules.* Mead *therefore requires that courts decipher the meaning of facially ambiguous rulemaking grants. This Article argues that throughout most of the Progressive and New Deal eras, Congress followed a convention for signaling when an otherwise ambiguous rulemaking grant was intended to confer delegated authority to make rules with the force of law. Under this convention, rulemaking grants coupled with a statutory provision imposing sanctions on those who violate the rules were understood to authorize rules with the force of law; rulemaking grants not coupled with any provision for sanctions were understood to authorize only interpretive and procedural rules. Although this understanding can be detected in the Administrative Procedure Act of 1946 (APA), the Supreme Court's decisions construing rulemaking grants after the adoption of the APA betray no awareness of the convention. In the 1970s and early 1980s, the D.C. Circuit and Second Circuit, in an effort to encourage greater use of rulemaking, adopted in place of the convention a presumption that facially ambiguous rulemaking grants always authorize rules with the force of law. As a result, courts held that some agencies, such as the FTC, FDA, and NLRB, had legislative rulemaking powers that Congress almost certainly had not intended. Because the Supreme Court has never endorsed the presumption of the D.C. and Second Circuits, it is not constrained in the aftermath of* Mead *from drawing upon the original convention in discerning whether Congress intended to delegate power to make rules with the force of law. Strong arguments exist in favor of adopting the convention as a general canon for interpreting facially ambiguous rulemaking grants. Compared to the current approach that treats all rulemaking grants as presumptively authorizing legislative rules, the convention is generally more faithful to congressional intent and to constitutional values associated with the nondelegation doctrine. These advantages, however, must be weighed against the fact that adopting such a canon at this late date would almost certainly upset reliance interests, most prominently in the FDA context.*

\* John Paul Stevens Professor of Law, Northwestern University.
\*\* J.D., Northwestern University, 2001. The authors would like to thank Carl Auerbach, Robert Blakey, Charlotte Crane, William Jordan, Brian Leiter, Liz Magill, Richard Merrill, John Manning, Larry Sager, Jim Speta, Henry Smith, Peter Strauss, and Jay Tidmarsh for helpful comments and other input, and would like to thank the participants in workshops at Columbia, Notre Dame and Texas Law Schools and at a D.C. Circuit judges' luncheon for stimulating discussions on earlier drafts.

JA0317

## INTRODUCTION

Whether Congress has delegated to particular agencies the authority to make rules with the force of law has been, until very recently, a question of little interest in the administrative law community. Controversies simmered in the 1960s and 1970s over whether the Federal Trade Commission (FTC), the Food and Drug Administration (FDA), and the National Labor Relations Board (NLRB) had power to engage in legislative rulemaking. But these debates are now largely forgotten. An unarticulated assumption took hold sometime after the 1970s that virtually every agency is free to make policy in any mode it chooses, including legislative rules, interpretive rules, policy statements, or adjudication. Administrative lawyers have come to believe that an agency's intent in promulgating a rule, not Congress's intent in delegating power to the agency, determines whether an agency's action has the force of law.

This assumption may soon change. The Supreme Court's recent decisions in *Christensen v. Harris County*[1] and *United States v. Mead Corp.*[2] thrust the question whether agencies have been delegated authority to act with the force of law to the forefront of the most contested issue in administrative law: the scope of the *Chevron* doctrine, which directs courts to accept reasonable agency interpretations of ambiguous statutes.[3] *Christensen* and *Mead* hold that *Chevron*'s high level of deference applies only to agency interpretations that have the "force of law."[4] Moreover, *Mead* makes clear that agencies act with the force of law only if Congress intended to delegate authority to them to so act.[5] To decide whether *Chevron* deference is appropriate, reviewing courts will therefore have to focus on the intended scope of Congress's authorization.

Unfortunately, *Mead* provides incomplete guidance about how courts should undertake this inquiry. One problem is that both *Christensen* and *Mead* involved agency action considerably more informal than either legislative rulemaking or formal adjudication, both of which unquestionably have the force of law.[6] *Christensen* involved an opinion letter written by the head of the Wage and Hour Division of the Department of Labor. *Mead* considered a letter ruling issued by the Customs Service indicating what tariff would be applied to a particular importation of goods. The Court held in both contexts that these actions did not have the force of law, and hence that *Chevron* did

---

[1] 529 U.S. 576 (2000).
[2] 533 U.S. 218 (2001).
[3] *See* Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984).
[4] *Christensen*, 529 U.S. at 587; *Mead*, 533 U.S. at 226–27.
[5] *Mead*, 533 U.S. at 226–27.
[6] *See id.* at 230.

not apply.[7]  But the factors that *Mead*, the more fully considered decision, discussed as being relevant to whether tariff classification letters have the force of law are not likely to provide much help in the rulemaking or formal adjudication context.

With respect to rulemaking, which is the focus of this Article, the central difficulty going forward is that nearly all agency rulemaking grants are facially ambiguous concerning whether the agency is authorized to make rules with the force of law.  Statutes typically give agencies the power "to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this title,"[8] or "to make such rules and regulations . . . as may be necessary in the administration of this Act."[9]  The phrase "rules and regulations" in these statutes could refer to legislative rules — that is, rules that have legally binding effect on the general public — or it could refer to interpretive rules that do not have such binding effect.[10]  If "rules and regulations" refers to the former type of rule, then Congress has delegated power to the agency to act with the force of law, and under *Mead* the agency would be eligible for *Chevron* deference.  However, if "rules and regulations" refers to the latter type of rule, then *Mead*'s threshold inquiry presumably would not be satisfied, and the agency would not be eligible for *Chevron* deference.[11]

---

[7]  *See id.* at 226–27; *Christensen*, 529 U.S. at 587.

[8]  Securities Act of 1933, ch. 38, § 19(a), 48 Stat. 74, 85 (codified as amended at 15 U.S.C. § 77s(a) (2000)); *see also* Communications Act of 1934, ch. 652, § 4(i), 48 Stat. 1064, 1068 (codified as amended at 47 U.S.C. § 154(i) (2000)) (authorizing the FCC to "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions"); Natural Gas Act, ch. 556, § 16, 52 Stat. 821, 830 (1938) (codified as amended at 15 U.S.C. § 717o) (giving the Federal Power Commission the "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act"); Securities Exchange Act of 1934, ch. 404, § 23(a), 48 Stat. 881, 901 (codified as amended at 15 U.S.C. § 78w(a)(1)) ("The Commission and the Federal Reserve Board shall each have power to make such rules and regulations as may be necessary for the execution of the functions vested in them by this title . . . ."). According to one report, by January 1, 1935, more than 190 federal statutes included rulemaking grants that gave agencies power to "make any and all regulations 'to carry out the purposes of the Act.'" *Report of the Special Committee on Administrative Law*, 61 ANN. REP. A.B.A. 720, 778 (1936).

[9]  Longshoremen's and Harbor Workers' Compensation Act, ch. 509, § 39(a), 44 Stat. 1424, 1442 (1927) (codified as amended at 33 U.S.C. § 939(a) (2000)); *see also* Motor Carrier Act, 1935, ch. 498, § 204(a)(6), 49 Stat. 543, 546 (repealed 1983) (providing that the Interstate Commerce Commission (ICC) has the power "to administer, execute, and enforce all other provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration"); Wool Products Labeling Act of 1939, ch. 871, § 6(a), 54 Stat. 1128, 1131 (1940) (codified at 15 U.S.C. § 68d(a)) (authorizing the FTC to make rules and regulations "as may be necessary and proper for administration and enforcement").

[10]  For the definition of "legislative" rules (and other classifications of rules), *see infra* Part I, pp. 476–77.

[11]  *Mead*, 533 U.S. at 232 (indicating that interpretive rules "enjoy no *Chevron* status as a class").

Although the language of most rulemaking grants is facially ambiguous, we argue in this Article that these grants were not ambiguous during the formative years of the modern administrative state — up to and beyond the enactment of the Administrative Procedure Act (APA) in 1946.  Throughout the Progressive and New Deal eras, Congress followed a drafting convention that signaled to agencies whether particular rulemaking grants conferred authority to make rules with the force of law as opposed to mere housekeeping rules.  That convention was simple and easy to apply in most cases: If Congress specified in the statute that a violation of agency rules would subject the offending party to some sanction — for example, a civil or criminal penalty; loss of a permit, license, or benefits; or other adverse legal consequences — then the grant conferred power to make rules with the force of law.  Conversely, if Congress made no provision for sanctions for rule violations, the grant authorized only procedural or interpretive rules.  Congress followed this convention from the second decade of the twentieth century through the enactment of the APA, and it can be discerned in statutes enacted as recently as 1967.[12]

The most remarkable aspect of this drafting convention is that modern administrative lawyers are not aware of its existence.  How could a convention that Congress consistently followed during the formative years of the administrative state simply disappear from legal consciousness?  The explanation, we suggest, lies in the fact that during the time the convention was developed and followed by Congress, no appellate court rendered a decision that required it to determine whether Congress had conferred authority on an agency to make rules with the force of law.  In administrative law, as in other areas of American law, legal knowledge is transmitted through the study of appellate opinions.  With no opinion to flag the issue, questions about the meaning of ambiguous rulemaking grants were ignored in post-World War II treatises and instructional materials devoted to administrative law.  As a result, knowledge of the convention died out.  When, in subsequent years, the Supreme Court occasionally encountered cases that implicated the meaning of such rulemaking grants, none of the parties alerted the Court to the existence of the convention, even if it would have been in their interests to do so — presumably because their lawyers did not know about it.

The collective amnesia about the drafting convention eventually had important consequences.  In the 1960s, courts and commentators began to urge an expanded use of rulemaking by agencies and a reduced emphasis on adjudication.  Eventually, two influential federal

---

[12]  *See* Flammable Fabrics Act, amendment, Pub. L. No. 90-189, § 4(a), 81 Stat. 568, 571 (1967) (codified as amended at 15 U.S.C. § 1194(c)), discussed *infra* note 426.

appellate judges who strongly favored greater use of rulemaking —
Judges J. Skelly Wright of the D.C. Circuit and Henry Friendly of the
Second Circuit — authored important opinions construing facially
ambiguous rulemaking grants to the FTC and FDA as authorizing leg-
islative rulemaking.[13]   These holdings were inconsistent with what
Congress had intended, as measured by the convention.   Although
some commentators expressed unease about allowing the FTC and
FDA to engage in legislative rulemaking under their general rulemak-
ing grants,[14] neither Congress nor the Supreme Court attempted to re-
verse these decisions.

Soon, the assumption took hold that facially ambiguous rulemaking
grants always include the authority to adopt rules having the force of
law.   In 1991, for example, the Supreme Court upheld a legislative rule
promulgated by the NLRB pursuant to its general rulemaking grant
under the National Labor Relations Act.[15]   Although the case involved
the first broad-scale exercise of legislative rulemaking by the NLRB
since its creation in 1935,[16] no Justice questioned whether the agency
had the authority to promulgate such a rule.[17]   Similarly, the Supreme
Court's *Chevron* decision treated as legally binding a rule adopted by
the Environmental Protection Agency (EPA) pursuant to its general
rulemaking powers under the Clean Air Act.[18]   The *Chevron* Court
never questioned whether the Act's facially ambiguous rulemaking
grant authorized the agency to promulgate a legislative rule.[19]

This history is highly relevant to whether agencies have authority
to act with the force of law.  *Christensen* and *Mead* appear to contem-
plate that courts will engage in a statute-by-statute determination of

---

[13] *See* Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672, 693 (D.C. Cir. 1973) (Wright, J.);
Nat'l Ass'n of Pharm. Mfrs. v. FDA, 637 F.2d 877, 888 (2d Cir. 1981) (Friendly, J.); *see also* Nat'l
Nutritional Foods Ass'n v. Weinberger, 512 F.2d 688, 694–98 (2d Cir. 1975) (anticipating the hold-
ing in *Pharmaceutical Manufacturers*).

[14] *See* Bernie R. Burrus & Harry Teter, *Antitrust: Rulemaking v. Adjudication in the FTC*, 54
GEO. L.J. 1106 (1966); Richard A. Merrill, *FDA and the Effects of Substantive Rules*, 35 FOOD
DRUG COSM. L.J. 270, 273–75 (1980).

[15] Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 609–610 (1991) (holding that section 6 of the Act,
which gives the NLRB the power "to make, amend, and rescind . . . such rules and regulations as
may be necessary to carry out the provisions" of the Act, was adequate to authorize the rule).

[16] *See generally* Mark H. Grunewald, *The NLRB's First Rulemaking: An Exercise in Pragma-
tism*, 41 DUKE L.J. 274 (1991) (evaluating the importance of the NLRB's first significant exercise
in legislative rulemaking).

[17] *See American Hospital Ass'n*, 499 U.S. at 609–10 (stating without further explanation that
the general rulemaking grant was "unquestionably sufficient to authorize the rule at issue" in the
absence of specific limiting provisions).

[18] Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 866 (1984); *see also* 42
U.S.C. § 7601(a)(1) (2000) ("The Administrator is authorized to prescribe such regulations . . . as
are necessary to carry out his functions under this Act.").

[19] Indeed, the Court did not even cite the EPA's general rulemaking provision as authority in
its opinion.

whether agencies can exercise such authority. For any statute enacted before the revisionist Wright-Friendly view took hold, the convention in most cases provides the key to unlocking Congress's delegatory intent. The convention is obviously less reliable as a guide to congressional intent for statutes enacted after Wright and Friendly wrote their opinions, since the background understanding against which Congress acts has arguably shifted. Nevertheless, courts may wish to consider adopting the convention as a general canon for determining the presumptive meaning of facially ambiguous rulemaking grants. The ultimate objective of *Chevron*, as interpreted in *Mead*, appears to be to develop a set of signals by which Congress can indicate when agencies, rather than courts, are to serve as the primary interpreters of federal statutes. From this perspective, the original convention for distinguishing between legislative and housekeeping grants — whether Congress prescribed some sanction for rule violations — not only has the imprimatur of history, but would also serve as a clear rule for Congress, agencies, courts, and regulated entities to follow in determining whether the critical delegation occurred. Perhaps most importantly, such a canon — by identifying an unambiguous signal from Congress of its intent to delegate power to act with the force of law — would reinforce an important nondelegation principle: executive branch agents have no inherent authority to act with the force of law and instead possess such power only when it has been deliberately given to them by the people's representatives in Congress.[20]

This Article is divided into seven Parts. Part I begins by describing two reasons why it is important to know whether facially ambiguous rulemaking grants confer power to adopt rules with the force of law. First, legislative rules are subject to special procedural obligations,[21] known as notice-and-comment procedures. To determine whether an agency has promulgated a legislative rule and hence must follow these procedures, we need to know whether Congress has delegated authority to the agency to issue rules that have the force of law. Second, and more urgently, the Supreme Court in its recent *Christensen* and *Mead* decisions has confined the scope of the *Chevron* doctrine to agency interpretations that have the force of law. To implement the *Mead* doctrine, it is necessary to determine when particular rulemaking grants confer authority to make rules with the force of law.

---

[20] *See* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585 (1952) (stating that the President's authority to seize control of steel mills "must stem either from an act of Congress or from the Constitution itself"). For a thorough, but quite dated, discussion of historical sources relating to the existence of inherent presidential power to act with the force of law, see JAMES HART, THE ORDINANCE MAKING POWERS OF THE PRESIDENT OF THE UNITED STATES 110–19 (1925).

[21] *See* Administrative Procedure Act, 5 U.S.C. § 553 (2000).

Anticipating that some interpreters will want to know whether it is possible to ascertain Congress's delegatory intent without recourse to legislative history, Part II canvasses the chief textualist approaches to interpreting facially ambiguous rulemaking grants.  We conclude that the meaning of such grants will often remain inconclusive if interpreters examine them through a purely textualist lens, without any reference to history.

Part III turns to history and shows how Congress in the first half of the twentieth century relied on a convention for distinguishing between legislative and nonlegislative rulemaking grants.  This convention emerged in the wake of two Supreme Court decisions, *United States v. Eaton*[22] and *United States v. Grimaud*,[23] that considered whether Congress could delegate to administrative agencies the authority to impose criminal penalties for violations of agency regulations.  In answering this question, the Court focused on whether Congress had adopted legislation specifically authorizing criminal sanctions for rule violations,[24] and thus provided a point of reference for differentiating between legislative and housekeeping grants.  After *Grimaud*, Congress repeatedly deployed the device of including or omitting sanctions for rule violations in a statute as a way of signaling whether an agency had received legislative rulemaking authority.  We show that numerous important regulatory statutes enacted in the Progressive and New Deal eras followed this pattern, and that the convention can be discerned in the text and legislative history of the APA.

Despite the fact that legislative actors adhered to the convention through the adoption of the APA, Supreme Court decisions touching on rulemaking grants in the subsequent decades betrayed no awareness of the convention.  As we recount in Part IV, the outcomes of the Court's decisions through the 1960s were, with one exception, consistent with the convention.[25]  Nevertheless, the Court's general failure to attend to the distinction between grants of legislative authority and grants of housekeeping authority increasingly caused lower courts and commentators to view agency intent, rather than congressional intent, as the key factor in identifying legislative rules.

As support for agency rulemaking grew in the 1960s, advocates inside and outside certain agencies began to urge that facially ambiguous rulemaking grants that had been long regarded as authorizing only housekeeping rules provide a basis for legislative rulemaking.  As chronicled in Part V, these efforts eventually led to the successful exer-

---

[22] 144 U.S. 677 (1892).

[23] 220 U.S. 506 (1911).

[24] *See Eaton*, 144 U.S. at 677; *Grimaud*, 220 U.S. at 517.

[25] The exception is *Thorpe v. Housing Authority*, 393 U.S. 268 (1969), discussed *infra* notes 342–354 and accompanying text.

cise of general legislative rulemaking powers by three federal agencies that had not previously wielded such powers: the FTC, FDA, and NLRB.[26]   Opinions by Judges Wright and Friendly sanctioning the exercise of general legislative rulemaking authority by the FTC and the FDA in effect established a presumption that facially ambiguous rulemaking grants confer legislative rulemaking authority.

Part VI describes one vestige of administrative practice that deviates from the Wright-Friendly presumption: the tax world, which adheres to the view that the Treasury Department's general rulemaking grant authorizes only interpretive rules.  This view, however, rests on the distinction between general and specific grants of rulemaking authority rather than on whether Congress attached legal sanctions to rule violations.  Thus, even the tax world deviates from the original congressional understanding as reflected in the convention.

Finally, Part VII considers how courts should use this history in determining whether Congress has delegated power to agencies to make rules having the force of law, the inquiry that *Christensen* and *Mead* require.  We consider how Congress, agencies, and courts might use the convention either as a key to understanding legislative intent on a statute-by-statute basis, or as a canon of presumptive congressional intent that overcomes *Mead*'s greatest weakness — its failure to provide a clear rule for identifying the scope of the *Chevron* doctrine.

## I. WHY THE MEANING OF RULEMAKING GRANTS MATTERS

Agency rules come in several types.[27]  A basic distinction is between "legislative" rules and "nonlegislative" rules.[28]  Legislative rules

---

[26] The FDA's story is somewhat different from those of the FTC and the NLRB: although the agency's general rulemaking grant does not confer legislative rulemaking powers, according to the convention the FDA does have legislative rulemaking powers under several *specific* rulemaking grants.  *See infra* section V.B.2, pp. 557–65.

[27] For an overview of the different kinds of rules that agencies can make under the APA regime, see 1 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 6.3 (3d ed. 1994); Michael Asimow, *Nonlegislative Rulemaking and Regulatory Reform*, 1985 DUKE L.J. 381, 383–88 (distinguishing legislative from nonlegislative agency rules, describing the difficulty of distinguishing them in practice, and describing the functions of nonlegislative rules); William T. Mayton, *A Concept of a Rule and the "Substantial Impact" Test in Rulemaking*, 33 EMORY L. REV. 889, 895–910 (1984) (describing the rulemaking process and several proposed conditions for the creation of agency rules); Richard J. Pierce, Jr., *Distinguishing Legislative Rules from Interpretative Rules*, 52 ADMIN. L. REV. 547, 549–54 (2000) (describing the differences between legislative rules and interpretive rules under the APA in terms of their effects and the procedures used to make them); Peter L. Strauss, *The Rulemaking Continuum*, 41 DUKE L.J. 1463, 1466–68 (1992) (outlining four kinds of rulemaking activity under the APA: "formal rulemaking," which has stringent procedural requirements, and "informal rulemaking," which has less stringent procedural requirements (both of which result in rules with the force of law); "publication rulemaking," which includes statements of policy and interpretive statements; and other "rules" of "lesser dignity" such as guidance documents and press releases).

[28] *See* Asimow, *supra* note 27, at 383.

are those that have the force and effect of law. From the perspective of agency personnel, regulated parties, and courts, these rules have a status akin to that of a statute.[29] Nonlegislative rules do not have the force and effect of law; rather, they are simply statements about what an agency intends to do in the future.

Another distinction is between "substantive" rules and "procedural" rules. Substantive rules regulate the primary behavior of parties outside the walls of the issuing agency — addressing how much pollution they can emit, what they must disclose in proxy statements, and so forth.[30] The most important type of substantive rules are legislative substantive rules, which regulate primary behavior with the force of law. Such rules are typically referred to as either "legislative rules" or "substantive rules" for short; we will refer to them throughout this Article as "legislative rules." Substantive rules can also be nonlegislative in nature. "Interpretive rules" are nonbinding substantive rules that advise the public about how an agency interprets a particular statute or legislative rule that it administers.[31] "Policy statements" are nonbinding substantive rules that advise the public about how the agency intends to exercise some discretionary power that it has.[32] Procedural rules, in contrast to substantive rules, govern what happens inside an agency — how it is organized, how it conducts hearings, and so forth. Like substantive rules, these too can be either legislative or nonlegislative in character.[33] This Article will not consider procedural rules in detail.

The distinction between legislative rules (that is, substantive legislative rules) and other types of rules is important in administrative law for several reasons.[34] First, the APA generally requires agencies to en-

---

[29] *See* ATTORNEY GENERAL'S COMM. ON ADMIN. PROCEDURE, ADMINISTRATIVE PROCEDURE IN GOVERNMENT AGENCIES, S. DOC. NO. 77-8, at 100 (1st Sess. 1941) [hereinafter FINAL REPORT] (distinguishing "legally binding regulations" that receive statutory force from "interpretive regulations," under which the "statutes themselves and not the interpretations remain in theory the sole criterion of what the law authorizes"). We realize that to say that a legislative rule has a status akin to a statute begs the question of what qualities distinguish a statute. We have more to say about this in Part III, *infra* pp. 493–528, where we unpack the historical convention for differentiating between legislative and nonlegislative rulemaking grants.

[30] *See* U.S. DEP'T OF JUSTICE, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 30 n.3 (1947).

[31] *See id.*; *see also* Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993) (quoting and discussing U.S. DEP'T OF JUSTICE, *supra* note 30, at 30 n.3).

[32] *See* U.S. DEP'T OF JUSTICE, *supra* note 30, at 30 n.3.

[33] *See* Joseph v. U.S. Civil Serv. Comm'n, 554 F.2d 1140, 1153 n.24 (D.C. Cir. 1977); 1 DAVIS & PIERCE, *supra* note 27, § 6.6, at 252–54.

[34] In addition to the two reasons discussed in the text, three others deserve mention. First, because legislative rules are legally binding, in an enforcement action the agency need only show that a party violated the rule to prove it acted illegally; in contrast, if the agency invokes an interpretive rule, it is the statute itself, not the rule, that is controlling. Thus a legislative rule can ease an agency's burden of proof and narrow the issues to be litigated. *See* JERRY L. MASHAW ET

gage in notice-and-comment rulemaking before developing legislative rules, but not before making procedural rules, interpretive rules, or policy statements.[35] In identifying legislative rules for the purposes of APA notice-and-comment requirements, recent appellate decisions have held that two conditions must be satisfied: "Congress has delegated legislative power to the agency and . . . the agency intended to exercise that power in promulgating the rule."[36] In practice, the decisions that apply this two-part test focus almost exclusively on the second part — whether the agency intended to make a rule that has the force and effect of law.[37] As far as we are aware, the first part — whether Congress has delegated power to the agency to make rules that have the force of law — has never been the focus of any appellate opinion considering whether a particular rule is legislative and hence subject to the procedural requirements of § 553.

The judicial indifference to the first half of the test is puzzling. With rare exceptions, nearly all of the rulemaking grants adopted by Congress in the twentieth century do not specify whether they authorize legislative rules, procedural rules, interpretive rules, or policy statements. Instead, they simply speak of "rules and regulations" and leave it at that.[38] Examining the bare language of these statutes, therefore, courts cannot tell whether Congress "has delegated legislative power to the agency."[39] By focusing only on agency intent in determining whether a rule is legislative for § 553 purposes, then, courts implicitly assume that facially ambiguous rulemaking grants confer the

---

AL., ADMINISTRATIVE LAW: THE AMERICAN PUBLIC LAW SYSTEM 448 (4th ed. 1998). Second, under some statutes a legislative rule, unlike an interpretive rule, is not open to judicial review in an enforcement action. *See, e.g.,* 42 U.S.C. § 7607(b)(1) (2000) (providing that petitions for judicial review of a rule made pursuant to certain sections of the Clean Air Act must be filed within sixty days of the rule's promulgation). Third, legislative rules are more likely than interpretive rules to be subject to judicial review before an agency brings an enforcement action. *See* 1 DAVIS & PIERCE, *supra* note 27, § 6.2, at 228; Peter L. Strauss, *Publication Rules in the Rulemaking Spectrum: Assuring Proper Respect for an Essential Element,* 53 ADMIN. L. REV. 803, 817–22 (2001).

[35] *See* 5 U.S.C. § 553(b)–(c) (2000).

[36] *American Mining Congress,* 995 F.2d at 1109; *see also* Am. Postal Workers Union v. U.S. Postal Serv., 707 F.2d 548, 558 (D.C. Cir. 1983) ("A rule can be legislative only if Congress has delegated legislative power to the agency and if the agency intended to use that power in promulgating the rule at issue."); *cf. Joseph,* 554 F.2d at 1153 n.24 (noting that whether a rule is legislative depends on the balance of circumstances "the authority and intent with which [it is] issued").

[37] For example, in *American Mining Congress,* after stating the two-part test, the court devoted the balance of its opinion to discussing a variety of circumstances that indicate agency intent to make rules with the force of law. *See American Mining Congress,* 995 F.2d at 1109–13.

[38] *See infra* section III.C, pp. 503–19 (describing grants of rulemaking authority in numerous twentieth-century statutes).

[39] *American Mining Congress,* 995 F.2d at 1109.

power to make legislative rules. Later in the Article, we explain the origins of this unstated presumption and question its validity.[40]

A second reason that the distinction between legislative and other types of rulemaking is important concerns the standard that courts apply in reviewing agency interpretations of their statutory authority. The issue here is whether courts will review agency interpretations of statutes under the highly deferential *Chevron* test,[41] or the multifactor *Skidmore* standard,[42] or whether they will instead determine the meaning of the statute de novo.[43] The Supreme Court recently held in *Christensen v. Harris County*[44] and *United States v. Mead Corp.*[45] that *Chevron* applies only to agency interpretations that have the "force of law."[46] Agency interpretations that do not have the force of law receive only whatever deference is due under the *Skidmore* standard.[47] In elaborating the "force of law" criterion, the Court in *Mead* adopted a two-part test similar to that used to distinguish between legislative and nonlegislative rules in the APA rulemaking-requirements context: "We hold that administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."[48]

In applying the two-part *Mead* test, lower courts may do what they have done in the APA cases: ignore the first part and concentrate solely on the second. But this response is unlikely. The Court in *Mead* made clear that *Chevron* deference is grounded in a congressional intent to delegate primary interpretive authority to the agency. Its opinion referred throughout to congressional intent, expectations, contempla-

---

[40]  *See infra* Part V, pp. 544–70.

[41]  *See* Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–44 (1984) (holding that courts must defer to an agency's interpretation of an ambiguous statute if the interpretation is reasonable).

[42]  *See* Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (requiring courts to consider agency interpretations of ambiguous statutes, to assess these interpretations against a variety of contextual factors, and to defer to such interpretations to the extent that they are persuasive).

[43]  For a general discussion of these three standards of review and their respective domains, see Thomas W. Merrill & Kristin E. Hickman, *Chevron's Domain*, 89 GEO. L.J. 833, 852–63 (2001).

[44]  529 U.S. 576 (2000).

[45]  533 U.S. 218 (2001).

[46]  *See id.* at 226–27; *Christensen*, 529 U.S. at 587. Neither *Mead* nor *Christensen* explained why courts should give more deference to decisions that have the force of law and less deference to decisions that do not. For a discussion of some reasons supporting this proposition, see Merrill & Hickman, *supra* note 43, at 874–82.

[47]  *See Mead*, 533 U.S. at 234–35.

[48]  *Id.* at 226–27; *see also id.* at 237 (holding that *Skidmore* rather than *Chevron* applies "where statutory circumstances indicate no intent to delegate general authority to make rules with force of law, or where such authority was not invoked").

tions, thoughts, and objectives.[49]   The Court also discussed a number of factors that led it to conclude that Congress had not delegated authority to the Customs Service to act with the force of law when it authorized the agency to issue tariff classification rulings.   Specifically, the Court considered whether Congress required the agency to engage in relatively formal procedures before acting, whether Congress authorized the agency to adopt rules or precedents that generalize beyond a single case, and whether Congress authorized the agency to prescribe legal norms that apply uniformly throughout its jurisdiction.[50]   The Court conspicuously framed each of these factors in terms of congressional rather than agency intent.

If courts take seriously the relevance of Congress's intent to give an agency's rules the force of law, and heed the passages in *Mead* that appear to say that the inquiry into congressional intent should proceed by looking to all conceivably relevant factors, the result in most cases will be highly unpredictable.   The central problem, again, is that Congress typically authorizes agencies to adopt "rules and regulations," but does not specifically say "legislative" rules and regulations.[51]   And without any direction in the legislative text, the all-things-considered *Mead* framework provides little guidance to lower courts, agencies, and regulated parties about how to discern congressional intent in any given set of circumstances.   Thus, it is likely to sow confusion among lower courts, inhibit agency planning, and generate additional legal costs.   It is also likely to undermine congressional control over the allocation of interpretive authority, for while Congress can be explicit in new legislation, an unpredictable framework makes it difficult to determine how courts will construe existing legislation.[52]   Given the dif-

---

[49]  *See id.* at 229–34.

[50]  *See id.*

[51]  *Mead* also creates problems in determining whether agencies should receive *Chevron* deference for interpretations embodied in procedural rules.   Procedural rules, like substantive legislative rules, can have the force of law.   *See* 1 DAVIS & PIERCE, *supra* note 27, § 6.6, at 252–54 (noting that procedural rules are sometimes legislative and sometimes merely guidelines).   Moreover, there is little doubt that when Congress enacts a facially ambiguous grant of authority to an agency to adopt "rules and regulations," it intends at the very least to include in this grant the authority to make procedural rules.   Thus, procedural rules will often satisfy *Mead*'s basic requirement for *Chevron* deference — a delegation of authority from Congress to act with the force of law.   *Cf.* Merrill & Hickman, *supra* note 43, at 905–06.   On the other hand, *Mead* places considerable emphasis on whether Congress has required that an agency follow notice-and-comment procedures in issuing a rule, *see Mead*, 533 U.S. at 230–31, and the APA specifically exempts procedural rules from notice-and-comment procedures, *see* 5 U.S.C. § 553(b) (2000).   Thus, one of the signals of congressional intent to make rules legally binding emphasized by *Mead* — the requirement of notice-and-comment procedures — is irrelevant.   The Supreme Court recently reserved judgment on the degree of deference owed to a particular procedural rule.   *See* Edelman v. Lynchburg Coll., 122 S. Ct. 1145, 1150 (2002).

[52]  *See* Thomas W. Merrill, *The* Mead *Doctrine: Rules and Standards, Meta-Rules and Meta-Standards*, 54 ADMIN. L. REV. 807, 819–26 (2002).

ficulty in determining actual congressional intent, "some version of constructive — or perhaps more frankly said, fictional — intent must operate in judicial efforts to delineate the scope of *Chevron*."[53] The need to attribute some intent to Congress, in turn, raises the question whether there is any background principle that courts can apply in a manner that is reasonably faithful to Congress's actual intent and that simultaneously resolves disputes over the nature of delegated authority in a reasonably predictable manner.

## II. TEXTUALIST INTERPRETATION OF FACIALLY AMBIGUOUS RULEMAKING GRANTS

What does Congress mean when it gives agencies the power to make such "rules and regulations" as may be necessary to implement or administer an act? In Part III, we discuss how Congress historically followed a convention to signal its intent to grant either legislative rulemaking authority or merely housekeeping authority.[54] Once we understand this convention, we can discern Congress's probable intent in most instances. But to confirm the existence of this convention we must examine the legislative histories of numerous statutes. Using legislative history to resolve questions of statutory interpretation is controversial. Some interpreters, such as Justice Scalia, have insisted that questions of statutory interpretation should be resolved solely in terms of the objective meaning of a statute rather than by reference to Congress's subjective intentions.[55] Such "textualist" interpreters look to the language of a statute, its structure, and canons of interpretation in resolving statutory meaning, but ordinarily avoid legislative history, such as committee reports and floor debates.[56] However, a survey of the techniques of interpretation typically deployed by textualists sug-

---

[53] David J. Barron & Elena Kagan, *Chevron's Nondelegation Doctrine*, 2001 SUP. CT. REV. 201, 203; *see also* Russell L. Weaver, *The Emperor Has No Clothes*: Christensen, Mead *and Dual Deference Standards*, 54 ADMIN. L. REV. 173, 186–87 (2002) ("Because Congress never explicitly states that a particular agency is given the power to interpret with the 'force of law,' the Court must focus on 'implicit' manifestations of intent if the 'force of law' standard is to be workable.").

[54] *See infra* pp. 493–528. By "housekeeping authority" we mean the authority to promulgate nonlegislative substantive rules (interpretive rules and policy statements) and procedural rules.

[55] *See* Antonin Scalia, *Common Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, *in* A MATTER OF INTERPRETATION 29–37 (Amy Gutmann ed., 1997) (arguing that "legislative history should not be used as an authoritative indication of a statute's meaning").

[56] *See id.* at 17–18, 23–37; *see also* Daniel A. Farber & Philip P. Frickey, *Legislative Intent and Public Choice*, 74 VA. L. REV. 423, 453–457 (1988); John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 COLUM. L. REV. 673, 675–76 (1997); Thomas W. Merrill, *Textualism and the Future of the* Chevron *Doctrine*, 72 WASH. U. L.Q. 351, 352 (1994). *See generally* William N. Eskridge, Jr., *The New Textualism*, 37 UCLA L. REV. 621 (1990) (describing the "new textualism" of Justice Scalia and Judge Easterbrook).

gests that these tools cannot clearly resolve the meaning of ambiguous rulemaking grants in most instances.

### A. Language

All interpreters regard a statute's language as the most important datum in statutory interpretation.[57]   And indeed, sometimes the language of a rulemaking grant expressly specifies whether the grant includes the authority to adopt legally binding rules.   For example, a few statutes state that the rules promulgated by an agency shall have "the force and effect of law."[58]   Other rulemaking grants unambiguously limit their reach to procedural rules, providing, for example, that an agency has the power to issue "suitable *procedural* regulations to carry out the provisions" of an act.[59]

More often, however, the language used in rulemaking grants is ambiguous, stating only that an agency has the power to make "rules and regulations as may be necessary to carry out the provisions of this title,"[60] or "to make such rules and regulations . . . as may be necessary in the administration of this Act."[61]   It is possible that the varying language used in different grants could be given different meanings.   For example, a grant that gives power to an agency to "enforce" an act or a provision of an act might be construed as authorizing legislative rules, whereas grants that speak only of "administering" an act might not.[62]

---

[57] Even those interpreters who formulate the inquiry in terms of ascertaining legislative purpose or intent routinely "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." Sec. Indus. Ass'n v. Bd. of Governors, 468 U.S. 137, 149 (1984) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)); *see also* Eskridge, *supra* note 56, at 621 (stating that "[t]he statute's text is the most important consideration in statutory interpretation").

[58] *E.g.*, Agricultural Adjustment Act, ch. 25, § 10(c), 48 Stat. 31, 37 (1933) (codified as amended at 7 U.S.C. § 610(c) (2000)).

[59] 42 U.S.C. § 2000e-12(a) (2000) (emphasis added); *see also* Interstate Commerce Act, ch. 104, § 17, 24 Stat. 379 (1887) (repealed 1978) ("Said Commission may, from time to time, make or amend such general rules or orders as may be requisite for the order and regulation of proceedings before it . . . .").

[60] *E.g.*, Securities Act of 1933, ch. 38, § 19(a), 48 Stat. 74, 85 (codified as amended at 15 U.S.C. § 77s(a) (2000)); *see also* Natural Gas Act, ch. 556, § 16, 52 Stat. 821, 830 (1938) (codified as amended at 15 U.S.C. § 717o) (giving the Federal Power Commission the "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act").

[61] *E.g.*, Longshoremen's and Harbor Workers' Compensation Act, ch. 509, § 39(a), 44 Stat. 1424, 1442 (1927) (codified as amended at 33 U.S.C. § 939(a) (2000)); *see also* Motor Carrier Act, 1935, ch. 498, § 204(a)(6), 49 Stat. 543, 546 (repealed 1983) (providing that the ICC has the power "[t]o administer, execute, and enforce all other provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations and procedure for such administration").

[62] This possibility is suggested in passing in *American Trucking Ass'ns v. United States*, 344 U.S. 298, 311 (1953): "We cannot agree with appellants' contention that the rule-making authority

334 of 504

Or, rulemaking grants might be differentiated on the ground that a grant that authorizes an agency to "carry out" the provisions of an act[63] is more legislative in tone than a grant that gives an agency the power to make rules for the "administration" of an act[64] or to promulgate rules "as may be necessary in the execution of its functions."[65]

Briefs filed with the Supreme Court have occasionally made arguments of this nature.[66]  But only rarely have courts suggested that different verbal formulations signify the conveyance of different types of powers.[67]  In the end, whether any particular formulation is "legislative" or "interpretive" remains debatable.  For example, it has been argued that a conferral of authority "to enforce" the provisions of an act is both a signal that legislative rulemaking authority has been given and a signal that the agency possesses only interpretive rulemaking authority.[68]  Given the general language used in most rulemaking grants, it is not ordinarily possible simply by analyzing the text to determine whether such grants confer legislative as opposed to procedural and interpretive powers.

## B. Structure

The overall structure of statutes provides another important consideration that meets with approval from textualist interpreters.  As Justice Scalia has stated, a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme."[69]  Structural arguments usually focus on the internal structure of a single

---

. . . merely concerns agency procedures and is solely administrative.  It ignores the distinct reference in the section to enforcement."

63  *See* statutes cited *supra* note 60.

64  *See* statutes cited *supra* note 61.

65  Communications Act of 1934, ch. 652, § 4(i), 48 Stat. 1064, 1068 (codified as amended at 47 U.S.C. § 154(i) (2000)) ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions.").

66  For example, in *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356 (1973), the petitioner argued that a rulemaking grant to carry out "the purpose" of an act was broader than a grant to carry out "the provisions" of an act.  *See* Brief for Petitioner at 24, *Mourning*, 411 U.S. 356 (1973) (No. 71-829).  Similarly, in *American Trucking*, the appellants argued that the power the Motor Carrier Act gave to the ICC to "prescribe rules, regulations, and procedure for such administration" of the Act was specifically limited to rules and regulations for "administration."  Appellants' Petition for Rehearing at 10–12, E. Motor Express, Inc., v. United States, 344 U.S. 298 (1953) (No. 35).

67  Nor are we aware of any evidence from legislative history that Congress has ever placed any significance on these divergences in verbal formulations.

68  *Compare American Trucking*, 344 U.S. at 311 (stating that the power of "enforcement" suggests a legislative grant), *with* Brief for Petitioner, *supra* note 66, at 23–24 (arguing that the power of "enforcement" suggests an interpretive grant).

69  United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988); *see also* Eskridge, *supra* note 56, at 660–63 (noting a rise in the use of structural arguments by the Supreme Court).

*HARVARD LAW REVIEW* [Vol. 116:467]

act, but occasionally such arguments also consider the relationship be-tween the act under consideration and related statutes.[70]

Important clues about the meaning of a rulemaking grant can sometimes be gleaned from its placement in an act. One potential in-dicator of meaning is the grant's location in the administrative or or-ganizational sections of an act.[71] For example, the general rulemaking grant in the Social Security Act of 1935 appears in Title XI, the "Gen-eral Provisions" title, which contains statutory definitions, a severabil-ity clause, and the short title of the Act.[72] A general rulemaking grant in the Communications Act of 1934 also appears in the "General Pro-visions" title of the Act, which contains organizational provisions relat-ing to the Federal Communications Commission (FCC) and its divi-sions, as well as statutory definitions.[73] Similarly, the general rulemaking grant in the Internal Revenue Code appears in Subtitle F, which pertains to "Procedure and Administration."[74] The placement of each of these grants may signal that the grant pertains to house-keeping matters only and hence does not authorize legislative rules.

In contrast, the placement of other rulemaking grants suggests that they authorize legislative rules. The most compelling example is a statute that includes both general and more specific rulemaking grants that overlap. For instance, a statute may contain both a general rule-making grant that authorizes the promulgation of all rules and regula-tions necessary to carry out the administration of "this subchapter," and one or more narrower rulemaking grants that authorize rules nec-essary to carry out "this section."[75] The Securities Exchange Act of 1934, the Internal Revenue Code, and the Clean Water Act, among

---

[70] *See, e.g.*, FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 148–49 (2000) (review-ing numerous statutes other than the Federal Food, Drug, and Cosmetic Act in determining that the FDA does not have authority to regulate tobacco products).

[71] *See, e.g.*, Federal Food, Drug, and Cosmetic Act, ch. 675, § 701(a), 52 Stat. 1040, 1055 (1938) (codified as amended at 21 U.S.C. § 371(a) (2000)); Civil Aeronautics Act of 1938, ch. 601, § 205, 52 Stat. 973, 984; Social Security Act, ch. 531, § 1102, 49 Stat. 620, 647 (1935) (codified as amended at 42 U.S.C. § 1302 (2000)); Communications Act of 1934, ch. 652, § 4(i), 48 Stat. 1064, 1068 (codified as amended at 47 U.S.C. § 154(i) (2000)); Packers and Stockyards Act, 1921, ch. 64, § 407, 42 Stat. 159, 169 (codified as amended at 7 U.S.C. § 228 (2000)).

[72] Social Security Act, § 1102, 49 Stat. at 647.

[73] Communications Act of 1934, § 4(i), 48 Stat. at 1068.

[74] I.R.C. § 7805 (2000).

[75] *See, e.g.*, Securities Act of 1933, ch. 38, §§ 19–20, 48 Stat. 74, 85–86 (codified as amended at 15 U.S.C. §§ 77s–77t (2000)) (giving the SEC general rulemaking powers in section 19(a) of the Act and then providing in section 20 that the SEC may institute proceedings against any person who violates "any rule or regulation" promulgated by the SEC under the authority of the Act); Natural Gas Act, ch. 556, §§ 16, 20–21, 52 Stat. 830, 832–33 (1938) (codified as amended at 15 U.S.C. §§ 717o, 717s–717t) (giving the Federal Power Commission general rulemaking powers in section 16 and then providing in sections 20 and 21 for enforcement of the Commission's rules and regulations).

other statutes, fit this pattern.[76]  Although both the general grant and the specific grants are often ambiguous on their face, given the overlap it is reasonable to argue that the general grant confers only housekeeping powers, while the narrower grants confer legislative powers.  After all, if both the general grant and the specific grants conferred the same type of power (either legislative or housekeeping), then the statute would include a significant redundancy.[77]  By construing the general grant to confer the more generally available housekeeping powers — the power to issue procedural or interpretive rules — and construing the specific grants to confer the more jealously guarded power — the power to issue legislative rules — the redundancy disappears.[78]

The structural argument based on overlapping rulemaking grants is not necessarily decisive, however.  One problem is that interpretive rulemaking (and perhaps procedural rulemaking as well) has long been viewed as an "inherent" power of all executive institutions.[79]  Whether this power is inherent or not, in 1874 Congress granted to the heads of

---

[76] With respect to the Securities Exchange Act, see 15 U.S.C. § 78w, which grants general rulemaking authority to the SEC; *id.* § 78m, which grants authority to make rules regulating periodical reports of registered securities; and *id.* § 78n, which grants authority to make rules regulating proxies.  With respect to the Internal Revenue Code, see I.R.C. § 7805(a) (2000), which grants general rulemaking authority; and *id.* § 1502, which grants rulemaking authority dealing with consolidated returns of affiliated corporations.  For the Clean Water Act, see *infra* notes 632–635 and accompanying text.

[77] *See* Gustafson v. Alloyd Co., 513 U.S. 561, 574 (1995) (stating that the "Court will avoid a reading which renders some words altogether redundant" (citing *United States v. Menasche*, 348 U.S. 528, 538–539 (1955))).

[78] For judicial decisions recognizing this point in the regulatory context, see *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 408 (1999) (Thomas, J., concurring in part and dissenting in part) (arguing that the majority's construction of a general rulemaking grant in the Communications Act to extend to new authority conferred on the FCC by the Telecommunications Act of 1996 renders specific grants of rulemaking authority in the latter Act redundant; and *In re Permanent Surface Mining Regulation Litigation*, 653 F.2d 514, 524 (D.C. Cir. 1981) (considering but rejecting the same argument in the context of the general rulemaking grant in the Surface Mining Control and Reclamation Act of 1977).  For commentary recognizing the point in connection with the Internal Revenue Code, see Ellsworth C. Alvord, *Treasury Regulations and the Wilshire Oil Case*, 40 COLUM. L. REV. 252, 257 (1940) (arguing that "some difference was intended by Congress" or else it would not have granted the Treasury both specific and general rulemaking powers); and Stanley S. Surrey, *The Scope and Effect of Treasury Regulations Under the Income, Estate, and Gift Taxes*, 88 U. PA. L. REV. 556, 558 (1940) (contending that rules issued under specific rulemaking grants must be construed to possess different attributes than rules issued under the general rulemaking grant, because otherwise "the careful particularization of Congress in these other sections would be without meaning").

[79] *See* Kenneth Culp Davis, *Administrative Rules — Interpretative, Legislative, and Retroactive*, 57 YALE L.J. 919, 930 (1948) (stating that "the power to issue interpretative regulations is commonly inherent or implied"); Frederic P. Lee, *Legislative and Interpretive Regulations*, 29 GEO. L.J. 1, 24 (1940) ("[T]he power of an administrative officer or agency to prescribe interpretive regulations is not necessarily a delegated power.  The authority to exercise such power need not be found in an Act of Congress."); John B. Olverson, Jr., Note, *Legislation by Administrative Agencies*, 29 GEO. L.J. 637, 640 (1941) ("In the mere interpretation of a statute, the administrative agency need not be empowered by such statute to make regulations.").

executive departments general authority to adopt rules governing their employees and affairs.[80]  This "Housekeeping Act," which is codified at 5 U.S.C. § 301, provides that: "The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."[81]  Because executive agencies have long possessed these powers, one could argue that it would be redundant for Congress to give such agencies an additional general grant of power authorizing *only* interpretive and procedural rules.  Therefore, to avoid redundancy between the Housekeeping Act and the agency's statute, the general rulemaking grant in the statute should be treated as legislative.

The matter is more complicated still.  Section 301's housekeeping grant applies only to the heads of executive departments and military departments, not independent administrative agencies.[82]  As a result, it might not be redundant for Congress to give independent agencies such as the FTC, FCC, and NLRB general grants of power to adopt housekeeping rules.  Such grants could simply be viewed as substitutes for the housekeeping grant already given to department heads.[83]

---

[80]  *See* REV. STAT. § 161 (1873–1874).

[81]  5 U.S.C. § 301 (2000).  The Housekeeping Act consolidated into one place various housekeeping powers that had been conferred on department heads in prior acts.  *See, e.g.*, Act of July 27, 1789, ch. 4, §§ 1–2, 1 Stat. 28, 29 (giving the Secretary for the Department of Foreign Affairs power over all the records, books, and papers of his office and giving the Secretary the power to "perform and execute such duties" as the President shall entrust to him); Act of Aug. 7, 1789, ch. 7, § 2, 1 Stat. 49, 50 (giving the Secretary of the Department of War power over its records, books, and papers); Act of April 30, 1798, ch. 35, §§ 2–3, 2 Stat. 553, 554 (giving the Secretary of the Navy possession and charge of all books, records, and documents pertaining to the Department of the Navy).  Notes presented to Congress by the commissioners who drafted the revised statutes explained the purpose of section 161 as follows:

> This section is suggested by section 8 of the act of 22 June, 1870, which reads as follows: "That the Attorney General is hereby empowered to make all necessary rules and regulations for the government of said Department of Justice, and for the management and distribution of its business."  Substantially the same power seems to be conferred, though in vague and uncertain language, by the earlier acts organizing the other Departments.  The commissioners have thought it advantageous that the power should be stated in terms, and be conferred alike on all the Secretaries.

1 REVISION OF THE UNITED STATES STATUTES AS DRAFTED BY THE COMMISSIONERS APPOINTED FOR THAT PURPOSE 80 (1872) (citation omitted).  Thus, although the language used in REV. STAT. § 161 conferred what could be viewed as very broad procedural rulemaking powers on department heads, the commissioners' notes indicate that they were not attempting to enlarge the powers granted by earlier acts.

[82]  *See* 5 U.S.C. § 301; *see also id.* § 101 (defining the term "executive department").

[83]  However, if Congress intended general rulemaking grants to independent agencies, such as the FTC and the NLRB, merely to be substitutes for section 301's housekeeping grant, one would expect that Congress would not give general rulemaking grants to executive departments (since section 301's housekeeping grant already covers executive officers).  But this is not the case, as Congress has frequently given executive department heads both general and specific rulemaking

Thus, structural arguments about overlapping grants do not definitively resolve the meaning of facially ambiguous rulemaking grants, at least not in all cases.

### C. Canons of Interpretation

Canons of interpretation are another tool accepted by most textualists. Three types of canons in particular are potentially relevant in determining the meaning of ambiguous rulemaking grants: the rule of lenity, nondelegation canons, and what this Article will call the *Petroleum Refiners* canon.

*1. The Rule of Lenity.* — The rule of lenity requires courts to construe ambiguous statutes imposing criminal liability narrowly to provide fair notice to potential offenders and to constrain the discretion of prosecutors and courts.[84] Thus, where violation of an agency rule would expose persons to criminal sanctions, the rule of lenity provides a rationale for construing an ambiguous rulemaking grant as authorizing only interpretive rules. This application of the rule of lenity is particularly relevant where Congress has prescribed criminal sanctions for violating legislative agency rules and has given the agency multiple rulemaking grants, some of which are ambiguous. A potential offender would know that violating some agency rules could give rise to criminal sanctions but would not be able to tell whether rules promulgated pursuant to an ambiguous rulemaking grant are included in that category.

Of course, this canon applies only where rule violations are criminally punishable. Courts do not ordinarily apply the rule of lenity to statutes that impose only civil sanctions.[85] The Supreme Court has also curtailed the rule of lenity in recent years, and there is some question whether it applies at all in the context of judicial review of administrative regulations.[86]

---

grants in statutes. *See, e.g.,* Act of June 17, 1902, ch. 1093, § 10, 32 Stat. 388, 390 (giving the Secretary of the Interior general rulemaking powers); Act of June 28, 1934, ch. 865, § 2, 48 Stat. 1269, 1270 (same). This fact would seem to counter any argument that general rulemaking grants should be viewed as mere substitutes for section 301.

[84] *See generally* Patricia G. Chapman, *Has the* Chevron *Doctrine Run out of Gas? Senza Ripieni Use of* Chevron *Deference or the Rule of Lenity,* 19 MISS. C. L. REV. 115, 142–43 (1998) (explaining that the "rule of lenity requires a reviewing court to prefer a narrow (as opposed to a generous) reading of an ambiguous penal or punitive statute, allowing penalties only if the language of the statute is clear or if legislative intent to punish the prohibited actions can be unmistakably ascertained").

[85] *See* United States v. Thompson/Ctr. Arms Co., 504 U.S. 505, 518–19 n.10 (1992).

[86] *See* Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or., 515 U.S. 687, 704 n.18 (1995) (applying *Chevron* rather than the rule of lenity in reviewing an agency regulation that could give rise to criminal sanctions, and stating "[w]e have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement").

    *2.  Nondelegation Canons.* — Canons based on the nondelegation doctrine[87] are also potentially relevant in interpreting the meaning of ambiguous rulemaking grants.[88]  Courts have never vigorously enforced the original nondelegation principle — that Congress may not delegate powers that are "strictly and exclusively legislative."[89]  Congressional delegations of significant discretionary powers, including rulemaking powers, began in the First Congress and have been a feature of our government ever since.[90]  Nevertheless, courts have employed the nondelegation doctrine as a canon of statutory construction.[91]

    One familiar nondelegation principle provides that a congressional delegation of authority to an agency must contain an "intelligible principle" to guide and constrain the agency's behavior.[92]  Courts could invoke the intelligible principle requirement as support for interpreting ambiguous rulemaking grants narrowly, on the ground that such grants fail to provide meaningful guidance to agencies about which sorts of rules are permitted.  Thus, Stanley Surrey, a prominent tax

---

    [87]  The nondelegation doctrine is based on Article I, Section 1 of the Constitution, which vests "all legislative Powers herein granted . . . in a Congress of the United States." U.S. CONST. art. I, § 1.

    [88]  *See generally* Cass R. Sunstein, *Nondelegation Canons*, 67 U. CHI. L. REV. 315 (2000) (arguing that nondelegation canons act as rules of construction that prevent agencies from making decisions on their own without authorization from Congress).

    [89]  Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 42–43 (1825).  As Chief Justice Marshall admitted in *Wayman*, the line between those "important subjects" that must be entirely regulated by the legislature itself and those lesser subjects that might be delegated to others was not drawn exactly. *Id.* at 43; *see* James Hart, *The Exercise of Rulemaking Power, in* THE PRESIDENT'S COMM. ON ADMIN. MGMT., REPORT OF THE COMMITTEE WITH STUDIES OF ADMINISTRATIVE MANAGEMENT IN THE FEDERAL GOVERNMENT 311, 322 (1937) (noting a "general trend over many years in the direction of an increase in the number of rules and regulations issued by various Federal agencies in pursuance of delegated authority"); *see also* Marshall Field & Co. v. Clark, 143 U.S. 649, 694 (1892) ("There are many things upon which wise and useful legislation must depend which cannot be known to the law making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation."); 1 FRANK J. GOODNOW, COMPARATIVE ADMINISTRATIVE LAW 27–28 (1893) ("No legislature, however wise or far-seeing, can, with due regard for the interests of the people, which differ with the locality and change with the passage of time, regulate all the matters that need the regulation of administrative law.").

    [90]  *See* United States v. Grimaud, 220 U.S. 506, 517 (1911) ("From the beginning of the Government various acts have been passed conferring upon executive officers power to make rules and regulations — not for the government of their departments, but for administering the laws which did govern.").

    [91]  *See* Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 646 (1980) (ruling that courts should construe statutes to avoid open-ended delegations of legislative power); *see* Sunstein, *supra* note 88, at 316 (arguing that "certain canons of construction operate as nondelegation principles").

    [92]  This requirement, rooted in *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928), is still occasionally litigated.  *See, e.g.,* Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472–76 (2001) (holding that Congress had articulated an "intelligible principle" when it granted the EPA the power to promulgate national ambient air quality standards).

scholar, once suggested that the grant of authority to the Treasury Department to adopt rules "needful . . . for the enforcement" of the Internal Revenue Code does not constitute a delegation of legislative rulemaking power, because such a sweeping grant lacks an intelligible principle.[93]

The intelligible principle argument, however, overlooks the fact that the content of an agency's legislative rulemaking will be constrained not only by the grant of rulemaking authority, but also by limitations in the relevant act's substantive provisions. The existence of this additional constraint on agency discretion, together with the Court's extreme reluctance to second-guess Congress regarding the degree of guidance that agencies should receive, probably means that any argument about ambiguous rulemaking grants based on the intelligible principle requirement would fail.[94]

Another nondelegation principle that is perhaps more helpful in interpreting ambiguous rulemaking grants is that an agency may not bind the public with the force of law unless Congress has delegated it the power to do so.[95] In our system of separation of powers, it has always been assumed that the President, members of the executive branch, and federal administrative agencies have no inherent power to make law.[96] By the late nineteenth century, courts had recognized a corollary to this principle: administrative agencies cannot make legislative rules absent a delegation of this power from Congress.[97]

---

[93] *See* Surrey, *supra* note 78, at 557–58. For more discussion of Surrey's arguments, see *infra* pp. 574–75.

[94] The Court has found the requisite intelligible principle lacking in only two statutes. *See* A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 529–42 (1935); Pan. Ref. Co. v. Ryan, 293 U.S. 388, 414–20 (1935).

[95] *See* Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979) ("The legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes."); 1 DAVIS & PIERCE, *supra* note 27, § 6.3, at 234 ("[A]n agency has the power to issue binding legislative rules only if and to the extent Congress has authorized it to do so.").

[96] *See supra* note 20 and accompanying text.

[97] *See, e.g.,* FRANK J. GOODNOW, THE PRINCIPLES OF THE ADMINISTRATIVE LAW OF THE UNITED STATES 326–27 (1905) ("[T]he general rule in this country is that the administrative authorities possess only the delegated ordinance power — that is, they may issue ordinances only where the power to issue such ordinances has been expressly given to them by the legislature."); Morris M. Cohn, *To What Extent Have Rules and Regulations of the Federal Departments the Force of Law,* 41 AM. L. REV. 343, 345 (1907) ("It has been held that heads of departments have no right, in the absence of statute, to make regulations upon a subject, so as to bind third persons.").

The understanding that a clear delegation is necessary before agencies can bind the public may be related to the rule, first set forth in the nineteenth century, that a municipality cannot act

*HARVARD LAW REVIEW* [Vol. 116:467]

One historically significant manifestation of this understanding is *Interstate Commerce Commission v. Cincinnati, New Orleans, & Texas Pacific Railway Co.*,[98] the now largely-forgotten *Queen and Crescent Case*,[99] in which the Supreme Court held that the Interstate Commerce Commission (ICC) had no power to prescribe future railroad rates.[100] The Interstate Commerce Act of 1887[101] unquestionably gave the ICC the power to determine whether current rates were reasonable.[102] But the Act contained only a narrow grant of procedural rulemaking authority.[103] The Court held that the power to adjudicate whether rates were reasonable could not be construed to imply the power to set future rates by rule,[104] because delegations of power to bind the public with the force of law are "never to be implied."[105] The Court noted that whether Congress had given the ICC the power to set future rates had "been most strenuously and earnestly debated" by the parties,[106] and concluded that because the question was debatable, the Act had to be construed as not implying that power.[107]

---

unless authorized to do so by the state of which it is a part. John F. Dillon explained the rule, which became known as "Dillon's Rule," as follows:

> It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation, — not simply convenient, but indispensable.

1 JOHN F. DILLON, COMMENTARIES ON THE LAW OF MUNICIPAL CORPORATIONS § 89, at 145 (4th ed. 1890).

[98] 167 U.S. 479 (1897).

[99] The *Queen and Crescent Case*, evidently referring to the nicknames of Cincinnati and New Orleans, two principal cities that the railroad served, was the name that some contemporary commentators gave the case. *See, e.g.*, ERNST FREUND, ADMINISTRATIVE POWERS OVER PERSONS AND PROPERTY 148 (1928).

[100] *See The Queen and Crescent Case*, 167 U.S. at 506.

[101] Ch. 104, 24 Stat. 379 (repealed 1978).

[102] *See The Queen and Crescent Case*, 167 U.S. at 505–07.

[103] *See* Interstate Commerce Act, § 17, 24 Stat. at 386 ("Said Commission may, from time to time, make or amend such general rules or orders as may be requisite for the order and regulation of proceedings before it . . . .").

[104] *See The Queen and Crescent Case*, 167 U.S. at 509.

[105] *Id.* at 494.

[106] *Id.*

[107] *See id.* at 509. Two other prominent nondelegation decisions of this era also emphasized the importance of an express delegation of power to act with the force of law. In *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), the Supreme Court upheld a delegation of power to the President to suspend certain portions of the Tariff Act of 1890. *See id.* at 680–94. The Court emphasized that one important factor in reaching this result was that Congress, not the President, had fixed the standard and declared that the President should ascertain when that standard had been met. *See id.* at 692–93. Similarly, in *Buttfield v. Stranahan*, 192 U.S. 470 (1904), the Court upheld the Secretary of the Treasury's power to set standards for imported tea. *Id.* at 496. The Court again stressed that it was Congress, not the Secretary, that had declared it unlawful to import any tea falling below the Secretary's standards. *See id.* An Attorney General's opinion pub-

The *Queen and Crescent Case* suggests a nondelegation canon in the form of an "express statement" rule: all grants of rulemaking authority confer only housekeeping powers, unless Congress expressly confers the power to make legislative rules.[108] Such a rule, if consistently followed, would eliminate any disputes about the extent of ambiguous rulemaking grants. Unless Congress states in the text of the grant that agency rules will have the "force of law," or includes other words to that effect, the grant authorizes only interpretive and procedural rules. But the *Queen and Crescent Case* is the only time the Court suggested such an express statement rule.[109] For whatever reason, the *Queen and Crescent Case* and its maxim that legislative rulemaking power is "never to be implied" were soon forgotten.[110]

A similar but less draconian canon would insist not on an express statement, but only on some clear expression of congressional intent to confer power to act with the force of law. A number of decisions, including some of fairly recent vintage, contain language consistent with this proposition.[111] The difference between a "clear intent" rule and the ordinary rule that statutes should be given the meaning that Congress more likely than not intended is rather hazy. Presumably, under a clear intent rule, something more than a preponderance of the evidence is required to find a delegation of power.[112] Under the clear intent version of the canon, courts would construe ambiguous rulemaking grants to authorize only nonlegislative rules unless the ordinary tools of statutory interpretation — including, of course, the language

---

lished in 1904 read these decisions as resting on the proposition that only Congress can declare what action has the force of law:

> In [*Marshall Field*] it was specifically declared [by Congress] that the free importation of certain articles *should be suspended* upon a certain contingency, to be ascertained by the President; in [*Stranahan*], that it *should be unlawful* to import any merchandise or tea below the standards directed to be fixed by the Secretary of the Treasury.

25 OFFICIAL OPINIONS OF THE ATTORNEYS-GENERAL OF THE UNITED STATES 249, 254 (John L. Lott & James A. Finch eds., 1906).

[108] An "express statement" rule would require an affirmative statement in the text of the statute. In contrast, what this Article calls a "clear intent" rule would merely require a clear manifestation of legislative intent in view of the totality of the statutory context. *See* Merrill & Hickman, *supra* note 43, at 888. On the nature of clear statement rules more generally, including both express statement and clear intent rules, see William N. Eskridge, Jr. & Philip P. Frickey, *Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking*, 45 VAND. L. REV. 593 (1992).

[109] Perhaps the case owes its singularity to the fact that Congress soon overruled the specific result by giving the ICC power to prescribe future rates. *See infra* note 150 and accompanying text.

[110] A LEXIS search reveals that the *Queen and Crescent Case* has been cited by the Supreme Court only three times since 1933.

[111] *See* cases cited *supra* note 95. This Article argues that the Court's decisions in *United States v. Eaton*, 144 U.S. 677 (1892) and *United States v. Grimaud*, 220 U.S. 506 (1911), rest implicitly on such a clear intent canon. *See infra* section II.B, pp. 499–503.

[112] *See* Gary Lawson, *Proving the Law*, 86 NW. U. L. REV. 859, 890–91 (1992).

and structure of the act — clearly reveal that Congress intended to confer legislative rulemaking authority.[113]

*3. The* Petroleum Refiners *Canon.* — A third potentially relevant canon lacks the pedigree of either the rule of lenity or the nondelegation doctrine. For want of a better term, this Article calls it the *Petroleum Refiners* canon, after the leading federal appellate opinion that adopted this approach.[114] The *Petroleum Refiners* canon provides that ambiguous grants of rulemaking authority should be construed to give agencies the broadest possible powers, so that they will have flexibility in determining how to effectuate their statutory mandates. In contrast to the nondelegation canons, this canon derives not from fundamental principles of separation of powers but from pragmatic considerations, including the convenience of allowing agencies to make legislative rules on all matters properly within their jurisdiction. The *Petroleum Refiners* canon thus bears an affinity with the Supreme Court's pronouncement in *SEC v. Chenery Corp.*[115] that agencies should be free to choose between rulemaking and adjudication in determining how to formulate policy.[116] *Chenery* itself presented no question about the meaning of an ambiguous rulemaking grant.[117] Nevertheless, the *Chenery* doctrine is often invoked for the more general proposition that agencies should have discretion to choose the format in which they articulate policy. In this more general sense, the doctrine provides analogical support for the *Petroleum Refiners* canon.

While the Supreme Court has acknowledged the importance of construing rulemaking grants liberally so as not to "undermine the flexibility sought in vesting broad rulemaking authority in an administrative agency,"[118] it has never explicitly endorsed the *Petroleum Refiners* canon. As we shall see, however, two prominent federal courts of appeals have construed ambiguous rulemaking grants as conferring legislative rulemaking authority, and these opinions can be read as embracing the *Petroleum Refiners* canon.[119] In effect, these courts have adopted the exact opposite of the *Queen and Crescent Case*

---

[113] Section 558(b) of the APA, which provides that "[a] sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law," 5 U.S.C. § 558(b) (2000), supports such a canon. *See also infra* pp. 525–26 (discussing the significance of § 558(b) in light of the convention discussed in Part III).

[114] Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672 (D.C. Cir. 1973); *see also* Nat'l Ass'n of Pharm. Mfrs. v. FDA, 637 F.2d 877 (2d Cir. 1981). These decisions are discussed *infra* pp. 554–57, 562–65.

[115] 332 U.S. 194 (1947).

[116] *Id.* at 202–03.

[117] *See id.* at 201–02.

[118] Mourning v. Family Publ'ns Serv., Inc., 411 U.S. 356, 372 (1973); *see also* Am. Trucking Ass'ns v. United States, 344 U.S. 298, 309–10 (1953) (suggesting that rulemaking grants should be interpreted broadly because Congress cannot anticipate "every evil sought to be corrected").

[119] *See infra* pp. 554–57, 562–65.

canon: ambiguous grants confer legislative rulemaking power unless Congress has expressly limited the grant to interpretive or procedural rulemaking.

\* \* \*

In sum, given their ambiguous language, the uncertain implications of structural arguments, and the unavailability of conflicting canons, the meaning of ambiguous rulemaking grants is often debatable if they are examined through a purely textual lens. This Article, therefore, turns to a consideration of what history teaches about the meaning of such grants.

## III. THE CONVENTION CREATED

Although grants of authority allowing agencies to adopt "rules and regulations" appear to be facially ambiguous concerning whether they authorize rules having the force of law, the history of rulemaking during the Progressive and New Deal eras reveals that key participants in the legislative process did not regard such grants as ambiguous. Starting around World War I, Congress began following a convention for indicating whether an agency had the power to promulgate legislative rules. Under this convention, the requisite textual signal was provided by the inclusion of a separate provision in the statute attaching "sanctions" to the violation of rules and regulations promulgated under a particular rulemaking grant. If the statute prescribed a sanction, then the authority to make "rules and regulations" included the authority to adopt legislative rules having the force of law. If the statute did not include a sanction, the authority to make "rules and regulations" encompassed only interpretive or procedural rules.

The "sanctions" took various forms.[120] The clearest case, of course, was when Congress imposed criminal or monetary civil penalties on

---

[120] During the relevant time period, the required legal consequences were generally referred to as "sanctions," but the concept of a "sanction" was given a meaning broader than criminal or civil monetary penalties. This understanding accords with the APA, adopted in 1946, which defined "sanction" as follows:

"[S]anction" includes the whole or a part of an agency —
(1) prohibition, requirement, limitation, or other condition affecting the freedom of any person;
(2) withholding of relief;
(3) imposition of any form of penalty or fine;
(4) destruction, taking, seizure, or withholding of property;
(5) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;
(6) requirement, revocation, or suspension of a license; or
(7) taking other compulsory or restrictive action.

Ch. 324, § 2, 60 Stat. 237, 238 (1946) (codified as amended at 5 U.S.C. § 551 (2000)).

persons who violated an agency's regulations.[121]  On other occasions, however, the sanctions might take the form of the forfeiture or destruction of property,[122] the revocation of licenses,[123] or the denial of benefits.[124]  In contrast, if the statute was silent regarding the legal consequences for failure to conform to regulations, it was understood as granting the agency the power to make only housekeeping rules.[125]

This convention can be seen as resting on two propositions that participants in the legal system widely shared in the first half of the twentieth century.  The first is that "law" means roughly what John Austin defined it to mean: general commands backed by the threat of sanctions.[126]  In other words, law — as distinguished from moral norms or principles of justice — is a directive enforced by the infliction of punishment or the imposition of other material sanctions by the state.[127]  The second proposition is that only the legislature, as opposed to the executive and the judiciary, has the power to determine when directives will be given the force of law.  This principle, of course, is

---

[121] *See, e.g.,* Federal Water Power Act, ch. 285, § 25, 41 Stat. 1063, 1076 (1920) (repealed 1935) (attaching criminal penalties to violations of the Federal Power Commission's rules and regulations).

[122] *See, e.g.,* Tea Importation Act, ch. 358, § 6, 29 Stat. 604, 606 (1897) (repealed 1996) (providing for the destruction of impure tea that falls below the standards set by the Secretary of the Treasury if the owner fails to export such tea outside of the United States within six months of the examination).

[123] *See, e.g.,* Warehouse Act, ch. 313, pt. C, § 25, 39 Stat. 486, 490 (1916) (codified as amended at 7 U.S.C. § 252(a) (2000)) (providing that the Secretary of Agriculture may suspend or revoke any warehouseman's license for any violation of the rules and regulations made under the Act); Grain Standards Act, ch. 313, pt. B, § 7, 39 Stat. 482, 484 (1916) (codified as amended at 7 U.S.C. § 85) (providing for the suspension or revocation of any grain inspector's license for any violation of the rules and regulations made under the Act).

[124] *See, e.g.,* Social Security Act Amendments of 1939, ch. 666, § 205(a), 53 Stat. 1360, 1368.

[125] *See, e.g.,* Federal Trade Commission Act, ch. 311, § 6(g), 38 Stat. 717, 722 (1914) (codified as amended at 15 U.S.C. § 46(g) (2000)) (declaring that the FTC has the power "to classify corporations and to make rules and regulations for the purpose of carrying out the provisions of this Act" but providing no sanctions for the violation of those rules and regulations).

[126] *See* JOHN AUSTIN, THE PROVINCE OF JURISPRUDENCE DETERMINED 13–15 (Prometheus ed. 2000) (1832).

[127] As one authority put it:

> A rule of conduct which lacks a means of enforcement is not an expression of the will so much as of the mere wish of the state; and such a rule, if not enforceable by legal processes, should not even be graced with the title of a law of imperfect obligation.

HART, *supra* note 20, at 28. On the continuity between Austin's command theory and the tenets of the Langdellian legal formalism of the late nineteenth and early twentieth centuries, see ANTHONY J. SEBOK, LEGAL POSITIVISM IN AMERICAN JURISPRUDENCE 83–104 (1998).  Up until the middle of the twentieth century, jurisprudential writings demonstrate a continuing emphasis on the importance of sanctions in identifying those directives that can be said to have the force of law. *See, e.g.,* EDWIN W. PATTERSON, AN INTRODUCTION TO JURISPRUDENCE 119–26 (2d ed. 1946).  Only later did conceptions of law as having obligatory force without regard to sanctions gain currency. *See* H.L.A. HART, THE CONCEPT OF LAW 86–88 (1st ed. 1961) (discussing the "internal aspect of rules," which leads to obedience to law without regard to sanctions being imposed for noncompliance).

the version of the nondelegation doctrine that underlies the *Queen and Crescent Case*: agencies have no inherent authority to act with the force of law and can exercise such power only if Congress has delegated it to them.[128]

Combined, the first and second propositions produce the convention: First, under the Constitution, only Congress has the authority to specify when an agency can act with the force of law (the nondelegation proposition). Second, agencies act with the force of law only when their rules are backed by sanctions (the Austinian proposition). Consequently, Congress can indicate whether agencies have the authority to act with the force of law by specifying whether the rules they promulgate will be backed by sanctions.

The convention did not emerge full-blown at any one moment. Rather, it gradually developed around the second decade of the twentieth century as Congress created new administrative entities and considered what kind of rulemaking authority to give them. Moreover, as we shall see, the convention was never explicitly memorialized in an authoritative text, such as a statute, a legislative drafting guide, or a prominent judicial decision. It remained part of the unwritten "common law" of legislative drafting in the first half of the twentieth century. Accordingly, the only way to establish the existence of the convention is to examine a significant number of regulatory statutes and their associated legislative histories, supplemented by contemporary writings by knowledgeable participants in the legislative and administrative processes.[129]

## A. Early History: The Diversity of Rulemaking Grants

Although it was originally thought that Congress could not delegate powers that were "strictly and exclusively legislative,"[130] congressional grants of rulemaking power actually began in the first session of Congress. The twenty-fourth statute enacted in 1789 provided that the

---

[128] *See supra* pp. 490–91.

[129] A note about our method of identifying facially ambiguous rulemaking grants is appropriate at this juncture. We began by identifying and analyzing numerous nineteenth- and early twentieth-century regulatory statutes, which we located through a variety of sources, including case law, legal articles and books about rulemaking, and by scanning the United States Code's Popular Name Table, which lists acts and the years in which they were enacted. We next identified those regulatory statutes that include facially ambiguous rulemaking grants and sought to determine whether there was any authority discussing whether these grants conferred legislative or merely housekeeping powers.

We did not systematically attempt to identify facially ambiguous rulemaking grants in statutes passed after the New Deal era; they undoubtedly number in the thousands. We did, however, encounter a number of these grants in the course of our research and we mention them in the Article when relevant.

[130] Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 42–43 (1825); *see also* Field v. Clark, 143 U.S. 649, 692 (1892).

United States government would continue to pay previously granted pensions for one year "under such regulations as the President of the United States may direct."[131]  Similarly, a statute passed in the second session of the first Congress prohibited unlicensed trade with American Indian tribes, instructed the executive department to issue licenses to individuals engaged in trade with Indians, and provided that the licenses were to be "governed in all things touching the said trade and intercourse, by such rules and regulations as the President shall prescribe."[132]

From 1789 through most of the nineteenth century, delegations of rulemaking power generally ran to the President.[133]  Occasionally, however, such grants ran to other officers.  For example, in 1813 Congress passed a tax assessment and collection act that gave the Secretary of the Treasury the power to "establish regulations suitable and necessary for carrying this act into effect."[134]  Notably, the statute expressly stated that these regulations "shall be binding on each assessor in the performance of the duties enjoined by or under this act."[135]  About the same time, Congress passed an act involving taxation of foreign commerce in which it declared that "the Secretary of the Treasury shall give such directions to the collectors, and prescribe such rules and forms to be observed by them, as may appear to him proper for attaining the objects of this act."[136]

Whereas early rulemaking grants were largely confined to military, foreign affairs, tax, and internal government matters, Congress in the late nineteenth century began to legislate over a wider range of activities, including the control and disposition of federal lands and the regulation of interstate commerce.  Practical realities necessitated that the officers administering these statutes adopt implementing regula-

---

[131]  Act of Sept. 29, 1789, ch. 24, 1 Stat. 95, 95.

[132]  Act of July 22, 1790, ch. 33, 1 Stat. 137, 137.

[133]  For a thorough study of the early delegations of administrative rulemaking power, see JOHN PRESTON COMER, LEGISLATIVE FUNCTIONS OF NATIONAL ADMINISTRATIVE AUTHORITIES 50 (1927).  Comer divides the history of rulemaking into four periods: (1) 1789–1824; (2) 1825–1860; (3) 1861–1890; and (4) 1891–1926.  He reports that:

> [T]he legislature was inclined to share the burden of legislation with the Executive often during the first period; that this practice continued to some extent during the second; that Congress was liberal in delegating discretion during the third period; and that during the fourth period the practice was generally established.  Furthermore, . . . although the President received a major portion of all delegated legislation during the first three periods, a division of labor was appearing in the administrative branch of the government and the basis for practically all legislative powers exercised at the present time by the major departments was being laid.

*Id.* at 51.

[134]  Act of July 22, 1813, ch. 16, § 4, 3 Stat. 22, 26.

[135]  *Id.*

[136]  Act of Feb. 10, 1820, ch. 11, § 14, 3 Stat. 541, 543.

tions.[137]   Not surprisingly, therefore, Congress became increasingly willing to transfer rulemaking authority to the agencies it was creating.[138]

Some of the statutes enacted by Congress expressly indicated that the regulations promulgated under their authority would have the "force of law."[139]  In 1871, for example, Congress passed an act involving the safety of vessels that gave a supervising board the power to "establish all necessary rules and regulations required to carry out in the most effective manner the provisions of this act for the safety of life, which rules and regulations, when approved by the Secretary of the Treasury, shall have the force of law."[140]  Similarly, in 1870, Congress passed an internal revenue act that gave the Secretary of the Treasury the power to make "all needful rules and regulations, not inconsistent with law, to be observed in the execution of this act, which shall have the force and effect of law."[141]

Other statutes did not explicitly state that agency rules and regulations would have the force of law, but their context implied this conclusion.  In the Timber and Stone Act of 1878,[142] for example, Congress authorized citizens in western states and territories to cut timber on public land. Section 1 of the Act authorized the Secretary of the Interior to prescribe rules and regulations "for the protection of the tim-

---

[137] *See* Marshall Field & Co. v. Clark, 143 U.S. 649, 694 (1892) ("There are many things upon which wise and useful legislation must depend which cannot be known to the law making power, and, must, therefore, be a subject of inquiry and determination outside of the halls of legislation." (quoting *Commonwealth ex rel. McClain v. Locke*, 72 Pa. 491, 499 (1873)) (internal quotation marks omitted)).  *See generally* 1 FRANK J. GOODNOW, COMPARATIVE ADMINISTRATIVE LAW 27–28 (1897) ("The needs of the government make it necessary that many details in the law be fixed less permanently than by statute.  No legislature, however wise or far-seeing, can, with due regard for the interests of the people, which differ with the locality and change with the passage of time, regulate all the matters that need the regulation of administrative law.").

[138] *See* COMER, *supra* note 133, at 51.

[139] Congress's use of the "force of law" language during these years may have been influenced by court decisions holding that internal governmental regulations, navy regulations, and military regulations made pursuant to acts of Congress had the "force of law."  *See, e.g.*, Gratiot v. United States, 45 U.S. (4 How.) 80, 117 (1846) (holding that the army regulations at issue had the "force of law"); *see also Ex Parte* Reed, 100 U.S. 13, 22 (1879) (extending the holding of *Gratiot* to navy regulations); *In re* Major William Smith, 23 Ct. Cl. 452, 459 (1888) (holding that army regulations may have the "force of law"); BRUCE WYMAN, THE PRINCIPLES OF THE ADMINISTRATIVE LAW GOVERNING THE RELATIONS OF PUBLIC OFFICERS 285 (1903) (stating that regulations dealing with administration within the executive branch are "usually summed up in the ordinary decision by the statement that these regulations have the force of law"); *cf.* United States v. Ormsbee, 74 F. 207, 210 (E.D. Wis. 1896) (holding that regulations made by the Secretary of War involving access to water on the government's land had the "force of law" when Congress expressly prohibited any use of the water "unless approved and authorized by the secretary of war").

[140] Act of Feb. 28, 1871, ch. 100, § 23, 16 Stat. 440, 449.  The Supreme Court in 1908 pointed to the "force of law" language in this statute in holding that regulations promulgated under the Act were entitled to the force and effect of law.  *See* La Bourgogne, 210 U.S. 95, 132 (1908).

[141] Act of July 14, 1870, ch. 255, § 34, 16 Stat. 256, 271.

[142] Ch. 150, 20 Stat. 88.

ber and of the undergrowth growing upon such lands, and for other purposes."[143]   Section 3 specified that any person violating the provisions of the Act or any rules and regulations made under it would face potential criminal charges, imprisonment, and a fine of up to $500.[144] Consequently, even though Congress never expressly declared that the rules and regulations would have the "force and effect of law," the unmistakable effect of the Act was to give the Secretary of the Interior the authority to bind persons with the force of law.

The Tea Importation Act of 1897,[145] which sought to regulate the quality of tea imported into the United States, provides another example of Congress implicitly endowing agency rules with the force of law. Section 3 of the Act gave the Secretary of the Treasury the power to establish uniform standards for tea purity, quality, and fitness.[146]   Section 5 provided that any tea falling below the uniform standards set by the Secretary could not be released from the customs house unless it met those standards upon reexamination.[147]   In other words, Congress conditioned the right to import tea on compliance with the Secretary of the Treasury's regulations, effectively giving these regulations the force of law.[148]

By contrast, other statutes, exemplified by the landmark Interstate Commerce Act of 1887 (ICA),[149] included rulemaking grants that were expressly limited to matters of agency procedure and organization. Section 17 of the ICA gave the ICC the general power to "make or amend such general rules or orders *as may be requisite for the order and regulation of proceedings before it*, including forms of notices and the service thereof, which shall conform, as nearly as may be, to those in use in the courts of the United States."[150]

---

[143] *Id.* § 1, 20 Stat. at 88.

[144] *Id.* § 3, 20 Stat. at 89.

[145] Ch. 358, 29 Stat. 604 (repealed 1996).

[146] *Id.* § 3, 29 Stat. at 605.  This delegation of legislative rulemaking power to the Secretary of the Treasury to determine tea standards was challenged in *Buttfield v. Stranahan*, 192 U.S. 470 (1904), but the Supreme Court upheld the statute, concluding that Congress fixed "a primary standard, and devolved upon the Secretary of the Treasury the mere executive duty to effectuate the legislative policy declared in the statute." *Id.* at 495.

[147] Tea Importation Act of 1897, § 5, 29 Stat. at 606.

[148] In contrast, section 10 of the Act gave the Secretary of the Treasury general rulemaking powers, authorizing him to "enforce the provisions of this Act by appropriate regulations." *Id.* § 10, 29 Stat. at 607.  The Act was silent as to the effect of the regulations promulgated under this section.

[149] Ch. 104, 24 Stat. 379 (repealed 1978).

[150] *Id.* § 17, 24 Stat. at 386 (emphasis added).  In 1889, Congress added a provision to the Act that gave the ICC the power "to execute and enforce the provisions of this act." Amendments to the Interstate Commerce Act, ch. 382, § 3, 25 Stat. 855, 858 (1889).  This added provision made no mention of executing and enforcing the Act through rules and regulations; it simply gave the ICC the power "to execute and enforce" the Act. *Id.*  In 1906 the ICA was amended by the Hepburn Act to give the ICC specific power to establish maximum rates by rule. *See* Hepburn Act, ch.

## B. *The Importance of* Eaton *and* Grimaud

The increased use of rulemaking toward the end of the nineteenth century gave rise to two Supreme Court decisions that provided the impetus for a more uniform understanding about the proper form of rulemaking grants. No question was presented in either case about the meaning of a facially ambiguous rulemaking grant. Rather, the issue before the Court in both cases was one of authority: whether the federal government could impose criminal sanctions upon an individual for violating rules of conduct set forth in a regulation adopted by an agency pursuant to delegated authority. The Court's eventual answer focused on whether Congress had expressly provided by statute that those who violate a rule of conduct set forth in a regulation can be criminally punished. This response suggested a logical way of differentiating between delegations of legislative and nonlegislative authority. By specifically providing for the imposition of sanctions for the violation of a given regulation, Congress resolved any question of authority and also sent an unambiguous signal of its intent that the resulting rules have the force of law.

In *United States v. Eaton*,[151] the Court considered whether a wholesale oleomargarine dealer could be held criminally liable for failing to conform to a regulation, promulgated under the Oleomargarine Act, that required such dealers to keep books of receipts and disposals and to make returns to the Commissioner of Internal Revenue. Section 20 of the Act authorized the Commissioner to make "all needful regulations" for carrying out the Act's provisions.[152] The government argued that the prosecution was justified by section 18 of the Act, which made it a criminal offense for any manufacturer or distributor of oleomargarine to fail to do anything "required by law in the carrying on or conducting of his business."[153] The government urged that the regulation adopted by the Commissioner under section 20 created

---

3591, § 4, 34 Stat. 584, 589 (1906). This provision of the Hepburn Act overruled the holding in the *Queen and Crescent Case*, 167 U.S. 479 (1897), described *supra* pp. 490–91. *See* ROBERT E. CUSHMAN, THE INDEPENDENT REGULATORY COMMISSIONS 70–74 (1941). The grant was further broadened in the Transportation Act of 1920, ch. 91, 41 Stat. 456, to permit the ICC to prescribe specific rates or maximum and minimum rates. *See id.* § 418, 41 Stat. at 484–85. Neither amendment, however, changed the provision in the original Act limiting the general rulemaking grant to rules of procedure.

[151] 144 U.S. 677 (1892). The case involved a prosecution under the Oleomargarine Act, a statute designed to protect the dairy industry from competition from oleomargarine. *See* Geoffrey P. Miller, *Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine*, 77 CAL. L. REV. 83 (1989).

[152] *Eaton*, 144 U.S. at 685.

[153] *Id.* at 686.

duties that were "required by law," and hence fell within the terms of the general prohibition of section 18.[154]

The Court rejected this contention. Relying on a blend of nondelegation and lenity precepts, the Court stated that the prosecution violated the principle that "a sufficient statutory authority should exist for declaring any act or omission a criminal offence."[155] Although Congress had made it a criminal offense to neglect to do a thing "required by law," Congress had not expressly made it a criminal offense to neglect to do a thing required only by a regulation.[156] The Court did not hold that Congress could never make it a crime to violate a regulation adopted by an agency. It did suggest, however, that if such a delegation of legislative authority were ever to be permitted, Congress would have to speak "distinctly" in criminalizing failures to abide by agency regulations.[157]

*Eaton* established one thing that Congress could not do: it could not delegate to an agency the authority to issue regulations backed by criminal penalties without explicitly identifying the regulations that, if violated, would give rise to such penalties. It was unclear, however, whether the decision stood for the broader principle that it was impermissible to impose any type of legal consequence, criminal or civil, for the violation of a regulation that lacked the proper delegation of authority from Congress.[158] The answer would depend on whether subsequent courts read *Eaton* as being grounded primarily in the doctrine of lenity, and hence limited to criminal sanctions, or whether they read it as being grounded in broader principles of nondelegation.

For nearly two decades, it remained uncertain whether Congress could delegate authority to an agency to adopt regulations that would give rise to criminal sanctions.[159] The Court finally resolved the ques-

---

[154] *Id.*

[155] *Id.* at 688.

[156] *Id.*

[157] *See id.*

[158] At least one case decided in the early twentieth century applied *Eaton* outside the criminal context. *See* Van Lear v. Eisele, 126 F. 823, 828 (E.D. Ark. 1903) ("It is true, in the case at bar the rules do not make the acts of a physician not registered a criminal offense; still, so far as the complainant is concerned, the statute is highly penal, for it deprives him of a valuable right — the right to practice the profession, which, under the laws of the state where he seeks to exercise this right, he is permitted to do.").

[159] In 1897, the Court reaffirmed *Eaton* but distinguished the case before it in finding the regulation valid and upholding the prosecution. *See In re* Kollock, 165 U.S. 526, 533 (1897). On the question whether Congress could make violations of regulations criminal offenses with a sufficiently clear delegation, the lower courts were divided. *Compare* Dastervignes v. United States, 122 F. 30, 33–35 (9th Cir. 1903) (holding that violation of an administrative regulation *can* constitute a criminal offense), United States v. Rizzinelli, 182 F. 675, 678, 684 (D. Idaho 1910) (same), United States v. Moody, 164 F. 269, 271 (W.D. Mich. 1908) (same), United States v. Ormsbee, 74 F. 207, 208–09 (E.D. Wis. 1896) (same), *and* United States v. Breen, 40 F. 402, 403–04 (E.D. La. 1889) (same), *with* United States v. Matthews, 146 F. 306, 310 (E.D. Wash. 1906) (holding that a broad

tion in the 1911 case of *United States v. Grimaud*.[160]  The defendants were criminally charged with grazing sheep on a forest reservation without a permit.[161]  The Secretary of Agriculture had promulgated the permit requirement under authority given by the Forests Reserve Act to "make such rules and regulations and establish such service as will insure the objects of such reservation[s]."[162]  The Act further provided that "any violation of the provisions of this Act *or such rules and regulations* shall be punished as is provided for [in section 5388 of the Revised Statutes]."[163]

The defendants argued that Congress could never delegate to an executive agency the power to adopt rules and regulations punishable by criminal sanctions.  The Supreme Court disagreed.  In contrast to *Eaton*, which had rested on a blend of nondelegation and lenity reasoning, the Court in *Grimaud* framed its analysis exclusively in terms of whether the delegation was permissible.  The Court read the history of the nondelegation doctrine to mean that:

> [W]hen Congress [has] legislated and indicated its will, it [can] give to those who were to act under such general provisions "power to fill up the details" by the establishment of administrative rules and regulations, the violation of which [can] be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress or measured by the injury done.[164]

*Eaton* was readily distinguished because that case had ruled that "while a violation of the regulations might have been punished as an offense if Congress had so enacted, it had, in fact, made no such provision so far as concerned the particular charge then under consideration."[165]  The present case was entirely different: "[T]he very thing which was omitted in the Oleomargarine Act has been distinctly done in the Forest Reserve Act, which, in terms, provides that 'any violation of the provisions of this act or such rules and regulations of the Secretary shall be punished . . . .'"[166]

*Grimaud* thus established what Congress could do: it could delegate power to an agency to adopt regulations subject to criminal penalties,

---

criminalization of any violations of regulations to be set by the Secretary of the Interior represented an invalid delegation of legislative authority, *and* United States v. Blasingame, 116 F. 654, 654 (S.D. Cal. 1900) (same).

[160]  220 U.S. 506 (1911).

[161]  *Id.* at 509–10.

[162]  *Id.* at 515 (quoting Act of 1897, ch. 2, 30 Stat. 11, 35) (internal quotation marks omitted).

[163]  Act of 1897, 30 Stat. at 35 (emphasis added).

[164]  *Grimaud*, 220 U.S. at 517.

[165]  *Id.* at 519.

[166]  *Id.*

*HARVARD LAW REVIEW*

provided that Congress itself legislated the penalties.[167]  Moreover, because criminal sanctions are the most severe type of sanction for violating an agency regulation, there was little doubt after *Grimaud* that Congress could provide other types of sanctions for violating agency regulations as well.  In other words, *Grimaud* established that Congress can delegate authority to agencies to promulgate regulations that have a variety of legal consequences — as long as Congress itself spells out by statute what those consequences are.

Neither *Eaton* nor *Grimaud* spoke directly to the question of how facially ambiguous rulemaking grants should be interpreted.[168]  Nevertheless, the decisions established points of reference that Congress could use in signaling whether particular grants authorized rules and regulations having the force of law.  If Congress specifically provided that the violation of a regulation would result in the imposition of sanctions, such as criminal penalties, then the rule would have the force of law (*Grimaud*).  If Congress did not so provide, an agency could not enforce the rule with criminal penalties (*Eaton*), and it was doubtful whether it could be enforced with any type of civil sanction.[169]  Both cases assumed that the place to look for determining whether a regulation has the force of law is the statute that delegated rulemaking power to the agency.  This understanding, of course, was consistent with the version of the nondelegation principle underlying the *Queen and Crescent Case*, which the Court decided during the same era:[170] executive officers and agencies can act with the force of law only if Congress has delegated to them the power to do so.

After *Grimaud*, cases involving administrative rules and regulations appeared before the Court on occasion.  Some of these decisions recognized the distinction between legislative and nonlegislative rules, and they reflected the understanding that legislative rules are those that impose legal consequences on persons who violate them.[171]  More

---

[167] *See, e.g.,* McKinley v. United States, 249 U.S. 397 (1919) (upholding the constitutionality of convictions for violating regulations that the Secretary of War issued under delegated authority in which Congress prescribed the sanctions for rule violations).

[168] Significantly, however, in a case decided shortly after *Grimaud*, the Court dismissed out of hand the contention that either the Housekeeping Act, 5 U.S.C. § 301 (2000), or a general rulemaking grant given to the Commissioner of the General Land Office could serve as the source of a legislative rule.  *See* United States v. George, 228 U.S. 14 (1913).  Quoting these provisions in a footnote, the Court observed: "It will be seen that they confer administrative power only. . . . [A]nd certainly, under the guise of regulation legislation cannot be exercised." *Id.* at 20.

[169] One scholar explained the significance of both cases as follows: "[T]he court will not *presume* the intended policy of allowing the commission or delegate to inflict a penalty or create a new crime in any case; therefore the authority to do that must at least be clearly expressed in the statute." John B. Cheadle, *The Delegation of Legislative Functions*, 27 YALE L.J. 892, 918 (1918).

[170] *See supra* notes 99–109 and accompanying text.

[171] *See* AT&T v. United States, 299 U.S. 232 (1936) (holding that an FCC accounting rule had binding effect because Congress had delegated legislative rulemaking authority to the agency, and

than thirty years elapsed, however, before the Court decided a case implicating the authority of an agency to promulgate legislative rules based on a facially ambiguous rulemaking grant.[172]  Congress, in the meantime, entered a period of unprecedented activity in terms of the delegation of rulemaking authority to administrative agencies.

## C. The Convention Emerges

After *Eaton* and *Grimaud*, the structure of rulemaking grants in regulatory legislation assumed a much more uniform pattern.  Express references to regulations having the "force of law," which were not infrequent in the nineteenth century,[173] became relatively rare, as did express qualifications limiting regulations to matters of procedure.  Instead, "rules and regulations" became the standard refrain, but now Congress sometimes coupled the grant of authority to adopt rules and regulations with a specific provision imposing sanctions on rule violators, and sometimes it did not.  The legislative histories of these statutes, to the extent they clarify the intended meanings of these grants, indicate that knowledgeable participants in the legislative process understood the presence or absence of a provision establishing a sanction for rule violations as the key variable differentiating legislative rulemaking grants from housekeeping ones.  The convention that emerged, however, was most likely familiar only to staff attorneys working for Congress and for the agencies that Congress created.  There is no evidence that knowledge of the convention extended to most members of Congress themselves, to the courts, or — at least during the early years of this formative period — to the commentators who began making note of the growing importance of rulemaking.[174]

---

the FCC had promulgated the rule within the scope of that authority); Ariz. Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co., 284 U.S. 370, 376–78 (1932) (holding that the ICC had no power to impose a sanction on a party for conduct that is "in direct conformity with the Commission's own prior valid legislative pronouncement"); Standard Computing Scale Co. v. Farrell, 249 U.S. 571, 574 (1919) (describing legislative regulations as those that "prescribe a course of action to be enforced by the power of the State").  Most notably, in *Columbia Broadcasting System, Inc. v. United States*, 316 U.S. 407 (1942), the Court discussed at some length the nature of rules that have the force of law.  The specific holding was that such rules, when issued by the FCC, are subject to pre-enforcement judicial review under the Urgent Deficiencies Act.  *Id.* at 417.  The Court did not reach the issue of authority because the Communications Act of 1934 included a specific grant of authority to make the rules in question.  *Id.* at 416.

[172]  *See* Nat'l Broad. Co. v. United States, 319 U.S. 190 (1943), discussed *infra* pp. 529–32.

[173]  *See supra* notes 139–141 and accompanying text.

[174]  As rulemaking became increasingly common, commentaries began to catalog different kinds of rules and regulations and their legal effects.  *See, e.g.,* COMER, *supra* note 133; FREUND, *supra* note 99, at 211–23; John A. Fairlie, *Administrative Legislation*, 18 MICH. L. REV. 181 (1920); Fred T. Field, *The Legal Force and Effect of Treasury Interpretation, in* THE FEDERAL INCOME TAX 91 (Robert Murray Haig ed., 1921).  These commentators initiated the process of dividing rules into categories similar to those commonly employed today (for example, legislative or substantive, procedural, interpretive).  But they had little or nothing to say about how agencies and courts

*1. Progressive-Era Rulemaking Grants.* — Not long after *Grimaud*, Congress enacted a statute with a facially ambiguous rulemaking grant that will play a large role in our story: the Federal Trade Commission Act of 1914 (FTCA).[175]  The Act created the FTC to serve as both an adjudicatory and an investigative body.  Section 5 set forth the FTC's quasi-judicial adjudicatory functions, including its power to file complaints, hold hearings, determine whether violations of the FTCA had occurred or were occurring, and issue cease and desist orders.[176]  Section 6 set forth the investigative powers of the FTC, including its power to demand reports from corporations and to publish information deemed to be in the public interest.[177]

The FTCA contained only one reference to rules and regulations: section 6(g) provided that the FTC had the power "[f]rom time to time to classify corporations and to make rules and regulations for the purpose of carrying out the provisions of this Act."[178]  The statute included no sanction for violations of such rules and regulations.  In contrast, the Act empowered the FTC to bring suit to prevent violations of the Act[179] and set forth remedies for violations of the FTC's cease-and-desist orders.[180]  The failure to provide any sanction for the violation of rules adopted under section 6(g), along with the placement of

---

should distinguish between grants of legislative authority and grants of merely procedural and interpretive authority.  Particularly striking in this regard are Comer's rather hapless comments:

> [T]he terms of investment of rule-making power are not always so coupled with the law, or the subdivisions thereof, that the enforcing officer can readily see what his real power is.  Thus, the general law of 1789, which gives to the heads of departments the power to prescribe rules and regulations not inconsistent with law, may or may not bestow upon the Secretary of the Treasury the authority to make rules and regulations for carrying out the provisions of the current income-tax law.  A similar power bestowed specifically upon the Secretary of the Navy may or may not enable him to issue binding regulations for enforcing a particular policy entrusted to his care.  A blank delegation of such power for enforcing the Packers Act may not give the Secretary of the Agriculture authority to promulgate rules for putting into effect specific provisions of that Act. . . .  The officer must make the first guess and let the court determine whether such source is the correct one for effectuating the particular policy in question.

COMER, *supra* note 133, at 133–34.  Comer, a political scientist at Williams College, evidently drew his knowledge of rulemaking primarily from documentary sources, including, of course, appellate opinions.  Since these sources contained no reflection of the convention as of the time he wrote (1927), it is not surprising that he regarded the meaning of facially ambiguous rulemaking grants as essentially a mystery.

[175] Ch. 311, 38 Stat. 717.

[176] *Id.* § 5, 38 Stat. at 719–21 (codified as amended at 15 U.S.C. § 45 (2000)).

[177] *Id.* § 6, 38 Stat. at 721–22 (codified as amended at 15 U.S.C. § 46).

[178] *Id.* § 6(g), 38 Stat. at 722.

[179] Congress empowered the FTC only to prevent violations of the Act, not of the rules and regulations promulgated under it.  Section 5 declared the use of "unfair methods of competition in commerce" to be unlawful and gave the FTC the power to prevent violations.  *Id.* § 5, 38 Stat. at 719.

[180] Section 5 empowered the FTC to bring suit to enforce its cease and desist orders whenever any person failed to comply.  *Id.* § 5, 38 Stat. at 719–20.

the rulemaking grant in section 6, which conferred the FTC's investigative powers, clearly suggests that Congress intended the rulemaking grant to serve as an adjunct to the FTC's investigative duties, regarding which Congress had not given the agency the authority to act with the force of law.

The legislative history of the Act supports the conclusion that the FTC's rulemaking grant did not confer legislative rulemaking authority.[181]  Section 6(g)'s general rulemaking grant originated in the House Bill of 1914,[182] which conferred only investigative powers on the FTC, such as the power to require reports from corporations and to classify corporations.[183]  In contrast, the bill that passed the Senate granted adjudicative and investigative powers[184] but included no rulemaking provision at all.[185]  As a consequence, when the Conference Committee met, the only rulemaking provision under consideration was the one included in the House bill.  Under established practices for reconciling bills in conference, the Committee could not have granted the FTC legislative rulemaking powers, because neither bill granted the agency such authority.[186]

Statements made during floor debates after the Conference Committee incorporated the rulemaking provision into the bill confirm that Congress did not intend section 6(g) to confer legislative authority.  In response to questions about the scope of the FTC's powers, Representative Covington, a member of the Conference Committee, distinguished the powers given to the FTC from those delegated to the ICC under the Hepburn Act, which had given the ICC the power to prescribe future rates.[187]  Covington stated that the "Federal Trade Com-

---

[181]  *See* Burrus & Teter, *supra* note 14, at 1124 ("The legislative history of the Federal Trade Commission Act compels the conclusion that Congress had no intention to confer any 'legislative' rulemaking power upon the Commission."); Glen E. Weston, *Deceptive Advertising and the Federal Trade Commission: Decline of Caveat Emptor*, 24 FED. B.J. 548, 570 (1964) ("There is simply no indication in the legislative history of intent to confer any such power and plenty of evidence of an intent not to empower the FTC to make 'legislative' rules.").

[182]  *See* S. DOC. NO. 63-573, at 15 (2d Sess. 1914) (comparing the House, Senate, and Conference versions of the bill).

[183]  *See id* at 11.

[184]  *See id.* at 7–9, 10–13.

[185]  *See id.* at 15.

[186]  *See* LORY BRENEMAN, SENATE MANUAL CONTAINING THE STANDING RULES, ORDERS, LAWS, AND RESOLUTIONS AFFECTING THE BUSINESS OF THE UNITED STATES SENATE, S. DOC. NO. 106-1, § 28.2, at 51 (1999) ("Conferees shall not insert in their report matter not committed to them by either House, nor shall they strike from the bill matter agreed to by both Houses.").

[187]  Hepburn Act, ch. 3591, § 4, 34 Stat. 584, 589 (1906).  Representative Covington also stated:
[T]here is no analogy between the power of the Interstate Commerce Commission under the Hepburn Act and the power of the Federal trade commission in regard to unfair competition.  There is, however, a perfect analogy between the former power of the Interstate Commerce Commission under the Cullom Act and the power of the Federal trade commission.  Under the Cullom Act the Interstate Commerce Commission had the

mission will have no power to prescribe the methods of competition to be used in the future."[188]   In addition, he explained that the FTC, unlike the ICC, "will not be exercising power of a legislative nature" in issuing its orders.[189]

In subsequent years, the courts, Congress, the agency, and knowledgeable commentators all shared the understanding that section 6(g) did not confer legislative rulemaking power on the FTC.   In a leading separation of powers decision, *Humphrey's Executor v. United States*,[190] the Supreme Court surveyed the powers of the FTC and concluded that it exercised only "quasi-legislative" and "quasi-judicial" functions.   The principal "quasi-legislative" power the Court identified under section 6 was "making investigations and reports [on unfair forms of competition] for the information of Congress."[191]   The Court did not mention the rulemaking grant in section 6(g), presumably because the litigants in the case — and the Court itself — assumed that this provision did not confer any power on the FTC to make legislative rules.

Similarly, the FTC described its own rulemaking power as excluding the authority to issue legally binding rules.   In its 1922 *Annual Report*, for example, the FTC complained of the frequent confusion that existed over the extent of its authority:

> One of the most common mistakes is to suppose that the commission can issue orders, rulings, or regulations unconnected with any proceeding before it.  It is frequently asked to do this, not only in a broad general way, but also to issue warnings to concerns alleged to be using unfair practices. . . . It is hoped, in time, to bring about a thorough understanding of the fact that the commission can not and will not function by any method not authorized in its organic act, whereby complete investigation, careful consideration, and, in short, due process of law and full respect for the moral and legal rights of both parties to controversies are assured.[192]

---

power only to determine whether an existing rate was unreasonable, and, if it so found, to order the railroad to cease and desist from charging that rate.  The Federal trade commission will have precisely similar power in regard to an existing method of competition.

51 CONG. REC. 14,932 (1914).

[188]  *Id.*

[189]  *Id.*

[190]  295 U.S. 602 (1935).

[191]  *Id.* at 628.

[192]  ANNUAL REPORT OF THE FEDERAL TRADE COMMISSION 36 (1922).  Subsequent annual reports also support the conclusion that section 6(g) was confined to supplementing the FTC's investigative powers.  *See* ANNUAL REPORT OF THE FEDERAL TRADE COMMISSION 81 (1925) (pointing to investigatory powers, under section 6, as the main basis for the work carried out by the economic division, which investigates general business conditions); *see also* George Rublee, *The Original Plan and Early History of the Federal Trade Commission*, 11 PROC. ACAD.

Lastly, the *Final Report* of the Attorney General's Committee on Administrative Procedure of 1941 reflects the same understanding.[193] The report, which was instrumental in leading to the APA, noted that "[r]elatively few of the administrative agencies studied by the Committee lack power to prescribe regulations for the control of activities which are subject to their authority."[194]  But one of the agencies that the *Final Report* pointed to as lacking legislative rulemaking powers was the FTC.[195]  Similarly, a monograph on the FTC prepared by the Attorney General's Committee on Administrative Procedure concluded that rules issued by the FTC should be called "advisory interpretations" rather than "rules," because "[n]othing in the statutes administered by the Commission makes any provision for the promulgation of rules applicable to whole industries."[196]

The Packers and Stockyards Act of 1921,[197] which regulated the meat packing industry, provides further evidence of the emergence of the drafting convention.  The original House committee bill did not require either packers or stockyard operators to comply with any rules or regulations promulgated under the Act, nor did it include any general rulemaking grant.[198]  By contrast, the Senate committee bill included a general rulemaking grant that unquestionably conferred legislative rulemaking authority.  The bill declared that it was the "duty" of every packer and operator to comply with the Secretary's regulations and that conduct contrary to such regulations was "unlawful."[199]  The bill also set forth the procedures for ordering a packer or operator to cease and desist from violating a regulation.[200]

During Senate floor debate, the provision of the Senate bill requiring that packers and stockyard operators comply with rules and regulations generated much discussion.  Senator Stanfield criticized the provision, arguing that it gave the agency power to "practically enact a law under which the packer will become a criminal."[201]  Similarly, Senator Wadsworth expressed concern that the agency might "issue[] a

---

POL. SCI. 666, 671 (1926).  For Rublee, a drafter of the FTCA and one of the agency's first Commissioners, it was "perfectly clear" that the FTC had no authority to give advance advice about the legality of business practices, and he did not even mention the rulemaking grant.  *Id.*

[193]  *See* FINAL REPORT, *supra* note 29, at 98 n.19.

[194]  *Id.* at 98.

[195]  *Id.* at 98 n.18.  The Final Report stated that section 6(g) of the FTCA conferred only procedural rulemaking powers on the FTC.  *Id.* at 98 n.19.

[196]  THE ATTORNEY GENERAL'S COMM. ON ADMIN. PROCEDURE, U.S. DEP'T OF JUSTICE, MONOGRAPH NO. 6, THE FEDERAL TRADE COMMISSION 67 (1939).

[197]  Ch. 64, 42 Stat. 159.

[198]  *See* 61 CONG. REC. 2495–99 (1921) (summarizing the differences between the House and Senate committee bills).

[199]  *See id.* at 2710 (reprinting sections 12(g) and 15 of S. 659, 67th Cong. (1921)).

[200]  *See id.* (reprinting sections 20 and 21 of S. 659, 67th Cong. (1921)).

[201]  *Id.* at 2493.

rule or regulation which imposes an almost impossible condition of af-
fairs upon a man engaged in one of these businesses."[202]  Senator Nor-
ris defended the rulemaking provision, stating:

> I am one who has always looked with a jealous eye upon the granting of
> power to convict any man or establish a criminal offense for the violation
> of a rule or regulation that is not set out in the statute; but we can not set
> out here — no living man could set out here — every rule and every regu-
> lation that will be necessary to properly care for this big business.[203]

In the end, the bill that Congress passed into law reflected some-
thing of a compromise between the House and Senate views.  The Act
had four titles.  Title I provided general definitions, Title II set forth
the statutory provisions regulating packers, Title III regulated stock-
yards, and Title IV included the general provisions of the Act.[204]  Title
III subjected stockyard operators to penalties for violations of the rules
and regulations promulgated by the Secretary under a specific rule-
making grant included in that title.[205]  Title II, however, did not in-
clude a specific rulemaking grant with respect to the packers.  In addi-
tion, Congress included a general rulemaking grant in Title IV, but no
penalties were attached to this grant.[206]  There is little doubt that the
rulemaking grant in Title III was understood to confer power to adopt
legislative rules.  To be sure, the conferees deleted any reference to
stockyard operators having a "duty" to comply with regulations or to
violations of regulations being "unlawful."  But the rulemaking grant
in Title III was coupled with a provision imposing criminal sanctions
for rule violations,[207] and was clearly understood to confer legislative
rulemaking authority.

The critical question is what the members of the House and Senate
understood the general rulemaking grant in Title IV to mean.  This
grant, unlike the one contained in Title III, contained no provision for
sanctions for rule violations.  Remarks by Senator Kenyon on the Sen-
ate floor explaining the compromise bill[208] indicate that Congress un-

---

[202] *Id.* at 2494.

[203] *Id.* at 2493.

[204] Packers and Stockyards Act, 1921, ch. 64, 42 Stat. 159.

[205] Section 306(a) required stockyard owners to file schedules of their rates with the Secretary,
and section 306(b) gave the Secretary the power to prescribe the form, manner, and detail of the
schedules.  *See id.* § 306(a), (b), 42 Stat. at 164 (codified at 7 U.S.C. § 207 (2000)).

[206] *Id.* § 407, 42 Stat. at 169 (codified as amended at 7 U.S.C. § 228).

[207] The Secretary's rules regarding the schedules were given legislative effect by Congress in
section 306(h), which provided that "[w]hoever willfully fails to comply with the provisions of this
section or of any regulations or order of the Secretary made thereunder shall on conviction be
fined not more than $1,000, or imprisoned not more than one year, or both."  *Id.* § 306(a), (b), (h),
42 Stat. at 164–65 (codified at 7 U.S.C. § 207).

[208] *See* 61 CONG. REC. 4642 (1921) (noting "three amendments [including amendment 17,
which provided that the Secretary may make rules and regulations] adopted by the Senate were

derstood the ambiguous grant in Title IV to authorize only procedural rules. He noted that this grant "gave the Secretary of Agriculture the right to establish rules and regulations *of procedure*," and characterized the provision as "not an especially important amendment."[209] The legislative history of the Packers and Stockyards Act thus offers an example of a grant coupled with sanctions understood to confer legislative power, combined with a grant lacking any provision for sanctions understood to authorize only housekeeping-type rules.

Congress also appeared to follow the convention when enacting subsequent statutes that created new agencies and delegated rulemaking power to them.[210] One prominent example is the Longshoremen's and Harbor Workers' Compensation Act of 1927.[211] As enacted, the Act included a general rulemaking grant[212] but made no provision for sanctions for rules adopted under the grant. The *Final Report* of the Attorney General's Committee of 1941 confirms that the statute did not confer legislative rulemaking power: it noted that the United States Employees' Compensation Commission, the administrative agency initially charged with implementing the Act, was one of the "[r]elatively few" agencies that lacked the power to prescribe regulations having the force and effect of law.[213]

2. *New Deal-Era Rulemaking Grants.* — With the advent of the New Deal, Congress increased the pace at which it created new agen-

---

retained in conference. On the remaining Senate amendments the Senate conferees were compelled to accede to the insistence of the House conferees").

[209] *Id.* at 4643 (emphasis added).

[210] For example, the Federal Water Power Act, passed in 1920, is consistent with the convention. *See* Federal Water Power Act, ch. 285, 41 Stat. 1063 (1920). Section 4(h) of the Act gave the Federal Power Commission general rulemaking powers, authorizing it to "perform any and all acts, to make such rules and regulations, and to issue such orders not inconsistent with this Act as may be necessary and proper for the purpose of carrying out the provisions of this Act." *Id.* § 4(h), 41 Stat. at 1067. Section 25 of the Act provided criminal penalties for violations of the Commission's rules and regulations, and section 26 granted the Attorney General the power to institute proceedings for the revocation of licenses whenever any licensee violated the rules or regulations of the Commission. *Id.* §§ 25–26, 41 Stat. at 1076.

[211] Ch. 509, 44 Stat. 1424.

[212] Section 39 provided: "Except as otherwise specifically provided, the United States Employees' Compensation Commission shall administer the provisions of this Act, and for such purpose the commission is authorized . . . to make such rules and regulations . . . as may be necessary in the administration of this Act." *Id.* § 39, 44 Stat. at 1442. The current version of the Act is substantially the same, except that the rulemaking grant runs to the Secretary of Labor. *See* 33 U.S.C. § 939(a) (2000).

[213] *See* FINAL REPORT, *supra* note 29, at 98 n.18. The Act was amended in 1958 to give the Secretary of Labor power to issue safety regulations. *See* Longshoremen's and Harbor Workers' Compensation Act amendment, Pub. L. No. 85-742, § 41(a), 72 Stat. 835, 835 (1958) (codified as amended at 33 U.S.C. § 941(a) (2000)). The amended Act specifically made the violation of these regulations — unlike regulations issued under the original Act — an offense punishable by criminal fines. *Id.* § 41(f), 72 Stat. at 836 (codified as amended at 33 U.S.C. § 941(f)). Under the convention, therefore, the safety regulations were clearly legislative.

cies. There is no evidence, however, of any change in the convention for differentiating between legislative and housekeeping grants. For example, the Securities Act of 1933,[214] the Securities Exchange Act of 1934,[215] and the Motor Carrier Act of 1935[216] all contained facially ambiguous general rulemaking grants. In each case, these statutes also included provisions giving teeth to the rules promulgated under the acts — such as criminal penalties or fines — and empowered the agencies charged with administering the statutes to bring suit to enforce their rules and regulations. These statutes have always been regarded as conferring legislative rulemaking authority.[217]

---

[214] Ch. 38, 48 Stat. 74. Section 19(a) of the 1933 Act gave the SEC broad general rulemaking powers by authorizing it "from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this title." *Id.* § 19(a), 48 Stat. at 85 (codified as amended at 15 U.S.C. § 77s(a) (2000)). Congress gave teeth to the rules and regulations promulgated by the SEC through two statutory sections. First, section 20(b) gave the SEC the power to bring an action in any district court to enjoin acts or practices that constitute or will constitute a violation of the provisions of the Act, or any rule or regulations prescribed under the Act. *Id.* § 20(b), 48 Stat. at 86 (codified as amended at 15 U.S.C. § 77t). Second, section 24 provided that "[a]ny person who willfully violates any of the provisions of this title, or the rules and regulations promulgated by the Commission under authority thereof . . . shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both." *Id.* § 24, 48 Stat. at 87 (codified as amended at 15 U.S.C. § 77x). According to the convention, these two statutory provisions indicate Congress's intent to give the SEC the authority to bind persons outside the agency with the force of law.

[215] Ch. 404, 48 Stat. 881. Section 23(a) provided that "[t]he Commission and the Federal Reserve Board shall each have power to make such rules and regulations as may be necessary for the execution of the functions vested in them by this title." *Id.* § 23(a), 48 Stat. at 901 (codified as amended at 15 U.S.C. § 78w(a)(1)). According to the convention, Congress indicated its intent to give legislative effect to these rules and regulations through two statutory provisions. First, section 21(e) gave the SEC the power to bring an action seeking to enjoin the violation of any rule or regulation promulgated under the Act. *Id.* § 21(e), 48 Stat. at 900 (codified as amended at 15 U.S.C. 78u). Second, section 32 set forth penalties for violations of any rules or regulations promulgated by the SEC. *Id.* § 32, 48 Stat. at 904–05 (codified as amended at 15 U.S.C. § 78ff).

[216] Ch. 498, 49 Stat. 543 (repealed 1983). Although the ICC was not given general rulemaking powers in the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887) (repealed 1978), section 204(a)(6) of the Motor Carrier Act gave the ICC general legislative rulemaking powers over motor carriers. *See* Motor Carrier Act, 1935, § 204(a)(6), 49 Stat. at 546. Section 204(a)(6) provided that the ICC has the power "[t]o administer, execute, and enforce all other provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations and procedure for such administration." *Id.* Congress indicated its intent to give these rules and regulations legislative effect in sections 222(a) and (b). *See id.* § 222(a), 49 Stat. at 564 ("Any person knowingly and willfully violating any provision of this part, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not more than $100 for the first offense and not more than $500 for any subsequent offense."); *id.* § 222(b), 49 Stat. at 564 ("If any motor carrier or broker operates in violation of . . . any rule, regulation, requirement, or order . . . the Commission or its duly authorized agent may apply to the district court of the United States for any district where such motor carrier or broker operates, for the enforcement of such provision of this part, or of such rule, regulation, requirement, order, term, or condition.").

[217] *See* FINAL REPORT, *supra* note 29, at 98–99.

Case 2:24-cv-01743-KBH   Document 62   Filed 07/01/24   Page 362 of 504

The National Labor Relations Act (NLRA) of 1935,[218] by contrast, contained a facially ambiguous general rulemaking grant but lacked any textual signal indicating Congress's intent to attach legislative effect to such rules. Section 6(a) provided: "[t]he Board shall have authority from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this Act."[219] However, the Act did not give the NLRB the power to enjoin or prosecute violations of the rules promulgated under this grant, nor did it provide any statutory penalties for nonconformance with the NLRB's rules and regulations. According to the convention, these omissions indicate that Congress did not intend to grant legislative rulemaking powers to the NLRB.

The legislative history of the NLRA substantiates this conclusion. Upon consideration of different versions of the bill, one Senator made a proposal to limit the NLRB's rulemaking powers under what became section 6(a) to such "*reasonable* rules and regulations as may be necessary to carry out the provisions of this Act."[220] However, the proposal was rejected because, according to a Senate memorandum, "[i]n no case do the rules have the force of law in the sense that criminal penalties or fines accrue for their violation, and it seems sufficient that the rules prescribed must be 'necessary to carry out the provisions' of the act."[221] The *Final Report* of the Attorney General's Committee of 1941 confirms this legislative history: it notes that the NLRB's "power to 'make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this chapter' has been assumed to extend only to matters of procedure."[222]

Perhaps the strongest evidence of the continued operation of the convention during the New Deal years appears in statutes that contain multiple rulemaking grants. Several important New Deal measures, including the Social Security Act of 1935,[223] the Walsh-Healey Act of

---

[218] Ch. 372, 49 Stat. 449. For a further discussion of the general rulemaking grant included in the NLRA and of its legislative history, see *infra* section V.B.3, pp. 565–67.

[219] National Labor Relations Act, § 6(a), 49 Stat. at 452 (codified as amended at 29 U.S.C. § 156 (2000)).

[220] S. 2926, 73rd Cong. § 7 (1934), *reprinted in* 1 LEGISLATIVE HISTORY OF THE NATIONAL LABOR RELATIONS ACT, 1935, at 1090 (1949) (emphasis added).

[221] *See* COMPARISON OF S. 2926 (73D CONGRESS) AND S. 1958 (74TH CONGRESS) 24 (Comm. Print 1935), *reprinted in* 1 LEGISLATIVE HISTORY OF THE NATIONAL LABOR RELATIONS ACT, 1935, *supra* note 220, at 1349. The Senate memorandum further noted that the insertion of the word "reasonable" could only result in confusion and would not make any change of substance. *Id.* at 1350.

[222] *See* FINAL REPORT, *supra* note 29, at 98 n.18 (citation omitted).

[223] Ch. 531, 49 Stat. 620.

JA0359

*HARVARD LAW REVIEW* [Vol. 116:467]

1936,[224] and the Food, Drug, and Cosmetic Act of 1938,[225] share this trait.

As originally adopted in 1935, the Social Security Act contained both a general grant of rulemaking power and several more specific rulemaking grants.[226] Congress specified no legal consequences for violations of rules promulgated under the general grant. It was understood that this provision did not authorize legislative rules.[227] In contrast, the Act did attach sanctions to rules and regulations promulgated under specific rulemaking grants included in the statute,[228] and under the convention these would authorize legislative rules.[229]

The Walsh-Healey Act, which Congress enacted to regulate federal government contracts, also contained both a general rulemaking grant and specific, narrower rulemaking grants.[230] The Act gave the Secretary of Labor the "authority from time to time to make, amend, and

---

[224] Ch. 881, 49 Stat. 2036.

[225] Ch. 675, 52 Stat. 1040.

[226] *See* Social Security Act, § 1102, 49 Stat. at 647 (setting forth, in Title XI concerning the "general provisions" of the Act, a grant giving the Secretary of the Treasury, the Secretary of Labor, and the Social Security Board the power to make rules and regulations "necessary to the efficient administration of the functions with which each is charged under this Act").

[227] *See* FINAL REPORT, *supra* note 29, at 98 nn.18–19 (listing the Social Security Board as an example of an agency that was given the power to act via case-by-case adjudication but was "not given power to elaborate the law they apply by adopting general regulations").

[228] For example, section 808 of Title VIII, which dealt with taxes with respect to employees, gave the Commissioner of Internal Revenue the power to "make and publish rules and regulations for the enforcement of this title." Social Security Act § 808, 49 Stat. at 638. Section 810(a) gave teeth to the rules and regulations promulgated under section 808 by subjecting anyone who:

> [B]uys, sells, offers for sale, uses, transfers, takes or gives in exchange, or pledges or gives in pledge, except as authorized in this title or in *regulations made pursuant thereto*, any stamp, coupon, ticket, book, or other device, prescribed by the Commissioner of Internal Revenue under section 807 for the collection or payment of any tax imposed by this title, shall be fined not more than $1,000 or imprisoned for not more than six months, or both.

*Id.* § 810(a), 49 Stat. at 638 (emphasis added).

[229] In 1939, Congress adopted extensive amendments to the Social Security Act, including a new rulemaking grant. The new grant gave the Social Security Board "full power and authority to make rules and regulations." The rulemaking grant was facially ambiguous regarding whether it granted legislative, or merely interpretive, rulemaking authority. One provision of the amendments, however, mandated that when the Social Security Board denied a claimant benefits for failing "to submit proof in conformity with any regulation" issued under the general rulemaking grant, the court reviewing the denial of benefits "shall review only the question of conformity with such regulations and the validity of such regulations." Social Security Act Amendments of 1939, ch. 666, § 205(g), 53 Stat. 1360, 1370. In other words, the regulations, provided they were consistent with the Act, were to have legislative effect in determining eligibility for benefits. Because the statute specifically provided that a violation of a regulation could result in a sanction — denial of benefits — the new rulemaking grant authorized legislative rules under the convention.

[230] Walsh-Healey Act, ch. 881, 49 Stat. 2036 (1936); *see, e.g.*, *id.* § 4, 49 Stat. at 2038 (codified as amended at 41 U.S.C. § 38 (2000)) (granting the Secretary of Labor the authority to "administer the provisions of this Act . . . and to prescribe rules and regulations with respect thereto"); *id.* § 1(b), 49 Stat. at 2036 (codified as amended at 41 U.S.C. § 35) (stating that the Secretary of Labor will determine the minimum wage).

rescind such rules and regulations as may be necessary to carry out the provisions of this Act."[231]   The Act provided no sanctions for violations of the rules promulgated under this general grant.   By contrast, rules and regulations issued pursuant to section 6, which authorized the Secretary to make rules setting reasonable "exemptions" from the minimum rate and maximum hour provisions of the Act,[232] are legislative according to the convention, because such exemptions necessarily would affect the conduct of contractors by exempting them from the Act's requirements.

Support for this conclusion appears in a monograph on the Act prepared in 1939 for the Attorney General's Committee on Administrative Procedure, which summarized the significance of the differing treatment of rules and regulations promulgated under sections 4 and 6 as follows:

> The rules and regulations made by the Secretary under section 6 have vitality because they affect the nature of the performance required of a contractor.  For the rules and regulations under section 4, however, *no sanction* is provided; they have no dispositive effect, except in so far as they operate as controls upon the Division itself; as administrative interpretations of the statute they may be given respectful judicial consideration if the interpretations be contested in court actions, but they are not binding as acts of subordinate legislation having the force and effect of law.[233]

The Federal Food, Drug, and Cosmetic Act (FDCA)[234] similarly attached varying legal consequences to different rules and regulations based upon the source of rulemaking authority within the Act.  The FDCA repealed the Pure Food Act of 1906,[235] which did not confer legislative rulemaking authority over standards of identity for food or tolerances for poison residues in food.[236]  Because a primary goal of the 1938 Act was to give greater powers to the Secretary of Agricul-

---

[231] *Id.* § 4, 49 Stat. at 2038.

[232] *Id.* § 6, 49 Stat. at 2038–39 (codified at 41 U.S.C. § 40).

[233] ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, U.S. DEP'T OF JUSTICE, MONOGRAPH 1, THE WALSH-HEALEY ACT, at 68 (1939) (emphasis added).

[234] Ch. 675, 52 Stat. 1040 (1938).

[235] Ch. 3915, 34 Stat. 768 (repealed 1938).  The 1906 Act did include a general rulemaking grant, which provided that "the Secretary of the Treasury, the Secretary of Agriculture, and the Secretary of Commerce and Labor shall make uniform rules and regulations for carrying out the provisions of this Act." *Id.* § 3, 34 Stat. at 768–69.  This grant was understood to authorize only interpretive or procedural rules.  *See* Lee, *supra* note 79, at 9 (noting that the 1906 Act did not contain any specific authorization for the promulgation of legislative regulations and did not make observance of the regulations promulgated under the act compulsory).

[236] *See* Wesley E. Forte, *The GMP Regulations and the Proper Scope of FDA Rulemaking Authority*, 56 GEO. L.J. 688, 691 (1968).

ture,[237] Congress included important rulemaking provisions in the FDCA.[238]

The key rulemaking provisions appear in section 701, which has been described as "schizophrenic" because of the mixed rulemaking provisions included within it.[239] Section 701(a) granted general rule-making power to the Secretary, stating that the Secretary could "promulgate regulations for the efficient enforcement of this Act."[240] Then sections 701(e), (f), and (g) set forth detailed procedures, including procedures for public hearings and judicial review of regulations, that the Secretary was required to follow when promulgating regulations under certain enumerated, specific rulemaking grants.[241] Notably, section 701(e) does not refer to section 701(a), and therefore rules promulgated under section 701(a) are not subject to section 701(e)'s procedural safeguards.

Under the convention, the specific rulemaking provisions that were subject to the procedural safeguards of sections 701(e), (f) and (g) conferred *legislative* rulemaking authority.[242]  For example, section 401 gave the Secretary the power to promulgate regulations fixing standards of identity for food.[243]  Those regulations are given legislative effect by various sections that expressly make violations of section 401 regulations unlawful and subject to criminal penalties.[244]

---

[237] *See* Lee, *supra* note 79, at 18 (noting that "attempts to change over from a system of interpretive regulations to legislative regulations embodying definitions and standards of identity for all foods" were a part of the push for new comprehensive food and drug legislation).

[238] Congress initially charged the Secretary of Agriculture with administering the FDCA.  This power was transferred to the Federal Security Administrator in 1940, and later to the Secretary of Health, Education, and Welfare (HEW).  The Secretary of HEW delegated his powers under the Act to the FDA, which is a unit of HEW.  *See* 1 JAMES T. O'REILLY, FOOD AND DRUG ADMINISTRATION § 2:02 (1992) (explaining that Congress never created the FDA but that HEW instead delegated its powers under the FDCA to the FDA).

[239] Forte, *supra* note 236, at 693.

[240] Federal Food, Drug, and Cosmetic Act, ch. 675, § 701(a), 52 Stat. 1040, 1055 (1938) (codified at 21 U.S.C. § 371(a) (2000)).

[241] *Id.* § 701(e)–(g), 52 Stat. at 1055–56 (codified as amended at 21 U.S.C. § 371(e)–(g)).

[242] *Cf.* Robert H. Becker, *Thoughts for Food*, 28 FOOD DRUG COSM. L.J. 679, 685 (1973) ("For those areas in which the FDA is specifically authorized to promulgate substantive rules or regulations having the force and effect of law, e.g., food standards regulations, Section 701(e) provides that any person who is adversely affected may file objections and request a public hearing on those objections.").

[243] *See* Federal Food, Drug, and Cosmetic Act, § 401, 52 Stat. at 1046 (codified as amended at 21 U.S.C. § 341).

[244] The following provisions gave section 401 regulations legislative effect: (1) section 403(g), 52 Stat. at 1047 (codified as amended at 21 U.S.C. § 343(g)), which declared that a food shall be deemed "misbranded" if it failed to conform to any standard of identity promulgated under section 401; (2) section 301(a), 52 Stat. at 1042 (codified as amended at 21 U.S.C. § 331(a)), which made it unlawful to introduce into interstate commerce any "misbranded" food; (3) section 303(a), 52 Stat. at 1043 (codified as amended at 21 U.S.C. § 333(a)), which provided criminal penalties for introducing any "misbranded" food into interstate commerce; and (4) section 304, 52 Stat. at 1044–

In contrast to the regulations subjected to the procedural safeguards of section 701(e), nothing in the Act indicated that a regulation issued under the authority of section 701(a) would subject the violator to any sanction, penalty, or other legal consequence. This silence suggests Congress's intent to *withhold* legislative rulemaking powers under that section.[245]

Legislative history supports this conclusion. During debate on the Act, Congress divided sharply over whether to give the Secretary the power to promulgate definitions, standards, and regulations having the force and effect of law.[246] Congress ultimately granted specific legislative rulemaking powers to the Secretary only after intense debate about what procedural safeguards the Act should employ to constrain those powers.[247] In contrast to the serious attention Congress gave to the procedural safeguards set forth in sections 701(e), (f), and (g), the general rulemaking grant of section 701(a) passed almost unnoticed.[248] As one scholar writing in 1968 pointed out, the lack of attention paid to section 701(a), coupled with the absence of procedural safeguards attached to section 701(a) rulemaking, carry great significance because

---

45 (codified as amended at 21 U.S.C. § 334), which subjected any food that was "misbranded" to seizure and condemnation.

A similar analysis applies to the other rulemaking grants covered by section 701(e). For example, the following provisions gave section 403(j) regulations legislative effect: (1) section 403(j), 52 Stat. at 1046 (codified as amended at 21 U.S.C. § 343(j)), which declared that food that "purports to be or is represented for special dietary uses" shall be deemed "misbranded" if its label fails to "bear[] such information concerning its vitamin, mineral and other dietary properties as the Secretary [prescribes] by regulations"; (2) section 301(a), 52 Stat. at 1042 (codified as amended at 21 U.S.C. § 331(a)), which made it unlawful to introduce into interstate commerce any "misbranded food"; (3) section 303, 52 Stat. at 1043 (codified as amended at 21 U.S.C. § 333), which provided criminal penalties for introducing any "misbranded" food into interstate commerce; and (4) section 304, 52 Stat. at 1044–45 (codified as amended at 21 U.S.C. § 334), which subjected any misbranded food to seizure and condemnation. Similarly, the following statutory provisions gave section 406(b) regulations legislative effect: (1) section 406(b), 52 Stat. at 1049 (repealed 1960), which provided that "[t]he Secretary shall promulgate regulations providing for the listing of coaltar colors which are harmless and suitable for use in food and for the certification of batches of such colors"; (2) section 301(i), 52 Stat. at 1042 (codified as amended at 21 U.S.C. § 331(i)), which prohibited the unauthorized use of any mark, stamp, tag, or label authorized or required by the 406(b) regulations; and (3) section 303, 52 Stat. at 1043 (codified as amended at § 333), which provided criminal penalties for violating any of the provisions of section 301, including its prohibition of the unauthorized use of any marks, stamps, tags, or labels authorized or required by section 406(b) regulations.

[245] *See* Forte, *supra* note 236, at 693 n.29 (noting that there is no specific provision providing that a violation of section 701(a) is a violation of the Act and concluding that this omission is "probably due to the fact that Congress intended § 701(a) to authorize interpretive, not substantive, regulations").

[246] *See id.* at 692 (noting that serious questions were raised in Congress about both the advisability of authorizing legislative rulemaking and the procedural safeguards necessary to prevent arbitrary rules).

[247] *See id.* at 692–94.

[248] *See id.* at 693.

*HARVARD LAW REVIEW* [Vol. 116:467]

"[i]t seems inconceivable that Congress, after five years of debate on the procedural limitations to be placed on the promulgation of some substantive regulations, would authorize the issuance of other regulations having the force and effect of law without debate and without any procedural safeguards."[249]

Statements in Senate and House reports confirm that Congress did not intend section 701(a) to grant legislative rulemaking authority. A House Report, for example, described section 701 as follows:

> Section 701 relates generally to regulations. In the case of regulations, the violation of which constitutes an offense, it is required that appropriate notice of a public hearing be given and that adequate time shall be given after the promulgation of a regulation before it becomes effective. . . .
>
> Section 701(e), (f), and (g) of the committee amendment set forth the procedure governing the formulation and judicial review of certain regulations to be issued by the Secretary. . . .
>
> Such regulations are not merely interpretive. They have the force and effect of law and must be observed. Their violation may result in the imposition of criminal penalties, or in the confiscation of the goods involved if shipped in interstate commerce, or in their exclusion from the country if imported.[250]

This report indicates that key participants in the legislative process understood that by attaching sanctions to violations of certain rules and regulations, they elevated those regulations to legislative status. Given the understanding that these rules were legislative, Congress felt it necessary to attach important procedural safeguards to their issuance. No one urged the need to attach safeguards to rules promulgated under section 701(a), because those rules would carry only interpretive effect.

Overall, the text, structure, and legislative history of statutes Congress enacted through the end of the New Deal show a remarkably consistent adherence to the convention's framework for distinguishing between legislative and housekeeping grants. The key was not whether the rulemaking grant was general or specific. Members of Congress referred to the presence or absence of sanctions as the basis for distinguishing between legislative and housekeeping grants on sev-

---

[249] *Id.* at 694; *see also* Becker, *supra* note 242, at 681–82 ("In light of this history of express and specific safeguards governing the authority to issue the substantive regulations authorized by the statute, it seems strange to suggest that the same statute was also intended to authorize the issuance of other unspecified regulations having the force and effect of law, whose violation could also result in the imposition of criminal penalties, without any provision for hearings and with judicial review essentially limited to whether the Agency action is arbitrary or capricious."); Merrill S. Thompson, *FDA — They Mean Well, But . . .*, 28 FOOD DRUG COSM. L.J. 205, 209 (1973) ("It simply doesn't make sense that Congress would bother with 701(e) if it intended to give the Commissioner such powers under 701(a).").

[250] H.R. REP. NO. 75-2139, at 9–10 (1938).

eral occasions when debating rulemaking grants[251] but did not refer to the generality of rulemaking grants as a basis for making such distinctions. In fact, Congress occasionally adopted very general rulemaking grants and attached sanctions to violations of rules issued under them in the *same section of an act*, thereby signaling that the rules promulgated under the grant would be treated as binding.[252]

Despite the strength of the evidence supporting the existence of the convention, there is at least one rulemaking grant from the New Deal era in which the convention does not seem to capture congressional intent: the general rulemaking grant found in Title I of the Communications Act of 1934.[253] The problem stems from the mixture of regulatory schemes that Congress borrowed from other acts in putting together the Communications Act.[254] Title I, which copied many of its provisions from the ICA, sets forth the Act's general organizational provision. Section 4(i) of Title I contains a general rulemaking grant providing that the FCC "may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act as may be necessary in the execution of its functions."[255] Title II governs common carriers. Title III, which regulates broadcasting, borrowed many of its provisions from the Radio Act of 1927,[256] including

---

[251] *See* Comparison of S. 2926 (73d Congress) and S. 1958 (74th Congress), *supra* note 221, at 1319, 1349 ("In no case [S. 2926 or S. 1958] do the rules have the force of law in the sense that criminal penalties or fines accrue for their violation. . . ."); *see also* H.R. Rep. No. 75-2139, at 9–10 (1938) (containing FDCA legislative history).

[252] For example, the Taylor Grazing Act of 1934, ch. 865, 48 Stat. 1269, included in section 2 a general rulemaking grant and also specified the sanctions for violating rules promulgated under it:

> The Secretary of Interior shall make provision for the protection, administration, regulation, and improvement of such grazing districts as may be created under the authority of the foregoing section, and he shall *make such rules and regulations and establish such service, enter into such cooperative agreements, and do any and all things necessary to accomplish the purposes of this Act* and to insure the objects of such grazing districts, namely, to regulate their occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, to provide for the orderly use, improvement, and development of the range; . . . *and any willful violation of the provisions of this Act or of such rules and regulations thereunder after actual notice thereof shall be punishable by a fine of not more than $500.*

*Id.* § 2, 48 Stat. at 1270 (codified at 43 U.S.C. § 315a (2000)) (emphasis added).

[253] Ch. 652, 48 Stat. 1064.

[254] *See* Glen O. Robinson, *The Federal Communications Act: An Essay on Origins and Regulatory Purpose*, *in* A Legislative History of the Communications Act of 1934, at 3, 5 (Max D. Paglin ed., 1989) ("To be sure the provisions borrowed from the Interstate Commerce Act were specifically reworded to apply specially to communications carriers, but they are largely transplants from another regulatory regime all the same."); *see also* S. Rep. No. 73-781 (1934), *reprinted in* A Legislative History of the Communications Act of 1934, *supra*, at 711, 711–12 (explaining that the Communications Act borrows and rearranges provisions of the ICA and the Radio Act of 1927).

[255] Communications Act, ch. 652, § 4(i), 48 Stat. at 1068 (codified as amended at 47 U.S.C. § 154(i) (2000)).

[256] Ch. 169, 44 Stat. 1162.

several specific rulemaking grants.[257]  Title IV includes the Act's procedural and administrative provisions.  Finally, Title V contains the Act's penal provisions.  One provision of Title V, section 502, sets forth a general provision subjecting any person who violates any rule or regulation issued under the Act to criminal penalties.[258]

If we apply the convention to the Communications Act, the omnibus provision of criminal sanctions for rule violations in section 502 has the effect of transforming all rulemaking grants in the Act — including the grant in section 4(i) — into grants of legislative rulemaking authority.  Given the structure and history of the Act, however, it is doubtful that this is what Congress intended.  Section 4(i) was based on section 17 of the ICA,[259] which granted only procedural rulemaking powers.  In addition, section 4(i) appears in Title I amid provisions relating to the general administrative organization of the FCC — far away from the penal provisions in section 502 of Title V.[260]  Finally, section 4(i) was part of the original draft bill and passed through the

---

[257] *See, e.g.*, Communications Act, § 303(f), 48 Stat. at 1082 (codified as amended at 47 U.S.C. § 303(f)) (giving the FCC power to "[m]ake such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this Act"); *id.* § 303(i), 48 Stat. at 1082 ((codified at 47 U.S.C. § 303(i)) giving the FCC the "authority to make special regulations applicable to radio stations engaged in chain broadcasting"); *id.* § 303(j), 48 Stat. at 1082 (codified at 47 U.S.C. § 303(j)) (granting the FCC the power to "make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals as it may deem desirable"). In 1937, Title III of the Communications Act was amended to add a provision authorizing the FCC to "[m]ake such rules and regulations and prescribe such restrictions and conditions not inconsistent with law, as may be necessary to carry out the provisions of this Act." Amendments to the Communications Act of 1934, ch. 229, § 6(b), 50 Stat. 189, 191 (1937) (adding section 303(r)). All of these various rulemaking grants included within Title III were given legislative effect by section 312(a), which provided for license revocation if any licensee violated any of the Commission's regulations. Communications Act, § 312, 48 Stat. at 1086–87 (codified as amended at 47 U.S.C. § 312(a)).

[258] Section 502, which was part of the 1934 Act, subjects any person "who willfully and knowingly violates any rule, regulation, restriction, or condition" imposed by the FCC under the authority of the Communications Act to a fine of up to $500 for each day during which such offense occurs. Communications Act, § 502, 48 Stat. at 1100–01 (codified at 47 U.S.C. § 502).

[259] A comparison of the language used in section 17 of the ICA with sections 4(h) through (j) of the Communications Act shows that section 4(i) was based upon section 17 of the ICA. *Compare* Communications Act, § 4(i), 48 Stat. at 1068 (codified as amended at 47 U.S.C. § 154(i)) ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this Act, as may be necessary in the execution of its functions."), *with* Interstate Commerce Act, ch. 104, § 17, 24 Stat. 379, 385–86 (1887) (repealed 1978) ("Said Commission may, from time to time, make or amend such general rules or orders as may be requisite for the order and regulation of proceedings before it, including forms of notices and the service thereof, which shall conform, as nearly as may be to those in use in the courts of the United States.").

[260] Section 502, 48 Stat. at 1100, borrowed language from section 32 of the Radio Act of 1927. *See* Radio Act of 1927 ch. 169, § 32, 44 Stat. 1162, 1173 (repealed 1934); *see also* S. REP. NO. 73-781 (1934), *reprinted in* A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934, *supra* note 254, at 711, 721 (explaining that section 502, which provides penalties for violations of rules and regulations of the FCC, is "copied from section 32 of the Radio Act").

legislative process without comment or change.[261]   It was not even deemed significant enough to warrant a summary in the Senate, House, or Conference Committee reports.[262]   It is most unlikely that this provision would have been entirely uncontroversial if it had been understood as conferring general legislative rulemaking authority on the FCC.[263]

The Communications Act suggests that Congress was not infallibly attentive to the drafting convention in signaling which rulemaking grants are legislative and which are not.   The most likely explanation for this oversight, in the case of section 4(i) of the Communications Act, is that the general rulemaking grant drew so little attention, and was physically placed in the statute at such a great distance from section 502, that no one noticed section 502 was written in such a way that it literally applied to section 4(i).   Had someone noticed the interaction between section 4(i) and section 502, we suspect that section 502 would have been revised to make clear that the penal provision reached only those rules issued under specific rulemaking grants included in the Communications Act, such as those rulemaking provisions borrowed from the Radio Act and placed in Title III.   But apparently no one noticed.   The Communications Act thus presents an example of a statute in which the inference of legislative intent drawn from the application of the convention should probably be disregarded, given other, contrary evidence of legislative intent.[264]

---

[261] *Compare Hearings on S. 2910 Before the Senate Comm. on Interstate Commerce*, 73d Cong. 4 (1934), *reprinted in* A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934, *supra* note 254, at 123, 126 (reprinting original proposed bill), *with* Communications Act, § 4(i), 48 Stat. at 1068 (text of statute as enacted).

[262] *See* H.R. REP. NO. 73-1918, at 45–46 (1934), *reprinted in* A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934, *supra* note 254, at 733, 777–78; H.R. REP. NO. 73-1850, at 4–5 (1934), *reprinted in* A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934, *supra* note 254, at 723, 726–27; S. REP. NO. 73-781, at 3 (1934), *reprinted in* A LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT OF 1934, *supra* note 254, at 711, 713.

[263] As enacted in 1934, Title II (pertaining to common carriers) did not contain a general rulemaking grant. Thus, if section 4(i) had been understood to confer legislative rulemaking authority regarding all of the FCC's functions, this provision would have significantly expanded the agency's authority over interstate telephone and telegraph carriers. *See infra* note 264. Although they have not framed their discussion in terms of the convention, the courts have been uncomfortable with a broad reading of section 4(i). *See, e.g.*, California v. FCC, 905 F.2d 1217, 1240 n.35 (9th Cir. 1990); AT&T Co. v. FCC, 487 F.2d 865, 876–78 (2d Cir. 1973). The question whether section 4(i) authorizes legislative rules was briefed in *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366 (1999), but was not mentioned in any of the opinions. *Compare* Brief for California at 46 n.21, *Iowa Utilities Board* 525 U.S. 366 (1999) (Nos. 97-826, 97-829, 97-830, 97-831, 97-1075, 97-1087, 97-1099, 97-1141) (arguing that section 4(i) is not a grant of legislative authority), *with* Brief for FCC at 19 n.5, FCC v. Iowa Utilities Bd. (No. 97-831) (arguing that Congress gave the FCC expansive general rulemaking powers and pointing to the codified version of section 4(i) as a source of those rulemaking powers).

[264] In 1938, Congress amended section 201 of Title II of the Communications Act to add a general grant of authority to "prescribe such rules and regulations as may be necessary in the public

### D. The Office of Legislative Counsel

One notable institutional development took place at approximately the same time Congress began systematically following the convention: the creation of the Office of Legislative Counsel in both the Senate and the House.[265]   The offices began as a pilot project organized by Columbia Law School in 1916 but became permanent two years later.[266] According to Frederic P. Lee, one of the lawyers who served in both the House and Senate offices in their early days,[267] the offices were

---

interest to carry out the provisions of this Act." Amendments to the Communications Act, ch. 296, 52 Stat. 588, 588 (1938) (codified at 47 U.S.C. § 201(b)). Although the language of this additional rulemaking grant appears to be very broad, the legislative history suggests that its intended scope was narrowly confined to matters concerning the furnishing of reports of positions of ships at sea. One senator explained during debate on the Senate floor that the amendment "relates only to information which comes from vessels at sea as to their location." 83 CONG. REC. 6291 (1938) (statement of Sen. White); *see also* S. REP. NO. 75-1652, at 3 (1938) (noting that the amendment allows free reporting services regarding ships at sea, but that it subjects this free service "to rules, regulations, and limitations which the Commission finds desirable in the public interest"). Nonetheless, in *Iowa Utilities Board*, the Supreme Court held that section 201(b) constitutes a general grant of legislative rulemaking authority that extends to all of the FCC's jurisdiction over common carriers. *Iowa Utilities Board*, 525 U.S. at 377–78. Justice Scalia's opinion for the Court contained no discussion of the history of section 201(b), which suggests a far narrower purpose for that grant.

   Whether *Iowa Utilities Board* was correct about section 201(b) if we view the matter through the lens of the convention is a closer call than the question whether section 4(i) should be regarded as a grant of legislative rulemaking authority. Obviously, the omnibus penal provision in section 502 also applies to section 201(b), making section 201(b) presumptively legislative under the convention. And section 201(b), unlike section 4(i), is not in a separate title of the Act dealing with definitions and administrative provisions, nor was it borrowed from another statute that conferred only procedural authority. The correct analysis here probably turns on whether one is willing to credit the sort of legislative history that appears in committee reports and floor statements that bear on legislative purpose (a large topic beyond the scope of this Article). If one is willing to credit such materials, then the presumptive conclusion about section 201(b) drawn from the convention should probably be overcome by evidence that Congress intended this grant to apply only to locational signals from vessels at sea. If one is not willing to credit this kind of evidence, but only the inferences that can be drawn from the text of statutes (which of course is Justice Scalia's general position, *see* Scalia, *supra* note 55, at 29–37), then the presumptive conclusion based on the convention should probably stand and the Court was correct in *Iowa Utilities Board* to conclude that section 201(b) confers general legislative authority over all matters within the FCC's jurisdiction under Title II.

[265] For background, see GEORGE B. GALLOWAY, THE LEGISLATIVE PROCESS IN CONGRESS 409 (1953); KENNETH KOFMEHL, PROFESSIONAL STAFFS OF CONGRESS 183–200 (1962); and Frederic P. Lee, *The Office of the Legislative Counsel*, 29 COLUM. L. REV. 381 (1929). For an interesting case study that discusses the continuing importance of this office, see Victoria F. Nourse & Jane S. Schacter, *The Politics of Legislative Drafting: A Congressional Case Study*, 77 N.Y.U. L. REV. 575, 588–90 (2002).

[266] *See* Lee, *supra* note 265, at 385–86.

[267] Lee served as Assistant Legislative Counsel to the U.S. House of Representatives from 1919 to 1923 and as Legislative Counsel to the U.S. Senate from 1923 to 1930. *See* Lee, *supra* note 79, at 1 n.*.   Later he served as Special Counsel to the Secretary of Agriculture. *Id.*   Both the House and Senate Offices of Legislative Counsel in these years were small and were staffed by attorneys with extensive experience. *See* GALLOWAY, *supra* note 265, at 409 (noting that the principal at-

strictly nonpartisan and professional.[268]  Their functions included providing legal research to members of Congress, reviewing and commenting on proposed legislation, and most importantly, drafting bills.[269]  In drafting legislation, the lawyers in the offices paid particular attention to problems of constitutionality, administrability, and judicial review.  As Lee recounted:

> In all matters of drafting, knowledge of constitutional and administrative law is invaluable. . . . [M]ost of the complex legislative problems today involve extensive executive machinery for enforcement and administration. In the legislative provision for this machinery there must be met the many administrative and constitutional law problems involved in the form in which executive action may properly express itself and in the judicial review of such action.[270]

We are not aware of any direct evidence about the kind of advice the Offices of Legislative Counsel provided to members of Congress concerning how to signal whether a statute authorized legislative rulemaking.  But one very powerful piece of circumstantial evidence exists.  Lee published another article in the *Georgetown Law Journal* in 1940 detailing how to distinguish between legislative and interpretive regulations.[271]  In this article, Lee used the term "substantive" to describe two types of rules: "legislative" regulations, which prescribe what the law shall be and have the force and effect of law; and "interpretive" regulations, which merely construe a statute and do not have the force and effect of law.[272]  According to Lee, whether a "substantive" regulation is "legislative" or "interpretive" depends upon the grant of rulemaking authority in the statute, and in particular, whether Congress specified some sanction for violation of the rules.[273]  As Lee

---

torney in the House Office served for thirty years, from 1919 to 1949); Harry W. Jones, *Bill-Drafting Services in Congress and the State Legislatures*, 65 HARV. L. REV. 441, 444 (1952) (stating that in 1951 there were ten lawyers on the House side and eleven lawyers on the Senate side). The website of the House Office of Legislative Counsel observes that the "Office has traditionally been career-oriented, with unusually low turnover among the legal staff." *See* http://legcoun. house.gov/about.html (last modified July 16, 2002).

[268]  Lee, *supra* note 265, at 397–98.

[269]  *See generally id.* at 388–97 (describing the Senate office's many functions).

[270]  *Id.* at 391.

[271]  Lee, *supra* note 79.

[272]  *Id.* at 2.

[273]  *Id.* at 3. Lee further explains:

> The clear situations involving legislative regulations are those where non-conformity to the regulations results in criminal penalties or civil penalties or penalty taxes; or where non-compliance may result in exclusion of goods from importation or exportation, or in their forfeiture; or where non-compliance may result in denial, suspension or revocation of permits or other privileges or in denial of subsidy or benefit payments; where taxes are directed to be computed on the basis of such regulations; or where Congress authorizes regulations prescribing tolerances, variations, or exemptions relaxing a statutory rule.  In addition Congress may in the statute declare specifically that the regulations shall have the force and effect of law.  More often a statute granting authority to make

explained, if the "power to prescribe a substantive regulation is delegated by statute, but *no sanctions* are imposed by statute for failure to conform to the regulation, then it is interpretive."[274]  Only if the statute provides legal sanctions for violations of the regulations do those regulations have the force and effect of law.[275]

The implications of Lee's *Georgetown* article are considerable.  His comments about how one identifies a grant of legislative, as opposed to interpretive, rulemaking authority exactly track the convention we have described.  This understanding almost certainly reflects his extensive tenure as an attorney in the House and Senate Offices of Legislative Counsel — a tenure that coincided with the period during which Congress routinely observed the convention.  Since the members of Congress frequently called upon the attorneys in the Offices of Legislative Counsel for assistance in drafting statutes to create administrative agencies and to confer powers on them,[276] and since the attorneys sought to implement faithfully the wishes of their superiors,[277] one can only conclude that the convention described by Lee was the device used by the attorneys in these offices to signal the intentions of Congress.[278]

Lee's views about how to distinguish between legislative and interpretive grants of rulemaking authority are generally consistent with

---

regulations attaches none of these sanctions to the regulations, is silent as to their force and effect, and is intended to cover only interpretive regulations or regulations affecting internal departmental functions.  Particularly is this so of the usual broad grants that authorize "such regulations as may be necessary to carry out the provisions of this Act" or which are similarly phrased, sometimes with the additional requirement that the regulations be "not inconsistent with law."

*Id.* at 19–21 (footnotes omitted).

[274] *Id.* at 3 (emphasis added).

[275] *Id.* at 21.

[276] *See supra* notes 269–270 and accompanying text.

[277] *See* Lee, *supra* note 265, at 398.

[278] In one instance, we have direct evidence that a senior attorney in the Office of Legislative Counsel played a role in formulating the language defining an important rulemaking power. Lee's superior in the House Office of Legislative Counsel from 1919 to 1923 was Middleton Beaman, who would continue to serve as the first legislative draftsman in the House Office until 1949.  *See* GALLOWAY, *supra* note 265, at 409.  James Landis, who was closely involved in the drafting of the Securities Act of 1933, reported that Beaman suggested (and Congress accepted) changes to the wording of the section of the Act that imposes sanctions on persons who violate rules promulgated by the SEC.  *See* James M. Landis, *The Legislative History of the Securities Act of 1933*, 28 GEO. WASH. L. REV. 29, 36–38 (1959).  Beaman appears fully to have shared Lee's views about the importance of paying close attention to provisions of bills defining agency powers.  As he wrote in an early article:

Of course I do not mean that a statute should leave nothing to administrative discretion, for it may well be that the most effective administrative device is to create an administrative board to make rules and regulations; but what I wish to make clear is that the administrative machinery, whatever it may be, whether court procedure, penalty provisions, or what not, must be carefully worked out.

Middleton Beaman, *Bill Drafting*, 7 LAW LIBR. J. 64, 68 (1914).

other legal commentary in the New Deal period, up to and beyond the enactment of the APA.[279] For example, in a monograph written in the early 1950s, Frank Cooper of Michigan Law School enumerated those circumstances in which congressional intent to authorize legislative rulemaking was clear: where "the statute specifically declares that the regulations shall have the force and effect of law"; where "the statute provides penalties that will result from noncompliance with the regulations"; where the statute makes "noncompliance with the regulations a ground for revocation of permits or licenses"; or where the statute authorizes "regulations which will relax a statutory rule otherwise applicable."[280] Cooper further noted that many statutes contain general rulemaking grants that are facially ambiguous regarding whether they authorize legislative or interpretive rulemaking. In such cases, he wrote, "the courts usually treat the regulation on the same basis as in cases where there can be no doubt but that the regulation is merely interpretative."[281]

## E. *The Administrative Procedure Act*

If the prevailing understanding was that agencies could make rules with the force of law only if Congress had provided by statute some sanction for violations of those rules, one would expect to find this understanding reflected in the language and legislative history of the APA. Insofar as legislative history is concerned, such evidence abounds in the work of the Attorney General's Committee on Administrative Procedure, a blue-ribbon committee appointed by President Roosevelt in the late 1930s to undertake a comprehensive survey of administrative agencies and their procedures.[282] The committee pro-

---

[279] *See* sources cited *infra* note 281. A notable exception to this generalization is tax scholarship. As described more fully in section VI.C *infra*, pp. 574–75, tax specialists writing around the same time as Lee opined that the relevant distinction was between general and specific grants of rulemaking authority. *See infra* notes 604–612 and accompanying text.

[280] FRANK E. COOPER, ADMINISTRATIVE AGENCIES AND THE COURTS 277–78 (1951).

[281] *Id.* at 278–79; *see also* HART, *supra* note 20, at 173 ("Congress can delegate a power of regulation for defined purposes and provide for the punishment of violations of the resulting ordinances, . . . [but] it must be made clear by Congress that the violation of the particular type of ordinance in question is meant to be punished."); Hans J. Morgenthau, *Implied Regulatory Powers in Administrative Law*, 28 IOWA L. REV. 575, 582 (1943) (noting that whereas "legislative regulations lay down the law and have the force and effect of law, deriving from a specific delegation of power and supported by statutory sanctions, interpretative regulations only construe the statute and have no more the force and effect of law than the interpretation of a private individual"); Olverson, *supra* note 79, at 640 ("If the statute provides that nonconformance to the regulation will result in the imposition of legal sanctions specified by Congress, the regulation is legislative and has the force and effect of the statute itself. A regulation is said to be interpretive if the power to issue it is delegated by statute, but the statute does not impose legal sanctions for failure to conform to the regulation.").

[282] *See* Clark Byse, *In Memoriam: Walter Gellhorn: Administrative Law Scholar, Teacher, Reformer*, 96 COLUM. L. REV. 589, 590–91 (1996). For a detailed history of the APA, see George B.

duced twenty-seven monographs that described the decisionmaking processes of various agencies and a summary report entitled *Administrative Procedure in Government Agencies*,[283] better known as the committee's *Final Report*.[284]  Both the monographs and the *Final Report*, which are considered "classics of administrative law scholarship" and which laid the intellectual groundwork for the drafting of the APA,[285] contain statements that confirm the existence of the convention.  The *Final Report*, for example, distinguishes between interpretive and legislative regulations by focusing on whether the statute imposes sanctions to compel observance of the regulations.[286]  It explains that the "statutes themselves and not the regulations remain in theory the sole criterion of what the law authorizes or compels and what it forbids."[287]  Specifically, the *Final Report* describes legislative regulations as follows:

> Many statutes contain provisions which become fully operative only after exercise of an agency's rule-making function.  Sometimes the enjoyment of a privilege is made conditional upon regulations, as, for example, where Congress permits the importation of an article "upon such rules and regulations as the Secretary of the Treasury may prescribe," or allows utilization of public forests in accord with regulations to be laid down by administrative officers.  Sometimes the extent of an affirmative duty is to be fixed by regulations, as, for example, where employers are commanded to pay wages not less than those prescribed in administrative regulations.  Sometimes a prohibition is made precise by regulations, as, for example, where the sale of dangerous drugs is forbidden and the determination of what drugs are dangerous is left to administrative rules.  In such instances the striking characteristic of the legislation is that *it attaches sanctions to compel observance of the regulations,* by imposing penalties upon or withholding benefits from those who disregard their terms.[288]

---

Shepherd, *Fierce Compromise: The Administrative Procedure Act Emerges from New Deal Politics*, 90 NW. U. L. REV. 1557 (1996).

[283] FINAL REPORT, *supra* note 29.

[284] Peter L. Strauss, *Changing Times: The APA at Fifty*, 63 U. CHI. L. REV. 1389, 1389–90 (1996).

[285] *Id.*

[286] FINAL REPORT, *supra* note 29, at 27.

[287] *Id.* at 100.

[288] *Id.* at 27 (emphasis added).  The Final Report listed the NLRB, the FTC, the Social Security Board, and the United States Employees' Compensation Commission (the agency originally authorized to enforce the Longshoremen's and Harbor Workers' Compensation Act) as agencies that lack the power to adopt legislative rules and regulations.  *Id.* at 98 n.18.  The inclusion of the Social Security Board in the list fails to account for the 1939 amendments to the Social Security Act.  *See supra* notes 228–229 and accompanying text.  According to one of the monographs published by the Attorney General's Committee on Administrative Procedure, in 1940 the Social Security Board was in the process of developing a comprehensive set of regulations to implement the Act.  *See* ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, U.S. DEP'T OF JUSTICE, MONOGRAPH NO. 16, SOCIAL SECURITY BOARD 54 (1940).

The *Final Report*'s description makes it clear that legislative rules can be the product of a broad, general rulemaking grant, such as a grant to make "such rules and regulations as the Secretary of the Treasury may prescribe."[289]   The key, according to the *Final Report*, is not the general or specific nature of the rulemaking grant, but rather whether Congress attached sanctions in the statute to compel observance of the regulations.

In addition to the *Final Report*, at least two of the monographs prepared by the Attorney General's Committee recognize that facially ambiguous rulemaking grants sometimes confer authority to make only interpretive rules.[290]   For example, the monograph on the Walsh-Healey Act explains that rules issued by the Secretary of Labor under the Act's general rulemaking grant to "make, amend, and rescind such rules and regulations as may be necessary" are not binding because "no sanction is provided."[291]

Insofar as the text of the APA itself is concerned, the convention is less easy to discern.   We would submit, however, that the influence of the convention appears in the seldom noticed section 558(b), which provides: "A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law."[292]   Note the close association between "sanction" and "substantive rule," and the clear command that neither can be imposed by an agency unless Congress has authorized it to do so by law. Although section 558(b) does not expressly codify the convention — that an agency may not issue legislative rules unless Congress has provided sanctions for rule violations — the effect of the provision is the same.   Legislative rules were and are widely understood to be those that, when violated, give rise to adverse legal consequences — in other words, "sanctions" as that term is broadly defined by the APA.[293]

---

[289] FINAL REPORT, *supra* note 29, at 27 (internal quotation marks omitted).

[290] *See* ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, *supra* note 233, at 68; ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, *supra* note 196, at 66–67.   In preparing the monographs, the Committee conducted extensive interviews, attended hearings and other administrative proceedings, examined agency files, and received comments and input from agencies' staffs on preliminary drafts.

[291] ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, *supra* note 233, at 66–67.   Other monographs, however, make no mention of the convention when they discuss the meaning of general rulemaking grants.   *See, e.g.*, 1 ATT'Y GEN.'S COMM. ON ADMIN. PROCEDURE, U.S. DEP'T OF JUSTICE, MONOGRAPH NO. 22, ADMINISTRATION OF INTERNAL REVENUE LAWS: BUREAU OF INTERNAL REVENUE, BOARD OF TAX APPEALS, PROCESSING TAX BOARD OF REVIEW 143 (1940) ("The word 'enforcement' has been broadly construed to permit substantive or interpretive, as well as procedural regulations.").

[292] 5 U.S.C. § 558(b) (2000).

[293] The APA's broad definition of "sanction" includes not only the imposition of a penalty or fine, the forfeiture of property, the assessment of damages, or the loss of a license, but also any other "compulsory or restrictive action" by an agency.   5 U.S.C. § 551(10) (quoted in full *supra* note 120).

Thus, what section 558(b) means, in the words of the Senate Report, is that "agencies may not impose sanctions which have not been specifically or generally provided for them to impose."[294]  Once we understand the convention, we can read the APA in a new light and understand that it, too, presupposes that agencies can make rules with the force of law only if Congress has legislated statutory sanctions for rule violations.

### *F. Why a Convention?*

Only rarely in the Progressive and New Deal years did Congress state expressly that agencies were authorized to issue rules with the force of law or were limited to issuing advisory interpretations and procedural rules.  Instead, Congress repeatedly enacted legislation ambiguously authorizing agencies to issue "rules and regulations" and relied on a signaling device for indicating whether a grant was legislative: grants to make rules backed by sanctions authorized legislative rulemaking, whereas grants to make rules not backed by sanctions authorized only procedural or interpretive rulemaking.

As best we can tell, agencies consistently respected the convention during these years.  Of course, adjudication dominated administrative law for the first six decades of the twentieth century, with rulemaking assuming central importance only in the 1970s and afterward.[295]  Nevertheless, it is no accident that agencies operating under broadly worded rulemaking grants that, under the convention, conferred only nonlegislative rulemaking authority — including the FDA, NLRB, FTC, and United States Employees' Compensation Commission — made no attempt during these years to adopt legislative rules.[296]  In contrast, the FCC, SEC, Federal Power Commission, and ICC (with respect to specific rulemaking grants added to the ICA by amend-

---

[294] SENATE COMM. ON THE JUDICIARY, ADMINISTRATIVE PROCEDURE ACT LEGISLATIVE HISTORY, H.R. REP. NO. 79-1980 (1946), *in* S. DOC. NO. 79-248, at 235, 274 (1946); *see also* U.S. DEP'T OF JUSTICE, *supra* note 30, at 88 (explaining that the purpose of § 558(b) is to "assure that agencies will not appropriate to themselves powers Congress has not intended them to exercise").

[295] *See* CORNELIUS M. KERWIN, RULEMAKING: HOW GOVERNMENT AGENCIES WRITE LAW AND MAKE POLICY 11–15 (2d ed. 1999) (describing extensive rulemaking prior to the 1970s, but attributing to the 1970s a "fundamental change" in the ascendancy of rulemaking); Antonin Scalia, *Back to the Basics: Making Law Without Making Rules*, REGULATION, July/Aug. 1981, at 25.

[296] *See* David L. Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy*, 78 HARV. L. REV. 921, 943, 960–61 (1965) (noting that agencies such as the NLRB and FTC do not engage in legislative rulemaking, perhaps because their authorizing statutes are ambiguous); *see also supra* notes 175–196 and accompanying text (discussing the FTC); *supra* notes 218–222 and accompanying text (discussing the NLRB).

ments) all had occasion to issue legislative rules.[297]   Each agency in this latter group operated under broadly worded rulemaking grants that, under the convention, conferred legislative rulemaking authority.

Why did Congress use this convention to signal that it was conferring legislative rulemaking authority, rather than straightforwardly announcing that it was authorizing the agency to make "legislative" rules or rules with the "force of law"?   We can only speculate about the answer.   One possibility is economy in drafting.   If Congress had explicitly authorized an agency to promulgate legislative rules, then the question immediately would have arisen:   what sort of sanction attaches to persons who violate these rules?   *Eaton* and *Grimaud* (and later the APA) could be read to say that Congress also must specify the sanctions.[298]   So perhaps Congress thought it more economical to proceed immediately to the specification of the sanctions, which would by implication also convey the information that the rules would be legislative.

Another, more plausible possibility is that use of the convention would have been less likely to trigger political opposition than an explicit statement of authority to adopt rules with the force of law.   An express delegation of legislative authority would in effect wave a red flag and alert opponents of the legislation.   They could tap into deep-seated unease over the idea of delegating legislative rulemaking powers to a body of unelected administrators and could use this unease to rally opposition to the measure.   We have already seen examples of this phenomenon in the legislative histories of the Packers and Stockyards Act[299] and the FDCA.[300]   Later, we will see another example in the history of the Internal Revenue statutes.[301]   So we know the potential existed for opponents of particular bills to use the delegation of legislative rulemaking authority as a focal point of opposition.

Use of the convention obviously could not eliminate all such controversy about the delegation of legislative rulemaking authority.   But at least it allowed regulatory statutes to confer legislative powers without using the inflammatory words "legislative" or "force of law," and hence it reduced somewhat the opportunities for opponents to raise this issue.   This was especially true if the bill placed the sanctions at some distance from the grant of authority to adopt "rules and regulations."   Such "acoustical separation" would further reduce the chances

---

[297] *See, e.g.,* United States v. O'Hagan, 521 U.S. 642, 650–51, 666–77 (1997) (discussing SEC legislative rules); *infra* pp. 529–34 (discussing FCC, ICC, and Federal Power Commission legislative rules).

[298] *See supra* notes 151–170 and accompanying text.

[299] *See supra* pp. 507–08.

[300] *See supra* notes 246–249 and accompanying text.

[301] *See infra* notes 588–596 and accompanying text.

that a casual reader of the bill would notice that Congress was endowing the agency with legislative rulemaking power, even though knowledgeable insiders reading through the bill would grasp this implication immediately.[302]

## IV. THE CONVENTION IGNORED

Given the secondary importance of rulemaking during the first six decades of the twentieth century, it is perhaps not surprising that more than thirty years passed after *United States v. Grimaud*[303] before the Supreme Court heard a case that potentially presented the question whether Congress had authorized an agency to make rules having the force of law under a facially ambiguous rulemaking grant.[304] Nor is it surprising that another ten years passed before the Court confronted a similar case again.[305] All in all, we have identified eight principal cases decided between 1943 and 1979 that potentially presented the Court with a question about an agency's authority to make legislative rules.[306] These cases involved disparate issues under disparate statutes and were rendered too infrequently to generate anything that could be described as a jurisprudence of rulemaking. In fact, the most striking aspect of the eight decisions, taken as a whole, is the absence of any recognizable theory regarding when grants of rulemaking authority confer lawmaking power and when they do not.

---

[302] We postpone to Part VII the normative issues associated with whether Congress should be required to delegate legislative rulemaking powers through an express statement, as opposed to using a convention that signals its clear intent to do so.

[303] 220 U.S. 506 (1911), discussed *supra* pp. 501–03.

[304] The first major case after *Grimaud* to address this issue was *National Broadcasting Co. v. United States*, 319 U.S. 190 (1943).

[305] The next major case to address this issue was *American Trucking Ass'ns v. United States*, 344 U.S. 298 (1953).

[306] The eight cases are *National Broadcasting*, 319 U.S. 190 (1943); *American Trucking*, 344 U.S. 298 (1953); *United States v. Storer Broadcasting Co.*, 351 U.S. 192 (1956); *Federal Power Commission v. Texaco Inc.*, 377 U.S. 33 (1964); *Thorpe v. Housing Authority*, 393 U.S. 268 (1969); *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356 (1973); *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976); and *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979). In addition to these eight cases, the Supreme Court heard other cases in which the same or similar issues lurked in the background. *See, e.g.*, United States v. S.W. Cable Co., 392 U.S. 157, 178 (1968) (upholding the FCC's authority to regulate cable television systems based in part on the general rulemaking grant in section 303(r) of the Communications Act); E.I. du Pont de Nemours & Co. v. Train, 430 U.S. 112, 132, 136 (1977) (upholding the EPA's authority to issue industrywide regulations limiting discharges by existing plants and citing section 501(a) of the Federal Water Pollution Control Act, which gives the EPA power to make "such regulations as are necessary to carry out" its functions); FCC v. Nat'l Citizens Comm. for Broad., 436 U.S. 775, 793 (1978) (holding that the general rulemaking grant found in section 303(r) of the Communications Act of 1934 "supplies a statutory basis for the Commission to issue regulations codifying its view of the public-interest licensing standard").

In retrospect, only one of the eight decisions generated an outcome inconsistent with the convention,[307] and in that case, the party challenging the rule did not raise the question whether the agency had been delegated the power to act with the force of law.[308]  But any congruity between the convention and judicial outcomes during these years owes nothing to the Court's deliberative processes.  Not one of the cases discussed or even acknowledged the convention introduced in Part III.  Cumulatively, the only conclusion one can draw from reading the opinions is that the Justices — and the lawyers appearing before them — had no knowledge of the convention.  This ignorance was to have fateful consequences.  The Court's failure to offer any coherent basis for distinguishing between legislative and nonlegislative rulemaking grants created the opportunity for later courts and commentators to read the Court's opinions selectively to support the proposition that facially ambiguous rulemaking grants always confer legislative powers.

### A. Rulemaking Grants in the Supreme Court, 1943–1979

In an effort to compress our presentation, we divide the eight cases into four groups of two cases each.  Within each group, the cases relate chronologically, present similar underlying issues, and reflect similar styles of reasoning in the way those issues are resolved.

*1.  National Broadcasting (1943) and American Trucking (1953).* — The first two cases, *National Broadcasting Co. v. United States*[309] and *American Trucking Ass'ns v. United States*,[310] are separated by a full decade but present similar issues.  *National Broadcasting* arose under the Communications Act of 1934[311] and *American Trucking* under the Motor Carrier Act.[312]  Broadly speaking, the issue in each case was whether the agency had authority to promulgate a legislative rule on a subject regarding which Congress had not delegated specific regulatory authority.  *National Broadcasting* asked whether the FCC could adopt "chain broadcasting" rules regulating contractual relationships between networks and affiliated broadcasting stations.[313]  The granting of a broadcasting license was conditioned upon a station's following these rules.[314]  *American Trucking* asked whether the ICC could adopt regulations governing the practices of companies that leased

---

[307] *See* Thorpe v. Hous. Auth., 386 U.S. 670 (1967).
[308] *See infra* notes 342–354 and accompanying text.
[309] 319 U.S. 190 (1943).
[310] 344 U.S. 298 (1953).
[311] Ch. 652, 48 Stat. 1064.
[312] Ch. 498, 49 Stat. 543 (1935).
[313] *National Broadcasting*, 319 U.S. at 196, 209–10.
[314] *See id.* at 196.

trucks to licensed motor carriers.[315]  The granting of operating licenses was conditioned upon a carrier's following these rules.[316]

In both cases, the Court upheld the challenged regulations, citing multiple congressional rulemaking grants, including both specific and generic grants.  In *National Broadcasting*, the Court relied on three rulemaking grants found in Title III of the Communications Act, one general and two relatively specific, each of which was facially ambiguous concerning whether it authorized rules with the force of law.[317]  In *American Trucking*, the Court relied on two grants, one general and one specific, both of which were facially ambiguous in the same sense.[318]

The Court upheld the regulations in both cases without specifying which rulemaking grants endowed the regulations with the force of law.  It is not surprising that the Court proceeded in this manner.  The challenger in each case claimed that the agency was acting beyond the scope of its regulatory jurisdiction.[319]  In neither case did the challenger maintain that the agency lacked the power to adopt regulations having the force of law.  Thus the Court probably felt no compulsion to discuss which statutory provisions supported legislative rulemaking.

Had the parties raised the question of the agencies' power to adopt legislative rules, and had the Court resolved the question in light of the drafting convention, the agencies' authority would have been sustained in both cases.  With respect to the FCC's regulation of chain broadcasting, section 312(a) of the Communications Act provided for the revocation of licenses based on violations of the FCC's regulations,[320]

---

[315] *See American Trucking*, 344 U.S. at 300–02.

[316] *See id.* at 302.

[317] These were section 303(g), which provided that the FCC shall "generally encourage the larger and more effective use of radio in the public interest"; section 303(i), which gave the FCC "authority to make special regulations applicable to radio stations engaged in chain broadcasting"; and section 303(r) (added by section 6(b) of the 1937 amendments to the Communications Act), which empowered the FCC to adopt "such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act." Communications Act of 1934, ch. 652, § 303(g), (i), 48 Stat. 1064, 1082 (codified as amended at 47 U.S.C. § 303(g), (i) (2000)); Amendments to the Communications Act of 1934, ch. 229, § 6(b), 50 Stat. 189, 191 (1937), *quoted in National Broadcasting*, 319 U.S. at 217.

[318] These were section 212(b), which permitted transfers of motor carrier certificates and permits "pursuant to such rules and regulations as the Commission may prescribe," and section 204(a)(6), which gave the ICC the power "[t]o administer, execute, and enforce all provisions of this part, to make all necessary orders in connection therewith, and to prescribe rules, regulations, and procedure for such administration." *American Trucking*, 344 U.S. at 311 (alteration in original) (quoting Motor Carrier Act, 1935, ch. 498, §§ 204(b)(6), 212(b), 49 Stat. 543, 546, 555) (repealed 1983) (internal quotation marks omitted).

[319] *See National Broadcasting*, 319 U.S. at 209; *American Trucking*, 344 U.S. at 309.

[320] Communications Act, § 312(a), 48 Stat. at 1086–87 (codified as amended at 47 U.S.C. § 312(a)). For a discussion of this rulemaking grant, see *supra* note 257.

and section 502 made the violation of "any rule, regulation, restriction, or condition" imposed by the agency under authority of Title III of the Act a criminal offense.[321]   Thus, both the specific and the general rulemaking grants cited in *National Broadcasting* as authority for the FCC rule enabled legislative rulemaking, according to the convention. With respect to the ICC's leasing regulation, section 222(a) of the Motor Carrier Act provided for statutory fines for violations of the ICC's regulations, and section 222(b) gave the ICC the power to bring suit when any regulations were violated.[322]   Under the convention, these provisions signaled Congress's intent to give legislative effect to rules and regulations that the ICC promulgated under the Act.

The significance of *National Broadcasting* and *American Trucking* for the future lay not in what the Court said, but in what it did not say: the opinions demonstrated an apparent indifference to the question of the sources of the agencies' authority as legislative rulemakers.[323]   Nowhere in his opinion for the Court in *National Broadcasting* did Justice Frankfurter attend to the distinction between grants of legislative and nonlegislative rulemaking powers.[324]   Instead, the Court implicitly assumed that the Communications Act's rulemaking grants conferred the power to make legislative rules. Justice Reed's majority opinion in *American Trucking* quickly rejected the contention that the general rulemaking grant in the Motor Carrier Act "merely concerns agency procedures and is solely administrative."[325]   He stated that the reference to "enforcement" in the general grant refuted this conten-

---

[321] *Id.* § 502, 48 Stat. at 1100–01 (codified as amended at 47 U.S.C. § 502). For a further discussion of this statutory provision, see *supra* note 258 and accompanying text.

[322] *See* Motor Carrier Act, 1935, § 222(a)–(b), 49 Stat. at 564.

[323] The failure of the Supreme Court to address the source of legislative rulemaking authority enabled future courts and commentators to fill the gap with new theories about the meaning of statutory grants. For example, in his influential treatise, Kenneth Culp Davis read *National Broadcasting* to mean that a legislative rule "may rest upon an implied or an unclear grant of power" because the Court had sustained the FCC's rules even though the power to issue regulations governing the contractual relationships between networks and affiliates was not *specifically* conferred by the Communications Act.  1 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 5.03, at 299 n.2 (1st ed. 1958). Davis thus saw *National Broadcasting* as running contrary to the older view, associated with *Eaton* and *Grimaud*, that the authority to issue binding rules must be specifically or explicitly delegated. *Id.*

[324] *See National Broadcasting*, 319 U.S. at 209–26 (reasoning that the FCC's regulations were within its authority under the Communications Act). As will be discussed *infra* section V.B.2.(b), this silence proved to be significant when Judge Friendly later asserted that *National Broadcasting* supported the view that general grants of rulemaking authority confer the power to make legislative rules. *See* Nat'l Ass'n of Pharm. Mfrs. v. FDA, 637 F.2d 877, 880 (2d Cir. 1981) ("The Supreme Court's decision in *National Broadcasting Co. v. United States*, which in retrospect seems to have inaugurated the modern approach, was not universally so recognized at the time, since the Court there relied in part on more specific grants of rulemaking power and the regulations at issue in that case, although legislative in effect, were clothed in the garb of procedural rules." (citations omitted)).

[325] Am. Trucking Ass'ns v. United States, 344 U.S. 298, 311 (1953).

tion.[326]   In any event, he ultimately declined to identify the precise
source of authority for the rule, suggesting that it was sufficient to
show that the agency was pursuing a problem within the general area
that Congress had charged it with regulating.[327]

   *2. Storer Broadcasting (1956) and Texaco (1964).* — The next two
cases, *United States v. Storer Broadcasting Co.*[328] and *Federal Power
Commission v. Texaco Inc.*,[329] presented a different issue.   *Storer
Broadcasting* also arose under the Communications Act; *Texaco* arose
under the Natural Gas Act.[330]   Both cases presented the question
whether an agency could promulgate rules concerning issues that nor-
mally require adjudicatory hearings.   *Storer Broadcasting* posed the
question whether the FCC could provide by rule that it would deny
future applications for television broadcasting licenses if the applicant
already had an interest in five or more stations.[331]   *Texaco* posed the
question whether the Federal Power Commission could by rule adopt
pricing provisions for natural gas supply contracts and provide that it
would automatically reject any contract containing inconsistent provi-
sions.[332]

   In *Storer Broadcasting*, as in *National Broadcasting*, the FCC cited
multiple grants of rulemaking authority to support its rules restricting
multiple ownership, each of which was facially ambiguous.[333]   In *Tex-
aco*, only one rulemaking grant supported the Federal Power Commis-
sion: section 16 of the Natural Gas Act, which gave the Commission
authority to prescribe such regulations "as it may find necessary or ap-
propriate to carry out the provisions of this Act."[334]   This provision
was facially ambiguous in the same sense.

   The thrust of the challenge in each case was not that the agency
lacked power to make rules with the force of law, but that the struc-
ture of each act required that the issue in question be resolved through

---

[326]   *Id.*

[327]   *See id.* at 311–13.

[328]   351 U.S. 192 (1956).

[329]   377 U.S. 33 (1964).

[330]   Ch. 556, 52 Stat. 821 (1938).

[331]   *See Storer Broadcasting*, 351 U.S. at 193–94 & n.1.

[332]   *See Texaco*, 377 U.S. at 34–35.

[333]   Sections 303(f) and (r) of the Communications Act potentially supported the rules. Commu-
nications Act of 1934, ch. 652, § 303(f), 48 Stat. 1064, 1082 (codified as amended at 47 U.S.C.
§ 303(f) (2000)) (authorizing the FCC to make "regulations not inconsistent with law as it may
deem necessary to prevent interference between stations and to carry out the provisions" of the
Act); Amendments to the Communications Act of 1934, ch. 229, § 6(b), 50 Stat. 189, 191 (1937)
(adding section 303(r) to the Act and giving the FCC the power to make "rules and regulations
and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to
carry out" the chapter); *see Storer Broadcasting*, 351 U.S. at 201 & n.9 (quoting 47 U.S.C. § 303,
the codification of the provisions).

[334]   *See Texaco*, 377 U.S. at 41 (quoting Natural Gas Act, ch. 556, § 16, 52 Stat. 821, 830 (1938)).

case-by-case adjudication.[335]   The Supreme Court rejected the argument in both cases, holding that the statutory requirement of a hearing did not preclude the agencies from "particularizing statutory standards through the rulemaking process" and from rejecting without a hearing those who failed either to meet the regulation or to show why they were entitled to a waiver of the rule.[336]

Given that the challengers in both cases objected to the rules as interfering with individual hearing rights, it is not surprising that the Court spent little time considering whether the agency had authority to promulgate rules having the force of law.  The Court concerned itself only with the question whether the rules were within the scope of the agencies' authority, not with whether the rules were legislative.  In *Storer Broadcasting*, Justice Reed's opinion for the Court concluded that the FCC's multiple ownership rules, although not specifically authorized by statute, were sufficiently related to the purpose of the Communications Act and therefore within the scope of sections 4(i) and 303(r), which authorized rules "not inconsistent with the Act or law."[337]   In *Texaco*, Justice Douglas's majority opinion similarly concluded that the Federal Power Commission's general rulemaking grant provided "ample" authority for rules that imposed conditions on individual applications because the rules were within the substantive bounds of the Natural Gas Act.[338]

Had the Court addressed the question whether the agencies had authority to adopt legislative rules, and had it resolved the question in light of the drafting convention, then once again the Court would have upheld the agencies' authority in both cases.  In the Communications Act, addressed in *Storer Broadcasting*, section 4(i) probably does not support legislative rulemaking authority.[339]   But section 303(r) appears to carry legislative effect under the convention for the same reasons discussed in connection with *National Broadcasting* — rules promulgated under this grant are enforced by license revocations and criminal sanctions.[340]   The Federal Power Commission's general rulemaking grant in *Texaco* would have been construed as conferring legislative rulemaking authority under the convention, because the Natural Gas

---

[335] *See Storer Broadcasting*, 351 U.S. at 200; *Texaco*, 377 U.S. at 37, 39.

[336] *Texaco*, 377 U.S. at 39; *see also Storer Broadcasting*, 351 U.S. at 202–03.

[337] *Storer Broadcasting*, 351 U.S. at 203–04.

[338] *Texaco*, 377 U.S. at 41.

[339] *See supra* notes 255–264 and accompanying text (discussing how section 4(i) should probably be viewed as merely a housekeeping grant).

[340] *See supra* pp. 530–31 (describing the legal sanctions attached to rule violations); *supra* note 257 (describing various rulemaking provisions of the Act, including section 303(r), and their effects under the convention).

Act authorized the Commission to bring suit against those who violate its regulations and to subject them to a fine.[341]

The significance of *Storer Broadcasting* and *Texaco* does not lie in any holding by the Court about the meaning of facially ambiguous rulemaking grants. Rather, the cases are important largely because they encouraged the use of rulemaking by agencies in an effort to streamline the regulatory process and, more subtly, because they compounded the impression, inaugurated by *National Broadcasting* and *American Trucking*, that the question whether Congress has delegated to an agency the authority to make rules with the force of law is of little interest or significance to courts.

3. Thorpe *(1969) and* Mourning *(1973).* — The next two cases mark a departure from the Court's prior decisions in that, for the first time, the Court expressly considered whether particular rules adopted by agencies had the force of law. In *Thorpe v. Housing Authority,*[342] a tenant in a federally assisted housing project argued that a circular issued by the Department of Housing and Urban Development (HUD) entitled her to notice and an opportunity to respond prior to eviction by a local housing authority.[343] In *Mourning v. Family Publication Services, Inc.,*[344] a company selling magazine subscriptions challenged a Federal Reserve Board regulation, promulgated under the Truth in Lending Act, that broadly defined consumer credit transactions to include any transaction payable in four or more installments.[345]

The disposition of the two cases abounds with irony from the perspective of the drafting convention. In *Thorpe*, the local housing authority did not argue that HUD lacked the authority to issue legally binding regulations on the subject of eviction procedures.[346] Instead, it argued that HUD had intended the circular to be only advisory; the

---

[341] *See* Natural Gas Act, ch. 556, § 20(a), 52 Stat. 821, 832 (1938) (codified as amended at 15 U.S.C. § 717s (2000)) (empowering the Commission to bring suit); *id.* § 21(b), 52 Stat. at 833 (codified as amended at 15 U.S.C. § 717t) (setting statutory fines for rule violations).

[342] 393 U.S. 268 (1969).

[343] *See id.* at 269–70. When the case first came before the Court, the tenant challenged the state procedures authorizing eviction without notice on constitutional grounds. *See* Thorpe v. Hous. Auth., 386 U.S. 670, 671 (1967). After HUD issued the circular, and before the Court resolved the merits of the claim, the Court vacated and remanded for reconsideration in light of the circular. *See id.* at 673–74. The North Carolina Supreme Court then held that the circular did not apply retroactively to evictions instituted before it was promulgated. *See Thorpe*, 393 U.S. at 273–74. The Court probably viewed the second *Thorpe* decision, relying on the HUD circular rather than on due process, *see id.* at 283–84, as an exercise in avoiding a difficult constitutional question. Years later, the Court held that the eviction of a public housing tenant without notice violated due process. *See* Greene v. Lindsey, 456 U.S. 444, 456 (1982).

[344] 411 U.S. 356 (1973).

[345] *See id.* at 358, 361–62.

[346] *See* Brief for Respondent at 26, *Thorpe*, 393 U.S. 268 (1969) (No. 1003) (acknowledging that HUD had general rulemaking powers and arguing only that HUD could not adopt rules inconsistent with the statute).

authority alternatively argued that if the Court ruled that the circular was intended to be mandatory, it could not be applied retroactively to pending eviction proceedings.[347]  In an opinion by Chief Justice Warren, the Court held that the circular was mandatory[348] and thus was a legislative rule.  The Court did not explain why the facially ambiguous grant of rulemaking authority found in section 8 of the Housing Act of 1937[349] was a grant of legislative authority, other than to observe in a footnote that "[s]uch broad rule-making powers have been granted to numerous other federal administrative bodies in substantially the same language."[350]  The passage that immediately follows, and a passage later in the opinion, intimated that the only constraint on the agency was whether the rules were consistent with the general purposes of the Act.[351]  Having established that the circular had the force of law, the Court then rejected the housing authority's argument that applying the circular to evictions already in process would constitute impermissible retroactive rulemaking.[352]

Had the local housing authority challenged HUD's authority to issue rules with the force of law, and had the Court resolved that challenge in accordance with the convention, the housing authority would have prevailed.  No statutory sanctions attached to the general rulemaking grant under the Housing Act, and consequently under the convention Congress had not intended to give HUD authority to make

---

[347] *See Thorpe*, 393 U.S. at 275, 281; *see also id.* at 278–79 (noting that the housing authority made a constitutional argument as a third alternative).

[348] *See id.* at 275–76.

[349] Ch. 896, § 8, 50 Stat. 888, 891 (allowing HUD to "make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this Act").

[350] *Thorpe*, 393 U.S. at 277 n.28.  The Court cited three other rulemaking grants in support of this observation.  *See id.*  It cited a grant to the now-defunct Civil Aeronautics Board, which probably was not a legislative grant under the convention, *see* 49 U.S.C. § 1324(a) (1964) (endowing the Board with the power to make regulations but specifying no sanctions for violations of those regulations); the general grant contained in the Social Security Act, *see* Social Security Amendments of 1939, ch. 666, § 205(a), 53 Stat. 1360, 1368 (which was a legislative grant under the convention, *see supra* note 124 and pp. 493–94); and the grant in section 16 of the Natural Gas Act, *see* Natural Gas Act, ch. 556, §§ 16, 21(b), 52 Stat. 821, 830 (1938) (codified as amended at 15 U.S.C. § 717t (2000)) (which was also a legislative grant under the convention, *see supra* pp. 530–32).  The author of the footnote was obviously unaware of the signaling device that we argue Congress had used in indicating which grants were legislative and which were nonlegislative.

[351] In the passage immediately following, the Court addressed and rejected the local housing authority's contention that the circular, if understood to be a mandatory rule, was inconsistent with the statutory purpose of vesting in local housing authorities maximum responsibility for administering public housing programs.  *See Thorpe*, 393 U.S. at 277–78.  Later in the opinion, the Court observed that the circular was "reasonably related to the purposes of the enabling legislation under which it was promulgated," *id.* at 280–81, which the Court said included providing "a decent home and suitable living environment to every American family," *id.* at 281 (quoting Housing Act of 1949, ch. 338, § 2, 63 Stat. 413, 413) (internal quotation marks omitted).

[352] *See id.* at 281–83.

rules with legislative effect.[353]  *Thorpe* thus represented the first Supreme Court case to reach a result contrary to what would have been required by the convention, although whether the Court's decision can be characterized as a holding on this issue is doubtful, since the parties did not brief the precise issue, and the Court gave only a vague, perfunctory explanation for the outcome in a footnote.[354]

In contrast, the parties' briefs in *Mourning* did raise the question whether the facially ambiguous grant of rulemaking under the Truth in Lending Act[355] authorized the Federal Reserve Board to make rules having the force of law.[356]  In doing so, however, the parties did not discuss the convention.  Following *Thorpe*, the Court ignored this threshold issue, focusing instead on the scope of the agency's rulemaking authority.  As the Court framed the issue:

> Where the empowering provision of a statute states simply that the agency may "make . . . such rules and regulations as may be necessary to carry out the provisions of this Act," we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is "reasonably related to the purposes of the enabling legislation."[357]

The Court held that the Federal Reserve Board's four-installment rule fell within the scope of the agency's authority and was reasonably related to the statute's purpose.[358]

Had the Court sought to resolve the question whether the Federal Reserve Board's rules had the force of law under the convention, it would have concluded that they did.  Section 112 of the Truth in Lending Act provided for fines up to $5000 and imprisonment for per-

---

[353] *See* United States Housing Act of 1937, ch. 896, § 8, 50 Stat. 888, 891.  Even if Congress had given HUD the authority to render legislative rules, there is no indication the agency intended that the circular would function as a legislative rule.  Unlike most legislative rules, it was not promulgated in accordance with notice-and-comment procedures.  *See* 5 U.S.C. § 553(b) (2000).  *But see id.* § 553(a) (exempting rules related to "grants" — including perhaps HUD grants to local housing authorities — from notice-and-comment requirements).  Also, the agency did not publish the circular in the Federal Register.  *See* Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993) (noting that legislative rules are usually published in the Federal Register).

[354] *See, e.g.*, Brecht v. Abrahamson, 507 U.S. 619, 631 (1993) (noting that if a prior precedent does not "squarely" address an issue, the Court is "free to address [it] on the merits" at a later date); United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38 (1952) (stating that an issue not "raised in briefs or argument or discussed in the opinion of the Court" cannot be taken as "a binding precedent on [the] point"); Webster v. Fall, 266 U.S. 507, 511 (1925) (stating that issues that merely "lurk in the record" and are not brought to the Court's attention should not "be considered as having been so decided as to constitute precedents").

[355] Pub. L. No. 90-321, § 105, 82 Stat. 146, 148 (1968) (codified at 15 U.S.C. § 1604 (2000)) ("The Board shall prescribe regulations to carry out the purposes of this title.").

[356] *See, e.g.*, Brief for Petitioner at 20–31, Mourning v. Family Publ'ns Serv., Inc., 411 U.S. 356 (1973) (No. 71-829).

[357] *Mourning*, 411 U.S. at 369 (alteration in original) (footnote omitted) (quoting *Thorpe*, 393 U.S. at 280–81).

[358] *See id.* at 376–77.

sons who failed to disclose information required by any regulation issued under the Act.[359]  In addition, the Act expressly gave the Board's regulations the force of law by providing that "[a]ny reference to any requirement imposed under this title or any provision thereof includes reference to the regulations of the Board under this title or the provision thereof in question."[360]  Because of these statutory provisions, the regulation at issue in *Mourning* — unlike the circular in *Thorpe* — was legislative according to the convention.

In Supreme Court litigation, *Thorpe* and *Mourning* represent the low-water mark in terms of attention to congressional delegations of power to agencies to act with the force of law.  Neither the housing authority in *Thorpe* nor the consumer in *Mourning* referred to the convention, even though it would have been in their interests to do so.  For its part, the Court focused solely on whether an agency's regulations fell within the general scope of its jurisdiction, as conferred by the act, ignoring entirely the question whether Congress has delegated authority to the agency to act with the force of law.

*4.  Gilbert (1976) and Chrysler (1979).* — In the latter half of the 1970s, a reaction set in.  In both *General Electric Co. v. Gilbert*[361] and *Chrysler Corp. v. Brown*,[362] the Supreme Court held that particular agency pronouncements did *not* have the force of law, and for that reason were not valid legislative regulations.[363]  In other words, the very issue ignored in *Thorpe* and *Mourning* suddenly returned to the fore.  In neither case, however, did the Court point to the absence of congressionally mandated sanctions as the reason for denying these pronouncements the force of law.  Thus, although the Court affirmed the importance of delegated authority to act with the force of law, it did not acknowledge the device Congress had employed for signaling an intention to delegate such authority.

*Gilbert* involved the claim that General Electric's employee disability plan violated Title VII of the Civil Rights Act of 1964 by excluding disability based on pregnancy.[364]  One issue concerned the weight to be given to guidelines issued by the Equal Employment Opportunity Commission (EEOC) declaring that employers should apply disability benefits to pregnancy on the same terms and conditions as benefits applied to other temporary disabilities.[365]  The Court noted that "Congress, in enacting Title VII, did not confer upon the EEOC authority

---

[359] Truth in Lending Act, § 112, 82 Stat. at 151 (codified at 15 U.S.C. § 1611).

[360] *Id.* § 103, 82 Stat. at 147 (codified as amended at 15 U.S.C. § 1602).

[361] 429 U.S. 125 (1976).

[362] 441 U.S. 281 (1979).

[363] *See Gilbert*, 429 U.S. at 141; *Chrysler*, 441 U.S. at 306.

[364] *Gilbert*, 429 U.S. at 127–28.

[365] *Id.* at 140–41.

to promulgate rules or regulations pursuant to that Title."[366]   The Court specifically contrasted EEOC guidelines with "regulations which Congress has declared shall have the force of law" or "regulations which under the enabling statute may themselves supply the basis for imposition of liability."[367]   Because the EEOC guidelines did not have the force of law, the Court concluded that it would follow them only to the extent that their reasoning was persuasive.[368]

The words the Court used to distinguish the guidelines from a legislative regulation — "Congress has declared," "force of law," "themselves supply the basis for imposition of liability" — suggest that the Court was on the cusp of uncovering the logic of the convention.   But the Court betrayed no awareness of the device Congress had used in signaling that agency regulations have the force of law.   To be sure, such knowledge was unnecessary in *Gilbert*, because the rulemaking grant to the EEOC empowered the agency only to issue "suitable *procedural* regulations to carry out the provisions" of this subsection.[369]   Thus, the Court easily reached the right result — that Congress had not delegated to the EEOC the power to act with the force of law — without the need for recourse to the convention to unlock the meaning of a facially ambiguous rulemaking grant.

In *Chrysler*, a complicated "reverse-Freedom of Information Act" case, the Court considered whether regulations promulgated by the Department of Labor's Office of Federal Contract Compliance Programs (OFCCP), which required government contractors to furnish reports about their affirmative action programs, had the force of law.[370]   The Court held that the OFCCP's regulations were not reasonably related to a grant of power given by Congress and therefore could not be treated as legislative.[371]

---

[366] *Id.* at 141.

[367] *Id.*

[368] In other words, the guideline was entitled to *Skidmore* deference, not *Chevron* deference. *See id.* at 141–42; *see also* United States v. Mead Corp., 533 U.S. 218, 234–35 (2001) (noting that *Chevron* did not eliminate *Skidmore* deference, under which an administrative ruling is afforded "respect proportional to its 'power to persuade'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

[369] 42 U.S.C. § 2000e-12(a) (2000) (emphasis added).   In contrast, the EEOC does have legislative rulemaking authority under the Americans with Disabilities Act. *See* 42 U.S.C. §§ 12,116–12,117 (2000).

[370] *See* Chrysler Corp. v. Brown, 441 U.S. 281, 286–87 (1979).   A reverse-Freedom of Information Act (FOIA) suit is an action to enjoin the government from disclosing information — under FOIA — that a party has submitted to the government.   The Court in *Chrysler* held that FOIA did not authorize such suits, but discussed whether such an action might be permitted under 18 U.S.C. § 1905, a criminal statute that prohibits agencies from disclosing information "not authorized by law."   18 U.S.C. § 1905 (2000); *see Chrysler*, 441 U.S. at 294–95.   This in turn presented the question whether the OFCCP regulations, which required disclosure of contractor reports about affirmative action compliance, were binding legislative regulations. *Id.* at 295.

[371] *See Chrysler*, 441 U.S. at 303–09.

JA0386

One possible source of legal authority for the OFCCP regulations considered by the Court was 5 U.S.C. § 301, the "Housekeeping Act."[372]  This act gives each head of an executive department general power to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."[373]  The grant is facially ambiguous, because it does not specify whether the "regulations" to which it refers include legislative rules, or merely procedural and interpretive rules.  The Court resolved the ambiguity by analyzing the language and history of § 301, concluding that it authorized only "rules of agency organization, procedure or practice," as opposed to legislative rules.[374]  Application of the framework of the convention would have yielded the same conclusion with less effort, because § 301 does not contain any sanction for violating the rules promulgated under its authority.  But the Court did not mention the convention.

*Gilbert* and *Chrysler* are especially revealing because then-Justice William Rehnquist wrote both opinions.  In contrast to the authors of the other decisions we have considered, Justice Rehnquist was, at least at this time, highly sympathetic to the nondelegation doctrine.[375]  This explains his endorsement of the proposition, as stated in *Chrysler*, that "[t]he legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes."[376]  Yet even Justice Rehnquist, with his sensitivity to the nondelegation doctrine, was unable to discern the convention.  By 1979, as far as Supreme Court Justices and Supreme Court litigants were concerned, the convention had disappeared.

---

[372] *See id.* at 308–12.

[373] 5 U.S.C. § 301 (2000).

[374] *Chrysler*, 441 U.S. at 310.  For a discussion of the history of the Housekeeping Act, see *supra* pp. 485–86.

[375] Shortly after *Gilbert* and *Chrysler*, then-Justice Rehnquist authored two widely discussed minority opinions suggesting that aspects of the Occupational Health and Safety Act were unconstitutional on nondelegation grounds.  *See* Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 543–44 (1981) (Rehnquist, J., dissenting); Indus. Union Dep't, AFL–CIO v. Am. Petroleum Inst., 448 U.S. 607, 675–76 (1980) (Rehnquist, J., concurring).  More recently, as Chief Justice, he appears to have lost interest in the issue.  For example, he joined the Court's opinions rejecting nondelegation challenges in *Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001); and *Mistretta v. United States*, 488 U.S. 361 (1989).

[376] *Chrysler*, 441 U.S. at 302.

### B. Why the Convention Was Ignored

After a half-century of legislation in which Congress employed the convention to signal whether rulemaking grants authorized legislative rules or housekeeping rules, why did the convention never surface in Supreme Court litigation?  The most obvious explanation — and in the end the only satisfactory one — is that no party in any of these cases ever described the convention in its briefs.[377]  The Court is not omniscient and largely depends on the parties for information about the relevant law that applies to the many controversies it must resolve. If the parties fail to mention a source of law, the Court cannot be expected to discover it on its own.

It is possible, of course, that one or more Justices might have known about the convention from their own legal experiences.  Many Justices of this period had congressional and executive experience. Justices Black, Vinson, Burton, and Minton had served in the Senate; Justices Reed, Jackson, and Clark had served in high level positions in the Department of Justice, and Justice Douglas had been Chairman of the SEC.  But the convention functioned at a level of detail below that with which these individuals ordinarily would have been involved in their legislative and administrative capacities.  Thus, it is not surprising that they would not have known about the convention, or if they once had known about it, that they would forget about it years later when presented with briefs in which it was not mentioned.

Justice Felix Frankfurter is the most difficult to account for, since he taught administrative law at Harvard before being appointed to the Court and was familiar with *Eaton* and *Grimaud*.[378]  But Frankfurter was more an intellectual mentor to other administrative law scholars

---

[377] If any party in these cases had intended to describe the convention, one would expect at a minimum to find some reference to *United States v. Grimaud*, 220 U.S. 506 (1911).  In only one of the eight cases, however, did the parties make any reference to *Grimaud* in their briefs, and they did not do so to make the point that congressional sanctions for rule violations mark a grant of rulemaking as legislative.  *Compare* Brief for Intervenor-Appellee Teamsters Union at 50, Am. Trucking Ass'ns v. United States, 344 U.S. 298 (1953) (No. 26) ("The grant of a broad scope of rule-making authority, to fill the gaps of regulation, is a customary technique well established since *United States v. Grimaud*."), *with* Brief of Appellants at 31–32, *American Trucking*, 344 U.S. 298 (1953) (No. 26) (distinguishing *Grimaud* on the ground that the statute in that case expressly delegated to the Secretary the power to control public lands, whereas the Motor Carrier Act did not expressly give the ICC the power to regulate motor carrier leasing practices).

[378] *See* Singer v. United States, 323 U.S. 338, 351 (1945) (Frankfurter, J., dissenting) ("It is only when Congress in advance prescribes criminal sanctions for violations of authorized rules that violations of such rules can be punished as crimes.  It is this far-reaching distinction which, it was pointed out in the *Grimaud* case, put on one side the doctrine of the *Eaton* case, where violation of rules and regulations was not made criminal, and on the other side legislation such as that enforced in the *Grimaud* case where Congress specifically provided that '*any violation of the provisions of this act or such rules and regulations* [of the Secretary of Agriculture] *shall be punished*.'" (alteration in original) (quoting *United States v. Grimaud*, 220 U.S. at 515)).

and practitioners than a serious scholar of the subject himself.[379]  His casebook on administrative law, a jumble of material with little commentary, makes no mention of the convention.[380]  Nor does he allude to it in his other administrative law writings, most of which take the form of essays or introductions to other scholars' work.[381]

That the Justices were unfamiliar with the convention, however, only pushes the inquiry back one step: why did the parties fail to discuss it in their briefs?  With respect to the first four cases in our survey, it is clear why the industry lawyers did not allude to the convention: the convention represented a losing argument for them.  Their clients were anxious to secure a ruling holding particular regulations invalid, but in each case the convention indicated that the relevant agencies (the FCC, ICC, and Federal Power Commission) *did* have the authority to issue regulations having the force of law.  Consequently, the industry lawyers concentrated on other arguments.

It is less clear why the government lawyers representing the agencies in these cases did not discuss the convention.  Of course, their primary task was to defend the regulations against the attacks leveled by the industry lawyers, and achieving this goal did not require any reliance on the convention.  But the government would have gained at least a psychological advantage by demonstrating that Congress clearly intended to delegate legislative rulemaking authority to the agencies in question.  Perhaps the omission stems in part from the fact that the agencies are represented in the Supreme Court by lawyers in the Solicitor General's office.  These lawyers specialize in appellate advocacy and derive most of their knowledge from studying Supreme Court opinions.  Generally, they do not have a deep understanding of the law that surrounds the agencies they represent.  Because the convention had never appeared in an appellate opinion and existed only in the "common law" of agency authority as understood by lawyers in Congress and the agencies, the Solicitor General's lawyers perhaps were not aware of it.

With respect to the lawyers who came of age after World War II, there is a more basic explanation for the lack of awareness of the convention.  Administrative law scholarship in this period was dominated by scholars who were veterans of government service during the New Deal era.  As a general rule, these scholars downplayed the importance of limits on agency powers, instead emphasizing the pragmatic case for

---

[379] *See* WILLIAM C. CHASE, THE AMERICAN LAW SCHOOL AND THE RISE OF ADMINISTRATIVE GOVERNMENT 137–39 (1982).

[380] *See* FELIX FRANKFURTER & J. FORRESTER DAVISON, CASES AND OTHER MATERIALS ON ADMINISTRATIVE LAW (1st ed. 1932).

[381] *See, e.g.,* Felix Frankfurter, *Introduction,* 18 IOWA L. REV. 129 (1933); Felix Frankfurter, *The Task of Administrative Law,* 75 U. PA. L. REV. 614 (1927).

broad delegation of powers to administrative agencies and the impor-
tance of adapting administrative procedure to a judicial model of deci-
sionmaking.[382]  It is thus no coincidence that the early writings of
these scholars contain little discussion of rulemaking (in contrast to ad-
judication) and no discussion of how to determine whether an agency
has been granted legislative rulemaking authority.[383]  Nor is it a coin-
cidence that the instructional materials produced by members of this
group after the New Deal devoted little coverage to rulemaking, and
none at all to the interpretation of facially ambiguous delegations of
rulemaking authority.[384]  For this generation of scholars, the question
of how agencies obtain the power to issue rules that have the force and
effect of statutes was an awkward and potentially destabilizing one for
the federal administrative state.  Since no prominent appellate opinion
dealt with the issue, these scholars evidently felt no obligation to ex-
plore the question in their instructional materials.[385]  As best we can
tell, no lawyer who attended law school after World War II would
have learned about the convention from even the most assiduous study
of the classroom materials in use during this period.

   In any event, by the time we get to *Thorpe* and *Mourning*, consid-
erations of legal relevance and litigational advantage cannot explain
the failure of the parties to alert the Court to the convention.  The only
plausible explanation is collective ignorance.  In *Thorpe*, the conven-
tion provided a winning argument for the housing authority, but the
authority did not mention it.  It is possible that the lawyers for the

---

[382] *See* CHASE, *supra* note 379, at 136–50; G. EDWARD WHITE, THE CONSTITUTION AND
THE NEW DEAL 94–127 (2000).

[383] *See, e.g.*, WALTER GELLHORN, FEDERAL ADMINISTRATIVE PROCEEDINGS (1941) (con-
taining no index entries to regulations, rules, or rulemaking despite the author's experience as re-
search director of the Attorney General's Committee on Administrative Procedure); JAMES M.
LANDIS, THE ADMINISTRATIVE PROCESS (1938) (attempting to justify agencies on the ground
of their neutral expertise but containing no index entries to regulations, rules, or rulemaking); *see
also* JOHN DICKINSON, ADMINISTRATIVE JUSTICE AND THE SUPREMACY OF LAW IN THE
UNITED STATES 15 n.25 (1927) (noting that "[t]he subject of administrative regulations lies out-
side the scope of this book").

[384] *See* WALTER GELLHORN, ADMINISTRATIVE LAW: CASES AND COMMENTS (1st ed.
1940; 2d ed. 1947); WALTER GELLHORN & CLARK BYSE, ADMINISTRATIVE LAW: CASES AND
COMMENTS (1954); LOUIS L. JAFFE, ADMINISTRATIVE LAW: CASES AND MATERIALS (1953);
KENNETH C. SEARS, CASES AND MATERIALS ON ADMINISTRATIVE LAW (1938).  Professor
Davis, whom we have previously cited, devoted much more attention in his early work to rule-
making and to the distinction between legislative and interpretive rules.  *See* KENNETH CULP
DAVIS, ADMINISTRATIVE LAW §§ 54–55 (1951); 1 DAVIS, *supra* note 323, § 5.03; Davis, *supra*
note 79, at 928–34.  Although he cited some of the materials we discuss in this Article that recog-
nize the convention, he did not explicitly describe the convention in any of his work; indeed, he
did not seriously consider the possibility that the scope of an agency's power could be determined
from examining the terms of its organic legislation.

[385] In administrative law, as elsewhere in the law school curriculum, instructional materials
tend to emphasize appellate opinions to the exclusion of virtually everything else.  *See* CHASE,
*supra* note 379, at 117–24.

housing authority made a deliberate decision to concentrate solely on other arguments such as retroactivity. We learn from the Court's opinion that the authority had already begun complying with the circular,[386] and thus perhaps its only interest in continuing the litigation was to avoid an award of attorneys' fees. Still, it is unlikely that the authority's lawyers would have waived a winning argument had they been aware of its existence.

*Mourning* is even more revealing. The petitioner in *Mourning* — who supported the Federal Reserve Board's four-installment rule — devoted several pages of her brief to the issue of the Board's authority to promulgate legislative rules under the Truth in Lending Act's facially ambiguous rulemaking grant.[387] The petitioner set forth numerous arguments explaining why the grant authorized legislative rules. This presentation was thoroughly researched, but it included no mention of Congress's convention.[388] Given the petitioner's detailed analysis of the Board's general rulemaking grant, it is fair to assume that she would have relied upon the convention if she had been aware of it. Petitioner's failure to raise the convention thus suggests that the convention had disappeared from the consciousness of Supreme Court litigators by the time *Mourning* was argued and decided in 1973.

The final two cases confirm that knowledge of the convention was lost to the circle of lawyers who argue cases before the Supreme Court. In *Gilbert*, petitioner General Electric and supporting amici had every incentive to show that the EEOC's guidelines did not have the force of law. Granted, the express language of the general rulemaking grant made it possible to do so without resort to the convention. Still, had the lawyers known of the convention, one would expect some mention

---

[386] Thorpe v. Hous. Auth., 393 U.S. 268, 283 (1969).

[387] *See* Brief for Petitioner at 21–27, Mourning v. Family Publ'ns Serv., Inc., 411 U.S. 356 (1973) (No. 71-829).

[388] The petitioner argued that Supreme Court precedent established that general rulemaking grants arguably confer legislative powers even where several specific rulemaking grants are also included in the Act. *Id.* at 22–23. Relying on *Thorpe*, the petitioner claimed that "[t]he fact that the Act contains substantive provisions and authorizes the Board to issue interpretive regulations does not necessarily negate the grant of legislative rule making power to carry out the Act's more broadly phrased statement of purpose." *Id.* at 22. The petitioner acknowledged that the general rulemaking grant given to the Secretary of the Treasury under the Internal Revenue Code (IRC) was understood to authorize only interpretive rules. *Id.* at 23–24. However, the petitioner distinguished the Board's general rulemaking grant under the Truth in Lending Act from the grant included in the IRC on the ground that the Truth in Lending grant authorizes rules "to carry out *the purposes*" of the Act. *Id.* at 23 (emphasis added) (quoting 15 U.S.C. § 1604 (2000)) (internal quotation marks omitted). This language, the petitioner argued, was broader than the statutory language used in the IRC, which merely gives the power to issue rules "for the enforcement of this title." *Id.* (quoting 26 U.S.C. § 7805(a) (2000)) (internal quotation marks omitted). Finally, the petitioner supported her contention that the Board's general rulemaking grant authorizes legislative rules by pointing to section 1602(g) of the Truth in Lending Act, which gives Board regulations the same legal force as statutory provisions. *Id.* at 24 (citing 15 U.S.C. § 1602(g)).

of it. Yet the briefs' arguments only focus on the language of the rulemaking grant, never once referring to the convention.[389] Similarly, in *Chrysler*, the petitioner was anxious to demonstrate that 5 U.S.C. § 301 authorized only procedural and not legislative rules. Although the history of the rulemaking grant suggests it was, as its colloquial name indicates, only a housekeeping grant, one would expect some reference to the convention to confirm the point. The briefs, however, contained an exposition of the history of the particular grant but did not mention the convention.[390]

It is tempting to attribute this collective silence about the convention to changes in legal beliefs and values, such as a decline in belief in the Austinian conception of law as commands backed by sanctions[391] or a diminished allegiance to the nondelegation doctrine. But it is not clear that any such explanation holds water. The decision in *Thorpe* is as "Austinian" in its understanding of law as anything found in the opinions of the late nineteenth century. Once the Court deemed the HUD circular to have the force of law, it regarded the circular as having a direct preemptive effect on the state law of eviction and on the leases between housing authorities and their tenants. And although the early decisions in our series authored by New Dealers like Justices Frankfurter, Reed, and Douglas may conceivably reflect a latent hostility toward the nondelegation doctrine, this cannot be said of the last two decisions in our series, authored by then-Justice Rehnquist. *Gilbert* and *Chrysler*, in fact, reflect the first steps in a short-lived effort by Justice Rehnquist to *revive* the nondelegation doctrine.[392] Even Judge J. Skelly Wright, author of the leading appellate opinion that conferred legislative rulemaking power in the absence of conventional sanctions, purported to be an enthusiast of the nondelegation doctrine, going so far as to publish an article urging its re-

---

[389] *See* Brief of Westinghouse Electric Corporation as Amicus Curiae in Support of the Position of General Electric Company at 27–28, Gen. Elec. Co. v. Gilbert, 429 U.S. 125 (1976) (No. 74-1589) (arguing that Congress inserted the word "procedural" into the general rulemaking grant to exclude legislative rules from the EEOC's powers); *see also* Brief Amici Curiae of Owens-Illinois, Inc. & The Sherwin Williams Co. at 10–11, *Gilbert*, 429 U.S. 125 (1976) (No. 74-1589) (contending that the "EEOC was granted only *procedural, not substantive*, rulemaking authority, a clear indication of Congress' intent to allow EEOC substantially less rulemaking authority than most other administrative agencies").

[390] *See* Brief of Petitioner Chrysler Corporation at 48–51, Chrysler Corp. v. Brown, 441 U.S. 281 (1979) (No. 77-922) (arguing that 5 U.S.C. § 301 is merely a housekeeping statute that enables "agencies to carry out routine administrative tasks and to promulgate regulations for the conduct of their day-to-day operations"); *see also* Brief for the Respondents at 49, *Chrysler*, 441 U.S. 281 (1979) (No. 77-922) (same).

[391] *See* AUSTIN, *supra* note 126, at 13–15.

[392] *See supra* note 375 and accompanying text.

vival.[393]   Thus, there would appear to be no correlation between support for the nondelegation doctrine and receptivity to, or even acknowledgement of, the convention.

In the end, the most parsimonious explanation for the fact that the Supreme Court ignored the convention is simple ignorance.   The proximate cause of the Court's ignorance was the ignorance of the lawyers who appeared before it.   The lawyers remained ignorant because, due to accidents of timing, no case presenting an opportunity for the Court to recognize the convention arose when the convention was most familiar to lawyers serving in Congress and the agencies. Suppose that the FTC or the NLRB had sought to engage in legislative rulemaking in the 1940s, and these actions had been challenged in litigation reaching the Supreme Court or even the courts of appeals. The upshot almost certainly would have been an appellate opinion explaining why the facially ambiguous rulemaking grants that Congress gave to these agencies did not include the power to make rules with the force of law.   But this did not happen.   And it did not happen, ironically enough, primarily because it was *so clear* to the staff attorneys at the FTC and the NLRB that their agencies lacked statutory authority to make such rules.   Because lawyers tend to learn the law from reading appellate opinions,[394] and the convention never appeared in the Supreme Court opinions about rulemaking that accumulated in the years after the New Deal, the possibility of recovering knowledge of the convention slipped away.

## V. THE CONVENTION ERASED

The Supreme Court's failure to attend to the distinction between grants of legislative and housekeeping rulemaking — and the American practice of distilling knowledge of public law from Supreme Court opinions — set the stage for the de facto erasure of the convention by the courts of appeals.   As agencies and commentators began to perceive the advantages of rulemaking over adjudication, they began to rely on the language in several of the Court's opinions (including *National Broadcasting*, *American Trucking*, *Storer Broadcasting*, *Texaco*, *Thorpe*, and *Mourning*) as support for the proposition that agencies previously thought not to have legislative rulemaking authority in fact had enjoyed such power from their inception.   The understanding that eventually emerged was exactly the opposite of the *Queen and Cres-*

---

[393] *See* J. Skelly Wright, *Beyond Discretionary Justice*, 81 YALE L.J. 575, 582 (1972) (arguing that Congress should not be able "to vote itself out of business.   There must be some limit on the extent to which Congress can transfer its own powers to other bodies without guidance as to how these powers should be exercised.").

[394] *See supra* note 385.

*cent Case* express-statement canon: ambiguous grants of rulemaking authority are presumed to confer legislative rulemaking power unless Congress expressly indicates that the grant is limited to procedural or interpretive rules.

## A. Commentators Advocate Expanded Use of Rulemaking

Beginning in the late 1950s and early 1960s, administrative law commentators began to call for increased use of rulemaking. The case for rulemaking rested on two somewhat disparate sets of concerns — fairness and efficacy. Some commentators emphasized the greater fairness of rules relative to adjudication. Making policy through adjudication can lead to inconsistent outcomes and frustrates expectations when policy changes retroactively.[395] Making policy through rulemaking is much more likely to result in standards that apply prospectively, providing clear notice of the law's requirements to all concerned.[396] Other commentators championed rulemaking as a means of making agencies more effective regulators.[397] For example, some argued that rulemaking allows agencies to promulgate blanket prohibitions against certain industrywide practices.[398]

These somewhat conflicting aspirations — constraining agency discretion and expanding agency power — convinced numerous scholars and lawyers to join the call for more rulemaking. Warren E. Baker, the general counsel of the FCC, wrote a pioneering article in 1957 that embraced both themes. He argued that "rule-making is a sounder way of proceeding than the case-by-case method or general declarations of policy."[399] He pointed to *Storer Broadcasting* as "a perfect example" of how agencies could set policy through rulemaking.[400] He contended

---

[395] *See, e.g.*, KENNETH CULP DAVIS, DISCRETIONARY JUSTICE 66 (Illini Books ed. 1971) (1969) (arguing that the retroactive feature of adjudication may "be sufficiently unfair that good administrators ought to try to avoid it").

[396] *See generally* Shapiro, *supra* note 296, at 929–42 ("[A] rule declared in a regulation is more likely than a rule declared in adjudication to be limited in application to determining the legal status of future conduct . . . ."); *see also* DAVIS, *supra* note 395, at 66 ("[P]rospective rules often should be preferred to retroactive law-making through adjudication.").

[397] *See, e.g.*, Peter Barton Hutt, *Philosophy of Regulation Under the Federal Food, Drug and Cosmetic Act*, 28 FOOD DRUG COSM. L.J. 177, 183 (1973) (arguing that rulemaking allows the FDA to "induce widespread compliance" more effectively); Richard A. Wegman, *Cigarettes and Health: A Legal Analysis*, 51 CORNELL L.Q. 678, 749–51 (1966) (arguing that FTC rulemaking could effectively address the dangers of smoking because the "rulemaking approach assures that the entire industry will feel the weight of the FTC sanction at the same time").

[398] *See* Shapiro, *supra* note 296, at 935 (noting the FTC's view that "when a practice is widespread in an industry, a rulemaking proceeding operates evenhandedly to bar that practice on the part of all, while an order directed only to one permits his competitors to gain an unfair advantage").

[399] Warren E. Baker, *Policy by Rule or Ad Hoc Approach — Which Should It Be?*, 22 LAW & CONTEMP. PROBS. 658, 671 (1957).

[400] *See id.* at 670.

that rulemaking, by setting clear, across-the-board standards, serves as a more effective means of establishing policy than the manifold, time-consuming suits required by adjudication.[401]   In addition, he noted that rulemaking avoids the harsh consequences inherent in the retroactive application of agency policy set case-by-case through adjudication.[402]

Two prominent public figures, James Landis and Judge Henry Friendly, soon added their voices to the call for increased agency rulemaking.   In 1960, Landis wrote his influential *Report on Regulatory Agencies to the President-Elect*, in which he contended, "A prime criticism of the regulatory agencies is their failure to develop broad policies in the areas subject to their jurisdiction."[403]   Landis suggested that, rather than rely solely on adjudication, agencies should use rulemaking to set forward-looking policy.[404]   Similarly, in a book published in 1962, Judge Friendly explained that a major source of dissatisfaction with the federal administrative agencies stemmed from their "failure to develop standards sufficiently definite to permit decisions to be fairly predictable and the reasons for them to be understood."[405]   Although Judge Friendly devoted most of his book to the contention that agencies should develop more detailed adjudicative standards, he also urged that the case-by-case adjudication method "should be supplemented by much greater use of two other devices — policy statements and rulemaking."[406]

Professor Kenneth Culp Davis soon threw his formidable energies into promoting greater use of rulemaking.   In his 1969 book *Discretionary Justice*, Davis proclaimed rulemaking to be "one of the greatest inventions of modern government."[407]   He concluded that rulemaking is generally superior to adjudication because of its prospective nature and because it allows interested parties to participate in the development of the rule.[408]   Davis urged all policymakers to "push administra-

---

[401] *Id.* at 664.

[402] *Id.* at 662–63.

[403] JAMES M. LANDIS, REPORT ON REGULATORY AGENCIES TO THE PRESIDENT-ELECT 22 (1960).   *See generally* Carl McFarland, *Landis' Report: The Voice of One Crying in the Wilderness*, 47 VA. L. REV. 373, 434–36 (1961) (analyzing Landis's report and discussing Landis's suggestion that other methods of policy planning, such as rulemaking, should be used by agencies in addition to adjudication).   *But cf.* LANDIS, *supra* note 383 (New Deal-era work by same author that largely ignores rulemaking).

[404] LANDIS, *supra* note 383, at 18 (noting that "[p]olicy also emanates from rule-making where forward-planning is more possible").

[405] HENRY J. FRIENDLY, THE FEDERAL ADMINISTRATIVE AGENCIES 5–6 (1962).

[406] *Id.* at 145.   In 1965, Louis L. Jaffe, an administrative law professor at Harvard, agreed with Judge Friendly, noting that "agencies should do more to formulate policies and guides."   LOUIS L. JAFFE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 49 (1965).

[407] DAVIS, *supra* note 395, at 65.

[408] *Id.* at 66.

tors toward earlier and more diligent use of the rule-making power,"[409] and asserted that "[t]he typical failure in our system that is correctible is not legislative delegation of broad discretionary power with vague standards; it is the procrastination of administrators in resorting to the rule-making power to replace vagueness with clarity."[410]

Davis acknowledged that some agencies may lack statutory power to issue legislative rules with the force of law.[411] He argued, however, that this was not a justification for failure to issue rules, because even agencies lacking legislative rulemaking powers could issue interpretive rules.[412] Davis approvingly pointed to the FTC as an example of an agency that lacked legislative rulemaking powers but that had nevertheless engaged in valuable interpretive rulemaking.[413]

Soon, numerous scholars joined Davis, Landis, and Judge Friendly in cheerleading for rulemaking.[414]   *Storer Broadcasting*, *Texaco*, *Mourning*, and *Thorpe* were all cited in support of this advocacy.[415] For example, one scholar writing in 1965 relied on *Texaco* to argue in support of legislative rulemaking by the FTC.[416] Similarly, Professor Ralph F. Fuchs noted that *Texaco* and *Storer Broadcasting* were "likely to provide a new impetus" to rulemaking.[417] Fuchs predicted in

---

[409] *Id.* at 57.

[410] *Id.* at 56–57 (emphasis omitted).

[411] *Id.* at 220.

[412] *Id.* at 68, 220.

[413] *Id.* at 74–77.

[414] *See, e.g.*, Merton C. Bernstein, *The NLRB's Adjudication-Rule Making Dilemma Under the Administrative Procedure Act*, 79 YALE L.J. 571, 622 (1970) (contending that the NLRB should try rulemaking to "reinvigorate agencies now settled into dull, time-consuming, and relatively unproductive adjudicatory routines"); McFarland, *supra* note 403, at 433 (arguing for rulemaking as an alternative to setting policy through adjudication); Carl S. Silverman, *The Case for the National Labor Relations Board's Use of Rulemaking in Asserting Jurisdiction*, 25 LAB. L.J. 607 (1974) (contending that the NLRB should use rulemaking when deciding whether to assert jurisdiction).

[415] *See, e.g.*, Peter Barton Hutt, *Impact of Recent Court Decisions on the Future of FDA Regulations: An Impromptu Response to the Remarks of the Speakers*, 28 FOOD DRUG COSM. L.J. 707, 712 (1973) [hereinafter Hutt, *Impact of Recent Court Decisions*] (arguing that the debate over the FDA's general rulemaking grant, "although delightful for academic discussions and conferences," would turn out to be one of the "great red herrings of all time" because of cases like *Thorpe* and *Mourning*, which had upheld rulemaking based on general grants); *cf.* Ralph F. Fuchs, *Agency Development of Policy Through Rule-Making*, 59 NW. U. L. REV. 781, 788–89 (1965) (viewing *Storer Broadcasting* and *Texaco* as providing agencies encouragement to settle policy questions through regulation); Glen O. Robinson, *The Making of Administrative Policy: Another Look at Rulemaking and Adjudication and Administrative Procedure Reform*, 118 U. PA. L. REV. 485, 488–89 (1970) (discussing how *Storer* and *Texaco* invited agencies to use their largely neglected rulemaking powers).

[416] Wesley E. Forte, *The Food and Drug Administration, the Federal Trade Commission and the Deceptive Packaging of Foods*, 40 N.Y.U. L. REV. 860, 886 n.125 (1965) (citing *Texaco* as "the most authoritative source" for the FTC having "the basic authority necessary for . . . specific rulemaking activies").

[417] Fuchs, *supra* note 415, at 788–89.

1965 that, given the momentum these decisions provided, battles over agency powers to issue legislative rules based solely on general rulemaking grants had "probably just begun."[418]

### B. The FTC, FDA, and NLRB Exercise Legislative Rulemaking Powers

Professor Fuchs's prediction soon proved correct.  As the advocacy of rulemaking mounted in the 1960s, a number of agencies decided to test the limits of their rulemaking powers.  The payoff was substantial.  When the dust settled, three major agencies — the FTC, FDA, and NLRB — had acquired legislative rulemaking powers that Congress had not originally granted to them.

*1. The FTC.* — Consistent with the understanding that the FTCA did not confer any legislative rulemaking powers on the FTC, the agency made no attempt to promulgate rules with the force of law during the early decades of its existence.[419]  Later amendments to the Act, if anything, only underscored the limited nature of the agency's rulemaking powers.[420]  Congress expressly conferred legislative rulemaking authority on the FTC under several amendatory statutes, including the Wool Products Labeling Act[421] and the Fur Products Labeling Act.[422]  If Congress had granted general legislative rulemaking author-

---

[418] *Id.* at 806.

[419] *See* Shapiro, *supra* note 296, at 925 (noting that in the first half of this century, the FTC relied on adjudicatory proceedings rather than regulations to control unfair practices).

[420] A House Report issued in 1957 highlighted the limited nature of the FTC's rulemaking powers:

> The Federal Trade Commission, through its trade practice conference procedure, has promulgated rules with respect to the labeling and advertising of rayon, acetate, linen, and silk which move in interstate commerce.  *These rules, as such, do not have the force and effect of law but are rather advisory interpretations* as to what may constitute unfair methods of competition and unfair and deceptive acts or practices in commerce, under the Federal Trade Commission Act.  These rules, insofar as they go, have worked reasonably well, but their chief handicap is the limited jurisdiction of the Commission under its organic statute.

H.R. REP. NO. 85-986, at 2 n.1 (1957) (emphasis added).

[421] Ch. 871, § 6(a), 54 Stat. 1128, 1131 (1940) (codified as amended at 15 U.S.C. § 68d(a) (2000)) (authorizing the FTC to make rules and regulations "as may be necessary and proper for administration and enforcement").  Congress gave the rules promulgated under this general rulemaking grant legislative effect through various statutory provisions.  For example, section 3 provided that the introduction into commerce of any wool product that was misbranded within the meaning of the Act or of the *rules or regulations* promulgated by the FTC was unlawful, *id.* § 3, 54 Stat. at 1129 (codified at 15 U.S.C. § 68h), and section 10 then subjected any person who willfully violated section 3 to criminal penalties, *id.* § 10, 54 Stat. at 1133 (codified at 15 U.S.C. § 68i).

[422] Ch. 298, § 8(b), 65 Stat. 175, 180 (1951) (codified at 15 U.S.C. § 69f(b)) (authorizing the FTC to promulgate rules and regulations "as may be necessary and proper for purposes of administration and enforcement of this Act").  Various statutory provisions gave legislative effect to the rules and regulations promulgated under this general grant.  For example, section 3(a) made it unlawful to introduce into commerce any fur product that is misbranded within the meaning of the Act or of "the rules and regulations prescribed under Section 8(b)," *id.* § 3(a), 65 Stat. at 176 (codified at

*HARVARD LAW REVIEW* [Vol. 116:467]

ity to the FTC in 1914 when it created the Commission, these subsequent grants of legislative rulemaking powers would have been superfluous.[423]

The history of the Flammable Fabrics Act of 1953[424] confirms most strikingly that Congress did not grant the FTC legislative rulemaking powers under the original FTCA. The Flammable Fabrics Act included a general rulemaking grant that authorized the FTC to "prescribe such rules and regulations as may be necessary and proper for purposes of administration and enforcement of this Act."[425] Congress wrote this grant in language similar to the general grant included in section 6(g) of the FTCA. Both stood alone, lacking any statutory sanctions to put teeth into the regulations. In 1967, however, Congress amended the Flammable Fabrics Act[426] by adding the following language to the rulemaking provision: "The violation of such rules and regulations shall be unlawful and shall be an unfair method of competition . . . under the Federal Trade Commission Act."[427] Congress also gave the FTC the authority to enjoin any violations of the rules and regulations promulgated under the Act.[428] These amendments confirm that the rulemaking grant in the 1953 Act (which was identical to the grant in section 6(g)) did not confer legislative rulemaking powers. More important, they also show that, as late as 1967, when Congress wanted to signal that a particular rulemaking grant conferred legislative rulemaking authority, it added a provision imposing legal sanctions for rule violations.

---

15 U.S.C. § 69a), and section 11(a) subjected any person who violated section 3 to criminal penalties, *id.* § 11(a), 65 Stat. at 181 (codified at 15 U.S.C. § 69i).

[423] *See* Burrus & Teter, *supra* note 14, at 1124–25; *see also* Carl A. Auerbach, *The Federal Trade Commission: Internal Organization and Procedure*, 48 MINN. L. REV. 383, 458 (1964) (noting that criminal penalties attach to the violation of regulations that the FTC promulgated under the Wool Products Labeling Act and the Fur Products Labeling Act and arguing that Congress should amend the FTCA "to give the Commission the power to issue substantive rules and regulations for the violation of which criminal and civil penalties should attach").

[424] Ch. 164, 67 Stat. 111 (1953).

[425] *Id.* § 5(c), 67 Stat. at 113 (codified as amended at 15 U.S.C. § 1194(c) (2000)).

[426] Flammable Fabrics Act, amendment, Pub. L. No. 90-189, § 4(a), 81 Stat. 568, 571 (1967) (codified as amended at 15 U.S.C. § 1194(c)) (amending section 5(c) of the Act). The House Report explained that one purpose of the amendment was to "make the Flammable Fabrics Act more flexible by permitting flammability standards and other regulations to be issued under rulemaking procedures rather than having them fixed by law as is now the case." H.R. REP. NO. 90-972, at 6 (1967). This comment explicitly suggests that the House in 1967 did not believe that the general grant included in the original Act authorized the FTC to promulgate legislative regulations.

[427] Flammable Fabrics Act, amendment, § 4(a), 81 Stat. at 571.

[428] *Id.* § 5(a), 81 Stat. at 571 (codified at 15 U.S.C. § 1195(a)) (amending section 6(a) of the 1953 Act by inserting "or rule or regulation prescribed under section 5(c)" immediately after "section 3").

(a) *The FTC's Regulatory Practices from 1914 to 1962.* — Because Congress chose not to grant the FTC legislative rulemaking powers, for the first half-century of its existence the agency relied mainly on three methods of making policy. Case-by-case adjudication served as the primary enforcement tool.[429] Under the FTCA, the FTC possessed the power to issue a complaint, set a hearing, and decide whether to issue a cease and desist order requiring the respondent to stop any activities found to be unfair commercial practices or unfair methods of competition.[430] However, the shortcomings of adjudication as a method of setting policy soon became apparent. Adjudication failed to achieve widespread compliance, reaching only individual violators and specific acts rather than industrywide practices.[431]

Soon after Congress established the FTC, the agency developed Trade Practice Conferences to help overcome the shortcomings of adjudication[432] and to identify practices that violated the laws administered by the FTC.[433] The procedure worked as follows: a specific industry, a consumer group, or the FTC would initiate a conference about a certain industry; proposed rules would be developed at the conference; the FTC would hold a public hearing on the proposed rules and then issue a Trade Practice Conference Rule (TPCR).[434] TPCRs were not regarded as legally binding.[435] Rather, the FTC relied on voluntary compliance by industry members.[436] If the FTC initiated suit based on a violation, the complaint would "charge [the

---

[429] *See* Wegman, *supra* note 397, at 730 (noting that "[t]he cease and desist procedure is the usual route by which the FTC takes action against unfair commercial practices").

[430] *See* Forte, *supra* note 416, at 887–88.

[431] *See* Wegman, *supra* note 397, at 740 (concluding that adjudication "was not adequate to deal with certain industry-wide practices, since repeated adjudications involving identical facts not only were extremely cumbersome, but resulted in considerable unfairness to all parties concerned").

[432] *See* Weston, *supra* note 181, at 566–67 (noting that the FTC had used Trade Practice Conference Rules since about 1919).

[433] The FTC explained the purpose of the Trade Practice Conference procedure as follows:
   [T]o encourage widespread observance of the law by enlisting the cooperation of members of industries and informing them more fully of the requirements of the law, so that wherever consistently possible the Commission may avoid the need for adversary proceedings against persons who, through misunderstanding or carelessness, may violate the law unintentionally.
Federal Trade Commission — Policies, 12 Fed. Reg. 5811 (Aug. 29, 1947).

[434] Forte, *supra* note 416, at 880.

[435] *See* Auerbach, *supra* note 423, at 452 (explaining that trade practice rules "do not, themselves, have the force of law").

[436] *See* Note, *Voluntary Compliance: An Adjunct to the Mandatory Processes*, 38 IND. L.J. 377, 386 (1962) (noting that TPC is a voluntary procedure whose purpose is "to eliminate and prevent, on a voluntary and industrywide basis . . . illegal practices and acts . . . violative of laws administered by the FTC").

party with] violation of the statutory provision on which the rules are premised, and . . . not . . . violation of the trade practice rule."[437]

In 1955, the FTC added a third form of policymaking to its tool bag: Guides.[438]  Like TPCRs, Guides did not have the force of law.[439]  The Guides program consisted essentially of interpretive rules spelling out the FTC's understanding of the requirements of the FTCA.[440]  For example, the FTC issued Cigarette Advertising Guides in 1955 to summarize its view that it was unlawful to represent that cigarette smoking presents no health risks or to make references to that effect.[441]

*(b) The FTC Turns to Legislative Rulemaking.* — After nearly a half-century of setting policy through adjudication, TPCRs, and Guides, in 1962 the FTC decided to institute a new procedure — Trade Regulation Rules (TRRs).  Although the legal impact of TRRs was initially unclear,[442] it soon became apparent that the FTC did, in fact, intend to treat TRRs as legislative regulations.

The FTC cautiously tested political support for its new legislative rulemaking experiment by issuing several TRRs that dealt with fairly trivial matters.[443]  None of these early rules stirred much contro-

---

[437] FTC Trade Practice Conference Rules, 20 Fed. Reg. 3061 (May 6, 1955).

[438] *See generally* Auerbach, *supra* note 423, at 452–53 (explaining that the Guides program began in 1955 and that by October 31, 1962, the FTC had issued nine Guides).

[439] *See* Note, *supra* note 436, at 394.

[440] *See* Weston, *supra* note 181, at 567; *see also* Note, *supra* note 436, at 397 (noting that the "primary compliance tool in connection with the guides program has been education").

[441] *See* Note, *supra* note 436, at 396.

[442] *See* Burrus and Teter, *supra* note 14, at 1119–20 (noting that the question still remained in 1966 concerning "whether the rules possess[ed] the force and effect of law or simply present[ed] a prima facie case which may be rebutted"); *see also* Auerbach, *supra* note 423, at 455, 457 (arguing that "[a] trade regulation rule will not have the force and effect of law, in the sense that a violator of the rule will become subject to a penalty for its violation" but also noting that Commissioner MacIntyre contemplated the use of "substantive rule making power").  Auerbach's article was an outgrowth of his report to the Committee on Internal Organization and Procedure of the Administrative Conference.  He argued in favor of a legislative amendment to give the FTC the power to issue legislative rules and regulations for the violation of which criminal penalties would attach. *Id.* at 458.  He noted that the Commission staff was at that time divided on the desirability of legislation.  The Director of the FTC's Bureau of Industry Guidance opposed legislation imposing penalties, but the Bureau of Deceptive Practices supported legislation authorizing rules enforceable by penalties. *Id.*

[443] *See* Note, *FTC Substantive Rulemaking: An Evaluation of Past Practice and Proposed Legislation*, 48 N.Y.U. L. REV. 135, 143 (1973) (stating that "[t]he FTC's initial ventures into the area of rulemaking were marked by caution, reflecting not only the problems of adjustment to a new form of regulation, but also, perhaps, concern over its power to proceed and sensitivity to possible political ramifications.  The Commission began with minor regulation of advertising and labeling in small businesses . . . .").  For example, in 1963 the agency promulgated a rule requiring that sleeping bags be marked with the size of the finished product rather than the dimensions of the material used in making the bags.  16 C.F.R. § 400 (1964).  Similarly, a 1965 TRR declared that the practice of describing household electric sewing machines as "automatic," "fully automatic," or

versy.[444]  The actual effect of the rules was unclear because the FTC did not immediately attempt to bring any enforcement actions based on them.[445]

However, in 1964, the FTC adopted its first major, controversial TRR, which dealt with unfair and deceptive practices in advertising and labeling cigarettes.[446]  Perhaps anticipating opposition, the FTC included a lengthy discussion in the rule's statement of basis and purpose justifying the agency's use of legislative rulemaking.[447]  The FTC cited Judge Friendly and other critics of the administrative process who had urged agencies to engage in more rulemaking.[448]  It relied on *National Broadcasting*, *Storer Broadcasting*, and *Texaco* to support its claim that it possessed the power to promulgate the cigarette rule.[449]  The agency also pointed to the general rulemaking grant in section 6(g) of the FTCA as a source of authority to issue binding rules.  Finally, it argued that even if section 6(g) were not in the Act, the TRRs would not be ultra vires: "It is implicit in the basic purpose and design of the Trade Commission Act as a whole, to establish an administrative agency for the prevention of unfair trade practices, that the Commission should not be confined to quasijudicial proceedings."[450]

The FTC was correct in anticipating an adverse reaction to the cigarette rule and a challenge to its authority to promulgate it.  The tobacco industry mounted a full-scale offensive against the TRR[451] and persuaded Congress to enact a weak labeling bill as a substitute for the strong restrictions contained in the FTC cigarette rule.[452]  The

---

"automatic zig-zag sewing machine[s]" violated section 5 of the FTCA.  *See* 16 C.F.R. § 401 (1966).

[444] *See* Note, *supra* note 443, at 143 (stating that the FTC's earliest legislative "rules were relatively trivial, dealing with uncomplicated facts and business practices that were easy to isolate and rectify").

[445] *See* Burrus and Teter, *supra* note 14, at 1120 n.69.

[446] 16 C.F.R. pt. 408 (1966).

[447] FTC Rules and Regulations: Commercial Practices, 29 Fed. Reg. 8324 (July 2, 1964).  The FTC tried to claim that the Cigarette Rule was not "legislative in the sense of adding new substantive rights or obligations."  *Id.*  Some scholars believed that the FTC's characterization of the rule as nonlegislative was correct.  For example, Kenneth Culp Davis argued in his book *Discretionary Justice* that the FTC's Cigarette Rule was merely interpretive. *See* DAVIS, *supra* note 395, at 74–75.  Davis cited the Cigarette Rule as a good example of a valuable interpretive rule, and he noted that "Congress had not delegated to [the FTC] a separate power to make substantive rules." *Id.* at 74.

[448] 29 Fed. Reg. 8324, 8368 n.139 (1964).

[449] *Id.* at 8373 n.157.

[450] *Id.* at 8369.

[451] *See* Wegman, *supra* note 397, at 725 (stating that the promulgation of the TRR "jolted the tobacco industry").  *See generally* A. LEE FRITSCHLER, SMOKING AND POLITICS 74 (3d ed. 1983) (noting that the cigarette industry was "determined to prove that the FTC had no authority to write such rules").

[452] Wegman, *supra* note 397, at 726.

resulting Federal Cigarette Labeling and Advertising Act[453] required all cigarette packages to be accompanied by a statement that said: "Cigarette Smoking May Be Hazardous To Your Health."[454]  When signed into law in 1965, it overrode the FTC's rule, thereby nullifying the FTC's first major TRR.[455]

After its ill-fated attempt to regulate the cigarette industry, the FTC again resorted to promulgating fairly minor, uncontroversial TRRs.[456]  Late in the 1960s, however, criticism of the FTC for failing to act more aggressively in enforcing the FTCA rose to a new pitch.[457] Especially significant in this regard was *The Nader Report on the Federal Trade Commission*,[458] which pointed to the cigarette-advertising rule as an example of how the FTC could act to protect consumers, "if properly directed and motivated."[459]

*(c) National Petroleum Refiners Association.* — Prompted by these criticisms, the FTC once again aggressively tested the limits of its TRR procedure in the late 1960s and early 1970s.[460]  The agency's pursuit of legislative rulemaking, in turn, led to closer scrutiny concerning whether the FTC in fact possessed legislative authority to is-

---

[453] Pub. L. No. 89-92, 79 Stat. 282 (1965).

[454] *Id.* § 4, 79 Stat. at 283.

[455] Congress also overrode other early TRRs by legislation. A TRR relating to the shipment of unordered merchandise was superseded by provisions in the Postal Reorganization Act. *See* Unordered Merchandise, 35 Fed. Reg. 10,116 (June 18, 1970) (setting forth 16 C.F.R. § 427, which was superseded by 39 U.S.C. § 3009 (2000)). In addition, the Truth in Lending Act overrode a TRR relating to the unsolicited mailing of credit cards. *See* Unsolicited Mailing of Credit Cards, 35 Fed. Reg. 4614 (Mar. 16, 1970) (adopting the credit card regulation that was superseded by 15 U.S.C. §§ 1642–1644 (2000)). Congress's willingness to override the FTC's first attempts at legislative rulemaking may suggest that Congress rejected the validity of the FTC's use of TRRs.

[456] *See* Note, *supra* note 443, at 144 (noting that after its experience with the cigarette rule, the FTC "reverted to earlier policies of caution, and several years of relatively minor rulemaking"); *see, e.g.*, Incandescent Lamp (Light Bulb) Industry, 16 C.F.R. § 409 (1971) (providing that failure to disclose certain information about light bulbs, including the average laboratory life expressed in hours and the light output expressed in average initial lumens, is a violation of the FTCA); Discriminatory Practices in Men's and Boys' Tailored Clothing Industry, 16 C.F.R. § 412 (1968) (declaring that certain advertising practices relating to men's and boys' tailored clothing constitute violations of the FTCA).

[457] *See* FRITSCHLER, *supra* note 451, at 75 (reporting that two very critical studies of the FTC appeared in the late 1960s, one written for the American Bar Association and the other by a group of law students working for Ralph Nader).

[458] EDWARD F. COX, ROBERT C. FELLMETH & JOHN E. SCHULZ, THE NADER REPORT ON THE FEDERAL TRADE COMMISSION (1969).

[459] *Id.* at 77. The period from the late 1960s to the early 1980s was the high-water mark of "capture theory," which depicted administrative agencies as the captives of big business; commentators promoted a variety of procedural innovations as cures. *See generally* Thomas W. Merrill, *Capture Theory and the Courts: 1967–1983*, 72 CHI.-KENT L. REV. 1039 (1997).

[460] *See generally* WILLIAM F. WEST, ADMINISTRATIVE RULEMAKING: POLITICS AND PROCESSES 120 (1985) (noting that the Nader Report was instrumental in pushing the FTC to rely more heavily on its rulemaking powers).

sue such rules.[461]  It also resulted in court challenges.  The first case, decided in 1968, challenged a TRR based in part on the theory that the FTC lacked the statutory authority to promulgate legislative rules.[462]  However, the U.S. District Court for the District of Columbia ducked the issue on ripeness grounds.[463]

The National Petroleum Refiners Association brought the next challenge, asserting that the FTC lacked the authority to promulgate a TRR requiring the posting of octane ratings on gasoline pumps.[464] This time the U.S. District Court for the District of Columbia addressed the issue of the FTC's rulemaking authority head on.  After thoroughly canvassing the history of the FTCA and its amendments, the court held that the FTC lacked any general authority to issue rules with the force of law.[465]

The district court's decision created an uproar[466] and nearly brought the FTC's legislative rulemaking to a halt.[467]  In response, Congress began debating legislation that would confer legislative rulemaking authority on the FTC.  Meanwhile, the government appealed the district court's decision to the U.S. Court of Appeals for the D.C. Circuit.  This appeal placed the FTC in the awkward position of having to argue to the D.C. Circuit that it was *clear* that the agency possessed legislative powers while simultaneously arguing to Congress that the FTC's rulemaking powers were sufficiently *ambiguous* to warrant congressional clarification.[468]

Before Congress could act, the D.C. Circuit weighed in, holding that section 6(g) conferred full legislative rulemaking authority on the FTC.[469]  Judge J. Skelly Wright's opinion for the unanimous panel,

---

[461] *Compare* Wegman, *supra* note 397, at 749 (concluding that the FTC did have the power to control conduct prospectively through legislative rulemaking of general applicability), *with* Auerbach, *supra* note 423, at 457–58 (concluding that the FTC did not have legislative rulemaking authority).

[462] *See* Bristol-Myers Co. v. FTC, 284 F. Supp. 745 (D.D.C. 1968).

[463] *Id.* at 748.

[464] *See* Nat'l Petroleum Refiners Ass'n v. FTC, 340 F. Supp. 1343, 1346–47 (D.D.C. 1972) (holding that the general rulemaking grant in the FTCA gave the FTC authority to make rules in connection with its housekeeping chores and investigative responsibilities but did not authorize legislative rulemaking).

[465] *See id.* at 1350.

[466] *See* Note, *supra* note 443, at 142 (criticizing the district court's decision and arguing that there were "serious weaknesses" in the court's analysis).

[467] *See* WEST, *supra* note 460, at 121.

[468] One lawyer, who served as General Counsel to the FTC during this time, recalled that he was busy "either arguing that the Commission had the power to promulgate rules or taking alternative steps, but, of course, maintaining the consistent argument that Congress should clarify the matter once and for all and set down the manner in which the Commission could promulgate Trade Regulation Rules." Ronald M. Dietrich, *Business and Trade Practices*, 28 FOOD DRUG COSM. L.J. 700, 701 (1973).

[469] Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672, 674 (D.C. Cir. 1973).

*HARVARD LAW REVIEW* [Vol. 116:467]

joined by Chief Judge David Bazelon and Judge Spottswood Robinson, is a remarkable legal document. Judge Wright commenced with the usual disclaimers, observing that the FTC "is a creation of Congress, not a creation of judges' contemporary notions of what is wise policy. The extent of its powers can be decided only by considering the powers Congress specifically granted it in the light of the statutory language and background."[470] "As always," he continued, "we must begin with the words of the statute creating the Commission and delineating its powers."[471]

There followed a discussion of section 5 of the FTCA, which authorizes the FTC to adjudicate complaints and issue cease and desist orders. Judge Wright rejected the industry's claim that this section was the exclusive source of the FTC's authority to act with the force of law.[472] There was no language in section 5 indicating that it was exclusive, Judge Wright observed.[473] And of course there was section 6(g), which expressly gave the FTC general authority to "make rules and regulations for the purpose of carrying out" various provisions of the Act, including section 5.[474] Read together, Judge Wright explained, the two provisions suggest that the FTC could issue legislative rules that would then be applied and enforced in adjudications brought pursuant to section 5.[475]

Judge Wright then shifted gears, noting that this reading "is reinforced by the construction courts have given similar provisions in the authorizing statutes of other administrative agencies."[476] There followed a skillful exposition and selective quotation from *National Broadcasting*, *Storer Broadcasting*, *Texaco*, *American Trucking*, and *Mourning*, which he read as supporting his claim that the FTC should be allowed to promulgate binding legislative rules.[477] Not surprisingly, Judge Wright's opinion reflected no recognition of a central difference between the rulemaking grants given to the agencies in these cases and the FTC's general rulemaking grant: namely, that the rulemaking grants in those cases, unlike Section 6(g), were coupled with statutory provisions imposing sanctions for rule violations.

The legislative history of the FTCA, as we have seen, provides significant evidence that Congress did not intend to grant legislative rulemaking authority to the FTC.[478] Judge Wright nevertheless pro-

---

[470] *Id.* at 674.
[471] *Id.*
[472] *Id.* at 674–77.
[473] *Id.* at 675.
[474] *Id.* at 676.
[475] *Id.*
[476] *Id.* at 678.
[477] *Id.* at 680.
[478] For a discussion of this legislative history, see *supra* section III.C.1, pp. 504–09.

**JA0404**

nounced this history to be "ambiguous" regarding the meaning of Section 6(g),[479] and then relegated the details to an appendix for the especially diligent reader to consult.[480]  Such ambiguity, he said, was not enough to overcome "the plain language of Section 6(g)," which, "read in light of the broad, clearly agreed-upon concerns that motivated passage of the Trade Commission Act, confirms the framers' intent to allow exercise of the power claimed here."[481]  In the end, Judge Wright adopted what amounted to a new canon: unless the legislative history reveals a clear intent to the contrary, courts should resolve any uncertainty about the scope of an agency's rulemaking authority in favor of finding a delegation of the full measure of power to the agency.

The immediate significance of *Petroleum Refiners* was short-lived. Congress soon mooted the issue by adopting the Federal Trade Improvement Act of 1975,[482] which expressly conferred legislative rulemaking powers on the FTC, subject to certain legislative and procedural limitations.[483]  But the importance of Judge Wright's opinion went far beyond its impact on the FTC's rulemaking powers.  His self-confident tone and masterful blending of Supreme Court precedents provided the roadmap for a more general erasure of the convention and invited other agencies, including the FDA, to assert generalized legislative rulemaking powers that Congress had not expressly granted.[484]

   *2. The FDA.* — The FDA's rulemaking story is both similar to and different from that of the FTC.  Much like the FTCA, the FDCA[485] included a facially ambiguous rulemaking grant that did not confer legislative rulemaking authority under the convention.[486]  Unlike the FTCA, however, the FDCA also included several *specific* rulemaking grants that did authorize legislative rulemaking under the convention.[487]  The drawback to these specific rulemaking grants, from the

---

[479] *Petroleum Refiners*, 482 F.2d at 686.

[480] *See id.* at 698.

[481] *Id.* at 686.

[482] Pub. L. No. 93-637, 88 Stat. 2183.

[483] *Id.* § 202, 88 Stat. at 2193–98 (codified as amended at 15 U.S.C. § 57a (2000)).

[484] Although *Petroleum Refiners* is the best-known decision of the D.C. Circuit broadly proclaiming that courts should presume congressional grants of general rulemaking powers to confer legislative rulemaking authority, it was followed by other, lesser-known decisions to the same effect.  *See, e.g., In re* Permanent Surface Mining Regulation Litig., 653 F.2d 514, 523–25 (D.C. Cir. 1981) (en banc) (relying in part on *Mourning* and *Petroleum Refiners* to conclude that the general rulemaking grant in the Surface Mining Control and Reclamation Act confers legislative rulemaking powers); Citizens to Save Spencer County v. EPA, 600 F.2d 844, 873–74 (D.C. Cir. 1979) (holding that section 301(a)(1) of the Clean Air Act, which gives the EPA general rulemaking authority, authorizes the agency to adopt legislative rules imposing preconstruction review requirements).

[485] Ch. 675, 52 Stat. 1040 (1938).

[486] For a discussion of the FDA's general rulemaking grant and evidence that Congress intended it to be merely nonlegislative in nature, see *supra* section III.C.2, pp. 509–19.

[487] *See supra* note 244.

perspective of the agency, was that they required the agency to use formal rulemaking procedures when promulgating rules.  Consistent with this understanding, for thirty years after the adoption of the FDCA the agency made no effort to use section 701(a) to promulgate legislative rules.  Rather, it set policy through case-by-case adjudication, interpretive rulemaking, and legislative rulemaking under its specific rulemaking grants.  Beginning in the 1960s and 1970s, however, the FDA — primarily in an effort to free itself from the formal procedural constraints that attached to the FDCA's specific rulemaking grants under section 701(e) — began to assert that section 701(a) authorized it to issue legislative rules using only informal notice-and-comment rulemaking procedures.[488]

(a) *The Debate over the FDA's Rulemaking Powers Under Section 701(a).* — The FDA's "belated discovery" of general rulemaking powers in section 701(a) stemmed largely from the entrepreneurial efforts of Peter Barton Hutt during his tenure as the FDA's chief counsel.[489] In a paper presented to the Food and Drug Law Institute in 1972, Hutt expounded the theory that the FDCA should be viewed as a "constitution" that gave the FDA broad authority to implement "a set of fundamental objectives."[490]  Specifically, he argued that the Act gave the FDA power to do anything not excepted or withheld by the Act,[491] and he cited the general rulemaking clause in section 701(a) to support his conclusion that the Act "provide[d] ample legal authority" for the FDA to adopt procedures for the enforcement of FDCA requirements.[492]

Hutt's theory sparked a debate over the FDA's rulemaking authority[493] and drew strong criticism from industry attorneys.[494]  For example, one attorney argued that "[i]t is for some a weird and dissonant note to hear that in the sensitive area of congressionally delegated authority, a well-motivated administrative agency can legally do what it alone deems desirable unless Congress has *in advance* specifically *prohibited* it."[495]  Similarly, in a paper delivered at an FDA-sponsored

---

[488] *See* 1 JAMES T. O'REILLY, FOOD AND DRUG ADMINISTRATION § 4:02 (1979) ("The Food and Drug Administration grew during the late 1960s and the 1970s from a law enforcement agency which brought deterrent actions against violators, into a more paper-bound generator of rules and regulations.").

[489] *See id.*

[490] Hutt, *supra* note 397, at 178–79.

[491] *See id.* at 179. *See generally* 1 O'REILLY, *supra* note 488, § 4:03 n.33.

[492] Hutt, *supra* note 397, at 185.

[493] *See generally* 1 O'REILLY, *supra* note 488, § 4:02.

[494] *See, e.g.,* H. Thomas Austern, *Philosophy of Regulation: A Reply to Mr. Hutt,* 28 FOOD DRUG COSM. L.J. 189, 191 (1973) (describing Hutt's approach as "delegation running riot" (quoting Justice Cardozo)); Thompson, *supra* note 249, at 206–08 (arguing that Hutt "ignor[ed] the law as written by Congress").

[495] Austern, *supra* note 494, at 190–91.

conference on food labeling in 1973, another attorney criticized Hutt's view that the FDA could use section 701(a) to evade the procedural restrictions imposed by section 701(e) rulemaking proceedings.[496]

The debate surrounding the FDA's decision to use section 701(a) to expand its rulemaking powers reached the courts in the early 1970s.[497] The first major cases to touch on the issue were four related 1973 Supreme Court decisions usually referred to as the *Hynson Quartet*.[498] These cases assumed without discussion that the FDA had authority to issue legislative regulations under section 701(a). For example, in *Weinberger v. Hynson, Westcott & Dunning, Inc.*,[499] the Court upheld certain FDA regulations issued under section 701(a) — regulations setting forth standards and procedures pertaining to drug approval[500] — without considering the antecedent question whether section 701(a) granted the agency authority to issue the regulations.[501] None of Justice Douglas's opinions for the Court in the four cases squarely addressed the meaning of section 701(a), nor did they advert to the distinction among legislative and other types of rules. The Court's inattention to this issue is unsurprising in light of the parties' briefs, which addressed section 701(a) and the distinction between legislative and nonlegislative rules only in passing.[502]

Lawyers and scholars immediately began debating the significance of the *Hynson Quartet*, especially in conjunction with Judge Wright's opinion in *Petroleum Refiners*, decided the same year.[503] Some scholars, including Professor Kenneth Culp Davis, argued that the *Hynson Quartet* did not definitively resolve the scope of section 701(a), because

---

[496] *See* Thompson, *supra* note 249, at 207–12 (suggesting that this FDA action was "designed to circumvent and emasculate 701(e) and thereby to substitute the agency's judgment for the will of Congress").

[497] An earlier case, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 138, 147 (1967), arguably addressed the issue in dicta, describing FDA rules issued under the authority of section 701(a) as "self-operative" rules "that must be followed by an entire industry."

[498] USV Pharm. Corp. v. Weinberger, 412 U.S. 655 (1973); Weinberger v. Bentex Pharms., Inc., 412 U.S. 645 (1973); Ciba Corp. v. Weinberger, 412 U.S. 640 (1973); Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609 (1973).

[499] 412 U.S. 609 (1973).

[500] *See id.* at 612–18.

[501] *Id.* at 617–18 (asserting without discussion that the Commissioner was acting pursuant to his section 701(a) authority in issuing the regulations).

[502] *See* Nat'l Ass'n of Pharm. Mfrs. v. FDA, 637 F.2d 877, 881 (2d Cir. 1981) (noting that the parties' discussion of section 701(a) and the legislative-interpretive distinction in the briefs of the *Hynson Quartet* was "meagre").

[503] *See, e.g.*, Becker, *supra* note 242, at 685 (concluding that the language in *Petroleum Refiners* indicates that a case involving section 701(a) of the FDCA might be decided the same way); *see also* Hutt, *Impact of Recent Court Decisions*, *supra* note 415, at 711–12 (contending that the Court "by its actions . . . made it quite clear as to its views on Section 701(a)"); Peter Barton Hutt, *Views on Supreme Court/FDA Decisions*, 28 FOOD DRUG COSM. L.J. 662, 663–66 (1973) [hereinafter Hutt, *Views on Supreme Court*] (explaining the decisions of the *Hynson Quartet* and their impact on the scope of the FDA's administrative authority).

the rules at issue "rested only in part on Section 701(a) and because the Court did not address itself to the question whether Section 701(a) was sufficient support for the rules."[504]   Others argued that the *Hynson Quartet* had definitively resolved the questions surrounding the meaning of section 701(a).[505]   In particular, Hutt contended that the *Hynson Quartet* invited the FDA to promulgate legislative rules under section 701(a).[506]   Hutt also pointed to *Petroleum Refiners* as a sign that the FDA would prevail in court if it attempted to use section 701(a) as a source of legislative rulemaking power.[507]

Hutt's prediction came true in *National Nutritional Foods Ass'n v. Weinberger*,[508] a Second Circuit case decided in 1975 by a panel composed of Judges Mansfield, Waterman, and Lumbard.[509]   The case involved an action brought by manufacturers and distributors of vitamins challenging FDA regulations promulgated under the authority of section 701(a); the regulations declared vitamins A and D in high doses to be "prescription drugs" within the meaning of section 503(b)(1) of the FDCA.[510]   The vitamin manufacturers and distributors alleged, inter alia, that the FDA had no authority to issue regulations having the force of law other than those promulgated under the formal rulemaking procedures of section 701(e).[511]   Writing for the court, Judge Mansfield concluded that section 701(a) did in fact authorize the FDA to

---

[504] 1 KENNETH CULP DAVIS, ADMINISTRATIVE LAW TREATISE § 6:8, at 478 (2d ed. 1978).

[505] *See, e.g.*, 1 O'REILLY, *supra* note 488, § 4:02 ("From the standpoint of administrative powers, the 1973 Supreme Court cases resolved long-standing questions about the scope of § 701(a) and about the FDA's inherent authority to impose legislative rules on the drug industry."); *see also* Pharm. Mfrs. Ass'n v. FDA, 484 F. Supp. 1179, 1182 (D. Del. 1980) (citing cases from the *Hynson Quartet* for the proposition that section 701(a) "authorizes the Secretary to promulgate binding, substantive regulations").

[506] *See* Hutt, *Views on Supreme Court*, *supra* note 503, at 664 (noting that the Court's decisions permit the FDA to "issue regulations for the efficient and effective enforcement of the Food, Drug and Cosmetic Act [that] have *substantive* effect").

[507] *See* Hutt, *Impact of Recent Court Decisions*, *supra* note 415, at 717.   Should a court strike down the FDA's legislative rulemaking powers under section 701(a), Hutt suggested (no doubt facetiously): "We will take all of our new regulations and deposit them with the Federal Trade Commission.   Since they have jurisdiction over labeling as well as advertising, we will simply ask the FTC to repromulgate them." *Id.*

[508] 512 F.2d 688 (2d Cir. 1975).

[509] Although all three judges agreed that the FDA had legislative rulemaking authority under section 701(a), *see id.* at 695–98, Judge Lumbard wrote a concurring opinion arguing that in cases in which an agency engages in legislative rulemaking under a general rulemaking authorization, the courts should interpret the phrase "arbitrary, capricious, [or] an abuse of discretion" in the APA in such a way as to ensure that especially rigorous judicial review of agency action is provided, *id.* at 705   (Lumbard, J., concurring) (quoting 5 U.S.C. § 706(2)(A) (2000)) (alteration in original).

[510] *See Weinberger*, 512 F.2d at 691.

[511] *See id.* at 694.

promulgate binding regulations without complying with the procedural safeguards set forth in section 701(e).[512]

In reaching this conclusion, Judge Mansfield relied on three factors. First, he noted that while courts had once demanded proof of a specific delegation of legislative authority to an agency purporting to issue legislative rules, modern courts "have learned from experience to accept a general delegation as sufficient in certain areas of expertise."[513] Second, he observed that "over the last decade rule-making has been increasingly substituted for adjudication as a regulatory technique, with the support and encouragement of courts" in cases such as *Petroleum Refiners*.[514]  Third, he concluded that any "doubts . . . regarding the FDA's power under § 701(a) to promulgate binding regulations were dispelled" by the Supreme Court's decisions in the *Hynson Quartet*.[515]

One factor that did not significantly influence the Second Circuit's holding in *Nutritional Foods* was the legislative history of the FDCA, which, as we have seen, provides strong evidence that Congress intended to grant legislative rulemaking authority to the FDA *only* pursuant to specific rulemaking grants.[516]  Judge Mansfield made just one brief reference to the legislative history in his opinion, observing that the court's attention had not been directed to anything in the legislative history of sections 701(a) or (e) that militated against the court's decision.[517]

After *Nutritional Foods*, many courts treated the issue of the FDA's legislative rulemaking authority under section 701(a) as settled.[518] But, perhaps because of the court's failure to address the crucial legislative history — and because of the possibility of Supreme Court review in some future case — other interested observers, including both scholars and FDA officials, did not view the issue as completely re-

---

[512] *See id.* at 695–98.

[513] *Id.* at 696.

[514] *Id.* at 698.

[515] *Id.* at 696.

[516] *See supra* section III.C.2, p. 515–16.

[517] *Weinberger*, 512 F.2d at 698.  Although the discussion of section 701(a)'s legislative history was cursory in the parties' briefs, the appellant did in fact devote a few pages of its brief to the issue of section 701(a) and its legislative history.  *See* Brief for Plaintiffs-Appellants at 39–43, *Weinberger*, 512 F.2d 688 (2d Cir. 1975) (No. 74-1738).

[518] *See, e.g.*, Nat'l Nutritional Foods v. Califano, 603 F.2d 327, 333 (2d Cir. 1979) ("Appellants do not, indeed cannot, challenge that the FDA has power under § 701(a) to issue legislative rules to implement § 403(a)."); Nat'l Confectioners Ass'n v. Califano, 569 F.2d 690, 695 (D.C. Cir. 1978) (acknowledging the authority of the FDA under section 701(a) to impose mandatory source coding and recordkeeping requirements on confectioners); United States v. Nova Scotia Food Prods. Corp., 568 F.2d 240, 246–48 (2d Cir. 1977) (reading section 701(a) as authorizing binding regulations); Cosmetic, Toiletry & Fragrance Ass'n v. Minnesota, 440 F. Supp. 1216, 1221 (D. Minn. 1977) (recognizing the FDA's authority to promulgate "substantive regulations" that are "reviewable only under the arbitrary and capricious standard").

solved. Dialogue continued into the early 1980s about the FDA's rulemaking powers and the courts' apparent transformation of section 701(a).[519]

*(b) Pharmaceutical Manufacturers.* — The debate over section 701(a) culminated in 1981 when the Second Circuit decided yet another case involving the FDA's powers. Congress had passed various amendments to the FDCA in 1962, including an amendment that deemed a drug adulterated if its packaging, processing, holding, or manufacturing failed to conform to "current good manufacturing practice" (CGMP).[520] The amendment did not give the FDA the power to promulgate CGMPs through rulemaking. Rather, the legislative history indicates that Congress expected the FDA to rely on its existing powers under section 701(a) when implementing the statutory provisions dealing with CGMPs.[521]

This legislative history does not necessarily demonstrate, however, that Congress thought section 701(a) authorized *legislative* rules. The original Senate bill would have allowed the FDA to adopt CGMPs only as interpretive rules.[522] The Kennedy Administration objected, arguing that this proposal would invite "endless de novo litigation on the question what constitutes good manufacturing practice each time there is an enforcement action under the new quality control mechanism."[523] The administration proposed that CGMP rules be issued as binding regulations under the formal rulemaking procedures of section 701(e), and the House bill reflected this approach.[524] But the Senate committee balked at the prospect of requiring formal rulemaking and proposed a third approach: that the FDA be authorized to adopt regulations under the authority of section 701(a). Significantly, however, in accepting the section 701(a) approach, neither the Senate committee report nor the floor debate in either chamber characterized section 701(a) as authorizing legislative regulations. Instead, the effect of such regulations was deliberately left ambiguous. As Representative Schenk stated in the House:

> I favor the approach adopted by the Senate under which this determination is made pursuant to section 701(a) of the act. This procedure permits

---

[519] *See, e.g.*, Peter Barton Hutt, *Food and Drug Regulation in Transition*, 35 FOOD DRUG COSM. L.J. 283, 294 (1980) (implying that Congress need not act in order to legitimize courts' decisions regarding the FDA); Merrill, *supra* note 14, at 273–75 (discussing the plausibility of a nonlegislative interpretation of section 701(a) and describing the courts' transformation of section 701(a) into a legislative rulemaking grant as "puzzling").

[520] Drug Amendments of 1962, Pub. L. No. 87-781, § 101, 76 Stat. 780, 781 (codified at 21 U.S.C. § 351(a) (2000)).

[521] *Id.* at 882–84.

[522] S. REP. NO. 1744, pt. 2, at 9 (1962), *reprinted in* 1962 U.S.C.C.A.N. 2884, 2890.

[523] *Id.* at 3–4.

[524] H.R. REP. NO. 2464, at 2 (1962).

Case 2:24-cv-01743-KBH   Document 62   Filed 07/01/24   Page 414 of 504

> the Secretary to issue such regulations as he desires and their scope and ef-
> fect will be the same as that of other regulations issued under such general
> authority.  This procedure is more flexible.  Numerous regulations have
> been issued under this section and they have been the subject of consid-
> eration and application in the courts in actions arising under the various
> provisions of the act not now subject to formal rulemaking procedures.[525]

In other words, Congress effectively punted on the legal status of
CGMP rules, leaving the issue to be resolved by the courts.

The Second Circuit obliged in *National Association of Pharmaceu-
tical Manufacturers v. FDA*.[526]   The plaintiffs challenged various
CGMPs adopted by notice-and-comment rulemaking conducted under
section 701(a), on the ground that this provision authorized only inter-
pretive, not legislative, rules.[527]  In support, they mustered an exhaus-
tive review of the legislative history of the 1938 Act and the FDA's his-
torical interpretation of this grant as encompassing only interpretive
and procedural rules.[528]

In a lengthy opinion by Judge Friendly, the Second Circuit again
upheld the power of the FDA to issue legislative rules pursuant to sec-
tion 701(a). Judge Friendly admitted at the outset that "[i]n the inter-
est of historical accuracy, it should be noted that at one time it was
widely understood that generalized grants of rulemaking authority
conferred power only to make rules of a procedural or an interpreta-
tive nature, and not binding substantive regulations, for which a spe-
cific delegation was thought necessary."[529]  However, reading the lan-
guage of section 701(a) "with the eyes of 1980," Judge Friendly
concluded that this section did in fact give the FDA the power to issue
both "substantive as well as procedural" regulations.[530]

Judge Friendly based this conclusion primarily on arguments
drawn from precedent.  He began by reviewing numerous non-FDA
cases involving facially ambiguous rulemaking grants, including *Na-
tional Broadcasting*, *American Trucking*, and *Petroleum Refiners*.[531]
He read these decisions to stand for the proposition that general rule-
making provisions are ordinarily understood "to endow agencies with
power to issue binding rules and regulations."[532]  Notably, Judge

---

[525] 108 CONG. REC. 21,057 (Sept. 27, 1962) (remarks of Rep. Schenck); *see also* S. REP. NO.
1744, pt. 2, at 4 (1962); 108 CONG. REC. 17,365 (Aug. 23, 1962) (remarks of Sen. Eastland) ("As in
the case of other regulations, the courts in the final analysis will pass upon the scope and effect of
such regulations.").

[526] 637 F.2d 877 (2d Cir. 1981).

[527] *Id.* at 879, 884.

[528] *See id.* at 882–86.

[529] *Id.* at 880.

[530] *Id.* at 879.

[531] *Id.* at 880.

[532] *Id.*

*HARVARD LAW REVIEW* [Vol. 116:467]

Friendly discussed these cases at length even though the parties had cited only one, *American Trucking*, in their briefs.[533] Judge Friendly's invocation of non-FDA cases not briefed by the parties suggests that he aspired to build on Judge Wright's *Petroleum Refiners* opinion and develop a canon of interpretation regarding general rulemaking grants with applications beyond FDA cases. Judge Friendly also relied on the Supreme Court's decisions in *Abbott Laboratories* and the *Hynson Quartet* as well as the Second Circuit's earlier decision in *Nutritional Foods*,[534] describing these FDA cases as "formidable authority to the effect that § 701(a) itself is a grant of power to issue binding regulations."[535]

Only after considering these precedents did Judge Friendly turn to the legislative history of the FDCA. He acknowledged that "if the 1962 Congress had made the detailed examination of the legislative history and contemporary understanding of the 1938 Act, which plaintiffs' counsel have now made at long last, it might well have concluded that § 701(a) in fact very likely was not intended to confer power to issue binding substantive rules."[536] But it was not clear, he continued, whether the Congress that passed the CGMP amendments in 1962 was familiar with the 1938 history.[537] In any event, the belated excavation of the legislative history, Judge Friendly asserted, was insufficient to overcome the force of stare decisis created by the Supreme Court's decisions construing ambiguous rulemaking grants to confer legislative powers; nor should that history invalidate more specific rulings such as *Nutritional Foods*.[538]

Given Judge Friendly's acknowledgement that the ruling conflicted with the original understanding of section 701(a), his decision constituted an even more dramatic reversal of the *Queen and Crescent Case* canon than did Judge Wright's opinion in *Petroleum Refiners*. Judge Wright had suggested that facially ambiguous rulemaking grants should be presumed to confer legislative rulemaking power unless clear evidence to the contrary existed in the legislative history.[539] Judge Friendly appeared to say that facially ambiguous rulemaking grants should be construed to confer legislative rulemaking power,

---

[533] *See* Pet. for Reh'g with Suggestion for Reh'g En Banc 7–9, *Pharmaceutical Manufacturers*, 637 F.2d 877 (2d Cir. 1981) (No. 80-6090) ("[W]e respectfully request that Rehearing and Reargument be granted herein in view of the fact that the Court's decision was (erroneously we believe) based upon cases which the parties did not cite to this Court . . . .").

[534] *Pharmaceutical Manufacturers*, 637 F.2d at 880–82.

[535] *Id.* at 880.

[536] *Id.* at 885 (citation omitted).

[537] *Id.* at 887.

[538] *See id.* at 888.

[539] *See* Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672, 689–90 (D.C. Cir. 1973). For a full discussion of the case, see *supra* pp. 554–57.

even in the face of clear evidence to the contrary in the legislative history. In effect, *Pharmaceutical Manufacturers* adopted what we have called the *Petroleum Refiners* canon in full-blown form as an express statement rule: all rulemaking grants are conclusively presumed to confer legislative rulemaking authority unless Congress expressly indicates in the text of the statute that the grant is limited to procedural and interpretive rules.

*3. The NLRB.* — Much like the FDA and the FTC, the NLRB claimed no general rulemaking powers in its early years, in keeping with the understanding that the NLRA did not grant the NLRB legislative rulemaking powers.[540] From its creation in 1935 through the early 1970s, the NLRB formulated policy exclusively through adjudication.

Beginning in the 1960s and continuing through the 1980s, numerous scholars urged the NLRB to turn to rulemaking to formulate its policy.[541] Most of the arguments advanced by these proponents focused on the utility of rulemaking, which assertedly yielded greater precision, certainty, uniformity, and longevity than did adjudication.[542]

Only a few scholars attended to the threshold issue of whether the NLRB in fact had legislative rulemaking power.[543] In the face of the legislative history indicating that Congress had not given the NLRB such authority when creating it in 1935, these scholars pointed to an amendment to section 6(a) of the NLRA added by the Taft-Hartley Act in 1947.[544] As amended, the rulemaking grant read: "The Board shall have authority from time to time to make, amend, and rescind, *in the manner prescribed by the Administrative Procedure Act,* such rules and regulations as may be necessary to carry out the provisions of this

---

[540] For a discussion of why the NLRB's general rulemaking grant is nonlegislative, see *supra* section III.C.2, p. 511.

[541] *See, e.g.,* Bernstein, *supra* note 414, at 620–22; Samuel Estreicher, *Policy Oscillation at the Labor Board: A Plea for Rulemaking,* 37 ADMIN. L. REV. 163 (1985); Cornelius J. Peck, *A Critique of the National Labor Relations Board's Performance in Policy Formulation: Adjudication and Rule-Making,* 117 U. PA. L. REV. 254 (1968) [hereinafter Peck, *Critique*]; Cornelius J. Peck, *The Atrophied Rule-Making Powers of the National Labor Relations Board,* 70 YALE L.J. 729 (1961) [hereinafter Peck, *Atrophied Rule-Making*]; Silverman, *supra* note 414, at 607; *cf.* Note, *NLRB Rulemaking: Political Reality Versus Procedural Fairness,* 89 YALE L.J. 982 (1980) (summarizing the controversy and arguing that congressional consideration of mandatory NLRB rulemaking must balance procedural fairness against the NLRB's desire to minimize congressional and judicial intervention in its policies).

[542] *See, e.g.,* Charles J. Morris, *The NLRB in the Dog House — Can an Old Board Learn New Tricks?,* 24 SAN DIEGO L. REV. 9, 27–42 (1987) (describing eleven benefits of rulemaking); Peck, *Critique, supra* note 541, at 272–75.

[543] *See, e.g.,* Fuchs, *supra* note 415, at 798; Peck, *Critique, supra* note 541, at 260–61; *see also* Peck, *Atrophied Rule-Making, supra* note 541, at 732–33.

[544] Labor Management Relations Act, 1947, ch. 120, 61 Stat. 136.

*HARVARD LAW REVIEW*                    [Vol. 116:467

Act."[545]  These scholars argued that the addition of the reference to the APA, which prescribed the manner of adopting only legislative rules, would be meaningless unless it also referred to the adoption of legislative rules.[546]  Thus, the 1947 amendment was said to embody Congress's understanding that section 6(a) conferred legislative rulemaking authority on the NLRB.[547]

This argument fails, however, for two reasons.  First, it ignores the fact that the APA *does* impose certain procedural requirements on the manner of adopting procedural and interpretive rules.  Section 3(a)(2) of the APA requires that "the nature and requirements of all formal or informal procedures" be published in the Federal Register; section 3(a)(3) requires the same for "statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public."[548]  Thus, the added reference to the APA would *not* be meaningless when applied to procedural and interpretive rules adopted under the authority of section 6(a).[549]  Second, the argument ignores that an anti-labor, Republican-led Congress passed the Taft-Hartley Act in order to address "what many viewed as a tendency by the NLRB toward overzealous regulation of employer conduct through its unfair labor practice jurisdiction."[550]  It is implausible that Congress would have chosen to grant the NLRB expanded rulemaking powers in 1947 given that the primary objective of the Taft-Hartley Act was to rein in the NLRB.

---

[545] *Id.* sec. 101, § 6, 61 Stat. at 140 (emphasis added to show language added by the 1947 amendment to the original section, National Labor Relations Act, ch. 372, § 6, 49 Stat. 449, 452 (1935) (codified as amended at 29 U.S.C. § 156 (2000))).

[546] Section 4(a) of the APA exempts "interpretative rules, general statements of policy, rules of agency organization, procedure, or practice" from notice-and-comment requirements; section 4(c) requires advance publication of "substantive" rules only.  Administrative Procedure Act, ch. 324, § 4, 60 Stat. 237, 239 (1946) (codified as amended at 5 U.S.C. § 552(a) (2000)).

[547] *See* Fuchs, *supra* note 415, at 798; Peck, *Atrophied Rule-Making, supra* note 541, at 732–33.

[548] Administrative Procedure Act, § 3, 60 Stat. at 238 (codified as amended at 5 U.S.C. § 552(a)).

[549] Title VII of the Civil Rights Act of 1964 contains a rulemaking grant that is *expressly* limited to procedural rules; this grant also provides that "[r]egulations issued under this section shall be in conformity with the standards and limitations of" the APA.  42 U.S.C. § 2000e-12(a) (2000).  Thus, Congress in 1964 evidently saw no incongruity in authorizing an agency to make rules exempt from notice-and-comment requirements under, but in conformity with, the APA.  *See* Edelman v. Lynchburg College, 122 S. Ct. 1145, 1150 n.7 (2002) (noting both the conformity requirement and the exemption).

[550] ROBERT A. GORMAN, BASIC TEXT ON LABOR LAW 5 (1976).  Gorman explains:

> The years after 1935 witnessed a dramatic increase in union membership, greater use of the strike, and a post-war proliferation of work-assignment disputes between unions, secondary boycotts, mass picketing, and some corruption and undemocratic practices in internal union affairs . . . .  Congressional reaction become manifest in a number of post-war labor bills and finally in the enactment of the Taft-Hartley Act in 1947, reaffirmed over a veto by President Truman.

*Id.*

Later, Congress joined scholars in pressuring the NLRB to resort to rulemaking. In 1977, the House adopted a bill called the Labor Reform Act,[551] which would have required the NLRB to promulgate rules with specified purposes, such as defining appropriate bargaining units and expediting elections. The Act did not clarify or seek to change the language of the NLRB's general grant of rulemaking powers found in section 6(a); rather, it sought to encourage the agency to use its preexisting section 6(a) rulemaking powers, which the drafters implicitly assumed to include legislative rulemaking. For example, the bill provided that the NLRB "shall, to the fullest extent practicable, exercise its authority under [its general rulemaking grant in section 6(a)] to promulgate rules declaring certain units to be appropriate for the purposes of collective bargaining."[552] Although the Senate defeated the bill after six cloture attempts,[553] the effort served as an important barometer of the pressure exerted at the time to force the NLRB to resort to rulemaking.[554]

The judiciary represented a final source of pressure on the NLRB to resort to rulemaking. Most prominently, Judge Friendly authored numerous opinions urging the NLRB to use its rulemaking powers to issue legislative rules.[555] Perhaps the most influential judicial stimulus to use legislative rulemaking, however, came in 1969 when the Supreme Court decided *NLRB v. Wyman-Gordon Co.*[556] *Wyman-Gordon* began as an NLRB adjudication in which the NLRB enforced its so-called *Excelsior Underwear* rule, which required employers to furnish unions with the names and addresses of employees eligible to vote in bargaining elections.[557] The rule originated in *Excelsior Underwear*,[558] a prior adjudication in which the NLRB had announced the rule but limited its operation to future cases.[559]

The employer in *Wyman-Gordon* challenged the *Excelsior Underwear* rule on the ground that the NLRB had in effect engaged in rulemaking without complying with the procedures required by the

---

[551] Labor Reform Act of 1977, H.R. 8410, 95th Cong. (1977); *see also* H.R. REP. NO. 95-637, at 5–6 (1977).

[552] H.R. 8410, *supra* note 551, § 3.

[553] Note, *supra* note 541, at 987 n.30.

[554] Unlike the Federal Trade Improvement Act (FTIA), *see supra* note 482 and accompanying text, the failed Labor Reform Act does not provide indirect evidence that the NLRB was regarded as lacking legislative rulemaking powers. Unlike the FTIA, it did not grant the Board new powers, but merely urged the NLRB to use its preexisting section 6 powers.

[555] *See, e.g.*, NLRB v. Penn Cork & Closures, Inc., 376 F.2d 52, 57 (2d Cir. 1967); NLRB v. Majestic Weaving Co., 355 F.2d 854, 859–61 (2d Cir. 1966); NLRB v. Lorben Corp., 345 F.2d 346, 349 (2d Cir. 1965) (Friendly, J., dissenting).

[556] 394 U.S. 759 (1969).

[557] *See id.* at 761–62.

[558] Excelsior Underwear Inc., 156 N.L.R.B. 1236 (1966).

[559] *Id.* at 1240 n.5.

APA.[560]  This challenge produced a deeply split Supreme Court decision.[561]  Ultimately, seven members of the Court upheld the application of the *Excelsior Underwear* requirement in *Wyman-Gordon*.[562]  However, six Justices strongly criticized the NLRB for not adopting its *Excelsior Underwear* rule by notice-and-comment rulemaking.[563]  Not surprisingly, some commentators heralded *Wyman-Gordon* as recognizing that the NLRB possessed legislative rulemaking powers.[564]

Immediately after *Wyman-Gordon*, the NLRB gave in to the pleas for rulemaking and promulgated a minor jurisdictional rule declaring that it would assert jurisdiction in proceedings involving private, nonprofit colleges and universities with gross annual revenues of one million dollars or more.[565]  Two additional narrow jurisdictional rules soon followed.[566]  Although each of these rules was couched in procedural terms, they carried legislative effect in that they announced how the NLRB would exercise its enforcement authority in the future.

Then the Supreme Court decided *NLRB v. Bell Aerospace Co.*[567]  Reversing a Second Circuit decision authored by Judge Friendly that had directed the NLRB to engage in rulemaking,[568] the Court reaffirmed in strong terms the NLRB's discretion to announce new principles through adjudication.[569]  The agency happily reverted to its old

---

[560] *See Wyman-Gordon*, 394 U.S. at 762.  The NLRB explained that it decided to use adjudication rather than rulemaking because it viewed rulemaking as "too rigid and inflexible for most of the problems with which it is concerned."  Brief for the National Labor Relations Board 14–15, *Wyman-Gordon*, 394 U.S. 759 (1969) (No. 463).

[561] Justice Fortas wrote a plurality opinion in which Chief Justice Warren and Justices Stewart and White joined.  Justice Black wrote an opinion concurring in the result, in which Justices Brennan and Marshall joined, and Justices Douglas and Harlan each wrote a dissenting opinion. *Wyman-Gordon*, 394 U.S. 759 (1969).

[562] The seven votes derived from Justice Fortas's plurality opinion plus Justice Black's concurring opinion.  *See id.* at 766; *id.* at 769 (Black, J., concurring).

[563] The six votes derived from Justice Fortas's plurality opinion plus Justice Douglas's and Justice Harlan's separate dissenting opinions.  *See id.* at 764–65; *id.* 775–76; *id.* 780–81.  The NLRB argued that even if its *Excelsior* requirement did represent a rule rather than an order, this was at most a *procedural* rule — not a legislative one — and thus was exempt from the notice-and-comment requirements of the APA.  *See* Brief for the National Labor Relations Board, *supra* note 560, at 30–31.

[564] *See, e.g.*, Bernstein, *supra* note 414, at 604 ("*Wyman-Gordon* suggests that rule making — instead of adjudication — may be required in some circumstances.").

[565] Jurisdictional Standards, Colleges and Universities, 35 Fed. Reg. 18,370 (Dec. 3, 1970) (codified at 29 C.F.R. § 103.1 (2001)).

[566] One such provided that the NLRB would assert jurisdiction in proceedings involving symphony orchestras with gross annual revenues of not less than one million dollars, Jurisdictional Standards, Symphony Orchestras, 38 Fed. Reg. 6177 (Mar. 7, 1973) (codified at 29 C.F.R. § 103.2 (2001)); the other stated that the NLRB would not assert jurisdiction in any proceeding involving the horseracing and dogracing industries, Jurisdictional Standards, Horseracing and Dogracing Industries, 38 Fed. Reg. 9507 (Apr. 17, 1973) (codified at 29 C.F.R. § 103.3 (2001)).

[567] 416 U.S. 267 (1974).

[568] Bell Aerospace Co. v. NLRB, 475 F.2d 485, 495–97 (2d Cir. 1973).

[569] *Bell Aerospace*, 416 U.S. at 290–95.

practice of using adjudication to announce new principles and standards.[570]

In 1987, however, the NLRB decided once again to test the scope of its rulemaking powers. The result was the NLRB's first broad-scale legislative rule, which specified the employee bargaining units it would find appropriate in various kinds of health care facilities and hospitals.[571] In the Notice of Proposed Rulemaking, the NLRB explained that its authority to promulgate the rule derived from the general rulemaking grant in section 6 of the NLRA.[572] The agency also noted that for years members of Congress, the courts, and scholars had urged it to engage in rulemaking.[573]

The American Hospital Association challenged the validity of the NLRB's rule on three grounds: that section 9(b) of the NLRA requires the NLRB to make bargaining unit determinations "in each case" and therefore precludes the board from using rules to define bargaining units; that the rule violated a congressional admonition to the NLRB to avoid the undue proliferation of bargaining units in the health care industry; and that the rule was arbitrary and capricious.[574] The Association did not raise the more fundamental question whether the NLRB possessed legislative rulemaking authority in the first place. Rather, the parties, the Seventh Circuit, and the Supreme Court all assumed that Congress had given the NLRB the power to promulgate legislative rules.[575] Writing for the Seventh Circuit, Judge Posner remarked that "there is broad although not unanimous agreement in the legal community, which we and other courts have remarked approvingly, that the exercise of the Board's dormant substantive rulemaking power is long overdue."[576] Similarly, Justice Stevens, writing for the Supreme Court, noted in one perfunctory sentence that the general rulemaking grant given to the NLRB "was unquestionably sufficient to authorize the rule at issue in this case unless limited by some other provision in the Act," which limitation the Court did not find.[577]

---

[570] *See* Grunewald, *supra* note 16, at 274–76.

[571] *See* Appropriate Bargaining Units in the Health Care Industry, 52 Fed. Reg. 25,142, 25,149 (July 2, 1987) (codified at 29 C.F.R. § 103.30 (2001)).

[572] *Id.* at 25,144.

[573] *Id.* at 25,144–45.

[574] Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 608–09 (1991). The court rejected all three arguments and upheld the validity of the rule. *Id.*

[575] *See* Am. Hosp. Ass'n v. NLRB, 899 F.2d 651, 655 (7th Cir. 1990) ("The industry does not argue that the [general rulemaking] power is confined to nonsubstantive matters or has atrophied from disuse . . . ."); *see also American Hospital*, 499 U.S. at 609–10; Grunewald, *supra* note 16, at 294–95 (noting that the authority of the NLRB to engage in rulemaking is "not in doubt" because of section 6 of the NLRA).

[576] *American Hospital*, 899 F.2d at 655.

[577] *American Hospital*, 499 U.S. at 610.

The willingness of the parties in *American Hospital* to accept that the NLRB had been delegated legislative rulemaking powers most likely stemmed from two sources.  First, the pathbreaking opinions of Judges Wright and Friendly that had treated ambiguous rulemaking grants as presumptively authorizing legislative rules had by then been on the books for a decade or more.[578]  Second, although *Wyman-Gordon* did not expressly consider the NLRB's rulemaking powers under section 6(a), the opinions in that case, as well as the Court's treatment of the rulemaking versus adjudication issue in *Bell Aerospace*, implicitly suggested that the NLRB possessed legislative rulemaking powers.  Thus, by the time the Court decided *American Hospital* in 1991, counsel for the Association no doubt concluded it was not worth the effort to challenge the NLRB's exercise of legislative rulemaking powers.  As a consequence, the courts, guided as usual by the submissions of the parties, apparently did not perceive any issue of authority either.

## VI. Tax Exceptionalism

Although the successful assumption of legislative rulemaking powers by the FTC, FDA, and NLRB would appear to reflect a complete triumph of the view that facially ambiguous rulemaking grants confer legislative power, at least one important vestige of the earlier understanding remains.  The tax world continues to adhere to the notion that the facially ambiguous general rulemaking grant in section 7805(a) of the Internal Revenue Code (IRC) confers only interpretive, not legislative, rulemaking authority.[579]

---

[578] *See supra* pp. 554–57, 562–65.

[579] *See generally* Michael I. Saltzman, IRS Practice and Procedure ¶ 3.02[4][a]–[b] (2d ed. 1991) (explaining that regulations issued pursuant to a specific authorization in particular sections of the IRC are "legislative or substantive" and that those issued under the IRC's general grant of rulemaking authority are "interpretative"); Ellen P. Aprill, *Muffled* Chevron*: Judicial Review of Tax Regulations*, 3 Fla. Tax Rev. 51, 56–57 (1996) ("Regulations promulgated under the general authority of section 7805(a) are considered interpretive, and regulations promulgated pursuant to a grant of authority under a particular code section are considered legislative."  (footnote omitted)); Linda Galler, *Emerging Standards for Judicial Review of IRS Revenue Rulings*, 72 B.U. L. Rev. 841, 849 n.53 (1992) ("It has generally been assumed that Treasury regulations adopted pursuant to I.R.C. § 7805(a) are interpretive, while Treasury regulations adopted pursuant to specific delegations of rulemaking authority are legislative."); *see also* John F. Coverdale, *Court Review of Tax Regulations and Revenue Rulings in the* Chevron *Era*, 64 Geo. Wash. L. Rev. 35, 69–70 (1995) (citing and summarizing authorities in support of the distinction between general authority regulations and specific authority regulations and the deference given to each type).

## A. Section 7805(a) of the Internal Revenue Code

Section 7805(a) of the IRC grants the Secretary of the Treasury the power to "prescribe all needful rules and regulations for the enforcement" of the tax laws.[580]  This general grant of rulemaking authority appears to have originated in section 1005 of the Revenue Act of 1917,[581] which gave the Commissioner of Revenue the power to promulgate, with the approval of the Secretary of the Treasury, "all needful rules and regulations for the enforcement of the provisions of this Act."[582]  Congress did not attach any statutory sanctions to violations of the regulations promulgated under this general grant.  In contrast, sections 1001 and 1002 of the 1917 Act included specific grants of authority for the Commissioner to regulate returns,[583] and section 1004 attached penalties to the failure to make any returns required by regulation.[584]  Under the convention described in Part III of this Article, therefore, the general grant conferred only interpretive power upon the Commissioner, while the specific grants conferred legislative power.  The Revenue Act of 1918[585] and the Revenue Act of 1921[586] included the same combination of general and specific rulemaking grants, using similar language.[587]

When Congress sought to include the usual mixture of rulemaking grants in the Revenue Act of 1924, debate and confusion arose over whether a general grant of rulemaking authority would give the Commissioner the power to promulgate binding regulations.  In particular, Representative Deal expressed concern that the general rulemaking grant would give the Commissioner too much power.[588]  During debates on the House floor, Representative Deal argued:

> These regulations of the Internal Revenue Department have the force of law and subject the taxpayer to a prison penalty if he violates them.  It is nothing more or less than law.  I believe Congress should write the law and not leave it to the Internal Revenue Department. . . . These regulations are binding on the taxpayer and not upon the revenue department.  It can change the rules from year to year, month to month, week to week,

---

[580] I.R.C. § 7805(a) (2000).

[581] Ch. 63, 40 Stat. 300.

[582] *Id.* § 1005, 40 Stat. at 326.

[583] *Id.* §§ 1001–1002, 40 Stat. at 325.

[584] *Id.* § 1004, 40 Stat. at 325–26.

[585] Ch. 18, 40 Stat. 1057 (1919).

[586] Ch. 136, 42 Stat. 227, 309.

[587] *See* Revenue Act of 1918, § 1308, 40 Stat. at 1143; Revenue Act of 1921, §§ 1302–1303, 42 Stat. at 309.  Like the Revenue Act of 1917, the 1918 Act did not attach any statutory sanctions to violations of the rules and regulations promulgated under the general rulemaking grant.  Yet penalties were provided in the 1918 Act for violations of rules and regulations promulgated under specific rulemaking grants.  Like the 1917 and 1918 Revenue Acts, the 1921 Act attached statutory sanctions only to rules and regulations promulgated under certain specific rulemaking grants.

[588] 65 CONG. REC. 3333–34 (1924).

and every morning before breakfast if they feel like doing it. The taxpayer has no redress and they never know what the law is.[589]

To remedy this perceived threat to the taxpayer, Deal proposed an amendment providing that regulations issued under the general grant "shall not enlarge or modify any of the provisions of this act and of any other law, and all such rules and regulations and all amendments thereto shall be annually reported to Congress."[590]  The House ultimately agreed to Deal's proposed amendment, but the Senate declined to modify the general rulemaking grant.[591]  Senator Smoot noted during floor debate that the modification was unnecessary because "[n]o officer of the Government can make any rule or any regulation in violation of the law itself with any binding force."[592]

When the Conference Committee reconciled the differences between the House and Senate versions of the general grant, the Senate version won out, and Deal's proposed amendment was rejected.[593]  But Deal did not give up.  In 1925 and again in 1927, he persisted with his arguments against the general rulemaking grant.[594]  In particular, he continued to advance his contention that citizens could potentially face criminal punishment for violating any of the Treasury Department's rules or regulations.[595]  Yet each year, Deal failed to persuade a congressional majority that the general rulemaking grant given to the Commissioner was problematic.  Although we can only speculate about why Deal's arguments lacked majority support, the

---

[589] *Id.* at 3333.

[590] *Id.* at 3334.

[591] 65 CONG. REC. 7141 (1924).

[592] *Id.* at 7140.

[593] Revenue Act of 1924, H.R. 6715, § 1001, 68th Cong.

[594] *See* 67 CONG. REC. 1146–47 (1925); 69 CONG. REC. 438–43 (1927).

[595] Mr. Deal's arguments consumed several pages of the Congressional Record.  One of his more forceful arguments was the following:

Twenty thousand three hundred and eleven laws enacted by four separate units in the Internal Revenue Department, without concert of action, coordination of effort, or responsibility, these appointees of the Executive, who can not be reached by the votes of the people, are secretly making laws at will, laws not to be published, laws that can be changed in an hour.  Under this condition or plan or system, this department has assumed to increase taxes, exempt from taxes, write law, unwrite law, apply the laws of Congress, or ignore the laws of Congress accordingly to the whims, fancies, enmities, or favoritisms of somebody in the Internal Revenue Department, unknown to and unreachable by the voters of the United States.  Do not understand me, Mr. Chairman, to reflect, or intend to reflect, upon the Secretary of the Treasury, or the efficient honest employees in this service.  I am not.  It is the system that I criticize, a system that invites corruption, injustice, oppression, destruction.  A vicious system unworthy of any civilized nation.  It is the duty of Congress to wipe out the system, and *this may be done in part by withholding the blanket grant of power to the Commissioner of Internal Revenue to make rules and regulations.*

69 CONG. REC. 440 (1927) (emphasis added).

answer may be that many of the key players understood that the general grant conferred only interpretive authority.[596]

When the IRC was enacted in 1939 and subsequently amended in 1954, Congress continued to attach statutory sanctions solely to rules and regulations promulgated under specific rulemaking grants. Under the convention's framework, this absence of sanctions leads to the conclusion that the rules and regulations promulgated under section 7805(a)'s general rulemaking grant are interpretive, which is in fact the common understanding today among tax lawyers.

### B. The Supreme Court Confirms That Section 7805(a) Is Interpretive

Notwithstanding the gradual repudiation of the convention outside the tax world, the revisionism of Judges Wright and Friendly is unlikely to spread to the IRC. One reason for this resistance is that, in contrast to what happened in the regulatory context, the Supreme Court has endorsed the outcome dictated by the convention in decisions explicating the meaning of section 7805(a) of the IRC. For example, in *Rowan Cos. v. United States*,[597] the Court noted that "the Commissioner interpreted Congress' definition [of the word 'wages'] only under his general authority to 'prescribe all needful rules.' 26 U.S.C. § 7805(a)."[598] Because the regulation was merely interpretive, the Court held that it deserved "less deference than a regulation issued under a specific grant of authority."[599] Similarly, in *United States v. Vogel Fertilizer Co.*,[600] the Court considered a regulation, issued by the Commissioner under section 7805(a), which interpreted the statutory term "brother-sister controlled group."[601] The Court again observed that because the Commissioner had issued the regulation under his general rulemaking grant, the interpretation was entitled to "less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision."[602]

*Vogel Fertilizer* and *Rowan* confirm that in the tax world — in contrast to other administrative realms — a facially ambiguous general

---

[596] The House and Senate Offices of Legislative Counsel, which were fully institutionalized by this time, were especially active in consulting with the leadership on revenue bills. *See* KOFMEHL, *supra* note 265, at 183. If, as we have speculated, *see supra* pp. 520–23, the attorneys in these offices played a critical role in implementing the convention, then this may explain why the leadership saw no merit in Deal's amendments.

[597] 452 U.S. 247 (1981).

[598] *Id.* at 253.

[599] *Id.*

[600] 455 U.S. 16 (1982).

[601] *Id.* at 24.

[602] *Id.* (quoting *Rowan*, 452 U.S. at 253) (internal quotation marks omitted).

rulemaking grant authorizes only interpretive, not legislative, rules.[603] Because the Supreme Court has endorsed that view, it will probably remain secure, unless and until Congress amends the Code.

### C.  Why the Tax World Thinks Section 7805(a) Is Interpretive

When we trace the history of the understanding that section 7805(a) authorizes only interpretive rules, we uncover an anomaly that seems, at first, to cut against the convention.  This anomaly made its first appearance in a series of articles written in the 1940s by several eminent tax scholars.[604]  They include Erwin Griswold, who later became Dean of Harvard Law School and Solicitor General of the United States, and Stanley Surrey, who has been called "the most influential tax theorist of his generation."[605]  These authors did not focus on the absence of sanctions for violations of section 7805(a) as the reason for construing the grant to authorize only interpretive rules.[606]  Instead, they argued that the relevant distinction was between general and specific grants of rulemaking authority.  General grants were said to authorize only interpretive rules, whereas specific grants authorized legislative rules.[607]  Surrey buttressed this contention with two arguments: first, the specific rulemaking grants in the IRC would be redundant if the general grant were construed to give the agency general legislative rulemaking authority;[608] and second, the delegation of a general grant

---

[603] *See* Lomont v. O'Neill, 285 F.3d 9, 16 (D.C. Cir. 2002) (stating that section 7805(a) "is nothing more than a general grant of interpretative rulemaking power"); *see also* Michael Asimow, *Public Participation in the Adoption of Temporary Tax Regulations*, 44 TAX LAW. 343, 358 & nn.75–76 (1991) (citing *Rowan* and *Vogel Fertilizer* for the proposition that the tax world continues to adhere to the view that rules adopted pursuant to the Treasury's general rulemaking grant are interpretive in nature).

[604] *See* Surrey, *supra* note 78, at 558 (arguing that revenue acts do not "support a delegation of legislative power"); *see also* Alvord, *supra* note 78, at 256–61 (stating that for the great majority of Treasury regulations, the Commissioner has no legislative authority); Erwin N. Griswold, *A Summary of the Regulations Problem*, 54 HARV. L. REV. 398, 400–01 (1941) (explaining that interpretive regulations differ from legislative regulations, but only as a matter of degree); *cf.* Coverdale, *supra* note 579, at 69 (reporting that Surrey noted as early as 1940 that the general rulemaking grant given to the Treasury was not sufficient to delegate legislative powers).

[605] Coverdale, *supra* note 579, at 69.

[606] The distinction between interpretive and legislative rules caught Surrey's and other tax scholars' attention due to debate over the "reenactment doctrine," which was well entrenched by the 1940s.  This doctrine provided that when an agency interprets a statutory provision, the administrative construction is automatically given the force of law when Congress later reenacts the legislative language that the administrative rule construes.  In arguing against the reenactment doctrine, Surrey pointed to the fact that most Treasury regulations were merely interpretive because they were promulgated under the IRC's general rulemaking grant.  *See* Surrey, *supra* note 78, at 557–58.

[607] *Id.*  For a discussion of the distinction between general and specific grants, as compared with the conventional "sanctions" test, see *supra* section II.A, pp. 482–83.

[608] *See* Surrey, *supra* note 78, at 558 (contending that rules issued under specific rulemaking grants should be taken to possess different attributes than rules issued under the general rulemak-

of legislative rulemaking authority would raise serious constitutional questions under the nondelegation doctrine, because the general grant lacks an intelligible principle to guide agencies in making rules.[609]

As we have seen, the distinction between general and specific grants of authority was not the basis for distinguishing between legislative and nonlegislative rulemaking grants under the drafting convention. Indeed, many New Deal-era statutes, including the Natural Gas Act, the Securities Acts, the Communications Act, and the Taylor Grazing Act,[610] contain very broad rulemaking grants that nevertheless have always been understood to authorize legislative rules. We have also seen that the reasons that tax scholars cite in support of the general/specific distinction — the structural argument about redundancy and the invocation of the intelligible principle canon — remain open to question.[611]

We can only conjecture about how Surrey and other tax scholars came to adopt an explanation for the interpretive nature of section 7805(a) that is inconsistent with the logic of the convention. Part of the explanation may be that no appellate opinion or other written source has described the convention. Surrey had worked in the Treasury Department and was undoubtedly familiar with the received understanding that section 7805(a) authorizes only interpretive rules. He sought an explanation for this assumption that fit the facts of the tax world, and came up with the general/specific distinction. Since there was no judicial opinion or other written source that contradicted this explanation, and Surrey's arguments were at least superficially plausible, his explanation became the conventional wisdom of the tax world.[612]

---

ing grants because "otherwise the careful particularization of Congress in these other sections would be without meaning"); *see also* Alvord, *supra* note 78, at 257 (arguing that "some difference was intended by Congress," or it would not have granted the Treasury both specific and general rulemaking power).

[609] *See* Surrey, *supra* note 78, at 557–58 ("The standard of 'needful . . . for the enforcement' of a revenue act would hardly seem adequate . . . to support a delegation of legislative power." (quoting I.R.C. § 62 (Cur. Serv. 1939))).

[610] See *supra* note 252 for a discussion of the Taylor Grazing Act.

[611] *See supra* section II.C pp. 487–93.

[612] 1 DAVIS, *supra* note 323, § 5.03, at 300, 313 (citing Surrey, *supra* note 78, and noting that section 7805(a) of the IRC constituted "something less than a delegation of power to issue rules which would be binding upon the courts"); KENNETH CULP DAVIS, ADMINISTRATIVE LAW OF THE SEVENTIES § 5.03-3, at 157 (1976) (citing Griswold, *supra* note 604, and noting that "[t]he dominant understanding among tax lawyers was once that tax regulations were legislative when made pursuant to a specific statutory provision authorizing regulations, but interpretative when made under the broad words of 26 USCS § 7805(a)"). Because of the influential role that Davis's treatises played in the administrative law world, his attention to the tax scholars' writings and to the interpretive nature of the Treasury's general rulemaking grant may have ensured the perpetuation of that understanding in the tax world.

## VII. What the Convention Means Today

Our purpose in looking backward to uncover the historical understanding of facially ambiguous rulemaking grants is, ultimately, to advance understanding of administrative authority in ways that are relevant to ongoing controversies. As recounted in Part I, there are two contexts today in which it is critical to determine whether Congress has delegated power to an agency to make rules with the force of law. One of these contexts is when courts consider whether agencies must comply with the procedural requirements for promulgating legislative rules under the APA. The other is when courts decide whether to apply *Chevron*'s strong deference doctrine. This latter issue, in particular, is a matter of continuing debate within the Supreme Court. Eight Justices agreed in *United States v. Mead Corp.*[613] that *Chevron* rests on congressional intent, and that the requisite intent is to delegate authority to an agency to make rules that have the force of law. But the Court was much more divided the previous Term in *Christensen v. Harris County.*[614] Recent post-*Mead* decisions suggest that the division in *Christensen* may be more indicative of the lack of consensus among the Justices than what the united front in *Mead* might imply.[615]

---

[613] 533 U.S. 218 (2001). The lone dissenter was Justice Scalia. *Id.* at 239 (Scalia, J., dissenting).

[614] 529 U.S. 576 (2000).

[615] In *Barnhart v. Walton*, 122 S. Ct. 1265 (2002), Justice Breyer's opinion for the Court recited factors similar to those mentioned in *Skidmore* in support of the proposition that "*Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue." *Id.* at 1272; *see also id.* at 1269–72. This echoing of *Skidmore* suggests that Justice Breyer may continue to adhere to his view, set forth in *Christensen*, 529 U.S. at 596–97 (Breyer, J., dissenting), that *Chevron* is simply a special case of *Skidmore* deference. *But see Barnhart*, 122 S. Ct. at 1274 (Scalia, J., concurring in part and concurring in the judgment) (noting that one of the factor relied upon by Justice Breyer — whether the agency interpretation is "longstanding" — is an "anachronism" after *Chevron*, and criticizing the majority for failing to explain why certain agency interpretations were sufficiently authoritative under *Mead* to qualify for *Chevron* deference). In *Edelman v. Lynchburg College*, 122 S. Ct. 1145, 1150 (2002), the Court declined to resolve whether an interpretation set forth in an EEOC procedural rule warranted *Chevron* deference. The reason that Justice Souter's majority opinion gave for avoiding the question was that the agency interpretation was "the position we would adopt even if there were no formal rule and we were interpreting the statute from scratch." *Id.* This language seems disturbingly inconsistent with the delegated lawmaking rationale of *Chevron*, which directs courts to uphold reasonable agency interpretations even if they conflict with the interpretation the court would adopt on its own. Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, 467 U.S. 837, 843 n.11 (1984). As other Justices suggested in concurring opinions, *Edelman* also calls into question the apparent reaffirmation of the delegated lawmaking rationale in *Mead*. *See Edelman*, 122 S. Ct. at 1153 (Thomas, J., concurring) (urging acceptance of the agency interpretation because "the EEOC possessed the authority to promulgate this procedural regulation, and . . . the regulation is reasonable, not proscribed by the statute, and issued in conformity with the APA"); *id.* at 1154–55 (O'Connor, J., joined by Scalia, J., concurring in the judgment) (arguing that the EEOC regulation was entitled to *Chevron* deference because the agency had been delegated authority to adopt procedural regulations, and the regulation had been re-promulgated using formal notice-and-comment procedures).

## A. The Role of the Convention in Statute-Specific Determinations of Legislative Intent

*Mead* appears to contemplate that courts will seek to determine on a statute-by-statute basis whether Congress has delegated power to agencies to make rules with the force of law.[616] The convention we have described would seem at a minimum to be an important datum in undertaking this kind of ad hoc inquiry into congressional intent. The fact that during the formative years of the administrative state Congress followed a convention in signaling whether it was giving agencies the authority to make rules having the force of law is important contextual information in understanding the meaning of facially ambiguous rulemaking grants adopted both during the New Deal and afterwards.

With respect to rulemaking grants that predate the 1960s, we would go further. We are aware of no Supreme Court decision, prior to *Thorpe* in 1968, that is inconsistent with the convention; nor are we aware of any evidence that Congress had stopped following the convention. To be sure, there is little evidence that the typical member of Congress was aware of the convention, and some members — such as Representative Deal — clearly were not. Thus, we are not suggesting that Congress in any sense collectively intended that courts follow the convention. But there is substantial circumstantial evidence that staff attorneys, in drafting individual statutes, used the convention as a signaling mechanism to agencies and other informed observers. Consequently, even if the convention was unknown to most legislators themselves, it may nonetheless provide a reliable guide to the type of rulemaking authority that Congress had in fact agreed was appropriate under each particular statute. Even if courts consider other evidence of congressional intent, such as the structure of a statute or canons of interpretation, the convention is a sufficiently reliable indicator of congressional intent that it should ordinarily outweigh these other factors.

After the Wright and Friendly decisions of the 1970s and 1980s, matters became more complicated. The convention by that time was completely unknown to administrative lawyers, and Judges Wright and Friendly arguably succeeded in transforming the background understanding against which Congress legislated. After Judge Friendly's 1981 decision conferring general legislative rulemaking authority on

---

[616] *See* Barron & Kagan, *supra* note 53, at 225–34 (discussing *Mead*'s statute-specific approach, but arguing that under a proper reading *Mead* imposes more structure on a court's deference inquiry than critics suggest). *But see* Merrill, *supra* note 52, at 813–19 (characterizing *Mead* as adopting an open-ended standard of uncertain content).

the FDA,[617] an attorney from the Office of Legislative Counsel would likely have told a member of Congress that the courts would treat a similarly worded grant as authorizing rules having the force of law.[618] Still, we are aware of no evidence suggesting that Congress ever repudiated the convention or acquiesced in the Wright-Friendly view. Even today, when Congress includes a rulemaking grant in a statute, the legislation frequently specifies whether or not sanctions attach to violations of an agency's rules and regulations.[619]  In a statute-by-statute assessment of the legislative intent of statutes enacted after 1980, however, the convention undoubtedly becomes a more problematic guide.

## B. *The Case for a Canon*

An alternative to *Mead*'s statute-by-statute approach to ascertaining legislative intent would be the adoption of a canon that would serve as an aid to identifying congressional intent.[620]  We assume that

---

[617] *See* Nat'l Ass'n of Pharm. Mfrs. v. FDA, 637 F.2d 877, 889 (2d Cir. 1981).

[618] As confirmation of this, consider the views published by the Administrative Conference of the United States on the subject in the early 1980s:

> Though only a minority of statutes contain . . . forthright instructions to make rules, most regulatory agencies have no difficulty in pointing to statutory language authorizing them to make "such rules and regulations as may be necessary to carry out the provisions of the Act." Such an authorization clearly enables an agency to promulgate procedural, organizational or other "housekeeping" rules, and it also clearly enables an agency to issue non-binding guidelines or interpretations of its statutory authority. These powers are now quite accepted and may even be deemed within an agency's "inherent" authority. *Whether such language permits an agency to issue binding regulatory prescriptions is less clear, but recent decisions of the U.S. Supreme Court and the Court of Appeals for the D.C. Circuit indicate judicial willingness to find legislative authority in such language.*

OFFICE OF THE CHAIRMAN, ADMIN. CONFERENCE OF THE U.S., A GUIDE TO FEDERAL AGENCY RULEMAKING 74–75 (1983) (emphasis added); *see also* Asimow, *supra* note 27, at 395 (citing *Nutritional Foods* and *Petroleum Refiners* to support the proposition that "under the prevailing view, at least in the federal courts, general rulemaking provisions empower an agency to make either interpretative or legislative rules").

[619] *See, e.g.,* Americans with Disabilities Act of 1990, Pub. L. No. 101-336, §§ 106–107, 104 Stat. 327, 336–37 (codified at 42 U.S.C. §§ 12,116–12,117 (2000)) (declaring that the remedies set forth in specific sections of the Civil Rights Act of 1976 shall apply to violations of regulations promulgated under the general rulemaking grant included in Title I of the ADA); Petroleum Marketing Practices Act, Pub. L. No. 95-297, § 203(e), 92 Stat. 322, 337 (1978) (codified at 15 U.S.C. § 2823 (2000)) (making it unlawful for any person to violate a rule prescribed under section 202(d) of the Act); Occupational Safety and Health Act of 1970, Pub. L. No. 91-596, § 17, 84 Stat. 1590, 1606 (codified at 29 U.S.C. § 666 (2000)) (setting forth penalties for an employer's violation of the rules or regulations prescribed under the Act).

[620] Barron and Kagan, *supra* note 53, also recognize the need for a canon or "background rule" that would serve as a presumptive guide to congressional intent. The canon they suggest is based on whether "the official Congress named in the relevant delegation" has "personally assumed responsibility for the decision prior to issuance." *Id.* at 235. One of the problems with this proposal is that most agencies have legal authority to subdelegate functions to subordinate officials. Most prominently, in the Reorganization Act of 1949, Congress delegated standing authority to the

such a canon would serve only as a presumption and would be rebuttable based on other evidence from the text, structure, and history of the statute in question. But structuring the inquiry under such a canon would offer several advantages over an ad hoc consideration of legislative intent.[621]

The first and most important reason for adopting a general canon would be to facilitate communication between Congress and the courts.[622] *Christensen* and *Mead* make clear that Congress has the ultimate authority to turn *Chevron* deference on and off. Congress can do this either by delegating power to an agency to act with the force of law with respect to a particular issue (*Chevron* on) or by not delegating such power to the agency (*Chevron* off). But Congress can exercise this authority only if it knows what to say in a statute to delegate such power.[623] If a canon provides a general presumption, then Congress will generally know what it must do to confer primary interpretive authority on an agency. Conversely, if acting with the force of law is identified under an ad hoc inquiry, as *Mead* suggests, then Congress will not know if it has succeeded in designating an agency (or the courts) as the primary interpreter until after the issue is litigated. Adopting a canon thus could help to preserve and protect the role of Congress, which the Court has identified as the very foundation of the *Chevron* doctrine.

A possible objection to this argument is that Congress could, in the future, specify whether it has given agencies the authority to make interpretations that have the force of law. Congress could simply include — or not include — language in a given statute that agency rules will have "the force and effect of law." This suggestion, however, overlooks the problem of what happens under thousands of existing rulemaking grants. Congress has neither the time nor the institutional capacity to

---

President to issue reorganization plans that provide for "the authorization of any officer to delegate any of his functions." Reorganization Act of 1949, ch. 226, § 3, 63 Stat. 203, 203. Thus, Congress's naming of an official as the decision maker in an agency's organic act is only a default rule, making it a problematic guide to congressional intent if the default has been changed. Also, the Barron and Kagan proposal only provides an answer to the question whether *Chevron* deference applies to any particular agency interpretation; it does not address the broader issue of how to interpret facially ambiguous rulemaking grants.

[621] The following discussion draws on Merrill, *supra* note 52.

[622] *See* William N. Eskridge, Jr. & Philip P. Frickey, *The Supreme Court, 1993 Term—Foreword: Law as Equilibrium*, 108 HARV. L. REV. 26, 66 (1994).

[623] *Cf.* Finley v. United States, 490 U.S. 545, 556 (1989) ("What is of paramount importance is that Congress be able to legislate against a background of clear interpretative rules, so that it may know the effect of the language it adopts."). For recognition of this point in the context of *Chevron*, see Bernard W. Bell, *Using Statutory Interpretation To Improve the Legislative Process: Can It Be Done in the Post-Chevron Era?*, 13 J.L. & POL. 105 (1997); and Jonathan T. Molot, *The Judicial Perspective in the Administrative State: Reconciling Modern Doctrines of Deference with the Judiciary's Structural Role*, 53 STAN. L. REV. 1 (2000).

review and amend existing legislation to ensure that it has allocated interpretive authority properly. If the Court were to adopt a general canon about which kinds of delegations should sustain *Chevron* deference, Congress and affected agencies and interest groups would be better able to predict how courts will interpret existing delegations. In this way, the relevant parties would be in a better position to know which statutes should be targeted for revision.

A second reason to adopt a general canon is to facilitate agency planning. Agencies regard *Chevron* deference as a good thing, and they understandably want courts to accept their legal interpretations so that they can fulfill their statutory obligations as they see fit. Yet agencies must make a significant investment in administrative procedures to obtain the *Chevron* payoff. In the vocabulary of *Christensen* and *Mead*, agencies must take whatever procedural steps are necessary to demonstrate that they intend to exercise authority to make rules with the force of law. In the context of rulemaking, this ordinarily means committing considerable time and resources to notice-and-comment procedures.[624] The ability to know, in advance, whether such an investment will pay off would be tremendously helpful to agencies.

A third reason to adopt such a canon is to facilitate control of the lower federal courts by the Supreme Court. A canon would function like a presumptive rule, and rules are generally better than broad standards for exercising control over subordinate actors in a hierarchy.[625] In the federal judicial system, the problem of control is exacerbated by the fact that the Supreme Court can review only a limited number of cases each year.[626] If the Court had the capacity to review every court of appeals decision, it could define the scope of the *Chevron* doctrine by engaging in a statute-by-statue analysis. But given its limited resources, the Court might better control the behavior of lower courts by adopting a presumptive rule.

Finally, a general canon would allow lawyers to provide more accurate advice to clients about the probable outcome of litigation than

---

[624] For a discussion of the heavy administrative costs of what used to be called "informal" rulemaking, see Harold J. Krent, *Reviewing Agency Action for Inconsistency with Prior Rules and Regulations*, 72 CHI.-KENT L. REV. 1187 (1997); Thomas O. McGarity, *Some Thoughts on "Deossifying" the Rulemaking Process*, 41 DUKE L.J. 1385 (1992); and Richard J. Pierce, Jr., *Seven Ways To Deossify Agency Rulemaking*, 47 ADMIN. L. REV. 59 (1995).

[625] *See* Russell B. Korobkin, *Behavioral Analysis and Legal Form: Rules vs. Standards Revisited*, 79 OR. L. REV. 23, 37–38 (2000).

[626] *See* Peter L. Strauss, *One Hundred Fifty Cases Per Year: Some Implications of the Supreme Court's Limited Resources for Judicial Review of Agency Action*, 87 COLUM. L. REV. 1093, 1118–29 (1987).

would a more flexible standard.[627]  Similarly, when such litigation occurs, arguments about the proper application of a rule will generally require less effort to develop than arguments about the proper application of a standard.  Adopting a general canon would therefore reduce legal costs.

### C.  Choosing a Canon

The discussion in Parts II and III suggests three candidates for a canon that could be used to interpret facially ambiguous rulemaking grants.  First, the canon implicit in the *Queen and Crescent Case* would provide that rulemaking grants are presumed to authorize only procedural and interpretive rules unless Congress expressly states otherwise.  Second, the convention we describe in Part III would provide that rulemaking grants are presumed to authorize the imposition of rules with the force of law either when Congress states so expressly or when it provides for sanctions for rule violations.  Third, the *Petroleum Refiners* canon — the approach endorsed by Judges Wright and Friendly — would provide that rulemaking grants are always presumed to authorize legislative rules unless Congress clearly intends (or, in the Friendly version, expressly states) otherwise.  We assess these three candidates against three criteria: how well they respect the constitutional principle that only Congress can delegate authority to agencies to act with the force of law; how well they track probable congressional intent concerning the powers that agencies can exercise; and the disruption to reliance interests entailed by the transition from the current regime to the proposed canon.

*1.  The* Queen and Crescent Case *Canon.* — The *Queen and Crescent Case* express-statement canon has one great virtue: it would robustly enforce the principle that agencies have no inherent authority to act with the force of law unless Congress delegates that authority to them.  Under this canon, agencies could engage in legislative rulemaking if and only if Congress has expressly authorized them to make rules with "the force and effect of law" or the equivalent.  With the benefit of hindsight, the Court might have been well advised to generalize such an express-statement rule from the *Queen and Crescent Case.*  The nondelegation principle would have been secured; Congress, agencies, and the courts would have had a very clear signaling device for determining when authority to make legislative rules had been conferred; and no major reliance interests would have been frus-

---

[627] *See* FREDERICK SCHAUER, PLAYING BY THE RULES 145–49 (1991); *cf.* Louis Kaplow, *Rules Versus Standards: An Economic Analysis*, 42 DUKE L.J. 557, 579–84 (1992) (arguing that rules are more efficient than standards if fewer resources can be expended in determining the content of the law ex ante rather than ex post).

trated, since nearly all major delegations of such authority occurred after the *Queen and Crescent Case*.

But the Court did not generalize such an express-statement rule from the *Queen and Crescent Case*. Instead, it held in *Grimaud* that Congress could make it a criminal offense to violate an administrative regulation, as long as Congress itself legislated the sanction.[628] This decision presupposed that Congress was not required to confer legislative rulemaking authority through an express statement, but it could do so by clear implication. Relying on this ruling, Congress proceeded over the next half-century to enact thousands of rulemaking grants in which it conferred authority to make legislative rules by clear implication; that is, by prescribing sanctions for violations of "rules and regulations." To adopt an express-statement rule now would massively frustrate congressional intent, as manifested in these many enactments. It would be paradoxical to vindicate the principle of legislative supremacy with a rule that would undermine congressional intent on such a vast scale. Effectively, an express-statement rule would be the undoing of the administrative state. These costs are surely too great for the *Queen and Crescent Case* express-statement canon to tempt the Supreme Court today.

*2. The Convention as Canon.* — The convention we describe in Part III has a much stronger claim to being a viable canon for ascertaining presumptive delegatory intent. The convention would not vindicate the nondelegation principle with the same vigor as the *Queen and Crescent Case* canon, but Congress would still be required to confer the necessary authority by clear implication, most commonly by legislating sanctions for rule violations. In other words, some affirmative legislative act would be required — either the express conferral of legislative power or the express adoption of sanctions for rule violations — before the transfer of authority would be deemed to have occurred.

The convention would also harmonize much better with actual congressional intent. As we have shown, Congress followed the convention quite faithfully until about 1960, while it was adopting most of the regulatory statutes that serve as the foundation for the modern administrative state. We are less sure about what has happened since then, and in particular what has happened since 1981, when Judge Friendly's opinion in *Pharmaceutical Manufacturers* endorsed the *Petroleum Refiners* canon.[629] However, we are unaware of any evidence showing that Congress has relied on the *Petroleum Refiners* canon in drafting modern regulatory statutes.

---

[628] United States v. Grimaud, 220 U.S. 506 (1911); *see supra* pp. 501–02.
[629] *See supra* pp. 563–64.

The big question is how disruptive it would be to existing reliance interests to adopt the convention as a canon at this late date. For the past twenty years, any administrative agency that obtained a legal opinion on the subject would have been advised that a facially ambiguous rulemaking grant would likely be held to confer legislative rulemaking authority. It is unclear how many legislative regulations have been promulgated on this understanding, under statutes that the convention would deem not to authorize such regulations. We cannot even begin to provide a complete accounting, given the thousands of federal statutes containing tens of thousands of rulemaking grants, large and small. A systematic review of these rulemaking grants would pose a Herculean task. All we can offer are some observations drawn from the more historically significant examples of facially ambiguous rulemaking grants and from the controversies we have surveyed in this Article.

First, it appears that the vast majority of administrative agencies that need legislative rulemaking authority do in fact have such authority under the convention. Among the agencies we have reviewed, this includes the FCC, the SEC, the Federal Power Commission (now the Federal Energy Regulatory Commission), the Social Security Administration, the EPA (as to most functions), the IRS (through multiple individual grants), and the Federal Reserve Board (under the Truth in Lending Act). Other agencies that did not originally have legislative rulemaking authority have acquired it through statutory amendments; these include the FTC, the ICC (now the Surface Transportation Board), and the Department of Labor (under the Longshoremen's and Harbor Workers' Compensation Act).

Second, those agencies that lack legislative rulemaking authority under the convention have often been reluctant to engage in legislative rulemaking even when told that they could do so. This describes the NLRB, which, notwithstanding repeated prodding to engage in legislative rulemaking, has continually reverted to a system that relies exclusively on adjudication. It also describes the IRS, insofar as the general rulemaking grant in section 7805(a) is concerned.

Beyond these two categories of agencies are those agencies that lack general legislative rulemaking power under the convention but that have relied on decisions by the courts of appeals authorizing them to use nonlegislative rulemaking grants as sources of legislative rulemaking. The FDA is the most prominent agency in this category and is likely the agency that would be most severely affected by the adoption of the convention as a canon. Yet even here the convention would not necessarily result in the invalidation of all existing FDA regulations issued under the authority of section 701(a). We assume that some of these rules could have been adopted under specific rulemaking grants covered by section 701(e), which requires the use of formal rulemaking procedures. Any challenge to these rules for failure to

comply with the procedural requirements of section 701(e) would likely now be barred as untimely. Thus, with respect to these rules, the primary consequence of adopting the convention would be to deny the FDA *Chevron* deference for interpretations embodied in these rules.[630] Courts, however, would likely regard other FDA rules, such as the Current Good Manufacturing Practice rules, as interpretive rather than legislative.[631] These rules would not only lose *Chevron* deference, but they would also be open to challenge in individual enforcement proceedings.

Other agencies undoubtedly also lack general legislative rulemaking authority, although they may benefit from a greater number of specific grants of authority than does the FDA. The Clean Water Act (CWA), for example, grants general rulemaking authority to the EPA in section 501(a).[632] The CWA nowhere prescribes any sanctions for violations of rules issued under the authority of this grant. As a result, under the convention this provision is not a source of legislative rulemaking authority. However, the CWA also contains numerous specific rulemaking grants permitting the EPA to establish a variety of particular practices and standards.[633] Violations of these regulations are punishable by a variety of civil and criminal penalties and are enforced by other sanctions such as permit denials; thus the regulations authorize legislative rules under the convention. Still, these specific rulemaking grants are not exhaustive, and occasionally circumstances arise in which the EPA's authority to promulgate legislative rules under one of these specific provisions is unclear.[634] Lower courts have occasionally invoked section 501(a) as a source of legislative rulemaking authority in such cases,[635] but this avenue would be foreclosed under the convention.

---

[630] This is because the rules would violate the second step in the *Mead* test: whether the rules were adopted pursuant to a grant of authority to act with the force of law. *See* United States v. Mead Corp., 533 U.S. 218, 227 (2001). The rules *could* have been adopted pursuant to such a grant, but in fact were adopted pursuant to section 701(a), which authorizes only interpretive rules.

[631] *See supra* p. 562.

[632] 33 U.S.C. § 1361(a) (2000).

[633] *See id.* § 1314(e) (addressing best management practices for point sources of pollution); *id.* § 1316 (addressing standards of performance for new sources of pollution); *id.* § 1317(a) (addressing effluent standards for toxic pollutants); *id.* § 1317(b) (addressing pretreatment standards for waste discharged into public sewer systems).

[634] The most prominent of these issues has been whether the EPA has the authority to issue legislative regulations establishing effluent limitations for categories of pollution sources under section 301 of the Clean Water Act. Resolving a circuit split, the Supreme Court held in *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112 (1977), that section 301 authorized such rules (although the Court, in support of this construction of section 301, also made passing reference to section 501(a)), *id.* at 126–36.

[635] *See, e.g.*, Pronsolino v. Nastri, 291 F.3d 1123, 1131 (9th Cir. 2002) (relying on section 501(a) as a source of the EPA's authority to make rules with the force of law imposing total maximum

Similarly, HUD lacks general legislative rulemaking power under the convention (at least as far as the United States Housing Act of 1937[636] and Fair Housing Act of 1968[637] are concerned).  Congress gave HUD a generalized rulemaking grant in the chapter of the United States Code that establishes HUD and describes its administrative powers.[638]  However, no sanctions are attached to give any teeth to the rules HUD might make under this grant.  Similarly, the Fair Housing Act includes a general rulemaking grant, giving the Secretary of HUD the power to "make rules (including rules for the collection, maintenance, and analysis of appropriate data) to carry out this subchapter."[639]  Again, no sanctions back these rules.  Nevertheless, HUD also enjoys numerous narrower rulemaking grants tied to particular sections of the acts it administers, many of which confer power to make legislative rules.[640]  Still, there may be circumstances, analogous to the eviction procedures considered in *Thorpe*, in which none of the specific legislative rulemaking grants applies, and it would therefore be convenient to issue legislative rules under one of the agency's general rulemaking grants.[641]  Application of the convention would prohibit the agency from invoking its general rulemaking grants in this way.

---

daily load limits on a river not polluted by any point sources, and hence finding that the agency interpretation merited *Chevron* deference under *Mead*); E.I. du Pont de Nemours & Co. v. Train, 541 F.2d 1018, 1027 (4th Cir. 1976), *aff'd on other grounds*, 430 U.S. at 126–36 (relying on section 501(a) as source of agency authority to issue legislative regulations establishing effluent limitations for categories of sources under section 301 of the Act); *cf.* Am. Iron & Steel Inst. v. EPA, 115 F.3d 979, 988 (D.C. Cir. 1997) (holding that the EPA had authority to issue a binding Guidance document under section 118 of the Clean Water Act, and hence that it was not necessary to consider whether such a Guidance could be issued under the authority of section 501(a)).

[636] Ch. 896, 50 Stat. 888 (codified as amended in scattered sections of 42 U.S.C.).

[637] 42 U.S.C. §§ 3601–3631 (2000).

[638] *See id.* § 3535(d) (giving the Secretary of HUD the power to "make such rules and regulations as may be necessary to carry out his functions, powers, and duties").

[639] *Id.* § 3614a.  The Act also gives the Secretary the authority to prescribe the rights of appeal from the decisions of administrative law judges, *see id.* § 3608(c), and the power to issue "such regulations as may be necessary to carry out the provisions" of the section dealing with fair housing initiative programs, *see id.* § 3616a(f).

[640] *See, e.g., id.* § 1437c(b) (giving the Secretary the power to prescribe regulations that fix the maximum contribution available for low-income housing); *id.* § 1437s(e) (giving the Secretary the power to prescribe, through regulations, terms and conditions for homeownership or resident management).

[641] The general rulemaking grant included in section 8 of the Housing Act of 1937 — upon which the Supreme Court relied in *Thorpe* to conclude that HUD possessed legislative rulemaking powers, *see* Thorpe v. Hous. Auth., 393 U.S. 268, 277 (1969) — was omitted from the general revision of the Act in 1974.  *See* 42 U.S.C. §§ 1406c to 1411a, Codification Note (2000) ("Section 1408, act Sept. 1, 1937, ch. 896, § 8, 50 Stat. 891, authorized promulgation of rules and regulations by the Authority, prior to the general revision of the United States Housing Act of 1937 by Pub. L. 93-383, Title II, § 201(a), Aug. 22, 1974, 88 Stat. 653.").  Despite this omission, some courts continued to cite *Thorpe* for the proposition that HUD has broad powers to issue binding rules.  *See, e.g.*, Hess v. Ward, 497 F. Supp. 786, 798 (E.D. Pa. 1980).

Whatever the merits of adopting the convention as a presumptive guide to congressional intent, no significant precedential barrier prevents the Supreme Court from adopting such a canon. Nearly all of the Court's decisions that recognized specific rules to be legislative are consistent with the convention. The principal exceptions — *Thorpe*, the *Hynson* Quartet, and *American Hospital* — are cases in which the parties did not brief the question whether the agency had authority to act with the force of law. These decisions cannot, therefore, be characterized as holdings binding on the Court as a matter of stare decisis.[642] Perhaps more importantly, none of the reasoning in the Court's cases is inconsistent with the convention. The statements in *National Broadcasting, American Trucking, Storer Broadcasting, Texaco*, and *Mourning* regarding the importance of liberally construing grants of rulemaking authority are all unexceptional, because the rulemaking grants in those cases did in fact authorize legislative rules under the convention. And the holdings in *Petroleum Refiners* and *Pharmaceutical Manufacturers* — no matter how important to the formation of general legal attitudes since 1980 — are decisions of inferior courts not binding on the Supreme Court.

   *3. The* Petroleum Refiners *Canon.* — The third possible canon presents the mirror image of the virtues and vices of the *Queen and Crescent Case* as a canon. The *Petroleum Refiners* canon does the least to further the nondelegation principle that agencies may act with the force of law only pursuant to a specific delegation from Congress. This canon requires no unambiguous affirmative step to effectuate a delegation of legislative rulemaking authority. Courts would construe ambiguous references to rulemaking as transferring legislative authority, placing the burden on Congress to achieve a different outcome. Congress would still be able to restrict the agencies' ability to make rules with the force of law, but only by denying the agency all rulemaking authority or by clearly limiting rulemaking grants to procedural and interpretive rules. Such a strong presumption in favor of delegation seems like an inadequate level of protection for a principle that serves as a cornerstone of our system of separation of powers.

   Use of the *Petroleum Refiners* canon would also do considerable violence to actual congressional intent. Not only would the FTC, the FDA, and the NLRB receive legislative rulemaking authority under grants not intended to confer such powers, but so would the IRS and the Labor Department under statutes like the Longshoremen's and Harbor Workers' Protection Act.

   The affirmative case for the *Petroleum Refiners* canon is that it would not disturb any reliance interests grounded in existing legisla-

---

[642] *See* cases cited *supra* note 354.

tive rules, since the canon would legitimate all known legislative rules. In particular, we would not have to worry about the fate of the FDA's Current Good Manufacturing Practice rules and other rules adopted pursuant to section 701(a) and intended by the agency to be legislative rules.

Whether the plight of the FDA and other possible reliance issues are sufficiently troubling to warrant embracing the *Petroleum Refiners* canon in light of its other shortcomings is a matter of opinion. Our judgment is that the advantages of the convention in terms of respecting nondelegation values and achieving fidelity to congressional intent are sufficiently great, and the systemic costs of adopting the convention as a canon sufficiently confined, that the convention represents the best candidate for a general canon of presumptive delegatory intent.

### D. The Chevron Paradox

There is one final wrinkle that may prove to be an insuperable barrier to resurrecting the convention as a guide to the meaning of facially ambiguous rulemaking grants. The Court has, not surprisingly, treated *Chevron* as the lodestar situation in which *Chevron* deference is warranted.[643] However, it turns out that the rule at issue in *Chevron* did not have the force of law under the convention, and hence under *Mead* should not have been afforded *Chevron* deference. This outcome is likely to give the Court significant pause before endorsing the convention as a presumptive guide to congressional intent.

*Chevron* involved an EPA interpretation of the term "stationary source" as used in the 1977 Clean Air Act Amendments, applicable to states out of compliance with national ambient air quality standards.[644] The EPA adopted this interpretation in a rulemaking proceeding conducted under the authority of the general rulemaking grant in the Clean Air Act, which was facially ambiguous regarding whether it authorized rules with the force of law.[645] The agency used notice-and-comment procedures in adopting the rule.[646] However, the state-

---

[643] *See, e.g.,* United States v. Mead Corp., 533 U.S. 218, 237 n.18 (2001) (observing that "*Chevron* itself is a good example showing when *Chevron* deference is warranted").

[644] *See* Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 840 (1984).

[645] *See* 42 U.S.C. § 7601(a) (2000).

[646] *See* Requirements for Preparation, Adoption and Submittal of Implementation Plans and Approval and Promulgation of Implementation Plans, 46 Fed. Reg. 50,766 (Oct. 14, 1981). The fact that the agency employed notice-and-comment procedures is not, in itself, a sufficient basis to conclude that the rules were legislative. *Mead* indicates that "[i]t is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure" such as notice and comment. *Mead,* 533 U.S. at 230. But Congress did not direct the EPA to use notice-and-comment procedures under its general rulemaking grant. The decision to do so was the EPA's alone, and unilateral action by an agency

ment of basis and purposes did not clearly indicate whether the agency regarded the rule as legislative or interpretive.[647]

The general rulemaking grant upon which the EPA relied in issuing the stationary-source rule was enacted as part of the 1963 amendments to the Clean Air Act.[648]  The original Clean Air Act, adopted in 1955, was little more than a grant-in-aid program designed to stimulate cooperative federalism.[649]  In 1963, as part of a general revision of the Act, Congress added a rulemaking grant authorizing the Secretary of HEW (later the Administrator of the EPA) to "prescribe such regulations as are necessary to carry out his functions under this Act."[650]  Congress did not prescribe statutory sanctions for violations of the regulations issued under this grant.  Under the convention, the absence of sanctions meant that Congress did not intend to allow the regulations issued under the Act to bind persons outside of the agency with the force of law.

The legislative history of the 1963 amendments also lacks any clear expression of congressional understanding that regulations issued under the general rulemaking grant would be legally binding.  During debates on the 1963 amendments, a proposal was advanced in the House to add the word "procedural" to the general rulemaking provision, so that the amendments would only authorize the power to "prescribe such procedural regulations."[651]  Representative Taft, who offered the amendment, explained that he did not believe it was the intention of the House to authorize regulations that would have the force of law, and he argued that it should be made clear that the general rulemaking provision was intended to refer only to procedural regulations.[652]  The amendment passed the House; however, the Conference Committee did not agree to insert the word "procedural" into the grant.  Although the Conference Report stated that the word "procedural" was eliminated "as being too restrictive upon the authority

---

cannot establish the required delegation of power *from Congress*.  For further discussion of this aspect of *Mead*, see Merrill, *supra* note 52, at 814–15.

[647] Requirements for Preparation, Adoption and Submittal of Implementation Plans and Approval and Promulgation of Implementation Plans, 46 Fed. Reg. 50,766, 50,770 (Oct. 14, 1981).  Some aspects of the EPA's discussion suggest that the rule was interpretive.  For example, the agency said that it would not require states to follow the definition in their implementation plans, but only that it would not disapprove plans that followed the definition.  *Id.* at 50,769.  Other aspects suggest that the agency intended the rule to be legislative.  For instance, the EPA construed the rule as being subject to pre-enforcement review in the D.C. Circuit, *id.* at 50,770, which is generally a characteristic of legislative rules, *see supra* note 34.

[648] *See* Pub. L. No. 88-206, 77 Stat. 392 (1963).

[649] *See* ch. 360, 69 Stat. 322 (1955).

[650] Pub. L. No. 88-206, § 8(a), 77 Stat. at 400 (codified as amended at 42 U.S.C. § 7601 (2000)).

[651] *See* 109 CONG. REC. 13,291 (July 24, 1963) (statement of Rep. Taft).

[652] *See id.*

which the Secretary needs to carry out the act,"[653] it did not explain whether the Conference Committee understood the general grant to authorize legislative rulemaking.

Representative Taft raised concerns on the House floor about the deletion of the word "procedural" from the Conference Committee bill.[654] However, other House members assured him that the general rulemaking provision included in the Act was a limited one. Representative Roberts explained that despite the elimination of the word "procedural," he felt the Conference bill sufficiently addressed Representative Taft's concerns because "the power of the Secretary is very adequately tied down in this bill as to what he can do and as to what kind of information he must act upon, and the extent of the data upon which he may proceed."[655] Representative Rogers similarly assured Representative Taft that the rulemaking grant was narrow, stating that there was "no rulemaking power for abatement" included in the bill.[656]

In the end, when Congress passed the bill without Representative Taft's proposed qualification on the general rulemaking grant, the House understood the rulemaking grant to be fairly limited. But it was not clear just how limited the rulemaking grant really was.[657] Given that the legislative history is at best ambiguous, the general rulemaking grant would not be viewed as legislative under a canon adopting the presumption that only rulemaking grants providing sanctions for violations reflect a congressional delegation of authority to make rules with the force of law.

In 1990, Congress thoroughly overhauled the Clean Air Act and amended the statute to include sanctions for violations of rules issued under the general rulemaking grant.[658] Post-1990, therefore, the Act's general rulemaking grant clearly qualifies as a source of legislative rulemaking authority under the convention.[659] But the EPA adopted

---

[653] CONF. REP. NO. 88-1003 (1963), *reprinted in* 1963 U.S.C.C.A.N. 1260, 1285.

[654] *See* 109 CONG. REC. 23,962–63 (Dec. 10, 1963) (statement of Rep. Taft).

[655] *Id.* at 23,963 (statement of Rep. Roberts).

[656] *Id.* (statement of Rep. Rogers).

[657] Representative Taft asked the House members whether they understood the general rulemaking grant to authorize only procedural as opposed to substantive rules, but he never received a clear answer to this question. *See id.* (statement of Rep. Taft).

[658] *See* An Act to Amend the Clean Air Act, Pub. L. No. 101-549, 104 Stat. 2399, 2676–77 (1990) (codified as amended at 42 U.S.C. § 7413(b)(2)–(d)(1)(B) (2000)). As amended, the Clean Air Act authorizes the EPA to commence a civil action or assess a civil or administrative penalty of up to $25,000 per day of violation against any person who violates "a requirement or prohibition of any rule . . . issued . . . under this chapter." *Id.* (similar language in both provisions). In contrast, the law in effect in 1981, when the EPA adopted the stationary-source rule reviewed in *Chevron*, authorized the EPA to commence a civil action or assess a civil administrative penalty only for violation of select provisions of the Act or state implementation plans. *See* 42 U.S.C. § 7413(a)(1), (a)(3), (a)(5), (c)(1) (1982).

[659] The sanctions added to the Act, however, apply only to violations of "rules," and do not mention "regulations." *See* 42 U.S.C. § 7413 (b)(2)–(d)(1)(B). This word choice is potentially sig-

the rule at issue in *Chevron* under the 1977 version of the Act — well before Congress amended the general rulemaking grant to give the EPA general authority to issue legislative rules implementing the Clean Air Act. This situation presents the ultimate paradox: *Christensen* and *Mead* hold that *Chevron*'s strong doctrine of deference applies only where agencies have been delegated authority to make rules with the force of law. Yet the agency that *Chevron* held to be entitled to this strong deference did not, according to the convention, have authority to make rules having the force of law until many years after *Chevron* was decided — at least not with respect to the particular rule considered in *Chevron*.

In principle, this paradox should not really matter. The important propositions for which *Chevron* stands — that Congress often impliedly intends that an agency rather than the courts be the primary interpreter of gaps and ambiguities in a statute, and that in such cases, courts are to accept reasonable agency interpretations of the statute — remain unaffected even if *Chevron* incorrectly determined that Congress had implied such a delegation in the particular provision at issue. Only much later, in *Mead*, did the Court specify that the key question is whether Congress has delegated to the agency the authority to make rules with the force of law. *Chevron* did not fully anticipate this development, and it contains no holding concerning whether Congress had given the EPA authority to make rules with the force of law. Indeed, the Court in *Chevron* did not even cite the rulemaking grant under which the EPA issued its interpretation. Still, whether the Court would ever be willing to endorse the convention as the key to ascertaining the meaning of facially ambiguous rulemaking grants, when the convention generates this kind of internal dissonance in the Court's case law, remains very much to be seen.

## CONCLUSION

Our story is about legislative supremacy and the signals Congress uses in its exercise. In the abstract, all agree that agencies have no inherent authority to act with the force of law.[660] Agencies can issue edicts that have the effect of statutes only if Congress delegates to them the authority to do so. But what happens if Congress speaks ambiguously in delegating authority to an agency, referring to "rules and regulations" without specifying whether this means rules and

---

nificant because the general rulemaking grant authorizes "regulations," not "rules." If Congress had intended regulations issued under the general rulemaking grant to be enforced via the added sanctions in § 7413, one would think that it would have applied the sanctions to "regulations" as well as "rules."

[660] *See* authorities cited *supra* notes 95 and 97.

regulations with the force of law, or merely procedural and interpretive rules and regulations?

For a long time, Congress used one set of signals to indicate the meaning of such facially ambiguous grants. Most members of Congress were probably blissfully unaware of these signals. But the signals functioned well enough that the attorneys drafting the legislation and advising agency officials about the scope of their authority could do their jobs.

The signals were not, however, made sufficiently explicit that appellate lawyers or courts had easy access to them. Because of the vagaries of litigation, no Supreme Court decision enshrined the signals in an authoritative opinion. When times changed, other actors — agency critics, a new generation of agency lawyers, and judges and their law clerks — interpreted the signals differently. Because there was no controlling legal authority to stop them, these actors in effect engineered a major transfer of delegated power beyond anything that Congress contemplated. While courts continue to incant the principle that agencies have no inherent authority to act with the force of law, in practice courts have enabled every agency with a general grant of rulemaking authority to decide in its discretion whether to act with the force of law.

Another debate has recently emerged concerning which institution in the administrative state is to exercise primary authority in the interpretation of law. The Supreme Court has decided that this question is also a matter of legislative supremacy and that Congress is entitled to signal whether an agency can exercise primary interpretive authority in a given instance.[661] In an effort to describe in general terms which signal will be examined to answer this question, the Court has said that the threshold question is whether Congress has delegated authority to the agency to make rules with the force of law.[662] Thus, by a quirk of fate, the Supreme Court has come around to the question it never answered during the formative years of the administrative state: what language must Congress use to indicate that an agency has been given power to make rules with the force of law?

The Court will soon have to decide whether ambiguous rulemaking grants should be interpreted in accordance with the original set of signals or in accordance with the revisionist understanding that such grants always confer authority to act with the force of law unless Congress specifically limits the grant. We have argued that it is important that the question of delegatory intent be resolved by a presumptive rule, rather than ad hoc. Regarding the choice of a presumptive rule,

---

[661] *See* United States v. Mead Corp., 533 U.S. 218, 229 (2001).

[662] *See id.* at 231–32.

the forces of inertia favor the revisionist understanding.  We believe, however, that the original convention for deciphering the meaning of facially ambiguous rulemaking grants, if adopted now as a canon of interpretation, would achieve a better integration of constitutional values and practical realities, of our present and our past.

# ANTITRUST RULEMAKING: THE FTC'S DELEGATION DEFICIT

THOMAS W. MERRILL*

*The Federal Trade Commission's (FTC's) recent assertion of authority to engage in legislative rulemaking in antitrust matters can be addressed in terms of three frameworks: the major questions doctrine, the Chevron doctrine, and as a matter of ordinary statutory interpretation. The article argues that as a matter of ordinary statutory interpretation the FTC has no such authority. This can be seen by considering the structure and history of the Act and is confirmed by the 1975 Federal Trade Commission Improvements Act. Given that the result follows from ordinary statutory interpretation, it is unnecessary for courts to consider the other two frameworks.*

INTRODUCTION ........................................................................................ 278
I. IS FTC RULEMAKING AUTHORITY A MAJOR QUESTION? ............. 280
II. FTC RULEMAKING AUTHORITY AS A MATTER OF *CHEVRON*
    DEFERENCE .................................................................................... 290
III. FTC RULEMAKING AUTHORITY AS A MATTER OF ORDINARY
    STATUTORY INTERPRETATION ........................................................ 296
    A. *The Original Understanding* ....................................................... 296
    B. *Contemporary and Longstanding Agency Interpretation* ....................... 301
    C. *Congressional Ratification* ........................................................... 301
    D. *National Petroleum Refiners* ....................................................... 302
    E. *The 1975 Federal Trade Improvements Act* .................................... 305
CONCLUSION ......................................................................................... 315

* Charles Evans Hughes Professor, Columbia Law School. The article has benefitted from comments from participants at workshops on FTC rulemaking sponsored by the George Mason Antonin Scalia School of Law in 2022 and the Brigham Young School of Law in 2023. Kyle Oefelein provided excellent research assistance. Research support was provided by the Gray Center of the Study of Administrative Law at George Mason University.

JA0441

## INTRODUCTION

The leadership installed at the Federal Trade Commission (FTC or the Commission) by the Biden Administration would like to use legislative rulemaking to regulate anti-competitive practices.[1] The Commission Chair, Lina Khan, has argued that the traditional method used by the FTC and the courts to enforce the antitrust laws—adjudication—"generates ambiguity, unduly drains resources from enforcers, and deprives individuals and firms of any real opportunity to democratically participate in the process."[2] Legislative rulemaking would reverse these deficiencies; that is, it would reduce ambiguity about what is or is not permitted, conserve the resources of enforcers, and permit affected individuals and firms to participate in the process of formulating rules. The FTC made good on this aspiration on January 5, 2023, by issuing a notice of proposed rulemaking that, in the interest of enhancing competition among firms for workers, would make so-called non-compete clauses in employment contracts illegal.[3]

This Article will not focus on whether such rulemaking would be a good idea in determining what sorts of behavior are prohibited by the antitrust laws. That question, this Article argues, is essentially moot because the FTC has no legal authority to engage in legislative rulemaking on competition matters.

The question of the FTC's authority in this context has important implications for the future of the regulatory state. The FTC will argue that a provision allowing it to make "rules and regulations" tucked away in its 1914 organic act authorizes it to make legislative rules about unfair competition.[4] After all, the provision does not clearly say that legislative rules are *not* included in the phrase "rules and regulations," and courts have often assumed that similar language includes the authority to make legally binding rules.[5] Indeed,

---

1. *See generally* FED. TRADE COMM'N (FTC), STATEMENT OF REGULATORY POLICIES, (2021), https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/202110/Statement_3084_FTC.pdf.

2. Rohit Chopra & Lina M. Khan, *The Case for "Unfair Methods of Competition" Rulemaking*, 87 U. CHI. L. REV. 357, 359 (2020).

3. *See* Non-Compete Clause Rule, 88 Fed. Reg. 3,482 (proposed Jan. 19, 2023) (to be codified at 16 C.F.R. pt. 910); *FTC Proposes Rule to Ban Noncompete Clauses, Which Hurt Workers and Harm Competition*, FED. TRADE COMM'N (Jan. 5, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-proposes-rule-ban-noncompete-clauses-which-hurt-workers-harm-competition; Noam Scheiber, *U.S. Moves to Bar Noncompete Agreements in Labor Contracts*, N.Y. TIMES (Jan. 6, 2023), https://www.nytimes.com/2023/01/05/business/economy/ftc-noncompete.html.

4. Federal Trade Commission Act (FTC Act or the Act), Pub. L. No. 63-203, § 6(g), 38 Stat. 717, 722 (1914) (codified at 15 U.S.C. § 46(g)).

5. Two recent examples from the Supreme Court: In *Biden v. Missouri*, the Court refused to

the D.C. Circuit so held with respect to the FTC's rulemaking grant many years ago.[6]  And even if one regards the rulemaking grant as ambiguous, the Commission can point out that as recently as 2013 the Supreme Court held that agencies are entitled to *Chevron* deference with respect to interpretations of ambiguities about the scope of their own authority.[7]

Other aspects of the question, however, suggest that the FTC will encounter choppy waters.  The Supreme Court has recently embraced something called the "major questions" doctrine, most prominently in *West Virginia v. EPA*.[8]  Much about the doctrine remains uncertain, but it takes little imagination to predict that opponents of antitrust rulemaking will claim that the Commission's authority to make such rules is a major question, and thus, the commission must be able to point to "clear congressional authorization" before it goes down this path.[9]

There is a more general problem: The Supreme Court seems to have lost all enthusiasm for deferring to agency interpretations of the law they administer.  The Court has not applied the *Chevron* doctrine to resolve a question of agency law since 2016.[10]  In the most recent full Term, it was barely mentioned.  Instead, the Court has taken to resolving questions of agency law de novo, whether the result happens to be to affirm or reverse the

---

stay a regulation issued by the Department of Health and Human Services (HHS) requiring that all employees in facilities funded by Medicare and Medicaid be vaccinated against the COVID-19 virus.  142 S. Ct. 647 (2022).  The majority was unmoved by the dissenters' argument that HHS could point to no statute authorizing such regulations.  *Id.* at 655–58 (Thomas, J., dissenting) (noting that HHS relied on a provision authorizing regulations required for the "efficient administration" of the FTC Act).  It was enough, according to the majority, that HHS had imposed similar restrictions in the past.  *Id.* at 652.  In *West Virginia v. EPA*, the Court, without analysis of the relevant text, assumed that the Environmental Protection Agency (EPA) has authority under the Clean Air Act (CAA) to promulgate legislative regulations setting emissions standards for existing sources of air pollution.  142 S. Ct. 2587, 2601–02 (2022).  The relevant text, § 111(d) of the CAA, appears to delegate authority to EPA to promulgate only *procedural* regulations governing the manner in which states submit proposed emissions limits on existing sources.  *Compare* CAA § 111(b)(2), 42 U.S.C. § 7411(b)(2) (new sources), *with* § 111(d), 42 U.S.C. § 7411(d)(1) (existing sources).  *See* Tom Merrill, West Virginia v. EPA: *Getting to Actual Delegation*, VOLOKH CONSPIRACY (July 29, 2022, 7:10 AM), https://reason.com/volokh/2022/07/29/west-virginia-v-epa-getting-to-actual-delegation/.

6.   *See* Nat'l Petroleum Refiners Ass'n v. Fed. Trade Comm'n (FTC), 482 F.2d. 672 (D.C. Cir. 1973), *rev'g* 340 F. Supp. 1343 (D.D.C. 1972).

7.   *See* City of Arlington v. FCC, 569 U.S. 290 (2013).

8.   142 S. Ct. 2587, 2609–10 (2022).

9.   *Id.* at 2609.

10.   The last time the Court applied the two-step standard of review associated with *Chevron* was in *Cuozzo Speed Technologies, LLC v. Lee*, 579 U.S. 261, 276–77 (2016).

agency position.   A particularly pertinent example is *AMG Capital Management v. FTC*,[11] where the Court held that the FTC does not have statutory authority to bring original civil actions in federal court seeking restitution for consumers who have been victims of deceptive practices.[12] The Court reached this result by reviewing the structure of the Federal Trade Commission Act of 1914 (FTC Act or the Act) and its historical evolution over time.[13]   The Article will argue in Part III that a similar conclusion can be reached about antitrust rulemaking by tracing the history of the FTC's authority to engage in rulemaking.   Such a decision would obviate any need either to defer to the FTC's interpretation, or to trot out the heavy artillery of the major questions doctrine.

In what follows, the Article will discuss the question of the FTC's rulemaking authority in competition matters from three perspectives. Part I will consider how the issue should be resolved under the newly minted major questions doctrine.   Part II will address how the matter might be resolved under the *Chevron* doctrine, as it came to be regarded in its most expansive form, with the decision in *City of Arlington v. FCC*.[14] Part III will examine how the issue should be resolved as a matter of ordinary statutory interpretation.   The last framing is the correct one, the Article argues, because courts should always determine as a matter of independent judgment whether an agency is acting within the scope of its delegated regulatory authority.[15]   But the major questions frame and the *Chevron* doctrine are likely to be invoked if the matter becomes contested in litigation.   So, for the sake of completeness, the Article will address all three ways of viewing the question.

## I.     IS FTC RULEMAKING AUTHORITY A MAJOR QUESTION?

The Supreme Court Term that ended in the summer of 2022 will be remembered for, among other things, the Court's endorsement of something called the major questions doctrine.[16]   There are many uncertainties about this doctrine and how it will be deployed in the future.   A rough statement of the doctrine is that courts will not uphold

---

11.   141 S. Ct. 1341 (2021).

12.   *Id.* at 1344.

13.   *See id.* at 1345−49.

14.   569 U.S. 290 (2013).

15.   *See* THOMAS W. MERRILL, THE *CHEVRON* DOCTRINE: ITS RISE AND FALL, AND THE FUTURE OF THE ADMINISTRATIVE STATE 230−37, 263 (2022) [hereinafter MERRILL, *CHEVRON* DOCTRINE].

16.   *See* West Virginia v. EPA, 142 S. Ct. 2587, 2609 (2022).

novel agency interpretations that seek to regulate questions of economic and political significance unless the agency can point to clear congressional authorization for such actions.[17]

The major questions doctrine did not come out of nowhere. The Court has episodically expressed skepticism about agency assertions of "significant policymaking authority" in an unprecedented fashion.[18] For example, in 2000, the Court held that the Food and Drug Administration (FDA) could not regulate tobacco products as ordinarily marketed based on its general authority to regulate drugs and devices.[19] Then, in 2014, the Court held that Environmental Protection Agency (EPA) could not subject stationary sources of air pollution to certain stringent regulations based on their emission of greenhouse gases since this would "bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization."[20]

Until 2022, however, such expressions of skepticism had manifested themselves in the course of exercises in ordinary statutory interpretation, typically either as part of "step one" or "step two" of the *Chevron* doctrine.[21] The Court's expressions had the status of sayings or maxims, such as the often-quoted quip that Congress does not hide "elephants in mouseholes."[22] In contrast, in *National Federation of Independent Business (NFIB) v. OSHA*,[23] decided in January of 2022, and more emphatically in *West Virginia v. EPA*, decided in late June of that year, the Court reformulated these expressions of skepticism into a new canon of interpretation.[24]

Under this new doctrine, the obvious and generally dispositive question is what constitutes a major question. What do we learn from the recent decisions about this? Chief Justice Roberts's opinion for the Court in *West Virginia*, as is often his style, sought to ground the major questions doctrine in precedent. In so doing, the opinion includes quotations from a number of the Court's previous decisions.[25] Thus, we read that a major question exists when an agency offers a "novel reading" of a statute that would result in the "wholesale restructuring" of an industry; when it advances a claim of

---

17.   *See id.* at 2614.

18.   FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 160 (2000).

19.   *Id.*

20.   Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 324 (2014).

21.   Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984).

22.   Whitman v. Am. Trucking Ass'ns., 531 U.S. 457, 468 (2001).

23.   142 S. Ct. 661 (2022) (per curiam).

24.   West Virginia v. EPA, 142 S. Ct. 2587, 2609, 2614 (2022).

25.   *Id.* at 2605, 2608–10 (citations omitted).

"sweeping and consequential authority" based on a "cryptic" statutory provision; when it entails "unheralded" regulatory power over "a significant portion of the American economy;" when it invokes "oblique or elliptical language" to make a "radical or fundamental change" in a regulatory scheme; or when it cites an "ancillary provision" to "adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."[26] It is hazardous to attempt to distill a more precise formulation of what constitutes a major question based on this collection of quotations. The root idea of the Court's opinion, however, is that a major question is one in which an agency advances a novel interpretation of its statutory authority that has the effect of significantly changing the scope of its authority.

Justice Gorsuch, in a concurring opinion in *West Virginia* joined by Justice Alito, sought to provide a crisper formulation of the meaning of major question.[27] He discerned three inquiries that provide "a good deal of guidance" in this regard.[28] First, does the "agency claim[] the power to resolve a matter of great 'political significance,'" such as one in which Congress has considered and rejected in "bills authorizing something akin to the agency's proposed course of action?"[29] Second, does the agency seek to regulate "a significant portion of the American economy" or does its action implicate "billions of dollars in spending" by private persons or entities?[30] Third, does the "agency seek to 'intrud[e] into an area that is the particular domain of state law'" thus implicating considerations of federalism?[31] Whether this exegesis provides better guidance is a matter of opinion. The first two inquiries are compounds of two separate factors (e.g., political controversy and prior rejection by Congress), so arguably Justice Gorsuch has posited five factors rather than three. And the Justice added that his list of "triggers" "may not be exclusive."[32]

Justice Gorsuch's concurrence further complicates things by offering an exegesis about what qualifies as a clear statement of congressional authorization in this context. Here, as one would expect, we read that "oblique and elliptical language," "gap filler" provisions, and "broad and unusual authority" do not count as clear statements.[33] But we also read that novel interpretations of old

---

26.  *Id.* (citations omitted).
27.  *Id.* at 2616, 2620–21 (Gorsuch, J., concurring).
28.  *Id.* at 2620.
29.  *Id.* at 2620–21.
30.  *Id.* at 2621.
31.  *Id.*
32.  *Id.*
33.  *Id.* at 2622–23.

statutes, interpretations by an agency that are not contemporaneous with enactment of the statute or of longstanding duration, and interpretations that reflect a "mismatch between an agency's challenged action and its congressionally assigned mission and expertise" may not count.[34] These latter circumstances suggest a concern about the novelty or lack of precedent for the agency interpretation or what political scientists call policy drift, all of which seem to go to problems associated with the nature of the agency decision, not to whether Congress has supplied the requisite clear authorization. So maybe the concurrence posits eight factors, rather than three or five.

Without regard to how one tallies up the factors, the determination of whether something is a major question apparently entails a multi-factorial inquiry. And the various factors cannot be reduced to a common metric. The impression one gets is that the concept of major questions is grounded in an intuitive mix of considerations of the "know it when you see it" variety.[35]

In terms of the future path of development, there are some intriguing differences between the description of the major questions doctrine in Chief Justice Roberts's opinion for the Court in *West Virginia* and Justice Gorsuch's concurring opinions in *NFIB* and *West Virginia*.[36] Justice Gorsuch, who appears to be the most enthusiastic proponent of the new doctrine, describes the major questions doctrine as a "clear-statement rule[]."[37] Chief Justice Roberts, however, never uses this expression in the portions of his *West Virginia* opinion setting forth his understanding of the doctrine. Instead, he speaks of the requirement of "clear authorization" by Congress which might include, for example, implicit ratification of the agency position by subsequent legislative action.[38] Perhaps even more strikingly, Justice Gorsuch grounds the doctrine in constitutional law, namely the nondelegation doctrine that posits Congress has the exclusive power to legislate and may delegate authority to executive actors

---

34. *Id.* at 2623.

35. *See* U.S. Telecom Ass'n v. FCC, 855 F.3d 381, 423 (D.C. Cir. 2017) (per curiam) (Kavanaugh, J., dissenting from denial of rehearing en banc) (acknowledging that the major questions canon has a "'know it when you see it' quality").

36. *Compare West Virginia*, 142 S. Ct. at 2609 (describing the major questions doctrine as "agencies asserting highly consequential power beyond what Congress could reasonably understood to have granted"), *with* Nat'l Fed'n of Indep. Bus. (NFIB) v. OSHA, 142 S. Ct. 661, 667−70 (2022) (per curiam) (Gorsuch, J., concurring) (describing the major questions doctrine as one that requires Congress to "speak clearly" when delegating authority to agencies on issues of "vast economic and political significance" (quoting Ala. Ass'n of Realtors v. HHS, 141 S. Ct. 2485, 2489 (2021) (per curiam)) (internal quotations omitted)), *and West Virginia*, 142 S. Ct. at 2616−17, 2620−24 (Gorsuch, J., concurring) (outlining the applicability of the major questions doctrine).

37. *West Virginia*, 142 S. Ct. at 2616 (Gorsuch, J., concurring).

38. *Id.* at 2609, 2614 (majority opinion).

only on minor or interstitial matters of implementation of legislative policy.[39] The Chief Justice, in contrast, locates the doctrine almost entirely in what can be called administrative common law.[40]  A third difference is that the Chief Justice appears to incorporate something like the "swerve doctrine" into the major questions idea, emphasizing that prior opinions have identified major questions as being "unprecedented," "unheralded," or based on a "novel reading" of statutory authority.[41]  Justice Gorsuch does not mention this in his recitation of the elements that may qualify a question as being "major," although he describes agency inconsistency as a factor to be considered in determining whether the agency action is supported by a clear statement from Congress.[42]

How these differences are resolved in the future will have an important bearing on whether the major questions doctrine portends a revolution in administrative law or merely adds one more substantive canon to the proliferating list of canons collected in treatises on statutory interpretation.[43]  This Article leaves for another day a more systematic critique of the new doctrine.  For present purposes, all that can be said is that it is unclear how the major questions doctrine would apply to a claim by the FTC of antitrust rulemaking authority.

Many of the factors that help make something a major question, as enumerated by the Chief Justice and Justice Gorsuch, clearly suggest that the FTC's proposed ban on non-compete agreements is a major question.  The

---

39.  *Compare* Gundy v. United States, 139 S. Ct. 2116, 2123 (2019) (reaffirming the traditional test permitting the delegation of discretionary authority if constrained by an "intelligible principle"), *with West Virginia*, 142 S. Ct. at 2617–19 (Gorsuch, J., concurring) (insisting that delegations should be limited to filling the details in statutes with major questions resolved by Congress).

40.  The Chief Justice made one brief reference to "separation of powers principles" without spelling out what they were.  *West Virginia*, 142 S. Ct. at 2609.  This was paired in the same sentence with "a practical understanding of legislative intent."  *Id.*

41.  *Id.* at 2605, 2608.  The "swerve doctrine," like most administrative common law, originated in the D.C. Circuit.  *See* Greater Bos. Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970) (stating that "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.").  For endorsements of the idea by the Supreme Court, see Motor Vehicle Mfg. Ass'n of U.S. v. State Farm Mut. Auto. Ins., 463 U.S. 29 (1983); U.S. Dep't of Homeland Sec. v. Regents of Univ. of Cal., 140 S. Ct. 1891 (2020).

42.  *See West Virginia*, 142 S. Ct. at 2623 (Gorsuch, J., concurring) (noting that a novel assertion of agency power "warrants a measure of skepticism") (quoting Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 324 (2014)).

43.  *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–339 (2012) (discussing some fifty-one canons as guides to statutory interpretation).

proposed ban, according to the Notice of Proposed Rulemaking, would affect approximately thirty million workers and increase their earnings by $250 to $296 billion per year.[44]  This would seem clearly to satisfy the large number of persons and large number of dollars referenced by the Court as signifying a major question.  The issue would also appear to implicate questions of federalism, given that the permissibility of non-compete employment contracts has long been governed by state law, with some states (e.g., California) banning them, and others permitting them if they are reasonable.[45]  The issue is likely to be politically controversial, at least with employers.  But it does not appear that Congress has tried, and failed, to enact a similar nationwide ban.  Other factors, however, cut less clearly in favor of characterizing the FTC's proposed rule.

One factor stressed by the Chief Justice in his opinion for the Court in *West Virginia* is the swerve idea: a question is likely to be major if the agency action is unprecedented, unheralded, novel, or inconsistent with past agency understanding.[46]  This also appears in the per curiam opinion for the Court in *NFIB*,[47] and in Justice Gorsuch's discussion of what constitutes a clear statement in *West Virginia*.[48]

In one sense, the FTC's claim of legislative rulemaking power can be viewed as an avulse change.  For more than a century, the FTC has never engaged in legislative rulemaking in a matter that unambiguously involves its antitrust authority.  On the other hand, the FTC's claim that the source of this authority is § 6(g) of the FTC Act (discussed more fully in Part III), is not a bolt from the blue.[49]  The Commission asserted this interpretation of § 6(g) in the late 1960s, and its claim was upheld by the D.C. Circuit in *National Petroleum Refiners Ass'n v. FTC*[50] in 1973.  There is more to say about this decision (which is also covered in Part III).  The point for present purposes is that the FTC's claim for legislative rulemaking authority based on § 6(g) has

---

44.  Non-Compete Clause Rule, 88 Fed. Reg. 3,482, 3,482, 3,485, 3,501 (proposed Jan. 19, 2023) (to be codified at 16 C.F.R. pt. 910).

45.  *Id.* at 3,482, 3,493–94 (discussing variations in state statutory and common law).  The Restatement (Second) of Contracts: Ancillary Restraints on Competition § 188 (Am. L. Inst. 1981) provides that non-compete agreements are unreasonable if the restraint is greater than needed to protect the employer's legitimate interest or the employer's need is outweighed by the hardship to the employee and the likely injury to the public.

46.  *See supra* note 41 and accompanying text.

47.  *See* NFIB v. OSHA, 142 S. Ct. 661, 665–66 (2022) (per curiam).

48.  *See* West Virginia v. EPA, 142 S. Ct. 2587, 2623 (2022) (Gorsuch, J., concurring).

49.  *See* FTC Act, Pub. L. No. 63-203, § 6(g), 38 Stat. 717, 722 (1914) (codified at 15 U.S.C. § 46(g)).

50.  482 F.2d 672 (D.C. Cir. 1973).

been around for more than half century. This authority has rarely been asserted, and virtually never in a purely antitrust context. But it is different in this respect from the Occupational Safety and Health Administration's (OSHA's) claim of authority to require the vaccination or periodic testing of all employees at all major firms throughout the country, which the Court said had never been asserted by OSHA in the fifty years of its existence.[51]

Another variable is whether the agency interpretation significantly changes the scope of its regulatory authority. A number of cases cited as precedents for the major questions doctrine involved debatable expansions or contractions of an agency's substantive regulatory authority.[52] *FDA v. Brown & Williamson Tobacco Corp.*,[53] described by the Chief Justice as the "leading case," is a clear example: the FDA, after decades of disclaiming any power to regulate tobacco products, discovered such authority based on a revised reading of its statutory mandate. Similarly, in *King v. Burwell*,[54] the government allowed persons to claim tax credits for health insurance purchased on a federally-created insurance exchange, even though the statute spoke of exchanges "established by a state."[55] The Court characterized the statute as "ambiguous," but declined to rest on the agency's interpretation.[56] Instead, it invoked the major questions doctrine and decided the matter itself in favor of the agency's position.[57]

What is unclear is whether the major questions doctrine is reserved for interpretations that implicate the scope of an agency's substantive regulatory authority, as in *Brown & Williamson* and *King v. Burwell*, or whether it also applies to the changes in the *method* of exercising that authority. The question of whether the FTC has rulemaking authority over competition matters does not affect the scope of its substantive regulatory authority. The FTC has been charged with enforcing the antitrust laws for more than a century. The Sherman Act was passed in 1890,[58] and the FTC has enforced the antitrust laws ever since the Clayton Act was adopted in 1914.[59] That authority,

---

51. *NFIB*, 142 S. Ct. at 666.

52. *See* FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000); King v. Burwell, 576 U.S. 473, 493–97 (2015).

53. 529 U.S. 120 (2000).

54. 576 U.S. 473 (2015).

55. *Id.* at 483.

56. *Id.* at 490.

57. *Id.* at 485–86.

58. Sherman Act, ch. 647, 26 Stat. 209 (1890) (codified as amended at 15 U.S.C. §§ 1–38 (2018)).

59. Clayton Act, ch. 323, 38 Stat. 730 (1914) (codified as amended at 15 U.S.C. §§ 12–27 (2018)). To be sure, the Commission's current position is that its authority over "unfair methods of competition" extends beyond the scope of conduct that violates the antitrust laws. *See* Federal

however, has always been exercised through case-by-case adjudication. The precise question, therefore, is whether the belated discovery of legislative rulemaking power as a means of supplementing a long-existing form of substantive regulatory authority also triggers the major questions doctrine.

The Court's limited jurisprudence of major questions points both ways. Consider *West Virginia*. At times the Chief Justice appears to say that the Obama Administration's Clean Power Plan (CPP) was a major question because it was designed to force utilities to enter into cap-and-trade systems in order to reduce carbon dioxide emissions, and this particular regulatory tool had not been clearly authorized by Congress under the relevant provision of the Clean Air Act.[60] This points toward the choice of method for achieving a regulatory goal as being included within the ambit of the major questions doctrine. At other times, the Chief Justice seems to say that the CPP was designed to force coal-burning plants out of business, transforming the nation's electric power industry into one based on renewables and natural gas rather than coal, and that this goal had not been authorized by Congress.[61] This points toward the major questions doctrine being concerned with the scope of regulatory authority.

Justice Gorsuch, in his concurring opinion in *West Virginia*, cited a late nineteenth-century decision holding that the Interstate Commerce Commission (ICC) could not prescribe rates for the future without a "clear and direct" authorization from Congress.[62] Rate prescription orders are a form of legislative rulemaking, as opposed to awards of reparations for unreasonable rates charged in the past, which are a type of adjudication.[63]

---

Trade Commission, Policy Statement Regarding the Scope of Unfair Methods of Competition Under § 5 of the Federal Trade Commission Act, Commission file No. P221202 at 1 (Nov. 10, 2022). The proposed rulemaking that would ban non-compete agreements in employment contracts, see Non-Compete Clause Rule, 88 Fed. Reg. 3,482 (proposed Jan. 19, 2023) (to be codified at 16 C.F.R. pt. 910), would appear to fall in this category since there is no allegation of collusion or monopolization as a basis for the proposed rule. The assertion of authority over "methods of competition" that the FTC deems "unfair" (but not violative of the antitrust law) combined with an assertion of authority to condemn such conduct by legislative rule is likely to enhance the judicial perception that the proposed action is a major question.

60. West Virginia v. EPA, 142 S. Ct. 2587, 2610–11 (2022).

61. *See id.* at 2610, 2612.

62. *Id.* at 2619 (Gorsuch, J., concurring) (citing and quoting Interstate Com. Comm'n (ICC) v. Cincinnati, New Orleans & Tex. Pac. Ry. Co., 167 U.S. 479, 505 (1897)).

63. *See* 5 U.S.C. § 551(4) (definition of "rule"); Arizona Grocery Co. v. Atchison, T. & S.F. Ry. Co., 284 U.S. 370, 383–89 (1932) (distinguishing rate prescription orders which have legislative effect from rates previously established by carriers that are subject to adjudication for reasonableness).

So *The Queen and Crescent Case*[64] is a close parallel to the question we are considering and suggests that the major questions doctrine applies to an agency interpretation discovering a new source of rulemaking authority.[65] But the Chief Justice in his opinion for the Court did not include the decision in his rendition of the precedents for the major questions doctrine.

The better view is that both agencies and reviewing courts "are bound, not only by the ultimate purposes Congress selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."[66] This would seem to be required by the principle of legislative supremacy.[67] But this position does not answer the question whether a deviation from "the means" Congress has selected should be regarded as a major question, in all or even some cases. That remains unclear and may depend on other contextual factors.

Yet another factor, implicit in the majority decision in *West Virginia*, was labeled by the concurrence and Justice Kagan's dissent as "a mismatch between an agency's challenged action and its congressionally assigned mission and expertise."[68] The majority and the concurrence regarded the mismatch to be EPA's decision to balance "the many vital considerations of national policy implicated in deciding how Americans will get their energy."[69] EPA, in their view, was charged with controlling air pollution, not with formulating energy policy.[70] Justice Kagan demurred, finding "no misfit, of the kind apparent in our precedents, between the regulation, the agency, and the statutory design[.]"[71]

Whatever the correct conception of EPA's statutory mandate to deal with climate change, this variable would not seem to impeach the FTC's desire to engage in antitrust rulemaking. In this regard, consider that the FTC, in conjunction with the Antitrust Division of the Justice Department, has for many years promulgated the Merger Guidelines (the Guidelines), which FTC officials and Department of Justice (DOJ) officials use in opining on whether proposed mergers of companies should be allowed to go forward consistent with the antitrust laws.[72] The Guidelines are a policy

---

64. *Cincinnati, New Orleans, Tex. Pac. Ry. Co.*, 167 U.S. at 479. It was colloquially known as "The Queen and Crescent Case" because of the nicknames given to the principal cities—Cincinnati (the Queen City) and New Orleans (the Crescent City).

65. *Id.* at 498–99.

66. MCI Telecomms. Corp. v. AT&T Co., 512 U.S. 218, 231 n.4 (1994).

67. *See* MERRILL, *CHEVRON* DOCTRINE, *supra* note 15 at 195–216.

68. West Virginia v. EPA, 142 S. Ct. 2687, 2623 (Gorsuch, J., concurring).

69. *Id.* at 2612 (majority opinion).

70. *See id.* at 2611–12.

71. *Id.* at 2638 (Kagan, J., dissenting).

72. U.S. DEP'T OF JUST. & FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES

statement, not a legislative rule.[73]  They are used to predict how FTC and DOJ officials, as enforcement agents, regard a proposed merger, not to prohibit or permit particular mergers.  But they are "rules" within the meaning of the Administrative Procedure Act (APA),[74] and they unquestionably have a significant impact on whether companies decide to proceed or abandon particular merger agreements.  If officials of the FTC or the DOJ, applying the Guidelines, announce their opposition to a merger, the affected firms generally assume this will carry weight with the courts, which means that the merger is more likely to be disapproved.[75]  Uncertainty about approval can be fatal to a merger, so many firms—faced with opposition of the FTC or DOJ—will abandon the merger.[76]  Courts and lawyers are familiar with this dynamic, which means that the prospect of legislative rulemaking by the FTC on matters of antitrust law more generally may not strike them as some alien intrusion into the fabric of American public law.[77]

---

(2010), https://www.ftc.gov/sites/default/files/attachments/mergers/100819hmg.pdf.

73.    Press Release, Federal Trade Commission, Federal Trade Commission and U.S. Department of Justice Issue Revised Horizontal Merger Guidelines (Aug. 19, 2010) ("The Horizontal Merger Guidelines . . . serve as an outline of the main analytical techniques, practices and enforcement policies the Department of Justice (DOJ) and the FTC use to evaluate mergers and acquisitions . . . .").

74.    The Administrative Procedure Act (APA) defines "rule" to mean:

[T]he whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services, or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4).  Thus, interpretative rules and policy statements are rules, as are legislative rules, such as rules prescribing rates of utilities or regulated carriers.

75.    *See* Herbert Hovenkamp, Principles of Antitrust 105 (2d ed. 2021) (noting in § 3.8 that courts have generally concurred with the judgments of the FTC and DOJ based on the Merger Guidelines).

76.    *See, e.g.*, William E. Kovacic, *The Modern Evolution of U.S. Competition Policy Enforcement Norms*, 71 Antitrust J. 377, 435 (2003) (noting that the merger guidelines are the "most significant contribution by the federal agencies to non-criminal competition policy analysis in the modern era" and have "changed the way the U.S. courts and enforcement agencies examine mergers").

77.    *See* D. Daniel Sokol, Marissa Ginn, Robert J. Calzaretta, Jr. & Marcello Santana, *Antitrust Mergers and Regulatory Uncertainty* (Dec. 6, 2022) (unpublished manuscript), https:ssrn.com/abstract=4295283 (reporting on an empirical survey of how lawyers have changed their advice to clients in response to uncertainty created by the failure of the FTC and DOJ to propose new merger guidelines).

In sum, many of the factors cited in the recent decisions about what constitutes a major question, such as the large numbers of persons and dollars implicated by the agency decision clearly point to the proposed rule as being a major question.   Other factors, such as the novelty of the agency interpretation or whether a change in the methods of enforcement can count as a major question, could be resolved either way.  A final factor, whether there is a mismatch between the agency's basic mission and the assertion of agency authority, seemingly counts against characterizing the claim of rulemaking authority in competition matters as a major question.   On balance, my view is that the issue should not be classified as a major question, but that is surely debatable, given the uncertain scope of the doctrine. Opponents of antitrust rulemaking will certainly claim that it is.[78]  Because the question can be resolved as a matter of ordinary statutory interpretation, as discussed in Part III, courts should resist the temptation to invoke the major questions doctrine in resolving it.  In other words, they should avoid using the new form of constitutional avoidance, if that is what it is.

## II.    FTC RULEMAKING AUTHORITY AS A MATTER OF *CHEVRON* DEFERENCE

If the major questions doctrine does not answer the question about the FTC's authority to engage in legislative rulemaking in competition matters, what does?  Until recently, most administrative lawyers would answer "the *Chevron* doctrine."[79]  That answer is no longer clear either.  For some thirty years, *Chevron* served as the principal metric used by the Supreme Court in reviewing challenges to an agency's interpretation of the statute it administers.[80]  The Court invoked the two-step standard of review in over 100 decisions, and occasionally rebuked lower courts for failing to apply it.[81]  The Supreme Court essentially stopped using the *Chevron* doctrine in 2016,[82] and several Justices have taken to writing separate opinions

---

78.   *See, e.g.*, Eugene Scalia, *The FTC's Breathtaking Power Grab*, WALL ST. J. (Jan. 12, 2023, 6:50 PM), https://www.wsj.com/articles/the-ftcs-breathtaking-power-grab-noncompete-agreements-rule-capital-investment-wage-gap-job-growth-compliance-11673546029.

79.   So named for *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

80.   *See generally* MERRILL, *CHEVRON* DOCTRINE, *supra* note 15.

81.   *See* Kristin E. Hickman & Aaron L. Nielson, *Narrowing* Chevron*'s Domain*, 70 DUKE L.J. 931, 1000–04 (2021) (listing 107 Supreme Court decisions applying the *Chevron* doctrine between 1984 and 2019).  For a decision reversing and remanding a lower court for failing to apply the *Chevron* doctrine, see, for example, Immigr. & Naturalization Serv. v. Aguirre-Aguirre, 526 U.S. 415, 424 (1999).

82.   *See* Cuozzo Speed Techs., LLC v. Lee, 579 U.S. 261, 276–77 (2016) (invoking *Chevron*

arguing that it should be overruled or at least reconsidered.[83] The Court's latest Term is perhaps the most striking. The Court considered seven cases that involved a challenge to an agency's interpretation of its statute.[84] *Chevron* was not mentioned once in a controlling opinion and received only the most fleeting mention in two separate opinions.[85] Notwithstanding that many parties and amici filed briefs arguing that *Chevron* should be overruled or modified, and that these pleas were expressly addressed in oral argument in two cases.[86]

The Court's determination to leave *Chevron* unmentioned is particularly striking in *West Virginia v. EPA*. The emergence of the major questions doctrine clearly operates as a modification of *Chevron*. Indeed, it is a kind of reverse-*Chevron*. *Chevron* says if the statute is unclear, defer to the agency;[87] *West Virginia* says, if the question is major, do not defer to the agency unless the statute is clear.[88] But the Court did not offer a single word in any of its recent decisions about how to integrate the new major questions doctrine with the *Chevron* doctrine. Does the major questions doctrine function as a preliminary inquiry (a "step zero" or maybe "step minus one"), which cuts off further analysis if the authorization is not clear? Or does the major questions doctrine operate like a substantive canon of interpretation applied at step one of *Chevron*, which supports the conclusion that the statute has a clear meaning contrary to the meaning urged by the agency? Or is the major questions doctrine analogous to the *Mead* doctrine, determining that the

---

in deferring to agency's interpretation of the standard of review on inter partes patent appeal).

83. *See* Michigan v. EPA, 576 U.S. 743, 761–64 (2015) (Thomas, J., concurring) (noting that EPA's "request for deference raises serious questions about the constitutionality of our broader practice of deferring to agency interpretations of federal statutes"); Buffington v. McDonough, 143 S. Ct. 14, 22 (Nov. 7, 2022) (cert. denied) (Gorsuch, J., dissenting) ("We should acknowledge forthrightly that *Chevron* did not undo, and could not have undone, the judicial duty to provide an independent judgment of the law's meaning in the cases that come before the Nation's courts."); Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118, 2118 (2016) (reviewing ROBERT A. KATZMANN, JUDGING STATUTES (2014)) (noting *Chevron* analysis depends on "an initial determination of whether a text is clear or ambiguous[,]" which judges often cannot make "in a settled, principled, or evenhanded way.").

84. Gary Lawson, *"Mostly Dead":* Chevron*'s Shade* (forthcoming) (on file with author).

85. West Virginia v. EPA, 142 S. Ct. 2587, 2635 (2022) (Kagan, J., dissenting); Becerra v. Empire Health Found., 142 S. Ct. 2354, 2368 (2022) (Kavanaugh, J., dissenting).

86. Transcript of Oral Argument at 52–53, Becerra v. Empire Health Found., 142 S. Ct. 2354 (2022) (No. 20-1312); Transcript of Oral Argument at 30–35, Am. Hosp. Ass'n v. Becerra, 142 S. Ct. 1896 (2022) (No. 20-1114).

87. Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843–44 (1984).

88. *West Virginia*, 142 S. Ct. at 2608–09.

agency is not entitled to *Chevron*-style deference but only respectful consideration under *Skidmore*?[89]  Or perhaps no deference at all?

The matter is further clouded by the Court's recent practice, during what can be called the "*Chevron* moratorium," of deciding all questions of statutory interpretation that arise on review of agency action de novo, without giving any consideration one way or another to the agency's view.  The practice has been followed by all Justices, liberal and conservative alike, and sometimes results in upholding the agency and sometimes in reversing it.[90]  The simple explanation for this development is that the Court is deeply divided about what to do about *Chevron*, and all Justices have tacitly agreed to ignore the doctrine until some kind of consensus emerges about the path forward.  But it is also conceivable that the Justices have tacitly agreed to replace *Chevron* with de novo review, i.e., overrule it, but cannot decide how to handle the embarrassment that the Court itself applied *Chevron* in over 100 cases.  The possibility that the Court has opted for de novo review in every case would ignore the critical fact that it is possible for the Justices, who decide only about seventy cases per Term, to dig into the details of complex regulatory statutes and decide the matter de novo; it is far more difficult for lower court judges, who have much heavier caseloads, to function without some kind of deference doctrine.[91]

What is a lower court judge supposed to do in this puzzling situation?  Perhaps the most obvious course of action is to ask, first, if the question is major or minor in light of the multiple factors listed by the Court.  If major, the agency loses, and the matter is effectively sent back to Congress for possible resolution.  If minor, the *Chevron* doctrine applies, as the Court explicated through 2016.  On the assumption that the question of the FTC's antitrust rulemaking authority is not a major question, as discussed in Part I, how then should the matter be resolved under the Court's explication of the *Chevron* doctrine as of 2016?

As detailed in *The* Chevron *Doctrine: Its Rise and Fall, and the Future of the Administrative State*,[92] the *Chevron* doctrine has undergone significant

---

89.    *See* United States v. Mead Corp., 533 U.S. 218 (2001).  *Mead* effectively made *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), which requires giving agency interpretations of statutes respectful consideration but does not make them binding, the general default standard of review, with *Chevron* reserved for cases in which the agency is exercising delegated authority to make binding rules or decisions.

90.    *See Am. Hosp. Ass'n*, 142 S. Ct. at 1902–06 (striking down agency interpretation of complex Medicare reimbursement provision without mentioning *Chevron*); *Empire Health Found.*, 142 S. Ct. at 2358, 2361–67 (upholding agency interpretation of complex Medicare reimbursement provision without mentioning *Chevron*).

91.    *See* Nicholas R. Bednar & Kristin E. Hickman, Chevron*'s Inevitability*, 85 GEO. WASH. L. REV. 1392, 1395–1398, 1415, 1443 (2017).

92.    *See* MERRILL, *CHEVRON* DOCTRINE, *supra* note 15.

revision over its thirty-plus-year life span. What follows is a highly abbreviated version of the history most relevant to the question of whether the FTC has antitrust rulemaking authority.

In its classical formulation, the *Chevron* doctrine was understood to require courts to accept reasonable agency interpretations of ambiguities in the statutes they administer. The Court narrowed the doctrine in *United States v. Mead Corp.*,[93] holding that the agency must act with the "force of law" in order to be eligible for *Chevron* deference, as opposed to some lesser degree of deference like *Skidmore*.[94] The Court was unclear about what sorts of agency decisions should be regarded as having the force of law, but legislative rulemaking and binding adjudication were implicitly regarded as the core cases.[95] The pattern of later decisions applying *Mead* is consistent with this understanding.[96] Justice Scalia filed the only dissent in *Mead*, arguing that *Chevron* should apply whenever the agency has offered an "authoritative" interpretation of the statute it administers, as when the agency files an amicus brief endorsed by the head of the agency or its general counsel.[97] Justice Scalia continued in later cases to condemn *Mead* and its "force of law" requirement.[98]

In 2013, the Court agreed to decide an issue that had divided the Justices early in the *Chevron* era and had produced a split in the circuits: whether *Chevron* should apply to an agency interpretation that implicates the scope of the agency's "jurisdiction."[99] Justice Scalia had staked out the position in 1988 that *Chevron* should apply to "jurisdictional" questions, because there is no meaningful distinction between jurisdictional and nonjurisdictional questions in the agency context.[100] When the issue came back to the Court twenty-five years later, Justice Scalia was able to command a bare majority for this position.[101] The distinction between jurisdictional and nonjurisdictional decisions was meaningless in the administrative context, he wrote for the Court, because all statutory limits on agency authority, if violated, make the

---

93. 533 U.S. 218 (2001).

94. *Id.* at 226–27.

95. *Id.* at 226–27, 230.

96. MERRILL, *CHEVRON DOCTRINE*, *supra* note 15, at 137–41 (discussing post-*Mead* decisions).

97. *Mead*, 533 U.S. at 239 (Scalia, J., dissenting).

98. MERRILL, *CHEVRON DOCTRINE*, *supra* note 15, at 138–41.

99. City of Arlington v. FCC, 569 U.S. 290, 293 (2013).

100. Miss. Power & Light Co. v. Mississippi *ex rel.* Moore, 487 U.S. 354, 377, 381–82 (1988) (Scalia, J., concurring).

101. *See generally* City of Arlington v. FCC, 569 U.S. 290 (2013) (Justice Scalia was joined by Justices Thomas, Ginsburg, Sotomayor, and Kagan.).

agency action ultra vires.[102]   Ergo all agency interpretations should be reviewed under *Chevron*.[103]

In order to reach this result, Justice Scalia had to adopt a narrowing interpretation of *Mead* and the proposition that only agency actions having force of law are eligible for *Chevron* deference. In doing so, Justice Scalia held that it is not necessary to identify a delegation of power to act with the force of law with respect to the specific statutory provision in question; it is enough that Congress has in general terms authorized the agency to act with the force of law.[104] Thus, as long as Congress has generally authorized an agency to engage in legislative rulemaking or to render binding adjudications, a court should apply *Chevron* to any and all agency decisions the agency adopts, whether or not Congress has specifically authorized the agency to act with the force of law with respect to the issue in question.

Chief Justice Roberts filed a vigorous dissent, joined by Justices Kennedy and Alito. He wrote in part:

> Courts defer to an agency's interpretation of law when and because Congress has conferred on the agency interpretive authority over the question at issue. An agency cannot exercise interpretive authority until it has it; the question whether an agency enjoys that authority must be decided by a court, without deference to the agency.[105]

Specifically, Chief Justice Roberts objected to the interpretation of *Mead* as making an agency eligible for *Chevron* deference based on one generic authority to act with the force of law.[106] Instead, courts must undertake to determine whether the agency has been given authority to act with the force of law with respect to the specific issue in contention.[107]

The question whether the FTC has authority to issue legislative rules on competition matters would seem to implicate the scope of the agency's regulatory authority or jurisdiction. Under *Arlington*, this does not matter. The critical question is whether the agency has been given general authority to act with the force of law. With respect to the agency at issue in *Arlington*—the FCC— Justice Scalia was able to rely on precedent holding that it has general authority

---

102.   *Id.* at 297–98.

103.   *See id.* at 306–07. The "ergo," of course, does not follow. One could equally argue that if the transgression of any limit on agency authority renders its action ultra vires, all limits should be interpreted as a matter of independent judgment, which is effectively what the APA requires. *See* 5 U.S.C. § 706(2)(C).

104.   *City of Arlington*, 569 U.S. at 306.

105.   *Id.* at 312 (Roberts, C.J., dissenting).

106.   *Id.* at 317.

107.   *Id.* at 318.

to issue legislative rules as to all titles that it administers.[108]  With respect to the FTC, the answer to this question is by no means simple or straightforward.

One possible source of authority for the FTC to act with the force of law is § 5 of the FTC Act, which authorizes the agency to file complaints and determine whether particular firms are engaging in unfair methods of competition.[109]  If the FTC finds a violation, it can issue a cease and desist order.[110]  However, under the original FTC Act, and still today, the agency has no authority to enforce such orders if they are challenged in court.[111]  Rather, the order must be reviewed by a federal court of appeals, and if the court determines that it is valid, it will be *enforced by the court*.[112]  Whether this constitutes agency authority to act with the force of law, or is more accurately characterized, as the Court did in a landmark decision in 1935, *Humphrey's Executor v. United States*,[113] as the agency acting as a "judicial aid" to the court, is debatable.[114]

Another possible source of authority for the FTC to act with the force of law is § 6(g), which authorizes the agency to "make rules and regulations for the purpose of carrying out the provisions of this subchapter."[115]  As discussed in Part III, this was long understood to refer to procedural rules and other housekeeping matters.  It is true that in recent cases the Court has often construed such generic rulemaking grants to include the authority to issue legislative rules.[116]  But the historical understanding of the FTC rulemaking grant, and the fact that Congress saw fit in 1975 to adopt an explicit grant of legislative rulemaking authority for the FTC with respect to deceptive practices, would seem to counsel against this interpretation.[117]

---

108.   *See id.* at 296 ("Chevron thus provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency.") (citing AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 397 (1999) (Souter, J., concurring in part and dissenting in part)).

109.   15 U.S.C. § 45(b).

110.   *Id.*

111.   *See infra* Part III.A, Part III.E.

112.   15 U.S.C. § 45(c) ("To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission.").

113.   295 U.S. 602 (1935).

114.   *Id.* at 628; *see* Thomas W. Merrill & Kristin E. Hickman, Chevron*'s Domain*, 89 GEO. L.J. 833, 890–92 (2001) (arguing that agency orders that can only be enforced by an Article III court do not have the "force of law").

115.   FTC Act, Pub. L. No. 63-203, § 6(g), 38 Stat. 717, 722 (1914) (codified at 15 U.S.C. § 46(g)).

116.   *See, e.g.*, sources cited *supra* note 5.

117.   *See infra* Part III.

Even if a court were to conclude that the FTC has a generic source of authority to act with the force of law within the meaning of *Arlington*, there is still the question whether the FTC Act, as amended, is "unclear" or "ambiguous" as to whether this-force-of-law authority extends to issuing legislative rules about competition policy. *Chevron* deference applies only when a court concludes, at step one, that Congress has not clearly or unambiguously addressed the precise question at issue. *Arlington* reaffirms this understanding.[118] Courts should enforce the limits Congress has placed on agency authority, Justice Scalia wrote, "by taking seriously, and applying rigorously, in all cases, statutory limits on agencies' authority. Where Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow."[119]

So even if the *Chevron* doctrine applies, the decisive question is likely to boil down to one question of statutory interpretation: has Congress clearly or unambiguously foreclosed FTC authority to issue legislative rules on matters of competition policy? If the answer is yes, then the FTC's assertion of such authority must be rejected at *Chevron*'s step one. As the Court observed in *Chevron*, "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously intent of Congress."[120] It is to that question of statutory interpretation that the Article now turns.

## III.   FTC RULEMAKING AUTHORITY AS A MATTER OF ORDINARY STATUTORY INTERPRETATION

### A.   *The Original Understanding*

Congress created the FTC in 1914.[121]  And, as a creation of Congress, it has only the powers given to it by Congress.[122]   In terms of regulatory

---

118.   City of Arlington v. FCC, 569 U.S. 290, 307 (2013).

119.   *Id.*

120.   Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984).

121.   *See generally* FTC Act, ch. 311, §§ 1–10, 38 Stat. 717 (1914) (codified at 15 U.S.C. §§ 41–58).

122.   *See, e.g.*, Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."); Chrysler Corp. v. Brown, 441 U.S. 281, 302 (1979) ("The legislative power of the United States is vested in the Congress, and the exercise of quasi-legislative authority by governmental departments and agencies must be rooted in a grant of such power by the Congress and subject to limitations which that body imposes."). The Court reaffirmed this understanding in *West Virginia v. EPA*, 142

authority, the relevant provision was § 5, which declared that "unfair methods of competition in commerce are hereby declared unlawful."[123] Congress subsequently amended this provision in two respects. The current Act declares that unfair methods are also prohibited when they only "affect[] commerce."[124] And it now also prohibits "unfair or deceptive acts or practices in or affecting commerce."[125] Thus, while the Act originally prevented only "unfair methods of competition," i.e., antitrust violations, it now prohibits not only antitrust violations but also "unfair or deceptive acts or practices," i.e., false advertising and the like.

The enforcement powers given to the Commission under § 5 remain largely as they were established in 1914. The Act empowers the Commission to file complaints, hold hearings, and issue cease and desist orders when it finds that some person or entity has engaged in unfair methods of competition or unfair and deceptive acts or practices.[126] In order to enforce a cease and desist order, the original Act required the FTC to bring an enforcement action in the court of appeals.[127] Thus, Commission orders were not self-executing but could only be enforced by an Article III court. Congress has since modified the Act to provide that the Commission's orders are "final" if the person or entity directed to cease and desist does not appeal the order or, if it has been appealed, after a final judgment upholding it on appeal.[128] With respect to "final orders" regarding "unfair or deceptive" acts, the Commission itself may file a civil action seeking penalties for violation of a final order in federal district court.[129] Otherwise, however, the DOJ must bring civil penalty actions in federal district court.[130] By negative implication, therefore, cease and desist

---

S. Ct. 2587, 2609 (2022) (agencies "have only those powers given to them by Congress").

123.    FTC Act, Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (1914) (codified at 15 U.S.C. § 45(a)(1)).

124.    *Id.*

125.    The current Act reads: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." *Id.* Congress added the explicit extension to unfair and deceptive acts and practices in the Wheeler-Lea Act of 1938, Pub. L. No. 75-447, 52 Stat. 111. Congress added the change from acts and practices "in commerce" to those "affecting commerce" in the Magnuson-Moss Warranty—Federal Trade Commission Improvements Act of 1975. *See* Pub. L. No. 93-637, sec. 201(a), § 5, 88 Stat. 2183, 2193 (1975).

126.    FTC Act, Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (1914) (codified at 15 U.S.C. § 45(b)).

127.    § 5, 38 Stat. at 720 (codified at 15 U.S.C. § 45(l)).

128.    § 5, 38 Stat. at 721 (codified at 15 U.S.C. § 45(g)(1)–(2).

129.    15 U.S.C. § 45(m)(1)(A).

130.    *Id.* § 45(l).

orders regarding antitrust matters (that is, "unfair methods of competition" as opposed to "unfair or deceptive" acts or practices), when they become final, may only be enforced by a court pursuant to an action brought by the DOJ. Which makes sense, given that DOJ has concurrent authority to ask courts to adjudicate violations of the antitrust laws.[131]

The original Act also authorized the Commission, under § 6, to investigate corporations and issue reports for the use of the public and Congress about the "organization, business, conduct, practices, and management of any corporation."[132] Section 6(g) of the Act authorized the Commission "[f]rom time to time to classify corporations and to make rules and regulations for the purpose of carrying out the provisions of this Act."[133]

What was the original meaning of the rulemaking grant found in § 6(g)? The best answer would seem to be that it was understood to empower the FTC to adopt "procedural" or internal housekeeping rules.[134] The relevant substantive authority over unfair competition was conferred by § 5.[135] This clearly contemplated adjudication, not rulemaking. Indeed, § 5 did not even contemplate an adjudication having the force of law, something that was regarded as problematic for an administrative body in 1914.[136] Any order issued under § 5 could only be enforced by an Article III court. Section 6 included a grant of authority to "make rules and regulations for the purpose[s] of carrying out the provisions of this Act."[137] The referenced "rules and regulations" almost certainly meant procedural rules and regulations, since there was no provision in § 6 (or elsewhere) for the Commission to bring an enforcement action based on such rules.[138] This inference is reinforced by the placement of the rulemaking grant in § 6, which authorized investigations and reports but not any form of substantive regulation.[139]

---

131.    *See, e.g.*, FTC v. Cement Inst., 333 U.S. 683, 694–95 (1948) (holding that the FTC and DOJ can exercise concurrent jurisdiction over the same conduct by the same parties).

132.    § 6, 38 Stat. at 722 (codified at 15 U.S.C. § 46).

133.    § 6(g) 38 Stat. at 722 (codified at 15 U.S.C. § 46(g)).

134.    Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 HARV. L. REV. 467, 505 (2002).

135.    § 5, 38 Stat. at 719 (codified at 15 U.S.C. § 45).

136.    Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 COLUM. L. REV. 939, 969–70 (2011).

137.    § 6(g), 38 Stat. at 722 (codified at 15 U.S.C. § 46(g)).

138.    *See* Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993) (explaining that rules are legislative rather than interpretive when they are the predicate for an enforcement action).

139.    In *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Supreme Court

The fact that the rulemaking provision appears in a sentence authorizing the Commission to "classify corporations" further supports this inference.

Admittedly, it is logically possible to interpret § 6(g) as a grant of legislative rulemaking authority, and as interpreted, to assert that such rules could then be enforced through adjudications conducted under § 5, which is another "provision[] of [the] Act."[140] But the structure of the Act makes it highly unlikely that this was the original meaning of the Act. There is no language in the 1914 Act conferring authority on the Commission to bring enforcement actions against firms for violating the "rules" adopted under § 6. If § 6 contemplated legislative rules defining unfair competition, the only possible way to enforce such rules would be under § 5. But recall that orders issued under § 5 had to be developed through adjudication, and the description of the adjudication process clearly indicates that it is de novo. There is no hint of structuring the adjudication by promulgating pre-existing substantive rules. Recall too that FTC adjudication orders, once entered, could only be enforced by a court. It would be odd, to say the least, for a statute to confer legislative rulemaking authority on an agency, which rules would then be applied in orders that can only be enforced by courts. We usually think of legislative rulemaking authority as carrying with it various forms of ancillary authority, such as the power to enforce and interpret the rules so adopted.[141] But under the structure of the FTC Act, as originally enacted, the power to enforce—and presumably to interpret—the supposed rules would be lodged, via § 5, not in the agency, but in the enforcement court.

Any uncertainty about the original meaning of the rulemaking grant in § 6 is resolved by considering the jurisprudence of rulemaking as it existed in 1914. In 1914, both Congress and the courts followed a conv[ention for differentiating between grants of legislative and procedural rulemaking authority.[142] Grants of rulemaking were regarded as legislative only if the organic statute provided some sanction or penalty for violation of the rules in question.[143] If the grant did not include such a provision, it was understood to confer only procedural or internal housekeeping authority.[144] The rulemaking grant in § 6 of the FTC Act contains

---

interpreted § 6 as conferring "quasi-legislative" powers on the FTC, by which it meant power to aid Congress in its legislative functions. *Id.* at 624. The Court made no mention of the § 6(g) rulemaking grant.

140.  § 6(g), 38 Stat. at 722 (codified at 15 U.S.C. § 46(g)).

141.  *See* Kisor v. Wilkie, 139 S. Ct. 2400, 2412 (2019) ("[W]hen granting rulemaking power to agencies, Congress usually intends to give them, too, considerable latitude to interpret the ambiguous rules they issue.").

142.  Merrill & Watts, *supra* note 134, at 495.

143.  *Id.* at 472, 549–50.

144.  *Id.* at 472.

no mention of any sanction for violation of the rules issued under its authority. Thus, it was clearly understood at the time of enactment to be a grant of procedural rulemaking authority.[145]    As previously noted, this shared understanding is reinforced by the placement of the rulemaking grant in § 6, which deals with information gathering and issuing reports.

For those who would consult legislative history—a shrinking tribe largely on the defensive these days—the available evidence fully confirms the inference of original meaning drawn from the text, the structure of the Act, and conventions about rulemaking in effect at the time of enactment.  As Victoria Nourse has emphasized, the most powerful form of legislative history is the conference report, since this is where divergent versions of legislative bills are reconciled, and both Houses vote to approve the report.[146] Section 6(g) originated in the House bill, which conferred only investigative powers on the FTC, not adjudicative power.[147]  The Senate bill granted the FTC adjudicative power but contained no reference to rulemaking.[148]  The Conference Committee adopted the House measures on investigation, including § 6(g), and the Senate provisions regarding adjudication.[149]  Under established practices for reconciling bills in conference, the Committee could not have granted the FTC legislative rulemaking authority over unfair competition matters, since neither bill granted the agency such authority.[150] In explaining the conference report to the House, Representative Covington, a member of the Conference Committee, stated that the "[FTC] will have no power to prescribe the methods of competition to be used in the future."[151] If one believes that we should consult legislative history to help determine meaning, this evidence is as close to conclusive as one can get.

---

145.   The so-called "[H]ousekeeping [S]tatute," 5 U.S.C. § 301, which predates the FTC Act, generally authorizes executive branch agencies to promulgate procedural rules and internal operating procedures.  *See* Chrysler Corp. v. Brown, 441 U.S. 281, 308–10 (1979). But the Act confers this authority only on "the head[s] of . . . [e]xecutive department[s] or military department[s]," and the FTC was envisioned as an "independent agency," not an executive department.  *Id.* at 309; Merrill & Watts, *supra* note 134, at 486.  So, Congress may have felt it was necessary to include a specific grant of authority for the FTC to adopt procedural rules.

146.   VICTORIA NOURSE, MISREADING LAW, MISREADING DEMOCRACY 79–88 (2016).

147.   *See* S. Doc. No. 63-573, at 15 (2d Sess. 1914).

148.   *Id.* at 7–10.

149.   Merrill & Watts, *supra* note 134, at 505.

150.   *Id.*

151.   51 CONG. REC. 14,932 (1914).

### B.  *Contemporary and Longstanding Agency Interpretation*

Even if one thinks that § 6(g) is ambiguous, relevant canons of statutory interpretation powerfully reinforce the conclusion that Congress did not contemplate legislative rulemaking.  A prominent canon of statutory interpretation, well established in 1914 and frequently referenced afterwards, is that the interpretation of a statute by an agency closely contemporaneous with its enactment is entitled to significant weight.[152]  A related canon is that longstanding and consistent agency interpretations by an agency are entitled to significant weight.[153]

Soon after the enactment of the FTC Act in 1914, and consistently for nearly fifty years thereafter, the FTC interpreted the statute as conferring only the power to conduct adjudications and investigations and not as conferring any power to issue legislative rules.  During the latter part of this period, the FTC experimented with various "Guides" and "Trade Practice Conferences."[154]  But these were understood to be voluntary, not legally binding.[155]

### C.  *Congressional Ratification*

Another relevant canon of interpretation is that the interpretation of a statute by the relevant administrative agency will be given significant weight if Congress has ratified that interpretation.  Congress ratified the FTC's original understanding of § 6(g) on multiple occasions.  Over the years, it enacted several discrete statutes conferring legislative rulemaking power on the FTC— in each case with respect to a specific industry.  These enactments included the Wool Products Labeling Act of 1940,[156] the Fur Products Labeling Act of 1951,[157] and the Flammable Fabrics Act of 1953.[158]  These discrete enactments of legislative rulemaking authority clearly presuppose that the FTC did not have any general authority to make legislative rules under the original FTC Act, otherwise, these laws would have been unnecessary.

---

152.  *See generally* Merrill & Watts, *supra* note 134, at 487.

153.  *See* MERRILL, *CHEVRON* DOCTRINE, *supra* note 15, at 33–54, 146–65 (reviewing both canons).  *See generally* Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 YALE L.J. 908 (2017).

154.  Merrill & Watts, *supra* note 134, at 551–52.

155.  *Id.* at 471–72, 551–52.

156.  Wool Products Labeling Act of 1940, ch. 871, § 1, 54 Stat. 1128 (codified at 15 U.S.C. § 68d(a)); *see* Merrill & Watts, *supra* note 134, at 549.

157.  Fur Products Labeling Act, ch. 298, § 1, 65 Stat. 175 (1951) (codified at 15 U.S.C. § 69f(a)); *see* Merrill & Watts, *supra* note 134, at 549.

158.  Flammable Fabrics Act, Pub. L. No. 83-88, 67 Stat. 111, 112 (1953); *see* Merrill & Watts, *supra* note 134, at 550.

Any doubt on this score is eliminated by an episode that occurred in the early 1960s. Prodded by advocates who, like Chairman Kahn and her supporters, earnestly believed the agency should have legislative rulemaking authority, the FTC adopted a legislative rule prescribing the types of product labeling appropriate for the sale and promotion of cigarettes.[159] Congress promptly overturned the rule with the enactment of the Federal Cigarette Labeling and Advertising Act in 1965.[160]

Indeed, the history of the FTC with respect to legislative rulemaking authority is strikingly similar to the history of the FDA with respect to the latter agency's authority to regulate tobacco products. When the FDA disclaimed any authority over tobacco,[161] Congress enacted a series of statutes prescribing restrictions on marketing tobacco products and assigned authority to enforce those statutes to agencies other than the FDA.[162] When the FDA, at the urging of the Clinton Administration, changed its mind and asserted that it did have regulatory authority over tobacco, the Supreme Court struck down its rule.[163] The Court concluded that the history of interaction between Congress and the agency made it clear that Congress gave the FDA no regulatory authority over tobacco.[164] Similarly, the history between the FTC and Congress indicates that it was well understood that the agency had no authority to make legislative rules.

### D. *National Petroleum Refiners*

Frustrated by Congress's piecemeal approach to conferring rulemaking authority on the FTC, proponents of more aggressive FTC action pushed the agency to adopt legislative rules and dare the courts to stop them.[165] The oil industry, as always, was a convenient target. The FTC was convinced to issue a legislative rule, grounded in both its competition rule and deceptive practices authority, requiring all gasoline stations to post octane ratings at every gas

---

159. 16 C.F.R. pt. 408 (1966).

160. Federal Cigarette Labeling and Advertising Act, Pub. L. No. 89-92, 79 Stat. 282 (1965); *see* Merrill & Watts, *supra* note 134, at 553–54.

161. Brown & Williamson Tobacco Corp. v. FDA, 153 F.3d 155, 168–69 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000).

162. *Brown & Williamson Tobacco Corp.*, 529 U.S. at 143–44.

163. *Id.* at 126.

164. *Id.* at 159–60.

165. For a history of fluctuating attitudes toward FTC rulemaking, see Kurt Walters, *Reassessing the Mythology of Magnuson-Moss: A Call to Revive Section 18 Rulemaking at the FTC*, 16 HARV. L. & POL'Y REV. 519 (2022).

pump.[166]  The FTC explained that the rule would be applied in § 5 enforcement actions, with the only issue being whether the company had complied with the rule.[167]  When the industry challenged the rule in court, the district court examined the historical evolution of the FTC's regulatory authority and concluded that Congress had delegated no authority to the agency to issue such a rule.[168]

The D.C. Circuit, acting through an arch-liberal panel consisting of judges Wright, Bazelon, and Robinson, reversed.[169]  The appeals court framed the question as whether the text of § 6(g), in particular the reference to "rules and regulations," could be interpreted to authorize legislative rulemaking.[170]  The court characterized the "plain meaning" of this phrase to be broad enough to including binding regulations, i.e., legislative rules.[171]  But of course, there are other types of rules—interpretive rules, statements of policy, and procedural rules.  So, the unadorned reference to "rules and regulations" was in fact ambiguous as to whether legislative rules were included.  The court's basic strategy was to interpret the ambiguous language of § 6(g) using the broadest possible form of purposive interpretation:

> In determining the legislative intent, our duty is to favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies more difficult of fulfillment, particularly where, as here, that interpretation is consistent with the plain language of the statute.[172]

The fact that § 5—the only provision that gave the FTC regulatory authority—made no mention of rulemaking was not dispositive, because no language in § 5 made the power to adjudicate unfair acts and practices the exclusive method of regulation.[173]  This effectively reversed the standard presumption about the scope of delegated powers.  Rather than seeking affirmative evidence of a delegation of power to make legislative rules, the court framed the question as whether there was affirmative evidence *not* to confer power to make legislative rules.[174]  When the court turned to

---

166.  Posting of Minimum Octane Ratings on Gasoline Pumps, 36 Fed. Reg. 23,871, 23,871 (1971).  The current octane rating rules are stated to be based on the Commission's authority over deceptive practices.  *See* 16 C.F.R. § 306.1 (2022).

167.  Nat'l Petroleum Refiners Ass'n v. FTC, 340 F. Supp. 1343, 1344–45 (D.D.C. 1972), *rev'd*, 482 F.2d 672 (D.C. Cir. 1973).

168.  *Nat'l Petroleum Refiners Ass'n*, 340 F. Supp. at 1345–46.

169.  *Nat'l Petroleum Refiners Ass'n*, 482 F.2d. at 672.

170.  *Id.* at 677.

171.  *Id.* at 685–86.

172.  *Id.* at 689.

173.  *Id.* at 675–76.

174.  *Id.* at 673, 691.  Many years ago, in the *Queen and Crescent Case*, the Supreme Court

legislative history, which was still very much in vogue at the time, it pronounced the legislative history of the 1914 Act on the point "ambiguous."[175]  The details were largely relegated to an appendix, so as to disguise the dissembling about this.[176]

   With the presumption about the scope of delegated powers flipped on its head, the court had little trouble determining that the § 6(g) gave the FTC the power to issue legislative rules, which would then be enforced through § 5 adjudications.  Citing "similar provisions" in other statutes, the court determined that "contemporary considerations of practicality and fairness" supported the FTC's position that it had the power to engage in legislative rulemaking.[177]  In point of fact, the majority of these "similar provisions" were actually quite different, as they concerned the proper interpretation of *existing* grants of legislative rulemaking authority, not the question of whether there was a grant of such authority in the first place.[178]

   To its credit, the D.C. Circuit addressed the interpretive arguments relied upon by the district court in concluding that legislative rulemaking power had not been given to the FTC.[179]  These included the structural argument that the rulemaking grant appeared in § 6 rather than § 5, the weight ordinarily given the FTC's contemporaneous and longstanding understanding that it had no legislative authority, and Congress's apparent ratification of this understanding through the enactment of multiple rulemaking grants.[180]  But the panel concluded that these interpretive guideposts were outweighed by what it characterized as the "felt and openly articulated concerns motivating

---

held that the power of an agency to make legislative rules was "never to be implied" but had to be conferred expressly.  *See* ICC v. Cincinnati, New Orleans, & Tex. Pac. Ry., 167 U.S. 479, 494–95 (1897).  Justice Gorsuch, in his concurring opinion in *West Virginia v. EPA*, cited the case as demonstrating the venerable provenance of the major questions doctrine.  142 S. Ct. 2587, 2619 (2022) (Gorsuch, J., concurring).

   175.   *Nat'l Petroleum Refiners Ass'n*, 482 F.2d. at 686.

   176.   *Id.* at 698–709.

   177.   *Id.* at 678–83.

   178.   *Id.* at 678.  For example, the issue in *National Broadcasting Co. v. United States*, 319 U.S. 190 (1943), was whether a grant of authority to the FCC to make "special regulations applicable to radio stations engaged in chain broadcasting" was limited to regulations governing matters of signal interference, or also extended to regulations restricting the number of stations owned by networks.  *Id.* at 215.  Other decisions cited by the court held that an agency given legislative rulemaking authority could cut off further consideration of issues governed by a rule in individual adjudications.  *See* United States v. Storer Broad. Co., 351 U.S. 192, 202 (1956); Fed. Power Comm'n v. Texaco, Inc., 377 U.S. 33, 39–41 (1964).

   179.   *Nat'l Petroleum Refiners Ass'n*, 482 F.2d. at 693–97.

   180.   *Id.*

the law's framers": protecting the public from unfair competition and deceptive marketing practices.[181]  Congress took the first step in 1914 when it eliminated the judicial monopoly on trials and gave the Commission authority to conduct adjudications.[182]  Now, the Commission required authority to adopt legislative rules "to carry out what the Congress agreed was among its central purposes: expedited administrative enforcement of the national policy against monopolies and unfair business practices."[183]  The rationale for the decision boiled down to the proposition that an ambiguous rulemaking grant should be construed to include the power to make binding legislative rules, because Congress could not foresee in 1914 how important rulemaking would become as a supplement to adjudication.

With the panel adopting the broadest conceivable purposive argument, and bending every possible precedent to favor the FTC, it came as no surprise that it overturned the district court and held the FTC had the power to issue the octane rule.  The real surprise was that only Justice Stewart publicly noted that he would have granted certiorari, presumably to correct the D.C. Circuit's result-oriented decision.[184]

### E.  The 1975 Federal Trade Improvements Act

At the same time the D.C. Circuit was revising the FTC Act through aggressive interpretation, Congress was also considering whether to confer legislative rulemaking authority on the agency, which likely explains why the Supreme Court was reluctant to grant certiorari.  The result was something called the Magnuson-Moss Warranty—Federal Trade Commission Improvements Act of 1975.[185]  That Act gave the FTC authority to issue legislative rules with respect to unfair or deceptive acts or practices in or affecting commerce, i.e., deceptive advertising.[186]  However, in keeping with the then-fashionable enthusiasm for "hybrid rulemaking," this new authority was hedged in with certain procedural requirements not found in the APA's

---

181.   *Id.* at 690.

182.   *Id.* at 693.

183.   *Id.*

184.   Nat'l Petroleum Refiners Ass'n v. FTC, 415 U.S. 951 (1974).

185.   Magnuson-Moss Warranty—Federal Trade Commission Improvements Act, Pub. L. No. 93-637, 88 Stat. 2183 (1975).  This Act was two statutes in one.  The largest part dealt with warranty claims and conferred additional authority on the FTC to regulate warranties to make them more useful for consumers.  A second part gave the FTC new powers to enforce its orders, seek relief for consumers when harmed by violations of FTC orders, and engage in legislative rulemaking on matters of deceptive practices.

186.   15 U.S.C. § 57a.

general provisions that govern legislative rulemaking.[187] For example, the FTC was directed to allow oral presentations and cross examination if necessary to resolve disputed issues of fact, and all rules were subject to judicial review under the substantial evidence standard of review.[188]

Significantly, Congress also expressly provided that the new rulemaking authority with respect to unfair or deceptive acts and practices would be the *exclusive source* of authority to make such rules.[189] The Act provided: "The Commission shall have no authority under this subchapter, other than its authority under this section, to prescribe any rule with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of [§ 5] of this title)."[190] This was an express affirmation of the *expressio unis* canon—the expression of one thing precludes the inclusion of another. Standing alone, this sentence would preclude any exercise of rulemaking by the FTC under the general notice-and-comment procedures of the APA.

Then came the following sentence: "The preceding sentence shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce."[191] Thus, the addition of express rulemaking authority with respect to unfair or deceptive practices did not extend to "any authority" the Commission might have to issue rules with respect to unfair methods of competition, i.e., antitrust matters. Congress underscored the

---

187. 5 U.S.C. § 553. On the movement for hybrid rulemaking, see Stephen F. Williams, *"Hybrid Rulemaking" under the Administrative Procedure Act: A Legal and Empirical Analysis*, 42 U. CHI. L. REV. 401 (1974). At least as a matter of judicially-imposed procedures, the trend came to an abrupt end with *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978) (holding that courts generally have no authority to impose procedures on agencies beyond those required by the APA).

188. *See* Magnuson-Moss Warranty—Federal Trade Commission Improvements Act, Pub. L. No. 93-637, § 202(c)(1), (e)(3), 88 Stat. 2183, 2194–95 (1975). The original hybrid provisions are codified at 15 U.S.C. § 57a(c)(2) and § 57a(e)(3)(B). Without expanding the FTC's authority beyond deceptive practices rulemaking, Congress added additional hybrid procedures in 1980, including a requirement that rulemaking be conducted before an independent hearing officer, a prohibition on ex parte contacts, a requirement that the Commission provide a regulatory analysis of the need for the rule, a requirement that rules be submitted to the appropriate congressional committees before they become final, and a provision for a two-House veto of rules. *See* Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, 94 Stat. 374 (codified in part at § 57a(b)(2)(A), (c)(1)(B), (d)(1)).

189. § 57a(a).

190. § 57a(a)(2). The Act clarified that the Commission would also have authority to issue interpretative rules and statements of policy (which do not have the force of law) with respect to unfair or deceptive acts or practices. § 57a(a)(1)(A).

191. § 57a(a)(2) (emphasis added).

significance of these qualifying sentences by amending the original § 6(g) to provide that the FTC had authority to make rules and regulations for the purposes of carrying out the provisions of this Act "except as provided in section 57a(a)(2) of this title"—the provision containing the two forgoing sentences.

Herein lies what may be the dispositive question about the scope of the FTC's authority to issue legislative rules dealing with unfair competition as opposed to deceptive practices.  Clearly, the second sentence meant to preserve the status quo with respect to the FTC's rulemaking authority in antitrust matters.  Chairman Kahn and her supporters will argue that the status quo was the meaning attributed to the Act by the D.C. Circuit's 1973 decision in *National Petroleum Refiners*.[192]  After all, the D.C. Circuit had authoritatively construed the original § 6(g) to confer legislative rulemaking authority on the FTC in both competition and deceptive practices matters, the Supreme Court had denied certiorari, and this had occurred before the enactment of the Magnuson-Moss Warranty—Federal Trade Commission Improvements Act in 1975.[193]

The first thing to do, as always, is to take a close look at the text of this savings clause.  Note that the savings clause mentions only two types of "rules" affecting unfair competition which are to remain unaffected by the adoption of rulemaking authority over deceptive practices: interpretative rules and general statements of policy.[194]  As previously discussed, the most important "rules" employed by the FTC and DOJ in competition matters are the Merger Guidelines, which are general statements of policy, not legislative rules.  One or more members of Congress, or someone on the staff, was apparently aware of the importance of the Merger Guidelines and thought it was important to provide that they were not affected.[195]  There is no mention of legislative rules about competition policy, although Congress

---

192.   The only source cited by the FTC for its authority to promulgate a legislative rule in an unfair competition matter is National Petroleum Refiners Association v. FTC, 415 U.S. 951 (1974).  Non-Compete Clause Rule, 88 Fed. Reg. 3,482, 3,499 n.226 (proposed Jan. 19, 2023) (to be codified at 16 C.F.R. pt. 910).

193.   The Supreme Court denied certiorari on February 25, 1974.  *See* Nat'l Petroleum Refiners Ass'n v. FTC, 415 U.S. 951 (1974).  The House approved the conference report on the bill that became the FTC Improvements Act ten months later, on December 16, 1974. 120 CONG. REC. 40,238 (1974).  The Senate followed suit two days after that.  120 CONG. REC. 40,711 (1974).

194.   It says, "including interpretive rules" and "general statements of policy," however, there are other types of rules besides legislative rules, such as procedural rules and rules governing matters of internal organization. 15 U.S.C. § 57a(a)(2).  So, one cannot infer from the use of the word "including" that legislative rules were saved.

195.   The Merger Guidelines were first issued in 1968. *1968 Merger Guidelines*, U.S. DEPT. OF JUST., https://www.justice.gov/archives/atr/1968-merger-guidelines (Aug. 4, 2015).

added a provision preserving rules adopted under the authority of § 6(g) prior to the date of the amendment, thereby saving the octane rule.[196]

Consider, too, the oddity that Congress would see fit to adopt relatively more restrictive hybrid procedures for rulemaking about deceptive practices while supposedly allowing the FTC to engage in legislative rulemaking in competition matters using the more streamlined notice-and-comment procedures of § 553 of the APA. Antitrust cases are often fact-intensive, which is one reason why they have been resolved using trial-type procedures ever since the Sherman Act was passed in 1890. Given that Congress was enamored of hybrid rulemaking procedures in 1975, on the ground that they would allow more intensive probing of fact issues, one would expect it to require the use of such procedures in competition cases if Congress intended to ratify FTC rulemaking authority in competition cases. Instead, it focused its attention exclusively on deceptive practices, and mentioned the FTC's unfair competition authority only in a savings clause.

Recall as well that the FTC's authority to enforce the antitrust laws is exercised concurrently with DOJ. DOJ has always enforced those laws using case-by-case adjudication in court. There has always been some tension between the FTC and DOJ over their respective spheres of authority in enforcing the antitrust laws.[197] If DOJ thought that Congress was ratifying FTC authority to adopt legislative rules dealing with competition policy, while the Antitrust Division had to remain content to engage in case-by-case adjudication, the protests would have penetrated even the thickest walls of the legislative office buildings on the Hill.

Finally, the entire focus of the Magnuson-Moss Warranty—Federal Trade Commission Improvements Act of 1975 was on protecting consumers from misleading warranty claims and other deceptive practices. Improvements in antitrust enforcement were not on the table. There is much to be said for assuming that long and well-established institutional practices have not been overturned by obscure and ambiguous clauses in legislation devoted to other

---

196. Section 202(c)(1) of the Magnuson-Moss Warranty—Federal Trade Commission Improvements Act provided that the new rulemaking grant and the provision making it exclusive "shall not affect the validity of any rule which was promulgated under § 6(g) of the FTC Act prior to the date of enactment of this section." 88 Stat. 2198 (not codified). Congress codified a version of the octane rule in 1978. Petroleum Marketing Practices Act, Pub. L. No. 95-297, tit. II, § 202, 92 Stat. 334 (1978) (codified at 15 U.S.C. § 2822). The implementing regulations currently state that a violation of the rule "is an unfair or deceptive act or practice" under § 5 of the FTC Act, 16 CFR § 306.1 (2022), indicating that the rule is now understood to be grounded in deceptive practices concerns, rather than unfair competition.

197. HOVENKAMP, *supra* note 75, at 521 (focusing on § 13.1).

matters. (No "elephants in mouseholes" again).[198] By 1975, the FTC had enforced antitrust claims through case-by-case adjudication for fifty years; DOJ had been doing so even longer. Congress undoubtedly assumed that competition claims would continue to be addressed through case-by-case adjudication, informed by interpretive rules and general statements of policy like the Merger Guidelines. The agency's institutional practice in this regard was thoroughly entrenched and it is highly unlikely that Congress would act to upset this settled convention through ratification of a recent D.C. Circuit decision.

It is fair to ask whether the legislative history sheds any light on the two sentences of the 1975 Act making the new legislative rulemaking authority for deceptive practices "exclusive" and stating that the new authority "shall not affect any authority" of the Commission to prescribe rules in competition matters.[199] One thing we learn from that history is that the two sentences in question were added by the Conference Committee at the last moment. The Senate bill that served as the primary vehicle for the 1975 Act (S.B. 356) contained no grant of legislative rulemaking authority for the Commission.[200] The House amended the Senate bill in various ways, including by adding the grant of rulemaking for deceptive practices.[201] The House amendment stated flatly that "[t]he Commission shall have no authority under this Act, other than its authority under this section, to prescribe rules."[202] The matter was referred to a Conference Committee to iron out the differences, which returned a conference substitute that included, for the first time, the two sentences in question.[203] The Joint Explanatory Statement of the Committee of Conference observed that the new rulemaking grant "would be the exclusive authority for such rules" and that "[t]he conference substitute does not affect any authority of the FTC under existing law to prescribe rules with respect to unfair methods of competition in or affecting commerce."[204] In effect, the Joint Explanatory Statement simply paraphrased the two sentences in the text.

Some additional context is provided by the House Report issued in connection with the House bill that added the rulemaking grant.[205] The Report observed that hearings were held and the markup of the bill began after the District Court held that the FTC has no legislative rulemaking

---

198.  *See* Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001).

199.  15 U.S.C. § 57a(a)(2).

200.  *See* S. REP. NO. 93-151 (1973); S. REP. NO. 93-280 (1973).

201.  120 CONG. REC. 33,979 (1974).

202.  *Id.* (reproducing House amendments to Senate Bill 356 as reported to the Senate).

203.  120 CONG. REC. 40,247 (1974).

204.  *Id.* (reproducing conference substitute and the Joint Explanatory Statement).

205.  H. Rep. No. 93-1107, 93d Cong., 2d Sess., 29–34 (June 13, 1974).

authority.[206]  In contrast, the final version of the bill, and the accompanying Report, were prepared after the D.C. Circuit had reversed that decision.[207]  The Report described the effect of the D.C. Circuit's decision as being "to recognize the FTC's authority to prescribe rules having substantive effect which would constrain the conduct of legitimate businesses based on the very broad standards of unfair methods of competition and unfair or deceptive acts or practices."[208]  It went on to observe that such rules would be adopted using the notice-and-comment procedures of § 553 of the APA, and would be reviewed under the arbitrary and capricious standard of review.  It then stated: "Your committee believes that these rulemaking procedures and the scope of judicial review are inadequate for proceedings in which the integrity of the proposed rule may rest on the resolution of issues of material fact."[209]  Hence, the hybrid procedures prescribed for the new rulemaking grant for deceptive practices were designed to "afford the safeguards which are needed."[210]  Similar statements are found in the section-by-section analysis of the Report.[211]

In describing the new rulemaking authority in greater detail, the Report made clear that the House bill repealed the rulemaking grant in § 6(g), and hence precluded any authority for the FTC to engage in legislative rulemaking in antitrust matters:

> Section 202 replaces the existing rulemaking authority of the FTC under section 6(g) of the Act with a new section 18 which authorizes the FTC to issue rules defining with specificity the acts or practices which are unfair or deceptive and which are within the scope of section 5(a)(1) of the Federal Trade Commission Act . . . .  This rulemaking authority would be the exclusive substantive rulemaking authority of the FTC under the Federal Trade Commission Act.  Thus, the Commission would not have rulemaking authority with respect to unfair methods of competition to the extent they are not unfair for deceptive acts or practices.[212]

---

206.  *Id.* at 33.

207.  *Id.* (citing the Appeals Court decision and noting the Supreme Court's denial of certiorari).

208.  *Id.*

209.  *Id.*

210.  *Id.*

211.  *Id.* at 45–48; *see, e.g.*, *id.* at 45 ("Your committee believes these [notice-and-comment] rulemaking procedures and this scope of judicial review may be inadequate in some cases where fundamental factual premises of a rule are at issue.").

212.  H.R. Rep. No. 93-1107, at 46 (1974) (emphasis added).

The FTC responded to the House bill with a critical letter.[213]   The Commission stated that the D.C. Circuit's decision in *National Petroleum Refiners* had "laid to rest" any doubts about whether the agency had authority to promulgate legislative rules.[214]   Therefore, the Commission saw "no need for legislative reaffirmation of its rulemaking authority."[215]  The FTC was especially critical of the bill's adoption of hybrid procedures for deceptive practices rulemaking which, according to the Commission, would "prevent the Commission from expeditiously fulfilling its responsibilities."[216]   Finally, the Commission objected to prohibition of rulemaking in competition matters.  It wrote:

> The Commission perceives no reason for curtailing its powers in this area. Admittedly, the Commission's consumer protection responsibilities are far more conducive to the rulemaking process, and, for this reason, the Commission does not foresee a high level of rulemaking activity in the antitrust area.  That is not to say, however, that rulemaking is not an appropriate or an effective regulatory device for antitrust enforcement.  For instance, where the legality of identical, similar, or related practices of an anticompetitive nature may be addressed responsibly and more efficiently in a single proceeding than in case-by-case adjudication, law enforcement by rulemaking would be considered more favorably."[217]

Although it reproduced the Commission's letter in its Report, the House Committee was unmoved by these entreaties.

As previously noted, the Conference Committee softened the House's language that expressly precluded rulemaking in antitrust matters, substituting instead the savings clause that preserved "any authority" the FTC had to engage in rulemaking with respect to unfair competition.[218]   The Joint Explanatory Statement of the Committee of Conference contains no explanation for the last-minute change,[219] although as previously speculated, it may have been motivated by a desire to avoid casting doubt on the Merger Guidelines.  There is no suggestion in the Joint Explanatory Statement that the savings clause was added to preserve the D.C. Circuit's interpretation of the original § 6(g).  There is one reference to the "octane rating" rule, but no mention of the D.C. Circuit's decision in *National Petroleum Refiners* upholding that rule based on its

---

213.   *Id.* at 56–61 (reproducing the April 29, 1974 letter from the FTC to Congressman Harley Staggers, Chair of the House Committee on Interstate and Foreign Commerce).

214.   *Id.* at 57.

215.   *Id.*

216.   *Id.* at 57–58.

217.   *Id.* at 57.

218.   15 U.S.C. § 57a(a)(2).

219.   *See generally* 120 Cong. Rec. 40,244–50 (1974).

interpretation of the original § 6(g).[220]   As previously noted, the Conference Bill amended § 6(g) by qualifying the authority of the FTC to make rules under § 6(g) by referencing the limitations added by new rulemaking grant and the savings clause.[221]

When we examine the statements made on the floor of the House and Senate as the members prepared to vote on the conference report, we find some references to the "octane ruling" and in one instance to *National Petroleum Refiners*.[222]   Particularly in the Senate, which was taken by surprise by the House's addition of legislative rulemaking in deceptive practices cases, several speakers appeared to assume that the FTC had been "granted" rulemaking authority by a recent judicial decision.   But with one exception,[223] the Senators had only a vague notion about which court had rendered the decision or whether it applied to competition matters as well as deceptive practices.[224]

The House provided a more extensive explanation of the reason for the rulemaking grant and its limits.   Representative James Broyhill of North Carolina was closely involved in the drafting of the grant of rulemaking authority and was one of the House managers in the Conference Committee.   In urging his fellow legislators to adopt the

---

220.   *Id.* at 40,247.

221.   *See infra* notes 222–223.

222.   Senator Gary Hart of Colorado, who was not a member of the Conference Committee, quoted from the D.C. Circuit's opinion in *National Petroleum Refiners* and observed that the bill about to be passed would establish a kind of natural experiment between hybrid procedures, which would apply to deceptive practices rules, and informal rulemaking procedures, which would apply to rules respecting unfair competition.   120 CONG. REC. 40,713 (1974) (statement of Sen. Hart).   So, he at least read the savings clause as preserving the *National Petroleum Refiners* interpretation as applied to competition matters.

223.   *See supra* note 200 and accompanying text.

224.   For example, Senator Warren Magnuson, a bill sponsor and a member of the Conference Committee, thought that the hybrid rulemaking procedures in the conference report struck the right balance between fairness and avoiding abuse, at least relative to "the completely informal rulemaking procedure under which the Commission is presently authorized to operate."   120 CONG. REC. 40,713 (1974) (statement of Sen. Magnuson).   Senator Taft of Ohio, who was not a member of the Conference Committee, expressed concern that the hybrid procedures endorsed by the Conference Committee provided inadequate protection to firms respecting a record about contested questions of fact.   This was especially true given that "the Supreme Court in a recent ruling has recently given to the Federal Trade Commission very broad rulemaking power, subject only, of course, to the due process requirement."   *Id.* at 40,723 (statement of Sen. Taft) (Although one cannot be completely sure, he evidently thought that *National Petroleum Refiners* was a decision of the Supreme Court).

conference report, he began by explaining the rationale for the rulemaking provision:

> For a number of years, the FTC issued rules defining acts or practices deemed unfair or deceptive to consumers. During this period, there were continuing assertions that the FTC did not possess substantive rulemaking authority, and that any rules it issued had only the effect of being a guideline to industries.
>
> In the Octane Rating case, the court held that the Federal Trade Act did confer authority to the FTC to issue substantive rules defining both unfair methods of competition and unfair or deceptive acts or practices to consumers. Under this interpretation, the FTC has the authority to issue substantive rules which may affect an entire industry and, in some cases, a great number of industries. However, the Act is silent regarding the procedural requirements to be followed in issuing these rules; therefore, those persons immediately and seriously affected by such rules have no procedural rights before the agency except the informal rulemaking procedure set by the Administrative Procedures Act. Thus, the Interstate and Foreign Commerce Committee determined that the Federal Trade Commission Act should be amended to provide adequate procedural safeguards for those affected by the Commission's rules. In our judgment, more effective, workable, and meaningful rules will be promulgated if persons affected by such rules have an opportunity, by cross-examination and rebuttal evidence, to challenge the factual assumptions on which the agency is proceeding and to show in what respect such assumptions are erroneous.[225]

This summary of the background running up to the new legislation is entirely accurate, from the recognition of controversy over the authority of the FTC to make legislative rules (what Representative Broyhill calls "substantive rules"), to the recent interpretation of the FTC Act by the D.C. Circuit in *National Petroleum Refiners* (which he calls the "Octane Rating case"), to the recognition that such rules would be governed by the informal notice-and-comment procedures of the APA, to the rationale that the House committee had for adopting hybrid procedures in lieu of the APA procedures.[226]

Representative Broyhill then proceeded to describe the savings clause, i.e., what import the new rulemaking authority in deceptive practice matters would have for FTC authority in competition cases. His comments appear under the heading (which was likely added after he spoke): "Antitrust Rulemaking Authority Not Intended."[227] The transcript reads:

> The rulemaking provision, I might add, does not affect any authority the FTC might have to promulgate rules which respect to "unfair methods of competition" including, of course, antitrust prohibitions. I myself do not believe that the FTC has any such authority. I am advised that there is a passing reference in the appellate court decision in the Octane

---

225. 120 Cong. Rec. 41,407 (1974) (statement of Rep. Broyhill).
226. *Id.*
227. *Id.*

> Posting case, to the effect that the FTC may have some kind of authority to issue some kind of antitrust rules. Antitrust rules would obviously have a far more pervasive effect than rules defining unfair or deceptive acts or practices, and I would feel very uncomfortable giving such antitrust rules the same effect as this bill gives consumer practices rules. Accordingly, we have made clear that the new bill does not deal with the antitrust laws.[228]

These statements are subject to the usual caveats about the probative value of interpretive statements of individual legislators. Representative Broyhill speaks primarily about his own views and caution is always in order before attributing the views of a single legislator to those of Congress as a whole.[229] But he spoke from a position of authority, as a member of the House committee that drafted the rulemaking grant and a member of the Conference Committee. No one in the House rose to challenge his views. Perhaps more importantly, his final sentence purports to speak for the Conference Committee: "[W]e have made clear that the new bill does not deal with the antitrust laws."[230]

Broyhill's understanding of the FTC Act as it existed in 1974 is consistent with the statements of Senators noted above.[231] They all assume that the D.C. Circuit's decision is the most recent and authoritative judicial interpretation of the scope of the FTC's rulemaking authority. The Senators, however, do not offer any independent view about the correct meaning of the FTC Act as of 1974. Representative Broyhill states that "I myself do not believe the FTC has any such authority."[232] So he, at least, disagreed with the D.C. Circuit interpretation of the Act. The bottom line of the Broyhill comments is that the Improvements Act "does not deal with the antitrust laws."[233] This is consistent with the best understanding of the 1975 legislation that can be gathered from the text.

In sum, the enactment of the FTC Improvements Act in 1975 cannot be construed as a ratification of the D.C. Circuit's interpretation of § 6(g) of the original FTC Act in *National Petroleum Refiners*. The text of the 1975 Act makes no reference to *National Petroleum Refiners*. The context of the 1975 enactment makes clear that Congress was focused entirely on the Commission's authority to regulate deceptive practices, especially misleading warranties. The sole reference to rulemaking in competition matters; the savings clause now codified as 15 U.S.C. § 57a(a)(2) makes clear that antitrust rulemaking

---

228.   *Id.* (emphasis added).

229.   *Id.*

230.   *Id.*

231.   *See supra* notes 222–223.

232.   120 CONG. REC. 41,407 (1974) (comments of Rep. Broyhill).

233.   *Id.*

was left untouched.[234]   The fact that some participants in the legislative process assumed the D.C. Circuit had correctly interpreted § 6(g) does not matter; others thought it had not.  The fact that the FTC wanted the D.C. Circuit's decision to be regarded as correct does not matter.  The House and the Conference Committee rejected the Commission's entreaty to preserve its rulemaking authority as construed in *National Petroleum Refiners*.[235]

When Congress wrote that the conferral of new rulemaking authority on the FTC with respect to deceptive practices "shall not affect any authority of the Commission to prescribe rules . . . with respect to unfair methods of competition" it undoubtedly meant the "authority" of the FTC *correctly determined*.[236]   Conceivably, the D.C. Circuit might accept the claim that the decision in *National Petroleum Refiners* should be regarded as the correct interpretation of the FTC's authority in this respect, on grounds of stare decisis. But for all the reasons previously given, this is not a plausible interpretation of the original Act.  *National Petroleum Refiners* does not bind the Court, and it would be short work for the Court to see through the activism of that decision.  The FTC Act did not authorize legislative rulemaking on any issue in 1914, and it did not authorize it for deceptive practices until 1975.[237]  It has not authorized it with respect to unfair competition as of today.

CONCLUSION

The FTC's chair has made clear that she wants the FTC to have authority to issue legislative rules in competition matters.   In early 2023, the Commission threw down the gauntlet, issuing a notice in the Federal Register proposing to adopt a legislative rule that would ban all non-compete agreements in employment contracts, on a nationwide basis.[238]  If upheld by the courts, this would constitute a precedent for other legislative rules, such as rules requiring that high tech firms be broken up if they obtain a specified level of market dominance or rules that effectively transform tech firms into

---

234.   15 U.S.C. § 57a(a)(2).

235.   Any attempt by the FTC to argue that the 1975 Act ratified the interpretation in *National Petroleum Refiners* is undermined by the fact nearly fifty years have elapsed since the decision and the enactment of the Reform Act, and the FTC has not asserted authority to engage in legislative rulemaking based on § 6(g) in the intervening years.  *See* Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672, 698 (D.C. Cir. 1973); 15 U.S.C. § 46(g).  As always, novel interpretations of agency authority inconsistent with longstanding practice should be regarded with skepticism.

236.   15 U.S.C. § 57a(a)(2).

237.   *Id.* § 57a(a)(1)(A).

238.   *See* Non-Compete Clause Rule, 88 Fed. Reg. 3,482 (proposed Jan. 19, 2023) (to be codified at 16 C.F.R. pt. 910).

common carriers.[239]   Whatever one thinks of such ideas, administrative agencies are powerless to act under our system of government unless Congress gives them such power.   When considered against the drafting conventions followed when Congress passed the FTC Act in 1914, the original law was never intended to grant legislative rulemaking authority to the FTC.   The Commission adhered to this understanding for the first fifty years of its existence.   Congress repeatedly ratified this understanding by enacting limited grants of rulemaking power to the FTC.   The evidence that the FTC has the power to promulgate legislative rules regulating anti-competitive behavior consists of a single D.C. Circuit opinion that boils down to the proposition that legislative rulemaking had come to be regarded in the 1970s to be a good thing.   The Supreme Court should make quick work of such a claim if and when any forthcoming rules are challenged.

The stakes here go to the heart of our system of separation of powers. Under the Constitution, only Congress has the power to legislate.  We have come to understand that this means only Congress can create administrative agencies and delineate their authority.[240]   When Congress has delegated authority to an agency, we have also come to understand—most prominently in the *Chevron* decision—that courts should generally defer to the agency's interpretation of ambiguities that fall within the scope of its delegated authority.[241]   But this structure of government can be sustained only if courts conclude that Congress has *actually*, even if only implicitly, made the required delegation of regulatory authority.  Adopting a fiction that any ambiguity in an agency's organic act is an implicit delegation of the power to regulate, to be accepted by courts if reasonable, is a recipe for a runaway administrative state.   *West Virginia v. EPA* indicates that the Court now believes some corrective to *Arlington* is required.  But the corrective should not be limited to what a majority of the Justices regard as a major question.   *Chevron* should be clarified by requiring courts to determine the delegated authority of an agency in every case in which the scope of its authority is contested.[242]   A future case addressing the FTC's assertion of authority to make legislative rules governing antitrust law would be a fitting occasion to do so.

---

239.   Some journalistic accounts suggest the FTC would like to adopt rules that would require high tech companies "to offer open and fair access to their platforms, enable data sharing with new entrants and offer data portability to consumers."  Steve Lohr, *Biden Administration and Antitrust Officials Take Aim at Big Tech Companies*, N.Y. TIMES, Dec. 12, 2022, at B4.

240.   *See supra* note 122 and accompanying text.

241.   Cuozzo Speed Techs., LLC v. Lee, 579 U.S. 261, 276–77 (2016).

242.   *See* MERRILL, *CHEVRON* DOCTRINE, *supra* note 15.

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Alabama | Yes. Ala. Code § 8-1-190-197 (§ 8-1-1 repealed effective 1/1/2016) | Trade secrets; confidential information; commercial relationships or contacts with specific prospective or existing customers, patients, vendors, or clients; customer, patient, vendor, or client goodwill; specialized and unique training involving substantial business expenditure specifically directed to a particular agent, servant, or employee (if identified in writing as consideration for the restriction). | Must be in writing, signed by all parties, and be supported by adequate consideration. Must preserve a protectable interest. Employee-employer relationship must exist at the time the agreement is executed. A two-year restriction is presumptively reasonable. Employee has burden of proving undue hardship, if raised as a defense. | Professionals (includes physicians, physical therapists, veterinarians, public accountants, certified public accountants, and maybe securities brokers, all based on pre-2016 cases) | Yes (pre-amendment) | Reformation | Yes, likely (pre-amendment) |
| Alaska | Yes | Trade secrets; intellectual property; customer lists; goodwill with customers; knowledge of his or her business practices; methods; profit margins; costs; other confidential information (that is confidential, proprietary, and increases in value from not being known by a competitor; other valuable employer data that the empoyer has provided to an employee that an employer would reasonably seek to protect or safeguard from a competitor in the interest of fairness. | Factors: limitations in time and space; whether employee was sole contact with customer; employee's possession of trade secrets or confidential information; whether restriction eliminates unfair or ordinary competition; whether the covenant stifles employee's inherent skill and experience; proportionality of benefit to employer and detriment to employee; whether employee's sole means of support is barred; whether employee's talent was developed during employment; whether forbidden employment is incidental to the main employment. | - | Undecided | Reformation | Undecided |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

**JA0481**

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Arizona | Yes | Trade Secrets; confidential information; customer relationships. | No broader than necessary to protect the employer's legitimate business interest; not unreasonably restrictive; not contrary to public policy; ancillary to another contract. | Broadcasters; maybe physicians | Yes | Blue Pencil | Undecided |
| Arkansas | Yes. AR Code 4-75-101 | Trade secrets; intellectual property; customer lists; goodwill with customers; knowledge of business practices; methods; profit margins; costs; other confidential information (that is confidential, proprietary, and increases in value from not being known by a competitor); training and education; other valuable employer data (if provided to employee and an employer would reasonably seek to protect or safeguard from a competitor in the interest of fairness). | Limited with respect to time and scope in a manner that is not greater than necessary to defend the protectable business interest of the employer. The lack of a geographic limit does not render the agreement unenforceable, provided that the time and scope limits appropriately limit the restriction. Factors to consider include the nature of the employer's business interest; the geographic scope, including whether a geographic limit is feasible; whether the restriction is limited to specific group of customers or others; and the nature of the employer's business. A two-year restriction is presumptively reasonable unless clearly demonstrated otherwise. | Various professionals (medical, veterinary, social workers, others) | Yes | Reformation (mandatory) | Undecided, but it can be a factor. |
| California | No, except maybe as to trade secrets. Cal. Business & Professions Code §§ 16600-16602.5 | Trade secrets. | Uncertain status as to trade secrets. | - | - | - | - |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

2 of 21
August 17, 2022
©2010-2022 Beck Reed Riden LLP
*Not Legal Advice*

**JA0482**

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Colorado | Yes. Colo. Rev. Stat. § 8-2-113 | Trade secrets; recovery of training expenses for short-term employees. | Prior to August 10, 2022, must fall within statutory exception (executive or management employees and professional staff or to protect trade secrets or recover cost of training); be reasonable; and be narrowly-tailored.<br><br>Agreements on or after August 10, 2022: only if no broader than reasonably necessary to protect the employer's trade secrets. Prospective employees must receive notice of the noncompete and its terms before they accept the offer of employment; existing employees must receive notice of the noncompete and its terms at least fourteen days before the earlier of the effective date of the noncompete or "the effective date of any additional compensation or change in the terms or conditions of employment that provides consideration for the covenant." Notice must be in a separate document (accompanied by the noncompete) and must "in clear and conspicuous terms" identify the noncompete by name, "[d]irect[] the worker to the specific sections or paragraphs of the agreement that contain the covenant not to compete," and "state that the agreement contains a covenant not to compete that could restrict the workers' options for subsequent employment following their separation from the employer." The notice must also be "in the language in which the worker and employer communicate about the worker's performance" and be "signed by the worker." Venue and choice of law are limited.<br><br>(Note: The new law clarifies the limited application of Colorado's criminal law.) | Physicians (damages not barred).<br><br>For agreements entered on or after August 10, 2022, noncompetes cannot be used for anyone who is not a "highly compensated employee," *i.e.*, an employee earning (both at the time of execution and enforcement) at least $101,250 and $865.38 weekly (as of 2022). (This amount will increase). | Yes | Reformation | Undecided |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

**JA0483**

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Connecticut | Yes | Trade secrets; confidential information; customer relationships. | Factors: time; geographic reach; fairness of protection afforded to employer; extent of restraint on employee; extent of interference with public interest. | Broadcasters; security guards; limited as to physicians | Yes, likely | Blue Pencil | Yes |
| Delaware | Yes | Trade secrets; confidential information; customer relationships. | Reasonable in time and geographic reach; protects legitimate economic interests; survives balance of equities. | Physicians | Yes | Reformation | Yes |
| D.C. | Yes<br><br>*[NEW LEGISLATION IS PENDING AMENDMENT AND FUNDING]* | Trade secrets; confidential knowledge; fruits of employment. | Reasonable in time and geographic area; necessary to protect legitimate business interests; promisee's need outweighs promisor's hardship. [Follows Restatement (Second) of Contracts, §§ 186-88.]<br><br>*[NEW LEGISLATION - SUBJECT TO PENDING AMENDMENTS - WILL CHANGE THE RULES ONCE FUNDED; EFFECTIVE DATE TBD. THIS SECTION WILL BE UPDATED WHEN THE LAW CHANGES]* | Broadcasters | Yes (if employment continued for sufficient duration) | Reformation | Undecided |
| Florida | Yes.<br>Fla. Stat. Ann. §§ 542.335 | Trade secrets; confidential business information; substantial customer relationships and goodwill; extraordinary or specialized training. | Legitimate business interest; reasonably necessary to protect legitimate business interest. [Rebuttal presumptions exist.] | Mediators; physician specialists (where they are exclusive in a county) | Yes | Reformation (mandatory) | Undecided |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0484

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Georgia | Yes. Ga. Const., Art. III, Sec. VI, Par. V(c), as amended; OCGA §§ 13-8-50-59. [NOTE: Pre-amendment law was more restrictive and applies to pre-amendment agreements] | Trade secrets (per OCGA § 10-1-761): valuable confidential information that does not otherwise qualify as a trade secret; substantial relationships with specific prospective or existing customers, patients, vendors, or clients; customer, patient, or client goodwill associated with: an ongoing business, commercial, or professional practice, a specific geographic location; or a specific marketing or trade area; and extraordinary or specialized training. [Statute anticipates additional legitimate business interests.] | Reasonable in time, space, and scope; justified by a legitimate business interest; applied to employees who regularly solicit customers, engage in sales, perform the duties of a key employee, or have the duty of managing a department and regularly direct the work of employees and have the authority to hire or fire them. [Statute provides presumptions for reasonableness of time and geography.] | - | Yes | Blue Pencil (according to the Northern District). | Yes, but it's a factor to consider. |
| Hawai'i | Yes. Haw. Rev. Stat. § 480-4 | Trade secrets; confidential information (though somewhat in doubt); special training that provides skills beyond those of a general nature (at least when combined with other factors such as protecting trade secrets, confidential information, or special customer relationships). | Must protect a legitimate business interest and be reasonable," i.e., not "greater than required for the protection of the person for whose benefit it is imposed"; does not "impose undue hardship on the person restricted"; and the "benefit to the covenantee [cannot be] outweighed by injury to the public . . . ." | Employees in a technology business [effective as of 1/1/2015] | Yes, likely | Reformation | Undecided |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0485

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Idaho | Yes. Idaho Code §§ 44-2701-2704 | Trade secrets; technologies; intellectual property; business plans; business processes and methods of operation; goodwill; customers; customer lists; customer contacts and referral sources; vendors and vendor contacts; financial and marketing information; potentially others. | Applicable to "key employee"; reasonable as to duration, geographical area, type of employment or line of business, and does not impose a greater restraint than is reasonably necessary to protect the employer's legitimate business interests; reasonable as to covenantor, covenantee, and public. Rebuttable presumptions of reasonableness: 18 months; geographic area restricted to areas employee provided services or had significant presence or influence; limited to line of business in which employee worked. Presumption that employee is "key employee" if in highest paid 5% employees in company. | Non-"key employees." ("Key employees" are those who have gained a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the employer, and as a result, have the ability to harm or threaten an employer's legitimate business interests.) | Yes (but if no additional consideration, noncompete is limited to 18 months) | Reformation | Yes |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
*Not Legal Advice*

**JA0486**

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Illinois | Yes 820 I.L.C.S. §§ 90/1 et seq. | For agreements pre-January 1, 2022: Legitimate business interests are based on the totality of the facts and circumstances of the case. Trade secrets, confidential information, and near permanent business relationships are factors. For agreements entered on or after January 1, 2022: "the employee's exposure to the employer's customer relationships or other employees, the near-permanence of customer relationships, the employee's acquisition, use, or knowledge of confidential information through the employee's employment, the time restrictions, the place restrictions, and the scope of the activity restrictions." The bill is also express that "[n]o factor carries any more weight than any other" and that the "factors are only non-conclusive aids in determining the employer's legitimate business interest, which in turn is but one component in the 3-prong rule of reason, grounded in the totality of the circumstances." | For agreements pre-January 1, 2022: No greater than required to protect a legitimate business interest: does not impose undue hardship on the employee: not injurious to the public; and reasonable in time, space, and scope. [May require two years of employment before any noncompete can be enforced.] For agreements entered on or after January 1, 2022: Noncompete "is illegal and void unless (1) the employee receives adequate consideration, (2) the covenant is ancillary to a valid employment relationship, (3) the covenant is no greater than is required for the protection of a legitimate business interest of the employer, (4) the covenant does not impose undue hardship on the employee, and (5) the covenant is not injurious to the public," and the employee (a) is advised "in writing to consult with an attorney" and (b) provided with the covenant at least 14 calendar days' notice (though the notice is waivable). Adequate consideration is defined as: "(1) the employee worked for the employer for at least 2 years after the employee signed an agreement containing a covenant not to compete . . . or (2) the employer otherwise provided consideration adequate to support an agreement to not compete . . . , which consideration can consist of the period of employment plus additional professional or financial benefits or merely professional or financial benefits adequate by themselves." [*Illinois venue and choice of law. Attorney's fees to prevailing employee.*] | Broadcasters: government contractors: physicians: low-wage workers: certain nurses and certified nurse aides. For agreements entered on or after January 1, 2022: The "low-wage" exemption changes to a wage threshold (all earnings from the employer) of $75,000 (increasing to $80,000 by 2027, $85,000 by 2032, and $90,000 by 2037); individuals covered by collective bargaining agreements under the Illinois Public Labor Relations Act or the Illinois Educational Labor Relations Act or employed in construction (unless they "primarily perform management, engineering or architectural, design, or sales functions for the employer or . . . are shareholders, partners, or owners in any capacity of the employer"). | For agreements pre-January 1, 2022: Yes (if employment continued for sufficient duration) For agreements entered on or after January 1, 2022: No. | For agreements pre-January 1, 2022: Reformation For agreements entered on or after January 1, 2022: Reformation (purple pencil) | For agreements pre-January 1, 2022: Yes For agreements entered on or after January 1, 2022: No, if the employer enters a noncompete with an employee who is terminated, furloughed or laid off "as the result of business circumstances or govermental orders related to the COVID-19 pandemic," unless the employee is paid the equivalent of their base salary (less earnings from new employment). |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
*Not Legal Advice*

**JA0487**

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|-------|--------------------------|-----------------------------------|-----------|------------|-------------------------------------------------|--------------------------------------------------|---------------------------------------------------|
| Indiana | Yes | Trade secrets; confidential information; goodwill. | Reasonably necessary to protect the employer, not unreasonably restrictive of the employee and not against public policy. Clear and specific (not general) restraint must be reasonable in light of the legitimate interests to be protected; reasonableness is measured by totality of interrelationship of the interest, and the time, space, and scope of the restriction, judged by the needs for the restriction, the effect on the employee, and the public interest. Physician noncompetes entered into on or after July 1, 2020, must contain specific provisions concerning communications with patients, access to patient information, and a "buy-out" option. See Ind. Code § 25-22.5-5.5. | - | Yes | Blue Pencil | Yes |
| Iowa | Yes Iowa Code § 135Q.1-2 (concerns healthcare employment agency workers only, eff. 7/1/2022) | Trade secrets; goodwill; special training or peculiar knowledge that would unjustly enrich an employee at the expense of the former employer. | Whether the restriction is reasonably necessary to protect the employer's business, unreasonably restrictive (time and space), and prejudicial to the public interest. | Franchisees (where franchisor does not renew); healthcare employment agency workers (effective July 1, 2022) | Yes | Reformation | Yes, but it's a factor to consider. |
| Kansas | Yes | Trade secrets; confidential business information; loss of clients; goodwill; customer contacts; referral sources; reputation; special training. | Reasonable under the circumstances: protects a legitimate business interest; no undue burden on the employee; not injurious to public interest or welfare; reasonable in time and space. | Accountants (limited) | Yes | Reformation | Yes |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

**JA0488**

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Kentucky | Yes KRS § 216.724 (concerns healthcare services agency direct staff only, eff. 7/1/2022) | Confidential business information; customer lists; competition; investment in training. | Reasonable in scope and purpose; reasonableness determined by the time, space, and "charter" of the restriction; no undue hardship; does not interfere with public interest. | Direct care staff of a healthcare services agency (effective July 14, 2022; a violation is an unfair trade practice) | Yes, if employment is continued for "an appreciable length of time." | Reformation | Yes, but it can be a factor. |
| Louisiana | Yes. La. Rev. Stat. Ann. § 23:921 | Trade secrets; financial information; management techniques; extensive training (if such training is unrecouped through employee's work). | No more than two years; specifies the specific geographic reach (by parishes, municipalities, or their respective parts); defines employer's business; strict compliance with statute, including that employee-employer relationship must exist at the time the agreement is executed. | Automobile salesmen; real estate broker's licensees (procedural requirements) | Yes | Blue Pencil, if allowed by the noncompete | Yes, likely |
| Maine | Yes Me. Rev. Stat. Ti. 26, c. 7, § 599-A | Trade secrets; confidential information; goodwill. | No broader than necessary to protect the employer's legitimate business interest; reasonable as to time, space, and interests to be protected; no undue hardship to employee. In addition, *for agreements signed on or after September 18, 2019*: employee must receive notice of noncompete prior to an offer of employment and a copy of the agreement 3 business days in advance of the deadline to sign; and the employee (except certain physicians) must be employed at least a year or remain employed for at least six months after signed, whichever is longer. | Broadcast industry (presumption); low-wage workers (earning less than or equal to 400% of the federal individual poverty level - $54,360 (est.) as of 2022) | Yes | Reformation | Yes, likely |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

9 of 21
August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0489

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Maryland | Yes Md. Code, Lab. & Empl. § 3-716 | Trade secrets; routes; client lists; established customer relationships; goodwill; unique services. | Duration and space no wider than reasonably necessary to protect legitimate interests; no undue hardship to employee; not contrary to public policy; ancillary to the employment. | *Effective 10/1/2020:* Low-wage employees, *i.e.*, employees earning less than $15 per hour or $31,200 annually | Yes | Blue Pencil | No, likely |
| Massachusetts | Yes. Mass. Gen. Laws c. 149, § 24L (applies only to agreements signed on or after October 1, 2018) | Trade secrets; confidential information; goodwill. | Narrowly tailored to protect legitimate business interest; limited in time, space, and scope; consonant with public policy.  Additional requirements added by 2018 statute: must be signed by both parties; provided to employee 10 business days in advance (or prior to a formal offer, if earlier); state that the employee has the right to consult counsel; and satisfy consideration requirements. Presumptions of necessity of the agreement and reasonableness as to place and scope apply. Venue and choice of law are limited. | Broadcasters; physicians; nurses; social workers; psychologists.  Additional exemptions added by 2018 statute: FLSA nonexempt employees; student interns/short-term student employees; employees who have been terminated without cause or laid off; and employees that re 18 years old or younger | No (per new statute; yes before) | Reformation | No (per new statute; yes before) |
| Michigan | Yes. Mich. Comp. Laws § 445.774a | Trade secrets; confidential business information; goodwill. | Must have an honest and just purpose and to protect legitimate business interests; reasonable in time (no more than one year), space, and scope or line of business; not injurious to the public. | - | Yes | Reformation | Yes |
| Minnesota | Yes | Trade secrets; confidential business information; goodwill; prevention of unfair competition. | No broader than necessary to protect the employer's legitimate business interest; does not impose unnecessary hardship on employee. | - | No | Reformation (though called "blue pencil") | Yes |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
*Not Legal Advice*

**JA0490**

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Mississippi | Yes | Trade secrets; confidential business information; goodwill; ability to succeed in a competitive market. | Reasonableness and specificity of restriction, primarily, in time and space; hardship to employer and employee; public interest. | - | Yes (though questioned if employee terminated shortly after) | Reformation | Yes, absent bad faith or arbitrary basis for termination |
| Missouri | Yes. 28 Mo. Stat. Ann. § 431.202 (related) | Trade secrets; confidential business information; customer or supplier relationships, goodwill, or loyalty; customer lists; protection from unfair competition; stability in the workforce. | Reasonably necessary to protect legitimate interests; reasonable in time and space; not an unreasonable restraint on employee; purpose served; situation of the parties; limits of the restraint; specialization of the business. [Absence of legitimate business interest impacts duration, which can be no more than one year.] | Secretaries (limited); clerks (limited) | No | Reformation | Yes |
| Montana | Yes. Mont. Code Ann. §§ 28-2-703-05 | Trade secrets; proprietary information that would provide an employee with an unfair advantage; goodwill; customer relationships. | Partial or restricted in its operation by being limited in operation either as to time or place; supported by "some good consideration"; protects a legitimate business interest; reasonable, affording only a fair protection to the interests of the party in whose favor it is made, and not so large in its operation as to interfere with (or impose an unreasonable burden upon) the employer, the employee, or the interests of the public. | - | No | Blue Pencil, likely | No |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0491

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Nebraska | Yes | Trade secrets; confidential information; goodwill. | Reasonably necessary to protect legitimate interests; not unduly harsh or oppressive to employee; not injurious to the public. Considerations include: inequality in bargaining power; risk of loss of customers; extent of participation in securing and retaining customers; good faith of employer; employee's job, training, health, education, and family needs; current employment conditions; need for employee to change his calling or residence; relation of restriction to legitimate interest being protected. True noncompetes are rare. | - | Yes, likely | Red Pencil | Undecided |
| Nevada | Yes. Nev. Rev. Stat. § 613.195-200 [*effective June 3, 2017*] | Trade secrets; goodwill. | Void unless: (a) supported by valuable consideration; (b) not greater than required to protect employer; (c) no undue hardship on employee; and (d) appropriate in relation to the consideration. Cannot restrict employee from providing service to customer/client if (a) customer/client was not solicited; (b) customer/client voluntarily chose to leave or seek services from employee; and (c) employee otherwise complies with time, geographical area, and scope of noncompete. [*Effective 10/1/2021: Attorney's fees for the employee if the employer ignored the exemption or used the noncompete to prevent solicitation of customers in violation of the statute.*] | Pre-10/1/2021: none<br><br>*Effective 10/1/2021*: employees "paid solely on an hourly wage basis, exclusive of any tips or gratuities" | Yes (pre-amendment) | Pre-10/1/2021: Reformation (mandatory)<br><br>Effective 10/1/2021: Reformation (mandatory), and revised noncompete must "not impose undue hardship on the employee" | Undecided, except in connection with reduction in force, "reorganization or similar restructuring of the employer," in which case employee must be paid "salary, benefits or equivalent compensation," including severance. |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

12 of 21
August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0492

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| New Hampshire | Yes. RSA 275:70, 275:70-a | Trade secrets; confidential business information; goodwill; employee's special influence over the employer's customers; contacts developed during employment.. | Not greater than necessary to protect the employer's legitimate business interests; no undue or disproportionate hardship to employee; not injurious to public interest; new employees must be given a copy of the noncompete prior to acceptance of offer for employment. | Physicians (RSA 329:31-a (*effective 8/5/2016*)); low-wage employees, *i.e.*, those earning less than or equal to 2x federal minimum wage (*i.e.*, $14.50/hour) or tipped minimum wage, whichever applies (*effective 9/8/2019*). | Yes | Reformation | Undecided |
| New Jersey | Yes | Trade secrets; confidential business information; goodwill in existing customers; preventing employee from working with customer at lower cost than working through employer. | Protects a legitimate business interest; not undue burden on employee; not injurious to the public; not overbroad in time, space, and scope. | In-house counsel; psychologists | Yes | Reformation | Yes, but it's a factor to consider. |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0493

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| New Mexico | Yes. N.M.S.A. 1978, §§ 24-1I-1-5 (creates healthcare practitioner exemption only) | Maintaining workforce; limitation of competition (but not to stifle competition); customer relationships. | Reasonable as applied to the employer, employee, and public; not great hardship to employee in exchange for small benefits to employer. | Healthcare practitioners (dentists, osteopathic physicians, physicians, podiatrists, certified registered nurse anethetists) to the extent they are providing clinical health care services. [Exemption has limits (including that it does not apply to a covered medical professional if they are a shareholder, owner, partner, or director of a health care practice) and is effective only to agreements from 7/1/2015 and after.] | Yes, likely | Undecided | Undecided |
| New York | Yes | Trade secrets; confidential information; goodwill; on-air persona of broadcasters; employee's unique or extraordinary services. | Reasonable in time and space, and no greater than is required for the protection of the legitimate interest of the employer; does not impose undue hardship on the employee; not injurious to the public. | Broadcast industry employees (except "management employees") | Yes | Reformation | Cases are split |
| North Carolina | Yes. N.C. Gen. Stat. § 75-4 | Trade secrets; confidential business information; goodwill. | In writing; part of an employment contract; reasonably necessary to protect legitimate business interest; reasonable in time and space; not against public policy. | Physicians, possibly (in underserved areas) | No | Blue Pencil | Yes, likely |
| North Dakota | No. N.D. Cent. Code § 9-08-06 | - | - | - | - | - | - |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

**JA0494**

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Ohio | Yes | Trade secrets; confidential information; customer relationships; prevention of the use of proprietary customer information to solicit customers. | Not greater than necessary to protect the employer's legitimate business interests; no undue hardship to employee; not injurious to public interest.  Considerations: absence or presence of limitations as to time and space; whether employee is sole contact with customer; employee's possession of trade secrets or confidential information; purpose of restriction (elimination of unfair competition vs. ordinary competition and whether seeks to stifle employee's inherent skill and experience); proportionality of benefit to employer as compared to the detriment to the employee; other means of support for employee; when employee's talent was developed; whether forbidden employment is merely incidental to the main employment. | - | Yes | Reformation | Yes |
| Oklahoma | No. OK Stat. § 15-219A | - | - | - | - | - | - |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17,  2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0495

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Oregon | Yes. Or. Rev. Stat. § 653.295 | Trade secrets; confidential business or professional information; investment in certain on-air broadcasters; customer contacts and goodwill. | Noncompete must be provided at least two weeks before employment or with a bona fide advancement; employee is in an executive, administrative, or professional role and meets minimum compensation threshold; restricted in time or space; application of restriction should afford only a fair protection of the employer's interests; must not interfere with public interest. As of January 1, 2016, noncompetes are limited to 18 months. [Qualifying garden leave clauses are enforceable.] *Effective January 1, 2020, a signed, written copy of the employee's noncompete must be sent within 30 days following termination of employment. Noncompetes entered on or after January 1, 2022, cannot be longer than 12 months, and employees subject to them must have "annual gross salary and commissions" exceeding $100,533 (adjusted annually for inflation); failure to satisfy the statutory requirements renders the nonocmpete void.* | Home healthcare workers. *Though not listed as exemptions, a salary threshold applies. For agreements entered into before January 1, 2022: an "employee's annual gross salary and commissions" must "exceed[] the median family income for a four-person family" applies; for agreements entered on or after January 1, 2022, the "employee's annual gross salary and commissions" must "exceed[] $100,533, adjusted annual for inflation . . . ."* | No | Reformation | Undecided |
| Pennsylvania | Yes | Trade secrets; confidential information; goodwill; investment in specialized training; unique or extraordinary skills; patient referral base. | Reasonably necessary to protect the employer's legitimate interests; reasonable in time and space. | - | No | Reformation | Yes, but it's a factor to consider. |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

**JA0496**

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Rhode Island | Yes R.I. Gen. Laws §§ 28-59-1–3 | Trade secrets; confidential information; customer lists; goodwill; training in unique or special services. | Narrowly tailored to protect a legitimate business interest; reasonably limited in activity, geography, and time; does not impose undue burden on employee in light of the need to protect the employer's legitimate business interests; not likely to harm the public interest. | Physicians. *Effective 1/15/2020* (with retroactive effect): employees who are 18 years old or younger; student interns/short-term student employees; FLSA nonexempt employees and other low-wage employees, *i.e.*, employees earning no more than 2.5x the federal poverty level ($33,975 (est.) as of 2022 – based on the employee's "regular" hours, *i.e.*, non-overtime, non-weekend, non-holiday hours). | Undecided, but likely | Reformation | Undecided |
| South Carolina | Yes | Business and customer contacts; existing employees; existing payroll deduction accounts. | Necessary to protect legitimate business interest; reasonably limited in time and space; not unduly harsh and oppressive to employee's efforts to earn a living; reasonable from standpoint of public policy. | - | No | Blue pencil, likely. (SC S.Ct rejected blue pencil doctrine by name, but case involved reformation; SC Ct. App. has since permitted step-down provisions.) | Undecided |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

**JA0497**

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|-------|--------------------------|-----------------------------------|-----------|------------|--------------------------------------------------|--------------------------------------------------|----------------------------------------------------|
| South Dakota | Yes. S.D. Codified Laws §§ 53-9-8, et seq. | Trade secrets; protection from unfair competition; existing customers. | Restriction in the same business or profession as that carried on by employer and does not exceed two years and in a specified geographic area; reasonableness in time, space, and scope is a factor in certain circumstances. | - | Yes | Reformation, likely | Yes, but it's a factor to consider. |
| Tennessee | Yes | Trade secrets; confidential information; retention of existing customers; specialized training. | Reasonable in time and space and necessary to protect legitimate interest; public interest not adversely affected; no undue hardship to the employee. | Physicians (in certain circumstances). | Yes (if employment continued for appreciably long period) | Reformation | Yes, but it's a factor to consider. |
| Texas | Yes. Tex. Bus. & Com. Code §§ 15.50–.52 | Trade secrets; confidential or proprietary information; goodwill; specialized training. | Reasonable in time, space, and scope; does not impose a greater restraint than necessary to protect legitimate business interest. *In December 2011, the Texas Supreme Court withdrew its June 2011 landmark decision, but still eliminated the requirement that the consideration given by the employer in exchange for the noncompete must give rise to the interest protected by the noncompete, and held that the consideration for the noncompete agreement must be reasonably related to the company's interest sought to be protected.* | Physicians (in certain circumstances) | No | Reformation (mandatory) | Yes |
| Utah | Yes. Utah Code Ann. §§ 34-51-101-301 [Certain changes apply to agreements starting May 10, 2016 and others May 14, 2019] | Trade secrets; goodwill; extraordinary investment in training or education. | Carefully drawn to protect only the legitimate interests of the employer; reasonable based on geography, duration, and nature of the employee's duties in light of the legitimate business interests to be protected. One year limit for agreements entered on or after May 10, 2016. | Broadcasters (under certain circumstances) | Yes | Undecided | Yes |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0498

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Vermont | Yes | Trade secrets; confidential information; goodwill; relationships with customers. | Necessary to protect legitimate business interest; not unnecessarily restrictive to employee; limited in time, space, and/or industry; not contrary to public policy. | Beauticians and cosmetologists (by their school) | Yes | No, but possibly if contract provides. | Undecided |
| Virginia | Yes Virginia code § 40.1-28.7:8 | Trade secrets; confidential information; knowledge of methods of operation; protection from detrimental competition; customer contacts. | Narrowly drawn (no greater than necessary) to protect the employer's legitimate business interest; reasonable in time, space, and scope; not unduly harsh or oppressive (or burdensome on the employee) in curtailing the employee's ability to earn a livelihood; not against, and reasonable in light of, sound public policy. *Effective 7/1/2020: a notice must be posted.* | *Effective 7/1/2020*: "Low-wage" employees, *i.e.*, employees earning less than approximately $52,000 annually; likely not applicable to salespersons. (As for 2022, the amount is approximately $58,039 annually.) | Yes | Red Pencil, but severable portions can be enforced if remaining restrictions are otherwise enforceable. | Yes |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0499

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Washington | Yes RCW §§ 49.62.005–900 | Customer information and contacts; goodwill. | Restriction is necessary to protect employer's business or goodwill; restriction is no greater than reasonably necessary to secure employer's business or goodwill; reasonable in time and space; injury to public does not outweigh benefit to employer. *Effective 1/1/2020:* notice must be provided before acceptance of offer or before agreement becomes effective (whichever applies); independent consideration for mid-employment agreements; and presumption (rebuttable by clear and convincing evidence to the contrary) that noncompetes with a duration longer than 18 months are unreasonable and unenforceable; must not avoid Washington law; must not require adjudication outside of Washington; attorney's fees to employee if noncompete violates the statute. | Broadcasters (under certain circumstances). *Effective 1/1/2020:* Employees earning less than or equal to $100,000 for employees and independent contractors earning less than or equal to $250,000 (both adjusted for inflation; as of 2022, the amounts are $107,301.04 and $268,252.59); employees who are laid off (unless paid base salary, less new earnings). *Also effective 1/1/2020:* cannot prohibit moonlighting for low-wage workers, *i.e.*, those earning less than 2x minimum hourly rate. | No | Reformation | Yes, likely |
| West Virginia | Yes | Trade secrets; confidential or unique information; customer lists; direct investment in employee's skills; goodwill. | Ancillary to a lawful contract; not greater than reasonably necessary to protect legitimate business interest; reasonable in time and space; no undue hardship on employee; not injurious to public. | - | No | Reformation | Undecided |

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0500

Employee Noncompetes
A State-by-State Survey

| State | If Permitted and Statute | Protectable / Legitimate Interests | Standards | Exemptions | Continued Employment is Sufficient Consideration | Reformation Blue Pencil Red Pencil Purple Pencil | Enforceable Against Employees Terminated w/o Cause |
|---|---|---|---|---|---|---|---|
| Wisconsin | Yes. Wis. Stat. Ann. § 103.465 | Trade secrets; confidential business information; customer relationships. | Necessary to protect legitimate business interest; reasonable in time and space; not harsh or oppressive to the employee; not contrary to public policy. | - | Yes, if continued employment is conditioned on signing the agreement. | Red pencil, but, courts (and legislature) may be moving toward a more tolerant approach. | Undecided |
| Wyoming | Yes | Trade secrets; confidential information; special influence of employee over customers to the extent gained during employment. | Restraint must be "(1) in writing; (2) part of a contract of employment; (3) based on reasonable consideration; (4) reasonable in duration and geographical limitations; . . . (5) not against public policy" and no greater than "necessary to protect the employer's legitimate business interests." | - | No | Red Pencil (reflecting a change by the Supreme Court of Wyoming on February 25, 2022) | Yes, likely. |
| | *Chart covers employee noncompetes only. It does not cover noncompetes arising from the sale of a business or in other contexts.* | *The interests identified above are those expressly identified by statute or case law. Other protectable interests may exist.*<br><br>*Trade secrets are subsumed within confidential information if not specified.*<br><br>*Customer lists are frequently included within the category of trade secrets or confidential information, assuming the particular customer list satisfies the requirements to be protectable as such. Some states, however, separately identify them as protectable interests.* | *Consideration for a noncompete is always required, as is the requirement that a noncompete be ancillary to an otherwise lawful agreement. These requirements are typically satisfied when the agreement is entered into at the inception of an employment relationship.* | *Attorneys (outside counsel and in-house counsel) and certain persons in the financial services industry are subject to industry regulations not addressed in this chart. However, while outside counsel are exempt in all states: in-house counsel rules vary by state.* | *The continued employment issue addresses only at-will employment relationships.* | *Reformation is sometimes called "Judicial Modification," the "Rule of Reasonableness," the "Reasonable Alteration Approach," or the "Partial-Enforcement" rule. Red Pencil is sometimes called the "All or Nothing" rule. "Purple pencil" is a made-up term for the reformation approach with an express good faith (of the drafter) requirment grafted on.* | *Addresses only not-for-cause terminations and assumes no breach or bad faith by the employer.* |

Originally drafted in 2010, this chart is updated periodically and is current as of the date indicated.
Please contact Russell Beck (*rbeck@beckreed.com*) if you would like to receive updates.

Russell Beck
Beck Reed Riden LLP
155 Federal Street
Boston, MA 02110
rbeck@beckreed.com

21 of 21
August 17, 2022
©2010-2022 Beck Reed Riden LLP
Not Legal Advice

JA0501