**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ATS TREE SERVICES, LLC,**<br>              **Plaintiff,**<br><br>              **v.**<br><br>**FEDERAL TRADE COMMISSION,**<br>**LINA M. KHAN, in her official capacity as**<br>**Chair of the Federal Trade Commission,**<br>**REBECCA KELLY SLAUGHTER,**<br>**ALVARO BEDOYA,**<br>**ANDREW N. FERGUSON and**<br>**MELISSA HOLYOAK, in their official**<br>**capacities as Commissioners of the FTC,**<br>              **Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  24-1743** |

**<u>MEMORANDUM</u>**

**HODGE, J.**                                                                                   **July 23, 2024**

## I.    INTRODUCTION

Plaintiff ATS Tree Services, LLC ("ATS" or "Plaintiff") brings the present case under the Administrative Procedure Act ("APA") and the United States Constitution, alleging Defendants the Federal Trade Commission, and its Commissioners, Lina M. Khan, Rebecca Kelly Slaughter, Alvaro Bedoya, Andrew N. Ferguson, and Melissa Holyoak (collectively "Defendants" or "FTC"), have exceeded their authority under the Federal Trade Commission Act ("the FTC Act" or "the Act"), and violated Article I of the United States Constitution in enacting the Non-Compete Clause Rule ("the Final Rule" or "the Rule"), which bans the use of most non-compete clauses in employment contracts. 16 C.F.R. § 910.1-.6. Presently before the Court is Plaintiff's Motion for Stay of Effective Date and Preliminary Injunction (the "Motion") (ECF No. 10.) For the reasons discussed herein, the Court denies Plaintiff's Motion.

## II.    BACKGROUND[1]

### A.    Factual Background and Procedural History

ATS is a tree care company with twelve (12) employees, operating out of Bucks County, Pennsylvania. (ECF No. 1 at 10 ¶¶ 65, 71.) ATS requires its employees to sign non-compete agreements, prohibiting them from working for direct competitors following separation from ATS. (*Id.* at 12 ¶¶ 85-86.) The non-compete agreement allegedly requires—or would only be enforced to require[2]—"employees not to engage in the same type of work they performed at ATS at a competitor . . . . within the geographic area in which the employee worked while at ATS for one year after leaving ATS."[3] (*Id.*) ATS argues that it will be irreparably harmed if the FTC's Final Rule on non-compete clauses is permitted to go into effect on September 4, 2024, and that the FTC lacks the authority to issue this Rule. (*Id.* at 13-15 ¶¶ 90-109.) ATS avers that the feasibility of its business model is contingent upon the enforceability of its non-compete agreements because without the non-compete clauses, it will lose the return on its investment of specialized training it provides to all employees. (*Id.* at 14 ¶ 97.)

---

[1]    The Court adopts the pagination supplied by the CM/ECF docketing system.

[2]    ATS's non-compete provision was "narrowed in scope over time." (*See* Transcript of Oral Argument, ECF No. 70 at 84:11-18 ("My understanding is there are two versions of the non-compete agreement and that they have then narrowed in scope over time, too. And that's why the declaration's phrased such that they would be either enforced as written or enforced only to the extent that they applied for one year or near to nearby direct competitors.").)

[3]    ATS did not provide the Court with a copy of its employment contract, or the language used in its non-compete provisions. As such, the Court is unable to determine whether the non-compete clause would be enforceable under Pennsylvania law (notwithstanding the effect of the Final Rule). ATS argues that "[t]he enforceability of the scope of ATS's non-compete agreements is not a factor in the irreparable harm analysis because Pennsylvania courts may limit enforcement of non-compete agreements to restrictions that are "reasonably necessary for the protection of the employer," (ECF No. 53 at 17 n.9), which appears to echo one of the concerns forming the basis of the Rule—unequal bargaining power between employees and employers requiring non-compete agreements. *See* 89 Fed. Reg. 38343.

On April 23, 2024, the FTC voted to adopt a final rule banning nearly all non-compete agreements in employment contracts. Press Release, FED. TRADE COMM'N, FTC Announces Rule Banning Noncompetes (Apr. 23, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/04/ftc-announces-rule-banning-noncompetes [https://perma.cc/8QAM-PUTR]. Two days later, on April 25, 2024, ATS filed its Complaint challenging the Final Rule on several constitutional and statutory bases under the APA, (ECF No. 1 at 14-21 ¶¶ 101-54), asserting the following four claims:

- **Count I:** the FTC lacks statutory authority to promulgate substantive rules to prevent unfair methods of competition (pursuant to 5 U.S.C. § 706(2));

- **Count II:** if the FTC has substantive rulemaking power, the FTC's ban on *all* non-compete agreements exceeds its statutory authority to prevent methods of unfair competition (pursuant to 5 U.S.C. § 706(2));

- **Count III:** rendering existing non-compete agreements for non-senior executives unenforceable is arbitrary and capricious (pursuant to 5 U.S.C. § 706(2)); and

- **Count IV:** the FTC Act unconstitutionally delegates legislative power to the FTC (pursuant to U.S. Const. art. 1 § 1; and 5 U.S.C. § 706(2)(B)).

On May 14, 2024, ATS moved this Court for a stay of the Final Rule's September 4, 2024 effective date and for a preliminary injunction preventing enforcement of the Rule, and requested oral argument. (ECF No. 10.) Although ATS raised four independent claims in its Complaint, ATS limited its Motion to Counts I, II, and IV. [4] (ECF No. 11 at 2 n.1.) On June 4, 2024, Defendants filed their Response in Opposition. (ECF No. 22.) Plaintiff filed its Reply in Support of its Motion on June 25, 2024. (ECF No. 53.) Various *amici* filed briefs on both sides of the issue. (ECF Nos. 19, 21, 24, 27, 30-32, 36-40, 43, 47, 51, 55, 61.) The Parties filed a joint appendix on July 1, 2024.

---

[4]      Because ATS's Motion excludes Count III of its Complaint, (ECF No. 11 at 2 n.1), the Court need not analyze the FTC's Final Rule under the "arbitrary and capricious" standard at this stage.

(ECF No. 62.) On July 3, 2024, Plaintiff filed a Notice of Supplemental Authorities. (ECF No. 65.) Also on July 3, 2024, the Parties stipulated that "the facts as presented in the record would be the same if presented during the July 10, 2024 hearing" and therefore the "Parties will forgo the presentation of evidence; neither party intends to call any witnesses in connection with the Motion." (ECF No. 64 at 1.) On July 10, 2024, the Court held oral argument on Plaintiff's Motion. (ECF No. 70.) On July 16, 2024, Defendants filed a Notice of Supplemental Authority (ECF No. 72), which ATS responded to on July 18, 2024. (ECF No. 77.) On July 17, 2024, ATS filed a Motion for Leave to Supplement the Record, (ECF No. 74), which the FTC opposed, (ECF No. 78), and which the Court denied, (ECF No. 79). Thus, the Motion is fully briefed and ripe for disposition before the Court.

**B.      Federal Trade Commission Act**

The Federal Trade Commission was established by Congress in 1914 through the Federal Trade Commission Act, which "empowered and directed" the bipartisan agency "to prevent unfair methods of competition in commerce." Federal Trade Commission Act of 1914, Pub. L. No. 63-203, 38 Stat. 717 (codified as amended at 15 U.S.C. §§ 41-58). Congress expanded the Commission's power in 1938 to also include the power to prevent "unfair or deceptive acts or practices [("UDAP")] in commerce." *See* Federal Trade Commission Act., ch. 49, § 3, 52 Stat. 111 (1938) (current version at 15 U.S.C. § 45(a)).

The FTC Act was passed "in the thick of the antitrust movement." *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 57 (2d Cir. 2006). The Act was designed to "supplement and bolster" the Sherman and Clayton Acts in order to "stop in their incipiency acts and practices which, when full blown, would violate those Acts[.]" *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394-95 (1953). In crafting the Act, Congress made the "deliberate" choice to introduce the new term

4

"unfair methods of competition" in order to provide "broad and flexible authority to the Commission[.]" *E. I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136 (2d Cir. 1984).

The FTC Act was the first time the phrase "unfair methods of competition" appeared in the law. 89 Fed. Reg. at 38348; (ECF No. 62 at 10). The passage of the Act was a result of Congress's desire "to push back against the judiciary's adoption and use of the open-ended rule of reason for analyzing Sherman Act claims, which it feared would deliver inconsistent and unpredictable results and 'substitute the court in the place of Congress.'" Federal Trade Commission, Comm'n File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act ("Section 5 Policy Statement"), (Nov. 10, 2022); (ECF No. 62 at 235 (citing S. REP. No. 62-1326, at 10 (1913))). The legislative history of the statute reveals that Congress was intentionally vague in utilizing the term "unfair methods of competition" in order "to give the Commission flexibility to adapt to changing circumstances." Section 5 Policy Statement at 3; (ECF No. 62 at 236 (citing H.R. REP. No. 63-1142, at 19)). "All of the committee reports and the statements of those in charge of the [Act] reveal an abiding purpose to vest both the Commission and the courts with adequate powers to hit at every trade practice, then existing or thereafter contrived, which restrained competition or might lead to such restraint if not stopped in its incipient stages." *FTC v. Cement Inst.*, 333 U.S. 683, 693 (1948).

> Congress "explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase 'unfair methods of competition' . . . by enumerating the particular practices to which it was intended to apply." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239-40, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972) (citing S. Rep. No. 63-597, at 13 (1914)); *see also* S. Rep. No. 63-597, at 13 ("The committee gave *careful consideration* to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce . . . . It concluded that . . . there were too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent others." (emphasis added)). The takeaway is that Congress designed the term as a "flexible concept with evolving content," *FTC v. Bunte Bros.*, 312 U.S. 349, 353, 61 S. Ct. 580, 85 L. Ed. 881, 32 F.T.C. 1848 (1941), and "intentionally left [its] development . . . to the

Commission." *Atl. Ref. Co. v. FTC*, 381 U.S. 357, 367, 85 S. Ct. 1498, 14 L. Ed.
2d 443 (1965).

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015).

The FTC's powers to regulate competition are set forth in Section 5 of the Act ("Section

5")[5], entitled "Unfair methods of competition unlawful; prevention by Commission":

> The Commission is hereby empowered and directed to prevent persons,
> partnerships, or corporations, except banks, savings and loan institutions described
> in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4)
> of this title, common carriers subject to the Acts to regulate commerce, air carriers
> and foreign air carriers subject to part A of subtitle VII of Title 49, and persons,
> partnerships, or corporations insofar as they are subject to the Packers and
> Stockyards Act, 1921, as amended [7 U.S.C.A. § 181 et seq.], except as provided
> in section 406(b) of said Act [7 U.S.C.A. § 227(b)], from using unfair methods of
> competition in or affecting commerce and unfair or deceptive acts or practices in
> or affecting commerce.

15 U.S.C. § 45(a)(2). The FTC's Section 5[6] Policy Statement elaborates on the "key principles of

general applicability concerning whether conduct is an unfair method of competition." Section 5

Policy Statement at 1; (ECF No. 62 at 234). The Section 5 Policy Statement is based on an

extensive review of relevant case law and prior enforcement actions. *Id.* To be subject to the FTC's

Section 5 authority, conduct must be "undertaken by an actor in the marketplace—as opposed to

merely a condition of the marketplace, not of the respondent's making, such as high concentration

of barriers to entry." Section 5 Policy Statement at 8; (ECF No. 62 at 241). The conduct must also

"implicate competition," though "the relationship can be indirect." *Id.*

---

[5]     The Court refers to 15 U.S.C. § 45 and 15 U.S.C. § 46 as "Section 5" and "Section 6" of
the Act, respectively.

[6]     The Policy Statement is "consistent with the Supreme Court's interpretation of the FTC
Act in at least twelve decisions" which clarify that "Section 5 reaches beyond the Sherman and
Clayton Acts to encompass various types of unfair conduct that tend to negatively affect
competitive conditions." Policy Statement at 1; (ECF No. 62 at 234).

In addition, the conduct must be "unfair," which the Policy Statement defines as conduct that "goes beyond competition on the merits." *Id.* The Section 5 Policy Statement outlines "two key criteria to consider when evaluating whether conduct" reaches this threshold: (1) "the conduct *may* be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature"; and (2) "the conduct *must* tend to negatively affect competitive conditions," which may include "conduct that tends to foreclose or impair the opportunities of market participants, reduce[s] competition between rivals, limit[s] choice, or otherwise harm[s] consumers." *Id.* at 9; (ECF No. 62 at 242) (emphasis added). The FTC weighs these two principles "according to a sliding scale." *Id.* For situations in which "the indicia of unfairness are clear, less may be necessary to show a tendency to negatively affect competitive conditions." *Id.* Given Section 5's focus on the FTC's "power to prohibit unfair practices," which directs the Commission to "prevent" anticipated threats to competitive conditions, the inquiry does not focus on "whether the conduct directly caused *actual* harm," but rather, whether the conduct "has a tendency to generate negative consequences" when "examined in the aggregate along with the conduct of others engaging in the same or similar conduct[.]"[7] 15 U.S.C. § 45(a); Section 5 Policy Statement at 9-10; (ECF No. 62 at 242-43).

---

[7]     The legislative history and case law interpreting Section 5 provide that its directive to "prevent . . . . unfair methods of competition" is a mandate to stop "incipient" threats of antitrust violations. *See* 51 CONG. REC. 13118 at 14929 (statement of Rep. Covington) ("We are seeking . . . to deal, with those practices of unfair trade in their incipient stages which if left untrammeled and uncontrolled become the acts which constitute in their culmination restraint of trade and monopoly and the groundwork of the trusts which have menaced us industrially."); *see also FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. at 394 ("It is also clear that the [FTC Act] was designed to supplement and bolster the Sherman Act and the Clayton Act . . . to stop in their incipiency acts and practices which, when full blown, would violate those Acts[.]"); *accord*, *E.I. du Pont de Nemours*, 729 F.2d at 136 (finding the FTC "may bar incipient violations" of the Sherman and Clayton Acts).

### 1.    Proceedings under Section 5 of the FTC Act

Section 5 of the Act includes a section entitled "Proceeding by Commission; modifying and setting aside orders," which lays out the agency's adjudicatory procedures. *See* 15 U.S.C. § 45(b). Pursuant to this section, the FTC shall issue a "complaint" containing a "notice of a hearing" whenever the Commission "shall have reason to believe" that a party is "using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce[.]" *Id.* If the FTC finds the conduct is prohibited, it may issue an order to the party to "cease and desist from using such method of competition or such act or practice." *Id.* Any party subject to such an adjudication "may obtain review" in "the court of appeals of the United States." 15 U.S.C. § 45(b)-(c). In addition, Section 5's adjudicative power is supplemented in Section 13, which allows the FTC to "bring suit in a district court of the United States to enjoin" practices that may be in violation of the Act. 15 U.S.C. § 53(b).

### 2.    Section 6 of the FTC Act

Section 6 of the Act, entitled "Additional Powers of Commission," provides the FTC with additional mechanisms, including investigatory and regulatory powers, to effectuate its mandate. 15 U.S.C. § 46. These additional powers include rulemaking authority authorized under the section entitled "classification of corporations; regulations." 15 U.S.C. § 46(g). In this provision, Congress granted the FTC authority to "make rules and regulations for the purpose of carrying out the provisions of this subchapter[8]." *Id.* At issue in the present matter is whether Section 6(g) empowers the FTC with the authority to make substantive rules related to unfair methods of competition in or affecting commerce, or whether the rulemaking authority therein is limited to procedural rules relating to adjudications of unfair methods of competition in or affecting commerce.

---

[8]    *Compare* 38 Stat. at 722, *with* 15 U.S.C. § 46(g) (substituting "subchapter" for "Act").

### 3.      The 1975 and 1980 Amendments to the FTC Act

In 1975, Congress passed amendments to the FTC Act including the addition of a new Section 18, which detailed the procedural requirements for the FTC's UDAP rulemaking. *See* Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183 (Jan. 4, 1975) ("1975 Amendments"). The FTC's actions prior to the 1975 Amendments, and judicial opinions reviewing those actions, provide important context for interpreting Congress's intent in amending the Act.

Before Congress enacted amendments to the Act outlining separate procedural requirements for rulemaking related to UDAPs, the FTC had utilized its Section 6(g) authority on twenty-six occasions to conduct rulemaking regarding Section 5 violations, including both unfair methods of competition and UDAPs. *See* 89 Fed. Reg. at 38349-50; (ECF No. 62 at 11-12). This rulemaking was related to both "unfair methods of competition" and "unfair or deceptive acts or practices." *Id.* Relying on section 6(g), the FTC promulgated twenty-six rules, including, for example:

(1) a rule declaring it a UDAP to fail to disclose certain health warnings in cigarette advertising and on cigarette packaging ("Cigarette Rule");
(2) a rule declaring it a UMC and UDAP to fail to disclose the minimum octane number on gasoline pumps ("Octane Rule");
(3) a rule declaring it a UMC and UDAP to fail to make certain disclosures about sound power amplification for home entertainment products;
(4) a rule declaring it a UDAP for sellers failing to include certain contract provisions preserving claims and defenses in consumer credit contracts ("Holder Rule"); and
(5) a rule declaring it a UMC or UDAP to solicit mail order merchandise from a buyer unless the seller can ship the merchandise within 30 days ("Mail Order Rule"); and

*See* 89 Fed. Reg. at 38349-50; (ECF No. 62 at 11-12) (providing citations to promulgated rules in footnotes). These twenty-six rules were not procedural in nature but substantive. For example, in 1971, when the FTC promulgated its "Octane Rule," the rule declared it "an unfair method of

competition and unfair or deceptive act or practice" for refiners to fail "to disclose clearly . . . on the pumps the minimum octane number or numbers of the motor gasoline being dispensed." Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 Fed. Reg. 23871 (Dec. 16, 1971), *repealed by* 43 Fed. Reg. 43022 (Sept. 22, 1978). Some of these rules, such as the "Cigarette Rule" which declared it an "unfair or deceptive act or practice" to "fail to disclose" certain health warnings in cigarette marketing, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324 (July 2, 1964), were later superseded by congressional legislation. *See* Cigarette Labeling and Advertising Act of 1965, Pub. L. No. 89-92 (1965), 79 Stat. 282, codified as amended at 15 U.S.C. § 1333.

In 1973, the D.C. Circuit addressed the question of whether Section 6(g) of the Act empowers the FTC to "promulgate substantive rules of business conduct." *Nat'l Petroleum Refiners, Ass'n v. FTC*, 482 F.2d 672, 673 (D.C. Cir. 1973) (hereinafter, *National Petroleum*). The *National Petroleum* Court reversed the lower court's decision which had denied the FTC's authority to issue its "Octane Rule." *Id.* at 674. The D.C. Circuit held that under "the plain language of Section 6(g) which gives the Commission the authority to 'make rules and regulations for the purpose of carrying out the provisions of [Section 5],'" the Commission "is authorized to promulgate rules defining the meaning of statutory standards of the illegality the Commission is empowered to prevent." *Id.* at 698.

Two years later, the 1975 Amendments codified certain procedures relating to the FTC's authority to conduct rulemaking with respect to UDAPs in Section 18:

> The Commission shall have no authority under this Act, other than its authority under this section, to prescribe any rule with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of [section 5(a)(1)]). The preceding sentence shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce.

15 U.S.C. § 57a(a)(2). Congress also amended Section 6(g) of the Act to include a cross reference

to Section 18 in its description of the FTC's rulemaking powers:

> From time to time classify corporations and *(except as provided in section 57a(a)(2) of this title)* to make rules and regulations for the purpose of carrying out the provisions of this subchapter.

15 U.S.C. § 46(g) (emphasis added).

Congress amended the FTC Act again in 1980 with the passage of the Federal Trade

Commission Improvements Act of 1980 ("1980 Amendments"), Pub. L. No. 96-252, 94 Stat. 374.

The 1980 Amendments addressed additional procedural requirements for the FTC's rulemaking,

including the insertion of a new Section 22 which provided a definition for the term "rule":

> The term "rule" means any rule promulgated by the Commission under section 46 or section 57a of this title, except that such term does not include interpretive rules, rules involving Commission management or personnel, general statements of policy, or rules relating to Commission organization, procedure, or practice.

15 U.S.C. § 57b-3(a)(1). The section goes on to state that the term "rule" under that section "does

not include any amendment" unless the Commission "estimates that such amendment will have an

annual effect on the national economy of $100,000,000 or more," "cause a substantial change in

the cost or price of goods or services which are used extensively by particular industries," or

"otherwise determines that such amendment will have a significant impact upon persons subject

to regulation under such amendment and upon consumers." *Id.*

### C.    The Non-Compete Clause Rule

On April 23, 2024, the FTC voted to adopt the Final Rule.[9] The Rule was published in the

Federal Register on May 7, 2024. Non-Compete Clause Rule, 89 Fed. Reg. 38342 (May 7, 2024),

---

[9]     According to the Final Rule, the FTC "estimates that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete." 89 Fed. Reg. at.

and is scheduled to go into effect on September 4, 2024. *See* 89 Fed. Reg. 38342; (ECF No. 62 at 4). The Final Rule "provides that it is an unfair method of competition for persons to, among other things, enter into non-compete clauses ("non-competes") with workers on or after the final rule's effective date." *Id.* The FTC defines a "non-compete clause" as:

> [A] term or condition of employment that prohibits a worker from, penalizes a worker for, or functions to prevent a worker from: (i) Seeking or accepting work in the United States with a different person where such work would begin after the conclusion of the employment that includes the term or condition; or (ii) Operating a business in the United States after the conclusion of the employment that includes the term or condition.

16 C.F.R. § 910.1. Pursuant to the Final Rule, employers are barred from entering into non-competes after the Rule's effective date and, except for a carve-out for senior executives, existing non-competes are "not enforceable after the effective date." *Id.* Employers are also required to provide "workers with existing non-competes notice that they are no longer enforceable." 89 Fed. Reg. at 38342; *see also* 16 C.F.R. § 910.2(b)(1). The Final Rule includes "model language that satisfies this notice requirement." 89 Fed. Reg. at 38342; *see also* 16 C.F.R. § 910.2(b)(4).

---

38343. And yet, "research has shown that the use of non-competes by employers tends to negatively affect competition in labor markets, suppressing earnings for workers across the labor force—including even workers not subject to non-competes." (*Id.*) The research has further shown that "non-competes tend to negatively affect competition in product and service markets, suppressing new business formation and innovation." (*Id.*) While non-competes have been subject to antitrust laws for over a century, "concern about the harmful effects of non-competes increased" in recent years. (*Id.*) Non-competes are "disfavored" under state law "because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood." (*Id.* (quoting Restatement (Second) of Contracts sec. 188, cmt. g (1981)).)

Noting that the "case-by-case and State-by-State approaches to non-competes have proven insufficient to address the tendency of non-competes to harm competitive conditions in labor, product, and service markets," in 2018, the FTC held hearings and began studying the effects of non-compete clauses. (*Id.*) "Based on the feedback obtained from years of extensive public outreach and fact-gathering," the FTC issued a notice of proposed rulemaking in January 2023. (*Id.* at 38344.)

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 empowers courts to grant preliminary injunctions to enjoin harmful conduct. *See* Fed. R. Civ. P. 65(a). The Third Circuit Court of Appeals instructs courts to consider four factors in determining whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *See Allegheny Energy, Inc v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999) (citations omitted).

The Supreme Court has characterized injunctive relief as "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *accord Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, Nos. 23-1633, 23-1634, 23-1641, 2024 U.S. App. LEXIS 17214, __ F.4th __, at *11 (3d Cir. July 15, 2024). "This equitable remedy is never automatic: It always involves a district court's sound discretion." *Del. State Sportsmen's Ass'n*, 2024 U.S. App. LEXIS 17214, at *4.

The Third Circuit has stated that "'the most compelling reason' to grant a preliminary injunction is 'to preserve the court's power to render a meaningful decision after a trial on the merits.'" *Del. State Sportsmen's Ass'n*, 2024 U.S. App. LEXIS 17214, at *13 (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2947, at 112, 114 (3d ed. 2013)).[10] Preliminary injunctions "raise further problems" including "limit[ing]

---

[10]     In *Del. State Sportsmen's Ass'n*, "Delaware residents and organizations challenged a pair of new state gun laws in federal court. Then they moved to preliminarily enjoin enforcement of

adversarial testing," requiring courts to "forecast[] the merits," and, in doing so, creating a risk of "prejudg[ment]." *Id*. at *10-11. "Case preservation is thus the main reason that the benefits of a preliminary injunction may outweigh its risks. Courts may withhold this extraordinary remedy if a plaintiff's alleged injury does not threaten to moot the case. That approach is often, perhaps usually, the wiser course." *Id.* at *14-15.

In seeking a preliminary injunction, "[t]he burden lies with the plaintiff to establish every element in its favor," *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005), and, "[a]bsent a showing of irreparable harm, a plaintiff is not entitled to injunctive relief, even if the other three elements are found." *Ferring Pharms., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 219 (3d Cir. 2014). Further, the plaintiff must meet the first two "threshold factors"—likelihood of success on the merits and irreparable harm—before the court reaches the last two factors—balance of the equities and public interest. *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021).

A preliminary injunction is not appropriate if damages would be an adequate remedy. *See Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988). Furthermore, speculation of possible harm is insufficient to warrant the issuance of a preliminary injunction. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) ("Establishing a *risk* of irreparable harm is not enough" (emphasis added)). Instead, "[a] plaintiff has the burden of proving

---

those laws." 2024 U.S. App. LEXIS 17214, at *4. The Third Circuit affirmed the District Court's denial of the preliminary injunction, holding that "the injury they allege does not threaten the court's ability to decide the case or to give meaningful relief later on." *Id.* In its opinion, the Third Circuit rejected the argument that, "if a plaintiff will likely succeed on the merits of a constitutional claim, a court must grant a preliminary injunction," providing that "[t]his equitable remedy is never automatic: It always involves a district court's sound discretion. Key to that discretion is whether an alleged injury jeopardizes the court's ability to see a case through." *Id.*

a 'clear showing of immediate irreparable injury.'" *Id.* at 226 (quoting *Continental Group, Inc. v. Amoco Chem. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)). "The 'requisite feared injury or harm must be irreparable–not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it.'" *Id.* (quoting *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).

## IV.    DISCUSSION

The Court finds that Plaintiff has failed to establish irreparable harm. On that finding alone, the Court must deny Plaintiff's Motion. *Ferring Pharm., Inc.*, 765 F.3d at 219 ("Absent a showing of irreparable harm, a plaintiff is not entitled to injunctive relief, even if the other three elements are found."). Nevertheless, the Court analyzes likelihood of success on the merits as the Parties presented extensive argument on this issue. *Del. State Sportsmen's Ass'n*, 2024 U.S. App. LEXIS 17214, at *4 ("[T]his equitable remedy is never automatic: It always involves a district court's sound discretion."). As to the likelihood of success on the merits, Plaintiff has similarly failed to establish "'a reasonable chance, or probability, of winning.'" *Mallet & Co.*, 16 F.4th at 380 (quoting *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015)).

### A.    Irreparable Harm

ATS has the burden of demonstrating it will suffer irreparable harm in the absence of injunctive relief. ATS argues that if the Rule goes into effect, it will be harmed in two ways: (1) by incurring "nonrecoverable efforts to comply" with the Rule; and (2) by losing "the contractual benefits from its existing non-compete agreements." (ECF No. 11 at 23; ECF No. 53 at 15.) The Court will address these arguments in turn.

15

### 1.     Nonrecoverable Costs of Compliance

ATS first argues that it will be irreparably harmed because the interim costs of its compliance with the Final Rule are not recoverable against the FTC if the Rule is eventually found invalid. (ECF No. 11 at 23.) ATS relies on Fifth Circuit caselaw in support of its assertion that nonrecoverable costs, including purely economic costs, to come into compliance with government rules and regulations are a valid basis for a finding of irreparable harm (*see* ECF No. 11 at 23 (citing *Rest. Law Ctr. V. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023)).) The Third Circuit, however, has not adopted this rule, and has held the opposite: that nonrecoverable compliance costs are not a valid basis for a finding of irreparable harm. *See A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976); *accord Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("[O]rdinary compliance costs are typically insufficient to constitute irreparable harm."); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury . . . from attempted compliance with government regulation ordinarily is not irreparable harm."). In *A.O. Smith*, the Third Circuit reviewed a district court's grant of a preliminary injunction against a new FTC rule partially on the basis of unrecoverable costs relating to coming into compliance with the rule. *A.O. Smith Corp*, 530 F.2d at 527. In that case, the FTC adopted a resolution to expand corporate financial reporting, requiring 345 of the nation's largest companies to complete and file detailed Line of Business reports. *Id.* at 518. Companies were required to file the reports within 150 days of receiving the order and were subjected to penalties for failing to file the report. *Id.* After the district court denied the companies' requests to quash the FTC's orders, several companies filed suit for pre-enforcement declaratory and injunctive relief. *Id.* The district court granted the preliminary injunction, and the FTC appealed to the Third Circuit. *Id.* The Third Circuit vacated

the preliminary injunction "because the district court erred in finding that appellees sustained their

burden of proving irreparable injury[.]" *Id.* In its holding, the Court stated:

> the alleged injury was "unrecoverable costs and commitment of diverse business
> resources." Without intending to disparage the importance of such an injury, we
> observe that all that is lost is profits. **Any time a corporation complies with a
> government regulation that requires corporation action, it spends money and
> loses profits; yet it could hardly be contended that proof of such an injury,
> alone, would satisfy the requisite for a preliminary injunction. Rather, in cases
> like these, courts ought to harken to the basic principle of equity that the
> threatened injury must be, in some way, "peculiar."** . . . [T]here is no contention
> that compliance with the LB program would render any appellee unable to meet its
> debts as they come due. Nor is there any contention that the cost of compliance
> would be so great vis a vis the corporate budget that significant changes in a
> company's operations would be necessitated. Nor is this a case where compliance
> would permanently injure the corporation's reputation, or its goodwill. If, in the
> final analysis, the Commission's authority to order the reports is upheld, the cost of
> compliance will have to be considered a necessary business expense, albeit
> government mandated, and not a loss of profits in any usual sense of that term.

*Id.* at 527-28 (citations and footnote omitted) (emphasis added).

Plaintiff is articulating the same argument here. The Final Rule requires employers to

notify current and former employees who are subject to existing non-competes that their non-

competes cannot and will not be enforced. 16 C.F.R. § 910.2(b)(1). ATS describes its

nonrecoverable compliance costs as (1) the costs associated with notifying its twelve employees

of the change in accordance with the Rule's notice provision; (2) the costs and efforts to "review

and modify [its] business strategy"; and (3) the unquantifiable costs and efforts of altering its

specialized training program. (ECF No. 53 at 16.) In its briefing, ATS pointed to the notice costs

as evidence of its irreparable harm, (ECF No. 11 at 23), but conceded during oral argument, (ECF

No. 70 at 85:2-25), that the one-time notice costs estimated at $27.78 are *de minimis*.[11] ATS also

---

[11]     The FTC projected that the average affected employer would incur $27.78 to comply
with the one-time notice requirement. *See* 89 Fed. Reg. at 38483-84.

pointed to the cost of "revis[ing] contractual practices," at up to $1,211.58, as further evidence of irreparable harm.[12] (ECF No. 53 at 16.) At oral argument, ATS presented that it would be required to spend unrecoverable time and money on attorneys' fees to revise its contracts if it were forced to come into compliance with the Rule prior to a final decision on the Rule's merits. (ECF No. 70 at 92:11-93:21.) However, the Court is not persuaded by this argument, and instead follows the Third Circuit's precedent that monetary loss and business expenses alone are insufficient bases for injunctive relief. *A.O. Smith Corp.*, 530 F.2d at 527; *see also ECRI*, 809 F.2d at 226. The Court finds these costs are in no way "peculiar," and ATS does not provide a sufficient evidentiary basis for the Court to find otherwise. *A.O. Smith Corp.*, 530 F.2d at 527; *see also ECRI*, 809 F.2d at 226 (The Third Circuit "has never upheld an injunction where the claimed injury constituted a loss of money.").[13]

ATS also argues it will suffer the loss of employees, and the "non-quantifiable" efforts of having to scale back its specialized training program to avoid losing its return on the investment of training its staff if it is unable to enforce its non-compete agreements. (ECF No. 11 at 23; ECF No. 53 at 17.) The FTC counters that providing specialized training can be a competitive differentiator for an employer in a more competitive labor market where non-competes do not restrict labor mobility, and therefore not scaling back training may be a means for ATS to retain

---

[12]    The FTC anticipated such costs in the Final Rule. *See* 89 Fed. Reg. at 38482.

[13]    ATS highlights the Supreme Court's recent holding in *Ohio v. Env't Prot. Agency*, 603 U.S. __, 144 S. Ct. 2040 (2024) in which the petitioners argued that costs of complying with government regulations are "nonrecoverable." (ECF No. 65 at 2.) The instant case is distinguishable from *Ohio* for two key reasons. First, in *Ohio*, the Court's decision turned on likelihood of success on the merits and did not focus on whether petitioners would suffer irreparable harm. Second, in *Ohio*, petitioners claimed that compliance would require them to incur "hundred of millions[,] if not billions of dollars." *Ohio*, 144 S. Ct. at 2053. By contrast, here, the compliance costs are estimated at less than $1,250.00. (ECF No. 53 at 16.)

and attract employees. (ECF No. 22 at 41 (citing 89 Fed. Reg. at 38431).) The FTC further responds that any changes ATS undertakes to its training are not mandated by the Rule, and its choice to do so would be "self-inflicted harm" not sufficient for a preliminary injunction. (ECF No. 22 at 40-41 (citing *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995).) The Court holds that the possibility that ATS would need to scale back its training program to an unknown extent is too attenuated to constitute an immediate, irreparable harm. The Court finds that ATS's argument that it will be required to change its training program is predicated upon the fear that its employees will immediately quit and defect to direct competitors when the Rule goes into effect, taking the "specialized training" with them. (ECF No. 11 at 8; ECF No. 11-1 at 4 ¶ 24.) The FTC contends that ATS has "proffered no evidence that any of its twelve employees would leave the company but for his or her non-compete," (ECF No. 22 at 41), and the Court agrees. ATS has provided no evidence to meaningfully substantiate this fear, such as any indication that its employees are planning to leave, or examples of employees previously attempting to leave to join competitors. (*See generally* ECF No. 11-1.)

Indeed, Plaintiff's concern is that "ATS's employees will be in high demand from ATS's competitors" and the Final Rule will prevent it from being able to "restrict[] their ability to immediately leave for one of ATS's direct competitors." (ECF No. 11-1 at 4-5); (*see also* ECF No. 70 at 25:9-10 ("[W]ithout noncompete agreements, ATS' workers *could* leave immediately[.]") (emphasis added); *id.* at 25:3-5 ("it creates a significant *risk* that the -- that its employees . . . . will immediately leave[.]") (emphasis added).) ATS has the "burden of proving a 'clear showing of immediate irreparable injury,'" which it has failed to do. *ECRI*, 809 F.2d at 226 (quoting *Continental Group, Inc.*, 614 F.2d at 359). Plaintiff's sparse affidavit submitted as its evidence, which contains no affirmative statement that any employee is even likely to leave ATS, is simply

not enough to satisfy the high bar required for this rare and "extraordinary remedy." *Del. State Sportsmen's Ass'n.*, 2024 U.S. App. LEXIS 17214, at \*14-15. Thus, the Court finds the alleged harm of possibly choosing to scale back its training program is based upon a speculative risk that employees could leave, and therefore is neither irreparable nor immediate. *See ECRI*, 809 F.2d at 226 ("Establishing a *risk* of irreparable harm is not enough." (emphasis added)).

### 2.     Loss of Contractual Benefits

ATS argues it will be "depriv[ed] of its contractual rights" under its non-compete clauses, and therefore "face the risk that its employees will leave and transfer the benefit of ATS's training and investment, as well as ATS's confidential information, immediately to a direct competitor." (ECF No. 11 at 8; ECF No. 11-1 at 4-5 ¶ 24.) However, ATS relies on a non-binding, out of circuit district court case for the assertion that loss of contractual rights, in and of itself, is an irreparable harm. (ECF No. 11 at 24 (citing *SEIU Health Care Mich. v. Snyder*, 875 F. Supp. 2d 710, 725 (E.D. Mich. 2012).) This Court declines to follow this approach, as the test for irreparable harm requires a case-specific analysis to determine whether the harm alleged is both particular and immediate. ATS also relies on *Syzygy Integration LLC v. Harris* to support its argument that losing an employee to a direct competitor is irreparable harm, which it asserts *could* happen if the Rule goes into effect and ATS's employees are no longer bound by their noncompete agreements. (ECF No. 11 at 24 (citing 616 F. Supp. 3d 439, 443 (E.D. Pa. 2022), *appeal dismissed*, 2022 WL 18587916 (3d Cir. Dec. 7, 2022)).) The FTC counters that *Syzygy* is not applicable because, in that case, a former employee had *already* begun working with a competitor, which demonstrated existing and therefore immediate harm, rather than simply a *risk* of harm. (ECF No. 22 at 42.) The

Court agrees and finds that no employee of ATS has quit or even indicated an intention to resign, and such speculation remains inadequate.[14]

Finally, the Court agrees with the FTC that ATS's reliance upon *Louisiana v. Biden* for the assertion that loss of employees constitutes irreparable harm is misplaced. (ECF No. 11 at 23 (citing 55 F.4th 1017, 1034 (5th Cir. 2022)).) In *Louisiana*, employers were required to terminate employees who refused the Covid-19 vaccination or risk losing federal contracts. *Id.* The *Louisiana* plaintiffs provided testimony from an employee who was denied a religious exemption from the vaccination and thus faced termination. *Louisiana v. Biden*, 575 F. Supp. 3d 680, 687 (W.D. La. 2021), *aff'd*, 55 F.4th 1017 (5th Cir. 2022). By contrast, ATS is not required to terminate its own employees, nor has it provided any evidence that its employees would quit if the Rule went into effect. To the contrary, ATS lauds its "culture of mutual commitment" between the business and its employees—surely the type of professional environment in which employees would be inclined to stay. (ECF No. 11 at 8-9.) The possible risk of losing employees, without more, cannot substantiate a finding of immediate and irreparable harm. *Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d at 569 (Plaintiff "must demonstrate that irreparable injury is likely[, not merely possible].") (internal quotation marks omitted).

To the extent ATS fears losing proprietary training information to competitors, the Rule highlights less harmful alternatives it may choose to implement to allay such concerns, such as non-disclosure agreements:

> NDAs provide employers with another well-established, viable means for protecting valuable investments. NDAs are contracts in which a party agrees not to disclose and/or use information designated as confidential. If a worker violates an NDA, the worker may be liable for breach of contract. Employers regularly use NDAs to protect trade secrets and other confidential business information. . . . [T]he final rule will not prevent employers from adopting garden-variety NDAs; rather,

---

[14]      *See supra* Section IV.A.1.

> it prohibits only NDAs that are so overbroad as to function to prevent a worker from seeking or accepting employment or operating a business. Appropriately tailored NDAs burden competition to a lesser degree than non-competes.

89 Fed. Reg. 38425-26 (footnotes omitted). ATS did not explain why alternative methods for protecting purportedly proprietary information would not be sufficient. Instead, it merely raised the expense of paying counsel to revise contracts for its twelve employees. (ECF No. 70 at 92:11-93:21.) For these reasons, the Court finds ATS has failed to establish that it would suffer irreparable harm as a result of the enactment of, and its compliance with, the Rule.

### B.      Likelihood of Success on the Merits

The Court finds that, even if ATS could establish irreparable harm, its Motion would still fail because ATS is also unable to demonstrate a likelihood of success on the merits. To establish a likelihood of success on the merits, Plaintiff needs to show that there is a reasonable probability that the FTC lacked authority under the FTC Act to issue the Final Rule, or that Congress's delegation of such authority under the FTC Act was unconstitutional. The Third Circuit has held that "[t]o establish a likelihood of success, a plaintiff must show that there is a reasonable chance, or probability, of winning." *Mallet & Co.*, 16 F.4th at 380 (citation omitted). "That does not require a more-likely-than-not showing of success on the merits . . . . [b]ut it does require the plaintiff to demonstrate that it can win on the merits, which involves a showing that its chances of establishing each of the elements of the claim are significantly better than negligible." *Id.* (internal quotation omitted).

Plaintiff's claims arise pursuant to the APA, which, in relevant part, directs courts to:

> [D]ecide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> . . .
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious,[15] an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

5 U.S.C. § 706(2)(A)-(C).

Plaintiff contends that the FTC lacks statutory authority for substantive rulemaking under the FTC Act to regulate "unfair methods of competition." Alternatively, Plaintiff argues that even if the FTC has substantive rulemaking authority, the Rule goes too far by outlawing *all* non-compete clauses. In support of its position Plaintiff asserts four additional arguments that: (1) a rule-of-reason analysis should be applied to non-compete agreements; (2) the Rule is prevented by federalism principles, in light of state regulations covering non-compete clauses; (3) the Major Questions Doctrine should be applied; and (4) Congress unconstitutionally delegated legislative authority to the FTC through the Act. The FTC argues in response that it has express authority under the Act to issue the Rule, it properly defined all non-compete clauses as "unfair methods of competition," and Congress lawfully delegated authority to the FTC by creating an "intelligible principle" to guide the FTC's actions. The Court will address the key arguments in turn.

### 1.    Statutory Authority for Rulemaking under the FTC Act

The questions before the Court are whether the FTC, under Sections 5 and 6 of the Act, has the authority to promulgate substantive regulations like the Final Rule, or whether the FTC's enforcement authority is limited to adjudication and strictly procedural rulemaking related to the adjudication process. And depending on the outcome of that analysis, whether there is a reasonable likelihood that ATS will succeed on the merits of its claim that the FTC lacks such authority.

---

[15]    ATS's claim under Count III that the Rule is "arbitrary and capricious" is not presently before the Court. (ECF No. 11 at 2 n.1.)

a)        *Substantive and Procedural Rulemaking Authority under the Act*

When construing statutory provisions, courts "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 175 (2009) (internal citation omitted); *accord Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself."); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal citation omitted) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). "Where, as here, that examination yields a clear answer, judges must stop." *Food Mktg. Inst.*, 588 U.S. at 436 (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)). Indeed, "[i]f the meaning of the text is clear, 'the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce [the statute] according to its terms.'" *In re FTX Trading Ltd.*, 91 F.4th 148, 153 (3d Cir. 2024) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). Even if a court consults legislative history, it will "never allow it to be used to 'muddy' the meaning of 'clear statutory language.'" *Food Mktg. Inst.*, 588 U.S. at 436 (quoting *Milner v. Department of Navy*, 562 U.S. 562, 569 (2011)).

Courts must be mindful that "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133. Courts must construe the statute "as a symmetrical and coherent regulatory scheme," *id.* (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)), and "fit, if possible, all parts into an harmonious whole," *id.* (quoting *FTC v. Mandel*

*Brothers, Inc.*, 359 U.S. 385, 389 (1959)). When interpreting a statute's delegation of discretionary authority to an agency, courts must

> independently interpret the statute and effectuate the will of Congress subject to constitutional limits. The court fulfills that role by recognizing constitutional delegations, "fix[ing] the boundaries of [the] delegated authority," . . . and ensuring the agency has engaged in "'reasoned decisionmaking'" within those boundaries[.]

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (internal citations omitted).[16] With these principles of statutory interpretation in mind, the Court begins its analysis with the text of the Act.

In Section 6, entitled "Additional powers of Commission," Congress provided the FTC with the power "to make rules and regulations for the purpose of carrying out the provisions of this subchapter." 15 U.S.C. § 46(g). Section 5 creates a comprehensive scheme to "prevent . . . . unfair methods of competition," and Section 6 enumerates additional powers for the FTC to employ in realizing its directive. *See generally* 15 U.S.C. §§ 45-46. Nothing in Section 5 or Section 6 expressly limits the FTC's rulemaking power to issuing exclusively procedural rules. Further, nowhere in the text does Congress expressly limit the FTC's enforcement mechanisms to adjudications; in fact, Congress does just the opposite by empowering the FTC to issue rules.

Nothing in Section 6(g) limits Section 5; rather, Section 6 is complementary to Section 5, as is clear from its title: "Additional powers of Commission." 15 U.S.C. § 46. Neither the word "procedural" nor the word "substantive" appears in the text of Section 6(g), and the Court will not

---

[16]     The Supreme Court's opinion in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), was issued while the fully briefed Motion was pending in this case. Although neither party briefed this case, the Court acknowledges the holding in *Loper Bright* that under the APA, courts are required to exercise their independent judgment in deciding whether an agency has acted within its statutory authority, and courts may not defer to an agency interpretation of the law simply because a statute is ambiguous. *Loper Bright*, 144 S. Ct. at 2273.

infer meaning from that absence, particularly as the ordinary meaning of the text speaks for itself. Section 6(g) empowers the FTC to "make rules and regulations." *Id.* When taken in the context of the goal of the Act and the FTC's purpose, the Court finds it clear that the FTC is empowered to make both procedural and substantive rules as is necessary to prevent unfair methods of competition. Thus, the Court rejects ATS's argument that it should read the word "procedural" but not the word "substantive" into the statutory text defining the FTC's rulemaking authority. This argument is inherently inconsistent and therefore untenable. (*See* ECF No. 11 at 10-11.) It is unnecessary to read either procedural or substantive into the text because, when read together and construed in a symmetrical and coherent manner, Sections 5 and 6(g) authorize the FTC to promulgate "rules and regulations" as one of its tools to prevent unfair methods of competition. 15 U.S.C. § 46(g).

Plaintiff's argument that Section 5 of the Act should be interpreted as limiting the FTC to utilizing adjudications as the exclusive means of preventing unfair methods of competition is also unavailing.[17] (ECF No. 11 at 9-10.) ATS relies on *Schechter Poultry* for the assertion that the FTC is an exclusively "adjudicative body." (ECF No. 11 at 13 (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 532-33 (1935)).) However, *Schechter Poultry* does not analyze the tools the FTC is authorized to use to exercise its mandate under Section 5. Rather, the *Schechter Poultry* Court held that the National Industrial Recovery Act's ("NIRA") authorization for the President to adopt codes of "fair competition" without any meaningful standards or limits, was an unconstitutional delegation of legislative authority. *Id.* at 541-42. It contrasted the NIRA with the

---

[17]    It is not unusual for agencies empowered with both adjudicative and rulemaking authority to have the discretion to select which tools to use. *See NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974); *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947).

FTC Act which "set up a special procedure" for the FTC to adjudicate unfair methods of competition "within its statutory authority." *Id.* at 533. The *Schechter Poultry* Court's acknowledgment that the FTC has the power to adjudicate unfair methods of competition does not bear on whether, under Section 6(g), the FTC has the authority to make rules to do so as well. The only courts to have engaged in that analysis have found that Congress directly authorized the FTC to issue substantive rules to prevent unfair methods of competition under Section 6(g). *See National Petroleum*, 482 F.2d at 672*; United States v. JS&A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983).

Plaintiff argues that the FTC is a purely adjudicative body and that because the Act empowers the FTC to proceed through complaint and hearing, it lacks substantive rulemaking authority. (ECF No. 11 at 14.) Plaintiff rationalizes the FTC's powers under Section 6(g) by providing that any rulemaking authority the Act authorized under Section 6(g) is procedural in nature, for the sole purpose of developing mechanisms for the adjudications under Section 5. (ECF No. 11 at 5, 11.) However, Plaintiff's interpretation runs contrary to logic, as the ordinary meaning of the statutory text provides the FTC with the authority to promulgate rules prohibiting unfair methods of competition. The plain text of the statute provides no express limitations on the FTC's rulemaking authority and the Court will not read in such limitations. As such, it would undermine the purpose of the FTC Act to interpret the statute as providing only adjudicative authority, when it is clear in the text what Congress intended the Act to do and what authority it granted to the FTC to fulfill its purpose. Statutory provisions are not to be read in a vacuum, but rather in consort with an eye towards creating a "harmonious whole." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133.

       **b)**       *The Directive to "Prevent" Inherently Contemplates Substantive Rulemaking Authority*

The Court now turns to the FTC's mandate to prevent prohibited "unfair methods of competition." Section 5 of the Act "empowered and directed" the FTC to "*prevent* persons, partnerships, or corporations, . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2) (emphasis added). Merriam-Webster's Dictionary defines the term "prevent" as "to keep from happening or existing." *Prevent*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/prevent (last accessed July 22, 2024) [https://perma.cc/7WYQ-K6JA]. Prevent is an inherently forward-looking directive, requiring the FTC to take action to avoid or avert a future occurrence in addition to remediating or stopping past harm. Plaintiff asks the Court to cabin the FTC's power as solely adjudicatory, and therefore reactionary and backward-looking, only arising once unfair methods of competition have already occurred. The Court declines to do so. If the Court adopts ATS's interpretation of the Act, it would limit the FTC's power to only responsive or remedial methods of addressing unfair methods of competition through adjudication, which is inherently at odds with the ordinary interpretation of the word "prevent."

Congress chose the term "prevent," which on its face means the FTC was intended to act prophylactically to stop "incipient" threats of unfair methods of competition, not solely responsively through adjudications, as courts interpreting the statute have confirmed. *See E.I. du Pont de Nemours*, 729 F.2d at 136. The FTC's Final Rule serves to do just that: to prevent unfair methods of competition in the form of non-compete agreements, both before they occur as well as after, to cease the past and ongoing harm they inflict as illustrated in the FTC's Final Rule. If the FTC's Section 6(g) rulemaking power was limited solely to procedural rules for adjudications as

Plaintiff argues, the FTC would only be able to remediate harm once it occurred. This would result in a myopic and illogical interpretation of the ordinary meaning of the statutory text.

<em>c)</em>     <strong><em>Historical Context: Amendments to the Act</em></strong>

The FTC's substantive rulemaking authority has been confirmed by circuit courts[18] interpreting the FTC Act, as well as by Congress when it enacted its 1975 and 1980 Amendments to the Act. Because Congress has "spoken subsequently" on the FTC Act, with its 1975 and 1980 Amendments, the Court now considers the ordinary meaning of the statutory language in light of the historical context of those Amendments.

In 1973, shortly before Congress adopted its first set of amendments to the Act, the D.C. Circuit issued its decision in *National Petroleum*, holding that the FTC "is authorized to promulgate rules defining the meaning of the statutory standards of the illegality the Commission is empowered to prevent," including unfair methods of competition. 482 F.2d at 698. To find otherwise "would render the Commission ineffective to do the job assigned it by Congress. Such a result is not required by the legislative history of the Act." *Id.* at 697-98. The Seventh Circuit later agreed and "incorporate[d] by reference that case's lengthy discussion of the Commission's rulemaking authority under section 6(g)." *JS&A Grp., Inc.*, 716 F.2d at 454.

In 1975, shortly after the D.C. Circuit issued its opinion in *National Petroleum*, Congress amended the Act, providing the FTC with special procedures for rulemaking related to UDAPs under the new Section 18, and preserving the FTC's existing Section 6(g) authority to promulgate rules for unfair methods of competition. *See* 15 U.S.C. § 57a. Section 18(a)(2) provides:

> The Commission shall have no authority under this subchapter other than its authority under this section, to prescribe any rule with respect to [UDAPs]. . . . *The preceding sentence shall not affect any authority of the Commission to prescribe*

---

[18]     *See, e.g.*, *National Petroleum*, 482 F.2d at 672; *JS&A Grp., Inc.*, 716 F.2d at 454.

> *rules (including interpretive rules), and general statements of policy, with respect*
> *to unfair methods of competition*[.]

*Id.* § 57a(a)(2) (emphasis added). Congress also amended Section 6(g) to cross reference Section 18, stating that the Commission may issue rules and regulations "except as provided in [Section 18(a)(2)]." *Id.* § 46(g). If, as ATS suggests, the Court were to interpret Section 6(g) of the Act as providing the FTC no authority for substantive rulemaking at all, it would render these provisions superfluous. A statutory reading that renders language in Sections 6(g) and 18(a)(2) "inoperative or superfluous" is "at odds with one of the most basic interpretive canons." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotations omitted).

Furthermore, the history of the FTC's substantive rulemaking leading up to the decision in *National Petroleum* and the 1975 Amendments provides essential historical context for the Court's interpretation. Before the 1975 Amendments created the separate Section 18 procedural requirements for UDAP rulemaking, the FTC had used its Section 6(g) authority to promulgate twenty-six different rules to prevent both unfair methods of competition and UDAPs.[19] *See* 89 Fed. Reg. at 38349-50. Congress could have limited the FTC's substantive rulemaking authority on multiple occasions, including during the 1975 Amendments convention, but it did not. In fact, this very issue was discussed during the convention. Notably, the House proposed to prohibit the FTC

---

[19]     Plaintiff points out that the FTC did not utilize its Section 6(g) rulemaking authority until 1962 to support its argument that the FTC Act does not authorize substantive rulemaking. (ECF No. 11 at 5, 12.) As the FTC explained, however, powers authorized to federal agencies under their enabling statutes "are not lost by being allowed to lie dormant." *United States v. Morton Salt Co.*, 338 U.S. 632, 647-51 (1950); (ECF No. 22 at 25 n.4). This Court agrees; the FTC's powers under Sections 5 and 6 of the Act are available for the Agency to utilize as is needed to effectuate its purpose. *See National Petroleum*, 482 F.2d at 693 ("Our conclusion as to the scope of Section 6(g) is not disturbed by the fact that the agency itself did not assert the power to promulgate substantive rules until 1962 and indeed indicated intermittently before that time that it lacked such power.") It is logical that the methods used to do so would evolve over time as economic and societal conditions change.

from "prescribing rules with respect to unfair competitive practices." S. Conf. Rep. 93-1408 § 202 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7755, 7762. But the Senate rejected the House's proposal, and the conference report adopting the final text of the 1975 Amendments made clear that "[t]he conference substitute does not affect any authority of the FTC under existing law to prescribe rules with respect to unfair methods of competition[.]"[20] *Id.* The historical background demonstrates that the intent of Congress was to retain the existing authority empowering the FTC to prevent unfair methods of competition, and the discretion to determine the appropriate mechanisms to accomplish that directive, including Section 5's adjudicative authority, and Section 6's rulemaking authority.

ATS also argues that *National Petroleum* was wrongly decided. (ECF No. 11 at 13-15.) However, regardless of whether the *National Petroleum* Court reached the correct outcome or not, Congress affirmed its holding implicitly through its ratification of the 1975 Amendments, by leaving Section 6(g) in place as written with no material changes, and only modifying it to cross-reference the newly added rulemaking procedures for UDAPs. ATS contends that the 1975 Amendments "did *not* ratify the FTC's or D.C. Circuit's contemporaneous interpretations of section 46(g) as authorizing substantive rulemaking authority." (ECF No. 53 at 3 (emphasis in original).) To support this argument ATS cites to *Jama v. ICE* for the proposition that "[c]ongressional ratification of a judicial interpretation can only be assumed when Congress 'simply reenact[s]' a statute 'without change'" and that the Court must be able to "presume Congress knew of and endorsed it." (*Id.* (quoting *Jama v. ICE*, 543 U.S. 335, 349 (2005)).) However, ATS fails to note that "the doctrine of congressional ratification applies only when Congress reenacts a statute *without relevant change*." *Holder v. Martinez Gutierrez*, 566 U.S. 583,

---

[20]     *See supra* Section II.B. discussing background of FTC Act.

593 (2012) (emphasis added); *accord Cook Cty. v. Wolf*, 962 F.3d 208, 243 (7th Cir. 2020) (To satisfy the doctrine of congressional ratification, "the reenactment canon requires more than a judicial consensus—it applies only if Congress reenacted the provision without making *material* changes") (emphasis added). Further, "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *CFTC v. Schor*, 478 U.S. 833, 846 (1986) (internal quotation omitted).

However, the Court need not solely rely on Congress's retention of Section 6(g) in its original form. Both the holding in *National Petroleum* and the FTC's Section 6(g) rulemaking authority were topics of discussion during the 1975 Amendments convention. (ECF No. 22 at 15 (quoting 120 Cong. Rec. 39579, 40713 (1974) (statement of Sen. Hart)) ("Debate immediately before the Senate vote on the conference report further demonstrated Congress's awareness of the holding in *National Petroleum*, with a statement quoting from the decision and noting that, because the 1975 Amendments concerned consumer protection provisions, the new procedural requirements 'are limited to unfair or deceptive acts or practices rules.'") 120 Cong. Rec. 39579, 40713 (1974) (statement of Sen. Hart.) Indeed, no *material* change was made to Section 6(g). Had Congress intended to limit the FTC's substantive rulemaking authority under Section 6, it would have done so at any time over the last century and, more specifically, any of the times it amended the Act.

### 2.    Plaintiff's Alternative Arguments as to the Validity of the Final Rule

Plaintiff argues in the alternative that, even if the FTC Act does provide statutory authority for the FTC to define "unfair methods of competition," the FTC exceeded that authority by banning *all* non-compete clauses. (*See generally* ECF No. 11 at 15-21.) Plaintiff asserts four primary bases

for this argument: (1) that reasonable non-compete agreements are fair, (2) that the Final Rule improperly displaces an area traditionally regulated by state law, (3) that the Final Rule is of the type of economic and political significance that requires clear authorization from Congress under the Major Questions Doctrine, and (4) that the Final Rule requires an interpretation of the FTC Act that would raise a serious constitutional problem. (*Id.*) The FTC responds that it properly designated all non-compete clauses as "unfair" pursuant to its Section 5 Policy Statement. (ECF No. 22 at 32-36.) The Court will analyze these four arguments in turn below.

### a)        *Applicability of the Rule of Reason to the Final Rule*

Plaintiff contends that the FTC's Section 5 Policy Statement defining unfair methods of competition is too broad, creating a "vague" standard "based solely upon restraint of competition," creating a danger of government overreach. (ECF No. 11 at 16 (quoting *E.I. du Pont de Nemours*, 729 F.2d at 137).) In Plaintiff's view, the rule of reason should be applied on a case-by-case basis to "determine the fairness of non-compete agreements in particular circumstances." (*Id.*) Although ATS concedes that the "FTC Act applies beyond the federal antitrust statutes to 'incipient' antitrust violations," ATS still urges this Court to find the opposite and require that the FTC apply a rule-of-reason analysis, which it views to be consistent with the "exclusively adjudicative authority" of the FTC. (*Id.* at 16-17.) In response, the FTC explains the basis for its Section 5 Policy Statement, which relied upon "decades of Supreme Court caselaw" as well as the text and history of Section 5, to determine "unfair conduct" is that which "goes beyond competition on the merits." (ECF No. 22 at 32 (citing Section 5 Policy Statement at 8) (internal quotations omitted).) The Policy Statement provides two primary considerations for assessing if conduct goes beyond competition on the merits: if the conduct (1) is "coercive, exploitative, collusive, abusive, deceptive, predatory"

or similarly unfair; and (2) "tend[s] to negatively affect competitive conditions." Section 5 Policy Statement at 9 (collecting cases); *see also* 89 Fed. Reg. at 38358-59.

The Court finds that the basis for the FTC's Final Rule is authorized under the Act, and that a rule-of-reason analysis is not proper in this context. Plaintiff relies on *E.I. du Pont de Nemours*, a Second Circuit case involving an oligopoly of three companies' pricing practices to support its request for the rule of reason test. 729 F.2d 128, 132. However, the *E.I. du Pont de Nemours* Court did not apply a rule of reason test, nor did it opine upon the appropriate standard for analyzing non-compete clauses. It stated:

> The statute's legislative history reveals that, in reaction to the relatively narrow terms of the Sherman Act as limited by the Supreme Court's adoption of the Rule of Reason in *Standard Oil Co. v. United States*, 221 U.S. 1, 55 L. Ed. 619, 31 S. Ct. 502 (1911), Congress sought to **provide broad and flexible authority** to the Commission as an administrative body of presumably practical men with broad business and economic expertise in order that they might preserve business' freedom to compete from restraints.

*Id.* at 136 (emphasis added). In that case, the Court acknowledged the FTC's "broad . . . power to declare trade practices unfair," (*id.* at 136-37), but ultimately found the conduct at issue to be "non-collusive, non-predatory and independent conduct of a non-artificial nature." *Id.* at 137. Unlike the pricing practices addressed in *E.I. du Pont de Nemours*, however, here the FTC has determined through an extensive and thorough research and rule-making process, with over 26,000 public comments, that non-compete clauses are "not justified by legitimate business purposes." 89 Fed. Reg. at 38379-402. Non-competes are in fact "exploitative and coercive" when not involving "senior executives" because employers often unilaterally require non-compete clauses "without meaningful negotiation or compensation" and because they "trap workers in worse jobs." 89 Fed. Reg. at 38375-79. For these reasons, the Court finds that the FTC acted within its authority under the Act in designating all non-compete clauses as "unfair methods of competition."

34

### b)     *The Final Rule and State Regulation*

Plaintiff next asserts that, because non-compete clauses are "traditionally regulated by state law," the FTC lacks the power to issue the Final Rule without express authority to do so under the Act. (ECF No. 11 at 17-18; *see* ECF No. 53 at 9.) The FTC responds that there is overlapping antitrust jurisdiction as states often have their own antitrust laws, similar to federal antitrust law. (ECF No. 22 at 35 (citing examples of New York and Pennsylvania statutes).) The FTC further contends that ATS's implicit concession that the FTC has the power to regulate some, just not all, non-compete clauses, undermines its argument that the regulation of non-competes is the "exclusive province of the states." (*Id.*) The Court agrees that the states and federal government have shared jurisdiction in this area, and that the existence of state regulations of non-competes does not preclude the FTC from issuing rules to prevent unfair methods of competition. Many states have adopted or are considering adopting limitations to non-compete clauses, and California, North Dakota, Oklahoma, and Minnesota have banned them. 89 Fed. Reg. 38465.

Moreover, the Rule provides that "States may continue to enforce in parallel laws that restrict non-competes and do not conflict with the final rule," and state laws are therefore not entirely preempted. 89 Fed. Reg. at 38454, 38505. However, the Act empowers the FTC to prevent "unfair methods of competition," and therefore if state laws conflict with the Final Rule, they are rightfully preempted. The Rule notes that "[t]he ability of States to regulate non-competes effectively is constrained by employers' use of choice-of-law provisions, significant variation in how courts apply choice-of-law rules in disputes over non-competes, and the increasingly interstate nature of work." 89 Fed. Reg. at 38343. As such, the Court finds that the FTC's Final Rule banning the majority of non-compete clauses does not exceed its authority, nor does it raise issues of federalism due to its overlap with states laws.

35

*c)*      ***Major Questions Doctrine***

ATS argues that the nature of the Final Rule implicates the Major Questions Doctrine ("MQD") and that the Court should apply the doctrine in analyzing the FTC's authority to promulgate the Rule. (ECF No. 11 at 18-20.) In response, the FTC argues that because the Final Rule falls squarely within its mandate to "prevent" "unfair methods of competition," the MQD does not apply. (ECF No. 22 at 29.) The Court finds that the MQD is not applicable here.

The MQD requires agencies to "point to 'clear congressional authorization' to regulate" in a certain manner. *See West Virginia v. EPA*, 597 U.S. 697, 732 (2022) (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)). The doctrine is reserved for "extraordinary" cases, "in which the history and breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721 (internal quotations omitted). The presence of certain factors may counsel in favor of applying the MQD including when the regulation at issue has "vast economic and political significance," *Id.* at 716 (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. at 324), and "when there is a mismatch between an agency's challenged action and its congressionally assigned mission and expertise." *Id.* at 748; *see also Nat'l Fed'n of Indep. Bus. v. DOL, OSHA*, 595 U.S. 109, 117-18 (2022) (applying major questions doctrine to rule setting "public health measures" that were "outside of OSHA's sphere of expertise" rather than "workplace safety standards").

Because the FTC has previously utilized its Section 6(g) rulemaking authority to promulgate substantive rules to prevent unfair methods of competition that had significant economic impact, this case is distinguishable from other major questions cases. In *West Virginia*, the Court noted that the EPA had only issued one prior rule under the relevant section of the statute,

36

noting that "the legality of that choice was controversial at the time and was never addressed by a court." 597 U.S. at 725. Contrary to the *West Virginia* case where the challenged rule had "no precedent" because it operated differently from the sole prior rule, the FTC's Final Rule is consistent with its past use of Section 6(g) to promulgate substantive rules to prevent unfair methods of competition. *Id.* at 726. The FTC's Final Rule is further distinguishable from the one at issue in *West Virginia* in that the courts that have reviewed the Commission's rulemaking authority have upheld it. *See, e.g.*, *National Petroleum*, 482 F.2d at 672; *JS&A Grp., Inc.*, 716 F.2d at 451. Because the FTC's Rule falls squarely within its core mandate, and it has previously used its Section 6(g) rulemaking power in similar ways, the Court finds that the Major Question Doctrine is not applicable.

### d)      *Constitutionality of Congress's Delegation of Authority*

The Court finds ATS's final argument—that Congress unconstitutionally delegated legislative authority to the FTC in authorizing substantive rulemaking under Section 6(g)—is without merit. "Only twice in this country's history has the Court found a delegation excessive, in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion." *Gundy v. U.S.*, 588 U.S. 128, 130 (2019) (plurality op.). The nondelegation doctrine requires that Congress articulate "an intelligible principle" to guide the agency. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). The "intelligible principle" standard is "not demanding." *Gundy*, 588 U.S. at 146. This is because of the practical understanding that "'in our increasingly complex society, replete with ever changing and more technical problems,' . . . . 'Congress simply cannot do its job absent an ability to delegate power under broad general directives.'" *Id.* at 135 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). For that reason, the Supreme Court has repeatedly held that "a statutory delegation is constitutional as long as Congress 'lay[s] down by

37

legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy*, 588 U.S. at 135 (quoting *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 409 (1928); brackets in original).

While this Court appreciates ATS's novel argument that "unfair methods of competition" is an unconstitutional delegation when the FTC is utilizing its Section 6(g) substantive rulemaking authority but is a constitutional delegation when the FTC employs its adjudicative authority, (ECF No. 11 at 22); the Court is unpersuaded. Moreover, ATS's reliance on *Schechter Poultry* is likewise unconvincing. (*Id.*) The *Schechter Poultry* Court drew the essential contrast that puts the FTC Act outside the bounds of an unconstitutional delegation issue, when it stated:

> [T]he National Industrial Recovery Act dispenses with this administrative procedure and with any administrative procedure of an analogous character. But the difference between the code plan of the Recovery Act and the scheme of the Federal Trade Commission Act lies *not only in procedure but in subjec*t matter. We cannot regard the fair competition of the codes as antithetical to the unfair methods of competition of the Federal Trade Commission Act. The fair competition of the codes has a much broader range and a new significance.

*Schechter Poultry*, 295 U.S. at 533-34 (emphasis added) (internal quotations omitted). The Court therefore finds Congress properly delegated authority to the FTC under the Act.

For these reasons, and in exercising its sound discretion, the Court finds Plaintiff has failed to establish a reasonable likelihood that it will succeed on the merits of its claims that the FTC lacks substantive rulemaking authority under its enabling statute, that the FTC exceeded its authority, and that Congress unconstitutionally delegated legislative power to the FTC. Having failed to establish both of the threshold factors, likelihood of success on the merits and irreparable harm, the Court need not and therefore declines to analyze the final two prongs of the preliminary injunction analysis, the balance of the equities and the public interest.

## V.      CONCLUSION

For the reasons discussed herein, Plaintiff's Motion for Stay of Effective Date and Preliminary Injunction (ECF No. 10) is **DENIED**. An appropriate Order follows.


**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**